## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS,<br>  1300 19th Street NW, Suite 750<br>  Washington, DC 20036<br><br>SOUTHERN BORDER<br>COMMUNITIES COALITION,<br>  1616 Newton Ave.<br>  San Diego, CA 92113<br><br>  and<br><br>URBAN JUSTICE CENTER,<br>  40 Rector Street, 9th Floor<br>  New York, NY 10006<br><br>     *Plaintiffs*,<br><br>     v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY,<br>  2707 Martin Luther King Jr Ave. SE<br>  Washington, DC 20528<br><br>  and<br><br>KRISTI NOEM, in her official capacity<br>as Secretary of Homeland Security,<br>  2707 Martin Luther King Jr Ave. SE<br>  Washington, DC 20528<br><br>     *Defendants*. | Civil Action No. 25-1270 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Since passing the Homeland Security Act in 2002, Congress has sought to balance

the need to defend national security with the need to protect the privacy interests and civil rights

of individuals. To this end, Congress created three offices within the Department of Homeland

Security (DHS) dedicated to protecting individual rights and interests: the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services Ombudsman Office (CIS Ombudsman Office), and the Office of the Immigration Detention Ombudsman (OIDO) (collectively, DHS Oversight Offices).

2.     CRCL is charged by statute with receiving complaints of civil rights and civil liberties abuses by DHS, conducting public outreach so that people are aware of their ability to file complaints, and annually submitting reports to Congress on the complaints it receives. 6 U.S.C. § 345. CRCL is also responsible for adjudicating complaints of employment discrimination from among DHS's more than 260,000 employees and providing training and publishing annual reports on matters of equal employment opportunity within DHS.[1] In fiscal year 2023, CRCL took action on a broad spectrum of DHS activities with privacy or civil rights implications, from the use of facial recognition technology at airports to the needs of people with disabilities during wildfires and other natural disasters. It also fielded hundreds of complaints and conducted hundreds of investigations on issues like collection of DNA samples by Border Patrol agents, racial profiling during investigatory stops, and sexual assault in detention facilities.[2]

3.     The CIS Ombudsman Office is required by statute to assist individuals and employers who are having problems with visas, work permits, and other immigration issues; make recommendations to U.S. Citizenship and Immigration Services for programmatic improvements based on the types of problems it observes; and annually report to Congress on the types of problems being experienced, its recommendations, and the status of any responses. 6 U.S.C. § 272.

---

[1]     *Equal Employment Opportunity Division*, Dep't of Homeland Sec., https://perma.cc/RLH5-5KSG (archived Apr. 21, 2025).

[2]     Office for C.R. and C.L., *Fiscal Year 2023 Annual Report* (Nov. 2024), https://perma.cc/3SWH-KEGX.

In fiscal year 2023, the CIS Ombudsman Office handled nearly 24,000 requests for assistance through its online portal.[3]

4.    OIDO is required by statute to take complaints alleging violations of law, professional standards, and contract terms by operators of public or private detention facilities; to conduct on-site inspections of immigration detention facilities and "assist those affected by potential misconduct, excessive force, and violations of law or detention standards"; and to report to Congress on its "activities, findings, and recommendations." 6 U.S.C. § 205. In fiscal year 2023, OIDO's case workers visited over 100 detention facilities each month to monitor conditions and speak with detained individuals.[4]

5.    The three DHS Oversight Offices all received specific appropriations from Congress in 2024.[5]

6.    On March 21, 2025, Defendants DHS and Secretary of Homeland Security Kristi Noem abruptly closed CRCL, the CIS Ombudsman Office, and OIDO. Defendants placed nearly all CRCL, CIS Ombudsman Office, and OIDO employees on administrative leave, with separation dates of May 23, 2025. They ordered those employees not to perform any job functions, even those related to winding down operations or transferring any of their hundreds of pending complaints to other departments.

7.    Plaintiffs Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC) have all filed complaints with CRCL and/or

---

[3] Dep't of Homeland Sec., Citizenship and Immigr. Servs. Ombudsman, *Annual Report 2024* (June 28, 2024), https://perma.cc/7TB9-D824.

[4] Office of the Immigr. Det. Ombudsman, *OIDO Annual Report 2023* (Mar. 29, 2024), https://perma.cc/C5RF-U4RT.

[5] Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024 at 79 (Mar. 18, 2024), https://perma.cc/UNG3-837F.

OIDO or requests for case assistance with the CIS Ombudsman Office, and all have matters they would currently be raising with one or more of these offices if they were still functioning. They, their members, or their clients have directly benefited from these offices' investigations, their intervention with other components of DHS, and the congressionally mandated reports and findings that they publish. Because of the elimination of these offices, Plaintiffs must dedicate additional resources to other, more costly and labor-intensive methods of seeking information about DHS policies, reporting rights violations, and advocating for clients in immigration matters.

8.     Defendants' actions to eliminate CRCL, OIDO, and the CIS Ombudsman Office are ultra vires and violate the constitutional separation of powers by flouting Congress's express statutory direction that these offices must exist and perform various functions. Their actions are also arbitrary and capricious, in violation of the Administrative Procedure Act. For all these reasons, declaratory and injunctive relief are warranted.

## JURISDICTION AND VENUE

9.     This Court has statutory jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers and agencies of the United States and because at least one plaintiff resides in this judicial district.

## PARTIES

11.     Plaintiff Robert F. Kennedy Human Rights (RFK) is a non-partisan, nonprofit organization with offices in New York, New York and Washington, D.C. The organization was created in 1968 to carry on Senator Robert F. Kennedy's legacy and advance his unfinished work in pursuit of a more just and peaceful world. RFK advocates for human rights and pursues strategic litigation to hold governments accountable at home and around the world, including by pursuing

immigrants' rights and anti-detention advocacy and litigation in states around the country, including New York, Louisiana, Florida, and Colorado. RFK's advocacy includes monitoring conditions of confinement in immigration detention and exposing and combatting human and civil rights abuses that occur there, including through filing complaints with CRCL and OIDO.

12.     Plaintiff Southern Border Communities Coalition (SBCC) is a project of Alliance San Diego, a nonprofit organization based in San Diego, California. SBCC comprises over 60 member organizations spanning the entire length of the U.S.-Mexico border, including California, Arizona, New Mexico, and Texas. Its members include environmental, faith-based, human rights, direct service, immigrant rights, and labor organizations. All SBCC member organizations are located, or serve a constituency, within 100 miles of the U.S.-Mexico border. SBCC's mission is to 1) advocate for federal policy reform, 2) advocate for border enforcement policies and practices that are fair, respect human dignity and human rights, and 3) prevent the loss of life in the border region. Further, SBCC promotes policies and solutions that improve the quality of life in border communities, advances a positive image of the border region, and supports rational and humane immigration reform policies affecting the border region. As part of its advocacy efforts, SBCC has filed two complaints with CRCL since 2023 and regularly advocates to CRCL, its officers, and its staff on border and immigration policy concerns, including excessive use of force and inhumane treatment by CBP.

13.     Plaintiff Urban Justice Center (UJC) is a nonprofit organization based in New York, New York. UJC provides free legal services to over 10,000 people each year, many of whom are noncitizens. UJC frequently interacts with the CIS Ombudsman Office while representing its clients with immigration issues. UJC recently filed a complaint with CRCL regarding a violation of law affecting one of UJC's clients.

14.    Defendant Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity.

15.    Defendant the U.S. Department of Homeland Security is an agency of the United States, headquartered in Washington, D.C.

## FACTUAL BACKGROUND

**The Establishment and Statutory Functions of CRCL**

16.    The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, *codified at* 6 U.S.C. §§ 101–681g, consolidated government functions relating to immigration, ports of entry, and disaster planning and recovery into a new executive department, the Department of Homeland Security. DHS now contains such formerly separate agencies as the Transportation Security Administration (TSA), the Federal Emergency Management Agency (FEMA), the Secret Service and Federal Protective Service, and the Coast Guard, as well as immigration enforcement and adjudication agencies including Immigration and Customs Enforcement (ICE), United States Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP).

17.    The Homeland Security Act established the "Officer for Civil Rights and Civil Liberties," charged with the responsibility to "review and assess information alleging abuses of civil rights [and] civil liberties" committed by "employees or officials" of DHS and to report annually to Congress on those allegations. Pub. L. No. 107-296, § 705, 116 Stat. at 2219–2220 (codified at 6 U.S.C. § 345(a)(1), (b)).

18.    Congress reiterated this commitment to civil rights and civil liberties two years later when it passed the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 8302(3), 118 Stat. 3638, 3867 (Dec. 17, 2004). That statute amended DHS's "primary mission" to state that DHS should "ensure that civil rights and civil liberties of persons are not

6

diminished by efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. § 111(g). The 2004 statute also expanded the CRCL Officer's functions beyond taking complaints and interfacing with the public to include developing and implementing "policies and procedures to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities" and "oversee[ing] compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by programs and activities of the Department." 6 U.S.C. § 345(a)(3)–(4).

19.    Congress assigned yet more statutory responsibilities to CRCL in the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 803, 121 Stat. 266, 360 (Aug. 3, 2007), requiring that the Officer for CRCL provide detailed reports about complaints, and responses to complaints, annually to Congress and the public.  42 U.S.C. § 2000ee-1(f)–(g). This statute also specified that the Officer for CRCL must have adequate "resources" to carry out all required functions. 42 U.S.C. § 2000ee-1(d)(1).

20.    Although these statutes refer to the "Officer for" CRCL, congressional statements, including those involving appropriations, refer to the "Office for Civil Rights and Civil Liberties."[6] And DHS has recognized that the Office for CRCL's authority comes from "statutes passed by Congress," among other sources.[7]

21.    On several occasions, Congress has required consultation between CRCL and other components of DHS on specific issues, from the establishment and oversight of state, local and regional fusion centers, 6 U.S.C. § 124h; to the development of  "standard operating procedures"

---

[6] Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024 at 7, 79 (Mar. 18, 2024), https://perma.cc/UNG3-837F.

[7] Dep't of Homeland Sec'y, *Legal Authorities for the Office for Civil Rights and Civil Liberties*, https://perma.cc/4BVE-N898.

for the use of unmanned aerial systems or drones, 6 U.S.C. § 211(k)(1)(E); to developing policies and procedures for the acquisition and use of artificial intelligence by DHS that take into account the privacy, civil rights, and civil liberties implications of these systems, *see* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, § 7224(b)(1)(B)(i), 136 Stat. 2395, 3670 (Dec. 23, 2022).

22.    In recent appropriations statutes, Congress has tasked CRCL with ensuring that grantees or state and local agencies partnering with DHS are giving due consideration to the civil-rights and civil-liberties implications of their activities. For example:

     a.    CRCL is required to conduct an analysis of every state or local jurisdiction to whom law enforcement authority has been delegated under 8 U.S.C. § 1357(g) and "to issue and publish online, with redactions only as required by the Freedom of Information Act,  an annual report" detailing any removals made by state or local officers acting under delegated authority in that jurisdiction, any civil rights or civil liberties complaints regarding that jurisdiction's immigration enforcement activities, and CRCL's own conclusion about whether the jurisdiction is meeting the terms and conditions of the delegation agreement.[8]

     b.    CRCL is responsible for making sure that recipients of all DHS grants are complying with the civil rights obligations of those grants.[9] CRCL accomplishes this

---

[8] Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024  at 7 (Mar. 18, 2024), https://perma.cc/UNG3-837F.

[9] Dep't of Homeland Sec'y, *Civil Rights Resources for Recipients of DHS Financial Assistance*, https://perma.cc/LMW6-5242.

through the Civil Rights Evaluation Tool, which must be completed by grantees within 60 days of receiving their award from DHS.[10]

      c.      In the Consolidated Appropriations Act, 2021, Congress appropriated $5 million for an Alternatives to Detention Case Management Pilot Program through which asylum applicants could receive certain types of case management, mental health, legal orientation, and cultural orientation services from nonprofit organizations and local governments. The award of grants under the pilot program, and the activities of grantees, were to be overseen by a board chaired by the head of CRCL. Pub. Law No. 116-60, Div. F., 134 Stat. 1449 (Dec. 27, 2021). Congress has appropriated funding for this program each year since, including in 2024. *See* Pub. L. No. 118-47, 138 Stat. 560, 594 (Mar. 23, 2024).

23.      In addition, because CRCL is responsible for "oversee[ing] compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by" DHS activities, 6 U.S.C. § 345(a)(4), CRCL is also responsible for various tasks associated with civil-rights and civil-liberties laws of general applicability as they apply to the operations of DHS. For example:

      a.      Individuals with disabilities who believe their rights under section 504 of the Rehabilitation Act of 1973 have been violated by a program or activity of DHS, whether by security procedures at airports or conditions in ICE detention facilities or FEMA disaster plans, may file complaints with CRCL. 6 C.F.R. § 15.70.

      b.      Under the Prison Rape Elimination Act of 2003, 34 U.S.C. § 30301 et seq., and its implementing DHS regulation, 6 C.F.R. part 115, CRCL is responsible for arranging

---

[10] DHS Form 3095, Civil Rights Evaluation Tool, https://perma.cc/9J53-ZF4S.pdf.

expedited audits of institutions where CRCL believes a systemic problem around sexual assault may be occurring.

      c.      Under 8 U.S.C. § 1367, as amended by the Violence Against Women Reauthorization Act of 2013, no employee of DHS or any other law enforcement agency may deport a person or take other adverse immigration action against that person based solely on information obtained from a spouse, parent or other family member who has abused that person or their child, or from a trafficker if the person is applying for nonimmigrant status based on being a victim of human trafficking. This "prohibited source" rule is intended to minimize the leverage that knowledge of immigration status could otherwise give an abuser to further exploit the abuse victim and, where children are present, the victim's children. CRCL issued a policy for implementing, throughout all of DHS, the protections that 8 U.S.C. § 1367 affords to domestic violence and trafficking victims, and it trains other DHS components on that policy. CRCL also receives and investigates complaints regarding violations of 8 U.S.C. § 1367.

24.      Until its closure on March 21, 2025, CRCL handled investigations of complaints of violations of employment discrimination statutes, including title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000ee et seq., the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg et seq., for all employees of DHS. Under Equal Employment Opportunity Commission regulations, a federal agency must complete its investigation of a complaint within 180 days after the complaint is filed. 29 C.F.R. § 1614.108.

**The Establishment and Statutory Functions of the CIS Ombudsman Office**

25.     The Homeland Security Act of 2002 also established the CIS Ombudsman Office. *See* Pub. L. No. 107-296, § 452, 116 Stat. at 2197, *codified at* 6 U.S.C. § 272. That law tasks the Office of the CIS Ombudsman with "assist[ing] individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services" and proposing improvements to CIS's administrative practices based on the trends and recurring problems the ombudsman office identifies. 6 U.S.C. § 272(b); *see also id.* § 272(d)(4) (mandating that regular meetings occur between the director of CIS and the ombudsman "to identify serious service problems and to present recommendations" for administrative action to resolve those problems).

26.      The CIS Ombudsman Office is required by law to prepare a detailed report to Congress each year that contains "a summary of the most pervasive and serious problems encountered by individuals and employers" as well as a list of recommendations for improving CIS practices and the status of action or inaction on those recommendations. *Id.* § 272(c)(1).

27.     To ensure that CIS is responsive to the Ombudsman Office's suggestions, Congress required the CIS Director to "establish procedures requiring a formal response" by CIS within three months of receiving any recommendation from the CIS Ombudsman Office. *Id.* § 272(f).

28.     The CIS Ombudsman is also authorized to appoint at least one local ombudsman in each state and to establish lines of communication between those local ombudsman offices and CIS. *Id.* §§ 272(d)(2), (e)(1)(A). Congress created several mechanisms for ensuring that these local ombudsman offices remain independent from CIS, including that they maintain separate phone numbers and mailing addresses from CIS "or any component" thereof, and that representatives of the local ombudsman office tell any individual or employer requesting assistance during their

11

initial meeting that they operate independently "of any other component of the Department and report directly to Congress through the Ombudsman." *Id.* §§ 272(g)(1)(C), (2).

29.    The CIS Ombudsman Office is an office of last resort. Before an individual or employer may request assistance through the office's online portal, that individual or employer must first request assistance through CIS's own customer service tools and wait at least 60 days for CIS to respond.[11] The CIS Ombudsman Office helps with problems such as typos in green cards or work authorizations, like misspelled names or incorrect dates of birth; rejections of immigration-related petitions by CIS based on a clear legal or factual error; and requests involving military personnel.[12]

30.    Employers frequently request assistance from the CIS Ombudsman Office to expedite processing or renewal of H1B, H2A, and other non-immigrant work visas.[13]

**The Establishment and Statutory Functions of OIDO**

31.    Congress created OIDO in the Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 106 (a), 133 Stat. 2317, 2504 (Dec. 20, 2019); *see* DHS, About the Office of the Immigration Detention Ombudsman (OIDO), https://perma.cc/82DC-K8HG (archived Apr. 21, 2025). The statute specifies that the Immigration Detention Ombudsman "shall be independent of Department agencies and officers." 6 U.S.C. § 205(a).

32.    OIDO is charged by statute with "administer[ing] an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress ... for cases in which

---

[11]    CIS Ombudsman Office, *How to Submit a Case Assistance Request*, https://perma.cc/Y7PR-QPCM (archived Apr. 21, 2025).

[12]    *Id.*

[13]    Citizenship and Immigr. Servs. Ombudsman, Annual Report 2024, https://perma.cc/7TB9-D824.

Department officers or other personnel, or contracted, subcontracted, or cooperating entity personnel, are found to have engaged in misconduct or violated the rights of individuals in immigration detention." *Id.* § 205(b)(1). OIDO is also charged with conducting unannounced inspections at detention facilities, including those run by states or private parties; making recommendations to address the findings of those inspections, including any terms of detention contracts found to have been violated; and assisting those in detention affected by excessive force or other types of misconduct. *Id.* §§ 205(b)(3)–(5).

33.    To facilitate accomplishing these statutory functions, Congress mandated that "the ombudsman and designated personnel of the ombudsman" shall have "unfettered access" to detention facilities and records, as well as the ability to meet with detainees privately. *Id.* § 205(c). Congress also mandated that the directors of ICE and CBP develop procedures for responding to OIDO recommendations within 60 days of receiving them. *Id.* § 205(d).

34.    Like CRCL and the CIS Ombudsman Office, OIDO is required to report to Congress "on an annual basis its activities, findings, and recommendations." *Id.* § 205(e).

35.    By the end of 2022, OIDO case managers had established a continuing presence at nearly 100 detention facilities around the United States and reviewed nearly 6,000 concerns from people in detention.[14]

36.    Most OIDO employees are based in the field and visit detention facilities regularly, as often as four or five times a week. They observe conditions and interact with both detained people and staff at those facilities. As OIDO has explained, "By drawing on the trust earned from

---

[14] Dep't of Homeland Sec., *About the Office of the Immigration Detention Ombudsman (OIDO)*, https://perma.cc/82DC-K8HG (archived Apr. 21, 2025).

detained people and ICE and CBP personnel, OIDO leverages this position to provide timely resolution to issues before they escalate through fast, on-the-ground problem solving."[15]

37.     The most common type of complaint that OIDO investigates involves poor medical care due to unqualified staff or inadequate staffing levels. OIDO has also successfully resolved problems like lack of access to crutches for a detained person with an amputated limb, lack of access to religious services, and lack of private space for detained people to consult with counsel.[16]

38.     OIDO also makes use of its continued presence at detention facilities to follow up on earlier findings from investigations conducted by CRCL or the DHS Office of the Inspector General (OIG) and ensure that recommendations from those earlier investigations are being implemented.[17]

**Shutdown of DHS Oversight Offices**

39.     In February 2025, the contracts for the Alternatives to Detention Case Management Pilot Program being overseen by CRCL were canceled.[18]

40.     On March 13, the Ranking Members on two Senate committees with oversight over DHS functions wrote a letter to Secretary Noem, warning against any large-scale reduction-in-force at CRCL given the statutory functions it serves and the need for "sufficient personnel and resources" to perform those functions.[19]

---

[15] Office of the Immigr. Det. Ombudsman, *OIDO Annual Report 2023*, at 4 https://perma.cc/C5RF-U4RT.

[16] *Id.* at 26, 42.

[17] *Id.* at 39–40.

[18] J. David McSwane and Hannah Allam, "*They Don't Care About Civil Rights": Trump's Shuttering of DHS Oversight Arm Freezes 600 Cases, Imperils Human Rights*, ProPublica (Apr. 8, 2025), https://perma.cc/7H9D-YXHN.

[19] Letter from Sen. Peters and Sen. Durbin to Kristi Noem, Sec'y of Homeland Sec. (Mar. 13, 2025), https://perma.cc/2664-U46Y.

41.    As of March 21, 2025, CRCL had approximately 150 full-time employees. On that date, Defendants sent all but three CRCL employees, members of the Senior Executive Service, a reduction-in-force (RIF) notice stating a separation date of May 23. On information and belief, all or most of these RIF notices stated the reason for the RIF as the "dissolution of Office of Civil Rights and Civil Liberties."

42.    As of March 21, 2025, the CIS Ombudsman Office had approximately 44 full-time employees. On that date, Defendants sent all but one employee, a member of the Senior Executive Service, a RIF notice stating a separation date of May 23. On information and belief, all or most of these RIF notices stated the reason for the RIF as the "dissolution of the Citizenship and Immigration Services Ombudsman."

43.    Before March 21, 2025, the CIS Ombudsman Office workforce had been supplemented by approximately ten contractors who provided operations support. The office also had contracts for graphic design and language services. All of these contracts were terminated on or about March 21, 2025.

44.    As of March 21, 2025, OIDO had approximately 110 full-time employees, most of whom were case managers assigned to detention facilities around the country. On that date, Defendants sent every one of these employees a RIF notice stating a separation date of May 23. On information and belief, all or most of these RIF notices stated the reason for the RIF as the "dissolution of the Office of the Immigration Detention Ombudsman."

45.    Immigration advocates have reported that they have multiple pending complaints with CRCL regarding serious medical situations, including a complaint on behalf of a detainee with stomach cancer who cannot get any medicine stronger than ibuprofen and a complaint

involving an HIV-positive detainee who has been unable to see a doctor.[20] Another complaint filed with CRCL shortly before its closure involves a ten-year-old U.S. citizen child who was deported, along with her undocumented parents, after being apprehended at an interior Border Patrol checkpoint while seeking medical treatment for brain cancer.[21]

46.    Many case management requests on the status of visas, green cards, and work permits were also pending with the CIS Ombudsman Office when it was abruptly shuttered. A blog advising immigrants on their options suggests that they should contact their members of Congress for help in the CIS Ombudsman Office's absence.[22]

47.    Meanwhile, a group of 49 members of Congress wrote a letter to Secretary Noem on April 8 decrying the closure of the oversight offices, especially in light of the "inhumane" and "alarming" conditions reported at immigration detention facilities. Their letter noted, "The elimination of oversight mechanisms leaves individuals … without recourse, undermines transparency, and erodes public trust in the Department's ability to uphold basic human rights and responsibly manage billions of taxpayer dollars."[23]

---

[20] McSwane and Allam, *Trump's Shuttering of DHS Oversight Arm Freezes 600 cases*, https://perma.cc/7H9D-YXHN.

[21] Polo Sandoval, *Parents Deported to Mexico File DHS Complaint Seeking Return to US with Sick American Daughter*, CNN (Mar. 20, 2025), https://perma.cc/LDR9-VLVX.

[22] Hasalyn Modine, *DHS Suspends Immigration Oversight Offices*, Boundless (Apr. 5, 2025), https://perma.cc/5QZV-JW8T.

[23] Letter from Rep. Debbie Wasserman-Schultz and Other Members of Congress to Kristi Noem, Sec'y of Homeland Sec. (Apr. 8, 2025), https://perma.cc/8K27-XHL3.

48.     Defendants have acknowledged that they shut down the DHS Oversight Offices. A DHS spokesperson stated that the offices were closed because they "obstructed immigration enforcement by adding bureaucratic hurdles and undermining DHS's mission."[24]

**Plaintiffs' Experiences with the DHS Oversight Offices**

**Plaintiff RFK**

49.     Since 2022, Plaintiff RFK has filed more than a dozen complaints with CRCL and OIDO to address civil and human rights abuses against people held in immigration detention centers throughout the country. Examples include:

a.      A November 14, 2024, complaint to CRCL and OIDO about sexual abuse, unlawful use of force, solitary confinement, medical neglect, and retaliation against a woman detained at the Baker County Detention Center in Macclenny, Florida, recounting how male officers stripped her, strapped her to a restraint chair with her breast exposed, and laughed at her.[25]

b.      A July 9, 2024, complaint to CRCL and OIDO regarding violation of First Amendment rights of people engaged in a hunger strike at the Buffalo Federal Detention Facility stemming from a June 2024 incident where approximately 40 detained people engaged in a hunger strike to protest the discontinuance of free phone calls to family and a facility policy and practice of indiscriminately locking people in their cells for

---

[24] Ellen M. Gilmer, *Trump Aides Shutter Homeland Security Civil Rights Office*, Bloomberg Gov't (Mar. 21, 2025), https://perma.cc/P88P-SEZP.

[25] Letter from ACLU FL and RFK Human Rights to CRCL Officer et al. (Nov. 14, 2024), perma.cc/828B-ZD34.

approximately 18 hours per day. In response, ICE retaliated with battery, solitary confinement, and denial of access to recreational activities and the law library.[26]

c.    A March 27, 2024, complaint to CRCL and OIDO on use of force, medical neglect, verbal abuse, retaliation, and violations of First Amendment rights of people detained at the Winn Correctional Center in Winnfield, Louisiana stemming from a January 2024 incident where officials attacked approximately 200 people in a housing unit with pepper-spray in retaliation for participation in a peaceful demonstration and hunger strike protesting conditions of confinement and then locked the unit's doors and windows, turned off cameras in the unit, and cut power and water to the unit, denying people the ability to rinse their eyes, throats, and skin.[27]

d.    A March 29, 2023, complaint to CRCL and OIDO reporting sexual abuse, medical abuse amounting to torture, severe medical neglect, and battery of a person with a seizure condition detained at the Central Louisiana ICE Processing Center in Jena, Louisiana. When the person reported his medical neglect and abuse by filing grievances with the facility and oversight bodies, he experienced retaliation, threats, and further harassment from ICE and facility staff, including medical providers.[28]

50.    RFK's advocacy with CRCL and OIDO led to agency investigations and remedial actions. For example:

---

[26] Letter from RFK Human Rights et al. to CRCL Officer et al. (July 9, 2024), https://perma.cc/4VSK-UJQU.

[27] Letter from RFK Human Rights et al. to CRCL Officer et al. (Mar. 27, 2024), https://perma.cc/ASK5-C3SP.

[28] Letter from RFK Human Rights et al. to CRCL Officer et al. (Mar. 29, 2023), https://perma.cc/4S3F-9D72.

a.      In response to the March 27, 2024, complaint from RFK, CRCL opened a multidisciplinary on-site investigation into the Winn Correctional Center.[29]

b.      In response to the March 29, 2023, complaint of abuse of a person with a seizure condition at the Central Louisiana ICE Processing Center, CRCL issued a finding of disability discrimination under § 504 of the Rehabilitation Act, and the detained person received an accommodation for his disability related to his sleeping area. The person also met with an OIDO officer multiple times while detained at the Central Louisiana ICE Processing Center, leading to improvements in conditions of confinement.

51.     Since March 21, 2025, no representative from CRCL or OIDO has communicated with RFK as to whether investigations into RFK's recently submitted complaints have been opened and whether investigations into earlier complaints remain pending or have been closed.

52.     The closure of CRCL and OIDO harms RFK's core business activities of pursuing accountability for abuses of immigrants' human rights through anti-detention advocacy. RFK is a nonprofit organization whose funders include philanthropic organizations that condition continued funding on performance, including examples of successful casework that remedies violations of immigrants' rights and furthers systemic change to immigration detention policy. As a result of the closure of CRCL and OIDO, RFK has lost legal avenues for remedying individual rights violations and for achieving systemic change, imperiling continuation of current funding and future funding. Moreover, to remedy individual rights violations and achieve systemic change, RFK will be forced to spend attorney time and organizational resources that otherwise would have

---

[29] Mem. from Dana Salvano-Dunn, Exec. Dir., Compliance Branch, Office for C.R. & C.L., to Patrick J. Lechleitner, Deputy Dir., U.S. Immigr. & Customs Enforcement, and Kerry E. Doyle, Principal Legal Advisor, U.S. Immigr. & Customs Enforcement, *Retention Memo: Winn Correctional Center,* Dep't of Homeland Sec. (Sept. 5, 2024), https://perma.cc/7JLZ-9SMR.

been saved through CRCL and OIDO intervention. For example, RFK must now spend additional staff time in administrative advocacy with ICE, additional funds on travel to visit clients detained far from RFK's offices in New York and Washington, D.C., and court filing fees and other litigation expenses for matters that otherwise would have been resolved by CRCL and OIDO.

**Plaintiff SBCC**

53.    Plaintiff SBCC filed two complaints with CRCL in 2023 that focused on open-air detention sites in southern California created by CBP. Through these complaints, SBCC was able to:

    a.    bring public attention to CBP's illegal practices at the sites, including spurring media interest in CBP's abuses;[30]

    b.    help provoke responses from CBP when it previously denied the sites existed;[31] and

    c.    contribute to a favorable court ruling in *Flores v. Garland*, 2:85-cv-4544 (C.D. Cal.), a long-running settlement agreement governing children in U.S. detention. In February 2024, SBCC submitted a declaration in support of a motion to enforce the settlement agreement in *Flores*, which included the two earlier complaints filed with CRCL as exhibits. The court order resulting from this motion established that children in open-air

---

[30] Soumya Karlamangla, *Visiting the Migrant Camp at the San Diego-Tijuana Border*, N.Y. Times (May 15, 2023), https://perma.cc/V9DZ-H945; Soumya Karlamangla, *Scenes From a Migrant Camp at California's Southern Border*, N.Y. Times (May 19, 2023), https://perma.cc/P9YB-TQWZ.

[31] Kate Morrissey, *In letter to congressmembers, CBP denies holding migrants in custody between border fences in San Diego*, The San Diego Union-Tribune (July 12, 2023), https://perma.cc/63Z4-W9KM.

detention sites were in U.S. government custody, leading to a decrease in the number of migrants held at the sites.[32]

54.     Beyond filing complaints, SBCC has advocated with CRCL, its officers, and its staff on numerous occasions to raise border and immigration policy concerns on a formal and informal basis, including:

      a.     Participating in numerous CRCL-organized events where community members were invited to raise concerns.

      b.     Urging CRCL to locate office staff at the southern border in a coalition advocacy letter on October 31, 2023.[33]

      c.     Meeting with CRCL staff on SBCC recommendations and priorities.

      d.     Meeting with CRCL official as part of human rights engagement work through a UN Human Rights Commission review of the United States under the International Covenant on Civil and Political Rights (ICCPR).

55.     CRCL has initiated action in response to SBCC's advocacy, yielding concrete results beneficial to SBCC's mission. For example:

      a.     On October 27, 2021, SBCC sent a letter to congressional leadership urging that Congress investigate CBP's Border Patrol Critical Incident Teams.[34]

---

[32] Notice of Motion and Motion to Enforce Settlement re Open-Air Detention Sites, *Flores v. Garland*, 2:85-cv-4544 (C.D. Cal. Feb. 29, 2024), ECF No. 1392, available at https://perma.cc/NGP8-LA3D.

[33] POGO Staff, *POGO and Partners Recommend More Civil Rights Oversight on Border*, Project on Gov't Oversight (Oct. 31, 2023), https://perma.cc/PMN7-4PMU.

[34] Letter from Vicki B. Gaubeca, Dir. of S. Border Cmtys. Coal., and Andrea Guerrero, Exec. Dir. of All. San Diego, to Congressional Committee Leaders, *Request for congressional investigations and oversight hearings on the unlawful operation of the U.S. Border Patrol's Critical Incident Teams (BPCITs)* (Oct. 27, 2021), https://perma.cc/6H79-ZA95.

   b.    On February 4, 2022, CRCL notified CBP that it was opening an investigation in response to SBCC's advocacy.[35]

   c.    On May 6, 2022, CBP announced that it was eliminating the Border Patrol Critical Incident Teams units.[36]

56.    In addition to its engagement with CRCL, SBCC relies on OIDO reports. For example, in 2023 SBCC joined a coalition letter to CBP calling for accountability with respect to the death in custody of 8-year-old Anadith Danay Reyes Álvarez. That letter cited to a 2022 OIDO report entitled "Critical Medical Understaffing at the Border" which had warned of the serious health consequences that could occur if critical staffing shortages were not addressed.[37]

57.    SBCC's mission is frustrated by no longer being able to file complaints with or contact CRCL and OIDO and by CRCL's inability to respond to SBCC activities. The shuttering of those offices means that valuable channels for seeking government oversight and accountability at the border are no longer available to SBCC and its members. In addition, SBCC would currently be engaging with CRCL about reported plans to expand open-air detention near the border at the Roosevelt Reservation,[38] but is unable to do so because the office has ceased to function.

---

[35] CRCL, Letter to CBP RE: United States Border Patrol Critical Incident Teams Complaint No. 002687-22-CBP (Feb. 4, 2022).

[36] Mem. from Chris Magnus, Comm'r, *Critical Incident Response Transition and Support,* U.S. Customs & Border Prot. (May 3, 2022), https://perma.cc/R474-9RXF.

[37] Ombudsman Alert, Office of the Immigr. Det. Ombudsman, *Critical Medical Understaffing on the Border* (July 12, 2022), https://perma.cc/RC2Q-JJBW.

[38] Tara Copp and Lolita C. Baldor, *US Army to control land on Mexico border as part of base, migrants could be detained, officials say,* AP News (April 14, 2025), https://perma.cc/HEH5-6RMT.

**Plaintiff UJC**

58.     Plaintiff UJC frequently represents noncitizen survivors of domestic violence, trafficking, and other forms of abuse and exploitation, including hundreds of clients who have applied for a change to their immigration status under the Violence Against Women Act (VAWA), including a VAWA self-petition through an application for U or T nonimmigrant status. As part of that representation, UJC explains to its clients that the confidentiality of their filings is protected from their abusers or traffickers by 8 U.S.C. § 1367. UJC further counsels its clients on the enforcement mechanisms available if that statute is violated, including filing a complaint with CRCL.

59.     Recently, one domestic violence survivor being represented by a lawyer at UJC's Domestic Violence Project (DVP) experienced a violation of 8 U.S.C. § 1367. Specifically, her abusive spouse filed a request under the Freedom of Information Act (FOIA) for her U nonimmigrant status application and that of her minor child. CIS unlawfully shared the contents of the statutorily protected filing with this spouse, who then used the information against UJC's client in family court proceedings. The DVP lawyer filed a complaint with CRCL regarding the violation of 8 U.S.C. § 1367 on April 4, 2025, two weeks after CRCL was shut down. To date, no response has been received.

60.     UJC lawyers frequently rely on the CIS Ombudsman Office by filing requests for case assistance when experiencing delays outside of normal processing times for various immigration-related forms filed on their clients' behalf. With the CIS Ombudsman Office no longer available as an avenue for seeking recourse, UJC lawyers must rely on inferior, less efficient alternatives like the CIS email hotlines for VAWA-protected cases, which routinely take several months to respond to an inquiry and sometimes do not respond at all. The unavailability of the CIS

Ombudsman will thus hamper their ability to obtain information needed to represent their clients and require them to expend additional time on each client's case by pursuing mechanisms for redress that would have been unnecessary with a functioning CIS Ombudsman's Office.

61.    Without the ability to complain to CRCL about violations of 8 U.S.C. § 1367, UJC lawyers are inhibited in their ability to represent their clients under the VAWA, as a key confidentiality provision in that statute will be less effective because it will lose its enforcement mechanism. UJC's VAWA-protected clients are already reluctant to use the legal tools available to them for fear of retribution from an abuser, and this reluctance will be compounded now that CRCL is no longer available to take or address complaints of violations of rights under 8 U.S.C. § 1367, or to train other DHS employees on their obligations under that law. For those clients who proceed with applying for VAWA or T or U nonimmigrant status despite these risks, UJC will be unable to effectively intervene and seek redress if a violation of 8 U.S.C. § 1367 occurs, in turn frustrating UJC's mission of providing legal services to this community.

### COUNT I
### (Non-statutory review of official and agency action)

62.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

63.    Members of the Executive Branch have only those powers conferred upon them by the Constitution and federal statutes.

64.    The DHS Oversight Offices were established and assigned specified functions by Congress, and can be eliminated or have their statutory functions removed only by Congress.

65.    Defendants' actions to eliminate the DHS Oversight Offices and to terminate the performance of their statutorily mandated functions exceed their authority and usurp legislative authority conferred upon Congress by the Constitution.

**COUNT II**
**(Administrative Procedure Act – 5 U.S.C. § 706(2)(C))**

66.    The APA directs courts to hold unlawful and set aside agency actions that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

67.    Defendants' actions to terminate the DHS Oversight Offices' performance of their statutorily mandated functions constitute final agency action under the APA.

68.    No statute authorizes Defendants to eliminate the DHS Oversight Offices and to require they cease their work on activities that they are required by statute to perform.

69.    Defendants' actions exceed their statutory authority.

**COUNT III**
**(Administrative Procedure Act – 5 U.S.C. § 706(2)(A))**

70.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

71.    Defendants' actions to terminate the DHS Oversight Offices and the performance of their statutorily mandated functions constitute final agency action under the APA.

72.    Defendants' actions were contrary to law in that they violate the statutes requiring the DHS Oversight Offices to exist, to have the cooperation of DHS leadership and other DHS components, and to have sufficient resources to carry out their functions. These include 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1 (CRCL), 6 U.S.C. § 272 (CIS Ombudsman Office), and 6 U.S.C. § 205 (OIDO). They also violate the appropriations statutes allocating funding specifically for the operations of the DHS Oversight Offices.

73.    Defendants' actions were taken without notice, reasoned explanation, or reasonable recourse.

74.    Defendants' actions were arbitrary, capricious, unconstitutional, and not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare that Defendants' actions to eliminate CRCL and their suspension or termination of CRCL's statutorily mandated functions are unlawful;

(B)    Declare that Defendants' actions to eliminate OIDO and their suspension or termination of OIDO's statutorily mandated functions are unlawful;

(C)    Declare that Defendants' actions to eliminate the CIS Ombudsman Office and their suspension or termination of the CIS Ombudsman Office's statutorily mandated functions are unlawful;

(D)    Declare unlawful and set aside Defendants' actions to eliminate the DHS Oversight Offices, including the mass firing of employees and termination of contractors, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

(E)    Order Defendants immediately to reverse the RIF and termination of contractors as to CRCL, OIDO, and/or CIS Ombudsman Office employees and contractors necessary to perform the DHS Oversight Offices' statutory functions;

(F)    Enjoin Defendants from taking any further steps that hinder the DHS Oversight Offices' ability to perform their statutorily mandated tasks;

(G)    Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as appropriate; and

(H)     Grant such other relief as the Court deems necessary, just, and proper.


Dated: April 24, 2025                              Respectfully submitted,

                                                   /s/ Karla Gilbride
                                                   Karla Gilbride (DC Bar No. 1005586)
                                                   Adina H. Rosenbaum (DC Bar No. 490928)
                                                   Public Citizen Litigation Group
                                                   1600 20th Street NW
                                                   Washington, DC 20009
                                                   (202) 588-1000
                                                   kgilbride@citizen.org
                                                   arosenbaum@citizen.org

                                                   Michael C. Martinez (DC Bar No. 1686872)
                                                   Christine L. Coogle (DC Bar No. 1738913)
                                                     (admission pending)
                                                   Brian D. Netter (DC Bar No. 979362)
                                                   Skye L. Perryman (DC Bar No. 984573)
                                                   Democracy Forward Foundation
                                                   P.O. Box 34553
                                                   Washington, DC 20043
                                                   (202) 448-9090
                                                   mmartinez@democracyforward.org
                                                   ccoogle@democracyforward.org
                                                   bnetter@democracyforward.org
                                                   sperryman@democracyforward.org

                                                   *Counsel for All Plaintiffs*

                                                   Anthony Enriquez (DDC Bar No. NY0626)
                                                     (admission pending)
                                                   Sarah T. Gillman (DDC Bar No. NY0316)
                                                   Robert F. Kennedy Human Rights
                                                   88 Pine Street, Suite 801
                                                   New York, NY 10005
                                                   (917) 284-6355
                                                   enriquez@rfkhumanrights.org
                                                   gillman@rfkhumanrights.org

                                                   Sarah E. Decker (DDC Bar No. NY0566)
                                                   Robert F. Kennedy Human Rights
                                                   1300 19th Street NW, Suite 750
                                                   Washington, DC 20036

(202) 559-4432
decker@rfkhumanrights.org

*Counsel for Plaintiff RFK*