# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, <br><br> Defendants. | Civil Action No. 25-1270-ACR |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Michael C. Martinez (DC Bar No. 1686872)
Christine L. Coogle (DC Bar No. 1738913)
Brian D. Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448- 9090

Karla Gilbride (DC Bar No. 1005586)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
kgilbride@citizen.org

*Attorneys for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284- 6355

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432

*Counsel for Plaintiff RFK*

May 8, 2025

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATUTORY BACKGROUND ......................................................................................... 2

FACTUAL BACKGROUND .............................................................................................. 5

   I.   DHS Oversight Offices' activities before March 21, 2025 .................................... 5

   II.   Dissolution of DHS Oversight Offices ............................................................... 11

LEGAL STANDARD ....................................................................................................... 14

ARGUMENT .................................................................................................................... 14

   III.   Plaintiffs are likely to succeed on the merits ..................................................... 14

     A.   Plaintiffs have shown a likelihood of standing. ........................................... 14

       1.   Plaintiffs have organizational standing. ........................................... 15

       2.   SBCC has associational standing. .................................................... 21

     B.   Plaintiffs are likely to succeed on their claim that Defendants' dissolution of the DHS Oversight Offices exceeds their constitutional and statutory authority. .......... 23

     C.   Plaintiffs are likely to succeed on their Administrative Procedure Act claims. ....... 25

       1.   The DHS Oversight Office dissolutions are reviewable final agency actions...... 25

       2.   The DHS Oversight Office dissolutions exceed Defendants' statutory authority. 26

       3.   The DHS Oversight Office dissolutions were contrary to law. ........................... 27

       4.   Defendants' action was arbitrary and capricious. ................................................. 32

   IV.   Plaintiffs will suffer irreparable harm absent a preliminary injunction. ........................ 35

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

Cases

*Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931 (D.C. Cir. 1987)........18

*Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-400, 2025 WL 752378 (D.D.C. Mar. 10, 2025)..................................................................................................32

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)................................32

*Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320 (2015)........................................................25

*Beattie v. Barnhart*, 663 F. Supp. 2d 5 (D.D.C. 2009) ................................................................35

*Bennett v. Spear*, 520 U.S. 154 (1997) ......................................................................................26

*Brodie v. HHS*, 715 F. Supp. 2d 74 (D.D.C. 2010) ....................................................................36

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)....................................................................37

*Cath. Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Review,* 513 F. Supp. 3d 154 (D.D.C. 2021) ..................................................................................................................19

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)................14, 36

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................................24

*Ctr. for Biological Diversity v. EPA*, 56 F.4th 55 (D.C. Cir. 2022) ............................................21

*Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2024)....................................21

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ..........................................23

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)....................................................32, 33, 34

*Doctors for Am. v. Office of Personnel Mgmt.*, No. 25-cv-322, 2025 WL 452707 (D.D.C. Feb. 11, 2025) ..................................................................................................................22

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95 (D.C. Cir. 2019)..................................14

*Equal Rts. Ctr. v. Post Props., Inc.,* 633 F.3d 1136 (D.C. Cir. 2011) ..........................................15

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)............................................................32

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............................................................15

*\*Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998)..................................................................20

*Food and Water Watch, Inc. v. Vilsack,* 808 F.3d 905 (D.C. Cir. 2015) ........................................15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010).......................................25

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) .......................................................20

*Havens Realty v. Coleman*, 455 U.S. 363 (1983) .........................................................................15

*Immigr. & Naturalization Servs. v. Chadha*, 462 U.S. 919 (1983) ...............................................23

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013)......................................................................31

*J. Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025).........................24

*Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36 (D.C. Cir. 2016) ............................................15

*\*League of Women Voters of U.S. v.* Newby, 838 F.3d 1 (D.C. Cir. 2016) ...................................35

*Maryland v. USDA*, Civil No. JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025),
     *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17, 2025)............................................................26

*Michigan v. EPA*, 576 U.S. 743 (2015) .........................................................................................32

*\*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).......32, 33, 34

*Myers v. United States*, 272 U.S. 52 (1926)...................................................................................23

*N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31
     (D.D.C. 2020) ........................................................................................................................19

*\*Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381, 2025 WL 942772 (D.D.C.
     Mar. 28, 2025), *stay denied in relevant part,* No. 25-5091 (D.C. Cir. Apr. 11, 2025; as
     modified Apr. 28, 2025)...........................................................................................20, 25, 35, 37

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996) ...........................35

*Ohio v. EPA*, 603 U.S. 279 (2024).................................................................................................32

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .................................................37

*\*People for the Ethical Treatment of Animals v. USDA,* 797 F.3d 1087 (D.C. Cir. 2015)....15, 16,
     17, 19

*Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151 (D.D.C.
     2024) .....................................................................................................................................23

*Pursuing Am.'s Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500 (D.C. Cir. 2016).......................14

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) .......................................................................24

## Statutes

2 U.S.C. § 683 ..........................................................................................................31

5 U.S.C. § 706 .....................................................................................................25, 27

6 U.S.C. § 111 .........................................................................................................24

6 U.S.C. § 113 ...........................................................................................................2

6 U.S.C. § 124h .........................................................................................................3

6 U.S.C. § 205 ................................................................................................... passim

6 U.S.C. § 211 ...........................................................................................................4

6 U.S.C. § 272 ................................................................................................... passim

6 U.S.C. § 452 .................................................................................................24, 26, 27

6 U.S.C. § 345 ................................................................................................... passim

8 U.S.C. § 1357 .......................................................................................................28

8 U.S.C. § 1367 ...........................................................................................7, 9, 18, 28

31 U.S.C. § 1512 ......................................................................................................32

34 U.S.C. §§ 30301 *et seq.*........................................................................................28

42 U.S.C. § 2000ee-1 ......................................................................................... passim

Consolidated Appropriations Act, 2020, Pub. L. No. 116- 93, 133 Stat. 2317 (Dec. 20, 2019) ..............................................................................................................4

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 560 (Mar. 23, 2024) .............................................................................................................6

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)...............4

Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004) ...............................................................................3

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117- 263, 136 Stat. 2395 (Dec. 23, 2022) ............................................................................4

## Other Authorities

David J. Bier, *US Citizens Don't Have First Amendment Rights if Noncitizens Don't,*

Cato Inst.: Cato at Liberty Blog (Apr. 15, 2025), https://perma.cc/U5AM-73SX ...................38

Dep't of Homeland Sec., *About the Office of the Immigration Detention Ombudsman (OIDO)*, https://perma.cc/82DC-K8HG (archived Apr. 21, 2025)............................................30

Dep't of Homeland Sec., Citizenship and Immigr. Servs. Ombudsman, *Annual Report 2024* (June 28, 2024), https://perma.cc/7TB9-D824 .........................................................6, 8, 9

Dep't of Homeland Sec., *Civil Rights Resources for Recipients of DHS Financial Assistance*, https://perma.cc/LMW6-5242...............................................................29

Dep't of Homeland Sec., Delegation No. 3095, *Delegation to the Officer for Civil Rights and Civil Liberties for Matters Involving Civil Rights, Civil Liberties, and Equal Employment Opportunity* (June 5, 2003), https://perma.cc/J9EQ-DYP3 ...................................3

Dep't of Homeland Sec., *Legal Authorities for the Office for Civil Rights and Civil Liberties*, https://perma.cc/4BVE-N898 (archived Apr. 23, 2025)............................................7

Ellen M. Gilmer, *Trump Aides Shutter Homeland Security Civil Rights Office*, Bloomberg Gov't (Mar. 21, 2025), https://perma.cc/P88P-SEZP ..................................................1

*Equal Emp. Opportunity Div.*, Dep't of Homeland Sec., https://perma.cc/RLH5-5KSG (archived Apr. 21, 2025)..............................................................................8

*How to Submit a Case Assistance Request*, CIS Ombudsman, Dep't of Homeland Sec., https://perma.cc/9NF9-RSB4 ..............................................................................8

*ICE Detainees*, TRACImmigration, https://perma.cc/8YVB-WNT4 (archived May 7, 2025) ..............................................................................................................38

Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024  (Mar. 18, 2024), https://perma.cc/UNG3-837F ......................................................23

Justin Siken, *List of All Contracts Terminated by DOGE*, HigherGov (May 6, 2025), https://perma.cc/FBY9-YQHA .........................................................................12

Letter from Sen. Peters and Sen. Durbin to Kristi Noem, Sec'y of Homeland Sec. (Mar. 13, 2025), https://perma.cc/2664-U46Y ...........................................................12

Nick Schwellenbach, *DHS Removed 100+ Civil Rights and Civil Liberties Records*, Project on Gov't Accountability (Apr. 21, 2025), https://perma.cc/NWP7-SBD3 ..................11

Office for C.R. and C.L., *Fiscal Year 2023 Annual Report* (Nov. 2024), https://perma.cc/3SWH-KEGX .................................................................... passim

Office of the Immigr. Det. Ombudsman, *OIDO Annual Report 2023* (Mar. 29, 2024), https://perma.cc/C5RF-U4RT....................................................................6, 7, 8, 9

*OIDO Case Intake Form (DHS Form 405)*, Dep't of Homeland Sec.,

https://perma.cc/6Z6A-ZNTW ...........................................................................................8

Ximena Bustillo, *Homeland Security Makes Cuts to Civil Rights and Oversight Offices*,
    NPR (Mar. 21, 2025), https://perma.cc/B9HN-RWRC ............................................24

Regulations

29 C.F.R. Part 1614 .......................................................................................................3

6 C.F.R. § 115.93 ..........................................................................................................7

6 C.F.R. § 15.70 .....................................................................................................10, 28

6 C.F.R. § 115.87 ..........................................................................................................7

Constitutional Provisions

U.S. Const. art. I, § 1 ..................................................................................................23

## INTRODUCTION

Since establishing the Department of Homeland Security (DHS) in 2002, Congress has recognized that this department, with its sweeping powers and under centralized control, could impact the civil and constitutional rights of immigrants and citizens alike.  To mitigate the risk of abuse, Congress created multiple oversight bodies within DHS and charged them with monitoring Department activities to ensure that they comply with the Constitution and civil rights laws, taking and investigating complaints from the public, and reporting to Congress on alleged rights violations by DHS personnel.  In this way Congress built early warning systems into DHS itself, ensuring that the public would have avenues for raising concerns about invasions of privacy, racial profiling, and human rights abuses committed in the name of protecting the homeland and that such concerns would quickly come to Congress's attention.

On March 21, 2025, Defendants DHS and Secretary Kristi Noem shut down three of these early warning systems, effectively abolishing the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services (CIS) Ombudsman's Office, and the Office of the Immigration Detention Ombudsman (OIDO) (together, DHS Oversight Offices) by announcing plans to terminate virtually all of their employees and ordering those employees to immediately stop investigating complaints and performing other statutorily-required work. Defendants publicly acknowledged that they intended to dissolve these offices completely, explaining that they did so because the offices had "obstructed immigration enforcement by adding bureaucratic hurdles."[1]

When Congress created each of these three offices, it mandated that they perform specific

---

[1] Ellen M. Gilmer, *Trump Aides Shutter Homeland Security Civil Rights Office*, Bloomberg Gov't (Mar. 21, 2025), https://perma.cc/P88P-SEZP.

functions.  For example, it requires them to take complaints, interact with the public, and report annually to Congress on their activities.  It also requires other components of DHS to consult with them.  Defendants' actions to unilaterally shutter the DHS Oversight Offices without congressional authorization are thus ultra vires and violate the Constitution's separation of powers principle.  They also violate the Administrative Procedure Act (APA) because they exceed Defendants' statutory authority, are contrary to law, and are both substantively unreasonable and undertaken without reasoned decisionmaking.

Plaintiffs Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC) all file complaints or otherwise seek assistance from the DHS Oversight Offices to further their missions of combatting human rights abuses or serving their immigrant clients.  RFK and members of SBCC also rely on information made available to the public by these offices.  The closure of these offices has impaired Plaintiffs' ability to perform their core activities and deprived them of information to which they are statutorily entitled—harm that will continue unless enjoined by this Court.  And shutting down these congressionally mandated Oversight Offices precisely when many DHS actions are being challenged for violating constitutional protections and human rights underscores that the balance of equities and public interest factors weigh sharply in favor of injunctive relief here.

## STATUTORY BACKGROUND

Congress created DHS in response to the terrorist attacks of September 11, 2001, when concerns over security were at a zenith.  Yet among the presidentially appointed officers that Congress required for the new agency was an "Officer for Civil Rights and Civil Liberties," 6 U.S.C. § 113(d)(3), responsible for "review[ing] and assess[ing] information alleging abuses of civil rights, civil liberties, and racial and ethnic profiling by employees and officials of" DHS.  *Id*. § 345(a)(1).  From its inception, CRCL's functions have included a public-facing component:

"mak[ing] public through the internet, radio, television, or newspaper advertisements information on the responsibilities and functions of, and how to contact" CRCL. *Id*. § 345(a)(2).

In 2003, the Secretary of Homeland Security delegated to the CRCL Officer the authority to investigate and adjudicate equal employment opportunity (EEO) complaints for all DHS employees pursuant to the procedures established in 29 C.F.R. Part 1614, and to ensure that DHS complied with various antidiscrimination statutes.[2]  Congress then made many of these delegated CRCL functions into statutory CRCL obligations through the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 8303, 118 Stat. 3638, 3867 (Dec. 17, 2004), requiring that the CRCL Officer "oversee compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by programs and activities of the Department."  6 U.S.C. § 345(a)(4).

Also in 2004, Congress established a new policy-setting and consultative role for the CRCL Officer, requiring the Officer to "assist the Secretary, directorates, and offices of the Department [of Homeland Security] to develop, implement, and periodically review … policies and procedures to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities." *Id*. § 345(a)(3).

In subsequent years, Congress has from time to time imposed reciprocal obligations on other DHS components, requiring them to consult with CRCL on such initiatives as the establishment and oversight of state, local, and regional fusion centers, 6 U.S.C. § 124h; the

---

[2]Dep't of Homeland Sec., Delegation No. 3095, *Delegation to the Officer for Civil Rights and Civil Liberties for Matters Involving Civil Rights, Civil Liberties, and Equal Employment Opportunity* (June 5, 2003), https://perma.cc/J9EQ-DYP3(delegating to CRCL the authority to "[a]ssure that all federally-assisted and federally-conducted programs or activities of the Department comply with the provisions of Title VI of the Civil Rights Act of 1964, as amended; Title IX of the Education Amendments of 1972, as amended; the Rehabilitation Act of 1973, as amended; the Age Discrimination Act of 1975, as amended; and related Executive Orders").

development of "standard operating procedures" for the use of unmanned aerial systems or drones, 6 U.S.C. § 211(k)(1)(E); and the development of policies and procedures for the acquisition and use of artificial intelligence by DHS that take into account the privacy, civil rights, and civil liberties implications of these systems, *see* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117- 263, § 7224(b)(1)(B)(i), 136 Stat. 2395, 3670 (Dec. 23, 2022). At a higher level of generality, Congress mandated that DHS ensure that the CRCL Officer, as the designated civil liberties officer under 42 U.S.C. § 2000ee-1(b)(2), "has the information, material, and resources necessary to carry out the functions of such officer" and "is given access to material and personnel the officer determines to be necessary to carry out the functions of such officer." 42 U.S.C. §§ 2000ee-1(d)(1), (4).

The position of CIS Ombudsman, too, was created in the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, § 452, 116 Stat. 2135, 2197, *codified at* 6 U.S.C. § 272. The CIS Ombudsman's functions are to "assist individuals and employers in resolving problems" with CIS, to identify recurring problems, and to "propose changes in administrative practices" of CIS to "mitigate" those problems. 6 U.S.C. § 272(b). CIS leadership, in turn, must meet with the Ombudsman regularly, *id.* § 272(d)(4), and must respond to any recommendations from the Ombudsman's Office within three months, *id.* § 272(f).

Finally, the OIDO was established by Congress in 2019. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116- 93, § 106(a), 133 Stat. 2317, 2504 (Dec. 20, 2019). OIDO is statutorily required to be "independent of Department agencies and officers." 6 U.S.C. § 205(a). Its functions are to "[e]stablish and administer an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress ... for cases in which Department officers or other personnel, or contracted, subcontracted, or cooperating entity personnel, are found to have engaged

4

in misconduct or violated the rights of individuals in immigration detention." *Id*. § 205(b)(1). OIDO is also charged with conducting unannounced inspections at detention facilities, including those run by states or private parties; making recommendations to address the findings of those inspections, including any terms of detention contracts found to have been violated; and assisting those in detention affected by excessive force or other types of misconduct. *Id*. §§ 205(b)(3)–(5).

To facilitate performance of these statutory functions, Congress mandated that "the ombudsman and designated personnel of the ombudsman" shall have "unfettered access" to detention facilities and records, as well as the ability to meet with detainees privately. *Id*. §§ 205(c), (d)(2). Congress also mandated that the directors of Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) develop procedures for responding to OIDO recommendations within 60 days of receiving them. *Id*. § 205(d)(1).

All three DHS Oversight Offices must report annually to Congress on their activities, the complaints they received, and the recommendations they made. *Id.* § 205(e) (OIDO); *id.* § 272(c) (CIS Ombudsman); *id.* § 345(b), 42 U.S.C. § 2000ee-1(f) (CRCL). CRCL is further charged with making these congressional reports available to the public and "otherwise informing the public" of its activities. 42 U.S.C. § 2000ee-1(g).

## FACTUAL BACKGROUND

## I. DHS Oversight Offices' activities before March 21, 2025

Before Defendants dissolved them, the three DHS Oversight Offices performed their statutorily mandated functions through a variety of activities conducted by a combined workforce of approximately 400 people. Regarding their statutory mandates to engage with the public, the CIS Ombudsman's Office participated in 132 engagements with 207 unique organizations in 2023, allowing the office to reach more than 4,800 stakeholders. *See* Dep't of Homeland Sec., Citizenship and Immigr. Servs. Ombudsman, *Annual Report 2024* at 5 (June 28, 2024),

https://perma.cc/7TB9-D824 (CIS Ombudsman Report).  *See also* Decl. of Alex Doe (A. Doe Decl.) ¶ 8 (PLFS 155-56) (describing CIS Ombudsman Office's public engagement activities); Decl. of Debra Rogers (Rogers Decl.) ¶ 7 (PLFS 170) (same).  Also in 2023, OIDO launched a public awareness campaign using billboards and videos at gas station pumps to inform those potentially impacted by immigration detention of the services OIDO provides.  Office of the Immigr. Det. Ombudsman, *OIDO Annual Report 2023* at 30 (Mar. 29, 2024), https://perma.cc/C5RF-U4RT (OIDO Report).  And CRCL conducted community engagement events in twenty-two different metro areas, including arranging a training on Muslim religious practices for a group of over 100 TSA screening supervisors.  Office for C.R. and C.L., *Fiscal Year 2023 Annual Report* at 27 (Nov. 2024), https://perma.cc/3SWH-KEGX (CRCL Report).

One focal point for CRCL community engagement in recent years has been its administration of the Alternatives to Detention Case Management Pilot Program (CMPP), which was established by Congress in 2021 and received over $50 million in congressional appropriations between FY2021 and FY2024.  *See* CRCL Report at 77; Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 560, 594 (Mar. 23, 2024).  Under the Pilot Program, local NGOs received government funds to provide mental health services, trafficking screening, legal orientation, and other supports to asylum seekers waiting for dates with backlogged immigration courts.  CRCL Report at 78.  CRCL was responsible for convening the national board that selects grantees for the program and oversees its administration.  *Id.* at 79.  At the end of FY2023, 100% of CMPP participants with a scheduled immigration court date had attended their court dates.  *Id.*

In addition to engaging with the public, CRCL also consults with and trains other components of DHS on civil rights-related issues.  For example, pursuant to DHS Delegation No.

19004,[3] CRCL is responsible for developing DHS-wide guidance on the confidentiality provisions of 8 U.S.C. § 1367.  These provisions prohibit disclosure of information regarding applicants for, and beneficiaries of, certain types of immigration petitions available to victims of gender-based violence, human trafficking, and other types of abuse—Violence Against Women Act (VAWA) self-petitions and petitions for T nonimmigrant status and U nonimmigrant status for victims of human trafficking and serious crimes, respectively.  CRCL continued to provide training to ICE and CIS on these confidentiality provisions during FY2023.  CRCL Report at 67, 112–113.

CRCL is also responsible for enforcing DHS's standards for preventing sexual abuse in short-term holding and long-term detention facilities under the Prison Rape Elimination Act (PREA), including collecting data from facilities and conducting audits.  *See, e.g.*, 6 C.F.R. §§ 115.87(e), 115.93(d).  Advocacy groups like the Women's Refugee Commission rely on these data and audit results to supplement their own reporting and track conditions affecting women and girls in detention.  Decl. of Zain Lakhani (Lakhani Decl.) ¶¶ 3, 4, 11 (PLFS 203-04, 207).

OIDO, too, works closely with other components of DHS while retaining its status as an independent ombudsman's office.  For example, OIDO chaired a work group on deaths in custody with representatives from nine other law enforcement agencies.  OIDO Report at 41.  It also developed a deconfliction mechanism with other DHS components that conduct inspections of detention facilities to ensure that inspections are spaced a reasonable time apart and to revisit issues found on previous inspections to determine if the situation has improved.  *Id.* at 39.

One common function of the three DHS Oversight Offices, grounded in their authorizing statutes, is that they take complaints from the public via online portals.  *See* 6 U.S.C. §§ 345(a)(1),

---

[3] Dep't of Homeland Sec., *Legal Authorities for the Office for Civil Rights and Civil Liberties*, https://perma.cc/4BVE-N898 (archived Apr. 23, 2025).

(6) (requiring CRCL to "review" and "investigate" complaints); *id.* § 205(b)(2) (requiring the OIDO complaint process to be "accessible"); *id.* § 272(b)(1) (requiring the CIS Ombudsman to "assist individuals and employers in resolving problems" with CIS).[4]  OIDO opened 12,664 new cases in Calendar Year (CY) 2023, *see* OIDO Report at 64, while the CIS Ombudsman received nearly 24,000 requests for case assistance in FY2023, *see* CIS Ombudsman Report at 7.  *See also* A. Doe Decl. ¶ 7 (PLFS 153-55); Rogers Decl. ¶¶ 10–15 (PLFS 171-72).  Meanwhile CRCL stated in its FY2023 report to Congress that its compliance division had received 3,104 allegations of civil rights or civil liberties violations that year.  CRCL Report at 45.  Presumably this figure does not include complaints of discrimination from DHS's over 260,000 employees, which CRCL is also responsible for investigating.[5]

The most frequent topics of OIDO complaints are inadequate medical care, environmental conditions like extreme heat or cold, and lack of contact with lawyers or family members.  OIDO Report at 11; *see also* Decl. of Kelsey Vitullo (Vitullo Decl.) ¶ 5 (PLFS 175) (OIDO case manager frequently received complaints about medical care, sexual abuse, lack of adequate food or warm clothing, and lengthy placements in solitary confinement).  Most of these complaints are resolved informally at the facility level and not tracked on a public website, although the complaints are summarized in OIDO's annual reports to Congress.  *See* Vitullo Decl. ¶¶ 4–7 (PLFS 175-76); *see, e.g.*, Decl. of Anthony Enriquez (Enriquez Decl.) ¶ 9 (PLFS 4) (describing an OIDO complaint resolved at the facility level).  However, if there are multiple complaints about a facility or other

---

[4] *See* CRCL Report at 7 (describing online complaint portal at https://engage.dhs.gov/crcl-complaint (archived at https://perma.cc/9TL6-CUFG)); *How to Submit a Case Assistance Request*, CIS Ombudsman, Dep't of Homeland Sec., https://perma.cc/9NF9-RSB4; *OIDO Case Intake Form (DHS Form 405)*, Dep't of Homeland Sec., https://perma.cc/6Z6A-ZNTW.

[5] *Equal Emp. Opportunity Div.*, Dep't of Homeland Sec., https://perma.cc/RLH5-5KSG (archived Apr. 21, 2025).

reasons to believe that a full inspection is warranted, OIDO will conduct an announced or unannounced inspection, document its findings in a report, and publish that report online at dhs.gov/oido-publications (archived at https://perma.cc/8CDD-M8X7). *See* OIDO Report at 55–62. In 2023, OIDO conducted 22 inspections and published eleven reports. *Id*. at 64.

The CIS Ombudsman's Office summarizes the most frequent topics on which people request case assistance as part of its report to Congress, in which it is required to identify recurring problems and make corresponding recommendations to CIS. *See* CIS Ombudsman's Report at 6 (describing most common problems); Rogers Decl. ¶¶ 12–14 (PLFS 171-72) (listing types of problems the office handled, including unreasonable delays in CIS acting on an application, urgent issues like a sick child needing more time in the United States to complete medical care, and complex situations such as applications pending with multiple offices); Decl. Of Margaret Cargioli (Cargioli Decl.) ¶ 7 (PLFS 140) (CIS Ombudsman helped asylm seeker to get her fingerprints taken when the process had been significantly delayed, so that she could leave detention and be reunited with her minor child). Legal service organizations that aid victims of domestic violence and human trafficking, and who apply for immigration protections for these individuals through CIS, report that the CIS Ombudsman's Office is extremely helpful in resolving situations where applications have gotten bogged down in the CIS system, causing long delays or erroneous denials. Decl. of Timothy Fallon (Fallon Decl.) ¶¶ 6–7 (PLFS 216-17); Decl. of Jodi Ziesemer (Ziesemer Decl.) ¶¶ 3–7 (PLFS 221-22); Decl. Of Susu D'Andrea (D'Andrea Decl.) ¶¶ 4-6 (PLFS 212).

CRCL receives complaints on a wide range of potential constitutional and statutory violations, including allegations of racial or religious profiling, disability discrimination, denials of due process, use of excessive force by DHS personnel, and violations of the confidentiality provisions of 8 U.S.C. § 1367. CRCL Report at 41. Before CRCL can act on an incoming

complaint, it must refer the complaint to DHS's Office of Inspector General, which has the right of first refusal on investigating such complaints.  6 U.S.C. § 345(a)(6).  Of the 3,104 complaints filed with CRCL in FY2023, the Office of the Inspector General chose to retain and investigate only two.  CRCL Report at 45.

CRCL resolves many complaints without a formal investigation or written report, especially when they do not implicate a systemic or widespread problem.  Decl. of Deborah Fleischaker (Fleischaker Decl.) ¶¶ 8–9 (PLFS 144).  Pursuant to 6 C.F.R. § 15.70, CRCL may negotiate an informal resolution of complaints alleging disability discrimination under § 504 of the Rehabilitation Act.  CRCL described this approach approvingly in its 2023 annual report, noting that it offers a swift improvement for the disabled person and a training opportunity for DHS personnel.  *See* CRCL Report at 43–44.

When CRCL does open a formal investigation of a complaint, it sometimes sends investigators to the scene, in a so-called "onsite," to observe conditions directly.  CRCL Report at 48.  In December 2023, for example, CRCL conducted an onsite inspection of open-air detention sites in San Ysidro and Jacumba, California, in which CBP was detaining migrants, after Plaintiff SBCC filed two complaints with CRCL about conditions at these sites. Decl. of Lilian Serrano (Serrano Decl.) ¶¶ 8–9 (PLFS 17).

If CRCL concludes that rights were violated or that the component of DHS being investigated should change its practices to avoid violating rights in the future, CRCL issues a recommendation memorandum explaining its conclusions and the changes it recommends, to which the DHS component under investigation is asked to respond within 120 days.  CRCL Report at 49.  The component being investigated notes in its response whether it concurs, partially concurs, or non-concurs with each recommendation in the memorandum.  *Id.*  In FY2023, CRCL posted 57

investigative work products, including recommendation memoranda, to its online transparency library. *Id.*

One recommendation memorandum posted online during this period resulted from a CRCL investigation into CBP's deportation of migrants immediately after they were discharged from hospitals, sometimes in fragile medical states and often without proper clothing or medical documentation. Decl. of Sister Tracey Horan (Horan Decl.) ¶ 4 (PLFS 182). This investigation and recommendation, in turn, followed many complaints that faith-based community organization Kino Border Initiative had made to CRCL about migrants being deported directly from hospitals. *Id.* ¶ 3 (PLFS 181-82) (describing one migrant who was deported with no shoes or underwear, wearing only a hospital gown and slipper socks, and another who was deported against doctor's advice despite having a shattered tibia). CBP eventually agreed to most of CRCL's recommendations and implemented policy changes in 2024. *Id.* ¶ 4 (PLFS 182). But in 2025, the recommendation memorandum about hospital discharges, along with more than one hundred other recommendations, was removed from CRCL's transparency library. *Id.*

## II.    Dissolution of DHS Oversight Offices

Some warning signs about the continued viability of the DHS Oversight Offices appeared in February 2025, when without any warning or public announcement, over 100 of the 160 investigative documents formerly housed on CRCL's transparency library, dating back to October 2014, were removed.[6] Also in February, the contract for the Case Management Pilot Program that CRCL administered, for which Congress had appropriated $15 million in March of 2024, was

---

[6] Nick Schwellenbach, *DHS Removed 100+ Civil Rights and Civil Liberties Records*, Project on Gov't Accountability (Apr. 21, 2025), https://perma.cc/NWP7-SBD3.

terminated.[7]  Following these developments, the Ranking Members on two Senate committees with oversight over DHS wrote a letter to Secretary Noem on March 13, 2025, warning against any large-scale reduction-in-force (RIF) at CRCL given the statutory functions it serves and the need for "sufficient personnel and resources" to perform those functions.[8]

Nonetheless, on March 21, 2025, Defendants placed nearly every employee in each of the three DHS Oversight Offices on administrative leave.  A. Doe Decl. ¶¶ 11–13 (PLFS 158); Vitullo Decl. ¶¶ 11–12 (PLFS 177); Enriquez Decl. ¶ 17 (PLFS 7).  Contractors for OIDO and the CIS Ombudsman's Office were also instructed to stop working.  Vitullo Decl. ¶ 12 (PLFS 177); A. Doe Decl. ¶ 16 (PLFS 159).  Employees from all three offices also received notices that day informing them that their positions were being eliminated pursuant to a RIF, with their date of separation from federal service listed as May 23, 2025.  On each of the notices, the reason given for the RIF was the "dissolution" of CRCL, the CIS Ombudsman, and OIDO, respectively.  A. Doe Decl. Ex. D (PLFS 163-67); Vitullo Decl. Ex. E (PLFS 170a); Enriquez Decl. ¶ 17 (PLFS 7).

In the weeks after March 21, complaint portals remained operational on all three offices' websites and new complaints continued to be filed.  A. Doe Decl. ¶¶ 17–18 (PLFS 159); Vitullo Decl. ¶ 14 (PLFS 177).  CIS Ombudsman employees received emails from their colleagues at CIS about pending cases, and OIDO employees received emails from staff at detention facilities asking when they would return for another visit.  *Id.*  But the affected employees were not permitted to respond to these emails or even create an out-of-office message explaining that they were on

---

[7] Justin Siken, *List of All Contracts Terminated by DOGE*, HigherGov (May 6, 2025), https://perma.cc/FBY9-YQHA.

[8] Letter from Sen. Peters and Sen. Durbin to Kristi Noem, Sec'y of Homeland Sec. (Mar. 13, 2025), https://perma.cc/2664-U46Y.

administrative leave and could not respond.  *Id.*  Nor were they permitted to hand off their pending caseloads or make plans to transfer work to others.  A. Doe Decl. ¶ 18 (PLFS 159).

More recently, complainants have started receiving an automated response via email when a new complaint is opened on the OIDO online portal.  The Kino Border Initiative submitted an online complaint with OIDO on April 24, 2025, and received an email stating, "Thank you for your message.  The Office of the Immigration Detention Ombudsman has been abolished and is no longer operational.  Consequently, this inbox will not be monitored."  Horan Decl. ¶ 6 & Ex. G (PLFS 183, 187).

On Sunday, April 27, three days after this case was filed, employees from all three DHS Oversight Offices were notified that their access to email and other IT systems would be cut off the next day and that they would be required to return computers and other government equipment later that week.  Vitullo Decl. ¶ 15 (PLFS 178).  At an April 28 meeting at which these close-out procedures were discussed, the Acting OIDO Ombudsman noted that she would be shredding lots of her documents and instructed other OIDO employees with "shred material" to take it to a government building or shred it themselves.  *Id.* ¶ 16 (PLFS 178-79).  The Acting Ombudsman added that she had tried, unsuccessfully, to schedule a meeting where Records Management could explain document handling procedures to the employees.  *Id.*[9]  The rushed nature of the shutdown has left OIDO employees concerned that handwritten case notes and other government records will be, or have already been, destroyed.  *Id.*

---

[9] On Friday, May 2, after counsel for Plaintiffs had contacted counsel for Defendants to express concerns about the discussion of document shredding, a clarifying email was sent out to all OIDO personnel reminding them of their obligations to preserve official government records. Vitullo Decl. Ex. F (PLFS 179g).

As detention facilities grow increasingly crowded, OIDO employees also worry that detained people will needlessly suffer and may even die without OIDO's on-the-ground monitoring and assistance. *Id.* ¶ 17 (PLFS 179). CIS Ombudsman employees worry that CIS will function less efficiently and effectively without the Ombudsman's Office's help, and that thousands of cases will fall through the cracks. A. Doe Decl. ¶¶ 21–23 (PLFS 160); Rogers Decl. ¶¶ 16–18 (PLFS 172-73). Finally, a former employee of CRCL with more than a decade of agency experience observed that the dissolution of CRCL "will … increase exposure to constitutional and statutory violations" and "create[] long-term risks for DHS and everyone who interacts with DHS." Fleischaker Decl. ¶¶ 48–49 (PLFS 150); Decl. of Mayra Jones (Jones Decl.) ¶¶ 11-16 (PLFS 196) (describing impacts of CRCL dissolution).

## LEGAL STANDARD

To obtain a preliminary injunction, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the preliminary injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). In actions to enjoin the government, the final two preliminary-injunction factors—balancing the equities and the public interest—merge. *Pursuing Am.'s Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

### III. Plaintiffs are likely to succeed on the merits.

#### A. Plaintiffs have shown a likelihood of standing.

A plaintiff seeking a preliminary injunction must show a substantial likelihood of standing. *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019). A membership-

based organization like SBCC may establish standing in one of two ways: by asserting an injury

to itself (organizational standing) or an injury to one of its members (associational standing).

*Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016).  Here, all three plaintiffs

have organizational standing, and SBCC also has associational standing on behalf of its members.

### 1.  Plaintiffs have organizational standing.

An organization establishes standing to sue on its own behalf in the same way as an

individual plaintiff: by "show[ing] actual or threatened injury in fact that is fairly traceable to the

alleged illegal action and likely to be redressed by a favorable court decision."  *Food and Water*

*Watch, Inc. v. Vilsack,* 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks omitted).  An

organization cannot assert standing based merely on "a setback to [its] abstract social interests" or

its opposition to the defendant's actions.  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394

(2024).  Rather, it must show that the defendant's actions "perceptibly impaired" its ability to

perform its core activities.  *Id.* at 395 (citing *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1983)).

The D.C. Circuit has developed a two-part test to determine whether an organization has

standing based on injury to its activities: First, the court asks whether the agency's act or omission

"'injured the [organization's] interest' and, second, whether the organization 'used its resources to

counteract that harm.'"  *People for the Ethical Treatment of Animals v. USDA,* 797 F.3d 1087,

1094 (D.C. Cir. 2015) (*PETA*) (quoting *Equal Rts. Ctr. v. Post Props., Inc.,* 633 F.3d 1136, 1140

(D.C. Cir. 2011)).  To ensure that the alleged injury to the organization's interest is sufficiently

concrete and particularized, courts focus on whether the organization alleges that the challenged

actions have "inhibit[ed] their daily operations" and "perceptibly impaired" the organization's

ability to engage in specific activities core to advancing its mission.  *Id.* at 1094–95 (citations

omitted).  In *PETA,* for example, the plaintiff organization had standing where the Department of

Agriculture's failure to apply animal-welfare protections to birds injured the organization's interest in protecting animals from cruel and inhumane treatment by preventing the organization from filing complaints with the agency about bird abuse and by depriving it of relevant information, and where the organization alleged that it had expended resources to counter those injuries. *Id.*

Here, Defendants' actions in shutting down the DHS Oversight Agencies have injured all three plaintiffs' interests in concrete, particularized ways, impacting their daily operations and their ability to engage in core activities. Plaintiff RFK has filed complaints for hundreds of detained people with CRCL and OIDO regarding civil and human rights abuses that it learned about during visits to immigration detention centers, finding such complaints to be "an effective means to further [its] core mission to expose and stop" human rights violations, especially in situations where ICE staff at the detention facilities are unresponsive to RFK's direct requests and where litigation is not a feasible option given the organization's limited resources. Enriquez Decl. ¶ 8 (PLFS 4); *see id.* ¶¶ 4, 7 (PLFS 2-3) (describing organization's small staff and limited litigation capacity). Such complaints have sometimes obviated the need for costly litigation by yielding immediate changes to conditions, *id.* ¶ 9 (PLFS 4-5), and they have had a deterrent effect by making ICE personnel aware that their actions are under scrutiny, *id.* ¶¶ 10–11 (PLFS 5). In addition to filing complaints, RFK relies on investigatory memos published on CRCL's website in its work to raise public awareness of human rights abuses in immigration detention and in its filings in federal court and with United Nations human rights bodies. *Id.* ¶ 12 (PLFS 6).

Defendants' actions have perceptibly impaired RFK's ability to seek redress for human rights abuses through filing complaints with CRCL and OIDO and deprived it of information key to its educational and advocacy efforts, by both removing that information from CRCL's website and sidelining staff who would otherwise be available to respond to RFK's Freedom of

Information Act (FOIA) requests.  *Id.* ¶¶ 13–15 (PLFS 6-7).  These are precisely the sorts of organizational injuries that the D.C. Circuit found sufficient to confer standing in *PETA*.  797 F.3d at 1094–95.

Plaintiff SBCC has also filed complaints with CRCL regarding human rights abuses. Those complaints focused on conditions at the US-Mexico border and the actions of CBP officials at the open-air detention sites it created there in 2023.  Serrano Decl. ¶ 8 & Exs. A, B (PLFS 17, 23, 44).  CRCL opened an investigation and conducted a site visit after SBCC filed these complaints, *id.* ¶ 9 & Ex. C (PLFS 17-18, 132), and those complaints, along with CRCL's response, drew attention to the conditions at the open-air detention sites and, in SBCC's view, spurred changes to CBP's behavior and led to improved conditions there, *id.* ¶ 10 (PLFS 18).  Filing complaints with CRCL, as well as participating in CRCL's public engagement efforts in the community as a forum to raise issues of ongoing concern, have furthered SBCC's ability to accomplish its mission of improving the quality of life in border communities.  *Id.* ¶¶ 10–12 (PLFS 18-19).  SBCC has also used the fact that CBP is required to report on deaths involving CBP personnel to CRCL, and that CRCL is generally more responsive and accessible than CBP itself, to engage with CRCL regarding fatal encounters between CBP officers and members of the public, including migrants and border residents, including the proper Use of Force standard for CBP agents.  This furthers its mission of seeking to prevent loss of life in the border region.  *Id.* ¶ 11 (PLFS 18).

Defendants' actions to dissolve CRCL, and specifically to prevent CRCL from responding to complaints with on-site inspections and conducting the sorts of public engagement efforts on which SBCC has relied, by eliminating nearly all of its staff, have concretely injured SBCC's "daily operations" and the "specific work in which they are engaged."  *PETA*, 797 F.3d at 1094

(quoting *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1987)); *see* Serrano Decl. ¶¶ 13–14 (PLFS 19) (describing impacts that CRCL's closure will have on SBCC's activities).

Finally, lawyers with Plaintiff UJC's Domestic Violence Project file requests for case assistance with the CIS Ombudsman's Office approximately twelve times per year, when petitions for immigration relief they have filed on behalf of their clients have been pending with CIS longer than the standard processing time or when CIS has made an error with respect to one of those petitions. Decl. of Joy Ziegeweid (Ziegeweid Decl.) ¶ 7 (PLFS 11). CIS Ombudsman intervention has often resulted in UJC clients' petitions reaching final adjudication when they had previously been languishing with CIS for years. *Id.* UJC's Domestic Violence Project created its immigration law unit in 2017 to respond to the fact that undocumented status often prevented survivors from escaping abusive situations because of the legal and economic leverage it afforded abusers. *Id.* ¶¶ 5–6 (PLFS 10). Accordingly, being able to pursue legal status for their domestic violence survivor clients is crucial to UJC's ability to fulfill its mission of providing comprehensive services to that community. *Id.* ¶ 11 (PLFS 13). Similar concerns about abusers' ability to use immigration status as a cudgel make the continued viability of 8 U.S.C. § 1367 vital to UJC's ability to gain its clients' trust and provide them with effective representation, so UJC lawyers must be able to enforce that provision by filing complaints with CRCL when CIS personnel violate its confidentiality guarantees. Ziegeweid Decl. ¶¶ 12–14 (PLFS 13-14).

Defendants' actions in shutting down the CIS Ombudsman's Office and in preventing CRCL from continuing to train other DHS components in the requirements of 8 U.S.C. §1367 and to investigate complaints when that provision is violated make UJC's representation of its clients more difficult and time-consuming, and threaten to decrease the number of clients UJC will be

able to represent, Ziegeweid Decl. ¶ 10 (PLFS 12-13)—types of injuries that confer standing. *See Cath. Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Review,* 513 F. Supp. 3d 154, 170 (D.D.C. 2021) (holding at preliminary-injunction stage that declarations describing loss of clients and diversion of resources away from direct client service constituted "concrete drains on" the organization's "time and resources" sufficient to establish Article III standing); *N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46–47 (D.D.C. 2020) (holding at preliminary-injunction stage that legal organizations had standing to challenge a rule that they averred would make it more difficult to serve their existing clients and require them to spend more time serving each client, consequently reducing the number of clients they could serve).

All three plaintiffs have also established that they will expend additional resources to counteract the injuries caused by Defendants' actions, if those actions are not enjoined. RFK will be required to spend more time traveling to immigration detention facilities and more money on litigation to resolve complaints that would have previously been addressed by the DHS Oversight Offices. Enriquez Decl. ¶ 15 (PLFS 7). SBCC will be required to engage directly with CBP around border policy matters, even though it has found such direct engagement with CBP to be less effective than engagement with CRCL. Serrano Decl. ¶ 14 (PLFS 19). And UJC lawyers will be required to use CIS's email hotlines or help their clients to use CIS's 1-800 contact center to obtain case information, even though these methods are slower, more burdensome, and often less effective than requesting assistance from the CIS Ombudsman's Office. Ziegeweid Decl. ¶¶ 8–9 (PLFS 11-12). These resource expenditures are like those the D.C. Circuit found to satisfy the second factor in *PETA*, 797 F.3d at 1095–96 (describing PETA's expenditure of resources to investigate "alternative means" of seeking redress for mistreated birds, and its filing of complaints

with other "local, state, or federal agencies" because the Department of Agriculture would not act on its complaints of avian abuse under the Animal Welfare Act).

In addition to the injuries caused to RFK by Defendants' interference with its core activities, Plaintiff RFK has also suffered an informational injury. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (injury in fact for Article III standing purposes is the "inability to obtain information" that, on the plaintiffs' view, "the statute requires" be made public). Specifically, CRCL is required to inform the public of its activities and to "make [its] reports … available to the public to the greatest extent that is consistent with the protection of classified information and applicable law."  42 U.S.C. § 2000ee-1(g).  Plaintiff RFK has relied on the investigatory findings CRCL previously made available on its website regarding conditions in immigration detention facilities, citing these findings to bolster RFK's own contentions about human rights abuses in immigration detention facilities.  Enriquez Decl. ¶ 12 (PLFS 6).  Losing access to this information, which Congress intended to be made publicly available "to the greatest extent that is consistent with . . . applicable law," 42 U.S.C. § 2000ee-1(g), has subjected RFK "to the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  This is sufficient to establish informational injury.

All three plaintiffs have thus suffered injuries in fact that are actual or imminent through the dissolution of the DHS Oversight Agencies.  Moreover, these injuries are traceable to Defendants' actions ordering the offices to be shuttered and their work to cease, and a court order reversing those actions and ordering a resumption of the DHS Oversight Offices' statutory functions would redress those injuries.  *See Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381, 2025 WL 942772, at *18 (D.D.C. Mar. 28, 2025) (*NTEU*), *stay denied in relevant part,* No. 25-5091 (D.C. Cir. Apr. 11, 2025; as modified Apr. 28, 2025) (finding plaintiffs' injuries traceable

to the defendants' actions to shut down the Consumer Financial Protection Bureau, including order to employees to stop work and plans to implement widespread RIF, and likely to be redressed by a court order halting those actions). Thus, all three elements of organizational standing are present.

### 2. SBCC has associational standing.

In addition to its organizational standing, SBCC has associational standing to bring this action on behalf of its members. A membership organization may assert associational standing if "'(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation.'" *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 32 (D.D.C. 2024) (quoting *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022)). Each of these requirements is satisfied here.

First, the accompanying declarations of Pedro Rios, Margaret Cargioli, Sister Tracy Horan, and Laura St. John establish that at least four SBCC member organizations are suffering injuries in fact from the dissolution of the DHS Oversight Offices and would have standing to sue in their own right. The American Friends Service Committee's U.S.-Mexico Border Program, a member of SBCC, documents its observations of conditions at the border to further its mission of promoting human rights, and is harmed by the inability to continue filing complaints based on those observations, and otherwise engaging, with CRCL and OIDO. Decl. of Pedro Rios (Rios Decl.) ¶¶ 3–9 (PLFS 136-38). SBCC member Immigrant Defenders Law Center (ImmDef), a social justice law firm representing immigrants, has obtained relief for its clients through engaging with all three DHS Oversight Offices, and the loss of these means of serving its clients' interests will make it more difficult for ImmDef lawyers to do their jobs. Cargioli Decl. ¶¶ 3–8, 15 (PLFS 138-

39, 142). ImmDef also relies on information provided by CRCL, including information about complaints posted on its website, thus establishing standing for SBCC to pursue this informational injury on ImmDef's behalf. Cargioli Decl. ¶¶ 9–10 (PLFS 140-41); *see also Doctors for Am. v. Office of Personnel Mgmt.*, No. 25-cv-322, 2025 WL 452707, at *4 (D.D.C. Feb. 11, 2025) (holding that a professional association had standing based on denial of information that would impact its members' ability to do their jobs). SBCC member Kino Border Initiative, a faith-based organization assisting migrants on both sides of the border that has filed hundreds of complaints with CRCL and OIDO on behalf of migrants being served at its shelter in Nogales, Sonora, Mexico, is injured because it can no longer file such complaints on behalf of the migrants who are reaching its shelter now and reporting deteriorating and dangerous conditions in U.S. detention facilities. Horan Decl. ¶¶ 3, 7 (PLFS 181, 183-85). And Florence Immigrant and Refugee Rights Project, also an SBCC member, has filed over 400 complaints with CRCL and over 100 complaints with OIDO on behalf of children and adults in immigration detention facilities and is harmed by the lack of any ongoing mechanism for reporting urgent issues experienced by the detained people it serves. St. John Decl. ¶¶ 3–16 (PLFS 188-93).

As with the injuries to SBCC and the other plaintiffs as organizations, these injuries to SBCC members are traceable to Defendants' dissolution of the DHS Oversight Offices and their order to employees that work on those offices' statutory functions cease. An order requiring those functions to be resumed would redress those harms.

The other two elements of associational standing are easily met as well. This action is germane to SBCC's mission of seeking to improve living conditions and prevent loss of life on and around the southern border. Serrano Decl. ¶ 7 (PLFS 17). And because the suit "turns entirely on whether [the agency] complied with its statutory obligations, and the relief [SBCC] seeks is

invalidation of agency action," rather than damages for any individual SBCC member, individual member participation is not necessary. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015); *see Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024) (participation of individual members unnecessary where organization sought only prospective relief and not damages).

**B.  Plaintiffs are likely to succeed on their claim that Defendants' dissolution of the DHS Oversight Offices exceeds their constitutional and statutory authority.**

Each of the three DHS Oversight Offices fulfills specific functions that were established by statute—functions that, as will be discussed in greater detail in the next section, cannot plausibly be performed by a single officer or ombudsman acting alone.  6 U.S.C. § 345 (CRCL); 6 U.S.C. § 272 (CIS Ombudsman); 6 U.S.C. § 205 (OIDO).  Each of the three offices also received a separate appropriation from Congress in 2024.  *See* Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024, at 79 (Mar. 18, 2024), https://perma.cc/UNG3-837F (providing itemized appropriations to the "Office of Civil Rights and Civil Liberties," the "Office of the Citizenship and Immigration Services Ombudsman," and the "Office of the Immigration Detention Ombudsman").  Defendants' actions to shut down these congressionally funded offices, and end their congressionally mandated functions, are *ultra vires*.

The Framers of the U.S. Constitution "divide[d] the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Immigr. & Naturalization Servs. v. Chadha*, 462 U.S. 919, 951 (1983).  Consistent with this separation of powers principle, the power to make laws rests exclusively with Congress.  *See* U.S. Const. art. I, § 1.  As part of that authority, the power to establish, reorganize, restructure, and abolish agencies likewise rests squarely with Congress.  *See Myers v. United States*, 272 U.S. 52,

129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]").

Conversely, the Constitution contains no provision authorizing the executive "to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see J. Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring) ("[T]he Executive branch may not eliminate a congressionally created and funded agency withou*t* congressional authorization.").

Here, Defendants have flouted the careful balance of powers that the Framers designed by acting unilaterally to dissolve the three DHS Oversight Offices and to end performance of their statutorily required functions.  This unilateral action also violates 6 U.S.C. § 452(b), which prohibits the Secretary of Homeland Security from "aboli[shing] any agency, entity, organizational unit, program, or function established or required to be maintained by" the Homeland Security Act or by any other statute.

Defendants' public statements explaining why they took the actions challenged here suggest that they disagree with the reasons Congress created these oversight offices, which they consider unnecessary.[10]  But the mission of DHS, as established by Congress, includes "ensur[ing] that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland."  6 U.S.C. § 111(b)(1)(G).  Moreover, Defendants' disagreement with Congress's judgment, as reflected in provisions establishing, funding, and assigning functions to the DHS Oversight Offices, does not permit Defendants to ignore or

---

[10] *See* Ximena Bustillo, *Homeland Security Makes Cuts to Civil Rights and Oversight Offices*, NPR (Mar. 21, 2025), https://perma.cc/B9HN-RWRC (quoting DHS spokesperson stating that the offices were abolished because they "obstructed immigration enforcement" and "undermin[ed] DHS's mission").

override those congressional directives. *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

Plaintiffs are thus likely to prevail on their claim that Defendants' actions usurp legislative authority conferred upon Congress by the Constitution. *See* Compl. ¶¶ 62–65, ECF No. 6; *see also Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing a right of action under the Constitution to seek injunctive relief for a separation of powers violation).

### C. Plaintiffs are likely to succeed on their Administrative Procedure Act claims.

The APA directs courts to "hold unlawful and set aside" final agency actions that are, in relevant part, (1) in excess of statutory authority; (2) contrary to law; or (3) arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706. While any one of these grounds alone would be sufficient for an injunction, the ordered dissolution of the DHS Oversight Offices is unlawful under all three and should be set aside to restore the status quo ante.

#### 1. The DHS Oversight Office dissolutions are reviewable final agency actions.

As a threshold matter, the decision to dissolve each of the DHS Oversight Offices was a discrete agency action. Although it affected numerous employees, they each received a substantively identical notice referring to the "dissolution" of their office, and were all instructed to stop performing their duties that same day. A. Doe Decl. ¶¶ 13, 15, 20 & Ex. D (PLFS 158, 159, 160, 163-67); Vitullo Decl. ¶¶ 12, 13 & Ex. E (PLFS 177, 179a); Enriquez Decl. ¶ 17 (PLFS 7). Accordingly, as of March 21, all three offices ceased performing their statutory functions. *Cf.*

*NTEU*, 2025 WL 942772, at *9 (acting CFPB Director's order to stop work was a discrete action for APA purposes).

The action is also final: It "mark[s] the consummation of the agency's decisionmaking process," and is an action that determines "rights or obligations" or "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). The decision to dissolve the offices has already been made and communicated both to employees through the RIF notices, *see* A. Doe Decl. Ex. D (PLFS 163-67); Vitullo Decl. Ex. E (PLFS 179a), *Enriquez Decl.* ¶ 17 (PLFS 7), and to the public through a DHS spokesperson. *See also* Horan Decl. Ex. G (PLFS 187) (automated email response to OIDO complaint stating that the OIDO "is no longer operational"). As part of that decision, the planned terminations of virtually all employees of the three offices are likewise neither tentative nor conditional, and they undeniably create legal consequences for the employees and for DHS itself. *See, e.g.*, *Maryland v. USDA*, Civil No. JKB-25-0748, 2025 WL 800216, at *11 (D. Md. Mar. 13, 2025) ("[A]ny agency's decision to dismiss an employee effects self-evident legal consequences for both parties and plainly marks the end of the agency's decisionmaking with respect to the employee involved."), *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17, 2025).

### 2. The DHS Oversight Office dissolutions exceed Defendants' statutory authority.

No statute authorizes Defendants to eliminate the DHS Oversight Offices and to force them to cease their work on activities that they are statutorily required to perform. Although Secretary Noem has authority to "reallocate functions" among officers and to "consolidate" or "discontinue organizational units" within DHS, 6 U.S.C. § 452(a), these reorganization authorities have two important limitations pertinent here.

First, the reorganization authority in 6 U.S.C. § 452(a) "does not extend" to the "abolition" of any "entity, organizational unit, program, or function" that was "established" or "required to be maintained" by statute. 6 U.S.C. § 452(b)(2). This provision thus codifies in statute the separation of powers principle discussed in part I.B, *supra*, that the executive may not unilaterally eliminate a function that Congress created.

Second, even for those reorganizations of functions that the Secretary may perform because they do not involve a statutory establishment or requirement, the Secretary must provide 60 days' notice to the relevant congressional committees before making such a change, "which shall include an explanation of the rationale for the action." 6 U.S.C. § 452(a)(2). Defendants provided no notice whatsoever before dissolving the DHS Oversight Offices, and so even if these dissolutions fell within the scope of the Secretary's reauthorization authority—which they do not—they were additionally unlawful because they were made without the required 60-day prior notice to Congress. Thus, these actions exceeded Defendants' statutory authority and may be set aside under 5 U.S.C. § 706(2)(C).

### 3. The DHS Oversight Office dissolutions were contrary to law.

The APA instructs reviewing courts to vacate and set aside agency action that is contrary to law. 5 U.S.C. § 706(2). Defendants' action in ordering a work stoppage to dissolve the DHS Oversight Offices was contrary to law in at least three respects.

**a.** Each of the DHS Oversight Offices is charged with carrying out numerous statutory functions. Defendants' action has prevented the offices from performing their required functions.

First, the Homeland Security Act requires CRCL to "review and assess information alleging abuses of civil rights [and] civil liberties" committed by "employees or officials" of DHS and to report annually to Congress on those allegations. 6 U.S.C. § 345(a)(1), (b). Although the

statute refers to the "Officer for Civil Rights and Civil Liberties," *id*. § 345(a), rather than the office, these statutory functions require far more staff and infrastructure than a single officer. The allegations brought to CRCL pursuant to its statutory directive address violations by any of DHS's 260,000 employees of their constitutional, statutory, and regulatory obligations, including under section 504 of the Rehabilitation Act of 1973, 6 C.F.R. § 15.70; the Prison Rape Elimination Act of 2003, 34 U.S.C. §§ 30301 *et seq.*; the Violence Against Women Reauthorization Act of 2013, 8 U.S.C. § 1367; and several employment-discrimination statutes. The sheer "volume of complaints alone—hundreds received annually—requires a dedicated staff for intake, triage, investigation, and follow-up." Fleischaker Decl. ¶ 36 (PLFS 148). Even with a dedicated staff and a rigorous triaging process, only "approximately 20%" of complaints received by CRCL "could be formally investigated due to limited resources." *Id.* ¶¶ 8–9, 36 (PLFS 144).

Moreover, CRCL's "work extended far beyond resolving individual grievances." *Id.* ¶ 12 (PLFS 145). Congress has expanded CRCL's statutory mandate multiple times, to include developing and implementing "policies and procedures to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities," 6 U.S.C. § 345(a)(3); "oversee[ing] compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by programs and activities of the Department," *id.* § 345(a)(4); and providing detailed annual reports about complaints and responses to complaints, 42 U.S.C. § 2000ee-1(f)–(g). Lest there be any doubt, Congress specified that CRCL must have adequate "resources" to carry out all of its required functions. *Id.* § 2000ee-1(d)(1). CRCL must carry out these functions with respect to the programs and activities of DHS, which employs more than 260,000 workers and exercises broad authority "spanning immigration enforcement, criminal investigations, border security, emergency

management, intelligence analysis, and transportation security."  Fleischaker Decl. ¶ 34 (PLFS 147).  CRCL is also responsible for conducting certain analyses and reports regarding every state or local jurisdiction exercising delegated law enforcement authority under 8 U.S.C. § 1357(g) and ensuring that all recipients of DHS grants are complying with their civil rights obligations.[11]  To advance their objective of shuttering CRCL, Defendants have cut CRCL from 150 employees to three.  A. Doe Decl. ¶ 20 (PLFS 160).  Their action makes the performance of CRCL's statutory functions impossible.

Second, the CIS Ombudsman Office, comprising approximately 44 employees, likewise represents a relatively small team carrying out extensive statutory functions.  That office's statutory mandate is three-pronged: "to assist individuals and employers in resolving problems with [CIS]"; "to identify areas in which individuals and employers have problems in dealing with [CIS]"; and "to propose changes in the administrative practices of [CIS] to mitigate problems identified" by the office.  6 U.S.C. § 272(b)(1)–(3).  In addition, the Ombudsman must meet regularly with the director of CIS and prepare a detailed annual report to Congress, which must include "a summary of the most pervasive and serious problems encountered by individuals and employers" as well as a list of recommendations for improving CIS practices and the status of action or inaction on those recommendations.  *Id.* § 272(c)(1).

To assist with "resolving problems" with CIS, *id.* § 272(b)(1), the CIS Ombudsman Office employed approximately 20 analysts who process, investigate, and resolve complaints filed with the office.  A. Doe Decl. ¶ 7(a) (PLFS 153).  In 2024, the office received about 25,000 complaints, approximately 40% of which required resolution with CIS.  *Id.*  The Office also included a public

---

[11] Dep't of Homeland Sec., *Civil Rights Resources for Recipients of DHS Financial Assistance*, https://perma.cc/LMW6-5242.

engagement division, which "identif[ies] areas in which individuals and employers have problems in dealing with [CIS]" through nationwide engagement with stakeholders ranging from businesses and universities to nonprofits and individuals who interact with CIS.  *Id.* ¶ 8 (PLFS 155-56) (quoting 6 U.S.C. § 272(b)(2)).  The Office's policy division examines the information received from both casework and public engagement and conducts its own research to identify significant systemic issues, in furtherance of its statutory duty to "propose changes in the administrative practices of USCIS to mitigate [the] problems identified." *Id.* ¶ 9 (PLFS 156-58) (quoting 6 U.S.C. § 272(b)(3)).  By reducing the staff of the CIS Ombudsman Office to one person, Defendants have made it impossible to carry out these statutory duties.

Finally, the statutorily mandated functions of OIDO are not only far more than a single person could handle but also geographically dispersed. In order to "receive, investigate, resolve, and provide redress" for misconduct and violations of the rights of individuals in immigration detention, 6 U.S.C. § 205(b)(1), OIDO employees have an established, continuing presence at nearly 100 detention facilities around the United States,[12] *see* Vitullo Decl. ¶ 3 (PLFS 174-75). Congress has mandated that OIDO and its "designated personnel" shall have "unfettered access" to detention facilities and records and the ability to meet with detainees privately.  6 U.S.C. § 205(c).  This access and frequent presence allow individual OIDO case managers to build rapport with detainees in order to effectively carry out their statutory functions.  With case workers covering multiple detention facilities, sometimes over large geographic areas, and conducting eight to ten interviews per day while also touring the facility to make observations, *see* Vitullo Decl. ¶¶ 3–4 (PLFS 174-75), even shrinking the OIDO workforce could be devastating to the office's

---

[12] Dep't of Homeland Sec., *About the Office of the Immigration Detention Ombudsman (OIDO)*, https://perma.cc/82DC-K8HG (archived Apr. 21, 2025).

ability to fulfill its statutory mandate to address misconduct and rights violations affecting detained people.  By terminating every one of its employees, Defendants have eliminated this statutorily mandated office entirely.

In sum, Defendants' decision to abolish the DHS Oversight Offices runs counter to express statutory directives.  Plaintiffs are therefore likely to succeed on their claim that the decision is contrary to law.

**b.**  Defendants' actions also violate the statutory provisions requiring that DHS leadership ensure that CRCL has sufficient "resources" to perform its required functions, 42 U.S.C. § 2000ee-1(d)(1), and requiring agency leadership to cooperate with the Ombudsman's offices, such as by acting promptly on their recommendations and providing OIDO with "unfettered" access to detained people and relevant records. 6 U.S.C. §§ 205(c), (d); *id.* § 272(f).  Congress explicitly required components of DHS to consult with CRCL about various issues related to civil liberties and civil rights, charged the ombudsman's offices with being independent from the rest of DHS, and charged other DHS components with cooperating with the oversight offices.  Congress thus designed the statutory structure to build some internal checks and balances into DHS.  Defendants cannot unilaterally remove the guardrails that Congress created.

**c.**  Finally, by halting the DHS Oversight Offices' activities and preparing to terminate their employees, Defendants have also likely violated appropriations law.  "Where the executive has policy reasons ... for wanting to spend less than the full amount appropriated by Congress for a particular project or program, … even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill," pursuant to the Congressional Budget and Impoundment Control Act of 1974 (ICA), 2 U.S.C. § 683. *See also In re Aiken County*, 725 F.3d

255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).   Absent compliance with that procedure, congressionally appropriated funds "shall be made available for obligation."  2 U.S.C. § 683(b). Because none of the ICA's statutory preconditions have been satisfied, Defendants lack authority to withhold appropriated funds, as they are doing here by preparing to separate all but four employees of the three offices.  *See Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-400, 2025 WL 752378, at *15–17 (D.D.C. Mar. 10, 2025).  To the extent Defendants are simply holding onto the appropriated funds, that is also prohibited by the Antideficiency Act.   The executive branch may reserve appropriated funds "only … to provide for contingencies; … to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or … as specifically provided by law."  31 U.S.C. § 1512(c)(1).  Defendants have not identified any contingencies or sources of law that justify holding appropriated funds for the three DHS Oversight Offices in reserve.

### 4.   Defendants' action was arbitrary and capricious.

The APA "requires agencies to engage in 'reasoned decisionmaking.'"  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  To do so, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Courts reviewing agency action for compliance with this standard "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (cleaned up).  Where an agency fails "to consider or to adequately analyze the … consequences of" its actions, it has failed to engage in reasoned decisionmaking.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

Thus, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Here, abolishing the DHS Oversight Offices, effectuated through the blanket terminations of virtually all employees and ordered cessation of work by both employees and contractors, was arbitrary and capricious in multiple respects. To start, it was not substantively reasonable because, as discussed in the previous section, it left at most four employees to carry out a myriad of statutory functions without adequate resources to do so, meaning that statutory functions for the three DHS Oversight Offices were effectively ceased. *See supra* section I.C.3(a).

Nor was the decision reasonably explained. The reason given in the RIF notices for the offices' "dissolution" is that the offices' "positions or functions [were] identified as non-essential or not legally mandated." A. Doe Decl. Ex. D (PLFS 163-67); Vitullo Decl. Ex. E (PLFS 179a); Enriquez Decl. ¶ 17 (PLFS 7). This threadbare explanation runs directly "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. As explained above, each of the three offices has extensive and detailed statutory mandates. Those statutory mandates cannot be reconciled with Defendants' apparent conclusion that all of the offices' employees—and indeed the very existence of the offices—are "non-essential or not legally mandated."

Defendants also failed to consider serious reliance interests. "When an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (internal quotation marks omitted). Here, Defendants neglected to consider the reliance interests of stakeholders who interact with the DHS Oversight Offices and who depend on the assistance and information they provide. For example, Plaintiffs, among others, have "historically relied on

CRCL as a trusted interlocutor" with DHS, Fleischaker Decl. ¶ 30 (PLFS 147); Serrano Decl. ¶¶ 11–12 (PLFS 12); Jones Decl. ¶¶ 12-13 (PLFS 196); have relied on the CIS Ombudsman Office as a final avenue for resolution of issues with CIS, A. Doe Decl. ¶¶ 18–22 (PLFS 159-60); Ziegeweid Decl. ¶ 7 (PLFS 11); Fallon Decl. ¶ 6 (PLFS 215-16); Decl. Of Christine Brito (Brito Decl.) ¶¶ 3-4 (PLFS 200-01); and have relied on OIDO to bring to light issues within immigration detention facilities, Vitullo Decl. ¶ 17 (PLFS 179); St. John Decl. ¶¶ 12, 16 (PLFS 191, 193).

In addition, Defendants "failed to consider [another] important aspect of the problem," *State Farm*, 463 U.S. at 43, by overlooking the harm to individuals who experience misconduct or violations of their rights in DHS custody and will no longer have CRCL or OIDO as a critical avenue for redress.  *See* Fleischaker Decl. ¶ 27 (PLFS 146); Vitullo Decl. ¶¶ 6–8 (PLFS 175-76); Decl. Of Alicia de la O (de la O Decl.) ¶¶ 2-5 (PLFS 198-99); Horan Decl. ¶¶ 7–8 (PLFS 183-85). *See also* Lakhani Decl. ¶¶ 7–9 (PLFS 206-07) (describing vital role of CRCL and OIDO in responding to complaints of sexual assault in detention facilities).  Defendants likewise neglected to consider the community members who relied on CRCL's public engagement efforts for vital information, Rios Decl. ¶¶ 5–8 (PLFS 137-38), or who relied on the investigatory reports and other documents formerly published on CRCL's website, Enriquez Decl. ¶¶ 12–13 (PLFS 6); Cargioli Decl. ¶ 9 (PLFS 140-41).  Nor did they consider the interests of the individuals who had complaints pending with one or more of these offices when they ordered all work at the offices to stop.  *See* Cargioli Decl. ¶ 13 (PLFS 142); Ziegeweid Decl. ¶ 13 (PLFS 13-14); Horan Decl. ¶ 6 (PLFS 183); Jones Decl. ¶¶ 9-11 (PLFS 195-96); Brito Decl. ¶ 5 (PLFS 201).  These failures are compounded by the immediate placement of the offices' employees on administrative leave, without the ability to inform customers or stakeholders, much less wind down their ongoing work.  Defendants utterly failed to consider "[t]he consequences of [their actions]," which "would radiate outward" to

individuals, organizations, and the public. *Regents of the Univ. of Cal.*, 591 U.S. at 31 (internal quotation marks omitted).

For all these reasons, Plaintiffs are likely to succeed on the merits of their claim that abolishing the DHS oversight offices was arbitrary and capricious. *See NTEU*, 2025 WL 942772, at *40 (finding that the plaintiffs were likely to succeed on the merits of their APA claim where "there was little or no analysis undertaken before the employees were ordered to put their pencils down").

## IV.    Plaintiffs will suffer irreparable harm absent a preliminary injunction.

Plaintiffs are suffering, and will continue to suffer, irreparable injury from Defendants' dissolution of the DHS Oversight Offices. "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). When the plaintiff is an organization, harm occurs when the defendants' actions "perceptibly impair[]" the plaintiff's programs by making it "more difficult" for them to conduct their activities. *League of Women Voters of U.S. v.* Newby, 838 F.3d 1, 8 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Plaintiffs have made that showing, as explained above. *See* part I.A, *supra*. Defendants' actions also directly conflict with Plaintiffs' missions, leaving no doubt that the irreparable harms they are suffering are caused by Defendants and are not self-inflicted injuries. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

Here, the additional time that RFK must spend traveling to detention facilities and engaging in advocacy with ICE on behalf of detained people, Enriquez Decl. ¶ 15 (PLFS 7), the additional efforts SBCC must make seeking information and assistance from CBP regarding border conditions, Serrano Decl. ¶ 14 (PLFS 19), and the additional time UJC lawyers will spend on less effective CIS customer service mechanisms in trying to get answers for their clients, Ziegeweid

Decl. ¶¶ 8–10 (PLFS 11-12), are all injuries caused by Defendants' actions and all relate directly to Plaintiffs' missions (protecting human rights of detained people for RFK, promoting human rights and living conditions on the southern border for SBCC, and serving the legal needs of domestic violence survivors for UJC). Because Defendants' actions perceptibly impair Plaintiffs' ability to conduct their core activities and directly conflict with their missions, Plaintiffs are suffering irreparable injury, and a preliminary injunction is warranted. Indeed, the urgency of Plaintiffs' injuries is placed in particularly sharp relief by the impending May 23 separation date for nearly all employees of the DHS Oversight Offices. Once those separations become permanent, it will become substantially more difficult for these offices to resume any semblance of normal functioning, and the perceptible impairment to Plaintiffs' activities will be heightened and will last longer as a result.

In addition, RFK is suffering reputational harm because the government reports it has pointed to as corroboration for its own statements about human rights violations in immigration detention have been removed from the public domain, undermining its credibility. Enriquez Decl. ¶ 13 (PLFS 6); *see Brodie v. HHS*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) (recognizing that harm to reputation can be irreparable). It also faces the prospect of losing funding because of needing to divert resources to more immigration-related advocacy, thus impairing its ability to "respond to other emergent threats to human rights," Enriquez Decl. ¶ 16 (PLFS 7). UJC also suffers reputational and professional harm because it must spend more time on each client's case but with less to show for that time in terms of immigration outcomes. Ziegeweid Decl. ¶ 10–11 (PLFS 12-13).

These injuries are not "theoretical" and are so "imminent" as to create a "clear and present need" for equitable relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Because the

employees of these three offices have been placed on administrative leave pending the RIF, no statutorily mandated work is being performed, and the employees are slated for termination on May 23, which will make this work stoppage permanent.  UJC currently has a complaint pending with CRCL but has received no response, leaving them with nothing to tell their domestic violence survivor client whose abusive spouse has been able to use confidential information against her with impunity.  Ziegeweid Decl. ¶ 13 (PLFS 13-14).  SBCC member ImmDef similarly has filed complaints for clients with the DHS Oversight Offices about which it has received no updates since they were closed, s*ee* Cargioli Decl. ¶ 14–15 (PLFS 142), while SBCC member Kino Border Initiative has had a complaint it attempted to file with OIDO rejected and lacks clarity about what to tell migrants who wish to report their mistreatment but can no longer use the DHS Oversight Offices to do so, Horan Decl. ¶¶ 7–8 (PLFS 183-85).  Finally, SBCC itself would currently be engaging with CRCL and perhaps filing a complaint about the potential use of the Roosevelt Reservation as an open-air detention site near the border, but cannot do so because CRCL has ceased operations, Serrano Decl. ¶ 13 (PLFS 19).  Plaintiffs and SBCC's members will obtain no help or relief on these complaints, or any others, if the DHS Oversight Offices are dissolved and all of their employees terminated.

These irreparable harms to Plaintiffs will continue unless this Court intervenes to order a resumption of the statutorily required functions of the DHS Oversight Offices.  Waiting to afford relief until the end of the case is not a viable option.  *See NTEU*, 2025 WL 942772, at *41 ("Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation.").

## V.    The balance of equities and the public interest support a preliminary injunction.

Finally, the balance of equities and the public interest support Plaintiffs' requested relief.  "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'"  *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)).  And given that the three DHS Oversight Offices have statutory functions they must perform and have already had their funding appropriated by Congress, it is difficult to fathom how Defendants will be harmed by merely undoing the March 21, 2025, stop-work order and allowing the offices to resume operation.

On the other side of the ledger, DHS has become the locus of serious civil rights and civil liberty questions precisely at the time the DHS Oversight Offices have been shuttered. Immigration detention facilities are growing increasingly crowded as the number of detained individuals in the United States approaches 50,000, more than 10,000 above the number in immigration detention when President Trump took office.[13]  But even though OIDO was created by Congress to provide on-the-ground surveillance of conditions in those facilities, it is now unable to do so.  At the same time, novel questions are emerging about the ability to revoke legal status for constitutionally protected speech[14] and the due process rights of people being deported under the rarely invoked Alien Enemies Act.  And as these important constitutional questions percolate through the national consciousness, with DHS at the center of them, the entity that Congress established within DHS to "oversee compliance with constitutional, statutory … and other requirements relating to the civil rights and civil liberties of individuals affected by" DHS activities has been relegated to the sidelines. 6 U.S.C. § 345(a)(4).

All three DHS Oversight Offices have public-facing components.  They take complaints from the public and are required to provide information to the public about their activities and about the complaints they have received, through public engagement activities and by publishing

---

[13] *ICE Detainees*, TRACImmigration, https://perma.cc/8YVB-WNT4 (archived May 7, 2025).

[14] David J. Bier, *US Citizens Don't Have First Amendment Rights if Noncitizens Don't*, Cato Inst.: Cato at Liberty Blog (Apr. 15, 2025), https://perma.cc/U5AM-73SX.

periodic reports.  This statutory requirement to serve as conduits to the public, bringing increased transparency to an otherwise opaque DHS bureaucracy, enables people to better understand what the government is doing.  It also provides a modicum of accountability for DHS officials and a voice for vulnerable populations who would otherwise have few if any avenues for reporting what is happening to them.

Individuals with decades of experience in government, in legal services, and in immigration advocacy are sounding the alarm about the crucial roles of the DHS Oversight Offices, and the danger resulting from their absence at this particular moment.  *See* Horan Decl. ¶¶ 7–8 (183-85) (leader at Kino Border Initiative stating that migrants reaching KBI's shelter in Mexico are reporting being given rotten food and being forced to sleep on the floor in overcrowded U.S. detention facilities); Fleischaker Decl. ¶¶ 47–49 (PLFS 150) (former CRCL official discussing concern that "the absence of CRCL's functions will weaken DHS's operational effectiveness, increase exposure to constitutional and statutory violations, and damage the Department's standing with the American people"; Lakhani Decl. ¶¶ 5–15 (PLFS 204-09) (discussing prevalence of sexual abuse in detention facilities, and the importance of CRCL and OIDO to preventing and combating such abuse); Rogers Decl. ¶¶ 17–18 (PLFS 172-73) (discussing how loss of CIS Ombudsman's office could cause thousands of cases to fall through the cracks, leading to expensive litigation and undermining faith in government); St. John Decl. ¶ 16 (PLFS 193) (long-time immigrant advocate noting that the loss of CRCL and OIDO has caused "a vacuum" and warning that "ICE and CBP – agencies that already are rife with a great deal of impunity – will have even more freedom from oversight, with even fewer ways that organizations like ours can even document the abuses and violations that are inflicted upon people in their custody."); Jones Decl. ¶¶ 14 (PLFS 196) (explaining that, without these offices, few

options remain to help harmed detainees).  Given the breadth and depth of these concerns about what will happen if the DHS Oversight Offices remain shuttered, and the lack of articulable harm to the government, these last two combined factors tip sharply in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction and (1) order Defendants not to take any further actions to dissolve, or cease the statutory functions of, CRCL, OIDO, or the CIS Ombudsman's Office; (2) order Defendants to reverse work stoppages that were ordered as to the functions of the DHS Oversight Offices on March 21, 2025; and (3) enjoin Defendants from effectuating the RIF scheduled to take effect on May 23, 2025, or effectuating any other RIF affecting any or all of the DHS Oversight Offices, during the pendency of this litigation.

Dated: May 8, 2025                                    Respectfully submitted,

                                                     /s/ Karla Gilbride
Michael C. Martinez (DC Bar No. 1686872)             Karla Gilbride (DC Bar No. 1005586)
Christine L. Coogle (DC Bar No. 1738913)             Adina H. Rosenbaum (DC Bar No. 490928)
Brian D. Netter (DC Bar No. 979362)                  Public Citizen Litigation Group
Skye L. Perryman (DC Bar No. 984573)                 1600 20th Street NW
Democracy Forward Foundation                         Washington, DC 20009
P.O. Box 34553                                       (202) 588-1000
Washington, DC 20043                                 kgilbride@citizen.org
(202) 448-9090

                        *Attorneys for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)                Sarah E. Decker (DDC Bar No. NY0566)
Sarah T. Gillman (DDC Bar No. NY0316)                Robert F. Kennedy Human Rights
Robert F. Kennedy Human Rights                       1300 19th Street NW, Suite 750
88 Pine Street, Suite 801                            Washington, DC 20036
New York, NY 10005                                   (202) 559-4432
(917) 284- 6355

                        *Counsel for Plaintiff RFK*