UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | Civil Action No. 25-1270-ACR |

**DECLARATION OF ANTHONY ENRIQUEZ**

I, Anthony Enriquez, declare as follows:

1.      I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues.

2.      I am the Vice President of U.S. Advocacy and Litigation at Robert F. Kennedy Human Rights (RFK) and have held this position for over three years, since January 2022.  Since graduating from New York University School of Law in 2013 and being admitted to the New York bar in 2014, I have been a practicing attorney specializing in legal representation of people in immigration detention.   From 2013 through 2015, I represented unaccompanied immigrant children, including detained children, in removal proceedings in immigration court.  In 2015, I began working as a judicial law clerk for a district court judge in the Southern District of New York.  Beginning in 2016, I began working as an attorney fellow at the Immigrant Defense Project,

a non-profit engaged in litigation and advocacy to defend the rights of immigrants accused and convicted of crimes, where I litigated federal court cases concerning violations of constitutional rights of people held in immigration detention centers.  Beginning in 2018 through January 2022, I was the Director of the Unaccompanied Minors Program of Catholic Charities Community Services in New York City, where, on an annual basis, I managed the provision of removal defense and other legal services to thousands of children detained in federal custody in the New York City area.  In late January 2022, I joined RFK to design and direct its U.S. Advocacy and Litigation program.

3.     RFK is a nonpartisan, nonprofit organization with offices in New York City and Washington, D.C.  The organization was created in 1968 to carry on Senator Robert F. Kennedy's legacy and advance his unfinished work in pursuit of a more just and peaceful world.  The U.S. Advocacy and Litigation program at RFK partners with grassroots human rights defenders to reduce the size, scope, and power of mass incarceration in the United States.  The program exposes and stops human rights abuses in the U.S. criminal and immigration legal systems, including state-sponsored racial discrimination, torture, and extrajudicial killings that occur at the hands of U.S. police and prison and detention center officials.

4.     The U.S. Advocacy and Litigation program has five full-time employees: four attorneys, including me, and a first-year law school graduate employed as a legal fellow.  One of the attorneys is the Director of Strategic U.S. Litigation, responsible for directly supervising the litigation work of two staff attorneys and the legal fellow.  One of the staff attorneys works on immigration litigation and advocacy and the other works on criminal legal reform litigation and advocacy.

2

5.      Our immigration programming focuses on stopping human rights abuses in immigration detention centers. To do so, for the past three years we have visited isolated immigration detention centers around the country monthly to provide legal rights presentations to detained people. At each of these visits, detained people report abuses of their human and civil rights at the hands of detention center officials. We have heard hundreds of first-hand accounts of violations of civil and human rights, including physical and sexual abuse by guards; torturous conditions of confinement like solitary confinement lasting months, sleep deprivation, and punitive exposure to extreme temperatures; suppression of speech and religious worship protected by the First Amendment; denial of medical care for chronic, urgent, and emergency conditions that has led to preventable illness and death; and discrimination from officials on the basis of race, gender, sexual orientation, and disability, among other abuses.

6.      Where our limited capacity admits, we represent detained people to remediate violations of civil and human rights. For example, we frequently communicate with wardens of facilities we visit and Immigration and Customs Enforcement (ICE) staff to request medical treatment for people suffering from severe pain or illness. In one case, I met with a woman from Haiti in a detention center in Louisiana whose skin and eyes had turned yellow due to severe and untreated anemia. Staff at the detention center had only given her over-the-counter pain medication. We received her permission to contact the detention center officials to advocate for her to receive necessary medical care. But often, ICE officials ignore or dispute our requests for adequate medical treatment.

7.      When administrative advocacy is unsuccessful, and if our limited capacity permits, we litigate in federal courts to secure enforcement of detained peoples' rights. For example, we filed a habeas corpus petition in federal district court for a Russian woman seeking asylum while

3

detained in the South Louisiana ICE Processing Center. She suffered severe, debilitating bilateral osteoarthritis and meniscal injury that left her barely able to walk. Detention center officials had denied her a wheelchair and refused to consider releasing her on humanitarian parole, inexplicably labeling her a flight risk even though she was literally unable to walk. Only after we filed a lawsuit alleging disability discrimination and denial of her due process rights did ICE officials agree to release her to a sponsor. But we are unable to provide individual representation to the large numbers of people whose civil and human rights are violated by detention center officials.

8.      In cases where ICE ignores us and our capacity constraints make litigation impossible, complaints to the Office for Civil Rights and Civil Liberties (CRCL) and the Office of the Immigration Detention Ombudsman (OIDO) can be an effective means to further our core mission to expose and stop violations of human rights. Over the past three years of detention center visits by RFK Human Rights staff, we have filed over a dozen complaints with CRCL and OIDO to report abuses of hundreds of detained people, including the indiscriminate pepper spraying of nearly 200 people engaged in a peaceful hunger strike at the Winn Correctional Center in Louisiana and the use of excessive force and solitary confinement to punish approximately 40 hunger strikers at the Buffalo Federal Processing Center in New York.

9.      In some cases, our individual complaints with CRCL and OIDO remedied ongoing violations of individual rights, saving us the expense and labor of further legal action. In one case from the Central Louisiana ICE Processing Center, a man with a seizure disorder was suffering discrimination from officials on account of his disability. After we alerted CRCL and OIDO of the violation of his rights to a reasonable accommodation for his disability under the Rehabilitation Act, he was given a modified sleeping arrangement to protect him from serious harm. CRCL and

PLFS-0004

OIDO's intervention saved RFK the time and financial resources we would have needed to expend to vindicate his rights through litigation.

10.     RFK has also used CRCL and OIDO to address systemic violations of detained people's rights.  For example, during repeated visits to the Winn Detention Center in Louisiana, we consistently heard complaints from detained people of use of excessive force by detention center officials against people who engaged in hunger strikes and other First Amendment-protected activity to protest inhumane and illegal conditions of confinement.  In one incident in January 2024, Winn officials attacked approximately 200 people in a housing unit with pepper-spray in retaliation for participation in a peaceful demonstration and hunger strike protesting conditions of confinement.  After spraying detained people directly in their faces, guards then locked the unit's doors and windows and cut off power and water in the unit so that people would be unable to rinse their eyes, throats, and skin.  Officials also cut off cameras so that there would be no record of the incident.  The incident was one in a long-term pattern of violent suppression of constitutionally protected speech.

11.     Litigation over large-scale, systemic issues in a federal district court far from RFK's offices in New York and Washington, D.C. is extraordinarily expensive, would require more attorneys and paralegal staff than RFK is currently able to employ, and faces an uncertain outcome. Complaints to CRCL and OIDO, however, are an immediate step we can take to pressure detention center officials into ceasing future illegal activity because the complaints put officials on notice that their practices are under scrutiny.  After filing a complaint with CRCL and OIDO about the January 2024 pepper spraying incident and its relation to systemic patterns of abuse, CRCL publicly released a memorandum announcing that it has initiated a multidisciplinary on-site

PLFS-0005

investigation into the Winn Detention Center, discouraging officials from continued use of violent suppression of speech.

12.    CRCL's website publication of its investigatory memos have also helped RFK advance its core mission of exposing and stopping detention center abuses by providing official confirmation of abuses we have documented.  For example, we have cited to CRCL's publicly released findings concerning a culture of abuse at the Winn Detention Center in Louisiana in a report on systemic human rights abuses in Louisiana detention centers and interviews with journalists covering that report.  We have also cited to CRCL investigatory findings in submissions to United Nations human rights mechanisms, the Inter-American Commission on Human Rights, and in federal lawsuits seeking accountability for harm to detained people, advancing our credibility and providing a plausible basis for factual allegations presented in complaints.

13.    In February 2025, the federal government abruptly removed over a hundred investigatory records from the CRCL website.  Because the removal of records was without advance notice, we were unable to download them for permanent recordkeeping.  Now, formerly public investigatory records we have cited to in previous advocacy are no longer available to bolster our claims of individual and systemic abuse in immigration detention.  I am concerned that, as a result, our credibility will be damaged with journalists, human rights experts at the United Nations and Inter-American Commission on Human Rights, and members of the public, undermining our core mission.

14.    We have also filed Freedom of Information Act (FOIA) requests with CRCL that have not been answered, well past the statutory deadline.  For instance, on January 27, 2025, we filed a FOIA request with CRCL for documents related to its investigation into allegations that DHS officials coerced unaccompanied children into signing false admissions that they were over

18 for the purpose of depriving them of statutory protections for vulnerable youth.  By law, the CRCL FOIA Officer was required to respond with its determination of whether to grant our request within 20 days of its submission.  5 U.S.C. § 552(a)(6)(A)(i)(I).  But we have heard nothing from the CRCL FOIA Officer.

15.    The closure of CRCL and OIDO directly harm the core mission of RFK because it entirely deprives us of administrative mechanisms to expose and stop human rights abuses in immigration detention.  As a result, we will be forced to spend time and financial resources on resolving those abuses through other potentially less effective means: administrative advocacy with ICE, which is frequently ignored or unsuccessful; or litigation, which can be cost- and labor-prohibitive.  We will have to spend more money on more frequent travel to detention centers and additional court costs and fees to litigate legal rights and protections that would have previously been enforced by CRCL and OIDO.

16.    The increased demands on staff time and resources to address issues that would have been resolved by CRCL and OIDO will also impact our ability to secure current and future funding.  Philanthropic funders expect RFK to deliver tangible responses to human rights crises in both the immigration and criminal legal systems.  With more of our capacity tied up in immigration detention matters, we will be less able to respond to other emergent threats to human rights.

17.    I have reviewed the Reduction in Force Notices submitted with this motion as Exhibits D and E.  I understand that all but three employees in DHS's Office for Civil Rights and Civil Liberties received RIF notices that are substantively identical to Exhibits D and E except for the name of the office, with effective dates of March 21, 2025 and separation dates of May 23, 2025.  I understand that like Exhibits D and E, the RIF notices that the CRCL employees received listed the reason for the RIF as the "dissolution" of their office.

PLFS-0007

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 2025

_____
Anthony Enriquez

PLFS-0008