UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, <br><br> Defendants. | Civil Action No. 25-1270- |

**DECLARATION OF LILIAN SERRANO**

I, Lilian Serrano, declare as follows:

1.      I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues.

2.      I am the director of the Southern Border Communities Coalition.  I have served in this position since January of 2023.  My primary roles include directing the strategic planning and activities of SBCC; developing relationships with congressional offices, allies, and stakeholders to advance SBCC priorities; supervising staff; serving as the organization's primary spokesperson in the media; and drafting, editing, and reviewing policy materials. All of these activities are for the purpose of advancing human rights in the U.S.-Mexico border region and advocating for better, more humane border policies. I joined SBCC as a coalition member in 2018 when I was a volunteer

1

with Alianza Comunitaria. I am based in San Diego, CA, and have over a decade of experience working with immigrants in the San Diego region and advancing human rights.

3.      SBCC is a program of Alliance San Diego (ASD), a nonprofit organization whose mission is to build collective power to create an inclusive democracy where everyone can participate fully with dignity. While SBCC and ASD have complementary missions, SBCC is focused on the southern border region, border enforcement, and border communities. SBCC has its own budget, dedicated funding and staff, and full autonomy in decision-making regarding its strategy direction and actions.

4.      SBCC comprises over 60 member organizations spanning the entire length of the U.S.-Mexico border, including California, Arizona, New Mexico, and Texas.  Its members include environmental, faith- based, human rights, direct service, immigrant rights, and labor organizations.  All SBCC member organizations are located, or serve a constituency, within 100 miles of the U.S.-Mexico border.

5.      SBCC is governed by an annually renewed Memorandum of Agreement (MOA) defining the Coalition's structure, which includes Regional Networks based in the four border states that are parties to the MOA and Anchor Organizations which receive grants and serve as fiscal sponsor for the network(s) in the region.  Additionally, the SBCC Steering Committee, made up of a rotating subset of SBCC members, is empowered to make decisions on policy, strategy, and the addition of new members to SBCC.

6.      SBCC also has four full-time staff members, including myself; our Border Policy Counsel, Ricardo Garza; our Border Policy Advisor, Jennifer Johnson; and our Border Policy Coordinator, Nedy Velazquez. In addition, some Alliance San Diego staff allocate part of their

2

time to SBCC, including staff involved in communications, regional policy, research data analysis and administration.

7.      SBCC's mission is to 1) advocate for federal policy reform, 2) advocate for border enforcement policies and practices that are fair, respect human dignity and human rights, and 3) prevent the loss of life in the border region.  Further, SBCC promotes policies and solutions that improve the quality of life in border communities, advances a positive image of the border region, and supports rational and humane immigration reform policies affecting the border region.

8.      SBCC filed two formal complaints with CRCL, one on May 13, 2023 and one on December 11, 2023.  Both complaints concerned conditions at open-air detention sites (OADS) where CBP was detaining migrants within the United States, near the San Ysidro Port of Entry and Jacumba, California.  In these complaints, SBCC explained, supported by declarations from me and other firsthand observers, that CBP agents who were maintaining the OADS were not providing the migrants being held there with adequate food, water, shelter, sanitation, or medical assistance, "exacerbating the trauma of already vulnerable migrants and undermining their basic human rights."  For example, the May 13, 2023 complaint noted, CBP gave migrants held at the OADS only one bottle of water and one granola bar per day, had only one portable toilet for hundreds of migrants, and provided no showers, handwashing stations, or feminine hygiene products even though migrants were being held at the sites for up to a week.  Attached to this declaration as Exhibits A and B are true and correct copies of SBCC's May 13, 2023 and December 11, 2023 complaints.

9.      In response to SBCC's complaints and related media attention, CBP eventually acknowledged the existence of the OADS, after initially denying that such sites were being

PLFS-0017

maintained.[1]  In December 2023, CRCL sent a team to conduct an on-site inspection of the conditions at the Jacumba OADS.  CRCL sent a letter to SBCC on February 2, 2024 confirming that it was conducting an investigation of conditions at the OADS and encouraging SBCC to contact CRCL by email or phone with additional concerns.  A true and correct copy of CRCL's February 2024 letter to SBCC is attached to this declaration as Exhibit C.

10.    Based on my knowledge of follow-up discussions between SBCC and CRCL, I understand that CRCL made specific recommendations to CBP based on our complaints and CRCL's own observations when visiting the OADS.  On the whole, I believe that our engagement with CRCL played a role in bringing attention to conditions at the OADS and spurring changes in CBP's behavior at those sites, in turn advancing SBCC's mission of improving living conditions and preventing loss of life in the border region.

11.    Outside of filing formal complaints, SBCC has engaged with CRCL more informally on numerous other occasions to raise issues of concern involving the southern border. For example, we frequently contact CRCL regarding fatal encounters between CBP officers and members of the public including migrants and border residents. Our discussions have included issues involving the proper use of force standard for CBP agents, a key element of civil rights and civil liberties. CBP is also required to report to CRCL on any deaths involving CBP personnel.

12.    In addition, SBCC has attended various meetings organized by CRCL at which it has explained the complaint filing process, asked us about our concerns, and sought input about CBP activities.  Compared to other components of DHS, CRCL was a much more communicative and active presence to advocates including SBCC and our members, and we would make use of

---

[1] Kate Morrissey, In letter to congressmembers, CBP denies holding migrants in custody between border fences in San Diego, The San Diego Union- Tribune ( July 12, 2023), https:// perma. cc/ 63Z4- W9KM.

4

on our lines of communication to CRCL as a way of communicating our concerns to other parts of DHS that were more impenetrable and harder to reach.

13.    Today, SBCC is concerned about a rapidly evolving situation at the border involving the militarization of the Roosevelt Reservation and nearby land, including the detention of migrants by military personnel based on the purported transfer of jurisdiction of the land to the Department of Defense. If CRCL was not shuttered, SBCC would be engaging with CRCL about CBP's involvement with this plan, as it could constitute an expansion of open-air detention.

14.    While CRCL has not always responded to our concerns as SBCC would have liked, having an office within DHS that would directly engage with us and actively sought out our perspectives and input made SBCC more effective in its mission of advocating for border enforcement policies and practices that are fair, respect human dignity and human rights. CRCL is now losing all of its staff while CBP remains the nation's largest law enforcement agency with over 60,000 employees, a number that is likely to grow. SBCC's engagement and outreach with CRCL will cease, and we will be left to only engage with less responsive components of DHS such as CBP in carrying out our core activities of seeking to improve conditions at the southern border. I fear that the closure of CRCL will make SBCC less effective in its efforts on behalf of border communities, and that human and civil rights at the southern border will suffer as transparency and oversight decrease.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May ___, 2025

*Signature page attached hereto.

_____
Lilian Serrano*

6

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2025

_____
Lilian A. Serrano

# Exhibit A

(Serrano Decl.)



May 13, 2023

Shoba Sivaprasad Wadhia, Officer
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Compliance Branch, Mail Stop # 0190
2707 Martin Luther King, Jr. Ave., SE
Washington, DC 20528-0190

*Via Electronic Mail:* CRCLCompliance@hq.dhs.gov

**RE: CBP Violations of Custody Standards and International Human Rights By Failing to Provide Water, Food, Shelter, Sanitation and Medical Assistance to Migrants Detained in Open-Air Corridor Between Border Wall Layers Near San Ysidro Port of Entry**

Dear Officer Wadhia:

We write to file a formal complaint about grave violations of rights in the United States committed by U.S. Customs and Border Protection (CBP) agents, namely Border Patrol agents, who for months have used an open-air corridor between the primary and secondary walls west of the San Ysidro Port of Entry in California as a holding area for migrants in their custody without complying with custody standards. As detailed in this complaint and the attached witness declarations, Border Patrol agents are not providing adequate water, food, shelter, sanitation or medical assistance, exacerbating the trauma of already vulnerable migrants and undermining their basic human rights. Instead, they stand by with guns watching migrants in need.




**PLFS-0023**

Now, with the lifting of Title 42 exclusions, and the increase of migrants seeking asylum, it is imperative that CBP correct course to comply with custody standards and protect human rights. Your office, in conjunction with Congress, has an important oversight role to play. The violations of custody standards by CBP in this California corridor are systemic. They are not the actions of a few agents, but rather of an agency that has acted intentionally with full knowledge of the conditions they are subjecting migrants to while endangering their well being.

1. **The migrants in the California corridor between walls are indisputably in CBP custody.**



The area of concern in which CBP is violating rights is a space between the primary border wall that abuts Tijuana, Mexico, and the parallel secondary wall approximately 75 yards to the north. The area between the walls where CBP is holding migrants is U.S. soil. There is in fact a sign posted on the secondary wall in front of that space declaring it U.S. property. In that space, CBP exercises full control, patrolling it regularly with vehicles and ATVs. The area is also monitored by CBP cameras.

Civil society organizations who form part of the Southern Border Communities Coalition (SBCC) have borne witness to the treatment of migrants over the last several months in the California corridor. The migrants originate from countries all over the world, seeking refuge from the dangers they face at home. While visiting the site, our team observed and continues to observe Border Patrol agents clearly exercising control in the following ways:

a. **CBP controls movement** — Agents drive in and out of the detention area, walk among detained migrants and occasionally direct them to different areas within the corridor. Pedro Rios observed "Border Patrol agents ushering migrants from the area near Las Americas to the Whiskey 8 area. Agents also directed single men to the area closer to the beach."[1] Additionally, "Border Patrol told the migrants they had to sit in rows and stay seated. Occasionally, the agents would drive through with an ATV or cars, to check that they were seated."[2]

b. **CBP controls access to water and food** — Due to the migrants being detained in an area controlled by Border Patrol, agents control access to basic necessities. In Whisky 8, our declarants have observed Border Patrol provided very limited water and only a granola bar that left them hungry and thirsty with no way to access more without the help of community members on the other side of the wall[3] When Pedro Rios raised concerns about lack of access to water he was told "that the government was considering bringing in a buffalo water tank, but then the Border Patrol liaison told [him] they would not out of concern that it would attract more migrants. They never brought the tank in."[4]

---

[1] Decl. of Pedro Rios at ¶ 21
[2] Decl. of Pedro Rios at ¶ 20
[3] Decl. of Adriana Jasso at ¶ 8
[4] Decl. of Pedro Rios at ¶ 12

c. **CBP controls migrant tracking system** — Border Patrol monitors migrants by issuing color coded or labeled wristbands. From Pedro Rios' observations, "Border Patrol instituted the use of wristbands to identify people's arrival based on the agent's first interaction with them, which might be a day or two after they actually arrive in the corridor. The wristbands are like the ones used for concerts. They are different colors and some have the day of the week printed on them."[5]



d. **CBP controls access to the area** — Border Patrol also controls access to the area, not allowing anyone to leave without the assistance of agents. Migrants "cannot leave the area because of the physical walls that stand in their way. Some of those arriving are suffering severe pain, diarrhea, headaches, etc. Many individuals are pregnant, have children with them, have no shoes, are muddy, wet and in terrible condition."[6] Individuals in need of medical attention are dependent on Border Patrol to transport them to a hospital, but they are slow to respond. For example, A 79-year old Colombian woman who fell off the border wall and suffered injuries to her leg and other distress because of a lack of medicine, was not provided medical attention by Border Patrol until after an entire day of advocacy by advocates.[7]

The control CBP has over every aspect of the migrant's environment and well-being from where and how they are able to move, to the basic necessities they have access to, indisputably amounts to custody. CBP has the responsibility to follow the laws and protocols in place and uphold the human rights and dignity of all migrants in their custody.

2. <u>**CBP is violating its own standards for conditions and length in custody.**</u>

The U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search ("TEDS Standards") dictate the custody standards that CBP must follow when they detain people in a holding facility.[8] A holding facility is any "secure enclosure" that is "[u]nder the control of CBP; and [p]rimarily used for the short-term confinement of individuals who have recently been detained".[9] Individuals are detained when they are restrained from having freedom of movement.[10] Border Patrol agents that hold migrants in the corridor between the walls are subject to the TEDS Standards.

---

[5] Decl. of Pedro Rios at ¶ 22
[6] Decl. of Adriana Jasso at ¶ 7
[7] Decl. of Lilian Serrano at ¶ 2-4, 9-10
[8] CBP National Standards on Transport, Escort, Detention, and Search (2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf. ("TEDS Standards")
[9] TEDS Standards at Pg. 29.
[10] TEDS Standards at Pg. 28.

The TEDS Standards provide, among other things, that all detainees must be provided medical attention, meals at regularly scheduled times, adequate water, have restroom accommodations, and must be provided with personal hygiene items.[11] All efforts must be made to ensure care for migrants under the Standards.[12]

As described above and in the specific examples below, CBP is violating all of these standards at the open air detention site in the California corridor.

### a. CBP does not provide medical assistance in violation of TEDS § 4.10



Observers have documented numerous examples of Border Patrol failing to provide medical attention to detained migrants, including at-risk populations.[13] TEDS Standards provide that "[e]mergency medical services will be called immediately in the event of a medical emergency."[14] Adriana Jasso states in her declaration that she encountered an African man who collapsed and was described as dying by a Colombian nurse. Only after advocate intervention did Border Patrol come to assist.[15] Additionally, she describes migrants "suffering severe pain, diarrhea, headaches, severe cuts and bruises. One Asian man's leg was severely infected. He was in extreme pain with no way to communicate."[16]

Lilian Serrano has various accounts of migrants needing medical assistance. In reaching out to the Border Patrol liaison she was told the liaison "was receiving our emergency flags and following up, but that when his agents went to take people to the hospital, the migrants were all of a sudden fine and that they didn't have a medical need."[17] In another instance the liaison asked why she was calling him and not 9-1-1.[18] Lilian also encountered a 79-year old Colombian woman who fell off the border wall and suffered injuries to her leg and other distress because of a lack of medication; she was not provided medical attention by Border Patrol until after an entire day of advocacy by multiple advocates.[19] Additionally, she encountered an asylum seeking woman from Afghanistan who the Border Patrol took to the hospital after she suffered injury and infection to her arm. The woman was dumped at a hospital without any paperwork from

---

[11] TEDS Standards at Pgs. 17-18
[12] TEDS Standards at Pg. 3
[13] TEDS Standards § 5.1 defines "at-risk populations" as including children, "pregnant individuals; those known to be on life-sustaining or life-saving medical treatment; those at higher risk of sexual abuse (including but not limited to gender nonconforming, intersex, and transgender); reported victims of sexual abuse; those who have identified mental, physical or developmental disabilities; those of advanced age; or family units." The Standards provide such individuals "may require additional care or oversight".
[14] TEDS Standards § 4.10 ("Medical Emergencies")
[15] Decl. of Adriana Jasso at ¶ 11
[16] Decl. of Adriana Jasso at ¶ 7
[17] Decl. of Lilian Serrano ¶ 9.
[18] Decl. of Lilian Serrano at ¶ 13
[19] Decl. of Lilian Serrano at ¶ 2-4, 9-10

Border Patrol and was later denied access to agents so she could be processed.[20] In addition, Lilian encountered a 29-year old pregnant Somali woman suffering repeated vomiting without medical attention.[21]

Pedro Rios confirmed that a Jamaican woman who suffered a miscarriage after being kidnapped and raped in Mexico and remained in excruciating pain, was not provided medical attention by Border Patrol for days despite advocates raising the issue multiple times.[22] Pedro also documented an infant no longer taking breastmilk who suffered vomiting and was listless and was only taken to a hospital after advocates' intervention.[23]

### b. CBP does not provide meals to detained migrants in violation of TEDS § 4.13

Border Patrol did not provide regular meals as required under the TEDS Standards, leaving migrants at risk of starvation while relying on the limited resources of NGOs providing emergency food aid. The TEDS Standards require that "[a]dult detainees, whether in a hold room or not, will be provided with food at regularly scheduled meal times."[24] For children and pregnant individuals, the Standards require "a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times. At least two of those meals will be hot. Juveniles and pregnant or nursing detainees must have regular access to snacks, milk, and juice."[25]



Instead, Border Patrol only provided migrants with a single small water bottle per person, and a granola bar.[26] Adriana Jasso observed that Border Patrol entered the corridor between the walls "[o]nce a day [to] provide a bottle of water and some kind of granola bar. To keep people from starving, NGOs, volunteers both on the Mexico and US side of the border, are supplying the basic necessities they can."[27] One group of Indian men detained for five days were left to starve and resorted to eating leaves.[28]

---

[20] Decl. of Lilian Serrano at ¶ 5-7
[21] Decl. of Lilian Serrano at ¶ 13
[22] Decl. of Pedro Rios at ¶ 30.
[23] Decl. of Pedro Rios at ¶ 16.
[24] TEDS Standards § 4.13.
[25] TEDS Standards § 5.6 ("Meals and Snacks – Juveniles, Pregnant, and Nursing Detainees").
[26] Decl. Adriana Jasso at ¶ 3, Dec. Flower Alvarez Lopez at ¶ 5.
[27] Decl. of Adriana Jasso at ¶ 8
[28] Decl. of Pedro Rios at ¶ 15.

### c. *CBP does not provide adequate water to detained migrants in violation of TEDS § 4.14*

CBP is required to make available clean drinking water along with clean drinking cups to detainees.[29] Pedro Rios stated that in April of 2023, "migrants reported waiting up to 7 days with no shelter, minimal water, and only a granola bar to eat. I communicated with the Border Patrol liaison about the conditions, and shortly thereafter, agents placed a 5 gallon container of water every morning, but this would finish quickly. By mid day there was no available water."[30]



The amount of water was wholly inadequate, requiring advocates to push Border Patrol to provide more water.[31] The Border Patrol liaison said they considered bringing a buffalo water tank, but chose not to because they did not want to attract more migrants.[32]

By May, Pedro stated,"Border agents had removed the 5 gallon water jug. They handed out one small water bottle per migrant every day, leaving migrants thirsty by the afternoon."[33] As of May 12, declarants continue to report that Border Patrol is only providing one bottle of water per day.[34]

### d. *CBP does not provide restroom facilities for detained migrants in violation of TEDS § 4.15 nor maintain cleanliness standards in violation of TEDS § 4.7*

CBP is required to provide restroom accommodations to all detainees with a reasonable amount of privacy ensured.[35] Border Patrol agents have only provided <u>one</u> port-a-potty for hundreds of migrants.[36] The port-a-potty was brought into the area on April 28, 2023 when there were approximately 70 individuals in custody.[37] Within two days the port-a-potty was full and unusable.[38]  Since that time, the number of migrants has grown to approximately 400 and no additional facilities have been added.[39] To date, we have not seen the one port-a-potty be cleaned and migrants have regularly complained since that is unusable.[40]



---

[29] TEDS Standards § 4.14 ("Drinking Water")
[30] Decl. of Pedro Rios at ¶ 9
[31] Decl. of Pedro Rios at ¶ 12
[32] Decl. of Pedro Rios at ¶ 12
[33] Decl. of Pedro Rios at ¶ 15.
[34] Decl. of Flower Alvarez Lopez at ¶ 5
[35] TEDS Standards § 4.15 ("Restroom Facilities")
[36] Decl. of Flower Alvarez Lopez at ¶ 5
[37] Decl. of Pedro Rios at ¶ 13
[38] Decl. of Pedro Rios at ¶ 13
[39] Decl. of Pedro Rios at ¶ 14
[40] Decl. of Pedro Rios at ¶ 14; Decl. of Flower Alvarez at ¶ 5

PLFS-0028



Border Patrol fails to provide minimum standards of cleanliness; CBP TEDS standards require facilities "be regularly and professionally cleaned and sanitized."[41] Despite this, Flower Alvarez Lopez saw "a pile of trash that has not been picked up in days" and "one portable restroom for" hundreds of people that has "not been cleaned at all."[42]

### e. *CBP does not provide basic hygiene items and made no efforts to provide showers in violation of TEDS § 4.11*

Additionally, CBP did not provide access to basic hygiene items as required under the Standards. TEDS provides that "Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security needs" where "[f]amilies with small children will also have access to diapers and baby wipes" and restrooms must include "access to toiletry items, such as toilet paper and sanitary napkins."[43] In contrast, Flower Alvarez Lopez found that "[t]here are no showers, hand washing stations, nor basic personal hygiene items like feminine hygiene products, baby wipes, toothbrushes, etc. I see families, babies, children, women with children, and people of all ages in here and they don't have the basic necessities."[44]



CBP has made no effort to provide showers to migrants who were detained for up to a week, even though the Standards provide that "reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention."[45] Instead, Flower Alvarez Lopez confirmed no showers were available at the open air detention site.[46]

### f. *CBP Detains Migrants Far Beyond 72 Hours in violation of TEDS § 4.1*

The TEDS standards provide that migrants should not be detained for longer than 72 hours in holding facilities.[47] CBP is regularly detaining migrants in the corridor between the border walls for over 72 hours

---

[41] TEDS Standards § 4.7 ("Cleanliness")
[42] Decl. Flower Alvarez Lopez ¶ 5
[43] TEDS Standards § 4.11.
[44] Decl. of Flower Alvarez Lopez at ¶ 5
[45] TEDS Standards § 4.11.
[46] Decl. of Flower Alvarez Lopez at ¶ 5
[47] CBP National Standards on Transport, Escort, Detention, and Search (2015) at Pg. 14
https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf  ("TEDS Standards")

and up to a week.[48] Every effort must be made to hold detainees for the least amount of time required."[49] Pedro Rios found that "migrants reported waiting up to 7 days."[50] After a Border Patrol liaison claimed migrants were exaggerating their length of detention, Pedro Rios confirmed that migrants "continued to tell [him] they had been there 2, 3, 4 and up to 7 days."[51] The wristbands issued by agents to migrants are evidence of the length of detention.

For months, Border Patrol has continued to egregiously violate its basic obligations to people it detains under its own TEDS Standards in the California corridor between border walls.



    **3.**   **CBP is violating international treaties on cruel, inhuman and degrading treatment.**

The United States has signed and ratified the International Covenant on Civil and Political Rights (ICCPR), an international treaty that recognizes fundamental human rights. Under the U.S. Constitution's Article VI, treaties are the "supreme law of the land" governing the responsibilities of every part of government at the local, state, and federal level.[52] Thus, CBP is bound by the ICCPR.

This year, the U.S. Government is under review by sister nations who are signatories to the ICCPR for compliance with the treaty's obligations. In fact, the U.S. Government led by the Department of State is preparing to appear before the ICCPR Human Rights Committee to answer questions from other nations about non compliance. Civil society groups, including SBCC, will be submitting reports to the Human Rights Committee to alert them to the violations we have witnessed, including those occurring now in the California corridor between the walls.

The ICCPR provides that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment."[53] The violations of the TEDS Standards described above and detailed in the attached declarations also constitute violations of migrants' rights under the ICCPR. Pedro Rios, who has observed CBP human rights violations in the California corridor for months, summarized:

---

[48] Decl. Pedro Rios  ¶ 9, 10, 18
[49] TEDS Standards § 4.1
[50] Decl. Pedro Rios  ¶ 9
[51] Decl. Pedro Rios  ¶ 18
[52] U.S. Constitution, Art. VI., International Covenant on Civil and Political Rights (ICCPR) Art 2
[53] International Covenant on Civil and Political Rights (ICCPR) Art. 7

PLFS-0030

My overarching concern is the inhumane treatment that I have witnessed since February, the ongoing lack of water, food, and shelter, the degrading treatment, and overall lack of respect or compassion for the migrants who are seeking safety from the dangers they face in their home countries[54]…. [T]hey should be treated with dignity and decency pursuant to human rights standards. That is not what's happening.[55]

In his declaration, Pedro details how border agents treat migrants in cruel, inhuman, and degrading ways, leaving them starving and freezing while in their custody.[56] He also describes how some agents treat migrants with complete disregard, for example, one agent told migrants, "I don't give a fuck how long you've been here," and another said, "get the fuck away from me" when a migrant approached to ask a question.[57]

Flower Alvarez Lopez in her declaration echoed the statements by other declarants, speaking to the indignity of the situation facing migrants. "This is devastating. We should not have to bear witness to what is happening today…. To see babies and children here in this type of setting, it's heartbreaking. We need to do better. Our government needs to do better."[58]

The ICCPR states that if violations of human rights occur, as they have for some time and continue to occur, the government shall provide an effective remedy.[59] That could be an administrative, legislative, or judicial remedy. Despite the pleas of migrants and advocates, CBP has not provided an effective remedy. Through this petition, we hope to prompt a remedy — the cessation of the violations and the protection of human rights.

4. **CRCL must act to investigate and address these violations with Congress.**

The Office of Civil Rights and Civil Liberties (CRCL) was established to, among other things, "oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities" of the Department of Homeland Security, including CBP,[60] in conjunction with Congress. You have the mandate to address both the violation of the TEDS custody standards and the ICCPR rights incorporated into U.S. law through the Constitution. We look to your office to end the harm caused by CBP in its treatment of migrants in the California corridor between walls west of the San Ysidro Port of Entry.

Those seeking safety at our border should be treated at all times with humanity, dignity, and respect. For months now, CBP has fallen short of this responsibility. We recognize that the challenges facing CBP are many, but that should never be an excuse for violating the rights of migrants. The violations that declarants describe have been going on for months. Since at least February 2023, migrants in the corridor have been left waiting for days without adequate water, food, shelter and other basic necessities. Long before that, CBP has taken custody of migrants in the corridor and used it as a pre-processing holding area, exercising control of migrants.

---

[54] Decl. of Pedro Rios at ¶ 26
[55] Decl. of Pedro Rios at ¶ 31
[56] Decl. of Pedro Rios at ¶ 27
[57] Decl. of Pedro Rios at ¶ 25
[58] Decl. of Flower Alvarez Lopez ¶ 7
[59] ICCPR Art. 2
[60] 6 U.S.C. § 345

CBP anticipated an increased number of migrants, especially asylum seekers. Congress increased CBP resources significantly, but those resources are not being used to comply with the agency's duties of care in the California corridor. If CBP is going to continue using the corridor as a holding area or a pre-processing area (as opposed to processing someone from the area that day), then the agency must stand up the infrastructure and engage in practices that honor the rights and dignity of migrants. That is what we committed to do as a nation when we signed the ICCPR and what the agency committed to do when it adopted the TEDS standards.

We call on CRCL to ensure that not only will the current violations cease and human rights be protected, but also that this situation will not be allowed to reoccur in California or anywhere else along the border. We stand ready to speak with your Office to discuss these claims further if needed. Please contact us to acknowledge receipt and discuss immediate next steps.

Sincerely,

Ricky Garza, Border Policy Counsel
Southern Border Communities Coalition[61]

*Enclosures:*
   1.  *Declaration of Pedro Rios*
   2.  *Declaration of Lilian Serrano*
   3.  *Declaration of Flower Alvarez Lopez*
   4.  *Declaration of Adriana Jasso*

**CC:**

Chairman Dick Durbin
Ranking Member Lindsey Graham
Senate Judiciary Committee

Chairman Jim Jordan
Ranking Member Jerrold Nadler
House Committee on the Judiciary

Chairman Gary Peters
Ranking Member Rand Paul
Senate Committee on Homeland Security & Governmental Affairs

Chairman Mark Green
Ranking Member Bennie Thompson

---

[61] SBCC is a program of Alliance San Diego, which is based in San Diego, but staffs SBCC throughout the border region and in D.C. SBCC is governed by a steering committee of members from CA, AZ, NM, and AZ.

House Committee on Homeland Security

Chairman James Comer
Ranking Member Jamie Raskin
House Committee on Oversight and Reform

Majority Leader Mitch McConnell
Minority Leader Charles Schumer
United States Senate

Speaker Kevin McCarthy
Minority Leader Hakeem Jeffries
United States House of Representatives

Attorney General Merrick Garland
U.S. Department of Justice

Assistant Attorney General Kristen Clarke
Civil Rights Division
U.S. Department of Justice

Erin Barclay
Acting Assistant Secretary of State for Democracy, Human Rights, and Labor
U.S. Department of State

Acting Commissioner Troy A. Miller
Customs and Border Protection
Department of Homeland Security

Nathaniel Kaine
Chief of Staff
Customs and Border Protection
Department of Homeland Security

Chief Raul Ortiz
United States Border Patrol
Customs and Border Protection
Department of Homeland Security

## <u>DECLARATION OF PEDRO RIOS</u>

I, Pedro Rios, declare the following:

1. I am the director of the American Friends Service Committee (AFSC) US-Mexico Border Program. I have been monitoring and advocating for human rights at AFSC for twenty years.

2. For the last several months, I have observed migrants trapped between the primary and secondary barriers on the western most segment of the US-Mexico border near San Ysidro. Migrants have identified themselves as from many different countries including Afghanistan, Jamaica, India and Colombia, and they state they are seeking asylum because of dangers they face in their home countries.

3. The area in which they are trapped is north of the primary barrier abutting Mexico. That area north of the barrier is in the United States. The migrants state they have crossed the barrier to turn themselves in to border agents and are doing so out of desperation, because they seek safety. Once over the barrier, they await to be processed by border agents.

4. The migrants are trapped in an area bounded by a secondary barrier to the north of the primary barrier. This corridor between the barriers is fully controlled by the U.S. Border Patrol. Agents pass along this corridor with vehicles and ATVs. The area is also monitored by cameras. Anyone in this corridor is under their control and in their custody.

5. In February 2023, I first spoke to migrants trapped in the corridor, while I was at an event we held near the border walls. About a dozen migrants approached the northern barrier to talk to me and told me that they had been in the corridor for several days hoping to be processed by border agents, but had not yet been, even though agents were regularly passing by. The agents had given them mylar blankets but little else. During this time, it rained regularly in San Diego.

6. I have continued to see migrants in the corridor since, and have monitored their conditions. I have seen them in several locations in the corridor identified as follows from east to west: near the Las Americas mall, at the section known as Whiskey 8, and closer to the beach.

7. The number of people that I have been able to see has varied from dozens to hundreds. In March, I began coming 2-3 times a week to talk to migrants and monitor the conditions. In most cases, they had been there for at least 2 days. Some had mylar blankets given to them by border agents, others had nothing to cover themselves at night. During this time it rained regularly and was cold day and night. They told me they were thirsty and hungry with little to nothing to eat or drink.

8. In April, the number of migrants in the corridor seemed to grow until it was regularly around 70 people who were visible to me at the Whiskey 8 area, and I knew there were more at other locations in the corridor. More women and children appeared in the corridor. Because Whiskey 8 is most accessible from the U.S. side, this is where I came to speak to migrants.

9. Migrants reported waiting up to 7 days with no shelter, minimal water, and only a granola bar to eat. I communicated with the Border Patrol liaison about the conditions, and shortly thereafter,

agents placed a 5 gallon container of water every morning, but this would finish quickly. By mid day there was no available water.

10. This year, San Diego has been unusually cold and rainy. I recall a particularly rainy night in mid April. The following morning, I came to the border and spoke to a group of migrants who were all from Africa. They had not been given mylar blankets, but had regular blankets that were soaked. They had no other clothes or cover to protect them from the weather. They told me they had been there for 5 days.

11. In the last week of April, I spoke to the Border Patrol community liaison as well as the Department of Homeland Security Civil Rights and Civil Liberties liaison expressing concerns about the conditions, including the lack of water and sanitation.

12. Initially they told me that the government was considering bringing in a buffalo water tank, but then the Border Patrol liaison told me they would not out of concern that it would attract more migrants. They never brought the tank in.

13. On April 28, several months after I began witnessing the presence of migrants in the corridor, agents brought in a single port-a-potty to the Whiskey 8 area, but it was not enough for what was then about 70 people on average in that area. I don't know if they brought additional port-a-potties to other parts of the corridor.

14. Two days after the port-a-potty arrived, it was full and unusable. It may have been serviced, but I never saw that happen, and migrants have regularly complained since that it is unusable. As of today, there is only one port-a-potty, even though the number of migrants has grown to an estimated 400.

15. Beginning in May, I began coming to the border nearly every day, spending several hours at a time. On May 1st, I spoke with a group of men from India who told me they were starving. They showed me the leaves they were eating. They had been there for 5 days. During that time, I observed that border agents had removed the 5 gallon water jug. They handed out one small water bottle per migrant every day, leaving migrants thirsty by the afternoon.

16. On May 3rd, migrants told me that border agents had taken their shoelaces, and they did not know why, but believed it was in preparation for agents to take them in. I am familiar with this practice, a tactic that border agents have previously said they use to prevent migrants from running away. I took photos of their shoes without laces.

17. Out of grave concern for the condition of migrants, my organization began to provide basic necessities to migrants, including water, food, and mylar blankets. Initially, an agent scolded me, telling me that we needed to alert Border Patrol every time we came. They told the media that was starting to cover the encampment the same thing. This is not a requirement, but something they suggested we must do nonetheless. I believe this was meant to dissuade us from coming, especially as the media began to arrive.

18. After the first article in the San Diego Union-Tribune was published, stating that migrants were there up to 7 days, the Border Patrol liaison told me that this was not true, that migrants were exaggerating and were conflating their days in Tijuana with their days in the corridor. But I had been witness to migrants trapped in the area, waiting to be processed for many days. I asked

migrants to clarify and confirm the number of days they had been in the corridor, and they continued to tell me they had been there 2, 3, 4 and up to 7 days.

19. At the end of the first week of May, the number of migrants grew significantly to around 400. I worked with my organization to alert the media. Migrants shared with them what they had told me — that agents were waiting days to process them, but not providing them with basic necessities including sufficient water, food, and shelter.

20. With the arrival of the media, Border Patrol told the migrants they had to sit in rows and stay seated. Occasionally, the agents would drive through with an ATV or cars, to check that they were seated. This would happen at various times of the day. Migrants have told me they believe this is in anticipation of them being processed, but the agents will make them all sit for hours on end and not process any of them. Then they will come with vans and take a few people or sometimes 20, but there are hundreds of people.

21. I have observed Border Patrol agents ushering migrants from the area near Las Americas to the Whiskey 8 area. Agents also directed single men to the area closer to the beach. Between the direction for them to sit in rows to ushering them from one part of the corridor to another, agents are controlling the movement of migrants.

22. This week, Border Patrol instituted the use of wristbands to identify people's arrival based on the agent's first interaction with them, which might be a day or two after they actually arrive in the corridor. The wristbands are like the ones used for concerts. They are different colors and some have the day of the week printed on them.

23. Migrants have now organized themselves in rows based on their wristband, hoping that the more organized they are, the more quickly they will be processed, but they are still waiting for days. Migrants state, and I have observed, that agents come through every so often to see if people are sitting and if they are not, they sometimes yell at the migrants. This includes children, who don't understand what is happening. They sit under full sun and then rain and cold, they sit and they wait.

24. One of the migrants who took the initiative to organize the other migrants shared his frustrations that agents come to scold the migrants, but not to process them. He told me he had not slept for 3 days and was concerned that the other migrants thought he was colluding with the agents and felt he was in danger, and that the agents are not there to protect him or anyone, but to leave them waiting.

25. Throughout my time monitoring the conditions in the corridor, I have also witnessed some Border Patrol agents speaking aggressively towards migrants. For example, I heard one agent say, "I don't give a fuck how long you've been here," and another say, "get the fuck away from me" when a migrant approached to ask a question.

26. My overarching concern is the inhumane treatment that I have witnessed since February, the ongoing lack of water, food, and shelter, the degrading treatment, and overall lack of respect or compassion for the migrants who are seeking safety from the dangers they face in their home countries.

27. I am especially concerned about the treatment of migrants who are out of sight from us, especially the area where the men have been directed to, closer to the beach. Last night, I spoke with two men who came to the Whiskey 8 area hoping volunteers would charge their phones. They told me they were hungry and freezing. One was from a Spanish speaking country (not sure which) and one appeared to be from Eastern Europe.

28. I'm also concerned about the children. Two days ago, I witnessed a child who was less than a year old whose mother said was no longer taking her breast milk and was throwing up and listless. I called the Border Patrol liaison for medical assistance, and they came to take the child and mother to the hospital. But had I or another human rights observer not been there, that child might not have received any assistance. Especially since agents are not making themselves approachable and some are actively aggressive towards migrants.

29. In another instance, parents of an 8 year old child approached me to tell my colleague that their child had had a seizure as a result of his medication being taken away by Mexican authorities. They were concerned for the child's health. I left a message for the Border Patrol liaison and agents came for him soon after. As with other incidents, I am concerned that if we had not been there, the child would have fallen into greater danger.

30. One migrant told me that in the night, the children cry. He said that the adults have a way to cope, but the children are scared.

30. I am deeply concerned about other vulnerable migrants. Today, I alerted the Border Patrol liaison that a Jamaican woman had approached me to tell me she had suffered a miscarriage after being kidnapped and raped in Mexico and is now in what she described as excruciating pain. Other human rights observers shared that they alerted Border Patrol to this woman's condition several days ago, but nothing was done.

31. In conclusion, there is no doubt that the migrants in the corridor are in Border Patrol custody. As such, they should be treated with dignity and decency pursuant to human rights standards. That is not what's happening.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.


May 12, 20223


Pedro Rios

## DECLARATION OF LILIAN  SERRANO

I, Lillian Serrano, declare the following:

1. I am the director of the Southern Border Communities Coalition, a program of Alliance San Diego. As part of that role, I monitor human rights conditions in the border region.

2. On May 11, after hearing from colleagues about migrants trapped in the corridor between the two border walls, both of which are in the United States, near San Ysidro, California, I arrived at the border wall at 5:45 am. The first thing I saw was a group of migrants that had spent the night outdoors between the two border walls. When I approached the wall, a man called us over. His mother was in need of medical attention.

3. He had traveled with his 79 year old mother from Colombia. He told us she has several medical conditions and at that moment had been without her medication for 2-3 days, trapped in Border Patrol custody. Without her medication, she was falling ill. She was also suffering from an injury to her leg after falling from the wall she had climbed to turn herself in to border agents. Her son was also worried that she hadn't used the restroom in 5 days. The day before she was able to walk a little, but that morning she was just laying down and couldn't move.

4. I immediately contacted the Border Patrol community liaison for the San Diego sector. I called him to try to provide details about what was happening, but he didn't pick up. I sent him a text at 8:00 am with general information about the woman and that we needed to get her medical care. We didn't hear back from him. The son checked in with me on multiple occasions, but at one point I lost track of him amidst the hundreds of migrants.

5. Around the same time, I encountered another woman, who we later learned was an asylum seeker from Afghanistan, who was sleeping by herself on the US side of the border wall wrapped in blankets. She was wearing a hijab. I approached her with colleagues and asked her why she was there. She showed us documents from Scripps hospital. She was taken in an ambulance from the encampment the day before. She told us she wasn't feeling well, she showed us her arm and it was swollen, and had an infection.

6. She told us she had flagged this for Border Patrol, and they took her to Scripps hospital. When the hospital released her, they put her in a taxi. She didn't know where she was, she had no way of contacting anyone, she didn't have an address, so the taxi brought her back to the border wall. She didn't know what to do, she wanted to make sure Border Patrol knew she wasn't trying to sneak into the country. She was waiting for them, but they never arrived at the hospital.

7. She told us she arrived at this site at 2:00 am and knocked multiple times on the gate trying to get inside the encampment. The agents did not open it. She told us that she had family in New York, but didn't have a way to contact them. We had her take a nap in my car. It was the first time she slept indoors after 4 days.

8. She slept and our partner organization PANA (Partnership for the Advancement of New Americans) was able to pick her up around noon. They were able to get her placed in a Catholic Charities shelter. We believe they were able to get in contact with her family in New York, but she doesn't have any paperwork from Border Patrol that would allow her to travel on a plane.

9.  In the evening, I eventually spoke with the Border Patrol liaison regarding the 79 year old Colombian woman described above. The liaison said he was receiving our emergency flags and following up, but that when his agents went to take people to the hospital, the migrants were all of a sudden fine and that they didn't have a medical need. I reiterated that the woman we were discussing needed medical attention and told him that the people we were talking to had medical needs. He said that he felt that migrants were taking advantage of this situation and that they were using this to get into the United States.

10. The Border Patrol liaison mentioned he was going to be on site last night because at 9:00 pm "migrants were going to rush the border." Because of this I came back to the site around 8-8:30 pm. At 9:45, I noticed that Border Patrol agents were carrying a woman to their truck who was accompanied by another woman. Her son told me he finally got the attention from the Border Patrol and that they were taking his mother to the hospital, but they would only let one person go with her. He decided to have his wife accompany his mother.

11. To follow up, my colleagues and I went to the hospital and we found his wife. She was confused. As soon as she arrived at the hospital, staff told her she couldn't go in and they left her outside. The Border Patrol left and gave her no instructions, so she was outside of the hospital, and she said she was waiting for them to come and give her instructions. We explained they were not coming back. She didn't get any documents from Border Patrol and was told she couldn't go inside. It was cold and late and she had no way to communicate with her mother-in-law inside. We stayed in the hospital past midnight and assisted her to communicate with the hospital staff to get information about her mother-in-law.

12. The mother-in-law was released this morning, and a family member in the United States was able to come and accompany her. The family member shared that the 79 year old woman was concerned about her Colombian passport, which Border Patrol agents had asked her for before transporting her to the hospital. She gave it to them and she saw an agent put it in his pocket. The passport was never returned to her. She now has no identity documents, nor does she have any paperwork from Border Patrol from her entry to apply for asylum. Her son is still in custody in the area between the walls, separated from his mother and wife, all of whom have a related asylum claim. It is uncertain whether he will be released or whether his asylum claim will be heard. For the moment, they face the prospect of indefinite separation far from a country they fear returning to.

13. In another incident, I was notified today at 4:15 pm that a 29 year old pregnant Somali woman had thrown up 5 times today.  I contacted the Border Patrol liaison, and he told me that I should have just called 9-1-1. Then he said he would call them. Several hours have now passed and no one has arrived to assist the pregnant woman. We are keeping a close eye on her and hopefully she will receive help soon.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.


May 12, 20223

Lilian Serrano

## DECLARATION OF FLOWER ALVAREZ LOPEZ

I, Flower Alvarez Lopez, declare the following.

1.  My name is Flower Alvarez Lopez and I am a Co-Director at Universidad Popular.

2.  Around 12 pm on May 11, I went to the border wall near San Ysidro to find hundreds of people in an encampment between two fences, unable to leave. Border Patrol provided the migrants with wristbands of different colors to indicate when they arrived and have created some sort of a system for when they will process them.

3.  I stayed overnight at the encampment and observed and talked to Border Patrol agents around 2:00 am during a big round up. I saw Border Patrol agents ask those who had children to raise their hands. I saw them yelling at folks that were sitting down telling them to not get up. If they tried to move, they would be immediately yelled at. I tried to gather information from the agents about how many people they were taking and where they were taking them. They said 60 people and didn't say anything else. Border Patrol has not communicated their plans for the individuals who are trapped in the corridor between the border walls.

4.  They are being treated inhumanely. The government has not provided any blankets or shelter for these individuals. At night, it is cold and everyone is exposed to the elements including our most vulnerable populations: children, pregnant women and the elderly.

5.  There is a pile of trash that has not been picked up in days. There is only one portable restroom for all 300-450 people to use and it has not been cleaned at all. There are no showers, hand washing stations, nor basic personal hygiene items like feminine hygiene products, baby wipes, toothbrushes, etc. I see families, babies, children, women with children, and people of all ages in here and they don't have the basic necessities. They are sleeping on the ground with few clothes to keep them warm. Border Patrol has only provided one water bottle and one granola bar per person per day. A lot of them have been sleeping directly on the dirt and gravel ground except for those who we were able to provide cardboard boxes to use as mattresses.

6.  Border Patrol is not providing medical support on site. We are providing the limited first aid we can, but we don't have any medics on site. We know a few people have been taken by ambulance to other hospitals.

7.  This is devastating. We should not have to bear witness to what is happening today. Folks are showing up and they are very emotional to what they are seeing because it is a devastating sight. To see babies and children here in this type of setting, it's heartbreaking. We need to do better. Our government needs to do better.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.

May 12, 20223

Flower Alvarez Lopez

## <u>DECLARATION OF ADRIANA JASSO</u>

I, Adriana Jasso, declare the following:

1. I have worked with the American Friends Service Committee for 16 years assisting migrants. I am currently working alongside a border wall in the San Ysidro area that is one of two parallel walls at the border of the United States and Mexico. The space between the first and second wall is inside the United States. In the space between the walls, there are approximately 400-500 individuals who are waiting with nothing but the clothes on their backs to be processed for asylum claims.

2. I first arrived at the San Ysidro border just south of South Bay Water Reclamation Plant about 2 weeks ago. Border agents refer to that area as Whiskey 8. When I arrived, I saw approximately 20 people. Then 20 quickly turned to 80 and 80 quickly turned into 120. Later on we started seeing 400-500 individuals. Not only have the numbers changed, but the demographics as well. Now we are seeing mainly women with children. As the encampment grew, Border Patrol moved males to an area approximately 20 minutes away on foot to a different canyon.

3. I have not been able to access the canyon, but have heard there are anywhere between 600-800 single men in the encampment. What we have heard is that the conditions there are a lot worse in terms of access to food and shelter. I took a statement from a Colombian family that said they only received a bottle of water for a whole day. We haven't been able to transport anything to them and we are not able to carry things over there. It would require us hiking to the location.

4. The individuals who come through the primary fence and who are then between the two walls are in the United States. For the last several weeks I have witnessed Border Patrol direct and control their movements, such as the movement of men to a different part of the corridor.  Border Patrol agents are the only people who have access to the encampment. They are the only ones on site. These individuals are in their custody and Border Patrol is responsible for their fundamental well being. The individuals are being detained in dire conditions.

5. Border Patrol developed a system to track the individuals who are in the encampment by providing them with wrist bands to track when they entered into their custody.  The wristbands vary in color from red, yellow, blue, green and gray to reflect the date they entered the encampment.

6. It appears they have different wristbands for the day of the week that border agents first identify them, and it appears to indicate the priority based on the days and nights that they have been here.  But we have seen over and over again that the system isn't being followed and it depends on what officers they get on which wristband they are given. For example, migrants have told us they have been here for 4 days, but their wristband indicates less.

7. Individuals cannot leave the area because of the physical walls that stand in their way. Some of those arriving are suffering severe pain, diarrhea, headaches, severe cuts and bruises. One Asian man's leg was severely infected. He was in extreme pain with no way to communicate. We had to wait for Border Patrol to respond to our texts and.

Many individuals are pregnant, have children with them, have no shoes, are muddy, wet and in terrible condition. All they can do is wait for Border Patrol to take them to be processed for asylum.

8. Border Patrol agents do not come often to the site. Once a day, they provide a bottle of water and some kind of granola bar. To keep people from starving, NGOs, volunteers both on the Mexico and US side of the border, are supplying the basic necessities they can. It is a dire situation.

9. On Tuesday, May 9th, 2023, an incident happened where two Colombian women were traveling alone and were being sexually harassed.  Four males became abusive towards them and the women decided to approach us (there were no agents to approach). We let the authorities know. Fortunately there was no sexual attack, but there was physical and verbal abuse. If we were not there, we don't know whether the attack would have been prevented.

10. We have seen several pregnant women come through. One woman, approximately a week ago, had a miscarriage. She has continually expressed the pain she is going through, especially at night.

11. In a particularly distressing incident, a man from Africa was walking and collapsed.  A Colombian nurse tried to help and told us he was dying. We alerted the Border Patrol. Fortunately, the Border Patrol came and picked him up.

12. On a different occasion, a child suffered an epilepsy attack and we were able to get assistance from Border Patrol. I continue to be concerned that if we were not there bearing witness that children and adults would suffer harm while in Border Patrol custody.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.

May 12, 20223

Adriana Jasso

# Exhibit B

(Serrano Decl.)










December 11, 2023

Officer Shoba Sivaprasad Wadhia
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Compliance Branch, Mail Stop # 0190
2707 Martin Luther King, Jr. Ave., SE
Washington, DC 20528-0190

*Via Electronic Mail:* CRCLCompliance@hq.dhs.gov

> **RE:** **CBP Violations of Custody Standards and Human Rights of Individuals Detained in Open-Air Detention Sites in the San Diego Sector Require Immediate Attention to Save Lives**

Dear Officer Wadhia:

We are writing to file a renewed and expanded formal complaint with the Office for Civil Rights and Civil Liberties (CRCL) about the continued gross violations of rights by U.S. Customs and Border Protection (CBP), specifically, Border Patrol, which has now for nearly a year forced asylum seekers to remain in CBP custody in open-air detention sites along the U.S.-Mexico border in California. The sites are located in the open-air corridor between the primary and secondary border walls west of the San Ysidro port of entry and in open-air encampments near the town of Jacumba, California.

As detailed in the original complaint filed by the Southern Border Communities Coalition (SBCC)—and since corroborated by numerous media reports and accounts from organizations providing asylum seekers with minimal supplies to survive—Border Patrol agents are still detaining asylum seekers in dangerous, exposed conditions, and are failing to provide the adequate food, water, sanitation, shelter, and medical care required under the law. Since your office completed its review of the previous complaint, at least one individual has died at an open-air detention site despite CRCL having "raised concerns about conditions" and suggesting

that "CBP have humanitarian assistance plans in place to ensure these conditions do not recur."[1] The situation is increasingly dire, as the cold and rainy winter season is beginning. CRCL must exercise its oversight function to ensure CBP takes immediate corrective action if it continues to detain asylum seekers at these open-air detention sites, including providing the basic shelter, food, water, and medical care required under the law.

The undersigned organizations are located at the border where they provide essential services and have documented conditions at the open-air detention sites in California. Based on our first-hand observations, it is indisputable that individuals held at the open-air detention sites are under CBP's custody and control, and that the conditions continue to violate CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS Standards") and violate the human rights of asylum seekers and other migrants, which the United States is bound to uphold. Thus, the undersigned organizations renew the demands in the previous complaint and implore CRCL to take immediate and meaningful action to address these ongoing and increasingly grave violations by CBP.

The open-air detention sites near San Ysidro were the subject of the previous complaint filed with your office on May 13, 2023. Section I, below, describes current conditions at those sites. In Section II, the sites near Jacumba are described for the first time in this complaint, given the government's expanded reliance on these more remote locations. The undersigned organizations are aware of open-air detention sites at other points along the border including outside of California, which are beyond the scope of this complaint. We urge CRCL to ensure oversight and compliance with basic human rights standards at *all* such sites.

---

[1] U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties, *Letter responding to Complaint No. 006336-23-CBP* (Sept. 28, 2023) [hereinafter CRCL Response to SBCC Complaint] (on file with the undersigned organizations).

# TABLE OF CONTENTS

I. San Ysidro Sites: The Ongoing Operations of Open-Air Detention Sites West of the San Ysidro Port of Entry Continue to Violate CBP's Own Standards, as Described in a May 2023 Complaint ............................................................................................................. 4

    A.    Asylum Seekers and Migrants at Open-Air Detention Sites Near San Ysidro Remain in CBP Custody ........................................................................................ 5

    B.    CBP is Still Not Adequately Responding to Medical Emergencies in San Ysidro ................ 7

    C.    CBP is Still Not Providing Sufficient Food and Water in San Ysidro ................................... 8

    D.    CBP is Still Not Providing Adequate Restroom Facilities at the Open-Air Detention Sites in San Ysidro ........................................................................................ 9

    E.    Volunteers are Addressing the Needs of Migrants at Open-Air Detention Sites in San Ysidro Because CBP is Not Providing Adequate Food, Water, Medical Care, or Other Necessities ....................................................................................... 10

II. Jacumba Sites: CBP Fails to Address the Basic Needs of Asylum Seekers Detained near Jacumba, California, in Violation of the TEDS Standards ......................................................... 11

    A.    Individuals at the Sites Near Jacumba are in CBP Custody ................................................. 12

        1.  The Physical Location of the Jacumba Sites Coupled with CBP Control Prevents People from Leaving ................................................................................. 12

        2.  CBP Directs Individuals to Remain at the Jacumba Sites ................................................. 14

        3.  CBP Acknowledges its Duties at the Jacumba Sites by Providing Inadequate Levels of Care ..................................................................................... 15

    B.    CBP is Not Providing Sufficient Food and Water at the Jacumba Sites ........................... 15

    C.    CBP is Denying Medical Care at the Jacumba Sites .......................................................... 16

    D.    CBP is Failing to Provide Adequate Shelter at the Jacumba Sites ..................................... 18

III. CRCL Must Take Immediate Action to Address the Grave Violations Documented in this Complaint ............................................................................................................... 20

PLFS-0046

I. **San Ysidro Sites: The Ongoing Operations of Open-Air Detention Sites West of the San Ysidro Port of Entry Continue to Violate CBP's Own Standards, as Described in a May 2023 Complaint**

In May 2023, the Southern Border Communities Coalition (SBCC) filed a complaint documenting CBP's use of open-air detention sites between the primary and secondary walls located west of the San Ysidro port of entry in California.[2] In the complaint and its supporting declarations, SBCC documented Border Patrol agents' failure to provide adequate water, food, shelter, sanitation, and medical assistance to asylum seekers and other migrants at the open-air detention sites.[3] It also provided examples of Border Patrol agents verbally mistreating individuals.[4]

Based on the conditions documented by advocates, SBCC established that CBP was violating its TEDS Standards[5] and violating migrants' rights under the International Covenant on Civil and Political Rights (ICCPR),[6] including Article 7 which provides that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment."[7] Accordingly, SBCC sought an investigation into the violations of the TEDS Standards and the ICCPR.[8] More specifically, SBCC asked CRCL to ensure that violations cease, that human rights be protected, and that the conditions not recur in California or anywhere else along the border.[9] CRCL completed its investigation with a September 28, 2023 letter indicating that it understood individuals in the open-air detention sites outside the San Ysidro port of entry "had since been processed" but that it would work with CBP to ensure that such conditions did not occur again.[10]

In November 2023, the U.N. Human Rights Committee ("the Committee") concluded its review of the United States' compliance with its obligations under the ICCPR. The United States is a signatory to the ICCPR, which it ratified in 1992, giving the ICCPR the status of the supreme law of the land per the U.S. Constitution's Supremacy Clause. The Committee expressed concern about the U.S. government's treatment of migrants, specifically "poor conditions of detention, including overcrowding and inadequate access to food, water and medical care," and stated that the United States "should take all measures necessary to enhance protection of migrants,

---

[2] Southern Border Communities Coalition, *Civil Rights Civil Liberties Complaint*, 1 (May 13, 2023) [hereinafter SBCC CRCL Complaint].
[3] SBCC CRCL Complaint at 2-8.
[4] *Id.* at 9 (citing Decl. of Pedro Rios ¶ 25).
[5] CBP, National Standards on Transport, Escort, Detention, and Search (2015), [hereinafter TEDS Standards].
[6] SBCC CRCL Complaint at 8.
[7] International Covenant on Civil and Political Rights Art. 7.
[8] SBCC CRCL Complaint at 9.
[9] *Id.* at 10.
[10] CRCL Response to SBCC Complaint.

refugees and asylum seekers" and ensure that immigration policy is aligned "with international human rights and humanitarian standards."[11] It further directed the United States to take measures to remedy the violations, as required under Article 2 of the ICCPR.[12] Despite raising these concerns at both the domestic and international levels, violations of the ICCPR and the TEDS Standards—and severe ongoing harm to asylum seekers and migrants—persist at the open-air detention sites. The inhumane conditions migrants face at the open-air detention sites will become even more dire, if not more deadly, as the rainy, freezing winter weather continues.

### A. Asylum Seekers and Migrants at Open-Air Detention Sites Near San Ysidro Remain in CBP Custody

CBP has established four open-air detention sites along the open-air corridor west of the San Ysidro port of entry. Listed from east to west they are known as: Whiskey 4; Whiskey 8 (where volunteers maintain a site providing migrants with food, water, and basic necessities); Spooner's Mesa (where it is believed predominantly single adult men are detained);[13] and 91X (closest to the beach).[14] CBP officers have stated that they are only present at the open-air detention sites to monitor for medical emergencies until their stations have capacity to process individuals.[15] But their interactions with individuals between the walls suggest otherwise. SBCC's May 2023 complaint explained that asylum seekers and migrants in the open-air detention sites are in CBP custody because of the extent of CBP's control over their environment, movement, and treatment.[16] CBP continues to exercise the same control now.

First and foremost, the area between the primary Tijuana wall and the secondary wall (about 75 yards north) is located on U.S. soil, as is evidenced by a sign posted on the secondary wall.[17] CBP regularly patrols and monitors this area[18] and exercises control over migrants by, for example: directing them from one area of the corridor to another,[19] and in some cases, transporting them from one area of the corridor to another in Border Patrol vehicles;[20] taking

---

[11] U.N. Human Rights Comm., *Concluding Observations on the Fifth Periodic Report of the United States of America* ¶¶ 54-55 (Nov. 3, 2023), U.N. Doc. CCPR/C/USA/CO/5.
[12] *Id.*
[13] Supp. Decl. of Flower Alvarez Lopez ¶ 8.
[14] Supp. Decl. of Pedro Rios ¶ 5.
[15] WRC Report at 3.
[16] SBCC CRCL Complaint at 3.
[17] *Id.* at 2.
[18] *Id.*
[19] *Id. See also* Supp. Decl. of Pedro Rios ¶ 12; Supp. Decl. of Flower Alvarez Lopez ¶ 9.
[20] Supp. Decl. of Adriana Jasso ¶ 10; Supp. Decl. of Lilian Serrano ¶ 10; Supp. Decl. of Pedro Rios ¶ 12.

counts of people in the corridor;[21] issuing color coded or labeled wristbands;[22] directing people to remain seated;[23] subjecting them to invasive body searches;[24] providing inadequate amounts of water and food, portable toilet facilities, and garbage collection;[25] and not allowing anyone, including those in need of medical attention, to leave the corridor without authorization from CBP agents.[26] Individuals only leave the corridor in Border Patrol vehicles or privately owned buses contracted by CBP, unless they are in a medical crisis so grave that they have to be picked up in an ambulance.

Recent reporting confirms that CBP officers tell migrants that they need to stay in the open-air detention sites; otherwise, they will be deported.[27] CBP officials place paper wristbands on individuals labeled with the day they entered custody, indicating the rough order in which they will be picked up.[28]

When CBP officers arrive to take asylum seekers on the sites for processing, they exert control over people in numerous ways. CBP officers order people to remove any additional clothing beyond a shirt or other article of clothing on top and pants or another article of clothing on the bottom.[29] People are forced to remove or discard blankets, jackets, and coats. CBP only allows people to have one small bag, and orders them to remove all shoelaces, hair ties, and other accessories. Often, CBP outsources transport to a private transportation company, which picks up and transports asylum seekers for processing. CBP officers are present and monitor the private company during transport. The private transport company often handcuffs asylum seekers before they board the bus.[30]

---

[21] Supp. Decl. of Flower Alvarez Lopez ¶ 11; Supp. Decl. of Adriana Jasso ¶¶ 11-12; Supp. Decl. of Lilian Serrano ¶¶ 14-15; Supp. Decl. of Pedro Rios ¶ 13.

[22] SBCC CRCL Complaint at 3.

[23] *Id.* at 2; Decl. of Pedro Rios ¶ 20.

[24] Supp. Decl. of Adriana Jasso ¶¶ 13-15.

[25] SBCC CRCL Complaint at 2; Decl. of Adriana Jasso ¶ 8; Supp. Decl. of Adriana Jasso ¶¶ 20-23; Supp. Decl. of Lilian Serrano ¶ 9.

[26] SBCC CRCL Complaint at 3.

[27] Jasmine Garsd, *Border Patrol sending migrants to unofficial camps in California desert, locals say*, NPR (Nov. 21, 2023), [hereinafter NPR Story].

[28] Women's Refugee Commission, *People Seeking Asylum Confined Outside in Appalling Conditions: Findings and Recommendations from a Monitoring Visit to San Diego* 3 (Nov. 2023) [hereinafter WRC Report]. *See also* Gustavo Solis, *Border Patrol once again puts migrants in outdoor San Ysidro camp with no bathrooms*, KPBS (Sept. 12, 2023), [hereinafter KPBS San Ysidro open-air detention sites]. As discussed below, some volunteers have reported that CBP has stopped issuing wristbands in the Jacumba sites as of early December. Decl. of Jacqueline Arellano ¶¶ 20-22.

[29] Supp. Decl. of Flower Alvarez Lopez ¶ 12.

[30] *Id.*

CBP continues to detain people in the open-air corridors for anywhere between a few hours to multiple days, although average time in detention at the corridor sites has dropped following the death of an asylum seeker. On October 11, 2023, a 29-year-old Guinean woman died after suffering a medical emergency at the Whiskey 4 site.[31] Before her death, advocates witnessed CBP regularly detaining migrants in the open-air detention sites for over 72 hours, in violation of the TEDS Standards.[32] Since her death, the average time a person is at Whiskey 8 has decreased.[33] However, without proper treatment, individuals still experience violations of their rights that are sometimes fatal. This decrease in detention time does not absolve CBP from complying with its duties.

### B. CBP is Still Not Adequately Responding to Medical Emergencies in San Ysidro

Notwithstanding that migrants at the open-air detention sites are within CBP's custody and control, CBP fails to satisfy its own minimum standards for providing for migrants' basic care. The TEDS Standards require CBP to provide individuals with medical attention, meals at regularly scheduled times, adequate water, restroom accommodations, and personal hygiene items.[34] TEDS Standards § 4.10 provides that "[e]mergency medical services will be called immediately in the event of a medical emergency."[35] Yet, advocates have witnessed CBP's delayed response in providing medical attention to detained asylum seekers and migrants,[36] including to a person on the verge of dying.[37]

Advocates have observed many people who sustained injuries from falling from the border walls.[38] Volunteers have tended to the medical needs of migrants because CBP has failed to do so. A volunteer reported providing first aid to a woman who suffered a deep laceration to her leg after being cut by concertina wire while climbing over the border wall in September 2023.[39] The woman had reported her injury to CBP, but the officer told her to go to the volunteers

---

[31] Alexandra Mendoza, *Migrant woman dies after waiting to be processed at the border near San Ysidro*, THE SAN DIEGO UNION-TRIBUNE (Oct. 13, 2023); Salvador Rivera, *Female migrant dies after crossing the border in California*, BORDER REPORT (Oct. 13, 2023).

[32] SBCC CRCL Complaint at 7-8 (describing detention of migrants for up to a week). *See* TEDS Standards § 4.1 ("Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible.").

[33] WRC Report at 3.

[34] SBCC CRCL Complaint at 4. *See also* TEDS Standards at 17-18.

[35] TEDS Standards § 4.10 ("Medical Emergencies").

[36] SBCC CRCL Complaint at 4-5.

[37] Decl. of Adriana Jasso ¶ 11.

[38] Supp. Decl. of Flower Alvarez Lopez ¶ 19.

[39] *Id.* ¶ 20.

instead.[40] Volunteers also supported an Ecuadorian woman who feared calling an ambulance for her 11-year-old son with a fever because she was told that she would not be able to move forward with her case.[41] Volunteers helped the mother call for medical assistance when her son's fever reached 103.5 degrees.[42] These examples show that CBP is not following the TEDS Standards, which require CBP to call for emergency medical services "immediately."[43] Rather, CBP is creating an environment that delays or discourages individuals from receiving medical services altogether.[44]

CBP does not adequately respond to medical emergencies, and when it does respond, it fails to account for the processing of individuals after they are discharged from local hospitals.[45] Without coordinated plans from CBP, individuals who are discharged from local hospitals have had to figure out how to return to the open-air detention sites on their own because they are unsure of what else to do.[46] According to a volunteer doctor providing medical services to asylum seekers, including through the slats of the border wall, there will be more injuries and deaths unless adequate medical care and additional support is provided.[47]

### C. CBP is Still Not Providing Sufficient Food and Water in San Ysidro

The May 2023 complaint describes CBP agents providing migrants with "a single small water bottle per person, and a granola bar"[48] after arrival even though the TEDS Standards require "regularly scheduled meal times" for adults[49] and "a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times" for children and pregnant individuals.[50] In direct contravention of the TEDS Standards, CBP was also not providing adequate amounts of water.[51]

---

[40] *Id.*

[41] *Id.* ¶ 17.

[42] *Id.*; Supp. Decl. of Pedro Rios ¶ 20.

[43] TEDS Standards § 4.10 ("Medical Emergencies").

[44] Supp. Decl. of Flower Alvarez ¶ 15.

[45] WRC Report at 6.

[46] *Id.*; *see also* Paul Sisson, *Federal government mum on why less-severe medical needs are not better coordinated*, THE SAN DIEGO UNION-TRIBUNE (Sept. 23, 2023).

[47] Alexander Mendoza, *Migrant woman dies after waiting to be processed at the border near San Ysidro*, THE SAN DIEGO UNION TRIBUNE (Oct. 13, 2023).

[48] SBCC CRCL Complaint at 5; Supp. Decl. of Lilian Serrano ¶ 9; Decl. of Jacqueline Arellano ¶ 13.

[49] TEDS Standards § 4.13.

[50] TEDS Standards § 5.6.

[51] SBCC CRCL Complaint at 6 (describing the use of a 5-gallon container of water that would be finished by mid-day). *See* TED Standards § 4.14 ("Functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees.").

CBP continues to commit blatant violations of these standards. CBP is still only providing—at best—a single bottle of water and one small snack per day.[52] In response to CBP's inadequate food provision, organizations and volunteers on both sides of the border have been supplying migrants with basic necessities.[53] In fact, CBP has stopped regularly providing even this minimal food and water to migrants at Whiskey 8, where volunteers have a constant presence and have direct access to provide supplies through the slits in the border wall.

**D. CBP is Still Not Providing Adequate Restroom Facilities at the Open-Air Detention Sites in San Ysidro**

The May 2023 complaint discussed CBP's failure to provide adequate restroom facilities[54] and basic hygiene items.[55] Six months later, there continues to be a dearth of restroom facilities at the open-air detention sites. To address the urgent need for restroom facilities, the American Friends Service Committee (AFSC) brought the issue to the attention of state Senator Steve Padilla's office, which advocated bringing portable restrooms to three open-air detention sites located west of the San Ysidro port of entry.[56] And, in fact, all of the open-air detention sites accessible to public view now appear to have at least one portable toilet provided by CBP. But this is not adequate sanitation for the number of individuals passing through these sites, which can include up to a hundred or more people daily.[57]

The TEDS Standards further require restrooms that afford a reasonable amount of privacy.[58] Yet, women at the open-air detention sites are forced to go to the restroom in groups for protection and use pieces of cardboard to provide a degree of privacy.[59] In addition, CBP does not provide any menstrual products, such as sanitary pads and tampons, or diapers for babies,[60] which violates TEDS Standard § 4.11.

---

[52] Supp. Decl. of Lilian Serrano ¶ 9; KPBS San Ysidro open-air detention sites.

[53] Decl. of Adriana Jasso ¶ 8; Supp. Decl. of Lilian Serrano ¶ 9.

[54] SBCC CRCL Complaint at 6 (describing use of a single port-a-potty for hundreds of migrants and lack of maintenance of the port-a-potty). *See* TEDS Standards § 4.15 (requiring restroom accommodations made available to "all detainees and a reasonable amount of privacy . . .").

[55] SBCC CRCL Complaint at 7 (describing a lack of showers, hand washing stations, and basic personal hygiene items despite some individuals being detained for up to a week). *See* TEDS Standards § 4.11 (requiring that detainees be provided with "basic personal hygiene items, consistent with short term detention and safety and security needs" and for families with small children to have "access to diapers and baby wipes," and requiring reasonable efforts to "provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention.").

[56] Pedro Rios, *Update: AFSC U.S.-Mexico Border Program staff responds to Border Patrol's open-air detention sites*, AFSC Newsroom (Oct. 2, 2023) hereafter "AFSC Update"]. *See also* Supp. Decl. of Pedro Rios ¶ 19.

[57] KPBS San Ysidro open-air detention sites.

[58] *See* TEDS Standards § 4.15 (requiring restroom accommodations made available to "all detainees and a reasonable amount of privacy . . .").

[59] KPBS San Ysidro open-air detention sites.

[60] SBCC CRCL Complaint at 7 (citing Decl. of Flower Alvarez Lopez ¶ 5).

**E. Volunteers are Addressing the Needs of Migrants at Open-Air Detention Sites in San Ysidro Because CBP is Not Providing Adequate Food, Water, Medical Care, or Other Necessities**

Because CBP is not addressing the basic needs of asylum seekers at the open-air detention sites, where they are exposed to the elements in the desert, organizations and volunteers have set up a volunteer station to provide water, food, and medical assistance.[61] AFSC, Al Otro Lado, and Border Kindness, among others, have committed to providing asylum seekers at the open-air detention sites with meals, water, and sources of warmth where CBP has failed to do so.[62] CBP does not provide blankets, jackets, umbrellas, ponchos, or shelter—even though TEDS Standards require CBP to provide clean bedding to children and clean blankets, when available, to adults upon request.[63] Instead, nongovernmental organizations have taken it upon themselves to provide food, water, blankets, tarps, informal translation services, clothing, medicine and first aid, diapers, and personal hygiene products to asylum seekers at the open-air detention sites.[64]

Volunteers responding to the needs of migrants use Whiskey 8 as a headquarters, where they prepare food and other items to distribute to people at the four sites near San Ysidro. Nonprofit organizations and volunteers advocated with CBP to be able to provide aid directly at one publicly accessible site through the wall; however, there are three other open-air detention sites where CBP generally does not allow nonprofit organizations and volunteers to go.[65] Volunteers give food to CBP agents, who presumably distribute it to individuals at the other sites.[66] The food provided by volunteers and organizations is the only substantial food that individuals at the open-air detention sites receive, given that CBP only provides them water and occasional snack foods, such as granola bars.[67] Men from Spooner's Mesa have repeatedly requested permission from Border Patrol to leave and hike to Whiskey 8 to bring back food for the men there.[68] CBP has generally denied them permission.[69] On at least one occasion, Border

---

[61] AFSC Update; Supp. Decl. of Pedro Rios ¶ 22; Supp. Decl. of Lilian Serrano ¶ 9.

[62] AFSC Update; Decl. of Jacqueline Arellano ¶ 17. *See also* Jacob Aere, *Migrants detained near Jacumba Hot Springs now face cold, wet weather*, KPBS (Nov. 15, 2023) [hereinafter KPBS Jacumba Report].

[63] *See* TEDS Standards § 4.12. *See also id.* § 8.0 (defining bedding as "[a] (or any combination of) blanket, mat, or cot").

[64] AFSC Update. *See also* KPBS San Ysidro open-air detention sites.

[65] WRC Report at 3; *see, e.g.*, Supp. Decl. of Adriana Jasso ¶¶ 8, 20-22.

[66] *See* Supp. Decl. of Lilian Serrano ¶ 13 noting that "Border Patrol agents tell volunteers at Whiskey 8 how many migrants are in Spooner's Mesa so that the volunteers can pack food lunches and Border Patrol takes those packages to the migrants in that site."

[67] SBCC CRCL Complaint at 5. *See also* AFSC Update; Supp. Decl. of Pedro Rios ¶ 18; Supp. Decl. of Lilian Serrano ¶ 9.

[68] Supp. Decl. of Adriana Jasso ¶¶ 21-22.

[69] *Id.* ¶ 22.

Patrol allowed migrants detained at Spooner's Mesa to access food and water provided by volunteers only after the volunteers interceded on the migrants' behalf and negotiated for permission for the migrants to bring food to the site.[70] Response efforts from organizations including Border Kindness, Al Otro Lado, Universidad Popular, and mutual aid groups are driven by volunteers and funded by donations, and thus are not guaranteed to continue.[71]

Given the dire conditions facing asylum seekers at these sites, CRCL should reopen its investigation into the open-air corridor between the primary and secondary border walls west of the San Ysidro Port of Entry. Although CRCL "raised concerns about [these] conditions"[72] with CBP, it does not appear that the agency has taken any meaningful action in response.

## II. Jacumba Sites: CBP Fails to Address the Basic Needs of Asylum Seekers Detained near Jacumba, California, in Violation of the TEDS Standards

Open-air encampments emerged in Jacumba, California around May 2023.[73] According to recent reporting, currently on any given day there are an average of 500 asylum seekers and other migrants at the sites.[74] According to data collected by Al Otro Lado, between the end of October 2023 and the beginning of December 2023, the number of asylum seekers at the Jacumba open-air detention sites on a single day ranged between less than 100 to over 750.[75] During this period, the number of children at the Jacumba open-air detention sites ranged between less than 20 and up to nearly 60, and the number of pregnant persons has reached over 60.[76] Conditions in Jacumba are just as, if not more, deplorable[77] than the conditions in between the primary and secondary border walls west of the San Ysidro port of entry. Thus, the undersigned organizations request that CRCL expand its investigation of CBP's violations of TEDS Standards to include all open-air detention sites currently in use in California and beyond and to ensure that such violations cease.

---

[70] *Id.*; Supp. Decl. of Pedro Rios ¶ 16.

[71] AFSC Update.

[72] CRCL Response to SBCC Complaint.

[73] Soumya Karlamangla, *Scenes From a Migrant Camp at California's Southern Border*, N.Y. TIMES (May 19, 2023). *See also* Melissa Gomez, *Migrants struggle against the elements in San Diego's open-air desert camps*, L.A. TIMES (Nov. 28, 2023) [hereinafter L.A. TIMES Article]. *See also* Supp. Decl. of Pedro Rios ¶ 7; Supp. Decl. of Lilian Serrano ¶¶ 4-6.

[74] L.A. TIMES Article.

[75] Decl. of Erika Pinheiro ¶ 23; *see also* Supp. Decl. of Lilian Serrano ¶ 6.

[76] Decl. of Erika Pinheiro ¶ 23.

[77] Supp. Decl. of Lilian Serrano ¶ 6 ("While conditions in the other sites are deplorable, the conditions in Jacumba are particularly dangerous because migrants are exposed to extreme desert weather conditions, including intense heat waves and cold fronts.").

### A. Individuals at the Sites Near Jacumba are in CBP Custody

There are four open-air detention sites in and near Jacumba, California, which are in remote locations in the middle of the desert. Three of the sites are presently in use: Valley of the Moon (also referred to as "Moon Valley" or "Moon"); Tower 177; and Willows.[78] While the sites vary in their precise location and geographic features, at each site, asylum seekers undoubtedly are—and understand themselves to be—under CBP's custody and control.[79] In fact, a senior CBP official recently acknowledged to a reporter that the camp serves as a "sort of informal holding spot."[80] Based on observations from advocates on the ground, asylum seekers and migrants at the Jacumba open-air detention sites are indeed in CBP custody, as detailed below.



*Figure 1. CBP vehicles and officers at the Moon Valley Site. (Photo from November 14, 2023).*

### 1. The Physical Location of the Jacumba Sites Coupled with CBP Control Prevents People from Leaving

The geography and operations of each site, as seen in the photos included in this complaint, prevent asylum seekers from leaving the sites. As an initial matter, all three sites are surrounded by desert, and any asylum seeker who leaves the sites will be at severe risk of dehydration, starvation, or death by exposure. The Moon Valley site is located by the shoulder of a highway and is bordered by mountains to the south and desert all around. When on site, CBP maintains its vehicles between the encampment and the highway.[81] Tower 177 and Willows are both located on private property and are only accessible through a gated road. The Tower 177 site is bordered by mountains on the side opposite to the road and CBP maintains

---

[78] The fourth site is referred to as O'Neill.

[79] Tom K. Wong, *Lives in Danger: Seeking Asylum Against the Backdrop of Increased Border Enforcement*, UC San Diego US Immigration Policy Center (May 16, 2023) [hereinafter "Immigration Policy Center Report"].

[80] L.A. Times Article.

[81] *See* Figure 1.

vehicles at the top of the hill leading out from the encampment.[82] And the Willows site is enclosed by the border wall on one side and by railroad tracks on the other side. CBP vehicles patrol the only road leading in and out of this site.[83] At each location, CBP monitors who may enter and interact with asylum seekers. At Willows, CBP has even installed a sign indicating the site is under CBP control and that only authorized personnel are allowed on the site.[84]



*Figure 2. A sign installed by CBP at the Willows site. (Photo from November 14, 2023).*

In addition to physical barriers and in-person monitoring, there are Anduril Autonomous Surveillance Towers (AST) at each of the three Jacumba open-air detention sites.[85] The ASTs use an artificial intelligence system that detects and tracks movement in a 360-degree radius up to more than a mile away from the site.[86] These ASTs alert Border Patrol when an "object of interest" is detected, meaning that it sends images of persons or vehicles of interest that have made movement at the sites.[87] Border Patrol therefore has capacity to monitor and surveil asylum seekers at the detention sites even when agents are not physically onsite.[88] When asylum seekers and migrants have attempted to leave the camp, Border Patrol agents have apprehended and returned them to the detention sites.[89]



*Figure 3. A CBP vehicle guards the road leading out of Tower 177. (Photo from November 14, 2023).*

---

[82] Supp. Decl. of Pedro Rios ¶ 6.
[83] *Id.*; Decl. of Jacqueline Arellano ¶ 11; Decl. of Erika Pinheiro ¶ 16.
[84] *See* Figure 6.
[85] Decl. of Erika Pinheiro ¶ 17.
[86] *Id.*
[87] Decl. of Erika Pinheiro ¶¶ 17-18.
[88] *Id.* ¶ 17.
[89] *Id.* ¶ 18.

PLFS-0056

Finally, CBP officers themselves consider the asylum seekers at Jacumba to be in custody. According to a report, a Border Patrol agent, when asked whether the asylum seekers were free to leave, said that they were not: "[W]hen asked what would happen if the migrants tried to leave Jacumba, the agent said they would be apprehended."[90]



Figure 4. The Willows site abuts the border wall. (Photo from November 14, 2023).



Figure 5. CBP vehicles patrol the only road leading to the Willows site. (Photo from November 14, 2023).

### 2. CBP Directs Individuals to Remain at the Jacumba Sites

CBP directs asylum seekers from wherever they are apprehended along the border to the sites and orders them to wait there to be taken for processing.[91] In some instances, CBP directly transports asylum seekers to the open-air detention sites in its vehicles.[92] As at the San Ysidro sites, CBP requires individuals to wear paper wristbands indicating the day they arrived.[93] CBP officers tell asylum seekers that they can expect to be at the site for at least 1-3 days and warn them that leaving the site will be harmful to their asylum case, meaning



Figure 6. Asylum seekers with wristbands. (Photo from November 14, 2023).

---

[90] Immigration Policy Center Report at 4.
[91] Supp. Decl. of Lilian Serrano ¶ 12.
[92] Decl. of Jacqueline Arellano ¶¶ 9-10; Decl. of Erika Pinheiro ¶¶ 14-15. *See also* Steve Inskeep and Jasmine Garsd, *Many migrants entering the U.S. illegally land in makeshift camps in California*, NPR MORNING EDITION (Nov. 21, 2023).
[93] *See* Paulina Velasco, *Detained in the desert: migrants stuck in camps in the extreme climate of the US-Mexico border*, THE GUARDIAN (Nov. 27, 2023) [hereinafter "GUARDIAN Story"]. *See also* L.A. TIMES Article; Decl. of Erika Pinheiro ¶¶ 14, 30.

that they could be denied asylum and deported. Children and family groups are often picked up first, though they may still be required to wait overnight.[94]

Asylum seekers at the Jacumba sites are not free to leave. As mentioned, when people venture out of open-air detention sites in search of food or other goods, CBP follows them and forces them to return, underscoring CBP's control over the sites.[95]

### 3. CBP Acknowledges its Duties at the Jacumba Sites by Providing Inadequate Levels of Care

CBP maintains a presence at the open-air detention sites: the agency has installed inadequate numbers of portable toilets at all the sites, and dumpsters at a few of the sites. Such infrastructure, however inadequate, further indicates that CBP's open-air detention sites are custodial and that the agency is adhering to some—deeply inadequate—standard of confinement. CBP is not consistently present on site to provide humanitarian services, but instead guards the side closest to the road at all sites: monitoring for any individuals attempting to leave or enter the site. At Tower 177, for example, advocates have witnessed an additional CBP vehicle stationed on the road outside the site,[96] which would prevent anyone from leaving without being surveilled by CBP.



*Figure 7. Portable toilets installed by CBP at the Tower 177 site (Photo from November 14, 2023).*

### B. CBP is Not Providing Sufficient Food and Water at the Jacumba Sites

Notwithstanding that migrants detained at the Jacumba open-air detention sites are in CBP's custody and control, CBP also fails to provide for their basic needs, just as it fails to provide for migrants detained at the sites near San Ysidro. The TEDS Standards require "regularly scheduled meal times" for adults[97] and "a snack upon arrival and a meal at least every six hours

---

[94] L.A. TIMES Article; Decl. of Erika Pinheiro ¶¶ 42-43; Supp. Decl. of Pedro Rios ¶ 15.
[95] Decl. of Jacqueline Arellano ¶ 11.
[96] *See* Figure 2.
[97] TEDS Standards § 4.13.

thereafter, at regularly scheduled meal times"
for children and pregnant individuals.[98]
However, individuals staying at the Jacumba
open-air detention sites rely exclusively on
volunteers to provide them with food and
water to survive.[99] In fact, CBP has even asked
humanitarian organizations to bring certain
items that CBP does not provide.[100] Like in San
Ysidro, CBP provides just one bottle of water,
and at most, a small snack-size pack of
crackers.[101] Some asylum seekers do not
receive even these basic items on arrival.[102]



*Figure 8. Tents at the Willows site. (Photo from November 14, 2023).*

People brought to these sites have often walked for hours through the desert and are tired, hungry, and dehydrated on arrival. Despite forcing people to remain at the sites for days at a time, CBP does not provide any meals. Only volunteers provide meals, traveling to all three sites twice a day to provide a meal in the morning and a meal in the afternoon.

### C.  CBP is Denying Medical Care at the Jacumba Sites

There are no medical facilities, supplies, or posted information about what to do in the event of a medical emergency at any of the described open-air detention sites. CBP does not assess medical needs or provide any emergency medical care.[103] Instead, medical volunteers regularly volunteer at the sites to address immediate needs.[104] Medical volunteers at the open-air detention sites include doctors, nurse practitioners, and medical students who are licensed to provide medical assistance.[105] Other volunteers, while not medical providers, have EMT or first aid training and provide care to address immediate needs.[106] People have required first aid care to address parasites, burns, broken bones, and other medical needs.[107] Volunteers have also seen people with significant medical conditions, including pregnant women or women in

---

[98] *Id*. § 5.6.
[99] NPR Story.
[100] GUARDIAN Story.
[101] Decl. of Erika Pinheiro ¶ 8.
[102] Decl. of Jacqueline Arellano ¶ 13.
[103] Decl. of Erika Pinheiro ¶ 39; Decl. of Jacqueline Arellano ¶ 18.
[104] Decl. of Erika Pinheiro ¶ 39; Decl. of Jacqueline Arellano ¶ 19.
[105] Decl. of Erika Pinheiro ¶ 39.
[106] Supp. Decl. of Flower Alvarez Lopez ¶ 16.
[107] NPR Story.

labor.[108] Given the recent change in weather, medical professionals are concerned that there may be an increase in cases of hypothermia and the flu, particularly among children and individuals with underlying medical conditions.[109] Since September, volunteers have already seen people at the open-air detention sites with hyperthermia and hypothermia.[110]

Yet, even as CBP deprives migrants of the basic necessities they need to survive, it threatens to bar or deter volunteers from assisting migrants detained at the open-air sites near Jacumba. In particular, medical volunteers have received pushback for the aid that they provide.[111] On December 4, 2023, two San Diego County sheriffs approached volunteers at Willows to inquire whether they were giving out pharmaceuticals.[112] Volunteers confirmed that they only provide over-the-counter medicine and wound care.[113]

Given the location of the detention sites, it is extremely difficult for migrants to receive appropriate medical attention in an emergency. Border Patrol agents often refuse to call local Emergency Medical Services (EMS),[114] but when migrants or volunteers call, EMS sometimes delays responding to emergency calls or discourages migrants from seeking medical attention.[115] Recently, Border Patrol has informed advocates that EMS will now only respond if CBP makes the 911 call.[116] Yet even when CBP does call, EMS has generally refused to go into the Jacumba open-air detention sites.[117] As a result, people experiencing medical emergencies need to be taken to the paved road next to the open-air detention sites to be treated by EMS, which at Tower 177 is a significant distance away.[118] Moreover, the remoteness of the sites delays how fast an ambulance can take a person to the nearest hospital.[119] Earlier this month, it took over an hour for EMS to respond after receiving an emergency call about a 13-year-old boy who was badly injured.[120] The boy died at the site.[121]

---

[108] Dani Miskell, *Freezing conditions at Jacumba border puts migrants at risk for hypothermia*, ABC 10 NEWS SAN DIEGO (Dec. 1, 2023).
[109] KPBS Jacumba Report.
[110] Decl. of Jacqueline Arellano ¶ 14.
[111] Decl. of Erika Pinheiro ¶ 40.
[112] *Id.*
[113] *Id.*
[114] *Id.* ¶¶ 31, 35.
[115] Decl. of Jacqueline Arellano ¶¶ 18-19; Decl. of Erika Pinheiro ¶¶ 36-37.
[116] Decl. of Erika Pinheiro ¶ 37; Decl. of Jacqueline Arellano ¶ 19.
[117] Decl. of Erika Pinheiro ¶ 34.
[118] *Id.* ¶¶ 34, 37.
[119] Supp. Decl. of Lilian Serrano ¶ 7.
[120] Decl. of Erika Pinheiro ¶ 37.
[121] *Id.*

CBP actively discourages and blocks access to medical care.[122] Some Border Patrol agents have falsely accused people of faking illnesses to get out of the open-air detention sites, and have told asylum seekers that they will be deported if they fake an illness, or that their asylum process will stop if they get into an ambulance.[123] Persons who are transported in an ambulance are often not allowed to bring anyone with them or are only allowed to bring one person.[124] Migrants in need of medical care express fear of having their asylum cases forestalled and of being separated from their families, and they hesitate to receive the medical aid that they need.[125] The fear of family separation is well founded, and volunteers have encountered instances where this fear has been realized.[126] Al Otro Lado has helped reunify families that have been separated under these circumstances.[127]

CBP also fails to provide hygiene products of any kind, such as toothbrushes, soap, or sanitary pads and tampons—a violation of the TEDS Standards, which require the provision of basic personal hygiene items.[128] Volunteers sometimes provide basic supplies such as ibuprofen, bandages, and sanitary pads.

### D. CBP is Failing to Provide Adequate Shelter at the Jacumba Sites

All of the sites are outdoors and completely exposed to the elements. There are no permanent shelters, and CBP has not set up any temporary structures or provided any protection from the weather.[129] Located in the desert, the sites are extremely dry, dusty, cold and windy—even in the middle of a sunny day.[130] Many asylum seekers are forced to sleep at the open-air detention sites overnight when temperatures drop considerably—recently as low as 20 degrees Fahrenheit.[131] Asylum seekers build fires out of uprooted trees, brush, and sticks, and even trash on site to try to keep warm.[132] And volunteers have reported that during the summer, temperatures often reach well over 100 degrees Fahrenheit, and that there is no shelter or protection from the sun.

---

[122] *Id.* ¶ 31.
[123] Decl. of Erika Pinheiro ¶¶ 31, 33; Supp. Decl. of Flower Alvarez Lopez ¶ 15.
[124] Decl. of Erika Pinheiro ¶ 38.
[125] Supp. Decl. of Flower Alvarez Lopez ¶ 17.
[126] Supp. Decl. of Flower Alvarez Lopez ¶ 22.
[127] Decl. of Erika Pinheiro ¶ 38.
[128] *See* TEDS Standards § 4.11.
[129] Decl. of Erika Pinheiro ¶¶ 10, 11.
[130] *Id.* ¶ 9.
[131] *See* Decl. of Jacqueline Arellano ¶ 15; *see also* TEDS Standards § 4.7 ("Temperature Controls: When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner.").
[132] L.A. Times Article.; Decl. of Jacqueline Arellano ¶ 15; Decl. of Erika Pinheiro ¶ 12.

At all three sites, people have built some rudimentary shelter for rest and privacy, either by setting up volunteer-provided tents or by building tent-like structures out of tarps and blankets.[133] Most of these structures are flimsy and built out of found materials—often dirty, dusty blankets—and do not provide adequate warmth or protection from the elements. At Tower 177, asylum seekers have also sought protection from the wind by huddling near large boulders.[134]

Volunteers are making extraordinary efforts to distribute jackets, blankets, and hats to asylum seekers to try to ensure their basic survival.[135] However, the donations and distribution are necessarily haphazard, leaving some asylum seekers without the items they need to stay warm. Volunteers are not able to maintain a permanent presence at the sites to offer this support at all times nor do they have adequate supplies to provide these basic essentials on a large scale when there are hundreds of people arriving at the same time.



*Figure 9. Asylum seekers seek protection from the elements at the Tower 177 site by sheltering near boulders. (Photo from November 14, 2023).*

Volunteers, including physicians,[136] are very concerned about the upcoming wet weather and colder temperatures in the winter. As it is, people are huddling under dirty blankets and building fires out of brush and trash to try to stay warm. Smoke from these fires has exacerbated allergies and health problems for some asylum seekers.[137] In the event of rain, the sites are likely to become very muddy, and the rudimentary tents that asylum seekers and volunteers have built will be insufficient to provide protection and warmth.

---

[133] Decl. of Jacqueline Arellano ¶ 15; Decl. of Erika Pinheiro ¶ 10.
[134] *See* Figure 9.
[135] Decl. of Jacqueline Arellano ¶¶ 15, 17.
[136] *See* KPBS Jacumba Report (describing a Kaiser Permanente physician's concern for asylum seekers and migrants, especially children, who do not have the "proper clothing" for 40-degree weather).
[137] Decl. of Erika Pinheiro ¶ 12.

### III. CRCL Must Take Immediate Action to Address the Grave Violations Documented in this Complaint

Given CBP's persistent and increasingly concerning violations of domestic and international standards through its operation of the open-air detention sites in California, and elsewhere along the border, we implore CRCL to reopen its investigation of the open-air detention sites operated by CBP and ensure adequate oversight. The recent death at an open-air detention site provides a painful reminder that lives hang in the balance. More lives are at risk as we move into the winter months.

CBP has not put in place any humanitarian assistance plans in response to concerns raised by CRCL. In fact, were it not for the courageous and tireless work of volunteers and humanitarian aid organizations, the fatal nature of these operations would no doubt be more severe. If CBP is not able to process people promptly, it must at a minimum comply with the TEDS Standards and provide: 1) shelter, warm clothing, and blankets that provide protection from the elements; 2) adequate water, food, and sanitation; and 3) medical care, particularly to address life threatening emergencies and those issues that if left untreated would cause irreparable harm. Ultimately, the agency could eliminate unnecessary suffering by permitting individuals to request asylum at ports of entry instead of unlawfully turning away those who do not have CBP One appointments.[138]

We welcome the opportunity to meet with your office to share more regarding the completely avoidable humanitarian crisis occurring at these sites. Further inquiries regarding this complaint may be directed to Lilian Serrano at lilian@alliancesd.org and Blaine Bookey at bookeybl@uclawsf.edu.

(Signatures on the following page)

---

[138] *See Al Otro Lado and Haitian Bridge Alliance v. Mayorkas*, 3:23-cv-01367-AGS-BLM (S.D. Cal., filed July 27, 2023).

Sincerely,

Erika Pinheiro
*Al Otro Lado (AOL)*

Edith Sangüeza
Dulce Rodas
Blaine Bookey
Pedro Rios
*American Friends Service Committee
(AFSC)*

Peter Habib*
*Center for Gender & Refugee Studies (CGRS)*

Mevlüde Akay Alp
Melissa Fich
Kelly Scott Overton
Jacqueline Arellano
*Border Kindness*

Linda Evarts
*International Refugee Assistance Project
(IRAP)*

Lilian Serrano
*Southern Border Communities Coalition
(SBCC)*

Sarah Kim Pak
Hilda Bonilla*
Michelle Lapointe
*National Immigration Law Center (NILC)*

*Law graduate

**Complainants**

**Counsel for Complainants**

**Enclosures**[139]

1. Supplemental Declaration of Adriana Jasso

2. Supplemental Declaration of Flower Alvarez Lopez

3. Supplemental Declaration of Lilian Serrano

4. Supplemental Declaration of Pedro Rios

5. Declaration of Erika Pinheiro

6. Declaration of Jacqueline Arellano

7. SBCC May 2013 Complaint to CRCL and Attachments

---

[139] Original declarations on file and available upon request.

**cc**

Chairman Dick Durbin
Ranking Member Lindsey Graham
Senate Judiciary Committee

Chairman Jim Jordan
Ranking Member Jerrold Nadler
House Committee on the Judiciary

Chairman Alex Padilla
Senate Judiciary Committee
Subcommittee on Immigration, Citizenship,
and Border Safety

Chairman Gary Peters
Ranking Member Rand Paul
Senate Committee on Homeland Security &
Governmental Affairs

Chairman Mark Green
Ranking Member Bennie Thompson
House Committee on Homeland Security

Chairman James Comer
Ranking Member Jamie Raskin
House Committee on Oversight and
Accountability

Chairman Tom McClintock
Ranking Member Pramila Jayapal
House Judiciary Committee
Subcommittee on Immigration Integrity,
Security, and Enforcement

Majority Leader Charles Schumer
Minority Leader Mitch McConnell
United States Senate

Speaker Mike Johnson
Minority Leader Hakeem Jeffries
United States House of Representatives

Attorney General Merrick Garland
U.S. Department of Justice

Assistant Attorney General Kristen Clarke
Civil Rights Division
U.S. Department of Justice

Secretary Alejandro Mayorkas
U.S. Department of Homeland Security

Acting Commissioner Troy A. Miller
Customs and Border Protection
U.S. Department of Homeland Security

Nathaniel Kaine
Chief of Staff
Customs and Border Protection
U.S. Department of Homeland Security

Chief Jason Owens
United States Border Patrol
Customs and Border Protection
U.S. Department of Homeland Security

Erin Barclay
Acting Assistant Secretary of State for
Democracy, Human Rights, and Labor
U.S. Department of State

PLFS-0065

# Attachment 1

**SUPPLEMENTAL DECLARATION OF ADRIANA JASSO**

I, Adriana Jasso, declare the following:

1. I have worked with the American Friends Service Committee for 17 years assisting migrants.

2. I previously submitted a declaration in support of the Civil Rights and Civil Liberties complaint that the Southern Border Communities Coalition filed on May 13, 2023.

3. Since early September, I have been running an open-air volunteer station supporting migrants alongside the border wall in the San Ysidro area—a location that is commonly referred to as "Whiskey 8."

4. The migrants we assist are inside the United States between two border walls.  At Whiskey 8 we provide the resources through the slats in the northern-most of the two walls.

5. Beginning on or about September 7, 2023 and continuing to the present, we have had an ongoing daily volunteer presence at Whiskey 8.  I work at the site five days a week for five to six hours a day.  Prior to September, I was involved in observations of the site in August 2023.

6. I provide this declaration based on my personal observations, the observations and experiences of my colleagues that they have communicated to me, my conversations with migrants we assist, and my conversations with Border Patrol agents in the course of my volunteer work at the site from August 2023 to the present.  I keep contemporaneous notes of my observations and information I receive from other volunteers, migrants, and Border Patrol.

7. The volunteers and I assist migrants, including by providing food, water, clothing, female hygiene products, diapers, blankets, a phone-charging station, and tarps.  We also identify migrants with medical emergencies and other medical needs and do our best to get them medical care.

8. We provide assistance to migrants at two nearby open-air sites as well: Whiskey 4 and Spooner's Mesa.   Generally, Border Patrol does not allow us to visit these sites, and we identify the needs of migrants there by speaking with their family members who are at Whiskey 8, as discussed more below.  I am aware, however, of a handful of occasions when Border Patrol has permitted a volunteer to visit these sites with a Border Patrol escort.

**Migrants are in Border Patrol Custody at the Open-Air Sites**

9. As I discussed in my prior declaration, the migrants at these open-air sites are in the custody and control of Border Patrol.  Unless otherwise specified, the information I provide below reflects ongoing Border Patrol practices between August 2023 and the present day.

*Agents direct migrants to the sites*

10. Border Patrol agents make contact with migrants in the United States and instruct them to walk to the open-air sites, or the agents actually drive them to the open-air sites in their vehicles. Agents also frequently transport migrants in their vehicles from one open-air site to another.

*Agents subject migrants to the count*

11. Every day at Whiskey 8, multiple times a day, Border Patrol agents hold a "count" of the migrants present, just as they would in a detention facility. But the practice is more brutal given the outdoor conditions. Agents conduct the "count" at any time of day or night. Not infrequently counts are held in the middle of the night when temperatures are cold, it is raining, and people are sleeping. Migrant families often try to construct makeshift shelters out of tarps, and volunteers have witnessed parents asking Border Patrol agents if their children can remain asleep under their tarps during the count. The agents have said no and demanded that everyone stand to be counted, even small children and even in the rain and freezing weather. The migrants and their children must stand for the count until the agents give them permission to go back to their tarps.

12. We have heard from migrants that their family members are subject to the count at the Whiskey 4 and Spooner's Mesa sites as well.

*Agents subject migrants to body searches*

13. Border Patrol agents regularly conduct invasive searches of migrants at the open-air sites. Specifically, agents conduct body searches of all male migrants, during which they require the migrants to put up their hands and spread their legs, and agents pat their legs, back, chest, and waist. The agents also search inside the migrants' pockets and require migrants to remove their shoes and the shoelaces from their shoes. When a female Border Patrol agent is present, female migrants are also body searched.

14. Even when a female Border Patrol agent is not available, female migrants are required to stand in a line and are subjected to the "one layer" rule—that is, Border Patrol agents inform them that the migrants can wear only one layer of clothing and they must remove all other layers before they are transported away from the open air site. As a result of this rule, I have observed female migrants removing their t-shirts and other inner layers of clothing in public view of male Border Patrol agents. I have seen the female migrants trying to cover each other with their bodies so that the male agents will not see them undressed. Female migrants are also required to let down their hair during these body inspections.

15. On or about November 9, 2023 at Whiskey 8, a male agent forced a female migrant to remove her hijab and then he touched the female migrant's hair. The female migrant and her husband

appeared to be deeply uncomfortable when the agent engaged in this culturally inappropriate act. I was present and witnessed the incident.

### Agents subject migrants to harsh verbal treatment

16. I have also seen Border Patrol agents screaming and swearing at migrants at the open-air sites. For example, on or about December 4, 2023, I observed an agent checking migrants' passports. A female migrant informed him that she did not have her passport in her hand because it was in her bag, and the agent began to scream and swear at her, repeatedly using the F word.

### Agents subject migrants to family separation

17. Border Patrol agents routinely separate families at the open-air sites, requiring men to leave their female and minor child relatives who they are traveling with. Border Patrol agents detain the men at the more remote Spooner's Mesa site. Male siblings and male cousins are routinely separated from their female siblings and cousins. And frequently fathers are separated from their spouses and children. Border Patrol agents ask the male migrants if they are legally married to their spouses, and if the answer is no, the agents typically separate the families.

18. On or about October 2, 2023, I spoke with a migrant mother who said she was very worried about her 17-year-old son who had been separated from her and sent to Spooner's Mesa. I asked a Border Patrol agent about this case, and the agent was dismissive of the concerns about separating the mother and her minor child.

19. Volunteers are generally not permitted by Border Patrol agents to enter or approach Spooner's Mesa where the men are detained. Spooner's Mesa is a hike into the canyon away from Whiskey 8, as I described in my earlier declaration. We cannot see what is happening there, but we hear from the family members of the detained men about the needs of the migrants at that site.

## Agents Fail to Provide Migrants Basic Life Necessities at the Open-Air Sites

20. For example, we have heard from family members, who are communicating by cell phone with male migrants at Spooner's Mesa, that there are times when there is no food or water at that site. Sometimes Border Patrol has asked for food or water from our volunteers and transported it to the site, which only Border Patrol is allowed to access.

21. At other times, the migrants at Spooner's Mesa have been desperate for food and water, and Border Patrol has not provided it. We have then communicated with Border Patrol agents to try to get permission for some men who are detained at Spooner's Mesa to hike to our volunteer station at Whiskey 8 so they can get food and water and then hike back to provide the food and water to the detained men at Spooner's Mesa.

22. On or about September 23, 2023, we had to negotiate with Border Patrol to get food and water for about 120 men at Spooner's Mesa. The lack of food and water for many hours is very

dangerous.  These men had to ask for the agents' permission because Border Patrol does not otherwise allow the men to leave Spooner's Mesa.  I and other volunteers have heard that many times men at Spooner's Mesa have requested permission to leave to get food and water and their requests have been denied.  I am not aware of any time that a man left Spooner's Mesa without permission.

23. Border Patrol agents frequently do not have the basic necessities they need to provide migrants detained in the open-air sites.  For example, they do not appear to carry extra water in their vehicles.  And agents have repeatedly asked our volunteer station to borrow water for Spooner's Mesa and Whiskey 4.  We have provided the water.

24. At times the Border Patrol agents have appeared embarrassed to have to rely on us and have promised to "pay us back" with water.  But it is unclear why they are not able to stock sufficient water in the first place.  Agents have told me that they need to provide projected migrant numbers in advance for the following week, and they say they have repeatedly had too few supplies to meet the demand.  But I do not know why they cannot ask for more water than they anticipate needing to ensure they do not fall short.


I affirm that the statements in this declaration are true, correct, and complete to the best of my knowledge and belief.

December 9, 2023

*/s/ Adriana Jasso*

Adriana Jasso

# Attachment 2

**SUPPLEMENTAL DECLARATION OF FLOWER ALVAREZ LOPEZ**

I, Flower Alvarez Lopez, declare the following:

1. My name is Flower Alvarez-Lopez. I am a Co-Director at Universidad Popular, a grassroots community organization that supports immigrants in the San Diego, CA region.

2. This declaration supplements the declaration that I provided on May 12, 2023 in support of the Civil Rights and Civil Liberties complaint filed by the Southern Border Communities Coalition on May 13, 2023.

3. I first went to the open air detention site near San Ysidro, known by Border Patrol agents as "Whiskey 8", in May 2023. I camped out for several days providing humanitarian assistance to migrants facing terrible conditions trapped by Border Patrol between the border walls on U.S. soil.

4. Since September 2023, I have been assisting at open air detention sites controlled by Border Patrol agents almost every single day, six or seven days a week. Our organization is part of a collective of organizations providing humanitarian aid to people at the open air detention sites. I would usually begin my day at Whiskey 8 and then move to Jacumba later in the day. Recently, I have spent more time at Whiskey 8.

5. As a result of my work over the past few months, I have gained significant personal knowledge about the devastating conditions at the sites and have triaged dozens of medical emergencies. I also interact multiple times a day with the Border Patrol agents controlling the sites.

6. The content of this declaration is based on my own observations, the observations and experiences of my colleagues and other volunteers that have been communicated directly to me by them, information communicated directly to me by people detained at open air detention sites and their family members, and my communications with Border Patrol agents at the sites.

**Border patrol control at the open air detention sites**

7. In addition to Whiskey 8, there are three other open-air detention sites located near San Ysidro: "Whiskey 4", "91X" and "Spooner's Mesa". Border Patrol does not permit volunteers to enter these sites to provide humanitarian aid. Since September, Border Patrol has made limited exceptions on about four occasions to allow us to bring humanitarian aid into Spooner's Mesa. I was present three of these times. Each of these times, a superior officer from the Imperial Beach Border Patrol Sector escorted us onto the site. On one occasion, a fellow volunteer reported that Border Patrol escorted them onto the Whiskey 4 site to provide humanitarian assistance. I have no knowledge of anyone else being allowed to enter Whiskey 4 on any other occasion. To my knowledge, no one from our collective has ever accessed 91X.

8. One of the sites near San Ysidro, "Spooner's Mesa", is also referred to by Border Patrol agents as "the men's site". This site is more remote and you have to cross hilly terrain to access the site. Individuals at this site do not have direct access to humanitarian aid from volunteers so they go longer without food or water. The reason it is called "the men's site" is because Border Patrol

sends men over 18-years-old who are traveling without minor children or a legal spouse to this site.

9. I have seen and heard Border Patrol agents at Whiskey 8 direct single men to walk to Spooner's Mesa. Sometimes agents will point and tell them to just keep walking. I have also seen ATV or Border Patrol vehicles lead groups of men to Spooner's Mesa. I would estimate that it takes approximately an hour and a half to walk from Whiskey 8 to Spooner's Mesa.

10. I have witnessed Border Patrol agents wake men up in the middle of the night and ask if they are traveling with their children or legal spouse. I have witnessed agents asking men to show copies of birth certificates or marriage certificates to prove parent-child or marital relationship in order to be able to stay with their families. Some of the most difficult separations I have witnessed are when barely 18-year-old sons get separated from their families and sent to Spooner's Mesa. I have witnessed mothers clinging to their sons who are barely adults and begging Border Patrol not to separate them.

11. Border Patrol agents regularly take a count of the number of people at Whiskey 8 and at the sites out in Jacumba. Border Patrol agents have also given us head count numbers for the other sites near San Ysidro so that we know how many hot meals to have ready for Border Patrol to bring there. At Whiskey 8, I have seen the counts occur at almost every shift change, which normally occurs about three times a day. Generally, what I observe is that the Border Patrol agents will make everyone stand up and get in a line. The agents will then make everyone stay in line while they patrol the site to make sure that everyone is standing and that no one is lying down. They then go along the line and take a headcount. We often ask Border Patrol to give us their headcount once they are done and then we document the head counts.

12. When Border Patrol agents are preparing to transport people off the sites for processing, the agents line them up and order them to remove shoelaces, jewelry, coins, extra layers of clothing etc. The agents only allow people to keep one article of clothing on top and one on the bottom, even in the cold weather. They are also only allowed one bag. On their person they are only allowed dollar bills, their passport and sponsor information. I have also witnessed Border Patrol photographing individuals before they are transported off the site. They are then mainly transported out in transport vehicles such as large vans or buses. I have seen the private transportation company put handcuffs or zip ties on individuals including young men before getting on the bus to be taken for processing. See photograph attached at Exhibit 1.

**Lack of food and water provided by Border Patrol**

13. When I first began visiting the sites, Border Patrol agents would provide limited insufficient offerings of food and water, but in recent months Border Patrol agents have stopped providing any food rations at Whiskey 8 or the site known as "Boulevard Tower 177" in Jacumba at all. Since September, our team has not witnessed Border Patrol handing out any food rations at these sites.

14. Prior to that, Border Patrol agents would hand out meager offerings only. On about four occasions, a Border Patrol field officer approached me with boxes of small cheez-it snack bags or small cookie bags and water bottles and asked me if I would hand them out along with the hot meals that our group was providing. The officer seemed embarrassed by the small snacks that

they were offering. Officers have also told me that they don't have money in their budget to buy meals.

**Lack of medical care and insufficient response to medical emergencies**

15. Border Patrol continues to fail to provide any type of medical support at the sites and volunteers are left to triage people and provide the limited first aid we can. At Whiskey 8 we deal with a high rate of medical emergencies that people tell us they have sustained from falling from the border wall. On multiple occasions, I have told Border Patrol agents that a person is in medical distress and agents have told me to let the person know that if they leave the site in an ambulance they won't get the documents they need and they won't get processed for their immigration case.

16. I have received basic emergency medical training and I triage and provide first aid to people with terrible injuries at the sites. I ask multiple triage questions and then I bring an extensive list of symptoms to Border Patrol agents to advocate as to why the person requires immediate medical attention. I am very persistent and often I have to approach Border Patrol agents multiple times to advocate on behalf of people in medical distress in order to convince Border Patrol to call an ambulance.

17. One morning in early October 2023 I triaged an 11-year old boy from Ecuador who had arrived the night before with his mother. He had a rising fever and had been vomiting throughout the night. I asked a Border Patrol agent how high his temperature would have to be in order to get medical help and he told me it had to be 102 degrees. I ran to CVS and bought a thermometer to measure his temperature. I approached Border Patrol agents multiple times on the boy's behalf as his condition worsened. When his temperature reached 103.5 degrees, the boy's mother told us that she was afraid to ask Border Patrol to call an ambulance because they had made it this far and she didn't want to get deported for not being processed properly. She also told me she was scared they would just take her son in the ambulance and she would get separated from him. When I asked Border Patrol to confirm that she could travel with her son in the ambulance he said that was the ambulance driver's decision. We had to persuade her to seek the medical care her son needed and eventually she agreed to allow Border Patrol to call an ambulance.

18. On November 17, 2023 I encountered a man from Colombia with a laceration on his forehead, which he told me he sustained from falling after being chased by Border Patrol. When he arrived at Whiskey 8 he told me he was too afraid to seek medical help because he feared that his case would not be processed. He asked me if I would suture the wound for him, despite knowing I wasn't a medic. I eventually convinced him to have Border Patrol call an ambulance. I took his phone number because I wanted to check in with him and make sure he got the medical assistance that he needed. He later texted me to let me know that he received stitches at the hospital and he sent me a photograph of the stitched wound on his forehead. See attached photograph at Exhibit 2.

19. On November 25, 2023 I assisted four people in a single night who had injuries they told us they sustained from falling from the wall. One woman was reported during wall triage to have suspected fractures in both feet from falling from the wall. She was transported off the site in an ambulance and the next morning she texted me a photograph from the hospital showing both her feet in bandages. See attached photograph at Exhibit 3.

20. At 11:33 pm on Sunday, September 24, 2023 I received a call from a fellow volunteer, Roberto. He told me he was at Whiskey 8 and that a woman had arrived with a deep laceration on her leg that she sustained after she was cut by concertina wire climbing over the border wall. He told me that she reported to him that Border Patrol had sent her to volunteers to get help. He asked me to walk him through what to do over the phone. I walked him through how to flush and pressure wash the wound to prevent infection. I then told him to apply direct pressure to stop the bleeding and told him how to bandage the wound. Since we don't have direct access to the other side of the fence where the migrants are physically located and he couldn't help her through the fence, I heard him guiding someone else inside the open air detention site on what to do. Roberto told me he provided the materials including the gloves, flush, gauze etc. He also sent me a photo of her wound which is attached as Exhibit 4.

21. I have observed that most of the time when Border Patrol agents call ambulances, they tell the ambulance to wait down the road and then they transport the person in medical distress from the open air detention site in a vehicle and transfer them from their custody into the ambulance further down the road. Agents have told me that they do this because they don't want people at the site to see ambulances coming into the site as this might make them fake injuries in order to leave the site. When a person has suspected spinal injuries from falling from the wall or is unable to walk, Border Patrol agents will allow the ambulance to enter the site through the gate.

**Family separation**

22. One day that stood out for me was Sunday, November 26, 2023, when multiple Border Patrol transport vans dropped off groups of people at Whiskey 8. A man ran out of one of the vehicles and told us that an elderly woman had fallen 16 feet from the border wall. He brought her over and I triaged her. She was nauseous and sleepy and had been unconscious for 5 to 10 minutes, which was a red flag. She was traveling with her two grandchildren, ages 11 and 8 years old. We were able to call the children's father who lives in the U.S. and speak with him and I have remained in contact with him via phone since. I was very concerned that the family would get separated so I asked an agent whether both children could travel with their grandmother in the ambulance. The agent called his supervisor to the site and eventually they said that they would process her very quickly and transport the family together. The family was transported off the site in a transport vehicle, but I later learned from their father that the grandmother was admitted to hospital and subsequently processed and released. He informed me that his children were separated from their grandmother and placed in ORR custody. Our organization hosted the grandmother after she was discharged. To my most recent knowledge, the children have not been released to either their father or grandmother's custody.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.

December 10, 2023


/s/Flower Alvarez Lopez
Flower Alvarez Lopez

**Exhibit 1**
**Photograph of private transportation company handcuffing asylum seekers at Whiskey 8, dated November 25, 2023**



**Exhibit 2**
**Photograph of stitched head wound, dated November 17, 2023**



**Exhibit 3**
**Photograph of bandaged feet injured after falling from wall, dated November 26, 2023**



**Exhibit 4**
**Photograph of leg laceration, dated September 24, 2023**



# Attachment 3

**SUPPLEMENTAL DECLARATION OF LILIAN SERRANO**

I, Lilian Serrano, declare the following:

1. I am the Director of the Southern Border Communities Coalition (SBCC), a program of Alliance San Diego. As part of that role, I monitor human rights conditions in the border region.

2. I previously submitted a declaration in support of a complaint filed by SBCC with the Office of Civil Rights and Civil Liberties (CRCL) on May 13, 2023.

3. I provide this declaration based on my personal observations, the observations and experiences of my colleagues that they have communicated to me, my conversations with migrants we assist, and my conversations with Border Patrol officers in the course of my work at the border since May 2023.

4. Since May 2023, I have witnessed the inhumane conditions in which migrants have been held in the open-air detention sites (OADS) near San Ysidro and Jacumba, California.

5. I have visited OADS in San Diego known as Spooner's Mesa and Whiskey 8; and four sites in Jacumba. We did not include the Jacumba sites in SBCC's May 2023 complaint because we had only learned about the Jacumba sites a few days before filing the complaint.

6. The situation in Jacumba is harrowing. Since May, the number of migrants at those sites has significantly increased. There are now reports that as many as 700 migrants are held at the Jacumba sites in one day. While conditions in the other sites are deplorable, the conditions in Jacumba are particularly dangerous because migrants are exposed to extreme desert weather conditions, including intense heat waves and cold fronts.

7. Additionally, the remoteness of Jacumba makes it harder for migrants to access basic necessities and services in a timely manner. For example, if someone needs medical services, it takes about an hour for an ambulance to take them to the nearest hospital. Further, given the remote location, it takes significantly more planning for the assisting organizations and volunteers to get out to the sites and bring any humanitarian aid to Jacumba.

8. In the San Ysidro area, I communicate with people assisting migrants on the ground throughout the day. I know from them that the number of migrants spending the night at one of these sites can be up to seventy (70) at a time. Waiting times for migrants to be taken from the OADS to a Border Patrol facility for processing can be up to and even beyond twenty-four hours.

**Access to Food and Water**

9. Border Patrol is very inconsistent with how it provides food and water to migrants. Every few days, Border Patrol shows up with cases of water and snacks — a granola bar or crackers. The agents hand out one bottle of water and one snack per migrant. If volunteers were not there to provide basic sustenance, migrants would go days without eating or drinking water. In fact, what

prompted our humanitarian efforts in May was finding out that migrants did not have access to basic necessities, and some were not eating for three days. Border Patrol agents tell migrants that volunteers will provide basic needs like food.

**Border Patrol Transportation of Migrants to OADS**

10. I have seen Border Patrol agents transport migrant family units in their vehicles from other locations along the border wall to the OADS known as Whiskey 8. When the family units arrive at Whiskey 8, Border Patrol agents tell them that they should wait there and that volunteers will provide food and water through the wall. Then, the agents leave.

11. Additionally, in November, I saw—on at least two separate occasions—Border Patrol agents guiding with their vehicle groups of about 40 migrants to the OADS known as Moon Valley in Jacumba. On one occasion, the migrants followed the Border Patrol vehicle and, on the other, the Border Patrol agent followed migrants in their vehicles to make sure migrants arrived at the OADS.

12. Migrants in Jacumba have also shared with me that when Border Patrol agents encounter migrants, the agents give them directions on how to get to the OADS and tell them to wait there to be taken for processing.

13. I have seen Border Patrol agents instruct male adults to walk west and, there, they encounter another site called Spooner's Mesa. Volunteers usually do not have access to this site. However, earlier this fall, I was driven there once by a Border Patrol supervisor. I have not been permitted to return or provide services directly to migrants there. Sometimes, Border Patrol agents tell volunteers at Whiskey 8 how many migrants are in Spooner's Mesa so that the volunteers can pack food lunches for Border Patrol to take to the migrants in that site.

**Border Patrol Counts of Migrants**

14. I know from volunteers that Border Patrol agents take counts of migrants in the OADS. In San Ysidro, the volunteers talk to Border Patrol agents in the Whiskey 8 area every morning, afternoon, and night (when the last volunteer leaves, usually at midnight) about the number of migrants in the OADS. Most of the time, Border Patrol shares numbers that are broken down by OADS, family units, and men.

15. In Whiskey 8, the counts happen late at night and Border Patrol wakes up migrants, including family units.

16. I also know that migrants were getting wristbands with the day they arrived at the OADS written on them. However, last week, Border Patrol stopped giving migrants wristbands at the Jacumba sites.

**Threats from Border Patrol to Migrants in the OADS**

17. When I visit the sites, I talk to migrants in Spanish and English. I also communicate in other languages by using Google Translate. Several migrants told me that they are here to seek asylum and that they want to do it the right way. Border Patrol agents often tell migrants that they need to follow instructions and wait at the OADS. The agents tell migrants that they will not be processed if they do not follow instructions. Consequently, many migrants are afraid their asylum claims won't be processed if they do not follow the officers' instructions.

18. At the Spooner's Mesa site, a Border Patrol agent told migrants that if they did not follow instructions, he would leave them outside to wait to be transported without access to food and water for as long as the agent wanted.

**Threats from Border Patrol to Advocates**

19. In September, once we saw the numbers go up in Whiskey 8 and our humanitarian efforts escalated, a Border Patrol agent threatened a group of four advocates, including me, with arrest for giving migrants food and water through the wall.

20. We had one table and some boxes against the border wall at around 10:00 or 11:00 PM with water and sandwiches. A Border Patrol agent told us to step away from the wall and that we were not allowed to give anything through the wall. I said I was with a group of humanitarian organizations providing humanitarian aid. The agent said he was the authority and advocates were not allowed to be there. We stepped away from the wall, but the agent demanded we leave the area or be arrested. We moved to a piece of land that does not belong to the federal government but to the City of San Diego. The agent contacted other agents and told them that their activities should shift from processing migrants to arresting us, the advocates.

21. The next morning, we had talks with sector leadership and we were allowed to continue to provide humanitarian aid.

**Medical Emergencies**

22. Border Patrol does not provide appropriate medical services to migrants held in the OADS, and non-medical and medical volunteers are the ones providing first aid and medical care to migrants. I received multiple reports from volunteers at Whiskey 8 about injuries, wounds, and concussions migrants have suffered. Some of these volunteer medical staff provide care through the border wall. Medical trauma experts take shifts to be at the sites in person. When the medical volunteers are not on site, other volunteers who are on site communicate with the medical volunteers via phone to triage emergencies and assess the gravity of a situation. When on site, the medical volunteers have reported to me seeing a lot of broken legs, open wounds, and people who lose consciousness. When the medical volunteers indicate that the person needs to go to an emergency room, the on-site volunteers call 911 and/or beg Border Patrol agents to call 911. But often, the agents say they do not believe the migrants when the migrants say they need medical care even if a trained medical expert is on site and telling them the migrant needs medical attention.

I affirm that the statements in this declaration are true to the best of my knowledge and belief.

December 10, 2023

/s/ Lilian Serrano
Lilian Serrano

# Attachment 4

**SUPPLEMENTAL DECLARATION OF PEDRO RIOS**

I, Pedro Rios, declare the following:

1. I am the director of the American Friends Service Committee (AFSC) US-Mexico Border Program. I have been monitoring and advocating for human rights at AFSC for twenty years.

2. This declaration supplements the declaration I previously submitted in support of the Civil Rights and Civil Liberties complaint filed by the Southern Border Communities Coalition on May 13, 2023.

3. I provide this declaration based on my personal observations, the observations and experiences of my colleagues that they have communicated to me, my conversations with migrants we assist, and my conversations with Border Patrol officers in the course of my work volunteering at the border since May 2023.

4. Since May 2023, I have visited the border many times, providing volunteer aid and observing the conditions of the open air detention sites (OADS) near San Ysidro and Jacumba, California. Since September 2023, I have gone to the OADS at the border nearly every day, about 5 days a week, and I spend 5-6 hours there each visit.

5. In San Ysidro, CBP traps migrants in various OADS between primary and secondary barriers on the western most segment of the U.S.-Mexico border. There are at least four OADS near San Ysidro, including Whiskey 8, Whiskey 4, Spooner's Mesa, and 91X. I have personally visited Whiskey 8 and Spooner's Mesa, and have observed Whiskey 4 from an adjacent parking lot. The 91X site is by the beach and seems to be used less frequently than the others, though I have occasionally heard a Border Patrol agent indicate that a migrant is being held at 91X. All four of these sites are fully controlled by U.S. Border Patrol; anyone held at these sites is under CBP's control and custody.

6. In Jacumba, CBP traps migrants in various OADS, including a site called Valley of the Moon (also sometimes called Moon Valley) that is along the highway; Tower 177 which is located on private land isolated at the bottom of a hill; and Willows, a gated-off site located on private land abutting a wall along the U.S.-Mexico border. These sites are fully controlled by U.S. Border Patrol, and anyone held at these sites is under CBP's control and custody.

7. The OADS near Jacumba emerged in or near May 2023, around the same time the Southern Border Communities Coalition filed the Civil Rights and Civil Liberties Complaint dated May 13, 2023. At the time, it was too early for coalition members, including my organization AFSC, to know the gravity or extent of the situation in Jacumba, as the OADS were then emerging. In recent weeks, Border Patrol agents have spoken with my colleague indicating they recognize that more people are passing through the Jacumba OADS.

8. We do not know with precision the total number of people that have been forced to wait at the OADS in southern California since May 2023. The first documented groups of people that were held between the primary and secondary barriers along the U.S.-Mexico border occurred in October 2022, near Friendship Park. Though the numbers of people detained at the OADS from October 2022 and January 2023 varied, the number steadily increased in February and again more significantly so in April and May 2023.

1

9. The numbers of people who CBP has released into the community after processing serve as the best estimate of the total number of people who have been detained at the OADS. Typically, CBP forces people to wait at the OADS, transfers them into a CBP detention facility, and then releases them to the community after processing. Since September 13, 2023, approximately 50,000 people have been released to the community after processing. This figure, though enormous, does not account for the numbers of people that passed through the OADS between May and September 2023, when large numbers of people were held at the OADS.

**Border Patrol Controls the Flow of Movement at and Within the OADS**

10. Border Patrol directs migrants where they must go, where they must stay, and where they must wait, underscoring Border Patrol's strict control and custody over the migrants held at the OADS. In San Ysidro, Border Patrol agents tell some migrants that they must remain at Whiskey 8 and wait to be picked up there, whereas they tell other migrants to head to another location. I have spoken to migrants at Whiskey 8 who told me that the men in their group were separated and told to remain at Spooner's Mesa.

11. There have been few unaccompanied children that I have observed at Whiskey 8.  On one occasion, Border Patrol separated a child out of a group and into a van. The remaining individuals were kept in a line and later transported in a bus out of Whiskey 8.

12. Border Patrol often transports people from one area of the corridor between the primary and secondary barriers along the U.S.-Mexico border to another. Nearly every day I am at the Whiskey 8 site, I have observed Border Patrol vans dropping off people to different areas of the open-air corridor. For example, on December 7th, I witnessed Border Patrol transporting two vanloads of people to the Whiskey 8 site; the Border Patrol agent told these transported individuals to eat food that volunteers were providing.

13. Border Patrol regularly takes count of people detained in the open-air corridor. The agents direct people to stand in a row and count everyone present. Sometimes they tell the families to stand separately and the single men and the single women to stand together to get a count of those present, including families.

14. In Jacumba, migrants are directed by Border Patrol to walk to the OADS location. On December 3, 2023, I spoke with three people at the Valley of the Moon site who had walked nearly three hours to get to the site, following Border Patrol agents' directions to go there. During the walk, one person said that they were walking in one direction, and a Border Patrol agent redirected them in another direction and to keep walking eastward. Migrants are not free to wander, and are periodically being monitored and directed by Border Patrol agents.

15. Migrants at the OADS are forced to wait at the sites for hours and even days at a time, without being allowed to freely leave. In May 2023, I spoke to several people at Whiskey 8 who were held for up to 7 days at the site. As of December 2023, at Whiskey 8, people are held there anywhere between 2 hours and 18 hours, while men held at Spooner's Mesa are forced to wait usually for at least 24 hours. On December 5th, I spoke with two families who had spent the night at the Valley of the Moon site near Jacumba.

16. Border Patrol also maintains strict control over who enters the OADS to assist migrants and asylum seekers. Usually, we are not allowed into the Spooner's Mesa site, but only once, in early

September 2023, after advocating with the supervising Border Patrol agent, my colleague and I were permitted to feed people meals there. We fed approximately 380 people during that visit.

17. Even when allowed in, volunteers like me are subject to Border Patrol's strict orders. In September 2023, Border Patrol agents told me on at least two occasions that they would arrest me and my group if we approached the secondary border wall at Whiskey 8. On September 12, 2023, I reported one such incident to the Sector Chief by email, but got no response. The threats to arrest volunteers are surprising, given that on more than three occasions, I have spoken with Border Patrol agents who have stated that they appreciate our presence and work in the area.

**Lack of Basic Human Necessities, Water, Sanitation, and Medical Care**

18. Border Patrol does not provide basic human necessities to the migrants detained at the OADS. At Whiskey 8, Border Patrol agents continue to fail to provide food or even water. I spoke with several men who came to Whiskey 8 from Spooner's Mesa, and they told me that they had not had water or food in the near 24 hours since they were directed to wait at Whiskey 8.

19. Border Patrol neglects to provide sufficient sanitation and adequate toilets. The sanitation and servicing of the portable toilets have gotten a bit better following AFSC's advocacy on the issue with state Senator Steve Padilla's office. It is our understanding that Senator Padilla's office is working with CBP to improve sanitation and trash conditions. However, at Whiskey 8, although portable toilets are supposed to be consistently serviced on Mondays, Wednesdays, and Fridays, sometimes the portable toilets still go for a week without servicing.

20. Border Patrol also fails to provide sufficient medical care to injured or ill migrants at the OADS, relying on volunteers like me to provide first aid and other first responder care. One day in early October 2023, a Border Patrol agent notified my colleague and me that a boy from Ecuador had a high temperature of about 101 degrees. The agent asked us to keep monitoring the boy. We monitored the boy's temperature every 30 minutes for about two hours, and when his temperature shot up to 103 degrees, I notified Border Patrol, who then called for an ambulance.

21. Border Patrol even leverages injuries and illness to maintain control and custody over migrants. Several months ago, I spoke with a mother of a one-year-old baby who had fallen from the border wall with her baby daughter strapped to her back. The mother agreed to have her injuries inspected by paramedics, and the paramedics suggested she and her child get further medical care at a hospital. But a Border Patrol agent threatened the mother that if she agreed to be transported to the hospital, she would not be processed and would suffer immigration consequences. The mother then refused medical treatment.

22. Due to Border Patrol's failure to provide a basic level of care, I and other volunteers visit the OADS regularly, almost every day to respond to the basic needs of the migrants. At Whiskey 8, we have set up four different stations, including a water station, food station, phone charging station, and a medical station. We have also added a food pantry at Whiskey 8. When Border Patrol permits us to do so, we also travel to other OADS locations to deliver water and food.

//

//

//

3

I affirm that the statements are true to the best of my knowledge and belief.

December 10, 2023


<u>/s/ Pedro Rios</u>
Pedro Rios

PLFS-0089

# Attachment 5

**DECLARATION OF ERIKA PINHEIRO**

I, Erika Pinheiro, declare the following:

1.  I am the Executive Director of Al Otro Lado (AOL), a nonprofit advocacy and legal services organization incorporated in California and based in Los Angeles, with offices in San Diego, California, and Tijuana, Mexico. As the Executive Director, I supervise attorneys and other staff who work directly with migrants on both sides of the U.S.-Mexico border. I am currently based in San Diego, CA/Tijuana, Mexico and I oversee programs and operations in all AOL locations.

2.  I have worked in the immigration legal field since 2003. I hold a J.D. degree from the Georgetown University Law Center, a Master's of Public Policy from the Georgetown Public Policy Institute, and a Certificate in Refugee and Humanitarian Emergencies from the Georgetown University Institute for the Study of International Migration.

3.  Throughout my legal career, I have specialized in high-volume legal representation and education for noncitizens detained in immigration or criminal custody, as well as those seeking asylum at the U.S.-Mexico border. In each position I have held, I have created, maintained, and analyzed extensive databases to identify the effects of policies governing the admission, detention, transfer, and release of noncitizen adults and children. Since 2010, I have personally observed and tracked migration and detention trends, with a particular focus on individuals and families seeking asylum at the U.S.-Mexico border.

4.  AOL provides legal and humanitarian support to indigent refugees, deportees, and other migrants, including providing free direct legal services on both sides of the U.S.-Mexico border and beyond. Our Border Rights Project, established in 2017, provides legal education, representation, accompaniment, and human rights monitoring for more than 15,000 asylum seekers in Tijuana each year. The project also documents human rights violations committed by U.S. and Mexican government officials against refugees at the U.S.-Mexico border. We use this data to demonstrate unlawful patterns or practices in our advocacy with U.S. policy makers, international human rights monitoring bodies, and nongovernmental human rights organizations. Since 2020, we have provided substantial humanitarian assistance to asylum seekers stuck on the Mexican side of the border, including emergency housing, medical care, food, hygiene supplies, and educational services for refugee children.

5.  I provide this affidavit based on my personal observations, the observations and experiences of my colleagues that they have communicated to me, my conversations with migrants we assist, and my conversations with Border Patrol officers in the course of my work from September 2023 to the present.

**Providing Aid at the Jacumba Open-air Detention Sites**

6.  AOL began providing aid to migrants and asylum seekers in Jacumba, California in September 2023. AOL provides support at three sites in Jacumba: Moon Valley, Tower 177, and Willows. Moon Valley

and Willows are both located in the Boulevard Border Patrol sector. Tower 177 is located in the Campo Border Patrol sector. Since September, I have traveled to Jacumba once or twice a week. An AOL staff member is generally on site three to four times a week. There are multiple organizations and local volunteers that provide aid at the Jacumba open-air detention sites (OADS). We all work together to provide aid; due to the volume of asylum seekers entering the Jacumba OADS, no single organization has the capacity or resources to provide aid alone. The organizations and mutual aid groups currently providing aid in Jacumba include AOL, Border Kindness, Universidad Popular, American Friends Service Committee (AFSC), Free Shit Collective, Borderlands Relief Collective, and Detention Resistance. A significant number of individuals residing in or near Jacumba also coordinate with the nonprofits and mutual aid groups to provide aid at OADS. AOL's Volunteer Coordinator helps coordinate the delivery of purchased items and donations and manages the volunteer schedule to ensure there is adequate coverage at the OADS.

7.  Providing aid at the Jacumba sites presents logistical hurdles given their remote locations. The camps themselves are on unpaved roads that have damaged the cars of some volunteers. Tower 177 in particular is difficult to access without a high-clearance vehicle. We had to raise money to rent a van to continue providing aid because none of the local volunteers had a vehicle able to carry enough food and water to the migrants detained at that site. We have also had to purchase specialized catering equipment in order to safely transport enough hot food to serve hundreds of people at a time at each camp. Getting enough water out to the camps is a logistical nightmare. The volume of water needed makes it impossible for us to rely on volunteers. The number of volunteers or nonprofit staff traveling to Jacumba each day doesn't enable them to bring enough water in their vehicles, unless they are driving a large truck. There is nowhere to buy bulk water within an hour's drive of the Jacumba camps. We usually need at least one pallet of bottled water each day to provide the minimum migrants need to survive, so we have had to arrange for delivery, which has been extremely inconsistent due to the remote location of the Jacumba OADS. We have had a few times when we have come close to running out of water, but thankfully the volunteers are an extremely dedicated and resourceful group who has gone to great lengths to ensure we can at least provide enough food and water. Every organization and mutual aid group works hard to raise funds, and some individual volunteers have put in thousands of dollars of their own money to fill the gaps. Still, we are always behind in having enough money to provide the bare minimum of food and water necessary for survival.

8.  Personally, I have never seen Border Patrol provide any water to the migrants at the Jacumba OADs. However, other volunteers and the migrants say that sometimes, Border Patrol will provide one bottle of water and a small bar or crackers when they initially turn themselves in, receive a wristband, and are told to wait in the camps. However, this is clearly insufficient to support survival for several days, especially in a harsh desert environment.

9.  The Jacumba OADS are located in the high desert. This means that temperatures are extreme; it can be very hot and dry during the day, and drop below freezing at night. It is often extremely windy and dusty at the Jacumba OADS, with high winds exacerbating dry or cold conditions. Migrants exposed to those conditions often experience dehydration, sunburn, cracked lips, and in the case of freezing

temperatures, are at risk of hypothermia. Migrants with pre-existing medical conditions are often at risk of complications when forced to endure this extreme environment for days at a time.

10. When I started going to the Jacumba OADS in September, temperatures were extremely hot during the day. There was no shade or shelter at the Moon Valley camp, and the only vegetation was scrub brush under which asylum seekers could not protect themselves from the sun or wind. At Willows and Tower 177, asylum seekers had cut down trees and gathered brush and garbage to construct makeshift shelters to protect themselves against the sun and wind. Migrants often told me that they slept in the dirt, where they were exposed to scorpions, snakes, and insects. Our collective brought tarps and tents to help the migrants survive these harsh conditions. Once the weather turned cold, our collective constructed shelters and provided tents to prevent asylum seekers from having to sleep in the dirt and protect against the wind and cold. Due to cost and labor constraints coupled with the volume of asylum seekers, we have not been able to provide enough shelter for everyone and there are still migrants who have to sleep in the dirt, exposed to insects, snakes, and the elements, for days at a time while they are forced to wait in the OADS.

11. Near the Willows camp, there are Border Patrol trucks always parked under a shade canopy. However, Border Patrol has never provided any shade or any other shelter to the migrants they force to wait in the Jacumba OADS.

12. Now that the weather has turned cold, migrants burn brush and garbage in an attempt to stay warm. Much of the brush they cut down is still "green" and produces a lot of smoke when burned. The asylum seekers also burn large amounts of creosote ("chaparral"), which is toxic to humans while burned. When I am in the camps, there are usually several fires of creosote burning, which causes my eyes to water and a burning sensation in my throat. Volunteers report expelling black mucous from their noses and throats after spending a significant time in the camps. Asylum seekers and volunteers with asthma or other respiratory ailments report having their conditions worsen significantly when exposed to creosote fires. The private property owners on which these camps are located also complain that their land has been stripped bare, with the desert plants and shrubs being burned taking decades or longer to regenerate. Unfortunately, despite the toxic nature of the smoke and the environmental impact, the asylum seekers have no other choice but to burn toxic fires in order to stave off hypothermia.

13. At each camp, there are only a few port-o-potties for several hundred migrants. The port-o-potties are not serviced often enough to prevent them from filling to overflowing with excrement on a regular basis. Migrants have expressed concern that they will contract disease or a bacterial infection if they use the port-o-potties. For this reason, many migrants relieve themselves in the area around the camps. This practice presents a potential public health risk given that hundreds or thousands of migrants move through the camps each week. When the weather is very dry and the wind is high, excrement particles are blown around along with the toxic smoke from fires. When the weather is very hot, the smell makes it evident that the area is surrounded by human waste.

**Transportation of Migrants and Asylum Seekers into the Jacumba Open Air Detention Sites**

14. Migrants and asylum seekers cross the U.S.-Mexico border at multiple points in the Campo and Boulevard Border Patrol Sectors. Migrants have reported being told by smugglers that the proper way to seek asylum is to turn themselves in to Border Patrol so that they can be processed. They attempt to make contact with a Border Patrol officer as soon as possible after crossing to turn themselves in. I have spoken to dozens of migrants about what happens when they turn themselves in. Migrants report that they are given a wristband indicating the date and time of their arrival. Then, they are directed into one of the three Jacumba open air detention sites. Sometimes, they are told to walk in the direction of the nearest camp with their group. Sometimes, a Border Patrol truck will accompany them; they walk in a group behind a truck that drives into the camp. Some migrants report having to walk several miles into the camps. I have also personally observed Border Patrol officers bringing small groups of migrants into the camps in their vehicles. Some migrants report being transported into the camps in a Border Patrol van or bus. Several volunteers have witnessed and documented van or buses dropping migrants off in the camps.

15. As a co-facilitator of the California Welcoming Task Force, I have been in numerous meetings with Department of Homeland Security (DHS) leadership where they unequivocally stated that they could not transport migrants unless they were in their custody. This conversation happened numerous times in the context of nonprofits requesting that CBP transport released migrants to where they could receive nonprofit services. DHS' own practices and policies dictate that any migrant in a Border Patrol or CBP-contracted vehicle would be "in custody," and we have documented numerous instances in which Border Patrol brings migrants into OADS in vehicles. DHS' assertion that migrants in OADS are not in custody is clearly contradicted by their policies regarding transport.

**CBP Custody and Control of Asylum Seekers and Other Migrants at the Jacumba Sites**

16. Each time I go into the Jacumba OADS, I ask at least a dozen migrants about their interactions with Border Patrol, how they arrived at the camps, and what they understand about their obligation to stay there. The migrants and asylum seekers have told me that when they turn themselves in to Border Patrol, they are directed into the Jacumba camps, and that Border Patrol agents tell them that they have to stay in the camps or they will be deported. In some camps, Border Patrol indicates a limit line that migrants cannot cross; for example, in the Willows camp, there is a train track running between the camp and the road; Border Patrol agents tell migrants that they cannot cross the railroad track, or they will be deported. Most of the time, Border Patrol officers are onsite, with their trucks parked on the road that leads out of the camps. When Border Patrol is onsite, migrants could not walk out of the camps without passing an officer. If they try or ask Border Patrol if they can leave, they are told they must stay to be processed.

17. Each of the three Jacumba OADs has an Anduril Autonomous Surveillance Tower (AST). Each AST uses an AI system that can detect and track humans and other movement in a 360 degree radius up to more than a mile away. When an "object of interest" is detected, the tower sends an alert to Border Patrol, with an image of the person or vehicle of interest. Each AST stands either in the

middle of the camp or at another point where it can detect who comes in and out of the camps.
Even if Border Patrol agents are not physically onsite, they can utilize the AST to alert them if a
migrant leaves.

18. When migrants have left the camps, they are apprehended and brought back. In October, two
migrants walked out of the Moon Valley camp to a nearby gas station to buy supplies. They were
apprehended by Border Patrol and brought back to the Moon Valley camp. Border Patrol also stops
individuals in the town of Jacumba who "look like migrants." In the last week of November 2023, a
Chinese-American volunteer doctor was walking near the Jacumba Hot Springs Hotel on Old
Highway 80, taking photos of a vintage gas station painted in bright patterns. A Border Patrol truck
pulled in front of her to block her path. The agents engaged with her, and during their conversation,
told her they "thought she was a migrant" who had come from one of the camps. In general,
whenever I drive in and out of Jacumba to access the camps, I see at least 2 to 5 Border Patrol trucks
patrolling the vicinity. It would not be possible for a migrant to walk out of the camps without
encountering an agent, and if they did, the Autonomous Surveillance Towers would send an alert to
Border Patrol agents with a live image of the individual leaving the camps, to which Border Patrol
could quickly respond.

19. Even in the unlikely event that a migrant managed to make it past Border Patrol and the surveillance
towers located in the camps, they would be unlikely to safely reach any area from which they could
travel further into the United States. Jacumba is surrounded by mountain ranges and deserts, with
incredibly challenging terrain. It would be near impossible to traverse the mountains without
specialized climbing equipment. A person could not survive crossing the Anza Borrego desert
without more water than any migrant would be able to carry. Any migrant traveling on roads would
be seen by Border Patrol or another law enforcement agency. Additionally, there are hundreds of
Border Patrol's Autonomous Surveillance Towers dotting the landscape, aside from those located in
the OADS, and a Border Patrol checkpoint for vehicles traveling to San Diego on Highway 8.

20. It would be very dangerous for migrants to try and cross back into Mexico from the OADS. The area
south of the border near Jacumba is extremely remote, with unforgiving terrain and few population
centers. The area directly south of the border wall is frequently patrolled by the Mexican National
Guard, which apprehends migrants they encounter to prevent them from crossing into the United
States. Additionally, there are several criminal groups fighting to control migrant access to the
border, and migrants often face danger if they pay the "wrong" group. There have been around a
dozen migrants murdered in Mexico near Jacumba since September, a significant increase from
what we have seen previously. Migrants also often recount stories of being extorted by officials in
Mexico or falling victim to crimes like robbery, extortion, or rape. Migrants I have talked to about
their experiences in Mexico report feeling traumatized and afraid to ever return.

21. To my knowledge, very few migrants or asylum seekers have attempted to leave the OADS in
Jacumba. The hundreds with whom I have spoken include migrants from all over the world who
have told me about the persecution and abuse they suffered in their countries of origin and on their
way to the United States. They want to follow the law, and believe based on misinformation from

smugglers that the best way to seek protection is to cross the border and turn oneself in to Border Patrol. Border Patrol agents then tell them that they must wait in the OADS to seek asylum. They are largely committed to obtaining asylum in the United States and would not jeopardize their chances by leaving the OADS, despite the harsh conditions.

**Monitoring and Documenting Deteriorating Conditions at the OADS**

22. AOL provides volunteers with a reporting form in which they document in real time conditions at the camps. For example, the questionnaire includes: how many people are processed out of the OADS during their rotation, and who transported them; whether there are children, pregnant persons, elderly persons, or persons with medical emergencies on site; whether people have wristbands issued by CBP; whether CBP is handing out food and water; whether Border Patrol agents were on site; and whether people were shackled when transported out of the sites. The form also has space to include any other incident of note, such as whether there was a medical issue that required emergency medical response, whether Border Patrol or the volunteer called 911, and how the agents or medical staff responded to the incident.

23. According to the data collected by AOL staff and volunteers, the number of asylum seekers at the Jacumba OADS has fluctuated between the end of October 2023 to the beginning of December 2023. During this period, the number of asylum seekers at the Jacumba OADS on a single day has ranged between less than 100 to over 750. And the number of children at the Jacumba OADS has ranged between less than 20 and up to nearly 60. The number of pregnant persons also varies but has reached over 60.

24. On October 1, 2023, I emailed DHS headquarters to inform them about Border Patrol's failure to provide for the basic survival of asylum seekers and the potentially life-threatening conditions at the Jacumba OADS. My email described Border Patrol's practice of using wristbands to indicate when people arrive; ways in which Border Patrol prevents people from leaving the sites; the average number of people at the sites; the separation of family units; and the lack of food, water, hygiene products, adequate bathroom facilities, and medical assistance. My email asked DHS to provide food, water, shelter, bathrooms, and medical assistance in accordance with its own detention standards.

25. The following week, around October 10-13, DHS headquarters staff visited the San Diego sector and visited the open air detention site in San Ysidro/San Diego and Jacumba. Immediately in advance of their arrival, Border Patrol processed most migrants out of the Jacumba OADS. At the same time, we saw an increased number of Mexican National Guard on the south side of the border immediately adjacent to the Jacumba OADS, where they prevented migrants from crossing through gaps in the wall. Border Patrol agents also cleaned the camps of some of the garbage, dismantled some of the makeshift shelters built by migrants, and threw out tents and other shelters our collective had built. When DHS headquarters officials arrived in Jacumba around October 10-11, the OADS looked very different from before they cleaned them up and cleared out most of the migrants.

26. On or around October 11, 2023, a 29 year old migrant from Guinea died at Whiskey 4, one of the OADS in San Diego. At the time, we did not have many details because volunteers are not allowed access to the Whiskey 4 OADS. Later, we learned that the woman needed emergency medical care shortly after crossing the border into Whiskey 4, but that she later died either in the camp or at the hospital.

27. On October 12, 2023, I met with Dr. Alexander Eastman, CBP's Chief Medical Officer, and Marc Olcott, a medical contractor with CBP, in San Diego. In our conversation, Dr. Eastman denied that migrants kept at OADS were "detained" such that DHS would be required to follow TEDS standards. They told me that moving forward, they would have agents with medical training onsite at OADS. They said that any responsibility for emergency medical services fell to the County of San Diego. They also said that "no one would be denied water," but did not commit to providing food, shelter, or triage medical services to prevent the need for emergency services.

28. However, after these meetings, the only notable difference was that people were being transported out of the OADS at a faster rate, including with buses provided by ISS, a private transportation contractor. For about a week, we saw a reduction in the number of people at the sites and in the length of time people were staying there. Volunteers also witnessed an increase in transportation services provided by CBP to remove people from the OADS. But in recent weeks, the number of individuals waiting at the sites for longer periods of time has spiked.

29. Before the meetings, I had never seen Border Patrol giving out water. After these meetings, Border Patrol began handing out water bottles and a small granola bar or crackers while providing the paper wristbands. Border Patrol does not provide additional food or water after this point.

30. CBP has been providing wristbands to individuals at OADS in Jacumba consistently, either before or after they enter the camps upon their initial encounter with Border Patrol. CBP would generally process individuals out of the camps in order of arrival, while prioritizing families with children, pregnant women, and the acutely medically vulnerable. Between approximately November 28 and December 5 of 2023, Border Patrol agents in the Boulevard sector stopped providing wristbands to migrants at the Moon Valley and Willows camp. What resulted was chaotic; migrants complained that they had been there for days while others who had arrived recently were picked up. We started to see a higher number of families, some with infant children, staying overnight at those OADS during that time. Even agents complained onsite about the difficulty in processing migrants unless they were able to distribute wristbands. By December 5th, I saw migrants with wristbands in all three Jacumba OADS.

**Lack of Medical Assistance at the Jacumba Sites**

31. Not only does Border Patrol fail to provide any medical services in the OADS, but the agents also actively discourage access to emergency care. Multiple migrants and volunteers have heard Border Patrol agents accuse individuals of "faking" illness, telling migrants that everyone in their group will be deported if any of them fake an illness in an attempt to get out of the camps. Volunteers reporting a medical emergency to Border Patrol officers in Jacumba on October 29, 2023, report the

agent refusing to call for assistance, saying "It's not my problem." On November 7, 2023, volunteers reported that Border Patrol told a Turkish man with likely appendicitis that he would be deported if he went to the hospital. I have witnessed Border Patrol agents refuse to prioritize a hypertensive woman because "the migrants fake illness to get processed out faster." Volunteers have reported that sick migrants will hide in caves or behind rocks because they are afraid of being accused of faking illness.

32. A lack of language capacity amongst the Border Patrol agents also contributes to delays in accessing care. Many of the migrants come from China, Turkey, Afghanistan, Uzbekistan, Brazil, and a host of other countries that do not speak Spanish or English. Even Spanish-speaking migrants often report that they have trouble communicating their ailments to Border Patrol agents with only a limited command of Spanish. Our volunteers have documented several instances where non-English/Spanish speaking migrants attempted to communicate the need for emergency assistance to agents, but were unable to do so. I have never seen Border Patrol agents call for an interpreter to better communicate with migrants with whom they do not share a common language.

33. Border Patrol agents in OADS frequently tell migrants that their asylum process will be "stopped" if they go to the hospital, which is legally incorrect. Migrants are not processed by Border Patrol if sent to the hospital from OADS, but can apply for asylum affirmatively. Jewish Family Service has also established a mechanism through which migrants released from hospitals can be processed by Immigration and Customs Enforcement (ICE) if they do not have a valid passport and require their NTA for air travel. However, during multiple incidents, migrants experiencing a medical emergency will refuse to be transported to a hospital based on Border Patrol's erroneous statements that they will no longer have access to asylum.

34. In Jacumba, ambulances will often refuse to come into the camps, so the migrant must be transported out to the paved road in order to access care. While some Border Patrol officers are helpful and transport the migrants to the ambulance themselves, some refuse, citing the aforementioned DHS policy dictating that because the migrants are not in their custody, they are not allowed to transport them. Some agents have asked volunteers to transport medically vulnerable migrants to the pavement.

35. In our collective, volunteers will immediately inform Border Patrol if they encounter an individual who needs an ambulance. While some Border Patrol officers will readily call for emergency medical services if our volunteers encounter an individual requiring care, others have refused, minimizing the illness or injury and accusing the individual of faking illness. Volunteers will often call 911 to help an individual, sometimes because Border Patrol asks them to, and sometimes because Border Patrol refuses to call themselves. Medical providers working across all seven OADS in San Diego County have documented dozens of these incidents.

36. Often, migrants themselves will call 911 because they are having a medical emergency, or because they feel they cannot endure the conditions in the camps, either due to an underlying medical issue, or because they fear they cannot survive the cold, heat, dehydration, hunger, and other issues they

confront while held at OADS. Jacumba's normal population is around 600, however local Emergency Medical Services (EMS) report receiving hundreds of emergency calls. This has caused tension between EMS and the migrants, as well as the volunteers advocating for their care. Individuals who form part of the EMS workers and leadership have made anti-immigrant comments, and acted with hostility toward volunteers and the migrants themselves. They, too, will accuse migrants of faking illness and send them back to the camps without adequate care. EMS workers and supervisors have complained that calls from the camps get in the way of "real emergencies."

37. Frequently, response times from EMS have been very long, either because EMS takes a long time to arrive, or because officers delay or refuse to call 911. The remote location of Tower 177 is also a factor, from which it takes at least 10 or 15 minutes to transport a migrant to the pavement to meet EMS. There are multiple documented instances of long response times that include the following. On November 21, 2023, an ambulance had just taken a woman who was in labor from the Moon Valley camp when volunteers identified another migrant who appeared to be having a heart attack. EMS was called and the licensed volunteer physician on site gave the man an aspirin. EMS did not arrive until more than 30 minutes later, and EMS staff berated the volunteers for having given the man aspirin, even though the volunteer doctor immediately reported the dosage to EMS and had correctly determined its administration to be medically sound given the situation. On November 26, 2023, a migrant in the Jacumba OADS with a pre-existing vascular disorder had a dangerously elevated heart rate and blood pressure. A volunteer onsite notified a CA National Guard officer to ask for EMS, but the National Guard officer put his hand on his weapon and shouted at the volunteer. The volunteer was able to make contact with a Border Patrol officer, who called EMS and transported the woman to the pavement. It took at least 30 minutes from when the volunteer first informed officials onsite for the ambulance to arrive. On Saturday, December 2, 2023, volunteers at the perimeter of the Moon Valley camp called 911 after a 13-year old boy was brought over the border and dropped near them. He had apparently been involved in an auto accident south of the border and badly injured; his traveling companions thought he could get more rapid care in the U.S., so they brought him to the Moon Valley camp. The volunteers also called Border Patrol, who were not onsite at the Moon Valley camp at the time and took around 30 minutes to respond. About ten minutes later, one of the volunteer doctors arrived on the scene. She reported that Border Patrol had not been administering CPR when she arrived, and despite her best efforts to help the boy with CPR, he died. EMS did not respond for over an hour after volunteers had initially called. Within 24 hours of the boy's death, Border Patrol agents told volunteers that EMS will only respond to calls from CBP and will not respond to emergency calls made directly by asylum seekers or volunteers at the OADS. Our collective has since been advocating with EMS locally to avoid implementation of this disastrous policy.

38. Most of the time, people transported in an ambulance are not allowed to bring anyone else with them, or sometimes they can only bring one person. As such, some people hesitate to get on an ambulance because they will be separated from family members who remain at the camps. This fear is very real, as migrants are discharged by hospitals to the streets as "homeless," often without phones or with phones that do not work in the U.S. Volunteers report that some individuals brought

to hospitals near El Campo, CA are put into a taxi by the hospital and dropped off near the OADS. Volunteers once encountered an elderly Turkish woman who had been dropped off on Old Highway 80 alone at night without a working phone, while her family remained in the camps. On September 13, 2023, I met a Chinese man and his son in San Diego, where he had been released from Border Patrol custody. His wife had been transported out of the Willows camp a few days earlier, and their daughter had gone to the hospital with them. We called multiple area hospitals to try to find them, but no one had a record. After about a week of not having heard from them, we helped the family file a missing person's report with the San Diego Police Department, fearing that they may have been abducted after being released to the streets. After another week, we finally learned that the wife and daughter had gone back to the border to turn themselves in, and instead of being released, were transferred to an ICE detention facility in Louisiana, where they remained until October 5, 2023. In another hospital release case, a woman turned herself back in at the border, only to be detained at the Otay Mesa Detention facility for several weeks. We are currently attempting to create systems to address the needs of individuals transported out of OADS so they do not end up homeless, detained, or separated from their families for extended periods of time, but progress has been slow and resources scarce.

39. CBP does not provide medical attention to individuals at the Jacumba sites. To fill the void, medical volunteers have visited the sites regularly to provide basic emergency services. Volunteers include licensed physicians, nurses, medical students, individuals with EMT certifications, and others with first-aid training. Medical volunteers provide asylum seekers with over-the-counter medication, including Tylenol, and materials for basic wound care, like bandages and Neosporin. Our collective receives these medications through donations or purchase basic wound care items and electrolytes for individuals experiencing acute dehydration. Medical volunteers have also provided blood pressure cuffs, COVID tests, glucose meters for diabetics, and other basic diagnostic equipment to measure heart rate and blood pressure. Generally, volunteers who are licensed physicians have their own kits with emergency inhalers, EpiPens, and other medical devices to monitor the conditions of diabetic persons and persons with respiratory conditions. Many of the medical volunteers have provided medical care at shelters in Tijuana or have worked in mobile medicine, and thus they have the adequate tools to respond to common medical needs. A mobile medical clinic from Operation Samaritan, a San Diego nonprofit medical provider, has provided care at the Jacumba OADS on at least two occasions.

40. Volunteers have experienced a lot of push back for providing basic medical care. Volunteer doctors, nurse practitioners, and medical students have been asked to leave the OADS by Border Patrol, even though Border Patrol is not providing any medical triage or treatment onsite. On December 4, 2023, I was at the Willows camp when our group was approached by two San Diego County sheriffs. They told us that it had "trickled down" that we were giving out "pharmaceuticals." I explained to the Sheriffs that volunteers only provide Tylenol and basic wound care, with licensed physicians sometimes providing an emergency inhaler or EpiPen in an emergency. At that time, there was a volunteer doctor onsite providing basic care, so the sheriffs approached her and confirmed that she was not dispensing prescription medication (even though she would legally be able to pursuant to

the rules of her medical license). On December 6, 2023, I was again at Willows camp and had a conversation with a Border Patrol officer. He asked me if I was giving out pharmaceuticals, and I said "I am not a doctor, I am a lawyer." I told him that there would be a licensed physician volunteer on site all week, plus a mobile medical unit. He said I should call the Boulevard Border Patrol station and let them know, and provide a schedule with physician medical license numbers. At around 4:30 PM that day, I called the Boulevard Border Patrol Station as instructed, and explained that I wanted to provide medical licenses for volunteers. The agent who answered told me "that's not how that works." He took my number and said a supervisor would call me back, but I never received a call back. On December 9, 2023, a volunteer who called 911 after being requested to do so by a Border Patrol officer on behalf of a migrant with a necrotic wound was berated by EMS workers, who asked things like "what are you doing here? Which organization is providing medical care? What drugs are you giving out?"

41. Volunteer medical professionals providing basic care and triage at Jacumba OADS have encountered multiple serious and emergency medical issues, including but not limited to the examples provided above, as well as COVID, chickenpox, scabies, hypertension, asthma, COPD, HIV, high-risk pregnancies with complications, including lack of fetal movement and bleeding, individuals with serious disabilities, individuals recovering from recent heart surgeries, strokes, and organ transplants, infants with severe vomiting and diarrhea, and a host of other ailments. Often, migrants' pre-existing conditions are exacerbated by the fact that they do not have their prescribed HIV, blood pressure, inhaler, or other medication that would keep the condition from becoming critical. Having medical volunteers at OADS saves lives, but Border Patrol and local officials seem committed to reducing or eliminating this volunteer service. Given that DHS claims that the migrants at Jacumba OADS are not in their custody, it is unclear under which authority they purport to prohibit volunteers from offering basic wound care, and under what authority they seek to regulate the practice of licensed physicians attempting to provide much-needed care and emergency triage to migrants trapped in OADS.

**Families and Children at the Jacumba Sites**

42. It is common to see families staying overnight at the Jacumba sites, although Border Patrol will prioritize their processing over that of single adults. Sometimes, Border Patrol takes out women and children first, but this sometimes means separating them from other family members such as spouses or adult children. Sometimes, families need to make the difficult choice of staying overnight to keep their family together. Since Thanksgiving, the average time that migrants spend in the Jacumba OADS has increased, and it has become more common for families with young children to stay overnight, sometimes for multiple nights.

43. Volunteers have seen many unaccompanied children at the Jacumba sites. Generally, unaccompanied children travel with extended family members like uncles, cousins, or friends, but I have met several children ranging from ages 15-17 who were traveling alone. Volunteers have documented instances of unaccompanied children staying overnight at the camps. Our practice is to inform Border Patrol agents about unaccompanied children when we come across them. On

December 6, 2023, I spoke with 8 unaccompanied children, three of whom were traveling alone. I alerted the Border Patrol officers onsite between noon and 1:00 PM. A van came to transport families out around that time, but the agents told me they couldn't take the unaccompanied children because families with young children had stayed the night before. I observed families with toddlers and infants lining up for transport. The agents onsite told me that they would likely be transported out after they changed shifts around 4:00 PM. The agent asked me how old the children were, and when I told him the ones traveling alone were all 15 and older, the agent told me that they prioritize young children, meaning children under the age of five or babies, not adolescents or older children. I observed about 40 children total in the camp that day, many under the age of 5, so I was not sure whether the unaccompanied children would be processed that evening. I left around 4:30 PM, and asked volunteers who stayed on site to alert Border Patrol as to the location of the unaccompanied children when they brought the next transport van. The volunteers reported that the children still had not been processed when they left a few hours later. I am not sure whether they were processed out that night or the following day.

44. The chaos of processing migrants out of OADS has led to frequent separations of family groups. Between September 20, 2023 and December 7, 2023, Al Otro Lado has documented over 1,000 separations of family groups. We document family separations at street release sites, where migrants often describe being separated from their families at the OADS or while being processed. Around 35% of separations involve legally married spouses, and around 18% involve at least one parent being separated from a minor or adult child. Migrants are often processed and released at different times, or separated if a family member seeks emergency medical care. At least 37 individuals have been sent to ICE detention facilities in Texas and Louisiana while their families are released to San Diego. It often takes us weeks to locate a missing family member because Border Patrol has not responded to numerous requests for information, and will not even confirm whether the missing individual is in DHS custody. I have worked with several families whose 18 and 20 year old children were separated and detained by ICE for weeks while we worked to secure their release. Although technically adults, these young migrants would otherwise be included on their parents' asylum application, and often do not know every detail of why the family fled, putting them at risk of failing a CFI and being separated from their families permanently.

45. Having watched Border Patrol process individuals out of the camps, it is no surprise that families get separated, especially when they do not provide wristbands to lend some order to processing. Even with the wristbands, processing can be haphazard; I once witnessed one Border Patrol officer ask another "what are the numbers on the bracelets for?", and the other replied that he did not know. I often encounter migrants who missed the time they should have been processed due to communication or other issues, who did not feel comfortable engaging with Border Patrol officers to let them know. On November 29, 2023, I accompanied researchers from Amnesty International to the Jacumba OADS. When they were observing Border Patrol agents processing migrants out of the Tower 177 camp, one agent told another that there was a family group that wanted to travel together, but who were not together in the line. The other agent replied, "I don't care. Border Patrol

separates families." This statement is consistent with a general lack of care in ensuring that family groups encountered in OADS stay together.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.

December 10, 2023


/s/ Erika Pinheiro
Erika Pinheiro

# Attachment 6

**DECLARATION OF JACQUELINE ARELLANO**

I, Jacqueline Arellano, declare as follows:

1.  I am the Director of United States Programming for Border Kindness, a largely volunteer organization. Since 2016, Border Kindness has worked to provide food, water, and first aid to migrants along the California-Mexico border. Border Kindness also operates in Mexico to assist migrants and asylum seekers, including running a children's center in Mexicali and assisting migrants in Mexico with their immediate needs. As the Director of U.S. programming, I coordinate our work to provide direct aid to immigrant communities in the United States. In addition to my work at Border Kindness, I also work a full-time job as an acupuncturist.

2.  I am providing this declaration based on my personal observations, the observations and experiences of my colleagues and volunteers that they have communicated to me, my conversations with migrants we assist, and my conversations with Border Patrol officers in the course of my work from May 2023 to the present.

3.  I live in San Diego, and I first became aware of the open-air detention sites near Jacumba around May 2023. In May, I received a search and rescue call from a woman who contacted Border Kindness, saying that her father was at a site near Jacumba, California, and that he urgently needed water. She told me that he was with a group of about 100 other people who also needed water. I told the woman that she or the people in the group should contact Border Patrol, who would arrive to process them and would provide water. The woman I spoke with told me that her father and the other people had already been held at the site for two days without food and water.

4.  That night, some volunteers from Border Kindness who do desert aid went out and dropped off food and water for the people at the site. The people were held at a site called O'Neill, near where the Moon Valley site is now. In May 2023, other members of Border Kindness and I provided food, water, first aid, and other basic supplies to people at the sites.

5.  Over the next roughly week and a half, Border Kindness volunteers and I saw that there were approximately 1,800 people who were held at three sites–O'Neill, Tower 177, and Willows– before being processed by Border Patrol.

6.  From late May 2023 until mid-September 2023, there were few people held in the desert near Jacumba. Occasionally while doing our border assistance work, we heard from or saw a few small groups who were being held at the three sites then in use, but there were rarely very many people.

7.  On September 16, 2023, I heard about a group of about 100 people who were being held at one of the sites near Jacumba. Since approximately September 16, 2023, there have consistently

1

been hundreds of people every week detained at the three open-air detention sites near Jacumba: Moon Valley, Tower 177, and Willows. While the numbers of people fluctuate from day to day and week to week, I would estimate that there are usually 500 people per day waiting across all three sites.

**Border Patrol maintains control of the Jacumba open-air detention sites and directs people to remain there.**

8.  I am familiar with all three sites and have been to all of them several times. Since mid-September, I regularly work 40 hours per week with Border Kindness, in addition to working a full-time job and caring for my toddler. I purchase and organize supplies at the Youth Center in Jacumba, coordinate our volunteers, communicate with other volunteer groups, deliver supplies, and work with migrants at the site. I am generally present at the open-air detention sites near Jacumba approximately three times a week: I spend one full weekend day working at the detention sites, and during the week I make shorter, intermittent trips to deliver supplies and provide assistance.

9.  Border Patrol officers direct and in some instances directly transport migrants to the detention sites. I have personally observed Border Patrol officers round up groups of migrants between vehicles at other points along the border  and then direct them in a caravan to the sites. One vehicle will drive in front and one vehicle will drive in back, with a group of migrants made to walk in between  the vehicles to the detention sites. I have seen this happen going towards all of the sites.

10. I have also personally observed Border Patrol officers transport migrants in vehicles and then bring them to the sites, at both Moon and Willows. For example, on or about November 11, 2023, two Turkish men flagged me down while I was driving near Jacumba and asked me to call Border Patrol for them. As I was speaking to them, Border Patrol officers arrived. They handcuffed the two men, put them in the Border Patrol vehicle, and drove away. Less than an hour later, I was at the Moon Valley site, when I saw the same men arrive at the site with a larger group of migrants. I talked to the men later, who told me that the Border Patrol officers had taken them back near the border wall, rounded them up with another group of migrants, and walked them in a caravan between two vehicles to the Moon Valley site, where they were told to stay.

11. If a migrant tries to leave one of the detention sites, Border Patrol brings them back. I have heard from other volunteers that when a migrant leaves a site temporarily, for example to try to buy food, Border Patrol will transport them back to the sites. I have heard about this practice happening at all three sites. Border Patrol will also position their vehicles to restrict access to the sites. For example, I have seen Border Patrol officers angle their vehicle and set up traffic cones to partially block the entrance to Willows.

2

12. Border Patrol also discourages people from leaving if they need medical attention. At Moon Valley, I have personally heard Border Patrol agents threaten people if they request emergency medical care. More than once, I have heard agents tell migrants that if they leave the site in an ambulance, their case will automatically be over and they will be denied asylum. I have spoken with migrants who tell me that, after being threatened, they believe Border Patrol and will not seek medical attention.

**Conditions at the open-air detention sites in Jacumba are extremely dangerous, and Border Patrol does not provide food, water, shelter, medical care, or basic hygiene items.**

13. Border Patrol agents provide next to nothing in terms of food and water. Distribution of food and water is sporadic and even then, only upon entry. Border Patrol will provide a 16-ounce bottle of water and a small snack-pack of crackers or another snack, but does not do so consistently. Currently, the vast majority of asylum seekers at the detention sites are not even given one meager snack a day.

14. The conditions at all the sites are very harsh. All are on desert terrain, and the temperatures are extreme. In the months since September that I've been working at the detention sites, we've seen people with hyperthermia and now hypothermia.

15. Now that it's December, the temperature regularly falls below freezing. Last weekend, the temperatures in the evening and at night were in the 20s. There was frost on the ground, and water bottles froze overnight. The wind is often really strong, which makes the temperature feel much colder. Because it is so cold, people build fires out of any materials they can find to try to stay warm, including cutting down brush and trees on private property or even burning trash. The ground is dry and dusty, and it quickly turns into mud when it rains. There is no shelter at any of the sites, aside from some tents and tarps that volunteers have provided. We give out blankets, coats, hats, and warm clothing to try to keep people alive, but the cold, wind, and rain are very dangerous.

16. Border Patrol installed and maintains Port-a-Potties at all three detention sites. However, because Border Patrol agents don't have a consistent schedule at the sites, I am not sure how regularly they empty the toilets or replenish toilet paper, if there is even toilet paper in the first place. Border Patrol does not provide hand sanitizer, soap, water for washing hands, or other basic hygiene items like toothpaste and toothbrushes, diapers, and menstrual products. The only personal hygiene items provided at the sites are donations from volunteers. People sometimes go to the bathroom outside when the Port-a-Potties are not maintained and become too unpleasant to use. The lack of sanitation is dangerous, especially in the winter.

17. Border Kindness and other volunteer groups have taken responsibility for providing food, water, and other basic needs for survival to the asylum seekers at the open-air detention sites. Volunteers go to all sites regularly to provide water, blankets, and at least two meals each day.

18. Border Patrol generally does not assist people with medical emergencies. Since September, I have personally seen many people arrive with medical needs, including some people in crisis. One evening in September or early October, my husband and I were at the Tower 177 site providing food and other supplies. A woman at the site began having multiple, severe seizures. One of the volunteers working with us had to try to hold her and put her hand in the woman's mouth so she would not bite her tongue off mid-seizure. My husband approached Border Patrol officers who were on site and asked them to contact the county Emergency Medical Services (EMS) to dispatch an ambulance. The officers refused and told him to call an ambulance himself. Tower 177 is in a remote area with poor signal, so my husband had to run down the road to try to get a signal so he could call an ambulance. He was finally able to call emergency services, who sent an ambulance.

19. I have seen many other people who are medically fragile or who experience medical emergencies, including seizures, symptoms of smoke inhalation, severe kidney pain to the point of vomiting, diabetic emergencies, and people going into labor. Border Patrol will rarely, if ever, call for an ambulance. Recently, I've heard from some volunteers that local emergency services will now only respond to 911 calls at the sites if Border Patrol calls themselves. This is very concerning since Border Patrol generally refuses to call 911. The local emergency services' practices seem to be constantly changing, and my understanding is that their current practice is that they will not respond to 911 calls from migrants. Instead, volunteer medical students and local doctors and healthcare workers provide medical care when they are present. However, medical volunteers can only provide first aid and things like ibuprofen—they cannot dispense medication that would require a prescription.

20. Until very recently, in approximately early December, Border Patrol officers gave wristbands to migrants who arrived at the sites. The wristbands were color-coded and had the days of the week on them. Border Patrol used the wristbands as a rough way to know how long people had been held at the detention sites and when to pick them up for processing. With the wristband system, adults were usually kept at the sites between two and five days. Children and families with children were usually processed more quickly.

21. About a week ago, Border Patrol discontinued the use of wristbands. Since then, the conditions at the detention sites have become even more chaotic and dangerous. Without wristbands, it's not clear how long someone has been held at the sites, and there is no order to how long people have to stay there or when they will be picked up for processing. The lack of organization has led to more tension at the sites between the asylum seekers themselves, because no one wants to be left behind or to have to wait longer than another person. People are on edge waiting for Border Patrol to come pick them up, but Border Patrol does not have a regular schedule or any consistency in when they come to the sites. Instead of going into a tent to try to seek shelter and warmth, people wait outside in the freezing cold for agents to come.

4

22. Due to this new policy by Border Patrol, I have seen children forced to wait much longer at the detention sites. Previously, Border Patrol would usually pick up children and one parent in a family unit within a day of the family's arrival at the detention sites. Over the last week, I have seen children, including sick and vulnerable children, kept at the sites for much longer. Last weekend, a child was forced to stay at the Willows site for several days. She had asthma and was wheezing, but her family did not have an inhaler for her.

23. I am extremely concerned about the winter months with rain and freezing temperatures. The work that volunteers have been doing is not sustainable over the long term, and I am worried that conditions at the open-air sites will continue to deteriorate.

I affirm that the statements in this declaration are true to the best of my knowledge and belief.

December 10, 2023

  /s/ Jacqueline Arellano
Jacqueline Arellano

PLFS-0110

# Attachment 7



May 13, 2023

Shoba Sivaprasad Wadhia, Officer
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Compliance Branch, Mail Stop # 0190
2707 Martin Luther King, Jr. Ave., SE
Washington, DC 20528-0190

*Via Electronic Mail:* CRCLCompliance@hq.dhs.gov

**RE: CBP Violations of Custody Standards and International Human Rights By Failing to Provide Water, Food, Shelter, Sanitation and Medical Assistance to Migrants Detained in Open-Air Corridor Between Border Wall Layers Near San Ysidro Port of Entry**

Dear Officer Wadhia:

We write to file a formal complaint about grave violations of rights in the United States committed by U.S. Customs and Border Protection (CBP) agents, namely Border Patrol agents, who for months have used an open-air corridor between the primary and secondary walls west of the San Ysidro Port of Entry in California as a holding area for migrants in their custody without complying with custody standards. As detailed in this complaint and the attached witness declarations, Border Patrol agents are not providing adequate water, food, shelter, sanitation or medical assistance, exacerbating the trauma of already vulnerable migrants and undermining their basic human rights. Instead, they stand by with guns watching migrants in need.




Now, with the lifting of Title 42 exclusions, and the increase of migrants seeking asylum, it is imperative that CBP correct course to comply with custody standards and protect human rights. Your office, in conjunction with Congress, has an important oversight role to play. The violations of custody standards by CBP in this California corridor are systemic. They are not the actions of a few agents, but rather of an agency that has acted intentionally with full knowledge of the conditions they are subjecting migrants to while endangering their well being.

1. **The migrants in the California corridor between walls are indisputably in CBP custody.**


The area of concern in which CBP is violating rights is a space between the primary border wall that abuts Tijuana, Mexico, and the parallel secondary wall approximately 75 yards to the north. The area between the walls where CBP is holding migrants is U.S. soil. There is in fact a sign posted on the secondary wall in front of that space declaring it U.S. property. In that space, CBP exercises full control, patrolling it regularly with vehicles and ATVs. The area is also monitored by CBP cameras.

Civil society organizations who form part of the Southern Border Communities Coalition (SBCC) have borne witness to the treatment of migrants over the last several months in the California corridor. The migrants originate from countries all over the world, seeking refuge from the dangers they face at home. While visiting the site, our team observed and continues to observe Border Patrol agents clearly exercising control in the following ways:

a. **CBP controls movement** — Agents drive in and out of the detention area, walk among detained migrants and occasionally direct them to different areas within the corridor. Pedro Rios observed "Border Patrol agents ushering migrants from the area near Las Americas to the Whiskey 8 area. Agents also directed single men to the area closer to the beach."[1] Additionally, "Border Patrol told the migrants they had to sit in rows and stay seated. Occasionally, the agents would drive through with an ATV or cars, to check that they were seated."[2]

b. **CBP controls access to water and food** — Due to the migrants being detained in an area controlled by Border Patrol, agents control access to basic necessities. In Whisky 8, our declarants have observed Border Patrol provided very limited water and only a granola bar that left them hungry and thirsty with no way to access more without the help of community members on the other side of the wall[3] When Pedro Rios raised concerns about lack of access to water he was told "that the government was considering bringing in a buffalo water tank, but then the Border Patrol liaison told [him] they would not out of concern that it would attract more migrants. They never brought the tank in."[4]

---

[1] Decl. of Pedro Rios at ¶ 21
[2] Decl. of Pedro Rios at ¶ 20
[3] Decl. of Adriana Jasso at ¶ 8
[4] Decl. of Pedro Rios at ¶ 12

c.  **CBP controls migrant tracking system** — Border Patrol monitors migrants by issuing color coded or labeled wristbands. From Pedro Rios' observations, "Border Patrol instituted the use of wristbands to identify people's arrival based on the agent's first interaction with them, which might be a day or two after they actually arrive in the corridor. The wristbands are like the ones used for concerts. They are different colors and some have the day of the week printed on them."[5]



d.  **CBP controls access to the area** — Border Patrol also controls access to the area, not allowing anyone to leave without the assistance of agents. Migrants "cannot leave the area because of the physical walls that stand in their way. Some of those arriving are suffering severe pain, diarrhea, headaches, etc. Many individuals are pregnant, have children with them, have no shoes, are muddy, wet and in terrible condition."[6] Individuals in need of medical attention are dependent on Border Patrol to transport them to a hospital, but they are slow to respond. For example, A 79-year old Colombian woman who fell off the border wall and suffered injuries to her leg and other distress because of a lack of medicine, was not provided medical attention by Border Patrol until after an entire day of advocacy by advocates.[7]

The control CBP has over every aspect of the migrant's environment and well-being from where and how they are able to move, to the basic necessities they have access to, indisputably amounts to custody. CBP has the responsibility to follow the laws and protocols in place and uphold the human rights and dignity of all migrants in their custody.

2.  <u>**CBP is violating its own standards for conditions and length in custody.**</u>

The U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search ("TEDS Standards") dictate the custody standards that CBP must follow when they detain people in a holding facility.[8] A holding facility is any "secure enclosure" that is "[u]nder the control of CBP; and [p]rimarily used for the short-term confinement of individuals who have recently been detained".[9] Individuals are detained when they are restrained from having freedom of movement.[10] Border Patrol agents that hold migrants in the corridor between the walls are subject to the TEDS Standards.

---

[5] Decl. of Pedro Rios at ¶ 22
[6] Decl. of Adriana Jasso at ¶ 7
[7] Decl. of Lilian Serrano at ¶ 2-4, 9-10
[8] CBP National Standards on Transport, Escort, Detention, and Search (2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.  ("TEDS Standards")
[9] TEDS Standards at Pg. 29.
[10] TEDS Standards at Pg. 28.

The TEDS Standards provide, among other things, that all detainees must be provided medical attention, meals at regularly scheduled times, adequate water, have restroom accommodations, and must be provided with personal hygiene items.[11] All efforts must be made to ensure care for migrants under the Standards.[12]

As described above and in the specific examples below, CBP is violating all of these standards at the open air detention site in the California corridor.

### a. CBP does not provide medical assistance in violation of TEDS § 4.10

Observers have documented numerous examples of Border Patrol failing to provide medical attention to detained migrants, including at-risk populations.[13] TEDS Standards provide that "[e]mergency medical services will be called immediately in the event of a medical emergency."[14] Adriana Jasso states in her declaration that she encountered an African man who collapsed and was described as dying by a Colombian nurse. Only after advocate intervention did Border Patrol come to assist.[15] Additionally, she describes migrants "suffering severe pain, diarrhea, headaches, severe cuts and bruises. One Asian man's leg was severely infected. He was in extreme pain with no way to communicate."[16]



Lilian Serrano has various accounts of migrants needing medical assistance. In reaching out to the Border Patrol liaison she was told the liaison "was receiving our emergency flags and following up, but that when his agents went to take people to the hospital, the migrants were all of a sudden fine and that they didn't have a medical need."[17] In another instance the liaison asked why she was calling him and not 9-1-1.[18] Lilian also encountered a 79-year old Colombian woman who fell off the border wall and suffered injuries to her leg and other distress because of a lack of medication; she was not provided medical attention by Border Patrol until after an entire day of advocacy by multiple advocates.[19] Additionally, she encountered an asylum seeking woman from Afghanistan who the Border Patrol took to the hospital after she suffered injury and infection to her arm. The woman was dumped at a hospital without any paperwork from

---

[11] TEDS Standards at Pgs. 17-18
[12] TEDS Standards at Pg. 3
[13] TEDS Standards § 5.1 defines "at-risk populations" as including children, "pregnant individuals; those known to be on life-sustaining or life-saving medical treatment; those at higher risk of sexual abuse (including but not limited to gender nonconforming, intersex, and transgender); reported victims of sexual abuse; those who have identified mental, physical or developmental disabilities; those of advanced age; or family units." The Standards provide such individuals "may require additional care or oversight".
[14] TEDS Standards § 4.10 ("Medical Emergencies")
[15] Decl. of Adriana Jasso at ¶ 11
[16] Decl. of Adriana Jasso at ¶ 7
[17] Decl. of Lilian Serrano ¶ 9.
[18] Decl. of Lilian Serrano at ¶ 13
[19] Decl. of Lilian Serrano at ¶ 2-4, 9-10

Border Patrol and was later denied access to agents so she could be processed.[20] In addition, Lilian encountered a 29-year old pregnant Somali woman suffering repeated vomiting without medical attention.[21]

Pedro Rios confirmed that a Jamaican woman who suffered a miscarriage after being kidnapped and raped in Mexico and remained in excruciating pain, was not provided medical attention by Border Patrol for days despite advocates raising the issue multiple times.[22] Pedro also documented an infant no longer taking breastmilk who suffered vomiting and was listless and was only taken to a hospital after advocates' intervention.[23]

### b. CBP does not provide meals to detained migrants in violation of TEDS § 4.13

Border Patrol did not provide regular meals as required under the TEDS Standards, leaving migrants at risk of starvation while relying on the limited resources of NGOs providing emergency food aid. The TEDS Standards require that "[a]dult detainees, whether in a hold room or not, will be provided with food at regularly scheduled meal times."[24] For children and pregnant individuals, the Standards require "a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times. At least two of those meals will be hot. Juveniles and pregnant or nursing detainees must have regular access to snacks, milk, and juice."[25]



Instead, Border Patrol only provided migrants with a single small water bottle per person, and a granola bar.[26] Adriana Jasso observed that Border Patrol entered the corridor between the walls "[o]nce a day [to] provide a bottle of water and some kind of granola bar. To keep people from starving, NGOs, volunteers both on the Mexico and US side of the border, are supplying the basic necessities they can."[27] One group of Indian men detained for five days were left to starve and resorted to eating leaves.[28]

---

[20] Decl. of Lilian Serrano at ¶ 5-7
[21] Decl. of Lilian Serrano at ¶ 13
[22] Decl. of Pedro Rios at ¶ 30.
[23] Decl. of Pedro Rios at ¶ 16.
[24] TEDS Standards § 4.13.
[25] TEDS Standards § 5.6 ("Meals and Snacks – Juveniles, Pregnant, and Nursing Detainees").
[26] Decl. Adriana Jasso at ¶ 3, Dec. Flower Alvarez Lopez at ¶ 5.
[27] Decl. of Adriana Jasso at ¶ 8
[28] Decl. of Pedro Rios at ¶ 15.

### c. *CBP does not provide adequate water to detained migrants in violation of TEDS § 4.14*

CBP is required to make available clean drinking water along with clean drinking cups to detainees.[29] Pedro Rios stated that in April of 2023, "migrants reported waiting up to 7 days with no shelter, minimal water, and only a granola bar to eat. I communicated with the Border Patrol liaison about the conditions, and shortly thereafter, agents placed a 5 gallon container of water every morning, but this would finish quickly. By mid day there was no available water."[30]



The amount of water was wholly inadequate, requiring advocates to push Border Patrol to provide more water.[31] The Border Patrol liaison said they considered bringing a buffalo water tank, but chose not to because they did not want to attract more migrants.[32]

By May, Pedro stated,"Border agents had removed the 5 gallon water jug. They handed out one small water bottle per migrant every day, leaving migrants thirsty by the afternoon."[33] As of May 12, declarants continue to report that Border Patrol is only providing one bottle of water per day.[34]

### d. *CBP does not provide restroom facilities for detained migrants in violation of TEDS § 4.15 nor maintain cleanliness standards in violation of TEDS § 4.7*

CBP is required to provide restroom accommodations to all detainees with a reasonable amount of privacy ensured.[35] Border Patrol agents have only provided <u>one</u> port-a-potty for hundreds of migrants.[36] The port-a-potty was brought into the area on April 28, 2023 when there were approximately 70 individuals in custody.[37] Within two days the port-a-potty was full and unusable.[38] Since that time, the number of migrants has grown to approximately 400 and no additional facilities have been added.[39] To date, we have not seen the one port-a-potty be cleaned and migrants have regularly complained since that is unusable.[40]



---

[29] TEDS Standards § 4.14 ("Drinking Water")
[30] Decl. of Pedro Rios at ¶ 9
[31] Decl. of Pedro Rios at ¶ 12
[32] Decl. of Pedro Rios at ¶ 12
[33] Decl. of Pedro Rios at ¶ 15.
[34] Decl. of Flower Alvarez Lopez at ¶ 5
[35] TEDS Standards § 4.15 ("Restroom Facilities")
[36] Decl. of Flower Alvarez Lopez at ¶ 5
[37] Decl. of Pedro Rios at ¶ 13
[38] Decl. of Pedro Rios at ¶ 13
[39] Decl. of Pedro Rios at ¶ 14
[40] Decl. of Pedro Rios at ¶ 14; Decl. of Flower Alvarez at ¶ 5



Border Patrol fails to provide minimum standards of cleanliness; CBP TEDS standards require facilities "be regularly and professionally cleaned and sanitized."[41] Despite this, Flower Alvarez Lopez saw "a pile of trash that has not been picked up in days" and "one portable restroom for" hundreds of people that has "not been cleaned at all."[42]

> **e.  CBP does not provide basic hygiene items and made no efforts to provide showers in violation of TEDS § 4.11**



Additionally, CBP did not provide access to basic hygiene items as required under the Standards. TEDS provides that "Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security needs" where "[f]amilies with small children will also have access to diapers and baby wipes" and restrooms must include "access to toiletry items, such as toilet paper and sanitary napkins."[43] In contrast, Flower Alvarez Lopez found that "[t]here are no showers, hand washing stations, nor basic personal hygiene items like feminine hygiene products, baby wipes, toothbrushes, etc. I see families, babies, children, women with children, and people of all ages in here and they don't have the basic necessities."[44]

CBP has made no effort to provide showers to migrants who were detained for up to a week, even though the Standards provide that "reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention."[45] Instead, Flower Alvarez Lopez confirmed no showers were available at the open air detention site.[46]

> **f.  CBP Detains Migrants Far Beyond 72 Hours in violation of TEDS § 4.1**

The TEDS standards provide that migrants should not be detained for longer than 72 hours in holding facilities.[47] CBP is regularly detaining migrants in the corridor between the border walls for over 72 hours

---

[41] TEDS Standards § 4.7 ("Cleanliness")
[42] Decl. Flower Alvarez Lopez ¶ 5
[43] TEDS Standards § 4.11.
[44] Decl. of Flower Alvarez Lopez at ¶ 5
[45] TEDS Standards § 4.11.
[46] Decl. of Flower Alvarez Lopez at ¶ 5
[47] CBP National Standards on Transport, Escort, Detention, and Search (2015) at Pg. 14
https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf  ("TEDS Standards")

and up to a week.[48] Every effort must be made to hold detainees for the least amount of time required."[49] Pedro Rios found that "migrants reported waiting up to 7 days."[50] After a Border Patrol liaison claimed migrants were exaggerating their length of detention, Pedro Rios confirmed that migrants "continued to tell [him] they had been there 2, 3, 4 and up to 7 days."[51] The wristbands issued by agents to migrants are evidence of the length of detention.

For months, Border Patrol has continued to egregiously violate its basic obligations to people it detains under its own TEDS Standards in the California corridor between border walls.



    **3.**   **CBP is violating international treaties on cruel, inhuman and degrading treatment.**

The United States has signed and ratified the International Covenant on Civil and Political Rights (ICCPR), an international treaty that recognizes fundamental human rights. Under the U.S. Constitution's Article VI, treaties are the "supreme law of the land" governing the responsibilities of every part of government at the local, state, and federal level.[52] Thus, CBP is bound by the ICCPR.

This year, the U.S. Government is under review by sister nations who are signatories to the ICCPR for compliance with the treaty's obligations. In fact, the U.S. Government led by the Department of State is preparing to appear before the ICCPR Human Rights Committee to answer questions from other nations about non compliance. Civil society groups, including SBCC, will be submitting reports to the Human Rights Committee to alert them to the violations we have witnessed, including those occurring now in the California corridor between the walls.

The ICCPR provides that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment."[53] The violations of the TEDS Standards described above and detailed in the attached declarations also constitute violations of migrants' rights under the ICCPR. Pedro Rios, who has observed CBP human rights violations in the California corridor for months, summarized:

---

[48] Decl. Pedro Rios ¶ 9, 10, 18
[49] TEDS Standards § 4.1
[50] Decl. Pedro Rios ¶ 9
[51] Decl. Pedro Rios ¶ 18
[52] U.S. Constitution, Art. VI., International Covenant on Civil and Political Rights (ICCPR) Art 2
[53] International Covenant on Civil and Political Rights (ICCPR) Art. 7

> My overarching concern is the inhumane treatment that I have witnessed since February, the ongoing lack of water, food, and shelter, the degrading treatment, and overall lack of respect or compassion for the migrants who are seeking safety from the dangers they face in their home countries[54]…. [T]hey should be treated with dignity and decency pursuant to human rights standards. That is not what's happening.[55]

In his declaration, Pedro details how border agents treat migrants in cruel, inhuman, and degrading ways, leaving them starving and freezing while in their custody.[56] He also describes how some agents treat migrants with complete disregard, for example, one agent told migrants, "I don't give a fuck how long you've been here," and another said, "get the fuck away from me" when a migrant approached to ask a question.[57]

Flower Alvarez Lopez in her declaration echoed the statements by other declarants, speaking to the indignity of the situation facing migrants. "This is devastating. We should not have to bear witness to what is happening today…. To see babies and children here in this type of setting, it's heartbreaking. We need to do better. Our government needs to do better."[58]

The ICCPR states that if violations of human rights occur, as they have for some time and continue to occur, the government shall provide an effective remedy.[59] That could be an administrative, legislative, or judicial remedy. Despite the pleas of migrants and advocates, CBP has not provided an effective remedy. Through this petition, we hope to prompt a remedy — the cessation of the violations and the protection of human rights.

### 4. <u>CRCL must act to investigate and address these violations with Congress.</u>

The Office of Civil Rights and Civil Liberties (CRCL) was established to, among other things, "oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities" of the Department of Homeland Security, including CBP,[60] in conjunction with Congress. You have the mandate to address both the violation of the TEDS custody standards and the ICCPR rights incorporated into U.S. law through the Constitution. We look to your office to end the harm caused by CBP in its treatment of migrants in the California corridor between walls west of the San Ysidro Port of Entry.

Those seeking safety at our border should be treated at all times with humanity, dignity, and respect. For months now, CBP has fallen short of this responsibility. We recognize that the challenges facing CBP are many, but that should never be an excuse for violating the rights of migrants. The violations that declarants describe have been going on for months. Since at least February 2023, migrants in the corridor have been left waiting for days without adequate water, food, shelter and other basic necessities. Long before that, CBP has taken custody of migrants in the corridor and used it as a pre-processing holding area, exercising control of migrants.

---

[54] Decl. of Pedro Rios at ¶ 26
[55] Decl. of Pedro Rios at ¶ 31
[56] Decl. of Pedro Rios at ¶ 27
[57] Decl. of Pedro Rios at ¶ 25
[58] Decl. of Flower Alvarez Lopez ¶ 7
[59] ICCPR Art. 2
[60] 6 U.S.C. § 345

CBP anticipated an increased number of migrants, especially asylum seekers. Congress increased CBP resources significantly, but those resources are not being used to comply with the agency's duties of care in the California corridor. If CBP is going to continue using the corridor as a holding area or a pre-processing area (as opposed to processing someone from the area that day), then the agency must stand up the infrastructure and engage in practices that honor the rights and dignity of migrants. That is what we committed to do as a nation when we signed the ICCPR and what the agency committed to do when it adopted the TEDS standards.

We call on CRCL to ensure that not only will the current violations cease and human rights be protected, but also that this situation will not be allowed to reoccur in California or anywhere else along the border. We stand ready to speak with your Office to discuss these claims further if needed. Please contact us to acknowledge receipt and discuss immediate next steps.

Sincerely,

Ricky Garza, Border Policy Counsel
Southern Border Communities Coalition[61]

*Enclosures:*
1. *Declaration of Pedro Rios*
2. *Declaration of Lilian Serrano*
3. *Declaration of Flower Alvarez Lopez*
4. *Declaration of Adriana Jasso*

**CC:**

Chairman Dick Durbin
Ranking Member Lindsey Graham
Senate Judiciary Committee

Chairman Jim Jordan
Ranking Member Jerrold Nadler
House Committee on the Judiciary

Chairman Gary Peters
Ranking Member Rand Paul
Senate Committee on Homeland Security & Governmental Affairs

Chairman Mark Green
Ranking Member Bennie Thompson

---

[61] SBCC is a program of Alliance San Diego, which is based in San Diego, but staffs SBCC throughout the border region and in D.C. SBCC is governed by a steering committee of members from CA, AZ, NM, and AZ.

House Committee on Homeland Security

Chairman James Comer
Ranking Member Jamie Raskin
House Committee on Oversight and Reform

Majority Leader Mitch McConnell
Minority Leader Charles Schumer
United States Senate

Speaker Kevin McCarthy
Minority Leader Hakeem Jeffries
United States House of Representatives

Attorney General Merrick Garland
U.S. Department of Justice

Assistant Attorney General Kristen Clarke
Civil Rights Division
U.S. Department of Justice

Erin Barclay
Acting Assistant Secretary of State for Democracy, Human Rights, and Labor
U.S. Department of State

Acting Commissioner Troy A. Miller
Customs and Border Protection
Department of Homeland Security

Nathaniel Kaine
Chief of Staff
Customs and Border Protection
Department of Homeland Security

Chief Raul Ortiz
United States Border Patrol
Customs and Border Protection
Department of Homeland Security

PLFS-0122

## DECLARATION OF PEDRO RIOS

I, Pedro Rios, declare the following:

1. I am the director of the American Friends Service Committee (AFSC) US-Mexico Border Program. I have been monitoring and advocating for human rights at AFSC for twenty years.

2. For the last several months, I have observed migrants trapped between the primary and secondary barriers on the western most segment of the US-Mexico border near San Ysidro. Migrants have identified themselves as from many different countries including Afghanistan, Jamaica, India and Colombia, and they state they are seeking asylum because of dangers they face in their home countries.

3. The area in which they are trapped is north of the primary barrier abutting Mexico. That area north of the barrier is in the United States. The migrants state they have crossed the barrier to turn themselves in to border agents and are doing so out of desperation, because they seek safety. Once over the barrier, they await to be processed by border agents.

4. The migrants are trapped in an area bounded by a secondary barrier to the north of the primary barrier. This corridor between the barriers is fully controlled by the U.S. Border Patrol. Agents pass along this corridor with vehicles and ATVs. The area is also monitored by cameras. Anyone in this corridor is under their control and in their custody.

5. In February 2023, I first spoke to migrants trapped in the corridor, while I was at an event we held near the border walls. About a dozen migrants approached the northern barrier to talk to me and told me that they had been in the corridor for several days hoping to be processed by border agents, but had not yet been, even though agents were regularly passing by. The agents had given them mylar blankets but little else. During this time, it rained regularly in San Diego.

6. I have continued to see migrants in the corridor since, and have monitored their conditions. I have seen them in several locations in the corridor identified as follows from east to west: near the Las Americas mall, at the section known as Whiskey 8, and closer to the beach.

7. The number of people that I have been able to see has varied from dozens to hundreds. In March, I began coming 2-3 times a week to talk to migrants and monitor the conditions. In most cases, they had been there for at least 2 days. Some had mylar blankets given to them by border agents, others had nothing to cover themselves at night. During this time it rained regularly and was cold day and night. They told me they were thirsty and hungry with little to nothing to eat or drink.

8. In April, the number of migrants in the corridor seemed to grow until it was regularly around 70 people who were visible to me at the Whiskey 8 area, and I knew there were more at other locations in the corridor. More women and children appeared in the corridor. Because Whiskey 8 is most accessible from the U.S. side, this is where I came to speak to migrants.

9. Migrants reported waiting up to 7 days with no shelter, minimal water, and only a granola bar to eat. I communicated with the Border Patrol liaison about the conditions, and shortly thereafter,

agents placed a 5 gallon container of water every morning, but this would finish quickly. By mid day there was no available water.

10. This year, San Diego has been unusually cold and rainy. I recall a particularly rainy night in mid April. The following morning, I came to the border and spoke to a group of migrants who were all from Africa. They had not been given mylar blankets, but had regular blankets that were soaked. They had no other clothes or cover to protect them from the weather. They told me they had been there for 5 days.

11. In the last week of April, I spoke to the Border Patrol community liaison as well as the Department of Homeland Security Civil Rights and Civil Liberties liaison expressing concerns about the conditions, including the lack of water and sanitation.

12. Initially they told me that the government was considering bringing in a buffalo water tank, but then the Border Patrol liaison told me they would not out of concern that it would attract more migrants. They never brought the tank in.

13. On April 28, several months after I began witnessing the presence of migrants in the corridor, agents brought in a single port-a-potty to the Whiskey 8 area, but it was not enough for what was then about 70 people on average in that area. I don't know if they brought additional port-a-potties to other parts of the corridor.

14. Two days after the port-a-potty arrived, it was full and unusable. It may have been serviced, but I never saw that happen, and migrants have regularly complained since that it is unusable. As of today, there is only one port-a-potty, even though the number of migrants has grown to an estimated 400.

15. Beginning in May, I began coming to the border nearly every day, spending several hours at a time. On May 1st, I spoke with a group of men from India who told me they were starving. They showed me the leaves they were eating. They had been there for 5 days. During that time, I observed that border agents had removed the 5 gallon water jug. They handed out one small water bottle per migrant every day, leaving migrants thirsty by the afternoon.

16. On May 3rd, migrants told me that border agents had taken their shoelaces, and they did not know why, but believed it was in preparation for agents to take them in. I am familiar with this practice, a tactic that border agents have previously said they use to prevent migrants from running away. I took photos of their shoes without laces.

17. Out of grave concern for the condition of migrants, my organization began to provide basic necessities to migrants, including water, food, and mylar blankets. Initially, an agent scolded me, telling me that we needed to alert Border Patrol every time we came. They told the media that was starting to cover the encampment the same thing. This is not a requirement, but something they suggested we must do nonetheless. I believe this was meant to dissuade us from coming, especially as the media began to arrive.

18. After the first article in the San Diego Union-Tribune was published, stating that migrants were there up to 7 days, the Border Patrol liaison told me that this was not true, that migrants were exaggerating and were conflating their days in Tijuana with their days in the corridor. But I had been witness to migrants trapped in the area, waiting to be processed for many days. I asked

migrants to clarify and confirm the number of days they had been in the corridor, and they continued to tell me they had been there 2, 3, 4 and up to 7 days.

19. At the end of the first week of May, the number of migrants grew significantly to around 400. I worked with my organization to alert the media. Migrants shared with them what they had told me — that agents were waiting days to process them, but not providing them with basic necessities including sufficient water, food, and shelter.

20. With the arrival of the media, Border Patrol told the migrants they had to sit in rows and stay seated. Occasionally, the agents would drive through with an ATV or cars, to check that they were seated. This would happen at various times of the day. Migrants have told me they believe this is in anticipation of them being processed, but the agents will make them all sit for hours on end and not process any of them. Then they will come with vans and take a few people or sometimes 20, but there are hundreds of people.

21. I have observed Border Patrol agents ushering migrants from the area near Las Americas to the Whiskey 8 area. Agents also directed single men to the area closer to the beach. Between the direction for them to sit in rows to ushering them from one part of the corridor to another, agents are controlling the movement of migrants.

22. This week, Border Patrol instituted the use of wristbands to identify people's arrival based on the agent's first interaction with them, which might be a day or two after they actually arrive in the corridor. The wristbands are like the ones used for concerts. They are different colors and some have the day of the week printed on them.

23. Migrants have now organized themselves in rows based on their wristband, hoping that the more organized they are, the more quickly they will be processed, but they are still waiting for days. Migrants state, and I have observed, that agents come through every so often to see if people are sitting and if they are not, they sometimes yell at the migrants. This includes children, who don't understand what is happening. They sit under full sun and then rain and cold, they sit and they wait.

24. One of the migrants who took the initiative to organize the other migrants shared his frustrations that agents come to scold the migrants, but not to process them. He told me he had not slept for 3 days and was concerned that the other migrants thought he was colluding with the agents and felt he was in danger, and that the agents are not there to protect him or anyone, but to leave them waiting.

25. Throughout my time monitoring the conditions in the corridor, I have also witnessed some Border Patrol agents speaking aggressively towards migrants. For example, I heard one agent say, "I don't give a fuck how long you've been here," and another say, "get the fuck away from me" when a migrant approached to ask a question.

26. My overarching concern is the inhumane treatment that I have witnessed since February, the ongoing lack of water, food, and shelter, the degrading treatment, and overall lack of respect or compassion for the migrants who are seeking safety from the dangers they face in their home countries.

27. I am especially concerned about the treatment of migrants who are out of sight from us, especially the area where the men have been directed to, closer to the beach. Last night, I spoke with two men who came to the Whiskey 8 area hoping volunteers would charge their phones. They told me they were hungry and freezing. One was from a Spanish speaking country (not sure which) and one appeared to be from Eastern Europe.

28. I'm also concerned about the children. Two days ago, I witnessed a child who was less than a year old whose mother said was no longer taking her breast milk and was throwing up and listless. I called the Border Patrol liaison for medical assistance, and they came to take the child and mother to the hospital. But had I or another human rights observer not been there, that child might not have received any assistance. Especially since agents are not making themselves approachable and some are actively aggressive towards migrants.

29. In another instance, parents of an 8 year old child approached me to tell my colleague that their child had had a seizure as a result of his medication being taken away by Mexican authorities. They were concerned for the child's health. I left a message for the Border Patrol liaison and agents came for him soon after. As with other incidents, I am concerned that if we had not been there, the child would have fallen into greater danger.

30. One migrant told me that in the night, the children cry. He said that the adults have a way to cope, but the children are scared.

30. I am deeply concerned about other vulnerable migrants. Today, I alerted the Border Patrol liaison that a Jamaican woman had approached me to tell me she had suffered a miscarriage after being kidnapped and raped in Mexico and is now in what she described as excruciating pain. Other human rights observers shared that they alerted Border Patrol to this woman's condition several days ago, but nothing was done.

31. In conclusion, there is no doubt that the migrants in the corridor are in Border Patrol custody. As such, they should be treated with dignity and decency pursuant to human rights standards. That is not what's happening.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.


May 12, 20223


Pedro Rios

## DECLARATION OF LILIAN  SERRANO

I, Lillian Serrano, declare the following:

1.  I am the director of the Southern Border Communities Coalition, a program of Alliance San Diego. As part of that role, I monitor human rights conditions in the border region.

2.  On May 11, after hearing from colleagues about migrants trapped in the corridor between the two border walls, both of which are in the United States, near San Ysidro, California, I arrived at the border wall at 5:45 am. The first thing I saw was a group of migrants that had spent the night outdoors between the two border walls. When I approached the wall, a man called us over. His mother was in need of medical attention.

3.  He had traveled with his 79 year old mother from Colombia. He told us she has several medical conditions and at that moment had been without her medication for 2-3 days, trapped in Border Patrol custody. Without her medication, she was falling ill. She was also suffering from an injury to her leg after falling from the wall she had climbed to turn herself in to border agents. Her son was also worried that she hadn't used the restroom in 5 days. The day before she was able to walk a little, but that morning she was just laying down and couldn't move.

4.  I immediately contacted the Border Patrol community liaison for the San Diego sector. I called him to try to provide details about what was happening, but he didn't pick up. I sent him a text at 8:00 am with general information about the woman and that we needed to get her medical care. We didn't hear back from him. The son checked in with me on multiple occasions, but at one point I lost track of him amidst the hundreds of migrants.

5.  Around the same time, I encountered another woman, who we later learned was an asylum seeker from Afghanistan, who was sleeping by herself on the US side of the border wall wrapped in blankets. She was wearing a hijab. I approached her with colleagues and asked her why she was there. She showed us documents from Scripps hospital. She was taken in an ambulance from the encampment the day before. She told us she wasn't feeling well, she showed us her arm and it was swollen, and had an infection.

6.  She told us she had flagged this for Border Patrol, and they took her to Scripps hospital. When the hospital released her, they put her in a taxi. She didn't know where she was, she had no way of contacting anyone, she didn't have an address, so the taxi brought her back to the border wall. She didn't know what to do, she wanted to make sure Border Patrol knew she wasn't trying to sneak into the country. She was waiting for them, but they never arrived at the hospital.

7.  She told us she arrived at this site at 2:00 am and knocked multiple times on the gate trying to get inside the encampment. The agents did not open it. She told us that she had family in New York, but didn't have a way to contact them. We had her take a nap in my car. It was the first time she slept indoors after 4 days.

8.  She slept and our partner organization PANA (Partnership for the Advancement of New Americans) was able to pick her up around noon. They were able to get her placed in a Catholic Charities shelter. We believe they were able to get in contact with her family in New York, but she doesn't have any paperwork from Border Patrol that would allow her to travel on a plane.

9.  In the evening, I eventually spoke with the Border Patrol liaison regarding the 79 year old Colombian woman described above. The liaison said he was receiving our emergency flags and following up, but that when his agents went to take people to the hospital, the migrants were all of a sudden fine and that they didn't have a medical need. I reiterated that the woman we were discussing needed medical attention and told him that the people we were talking to had medical needs. He said that he felt that migrants were taking advantage of this situation and that they were using this to get into the United States.

10. The Border Patrol liaison mentioned he was going to be on site last night because at 9:00 pm "migrants were going to rush the border." Because of this I came back to the site around 8-8:30 pm. At 9:45, I noticed that Border Patrol agents were carrying a woman to their truck who was accompanied by another woman. Her son told me he finally got the attention from the Border Patrol and that they were taking his mother to the hospital, but they would only let one person go with her. He decided to have his wife accompany his mother.

11. To follow up, my colleagues and I went to the hospital and we found his wife. She was confused. As soon as she arrived at the hospital, staff told her she couldn't go in and they left her outside. The Border Patrol left and gave her no instructions, so she was outside of the hospital, and she said she was waiting for them to come and give her instructions. We explained they were not coming back. She didn't get any documents from Border Patrol and was told she couldn't go inside. It was cold and late and she had no way to communicate with her mother-in-law inside. We stayed in the hospital past midnight and assisted her to communicate with the hospital staff to get information about her mother-in-law.

12. The mother-in-law was released this morning, and a family member in the United States was able to come and accompany her. The family member shared that the 79 year old woman was concerned about her Colombian passport, which Border Patrol agents had asked her for before transporting her to the hospital. She gave it to them and she saw an agent put it in his pocket. The passport was never returned to her. She now has no identity documents, nor does she have any paperwork from Border Patrol from her entry to apply for asylum. Her son is still in custody in the area between the walls, separated from his mother and wife, all of whom have a related asylum claim. It is uncertain whether he will be released or whether his asylum claim will be heard. For the moment, they face the prospect of indefinite separation far from a country they fear returning to.

13. In another incident, I was notified today at 4:15 pm that a 29 year old pregnant Somali woman had thrown up 5 times today.  I contacted the Border Patrol liaison, and he told me that I should have just called 9-1-1. Then he said he would call them. Several hours have now passed and no one has arrived to assist the pregnant woman. We are keeping a close eye on her and hopefully she will receive help soon.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.


May 12, 20223

Lilian Serrano

## <u>DECLARATION OF FLOWER ALVAREZ LOPEZ</u>

I, Flower Alvarez Lopez, declare the following.

1. My name is Flower Alvarez Lopez and I am a Co-Director at Universidad Popular.

2. Around 12 pm on May 11, I went to the border wall near San Ysidro to find hundreds of people in an encampment between two fences, unable to leave. Border Patrol provided the migrants with wristbands of different colors to indicate when they arrived and have created some sort of a system for when they will process them.

3. I stayed overnight at the encampment and observed and talked to Border Patrol agents around 2:00 am during a big round up. I saw Border Patrol agents ask those who had children to raise their hands. I saw them yelling at folks that were sitting down telling them to not get up. If they tried to move, they would be immediately yelled at. I tried to gather information from the agents about how many people they were taking and where they were taking them. They said 60 people and didn't say anything else. Border Patrol has not communicated their plans for the individuals who are trapped in the corridor between the border walls.

4. They are being treated inhumanely. The government has not provided any blankets or shelter for these individuals. At night, it is cold and everyone is exposed to the elements including our most vulnerable populations: children, pregnant women and the elderly.

5. There is a pile of trash that has not been picked up in days. There is only one portable restroom for all 300-450 people to use and it has not been cleaned at all. There are no showers, hand washing stations, nor basic personal hygiene items like feminine hygiene products, baby wipes, toothbrushes, etc. I see families, babies, children, women with children, and people of all ages in here and they don't have the basic necessities. They are sleeping on the ground with few clothes to keep them warm. Border Patrol has only provided one water bottle and one granola bar per person per day. A lot of them have been sleeping directly on the dirt and gravel ground except for those who we were able to provide cardboard boxes to use as mattresses.

6. Border Patrol is not providing medical support on site. We are providing the limited first aid we can, but we don't have any medics on site. We know a few people have been taken by ambulance to other hospitals.

7. This is devastating. We should not have to bear witness to what is happening today. Folks are showing up and they are very emotional to what they are seeing because it is a devastating sight. To see babies and children here in this type of setting, it's heartbreaking. We need to do better. Our government needs to do better.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.

May 12, 20223

Flower Alvarez Lopez

## <u>DECLARATION OF ADRIANA JASSO</u>

I, Adriana Jasso, declare the following:

1. I have worked with the American Friends Service Committee for 16 years assisting migrants. I am currently working alongside a border wall in the San Ysidro area that is one of two parallel walls at the border of the United States and Mexico. The space between the first and second wall is inside the United States. In the space between the walls, there are approximately 400-500 individuals who are waiting with nothing but the clothes on their backs to be processed for asylum claims.

2. I first arrived at the San Ysidro border just south of South Bay Water Reclamation Plant about 2 weeks ago. Border agents refer to that area as Whiskey 8. When I arrived, I saw approximately 20 people. Then 20 quickly turned to 80 and 80 quickly turned into 120. Later on we started seeing 400-500 individuals. Not only have the numbers changed, but the demographics as well. Now we are seeing mainly women with children. As the encampment grew, Border Patrol moved males to an area approximately 20 minutes away on foot to a different canyon.

3. I have not been able to access the canyon, but have heard there are anywhere between 600-800 single men in the encampment. What we have heard is that the conditions there are a lot worse in terms of access to food and shelter. I took a statement from a Colombian family that said they only received a bottle of water for a whole day. We haven't been able to transport anything to them and we are not able to carry things over there. It would require us hiking to the location.

4. The individuals who come through the primary fence and who are then between the two walls are in the United States. For the last several weeks I have witnessed Border Patrol direct and control their movements, such as the movement of men to a different part of the corridor.  Border Patrol agents are the only people who have access to the encampment. They are the only ones on site. These individuals are in their custody and Border Patrol is responsible for their fundamental well being. The individuals are being detained in dire conditions.

5. Border Patrol developed a system to track the individuals who are in the encampment by providing them with wrist bands to track when they entered into their custody.  The wristbands vary in color from red, yellow, blue, green and gray to reflect the date they entered the encampment.

6. It appears they have different wristbands for the day of the week that border agents first identify them, and it appears to indicate the priority based on the days and nights that they have been here.  But we have seen over and over again that the system isn't being followed and it depends on what officers they get on which wristband they are given. For example, migrants have told us they have been here for 4 days, but their wristband indicates less.

7. Individuals cannot leave the area because of the physical walls that stand in their way. Some of those arriving are suffering severe pain, diarrhea, headaches, severe cuts and bruises. One Asian man's leg was severely infected. He was in extreme pain with no way to communicate. We had to wait for Border Patrol to respond to our texts and.

Many individuals are pregnant, have children with them, have no shoes, are muddy, wet and in terrible condition. All they can do is wait for Border Patrol to take them to be processed for asylum.

8. Border Patrol agents do not come often to the site. Once a day, they provide a bottle of water and some kind of granola bar. To keep people from starving, NGOs, volunteers both on the Mexico and US side of the border, are supplying the basic necessities they can. It is a dire situation.

9. On Tuesday, May 9th, 2023, an incident happened where two Colombian women were traveling alone and were being sexually harassed.  Four males became abusive towards them and the women decided to approach us (there were no agents to approach). We let the authorities know. Fortunately there was no sexual attack, but there was physical and verbal abuse. If we were not there, we don't know whether the attack would have been prevented.

10. We have seen several pregnant women come through. One woman, approximately a week ago, had a miscarriage. She has continually expressed the pain she is going through, especially at night.

11. In a particularly distressing incident, a man from Africa was walking and collapsed.  A Colombian nurse tried to help and told us he was dying. We alerted the Border Patrol. Fortunately, the Border Patrol came and picked him up.

12. On a different occasion, a child suffered an epilepsy attack and we were able to get assistance from Border Patrol. I continue to be concerned that if we were not there bearing witness that children and adults would suffer harm while in Border Patrol custody.

I affirm that the statements in this affidavit are true to the best of my knowledge and belief.

May 12, 20223

Adriana Jasso

# Exhibit C

(Serrano Decl.)

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528



February 2, 2024

*Via Electronic Mail*

Lilian A. Serrano
Southern Border Communities Coalition
lilian@alliancesd.org

Blaine Bookey
Center for Gender & Refugee Studies
bookeybl@ucla.wsf.edu

Re:     Complaint No. 008138-24-CBP

Dear Lilian A. Serrano and Blaine Bookey:

Thank you for your correspondence to the U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL), dated December 11, 2023, that was co-signed by representatives of the Southern Border Communities Coalition, Al Otro Lado, American Friends Service Committee, Border Kindness, Center for Gender & Refugee Studies, International Refugee Assistance Project, and National Immigrant Law Center.  Your correspondence raises allegations which concern U.S. Border Patrol's operations at open-air migrant camps near Jacumba, California.

Under 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, CRCL reviews and assesses information concerning abuses of civil rights, civil liberties, and profiling on the basis of race, ethnicity, or religion, by employees and officials of DHS.  CRCL also reviews allegations that DHS employees, programs, or activities discriminated on the basis of disability under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794.

Initially, CRCL sent your correspondence to the DHS Office of Inspector General (OIG) for review, pursuant to standard procedure.  OIG has the right of first refusal within DHS to conduct investigations of allegations indicating possible abuses of civil rights or civil liberties.  OIG declined to investigate the allegations and returned the matter to CRCL.  In December 2023, CRCL opened the correspondence as a complaint investigation and incorporated the allegations into an underway CRCL investigation on the same issues.

As part of our investigation, CRCL conducted an onsite investigation in several locations in Jacumba in December 2023 and has communicated our immediate concerns to U.S. Customs and Border Protection.  That investigation remains open and ongoing.

Please be advised that our complaint process does not provide individuals with legal rights or remedies.  Accordingly, CRCL is not able to obtain any legal remedies or damages on an individual's behalf.  Instead, we use complaints like yours to find and address problems in DHS policy and its implementation.  If you believe your rights have been violated, you may wish to consult an attorney.  There may be time limitations that govern how quickly you need to act to protect your interests.

If you have not already done so, please provide CRCL with your complete contact information, including a phone number, email address, and mailing address if available.  You may contact CRCL by email at crclcompliance@hq.dhs.gov , by phone at 866-644-8360, or by mail at the following address:

> U.S. Department of Homeland Security
> Office for Civil Rights and Civil Liberties
> Compliance Branch, Mail Stop 0190
> 2707 Martin Luther King Jr Ave, SE
> Washington, DC 20528-0190

For additional information about CRCL's roles and responsibilities, please visit our website at www.dhs.gov/crcl.

If you are filing a submission on behalf of someone else, please provide CRCL with the express written consent of the individual(s) if you would like to be informed about the resolution of this investigation, if you have not already done so.

When communicating with CRCL about this matter, please include the complaint number referenced at the top of this letter.

Please note that Federal law forbids retaliation or reprisal by any Federal employee against a person who makes a complaint or discloses information to CRCL.  42 U.S.C. § 2000ee-1(e).  If you believe that you or someone else is a victim of such a reprisal, please contact us immediately.

Thank you again for contacting CRCL.  Communications like yours are essential to our ability to carry out our role of supporting the DHS's mission to secure the nation while preserving individual liberty, fairness, and equality under the law.  We look forward to working with you to address your concerns.  If you have questions, please contact us either by mail, phone, or by email.

> Sincerely,
>
>
> Office for Civil Rights and Civil Liberties
> U.S. Department of Homeland Security

2

## Privacy Act Statement

**Authority:** 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1 authorizes the collection of this information.

**Purpose:** The Department of Homeland Security (DHS) will use this information to review and investigate complaints and information from the public about possible violations of civil rights and/or civil liberties relating to DHS employees, programs, or activities.

**Routine Uses:** This information may be disclosed to and used by personnel and contractors within DHS who have a need to know the information in order to review your complaint. The DHS Office for Civil Rights and Civil Liberties (CRCL) may also share your information, as necessary, with appropriate government agencies outside of DHS or with non-government entities to address your complaint, or pursuant to its published Department of Homeland Security/ALL-029 Civil Rights and Civil Liberties Records System of Records.

**Disclosure:** Furnishing this information to CRCL is voluntary; however, failure to furnish the requested information may delay or prevent CRCL from adequately reviewing and investigating your complaint. If necessary, CRCL may also request additional information from you in order to determine the appropriate manner to address your concerns.

To learn more about the Privacy Act, go to www.dhs.gov/privacy.

3