UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | Civil Action No. 25-1270-ACR |

**DECLARATION OF DEBORAH FLEISCHAKER**

I, Deborah Fleischaker, declare as follows:

1. I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge, professional experience, and information that has been shared with me through conversations with my former colleagues.

2. I submit this declaration to describe the critical functions of the U.S. Department of Homeland Security ("DHS") Office for Civil Rights and Civil Liberties ("CRCL"), the benefits that CRCL provides to the public and the Department, and the serious harms resulting from its dismantling through a recent reduction-in-force ("RIF").

3. I devoted over a decade of my career (2011-2021) to CRCL, beginning as a Policy Advisor and rising to Deputy Director of CRCL's Compliance Branch.

1

PLFS-0143

4. Throughout my time at CRCL, I was a career civil servant, not a political appointee. I worked under multiple administrations of both political parties, guided by the statutory mandates established under the Homeland Security Act of 2002 and related civil rights authorities.

5. In my role, I was responsible for investigating civil rights and civil liberties complaints across several DHS components, including U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and the Federal Emergency Management Agency (FEMA).

6. I worked closely with other CRCL colleagues and DHS leadership to integrate civil rights protections into departmental policies, programs, and operations, ensuring that the agency's mission was carried out consistent with constitutional obligations, statutory obligations, and civil rights and civil liberties principles.

7. CRCL operated a robust, multi-stage complaint process that allowed individuals to report allegations of civil rights or civil liberties violations connected to DHS activities.

8. Upon receipt, complaints were categorized and analyzed to determine appropriate action. During my time with CRCL, it held weekly meetings to decide which allegations merited opening formal investigations, with an emphasis on prioritizing cases involving systemic issues as well as those reflecting particularly serious individual harms.

9. It is my informed estimate that 20% of the complaints received during my tenure were opened as formal investigations. Other complaints, even if not formally opened, were tracked and used to identify trends, recurring issues, and areas in need of policy intervention.

10. CRCL's complaint process was designed to ensure impartial, thorough investigations and served as a critical accountability mechanism within DHS.

11. CRCL contributed enormously to improving the quality, accuracy, and integrity of DHS operations.

12. Its work extended far beyond resolving individual grievances: CRCL influenced policy development at DHS in ways that promoted fairness, legality, and the protection of fundamental rights.

13. Rather than focusing solely on speed in resolving investigations, CRCL often emphasized thoughtful, careful analysis and the development of policy recommendations to better protect civil rights and civil liberties. CRCL's work ensured that DHS decisions considered not only operational efficiency but also the civil rights impacts on individuals and communities.

14. The statutory basis for CRCL's work was fundamental to its work. CRCL's authority derived from Section 705 of the Homeland Security Act of 2002, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Pregnant Workers Fairness Act, Section 504 of the Rehabilitation Act, and other key civil rights statutes.

15. By advising on policy before implementation, CRCL could prevent issues that might have otherwise led to costly legal challenges or public controversies.

16. Without CRCL's engagement, DHS policy-making risks becoming less deliberate and more vulnerable to legal or policy errors, operational failures, and public distrust.

17. A key part of CRCL's success lay in its sustained interaction with the public and non-governmental organizations ("NGOs"), advocacy groups, religious organizations, and community leaders.

18. NGOs played a vital role in CRCL's operations by filing complaints, offering information and policy recommendations, and serving as an essential communication channel for learning about civil rights and civil liberties concerns.

PLFS-0145

19. These interactions were not limited to formal complaint filings. CRCL maintained informal communications via phone calls, emails, and quarterly roundtables with stakeholders, creating an open line of dialogue that was critical for identifying issues and responding effectively.

20. This outreach helped build public trust and allowed DHS to respond more intelligently to the needs of diverse populations.

21. Even after leaving CRCL, I remained engaged with the office in my subsequent politically-appointed roles within DHS, including serving as the acting Chief of Staff at ICE, the DHS Executive Secretary, and the DHS Acting Chief Privacy Officer.

22. In these positions, I frequently collaborated with CRCL on cross-cutting civil rights matters, reviewed its recommendations, and benefited from its expertise.

23. My continued reliance on CRCL after my departure underscores the office's enduring relevance and importance to DHS's ability to perform its mission lawfully and effectively.

24. I believe the dismantling of CRCL through the RIF has resulted in, and will continue to result in, profound harm to DHS and to the public.

25. Without CRCL's independent oversight and substantial expertise, allegations of civil rights violations are now less likely to receive objective, thorough investigation.

26. DHS components investigating themselves inherently lacks credibility, undermines accountability, and diminishes public trust.

27. Individuals impacted by DHS operations — including vulnerable populations such as asylum seekers, immigrants, religious minorities, and persons with disabilities — have lost an important internal avenue for redress.

28. CRCL's absence leaves DHS policymaking without critical civil rights expertise and analysis at the earliest stages of decision-making.

29. This increases the risk that new policies will be substantively deficient, discriminatory, or otherwise harmful, exposing DHS to litigation and reputational damage.

30. NGOs and other stakeholder groups historically relied on CRCL as a trusted interlocutor. Without CRCL, there is already a notable chilling effect in DHS's community engagement efforts.

31. Communities that once provided feedback and cooperation are likely to become more wary and less willing to engage, impairing DHS's ability to effectively carry out its missions.

32. The absence of CRCL's preventive work raises the likelihood that civil rights abuses will be litigated in court rather than resolved administratively, costing DHS more in legal fees, settlements, and lost goodwill.

33. I understand that some at DHS believe the Homeland Security Act of 2002 requires only the appointment of a civil rights and civil liberties officer, not the maintenance of an office. This interpretation ignores what we understood as both the intent of Congress and the realities of the scope and scale of its statutory responsibility to provide civil rights compliance across DHS.

34. DHS is one of the largest and most complex federal agencies, with more than 260,000 employees and broad authorities spanning immigration enforcement, criminal investigations, border security, emergency management, intelligence analysis, and transportation security.

35. Within that structure, DHS components such as CBP, ICE, TSA, USCIS, and FEMA routinely engage in operations that touch on constitutional rights — including detention, search and seizure, asylum adjudications, surveillance, disability accommodation, and public

benefits distribution. Monitoring and responding to civil rights concerns across these domains cannot be done by a single individual, regardless of title.

36. The volume of complaints alone — hundreds received annually — requires a dedicated staff for intake, triage, investigation, and follow-up. As noted above, CRCL had established a weekly process to categorize and prioritize these complaints, and even then, only a fraction (approximately 20%) could be formally investigated due to limited resources. That volume cannot be meaningfully processed by a single officer acting alone.

37. Additionally, CRCL's responsibilities include providing detailed civil rights reviews of proposed DHS policies and regulations, developing and delivering training programs, conducting site visits, responding to Congressional and public inquiries, and maintaining regular engagement with stakeholders nationwide. Each of these areas of work demands teams of subject matter experts, analysts, community engagement specialists, and operational staff.

38. Another critically important function of CRCL is within its Equal Employment Opportunity (EEO) Division, which provides oversight and management of DHS's Equal EEO program. This responsibility is grounded in Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, and other federal anti-discrimination laws that apply to the federal workforce.

39. CRCL served as the central EEO authority for DHS headquarters and provided oversight and guidance to the component EEO offices throughout the Department. It ensured that DHS's employment practices were free from unlawful discrimination and retaliation, and that employees had meaningful access to the EEO complaint process.

40. CRCL's EEO team provided counseling, investigated complaints of discrimination filed by DHS employees and applicants, managed alternative dispute resolution (ADR) processes,

and ensured compliance with Equal Employment Opportunity Commission (EEOC) mandates. It also collected and analyzed workforce data to identify trends and potential barriers to equal opportunity in hiring, promotions, and retention.

41. CRCL's EEO function was essential not just to legal compliance, but to maintaining a fair, equitable, and inclusive workplace across one of the largest and most diverse agencies in the federal government. It also served as a critical channel for employee concerns that, if left unaddressed, could result in litigation, decreased morale, and loss of public trust in DHS.

42. The elimination of CRCL's EEO staff effectively removes this centralized function from the Department. Without trained EEO counselors and investigators, DHS employees who experience discrimination or harassment may now have no internal avenue for redress — or may fear retaliation or mishandling if forced to rely on management or other offices lacking expertise or independence.

43. The absence of a centralized EEO program at CRCL also undermines DHS's ability to monitor compliance across components, track systemic issues, and ensure that corrective action is taken where necessary. Over time, this could lead to increased complaints to the EEOC, more costly litigation, and reputational harm to the Department.

44. CRCL's elimination jeopardizes DHS's compliance with its EEO obligations.

45. To suggest that a single CRCL officer could investigate complaints, review all DHS policies for compliance, engage stakeholders, and advise DHS leadership, is to fundamentally misunderstand the complexity of DHS's civil rights obligations and the statutory framework within which CRCL operates.

46. While the law requires the designation of an officer, that requirement cannot reasonably be fulfilled without supporting infrastructure. In practice, CRCL has always functioned

as an office — and necessarily so — because protecting civil rights at DHS is not a ceremonial or symbolic task. It requires institutional capacity, continuity, and commitment.

47. DHS's ability to balance security with civil rights and civil liberties was a founding principle after the events of September 11, 2001.

48. The loss of CRCL represents a dramatic departure from that vision and creates long-term risks for DHS and everyone who interacts with DHS.

49. If not remedied, the absence of CRCL's functions will weaken DHS's operational effectiveness, increase exposure to constitutional and statutory violations, and damage the Department's standing with the American people.

50. In my professional judgment, informed by more than a decade of firsthand experience at CRCL and continued work across DHS, the closure of CRCL through the RIF severely undermines DHS's legal compliance, operational success, and relationship with the communities it serves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 1, 2025

*/s/ Deborah Fleischaker*
Deborah Fleischaker