**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ROBERT F. KENNEDY HUMAN RIGHTS, et al., |
| Plaintiffs, |
| v. |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity, |
| Defendants. |

Civil Action No. 25-1270-ACR

<u>**MEMORANDUM IN OPPOSITION TO**</u>
<u>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**</u>

## INTRODUCTION

The Executive Branch has broad discretion to manage its personnel and order its priorities. Yet Plaintiffs Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC), a group of immigration organizations, argue otherwise in seeking to preliminarily enjoin a reduction-in-force (RIF) issued by the Department of Homeland Security for its Office for Civil Rights and Civil Liberties (CRCL), Citizenship and Immigration Services (CIS) Ombudsman's Office, and Office of the Immigration Detention Ombudsman (OIDO) (together, the Offices). Plaintiffs assert that the RIF has resulted and will result in a violation of the Offices' statutory duties. But their arguments amount to the proposition that they, rather than the Executive, should get to dictate how DHS prerogatives and day-to-day operations are carried out. In and of itself, that is an extraordinary proposition; to go along with it, moreover, they seek a staggering preliminary injunction that would reinstate hundreds of employees and require the Offices to engage in the discretionary work they prefer. This Court should reject that invitation for multiple reasons.

First, Plaintiffs lack standing to challenge the RIF. Fundamentally, their theory about the RIF is just wrong: the Offices are not dissolving, and they will continue to carry out their statutory duties. So Plaintiffs have not been and will not be injured. And the injuries they assert are speculative, unsubstantiated, non-cognizable, and ephemeral. Part of this is because the Offices RIF is part of an ongoing transition, so it is too soon for Plaintiffs to determine whether they might ever suffer any harm. In addition, a court could not redress their claimed injuries. Nor do Plaintiffs meet the requirements for organizational standing or associational standing, as their injuries all amount to a diversion of resources the Supreme Court has held does not support standing.

Second, Plaintiffs have brought the wrong claims under the wrong statutes. Plaintiffs claim that the RIF violated the Administrative Procedure Act (APA). But their claims revolve around federal employment actions, so they must channel their claims through the avenues provided by Congress. Even if the APA was a proper vehicle, the RIF is not a final agency action, as it is only one part of an ongoing transition that does not affect the legal rights of the Plaintiffs. And Plaintiffs' claims are really directed at agency actions unlawfully withheld, which requires Plaintiffs to surmount a higher standard they have not met.

Third, Plaintiffs' claims fail on the merits. The statutes establish officers and set broad guidelines on what activities the Offices must do. The Offices are carrying out their statutory functions. Just because they are not doing so in the way or at the pace Plaintiffs would prefer does not mean they are violating their statutes. Nor was the decision to better align the Offices with their core statutory duties arbitrary and capricious.

Finally, the remaining preliminary injunction factors likewise counsel against relief. Plaintiffs' speculative injuries cannot establish standing much less and irreparable harm. And Plaintiffs' 7-week delay in seeking a preliminary injunction proves that they are not and will not be irreparably harmed. On the other hand, the harm to the executive in having Plaintiffs dictate their workforce and responsibilities would be immense. The public has an interest in the President being able to carry out polices on which he won an election. Plaintiffs should not be allowed to usurp that role. The Court should deny Plaintiffs' request for a preliminary injunction.

## BACKGROUND

I.    **Statutory Background**

In the wake of 9/11, Congress established the Department of Homeland Security (DHS) to held defend the nation from threats foreign and domestic. This new Department included a

presidential appointed "Officer for Civil Rights and Civil Liberties" (CRCL). 6 U.S.C. § 113(d)(3). Congress assigned that officer several roles, including "review[ing] and assess[ing] information alleging abuses of civil rights, civil liberties, and racial and ethnic profiling by employees and officials of" DHS. *Id.* § 345(a)(1). The CRCL is also required to assist the Department in reviewing and developing procedures to protect rights, oversee compliance with laws relating to rights, coordinate with the Privacy Officer on related matters, and "investigate complaints and information indicating possible abuses of civil rights or civil liberties, unless the Inspector General of the Department determines that any such complaint or information should be investigated by the Inspector General." *Id.* § 345(a)(3)-(6). The Department must also consult with the CRCL on specific policies, such as the use of drones. *See* 6 U.S.C. § 211(k)(1)(E); 6 U.S.C. § 124h. The CRCL was also delegated authority to adjudicate equal employment opportunity complaints for all Department employees. 29 C.F.R. § 1614. The CRCL must make its responsibilities, functions, and contact information public. *Id.* § 345(a)(2). The CRCL must also submit reports to various groups, including Congress, and make those reports available to the public. 6 U.S.C. § 211(k)(1)(E).

The Citizenship and Immigration Services (CIS) Ombudsman was created at the same time to identify areas and "assist individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services" and propose changes to mitigate these problems. 6 U.S.C. § 272(b). The Ombudsman must also submit reports to Congress, though not publicly. *Id.* § 272(c).

More recently, in 2019, Congress established the Office of the Immigration Detention Ombudsman (OIDO) to "[e]stablish and administer an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress" for cases where Department personnel "are found to have engaged in misconduct or violated the rights of individuals in immigration

- 3 -

detention." *Id.* § 205(b)(1). As part of its role, OIDO also inspects detention facilities, makes recommendations regarding those inspections, and assists detainees impacted by misconduct. *Id.* §§ 205(b)(3)–(5), (c). OIDO submits reports to Congress, but again does not have to make them public. *Id.* § 205(e).

In 2023 CRCL received 3,104 allegations about possible civil rights or civil liberties violations submitted from a variety of sources.[1] CRCL only opened investigations into 25% of these complaints. *Id.* Similarly, OIDO received over 12,000 complaints and only "completed 22 inspections and 9 observations and issued 11 reports to the component (ICE or CBP) that was inspected" and "provided redress—meaning a violation of a standard was addressed to resolve a complaint—on 815 cases." *Id.* at 21, 55. The statutes do not set a deadline for reviewing complaints or require every complaint to be adjudicated. *See* 6 U.S.C. §§ 345(a)(1), (6); *id.* § 205(b)(2); *id.* § 272(b)(1).

## II.     Executive Order 14210

On February 11, 2025, President Trump issued the Workforce Executive Order, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). Subpart c of Section 3— "*Reductions in Force*"—directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id*. § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity,

---

[1] *Fiscal Year 2023 Annual Report*, at 45, The Office of Civil Rights and Civil Liberties, *available at* https://www.dhs.gov/sites/default/files/2024-11/24_1127_crcl-fy-2023-annual-report.pdf.

equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id.* Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id.*

The Workforce Executive Order further provides that, within 30 days of its issuance (i.e., by March 13, 2025), "Agency Heads shall submit to" OMB "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* The Executive Order also allows agency heads to "exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities[,]" *id.* § 4(b), and provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 5(b).

### III.    The Offices and DHS's Workforce Restructuring

Consistent with the Executive Order, DHS began preparing for large-scale reductions in force (RIFs) of the Offices. Declaration of Ronald Sartini (Sartini Decl.) ¶ 5. The Department determined that the Offices could perform their statutory duties using leaner staffs and more streamlined processes. *Id.* On March 7, 2025, DHS sent a memorandum to OPM seeking approval of competitive areas that would be subject to the RIFs, since they would be in effect for less than 90 days prior to the RIF effective date. *See* 5 C.F.R. § 351.402(c) ("When a competitive area will be in effect less than 90 days prior to the effective date of a reduction in force, a description of the

competitive area shall be submitted to the OPM for approval in advance of the reduction in force. Descriptions of all competitive areas must be made readily available for review."). *Id.*

In the memorandum, DHS asked OPM to approve RIFs for competitive areas consisting of OIDO, CISOMB, and CRCL. DHS proposed eliminating 46 positions in OIDO, 118 positions in CISOMB, and 147 positions in CRCL. ¶ 6. These figures represented the entire staff of these Components, excluding employees in the Senior Executive Service. *Id.* OPM granted approval for these competitive areas on March 7, 2025. *Id.* On March 20, 2025, Secretary Noem gave final approval for the RIFs. *Id.*

On March 21, 2025, DHS delivered RIF notices to the majority of the workforce in CISOMB, OIDO, and CRCL. ¶ 7. Pursuant to 5 C.F.R. § 315.801, these employees were given a 60-day notice period, with a separation date of May 23, 2025. *Id.* Those employees have largely been on administrative leave since receiving their RIF notices. *Id.*

On April 7, 2025, DHS announced that qualifying employees would be allowed to participate in a Workforce Transition Program (WTP). ¶ 8. The WTP offered employees financial incentives in exchange for a release of claims and a commitment to resign from the agency. *Id.* Employees from CRCL, OIDO, and CISOMB were allowed to participate, and more than 100 employees from these Components expressed interest in signing a WTP agreement. *Id.* To date, 47 employees have signed WTP agreements and agreed to resign. *Id.* Their RIF notices will be rescinded. *Id.*

Moving forward, the Department will refocus the Offices on their core statutory duties. ¶ 10. The Offices have been engaged in unnecessary and sometimes duplicative discretionary oversight and public engagement activities. *Id.* Those discretionary functions will end. ¶ 9. Other offices in the Department, such as the Inspector General, Office of Partnership and Engagement,

and Office of Public Affairs, may perform similar tasks. ¶ 11. In coming to the conclusion on how much staff to reduce and what discretionary work to cease, the Department considered the President's Executive Order, the statutory requirements for each office, duplicative and inefficient workflows, and new means of increasing efficiency. ¶ 9. The Offices are and will continue to meet their statutory obligations, including providing necessary information to the public and submitting reports to Congress. *Id.* The Offices are still and will continue to review and respond to complaints as statutorily requires. ¶¶ 13-14. The complaint forms for all three offices remain open and available to receive complaints and requests for assistance. *Id.* After the RIF takes place, the Ombudsmen and the Officer for CRCL will be responsible for performing the duties required by statute.

## IV.    The Current Suit

On April 24, a group of immigration organizations, Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC) (Plaintiffs), sued DHS and Secretary Noem (Defendants) claiming that the RIF was unlawful. ECF No. 1. Plaintiffs claim the RIF is unlawful and arbitrary and capricious under the Administrative Procedures Act (APA) and ultra vires. *Id.* They claim they have or will be injured by the reduction in workforce because they rely on the Offices to review their complaints, post information publicly for research and education, and engage with stakeholders and they fear those functions have or will cease due to the RIF. *Id.*

Plaintiffs moved for a preliminary injunction two weeks later on May 8. ECF No. 15. They claim that the May 23 RIF date will irreparably harm them and requires immediate injunctive relief even though the employees had been on administrative leave for 48 days prior to the motion. *Id.* Plaintiffs seek a sweeping injunction that requires the Offices to reinstate all employees, refrain

from other RIFs, abstain from terminating any employees except for cause, and restart all work conducted prior to March 21, including discretionary work. ECF No. 15-21.  With six days to respond, Defendants now oppose.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted).  The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). That is especially true, as here, where the requested injunction "would alter, rather than preserve, the status quo by commanding some positive act;" so courts require the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage." *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (Jackson, J.) (collecting cases).

## ARGUMENT

### I.    Plaintiffs Lack Standing.

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or

controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). One element of this limitation is that a plaintiff must have standing to sue, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id*. Plaintiffs bear the burden of alleging facts that establish the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)—namely, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Where, as here, the case involves deciding "whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Plaintiffs' request for a preliminary injunction must be denied because they lack evidence of a concrete and particularized injury, the injuries they assert are not ripe nor redressable, and Plaintiffs cannot demonstrate organizational or associational standing.

### A. Plaintiffs Cannot Demonstrate a Cognizable Injury.

1. <u>Plaintiffs' asserted injuries are based on a false premise.</u>

All of Plaintiffs' asserted injuries are based on the false belief that Defendants are "shutting down" the Offices and failing to fulfil their statutory duties as a result of the RIF. Mot.16. As public statements have made clear, "DHS remains committed to civil rights."[2] The RIF is simply part of a transition that is aimed at refocusing the Offices on their core statutory duties; not shirking them. Sartini Decl. ¶¶ 10, 13. As the Acting CIS Ombudsman makes clear, the Offices are not being

---

[2] *See* Ximena Bustillo, *Homeland Security makes cuts to civil rights and immigration oversight offices*, NPR (Mar. 21, 2025), *available at* https://www.npr.org/2025/03/21/nx-s1-5336738/homeland-security-rif-cuts-dhs.

eradicated and will perform their statutory duties, including reviewing complaints, submitting reports to Congress, and providing information that is statutorily required. ¶¶ 9-10, 13-14. The mere fact that the Offices are no longer engaging in wholly discretionary activities does not mean the Plaintiffs have suffered a particularized and concrete injury.

Plaintiffs primary evidence of an injury is that they submit complaints to the various Offices that they believe may no longer be reviewed.  Mot.16-18.  This is the only even plausibly concrete injury Plaintiffs provide support for. Yet Plaintiffs' only support is an email message stating that OIDO was "no longer operational" and had "been abolished." Horan Decl. ¶ 6 & Ex. G. As the CIS Ombudsman declared, that "message is false and was not authorized by the Department."  Sartini Decl. ¶ 14. The Offices continue to receive and will process complaints consistent with core statutory functions following the RIF. *Id.* Plaintiffs do not dispute that CRCL's complaint portal is still active[3], the OIDO Case Intake Form is still active[4], or that you can request assistance from the CIS Ombudsman.[5] Plaintiffs plainly can still submit allegations and have not alleged either that their complaints are being summarily rejected or even delayed due to the reductions in force. In fact, Plaintiffs only other evidence for this injury is that they fear their complaints will not be reviewed and this will harm their operations. Mot.16-18. It is plainly insufficient for Plaintiffs to merely speculate that these terminations have or will cause them harms. *Clapper*, 568 U.S. at 409 (what the government could do is "too speculative for Article III purposes").

---

[3]  *See* CRCL Complaints, *available at* https://engage.dhs.gov/crcl-complaint?id=crcl_intake&sys_id=154d32711b4c9110b930628ae54bcb4f&lang=english.

[4] *See* DHS Form 405, Case Intake Form, *available at* https://myoido.dhs.gov/en-US/

[5] *See* From 7001, Request for Case Assistance, *available at* https://www.dhs.gov/topic/cis-ombudsman/forms/7001.

Even if there is some delay or not every complaint is addressed, however, any injury would be speculative and not subject to redress. Prior to the RIF, Plaintiffs own evidence shows that in fiscal year 2023 CRCL compliance received 3,104 incoming allegations about possible civil rights or civil liberties violations were submitted.[6]  CRCL only opened investigations into 25% of these complaints.  *Id.*  Plaintiffs say as few as 20% are formally investigates. Mot.28. Moreover, CRCL is not the only entity that can review these complaints.  "Pursuant to 6 U.S.C. § 345(a)(6) and internal DHS policies, Compliance begins its process by referring all allegations it receives to the OIG, which then determines whether it will investigate." CRCL *Fiscal Year 2023 Annual Report*, at 45. Plaintiffs have not alleged that OIG's capacity has been altered in any way by the challenged terminations. Similarly, OIDO received over 12,000 complaints in 2023.[7]  However, in 2023, "OIDO completed 22 inspections and 9 observations and issued 11 reports to the component (ICE or CBP) that was inspected" and "provided redress—meaning a violation of a standard was addressed to resolve a complaint—on 815 cases." *Id.* at 21, 55. There simply has never been an expectation, requirement, or capacity to adjudicate all of the complaints received by these offices. Indeed, the statutes do not require every complaint to be adjudicated, nor do they set a period for review. *See* 6 U.S.C. §§ 345(a)(1), (6); *id.* § 205(b)(2); *id.* § 272(b)(1). How these Offices respond to the changes in staffing and the assignment of responsibilities therefore does not create a cognizable injury that confers standing to Plaintiffs. It is completely speculative that the RIF caused any one of the complaints submitted by Plaintiffs to be reviewed or adjudicated within a

---

[6] Mot.8 (citing *Fiscal Year 2023 Annual Report*, at 45, The Office of Civil Rights and Civil Liberties, *available a*t https://www.dhs.gov/sites/default/files/2024-11/24_1127_crcl-fy-2023-annual-report.pdf.)

[7] *OIDO Annual Report 2023*, at 53, Office of the Immigration Detention Ombudsman, available at https://www.dhs.gov/sites/default/files/2024-05/24_0329_oido_2023-annual-report-to-congress-508.pdf.

certain timeframe any differently. And an injunction ordering reinstatement will not ensure their complaints are adjudicated either.

    2.  <u>Plaintiffs' asserted informational injuries are generalized and noncognizable.</u>

Plaintiffs' argument that they have suffered an informational injury fairs no better. Mot.20. Plaintiffs only really support this basis for standing with regards to RFK's reliance on reports posted by CRCL. *Id.* That does not support standing for the other Plaintiffs or against the other Defendants. *See Murthy v. Missouri*, 603 U.S. 43, 44 (2024) ("plaintiffs must demonstrate standing for each claim that they press against each defendant"). Regardless, there are three core problems with any informational standing theory here.

*First*, the Offices are not withholding any information they are required to make public. Sartini Decl. ¶ 10. While OIDO and the CIS Ombudsman must submit congressional reports, they are not required to make any information public. *See* 6 U.S.C. § 205(e) (OIDO); *id.* § 272(c) (CIS Ombudsman). Even if they have chosen to do so in the past, that is not a cognizable informational injury. *See New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 157 (D.D.C. 2016) ("Consequently, Plaintiffs' alleged informational injury—i.e., that they did not receive information that FWS failed to collect (where the disclosure provision upon which Plaintiffs rely to support this assertion does not require the collection of such information)—is not a cognizable injury for standing purposes.").

The only Office that is required to make such reports public is CRCL. 42 U.S.C. § 2000ee-1(f)-(g). And they will continue to make information "public to the greatest extent that is consistent with the protection of classified information and applicable law." 42 U.S.C. § 2000ee-1(g); Sartini Decl. ¶ 10. Plaintiffs provide no evidence to the contrary. To carry their burden of demonstrating a "sufficiently concrete and particularized informational injury," the Plaintiffs must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or

a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). All Plaintiffs say is that RFK has used "investigatory findings CRCL previously made available on its website." Mot.20, 36. They do not argue or support the idea that these reports were statutorily required to be made public, however. And the fact that some of these documents were removed in February does not mean Plaintiffs' will suffer a cognizable harm to their "credibility" because they previously cited to documents that are no longer public. Enriquez Decl. ¶¶ 12-13. Removal of information in February cannot be traced to the RIF. And such harms reliant on the reactions of third parties are speculative rather than concrete.

*Second*, any harm from failing to disclose information that is required to be public would be a "generalized interest" that "[a]ll citizens" share and thus is "too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974). Even if a statute requires disclosure, a bare "statutory violation" does not constitute a "concrete injury." *Spokeo, Inc.*, 578 U.S. at 341. Statues that can make informational injuries concrete are sunshine laws like FOIA, where an individual can request that otherwise non-public information be produced and sue to enforce it. *See TransUnion LLC*, 594 U.S. at 441–42 ("cases involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information"). The statutes here, unlike FOIA, do not create a private right of action to seek disclosures of information. *Compare* 5 U.S.C. § 552(a)(4)(B) ("On complaint, the district court of the United States" a private party can sue under FOIA) *with* 42 U.S.C. § 2000ee-1(f)-(g) (no similar language). As is the case here, not all statutes requiring certain information create causes of action and thus do not render informational injuries concrete. *See AmSouth Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004) (Back Secrecy Act did not

have cause of action); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 337–38 (7th Cir. 2019) (no informational harm under the Fair Debt Collection Practices Act).  Without such a cause of action, the injury here is too generalized for Article III purposes.

*Finally*, even if an informational injury was possible here, Plaintiffs must demonstrate "downstream consequences from failing to receive the required information." *TransUnion LLC*, 594 U.S. at 441–42. Again, the only evidence of any downstream harm is speculation that some third parties will find Plaintiffs less credible because their citations are no longer public. Enriquez Decl. ¶¶ 12-13. Otherwise, they simply conclude that the RIF has "deprived it of information key to its educational and advocacy efforts." Mot.16. That cannot suffice. *See Hekel v. Hunter Warfield, Inc.,* 118 F.4th 938, 942 (8th Cir. 2024) (a "*purely* informational injury" is not enough). Realizing this, Plaintiffs' meekly contest that reduced staff has delayed their FOIA requests. Mot.16-17. But to have standing to challenge a policy, like the RIF here, Plaintiffs must show that they "have any outstanding FOIA requests (other than the requests challenged in the litigation) that are likely to implicate the alleged policies and lead to future injury." *National Security Counselors v. CIA*, 931 F. Supp. 2d 77, 92-93 (D.D.C. 2013). Plaintiffs do not and cannot show that the RIF has or will cause injuries to any pending FOIA requests. As a result, Plaintiffs cannot demonstrate an informational harm. Any injury is too generalized and speculative to confer standing.

    3.  <u>Much of the Offices' work is internal or discretionary.</u>

The remaining functions of the Offices are purely internal or discretionary. For example. CRCL is required to "oversee compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by programs and activities of the Department," 6 U.S.C. § 345(a)(1)-(5), consult regarding "standard operating

procedures" for drones, 6 U.S.C. § 211(k)(1)(E), and the Department must cooperate with CRCL, 42 U.S.C. § 2000ee-1(e). The CIS Ombudsman Office is tasked with "proposing improvements to CIS's administrative practices based on the trends and recurring problems the ombudsman office identifies."  6 U.S.C. § 272(d)(4). And OIDO inspects detention facilities and makes recommendations.  *Id.* §§ 205(b)(3)–(5). While Plaintiffs often explain the importance of these functions, they do not clearly say that their cessation would cause them an injury. And for good reason. These are requirements internal to the Department, the violation of which could not harm Plaintiffs.  *See Spokeo, Inc.*, 136 S. Ct. at 1547 (a statutory violation does not equate to an injury). To the extent they claim downstream effects, Plaintiffs have provided no evidence that the RIF caused the Offices to violate their duties and that those violations caused them any harm. Such arguments would be "highly attenuated" and speculative. *Clapper*, 568 U.S. at 410.

Plaintiffs do, however, claim they are injured because CRCL may no longer conduct "public engagement efforts" such as outreach to stakeholders. Mot.17-19. Plaintiffs point to no statute requiring such public engagement. That is because none exists. The Offices engaged in such public outreach based solely on their discretion. Sartini Decl. ¶¶ 9-11. Since Plaintiffs' "claim has no foundation in law, [they have] no legally protected interest and thus no standing to sue." *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997). Indeed, the D.C. Circuit found no standing where a statute did not impose a legal duty on the Defendants that the Plaintiff sought to enforce. *Id.* That is the case here. The Offices engaged with Plaintiffs out of their own good will. Such purely discretionary actions by an agency cannot be challenged. *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021) (lack of jurisdiction to challenge failure to adjudicate visas because statute did not mandate it and the agency had discretion). Even so, the Department's Office of Public Affairs, Office of Partnership and Engagement, and Inspector General handle many of

these discretionary functions as well, including public engagement. Sartini Decl. ¶¶ 9-11. Plaintiffs

are not injured simply because they may have to seek engagement from other offices. Nor do they

face concrete injuries from enjoying fewer meetings and interactions with the Offices. Any such

injury is amorphous and speculative at best.

**B. Plaintiffs' alleged injuries are neither ripe nor redressable.**

The speculative nature of Plaintiffs' injuries demonstrates that they are not ripe for

challenge and would be impossible to redress. Ripeness "prevent[s] the courts, through avoidance

of premature adjudication, from entangling themselves in abstract disagreements." *National Park*

*Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807 (2003) (quotation marks omitted).

To evaluate ripeness, courts look to (1) "the fitness of the issues for judicial decision" and (2) "the

hardship to the parties of withholding court consideration." *Id.* Plaintiffs complaints here are

merely "abstract disagreemen[t] over administrative policies" that are unfit for resolution. *Id.* As

explained, the RIF is part of an ongoing transition. Sartini Decl. ¶¶ 9-14. Which is why Plaintiffs

lack evidence that any of their complaints are not going to be reviewed or that any statutorily

required information will be withheld and thus harm them. Plaintiffs must wait for the transition

to be complete. Only then can any harm possibly be evaluated, especially because many of the

relevant statutory provisions have long or no timelines for compliance. And at that point, it is

possible that any perceived harms will not have manifested at all. At this stage, however, Plaintiffs

are merely complaining about policy disagreements regarding how the Offices are managed. That

does not present a ripe dispute.

In addition, a court order could not redress these speculative harms. Redressability requires

the court to award relief "through the exercise of its power, not through the persuasive or even

awe-inspiring effect of the opinion." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023). Here,

Plaintiffs proposed relief is wholly improper. As explained further below, their proposed relief is a sweeping injunction that results in the reinstatement of hundreds of employees and the requirement that even discretionary work be continued as before. ECF No. 15-21. Courts cannot, however, order reinstatement or micromanage the "internal affairs" of the executive branch. *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974). And "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006); *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). So this Court could not grant such sweeping relief. Even if such an order was proper, the Court could not order back all the employees, as many have voluntarily left. Sartini Decl. ¶ 8. And even then, the Court could not ensure that Plaintiffs complaints were timely addressed, as many complaints were not investigated prior to the RIF. *Supra* n.6. Nor could the Court order and ensure that the Offices engaged in all of the discretionary public engagement work that Plaintiffs desire. The broad and speculative nature of Plaintiffs' harms thus render them impossible to redress through a proper court order.

### C. Plaintiffs Have Not Established Organizational Or Associational Standing.

Plaintiffs have failed to establish standing either on behalf of itself or its purported members. An association has standing either (1) by "its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy," or (2) "in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Plaintiffs have not established either.

### 1. Plaintiffs do not have organizational standing.

Plaintiffs lack organizational standing because they have not demonstrated any direct injury to the organization itself. "[A]n organization may establish Article III standing if it can

show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (internal quotations omitted). To do this, court's ask whether the agency "'injured the [organization's] interest' and whether the organization 'used its resources to counteract that harm.'" *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (PETA) (*quoting Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)).). But standing does not exist just "when an organization diverts its resources in response to a defendant's actions." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Instead, the organization must show that the challenged actions have "inhibit[ed] their daily operations" and "perceptibly impaired" the organization's ability to engage in specific activities core to advancing its mission. *PETA*, 797 F.3d at 1094–95.

Plaintiffs' injuries boil down to diversion, not direct harms. Plaintiffs assert that "they will expend additional resources to counteract the injuries caused by Defendants' actions, if those actions are not enjoined." Mot.19. For example, plaintiff RFK alleges that it "will be required to spend more time traveling to immigration detention facilities and more money on litigation," SBCC alleges it "will be required to engage directly with CBP around border policy matters," and UJC claims it will have to use "less effective" means "than requesting assistance from the CIS Ombudsman's Office." *Id.* These are classic diversion injuries that cannot establish standing lest every organization can manufacture standing to challenge every policy. *See All. for Hippocratic Med.*, 602 U.S. at 395.

And it is well established that an increase in an entity's expenditures on its normal activities is not enough to confer organizational standing. *See, e.g., Food & Water Watch, Inc. v. Vilsack*,

808 F.3d 905, 919 (D.C. Cir. 2015) ("Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.").  An impairment that gives rise to organizational standing involves something more than just an entity's allocation of additional resources toward its normal activities. Yet Plaintiffs allegations fail to establish organizational standing because causing an entity to engage in its regular activities does not satisfy Article III.  *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("The Trust does not allege impairment of its ability to provide services, only impairment of its advocacy. As we noted above, this will not suffice."); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 663 F.3d 470, 475–76 (D.C. Cir. 2011) ("Moreover, the passage of NWP 46 has done nothing to hinder the NAHB's ability to fulfill its regular mission of informing and counseling its members of developments in government regulation."). In fact, the Supreme Court stayed an injunction in a nearly identical case because the allegations [were] presently insufficient to support the organizations' standing." *OPM v. AFGE*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025). This Court should do the same here and deny the preliminary injunction in the first instance for lack of standing.

2.  <u>Plaintiffs lack associational standing</u>

Plaintiffs' associational standing argument fails for the same reasons. Where an organization is suing on behalf of its members, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Hunt v. Wash. St. Apple*

*Adver. Comm'n*, 432 U.S. 333, 343 (1977). SBCC's claim of associational standing is simply masking another claim of organizational standing. They fail for the same reasons.

SBCC claims that at least four SBCC member organizations are suffering injuries as a result of the alleged dissolution of the Offices. All of them are also immigration rights organizations like Plaintiffs. For example, SBCC makes the conclusory allegation that one member, the American Friends Service Committee's U.S.-Mexico Border Program, "is harmed by the inability to continue filing complaints based on those observations, and otherwise engaging, with CRCL and OIDO." Mot.21. Similarly, SBCC alleges another member, Immigrant Defenders Law Center, is harmed because it has lost a mechanism "of serving its clients' interests," which "will make it more difficult for ImmDef lawyers to do their jobs." *Id.* These are the same types of meager assertions the Plaintiffs advance in an effort to establish organizational standing. And for the reasons previously explained, none of the individual members have standing to bring suit in their own right. Any members of SBCC who also allege they are harmed would lack standing to bring suit for the same reasons as the named Plaintiffs. Because Plaintiffs lack standing for numerous reasons, they are not likely to succeed on the merits and their motion for a preliminary injunction must be denied.

## II.    The CSRA Precludes District Court Jurisdiction Over Plaintiffs' Claims.

Plaintiffs' claims suffer from another fatal jurisdictional defect—they are precluded by the Civil Service Reform Act (CSRA). In the CSRA, Congress "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted). The CSRA's preclusion scheme is comprehensive—it "'can preclude a claim from being brought in a district court even if it *forecloses* the claim from administrative review' and provides no other way to bring the claim." *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C.

Cir. 2019) (quoting *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013). That is the case here.

The CSRA, including the Federal Labor Management Relations Statute (FSLMRS), its subchapter governing collective bargaining, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (alterations, citation, and quotations marks omitted). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See AFGE v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). The purpose of this statute was to "replace the haphazard arrangements for administrative and judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quotation marks omitted).

Here, Plaintiffs are neither individual DHS employees nor unions representing such employees; they are organizations properly understood here as end-users of government services. But their challenge is derivative of the sorts of personnel claims that are channeled under the CSRA. The injuries they allege stem from DHS actions "eliminating nearly all of [CRCL's] staff," Mot. 17, "shutting down the CIS Ombudsman's Office," and eliminating CRCL and DHS Oversight Office capacity, *id.* at 18-19. The redress they seek for Article III standing purposes hinges in part on a potential "court order reversing those actions and ordering a resumption of the DHS Oversight Offices' statutory functions"—in other words, restoring employees subject to RIFs

not just to duty status, but in precisely the same positions, carrying out the same duties. *Id*. at 20. And the preliminary injunction they request would, in relevant part, "order Defendants to reverse work stoppages that were ordered as to the functions of the DHS Oversight Offices . . . and [] enjoin Defendants from effectuating the RIF scheduled to take effect on May 23, 2025, or effectuating any other RIF affecting any or all of the DHS Oversight Offices[.]" *Id*. at 40. These contentions and claims for relief—including the demand to prevent RIFs from going forward—all fall squarely within the heart of the federal employer-employee relationship. And if this lawsuit were brought by the real parties in interest—the employees subject to RIFs—it could proceed only through the scheme enacted by Congress. Plaintiffs, nonprofit organizations several steps removed from those employees, are not transformed by their exclusion from the CSRA's procedures into *favored* plaintiffs who can challenge the federal government's termination decisions directly in district court, without any of the limitations that would apply if the real parties in interest were to bring suit. Plaintiffs therefore cannot show that district courts have jurisdiction over their claims under the comprehensive, reticulated administrative-judicial review schemes of the FSLMRS and CSRA. *See AFGE v. Trump*, 929 F.3d at 752; *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025); *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080 (D.D.C. Feb. 20, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025).

The Supreme Court has repeatedly recognized this fundamental principle. In *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), the Supreme Court considered a statute that permitted dairy *handlers* to obtain review of certain "market orders" after exhausting administrative remedies but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy *consumers* sought review of a marketing order, the Supreme Court

explained that the statute omits a "provision for participation by consumers in any proceeding." *Id.* at 347. In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Accordingly, the Court explained, the statute's "structure ... indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

Not long after *Block*, the Supreme Court applied the same reasoning to the CSRA itself. In *Fausto*, the Court again explained that the "exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" under the CSRA "*prevents* [the party] from seeking review" under other provisions. 484 U.S. at 455 (emphasis added). There, a federal employee who lacked any "right to administrative or judicial review" under the CSRA challenged his suspension in federal claims court under the Back Pay Act. *See id.* at 440, 443. The Supreme Court explained that Congress's choice to "withhold[]" a remedy under the CSRA "preclude[d] judicial review" for that employee—it did not "leave [the employee] free to pursue" different remedies in a different forum. *Id.* at 443-44, 448-49. The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA. *Id.* at 448-49; *see Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009)

(Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Those principles likewise foreclose this Court's exercise of subject-matter jurisdiction here. Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for parties who are strangers to the federal government's employment relationships to challenge the terminations of employees subject to RIFs in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the terminated employees themselves. *See* 484 U.S. at 449-50. The exclusion of nonprofit organizations from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for nonprofit organizations or other interest groups to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) ("[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction. (quoting *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988) (en banc) (per curiam))).

The Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles, and the analysis above readily maps onto the frameworks they distill. Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject-matter jurisdiction over a claim that is, as here, "of the type Congress intended to be reviewed within" the statutory structure. *See id.* (quoting *Thunder Basin*, 510 U.S.

at 208, 212); *see also Elgin*, 567 U.S. at 12-14 (reaffirming that the CSRA establishes an "integrated scheme of administrative and judicial review" for challenges to federal employment actions (quoting *Fausto*, 484 U.S. at 445)).

Plaintiffs' claims are "of the type Congress intended to be reviewed within" the CSRA's integrated scheme. *See* 5 C.F.R. § 351.901 ("An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board"); 5 C.F.R. § 1201.3(a)(6). Their claims, "at bottom," rest on allegations that the government unlawfully terminated the Offices' employees by conducting an illegal RIF. *Federal Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). Moreover, Plaintiffs seek to restore the relevant employees to precisely the positions they previously occupied, and to enjoin the Department from effectuating its scheduled RIF or any other RIF affecting the employees at issue here. Mot. 40. Plaintiffs' claim thus falls in the heartland of challenges that Congress wanted only the MSPB (and, eventually, the Federal Circuit and Supreme Court) to resolve.

Relying on the same logic, several district courts have reached the same outcome in recent months. A federal district court this district recently held—in denying a preliminary injunction that challenged a range of personnel policies and actions, including RIFs anticipated under Executive Order 14210—that the FSLMRS channeled jurisdiction away from federal district courts and instead required the unions to pursue their claims before the FLRA. *See Nat'l Treasury Emps. Union*, 2025 WL 561080, at *4; *see also Am. Fed'n of Gov't Emps.*, 2025 WL 470459, at *1-*3 (requiring channeling in union suit challenging the closing of the deferred resignation offer known as the "Fork in the Road").

The same jurisdictional bottom line has held where non-employee, non-union plaintiffs have asserted similar claims. The Fourth Circuit, for example, reached a similar conclusion in April in a case brought by multiple states, staying a preliminary injunction issued by the District of Maryland enjoining numerous agencies to "refrain" from certain types of "reductions in force." *Maryland*, 2025 WL 1073657, at *1. "[T]he Government argue[d] . . . that the district court lacked subject-matter jurisdiction because the Civil Service Reform Act . . . provides the exclusive means for review of personnel actions taken against federal employees." *Id.* The Court agreed, recognizing that "the Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." *Id.*[8]

This Court should reach the same outcome here. The FSLMRS and the CSRA provide the exclusive means of redressing labor and employment disputes involving federal employees, *see United States v. Fausto*, 484 U.S. 439, 455 (1988)), as to statutory and constitutional claims alike. *See Elgin*, 567 U.S. at 10-15. Such claims must be pursued before the FLRA or the MSPB (if at all). The CSRA thus imposes an "implied preclusion of district court jurisdiction," *id.* at 12, and "precludes courts from providing supplemental remedies," *Lampon-Paz v. OPM*, 732 F. App'x

---

[8] In a case involving non-employee organizational plaintiffs similarly situated to Plaintiffs here, the Supreme Court also stayed a preliminary injunction issued by the Northern District of California enjoining the removals of probationary and trial period employees by multiple federal agencies. There, the district court had determined that claims challenging those removals by several non-profit advocacy organizations were not channeled under the FSLMRS or the CSRA because those organizations lacked direct rights or remedies under either statutory scheme. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025) (stayed by appeal) *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025). Although the Supreme Court ruled on standing grounds, it stayed that district court injunction. *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ("The [district court] injunction was based solely on the allegations of the nine non-profit-organization plaintiffs in this case. But under established law, those allegations are presently insufficient to support the organizations' standing." (citing *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398 (2013)).

158, 161 (3d Cir. 2018).  Likewise for the FSLMRS where labor disputes are at issue.  *AFGE v. Trump*, 929 F.3d at 754-61.

In short, Congress did not establish an implausible scheme in which employees must litigate their terminations through a comprehensive, integrated scheme, but nonprofits or other interest groups are left free to challenge those same employment actions directly in federal district court with "greater rights" than the affected employees themselves.  *See Graham*, 358 F.3d at 934.  That scheme would allow groups like Plaintiffs to "bypass" the reticulated statutory scheme Congress established "and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established."  *Pinar*, 747 F.2d at 913 (quotation marks omitted).  And it would risk conflicting decisions concerning the same personnel actions, recreating the very "haphazard" "patchwork" that Congress enacted the CSRA to avoid.  *See Fausto*, 484 U.S. at 444-45.  Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum.  And as then-Judge Roberts summed up, "what you get under the CSRA is what you get."  *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

## III.  **Plaintiffs Fail to Establish Reviewable Final Agency Action.**

Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. That requirement has two distinct parts: whether the act at issue qualifies as an agency "action" under the APA and whether it is "final." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).

First, what is challenged must be "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" *Id.* § 551(13). That definition is "not so all encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Independent Equip. Dealers Ass'n v.*

*EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.).  Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). That is precisely what Plaintiffs seek to do here. A RIF is not a "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C. § 551(13). Yet Plaintiffs attempt to transform this discrete personnel decision into a broadside against the Offices prioritizing their statutory functions over purely discretionary work. In doing so, Plaintiffs impermissibly seek "general judicial review of [an agency's] day-to-day operations." *National Wildlife Fed'n*, 497 U.S. at 899. The APA does not permit such micromanagement.

Second, the agency action must be "final," which means (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). Plaintiffs fail both prongs of the finality test.  They challenge the alleged dissolutions of the Offices.  As evidence of these dissolutions, Plaintiffs point to individual employment actions in the form of RIF notices, comments by a DHS spokesperson, and a bounce back notification received by the Kino Border Initiative when emailing OIDO.  Mot.25–26.

The focus of Plaintiffs' claims are that a reduction in workforce is and will result in the Offices failing to carry out their statutory functions. *Id.* Once again, these Offices are not being abolished and the statutory work will be carried out.  Sartini Decl. ¶¶ 9-14. The RIF was not the consummation of an agency decision-making process, it is part of an ongoing transition. *Id.* That

transition is not final. The ongoing nature of that project means that there has been no final agency action.

In any event, personnel actions and press announcements are not final agency actions reviewable through the APA.  *See Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *5 (D.D.C. Feb. 20, 2025) (CSRA review scheme is exclusive where "agency takes a final adverse action against an employee"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) ("Congress intended for the FSL-MRS and the [] CSRA[], of which the FSL-MRS is a part, to provide the exclusive procedures for disputes involving employees and their federal employers and disputes between unions representing federal employees and the federal government."); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 189 (D.C. Cir. 2006) ("we have never found a press release of the kind at issue here to constitute 'final agency action' under the APA.").

Importantly, Plaintiffs' legal rights have not been affected by this.  Plaintiffs only argument otherwise is that the RIFs "undeniably create legal consequences for the employees and for DHS itself." Mot.26.  But Plaintiffs are not employees, they do not represent employees, and they are not directly regulated in any way by the actions alleged in this suit. *See Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) ("no final agency action where the action "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks[.]"). Instead, Plaintiffs' primary complaint is that they utilize the services provided by these officers to carry out their organizational missions. Such speculative downstream effects do not suffice.  And since DHS's transition has not yet been finalized, Plaintiffs have failed to demonstrate that the statutory services on which they rely will not be maintained.  Absent a final agency action, Plaintiffs cannot bring a claim under the APA.

IV.    **Plaintiffs' Claims Fail on the Merits.**

A.    **Plaintiffs' APA Claims Fail.**

Plaintiffs are also unlikely to succeed on the merits of their APA claims.  First, as explained above, they do not seek review of a discrete, final agency action.  Rather, their claims are best considered under the APA's provision for agency action unlawfully withheld—and they cannot justify relief of that kind.  In any event, even if the RIFs were reviewable on the grounds Plaintiffs identify, they have not demonstrated that the RIFs are unlawful or arbitrary and capricious.

1.    Plaintiffs Seek to Compel Agency Action But Cannot Meet the
Mandamus-Like Standard.

At their core, Plaintiffs' claims assert that the RIFs violate the law because they will cause (or have caused) the Department to cease performing functions mandated by statute. *See, e.g.*, Mot.27 ("the executive may not unilaterally eliminate a function that Congress created"); *id.* ("Defendants' action has prevented the offices from performing their required functions.").  Such allegations are governed by the APA's provision permitting courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Plaintiffs cannot succeed under § 706(1)'s mandamus-like standard.

"The only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 63 (2004). In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act … about which [an official] had no discretion whatever." *Id.* (alterations in original) (citations and quotation marks omitted). Thus, "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664,

670 (D.C. Cir. 2016). Those strict limits mean that a plaintiff challenging "federal agency *inaction*" must show that the agency "failed to take a *discrete* agency action that it is *required to take.*" *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99 (1st Cir. 2012) (quoting *SUWA*, 542 U.S. at 64); *see In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (holding that § 706(1) relief "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000))).

Several significant hurdles limit the availability of § 706(1) relief. Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Bluewater*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)). Even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *Core Communications, Inc.*, 531 F.3d at 855 (quoting *Telecommunications Research & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 79 (D.C. Cir. 1984)). The *TRAC* standard for determining whether an agency's delay is sufficiently egregious "is very deferential to administrative agencies." *Am. Auto. Mfrs. Ass'n v. Massachusetts Dep't of Env't Prot.*, 163 F.3d 74, 82 n.9 (1st Cir. 1998). And even where performance of a required duty is delayed sufficiently to satisfy that deferential standard, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108-09 (D.C. Cir. 2001) (*Cobell*) (quotation marks omitted). If a court does find a violation after applying the proper deference, *see AAMA*, 163 F.3d at 82 n.9, "[i]t is proper . . . to allow the government the opportunity to cure" that violation, *Cobell*, 240 F.3d at 1108-09 (quotation marks omitted).

Rather than recognize that the crux of their complaint asks the Court to order agency action unlawfully withheld under § 706(1), Plaintiffs argue that their challenge is to final agency action under 5 U.S.C. 706(2)(A). *See* Mot.25-26. That is incorrect. As in *SUWA*, there was no "agency action" that Plaintiffs could challenge here. *See SUWA*, 542 U.S. at 64. And even if Plaintiffs had identified a discrete and statutorily required action that the Department was in danger of withholding, any relief would have to accord with the remedial principles applicable under Section 706(1). Yet Plaintiffs do not identify any "specific, unequivocal command" to which the Department is subject such that the Court could "order[] . . . a precise, definite act." *SUWA*, 542 U.S. at 63. They describe no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *Bluewater*, 234 F.3d at 1315 (citation omitted).

Indeed, as explained immediately below, in several instances where Plaintiffs purport to identify statutorily mandated actions, the Department is *not* subject to a ministerial duty and enjoys discretion in how to act. For example, the Department is not required to address any particular complaint in any particular way; nor must it continue the prior administration's community engagement projects. Finally, issuing a preliminary injunction now would not "allow the government the opportunity to cure" any statutory violation the Court may find. *Cobell*, 240 F.3d at 1108-09. The Court should deny Plaintiffs' requested relief.

### 2. The RIFs are a lawful exercise of agency authority.

If the Court nonetheless reaches the merits of Plaintiffs' APA claims, it should still find that Plaintiffs fail to demonstrate they are likely to succeed. Plaintiffs argue that the Department exceeded its statutory authority, 5 U.S.C. § 706(2)(C), and acted contrary to law, *id.* § 706(2), by conducting the RIFs. But Plaintiffs fail to demonstrate that the RIFs will cause the Department to violate any statutory mandate.

Plaintiffs' primary argument is that the Department lacks authority to reduce staffing in the Offices and "force them to cease their work on activities they are statutorily required to perform" because the Offices and their functions are "established" or "required to be maintained" by statute. Mot.26-27 (citing 6 U.S.C. § 452(b)(2)).   But the Department is exercising its authority under the RIF statutes, *see* 5 U.S.C. §§ 3501-3504, not the DHS reorganization statute.   And in any event, Plaintiffs acknowledge that the Secretary *is* authorized to "reallocate functions" among officers and to "consolidate" or "discontinue organizational units" within DHS so long as those decisions do not preclude the agency from fulfilling statutory mandates.  6 U.S.C. § 452(a).  T The agency's RIFs do not preclude the agency from fulfilling statutory mandates.

Importantly, the relevant statutes do not establish offices of any particular size or structure. Rather, each of the statutes establishes a single *officer*, who is tasked with performing particular functions.   6 U.S.C. §§ 345 (CRCL) ("Establishment of Officer for Civil Rights and Civil Liberties," "who shall report directly to the Secretary"), 272 (CISOMB) ("there shall be *a position* of Citizenship and Immigration Services Ombudsman," who "shall report directly to the Deputy Secretary" (emphasis added)), 205 (OIDO) ("there shall be *a position* of Immigration Detention Ombudsman," who "shall report directly to the Secretary" (emphasis added)).   Those specific positions—Officer for Civil Rights and Civil Liberties, Citizenship and Immigration Services Ombudsman, and Immigration Detention Ombudsman—are "established … by statute." *Id.* § 452(b).  The size and structure of the staff who work for the officers are not.

Plaintiffs therefore turn to the officers' statutory functions, asserting that the officers cannot perform their statutory functions without the staff who are subject to RIFs.  Mot. at 28-31.  But they fail to establish that the RIFs will preclude any of the three officers from fulfilling their statutorily mandated functions.  The Department has never disclaimed its statutory obligations—

indeed, it will perform its statutorily mandated functions and moving forward. *See* Sartini Decl. ¶ 13. Agencies have the authority to make policy choices about how to implement statutory directives, and it is not uncommon for agency leadership to reevaluate those policy choices at the start of a new administration. For example, the Department may find that other DHS components can assist the officers with fulfilling their statutory duties, or that software tools can assist with triaging complaints for more efficient review by employees. Those determinations are best made by the agency, which has access to all of the relevant information—not third-party plaintiffs or the judiciary. And here, the Department determined that a more streamlined team can perform all of its statutorily mandated functions.

None of Plaintiffs' office-specific examples, which are supported by little more than their own assessments of how many staff are required to complete a given task, change this analysis.

*CRCL.* Plaintiffs assert that CRCL must review and assess complaints regarding alleged civil rights and civil liberties abuses at the Department, report to Congress regarding those allegations, and develop, implement, and oversee compliance with policies and procedures to protect civil rights and civil liberties. Mot.28-29. They claim that because CRCL receives hundreds of complaints annually, and because the Department is a large agency with lots to oversee, CRCL requires a large staff. But as explained above, Plaintiffs' claims regarding how many staff are required to perform a particular set of tasks is unsupported and speculative. The Department has never disclaimed its statutory obligations, and Plaintiffs do not dispute that CRCL's complaint portal is still active and receiving complaints. *Supra* I.A.1. This Court may not

find that Plaintiffs are likely to succeed in showing a statutory violation based on Plaintiffs' assessment of the staffing needs of the Department.[9]

*CISOMB.*  Plaintiffs suggest that the CIS Ombudsman cannot "assist individuals and employers in resolving problems with" CIS, "identify areas in which" those problems exist, and prepare a report to Congress, 6 U.S.C. § 272(b), (c), without dozens of staff to assist him.  Mot.29. But again, they do not dispute that CISOMB is still accepting requests for assistance.  *Supra* I.A.1. Nor do they suggest that *every* complaint or request must be pursued.  Indeed, their own declarant stated that only about 40% of CISOMB's received complaints "required resolution with CIS." Mot.29 (citing A. Doe Decl. ¶ 7(a)).  The statute does not mandate that the Ombudsman pursue every complaint the office receives, and the agency is entitled to pursue more or fewer complaints in its discretion.

*OIDO.*  Plaintiffs suggest that because OIDO has previously exercised their job duties from various detention facilities around the United States, a single person could not possibly perform those functions.  Mot.30.[10]  But no statute requires that OIDO have an ongoing presence in detention facilities across the country—rather, the core of the Ombudsman's statutory functions is to "receive, investigate, resolve, and provide redress" for alleged misconduct in immigration detention contexts.  And while Plaintiffs cite an email stating that OIDO is no longer operational,

---

[9] Plaintiffs also suggest that CRCL "is responsible for" certain other activities—analyzing and reporting about delegated law enforcement authority and ensuring compliance with civil rights obligations by grant recipients.  Mot. at 29.  But they provide no evidence that those responsibilities are statutorily mandated.  *Id.*

[10] Indeed, Plaintiffs assert that "even shrinking the OIDO workforce could be devastating" to its functions.  *Id.* at 30-31.  That statement highlights the difficulty with Plaintiffs' assertion of reviewable final agency action—their claim would apparently be equally viable if the agency terminated a single employee.  But the APA does not waive sovereign immunity for plaintiffs to challenge every agency hiring and firing decision because of the marginal impacts those decisions may have on the agency's performance.

*see* Horan Decl. ¶ 6 & Ex. G, that email was not authorized by the Department and does not accurately reflect the Department's current operations.  *See* Sartini Decl. ¶ 14.  Indeed, the OIDO Case Intake Form remains active, *supra* I.A.1., and the Ombudsman will comply with the statutory mandate.

In sum, Plaintiffs plainly can still submit allegations and have not demonstrated either that their complaints are being summarily rejected or even delayed due to the RIFs.  Moreover, the statutory scheme provides no entitlement to individual relief or investigation of any particular complaint.  For example, in fiscal year 2023, CRCL compliance received 3,104 incoming allegations about possible civil rights or civil liberties violations submitted from a variety of sources, including the public, members of Congress, non-governmental organizations, DHS agencies and offices, and others.[11]  CRCL opened investigations into 25% of these complaints. *Id.* Moreover, CRCL is not the only entity that can review these complaints—the DHS Inspector General is expressly granted a right of first refusal to pursue any complaint sent to CRCL.  6 U.S.C. § 345(a)(6).   Similarly, OIDO received over 12,000 complaints in 2023, but provided redress in only 815 of those cases—and performed only 31 inspections or observations to investigate those complaints.  *Supra* I.A.1. There simply has never been an expectation, requirement, or capacity to adjudicate all of the complaints received by these offices.

Plaintiffs offer several other arguments that the RIFs are contrary to law because they violate statutory requirements regarding Department procedure.  None has merit.

First, Plaintiffs argue that the Department lacked authority for the RIFs because it did not provide notice to the relevant congressional committees before reducing the offices.  Mot.27

---

[11] *Fiscal Year 2023 Annual Report*, at 45, The Office of Civil Rights and Civil Liberties, *available at* https://www.dhs.gov/sites/default/files/2024-11/24_1127_crcl-fy-2023-annual-report.pdf.

(citing 6 U.S.C. § 452(a)(2)). As explained above, the RIFs are not a reorganization under § 452. But even if it were, a congressional notice provision does not confer judicially enforceable rights upon other parties. *See Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988) (opinion of Ginsburg, R.B., J., Starr, J., and Sentelle, J.) ("Generally, congressional reporting requirements are, and heretofore have been, a management tool employed by Congress for its own purposes."); *see also Guerrero v. Clinton*, 157 F.3d 1190, 1196 (9th Cir. 1998) ("Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants.").

Second, Plaintiffs suggest that the RIFs violate statutory mandates requiring that CRCL has sufficient resources to carry out its required functions, *see* 42 U.S.C. § 2000ee-1(d)(1), and that Department leadership "cooperate" with CISOMB and OIDO, *see* 6 U.S.C. §§ 205(c)-(d), 272(f); Mot.31. Those thin reeds provide no support for Plaintiffs' sweeping claim. As explained above, Plaintiffs have not demonstrated that CRCL lacks sufficient resources to carry out its required functions—indeed, the Department contends that it will continue to perform those functions. *See* Sartini Decl. ¶ 13. Nor has the Department violated the alleged "mandates" for CISOMB and OIDO. The Department must "provide[] unfettered access" to detention facilities for the Immigration Detention Ombudsman and his "designated personnel," 6 U.S.C. § 205(c), but Plaintiffs do not allege that the Ombudsman has been denied such access. Similarly, specific Department personnel must "establish procedures to provide formal responses to recommendations" by both Ombudsmen, 6 U.S.C. § 205(d); *see id.* § 272(f) (similar)—but again, Plaintiffs make no allegation that Department personnel have failed to establish those procedures or denied the Ombudsmen the required responses.

Finally, Plaintiffs assert that "Defendants have also likely violated appropriations law" by preparing to RIF the Offices. Mot.31. They suggest that by separating employees, the Department has "withh[e]ld appropriated funds" in violation of the Impoundment Control Act. *Id.* at 32. They offer no evidence that the Department will not ultimately expend the appropriated funds; perhaps recognizing that, they instead pivot to the Antideficiency Act. But that statute expressly permits an agency to reserve appropriated funds "to achieve savings made possible by or through … *greater efficiency of operations.*" 31 U.S.C. § 1512(c)(1). To the extent that the Department does not ultimately expend all of the appropriated funding—something Plaintiffs have failed to demonstrate with any support—those savings could be made possible by more efficient operations, including the use of shared staff, contractors, or software tools. *See* Sartini Decl. ¶ 9. Plaintiffs here, too, fail to marshal *any* support for their alleged statutory violations—let alone a likelihood that they will occur.

### 3. The RIFs were not arbitrary and capricious.

Plaintiffs next argue that the RIFs must be enjoined because they are arbitrary and capricious. Mot.32-35. This claim also fails.

First, Plaintiffs assert that the RIFs are not "substantively reasonable" because they left too few employees to perform too many tasks. *Id.* at 33. For the reasons explained above, the proper staffing levels for statutory functions are for the agency to determine—and Plaintiffs have produced no evidence that the agency will not be able to perform its statutorily mandated functions.

Plaintiffs further claim that the RIF notices' explanation—that the relevant "positions or functions" are "non-essential or not legally mandated"—is insufficient because the Offices perform statutorily mandated functions. Mot.33. But the "positions" subject to the RIF—that is, any position other than the "Officer for Civil Rights and Civil Liberties" and the two Ombudsmen—are "not legally mandated." And many of the Offices' "functions" are "non-

essential or not legally mandated." Indeed, Plaintiffs' motion explains in detail the many non-mandatory functions that the Offices perform, including "community engagement events in twenty-two different metro areas," Mot.6 (CRCL), and "a work group on deaths in custody with representatives from nine other law enforcement agencies," Mot.7 (OIDO).

Further, the Department did consider reliance interests and other considerations. Before making the decision to conduct the RIFs, the Department engaged in significant deliberation, including engagement with OPM. *See* Sartini Decl. ¶ 5-6. That the RIF notice did not include a lengthy explanation of the Department's assessment regarding the reliance interests of various stakeholders, *see* Mot.33-34, demonstrates only that RIFs are not properly considered final agency action subject to APA review, *see supra* III. It does not evince a failure to adequately consider the consequences of the RIF decision.

### B.    Plaintiffs' *Ultra Vires* Claim Fails.

Plaintiffs may not escape the APA's strictures on review by characterizing their claims as *ultra vires*. Rather, "[u]ltra vires review is . . . only available in extraordinary circumstances." *See DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (noting "extremely limited scope" and "extraordinarily narrow" nature of *ultra vires* claims). Indeed, the bar for asserting an *ultra vires* claim is high: Plaintiffs must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022). Accordingly, an *ultra vires* cause of action requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). As explained above, the RIFs are a lawful exercise of the Department's statutory authority. Because

the RIFs do not contravene any clear and specific statutory mandate, Plaintiffs fail to demonstrate a likelihood of success on the merits of their *ultra vires* claim.

## V.    <u>The Remaining Equitable Factors Weigh Strongly in the Government's Favor.</u>

### A. **Plaintiffs have not established irreparable harm.**

Even if Plaintiffs had standing and were likely to succeed on the merits (they are not), they cannot demonstrate any irreparable harm. Irreparable harm is a necessary element that Plaintiffs must establish in order the get preliminary relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (lack of irreparable harm is "grounds for refusing to issue a preliminary injunction" by itself). This is a "high standard" that requires "[t]he injury complained of [to be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quotation omitted). The injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quotation omitted). Plaintiffs cannot demonstrate any harm, much less an irreparable one.

Plaintiffs tie their irreparable harm analysis to their standing arguments. Mot.35. So Plaintiffs' argument that they face an irreparable harm must fail for the same reasons. Plaintiffs are not harmed by the RIF because the Offices will continue to perform their statutorily mandated duties. Sartini Decl. ¶¶ 9-14. Anything beyond that is discretionary and not something that Plaintiffs can claim irreparably injures them. *Id.*

Even if Plaintiffs' asserted injuries are sufficient for standing, however, they fall far below the "high" irreparable harm standard. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. The injuries they do allege are speculative and attenuated at best, hardly enough to establish an irreparable harm. *Id.* For example, Plaintiffs claim their pending complaints will never be resolved because of the RIF. Mot.37.  But the Offices are and will still review complaints.  Sartini Decl. ¶ 14. And even before the RIF not all complaints were resolved. *Supra* n.6. So the idea that the RIF

will cause irreparable harm because Plaintiffs' complaints will not be reviewed is baseless speculation. Most of Plaintiffs' asserted harms are minor diversions of resources, such as efforts spent on "less effective CIS customer service" or undermined "credibility" from removed reports. Mot.35-36. Such insignificant and amorphous harms cannot support organizational standing much less irreparable harm. *See Food & Drug Admin.*, 602 U.S. at 395 (diversion of resources is insufficient for standing). And there is no basis for assuming these harms will be ongoing after the transition period. So Plaintiffs must wait to determine whether these changes actually constitute irreparable harms rather than momentary disruptions. Any possible harm is thus far from concrete or imminent. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (impact of policy on promotion opportunities was speculative and not imminent). So Plaintiffs will not be irreparably harmed by proceeding through litigation at the normal pace.

On the other hand, if Plaintiffs truly have and are being injured, their "extensive delay in seeking a preliminary injunction weighs heavily against a finding of irreparable harm." *Maldonado v. D.C.*, 2019 WL 6877913, at *3 (D.D.C. Dec. 16, 2019) (denying preliminary injunction in part because of lack of harm due to delay). Any possible injury would have first accrued after the administrative leave was implemented on March 21, yet Plaintiffs waited *48 days* to seek a preliminary injunction. *See Open Top Sightseeing USA v. Mr. Sightseeing*, LLC, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) ("The D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue," quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C.Cir.1975)). Indeed, Plaintiffs claim there is a "clear and present need" for an injunction because employees have already been "placed on administrative leave pending the RIF" and "no statutorily mandated work is being performed" since March 21. Mot.37. Instead of suing and

seeking a preliminary injunction then, however, Plaintiffs waited for over a month to even file a complaint on April 24. ECF No. 1. Around that time, Plaintiffs claim they were already suffering ongoing injuries because their complaints were not being reviewed. Mot.13, 37. Even then, Plaintiffs waited two weeks to file a preliminary injunction on May 8. ECF No. 15. So Plaintiffs claim that nearly 7 weeks after most of the Offices' staff was put on administrative leave, they are suddenly facing some new imminent irreparable injury that must be remedied immediately. *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay weighed against harm).

They argue this is because the terminations will become permanent and thus harder to remedy. Mot.37. That is implausible. The employees have been on leave since March 21 and the plan was always to make this permanent. Nothing has changed. The May 23 date does not transform any harm from transitory to irreparable. And to the extent the Court can enjoin the RIF (it cannot), it could have done so weeks ago and can still do so months from now after full adjudication. So Plaintiffs' goldilocks approach dooms their request for a preliminary injunction: either they moved too early for the transition to be final and thus harm them; or they were harmed by the initial work disruption caused by the March 21 administrative leave and thus delayed far too long. *See Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). There is no irreparable harm. On that basis alone, Plaintiffs' preliminary injunction must be denied.

B.      **The balance of equities and public interest favor denial of preliminary injunctive relief.**

The balance of harms and the public interest strongly favor the government here, as an injunction would severely hamper the President's ability to manage his workforce and carry out his policies.  Where the government is a party, these two factors "merge."  *Nken*, 556 U.S. at 435.

Plaintiffs seek an extraordinary and sweeping injunction that will fundamentally impair the President's ability to supervise and manage core parts of one of his Departments.   Plaintiffs demand that:

- Any work the Offices "halted or suspended on or after March 21, 2025 shall resume," even if the work was wholly discretionary. *Id.*

- All employees who "would be subjected to a reduction-in-force on or around March 21, 2025, or otherwise placed on administrative leave since that date," must be restored. *Id.*

-  No employee can be terminated "except for cause related to the specific employee's performance or conduct." *Id.*

- And "Defendants shall not issue any notice of reduction-in-force." *Id.*

The Supreme Court stayed a nearly identical injunction in *OPM v. AFGE*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025).  For good reason. Each one of these requests intrude on Article II and create impractical barriers to the management of these Offices. Yet Plaintiffs seek to transform this Court into a micromanager of the day-to-day, internal operations of a federal agency. But the "well-established rule [is] that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83–84.  Dictating the personnel decisions of an agency contravenes that fundamental principal. The proposed injunction would impinge on the executive branch's flexibility in shifting its resources and staff, which is essential to executing the very policies the President was implemented to enact.  The injunction would lock the agency into a static operational structure that prevents leadership from determining

how best to fulfill the agency's statutory obligations consistent with the President's policy priorities.

Indeed, Plaintiffs would require the executive branch to rehire every employee and be prevented from terminating any of them absent a "for cause" standard they suggest. By itself, reengaging all of these employees would be an enormous and resource intensive task that would distract from the very statutory duties Plaintiffs care about. And Plaintiffs have done nothing to show that every employee is necessary for the Offices to carry out their statutory duties. Yet the requested relief would prevent even ordinary staffing adjustments made by a new administration. And even if every position was necessary, many of these employees have voluntarily agreed to separation. Sartini Decl. ¶ 8. So at least for purposes of preliminary relief, the Court could not order all of the employees to return to work.

Plaintiffs argue that the government is not harmed by an injunction against an unlawful practice and the public interest favors carrying out the statutory functions. Mot.37-38. But, as explained, the Offices are and will continue to perform their statutory duties. Sartini Decl. ¶¶ 9-14. There is nothing unlawful here. And Plaintiffs baseless and speculative concerns about the consequences of the Offices' transition do not change this fact or shift the equities. Mot.39-40. And Plaintiffs are not merely seeking to ensure the statutory functions are carried out. As they make clear, they seek an injunction to restore *all work* that was being conducted prior to March 21, including wholly discretionary actions such as "public engagement activities." Mot.38-39. Agencies are permitted to weigh "many variable involved in the proper ordering of [agency] priorities" without judicial overview of their discretionary decisions. *Heckler*, 470 U.S. at 831-32. Yet Plaintiffs' requested relief would hamstring the Offices and force them to operate as if a

- 44 -

new administration was never elected. Not only does this deprive the Offices of flexibility on how to execute their broad statutory mandates, but also requires completely voluntary work to continue.

From top to bottom, Plaintiffs' proposed relief would inflict severe constitutional harms on the Executive branch and run contrary to the public interest. It frustrates the public's interest in having the Executive Branch effectuate the President's policy priorities—including by reducing the federal government's operational footprint—through lawful direction. The equities and the public interest cannot favor such sweeping and intrusive relief. That is doubly true given Plaintiffs' significant delays in moving for preliminary relief. So the last factors weigh decisively against Plaintiffs' extreme relief.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: May 14, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

EMILY M. HALL
Counsel to the Assistant Attorney General,
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General,
Civil Division

/s/     *Christopher R. Hall*
CHRISTOPHER R. HALL
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 514-4778
Email: Christopher.Hall@usdoj.gov

*Counsel for Defendants*