**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, <br><br> Defendants. | Civil Action No. 25-1270-ACR |

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Michael C. Martinez (DC Bar No. 1686872)
Christine L. Coogle (DC Bar No. 1738913)
Brian D. Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448- 9090

Karla Gilbride (DC Bar No. 1005586)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
kgilbride@citizen.org

*Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284- 6355

Sarah E. Decker (DDC Bar No. NY0566)
Medha Raman (DC Bar No. 90027539)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432

*Counsel for Plaintiff RFK*

May 16, 2025

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

   I.    Plaintiffs are likely to establish standing ......................................................... 3

        A.  Plaintiffs are suffering concrete organizational and informational harms ................................................................................................................. 3

        B.  Plaintiffs' injuries are neither speculative nor self-inflicted ................. 5

   II.   Plaintiffs' claims fall outside the Civil Service Reform Act's statutory scheme, and this Court has jurisdiction to address them ................................................. 8

   III.  Plaintiffs' complaint challenges a discrete, final agency action, and this dispute is therefore ripe .......................................................................................... 11

   IV.  Plaintiffs are likely to prevail on their APA claims ......................................... 14

   V.   Plaintiffs are likely to succeed on their ultra vires claim ................................ 20

   VI.  Plaintiffs will suffer irreparable harm if Defendants' actions are not enjoined .......................................................................................................... 21

   VII.  The balance of equities and public interest favor issuing preliminary injunctive relief .............................................................................................................. 22

CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE v. Trump,*
929 F.3d 748 (2019) ............................................................................................ 8

*AFGE v. Trump,*
--- F. Supp. 3d ----, No. 1:25-cv-03698, 2025 WL 1358477 (N.D. Cal. May 9, 2025) .... 8, 9, 13

*Am. Society for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.,*
659 F.3d 13 (D.C. Cir. 2011)................................................................................ 5

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023) ...................................................................................... 2, 10

*Beattie v. Barnhart,*
663 F. Supp. 2d 5 (D.D.C. 2009)........................................................................ 21

*Biden v. Texas,*
597 U.S. 785 (2022) ........................................................................................... 13

*Block v. Community Nutrition Institute,*
467 U.S. 340 (1984) ............................................................................................. 9

*Bowen v. Michigan Academy of Family Physicians,*
476 U.S. 667 (1986) ........................................................................................... 20

*Campaign Legal Center & Democracy 21 v. FEC,*
952F.3d 352 (D.C. Cir. 2020) .............................................................................. 6

*Chacoty v. Pompeo,*
392 F. Supp. 3d 1 (D.D.C. 2019)........................................................................ 21

*Chamber of Commerce v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996)........................................................................... 20

*Coalition for Humane Immigrant Rights v. DHS,*
--- F. Supp.3d ----, 1:25-cv-00943, 2025 WL 1078776, (D.D.C. Apr. 10, 2025) ...................... 7

*Dart v. United States,*
848 F.2d 217 (D.C. Cir. 1988)...................................................................... 20, 21

*District 50, United Mine Workers of America v. International Union, United Mine Workers of America,*
  412 F.2d 165 (D.C. Cir. 1969) ........................................................................................ 1, 2

*Doctors for America v. OPM,*
  --- F. Supp.3d ----, No. 1:25-cv-00322, 2025 WL 452707, at *3-4 (D.D.C. Feb. 11, 2025) .. 6, 7

*Eco Tour Adventures, Inc. v. Zinke,*
  249 F. Supp. 3d 360 (D.D.C. 2015) ...................................................................................... 21

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) .............................................................................................. 3

*Elgin v. Department of Treasury,*
  567 U.S. 1 (2012) .................................................................................................................. 8

*Environmental Defense Fund v. EPA,*
  922 F.3d 446 (D.C. Cir. 2019) .............................................................................................. 6

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) .............................................................................................................. 7

*Food and Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) .............................................................................................. 1

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
  561 U.S. 477 (2010) ............................................................................................................ 10

*Gordon v. Holder,*
  632 F.3d 722 (D.C. Cir. 2011) ............................................................................................ 21

*Grosdidier v. Chairman, Broadcasting Board of Governors,*
  560 F.3d 495 (D.C. Cir. 2009) .............................................................................................. 8

*Havens Realty Corp. v.* Coleman,
  455 U.S. 363 (1983) .............................................................................................................. 7

*Hubbard v. U.S. EPA Administrator,*
  809 F.2d 1 (D.C. Cir. 1986) ................................................................................................ 20

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) .............................................................................................. 1

*Juliana v. United States,*
  947 F.3d 1159 (9th Cir. 2020) ........................................................................................ 20, 21

*Kingman Park Civic Ass'n v. Bowser,*
    815 F.3d 36 (D.C. Cir. 2016) ................................................................................... 3

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 3, 21

*Love v. Thomas,*
    858 F.2d 1347 (9th Cir. 1988) ............................................................................... 20

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) ............................................................................................... 11

*Maryland v. USDA,*
    --- F. Supp. 3d ----, No. JKB-25-0748, 2025 WL 800216, (D. Md. Mar. 13, 2025) .................. 9

*National Council of Nonprofits v. OMB,*
    --- F. Supp. 3d ----, No. 1:25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ............... 3, 19

*National Environmental Development Association's Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ............................................................................... 12

*National Park Hospitality Ass'n v. Department of the Interior,*
    538 U.S. 803 (2003) ............................................................................................... 12

*National Treasury Employees Union v. Vought,*
    --- F. Supp. 3d ----, No. 1:25-cv-00381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ............ 2, 11

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ................................................................................................. 14

*People for the Ethical Treatment of Animals v. USDA,*
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................................... 7

*Rhode Island v. Trump,*
    --- F. Supp. 3d ----, No. 1:25-cv-00128, 2025 WL 1303868 ............................ 2, 9, 12, 14, 15

*Sackett v. EPA,*
    566 U.S. 120 (2012) ............................................................................................... 12

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ............................................................................................... 10

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 20, 21

*United States v. Fausto,*
  484 U.S. 439 (1988) ........................................................................................... 8

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ......................................................................................... 11

*Whitman-Walker Clinic v. HHS,*
  485 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 8

*Widakuswara v. Lake,*
  --- F. Supp. 3d ----, No. 25-CV-2390, 2025 WL 945869, (S.D.N.Y. Mar. 28, 2025) ............. 11

*Z St., Inc. v. Koskinen,*
  44 F. Supp. 3d 48 (D.D.C. 2014) ....................................................................... 21

**Statutes**

5 U.S.C. § 706(1) ............................................................................................... 15

6 U.S.C. § 124h .................................................................................................. 17

6 U.S.C. § 205 .................................................................................................... 14

6 U.S.C. § 205(a) ............................................................................................... 19

6 U.S.C. § 205(b)(1) ....................................................................................... 5, 18

6 U.S.C. § 205(b)(2) ........................................................................................... 18

6 U.S.C. § 205(b)(3) ....................................................................................... 5, 18

6 U.S.C. § 205(b)(4) ........................................................................................... 18

6 U.S.C. § 205(b)(5) ....................................................................................... 5, 18

6 U.S.C. § 205(b)(6) ........................................................................................... 19

6 U.S.C. § 205(e)19

6 U.S.C § 272 ..................................................................................................... 14

6 U.S.C. § 272(a) ............................................................................................... 19

6 U.S.C. § 272(b)(1) ........................................................................................... 17

6 U.S.C. § 272(b)(2) ...................................................................................... 17, 18

6 U.S.C. § 272(b)(3) .................................................................................................... 18

6 U.S.C. § 272(c) ......................................................................................................... 19

6 U.S.C. § 272(d)(4) .................................................................................................... 18

6 U.S.C. § 272((e) ........................................................................................................ 18

6 U.S.C. § 345 .............................................................................................................. 14

6 U.S.C. § 345(a)(1) ..................................................................................................... 16

6 U.S.C. § 345(a)(2) ..................................................................................................... 16

6 U.S.C. § 345(a)(3) ..................................................................................................... 16

6 U.S.C. § 345(a)(4) ............................................................................................ 5, 16, 19

6 U.S.C. § 345(a)(5) ..................................................................................................... 17

6 U.S.C. § 345(a)(6) ..................................................................................................... 16

6 U.S.C. § 345(b) ......................................................................................................... 19

8 U.S.C. § 1367 ............................................................................................................ 17

20 U.S.C. § 1481 .......................................................................................................... 17

29 U.S.C. § 206 ............................................................................................................ 16

29 U.S.C. § 621 ............................................................................................................ 16

29 U.S.C. § 791 ............................................................................................................ 16

29 U.S.C. § 794 ............................................................................................................ 17

34 U.S.C. § 30301 ........................................................................................................ 17

42 U.S.C. § 2000d to 2000d-7 ..................................................................................... 17

42 U.S.C. § 2000e ........................................................................................................ 16

42 U.S.C. § 2000ee-1(f) ............................................................................................... 19

42 U.S.C. § 2000ee-1(g) ......................................................................................... 4, 16

42 U.S.C. § 2000ff .................................................................................................... 16

42 U.S.C. § 2000gg ................................................................................................... 17

## Regulations

6 C.F.R. Part 115 ..................................................................................................... 17

6 C.F.R. § 15.60 ....................................................................................................... 17

Executive Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ................................. 21

## Other Authorities

DHS Form 3095, Civil Rights Evaluation Tool, https://perma.cc/9J53-ZF4S ............................. 17

Dana L. Gold and Andrea Meza, Letter to Committee Chairs and Ranking Members re: Two
    Protected Whistleblower Disclosures Concerning the Dissolution of DHS's Office for Civil
    Rights and Civil Liberties (May 15, 2025), published by Gov't Accountability Project at
    https://perma.cc/445S-JEB4 ......................................................................................... 14

Paola Nagovitch, Lives cut short in ICE custody: Seven migrants die in Trump's first 100 days,
    El País (May 5, 2025), hhttps://perma.cc/M6ZZ-BNAC ........................................................ 23

## INTRODUCTION

Defendants concede that they have already made a final decision to gut three offices required by Congress to interface with the public by investigating civil rights complaints, responding to requests for assistance with immigration petitions, and monitoring conditions in immigration detention facilities.  Defendants also concede that they have no specific plan for performing the statutorily mandated functions of the Office for Civil Rights and Civil Liberties (CRCL), the Office of the Citizenship and Immigration Services Ombudsman (CISOM), and the Office of the Immigration Detention Ombudsman (OIDO), suggesting vaguely that they may be handled by "shared staff," by contractors, or by "software tools."  Defs. Opp. 38, ECF 19; Declaration of Ronald J. Sartini (Sartini Decl.), ¶ 9, ECF 19-1.

But Plaintiffs Robert F. Kennedy Human Rights (RFK), Urban Justice Center (UJC), and Southern Border Communities Coalition (SBCC) and its members utilize these three DHS Oversight Offices on an ongoing basis to perform their core activities of serving clients, including people in immigration detention facing human rights abuses and noncitizen survivors of domestic violence and/or trafficking, and of monitoring Customs and Border Protection (CBP) activities that affect living conditions on the U.S.-Mexico border.  Since March 21, Plaintiffs have been unable to reach contacts at the DHS Oversight Offices or receive information on the status of pending or newly filed complaints, thus "perceptibly impair[ing] their ability to provide services." *Food and Water Watch, Inc. v. Vilsac*, 808 F.3d 905, 919 (D.C. Cir. 2015).  This is a concrete, ongoing injury caused by Defendants' actions: halting the offices' work through a stop-work directive and reductions in force (RIFs) as to nearly every  employee—actions that Defendants acknowledge taking.  Sartini Decl. ¶¶ 5–7.  To redress the ongoing injury, Plaintiffs seek an order from this Court returning the parties to "the last uncontested status which preceded the pending controversy," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (quoting *District*

*50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)), by restoring employees of the DHS Oversight Offices so that they can resume performing the offices' statutory functions while this matter is litigated to final judgment.

Defendants' challenges to the reviewability of Plaintiffs' claims in this Court are unavailing. First, the statutory review scheme that Congress created under the Civil Service Reform Act, "though exclusive where it applies," does not reach Plaintiffs' claims, which are brought by non-employees and do not challenge individual personnel actions but rather the dissolution of offices and suspension of their functions. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). And far from a "broad programmatic attack" on multiple facets of Defendants' operations, Defs. Opp. 28, Plaintiffs challenge the discrete actions taken on March 21 to order CRCL, CISOM and OIDO employees to cease performing all work tasks, including statutorily required functions. These stop-work orders, as well as the RIF notices that those employees received the same day, constitute final agency action within the meaning of the Administrative Procedure Act (APA), as multiple courts faced with similar types of agency actions have found. *See Nat'l Treasury Emps. Union v. Vought* (*NTEU*), --- F. Supp. 3d ----, No. 1:25-cv-00381, 2025 WL 942772, at *9-12 (D.D.C. Mar. 28, 2025), *stay denied in relevant part,* No. 25-5091 (D.C. Cir. Apr. 11, 2025; as modified Apr. 28, 2025) (stop-work order); *Rhode Island v. Trump*, -- F. Supp. 3d --, No.1:25-cv-128, 2025 WL 1303868, at *3-4, *9 (D.R.I. May 6, 2025) (RIFs terminating majority of staff at three agencies).

Turning to the merits, Defendants repeatedly insist that the DHS Oversight Offices will continue to perform their statutory functions. But Defendants' own declarant admits that Defendants have yet to determine what resources performing those functions will require and have yet to put those resources in place. *See* Sartini Decl. ¶ 9. As a practical matter then, Defendants

concede that they have no plan for performing those functions now, with the employees on leave, or in the immediate aftermath of the RIFs. This "freeze first, ask questions later" approach is arbitrary and capricious. *See Nat'l Council of Nonprofits v. OMB*, --- F. Supp. 3d ----, No. 1:25-cv-00239, 2025 WL 597959, at *14 (D.D.C. Feb. 25, 2025). Moreover, Defendants' stated reason for their actions—that the DHS Oversight Offices performed "duplicative" and "unnecessary" functions, Sartini Decl. ¶ 10—reflects a disagreement with Congress's judgment to establish CRCL, CISOM, and OIDO as distinct, separately funded entities. The executive branch may not simply cease performing functions because it disagrees with the judgment of Congress. *See* Pls. Mem., at 24-25, ECF 15-1.

Because Plaintiffs are likely to succeed on the merits of their APA and ultra vires claims, because they are suffering irreparable harm through the ongoing impairment of their activities, and because the balance of equities and public interest favor these oversight offices remaining in operation without an extended pause or curtailment in function, preliminary injunctive relief is appropriate.

## ARGUMENT

## I.    Plaintiffs are likely to establish standing.

In challenging Plaintiffs' standing, Defendants both misstate the law in critical respects and misstate the nature of Plaintiffs' organizational and informational injuries. The injuries described in Plaintiffs' declarations are neither speculative nor self-inflicted, are directly traceable to Defendants' actions, and are likely to be redressed by an injunction from this Court. In short, Plaintiffs are likely to establish standing.

### A.    Plaintiffs are suffering concrete organizational and informational harms.

At the preliminary injunction stage, a plaintiff's burden is to offer evidence, such as through affidavits, that would demonstrate a "substantial likelihood of standing" if "taken to be

true." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citations and internal quotation marks omitted).  Here, Plaintiffs have offered evidence of how their day-to-day operations are currently being impeded and will continue to be impeded if they can no longer rely on the DHS Oversight Offices to perform the functions they performed in the past.  *See* Enriquez Decl. ¶¶ 4–11 (PLFS-0003–05)); Ziegeweid Decl. ¶¶ 5–14 (PLFS-0010–14); Serrano Decl. ¶¶ 8–12 (PLFS-0017–19).  Plaintiff RFK and SBCC member Immigrant Defenders Law Center also rely on information about complaints publicly posted by CRCL, as 42 U.S.C. § 2000ee-1(g) requires, and are harmed by being deprived of that information. Enriquez Decl. ¶¶ 12–15) (PLFS-0006–07); Cargioli Decl. ¶¶ 9–10 (PLFS-0140–41).  Taken as true, these statements are sufficient to establish organizational and informational standing.

Defendants confusingly structure their standing argument in a way that seems to treat organizational standing as an additional hurdle, first contesting the concreteness of Plaintiffs' asserted injuries, Defs. Opp. 9–16, and then arguing that Plaintiffs lack organizational or associational standing, *id*. 17–20.  But organizational and associational standing are not additional requirements that organizations must meet to establish standing above and beyond the requirements of injury-in-fact, traceability, and redressability; rather, they are alternative methods by which a membership organization like SBCC can establish those requirements.  *See Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016).  Here, all three plaintiffs can establish organizational standing, and SBCC also has associational standing on behalf of its members.

## B.    Plaintiffs' injuries are neither speculative nor self-inflicted.

Defendants label Plaintiffs' assertions of complaint-related injury speculative because CRCL opens formal investigations only on a minority of complaints and OIDO has conducted

relatively few facility inspections compared to the number of complaints it received. Defs. Opp. 10–12. Plaintiffs and SBCC members confirm, however, that CRCL and OIDO remedy conditions in facilities even without opening a formal investigation. *See* Enriquez Decl. ¶ 9 (PLFS-0004–05); St. John Decl. ¶¶ 8–13 (PLFS-0189-92). And OIDO facility inspections, like CRCL investigations, focus on widespread or systemic problems and arise from a different statutory obligation than the obligation to respond to complaints. *Compare* 6 U.S.C. §§ 205(b)(1), (5) (provisions on investigating and resolving complaints and providing assistance to those affected by potential misconduct), *with* 6 U.S.C. § 205(b)(3) (provision on conducting unannounced inspections).

Defendants' characterization of many DHS Oversight Office functions as "internal," Defs. Opp. 14–15, and their assertion that Plaintiffs can trace no injuries to cessation of those functions, is similarly baseless. CISOM's obligation to recommend improvements to USCIS procedures based on recurring problems directly benefits organizations, like Plaintiff UJC, who interact extensively with USCIS in serving their noncitizen clients, Ziegeweid Decl. ¶¶ 7–10 (PLFS-0011–13), and abruptly ending CISOM's advisory role to USCIS will cause entirely predictable, nonspeculative harm to frequent USCIS users like UJC. OIDO's role monitoring conditions in immigration detention supports RFK's mission of stopping human rights abuses in those detention facilities, Enriquez Decl. ¶ 5 (PLFS-0003), such that Defendants' actions suspending OIDO's monitoring work directly conflicts with RFK's mission. *See Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). And CRCL's statutorily required function of "oversee[ing] compliance with constitutional, statutory, … and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities" of DHS, 6 U.S.C. § 345(a)(4), is hardly an internal affair. It concerns whether the civil and

constitutional rights of the millions of American citizens and migrants who interact with DHS personnel will be protected, including the many people in the border region with whom CBP interacts and whose safety is core to the mission of SBCC.  *See* Serrano Decl. ¶ 11 (PLFS-0018) (discussing meetings with CRCL on proper use of force standard for CBP agents).  These statutory functions profoundly impact people outside DHS, and the interruption of these functions since March 21 continues to harm Plaintiffs and SBCC's members.

Plaintiffs' informational injuries, too, are concrete enough to establish standing.  Contrary to Defendants' contention that plaintiffs cannot rely on informational injury absent a statutory private right of action specific to the right to information, Defs. Opp. 13, it is sufficient for standing purposes that Plaintiffs assert they have a right to the information.  For example, in *Campaign Legal Center & Democracy 21 v. FEC*, 952 F.3d 352 (D.C. Cir. 2020) (per curiam), the D.C. Circuit found that the plaintiffs were injured by the Federal Election Commission's failure to disclose campaign spending information as mandated by statute, where disclosure "would further [the nonprofit organizations'] efforts to defend and implement campaign finance reform."  *Id*. at 356.  Similarly, in *Environmental Defense Fund v. EPA*, 922 F.3d 446 (D.C. Cir. 2019), the D.C. Circuit held that an environmental group had raised a "quintessential claim of informational standing" where the statutorily mandated public disclosure of chemical information would "promote [the group's] environmental interests, research, and educational activities."  *Id*. at 452. *See also, e.g., Doctors for America v. OPM*, --- F. Supp. 3d ----, No. 1:25-cv-00322, 2025 WL 452707, at *3-4 (D.D.C. Feb. 11, 2025) (finding likelihood of standing in TRO posture where organizational plaintiff's members stated in declarations that deprivation of information made it more difficult for them to advise patients in clinical settings, and finding that the defendant's counterargument that plaintiffs lacked a legal right to the information "speaks… to the merits, the

viability of which the Court must assume for standing purposes").

Finally, citing *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), Defendants characterize the actions that Plaintiffs are taking to counteract Defendants' injuries to their interests as "classic diversion injuries that cannot establish standing." Def. Opp. 18. That case, however, confirms that, whereas an organization cannot assert standing based merely on "a setback to [its] abstract social interests" or the self-inflicted injury of raising money for litigation or to otherwise oppose the defendant's actions, All. for Hippocratic Med., 602 U.S. at 394, it can establish standing by showing that the defendant's actions "perceptibly impaired" its ability to perform its core activities. *Id*. at 395 (citing *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1983)). Here, the additional resources Plaintiffs attested to expending as a result of Defendants' actions relate to the services they provide to detained people (RFK), border residents (SBCC) and domestic violence survivors (UJC), and the alternative, more costly or less effective means they must use to provide those services if they can no longer rely on the assistance provided by CRCL, CISOM, and OIDO. Enriquez Decl. ¶ 15 (PLFS-0007); Serrano Decl. ¶ 14 (PLFS-0019); Ziegeweid Decl. ¶¶ 8–9 (PLFS-0011–12). This is precisely the sort of expenditure of resources to counteract a defendant-inflicted injury that courts in this district have found adequate to confer standing. *See Coal. for Humane Immigrant Rts. v. DHS*, --- F. Supp. 3d ----, 1:25-cv-00943, 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (explaining that an organization could establish standing if its "activities were impeded by the government," such as by having to "expend resources to seek relief through other, less efficient and effective means") (quoting *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)) (appeal pending).

Defendants suggest, without authority, that the harms described by SBCC members are insufficient for those members to establish standing in their own right, thus undermining SBCC's

associational standing. Defs. Opp. 20. But the statement from Immigrant Defenders Law Center

that being deprived of the assistance that all three DHS Oversight Offices have afforded in the past

will make it more difficult to serve its immigrant clients, Cargioli Decl. ¶¶ 3–8, 15 (PLFS-0138–

39, PLFS-0142), describes a sufficiently concrete injury to establish standing. *See Whitman-

Walker Clinic v. HHS*, 485 F. Supp. 3d 1, 21–22 (D.D.C. 2020) (finding standing where

government's actions "perceptibly impaired" health clinic's "ability to provide services" by

forcing them to deliver "costlier and more difficult treatment") (citations and internal quotation

marks omitted). Defendants' challenge to SBCC's associational standing fails.


## II.    Plaintiffs' claims fall outside the Civil Service Reform Act's statutory scheme, and this Court has jurisdiction to address them.

Defendants suggest this case should be channeled into the administrative review

mechanisms provided by the Civil Service Reform Act (CSRA), despite acknowledging that

Plaintiffs could obtain no relief through those mechanisms. Defs. Opp. 21–27. The CSRA

administrative review schemes were designed to adjudicate the claims of federal employees or

their unions regarding personnel actions affecting federal employees. Not surprisingly, then, cases

in which courts have held that a plaintiff's claim must be resolved in an administrative forum

involve claims brought by employees or their unions. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567

U.S. 1, 6 (2012); *United States v. Fausto*, 484 U.S. 439, 441 (1988); *AFGE v. Trump*, 929 F.3d

748, 752 (2019); *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495 (D.C. Cir. 2009).

By contrast, where, as here, the claims are not brought by or on behalf of employees, district courts

have retained jurisdiction. *See AFGE v. Trump*, --- F. Supp. 3d ----, No. 1:25-cv-03698, 2025 WL

1358477, at *15 (N.D. Cal. May 9, 2025) (noting that the CSRA "says nothing at all" about

nonprofit organizations, and finding it unlikely that "when Congress created the Merit Systems

Protection Board or the Federal Labor Relations Authority, it intended for constitutional and APA claims by these sorts of plaintiffs to be precluded from federal court") (appeal pending); *Rhode Island v. Trump*, 2025 WL 1303868, at *7–8 (finding CSRA inapplicable to claims by states because that scheme is limited to "federal employees' disputes over employment decisions"); *Maryland v. USDA*, --- F. Supp. 3d ----, No. JKB-25-0748, 2025 WL 800216, at *14 (D. Md. Mar. 13, 2025) (rejecting the argument that the non-employee plaintiffs challenging mass termination of employees were "interjecting" themselves into the employment relationship, where those plaintiffs had suffered "unique harms" independent of "those harms' connection with the employee-agency relationship") (appeal pending).

Citing *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Defendants argue that allowing Plaintiffs to litigate in district court claims that touch factually on a RIF affecting federal employees would "facilitate circumvention" of the CSRA's statutory scheme.  Defs. Opp. 22–23. In *Block*, the statutory scheme at issue established a mechanism for dairy handlers—but not consumers—to seek review of milk market orders issued by the Secretary of Agriculture.  *Block,* 467 U.S. at 347.  The Supreme Court held that the omission of consumers from the review provision indicated that Congress intended to foreclose consumer review.  *Id.*  Here, unlike in *Block*, Plaintiffs' claims fall entirely outside the scope of the statutory schemes related to federal personnel.  Moreover, Defendants' breathtakingly capacious understanding of the scope of the CSRA would mean that no plaintiff could ever challenge any government action that in any way relates to or impacts federal employees—an atextual reading of those statutes that goes far beyond what Congress intended.

Applying the analytical framework established by the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994), leads to the same conclusion: These claims belong

in court and not before the CSRA's administrative adjudicators. While the CSRA's scheme establishes a "fairly discernible" intent to limit jurisdiction, the claims here, brought by these non-employee, non-union plaintiffs, are not "of the type Congress intended to be reviewed within" that scheme. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 207, 212). Courts "presume that Congress does not intend to limit jurisdiction" if "a finding of preclusion could eliminate all meaningful judicial review," as would be the case if these non-employee plaintiffs' claims were channeled to a forum that cannot adjudicate them. *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13). Here, no one can bring through the administrative channels claims that, in the guise of a RIF, Defendants have terminated the DHS Oversight Offices' performance of statutorily mandated activities. Finally, there is no doubt that Plaintiffs' claims are "outside the [federal employment agencies'] expertise." *Thunder Basin*, 510 U.S. at 212. Plaintiffs' claims "raise 'standard questions of administrative' and constitutional law," and the statutory obligations Plaintiffs invoke are "distant from [those agencies'] competence and expertise." *Axon*, 598 U.S. at 194 (quoting *Free Enterprise Fund*, 561 U.S. at 491); *see id.* (noting that the MSPB and FLRA know "a good deal" about federal labor and personnel law, but "nothing special about the separation of powers").

Finally, despite Defendants' focus on the relief requested, Defs. Opp. 25, that the remedy Plaintiffs seek for Defendants' unlawful dissolution of offices performing statutorily required functions may address the termination of employees whose presence is necessary to the performance of those functions does not transform this challenge to the unlawful dissolution of the DHS Oversight Offices into an employment dispute. *See NTEU*, 2025 WL 942772, at *46 (preliminarily enjoining actions to shut down the Consumer Financial Protection Bureau and ordering that "Defendants shall not terminate any CFPB employee, except for cause related to the

10

individual employee's performance or conduct; and Defendants shall not issue any notice of reduction-in-force to any CFPB employee") (appeal pending); *Widakuswara v. Lake*, --- F. Supp. 3d ----, No. 1:25-cv-2390, 2025 WL 945869, at *11 (S.D.N.Y. Mar. 28, 2025) (temporarily enjoining further actions to dissolve the U.S. Agency for Global Media (USAGM) and ordering that the defendants may "not take any action to reduce USAGM's workforce" including by "proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee").  This Court may require similar employment-related interim remedies to preserve the status quo without transforming this case into an employment dispute that must be handled in a different forum.

### III.    Plaintiffs' claims challenge final agency action, and this dispute is therefore ripe.

Plaintiffs challenge a discrete agency action: the March 21 stop-work order and placement of virtually all CRCL, CISOM, and OIDO employees on leave.  Those actions brought to a halt the functioning of the three DHS Oversight Offices.  Contrary to Defendants' assertion, Defs. Opp. 28, Plaintiffs are not seeking "general judicial review" of DHS's "day-to-day operations."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  They are asking this Court to review and set aside Defendants' precipitous action to shut down offices that Congress established to perform vital oversight of DHS.  The stop-work order certainly qualifies as an "action" under the APA, a broad term that "cover[s] comprehensively every manner in which an agency may exercise its power."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).  And it is the sort of agency action that other courts have found to constitute a discrete, final action triggering APA review in factually analogous circumstances.  *See NTEU*, 2025 WL 942772, at *9–12 (discussing a stop-work order at the Consumer Financial Protection Bureau).

Defendants relatedly charge that Plaintiffs' challenge is not ripe because the DHS Oversight Offices have not been closed but are merely going through a reorganization.  The

ripeness doctrine is intended to prevent courts "from entangling themselves in abstract disagreements." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003). But where the harm-precipitating event—here, the work stoppage and near-total RIF—has already occurred, there is nothing abstract about the resulting dispute. Plaintiffs should not have to wait for further harms to materialize before enlisting this Court's assistance. *See Rhode Island v. Trump*, 2025 WL 1303868, at *5 (rejecting the defendants' ripeness challenge where the plaintiffs pointed to drastic reductions in force at government agencies and agency employee testified that the few remaining employees would not be able to administer the existing grants and grant applications on which the plaintiffs relied). Just so here. Sartini Decl. ¶¶ 5–7 (all employees in all three offices subject to RIF); Fleischaker Decl. ¶¶ 33–46 (PLFS-0147–50); A. Doe Decl. ¶¶ 7–9 (PLFS-0153–58); Vitullo Decl. ¶ 3 (PLFS-0174–75).

For similar reasons, the challenged action is final. "The mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see also Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006–07 (D.C. Cir. 2014) (stating that agency action may be final even if it is subject to change). Even if Defendants later decide to hire more employees or transfer statutory functions of the DHS Oversight Offices to others, as Defendants' declarant suggests they may do, the fact remains that in the RIF notices issued to CRCL, CISOM, and OIDO employees on March 21, Defendants stated that all three offices were being dissolved. *See* Enriquez Decl. ¶ 17 (PLFS-0007); A. Doe Decl. Ex. D (PLFS-0163–67); Vitullo Decl. Ex. E (PLFS-0179a). Defendants issued RIF notices, publicly declared the offices shuttered, and placed employees on administrative leave or convinced them to resign through a "Workforce Transition Program," ahead of the May 23 RIF date. *See* Sartini Decl. ¶ 8. These were not tentative adjustments; they were definitive acts

with immediate legal consequences.  *See AFGE v. Trump*, 2025 WL 1358477, at *20 ("The record presently before the Court indicates that [plans to institute RIFs, once approved] are final agency actions under the APA.").

Defendants suggest that Plaintiffs cannot challenge the final agency action because the legal consequences affect agency employees, not Plaintiffs themselves.  Defs. Opp. 29.  But the APA's requirement that agency action be final does not specify on whom the legal consequences must fall.  *See Biden v. Texas*, 597 U.S. 785, 808 (2022) (finding a memorandum to be final agency action because it "bound DHS staff" even though those employees did not bring the APA action).  And in the weeks after the stop-work order, the rights of others outside of DHS, including the plaintiffs, were also affected.  People with pending requests for CISOM assistance continued to email CISOM employees about their cases but received no reply because the terms of the stop-work order prevented CISOM employees from responding.  A. Doe Decl. ¶¶ 17–18 (PLFS-0159).  OIDO employees similarly continued receiving requests for assistance from detained individuals and from staff at detention facilities, to whom they could not respond.  Vitullo Decl.  ¶ 14 (PLFS-0177).  And a public whistleblower disclosure from employees of CRCL sent to Congress on May 15 notes that on March 21, approximately 550 complaints were being investigated by CRCL, including around 25 sexual abuse investigations and around 20 investigations of disability discrimination under Section 504 of the Rehabilitation Act, which are subject to a 180-day response deadline.[1]  Only a few contractors are left to enter new CRCL complaints into the system,

---

[1]    https://whistleblower.org/wp-content/uploads/2025/05/05-15-2025-GovAcctProj-Whistleblower-Disclosures-to-Congress-re-CRCL.pdf1 Dana L. Gold and Andrea Meza, Letter to Committee Chairs and Ranking Members re: Two Protected Whistleblower Disclosures Concerning the Dissolution of DHS's Office for Civil Rights and Civil Liberties (May 15, 2025), published by Gov't Accountability Project at https://perma.cc/445S-JEB4.DHS Form 3095, Civil Rights Evaluation Tool, https://perma.cc/9J53-ZF4S.[4]  In any event, the executive order that

and they lack the subject matter expertise to investigate those complaints.[2]  This tranche of post-March 21 complaints includes complaints from Plaintiffs, as well as SBCC members.  Supplemental Enriquez Decl. ¶ 3;  Ziegeweid Decl. ¶ 13) (PLFS-0013–14); Cargioli Decl. ¶ 13 (PLFS-0142); Horan Decl. ¶ 6 (PLFS-0142).  Though Defendants insist that complaints will still be "process[ed]," Defs. Opp. 10, Plaintiffs have seen no evidence of post-March 21 processing to date.

## IV.    Plaintiffs are likely to prevail on their APA claims.

As Plaintiffs have explained, Defendants' actions halting the performance of statutorily required functions were contrary to law.  Halting the work of the DHS Oversight Offices was also arbitrary and capricious—an action taken without a reasoned explanation or consideration of reliance interests.  *See* Pls. Mem. 27–35.

**A.**  Defendants first argue that Plaintiffs improperly ask to intrude on the reasonable exercise of agency discretion.  Defs. Opp. 32.  But Plaintiffs are not challenging the way in which Defendants are  performing their work.  They challenge a completed, affirmative agency decision to functionally eliminate CRCL, CISOM, and OIDO, which perform functions Congress explicitly mandated.  How Defendants perform these functions is within the agency's discretion, but perform them, they must.  And Defendants have provided no evidence that they can do so without staff.

---

Defendants cite as the basis for the RIF does not seem to apply here, as it excludes offices and agencies engaged in public safety, immigration enforcement, and law enforcement. *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

1 Dana L. Gold and Andrea Meza, Letter to Committee Chairs and Ranking Members re: Two Protected Whistleblower Disclosures Concerning the Dissolution of DHS's Office for Civil Rights and Civil Liberties (May 15, 2025), published by Gov't Accountability Project at https://perma.cc/445S-JEB4.DHS    Form    3095,    Civil    Rights    Evaluation    Tool, https://perma.cc/9J53-ZF4S.[4]  In any event, the executive order that Defendants cite as the basis for the RIF does not seem to apply here, as it excludes offices and agencies engaged in public safety, immigration enforcement, and law enforcement. *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

By contrast, in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 63 (2004), on which Defendants principally rely, Def. Opp. 30–31, the plaintiffs sought to challenge actions with respect to which the agency retained discretion.  Here, Plaintiffs challenge no such discretionary acts.  Rather, Congress mandated the performance of duties by CRCL, CISOM, and OIDO, *see* 6 U.S.C. §§ 205, 272, 345, and Defendants have halted the performance of those duties.

The assertion that a handful of personnel remain does not change the analysis.  "[W]ith its substantial reduction of personnel from" about 400 to three, "nothing suggests that [an agency's] remaining employees can continue to perform its statutory duties."  *Rhode Island v. Trump*, 2025 WL 1303868, at *11-12 (explaining at preliminary injunction phase that) "with its substantial reduction of personnel from about 200 to fifteen, nothing suggests that [agency's] remaining employees can continue to perform its statutory duties").  The DHS Oversight Offices continue to exist in name only.  The APA does not permit an agency to preserve the façade of compliance while hollowing out the functions Congress has required.

Defendants' post hoc rationalizations and descriptions of potential upcoming plans do not alter this conclusion.  As Defendants' declarant confirms, the vast majority of staff have been placed on administrative leave or convinced to depart.  *See* Sartini Decl. ¶ 6 ("DHS proposed eliminating 46 positions in OIDO, 118 positions in CISOMB, and 147 positions in CRCL. These figures represented the entire staff of these Components, excluding employees in the Senior Executive Service.").  With such bare-bones staffing, Defendants have made compliance with the statutory mandates impossible.

This case falls well within the APA's scope.  Plaintiffs seek review of a completed agency decision that terminated statutory functions—not review of a failure to initiate enforcement or manage personnel more efficiently.  The higher mandamus-like standard of 5

U.S.C. § 706(1) simply does not apply here.

**B.** Defendants' statement that they have never "disclaimed" their statutory obligations, Defs. Opp. 33, ignores that both the RIF notices and an email sent from a DHS email address (although apparently without DHS authorization, Sartini Decl. ¶ 14) to people filing complaints with OIDO stated that the DHS offices had undergone "dissolution" or been "abolished." Enriquez Decl. ¶ 17 (PLFS-0007); A. Doe Decl. Ex. D (PLFS-0163–67); Vitullo Decl. Ex. E (PLFS-0179a); Horan Decl. ¶ 6 & Ex. G (PLFS-0183, PLFS-0187). Moreover, Defendants do not explain in anything but the most cursory manner how the three employees remaining on staff could conceivably perform the numerous functions mandated by Congress. These statutorily required functions include the following:

1) For CRCL: reviewing and investigating complaints of civil rights abuses, civil liberties abuses, and profiling (6 U.S.C. § 345(a)(1), (6));

2) For CRCL: reporting to the public on its functions, on how to file complaints, and on its activities, including the content and disposition of complaints (6 U.S.C. § 345(a)2), 42 U.S.C. § 2000ee-1(g));

3) For CRCL: assisting DHS to develop, implement, and periodically review policies and procedures to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities (6 U.S.C. § 345(a)(3));

4) For CRCL: overseeing DHS compliance with constitutional, statutory, regulatory, policy, and other requirements related to the civil rights and civil liberties of people affected by DHS programs and activities (6 U.S.C. § 345(a)(4)). Examples include:

   a. CBP compliance with Fourth Amendment principles regarding searches at

border checkpoints and points of entry;

b.   TSA compliance with prohibitions on racial or religious profiling during

airport security screenings;

c.   ICE compliance with Sixth Amendment access to counsel principles for

immigrants in detention facilities;

d.   ICE and CBP compliance with First Amendment principles preventing

immigration enforcement from being impacted by protected speech or

religious exercise;

e.   Compliance of all DHS components with equal employment opportunity

(EEO) laws including the Equal Pay Act (29 U.S.C. § 206), the Age

Discrimination in Employment Act (29 U.S.C. § 621 et seq), the

Rehabilitation Act of 1973 (29 U.S.C. § 791 et seq.), Title VII of the Civil

Rights Act (42 U.S.C. § 2000e et seq.), the Genetic Information

Nondiscrimination Act (42 U.S.C. § 2000ff et seq.), and the Pregnant Workers

Fairness Act (42 U.S.C. § 2000gg et seq.);

f.   Compliance of DHS grant recipients with the civil rights obligations of their

grants;[3]

g.   Compliance of all DHS components with Title IX regarding

nondiscrimination on the basis of sex, 20 U.S.C. §§ 1481 *et seq.*;

h.   Compliance of all DHS components with Section 504 of the Rehabilitation

---

DHS Form 3095, Civil Rights Evaluation Tool, https://perma.cc/9J53-ZF4S.[4]  In any event, the executive order that Defendants cite as the basis for the RIF does not seem to apply here, as it excludes offices and agencies engaged in public safety, immigration enforcement, and law enforcement. *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

act, 29 U.S.C. § 794, regarding discrimination on the basis of disability, and 6 C.F.R. § 15.60, the Rehabilitation Act's implementing regulation for DHS ;

i.   Compliance of all DHS components with Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d to 2000d-7, regarding discrimination on the basis of race or national origin;

j.   Compliance of ICE and other DHS components with the Prison Rape Elimination Act, 34 U.S.C. §§ 30301 *et seq.*, and its implementing DHS regulation, 6 C.F.R. Part 115; and

k.   Compliance of USCIS and other DHS components with the confidentiality provisions of the Violence Against Women Act, 8 U.S.C. § 1367;

5) For CRCL: training state and local law enforcement partners at fusion centers on civil rights and civil liberties (6 U.S.C. § 124h);

6) For CRCL: coordinating with the Privacy Officer (6 U.S.C. § 345(a)(5);

7) For CISOM: assisting individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services (6 U.S.C. § 272(b)(1));

8) For CISOM: identifying areas in which individuals and employers have problems dealing with USCIS (6 U.S.C. § 272(b)(2));

9) For CISOM: proposing changes in USCIS's administrative practices to mitigate recurring problems (6 U.S.C. § 272(b)(3));

10) For CISOM: establishing and staffing local ombudsman's offices (6 U.S.C. § 272(d), (e));

11) For CISOM; meeting regularly with the director of USCIS to discuss serious problems and make recommendations for improvement (6 U.S.C. § 272(d)(4));

12) For OIDO: establishing and administering an independent, neutral, and confidential process for investigating and providing redress for situations where DHS personnel or contractors are found to have engaged in misconduct or violated the rights of people in immigration detention (6 U.S.C. § 205(b)(1));

13) For OIDO: establishing an accessible and standardized complaint process for reporting violations of law, standards of professional conduct, contract terms, or policy related to immigration detention (6 U.S.C. § 205(b)(2));

14) For OIDO: conducting unannounced inspections of detention facilities holding individuals in federal immigration custody, including facilities operated by private entities or by state or local governments (6 U.S.C. § 205(b)(3));

15) For OIDO: making recommendations to address concerns or violations of contract terms identified in reviews, audits, investigations, or detainee interviews (6 U.S.C. § 205(b)(4));

16) For OIDO: assisting individuals affected by potential misconduct, excessive force, or violations of detention standards by DHS staff or contractors (6 U.S.C. § 205(b)(5));

17) For OIDO: ensuring that OIDO functions are complementary to existing functions within DHS (6 U.S.C. § 205(b)(6)); and

18) For all DHS Oversight Offices: providing annual reports to Congress.  6 U.S.C. § 345(b); 42 U.S.C. § 2000ee-1(f); 6 U.S.C. § 272(c); 6 U.S.C. § 205(e).

Defendants suggest that "other DHS components" may be able to assist in performing the functions of the DHS Oversight Offices.  Defs. Opp. 34.  But such involvement from other components would run afoul of the scheme established by Congress, which gave CRCL oversight responsibilities over other DHS components' compliance with various laws, 6 U.S.C. § 345(a)(4),

and required that CISOM and OIDO be independent from other components of DHS, 6 U.S.C. §§ 272(a), 205(a).  And while the Office of Inspector General has the right of first refusal to investigate complaints referred to CRCL, *see* Defs. Opp. 36, that right is rarely exercised.  *See* Pls. Mem. 10 (noting that the Office of Inspector General investigated only two of the 3,154 complaints received by CRCL in fiscal 2023).

Finally, as to both mandated and discretionary activities of the DHS Oversight Offices, the chaotic and unreasoned nature of Defendants' actions renders them arbitrary and capricious. Defendants failed to take into account the reliance interests of the many people who interact with the DHS Oversight Offices.  Indeed, that they initiated the stop-work order and RIF before formulating a plan for how to continue performance of the Oversight Offices' statutorily required functions, *see* Sartini Decl. ¶ 9, underscores the arbitrariness and capriciousness of Defendants' actions.  *See Love v. Thomas*, 858 F.2d 1347,1363 (9th Cir. 1988) (holding that agency acted arbitrarily and capriciously by "suspending first and asking questions later"); *Nat'l  Council of Nonprofits*, 2025 WL 597959, at *14.

## V.    Plaintiffs are likely to succeed on their ultra vires claim.

Courts "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 (1986)); *see also Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority.").   "[T]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself." *Trudeau v. FTC*, 456 F.3d 178, 190 n.22 (D.C. Cir. 2006) (quoting *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986)).

"Nothing in the APA evinces … an intent" to bar courts from exercising this traditional jurisdiction over constitutional claims. *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) (rejecting argument that "APA's comprehensive remedial scheme for challenging the constitutionality of agency actions implicitly bars the plaintiffs' freestanding constitutional claims"); *see also Trudeau*, 456 F.3d at 185 ("[T]he APA neither confers nor restricts jurisdiction.") As then-Judge Ketanji Brown Jackson explained, "the Constitution itself" provides "a cause of action independent of the APA" that "eschew[s] the statutory requirements that apply only to APA claims." *Z St., Inc. v. Koskinen,* 44 F. Supp. 3d 48, 65 (D.D.C. 2014), *aff'd,* 791 F.3d 24 (D.C. Cir. 2015); *see also*, *e.g.*, *Trudeau*, 456 F.3d at 189–90 (recognizing stand-alone constitutional claim separate from the APA and its final agency action requirement); *Juliana*, 947 F.3d at 1167–68 (compiling cases); *Chacoty v. Pompeo*, 392 F. Supp. 3d 1, 12 (D.D.C. 2019).

Defendants' argument that Plaintiffs are not likely to succeed on their ultra vires claim fails to engage with any of this precedent. While Defendants contend that the RIF is "a lawful exercise of [DHS's] statutory authority," Defs. Opp. 39, they cite no provision of law that allows them to cease statutorily required activities.

## VI.    Plaintiffs will suffer irreparable harm if Defendants' actions are not enjoined.

The injuries Plaintiffs are experiencing are both "great and certain to occur," and legal remedies are inadequate. *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Plaintiffs are currently expending resources based on perceptible impairment of their core activities to respond to actions of Defendants that directly conflict with their missions. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).

Defendants point to the length of time between the stop-work order and Plaintiffs' filing of the preliminary injunction motion, but "a delay in filing is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Courts have

looked to delay as an additional factor where irreparable harm was not present, or where the harm had already ceased, rendering an injunction moot.  *See Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360 (D.D.C. 2015).  Here, by contrast, the harm to Plaintiffs is ongoing, and the need for urgent action is heightened because of the impending separation date of May 23.  Preliminary injunctive relief is warranted.

## VII.    The balance of equities and public interest favor issuing preliminary injunctive relief.

Defendants contend that the final preliminary injunction factor favors them because the President must be able to manage his workforce and carry out his policies.  Defs. Opp. 43.  But the President's authority is circumscribed by the Constitution and statutes enacted into law. Defendants' generalized call to the President's policy preferences cannot override these basic tenets of our constitutional form of government.[4]

On the other side of the equity ledger, the human costs of a DHS bureaucracy unmoored from the congressionally mandated oversight mechanisms of CRCL, CISOM and OIDO continue to mount.  For example, seven people have died in ICE detention in the last three months.[5]  As former CRCL official Deborah Fleischaker put it, ensuring that DHS officials comply with the Constitution and civil rights laws is "not a ceremonial or symbolic task."  Fleischaker Decl. ¶ 46 (PLFS-0149–50).  It is a serious obligation, codified in the Homeland Security Act by Congress. Defendants' decision to stop performing that obligation, or to outsource it to a "software tool," Sartini Decl. ¶ 9, imperils the public interest.

---

[4]  In any event, the executive order that Defendants cite as the basis for the RIF does not seem to apply here, as it excludes offices and agencies engaged in public safety, immigration enforcement, and law enforcement. *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

[5]    https://english.elpais.com/usa/2025-05-05/lives-cut-short-in-ice-custody-seven-migrants-die-in-trumps-first-100-days.html

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: May 16, 2025                    Respectfully submitted,

                                       /s/ Karla Gilbride
Michael C. Martinez (DC Bar No. 1686872)    Karla Gilbride (DC Bar No. 1005586)
Christine L. Coogle (DC Bar No. 1738913)    Adina H. Rosenbaum (DC Bar No. 490928)
Brian D. Netter (DC Bar No. 979362)         Public Citizen Litigation Group
Skye L. Perryman (DC Bar No. 984573)        1600 20th Street NW
Democracy Forward Foundation                Washington, DC 20009
P.O. Box 34553                              (202) 588-1000
Washington, DC 20043                        kgilbride@citizen.org
(202) 448-9090

*Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)    Sarah E. Decker (DDC Bar No. NY0566)
Sarah T. Gillman (DDC Bar No. NY0316)    Robert F. Kennedy Human Rights
Robert F. Kennedy Human Rights           1300 19th Street NW, Suite 750
88 Pine Street, Suite 801                Washington, DC 20036
New York, NY 10005                       (202) 559-4432
(917) 284- 6355

*Counsel for Plaintiff RFK*