**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 25-1270-ACR |
| U.S. DEPARTMENT OF HOMELAND SECURITY *et al.*, | |
| *Defendants*. | |

**DECLARATION OF TAYLOR DOE**

I, Taylor Doe, declare as follows:

1. I am over the age of 18 and competent to testify to the matters described below. I am submitting this declaration under a pseudonym, as I am currently involuntarily separated from the Department of Homeland Security (DHS) as of May 23, 2025 and will be receiving severance pay, and fear possible retaliation from DHS for my testimony.

2. Until March 21, 2025 I worked at DHS's Office for Civil Rights and Civil Liberties (CRCL) as a Senior Policy Advisor. Thereafter I was placed on administrative leave after the entire office was "eliminated" (per DHS's Office of the Chief Human Capital Officer), and then involuntarily separated on May 23rd.

3. I submit this declaration to describe some of the oversight responsibilities that CRCL staff, like me, were required to perform, and the grave consequences on the ground due to the lack of

such oversight, since March 21st. This declaration is based on my personal knowledge, professional experience, and information that has been shared with me through conversations with my former colleagues.

4. The Plaintiffs have already submitted a comprehensive overview of CRCL's statutory authorities and mandates, which require that CRCL provide oversight and guidance on DHS's programs, policies, and procedures, including those of DHS's components, including Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP). These authorities and mandates are also further explained in the Whistleblower Disclosure filed with Congress by the Government Accountability Project on behalf of anonymous employees of CRCL on May 15, 2025 and attached hereto as Exhibit 1.

5. I believe that the very existence of a robust CRCL performing its statutory functions had a deterrent effect on some of the worst violations of civil rights and civil liberties. Given that CRCL is not currently operational, DHS is operating undeterred by the prospect of any civil rights oversight or enforcement.

6. Importantly, CRCL worked closely with all DHS components at both the leadership and working-level, and its oversight was integrated into much of the work of the Department. For example, CRCL Policy Advisors served on a variety of intra- and inter-agency working groups to provide regular input and oversight on issues that were likely to impact civil rights and civil liberties. CRCL's oversight responsibilities often began even before a DHS program or policy was instituted, in the pilot stages. CRCL's Policy Advisors would also learn about alleged civil rights or civil liberties violations from stakeholders and raise the concerns directly with staff members at DHS or its components. CRCL staff would request and receive briefings on

component activities; would review, draft, and help update relevant policies and procedures to ensure they protected civil rights and civil liberties; and would perform observational site visits and draft reports containing advice and recommendations for DHS and component leadership. CRCL leadership regularly raised issues of concern regarding policies and program execution in standing meetings with Component heads.  The Secretary would also sometimes ask the CRCL Officer to assign staff to investigate a particular issue or concern and prepare memoranda for the Secretary containing CRCL's observations and recommendations.

7. The following paragraphs describe some examples of oversight that CRCL could have provided DHS offices and components, which would have mitigated the civil rights and civil liberties, statutory, and constitutional violations that are alleged and reported to be taking place now.

8. Since early March 2025, ICE has detained many individuals (and only upon court orders released some of these individuals) reportedly for speaking out on topics that the administration objects to. Examples of such individuals include Mahmoud Khalil, Rumeysa Öztürk, Badar Khan Suri, Leqaa Kordia, Mohsen Mahdawi, Doğukan Günaydın, Mohammed Hoque, and others. In its oversight and advisory role, CRCL could have looked into the purpose of such arrests, and cautioned that unless there was a legitimate law enforcement or immigration related reason, such arrests are constitutionally and statutorily suspect, and could result in the chilling of free speech.

9.  Since March 15, 2025, DHS has deported many individuals to El Salvador who have been imprisoned in its Terrorism Confinement Center (CECOT). In its oversight role, CRCL would have raised significant concerns about the legality of deporting individuals who would be

incarcerated in a foreign prison that the media has likened to a concentration camp. CRCL would have questioned the legitimacy of using the Alien Enemies Act of 1798 when there is no war or foreign invasion; noted the lack of due process and violation of international law (including the principle of "non-refoulement"); and questioned the validity of evidence of individuals being members of the gang Tren de Agua (e.g. using tattoos as evidence, when tattoos are not a reliable indicator of membership).

10. In the last several months, ICE has dramatically increased the use of plain-clothes officers with face masks to prevent identification during immigration enforcement actions. Under DHS policies and procedures, ICE officers are required to identify themselves, present their badge and official identification when requested. While there are exceptions (e.g. due to sensitive or undercover criminal operations), use of plain-clothes officers should be quite uncommon. CRCL would have expressed serious concerns and raised questions about what appear to be new standard operating procedures; and requested relevant policies for examination and oversight. CRCL would have warned that such actions by ICE create public mistrust and pose a threat to public safety.

11. The 287(g) program authorizes ICE to delegate state and local law enforcement the authority to perform specified immigration enforcement functions under ICE supervision. CRCL has consistently been tasked with oversight of the 287(g) program, most recently in the Joint Explanatory Statement accompanying the 2024 DHS Appropriations Act, which requires CRCL to publish a comprehensive assessment of 287(g) jurisdictions and assess civil rights concerns stemming from 287(g) activities. While work on this Congressionally-mandated report was ongoing on March 21, 2025, the report has not since been published. Additionally, since March 2025, ICE has continued to massively expand the number of jurisdictions participating in the

287(g) program; since January ICE has reintroduced the "task-force model" which allows law enforcement to perform certain immigration enforcement actions during the course of their normal policing. This expansion has occurred without any oversight or civil rights policy expertise from CRCL, in plain contravention of Congress's mandated role for CRCL in this program. Current public concerns on issues of racial profiling, pretextual policing and expanded immigration enforcement in communities of color that would likely have been addressed by CRCL--as required by Congress--currently have no means of redress and no oversight.

12.  CRCL had broad oversight authority over DHS data collection and information sharing programs and policies. Generally, when DHS or a component agency initiated a new program, pilot, or initiative (including artificial intelligence) that might impact individual civil rights and civil liberties, CRCL would be involved early in the development and certainly prior to any deployment. CRCL's role would have been to provide oversight and input into the development of all appropriate protections, including policies, processes, and mitigation measures such as access controls and rules of behavior. Currently there is no oversight over DHS's new contracts with Palantir Technologies, and its reported efforts to share information and data broadly across federal agencies.  ICE's recent $30 million contract with Palantir (to track the movement of immigrants in real time for the purposes of immigration enforcement and national security investigations) could result in the misuse of data and result in large scale violations of civil rights and civil liberties, without proper oversight and accountability. This includes the risk of potentially sharing data of US Citizens, as well as non-citizens for purposes well outside of DHS's role and mission.

13. These are just some of the many examples of CRCL oversight that would and should be occurring to fulfil CRCL's statutory mandates, but that have not been occurring since March 21,

2025. It is difficult to understand how DHS plans on using detailees, and a few new "Law Enforcement Specialists" (as the job postings label the new employees who will eventually be hired) to perform the myriad oversight and investigative functions that were formerly performed by highly-experienced CRCL staff. In fact, in reading the job descriptions for the newly advertised positions in CRCL, it appears that DHS intends to turn civil rights on its head, by having CRCL staff protect the "civil rights" of ICE employees from peaceful protesters. So rather than protecting civil rights, it appears the reconstituted office may be involved in suppressing civil rights. This is clearly not what the relevant statutes and authorities creating and authorizing CRCL intended.

14. As Plaintiffs note in their June 2, 2025 Status Report, the fastest way to restore and preserve CRCL's oversight and investigative responsibilities, is to promptly return all of the experienced former CRCL staff to their roles. Under RIF procedures, they were supposed to be entitled to stay with their statutory work that was continuing, a rule that was likely intended to prevent just the sort of knowledge gaps and lack of civil rights compliance that is currently occurring. DHS initially claimed they were abolishing the office and therefore could not retain any of the experienced staff, but when faced with the illegality of abolishing statutorily mandated work, they created a disingenuous plan that would not really continue the statutory work in earnest.

15. DHS's current staffing plan (created in response to litigation in several hours between hearings and submitted by Mr. Troup Hemenway for DHS on May 22, 2025), contains only a skeletal staff of less than twenty-five individuals to handle the work performed by approximately 150 experienced prior CRCL staff. This staffing plan shows either a marked lack of understanding of or indifference to the statutory duties of the office and the personnel needed to fulfill these duties. Given that DHS has over 250,000 employees and 200,000 contractor staff, it

would be impossible for less than 25 employees to provide adequate oversight and ensure statutory compliance of all of the Department. But indeed, eliminating true statutory civil rights oversight of Department activities, in violation of law, appears to be the whole point.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 11, 2025.

/s/ *TAYLOR DOE*

Taylor Doe

# Exhibit 1



1612 K Street NW Suite #808
Washington, DC, 20006
(202) 457-0034
whistleblower.org

May 15, 2025

**VIA ELECTRONIC MAIL**

Honorable Chuck Grassley, Chair
Honorable Richard Durbin, Ranking Member
U.S. Senate Committee on the Judiciary
Washington, DC 20510

Honorable Rand Paul, Chair
Honorable Gary Peters, Ranking Member
U.S. Senate Committee on Homeland Security
and Governmental Affairs
Washington, DC 20510

Honorable Susan Collins, Chair
Honorable Patty Murray, Vice Chair
U.S. Senate Committee on Appropriations
Washington, DC 20510

Honorable Jim Jordan, Chair
Honorable Jamie Raskin, Ranking Member
U.S. House Committee on the Judiciary
Washington, DC 20515

Honorable Mark Green, Chair
Honorable Bennie Thompson, Ranking Member
U.S. House Committee on Homeland Security
Washington, DC 20515

Honorable Tom Cole, Chair
Honorable Rosa DeLauro, Ranking Member
U.S. House Committee on Appropriations
Washington, DC 20515

> **Re:**   **Two Protected Whistleblower Disclosures Concerning the Dissolution of
> DHS's Office for Civil Rights and Civil Liberties**

Dear Committee Chairs and Ranking Members:

The Government Accountability Project (GAP) respectfully submits, pursuant to 5 U.S.C. § 2302(b)(8), 5 U.S.C. § 7211, 41 U.S.C. § 4712, and other applicable whistleblower protection statutes, the enclosed protected disclosures for your immediate review and action. We transmit them in our capacity as counsel for the whistleblowers and request that the Committees treat the materials—and the identities of any confidential whistleblowers—with the full measure of statutory confidentiality and anti-retaliation safeguards.

The first disclosure details serious irregularities and unlawful conduct surrounding the Department of Homeland Security (DHS)'s abrupt dissolution of the Office for Civil Rights and Civil Liberties (CRCL) on March 21, 2025. The employees describe violations of law, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to public health and safety emanating from DHS's action, including:

- The apparent abandonment of approximately 550 open complaint investigations and hundreds of allegations pending review;

- Cessation of investigation into allegations that FEMA discriminated against supporters of President Trump in providing benefits following a federally-recognized natural disaster;
- Cessation of investigation into allegations that CBP discriminated against travelers, including U.S. citizens, based on protected characteristics when selecting them for additional screening;
- Abandonment of approximately 25 sexual abuse complaint allegations;
- Inability to investigate allegations of disability discrimination and deaths in custody; and
- Inability to provide EEO functions to DHS staff, among other issues.
- Waste of approximately $5 million in salary from directing CRCL's federal employees to not fulfill their obligations and functions, nor support the purported transition of those mandated functions, from March 21 to May 23, 2025 while on paid administrative leave pending the RIF.

All whistleblowers have invoked their right to remain confidential because of a credible fear of reprisal.

The second disclosure is made by two longtime DHS CRCL medical subject-matter experts, Dr. Scott Allen (internal medicine) and Dr. Pamela McPherson (adult and child psychiatry), warning that the renewed detention in March 2025 of families with children, now proceeding without CRCL oversight, poses an imminent threat of foreseeable medical harm.

Drs. Allen and McPherson provide first-hand, expert evidence drawn from a decade of investigations in family detention facilities spanning multiple presidential administrations, citing, as one example, the near-fatal case "of a 16-month-old baby boy who lost 31.8% of his body weight over 10 days of diarrheal disease but was never taken to an emergency room or given IV fluids."

These disclosures together depict a wholesale elimination of internal civil rights safeguards at DHS and the removal of congressionally mandated oversight, an unprecedented development with profound legal, humanitarian, and budgetary implications. We respectfully urge your Committees to:

- Investigate the legality and adverse consequences of DHS's dissolution of CRCL;
- Investigate the DHS's compliance with statutory civil rights functions;
- Direct DHS to preserve all relevant records and to halt any further personnel or programmatic actions that could prejudice whistleblowers or the public interest;
- Hold hearings to examine the consequences of family detention under current conditions and absent CRCL oversight.

Finally, we ask you to remind DHS of the agency's statutory obligation to permit federal employees and contractors to make protected whistleblower disclosures to Congress free from reprisal, and that restrictions on such disclosures are illegal pursuant to 5 U.S.C. § 2302(b)(8) and (b)(13).

Whistleblowers are available to speak confidentially to Congress. Please confirm receipt of these disclosures and advise us of any follow-up requests for briefings or additional information.

Respectfully submitted,

/s/
Dana L. Gold, Senior Counsel & Director, Democracy Protection Initiative
Andrea Meza, Counsel & Immigration Campaign Director

Enclosures:
Attachment 1: Protected Whistleblower Disclosure to Congress of Multiple CRCL Whistleblowers
Attachment 2: Protected Whistleblower Disclosure to Congress of Dr. Scott A. Allen and Dr. Pamela McPherson

cc:    U.S. Department of Homeland Security Office of Inspector General
        Secretary Kristi Noem, Department of Homeland Security

# ATTACHMENT 1:

Protected Whistleblower Disclosure to Congress of

Multiple CRCL Whistleblowers

May 15, 2025



GOVERNMENT
ACCOUNTABILITY
PROJECT

1612 K Street NW Suite #808
Washington, DC, 20006
(202) 457-0034
whistleblower.org

Protected Whistleblower Disclosure to Congress of
Multiple CRCL Whistleblowers
May 15, 2025

To Whom It May Concern:

Government Accountability Project writes on behalf of multiple whistleblowers who share deep concerns about the Trump Administration's abrupt and unlawful dissolution on March 21, 2025, of the U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL)[1] through a purported reduction in force (RIF).[2] The manner and consequences of the Administration's decision to close CRCL violate laws, rules, and regulations; constitute gross mismanagement, gross waste of funds, and abuse of authority; and cause a substantial and specific threat to the health, safety, security, rights, and liberties of U.S. citizens and other individuals who interact with DHS through its programs and activities.

Government Accountability Project represents these whistleblowers, who are currently employed by CRCL but are subject to removal from Federal service on May 23, 2025, should the RIF go forward. These employees, most of whom have worked with CRCL for years, hold positions across the office and possess critical information about important civil rights and civil liberties work authorized and required by law that DHS leadership appears to have abruptly halted.

All have chosen to remain anonymous for warranted fear of retaliation by DHS. On Thursday, April 24, three public interest organizations that file complaints with or seek assistance from CRCL, Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC), filed a lawsuit against DHS and DHS Secretary Noem for declaratory and injunctive relief challenging the decision to close the office. On April 28, 2025, all non-Senior Executive Service DHS employees subjected to the RIF were notified that their access to the DHS campus and network would be terminated and that they needed to return their laptops, mobile devices, and Personal Identity Verification (PIV) cards within the week. Even though the lawsuit does not seek direct enforcement of employment rights of CRCL, the swift action by DHS to terminate the employees' access to any official means of communicating with supervisors or the personnel office, the time and attendance system to enter time and certify time for payroll, and personnel information related to the RIF, retirement, and other topics, earlier than originally stated, and immediately following the lawsuit's filing, seems intended to chill employees from exercising their speech rights.

---

[1] U.S. Department of Homeland Security, "Office for Civil Rights and Civil Liberties," last modified March 6, 2024, https://www.dhs.gov/office-civil-rights-and-civil-liberties
[2] Zolan Kanno-Youngs, Hamed Aleaziz, Adam Goldman, Eileen Sullivan, "Trump Shuts Down 3 Watchdog Agencies Overseeing Immigration Crackdown," *New York Times,* March 21, 2025, https://www.nytimes.com/2025/03/21/us/politics/trump-civil-rights-homeland-security-deportations.html

Congress established the Officer for Civil Rights and Civil Liberties in 2002 when it enacted the Homeland Security Act of 2002, creating DHS.[3] The Department has requested and Congress has provided the "resources necessary to fulfill the functions of such officer" in annual appropriations every year since 2004.[4] CRCL's nonpartisan civil servants and contractors carry out one of the primary missions of the Department—to "ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland[.][5] The dissolution of CRCL contravenes statutory requirements, including 6 U.S.C. § 345(a)(1)-(6)[6] and 42 U.S.C. § 2000ee-1[7] among others, and abolishes internal oversight that ensures that DHS and its component agencies protect the civil rights and civil liberties of the public and DHS employees while carrying out the Department's mission to protect the homeland.[8]

The Department's elimination of CRCL also constitutes a gross abuse of authority: a DHS spokesperson publicly stated, upon the dissolution of CRCL and other oversight offices, that CRCL and other oversight offices "obstructed" enforcement activities and are "internal adversaries that slow down operations."[9] Based on this and other statements, whistleblowers are concerned that the Administration and DHS leadership have targeted and retaliated against CRCL employees for performing the duties for which they were hired, and that are required by statutes and federal regulations, and eliminated CRCL to avoid oversight and for improper purposes. The Administration and DHS leadership lack the authority to eliminate CRCL's statutorily required functions simply because they perceive civil rights and liberties as "roadblocks to enforcement."[10] Only Congress has the authority to change federal statutes.

Finally, by dissolving CRCL, the Administration has caused not only immediate and irreparable harm but foreseeable future harm. Everyone who interacts with DHS is at peril of the contravention of their constitutional, statutory, and regulatory protections, including workplace protections for DHS employees and protections for persons with disabilities under Section 504 of the Rehabilitation Act of 1973. The dissolution of CRCL, coupled with the Administration's unprecedented efforts related to immigration, border enforcement, datamining and information sharing, and other activities, pose a grave constitutional risk, as well as a health and safety risk for individuals who rely on CRCL's processes related to urgent medical referrals and disability accommodations.

---

[3] See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).

[4] 42 U.S.C. § 2000ee-1(d)(1).

[5] 6 U.S.C. § 111(b)(1)(G).

[6] 6 U.S.C. § 345(a)(1)-(6), Establishment of the Officer for Civil Rights and Liberties

[7] 42 U.S.C. § 2000ee-1, Privacy and Civil Liberties Officers.

[8] Gary C. Peters and Richard J. Durbin, letter to Secretary Kristi Noem, March 13, 2025, https://www.hsgac.senate.gov/wp-content/uploads/Secretary-Noem-re-CRCL.pdf

[9] Zolan Kanno-Youngs et al, "Trump Shuts Down 3 Watchdog Agencies Overseeing Immigration Crackdown," *New York Times,* March 21, 2025, https://www.nytimes.com/2025/03/21/us/politics/trump-civil-rights-homeland-security-deportations.html

[10] Maria Sacchetti and Ellie Silverman, "DHS shuts down internal watchdog agencies that advocated for immigrants," March 21, 2025, *The Washington Post,* https://www.washingtonpost.com/immigration/2025/03/21/dhs-immigrant-advocates-watchdogs-oversight/.

Moreover, the Department's closure of CRCL has caused and will continue to cause a significant and specific threat to U.S. citizens and other individuals who interact with the Department through its programs and activities and have already or would have brought complaints before CRCL: ongoing investigations of excessive use of solitary confinement, medical endangerment, and oversight of investigations of sexual abuse in immigration detention will cease, and future allegations of abuse, including violation of rights by DHS while in immigration detention or as a subject of immigration enforcement, violation of due process rights, such as the right to timely notice of proceedings or access to a lawyer, and physical or other abuse by DHS components or personnel will go unexamined because of the oversight vacuum created by CRCL's closure.[11]

---

[11] CRCL investigates a wide range of investigations regarding civil rights, Constitutional rights, and due process, as detailed below, including the recent case of Mahmoud Khalil, a Palestinian activist who was arrested due to his purported role in protests at Columbia University. In the days before March 21, 2025, CRCL opened an investigation into due process concerns raised by Khalil's arrest and his attempted removal from the United States.

## Table of Contents

*Background: The Decision to Shutter CRCL*                                                                  **5**

*The Cessation of CRCL Operations Results in Violations of Laws, Rules & Regulations, Gross Mismanagement, Gross Waste of Funds, Abuse of Authority, and a Substantial and Specific Danger to Public Health and Safety*                                                                                          **6**

   **Required Reporting to Congress Delayed or Halted**                                          **6**

   **CRCL's Compliance Branch Cannot Perform Additional Statutorily Required Functions**    **8**

      Compliance Branch Cannot Investigate Civil Rights and Civil Liberties Complaints or Resolve Pending Matters                                                                                                          8
      CRCL Cannot Alert ICE to Urgent Medical Issues                                              9
      CRCL Cannot Conduct Critical Oversight of Sexual Abuse Investigations                       9
      CRCL Cannot Timely Investigate and Resolve Allegations of Disability Discrimination         10
      CRCL Cannot Investigate Deaths in Custody                                                   10

   **CRCL's Antidiscrimination Group (ADG) is Unable to Perform Statutorily Mandated Functions**    **11**

      CRCL Cannot Ensure Civil Rights Compliance by DHS Grant Recipients                         11
      CRCL Cannot Process or Investigate Complaints Against Department Grantees                   11
      CRCL Cannot Ensure Language Access                                                          12

   **CRCL's Immigration Section is Unable to Perform its Mandated Functions**                 **12**

      CRCL Cannot Conduct Immigration Policy Oversight or Provide Advice                          12
      CRCL Cannot Monitor the 287(g) Immigration Enforcement Program                              12
      CRCL Cannot Ensure Statutory Confidentiality and Non-Disclosure Protections for Survivors of Domestic Violence, Human Trafficking, and Other Serious Crimes                                     13
      CRCL Cannot Ensure Compliance with International Human Rights Treaties                       14
      CRCL Cannot Implement the Women, Peace, and Security Act of 2017                            14

   **CRCL's Security, Intelligence, and Information Policy Section (SIIP) is Unable to Perform its Mandated Functions**    **14**

      CRCL Cannot Conduct Oversight of Facial Recognition                                         14
      CRCL Cannot Conduct Audits of Risk-Based Traveler Screening                                 15
      CRCL Cannot Conduct Pre-Deployment Training on Civil Liberties for DHS Officers and Intelligence Analysts                                                                                 15
      CRCL Cannot Train State and Local Fusion Center Personnel                                   15

   **CRCL's Community Engagement Section is Unable to Perform its Functions**                 **16**
      Community Engagement throughout the United States Halted                                    16

   **CRCL's Equal Employment Opportunity Division (EEOD) Cannot Provide EEO Services**        **16**

   **Case Management Pilot Program Activities Paused in Violation of Statute**                **17**

*Conclusion*                                                                                              **18**

# Background: The Decision to Shutter CRCL

On March 21, 2025, DHS officials called CRCL employees to a meeting at 1:00 p.m. ET and informed them about the RIF. A DHS official told CRCL staff that effective immediately staff would be placed on administrative leave, should stop work and not contact anyone about the RIF, and collect their personal belongings. The Administration and DHS leadership denied CRCL the opportunity to provide notice to complainants and stakeholders that CRCL would not reply to or resolve their pending allegations, not even allowing employees to set up "out of office" autoreplies on their email accounts. As a result, the work of the entire office suddenly ceased, leaving critical responsibilities unfulfilled, as described below. In the meeting with CRCL staff, DHS officials stated that the Department had not provided advance notification of the RIF to Congress.

In announcing the closure of CRCL, the DHS spokesperson suggested that the statutory role of CRCL had been transferred to other entities within DHS, an assertion that the whistleblowers reasonably believe is false.

The functions of CRCL are performed by highly specialized staff with deep subject matter expertise in civil rights issues, or the Department, or both. Many of these staff, equipped to work at a headquarters vantage point, were GS-14 and GS-15 level employees. Identifying substitute staff within DHS to perform these specialized skills would take many months of planning at best. Furthermore, a transition of CRCL's functions would require training other DHS personnel about how to conduct civil rights investigations, training on the substance and significance of various directives and procedures, and training on specialized IT systems, among other things. CRCL had relationships and institutional knowledge developed over 22 years to meet the needs of DHS's vast 250,000 workforce that was destroyed in a matter of hours.

It is the whistleblowers' understanding that as of April 2025, some of CRCL's contractors continued to perform limited functions, including complaint intake, with only limited supervision by the three Senior Executive Service level employees tasked with winding down the office. Moreover, whistleblowers further understand that two of the three Senior Executive Service employees are to be transferred to another DHS component agency, and the third has opted to leave Federal service at the end of the fiscal year. As of April 28, 2025, CRCL's office space will be used by the DHS Office of General Counsel and other offices. Additionally, the Department's effective elimination of CRCL constitutes gross mismanagement and waste of federal resources: from March 21 to May 23, 2025, pending the RIF, CRCL's federal employees have been directed to not fulfill their obligations and functions, wasting approximately $5 million in salary for no work while on paid administrative leave.

Circumstances demonstrate that the Administration and DHS leadership effectively eliminated CRCL and impeded its ability to fulfill its statutorily mandated functions on March 21 without a plan and without transferring statutory functions.  Whistleblowers assert on information and belief that to date CRCL's responsibilities have neither been continued nor transferred. That DHS did not have a responsible and thoughtful plan in place constitutes a remarkably gross mismanagement, abuse of authority and danger to public health and safety.

Finally, DHS has conducted the RIF illegally in contravention of statutory and regulatory requirements. The Department did not notify Congress in advance of the office's dissolution,[12] and has not offered CRCL employees other employment opportunities within the Department or the chance to transfer with the work if and when it is finally reassigned.[13]

# The Cessation of CRCL Operations Results in Violations of Laws, Rules & Regulations, Gross Mismanagement, Gross Waste of Funds, Abuse of Authority, and a Substantial and Specific Danger to Public Health and Safety

## Required Reporting to Congress Delayed or Halted

Per 42 U.S.C. § 2000ee-1(2), CRCL must report to Congress (A) information on the number and types of reviews undertaken; (B) the type of advice provided and the response given to such advice; (C) the number and nature of the complaints received by the department, agency, or element for alleged violations; and (D) a summary of the disposition of such complaints, the reviews and inquiries conducted, and the impact of the activities of such officer. CRCL employees, including whistleblowers, have been involved in satisfying this reporting requirement for FY 2024. Whistleblowers anticipate that because the work of the office has ceased, CRCL will be unable to comply with this Congressionally mandated requirement, or at a minimum, that

---

[12] 6 U.S.C. 452(a)(2) provides, "The Secretary may allocate or reallocate functions among the officers of the Department, and may establish, consolidate, alter, or discontinue organizational units within the Department, but only—

(1) pursuant to section 542(b) of this title; or

(2) after the expiration of 60 days after providing notice of such action to the appropriate congressional committees, which shall include an explanation of the rationale for the action.

*See also* Congress.gov, "Text - H.R.2617 - 117th Congress (2021-2022), Division F, Title V, Sec. 503, Consolidated Appropriations Act, 2023," December 29, 2022. https://www.congress.gov/bill/117-congress/house-bill/2617/text (requiring 15 days' notice to Senate and House Appropriations Committees before reprogramming funds).

[13] *See* 5 C.F.R. § 351.302, *Transfer of Employees*; *see also* Exhibit 1, Nicole Barksdale-Perry, Memo re: Reduction in Force Notice (redacted example), March 21, 2025, Department of Homeland Security.

the report, if filed, will not fully and accurately reflect the scope and breadth of the work performed in FY 2024.

Pursuant to the Joint Explanatory Statement accompanying the 2024 Department of Homeland Security Appropriations Act, CRCL is required to conduct an assessment of every jurisdiction delegated law enforcement authority under section 287(g) of the Immigration and Nationality Act (8 U.S.C. § 1357(g)) and submit an annual report to Congress. The assessment includes analysis of a variety of topics, including whether any 287(g) jurisdictions took immigration enforcement activities that exceeded the scope of the terms of their agreements and an analysis of the race, sex, nationality and criminality of immigrants placed into removal proceedings under the 287(g) program. As of March 21, 2025, the statutorily mandated report had not been completed or issued.[14] Whistleblowers anticipate that CRCL will be unable to comply with this requirement.

Pursuant to the Women, Peace, and Security Act of 2017, the DHS implementation of which was delegated to CRCL, DHS is required to produce annual reports to Congress detailing accomplishments under the Act.[15] Because DHS and other responsible agencies produced a new Women, Peace, and Security strategy, also required by the Act, the 2025 report to Congress was expected to contain DHS accomplishments in 2023 and 2024. Whistleblowers anticipate that this requirement will go unfulfilled because of the effective dissolution of the office.

Pursuant to the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 (No FEAR Act), CRCL prepares DHS's annual report to Congress with specific information relating to the Department's EEO complaints activity. The FY 2024 report was pending clearance as of March 21, 2025, and whistleblowers anticipate that DHS will be unable to complete the report without CRCL and the expertise of its staff.

Any failure to submit these reports not only violates the statutory reporting requirements but also leads to an information deficit that weakens oversight that is critical to the operation of the Department. The failure to report to Congress is itself an abuse of authority that deprives Congress of information it needs to fulfill its duty of oversight, but it could lead to abuses or violations of civil rights and civil liberties that have arisen in the past, and which have been the subject of Congressional investigations or oversight.[16]

---

[14] Ellen Gilmer, "Fears of Migrant Abuse Rise as Trump Cuts Civil Rights Office," April 17, 2025, *Bloomberg Law, https*://news.bgov.com/immigration/fears-of-migrant-abuse-rise-as-trump-cuts-civil-rights-office
[15] Section 8(b) of the Women, Peace, and Security Act of 2017 (P.L. 115-68).
[16] The scope of issues addressed in CRCL's annual reports to Congress track nearly every issue on which Congress has conducted oversight, including family detention and separation, the impacts of the Migrant Protection Protocols and Title 42 to close the southern border, U.S. Coast Guard interdictions and Guantanamo detention, disaster resilience, and the impact of covid. *See* CRCL Annual Reports to Congress, last updated November 27, 2024, https://www.dhs.gov/publication/crcl-annual-reports.

# CRCL's Compliance Branch Cannot Perform Additional Statutorily Required Functions

## *Compliance Branch Cannot Investigate Civil Rights and Civil Liberties Complaints or Resolve Pending Matters*

Per 6 U.S.C. § 345(a)(1)-(6) and 42 U.S.C. § 2000ee-1, CRCL's Compliance Branch staff investigate complaints and information alleging potential violations or abuses of civil rights or civil liberties by DHS programs, activities, personnel, or contractors. CRCL Compliance Branch employees, also under statutory and regulatory authorities, ensure that the Department's programs and activities comply with Section 504 of the Rehabilitation Act of 1974, and 6 C.F.R. Part 15.70, *Enforcement of Nondiscrimination on the Basis of Disability in Programs or Activities Conducted by the Department of Homeland Security.*

At the time of CRCL's elimination, approximately 550 complaint investigations were open and under investigation, and hundreds of allegations were pending CRCL's review to determine if the office would open a complaint investigation. CRCL was investigating matters involving U.S. Immigrations and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), the Federal Emergency Management Agency (FEMA), Federal Protective Service (FPS), and the Transportation Security Agency (TSA). Issues under investigation included, for example:

- Allegations that FEMA discriminated against supporters of President Trump in providing benefits following a federally-recognized natural disaster;
- Allegations that CBP discriminated against travelers, including U.S. citizens, based on country of national origin, religious affiliation, or other protected characteristics, when selecting them for additional screening when they entered the United States through one of the 328 official Ports of Entry;
- Allegations that CBP identified individuals for screening and immigration enforcement when they entered the United States through one of the 328 official Ports of Entry based on their engagement in protected First Amendment activity;
- ICE's identification of individuals for enforcement based on prohibited characteristics, including language spoken, race, and ethnicity, and First Amendment protected activity;
- CBP's identification of individuals to question and search at interior CBP checkpoints based on prohibited characteristics, including language spoken, race, and ethnicity;
- Individuals with disabilities' ability to access federal services in one of the hundreds of facilities protected by Federal Protective Service; and
- Individuals with disabilities not receiving reasonable accommodations for their disabilities when interacting with one of the many DHS components.

### *CRCL Cannot Alert ICE to Urgent Medical Issues*

CRCL receives a large volume of complaints alleging inadequate medical and mental health care for individuals in DHS custody. Since 2012, CRCL has collaborated with ICE to ensure that any urgent medical or mental health care allegations that CRCL receives are immediately sent to the ICE Health Service Corps (IHSC) for further investigation and response. CRCL reviews the IHSC response to these complaints and may also have a contract medical subject matter expert review IHSC's response. Following this review, CRCL may follow up with IHSC with additional advice or recommendations. Without this oversight, there is risk of imminent harm to individuals with urgent medical or mental health needs.

As of March 21, 2025, CRCL had more than 200 open medical referral complaint investigations. In the past, CRCL's medical referrals have assisted suicidal individuals, as well as individuals in need of hospitalization for serious mental illness, at risk of loss of vision, and whose referrals for surgery or critical specialty care were delayed or canceled because of a delay in diagnosis or treatment or a transfer to another facility.[17] A case open at the time of the CRCL RIF included allegations of inadequate medical and mental health care in ICE facilities in California including one complainant who reported severe gastrointestinal pain with rectal bleeding for six months before he obtained a colonoscopy.

### *CRCL Cannot Conduct Critical Oversight of Sexual Abuse Investigations*

Pursuant to 34 U.S.C. § 30301, *et seq.*, and 6 C.F.R. Part 115, the DHS Prison Rape Elimination Act (PREA) Standards, CRCL is directed to coordinate with ICE and CBP to conduct PREA audits and can request expedited audits when appropriate. Under Departmental policy, CRCL serves as the Department's experts on PREA implementation and conducts oversight of sexual abuse and assault protections at DHS component agencies, including ICE and CBP. CRCL's expertise on PREA dates to the drafting of the DHS regulation in 2012. Without CRCL staff to carry out these functions, there is no official outside of ICE and CBP who can provide PREA expertise, to coordinate on audits, or request expedited audits. Additionally, all oversight aimed at making recommendations to enhance protections against sexual abuse or assault in DHS custody has stopped. Approximately 25 sexual abuse complaint investigations were open and are pending as of March 21, 2025. At the time of the RIF, for example, CRCL was investigating allegations that a woman was "forcibly strapped to a restraint chair by male guards, stripped, and mocked" during a mental health crisis in ICE detention at the Baker County Detention Facility.[18]

---

[17] FY 2023 CRCL Annual Report, https://www.dhs.gov/sites/default/files/2024-11/24_1127_crcl-fy-2023-annual-report.pdf, p.105-11.

[18] Robert F. Kennedy Human Rights and ACLU of Florida, Complaint re: Sexual Abuse, Use of Force, Solitary Confinement, Medical Neglect, and Retaliation against Ana at the Baker County Detention Center in Maccleny, Florida," November 14, 2024, https://www.aclufl.org/en/civil-rights-complaint-department-homeland-securitys-office-civil-rights-and-civil-liberties

### CRCL Cannot Timely Investigate and Resolve Allegations of Disability Discrimination

DHS regulations designate CRCL as the office to receive, investigate, and resolve complaints alleging disability discrimination in violation of Section 504 of the Rehabilitation Act of 1973, as amended. Those regulations require CRCL to adjudicate complaints within 180 days, allow for CRCL to provide remedies (*i.e.*, accommodations) for violations of Section 504 found, and confer appellate rights to complainants to dispute a finding. At the time of the dissolution of the office on March 21, 2025, there were approximately 20 pending Section 504 complaints, including several nearing their 180-day regulatory deadline. Individuals who have pending complaints, as well as those who have filed complaints since March 21, 2025, will not receive a decision regarding whether the Department violated Section 504, will not have their disability-related needs met, and will lose their right to appeal.[19]

In the past, CRCL has investigated disability accommodation complaints where CBP confiscated crutches from an unaccompanied minor held in a border detention facility, FPS officers denied an individual entry into a Social Security Administration building because they did not believe her dog was a service animal, and USCIS did not allow the wife of an Alzheimer's patient to accompany him during his naturalization interview.[20] Since March 21, 2025, CRCL whistleblowers have identified in the news cases of people with disabilities in ICE custody who would typically file disability-related complaints with CRCL including an individual who is a double amputee in ICE custody at the Stewart Detention Center who alleges he has not been permitted to adequately charge batteries in his prosthetic legs and has instead been given a wheelchair he cannot use because he only has two fingers on his right hand.[21]

### CRCL Cannot Investigate Deaths in Custody

ICE notifies CRCL whenever a non-citizen has died in ICE custody, and CBP sends CRCL reports of all non-employee deaths. Given the potential significance of each death in DHS custody, CRCL reviews them all, and opens complaint investigations where the circumstances warrant further review or may lead to recommendations for changes in policy or practice that could prevent future deaths.  At least half a dozen death-related complaint investigations were open when CRCL's work was abruptly and illegally stopped. In the past, CRCL has investigated deaths by suicide, following withdrawal from addiction, and resulting from inadequate or inappropriate medical care.[22] Since January 2025, numerous reports have emerged of multiple

---

[19] 6 C.F.R. Part 15 (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and 42 U.S.C. § 12101 et seq.).

[20] FY 2023 CRCL Annual Report, https://www.dhs.gov/sites/default/files/2024-11/24_1127_crcl-fy-2023-annual-report.pdf, p.74, 121. FY 2020 CRCL Annual Report, https://www.dhs.gov/sites/default/files/2022-07/crcl-fy-2020-annual-report-508_0.pdf, p.47.

[21] Timothy Pratt, "Disabled people detained by Ice sound alarm over overcrowded jails," April 25, 2025, *The Guardian,* https://www.theguardian.com/us-news/2025/apr/25/ice-immigration-detention.

[22] FY 2020 CRCL Annual Report FY 2020 CRCL Annual Report, https://www.dhs.gov/sites/default/files/2022-07/crcl-fy-2020-annual-report-508_0.pdf, p.38.

deaths of noncitizens at ICE's Krome North Service Processing Center, alongside reports of extreme overcrowding and substandard conditions—all critical issues that CRCL would be responsible for investigating. [21]

# CRCL's Antidiscrimination Group (ADG) is Unable to Perform Statutorily Mandated Functions

## *CRCL Cannot Ensure Civil Rights Compliance by DHS Grant Recipients*

As a condition of receiving grants from DHS, recipients of DHS funding must comply with civil rights authorities including, for example, Section 504 of the Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964. Title VI provides that "no person in the United States, shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

There are approximately 5,000 recipients of DHS financial assistance, receiving billions of dollars in DHS assistance each year, which must meet these requirements. CRCL has provided assistance to grant recipients, including state agencies, fire departments, and other critical emergency services providers, in understanding and meeting these requirements by collecting and reviewing recipients' civil rights data and procedures through the DHS Civil Rights Evaluation Tool program. Submission of the Civil Rights Evaluation Tool is a standard condition contained in all DHS financial assistance award agreements. As of March 21, 2025, there are no CRCL employees to review recipients' Civil Rights Evaluation Tool submissions or provide the needed technical assistance to ensure recipients can provide public services on a nondiscriminatory basis.

## *CRCL Cannot Process or Investigate Complaints Against Department Grantees*

CRCL is responsible for processing and investigating civil rights complaints against the Department's federally-assisted recipients to ensure compliance with statutory and regulatory authorities prohibiting discrimination in federally-assisted programs including: Section 504 of the Rehabilitation Act of 1973; Title VI of the Civil Rights Act of 1964 and 6 C.F.R. Part 21; Title IX of the Education Amendments of 1972 and 6 C.F.R. Part 17; the Age Discrimination Act of 1975; and 6 C.F.R Part 19. As of March 21, 2025, there are no CRCL employees to review and investigate complaints alleging discrimination on the basis of race, color, national origin (including language proficiency), disability, sex, age, and religion in recipients' programs in violation of these authorities. At the time of CRCL's elimination, there were several matters under review or investigation, including complaints filed against emergency services providers and law enforcement agencies receiving financial assistance from the Department. Complaints

included allegations of discrimination based on race, national origin, and disability. Notably, CRCL was preparing to close a multi-year investigation that included mutually agreed upon actions that would have benefited community members impacted by the issues raised in the investigation.

### CRCL Cannot Ensure Language Access

CRCL has a long history of working to ensure that recipients of DHS financial assistance are aware of their language access obligations under Title VI and identifying and sharing practical ways to meet these requirements. The President's recent Executive Order declaring English the official language of the United States did not eliminate federal requirements for recipients related to language access under Title VI of the Civil Rights Act.

CRCL has conducted compliance reviews to ensure DHS recipients comply with Title VI, including a joint multi-state review by CRCL, FEMA, and the U.S. Department of Health and Human Services of states' public messaging and response to the COVID-19 public health emergency. The joint review resulted in trainings and technical assistance for states to ensure vital public health resources are available to people with limited English proficiency so that all persons in the United States have accurate and timely information regardless of the language they speak.

## CRCL's Immigration Section is Unable to Perform its Mandated Functions

### CRCL Cannot Conduct Immigration Policy Oversight or Provide Advice

CRCL regularly reviews and provides advice to DHS components in real time on the protection of civil rights and civil liberties in DHS immigration policies, regulations, and programs to ensure that DHS programs comply with the Constitution and other legal requirements. The elimination of this function as it pertains to immigration enforcement contravenes the statutory requirement that CRCL "oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of the Department[.]"[23]

### CRCL Cannot Monitor the 287(g) Immigration Enforcement Program

---

[23] Department of Homeland Security, *Establishment of Office for Civil Rights and Civil Liberties*, 2022. https://www.dhs.gov/publication/establishment-officer-civil-rights-and-civil-liberties.

Pursuant to the Joint Explanatory Statement accompanying the 2024 Department of Homeland Security Appropriations Act, CRCL is required to conduct an assessment of every jurisdiction delegated law enforcement authority under section 287(g) of the Immigration and Nationality Act (8 U.S.C. § 1357(g)) and submit an annual report to Congress and make it available for the public online.

In addition to compiling the 287(g) assessment report, Congress has regularly delegated CRCL the authority to monitor the 287(g) program for civil rights and civil liberties concerns.[24] As mentioned above, Congress and the public have yet to receive this report. As part of its longstanding monitoring of the 287(g) program, CRCL routinely visits 287(g) jurisdictions, engages with community stakeholders, investigates complaints alleging profiling based on race or national origin, prolonged detention, or mistreatment in custody, and advises ICE ERO on suggestions to strengthen civil rights and civil liberties protections and improve public trust in the 287(g) program. Given the rapid and significant expansion of the 287(g) program throughout the country, the absence of CRCL's expert monitoring for civil rights and civil liberties concerns such as racial profiling and access to due process curtails oversight in these critical areas.

### CRCL Cannot Ensure Statutory Confidentiality and Non-Disclosure Protections for Survivors of Domestic Violence, Human Trafficking, and Other Serious Crimes

CRCL was delegated the authority to oversee implementation of 8 U.S.C. § 1367 (also known as Violence Against Women Act (VAWA) Confidentiality) in 2013. Since that time, CRCL has led the Department's efforts, including working directly with the Components, to safeguard these critical confidentiality and non-disclosure protections for noncitizen victims and survivors of domestic violence, sexual assault, human trafficking and other serious crimes. CRCL personnel receive and track notifications of Section 1367 violations (disclosure of protected information related to victims). The elimination of these CRCL functions creates risks for victims of domestic violence, human trafficking, and other serious crimes.

Further, DHS employees are exposed to an increased and real risk of personal liability for mishandling protected data without proper training and guidance. Sec. 1367(c) provides for disciplinary action and a civil money penalty of not more than $5,000 for each violation. Guidance, training, and oversight provided by CRCL prepared DHS employees for the proper handling and sharing of this information. Without CRCL, incidents of mishandling could increase. For example, as of March 21, DHS had removed the DHS online training course

---

[24] *See* Department of Homeland Security, Statement for *Division F – Department of Homeland Security Appropriations Act, 2018,* March 19, 2018, https://docs.house.gov/billsthisweek/20180319/DIV%20F%20HOMELAND%20SOM%20FY18%20OMNI.OCR.pdf. Department of Homeland Security, Statement for *Division F – Department of Homeland Security Appropriations Act, 2023,* https://www.appropriations.senate.gov/imo/media/doc/Division%20F%20-%20Homeland%20Statement%20FY23.pdf.

developed by CRCL for this topic pending a review for compliance with recent Executive Orders. It is unclear when or if that course will be restored without CRCL.

### *CRCL Cannot Ensure Compliance with International Human Rights Treaties*

CRCL is designated as the single point of contact for international human rights treaty reporting under Executive Order 13107.[25] Thus, CRCL coordinates DHS-wide efforts and works with the interagency on U.S. government compliance with the UN treaties to which the United States is a party and reporting to the UN Treaty Bodies and the Inter-American Commission on Human Rights.

### *CRCL Cannot Implement the Women, Peace, and Security Act of 2017*

CRCL is the designated implementing office for this statute to promote the participation of women in mediation and negotiation processes to prevent violent conflict. Updates to the DHS Implementation Plan for the Act as well as an annual report to Congress were pending at the time of the RIF notice.

## CRCL's Security, Intelligence, and Information Policy Section (SIIP) is Unable to Perform its Mandated Functions

SIIP conducts reviews of DHS intelligence products before distribution to state and local law enforcement, performs oversight for sensitive security and classified activities, advises on the use of emerging technologies (e.g., facial recognition, artificial intelligence) in DHS programs, and provides training and technical assistance to the 80 state and local fusion centers across the country on civil rights and civil liberties protections. With CRCL shut down, it is unclear to whistleblowers who at DHS, if anyone, is now conducting this critical oversight, much of which relates to activities and programs affecting U.S. citizens.

### *CRCL Cannot Conduct Oversight of Facial Recognition*

CRCL conducts oversight of the use of facial recognition and facial capture technology by DHS agencies through standard setting, use case impact assessment, and providing the Department's only non-travel-related complaint process.

---

[25] Exec. Order No. 13107, 63 Fed. Reg. 68991 https://www.govinfo.gov/content/pkg/WCPD-1998-12-14/pdf/WCPD-1998-12-14-Pg2459.pdf

On facial recognition and facial capture, CRCL SMEs participated in the study and testing of all then current DHS FR/FC systems.[26] The Department planned to continue to monitor trends identified in the study, refine its testing practices, and take action as appropriate. At present, DHS appears to have removed the full report from DHS.gov. In the use of this technology, CRCL also ensured there was public notice, a complaint system to raise issues, and opt out for U.S. citizens. For public notice, CRCL advocated for clear signage and other real-world notices to the public. CRCL's complaint system is the only option for non-travel related feedback/complaints, in addition to the Traveler Redress Inquiry Program (DHS TRIP) for travel-related inquiries. And CRCL was the only office that has successfully pushed for and maintained US citizens' rights to opt out of most facial recognition use, protecting the right to travel for those who have concerns about this technology.

### *CRCL Cannot Conduct Audits of Risk-Based Traveler Screening*

CRCL audits risk-based traveler screening rules in CBP's Automated Targeting System and TSA's Silent Partner and Quiet Skies programs. These programs identify passengers for enhanced screening on domestic and international inbound and outbound travel, as well as other operational responses including observation by TSA Federal Air Marshal Service. Regular CRCL audits ensure each rule: "(1) is based on current intelligence; (2) identifies a specific potential threat to aviation security or the United States;7 (3) is deactivated when no longer necessary to address the threat; and (4) is appropriately tailored to minimize the impact on travelers' civil rights, civil liberties, and privacy, and is in compliance with relevant legal authorities, regulations, and DHS policies."[27]  Without active oversight, there is greater potential for systemic issues to arise.

### *CRCL Cannot Conduct Pre-Deployment Training on Civil Liberties for DHS Officers and Intelligence Analysts*

CRCL is required to develop, support, or sponsor civil liberties training for DHS officers and intelligence analysts before their assignment to State and major urban area fusion centers.[28]

### *CRCL Cannot Train State and Local Fusion Center Personnel*

State and major urban area fusion centers serve as focal points for the receipt, analysis, gathering, and sharing of threat-related information among the Federal Government and state,

---

[26] Department of Homeland Security, *2024 Update on DHS's Use of Face Recognition & Face Capture Technologies*, January 16, 2025, https://www.dhs.gov/archive/news/2025/01/16/2024-update-dhss-use-face-recognition-face-capture-technologies..

[27] Department of Homeland Security, *Privacy Impact Assessment Update for Secure Flight Silent Partner and Quiet Skies*, April 19, 2019, https://www.dhs.gov/sites/default/files/publications/pia-tsa-spqs018i-april2019_1.pdf.

[28] 6 U.S.C. § 124h(c)(4)(A)(ii).

local, tribal, territorial, and private sector partners. CRCL is required to coordinate with fusion centers on the provision of appropriate civil liberties training for all representatives at a fusion center.[29]

# CRCL's Community Engagement Section is Unable to Perform its Functions

### Community Engagement throughout the United States Halted

CRCL regularly engages with state and local government officials, community leaders, and faith-based leaders responding to community concerns and providing information about DHS's programs and activities. In recent years, CRCL has convened engagements with stakeholders in cities across the country, including Chicago, Denver, Los Angeles, Minneapolis, New York City, Phoenix, San Diego, Seattle, Tucson, and Yuma. The abrupt elimination of this function limits the ability of the public to interact with DHS on civil rights and civil liberties issues and has limited the Department's capacity to hear community concerns, provide reliable information on DHS programs, activities, and issues, and deepen channels of communication between communities and DHS partners to facilitate solution-oriented outcomes. CRCL staff was not even allowed to notify stakeholders that CRCL was being dissolved and any further engagements would cease.

# CRCL's Equal Employment Opportunity Division (EEOD) Cannot Provide EEO Services

CRCL leads DHS's efforts to ensure that all employees and applicants are provided equal employment opportunity (EEO) and a workplace that is free from unlawful discrimination and harassment in compliance with federal laws, including Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, the Equal Pay Act of 1963, the Genetic Information Nondiscrimination Act of 2008, and Executive Order 13152 prohibiting discrimination on the basis of parental status.

CRCL is responsible for overseeing and monitoring the provision of reasonable accommodations for qualified individuals with disabilities, adjudicating EEO complaints for all DHS components; overseeing the appropriate processing of EEO complaints across the Department; managing the Department's Alternative Dispute Resolution program; and overseeing component anti-harassment programs. CRCL is also responsible for coordinating EEO and workforce harassment complaints for the over 6,200 DHS Headquarters employees. In addition, CRCL generates a variety of annual, public-facing reports as required by federal law, to

---

[29] 6 U.S.C. § 124h(i)(6).

include DHS's annual report under the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 (No FEAR Act).

By dissolving CRCL, the Administration places everyone who interacts with DHS at peril of the contravention of their constitutional, statutory, and regulatory protections, including due process and workplace protections for DHS employees and protections for persons with disabilities within and external to the workforce under Sections 501 and 504 of the Rehabilitation Act of 1973, an imminent and irreparable harm.

# Case Management Pilot Program Activities Paused in Violation of Statute

Since 2021, CRCL has administered and provided programmatic oversight of the Congressionally created Case Management Pilot Program (CMPP), which provides grant funds to nonprofit organizations and local governments for case management services (e.g., human and sex trafficking screening, legal orientation, and mental health services) to individuals enrolled in the ICE Alternatives to Detention (ATD) program.[30] CMPP was created by the FY 2021 Appropriations Act, and funds were appropriated again by Congress for CMPP in fiscal years 2022, 2023, and 2024. Organizations that receive CMPP grants provide critical and potentially life-saving services to eligible participants including identifying and helping trafficking survivors. The goal of CMPP is to promote noncitizens' compliance with their immigration obligations and initial program outcome data indicated that CMPP participants attended 99% of their scheduled immigration court hearings.

The Joint Explanatory Statement accompanying the FY 2021 Appropriations Act requires the Department to evaluate CMPP and provide recommendations for ATD case management to Congress at the conclusion of the pilot program. Prior to releasing a Notice of Funding Opportunity for CMPP funds, CRCL provided notice to Congress outlining the CMPP evaluation plans. CMPP program enrollments were conducted to support robust outcome evaluation and the Department entered into a contract for evaluation services related to CMPP evaluation activities.

Since January 24, 2025, all CMPP activities, including program enrollments and evaluation efforts, have been paused as instructed by the DHS Secretary to review and, if appropriate audit, grants providing federal funding to NGOs supporting or providing services to noncitizens. CMPP grant funds have been unavailable to the CMPP grantee (including for work already completed under the grant) since approximately January 24, 2025. The audit of the grantee was to be conducted by CRCL as the entity providing programmatic oversight of the grant. As a result of CRCL's closing, the primary grantee and all sub-recipients are not receiving payment for their work completed as well as ongoing work required by the grant, and this statutorily required program is not currently operating. In addition, the Congressionally required

---

[30] Consolidated Appropriations Act, 2021, Pub. L.116-260, Div. F., Title I, 134 Stat. 1182, 1449 (2020) (hereinafter, FY 2021 Appropriations Act).

program evaluation cannot be conducted and years of work to support program evaluation will be wasted. Most importantly, individual enrollees do not have access to critical services that successfully promoted participation in the immigration legal process.

# Conclusion

CRCL, as DHS's internal expert on civil rights and civil liberties issues, has been critical to ensuring adequate protections are in place in all aspects of the Department's work and reporting on the work that it does in these areas. The shuttering of the office not only deprives Congress of its authority and express desire for information needed for its own oversight responsibilities as evidenced by its creation of CRCL with mandated reporting, but leaves the Department without vital checks on potential lapses or abuses that arise in the extensive and consequential work done by DHS.  The Department now faces a dramatically increased risk of its work leading to harms or abuses that could have been prevented or addressed with the engagement of civil rights and civil liberties experts internal to the Department.

We urge your committees to promptly:
- investigate the legality and adverse consequences of DHS's dissolution of CRCL;
- investigate the DHS's compliance with statutory civil rights functions;
- direct DHS to preserve all relevant records and to halt any further personnel or programmatic actions that could prejudice whistleblowers or the public interest;

Finally, we ask the Committees to reinforce to DHS leadership the statutory rights of federal employees to make protected disclosures to Congress free from reprisal, and that these rights supersede any nondisclosure directives pursuant to 5 U.S.C. § 2302(b)(8) and (b)(13).

Respectfully submitted,

/s/
Dana L. Gold, Senior Counsel & Director, Democracy Protection Initiative
Andrea Meza, Counsel & Immigration Campaign Director
Government Accountability Project
1612 K Street NW, Suite 808
Washington, DC 20006
danag@whistleblower.org
andream@whistleblower.org

cc:    U.S. Department of Homeland Security Office of Inspector General
       Secretary Kristi Noem, Department of Homeland Security

# Exhibit 1



**U.S. Department of Homeland Security**
**Washington, DC 20528**

March 21, 2025

MEMORANDUM FOR ███████████████

FROM:        Nicole C. Barksdale-Perry        NICOLE C ___ ███████
             Executive Director                PERRY
             Human Resources Management & Services
             Office of the Chief Human Capital Officer

SUBJECT:        Reduction in Force Notice

A reduction in force within your competitive area has been conducted with an effective date of March 21, 2025.  This action is a result of the dissolution of Office of Civil Rights and Civil Liberties (CRCL).

In accordance with Executive Order *14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative,"* signed by President Trump on February 11, 2025, each agency, department, or commission head, must prioritize the reduction of positions performing functions not explicitly mandated by statute or regulation. Following a comprehensive statute-by-statute analysis, positions or functions identified as non-essential or not legally mandated are subject to this RIF. It is with great regret that I must inform you that your position of ██████ ███████████ within CRCL is being abolished, and you have been reached for reduction in force action. This memorandum constitutes a specific reduction in force (RIF) notice.

This reduction in force is being carried out in accordance with current law and regulations, which include Chapter 35 of Title 5, United States Code, 5 Code of Federal Regulations, Part 351, and OPM policy. In accordance with these provisions, you will be released from your competitive level, and you do not have assignment rights to another position in your competitive area.   Your position and all positions in your competitive level are being abolished, therefore there is no one with lower standing that you can displace in your competitive area.  As a result, you will be separated from the Federal service by reduction in force on May 23, 2025.

To conduct the RIF, the Office of the Chief Human Capital Officer (OCHCO), Human Resources Management and Services (HRMS), prepared retention registers which listed employees in retention standing order based on civil service tenure, veterans'

preference, length of Federal service and performance ratings. We used the following information to determine your retention standing as of the RIF effective date:

**Competitive Area: CRCL** ███████████
**Type of Service:** ██████████████████
**Position Title, Series, Grade:** ████████████████████████████████
**Competitive Level:** ████
**Tenure Group and Subgroup:** █████████████████████
**Service Computation Date (SCD):**
**Latest Three Performance Evaluations:** ████████████████
**Adjusted SCD (SCD adjusted by latest three performance ratings):** ██████

You have been reached for release from your competitive level in accordance with reduction in force regulations and procedures. You have no assignment rights to be placed in any other position in any other competitive level within your competitive area. Therefore, you will be separated from DHS at the close of business on May 23, 2025.

You are eligible to receive severance pay. We will provide your severance pay calculation no later than May 23, 2025.

Attached to this letter is an "Employee's Guide to RIF Benefits" which contains information regarding leave and other benefits available to employees separated by RIF, as well as information on the DHS Career Transition Assistance Plan. In addition, you may authorize the Human Resources Office to release your qualifications information to Federal, state and private sector agencies and organizations by completing the attached release authorization. Information regarding benefits available under the Workforce Investment Act of 1998 Program, including unemployment insurance, can be found at http://www.doleta.gov/usworkforce/WIA/planstatus.cfm.

If you resign on or before the RIF separation date of May 23, 2025, your separation will be considered voluntary. Please be advised that you may affect your appeal rights if you resign. You are strongly encouraged to contact the Human Resources Office for information if you are considering resigning during this specific notice period.

Staff of the OCHCO is available to assist you by explaining this proposed action and will provide you with copies of pertinent regulations, benefits information, or other material related to this action that you may wish to review. You are entitled to a copy of OPM's retention regulations found in 5 CFR Part 351, which will be provided to you upon request, and you may inspect the appropriate retention register through the OCHCO. You may obtain any information in writing by sending your request to OCHCO – RIF Team, email: workforceshapinghq@hq.dhs.gov.

You have the right to appeal this action to the Merit Systems Protection Board (MSPB). Should you elect to appeal to the MSPB, your appeal must be in writing and must be submitted no later than 30 calendar days after the effective date of the reduction in force

action.  An appeal form and copy of the MSPB's regulations are at www.mspb.gov. The address to which an appeal should be sent is as follows:  MSPB Washington Regional Office, 1901 S. Bell Street, Suite 950, Arlington, Virginia 22202 or email washingtonregionaloffice@mspb.gov.

Alternatively, an electronic appeal may be filed at https://e-appeal.mspb.gov/. See "How to File an Appeal" at http://www.mspb.gov/appeals/appeals.htm.  If you file an appeal the Board must serve an acknowledgement order to the following address:

John T. Koerner

Assistant General Counsel for Labor and Employment Law

General Law Division, Office of the General Counsel

U.S. Department of Homeland Security

2707 Martin Luther King Jr. Ave, SE

Mail Stop 0485

Washington, D.C.  20528

Telephone:  202-603-8038

Facsimile:  202-282-9186

John.Koerner@hq.dhs.gov

If you believe this action has been taken because of a prohibited personnel practice other than discrimination on the basis of your race, color, religion, sex, national origin, age, disability, marital status, or political affiliation, you may seek corrective action with the Office of the Special Counsel (OSC). Your decision to file an MSPB appeal at this time or to seek corrective action from the OSC is exclusive and irrevocable.  See Prohibited Personnel Practices Overview for more information about seeking corrective action.

If you believe that this action has been taken because of race, color, religion, sex (including pregnancy and gender identity), national origin, sexual orientation, physical disability, genetic information, or age, you may file a complaint with DHS's HRMS Workforce Management. This office can be reached at workforcerelationstaskers@hq.dhs.gov.  To initiate a complaint, you must contact a Workforce Relations Program, Employee Relations and Performance Management within 45 days of the effective date of this action.

This reduction in force action should not be considered as reflecting upon your performance or conduct. It is being taken solely due to the reduction in the number of positions as described earlier in this letter. The Department of Homeland Security (DHS) sincerely appreciates the services you have rendered during your employment, and we regret that you have been personally affected.

Please sign and return a copy of this notice to acknowledge receipt.

Attachments: RIF Information Sheet
                     Employee Guide to RIF Benefits

DHS Placement Programs
Reemployment Priority List Registration Form
Authorization to Release Qualifications Information

Sent by email to: ████████████

No hard copy to follow.

**Receipt Acknowledged:**

_____

Employee Name

_____

Employee's Signature                    Date

### RELEASE STATEMENT FOR QUALIFICATIONS INFORMATION

Privacy Act Notice

I authorize the Department of Homeland Security (DHS) to disclose information regarding my employment qualifications to public and private employers. I will provide/have provided this information to DHS prior to my separation date, either through submission of new materials or prior application form. I understand that this authorization is voluntary. If I choose to rescind this authorization in the future, I will notify the DHS in writing.

_____

Employee Name

_____

Employee's Signature                                              Date

# ATTACHMENT 2:

Protected Whistleblower Disclosure to Congress of

Dr. Scott A. Allen

and

Dr. Pamela McPherson

May 15, 2025

May 15, 2025

**VIA ELECTRONIC MAIL**

Honorable Chuck Grassley, Chair
Honorable Richard J. Durbin, Ranking Member
U.S. Senate Committee on the Judiciary
Washington, D.C. 20510

Honorable Rand Paul, Chair
Honorable Gary C. Peters, Ranking Member
U.S. Senate Committee on Homeland Security
and Governmental Affairs
Washington, D.C. 20510

Honorable Susan Collins, Chair
Honorable Patty Murray, Vice Chair
U.S. Senate Committee on Appropriations
Washington, DC 20510

Honorable Jim Jordan, Chair
Honorable Jamie Raskin, Ranking Member
U.S. House Committee on the Judiciary
Washington, DC 20515

Honorable Mark Green, MD, Chair
Honorable Bennie Thompson, Ranking Member
U.S. House Committee on Homeland Security
Washington, DC 20515

Honorable Tom Cole, Chair
Honorable Rosa DeLaura, Ranking Member
U.S. House Appropriations Committee
Washington, DC 20515

Re:    **Protected Whistleblower Disclosure of DHS Medical Experts Regarding
Known & Foreseeable Harms to Immigrant Children in Family Detention**

Dear Chairs and Ranking Members:

On March 21, 2025, the Trump administration took the unprecedented step of shuttering
oversight offices within the Department of Homeland Security (DHS), including the Office of
Civil Rights and Civil Liberties (CRCL).[1] This is deeply concerning because it removes the very
safeguards that have helped identify and prevent serious medical harm to families and children in
immigration detention.

We are physicians—an internist and an adult and child/adolescent psychiatrist—with expertise in
medical care in detention settings. One of us, Dr. Scott Allen, has served since 2014 as a medical
subject matter expert in detention health for DHS CRCL and has conducted nearly a dozen
investigations of family immigration detention facilities and an additional 20 on-site
investigations of adult detention facilities on CRCL's behalf during the past three
administrations, some of which have involved serious harms, including deaths.[2] The other, Dr.

---

[1] "U.S. homeland department targets oversight in government cuts," *Reuters*, March 21, 2025,
https://www.reuters.com/world/us/us-homeland-department-targets-oversight-government-cuts-2025-03-21/.
[2] I, Dr. Scott A. Allen, am a board certified in Internal Medicine and is a Fellow of the American College of
Physicians. I am a Professor Emeritus of Medicine, a former Associate Dean of Academic Affairs and former Chair
of the Department of Internal Medicine at the University of California Riverside School of Medicine. From 1997 to

Pamela McPherson, served as a subject matter expert for detention mental health for DHS CRCL beginning in 2014, conducting all of the investigations at Family Detention Centers with Dr. Allen in Artesia, New Mexico; Karnes City, Texas; Dilley, Texas; and Leesport, Pennsylvania.[3] Dr. McPherson has not yet received notice that the contract under which she serves as a subcontractor has been terminated; Dr. Allen's contract was terminated on April 10, 2025.

We write in our individual capacities to express grave concern over the Trump administration's recent decision in early March 2025 to re-implement family detention,[4] a practice that both our experience and extensive medical literature have consistently shown to be harmful to children's health and fundamentally incapable of being made safe.[5] We have repeatedly raised alarms about the systemic medical and mental health dangers posed by these detention facilities — concerns

---

2004, I was a full-time correctional physician for the Rhode Island Department of Corrections; for the final three years, I served as the State Medical Program. I have published over 25 peer-reviewed papers in academic journals related to prison health care and am a former Associate Editor of the International Journal of Prisoner Health Care. I am the court appointed monitor for the consent decree in litigation involving medical care at Riverside County Jails. I have consulted on detention health issues both domestically and internationally for the Open Society Institute and the International Committee of the Red Cross among others. I have worked with the Institute of Medicine on several workshops related to detainee healthcare and serve as a medical advisor to Physicians for Human Rights. I am the co-founder and codirector of the Center for Prisoner Health and Human Rights at Brown University and a former Co-Investigator of the University of California Criminal Justice and Health Consortium. I am also the founder and medical director of the Access Clinic, a primary care medical home to adults with developmental disabilities.

[3] I, Dr. Pamela McPherson, am a medical doctor triple boarded in general, child and adolescent, and forensic psychiatry. I have practiced medicine for over 30 years. I currently serve as the child and adolescent psychiatrist at the Shreveport Behavioral Health Center, a regional state sponsored clinic in northwest Louisiana. In addition to providing mental health care to children and their families, I teach child and adolescent psychiatry fellows and forensic psychiatry fellows at the LSU Health Sciences University in Shreveport, Louisiana as gratis faculty. I have qualified as a forensic psychiatry expert in juvenile and adult matters and have participated in research and presented at national and international conferences regarding the mental health of justice involved youth. I have a special interest in juvenile justice, specifically conditions of confinement. In addition to acting as an expert for the Civil Rights/Civil Liberties Office of DHS, I have served as an expert on mental health services to justice involved youth in pre-adjudicatory (San Francisco, Detroit, and Los Angeles) and post-adjudicatory (Montana, Louisiana, and New Mexico) juvenile facilities for the United States Department of Justice, Youth Law Center and the ACLU.

[4] Morgan Lee, "Privately run immigration detention center that previously held families in Texas will reopen," *AP News*, March 5, 2025, https://apnews.com/article/immigrant-detention-facility-families-texas-dilley-2cd794bdd0b81dca98c8353348fc149b; Valerie Gonzales, "Trump administration resumes detention of immigrant families after Biden-era pause," *AP News*, March 19, 2025, https://apnews.com/article/immigration-detention-texas-border-c008c78469d85a7c1962a6b36ac29330.

[5] See, e.g., Shela Sridhar et al., "Child Migrants in Family Detention in the US: Addressing Fragmented Care," *Children* 11, no. 8 (August 5, 2024: 944), https://doi.org/10.3390/children11080944; M. von Werthern et al., "The Impact of Immigration Detention on Mental Health: A Systematic Review," *BMC Psychiatry* 18, no. 1 (December 2018), https://doi.org/10.1186/s12888-018-1945-y; Sarah Mares and Jon Jureidini, "Psychiatric Assessment of Children and Families in Immigration Detention − Clinical, Administrative and Ethical Issues," *Australian and New Zealand Journal of Public Health* 28, no. 6 (December 2004): 520−26, https://doi.org/10.1111/j.1467-842x.2004.tb00041.x; Laura C Wood, "Impact of Punitive Immigration Policies, Parent-Child Separation and Child Detention on the Mental Health and Development of Children," *BMJ Paediatrics Open* 2, no. 1 (September 2018), https://doi.org/10.1136/bmjpo-2018-000338.

amplified by the elimination of CRCL and other oversight bodies designed precisely to identify and mitigate such risks.[6]

The Karnes facility is already holding families with children as young as one year old,[7] and the Dilley facility is preparing to detain as many as 2,400 children and parents.[8] Recent reporting indicates that the same conditions that existed in the family detention centers when we blew the whistle persist today.[9] This compels us to raise the alarm once again: the detention of children is harmful to their health, and these facilities are structured to cause rather than prevent harm.

During the Obama administration, we shared our concerns internally with DHS CRCL about the dangers to children at the family detention centers generally while noting serious deficiencies we found in the course of ten investigations. At the end of 2016, DHS's own nonpartisan expert Advisory Committee on Family Residential Centers concluded that detention should be presumed inappropriate and unnecessary for families, and that "detention is never in the best interest of children."[10] When the first Trump administration ended its family separation policy while increasing its use of family detention, we felt compelled to speak out warn CRCL, Congress, the DHS Office of Inspector General, and the public that migrant children were at risk of imminent, foreseeable harm.[11]

Our experience conducting numerous oversight visits at the various iterations of family detention facilities, including at Karnes and Dilley, has led us to conclude that the DHS detention apparatus cannot meet minimum required standards of care for children in its custody, and that

---

[6] See, e.g., Drs. Scott Allen and Pamela McPherson, Letter to Senate Whistleblower Caucus Chairs, July 17, 2018, https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf); Miriam Jordan, "Whistle-blowers Say Detaining Migrant Families 'Poses High Risk of Harm'" *New York Times,* July 18, 2018, https://www.nytimes.com/2018/07/18/us/migrant-children-family-detention-doctors.html; Comment of Dr. Scott Allen and Dr. Pamela McPherson on the Immigration and Customs Enforcement Bureau (ICEB) Proposed Rule: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, https://www.regulations.gov/document?D=ICEB-2018-0002-18931, November 5, 2018; Drs. Scott Allen and Pamela McPherson, "Whistleblowers Renew Challenges to Family Detention," Letter to House and Senate Judiciary, Senate Homeland Security and Gov't Affairs, and House Homeland Security Committees, March 19, 2019, https://jayapal.house.gov/wp-content/uploads/2019/03/031919-whistleblowers-letter-to-Congress-w-cover-letter-fact-sheet-re-children-in-detention.pdf.
[7] Gonzales, "Trump administration resumes detention of immigrant families after Biden-era pause."
[8] Megan R. Wilson, "Dilley, Texas Family Detention Center to Resume Operations Under Trump Administration," *The Washington Post,* March 5, 2025, https://www.washingtonpost.com/immigration/2025/03/05/dilley-texas-family-detention-center-ice/.
[9] Dolores K. Schroeder, "The Long-Lasting Trauma of Family Detention Centers," *Time,* April 30, 2025, https://time.com/7280104/the-trauma-of-family-detention-centers/; Maanvi Singh, "Trump is jailing immigrant families again. A mother, father and teen tell of 'anguish on a daily basis'," *Guardian,* April 24, 2025, https://www.theguardian.com/us-news/ng-interactive/2025/apr/24/trump-immigration-families-detained; Jack Herrera, "The Immigrant Families Jailed in Texas," *The New Yorker,* April 23, 2025, https://www.newyorker.com/news/the-lede/the-immigrant-families-jailed-in-texas.
[10] Report of the DHS Advisory Committee on Family Residential Centers, September 30, 2016, https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.
[11] Drs. Scott Allen and Pamela McPherson, Letter to Senate Whistleblower Caucus Chairs, July 17, 2018, https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf).

its practice of incarcerating children is inherently harmful. We have witnessed shocking instances of substandard medical care including:

- The case of a 16-month-old baby boy who lost 31.8 % of his body weight over 10 days of diarrheal disease but was never taken to an emergency room or given IV fluids.
- A case where lack of proper medical screening resulted in a 27 day old infant suffering a seizure because an intracranial bleed was missed. It was only after the baby had a seizure that he saw a pediatrician at the facility.
- A two year old exhibiting biting and hitting behaviors, which can be common for children who have experienced trauma, was placed in medical isolation – essentially solitary confinement – with his parent for days.
- Due to poor intra-agency coordination and medical staff's unfamiliarity with pediatric dosing, a facility accidentally gave dozens of children adult dosages of vaccines.

In addition, we have consistently observed systemic problems that have never been adequately addressed such as:

- limitations in capacity to provide meaningful translation services for medical care, especially for speakers of indigenous languages, with overreliance on telephonic translation services instead of in-person, trained, medical interpreters;
- a dearth of qualified medical professionals available and willing to serve in rural areas, a particular challenge when facilities are expected to be swiftly filled with detained families;
- insufficient space for medical services, including at the Dilley facility, specifically built for the detention of families, where medical overflow spilled into the gymnasium;
- dangerous shortcomings in trauma-informed care, including inadequate space for observation of those expressing suicidal ideation and a lack of mental health providers;
- and evidence of concerning oversight weaknesses that enabled these systemic problems.

Importantly, our observations included periods of both prolonged and shortened detention of families. Shorter lengths of detention did not sufficiently mitigate the harmful conditions that we observed and their deleterious consequences; most of the harms we documented were in families detained less than 20 days. Indeed, the medical literature confirms that no amount of time spent in detention is safe for children.[12] The consensus of the medical profession stands in opposition to family detention, and our concerns about the risks associated with family detention have been echoed repeatedly by leading medical professional associations.[13]

---

[12] American Academy of Pediatrics, Detention of Immigrant Children Policy Statement, May 1, 2017, https://publications.aap.org/pediatrics/article/139/5/e20170483/38727/Detention-of-Immigrant-Children?autologincheck=redirected (noting that "expert consensus has concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children.")
[13] See, e.g., Academic Pediatric Association, American Academy of Pediatrics, American Association of Child & Adolescent Psychiatry, American College of Physicians, American Medical Association, et al, Letter to House

In December 2018, in the wake of the death of 7-year-old Jakelin Caal Maquin in Border Patrol Custody, we published our warning that, given the conditions, it was only a matter of time more children died in detention.[14] Sadly, our warnings proved prescient as at least six more children have died since then.[15] Most recently, we repeated our warnings of the dangers of family detention to the Biden administration in 2021 to underscore that detention is not a humane alternative to expulsions under Title 42 authority[16] and again in 2023 when reports indicated the previous administration was considering the detention of families.[17]

Nothing has changed for the better since we began to sound the alarm about the harms inherent to the detention of children nearly a decade ago. We have no reason to believe that the conditions of custody will adequately protect the medical and mental health needs of families in detention. In fact, the fundamental flaw that gives rise to harm is the detention of children and families

Judiciary Committee, House Energy and Commerce Committee, House Homeland Security Committee, and House Appropriations Committee, July 24, 2018,
https://www.acponline.org/acp_policy/letters/letter_house_oversight_request_on_child_detention_centers_2018.pdf;
American College of Physicians, Internists Call for Congressional Oversight of Family Detention, July 20, 2018,
https://www.acponline.org/acp-newsroom/internists-call-for-congressional-oversight-of-family-detention (letters validating disclosures of Drs. Allen and McPherson regarding harm to children in detention and calling for oversight); American Academy of Pediatrics, "Seeking Safe Haven: Detention of Immigrant Children & Families," *HealthyChildren.org*, March 13, 2017, https://healthychildren.org/English/healthy-living/emotional-wellness/Building-Resilience/Pages/Detention-of-Immigrant-Children.aspx; Andis Robeznieks, "Congress Told Impact Of Immigrant Children's Trauma May Be Lifelong," *American Medical Association*, July 12, 2019, https://www.ama-assn.org/delivering-care/population-care/congress-told-impact-immigrant-child; American College of Physicians, "ACP Says Family Detention Harms The Health Of Children, Other Family Members," *ACP Newsroom*, July 5, 2018,, https://www.acponline.org/acp-newsroom/acp-says-family-detention-harms-the-health-of-children-other-family-members; Jessica Henderson Daniel, "Statement Of APA President Regarding Administration's Proposal To Detain Child Migrants Longer Than Legally Allowed," *American Psychological Association*, September 16, 2018,
https://www.apa.org/news/press/releases/2018/09/detain-child-migrants; Saul Levin, "APA Letter to U.S. Commission on Civil Rights, re: Comments on Immigration Detention Centers and Treatment of Immigrants," *American Psychiatric Association,* May 13, 2019,
https://www.psychiatry.org/File%20Library/Psychiatrists/Advocacy/Federal/APA-Letter-USCoCR-Immigration-Detention-05132019.pdf
[14] Scott A. Allen & Pamela McPherson, "We Warned DHS That a Migrant Child Could Die in U.S. Custody. Now One Has," *The Washington Post*, Dec. 19, 2018, https://www.washingtonpost.com/outlook/2018/12/19/we-warned-dhs-that-migrant-child-could-die-us-custody-now-one-has/.
[15] Franco Ordoñez, "Deaths Of Migrant Children Haunt Former Official As Border Surge Increases"*, NPR,* March 17, 2021, https://www.npr.org/2021/03/17/977978891/deaths-of-migrant-children-haunt-former-official-as-border-surge-increases; "Deaths in Custody," *American Immigration Lawyers Association,* Sept. 5, 2023, https://www.aila.org/library/deaths-in-cbp-custody; "June 1, 2023 Update: Death in Custody of 8-Year-Old in Harlingen, Texas," U.S. Customs and Border Protection, June 1, 2023, https://www.cbp.gov/newsroom/national-media-release/june-1-2023-update-death-custody-8-year-old-harlingen-texas.
[16] Drs. Scott A. Allen and Pamela McPherson, Letter to Congress on the Ongoing Risks of Harm from Detention to Migrant Children and Families (May 24, 2021), https://whistleblower.org/wp-content/uploads/2021/05/052421-letter-to-Cong-from-doctors-re-child-family-detention.pdf
[17] Drs. Scott A. Allen and Pamela McPherson, Letter to President Biden and Secretary Mayorkas on the Ongoing Risks of Harm from Detention to Migrant Children and Families (March 8, 2023), https://whistleblower.org/wp-content/uploads/2023/03/2023.03.08-Full-Allen-McPherson-letter-to-Biden-Admin-re-Resuming-Family-Detention-with-cover.pdf.

itself. No amount of programming can ameliorate the harms created by the very act of confining children to detention centers.

Instead, the reduction in force to eliminate the DHS Office of Civil Rights and Civil Liberties only exacerbates our concerns. As contractors of DHS CRCL, we were deployed to investigate complaints of abuses and to monitor medical and mental health conditions for rights violations. CRCL worked to support the DHS mission by identifying threats to safety, security and the public health and by making specific recommendations to reduce or eliminate those threats. Without this critical line of oversight and guidance, dangerous mismanagement that puts detained children, their families, and communities at risk will go unchecked.

As medical professionals, we once more have a duty to warn the administration of imminent harm to children and their families. With clear warnings from the medical community, any effort to again implement the practice of family detention is a decision to knowingly create substantial and specific harm to children and has no place in U.S. border policy.

We want to contribute our expertise in detention health to Congress, DHS, and oversight bodies such as the Government Accountability Office and the DHS Office of Inspector General to protect against adverse health effects of detention on children. Our legal counsel, Dana Gold and Andrea Meza at the Government Accountability Project, are supporting and coordinating our efforts to communicate these serious issues to you and other oversight entities. Please contact Ms. Gold at danag@whistleblower.org, or Ms. Meza at andream@whistleblower.org, with any questions.

Sincerely,

Scott A. Allen, MD, FACP          Pamela McPherson, MD

Letter from Drs. Scott A. Allen and Pamela McPherson to Congress on Reinstatement of Immigrant Family Detention
Page 6 of 6