## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER,<br><br>  Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>  Defendants. | Civil Action No. 25-1270-ACR |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF DECLARATION

The Court has given Defendants every opportunity to demonstrate that they have a plan to comply with their statutory obligations to continue operating the three DHS Oversight Offices at the center of this case. But at every turn, the same pattern recurs—Defendants make public pronouncements that are irreconcilable with the offices' continued existence and then insist to the Court that it should disbelieve these out-of-court concessions. Defendants' spokesperson declared on March 21 that the offices were being closed because they "obstructed immigration enforcement by adding bureaucratic hurdles and undermining DHS's mission."[1] They told the offices' employees that they were ineligible for reassignment because the offices were being totally eliminated. Brian Doe Decl. ¶ 3 & Ex. 1, ECF No. 31-1. And, now, the Administration has told

---

[1] Maria Sacchetti and Ellie Silverman, *DHS Shuts Down Internal Watchdog Agencies that Advocated for Immigrants, Washington Post (Mar. 21, 2025),* https://www.washingtonpost.com/immigration/2025/03/21/dhs-immigrant-advocates-watchdogs-oversight/.

Congress that there is no need to fund OIDO in the next fiscal year because the RIFs succeeded in shutting it down. See Gilbride Decl., Ex. 2 at OSEM-O&S-11, ECF No. 41-1.

The Court's willingness to believe that Defendants are acting in good faith has been met with explanations that defy common sense. The Court should trust Defendants when they speak publicly about their intentions. Those representations flout Defendants' statutory obligations, to the remediable detriment of Plaintiffs. The time has come for the Court to enter the requested injunction. Failing that, the Court should permit Plaintiffs to conduct discovery into Defendants' actions since January 20, 2025 with respect to the three offices in question, including plans for their future funding and staffing.

1.  The Budget Request Undermines Defendants' Representations to this Court

Regardless of what DHS submitted to OMB in early 2025 before the April passback, the unredacted portions of the Tipton Declaration make clear that by May 19, when Mr. Sartini testified about his plans for the offices, and by May 22, when Mr. Hemenway met with Mr. Sartini and approved those plans, *see* Hemenway Decl. ¶ 2, ECF No. 33-1, DHS leadership knew, or had every reason to know, that the FY2026 budget request for DHS would seek no money for OIDO and only about one-tenth of the money in the budgets that CRCL and CISOM had been operating under during FY2025. *Compare* Tipton Decl. ¶¶ 2–3, ECF No. 43-1 (stating that CRCL will need $48,445,000 and CISOM will need $10,383,000 for the remainder of FY2025), *with* Gilbride Decl., Ex. 2 at OSEM-O&S-11 (seeking $4.9 million for CRCL and $1.6 million for CISOM for FY2026, designated for "interim staff salaries, severance pay, and leave payouts for employees who received RIF notifications").

Despite this, DHS leadership allowed Mr. Sartini to testify under oath, twice, about his long-term plans for staffing all three offices—plans that will become unworkable in three months when the FY2025 funding runs out, if DHS receives the funding requested by the President's budget. Ultimately, whether the drastic proposed budget cuts to the three DHS Oversight Offices originated with DHS or were introduced by OMB during a passback is immaterial. What matters is that DHS knew that a plan was being sent to Congress reflecting the complete elimination of OIDO and the winddown of the other two offices through "interim staff" and drastic funding cuts at the same time that their employee, Mr. Sartini, presented a very different plan to this Court suggesting the resumption of operations at all three offices, supported by hiring full-time staff so those operations could continue on a long-term basis.

These conflicting plans, presented more or less simultaneously to two different co-equal branches of government, raise serious doubts about which plan represents the executive's true intentions for these three offices. More troubling still, the timing and sequence of events suggest DHS leadership very likely knew about the President's budget recommendations for DHS when Mr. Hemenway consulted with Mr. Sartini about his plan and submitted a declaration to this Court on May 22, but chose not to share that information with this Court, with Plaintiffs, or perhaps even with Mr. Sartini or government counsel during this critical window. This information about the budget projections for FY2026 was certainly relevant to the viability of Mr. Sartini's plans for hiring new full-time staff. Defendants' choice  not to mention such highly relevant information to the Court until after it became a matter of public record on May 29, by which point the Court had denied Plaintiffs' motion for a TRO and the employees of all three offices had been separated from federal employment through a RIF on May 23, calls Defendants' good faith into question. At a minimum, Plaintiffs should be allowed to conduct discovery into the budget process and DHS's

communications with OMB and other governmental entities to better understand whether and to what extent DHS's actions reflect a sincere intention to resume operations at the three DHS Oversight Offices since Defendants issued the stop-work order on March 21, 2025.

2. The Tipton Declaration's Contradictions About OIDO Are Incoherent and Undermine Defendants' Credibility

The Tipton Declaration's discussion of OIDO is riddled with contradictions that border on incoherence. In paragraph 10, Tipton begins by stating that the "President's budget recommends that Congress eliminate funding for OIDO," which is consistent with the statement in that budget request that "OIDO has been eliminated in its entirety." Tipton Decl. ¶ 10. But then Tipton goes on to say that this elimination has nothing to do with the RIF conducted in that office, even though the budget document says that "[t]his program change represents the RIF that occurred within the Office of the Immigration Detention Ombudsman (OIDO)." Gilbride Decl., Ex. 2 at OSEM-O&S-12. This effort to decouple the budget request's statement of elimination from both the agency's present conduct and the RIF, which the budget request itself describes as the impetus for the program change, is both strained and implausible.

Indeed, just a week before this budget request was submitted to Congress, DHS human resources personnel used strikingly similar language in explaining to OIDO employees that there were no positions they could be reassigned to following the RIF because there would be no OIDO positions going forward. *See* Brian Doe Decl. ¶ 3 & Ex. 1 (recounting FAQ answer about offices being "eliminated in their entirety"). When asked about this statement, Defendants asserted, through Ms. Barksdale-Perry, that this RIF-related language pertained only to the present-tense elimination of positions and had no bearing on what would happen to these offices in the future. Barksdale-Perry Decl. ¶¶ 6–7, ECF No. 32-1. Now, in attempting to explain the similar language in the FY2026 budget request that OIDO "has been eliminated in its entirety," Ms. Tipton states

that this is a prospective statement about the President's plans for the future (notwithstanding its use of the past tense) and "is not a reflection of what OIDO is currently doing." Tipton Decl. ¶ 10.

Defendants' shifting and conflicting explanations for these repeated references to office elimination strain credulity. There is a far more straightforward explanation: that despite the representations made during this litigation, Defendants still plan to eliminate one or more of these offices in their entirety—consistent with the actions they took in March that precipitated the filing of this lawsuit in the first place. They continue to say precisely this to multiple audiences and in formal documents likely vetted by agency leadership, and they should be taken at their word.

3. Defendants' Pattern of Inconsistent Conduct Undermines Its Representations in this Case

The elimination plans evident in the budget request, and the contradictions between those plans and representations made to this Court, are not anomalies; they are part of a troubling and persistent pattern of conduct that undermines Defendants' assurances to this Court about the offices' continued existence, and the plans for staffing them.

For instance, Defendants' witnesses testified on May 23 that employees of the three offices who were subject to the RIF would be able to apply for the new positions that would be created in the three offices through the Re-Employment Priority List when new positions were announced, but when DHS posted the job announcements on June 2, it explicitly limited the eligibility criteria to exclude those former employees. *See* Gilbride Decl., Exs. 3–5. And while Defendants placed statements on each office's homepage about their continued existence at this Court's direction, no such announcements have been made at detention facilities where people arguably need these oversight offices the most. To the contrary, Plaintiff RFK has heard from detained people at two different detention facilities that information that was previously posted in the facilities about how

to contact CRCL and OIDO to file complaints has been removed, and that this is still the case as recently as today.  Declaration of Sarah Gillman ¶¶ 4–7.

This pattern of inconsistent messaging and inconsistent action erodes confidence in Defendants' stated intentions.  Defendants tell the Court that the offices exist, tell Congress that at least one has been eliminated, tell employees that the offices have been dissolved, and tell the public that relies on these offices almost nothing at all.  When confronted with such a pattern of glaring discrepancies, courts are entitled to draw reasonable inferences about credibility, transparency, and intent.

For all of these reasons, Plaintiffs respectfully request that their pending motion for preliminary injunction be granted.  In the alternative, Plaintiffs request that they be permitted to conduct discovery prior to filing of any dispositive motions, with the parties to meet and confer to seek agreement on the scope of such discovery.

Dated: June 18, 2025                          Respectfully submitted,

                                              /s/ Karla Gilbride

Michael C. Martinez (DC Bar No. 1686872)      Karla Gilbride (DC Bar No. 1005586)
Christine L. Coogle (DC Bar No. 1738913)      Adina H. Rosenbaum (DC Bar No. 490928)
Brian D. Netter (DC Bar No. 979362)           Public Citizen Litigation Group
Skye L. Perryman (DC Bar No. 984573)          1600 20th Street NW
Democracy Forward Foundation                  Washington, DC 20009
P.O. Box 34553                                (202) 588-1000
Washington, DC 20043                          kgilbride@citizen.org
(202) 448- 9090

                                              *Counsel for All Plaintiffs*


Anthony Enriquez (DDC Bar No. NY0626)         Sarah E. Decker (DDC Bar No. NY0566)
Sarah T. Gillman (DDC Bar No. NY0316)         Medha Raman (DC Bar No. 90027539)
Robert F. Kennedy Human Rights                Robert F. Kennedy Human Rights
88 Pine Street, Suite 801                     1300 19th Street NW, Suite 750
New York, NY 10005                            Washington, DC 20036
(917) 284- 6355                               (202) 559-4432

                                              *Counsel for Plaintiff RFK*

7