# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, <br><br> Defendants. | Civil Action No. 25-1270 (ACR) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' <br> MOTION FOR PARTIAL RECONSIDERATION OF JULY 11 ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

   I.   The Proffered Evidence Is Not New. .......................................................................... 2

      A.  Full and Fair Presentation Related to the "Newly Discovered" Single Auto-Response "Evidence" ............................................................................................. 3

      B.  OIDO Is Performing Its Statutory Functions ....................................................... 5

   II.   The Court Acted Well Within its Discretion. .............................................................. 8

   III.  This Case Fails on the Merits Regardless. .................................................................. 9

   IV.  Reconsideration Is Pointless Because the Preliminary-Injunction Motion Is Meritless... 15

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alcresta Therapeutics, Inc. v. Azar*,
    318 F. Supp. 3d 321 (D.D.C. 2018) ...................................................................... 17

*Ali v. Adamson*,
    132 F.4th 924 (6th Cir. 2025) ............................................................................ 11

*Am. Foreign Serv. Assoc. v. Trump*,
    Civ. A No. 25-352 (CJN), 2025 WL 2097574 (D.D.C. July 25, 2025) ................ 10

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ........................................................................................... 15

*Cardinal Health, Inc. v. Holder*,
    846 F. Supp. 2d 203 (D.D.C. 2012) .................................................................... 17

*Carter v. Dep't of Educ.*,
    Civ. A. No. 25-744 (PLF), 2025 WL 1453562 (D.D.C. May 21, 2025) ............... 17

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...................................................................... 15, 16

*Church v. Biden*,
    573 F. Supp. 3d 118 (D.D.C. 2021) .................................................................... 17

*Dietz v. Bouldin*,
    579 U.S. 40 (2016) ............................................................................................... 8

*Elgin v. Dep't of the Treasury*,
    567 U.S. 1 (2012) .............................................................................................. 12

*Falco v. WMATA*,
    Civ. A. No. 18-2766 (JEB), 2020 WL 12968925 (D.D.C. Apr. 1, 2020) ............... 1

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................... 10

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ........................................................................... 10

*Ghayoori v. Sultanate of Oman*,
    Civ. A. No. 24-2263 (RDM), 2024 WL 3837833 (D.D.C. Aug. 6, 2024) ........ 9, 10

*In re Sealed Case*,
    77 F.4th 815 (D.C. Cir. 2023) .............................................................................. 8

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*,
    101 F.3d 145 (D.C. Cir. 1996) .............................................................................. 8

*Lujan v. Nat'l Wildlife Fed.*,
  497 U.S. 871 (1990) ................................................................ 14, 15

*McBryde v. Comm. to Review Circ. Counc. Conduct*,
  264 F.3d 52 (D.C. Circ. 2001) ................................................ 11, 12

*McMahon v. New York, No. 24A1203*,
  2025 WL 1922626 (U.S. July 14, 2025) ...................................... 16

*Noel Canning v. NLRB*,
  705 F.3d 490 (D.C. Cir. 2013) .................................................... 9

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .................................................................. 14, 17

*NTEU v. Vought*,
  No. 25-5091 (D.C. Cir. Aug. 15, 2025).................................. passim

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
  48 F. Supp. 3d 87 (D.D.C. 2014) ............................................... 16

*OPM v. AFGE*,
  145 S. Ct. 1914 (Apr. 8, 2025) ................................................... 11

*Pueschel v. Nat'l Air Traffic Controllers' Ass'n*,
  606 F.Supp.2d 82 (D.D.C. 2009) ................................................. 2

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................... 16

*Singh v. George Washington Univ.*
  383 F. Supp. 2d 99 (D.D.C. 2005) ............................................ 2, 6

*Trump v. Boyle*,
  606 U.S. ----, 2025 WL 2056889 (U.S. July 23, 2025) .................. 16

Statutes

6 U.S.C. § 205 .......................................................................... 2, 6, 7

6 U.S.C. § 272 .......................................................................... 2, 7, 8

**INTRODUCTION**

On August 1, 2025, twenty-one days after the Court denied Plaintiffs' preliminary injunction motion as moot and entered a scheduling order for expedited discovery and summary judgment briefing (ECF No. 49), Plaintiffs moved for reconsideration of the July 11, 2025 order. Plaintiffs' new motion is based on alleged "new evidence" and their belief that the Court "misunderst[ood]" the parties' joint scheduling motion as a withdrawal of their preliminary injunction motion. Pls. Recon. Mot. (ECF No. 50) at 2, 5. But Plaintiffs' supposed evidence is not "new," as Plaintiffs themselves eventually admitted. Nor did the Court misunderstand anything. Regardless, this case fails as a matter of law because Plaintiffs do not have standing and for additional jurisdictional reasons explained below. And in any event, reconsidering the preliminary injunction would be pointless because it should be denied for all of the reasons explained before, including standing, ripeness, and lack of irreparable harm. *See* Defs. PI Opp'n (ECF No. 19). Indeed, today, the D.C. Circuit issued its decision in *NTEU v. Vought*, No. 25-5091 (D.C. Cir., Aug. 15, 2025) (Op. attached as Exhibit G), which conclusively establishes that Plaintiffs have no judicially-reviewable APA claims, as further explained below. The Court, therefore, should deny Plaintiffs' latest seriatim filing so the parties can continue with the agreed-upon schedule. Alternatively, if the Court agrees it lacks jurisdiction, as firmly established in *NTEU*, it should dismiss Plaintiffs' claims outright.

**LEGAL STANDARD**

Motions for reconsideration "are strongly discouraged," Standing Ord. (ECF No. 8) ¶ 8, and are within the trial court's "broad discretion," *Falco v. WMATA*, Civ. A. No. 18-2766 (JEB), 2020 WL 12968925, at *1 (D.D.C. Apr. 1, 2020). "The moving party has the burden of showing that reconsideration is warranted, and that some harm or injustice would result if reconsideration

were to be denied." *Pueschel v. Nat'l Air Traffic Controllers' Ass'n*, 606 F.Supp.2d 82, 85 (D.D.C. 2009). "Justice may require revision when the Court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court." *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).

## ARGUMENT

### I.     The Proffered Evidence Is Not New.

Plaintiffs' motion undermines the efficiency of the agreed-upon and court-ordered path to resolution because of "newly discovered evidence" that they present in an incomplete and misleading manner. Plaintiffs have provided to the Court a single auto-response from an Office of the Immigration Detention Ombudsman ("OIDO") Outreach mailbox. *See* ECF No. 50-1 at 9 (July 16 OIDO Outreach auto-reply). Plaintiffs suggest this shows that OIDO, the Office for Civil Rights and Civil Liberties ("CRCL"), and the Office of Citizenship and Immigration Services Ombudsman ("CIS Ombudsman") (collectively, the "Offices") are not performing their statutory functions. Pls. Recon. Mot. at 1, 2, 4, 5, 6. It does not. If anything, the pertinent evidence shows the Offices are performing their statutory functions diligently.

This saga started when Plaintiffs notified undersigned counsel that they would be moving for reconsideration of the denial of their preliminary injunction motion based, in part, on "newly discovered evidence." That was a single auto-response to an email from Robert F. Kennedy Human Rights ("RFK") that cc'd an OIDO Outreach email on July 16. *See* ECF 50-1 at 9. Concerned about the situation as Plaintiffs presented it, undersigned counsel diligently investigated in an attempt to identify and remedy any problems. What counsel discovered,

however, was that Plaintiffs had failed to provide key context for the bare-bones automated response, a lack of context maintained in Plaintiffs' presentation to this Court.

A.    Full and Fair Presentation Related to the "Newly Discovered" Single Auto-Response "Evidence"

Plaintiffs did not provide to the Court the email that generated the auto-response from the OIDO External Relations Division, which Defendants now provide.  *See* Defs. Opp'n, Ex. A (July 16 email from RFK).  Defendants also provide additional contemporaneous evidence tracking CRCL's response to RFK's presentation of the detainee's allegations to show that all statutory functions are still being performed, contrary to Plaintiffs' representations.  *See* Defs. Opp'n, Ex. B (June 27 and July 7 emails from CRCL to ICE); Defs. Opp'n, Ex. C (preceding emails between RFK and Enforcement and Removal Operations ("ERO") at ICE and CRCL). This shows that Plaintiffs have taken the single auto-response from an OIDO mailbox completely out of context.

Following the detainee's surgery, RFK communicated directly with an ERO Deputy Field Office Director in late May 2025 about post-surgical symptoms, as well as requests for protein shakes, an oncological consultation, a medication change, and a lower bunk.  Defs. Opp'n, Ex. C at 9-12. The Deputy repeatedly informed RFK that the detainee's medical requests were received and sent to the appropriate medical staff and the facility administrator.  *Id.* at 6-7. Indeed, ICE arranged for a medical consultation to address the detainee's post-surgical complaints, and the detainee attended the appointment but refused examination because of privacy concerns.  *Id.*

On June 27, 2025, apparently dissatisfied with ICE's response, RFK lawyers sent an internal email between each other and included CRCL Compliance (on a cc) for the first time about the detainee's medical issues.  *Id.* at 2-3 (cc'ing CRCL Compliance).  Just a few hours later,

3

a CRCL investigator emailed ERO CRCL with a cc to CRCL Medical Referral at DHS headquarters, summarizing the allegations "for ERO's consideration and action, if any, as it deems appropriate." Defs. Opp'n, Ex. B at 1-2. On July 2, 2025, RFK followed up with ERO, again cc'ing CRCL Compliance. Defs. Opp'n, Ex. C. at 1-2. The CRCL investigator then emailed ERO CRCL with a cc to CRCL Medical Referral at DHS headquarters about the supplemental correspondence. Defs. Opp'n, Ex. B at 1. Counsel learned about the details after conducting their own investigation and have submitted the evidence, so the Court has a full and fair picture of the issues that Plaintiffs raise in their reconsideration motion.

Plaintiffs, instead, provided to the Court only the single OIDO Outreach auto-response that Plaintiffs subsequently received. ECF No. 50-1 at 9. As Plaintiffs admit, less than one week after RFK reached out to OIDO, the detainee was scheduled for an appointment with "an off-site transgender care specialist," but the detainee opted to meet with legal counsel instead. 4th Enriquez Decl. (ECF No. 50-1) ¶ 17.

When undersigned counsel raised the fact that CRCL received, reviewed, and referred the detainee's complaint, Plaintiffs said that was insufficient. They claimed that the Offices could talk to ICE themselves; the point of the Offices was to be "independent" and fix the issues when ICE would not. But the Government has been consistent on this key fault in Plaintiffs' case: the Offices can generally only make recommendations and referrals; the component agencies are the entities that have ability to remedy the issues on the ground, and they retain discretion to do so. Defs. Opp'n, Ex. D (Hearing Tr. May 19, 2025) at 8:20-9:25, 38:11-39:3. This is especially true for serious medical issues, which will always require quick, on-the-ground responses rather than review by oversight Offices. *Id.* at 38:11-16. Here, CRCL did what it was supposed to: it quickly reviewed the complaint, determined it involved allegations of an urgent medical issue,

and sent it to ICE to take appropriate action.  Defs. Opp'n, Ex. B.  The fact that Plaintiffs do not like the process or outcome does not constitute a statutory violation, much less new evidence.

Indeed, Plaintiffs' counsel themselves admitted that the email was not the issue; it was that OIDO did not have people in the facilities to quickly address complaints in real time.  But that is neither new evidence nor statutorily required.  There have not been OIDO staff on the ground since the Reduction-in-Force ("RIF") notice; even when there was, the staff were not at every facility; even if they were in a facility, it was not 24/7 and they could not directly redress issues; the staff had serious issues; and, in any event, on-the-ground staffing is not statutorily required.  Defs. PI Opp'n (ECF 19) at 35; Defs. Opp'n, Ex. E (Hearing Tr. May 23, 2025) at 89:13-24 (testifying about "gross mismanagement" and "lots of problems" with previous staff at detention facilities).

    B.    <u>OIDO Is Performing Its Statutory Functions</u>

OIDO is operating, receiving complaints, and reviewing them.  *See* Defs. Opp'n, Ex. F (Sartini Decl. Aug. 15, 2025) ¶ 4.  The proper procedure for submitting complaints is through OIDO's online portal, *see* https://myoido.dhs.gov/en-US/, which is fully operational and shows that the OIDO is still receiving complaints.  *Id.*  Indeed, this portal has been operational since March 2023 and is easy to find.  *Id.*  The OIDO Outreach mailbox that RFK cc'd (Defs. Opp'n, Ex. A), however, was affiliated with the External Relations Division at OIDO; this is no longer a division within OIDO and reference to the mailbox no longer exists on OIDO public-facing resources.  *Id.*  Among many changes that were made to OIDO's web pages between March and May 2025, OIDO identified on its website that the proper manner for filing a complaint was through OIDO's online portal.  *Id.*  This change was made well before Plaintiffs' July 2025 email to the External Relations email box.  *Id.* Defendants have removed the auto-response message

because it is not an accurate representation of the complaint submission process as clearly stated on OIDO's website, https://myoido.dhs.gov/en-US/. *Id.* The External Relations email box, at the time of Plaintiffs' email, was and is not a proper means for filing a complaint; the email box is defunct. *Id.*

The single auto-response from an email address that is not intended for complaint submission and was solicited by an email from RFK that was outside of complaint submission protocol is not a "significant change" in fact that warrants reconsideration. *See Singh*, 383 F. Supp. 2d at 101. The Government is large and complex. The RIF is a significant ongoing process. It is unsurprising that not everything is perfect. But the Offices are working diligently to fix any misunderstandings. *See* Defs. Opp'n, Ex. F. (Sartini Decl. Aug. 15, 2025) ¶¶ 2-5. That hardly proves a statutory violation.

When undersigned counsel raised this with Plaintiffs, Plaintiffs responded that they used to be able to submit complaints in a variety of ways and that the online portal protocol was new to them. Their motion cites several statutory provisions this submission process allegedly violates, Pls. Recon. Mot. at 5, and argues that OIDO must "[e]stablish an accessible and standardized process regarding complaints." 6 U.S.C. § 205(b)(2). But OIDO does have an "accessible and standardized process," as the standardized online portal is readily accessible. *See* https://myoido.dhs.gov/en-US/. Indeed, detainees have access to the portal, and even if they do not, anyone can file on their behalf. *See* Defs. Opp'n, Ex. F. (Sartini Decl. Aug. 15, 2025) ¶ 4; *see also* https://myoido.dhs.gov/en-US/ ("Who Should Submit this Form?": explaining that either a detainee or individual on behalf of a detainee, including an acquaintance, family member, or attorney/accredited representative, can submit a case intake form). If anything, Plaintiffs' description of an ad hoc process by which they send complaints to individual employees they

have connections with is far less standardized or accessible than a uniform portal for intake and tracking of cases. *See* 4th Enriquez Decl. (ECF No. 50-1) ¶ 25.

Plaintiffs also claim that the Offices must "make public . . . how to contact the Officer," 6 U.S.C. § 205(b)(2), and contact information must be "published and made available to individuals and employers served by the office," 6 U.S.C. § 272(d)(3). Pls. Recon. Mot. at 5. Plaintiffs leave out key context, however. The first statute is just for CRCL and, in full, it says CRCL must "make public *through the Internet*, radio, television, or newspaper advertisements information on the responsibilities and functions of, and how to contact, the Officer." 6 U.S.C. § 205(b)(2) (emphasis added). CRCL certainly makes this information public on their website, *see* https://www.dhs.gov/file-civil-rights-complaint, and, indeed, Plaintiffs contacted CRCL, which took immediate action by referring the complaint to ICE ERO for their attention and response. *See* Def. Opp'n, Ex. B at 1-3; Def. Opp'n, Ex. C. OIDO's case intake portal is also readily available, *see* https://myoido.dhs.gov/en-US/, which is all that is required in terms of contacting an Officer. The other provision raised by Plaintiffs, 6 U.S.C. § 272(d)(3), is just for the CIS Ombudsman, who does not deal with detention issues.

Plaintiffs thus inaccurately state that OIDO is not "functioning and able to receive complaints." Pls. Recon. Mot. at 3. Further, faulting OIDO for "offer[ing] no alternative method through which a complaint to OIDO could be submitted" is completely unjustified given the clear messaging on OIDO's website about how to submit a case intake form through the online portal. *Id.*; *see* https://myoido.dhs.gov/en-US/. What Plaintiffs are actually complaining about is that they are not satisfied with the "results" of their complaints, not that they are unable to submit a complaint or that the Offices are not functioning. Pls. Recon. Mot. at 3.

In sum, there is no "significant change" in the facts or an "injustice" that would warrant reconsideration, and certainly not reconsideration of a preliminary injunction holding, which, in itself, is an extraordinary remedy.  It is clear from the chronology above that Defendants are "fulfilling statutory functions," contrary to Plaintiffs' representations.  Pls. Recon. Mot. at 4.  RFK was in direct contact with ERO about the situation.  Defs. Opp'n, Ex. C at 1-12.  RFK then cc'd CRCL on two emails about its concerns, *id.* at 1-3, and CRCL promptly reached out to ERO and CRCL Medical Referral at DHS headquarters, Defs. Mot., Ex. B.  ERO arranged two appointments for the detainee to meet with medical specialists, in the first of which the detainee refused to participate because of privacy concerns, Defs. Mot., Ex. C at 9-12, and the second of which the detainee did not attend, instead opting to meet with legal counsel, 4th Enriquez Decl. (ECF No. 50-1) ¶ 17.  If anything, this "new evidence" underscores the Court's previous determination that the Offices are operating and reinforces that Plaintiffs lack viable claims.  Reconsideration of the Court's denial of an extraordinary preliminary injunction based on a single OIDO auto-response in response to a misguided RFK email is completely unwarranted.

## II.    The Court Acted Well Within its Discretion.

Plaintiffs complain that the Court "misunderst[ood]" the scheduling order and that its motion for a preliminary injunction could not be moot.  Pls. Recon. Mot. at 2, 5.  District courts have the "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."  *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016); *see also In re Sealed Case*, 77 F.4th 815, 832 (D.C. Cir. 2023) ("docket-management decision[s]" are in the district court's discretion); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (district court "exercised its prerogative to manage its docket, and its discretion to determine how best to accomplish this goal").

The Court acted well within its discretion to deny Plaintiffs' preliminary injunction and move the parties to focus on expedited discovery and briefing. Based on the Court's order, the parties negotiated a precise and speedy schedule for discovery and briefing. Jt. Mot. for Sched. Ord. (ECF No. 48). Because the Court wanted the case to proceed this way, the Government agreed to the expedited schedule, despite preferring a normal litigation schedule and believing Plaintiffs lack standing. Yet Plaintiffs, as they have done repeatedly in this case, have engaged in hasty additional seriatim filings that necessitate quick responses. *See, e.g.,* ECF Nos. 31-33, 41-43. This practice disrupts the schedule, reduces efficiency, and accomplishes nothing but adding papers to the docket. Given the Court's desire for expedited discovery, the Court reasonably denied Plaintiffs' extraordinary remedy request for a preliminary injunction as moot because the case was set to be decided on the merits on an expedited basis.

The Court should exercise its broad discretion to deny Plaintiffs' meritless motion. Otherwise, the incentive for additional unnecessary seriatim filings will overshadow the Court-ordered schedule.

### III.    This Case Fails on the Merits Regardless.

As further evidenced in Plaintiff's reconsideration motion and the declaration attached to the motion, this Court does not have jurisdiction over Plaintiffs' claims and thus, the entire case, including the preliminary injunction, fails as a matter of law. "[F]ederal courts, being courts of limited jurisdiction, must assure themselves of jurisdiction over any controversy they hear," *Noel Canning v. NLRB*, 705 F.3d 490, 496 (D.C. Cir. 2013), even dismissing a case "sua sponte," *Ghayoori v. Sultanate of Oman*, Civ. A. No. 24-2263 (RDM), 2024 WL 3837833, at *2 (D.D.C. Aug. 6, 2024). Defendants have consistently maintained that Plaintiffs lack standing. Defs. PI Opp'n (ECF No. 19) at 8-20. Plaintiffs' standing theory rests on the incorrect premise that the

Offices have been closed.  Pls. PI Mot. (ECF 15) at 16.  When Defendants proved that the Offices were still functioning and complaints could still be filed, Sartini Decl., May 14, 2025 (ECF No. 19-1), Plaintiffs shifted to a resource-diversion theory of harm.  Plaintiffs make this crystal clear in their reconsideration motion, as the "direct[] harm[]" they are alleging is the "expend[iture]" of "additional resources," Pls. Recon. Mot. at 2, for example, by having to travel to visit the client and address the matter directly with the detention center, *id.* at 3.  *See also* 4th Enriquez Decl. (ECF No. 50-1) ¶ 14 (stating that OIDO's conduct has "forced" RFK "to make costly in-person visits"); *id.* ¶ 20 ("Now, without access to OIDO's services, RFK has been forced to spend our limited funds on in-person visits to attempt to resolve access to medical services for our client, including airfare, local accommodations and transportation, and travel meals for staff.").

But the Supreme Court has held that organizational plaintiffs "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024); *id.* at 395 (organization that "diverts its resources in response to a defendant's actions" does not have organizational standing); *see also Am. Foreign Serv. Assoc. v. Trump*, Civ. A No. 25-352 (CJN), 2025 WL 2097574, at *9 (D.D.C. July 25, 2025) (dismissing claims for lack of standing where organization "alleges injury based on its own perceived need to reallocate its resources to fill gaps previously occupied by USAID"); Defs. PI Opp'n (ECF No. 19) at 17-19 (no organizational standing).  Plaintiffs' choice to use other advocacy means they find more effective does not constitute a cognizable injury; it is merely a diversion of resources.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  Indeed, as explained before, the Supreme Court stayed an injunction in a nearly identical case because the allegations, like those presented here,

were insufficient to support the organizations' standing.  *OPM v. AFGE*, 145 S. Ct. 1914 (Apr. 8, 2025).  This Court should heed the Supreme Court's guidance and dismiss this case.

Even if there was a question as to standing at the start of this case, all doubts have since been answered.  The standing requirements "persist from a lawsuit's cradle to its grave," so a case becomes "moot once the federal courts can no longer grant effectual relief."  *Ali v. Adamson*, 132 F.4th 924, 930 (6th Cir. 2025); *see also McBryde v. Comm. to Review Circ. Counc. Conduct*, 264 F.3d 52, 55 (D.C. Circ. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").  That is the case here.  Mr. Sartini has made clear that the Offices continue to hire employees and carry out their statutory functions. Defs. Opp'n, Ex. F (Sartini Decl. Aug. 15, 2025) ¶¶ 3-5; Sartini Decl., June 2, 2025 (ECF No. 40-1).  The Offices have since reviewed numerous complaints, including a complaint by Plaintiffs. Status Rep., July 2, 2025 (ECF No. 46).  Contracts are being performed, EEO and Rehabilitation Act cases are being adjudicated, detainee complaints are being processed, meetings with USCIS leadership are being held, and congressional reports are being completed.  Defs. Opp'n, Ex. F (Sartini Decl. Aug. 15, 2025) ¶¶ 3-5.  In fact, Plaintiffs' own "new evidence" confirms this. Plaintiffs submitted allegations to CRCL, and CRCL quickly reviewed the allegations, determined urgency, and sent the complaint to the component agency to act.  *See* Defs. Opp'n, Ex. B.  The Offices are up and running.  There is no longer any injury to remedy (if there ever was one).  To the extent there was ever a redressable injury, it is now moot.

Plaintiffs seem to argue that this is insufficient because, at least for this complaint, CRCL did not force ICE to resolve the situation.  But again, the Offices cannot force the component agencies to take particular actions, nor has CRCL ever been able to do so.  Defs. Opp'n, Ex. D (Hearing Tr. May 19, 2025) at 8:20-9:25.   So it remains wholly speculative that unwinding the

RIF would remedy any injury: only some complaints are reviewed; only some of those are recommended for redress; and even then, the component agency has discretion about whether to implement any recommended remedies. *Id.*; Sartini Decl., May 14, 2025 (ECF No. 19-1). And while Plaintiffs' client may be in an undesirable situation, that does not confer standing on Plaintiffs. To hold otherwise would give attorneys (which most of the Plaintiff organizations consist of) standing to sue the Government any time their clients allege injury and require some resources to advocate for them.

This Court also lacks jurisdiction under the Civil Service Reform Act ("CSRA") because Plaintiffs are fundamentally challenging employment decisions and seek reinstatement of RIF'd employees as their remedy. Defs' PI Opp'n (ECF No. 19) at 20-27. In the CSRA, Congress "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted). Plaintiffs are neither individual DHS employees nor unions representing such employees; they are organizations properly understood here as end-users of government services. But their challenge is derivative of the sorts of personnel claims that are channeled under the CSRA. Allowing them to seek this remedy would grant third-party organizations more litigation avenues than the employees themselves have.

In *NTEU*, the D.C. Circuit explained that so long as a plaintiff's injuries "flow" from loss of employment, then CSRA's "specialized-review scheme governs such claims and ousts the district courts of their arising-under jurisdiction." Op. at 12. Similarly, claims that "seek to reverse the removal decisions"—like those Plaintiffs assert here—are not "wholly collateral to the CSRA scheme" and must be channeled through that scheme. *Id.* Indeed, even assuming Plaintiffs, who are not a federal employee or a labor union, could not invoke the CSRA, their "'exclusion . . . from

the provisions establishing administrative and judicial review for personnel action' is no reason to permit [them] to seek judicial review of personnel actions under other provisions." *Id.* at 14 n.3 (quoting *United States v. Fausto*, 484 U.S. 439 (1988)). "[I]f employees cannot end-run the CSRA's reticulated scheme of administrative and judicial review, then neither can [Plaintiffs]." *Id.*

Plaintiffs' claims are also not reviewable under the APA. This case is materially indistinguishable from *NTEU*. Like *NTEU*, Plaintiffs have sued the agency under the APA "to stop what they describe as a decision to 'shut down'" the Offices, Op. at 3, which they "infer from . . . various discrete actions," such as cancelling contracts and firing employees, in contravention of the agency's "statutorily mandated activities," *id.* at 9, 17. But such claims "cannot be brought under the APA because that statute provides a cause of action to challenge discrete, final agency action, which the claims here do not target." *Id.* at 17-18.

As the D.C. Circuit explained, "The APA cabins the timing, focus, and intensiveness of judicial review of federal agency action. It requires the plaintiff to target specific agency action that has caused him an injury. It requires that action to be final, ripe for review, and discrete. And it does not permit the courts to superintend how an agency carries out its broad statutory responsibilities." *Id.* at 18. "These requirements—agency action, finality, ripeness, and discreteness—reflect that the APA does not make federal courts 'roving commissions' assigned to pass on how well federal agencies are satisfying their statutory obligations." *Id.* at 23 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)). "Rather, a court may intervene only when a specific unlawful action harms the plaintiff, and only to the extent necessary to set aside that action." *Id.* "By avoiding premature adjudication and narrowing the scope of judicial review, these requirements 'protect agencies from undue judicial interference with [agencies'] lawful

discretion[] and . . . avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.'" *Id.* at 23-24 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004)).

Here, like NTEU, Plaintiffs' APA claims challenging a purported shutdown are unreviewable under the APA. First, "the shutdown decision posited here . . . is an abstract decision 'wholly apart from' any 'specific agency action, as defined in the APA.'" *Id.* at 29 (quoting *Biden v. Texas*, 597 U.S. 785, 809 (2022)). "[T]here is no such 'action' as defined in the APA—*i.e.*, no such "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* at 28-29 (quoting 5 U.S.C. § 551(13)), and thus, the claims of an alleged shutdown are unreviewable.

Second, "the putative shutdown decision was not *final* agency action" because "[n]o such decision by itself effected the termination of any employees or the cancellation of any contracts." *Id.* at 30 (emphasis in original). Rather, as DHS "attempted to downsize, it had to undertake separate, discrete action to lay off workers and cancel contracts—actions that . . . [are] reviewable in the MSPB or the Court of Federal Claims." *Id.*

Third, "the posited shutdown decision is insufficiently discrete to qualify as 'agency action.'" *Id.* at 31. As in *NTEU*, "[r]ather than seeking to challenge discrete decisions" such as firing employees and cancelling contracts "that may have caused them harm, the plaintiffs seek to dress up these 'many individual actions' as a single decision in order to challenge all of them at once, which is exactly what [Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 893 (1990)] prevents." *Id.*

Fourth, "the discreteness problem is made worse by the open-ended nature of the legal duties that the plaintiffs seek to enforce." *Id.* As in *NTEU*, Plaintiffs "seek an order compelling

14

the [agency] to keep providing its mandatory services." *Id.* But given the great deal of discretion given to DHS as to how to conduct its statutory functions, courts should not intervene in such day-to-day agency management. *Id.* at 31-32.

Lastly, "the challenge to the posited shutdown decision is unripe." *Id.* at 33. As in *NTEU*, agency consideration is "ongoing, which means that judicial intervention would inappropriately interfere with further administrative action." *Id.* (internal quotation marks omitted). "[R]egularly moving targets"—like the ongoing realignment actively taking place here—"do not raise issues fit for review." *Id.* at 34. In sum, as in *NTEU*, Plaintiffs' claims do not target "final agency action" reviewable under the APA.

At the end of the day, "if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," Fed. R. Civ. P. 12(c)(3), and should do so here. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (cleaned up)). For all of these reasons and those stated in Defendants' preliminary-injunction opposition brief, Plaintiffs case should be dismissed outright. Defs. PI Opp'n (ECF No. 19) at 8-20.

## IV. Reconsideration Is Pointless Because the Preliminary-Injunction Motion Is Meritless.

There is no reason to entertain Plaintiffs' motion to reconsider because their preliminary-injunction motion fails on the merits for all the reasons Defendants stated before. Defs. PI Opp'n (ECF 19). Even if the Court believes it has jurisdiction, the same factual developments demonstrate that there is no statutory violation, much less irreparable harm.

Begin with irreparable harm, which must be "both certain and great" and "of such imminence that there is a clear and present need for equitable relief in order to prevent irreparable

harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). (internal quotation marks omitted).  Even in this case's infancy, the Court denied Plaintiffs' motion for a temporary restraining order the Court itself requested that Plaintiffs file, at least in part because of a lack of irreparable harm.  Defs. Opp'n, Ex. E (Hearing Tr. May 23, 2025) at 115:10-117:8, 123:15-124:22.  This is because the Offices were beginning to rebuild.  *Id.*  A lot of that work has since been done.  Sartini Decl., June 2, 2025 (ECF No. 40-1); Status Rep., July 2, 2025 (ECF No. 46).  Again, that includes CRCL reviewing and acting on the "new evidence" Plaintiffs present here.  Thus, any argument for irreparable harm has significantly weakened over time.

Before, Plaintiffs pointed to the Department of Education cases as examples of preliminary relief being given in RIF cases.  Defs. Opp'n, Ex. E (Hearing Tr. May 23, 2025) at 122:7-10. Those cases have since been stayed.  *McMahon v. New York*, No. 24A1203, 2025 WL 1922626, at *1 (U.S. July 14, 2025).  As the Supreme Court said, its interim relief orders should "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (U.S. July 23, 2025).  The Government's case here is no less strong on standing, the merits, and the equities.

Indeed, Plaintiffs' claim of irreparable harm was in serious question already, in part because it took them forty-eight days from the RIF notice to move for a preliminary injunction. Defs. PI Opp'n (ECF No. 19) at 41 (citing *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014)).  It is now months later; the RIF has been completed; and the Offices are performing their statutory functions.  Furthermore, Plaintiffs waited three weeks to file this motion to reconsider after the Court denied their preliminary-injunction motion as moot.  Pls. Recon. Mot. (ECF No. 50).  Again, any claim for irreparable harm—the very "basis of injunctive

relief in the federal courts"—has vanished over time. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974).

Plaintiffs' only real argument is to anecdotally point to stories from their clients. While that may bear on the public-interest prong, much like standing, it does not prove an irreparable harm *to Plaintiffs*. "[I]njuries to third parties are not a basis to find irreparable harm." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018); *see also Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021) (holding that irreparable harm must be "connected specifically to the parties before the Court," not "unnamed third parties"); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (holding that argument about irreparable harm to consumers "fails because it shows irreparable harm not to [plaintiff], but to third parties"). On the other side of the ledger, the harm to the Government from an injunction would be irreparable and severe. Unwinding the RIF would be a months-long procedural nightmare that would disrupt the ongoing rebuilding of the Offices. *See, e.g.,* Defs. Opp'n, Ex. E (Hearing Tr. May 23, 2025) at 34:3-10 (testimony of Ms. Barksdale-Perry about "administrative feat").

On the merits, Plaintiffs' claims still fail for numerous reasons. In a similar case, Judge Friedman denied a preliminary injunction challenging the Department of Education's RIF because (1) the offices were still performing their statutory duties, (2) the challenges constituted an impermissible programmatic attack, and (3) the claims were really about allegations of unlawful delay, which was unripe (the Court reached this conclusion even though months of delay had occurred). *Carter v. Dep't of Educ.*, Civ. A. No. 25-744 (PLF), 2025 WL 1453562 (D.D.C. May 21, 2025). The flaws in Plaintiffs' case are just as glaring. First, since the Offices are operating and performing their statutory functions, there is no statutory violation on the merits. Defs. PI Opp'n (ECF No. 19) at 30-40.

Second, Plaintiffs "broad programmatic attack" on the RIF is not the type of "final agency action" reviewable by a court under the APA. *Norton*, 542 U.S. at 64; *supra* at 12-15 (discussing *NTEU*). As Plaintiffs have continually made clear, they want to micromanage the staffing, functions, and work of these agencies. The APA does not permit them to do so. *NTEU*, Op.. at 31-32; Defs. PI Opp'n (ECF No. 19) at 30-32.

Third, as has been made clear, any action is not "final" because part of the RIF always included a plan to rebuild the Offices with a focus on the statutory functions. Defs. PI Opp'n (ECF No. 19) at 27-29. While a significant amount of progress has been made, that process is not yet complete, and the RIF is therefore unripe for adjudication. *NTEU*, Op. at 33-34. And by the end of the process, although Plaintiffs may have preferred that the Offices remain the same as before the RIF, the statutory functions will be performed, and Plaintiffs will lack a cognizable claim.

Fourth, Plaintiffs' claim and alleged injuries sound in agency action unreasonably delayed or unlawfully withheld. *Id.* at 30-32. They claim that the Offices are not performing tasks they should or are taking too long to do so. Such claims take longer to ripen than some other types of APA claims and must satisfy an exceedingly high standard. Here, the Offices are reviewing complaints actively, including some of Plaintiffs' complaints. So there is no reason to reconsider a preliminary-injunction motion that should be denied on multiple grounds in addition to the mootness ground on which it was previously denied. Doing so does not serve the efficiency of this case or justice.

## CONCLUSION

The Court should deny Plaintiffs' motion to reconsider and dismiss this case for lack of jurisdiction.

Dated: August 15, 2025

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Yaakov M. Roth**
Principal Deputy Assistant Attorney
General

**Eric Hamilton**
Deputy Assistant Attorney General
Federal Programs

**Christopher R. Hall**
Assistant Branch Director
Federal Programs

*/s/ M. Jared Littman*
**M. Jared Littman**
Trial Attorney
United States Department of Justice
Civil Div., Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 514-5578
Jared.Littman2@usdoj.gov

*Counsel for Defendants*

19