```
                    IN THE UNITED STATES DISTRICT COURT
                           DISTRICT OF COLUMBIA


ROBERT F. KENNEDY HUMAN RIGHTS,  ) CIVIL NO.:
                                 ) 25-1270-ACR
         Plaintiff,              )
    vs.                          )
                                 )
DEPARTMENT OF HOMELAND SECURITY, )
et al.,                          ) May 23, 2025
         Defendant.              ) Washington, D.C.
_____) 9:30 a.m.



                     Transcript of Motions Hearing
                  Before the Honorable Ana C. Reyes
                     United States District Judge



APPEARANCES:

For the Plaintiff:   Karla A. Gilbride, Esquire
                     Public Justice, P.C.
                     1620 L Street NW
                     Suite 630
                     Washington, DC 20036

                     Michael C. Martinez, Esquire
                     Christina Coogle, Esquire
                     Democracy Forward Foundation
                     P.O. Box 34553
                     Washington, DC 20043

                     Medha Raman, Esquire
                     Robert F. Kennedy Human Rights
                     1300 19th St NW
                     Suite 750
                     Washington, DC 20036
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1  would be easier from an administrative perspective for my
2  office to receive that order prior to June 4th.
3      After June 4th, the actions would have already been
4  processed -- the actions would have already been processed,
5  and then we would have to -- it would be quite an
6  administrative feat in order to determine how we would return
7  the employees to federal service.  And essentially, we would
8  have to do a series of corrective actions to return the
9  employees to federal service and to essentially place them
10 back on our records.
11                        EXAMINATION
12 BY THE COURT:
13 **Q.**  And how difficult would it be -- maybe you've already told
14 me that you'd have to look into this, but how difficult would
15 be to place -- I understand some people have voluntarily left.
16 Forget those people.
17 **A.**  Okay.
18 **Q.**  The people who are being involuntarily separated as of
19 today, how complicated would it be to put them, instead of as
20 separated today, today, put them on unpaid leave?
21 **A.**  So it's essentially an administrative action to place them
22 in a leave without pay status.  That's --
23 **Q.**  So you could like do that with a few clicks of the
24 keyboard or -- I mean, I understand not just that, but it
25 wouldn't be sort of a day's process;  you could do that today,

1   **A.**   So it's lower in the total count, quite a bit lower, but
2   depending on the historical, so we talked about this a little
3   bit.  The office is only three years old.  For the beginning,
4   and I don't quite know how long, they only had three
5   employees.  And there was the understanding that the office
6   was intended to be small.  And then within the last two or so
7   years, they grew from three to 118.  So it's kind of hard to
8   put an average on where they were historically.
9   **Q.**   Can I just get some clarity on how old the office was.  It
10  was established in 2019?
11  **A.**   Yeah, it was written into law in 2019, but they did not
12  start in earnest until, I believe, 2022.
13  **Q.**   Okay.  And how about the sort of on the ground in the
14  detention facility people that we talked about last time?
15  **A.**   Right.  So that remains a question that I think Mr. Guy
16  will have to look into.  Where I landed on that was the
17  contract had gross mismanagement, in my estimation, and there
18  were a lot of problems.  And there may be some value to
19  putting individuals in detention facilities, but how that gets
20  done needs to be looked at.  That may need a new contract.
21  Perhaps that gets hiring.  Perhaps that becomes a collateral
22  duty assignment of some kind, like a rotational detail for a
23  corps of individuals who want to do that work.  That needs
24  some re-examination.
25              THE COURT:  Do you have a sense -- and I understand

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1            Mr. Sartini, thank you for everything.  I know that
2    a lot has been thrown onto your plate recently, and
3    particularly this week and in particular, I imagine,
4    yesterday.  I am very appreciative.  Thank you.  I recognize
5    that you have little desire to see me again.  I may have to
6    have you back at some point.  I'll try very hard not to make
7    that happen.  If I do ask for that, know I have exhausted
8    every other avenue before that.  All right.  Thank you, sir.
9            THE WITNESS:  Thank you.
10           THE COURT:  All right.  I will say that based on the
11   declarations that I received yesterday and today's testimony,
12   I am satisfied that my concerns from yesterday regarding the
13   veracity of the department's desire or ability or
14   effectiveness of implementing Mr. Sartini's plan were
15   unfounded.  I'm satisfied that DHS has an approved plan in
16   place.  I do not think it is in my purview or ability to
17   determine whether or not that plan is a good one, an effective
18   one.  It certainly is aimed at addressing the functions of the
19   three offices we now have, unlike when we were here last, an
20   officer at every post, contracts -- some contracts are being
21   continued, there's a definitive plan for detailees.  Mr.
22   Sartini has already received applications for those and has
23   authority, as I understand it, to open up positions at each of
24   the three agencies.
25           So that said, I am still concerned about whether or

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1  not these steps go into effect. I agree with plaintiffs, if
2  there was an elimination of the offices, that there would be
3  irreparable harm, and that they would have standing to bring
4  some sort of action and that the action would most likely than
5  not be ultra vires. I just don't think, based on what I've
6  seen so far, that the offices have, in fact, been abolished,
7  in which case, plaintiff's arguments are less valid.
8      I also was concerned about whether or not, if the
9  separation goes forward today, it would be difficult to unwind
10 that clock. Based on what I've heard, and certainly I'll hear
11 argument otherwise if people disagree, but what I heard both
12 from Ms. Barksdale-Perry and Mr. Sartini, I don't think it's
13 going to make a massive difference with respect to whether the
14 individuals are separated or not in terms of them being able
15 to be rehired and the timing of them being able to be rehired.
16 So far as I can tell, the main difference will be whether
17 they're on C-TAP list or the re-employment list.
18      Ms. Barksdale-Perry indicated that the difference
19 between being on the list, on average, would be about 25 days
20 from a 90-day turnaround to 115 day around [sic]. Mr. -- she
21 indicated, testified that that could be sped up. And that
22 Mr. Sartini clearly thinks that that can be sped up and has
23 approval to open up the positions and is just waiting on sort
24 of the legal technicalities as to when he can open up those
25 positions.

1           So I'm not currently inclined to stop the RIFs from
2    being effectuated today in terms of separations, particularly
3    where it looks like the paperwork won't be finalized until
4    June 4th, June 3rd.  So even in the next two weeks, we can
5    take some action if need be, if I learn something different.
6           All of that said, I am -- so I'm going to deny the
7    TRO with respect to the separations and will deny it -- will
8    deny the TRO.
9           The preliminary injunction I'm going to reserve
10   judgment on with respect to whether or not to grant that
11   personal -- the preliminary injunction, pending what I see
12   happening on the ground in the next couple of weeks.  So I'm
13   going to ask Mr. Davis and the plaintiffs to put together a
14   joint status report that will be filed with me by 12:00 p.m.
15   on Friday, May 30th, and another one -- actually, let's make
16   it -- let's make the second one June 2nd, the second status
17   report.  In the June 2nd status report, I want a declaration
18   from Mr. Sartini that he is effectuating the plan and that
19   there's been no hurdles put in his way.  And then we can -- if
20   need be, if I feel like I need more status reports or ongoing
21   status reports, I will so indicate after I receive your
22   June 2nd status report.
23          Everyone should keep their schedules clear in case I
24   find -- so make it by noon on June 2nd, so everyone keep your
25   schedules clear, so if I find that we need to have an

1  of these people back, we're not sure what we're doing, we may
2  move the functions. The Court still said there's irreparable
3  harm being caused by these health inspectors who help coal
4  miners with black lung disease. By having them not in their
5  positions, that's causing irreparable harm right now. I'm
6  going to enjoin the RIF so that it does not take effect.
7              Same thing a judge in Boston just yesterday, the New
8  York v. McMahon case, enjoined RIFs as to many staff at the
9  Department of Education that were set for -- those RIFs were
10 set to take effect, I believe, in the beginning of June.
11             So courts are doing this. It wouldn't be
12 unprecedented for you to do it, Your Honor. And for all the
13 reasons we've said, you know, that is the fastest way of
14 getting people back on the ground to do this work. They're
15 people who already know the jobs who've already been
16 performing the jobs. And for our clients who need these
17 offices to be stood back up as soon as possible, getting
18 people in those positions next week versus next month versus
19 several months from now makes a difference. So we would urge
20 you to think about, you know, the expediency of how to get
21 this done most quickly, also in a way that does not
22 essentially reward an unreasoned, and in our view, unlawful
23 action the defendants took back in March.
24             THE COURT: All right. Thank you.
25             Well, the good news is that nothing I do creates

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1  precedent.  So we're not going to set any precedent here today
2  whatever I do.  The -- I understand the point about a final
3  agency action.  I understand the point that it may well be
4  that DHS did intend to eliminate this office, and somehow
5  their OGC got them to see -- have religion and realize that
6  they can't do that and that they actually have to have these
7  offices ongoing and functioning.
8           Look, you're not going to find a more sympathetic
9  ear to your claim than me in any court.  I'm an immigrant, I
10 spent all of my pro bono work doing asylum work, I've
11 litigated immigration cases against the government.  I'm quite
12 confident that when they found out I was the judge assigned to
13 this case, everyone on the other side of the aisle from you
14 groaned.
15          But having said all that, my job is to apply the
16 law, is to consider the facts in evidence, and while I have
17 views as to what -- I might have speculation as to what
18 happened and why it happened with respect to the original RIF
19 and the language of the RIF, I am convinced that since then or
20 all along, the offices are not being abolished, that there is
21 a plan in place from a senior -- that has been approved by a
22 senior DHS official that has given authority to a senior or
23 midlevel official -- I think Mr. Sartini's probably senior --
24 to put in place at least a plan.  And I find Mr. Sartini quite
25 credible with respect to how he has gone thinking about this,

```
 1   what he plans to do and what he's been authorized to do.
 2              I also think, based on Ms. Barksdale-Perry's
 3   testimony, that we're not going to be saving much in terms of
 4   time with me extending the RIF, whether or not I can even do
 5   that or whether or not that even actually puts these people in
 6   C-TAP, I just -- based on everything I heard today, I do not
 7   think extending the RIF or abolishing the RIF is going to make
 8   things go smoother or faster.  If anything, I think undoing
 9   sort of the process that's going forward, that seems in place
10   to be in effect at least with respect to detailees within the
11   next couple weeks and people being hired within the next month
12   or so, I think it will upend that.
13              And so where does that leave you with your very good
14   point about a final Agency action?  Where it leads you is that
15   if they are remediating the harm, and I believe that their
16   plan is to, and that they are remediating the harm, then there
17   is no irreparable harm for purposes of the analysis.  And I
18   just don't think that, under the circumstances, and of course
19   what's happening in coal or at Department of Education is
20   totally different than what's happening here.  I just don't
21   think the public policy therefore favors doing everything that
22   would have to be done to eliminate the RIF.
23              I will say this, Mr. Davis, Ms. Gilbride does raise
24   a good concern.  If the offices are, in fact, being abolished
25   and if, in fact, the RIF was incorrect and the Q and A was
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter