UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | Civil Action No. 25-1270-ACR |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL RECONSIDERATION OF JULY 11 ORDER**

Plaintiffs' motion for partial reconsideration presented narrowly focused new evidence in the form of an email stating that "the Office of the Immigration Detention Ombudsman (OIDO) … can no longer receive or address complaints." Fourth Enriquez Decl., ECF 50-1, ¶ 13 and Exhibit A. In response, Defendants filed what amounts to a nearly 20-page motion to dismiss, far exceeding the scope of issues raised in Plaintiffs' motion. Plaintiffs will address Defendants' jurisdictional arguments, recognizing that this Court may consider its own subject matter jurisdiction at any time. First, however, Plaintiffs will respond to two key points in Defendants' factual narrative (Opp. at 2–8): the legal significance of the July 16 autoresponse from OIDO; and changes in how complaints can be submitted to OIDO, including the legal significance of those changes.

I.   **The July 16 autoresponse is new evidence that OIDO has disclaimed its statutory duty to receive and address complaints.**

Defendants suggest that Plaintiffs presented their new evidence in an "incomplete and misleading manner" by "fail[ing] to provide key context" for OIDO's "bare-bones automated response." Opp. at 2–3. That charge is misplaced. Plaintiffs did not move for reconsideration based on months of advocacy with ICE officials, nor on dissatisfaction with the results of that advocacy. They moved based on the categorical statement by OIDO that it was no longer able to receive and/or address complaints. That statement, on its face, announces that OIDO is not performing a core statutory function. 6 U.S.C. § 205(b)(1).

Moreover, Plaintiffs provided all necessary context for why Robert F. Kennedy Human Rights (RFKHR) lawyers contacted OIDO when and how they did, prompting the July 16 autoresponse. The declaration of Anthony Enriquez filed contemporaneously with Plaintiffs' motion described the medical problems being experienced by RFKHR's detained client and the fact that RFKHR reached out to OIDO in July only after numerous emails to ICE had failed to resolve those medical problems. Fourth Enriquez Decl. ¶¶ 5–12.

Nor can Defendants absolve themselves by pointing to OIDO's online portal. Defendants posit that OIDO is receiving and addressing complaints submitted through this portal and thus that OIDO's complaint-related functions are being performed. Opp. at 5–6. However, the autoresponse email did not direct those receiving it to the portal as the "proper" method for submitting complaints. *Id.* It simply stated that OIDO was "no longer able to receive and/or address complaints" at all.

Defendants also emphasize that the Office for Civil Rights and Civil Liberties (CRCL) received two emails from RFKHR about this client's medical situation and referred them to ICE before RFKHR contacted OIDO. *See* Opp. at 3, 4, 5, 7. Again, it was the content of the OIDO

autoresponse that spurred Plaintiffs to move for reconsideration, not anything that had happened previously in the correspondence with CRCL and ICE. Moreover, as Plaintiffs' counsel pointed out to Defendants' counsel during their July 29 meet and confer, and later explained in their motion, *see* Mot. at 4, CRCL and OIDO are required to "investigate" the complaints they receive, not simply forward them to ICE as CRCL apparently did here.

Finally, OIDO's investigations are "complementary to" the more systemic, trend-related investigations and policy recommendations undertaken by CRCL, 6 U.S.C. § 205(b)(6), in that their objective is to "provide assistance to individuals" in immigration detention, *id.* § 205(b)(5)—an objective that OIDO uniquely fulfilled before the reduction in force (RIF) by taking complaints and liaising with detention facility staff in person. Fourth Enriquez Decl. ¶ 19 (recounting comments from Geo Group Regional Health Services Manager that OIDO had previously resolved medical issues efficiently because their on-site personnel could interact with both detained people and detention center staff, but are no longer performing this function). The loss of OIDO's on-the-ground presence has in turn required RFKHR to expend additional resources conducting its own in-person visits to detention facilities in an attempt to resolve intractable medical issues. *Id.* ¶ 20.

II. **The recent changes to OIDO's complaint procedures raise questions about complaint handling at the other DHS Oversight Offices.**

Defendants contend that the "proper" way to file complaints with OIDO is through its online portal, https://myoido.dhs.gov/en-US/, and that this has been communicated on OIDO's website since sometime between March and May. August 15 Sartini Decl., ECF 51-6, ¶ 4. Yet as recently as June 12, a version of the My OIDO landing page available on the Internet Archive, commonly referred to as the Wayback Machine, noted that, in addition to using that online portal, complaints could also be filed with OIDO in person "at many U.S. Immigration and Customs

3

Enforcement (ICE) and U.S. Customs and Border Protection (CBP) facilities," as well as via email or mail, in multiple languages, using a "Paper Case Intake Form." Second Gilbride Decl. Exhibit A. Sometime after June 12, the OIDO website was apparently altered to remove references to filing complaints by mail, email or in person, or in any language besides English. Second Gilbride Decl. ¶ 3. But someone would have to be visiting the OIDO website to notice these changes to the complaint submission process, which were not communicated in any other way. Indeed, Defendants acknowledge in their opposition brief and in Ronald Sartini's most recent declaration that the external relations division within OIDO, which might be expected to communicate such changes to stakeholders, "no longer exists." Opp. at 5; August 15 Sartini Decl. ¶ 4.[1]

Plaintiffs first learned during the July 29 meet and confer that Defendants were now taking the position that complaints could be submitted to OIDO only through the online portal. This raised a serious concern that a similar unannounced narrowing of complaint channels might be happening at the other two DHS Oversight Offices. This is why Plaintiffs requested in their motion, with references to the statutory provisions regarding communication with the public pertinent to all three offices, that at a minimum Defendants be required to clarify how complaints can be submitted to the DHS Oversight Offices to ensure that they will be received and investigated, and that information about these complaint mechanisms be broadly disseminated and not just placed on the offices' websites for those who happen to visit them. Mot. at 5 (citing 6

---

[1] Further underscoring the changing and unclear status of OIDO's complaint filing procedures, Plaintiffs' counsel asked Defendants' counsel during their July 29 meet and confer how detained individuals in facilities without access to the internet could communicate with OIDO, to which Defendants' counsel responded that they believed the office was still accepting complaints by mail. But the lack of reference to a mailed complaint option in Defendants' opposition and the latest Sartini declaration suggests that complaints by mail are no longer, in fact, accepted.

U.S.C. § 205(b)(2) as to OIDO, 6 U.S.C. § 345(a)(2) as to CRCL, and 6 U.S.C. § 272(d)(3) as to CISOM).

Indeed, the fact that several recent complaints submitted by email to CRCL have yielded no response, not even the automated acknowledgment of receipt that such emails used to generate, Second Horan Decl., ECF 42-2, ¶ 7, adds to the uncertainty about whether complaints submitted to the DHS Oversight Offices through once-accepted channels are actually being received and investigated at all. And similar confusion prevails with respect to the Citizenship and Immigration Services Ombudsman's Office (CISOM). A legal services attorney sought to notify CISOM in early August via email that he wished to withdraw a case assistance request he had previously submitted to CISOM, after the underlying issue prompting him to request CISOM's assistance was resolved by CIS. He received an autoresponse that the mailbox was no longer being monitored, and when he tried contacting the office by phone instead, he waited on hold for over an hour without ever being able to reach anyone. Declaration of Vicente Lovelace ¶¶ 5, 8. The lawyer was so frustrated by the experience that he emailed a professional listserv to "warn" his colleagues about CISOM's lack of responsiveness. *Id.* ¶ 9.

In short, the sparse and inconsistent statements about how to communicate with the DHS Oversight Offices since the March stop-work order and RIF, and resulting confusion about which methods of communicating with those offices remain viable, suggest that the offices are not currently fulfilling their public-facing statutory functions. These developments reinforce that neither this case, nor Plaintiffs' need for a preliminary injunction, is moot.

**III.    The Court has subject matter jurisdiction over this dispute because Plaintiffs have standing and the case is not moot.**

Defendants renew their attack on Plaintiffs' organizational standing, arguing that references to expending additional resources run afoul of the Supreme Court's admonition that a

5

plaintiff cannot "spend its way into standing" by "expending money" to "advocate against the defendant's action." Opp. at 10 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024)). But as Plaintiffs have repeatedly explained, they are not expending additional resources to advocate against Defendants' actions of stopping all work and firing all staff at the DHS Oversight Offices. They are expending additional resources to continue performing the same core activities of representing immigrants and border residents that they performed before March 21. Plaintiffs must now do so in less effective and more costly ways because of Defendants' actions at the DHS Oversight Offices, which have perceptibly impaired Plaintiffs' ability to perform those core activities. PI Mem., ECF 15, at 16–20; PI Reply, ECF 24, at 7.

*Alliance for Hippocratic Medicine* explains the distinction between injuries to an organization's core activities caused by a defendant's actions, which confer standing, and resource expenditures to advocate against a defendant's actions, which do not. 602 U.S. at 395 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1983)); *see also Ctr. for Biological Diversity v. Dept. of Interior*, 144 F.4th 296, 314–15 (D.C. Cir. 2025) (discussing the distinction between "programmatic expenditures" that confer standing and "issue advocacy," which does not). And while Defendants suggest that this Court should "heed the Supreme Court's guidance" in *OPM v. AFGE*, 145 S. Ct. 1914 (Apr. 8, 2025), Opp. at 10–11, the Supreme Court said nothing in that brief order suggesting it granted the government's stay because of concerns about standing. Plaintiffs have described in detail how Defendants' actions have impaired their core activities. They possess organizational standing.[2]

---

[2] Defendants do not comment in their opposition on the associational standing of the Southern Border Communities Coalition (SBCC). Plaintiffs incorporate by reference the arguments in their preliminary injunction memorandum and reply regarding SBCC's associational standing.

Nor have Plaintiffs claims become moot since Defendants began hiring new staff to replace the roughly 300 employees of the DHS Oversight Offices that were removed through the May RIF. Defendants support their mootness argument by noting that some complaints are being addressed, Opp. at 11, but say nothing about the status of other statutory functions like OIDO performing unannounced inspections of detention facilities, 6 U.S.C. § 205(b)(3), or CRCL advising DHS components on policies affecting civil rights and liberties, 6 U.S.C. §§ 345(a)(3)–(4). Moreover, Mr. Sartini's staffing plan called for a total of 39 to 43 full-time employees between the three offices, Hemenway Decl., ECF 33-1, ¶¶ 3–4, 13 (listing 8 to 10 employees for CISOM, 23 for CRCL, and 8 to 10 for OIDO). As of August 15, counting Mr. Sartini only once (although he is simultaneously serving in three roles), the offices have four full-time staff between them, plus three detailees and two appointees in acting roles who occupy other full-time positions within DHS. August 15 Sartini Decl. ¶¶ 3–5. Thus, measured against the yardstick of Mr. Sartini's plan, the offices have not yet achieved the staffing levels that would permit them to perform their statutory functions.

It is unclear whether these staffing levels will ever be achieved, given the budget justifications submitted to Congress in late May, which sought no Fiscal Year 2026 funding for OIDO and very little funding for CRCL and CISOM. Plaintiffs' June 2 Status Report, ECF 41, at 2. But even if Defendants resume performing the statutory functions of the DHS Oversight Offices at some point in the future, this will not erase the ongoing injuries that Plaintiffs are suffering from the chaotic shutdown of the offices in March, the consequences of which continue to adversely affect them. *See* Fourth Enriquez Decl. ¶¶ 14–20. Accordingly, "events [have not] outrun the controversy," and this Court can still provide meaningful relief. *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 55 (D.C. Cir. 2001). The case is not moot.

## IV. Defendants' comparisons of this case to *NTEU v. Vought* are unavailing.

Finally, Defendants attempt to tie this case to the D.C. Circuit's recent opinion in *NTEU v. Vought*, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025). Those attempts fail.

First, Defendants cite *NTEU* in support of their argument that this Court cannot exercise jurisdiction over Plaintiffs' claims because of the Civil Service Reform Act (CSRA). Opp. at 12–13. But the D.C. Circuit held that the CSRA's administrative scheme only applied as to the claims of two plaintiffs in *NTEU*, the National Treasury Employees Union and an association representing employees of the Consumer Financial Protection Bureau. *See* 2025 WL 2371608, at *6 ("[T]he CSRA precludes district-court jurisdiction over the claims of the NTEU and CFPB Employee Association.").

As Defendants acknowledge, Plaintiffs are "neither individual DHS employees nor unions representing such employees" but instead are "properly understood here as end-users of government services." Opp. at 12. Three organizational plaintiffs in *NTEU* satisfied that same definition. 2025 WL 2371608, at *3 (describing those plaintiffs as "claim[ing] harm from the loss of services provided by" CFPB). And the D.C. Circuit did not find district-court jurisdiction precluded by the CSRA for those three plaintiffs' claims but went on to address their merits. *Id.* at *6–21. This Court can and should do the same, as Plaintiffs' injuries do not flow from the loss of any particular employee's employment but rather from the loss of government services.

Turning to the merits, Defendants suggest that Plaintiffs' claims are not reviewable under the Administrative Procedure Act because they are "materially indistinguishable" from the claims in *NTEU*. Opp. at 13. This is incorrect. The D.C. Circuit majority in *NTEU* found the challenged shutdown of the CFPB to be an "abstract decision" and not a discrete agency action. 2025 WL 2371608, at *12. Here, Plaintiffs challenge the stop-work order issued to all employees of the DHS Oversight Offices on March 21, 2025 and the subsequent RIF causing all of those employees

8

to be removed from federal service. These are discrete agency actions that meet the two-part test for finality established in *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Second, the *NTEU* majority found it significant that CFPB leadership did not issue blanket stop-work orders but instead allowed "legally required work" to continue. 2025 WL 2371608, at *13. Defendants have pointed to no such exceptions allowing for performance of statutorily required functions at the DHS Oversight Offices.

Third, Plaintiffs here did not group many discrete actions together in order to challenge them all at once, and thus did not run afoul of *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1999). *See NTEU*, 2025 WL 2371608, at *13. Instead, they challenged the stop-work order that occurred on March 21, contending that this discrete action injured them and that the DHS Oversight Offices have not performed their statutorily required functions since that date. For the same reason, Plaintiffs' claims do not "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at *14 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1997)). Defendants here did not "change course before the decision [to stop work and terminate all of the offices' employees] resulted in the denial of any services." *Id.* at *14. And those service denials have injured Plaintiffs in concrete and ongoing ways, making this case ripe for adjudication.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' Motion for Partial Reconsideration, Plaintiffs respectfully request that the Court reconsider the portion of its July 11 order denying Plaintiffs' request for preliminary injunctive relief as moot.

Dated: August 22, 2025                                    Respectfully submitted,

/s/ Karla Gilbride

| | |
|---|---|
| Michael C. Martinez (DC Bar No. 1686872) | Karla Gilbride (DC Bar No. 1005586) |
| Christine L. Coogle (DC Bar No. 1738913) | Adina H. Rosenbaum (DC Bar No. 490928) |
| Brian D. Netter (DC Bar No. 979362) | Public Citizen Litigation Group |
| Skye L. Perryman (DC Bar No. 984573) | 1600 20th Street NW |
| Democracy Forward Foundation | Washington, DC 20009 |
| P.O. Box 34553 | (202) 588-1000 |
| Washington, DC 20043 | kgilbride@citizen.org |
| (202) 448- 9090 | |

*Counsel for All Plaintiffs*

| | |
|---|---|
| Anthony Enriquez (DDC Bar No. NY0626) | Sarah E. Decker (DDC Bar No. NY0566) |
| Sarah T. Gillman (DDC Bar No. NY0316) | Medha Raman (DC Bar No. 90027539) |
| Robert F. Kennedy Human Rights | Robert F. Kennedy Human Rights |
| 88 Pine Street, Suite 801 | 1300 19th Street NW, Suite 750 |
| New York, NY 10005 | Washington, DC 20036 |
| (917) 284- 6355 | (202) 559-4432 |

*Counsel for Plaintiff RFK*