# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; and URBAN JUSTICE CENTER, | |
| Plaintiffs, | Civil Action No. 25-1270-ACR |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Christine L. Coogle (DC Bar No. 1738913)
Brian D. Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

Karla Gilbride (DC Bar No. 1005586)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
kgilbride@citizen.org

*Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert & Ethel Kennedy Human Rights Center
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355

Sarah E. Decker (DDC Bar No. NY0566)
Robert & Ethel Kennedy Human Rights Center
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432

*Counsel for Plaintiff KHRC*

January 16, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

STATUTORY BACKGROUND ..................................................................................... 3

FACTUAL BACKGROUND .......................................................................................... 5

I.       Process culminating in March 21, 2025, dissolution of Oversight Offices ....................... 5

II.      Aftermath of March 21, 2025, agency action .................................................................. 6

LEGAL STANDARD .................................................................................................... 14

ARGUMENT ................................................................................................................. 14

I.       This Court has subject matter jurisdiction ........................................................................ 14

         A.  Plaintiffs have standing.............................................................................................. 14

             1.  Plaintiffs have organizational standing........................................................ 15

             2.  SBCC has associational standing.................................................................. 23

         B.  This case is not moot.................................................................................................. 26

II. Defendants' March 21, 2025, action to eliminate the Oversight Offices was illegal ............. 27

         A.  Defendants' March 21, 2025, dissolution of the Oversight Offices violated the
             Administrative Procedure Act...................................................................................... 28

             1.  Defendants' dissolution of the Oversight Offices was a final agency
                 action................................................................................................................. 28

             2.  The Oversight Office dissolutions exceeded Defendants' statutory
                 authority ........................................................................................................... 29

             3.  The Oversight Office dissolutions were contrary to law ............................... 30

4.  Defendants' March 21, 2025, dissolution of the Oversight Offices was arbitrary and capricious.................................................................... 35

B.  The Oversight Office dissolutions exceeded Defendants' constitutional authority and were ultra vires.......................................................................... 38

III. The Court should grant permanent injunctive relief to ensure that the Oversight Offices resume performing, and continue to perform, their statutory functions ................................. 42

CONCLUSION........................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*AFL-CIO v. DOL*,
   778 F. Supp. 3d 56 (D.D.C. 2025).................................................................. 20

*American School of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) .......................................................................................... 41

*American Wild Horse Presidential Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017)......................................................................... 35

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................ 14

*Armstrong v. Exceptional Child Center*,
   575 U.S. 320 (2015) ........................................................................................ 40

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................ 28

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................ 14

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ........................................................................................ 39

*Conference Group, LLC v. FCC*,
   720 F.3d 957 (D.C. Cir. 2013).......................................................................... 15

*Center for Biological Diversity v. EPA*,
   56 F.4th 55 (D.C. Cir. 2022)............................................................................. 23

*Center for Biological Diversity v. Regan*,
   734 F. Supp. 3d 1 (D.D.C. 2024)...................................................................... 23

*Center for Sustainable Economy v. Jewell*,
   779 F.3d 588 (D.C. Cir. 2015).......................................................................... 26

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................... 40, 41

*Decker v. Northwest Environmental Defense Center*,
   568 U.S. 597 (2013) ........................................................................................ 26

*DHS v. Regents of the University of California*,
   591 U.S. 1 (2020) ................................................................................ 35, 36, 37

*Does 1-26 v. Musk*,
   No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ...................................... 39

*Equal Rights Center v. Post Properties, Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011) ................................................................................ 15

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................................. 35

*FDA v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024) ................................................................................................. 15

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .......................................................................... 15, 16

*Global Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ..................................................................................... 41

*Harmon v. Brucker*,
   355 U.S. 579 (1958) ................................................................................................. 42

*Havens Realty v. Coleman*,
   455 U.S. 363 (1983) ................................................................................................. 15

*Humane Society of the U.S. v. Perdue*,
   935 F.3d 598 (D.C. Cir. 2019) ................................................................................. 15

*Immigration & Naturalization Service v. Chadha*,
   462 U.S. 919 (1983) ................................................................................................. 38

*Kingman Park Civic Ass'n v. Bowser*,
   815 F.3d 36 (D.C. Cir. 2016) ................................................................................... 15

*League of United Latin American Citizens v. Executive Office of President*,
   --- F. Supp. 3d ---, 2025 WL 3042704 (D.D.C. Oct. 31, 2025) ................................ 16

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 43

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ................................................................................................. 41

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................ 15, 23

*Maldonado v. District of Columbia,*
   61 F.4th 1004 (D.C. Cir. 2023) ........................................................................ 26

*Michigan v. EPA,*
   576 U.S. 743 (2015) ................................................................................ 35

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ................................................................................ 43

*Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,*
   463 U.S. 29 (1983) ........................................................................ 35, 36, 37

*Myers v. United States,*
   272 U.S. 52 (1926) ................................................................................ 38

*National Ass'n of Postal Supervisors v. U.S. Postal Service,*
   26 F.4th 960 (D.C. Cir. 2022) ........................................................................ 42

*National Environment Development Ass'ns Clean Air Project v. EPA,*
   752 F.3d 999 (D.C. Cir. 2014) ........................................................................ 29

*National Urban League v. Trump,*
   783 F. Supp. 3d 61 (D.D.C. 2025) ................................................................... 22

*Northwest Immigrants Rights Project v. U.S. Citizenship & Immigration Service,*
   496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................... 21

*Nuclear Regulatory Commission v. Texas,*
   605 U.S. 665 (2025) ........................................................................ 41, 42

*Ohio v. EPA,*
   603 U.S. 279 (2024) ................................................................................ 35

*People for the Ethical Treatment of Animals v. USDA,*
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................... 15, 16, 22

*Powder River Basin Resource Council v. U.S. Department of Interior,*
   749 F. Supp. 3d 151 (D.D.C. 2024) ................................................................... 26

*Railway Clerks v. Ass'n for Benefit of Non-contract Employees,*
   380 U.S. 650 (1965) ................................................................................ 41

*True the Vote, Inc. v. IRS*,
    831 F.3d 551 (D.C. Cir. 2016) ............................................................................. 26

*Turlock Irrigation District v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015) ............................................................................... 16

*Tyler v. Hennepin County*,
    598 U.S. 631 (2023) ............................................................................................ 22

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ............................................................................................ 39

*Widukaswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025) ...................................................................... 28

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................................ 40

**Statutes**

5 U.S.C. § 706 ............................................................................................................. 28

5 U.S.C. § 2301 ........................................................................................................... 31

6 U.S.C. § 111(b)(1)(G) ...................................................................................... 1, 36, 39

6 U.S.C. § 113(d)(3) .............................................................................................. 3, 29

6 U.S.C. § 205 ...................................................................................................... 29, 38

6 U.S.C. § 205(a) .................................................................................................. 4, 32

6 U.S.C. § 205(b)(1) ......................................................................................... 5, 32, 33

6 U.S.C. § 205(b)(2) ......................................................................................... 5, 33, 43

6 U.S.C. § 205(b)(3) ......................................................................................... 5, 27, 43

6 U.S.C. § 205(b)(4) ......................................................................................... 5, 33, 43

6 U.S.C. § 205(b)(5) ......................................................................................... 5, 33, 43

6 U.S.C. § 205(e) .......................................................................................................... 5

6 U.S.C. § 272 ...................................................................................................... 4, 29, 38

6 U.S.C. § 272(b) ................................................................................................ 4, 43

6 U.S.C. § 272(b)(1) ................................................................................................ 34

6 U.S.C. § 272(c) ...................................................................................................... 5

6 U.S.C. § 272(d) ................................................................................................ 4, 34

6 U.S.C. § 272(e) ................................................................................................ 4, 34

6 U.S.C. § 272(g) .................................................................................. 4, 27, 34, 43

6 U.S.C. § 345 .................................................................................................... 11, 38

6 U.S.C. § 345(a)(1) ........................................................................................... 3, 30

6 U.S.C. § 345(a)(3) ................................................................................................ 31

6 U.S.C. § 345(a)(4) ................................................................................. 4, 5, 31, 43

6 U.S.C. § 345(a)(6) ................................................................................... 4, 5, 30

6 U.S.C. § 345(b) ...................................................................................................... 5

6 U.S.C. § 452(a) .................................................................................................... 29

6 U.S.C. § 452(a)(2) ................................................................................................ 30

6 U.S.C. § 452(b)(2) ................................................................................................ 29

8 U.S.C. § 1367 ...................................................................................................... 19

29 U.S.C. § 794 ...................................................................................................... 12

42 U.S.C. § 2000d .................................................................................................. 31

42 U.S.C. § 2000ee-1 ............................................................................................ 29

42 U.S.C. § 2000ee-1(a)(2) ...................................................................................... 4

42 U.S.C. § 2000ee-1(f) ............................................................................................ 5

42 U.S.C. § 2000ee-1(g) .......................................................................... 5, 24, 32, 43

Pub. L. No. 107-296, § 452, 116 Stat. 2135, 2197 .................................................. 4

Pub. L. No. 108-458, § 8303, 118 Stat. 3638, 3867 ......................................................... 3

Pub. L. No. 110-53, § 803, 121 Stat. 266, 360 ............................................................... 4

Pub. L. No. 116- 93, § 106(a), 133 Stat. 2317, 2504 ...................................................... 4

U.S. Const. art. I, § 1 ..................................................................................................... 38

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 14

Fed. R. Civ. P. 56(c) ...................................................................................................... 14

**Regulations**

5 C.F.R. § 351.806 ......................................................................................................... 6

28 C.F.R. § 115.16(b) .................................................................................................... 31

29 C.F.R. § 1614.109 ..................................................................................................... 32

**Other Authorities**

DHS, Delegation No. 3095, *Delegation to the Officer for Civil Rights and Civil Liberties for Matters Involving Civil Rights, Civil Liberties, and Equal Employment Opportunity* (June 5, 2003), ................................................................................................................ 3

Executive Order 14210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative (Feb. 11, 2025) ............................................. 36

Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024 (Mar. 18, 2024) .................................................................................................. 38

## INTRODUCTION

Congress established the Department of Homeland Security (DHS) in 2002 and charged it with a multifaceted mission, including to "ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. § 111(b)(1)(G). To support this aspect of DHS's mission, Congress created three oversight entities within DHS—the Office for Civil Rights and Civil Liberties (CRCL), the Office of the Citizenship and Immigration Services Ombudsman (CISOM), and the Office of the Immigration Detention Ombudsman (OIDO)—and designated specific functions that each entity must perform: CRCL must oversee DHS's activities to ensure compliance with constitutional and statutory requirements regarding civil rights and civil liberties. CISOM must assist individuals and employers having problems with the Bureau of Citizenship and Immigration Services (USCIS or CIS) and operate local ombudsman's offices throughout the nation. And OIDO must establish an accessible complaint process for immigrants in detention and provide assistance to those affected by potential misconduct, excessive force, or violations of law or detention standards.

On March 21, 2025, Defendants abruptly ordered all 309 employees at CRCL, CISOM, and OIDO (together, the "Oversight Offices") to stop performing any work, including work on the mandatory functions specified by statute. This stop-work order was issued as part of a reduction in force (RIF) whose stated goal was the "dissolution" of all three Oversight Offices. When Defendants issued the stop-work order and initiated the RIF, they had no plan for how the statutory functions of these offices would continue. Meanwhile, Plaintiffs Robert and Ethel Kennedy Human Rights Center (KHRC),[1] Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC), which had previously relied on the Oversight Offices to assist their detained

---

[1] KHRC was previously known as Robert F. Kennedy Human Rights.

clients, investigate their complaints of civil rights abuses, or respond to their requests for assistance with CIS, found those avenues for assistance and accountability abruptly cut off.

In the intervening months, Defendants have repeatedly assured this Court that the Oversight Offices were not being permanently dissolved but would be promptly restaffed so that their statutory functions could resume.  Instead, discovery has revealed that, despite the efforts of the single government employee who is essentially running the three offices by himself with a skeleton crew for assistance, statutory functions of all three offices continue to go unperformed. Only six full-time employees have been hired for the three offices combined, in sharp contrast to the staffing plan of dozens of new hires described to this Court in May.  Defendants have blamed this anemic hiring on their own decision to starve the Oversight Offices of funds, as the budget proposals for Fiscal Year 2026 slash two of the offices' funding by 90% and eliminate all funding for the third.

Despite receiving nearly 6,000 new complaints since March 21, and at a time of major expansions in DHS operations, CRCL has not made a single policy recommendation to any DHS component.  The loss of case managers in detention facilities has rendered OIDO's complaint process inaccessible, causing the number of OIDO complaints received to plummet by nearly 98% despite the number of people in detention increasing by nearly 30,000 during 2025.  And in contrast to the detailed correspondence that requesters of CISOM assistance used to receive providing updates on the status of their requests and any response from CIS, requesters now receive one of two autogenerated form responses, with 98.5% receiving the one-sentence statement that "[t]he CIS Ombudsman's Office has reviewed your inquiry but will not be taking further action."

In short, Defendants dissolved three congressionally mandated offices nearly ten months ago by stopping all of their work and eliminating all of their staff, and the damage caused by that

unlawful, arbitrary, and capricious action continues to injure Plaintiffs and SBCC's members to this day.  Summary judgment against Defendants is warranted, as is declaratory and injunctive relief requiring all statutory functions of the Oversight Offices to be resumed.

## STATUTORY BACKGROUND

Congress created DHS in response to the terrorist attacks of September 11, 2001, when concerns over security were at a zenith.  In creating DHS, however, Congress sought to ensure that civil rights and liberties were protected.  Among the presidentially appointed officers that Congress required for the new agency was an "Officer for Civil Rights and Civil Liberties," 6 U.S.C. § 113(d)(3), responsible for "review[ing] and assess[ing] information alleging abuses of civil rights, civil liberties, and profiling on the basis of race, ethnicity, or religion by employees and officials of" DHS.  *Id.* § 345(a)(1).  In 2003, the Secretary of Homeland Security delegated to the CRCL Officer the authority to ensure that DHS complied with various antidiscrimination statutes.[2]

Congress then made these delegated CRCL functions into statutory CRCL obligations through the Intelligence Reform and Terrorism Prevention Act of 2004, requiring that the CRCL Officer "oversee compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by programs and activities of the Department" and "investigate complaints and information indicating possible abuses of civil rights or civil liberties."  Pub. L. No. 108-458, § 8303, 118 Stat. 3638, 3867 (Dec.

---

[2] DHS, Delegation No. 3095, *Delegation to the Officer for Civil Rights and Civil Liberties for Matters Involving Civil Rights, Civil Liberties, and Equal Employment Opportunity* (June 5, 2003), https://perma.cc/J9EQ-DYP3 (delegating to CRCL the authority to investigate and render decisions on equal employment opportunity (EEO) complaints and "[a]ssure that all federally-assisted and federally-conducted programs or activities of the Department comply with the provisions of Title VI of the Civil Rights Act of 1964, as amended; Title IX of the Education Amendments of 1972, as amended; the Rehabilitation Act of 1973, as amended; the Age Discrimination Act of 1975, as amended; and related Executive Orders").

17, 2004) (codified at 6 U.S.C. §§ 345(a)(4), (6)). Congress further added to CRCL's responsibilities in the Implementing Recommendations of the 9/11 Commission Act of 2007, requiring it to "periodically investigate and review" departmental "actions, policies, procedures, guidelines, and related laws" to ensure that departmental actions adequately consider civil liberties. Pub. L. No. 110-53, § 803, 121 Stat. 266, 360 (Aug. 3, 2007) (codified at 42 U.S.C. §§ 2000ee-1(a)(2), (b)(2)).

The position of CIS Ombudsman, too, was created in the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, § 452, 116 Stat. 2135, 2197 (codified 6 U.S.C. § 272). The CIS Ombudsman's functions are to "assist individuals and employers in resolving problems" with CIS, to identify recurring problems, and to "propose changes in administrative practices" of CIS to "mitigate" those problems. 6 U.S.C. § 272(b). The CIS Ombudsman is additionally tasked with overseeing local ombudsman's offices, *id.* §§ 272(d)–(e), which also provide assistance to individuals and employers and must do so in a manner that preserves their independence from CIS, *id.* § 272(g).

Finally, the OIDO was established by Congress in 2019. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116- 93, § 106(a), 133 Stat. 2317, 2504 (Dec. 20, 2019). OIDO is statutorily required to be "independent of Department agencies and officers." 6 U.S.C. § 205(a). Its functions are to "[e]stablish and administer an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress … for cases in which Department officers or other personnel, or contracted, subcontracted, or cooperating entity personnel, are found to have engaged in misconduct or violated the rights of individuals in immigration detention" and to "[e]stablish an accessible and standardized" complaint process regarding "violations of law, standards of professional conduct, contract terms, and policy related to immigration detention." *Id.*

§§ 205(b)(1)–(2). OIDO is also charged with conducting unannounced inspections at detention facilities, including those run by states or private parties; making recommendations to address the findings of those inspections, including any terms of detention contracts found to have been violated; and assisting those in detention affected by potential excessive force or other types of misconduct. *Id.* §§ 205(b)(3)–(5).

All three DHS Oversight Offices must report annually to Congress on their activities, the complaints they received, and the recommendations they made. *Id.* § 205(e) (OIDO); *id.* § 272(c) (CIS Ombudsman); *id.* § 345(b), 42 U.S.C. § 2000ee-1(f) (CRCL). CRCL is further charged with making these congressional reports available to the public and "otherwise informing the public" of its activities. 42 U.S.C. § 2000ee-1(g).

## FACTUAL BACKGROUND

## I. Process culminating in March 21, 2025, dissolution of Oversight Offices

On March 6, 2025, DHS sent two memoranda to the Office of Personnel Management (OPM) announcing its intention to conduct a "100% RIF" of the three Oversight Offices. Plaintiffs' Statement of Material Facts (SOMF) ¶¶ 1–2. The reason for the RIF provided in these memoranda was that the offices' functions "do not advance the national security mission of DHS" and "do not advance [sic] mission of DHS to protect our homeland." *Id.* After OPM approved this proposed action, a memorandum was sent for Secretary Noem's approval on March 17, indicating that the RIF would affect "all employees" of the three offices except for those who chose to participate in the deferred resignation program—the RIF would include a total of 45 General Service (GS) employees at CISOM, 147 GS employees at CRCL, and 117 GS employees at OIDO. *Id.* ¶¶ 4–5. The memorandum sent to Secretary Noem was accompanied by a list of the offices' statutory authorities, which specifically mentioned CRCL's EEO responsibilities and obligation to investigate complaints of civil rights abuses by DHS personnel, *id.* ¶ 10, and the need to maintain

local ombudsmen within CISOM, *id.* ¶ 9.  Nonetheless, Secretary Noem approved the RIF on March 20.  *Id.* ¶ 11.

On March 21, 2025, employees at all three offices received RIF notices containing identical language referring to the "dissolution" of their office and noting that all positions in that office were being abolished.  *Id.* ¶¶ 12–13.  The RIF included four CISOM employees who had the job title of "Regional Representative, Local Ombudsman," *id.* ¶ 14, many CRCL employees whose work involved EEO functions, *id.* ¶ 15, and dozens of OIDO case managers whose jobs involved frequent visits to detention facilities to meet with detained people and observe on-the-ground conditions, *id.* ¶ 16.

OPM regulations specify that barring an emergency or a lack of work, employees subject to a RIF should remain on active duty status during the notice period after the RIF is announced but before their date of separation.  5 C.F.R. § 351.806; *see also* SOMF ¶ 18 (human resources employee at DHS testifying to her knowledge of this regulation).  However, all employees affected by the RIF at the Oversight Offices were placed on administrative leave on March 21, 2025, and prevented from performing any work from that day forward.  SOMF ¶ 17.  When this stop-work order was issued, 4,489 requests for assistance were pending with CISOM, *id.* ¶ 179, 778 complaints were pending with CRCL, *id.* ¶ 83, and 388 complaints were pending with OIDO, *id.* ¶ 140.

## II.    Aftermath of March 21, 2025, agency action

After Secretary Noem approved the RIF, Acting DHS General Counsel Joseph Mazzara asked Ronald Sartini to interview leadership at the three offices and analyze the functions they had been performing before the work stoppage.  *Id.* ¶ 28.  When he was given this assignment, Mr. Sartini was not provided with any plans for transitioning the work of those offices elsewhere, nor was he aware of any plans for continuing their work.  *Id.* ¶ 29.  Meanwhile, internal correspondence

within DHS continued to refer to the offices' "elimination," *id.* ¶ 20, and similar language was used in a May 12 letter addressed to Senator John Cornyn in response to an inquiry about a constituent employed by OIDO, *id.* ¶ 22.

In the days following the stop-work order and announcement of the RIF, affected employees expressed concerns about how the statutory functions of their offices would be performed going forward.  *Id.* ¶ 26.  Human resources employees within DHS expressed similar concerns, particularly regarding the EEO functions that CRCL had previously been performing. *Id.* ¶ 27.  And after conducting his analysis, Mr. Sartini concluded that before the stop-work order, all three Oversight Offices had been performing functions required by statute.  *Id.* ¶ 30. Nonetheless, the four senior executives who remained at the offices after the stop-work order were reassigned to other offices or left federal service so that by mid-May, the only person employed by any of the three offices was Mr. Sartini, who was appointed as CIS Ombudsman on May 4.  *Id.* ¶¶ 21, 23–25.

Based on his analysis of the offices' statutory functions, Mr. Sartini came up with a plan for partially re-staffing the three offices following the RIF, which he first presented to Principal Deputy Chief of Staff Troup Hemenway on May 22 and described in testimony before this Court the following day.  *Id.* ¶¶ 32–36.  Mr. Sartini's understanding at that time was that this plan would allow the offices' functions to resume after a two- or three-month pause.  *Id.* ¶ 31.  Under this plan, eight to ten employees would staff CISOM for a 50% reduction compared to its pre-RIF staffing levels, twenty-three employees plus contractors would staff CRCL for an approximately 75% reduction compared to its pre-RIF staffing levels, and one or two facility inspectors plus five to seven case workers would staff OIDO for a reduction of over 90% from its pre-RIF staffing levels. *Id.* ¶¶ 32–33, 35–36; *see also* Gilbride Decl. Ex. F.  Mr. Sartini testified that he believed the hiring

process could be expedited so that he could create the new positions for the three offices, publish job announcements, and hire people to fill them within a month, or by the end of June. SOMF ¶¶ 37–38.

Neither these time estimates, nor the number of hires in the staffing plan, came to fruition. No employees were onboarded at CRCL until August 11, and instead of the twenty-three employees projected in Mr. Hemenway's declaration, only two full-time employees had been hired at CRCL as of December 5. *Id.* ¶ 39.[3] Only three full-time employees were hired at OIDO, along with two detailees, and the employees did not begin work until late August or early September, in part because two of them needed to relocate to the Washington, D.C. area, where the positions are based. *Id.* ¶¶ 42, 44, 164.[4] And despite Defendants stating in a May 27 status report that a position description for employees at CISOM was "in progress," no such announcement was ever published, and the only person working full-time for CISOM as of December 5 was a single detailee. *Id.* ¶¶ 46, 51.[5]

---

[3] Defendants stated in their August 13 discovery responses that hiring was not yet complete, SOMF ¶ 48, and added in supplemental discovery responses nearly a month later that additional people had been hired at CRCL, *id.* ¶ 49, but Mr. Sartini's deposition in December clarified that no one else has been onboarded at CRCL since the two employees who started work on August 11, *id.* ¶ 50.

[4] These employee counts do not include Troup Hemenway, who was designated Acting CRCL Officer on May 22, or Joseph Guy, who was designated Acting Detention Ombudsman on the same date, two days after the first evidentiary hearing in this case. SOMF ¶¶ 52, 59. Both Mr. Hemenway and Mr. Guy continue to occupy the other full-time positions they held within DHS before being given these additional titles, and Mr. Guy testified to spending less than one-tenth of his time on his OIDO duties. *Id.* ¶¶ 52, 59–60. Moreover, at deposition, both men demonstrated a general lack of knowledge regarding many aspects of the offices they ostensibly head and a tendency to defer to Mr. Sartini on any operational details. *Id.* ¶¶ 53–58, 61–64, 67, 135, 199, 201.

[5] While Mr. Sartini is the CIS Ombudsman, he testified that he only spends 30% of his time on that role because 70% of his time is spent on his duties as Acting Deputy CRCL Officer and Acting Deputy Ombudsman for OIDO. SOMF ¶ 68. And while Rodolfo Gomes was hired to serve as deputy CIS Ombudsman, he in fact serves as chief of staff to Mr. Sartini in all three of his roles. *Id.* ¶ 69.

According to Mr. Sartini, hiring at CRCL and OIDO took longer than he anticipated in May because security-vetting resources for new employees were occupied with the surge in Immigration and Customs Enforcement (ICE) agents brought on board over the summer. *Id.* ¶ 45. As for why the number of employees hired was so much lower than the May estimates, a repeatedly cited reason for this discrepancy was the DHS fiscal year (FY) 2026 budget proposal. Shortly after Mr. Sartini testified about his staffing plans in May, DHS presented its proposed budget to Congress for FY2026. That proposed budget allocated about one-tenth the amount to CRCL and CISOM that they had been allocated in FY2025. *Id.* ¶¶ 70–74. At deposition, Mr. Sartini testified that the reason no other CISOM positions were ever announced or filled is that the proposed FY2026 budget could only support two CISOM employees, *id.* ¶ 75, and Mr. Hemenway similarly testified that the reason only two CRCL investigators were hired was because the proposed FY2026 budget would only support four full-time CRCL employees and so additional hiring "wouldn't be prudent." *Id.* ¶¶ 76–77.

The long gap in staffing that followed the March 21 stop-work order is evident in the similarly long gap in processing assistance requests at CISOM and complaints at CRCL and OIDO. Defendants produced charts on August 13 in response to one of Plaintiffs' discovery requests listing the number of cases resolved, dismissed, or otherwise closed by each office since January 20, 2025: these charts show 4,534 closures for CISOM between January 20 and March 21, and none between March 21 and August 13, *id.* ¶¶ 181–182; 310 closures for CRCL between January 20 and March 21, and one between March 21 and August 13, *id.* ¶¶ 93–94; and 2,057 closures for OIDO between January 20 and March 21, and none between March 21 and August 13, *id.* ¶¶ 153–154. Mr. Sartini explained at his deposition that in order to cope with the backlog of complaints that had accumulated between March and August, all three offices created form emails that were

sent in batches to everyone whose pending cases were being disposed of in a similar way once processing resumed, as evidenced by a batch of OIDO closure emails all sent on September 19 for complaints filed in April, July, and August.  *Id.* ¶¶ 96, 161, 185, 189–190.

These form emails also afford no way for the complainant or assistance requester to communicate directly with the office to provide information relevant to an ongoing investigation or to request further assistance.  Before March 21, 2025, correspondence from CISOM and CRCL used to include a phone number and email address that people could contact with questions or to provide additional information.  Lothrop Decl. ¶¶ 6–7; Third Serrano Decl. ¶ 7; Third Horan Decl. ¶ 5.  These phone numbers are no longer operational, and emails sent to CISOM's email address prompt an autoresponse that the mailbox is no longer monitored.  SOMF ¶¶ 90, 193, 195–196, 198.  Short of filing a new complaint or assistance request, there is now no way for someone to update CRCL or CISOM with new information about a pending case, or to withdraw a case the individual no longer wishes to pursue.  *Id.* ¶¶ 91–92, 194.  And in contrast to the detailed emails that CISOM used to send requesters with updates on the status of CISOM's attempts to resolve an inquiry with CIS, *see* Lothrop Decl. Exs. A–B; Gilbride Decl. Ex. O, CISOM now sends requesters one of two form emails, one when an inquiry is forwarded to CIS and another when the case is closed.  SOMF ¶¶ 185–186, 189; Lothrop Decl. Exs. C–D; Gilbride Decl. Exs. P–Q.[6]  According to Mr. Sartini, there is currently no way for someone requesting assistance to have a real-time conversation with a representative of CISOM.  SOMF ¶ 197.

Defendants have also eliminated avenues for submitting complaints to CRCL and OIDO for those who do not speak English and those who lack access to the internet.  Complaints can only

---

[6] Mr. Sartini testified that a requester would also be notified if and when CIS responds to an inquiry CISOM has forwarded, but as of December 5, CIS had not responded to any of the 113 inquiries forwarded by CISOM since March 21, 2025.  SOMF ¶¶ 191–192.

be submitted via each office's web portal, not via email or postal mail as they could be before March 21, 2025. *Id.* ¶¶ 86, 148. Moreover, CRCL and OIDO complaints can no longer be submitted in any language other than English. *Id.* ¶¶ 85, 149. These changes have had particularly stark consequences for OIDO, given that tablets to access the internet are not available at all detention facilities or to all detained people. *Id.* ¶ 150. Indeed, only 2.2% of complaint submissions to OIDO were made via the web portal during 2023, the last year for which data is publicly available, with the vast majority of complaints made in person to case managers during their visits to detention facilities. *Id.* ¶ 147. OIDO has received only 280 complaints since March 21, 2025, *id.* ¶ 141, and when asked why he thought this number had dropped so steeply from the 12,664 complaints OIDO received in 2023, Mr. Sartini pointed to the fact that case managers were no longer continually present in detention facilities, *id.* ¶ 144. Another possible reason for the decline is that, according to multiple detained clients of KHRC, information that was previously posted in detention center dormitories informing people of how to file complaints with CRCL and OIDO was removed as of June 2025. *Id.* ¶ 152.

Another way that CRCL and OIDO have coped with their self-imposed lack of human resources is to investigate fewer complaints themselves and instead refer more matters to other components of DHS and rely on assistance from attorneys in DHS's Office of General Counsel (OGC). OIDO has chosen to refer nearly as many complaints to ICE (12) since March 21 as it has chosen to investigate itself (14). *Id.* ¶ 156. CRCL, meanwhile, has opened 183 investigations of its own under 6 U.S.C. § 345 since March 21, while referring an additional 371 complaints to other DHS components. *Id.* ¶ 112.[7] In reaching determinations on the 70 complaints of disability

---

[7] Mr. Sartini testified that CRCL and OIDO may, but need not, follow up on complaints once referred to other components. SOMF ¶¶ 108, 158. This is a departure from past practice,

discrimination it has received since March 21 under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *id.* ¶ 115, CRCL investigators have consulted with attorneys at OGC before sending the determination letter to Mr. Sartini for his signature, *id.* ¶ 118.  None of CRCL's determinations on disability discrimination claims since March 21 have concluded that the Rehabilitation Act was violated.  *Id.* ¶ 116.[8]

The Oversight Offices' recent outputs in the form of recommendations and consultations made (or not made) also reveal the extent of the decimation wrought on March 21.  In their August 13 discovery responses, Defendants noted that only one draft recommendation memorandum was in progress based on a CRCL complaint, and in their supplemental responses four months later, they mentioned no additional recommendations.  *Id.* ¶¶ 120–121.[9]  Mr. Sartini could only recall making "minor edits to a few" policy documents in his time with CRCL.  *Id.* ¶ 133.  Acting CRCL Officer Hemenway testified that CRCL has not been consulted about the use of national defense areas for immigration detention and that he does not believe any such consultation would occur, *id.* ¶ 134, nor has CRCL been consulted about policies for care of pregnant or transgender people in detention, *id.* ¶ 136.

OIDO did not conduct any facility inspections between March 21 and August 13, *id.* ¶ 168, and conducted only three between August 13 and the beginning of the government shutdown in October, *id.* ¶ 170.  Although it conducted over twenty inspections between the end of the

---

when components to which CRCL referred complaints were required to produce a report of investigation for CRCL to review.  *Id.* ¶ 107.

[8] OGC's role has been even greater with respect to CRCL's EEO functions.  Most of the 177 final agency decisions CRCL has issued since March 21 have been written by OGC attorneys, with some assistance from contractors.  SOMF ¶ 129.

[9] By point of comparison, in FY2023, CRCL reported issuing 653 individual recommendations, informal resolutions, and instances of informal advice to DHS components based on investigations it had conducted.  SOMF. ¶ 81.

shutdown in mid-November and December 12, all of these were announced inspections with a few business days' notice and were conducted by one or two OIDO employees as inspectors, without any of the medical or environmental experts who participated in OIDO inspections before Defendants' March 21 action. *Id.* ¶¶ 169, 171–174. CRCL, too, previously retained medical expert contractors who participated in multidisciplinary on-site inspections, and in FY2023 these medical experts made 288 recommendations to other DHS components. *Id.* ¶ 122. According to Mr. Sartini, these medical contractors have been replaced with a new arrangement through which CRCL and OIDO can call on the Office of Health Security (OHS) within DHS to assist with medical reviews. *Id.* ¶ 123. As of December 5, the date of Mr. Sartini's deposition, OHS had not been asked to conduct any in-person inspections and had only begun reviewing the first medical documentation on which the Oversight Offices had sought assistance: a batch of twelve or so detainee medical files related to complaints from both CRCL and OIDO. *Id.* ¶¶ 124–125.

Finally, CISOM has responded to its backlog of thousands of assistance requests, and its almost complete lack of staff, by closing virtually all requests without taking any action on them. Mr. Sartini testified in May that in prior years, CISOM had opened about 40% of the requests it received and forwarded the substantial majority of these to CIS for a response. *Id.* ¶ 178. By contrast, between August 13 and December 12, CISOM has closed 7,914 requests with no further action to be taken, while forwarding only 113 to CIS, for a closure rate of 98.5%. *Id.* ¶¶ 183, 187. CISOM has also abandoned any attempt to maintain local or regional ombudsmen, with Mr. Sartini explaining that he believes this abandonment is justified because the statute requires 50 such ombudsmen, one for each state, and that obligation had never been met. *Id.* ¶ 34. But one of the four former local ombudsmen, who represented CISOM in Texas, Utah, and other states in the central United States, testified that despite her large geographic coverage area, she was able to

meet directly with employers, universities, refugees, and other stakeholders, answer their questions about the CIS process, and identify and solve recurring problems they were experiencing, all activities that are vital to a customer-service-oriented ombudsman role and that have gone unfulfilled since March 21. *Id.* ¶ 198; Tacey Decl. ¶¶ 2, 6–13.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts are limited to those identified by substantive law: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries that initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party's opposition must consist of competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

## ARGUMENT

I.    **This Court has subject matter jurisdiction.**

     **A. Plaintiffs have standing.**

Plaintiffs bear the burden of establishing standing. On cross-motions for summary

judgment, Plaintiffs "must set forth by affidavit or other evidence specific facts" to prove standing. *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). When evaluating standing, the Court must assume that Plaintiffs will prevail on the merits of their claims. *Conference Grp, LLC v. FCC*, 720 F.3d 957, 962 (D.C. Cir. 2013).

A membership-based organization like SBCC may establish standing in one of two ways: by asserting an injury to itself (organizational standing) or an injury to one of its members (associational standing). *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016). Here, all three plaintiffs have organizational standing, and SBCC also has associational standing on behalf of its members.

### 1. Plaintiffs have organizational standing.

An organization establishes standing to sue on its own behalf in the same way as an individual: by "show[ing] actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks omitted). An organization cannot assert standing based merely on "a setback to [its] abstract social interests" or its opposition to the defendant's actions. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Rather, it must show that the defendant's actions "perceptibly impaired" its ability to perform its core activities. *Id.* at 395 (citing *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1983)).

The D.C. Circuit has developed a two-part test to determine whether an organization has standing based on injury to its activities: the court asks, first, whether the agency's act or omission "'injured the [organization's] interest' and, second, whether the organization 'used its resources to counteract that harm.'" *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (*PETA*) (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140

(D.C. Cir. 2011)).  Injury to an organization's interest is sufficiently concrete and particularized if the organization can show that the challenged action has "perceptibly impaired its ability to provide services." *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)); *see also League of United Latin Am. Citizens v. Exec. Office of President*, --- F. Supp. 3d ---, 2025 WL 3042704, at *13 (D.D.C. Oct. 31, 2025) (contrasting diversion of resources to provide additional direct services to counteract harmful effects of the defendant's conduct, which is sufficient to create injury-in-fact for purposes of Article III standing, with diversion of resources to advocate against the defendant's conduct, which is not).  The ability to provide services is perceptibly impaired when the defendant's conduct inhibits the organization's daily operations.  *Food & Water Watch*, 808 F.3d at 919 (citing *PETA*, 797 F.3d at 1094).

Here, Defendants' March 21 action to dissolve the Oversight Offices, and the moribund state in which the offices have remained ever since, have injured all three Plaintiffs' interests in concrete, particularized ways, impacting their daily operations and their ability to engage in core activities, thus satisfying the first element of this circuit's two-part test.  Plaintiff KHRC has filed dozens of complaints with CRCL and OIDO about civil and human rights abuses occurring in immigration detention, and during visits to detention centers, it has educated detained people about how to contact CRCL and OIDO themselves.   Fifth Enriquez Decl. ¶ 5.   In the past, these complaints have secured needed accommodations for KHRC clients, obviating the need for time-consuming and expensive litigation.  Enriquez Decl., ECF 15-3, ¶ 9.  The complaints also have drawn attention to widespread or recurring patterns of abuse and provided a deterrent against that abuse continuing by making those responsible aware that their actions are under scrutiny.  *Id.* ¶¶ 10–11.  The complaint mechanisms of CRCL and OIDO have thus been an effective tool that

KHRC previously used in pursuing its core activities of stopping human rights abuses in immigration detention and helping detained people to advocate for themselves. Fifth Enriquez Decl. ¶¶ 6–10.

Plaintiff SBCC has also filed complaints with CRCL regarding conditions at the U.S.-Mexico border and the actions of Customs and Border Protection (CBP) officials at the open-air detention sites it created there in 2023. Serrano Decl., ECF 15-5, ¶ 8 & Exs. A, B. CRCL opened an investigation and conducted a site visit after SBCC filed these complaints, *id.* ¶ 9 & Ex. C, bringing attention to the conditions at the open-air detention sites and, in SBCC's view, changing CBP's behavior and leading to improved conditions there, *id.* ¶ 10. Filing complaints with CRCL, as well as participating in CRCL's public engagement efforts in the community as a forum to raise issues of ongoing concern, have furthered SBCC's ability to accomplish its mission of improving the quality of life in border communities. *Id.* ¶¶ 10–12.

Finally, lawyers with Plaintiff UJC's Domestic Violence Project have frequently sought assistance from CISOM when petitions for immigration relief they have filed on behalf of their clients have been pending with CIS longer than the standard processing time or when CIS has made an error with respect to one of those petitions. Ziegeweid Decl., ECF 15-4, ¶ 7. CISOM intervention has often resulted in UJC clients' petitions reaching final adjudication when they had previously been languishing with CIS for years. *Id.* Even when requesting assistance from CISOM did not yield such dramatic results, it still typically produced a substantive response on the status of the immigration petition, which was valuable to UJC attorneys in determining how to best serve their clients. *Id.*; *see also* Lothrop Decl. ¶ 10.

These previously essential tools—including filing formal complaints with CRCL and OIDO and requests for case assistance with CISOM, and engaging in CRCL's community-based

public engagement efforts—have all been rendered useless by Defendants' March 21, 2025, action of halting the Oversight Offices' operations and gutting their staff. For example, KHRC had filed a complaint in March 2024 about a brutal pepper-spraying incident at Winn Detention Center in Louisiana, in which guards sprayed approximately 200 people in a housing unit directly in their faces in retaliation for their participation in a hunger strike to protest their conditions of confinement, and then locked the unit's doors and windows and cut off power and water so that people in the unit could not wash their eyes, throats, or skin. Fifth Enriquez Decl. ¶¶ 11–13 & Ex. A. CRCL requested documents about and video footage of this incident from ICE in early 2024 and opened a multidisciplinary onsite investigation in September, but internal documents obtained through discovery reveal that the investigation has been effectively abandoned since March 21, 2025. *Id.* ¶¶ 14–15 & Exs. B–D. Similarly, a group of organizations including KHRC had filed a complaint in December 2024 regarding conditions at the South Louisiana ICE Processing Center in Basile, about which CRCL opened an investigation. *Id.* ¶¶ 16–18 & Exs. E–G. As part of that investigation, CRCL requested documents from ICE in February 2025, but nothing has happened with that complaint either since March 21. *Id.* Finally, KHRC's unsuccessful efforts to enlist CRCL's and OIDO's assistance in advocating for the medical needs of their client detained in Basile over the summer of 2025—where the Oversight Offices' only response was to forward to ICE the same requests for assistance that KHRC attorneys had already sent to ICE themselves—confirmed that the Oversight Offices are no longer conducting neutral or independent investigations of complaints as their authorizing statutes require, and that OIDO in particular was unable to provide effective assistance because it no longer had case managers stationed in detention facilities to interface directly with facility staff. Fourth Enriquez Decl., ECF 50-1, ¶¶ 3–24.

18

SBCC's and UJC's attempts to obtain assistance from the Oversight Offices since March 21, 2025, have proved equally unavailing. SBCC filed a complaint with CRCL on June 24, 2025, regarding an excessive use of force during an ICE raid in San Diego on May 30, in which flash-bang grenades were used against a group of peaceful protesters, injuring a pregnant woman and knocking down two children. Third Serrano Decl. ¶¶ 4–5 & Ex. A. The only response CRCL ever provided was a December 3 email indicating that CRCL had received the complaint but would be taking no action on it. *Id.* ¶ 6 & Ex. B. And SBCC has been unable to ask CRCL about how use-of-force standards relate to particular deaths in DHS custody or involving CBP personnel, as it had done in the past, because there is no longer anyone at CRCL that SBCC can contact by email or phone. *Id.* ¶¶ 8, 10. In any event, CRCL has chosen not to investigate any of the in-custody deaths that had occurred in 2025 as of the date of Mr. Sartini's deposition. SOMF ¶ 126.[10]

UJC has still received no response to the CRCL complaint one of its attorneys filed on April 4, 2025, concerning the violation of a UJC client's rights to confidentiality under 8 U.S.C. § 1367 by CIS, when CIS gave information about her Violence Against Women Act (VAWA) petition to her abusive husband and allowed him to use that information against her in child custody proceedings. Lothrop Decl. ¶ 11. And after refraining from contacting CISOM for the first two months after the stop-work order, UJC attorneys resumed filing such assistance requests upon receiving assurances through this litigation that the office was still functioning, only to have those requests summarily closed with identical one-sentence emails in early September without any

---

[10] There is not even agreement on how many deaths in DHS custody have occurred, with Mr. Sartini testifying to being aware of 22 such deaths, SOMF ¶ 126, while a recent media report recounts that there have been 32. Maanvi Singh, Coral Murphy Marcus, and Charlotte Simmons, *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, The Guardian (Jan. 4, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline.

explanation of the reasons for the closures or of the status of the underlying petitions with CIS.  *Id.* ¶¶ 8–9 & Exs. C–D.  As a result, UJC attorneys have again stopped contacting CISOM for assistance and have resorted to alternative, more time-consuming methods to seek assistance for their clients experiencing problems with pending petitions with CIS, such as contacting the CIS email hotline or requesting intervention from members of Congress.  *Id.* ¶ 10.

The injuries to Plaintiffs' interests are no less concrete even if Plaintiffs can still *file* complaints with CRCL and OIDO and request case assistance from CISOM,[11] because doing so no longer produces tangible results.  Rather, if Plaintiffs receive any response at all, the response is a form email that communicates nothing of substance.  In that way, they are in a similar position to the plaintiffs in *AFL-CIO v. DOL*, 778 F. Supp. 3d 56 (D.D.C. 2025).  There, the plaintiff organizations, which had previously used the complaint system of the Consumer Financial Protection Bureau (CFPB) in the direct services they provided to consumers, had stopped recommending that consumers file CFPB complaints after the plaintiffs learned that the CFPB might be sharing confidential information in those complaints with representatives of the Department of Government Efficiency (DOGE).  The court held that the organizations had standing to challenge that information sharing because it rendered the CFPB complaint system less reliable and thus less useful to them in providing their direct services to consumers.  *Id.* at 75.  Similarly here, the lack of staffing and non-performance of statutory functions at the Oversight Offices since March 21, 2025, has made those offices' complaint and case assistance systems unreliable and ineffective, in turn inhibiting Plaintiffs' daily operations and making it more

---

[11] It is not even clear that CRCL complaints can be filed by non-lawyers on behalf of others, given the statement on CRCL's website that a signed G-28 form is required to file a complaint on behalf of someone else.  SOMF ¶ 87; *see* Third Horan Decl. ¶ 8 (expressing concern about whether organization staffed by non-lawyers can file complaints with CRCL in light of this statement on the CRCL web portal).

difficult for them to perform their core activities.  *See* Fifth Enriquez Decl. ¶¶ 19, 26–27; Third Serrano Decl. ¶¶ 11–12; Lothrop Decl. ¶¶ 10–11.

Moreover, for the two organizational plaintiffs that represent clients, KHRC and UJC, Defendants' actions have also impaired their core activities by making it more difficult to represent their existing clients and by decreasing the number of clients they can represent.  For example, the void left by the Oversight Offices means that KHRC needs to more frequently advocate for its clients with ICE and facility staff, which is best done through in-person visits to the facilities where their clients are detained, but KHRC's small staff and budget limit the number of clients it can serve in this more hands-on way.  Fifth Enriquez Decl. ¶¶ 20–21.  And without effective assistance from CISOM, UJC's representation of each of its domestic violence clients requiring immigration assistance takes longer, thus limiting the number of new clients that UJC is able to assist.  Ziegeweid Decl. ¶ 10; Lothrop Decl. ¶ 10.  Courts in this circuit have found these sorts of professional injuries to confer standing as well.  *See N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46–48 (D.D.C. 2020) (holding that legal organizations had standing to challenge a rule that they averred would make it more difficult to serve their existing clients and require them to spend more time serving each client, consequently reducing the number of clients they could serve).

Turning to the second prong of the D.C. Circuit's test, all three Plaintiffs have established that they have expended resources and will continue to expend resources to counteract the injuries caused by Defendants' actions.  KHRC has been required to spend more time traveling to immigration detention facilities and more money on litigation to resolve complaints that would have previously been addressed by the Oversight Offices, new expenditures of resources that it has been making continuously since March 21 and that it expects to continue making if the

situation with the Oversight Offices remains unchanged.  Fifth Enriquez Decl. ¶¶ 20–23.  SBCC has been and will be required to engage directly with CBP around border policy matters, even though it found such direct engagement with CBP to be less effective than engagement with CRCL prior to March 21, 2025. Third Serrano Decl. ¶ 12.  And UJC lawyers have been and will be required to again use CIS's email hotline or enlist assistance from members of Congress to learn the status of their clients' immigration petitions stalled with CIS, even though these alternatives to CISOM assistance requests are more time-consuming and are often ineffective.  Lothrop Decl. ¶¶ 5, 10.  These resource expenditures are like those the D.C. Circuit found to satisfy the second factor in *PETA*, 797 F.3d at 1095–96 (describing PETA's expenditure of resources to investigate "alternative means" of seeking redress for mistreated birds, and its filing of complaints with other "local, state, or federal agencies" because the Department of Agriculture would not act on its complaints of avian abuse under the Animal Welfare Act).

Plaintiff KHRC has also suffered a loss of grant funding, after the closure of the Oversight Offices deprived it of one of the measures—a track record of effective advocacy with those oversight bodies—that distinguished it from other nonprofits.  Fifth Enriquez Decl. ¶¶ 9, 24.  KHRC's engagement with these offices had featured prominently in its reports to funders, and in June of 2025, one of those funders indicated that it would not be renewing its support, *id.* ¶ 25, an additional concrete economic injury to KHRC beyond the injuries to its activities described above.  *See Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61, 83 (D.D.C. 2025) (describing loss of access to money as "classic pocketbook injury" conferring standing) (quoting *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023)).

Plaintiffs' injuries are directly traceable to Defendants' action to dissolve the Oversight Offices.  And a court order mandating a resumption of the Oversight Offices' statutory functions

would likely redress Plaintiffs' injuries. *See Lujan*, 504 U.S. at 561 (stating that "it must be likely, as opposed to merely speculative," that a favorable decision will redress the plaintiffs' injuries (internal quotation marks omitted)). Thus, all three elements of organizational standing are present.

### 2. SBCC has associational standing.

In addition to organizational standing, SBCC has associational standing to bring this action on behalf of its members. A membership organization may assert associational standing if "'(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation.'" *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 32 (D.D.C. 2024) (quoting *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022)). Each of these requirements is satisfied here.

First, the declarations of Pedro Rios, ECF 15-6, Margaret Cargioli, ECF 15-7, Sister Tracy Horan, ECF 15-12, and Laura St. John, ECF 15-13, submitted in support of Plaintiffs' Motion for Preliminary Injunction, establish that at least four SBCC member organizations are suffering injuries in fact from Defendants' actions with respect to the Oversight Offices and would have standing to sue in their own right. Margaret Cargioli and Tracey Horan have submitted supplemental declarations contemporaneously with this motion describing the injuries that Immigrant Defenders Law Center and Kino Border Initiative, respectively, continue to suffer as a result of the non-functioning status of the Oversight Offices.

SBCC member Immigrant Defenders Law Center (ImmDef), a social justice law firm representing immigrants, has previously obtained relief for its clients through engaging with all three Oversight Offices, but in recent months its complaints filed with CRCL and OIDO have

yielded no response.  Second Cargioli Decl. ¶¶ 5–8 & Ex. A.  ImmDef also used to track written notices on CRCL's website and attend its webinars and public events to learn what types of systemic civil rights violations the office was investigating, and would use this information to determine which of the systemic issues ImmDef had observed in representing its clients it should bring to the Oversight Offices' attention through filing complaints.  *Id.* ¶ 10.  However, CRCL is no longer publishing information about ongoing investigations and recommendation memos on its website, and it has not conducted any public events since March 21, 2025, despite its statutory obligation to inform the public of its activities.  42 U.S.C. § 2000ee-1(g).  ImmDef therefore can no longer rely on statements about CRCL's priorities and areas of focus to inform its activities. Second Cargioli Decl. ¶ 12.

SBCC member Kino Border Initiative (KBI), a faith-based organization that maintains offices on both sides of the U.S.-Mexico border and that operates a shelter in Nogales, Mexico, for recently deported migrants, has filed many complaints with CRCL on behalf of people arriving at its shelter.  Horan Decl., ECF 15-12, ¶ 3.  Before March 21, 2025, CRCL reliably responded with an acknowledgment email referencing the name of the complainant, which allowed KBI staff to track each complaint and follow up with CRCL if necessary.  Third Horan Decl. ¶ 5.  KBI also sometimes filed complaints with OIDO if the person seeking KBI's assistance had experienced mistreatment while in detention.  *Id.* ¶ 12.  Between March and August of 2025, KBI received no responses whatsoever to complaints it submitted to CRCL or OIDO.  *Id.* ¶¶ 4, 12.  In September, KBI began receiving some generic emails from CRCL acknowledging receipt of earlier-filed complaints, but none of these identically worded emails included complainants' names or any details about the substance of the complaint, nor did they provide KBI with any way to follow up

with questions. *Id.* ¶¶ 5–7.[12]  KBI's misgivings about CRCL only intensified in December 2025, when in the course of a conversation with staff at CBP's Office of Professional Responsibility (OPR), the OPR employee mentioned that they had lost touch with their previous contacts at CRCL and asked if KBI could facilitate a connection. *Id.* ¶ 11.  Given that migrants reaching KBI's shelter are already hesitant to file complaints with U.S. government offices for fear of retribution against themselves or their families living in the United States, KBI has become less confident about recommending that they do so because the Oversight Offices' complaint procedures have become unreliable and ineffective since March 21, 2025. *Id.* ¶ 13.[13]

As with the injuries to SBCC and the other plaintiffs as organizations, these injuries to SBCC members are traceable to Defendants' action to shut down the Oversight Offices in March 2025, and the cessation of those offices' statutory functions.  An order requiring those functions to be resumed would redress those harms.

The other two elements of associational standing are easily met as well.  This action is germane to SBCC's mission of seeking to improve living conditions and prevent loss of life on and around the southern border. Serrano Decl. ¶ 7.  And because the suit "turns entirely on whether [the agency] complied with its statutory obligations, and the relief [SBCC] seeks is invalidation of

---

[12] OIDO has still not responded to any of the complaints KBI has submitted since March 21, 2025.  Third Horan Decl. ¶ 12.

[13] Another reason that CRCL's complaint procedures have become less useful to KBI since March 21, 2025 is that CRCL's new leadership has made a policy change following its precipitous loss of staff, in the stated interest of efficiency, of summarily closing complaints and not investigating them if the complainant, or person on whose behalf the complaint was filed, is no longer in U.S. custody.  SOMF ¶ 110.  Because all complaints filed by KBI are on behalf of people no longer in U.S. custody, *id.* ¶ 111, this policy would have precluded some of the significant improvements to DHS policy that CRCL was able to bring about in the past based on complaints submitted by KBI.  Horan Decl. ¶ 4 (describing recommendation memo sent to CBP by CRCL in 2023 in response to numerous KBI complaints, and adopted in part by CBP in 2024, regarding discharge procedures when migrants are deported directly from hospitals); *see also* Plavsic Decl. ¶ 4 (describing another CRCL recommendation memo regarding a deported individual).

agency action," individual member participation is not necessary. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015); *see Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024) (participation of individual members unnecessary where organization sought only prospective relief).  SBCC has associational standing.

### B.  This case is not moot.

Defendants may argue that the hiring of a few employees and resumption of some activities by the Oversight Offices renders this case moot.  Unlike standing, establishing mootness would be Defendants' burden, and that burden is a "heavy" one. *Maldonado v. Dist. of Columbia*, 61 F.4th 1004, 1006 (D.C. Cir. 2023).  A case only becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Decker v. Nw. Env'tal Def. Ctr.*, 568 U.S. 597, 609 (2013) (internal quotation marks omitted).  Defendants acted to dissolve the Oversight Offices on March 21 by ordering a work stoppage and gutting their staff, and the harmful effects of those precipitous March actions have never been undone.  By Defendants' own admission, only "some" of the statutory functions of the Oversight Offices were being performed as of early December, SOMF ¶ 131, and this partial resumption occurred only after a five-month gap and accumulation of a significant backlog in work at all three offices.  Plaintiffs still have complaints and assistance requests pending with the Oversight Offices about which they have not heard anything for months, or that have been recently closed with no notice beyond a form email that says nothing about the substance of the case or the reasons for its closure.  Fifth Enriquez Decl. ¶¶ 11–18, 26; Third Serrano Decl. ¶ 6; Lothrop Decl. ¶¶ 8–9.  The fact that a tiny fraction of complaints are being investigated or referred to other DHS components, while many other statutory functions go completely unfulfilled, does not render this case moot. *See True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) (government defendant did not satisfy its "heavy

burden" of establishing mootness by arguing that the challenged conduct had been rectified as to a "vast majority" of the parties, because that would only prove that the case was "nearly moot").

There is certainly effectual relief that this Court can grant should Plaintiffs prevail in this action. The Court can order Defendants to perform statutory functions that they admit they are not currently performing, like conducting unannounced inspections at detention facilities, 6 U.S.C. § 205(b)(3), or appointing local ombudsmen in at least the four regions where such ombudsmen were previously present, *id.* § 272(g). Because it is not impossible for the Court to grant effectual relief to Plaintiffs, this case is not moot.

## II. Defendants' March 21, 2025, action to eliminate the Oversight Offices was illegal.

DHS's communications to OPM in early March and the memorandum to Defendant Noem seeking authorization to conduct the RIF at the Oversight Offices leave no doubt that Defendants' intention was to eliminate all three Oversight Offices, and they accomplished this goal by implementing the RIF and stop-work order on March 21. But all three of these offices were created by statute and have functions that they are statutorily required to perform. Dissolving these offices without a plan to continue performing those functions violated the statutes creating those offices and mandating those functions, and the half-hearted actions Defendants have subsequently taken— which still leave the offices without the resources they need to function—have utterly failed to remedy the violations of law committed on March 21. The action to close the offices was also substantively unreasonable, and in taking that action, Defendants failed to consider the interests of the many individuals and organizations that rely on the Oversight Offices for assistance. Defendants' action to eliminate the offices and bring their functions to a halt thus violated the Administrative Procedure Act (APA) in that it exceeded Defendants' statutory authority, was contrary to law, and was arbitrary and capricious. Defendants' action also violated the separation of powers and was ultra vires.

27

**A. Defendants' March 21, 2025, dissolution of the Oversight Offices violated the Administrative Procedure Act**

The APA directs courts to "hold unlawful and set aside" final agency actions that are, in relevant part, (1) in excess of statutory authority; (2) contrary to law; or (3) arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706. While any one of these grounds alone would be sufficient for judgment in Plaintiffs' favor, the ordered dissolution of the DHS Oversight Offices was unlawful under all three.

**1. Defendants' dissolution of the Oversight Offices was a final agency action.**

As a threshold matter, the dissolution of the DHS Oversight Offices was a discrete agency action. Each employee of these offices received a substantively identical notice referring to the "dissolution" of their office, and they were each instructed to stop performing their duties that same day. SOMF ¶¶ 13, 17. Accordingly, as of March 21, all three offices ceased performing their statutory functions. *Cf. Widukaswara v. Lake*, 779 F. Supp. 3d 10, 21, 32 (D.D.C. 2025) (placement of all of an agency's employees on administrative leave, in anticipation of a RIF, was a discrete agency action for APA purposes).

The action was also final: It "marked the consummation of the agency's decisionmaking process," and was an action that determines "rights or obligations" or "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). The decisionmaking process to dissolve the offices culminated when Secretary Noem approved the RIF on March 20, and that decision was effectuated when all GS employees of the three offices were first ordered to stop performing all work on March 21 and then separated from employment, with the four senior executives remaining in the offices also transferred to other offices or permitted to take deferred resignation by May. SOMF ¶¶ 11–12, 17, 20–21, 23–25. The fact that some limited functions of the offices have subsequently resumed does not make the action

of March 21, 2025, any less final for APA purposes. *See* I-B *supra*; *see also Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006–07 (D.C. Cir. 2014) (agency action may be final even if it is subject to change). Legal consequences flowed, and continue to flow, from the March 21 action to dissolve the Oversight Offices, because from that day forward the offices have never had the human or financial resources that would allow them to perform all of their statutory functions, the offices have continuously failed to perform all of their statutory functions, and Plaintiffs continue to suffer injuries to their core activities as a result.

### 2. The Oversight Office dissolutions exceeded Defendants' statutory authority.

No statute authorizes Defendants to eliminate the Oversight Offices and to force them to cease their work on activities that they are statutorily required to perform. Although Secretary Noem has authority to "reallocate functions" among officers and to "consolidate" or "discontinue organizational units" within DHS, 6 U.S.C. § 452(a), these reorganization authorities have two important limitations pertinent here.

First, the reorganization authority in 6 U.S.C. § 452(a) "does not extend" to the "abolition" of any "entity, organizational unit, program, or function" that was "established" or "required to be maintained" by statute. *Id.* § 452(b)(2). Each of the Oversight Offices was established by statute and is required by statute to perform functions, *see id.* §§ 113(d)(3), 345; 42 U.S.C. § 2000ee-1 (CRCL); 6 U.S.C. § 272 (CISOM); *id.* § 205 (OIDO). But Defendants implemented a RIF and stop-work order that they knew would eliminate these offices in their entirety and prevent performance of their statutory functions, in excess of these limitations on Secretary Noem's reorganization authority. SOMF ¶¶ 4–5, 9–12.

Second, even for those reorganizations of functions that the Secretary may perform because they do not involve a statutory establishment or requirement, the Secretary must provide 60 days'

notice to the relevant congressional committees before making such a change, "which shall include an explanation of the rationale for the action." 6 U.S.C. § 452(a)(2). Yet when asked during discovery for any contemporaneous documentation of consultation or notice provided to Congress about the reorganization of the Oversight Offices before March 21, 2025, Defendants failed to produce any responsive documents. SOMF ¶ 8. Thus, even if these dissolutions fell within the scope of the Secretary's reauthorization authority—which they do not—they were additionally unlawful because they were made without the required 60-day prior notice to Congress. Thus, these dissolutions exceeded Defendants' statutory authority.

### 3. The Oversight Office dissolutions were contrary to law.

Defendants' action in ordering the dissolution of the Oversight Offices through a work stoppage and subsequent RIF was also contrary to law. It caused the abrupt cessation of those offices' statutorily required functions, many of which continue to go unperformed. Consequently, the harmful effects of Defendants' March 21 violations of law remain just as acute nearly a year later, as the Oversight Offices remain unable to carry out basic statutory functions despite the growing need for their independent oversight activity.

First, the Homeland Security Act requires CRCL to "review and assess information alleging abuses of civil rights [and] civil liberties" committed by "employees or officials" of DHS and to "investigate complaints and information regarding possible abuses of civil rights and civil liberties," unless the Office of the Inspector General chooses to investigate those complaints instead. 6 U.S.C. §§ 345(a)(1), (6). Given the volume of complaints that CRCL receives each year on such varied topics as immigration detention, encounters at the border and at TSA airport checkpoints, and FEMA emergency responses, this function has never been—and could not be— performed by a singular CRCL officer. Fleischaker Decl., ECF 15-8, ¶¶ 8–9. However, the post-March 21, 2025 shell of CRCL, reduced to an acting officer (Mr. Hemenway) with another full-

time job, an acting deputy (Mr. Sartini) with at least two other full-time jobs, and just two full-time investigators, has not been investigating most complaints it receives regarding abuses of civil rights and civil liberties; instead, it refers most complaints to other components of DHS.  SOMF ¶ 112.[14]  Moreover, as of December 12, 2025, CRCL had only made one draft recommendation to another DHS component based on any of the 778 complaints that were pending with CRCL on March 21, 2025, or any of the 5,989 complaints it has received since.  *Id.* ¶¶ 120–121.

CRCL is also required by statute to assist DHS components in developing policies and procedures "to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities," and to "oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of" DHS.  6 U.S.C. §§ 345(a)(3)–(4).  But no dedicated staff have been hired to perform these policy functions despite the vast expansion in DHS activities and operations during 2025, and Mr. Sartini could only recall making "minor edits to a few" policy documents, while Mr. Hemenway could not recall making any.  SOMF ¶¶ 132–133.  Moreover, in trying to fulfill one of these specific oversight functions— oversight of DHS's EEO program—without sufficient in-house resources at CRCL, Defendants have run afoul of another statute, the Notification and Federal Employee Antidiscrimination and Retaliation Act (NO FEAR Act), as amended by the Elijah E. Cummings Federal Employee Antidiscrimination Act of 2020, codified at 5 U.S.C. § 2301 note.  Section 401 of the 2020 amendments to the NO FEAR Act requires each federal agency to "establish a model equal

---

[14] CRCL's refusal to accept complaints in any language other than English also violates Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq, as well as specific regulatory requirements under the Prison Rape Elimination Act, which mandate that meaningful access to the investigation process be provided to people who are limited English proficient.  *See* 28 C.F.R. § 115.16(b).

employment opportunity program that is not under the control, either structurally or practically, of the agency's Office of Human Capital or Office of General Counsel." Because DHS's Office of General Counsel is now writing most final agency decisions on the EEO complaints CRCL investigates, SOMF ¶ 129, even though that office will also represent the agency in litigation on any appeal of those decisions to the Equal Employment Opportunity Commission (EEOC), *see* 29 C.F.R. § 1614.109, OGC's outsized role in the EEO review process creates a conflict of interest in violation of the NO FEAR Act.[15]

Third, CRCL is required to inform the public of its activities, in addition to making its annual report to Congress available to the public. 42 U.S.C. § 2000ee-1(g). But there is no longer any way for members of the public to contact CRCL, CRCL no longer conducts any public engagement activities, and nearly all investigation and recommendation memoranda have been removed from its website. SOMF ¶¶ 90–91, 208; Second Cargioli Decl. ¶¶ 10, 12.

Turning to OIDO's statutory functions, Congress required that office to "be independent of Department agencies and officers" and to establish a complaint process for people in immigration detention that is similarly "independent." 6 U.S.C. §§ 205(a), (b)(1). Yet without sufficient resources to satisfy that prerogative of independence, OIDO is now referring nearly as many complaints to ICE as it investigates itself, without any guarantee that it will follow up on the adequacy of ICE's review or assess the conclusions it reaches. SOMF ¶¶ 156, 158. And while OIDO is required to make recommendations to address concerns identified through investigations

---

[15] A similar conflict of interest exists with respect to CRCL's investigation of complaints of disability discrimination filed by members of the public under section 504 of the Rehabilitation Act, in which the Office of General Counsel also plays a large role in reviewing investigative findings and determination letters despite also representing the agency in adversarial proceedings. SOMF ¶¶ 117–118. Perhaps not coincidentally, no CRCL determination letter has found a violation of Section 504 of the Rehabilitation Act since March 21, 2025. *Id.* ¶ 116.

and detainee interviews, 6 U.S.C. § 205(b)(4), OIDO has made no policy recommendations since March 21, 2025.  SOMF ¶ 176.[16]

Congress also mandated that OIDO create a complaint mechanism for immigration detainees that is "neutral" and "accessible."  6 U.S.C. §§ 205(b)(1)–(2).  Acting Ombudsman Guy testified that he understood this requirement to mean that "there's not anything preventing anyone from filing a complaint" and that the complaint process "can be accessed by a broad swath of people that it applies to."  SOMF ¶¶ 145–146.  But the current conditions for filing complaints with OIDO fall far short of these standards.  Complaints can only be filed in English, a language in which many detained people have limited proficiency, and can only be submitted electronically despite access to the internet being unavailable in many detention facilities and to many detained people.  *Id.* ¶¶ 148–151.

Indeed, the vast majority of complaints were previously submitted in person through the assistance of case managers, who could also provide assistance in other ways through their regular presence on the ground and ability to interface directly with both detained people and facility staff to solve problems.  *Id.* ¶¶ 138, 147.  Despite recognizing the beneficial nature of the rapid assistance case managers could provide, *id.* ¶ 139, and despite the statutory mandate to "provide assistance to individuals" in immigration detention who are affected by potential DHS and contractor misconduct, 6 U.S.C. § 205(b)(5), current OIDO leadership has no plans to hire people to work in detention facilities when not conducting inspections, SOMF ¶¶ 166–167.  To the contrary, judging from Defendants' own budget proposal to Congress, its plans for OIDO are the

---

[16] By point of comparison, in 2023 OIDO published 11 inspection reports and made 36 recommendations, 26 of which were addressed to its satisfaction.  SOMF ¶ 175.

same now as they were in March of last year: to eliminate the office entirely, as Defendants have requested no money from Congress to fund it in FY2026.  *Id.* ¶¶ 78–79.

Finally, CISOM is required to "assist individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services." 6 U.S.C. § 272(b)(1).  Before March 21, 2025, CISOM did this by either forwarding inquiries to CIS and following up periodically if CIS did not timely respond, or telling the individual or employer why CISOM could not assist and otherwise providing information about their case pending with CIS.  SOMF ¶ 188.  In either case, the communication between the person requesting assistance and CISOM personnel was substantive and could operate in both directions.  *Id.*  Now, by contrast, CISOM is staffed with only one full-time employee, a detailee from another component of DHS, and is only sending form emails to requesters, 98.5% of which consist of one sentence and simply state that CISOM will be taking no further action.  *Id.* ¶¶ 183–187, 189–190, 198.  There is no mechanism for individuals or employers to have a real-time conversation with a representative of CISOM, which has neither a phone line nor a working email address.  *Id.* ¶¶ 193–198.  CISOM is no longer an office that, in any reasonable meaning of the term "assistance," is providing assistance to anyone.

In addition to this general abdication of statutory responsibilities, CISOM is failing to perform the specific statutory function of maintaining local ombudsmen, or indeed to make any effort whatsoever to perform any part of that function.  *See* 6 U.S.C. §§ 272(d)–(e), (g).  Mr. Sartini testified that this function had never been performed because CISOM had never employed 50 such ombudsmen. SOMF ¶ 34.  But CISOM did have four regional representatives.  *Id.* ¶ 14.  Krista Tacey, who was one of those representatives until she was separated from employment by the RIF, testified that she and her three colleagues fulfilled many of the functions of the local ombudsman role by meeting in person with employers, refugees, and other stakeholders to help them resolve

their problems with CIS.  Tacey Decl. ¶¶ 2–13.  These quintessential ombudsman functions have not been performed since March 21, 2025, when the stop-work order was issued, and there is now no one left to perform them.

### 4. Defendants' March 21, 2025, dissolution of the Oversight Offices was arbitrary and capricious.

The APA "requires agencies to engage in 'reasoned decisionmaking.'"  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  To do so, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).  Courts reviewing agency action for compliance with this standard "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (cleaned up).  Where an agency fails "to consider or to adequately analyze the … consequences of" its actions, it has failed to engage in reasoned decisionmaking.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).  Thus, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'"  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Here, dissolving the Oversight Offices, effectuated through the blanket terminations of all their employees and ordered cessation of their work, was arbitrary and capricious in multiple respects. To start, it was not substantively reasonable because, as discussed in the previous section, it left a skeleton crew of employees to carry out myriad statutory functions with drastically insufficient resources to do so.

Nor was the decision reasonably explained.  The reason given in the memorandum to OPM and the approval memorandum to Secretary Noem was Executive Order 14210 and related guidance from OPM and the Office of Management and Budget (OMB), which directed reductions-in-force for offices that were not performing statutorily required functions.  SOMF ¶¶ 1–2, 6.  All three Oversight Offices, however, were unquestionably performing such functions, and the guidance memo from OPM and OMB specifically instructed that any congressional notification obligations be met before initiating a RIF, which Defendants also failed to do here.  *Id.* ¶¶ 7–8.  Moreover, the memoranda to OPM further justified the RIFs at the three offices by stating that their functions were incompatible with DHS's mission.  *Id.* ¶¶ 1–2.  But that mission specifically includes "ensur[ing] that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland."  6 U.S.C. § 111(b)(1)(G).  Thus, the stated reason given for the agency action lacks any "rational connection" between the facts and the choice made.  *State Farm*, 463 U.S. at 43.[17]

Defendants also failed to consider serious reliance interests.  "When an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Regents of the Univ. of Cal.*, 591 U.S. at 30 (internal quotation marks omitted).  Here, Defendants neglected to consider the reliance interests of stakeholders who interact with the Oversight Offices and who depend on the assistance and information they provide.  For example, Plaintiffs, among others, have "historically relied on CRCL as a trusted interlocutor" with DHS, Fleischaker Decl. ¶ 30; Serrano Decl. ¶¶ 11–12; have

_____

[17] One possible explanation for the lack of reasoned decisionmaking apparent in the record may be that DHS did not actually make the decision to eliminate the Oversight Offices itself, but simply ratified a decision made by DOGE, as contemporaneous emails seem to suggest.  SOMF ¶ 3.

relied on CISOM as an avenue for resolution of issues with CIS, Ziegeweid Decl. ¶ 7; Brito Decl., ECF 15-16, ¶¶ 3–4; Fallon Decl., ECF 15-20, ¶ 6; and have relied on OIDO to bring to light issues within immigration detention facilities, Vitullo Decl., ECF 15-11, ¶ 17; St. John Decl. ¶¶ 12, 16.

In addition, Defendants "failed to consider [another] important aspect of the problem," *State Farm*, 463 U.S. at 43, by overlooking the harm to individuals who relied on CRCL's and OIDO's public engagement efforts for vital information, Second Cargioli Decl. ¶¶ 10–12, or who relied on the investigatory reports and other documents formerly published on CRCL's website, Enriquez Decl. ¶¶ 12–13.   Nor did they consider the interests of the individuals who had complaints pending with one or more of these offices when they ordered all work at the offices to stop.  *See* Cargioli Decl. ¶ 13; Horan Decl. ¶ 6.  These failures were compounded by the immediate placement of the offices' employees on administrative leave, without the ability to inform customers or stakeholders, much less wind down their ongoing work.  Defendants utterly failed to consider "[t]he consequences of [their actions]," which "would radiate outward" to individuals, organizations, and the public.  *Regents of the Univ. of Cal.*, 591 U.S. at 31 (internal quotation marks omitted).

The ill-conceived and unreasoned nature of Defendants' actions has only become more evident with the passage of time.  Mr. Sartini was belatedly asked to analyze the offices' functions, but Defendants had no plan to transition or continue those functions while he conducted that analysis, during which time complaints and assistance requests continued to pile up unaddressed. SOMF ¶¶ 28–29, 83, 94, 140, 154, 179, 182.  The abrupt departure of dozens of case managers from detention facilities rendered OIDO's complaint procedure inaccessible to many detained individuals at the same time that the number of people in immigration detention ballooned by over 25,000. *Id.* ¶¶ 142–143.  And Plaintiffs and SBCC members continue to receive no response, or a

37

virtually useless response, to complaints with the Oversight Offices pending on or filed after the shutdown of March 21.  Fifth Enriquez Decl. ¶¶ 11–18, 26; Third Serrano Decl. ¶¶ 6–7; Second Cargioli Decl. ¶¶ 5–8; Lothrop Decl. ¶¶ 8 –9, 11. The arbitrariness and capriciousness of the March 2025 decimation of the Oversight Offices, in itself, is a sufficient basis to enter summary judgment against Defendants.

### B.  The Oversight Office dissolutions exceeded Defendants' constitutional authority and were ultra vires.

Each of the Oversight Offices is required to perform specific functions that were established by statute.  *See* 6 U.S.C. § 345 (CRCL); *id.* § 272 (CISOM); *id.* § 205 (OIDO).  Each office also received a separate appropriation from Congress in 2024, and their funding has been maintained through the recent Continuing Resolutions.  *See* Joint Explanatory Statement for the Department of Homeland Security Appropriations Act, 2024, at 79 (Mar. 18, 2024), https://perma.cc/UNG3-837F (providing itemized appropriations to the "Office of Civil Rights and Civil Liberties," the "Office of the Citizenship and Immigration Services Ombudsman," and the "Office of the Immigration Detention Ombudsman"); SOMF ¶ 70 (discussing the offices' funding in FY2025).  Defendants' action to dissolve these offices, through the stop-work order and RIF, violates the constitutional separation of powers and is ultra vires.

The Framers of the U.S. Constitution "divide[d] the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Immigr. & Naturalization Servs. v. Chadha*, 462 U.S. 919, 951 (1983).  Consistent with this separation of powers principle, the power to make laws rests exclusively with Congress.  *See* U.S. Const. art. I, § 1.  As part of that authority, the power to establish, reorganize, restructure, and abolish agencies likewise rests squarely with Congress.  *See Myers v. United States*, 272 U.S. 52,

129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]").  Conversely, the Constitution contains no provision authorizing the executive "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see J. Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring) ("[T]he Executive branch may not eliminate a congressionally created and funded agency without congressional authorization.").

Here, Defendants have flouted the careful balance of powers by acting unilaterally to dissolve the three DHS Oversight Offices and to cease performance of their statutorily required functions.  Although Defendants later disclaimed an intention to dissolve the offices completely, they stated in their March 6 memoranda to OPM that they intended to conduct a "100% RIF" of the three offices because the offices' functions "did not advance" DHS's "law enforcement mission."  SOMF ¶¶ 1–2.[18]  But the mission of DHS, as established by Congress, includes "ensur[ing] that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland."  6 U.S.C. § 111(b)(1)(G).  Moreover, Defendants' disagreement with Congress's judgment, as reflected in provisions establishing, funding, and assigning functions to, the Oversight Offices, does not permit Defendants to ignore or override those congressional directives.  *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

---

[18] Moreover, the RIF notices Defendants issued to over 300 employees of the Oversight Offices on March 21, 2025, referred to those offices' "dissolution," SOMF ¶ 13.  Even after the RIF was announced, DHS continued to refer to the offices' "elimination through a reorganization" in internal emails and to their "dissolution" in response to a congressional inquiry.  *Id.* ¶¶ 20, 22.  Defendants' intent to eliminate the offices is further evidenced by their 2026 budget request, which makes it impossible to re-staff the offices to a point where they could fulfill their statutory functions.

Defendants thus usurped authority conferred upon Congress by the Constitution with the action they took on March 21, 2025, and Plaintiffs are entitled to declaratory and injunctive relief on this nonstatutory cause of action. *See* Compl., ECF 6, ¶¶ 62–65; *see also Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

This separation-of-powers claim is not foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994). In *Dalton*, the Supreme Court held that not "*every* action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472 (emphasis added). Thus, the claim in *Dalton* that the President approved "procedurally flawed recommendations" that a particular naval shipyard be closed was not cognizable as a claim that "he acted in violation of the Constitution" where the relevant statute conferred substantive authority on the President to approve the closure (albeit purportedly pursuant to a different process). *Id.* at 474. Critically, *Dalton* does not stand for the proposition that executive action that violates a statute *never* rises to the level of a constitutional violation. To the contrary, under the tripartite framework of Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), which guides separation-of-powers analysis in this context, presidential action that is "incompatible with the expressed or implied will of Congress … must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 637–38 (Jackson, J., concurring). Here, Defendants' actions dissolving the Oversight Offices flatly contravene Congress's direction that those offices exist and operate. And unlike in *Dalton*, Defendants can identify no grant of statutory authority empowering them to take these actions.

The D.C. Circuit's recent decision in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) (*GHC*), is not to the contrary.  In *GHC*, the court relied on *Dalton* to hold that recipients of foreign assistance funds lacked a constitutional cause of action to challenge the President's impoundment of foreign assistance funds that Congress had directed him to spend.[19]  *See id.* at 14–17.  The *GHC* court noted that an Act of Congress—the Impoundment Control Act—"provides a mechanism for the President to act on impoundment," *id.* at 16.  In other words, *GHC* appeared to construe the plaintiffs' claims, like those in *Dalton*, as challenging the President's failure to properly exercise a power that had been conferred on him by statute.  Here, Plaintiffs challenge Defendants' contravention of substantive legislative commands absent any constitutional or statutory basis for their unlawful action.

Defendants' March 21, 2025, action was also ultra vires.  An ultra vires claim is available where "an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (emphasis omitted; quoting *Ry. Clerks v. Ass'n for Ben. of Non-contract Emps.*, 380 U.S. 650, 660 (1965)).  Even absent a statutory prohibition, moreover, such a claim is available to challenge "the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902); *see Leedom v. Kyne*, 358 U.S. 184, 190 (1958) (citing *McAnnulty*).  At bottom, although a plaintiff may not use an ultra vires claim to "dress up a typical statutory-authority argument" and so make an "end-run around the limitations of … judicial-review statutes," *Nuclear Regulatory Comm'n*,

---

[19] The D.C. Circuit has granted en banc review of two cases that implicate the proper interpretation of *Dalton*, and oral argument in both cases is scheduled for February 24.  *See Climate United Fund v. EPA*, D.C. Cir. Nos. 25-5122, 25-5123; *Nat'l Treasury Emps. Union v. Vought* (*NTEU*), D.C. Cir. No. 25-5091.  Although *GHC* remains binding on this Court, the en banc court's disposition of *Climate United* and *NTEU* may abrogate some or all of *GHC*'s analysis on this point.

605 U.S. at 681–82, review is possible where an executive officer has acted wholly "in excess of powers granted him by Congress," *Harmon v. Brucker*, 355 U.S. 579, 581 (1958) (per curiam); *see Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms."). As explained above, Defendants' March 21, 2025, action was not only unauthorized by statute but runs directly contrary to express legislative command. Thus, that action was ultra vires, and if the Court concludes that Plaintiffs do not have a cause of action under the APA, then it should grant summary judgment against Defendants on this basis.[20]

## III.    The Court should grant permanent injunctive relief to ensure that the Oversight Offices resume performing, and continue to perform, their statutory functions.

Because Defendants' action to dissolve the Oversight Offices on March 21, 2025, violated the APA, violated the Constitution's separation of powers, and was ultra vires, this Court should at a minimum declare Defendants' action of that date to be unlawful. This declaratory relief alone, however, will not end the ongoing harm that Defendants' actions are causing Plaintiffs and SBCC's members. Time and time again, Defendants have given this Court assurances about how the Oversight Offices will be staffed, operated, and funded, and reality on the ground has borne little or no resemblance to those assurances.

Plaintiffs have no desire or intention to micromanage the staffing or day-to-day operations of the Oversight Offices, nor do they expect this Court to do so. But this Court can and should enter a permanent injunction requiring all functions of the Oversight Offices to be continually

---

[20] Plaintiffs acknowledge that if judicial review is available under the APA, then review under an ultra vires theory would be foreclosed. *See Nuclear Regul. Comm'n*, 605 U.S. at 681 (ultra vires claim not available if a statutory scheme affords "a meaningful and adequate opportunity for judicial review" (internal quotation marks omitted)).

performed.  Specifically, and at a minimum, record evidence demonstrates that CRCL is not performing its statutory functions to "oversee compliance with constitutional, statutory, regulatory, policy and other requirements relating to the civil rights and civil liberties of individuals affected by programs and activities of the Department," or to inform the public of its activities.  6 U.S.C. § 345(a)(4); 42 U.S.C. § 2000ee-1(g).  OIDO is not performing its statutory function of establishing an accessible complaint procedure for detained people, 6 U.S.C. § 205(b)(2), is not conducting unannounced inspections of detention facilities, *id.* § 205(b)(3), is not making recommendations based on audits or investigations, *id.* § 205(b)(4), and is not assisting people in immigration detention affected by potential misconduct, *id.* § 205(b)(5).  And CISOM is not assisting individuals and employers in resolving problems with CIS, 6 U.S.C. § 272(b), or operating local ombudsmen's offices throughout the country, *id.* § 272(g).  The Court should enter an injunction requiring the continual performance of these neglected functions and any others the Court concludes are not being performed.  The Court can and should also require that Defendants provide sufficient financial and human resources to the Oversight Offices to allow them to perform those statutory functions.

To obtain permanent injunctive relief, Plaintiffs must show that they have suffered an irreparable injury; that remedies at law are inadequate to compensate them for that injury; that, considering the balance of hardships between Plaintiffs and Defendants, equitable relief is warranted; and that the public interest would not be disserved by an injunction.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).  Plaintiffs have suffered irreparable injury through the harm to their core activities and organizational interests that Defendants' action has caused, and the diversion of resources that each Plaintiff has expended to counteract that action.  *See* I-A *supra*; *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C.

Cir. 2016) (same injury to organization's core activities established both Article III standing and irreparable harm). These nonquantifiable harms to Plaintiffs' ability to perform their core activities cannot be remedied by monetary damages, which in any event Plaintiffs do not seek. Finally, the balance of hardships and public interest factors, which merge in this case against a government entity, also strongly support injunctive relief. Indeed, the injunctive relief Plaintiffs seek will protect the public generally, and specifically the thousands of immigrants in detention facilities, from the very abuses of civil and human rights that these Oversight Offices were established to prevent, at a time when their protections are urgently needed. *See* Plavsic Decl. ¶¶ 5–6 (testimony of former CRCL senior policy advisor).

Defendants have had nearly a year to demonstrate that they were sincere in their representations to this Court that they had thought better of their March 2025 plan to dissolve the Oversight Offices and now genuinely intend to operate the offices and fulfill their statutory responsibilities. Actions speak louder than words, and Defendants' actions over the past ten months speak just as loudly about the low regard in which they hold these offices as the action they took to dissolve them last March.

The only way to ensure that the Oversight Offices will be able to perform their statutory functions consistently and reliably going forward is with a court order. This Court should enter such an order to ensure that Defendants comply with the law and that the Oversight Offices perform the duties assigned to them by Congress.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment.

Dated: January 16, 2026

Respectfully submitted,

/s/ Karla Gilbride

Christine L. Coogle (DC Bar No. 1738913)
Brian D. Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

Karla Gilbride (DC Bar No. 1005586)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
kgilbride@citizen.org

*Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert & Ethel Kennedy Human Rights Center
88 Pine Street, Suite 801
New York, NY 10005
(917) 284- 6355

Sarah E. Decker (DDC Bar No. NY0566)
Robert & Ethel Kennedy Human Rights Center
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432

*Counsel for Plaintiff KHRC*