IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


Robert F. Kennedy Human             )
Rights, et al.,                     ) Civil Action
                                    ) No. 25-cv-1270
              Plaintiffs,           )
                                    ) EVIDENTIARY HEARING
vs.                                 )
                                    ) Washington, DC
U.S. Department of Homeland         ) May 19, 2025
Security, et al.,                   ) Time:  11:00 a.m.
                                    )
              Defendants.           )
_____

TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE
THE HONORABLE JUDGE ANA C. REYES
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For Plaintiffs:          Karla Gilbride
                         Public Justice, P.C.
                         1620 L Street, NW
                         Suite 630
                         Washington, DC  20036
                         (202) 797-8600
                         Email:  Kgilbride@citizen.org

                         Michael C. Martinez
                         Democracy Forward Foundation
                         P.O. Box 34553
                         Washington, DC  20043
                         (202) 894-6582
                         Email:  Mmartinez@democracyforward.org

                         Anthony Enriquez
                         Robert F. Kennedy Human Rights
                         80 Pine Street
                         Suite 801
                         New York, NY  10005
                         (917) 941-9141
                         Email:  Enriquez@rfkhumanrights.org

Adina Rosenbaum
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC  20009
(202) 588-1000
Email:  Arosenbaum@citizen.org

For Defendants:      Christopher H. Hall
U.S. Department of Justice
Federal Programs Branch, Civil Division
20 Massachusetts Avenue, NW
Room 7224
Washington, DC  20530
(202) 514-4778
Email:  Christopher.hall@usdoj.gov

Tiberius Davis
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC  20530
(202) 514-4357
Email:  Tiberius.davis@usdoj.gov

_____

Court Reporter:      Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC  20001
202-354-3267

MR. DAVIS:  United States calls Mr. Ronald Sartini to the stand.

Is he permitted to bring water up?

THE WITNESS:  Am I permitted to bring water?

THE COURT:  Anything but vodka.

Would you like a water, sir?

THE WITNESS:  They confiscated it.

THE COURT:  Oh, no.  We will get you one.

RONALD SARTINI,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAVIS:

Q.  Good morning, Mr. Sartini.  Could you please introduce yourself to the Court?

A.  My name is Ronald Sartini and I am the Citizenship and Immigration Services Ombudsman in the Department of Homeland Security.

Q.  About how long have you been in that position?

A.  I've been in this position since May 4th of this year.

Q.  What do you do in that role?

A.  I perform the statutory functions of the office, which are to intake complaints and questions about, usually, delayed immigration cases, and then I seek a resolution for those questions and cases with USCIS.  And I also furnish an annual

know?  Do you have an estimate of how many of them were actually investigated beyond the initial review?

A.  My understanding is they worked about 20 percent of them. And I'm not exactly sure -- I know that they opened, at a minimum, 20 percent.  I don't know that that means there were recommendations issued in 20 percent, it could be.  But I know that they saw merit in opening 20 percent of those cases.

Q.  And how about CIS for the last year?

A.  CIS Ombudsman opened about 40 percent of those cases, and I would say the substan -- from my understanding, a substantial majority of those were forwarded to USCIS.

Q.  For the OIDO office, how many did they recommend remedies for?

A.  Of the 11,000, my understanding is about 800 received some kind of remedy or recommendation.

Q.  Do you know how many detention facilities, approximately, there are in the Department of Homeland Security?

A.  It varies all the time, but somewhere between 250 and 300.

Q.  And how many detention facilities did OIDO inspect last year?

A.  Last year they inspected about 22 facilities of that 250 or 300.

Q.  And how did these offices determine whether that's sufficient under their statutes?

A.  I have not found evidence that there was -- like, what the

came up with the best way to proceed was to fire everybody, right?

THE WITNESS:  No.

THE COURT:  All you know is that now you have three offices that are statutorily mandated and, so, as far as I can tell, you're basically the last man left standing and your job is to build the offices back up by rehiring some of the people for some of the roles that have been fired?

THE WITNESS:  That's not the only way we would staff up.

THE COURT:  But, also, who made the decision that the best way to do this was to have a work-stop order for everybody, even though you're paying them for 60 more days?  As I understand, everyone was told pencils down, right?

THE WITNESS:  Of the employees?

THE COURT:  Yeah, everyone was told pencils down as of March 21st, right?

THE WITNESS:  Except the senior executives.

THE COURT:  Okay.  Except the senior executives.  And then you would be fully terminated in 60 days, unless you took a severance, right?

THE WITNESS:  So the RIFs involved a severance.  So separation and then severance, yes.

THE COURT:  Right.  But if you didn't want the voluntary relief, you were going to be forced out in 60 days?

THE WITNESS:  Right.

THE COURT:  Right.  And during that 60 days those individuals were paid, right?

THE WITNESS:  They are still being paid, yes.

THE COURT:  They are still being paid.  So who came up with the brilliant idea that the best way to proceed was to fire everyone, have them stop work, and still pay them for 60 days while you -- someone somewhere figured out how to proceed, as opposed to, for example, saying, all right, in 60 days all of you all are gone, but in that 60 days we're going to sort of try to work with you all and have loose ends tied up and have you help us figure out how to move forward?

THE WITNESS:  That was a decision formally taken by the secretary.

THE COURT:  On whose -- like, on what analysis?

THE WITNESS:  I was not privy to that.  I don't know.

THE COURT:  Is there any analysis that would make sense for that?  Like, why are we paying -- how many people are we firing? 400, 500?

THE WITNESS:  No, 300.

THE COURT:  300.  So we have 300 people that the U.S. government taxpayer was paying for 60 days to do nothing?

THE WITNESS:  That is standard practice.  When someone is about to be RIF'd, there is, of course, the 60 days required, and the standard practice is to put them on --

THE COURT:  That's usually for, you know, we're getting rid of one person here, a second person there.  Right?  This is, like, 300 people.

THE WITNESS:  Even if there is a full office RIF, which does happen, they are usually put on admin leave for 60 days so they don't do anything inappropriate, harm the systems.

THE COURT:  Okay.  Who's helping you with putting together these plans, by the way?

THE WITNESS:  I have a number of individuals helping me at the Office of the General Counsel, and all of the attorneys are at my disposal to interpret the statutes and figure out what the requirements are going forward.

THE COURT:  Who is helping you put the plan together?

THE WITNESS:  I'm --

THE COURT:  You're having to collect a bunch of information, right, for your office that you're in charge of and two offices that you're not yet in charge of that no one appears to be in charge of, right?

THE WITNESS:  At the moment.

THE COURT:  And remind me, you're in charge of?

THE WITNESS:  CISOMB.

THE COURT:  CISOMB.  So CRCL right now does not have someone in charge?

THE WITNESS:  Correct.

THE COURT:  And OIDO does not right now have somebody

presented to me is there may be value in helping the operational components like TSA, CBP, and ICE do their jobs more effectively if we engage with certain groups who can bring concerns ahead of time.

THE COURT:  Okay.  But right now, whatever the statutory duties are, you're not alone able to do it all, right?

THE WITNESS:  No, not alone.  But what we're doing is we're taking a beat -- their expectation is that new leadership will be appointed soon by the secretary and then resuming the functions.

THE COURT:  What's the plan -- when will that happen?

THE WITNESS:  I don't know when the secretary will make the decision, but I've been told very soon.

THE COURT:  Who has told you that?

THE WITNESS:  Advisors to the secretary.

THE COURT:  Who are the advisors?  I mean, we could do this all day.  Who were the advisors to the secretary who told you that?

THE WITNESS:  A number of them.  We could start with the general counsel, acting --

THE COURT:  Names.

THE WITNESS:  -- general counsel --

MR. DAVIS:  Your Honor, I think this is getting a bit into deliberative processes here --

timeframe required for replying and the queue is in, actually, very good shape.  So there aren't old complaints.  They were worked diligently until the end, before the RIF notice.  And so I'm taking the most urgent and sensitive cases and sending them off to USCIS.  And then -- so there's details, contractors, and then I'm talking to the attorneys right now about what the right kind of job series is to hire.

THE COURT:  Okay.  So you have a thought -- don't tell me what you told the attorneys -- but you have a thought as to what the job series to hire is?

THE WITNESS:  Yes.

THE COURT:  About how many would those be?

THE WITNESS:  I'm looking to bring on about ten.

THE COURT:  That's your office.  Why don't we go through CRCL?

THE WITNESS:  Sure.  I think CRCL needs probably about 20 employees, at a minimum.  And the plan there is the same, there are existing contracts, they are quite large.  We need to maximize utilization on those contracts.  And I have, you know, a specific idea of volume.  But it is for the leadership to talk to the contracting officers' representative who liaise with the contractors to work out the details because it depends, you know, speed with which the contractor can scale up and all of that.

THE COURT:  Can you get authority to talk to the

long as you're by a mic.  Totally up to you.

MS. GILBRIDE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. GILBRIDE:

Q.  Good afternoon, Mr. Sartini.

A.  Good afternoon.

Q.  So you've been in your current position of acting CIS ombudsman for about two weeks, correct?

A.  I'm the CSI ombudsman, not acting.  But, yes, for about two weeks.

Q.  And you were appointed to that position of CIS ombudsman?

A.  Yes.

Q.  Is that your only position that you're currently serving within DHS?

A.  Officially, yes.

Q.  And does that mean you have other unofficial positions?

A.  Not other positions, but other duties.  For example, examining the work of CRCL and OIDO.

Q.  And when did you begin that task of examining the work of CIS ombudsman, OIDO, and CRCL?  When did that task come to you?

A.  Approximately two months ago.

Q.  Was that after March 21st?

A.  It was around the same time, I believe.

Q.  And were you -- did you have a title assigned to that role, or were you under a different title at the time that you were

urgents, I know as of Friday, this past Friday, were being worked by a senior executive who is in a leadership position at CRCL, not by contractors.

Q. And how many full-time employees staff are currently employed at CRCL?

A. As of today, zero.

Q. So there were three SES employees. None of them are currently working anymore, is that correct?

A. That's my understanding.

Q. I would like to focus on OIDO now. And I would turn your attention to the latest OIDO report to Congress, which is in your binder. I believe it is the fourth tab, might be the third.

And I think there is a bit of a discrepancy because you mentioned earlier that there were 800 complaints that were acted upon. There's a different number at page 64 of that report that refers to cases that were opened. So if you look at page 64 of that report, you see a figure there for cases opened in calendar year 2023.

A. One moment, please.

So, yeah, I do see the numbers you're referring to. We're talking about the 12,000-and-some figure?

Q. Yes.

A. Right. There isn't -- so I have not seen the 12,000 number. The number that I was given by outgoing OIDO

decided, oh, the out-of-office is say what the RIF said?

THE WITNESS:  Correct.

THE COURT:  Go ahead.

BY MS. GILBRIDE:

Q.  Speaking of the RIF, I would like to find out what you know about the process leading up to the RIF, and even backing up from that, to the memo that was sent to OPM on March 7th.  Were you consulted about the memo that was sent to OPM on March 7th?

A.  No.  That was some weeks before I had any involvement with these offices.

Q.  And were you consulted about the RIF before the notices went out on March 21st?

A.  No.

Q.  Have you seen the memo that went to OPM on March 7th?

A.  I don't believe so.

Q.  So you may not know the answers to this question -- these next couple questions either, but I'll ask and you can tell me.

Between the executive order being issued on February 11th and the memo going to OPM on March 7th, was any analysis conducted, to your knowledge, of positions across DHS, across all of the components of the department to determine which positions were performing statutory functions and which were performing discretionary functions?

A.  I do believe that analysis was conducted.  I know it was conducted because I conducted it, or led the doing of that for

include only discretionary, nonstatutory functions?

A.   No.   But I wouldn't categorize a position description as related necessarily to a statutory or discretionary function, position descriptions are incredibly broad and employees can be assigned to do any type of -- very wide range of work within a particular position description.   I don't think there is a good way to determine by a position description whether an employee was doing discretionary or required work.

THE COURT:   Well, since everyone was fired, we're assuming some people were working on statutory required work.

THE WITNESS:   Yes.

BY MS. GILBRIDE:

Q.   And your own analysis of what folks were doing has recognized that people were performing statutory functions, correct?

A.   Some were, yes.

Q.   That's why you want to rehire people and put detailees in there, to perform the statutory functions that these folks were performing up until March 21st, right?

A.   Yes.

Q.   We talked about the fact that there are no SES employees left at CRCL.   Just to make sure, are there any employees left at OIDO?

A.   No.

Q.   And besides yourself, how many employees are currently

about these three groups being over-bloated, or whatnot, you don't know that that was the reason for the RIF because you don't know the reason for the RIF.  You don't know what analysis went into it.

THE WITNESS:  I don't know what analysis.

THE COURT:  Sitting here today, you don't know that there was an analysis done that these many employees is too much for this amount of work?  That was just thrown out there as the reason so far as you're concerned, so far as you know?

THE WITNESS:  I don't know, the analysis could have been conducted.  I do not know what analysis was conducted.

THE COURT:  All right.

BY MS. GILBRIDE:

Q.  But as far as you know, the reason for the RIF was not based on hostility to the functions the offices were performing?

A.  No, I don't believe so because I was asked to come up with a plan to perform the functions.  So I do not believe there is a hostility to those functions.

Q.  You were asked to come up with that plan after the decision to fire everyone and subject them to the RIF, is that right?

A.  Yes.

Q.  Were you -- there was some discussion with the judge about this earlier, but I'm just going to quote it for you.  Are you familiar with the statement that DHS spokesperson Tricia

Q. And you are not the decisionmaker with regard to the staffing levels that are laid out in that plan, correct?

A. Correct.

Q. And when you started this process of evaluating the work of the three offices, were you starting from scratch? Or was there anyone else within the department who had begun looking at these functions and handed something off to you?

A. There was no other person in the department who has performing the task that I'm performing and looking at them. The existing work is what was provided to me by the leaders of those offices at the time.

Q. So as of March 21st, when the decision was made to conduct the RIF and place everyone on administrative leave, as of that time, to your knowledge there was no plan for how the work of the offices would continue?

A. I was not aware of a plan.

Q. And that plan, as we've heard you describe it, has three main components; detailees, hiring new full-time staff, and hiring contractors, is that accurate?

A. Yes. There's another component that I would add, which is technology. There are a lot of tools that could be brought to bear to risk-stratify the workloads, to triage and then to run analytics, keyword searches, for example, on the claims in queue so that we can elevate the most urgent or relevant, full-of-merit claims possible in those workloads.

Q.   Okay.  You also say, in paragraph 10, that the -- I think this is in paragraph 10 -- well, you also state in your declaration that the offices will continue to perform their statutorily mandated duties going forward after the RIF takes place or goes into effect, which is scheduled for May 23rd. But we've spent some time here today discussing various things that are not happening right now with regard to investigating complaints and with regard to handling new complaints that are coming in, unless they're of a particular category and with regard to some of the policy setting functions.  So you can't say that all statutory functions are taking place right now, can you?

A.   All statutory functions -- so there is no work being performed, no substantive work being performed in OIDO, and then CRCL, other than review of what's coming in.  The statutory functions can be performed within the required timeframe because I'm not aware of claims that are necessarily late because of the impending RIF.  And other than the 180-day clock, there is no statutory requirement to do any of the other work within a certain time frame.

        There's nothing that precludes us taking a beat as a new administration to review how we want to handle this work. And so if there is a two-month pause on the processing of certain complaint types, that seems consistent with statute, to me, when --

Q.  It would be more than a two-month pause, won't it?  It's already been a two-month pause.

A.  Even if it's a three-month pause.  Again, you're looking at what's in your own brief as relatively serious complaints that weren't resolved for up to a year and weren't even responded to for six months.  So I'm not seeing where a two- or three-month pause necessarily violates statute.

Q.  Let's try to nail down how long of a pause it will be.  I know you're not the ultimate decisionmaker and it's going to come down to leadership.  Based on what you've put in your plan, if they pick that plan up tomorrow, when -- how long would it take, do you believe, for the staffing levels for all contractors to be in place, for all the technology to be in place, for all the new hires to be in place?  Is that going to take two months, six more months?

A.  I would take -- sorry.  I would take issue with the "all of" in place because there is never an "all of" in place in the government.  These numbers flex tremendously all the time. People roll on --

THE COURT:  Why don't we just answer her question. Just, plan gets approval, how long before it goes into meaningful effect?

THE WITNESS:  So meaningful effect, I think we can -- like, I'll give you an example that I can speak most to.  In CISOMB I can have detailees on within a couple of weeks.  I am