IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ROBERT F. KENNEDY HUMAN RIGHTS, ) CIVIL NO.:
) 25-1270-ACR
Plaintiff, )
vs. )
)
DEPARTMENT OF HOMELAND SECURITY, )
et al., ) May 23, 2025
Defendant. ) Washington, D.C.
__________________________________) 9:30 a.m.

Transcript of Motions Hearing
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff: Karla A. Gilbride, Esquire
Public Justice, P.C.
1620 L Street NW
Suite 630
Washington, DC 20036

Michael C. Martinez, Esquire
Christina Coogle, Esquire
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Medha Raman, Esquire
Robert F. Kennedy Human Rights
1300 19th St NW
Suite 750
Washington, DC 20036

APPEARANCES: (Cont'd)

For the Defendant: Tiberius T. Davis, Esquire
Department of Justice
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001

Christopher R. Hall, Esquire
U.S. Department of Justice
Federal Programs Branch, Civil Division
20 Massachusetts Avenue, NW
Room 7224
Washington, DC 20530

Reported by: Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
333 Constitution Avenue, NW
Washington, D.C. 20001
(202) 354-3247

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription

**A.** So the approval for the reduction of force within my department has to come from the secretary. Once I receive the approval package, then my office works to initiate the reduction in force actions and notices.

**Q.** Okay. What does that approval package look like? Would that have been a memo to you?

**A.** The approval package that goes up to the secretary was a memorandum indicating that the department would initiate a reduction in force, and it explains the three offices that are involved, the number of personnel, the functions of the office, and the manner in which a reduction in force would need to be carried out.

**Q.** Okay. And do you recall off the top of your head if that memo that you received or that document that you received discussed eliminating the offices?

**A.** I do not recall off the top of my head.

**Q.** You don't recall? You'd have to see it to remember?

**A.** Yes.

**Q.** Okay. All right.

Is it your understanding that the offices are being eliminated?

**A.** No, the positions within --

**Q.** The positions?

**A.** The GS positions within the offices were being abolished in accordance with the reduction in force procedures and the

notice that the employees received.

**Q.** Okay. And when you got the memo, the package of the reduction in force, I take it it didn't -- as I understand it, it didn't have a plan for rehiring? What did it say about refilling the slots?

**A.** I did not have the inform- -- I do not recall.

**Q.** You don't recall? Okay.

And your declaration says that because there's a reduction in force, once these people are fired, let go, that they can't be considered for rehiring. That's my understanding of one of the reasons that you used the elimination language?

**A.** The elimination -- well, the elimination language did not indicate within the reduction in force notice -- and, again, I would have to see it in front of me.

**Q.** Okay.

**A.** I do not recall that the notice indicated that the employees would not be able to be rehired.

**Q.** Okay.

**A.** I would have to see the notice.

**Q.** All right. So hold on.

**A.** Uh-huh.

MR. DAVIS: Your Honor, if I may, I think there's a difference between reassignment and rehiring. Is that --

THE WITNESS: That is accurate. Yes.

in that way?

**A.** So they're tiered in order to determine placement and priority. So essentially, if, you know, number -- if you have a certain number of years of service, Veteran's preference status, again, also using performance rating, then the tiers, based within -- based within the tier and the positions that are available that you would qualify for, then, essentially, the employees compete for those vacant positions, but it has to be within that tier.

**Q.** So if I were a hiring manager and I wanted an employee from a tier 3, I would first have to go through tiers 1 and 2 to get to that employee?

**A.** Essentially, hypothetically, yes. The tiers -- and it also depends on the -- so that's -- again, it depends on the type of position for which you are trying to pull qualified positions. And also the Agency would then first, of course, try to determine what vacant funded positions would be available that we could potentially place these employees into once they compete.

**Q.** Have you seen the RIF regulations about status during a notice?

**A.** Yes, uh-huh.

**Q.** Do you know what the default status is during a notice during a RIF?

**A.** The default status is for the employees to be -- to remain

in a paid status.

**Q.** On duty?

**A.** On duty, regular duty status.

**Q.** Do you know why the employees here were taken off duty?

**A.** They weren't -- so they're still in a paid status. They're just on administrative leave.

**Q.** Admin leave?

**A.** Yes.

**Q.** Is there any limit to the admin leave with paid status?

**A.** There are various limits to administrative leave depending on the reason for the employee being placed on administrative leave.

**Q.** You -- in your declaration that -- you discuss the use of the word "dissolution," and you say you developed that those FAQs; is that correct?

**A.** Yes. Well, not me personally.

**Q.** Yes, your office did.

Does that -- those FAQs go through some clearance process outside of your office?

**A.** We received guidance on the FAQs; not necessarily clearance, guidance.

**Q.** Did you receive it from the Office of General Counsel, for example?

**A.** Yes.

**Q.** Did you receive it from the Office of the Secretary?

**A.** No.
**Q.** Any other offices involved in the FAQ clearance process?
**A.** No.
**Q.** The -- I guess the term "dissolution" has an actual effect in the regulation; is that right?
**A.** I would have to honestly look at the regulation. I don't recall off the top of my head.
**Q.** Fair enough.
The RIF notices themselves included competitive areas, as we said, that say the CSRC --
**A.** CRC.
**Q.** Yeah, the Office of Ombudsman or OIDO, and because they were being dissolved, the individuals had no abilities to compete within those offices; is that right?
**A.** Well, so the offices were not being dissolved or abolished. The positions themselves were being abolished.
**Q.** Every single nonSES position?
**A.** Yes.
**Q.** So when the notices say that the competitive areas that are the offices are being dissolved, is that incorrect?
**A.** I'm sorry?
**Q.** Is that inaccurate?
**A.** The notices say that the competitive area was being dissolved or that the -- I would have to see the notice, because the -- I do know that the reduction in force notice

offices. I am focused on the positions and the reduction in force process.

**Q.** Let me ask you, is there currently a federal hiring freeze?

**A.** I don't know if there's a federal hiring freeze. I know that there was a -- I know that there is a hiring freeze in effect for -- at least for DHS headquarters.

**Q.** Is there still a hiring freeze for DHS headquarters?

**A.** The hiring freeze, from what I understand, does not -- and it was recently extended, and it does not expire until, I believe, it's either June or July.

**Q.** Is when the hiring freeze expires, June or July?

**A.** Yes, uh-huh.

EXAMINATION

BY THE COURT:

**Q.** Hold on. Hold on. Does that mean DHS can't even hire anyone until June or July?

**A.** So the way that the hiring freeze was implemented, essentially, the way that it was written, was that for every four individuals that leave, you can onboard one once you've determined that that position is required. However, there is a process, of course, every -- well, there is a process, of course, for requesting an exception to -- for that particular 4-to-1 process.

**Q.** By the way, I'm sorry how long have you been in HR?

**A.** Since 1996.
**Q.** Oh, wow. How long you been in the federal government?
**A.** Since 1996.
**Q.** Where did you start?
**A.** Legacy U.S. Customs Service.
**Q.** Then have you been in DHS since it was created?
**A.** Yes.
**Q.** Have you ever seen a situation in which all positions in an office were dissolved?
**A.** All po- -- I've never been a part of a RIF from either side, so no.
**Q.** Have you ever seen -- have you ever heard of like every office -- every position in an office being dissolved?
**A.** No, huh-uh.

THE COURT: Okay.

CROSS-EXAMINATION (CONT'D)

BY MR. MARTINEZ:
**Q.** You mentioned a waiver process.
**A.** Uh-huh.
**Q.** Who does that waiver go to, the request?
**A.** I don't -- the waiver goes up through the human capital, the deputy human capital officer for the department in order to be reviewed and then a decision is made.
**Q.** Does that go to OPM?
**A.** I do not know. I don't have any information about that.

realistic. And so can you just tell me based on what you heard, you know, earlier and your own views as to how long it would get -- it would take to be staffed up. And I'm particularly concerned about your deputy. I understand Mr. Hemingway is going to be the Acting --

**A.** CRCL.

**Q.** -- CRCL. When did he get put in that position, by the way?

**A.** Yesterday, I believe.

**Q.** Yesterday? Okay. Was it yesterday morning, afternoon or evening?

**A.** I don't know.

**Q.** Okay. Had he been in that position by the time you met?

**A.** Yes. So it was probably the morning by the time we met.

**Q.** Okay. So we have one more office to fill, OIDO?

**A.** That's been filled as well.

**Q.** That's been filled.

**A.** Yes.

**Q.** Great. Okay. So we have the three offices -- officers?

**A.** Yes.

**Q.** Okay. And I understand the declaration, that some contracts have continued. And that was consistent with your testimony.

And let me just ask you first sort of what are your plans for the hiring -- for creating the new positions and the

**Q.** And how does your plan for staffing compare to the staffing levels historically in the office?

**A.** So it winds up not being that much lower. It may be around 50 percent lower. So we had talked about there is 40 -- around 40 employees by the time of the RIF notice. But that is not historically where that office was staffed. It was usually around 20 throughout most of its 20-year history, 20 FTEs, full-time equivalents. So given that the workload is expected to half, and the statistics bear that out from last year, having roughly half the staff to me seems reasonable.

**Q.** I guess you anticipated my follow-up question. How -- can that staff handle what last year was 24,000 complaints, at least reviewing them?

**A.** Well, so five to seven probably can't fully review 25,000 complaints, but again, we're not getting 25,000 questions or inquiries this year. Because I can see the trend line from what we've already received given that we're midyear now, I think, at most, we would receive 12,000, and many of those have already been worked from when the staff was there prior to the RIF.

So at this point, we're looking at a much smaller universe, several thousand, maybe five or six thousand more. And it seems like a staff of five to seven, even without contract support, could work them. And so, yeah, they could handle the workload that we're anticipating, not a workload

for a year that is in the past.

**Q.** So what about for future years, if the workload increases what are your tools to handle that?

**A.** Well, so always contracting and always detailees. And if the appropriation authorizations are there in terms of funding, you can staff up.

**Q.** And how about CRCL, what's the plan for CRCL?

**A.** So the plan, as I briefed it to Mr. Hemingway, and that he approved, is we think the right number there is about 20 investigators and then another report writer. So that's about 21. Plus there would be a CRCL officer and a deputy officer. And my understanding from the prior leadership is those two executives, one has oversight over the EEO process, and the other one is the CRCL officer. So that's total FTEs 23ish, 24.

**Q.** And how do those levels compare historically to staffing?

**A.** So that's lower. So in recent years, they grew to about 118. But they were not historically at 118. I'm not entirely sure. It's not quite -- it's not easy to reconstruct those numbers, but I know that there was a growth of at least 30 or 40 in the last three or so years. So it's maybe a quarter of where they were previously.

**Q.** How about for a staff that were focused on the complaints?

**A.** For the staff that did casework, it's actually the same number. I think that is the core function of the office, is investigating cases and complaints that come in. They had 20 or so assigned to that core work. I think that number should probably be left intact. And again, they would have contract support and detailees.

**Q.** How about the last office, OIDO, what's the --

**A.** So OIDO, they had, I believe -- so there's the two parts of OIDO. There's the casework as it came into headquarters and then there's the facility inspections. They had something like 10 to 15 facility inspectors. I think the right number for that is probably one to two given the number of facilities they inspected per year.

Again, looking at that and having spoken to outgoing leadership, I think there is inefficiency and gaps there in performance. And I'm not understanding why one or two individuals can't inspect 20 or so facilities a year, and I think we will probably do quite a bit better than that.

For the casework side, there, it seemed that the headquarters element had about 10 to 15 individuals. I think if you staffed it with five or seven and then again, detailees to help plug the gap, potentially contracts, you can do the work that the prior staff was doing.

**Q.** And how does that compare to staffing levels historically?

**Q.** Have you announced these five to seven caseworker positions and report writer position yet? Have they been announced for -- as vacancies?

**A.** No, because I'm not sure I can announce them yet so as to not violate the RIF.

**Q.** But you -- so there's one announcement that you have put out, correct, and that's for the deputy?

**A.** That is in the process of being put out, yes. HR is creating the various forms and paperwork to get it out now.

**Q.** And you began the process of sending that to HR to create the forms and paperwork when?

**A.** Last week.

**Q.** And it hasn't yet been announced publicly on USA Jobs?

**A.** No, because this was literally maybe two business days ago that we started the -- that I received and returned the position description for the position.

**Q.** And when it is announced, will it be internal only, or will it also be announced externally?

**A.** My plan is to announce it and make it open to all of DHS.

**Q.** And for how long will it be open?

**A.** Oh, I haven't determined that, but to move the process along, my thinking is five days.

**Q.** Then once you receive your list, certificate of eligibles, how long will it take for that position to be filled?

**A.** Then it's a question of how quickly I can review the resumes, interview the candidates, and then select them. And then HR reaches out to make the offer. So I don't know, that's probably at least two weeks, but likely longer.

**Q.** Okay. So from start to finish, from last week, when you began the process to when you anticipate having someone in the role, we're looking at a month, more than a month? What would you estimate?

**A.** Probably a month.

**Q.** So that's one position?

**A.** Yes.

**Q.** For each of the seven or eight other positions within CIS OM, do you anticipate a similar length of process to fill those vacancies?

**A.** Yes. And the reason for that is they're not hired, or they could not -- they don't have to be hired in series, they would be hired in parallel. So if it's all the same position type, the same series, the same grade or a ladder of grades, it would be a multivacancy announcement and then we would get the certificate of eligibles. And I'm able to interview and hire anyone off of that list, and all of those individuals could be hired in one shot.

**Q.** And in the meantime, until all of those people are hired, you're performing all of the work of the CIS ombudsman's office by yourself; correct?

**Q.** And would that entail opening additional detention facilities?

**A.** I'm not sure that that's true. It could be true. You could enlarge capacity at existing facilities. I have not heard any more detail than that.

**Q.** So if we were anticipating what the total number of immigrants in detention is a year from now, do you anticipate it would be a higher number than it is today?

**A.** Yes.

**Q.** And you still believe that seven people is sufficient staff for monitoring conditions in all those facilities going forward?

**A.** No. So this is a key distinction. I am talking about the case managers who worked the queue at headquarters that came in electronically, for the most part, at headquarters, right. So this is not a one-to-one replacement for the individuals who were largely contractors in the detention facilities. That is a somewhat different problem.

And I see nothing requiring anyone to be in the detention facilities. That is not to say there is no value in it. It is to say that is a problem that is difficult to solve and needs to be examined by Mr. Guy.

**Q.** Okay. But I think you spoke earlier about contractors -- well, let me back up a step.

Out of the 118 full-time employees at OIDO, who are

currently subject to the RIF, how many of those were case managers who were responsible for going into detention facilities and meeting in person with detained people?

**A.** I don't know. The number was, I believe, trying to envision an org chart in my head, probably and 40 or 50, but I'm not positive.

**Q.** So it was the largest component of the OIDO staff, were the case managers, and we can pull that up in the report to Congress that we discussed previously, but would you disagree with me the case managers -- I'm not talking about contractors. I'm talking about full-time employees -- were the largest component of the OIDO staff?

**A.** I'm not positive, but that sounds correct.

**Q.** Okay. And is it also your understanding that those full-time employee case managers were not perhaps every day, but that part of their duties were to go to detention facilities and meet in person and monitor conditions in the facilities directly?

**A.** Yes. And they were not in every facility -- not every facility had an OIDO staffer in it all the time. It's not clear how often they were staffed. But it was not a one-to-one relationship.

**Q.** Nor would it be a one-to-one relationship if we had seven people performing the tasks; correct?

**A.** Correct.

said the office could be constituted differently, but you did testify a few moments ago that you thought this would not be a reduction in the size of CRCL. Is it your understanding that there were around 20 people in the compliance branch previously handling complaints from the public?

**A.** Again, I can't speak to the breakdown. The way I asked the question of outgoing leadership was not tell me how many you have in the compliance branch, because I'm looking at work streams, not arbitrary organizational structures. So the work stream is that of investigating complaints. And outgoing leadership told me they had about 20 individuals plus a fair number of contractors doing casework and investigations.

**Q.** And that 20 individuals would not -- we talked about some of the statutory functions of CRCL, and one of the ones that we discussed on Monday was oversight of DHS programs and activities, to check them for compliance with civil rights law. In your sort of reorganized view under the plan, where you have around 23 staff, would there be any staff members dedicated to performing those programmatic oversight functions?

**A.** Not in my plan, and there's a very specific reason that. I think that that -- the best way to handle that skill set is with attorneys who would be detailed from other parts of the organization. That is an area where my research has indicated quality could have been improved, and the right skill set is

an attorney skill set. And I think detailees are the right way to close that gap.

And also, you're bringing in an expertise perhaps from the areas where there is oversight. So, for example, someone from TSA may have good insight into what kind of civil liberties challenges are faced by TSA customers or members of the public who interface with TSA.

**Q.** Given the statutory scheme that envisioned there being a separate office to conduct oversight of the DHS components, do you think that detailees from TSA, for example, would be able to perform that oversight function, if they're going to be going back to TSA in six months, the same way someone who is in a separate office that doesn't report to the TSA hierarchy would be able to do?

**A.** Yes. Actually, I've -- I'm aware of individuals who have done exactly this in the past. They use their knowledge to advance their career in a detail. And then at the end of the detail, if they perform well, and often the whole point of doing a detail is to try to explore opportunities to leave your current job, you're then able to impress your boss on detail and then you're hired into the new position.

But there are a lot of employees who would love to be able to share what they've learned, both the good and the bad, in jobs in their home office and share that with an oversight body. This also happens a lot with Congress. The Executive