CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    12

```
1      Q      Okay.  And for approximately how long

2  did you meet?

3      A      Two and a half, three hours.

4      Q      Did you speak with anyone besides

5  counsel about your testimony today?

6      A      No.

7      Q      Did you talk to Troup Hemenway about the

8  deposition testimony that he gave?

9      A      No.

10     Q      Did you talk to Joseph Guy about the

11  deposition testimony that he gave?

12     A      No.

13     Q      Are you familiar with the deposition

14  testimony that those two gentlemen provided?

15     A      Not directly familiar.

16     Q      You've testified previously in this case

17  at a couple of hearings before Judge Ana Reyes.

18  Do you recall that testimony?

19     A      Yes.

20     Q      During your testimony on May 19th, you

21  were asked or you gave testimony about

22  conversations you had had with existing staff at
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    24

1    job position is?

2        A        I am the CIS Ombudsman, the Acting

3    Deputy Immigration Detention Ombudsman, and Acting

4    Deputy CRCL Officer.

5        Q        How would you estimate that you divide

6    your time between those three roles?  How much

7    time do you spend on your duties as CIS Ombudsman?

8        A        It varies by the day.  I would say there

9    is -- I have to do some quick math in my head if

10   you're looking for one percentage first.  I would

11   say approximately 30 percent of my day is spent on

12   CISOM tasks.

13       Q        And approximately how much time do you

14   spend on tasks related to your Deputy CRCL Officer

15   role?

16       A        About 40 percent.

17       Q        And about how much time do you spend on

18   tasks related to your Deputy Detention Ombudsman

19   role?

20       A        About 30 percent.

21       Q        You testified during the May 19th

22   hearing -- I can show you the exact line if you'd

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    25

1  like to see it.  But you testified about not being

2  able to personally perform all the statutory

3  functions of all three offices yourself.  Do you

4  still agree that that is the case?

5      A      I don't recall particularly -- in

6  particular, saying that.  Do I perform -- I am

7  able to execute all of the required functions of

8  the offices that I hold, keeping in mind that none

9  of these components of DHS ever had their

10 functions executed by one person each.

11           They are all offices.  They are staffed.

12 I am not executing the functions alone by any

13 stretch.

14     Q      Who is helping you to perform these

15 functions?

16     A      So there is Mr. Guy and Mr. Hemenway at

17 OIDO and CRCL, respectively.

18           I have a chief of staff in CRCL and

19 OIDO, ███████████  who is an enormous help in

20 operating those offices.

21           I have staff, line-level,

22 non-supervisory staff in OIDO and CRCL.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    27

1   in the Office of Contracting to support all of our

2   contracts.  And the same for all of the other

3   admin functions.

4      Q      Thank you.  What are your duties as

5   acting CRCL Deputy Officer?

6      A      So for -- the primary duty is to be the

7   EEO Program Director, so I perform that function.

8   And then the way Mr. Hemenway has structured the

9   office, I'm primarily the Chief Operating Officer

10  for the component.

11             I operate the office.  I ensure that

12  we're meeting -- we're performing our statutory

13  requirements and regulatory requirements.

14             And that is what I do.  It's a varied

15  job.  But there's a lot to it, and I perform those

16  functions.

17     Q      And what duties does Mr. Hemenway

18  perform?

19     A      Mr. Hemenway provides guidance.  He

20  ensures that the Secretary signs whatever is

21  required of her to sign, and presents any

22  correspondence that needs signature related to

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    30

1    A      Mr. Guy provides guidance and oversight

2  to ensure that we are in keeping with the

3  Secretary's priorities for how the office should

4  be run.

5          He removes -- as Mr. Hemenway does.  I

6  neglected to say this.  He removes hurdles, which

7  is a very important role.  And it's very nice to

8  have individuals at such a high standing in the

9  department to be able to clear any hurdles that we

10  may face.  And so he removes those hurdles for us

11  and reviews documents that require higher-level

12  signature, including the Secretary's signature, or

13  that may go out of the department to Congress.

14    Q      So you would expect that Mr. Guy would

15  be familiar with correspondence to and from

16  members of Congress involving OIDO?

17    A      If received, yes.

18    Q      Who is                  ?

19    A      He is my Deputy Ombudsman in CISOM, and

20  he is acting as the Chief of Staff of CRCL and

21  OIDO.

22    Q      What duties does he perform?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    39

1    previously used.

2              (Exhibit 8 was marked for identification

3    and is attached to the transcript.)

4       Q      Mr. Sartini, have you ever seen this

5    document before?

6       A      I don't know that I've seen it.  I'm

7    familiar with its content.

8       Q      If you need a moment to read through it

9    and become familiar with it, let me know when

10   you're ready.

11      A      Okay.

12      Q      I'd like to direct your attention to

13   paragraph 5 of this document.

14      A      Okay.

15      Q      Is the contract described in Paragraph 5

16   still active with CRCL?

17      A      Yes.

18      Q      And what tasks are being performed under

19   that contract?

20      A      Those contractors are intaking,

21   reviewing, and processing allegations from the

22   public complaint portal and also those still

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    40

1   received by mail.

2          And they are analyzing the complaints

3   and proposing them to the federal staff, including

4   myself, for a determination of which complaints

5   will be opened and investigated.  And they're also

6   forwarding urgent medical complaints to ICE or

7   CBP.

8     Q      How many contractors are performing

9   those functions?

10    A      I would say it's about seven, although

11  contractor headcounts are always a difficult

12  number for the government to nail down because we

13  are not paying for a particular number of bodies

14  to be on the contract at a given time.  We are

15  paying for FTE utilization.  The way I'm using the

16  term is full-time equivalent.

17          And so they are allowed to staff it with

18  as many or as few individuals as they deem fit to

19  meet the workload that we are paying them to

20  accomplish.  But there seems to be a fairly stable

21  set of contractors working, at least that I

22  interface with, and I believe there are about

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    41

1    seven of them.

2        Q       And is that the same number of

3    contractors given the proviso you just made about

4    not knowing the exact number?  Is the volume of

5    work being performed under that contract the same

6    as it was in May of 2025 or more?

7        A       It is slightly more.  And I have

8    accordingly plussed up the contract to both add --

9    and how the contractor chose to handle my plussing

10   it up was to add an FTE who happens to have been a

11   former CRCL employee who was RIF'd.  And they have

12   also chosen to work overtime to meet the workload,

13   and I have authorized that time.

14       Q       So if there were -- if there are now

15   approximately seven FTEs, that means that in May

16   there were approximately six; is that right?

17       A       There was one less than there is now.

18   Yes.  Maybe it's eight now and seven then.  I'm

19   not 100 percent sure.

20       Q       All right.  Turning to paragraph 6 of

21   Mr. Hemenway's declaration.  Is the contract

22   described in paragraph 6 still active?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    43

1  volume of work under that contract since May of

2  2025?

3      A      No.

4      Q      So the contracts described in paragraphs

5  7, 8, and 9 all pertain to employment -- equal

6  employment matters.  In total, between the three

7  contracts, how many FTEs are working on EEO

8  matters for CRCL?

9      A      I do not know.  Because we do not

10 interface with them directly in a way that would

11 make it easy to count, and the names seem to

12 change often for Bashen and JDG.

13             I know that there are at least four or

14 five investigators for Bashen.  There's at least

15 four or five for JDG.

16             And the IntelliTrack case management

17 system, I would not know, because there's a lot of

18 behind-the-scenes.  That's a software contract, so

19 there's a lot of software engineers on the

20 contract that I just don't interface with.  But

21 they're devoted to the system either full-time or

22 at least half-time.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    44

1          But as far as I know, there are at least

2    three individuals on that contract for us.

3        Q        And to your knowledge, were those

4    staffing levels on the three contracts the same

5    when CRCL also had full-time employees handling

6    equal employment matters?

7        A        Yes.

8        Q        You mentioned earlier that part of your

9    role as Deputy CRCL Officer involves managing the

10   processing of the EEO complaints?

11       A        Yes.

12       Q        Does that mean that you are personally

13   responsible for supervising these contractors?

14       A        Yes.

15       Q        And what does that supervision entail?

16       A        It entails ensuring that case processing

17   in every step of the process is timely, and then

18   ensuring that the quality, the work is being done

19   to an acceptable level of performance to meet our

20   legal requirements.

21       Q        Do you review their work product?

22       A        I sign their work product.  The work

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    45

1    product is primarily reviewed by attorneys from

2    the Office of the General Counsel.

3        Q       And are there certain tasks that must be

4    performed by a full-time federal employee and

5    cannot be performed by a contractor?

6        A       The signing of the documents is done by

7    myself.  And as I understand it, that has to be

8    done by a federal employee.

9                I'm not aware of any others in the EEO

10   space that have to be performed by a federal

11   employee, but we do have one federal employee

12   assisting with managing the work and doing the

13   work itself, the investigations, plus the

14   attorneys from the Office of the General Counsel.

15       Q       And you mentioned that you sign

16   documents.  Do you ever recommend revisions or

17   changes to any of the documents before signing

18   them?

19       A       At times, I do.  Yes.

20       Q       What would be the basis for recommending

21   a change?

22       A       Reading the fact pattern in the

```
1   complaint and making a reasoned judgment as to

2   whether or not discrimination has occurred.  And

3   that will typically result in a conference between

4   me and my attorneys.  And we will go through the

5   law point by point, and the attorneys will explain

6   why the determination was reached that was.

7       Q       And when you say my attorneys, you're

8   referring to attorneys in DHS Office of General

9   Counsel?

10      A       Yes.

11      Q       Turning to paragraph 11 of Mr.

12  Hemenway's declaration, is the contract with

13  Klemen Consulting (phonetic) still in effect?

14      A       No.

15      Q       Has any other contract been entered into

16  to take the place of this contract with Klemen

17  Consulting?

18      A       Not a contract.  We have engaged the

19  Office of Health Services in the department to

20  conduct all medical review that we deem necessary.

21      Q       Is the Office of Health Services a

22  subcomponent of ICE, or is it a separate
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                                    47

1   component?

2       A       No.  It's a headquarters component

3   reporting direct to the Secretary.

4       Q       And can you speak more about this nature

5   of that consultation?  Are there staff details

6   full-time from OHS to CRCL, or is it more ad hoc?

7       A       It is as we need it, not -- there are no

8   details.

9       Q       And when you call in someone from the

10  Office of Health Services, are they being asked to

11  review documents, or are they being asked to go in

12  person to observe someone in detention?  What

13  sorts of things are they being asked to do?

14      A       So our agreement is that they will do

15  all of the above.  At the moment, we have asked

16  them to undertake document review.

17      Q       So you, between May of 2025 and today,

18  have not had occasion to ask them to consult

19  in-person on a case?

20      A       Correct.

21      Q       And approximately how many cases have

22  you asked them to conduct document review for?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    48

1    A    I don't know the exact number, but it's

2    at least a dozen.

3    Q    Turning back to Mr. Hemenway's

4    declaration, paragraph 12.  Oh, I'm sorry.  That's

5    JDG.  We've already talked about them.

6         I'll ask anyway:  Is JDG still

7    performing this function of writing up final

8    decisions that is discussed in paragraph 12?

9    A    Yes.  And this is a different contract

10   than the other JDG contract.  This is a

11   contract -- not only am I plussing up, but I'm

12   probably quintupling compared to its previous

13   utilization.

14   Q    Is JDG Associates writing all final

15   agency decisions for DHS at this time?

16   A    No.

17   Q    Which decisions are assigned to JDG

18   Associates?

19   A    There isn't a rubric that I use.  It's

20   as my attorneys are available.  Right now,

21   attorneys are writing the FADs.  And as their

22   workload allows their writing, and if they are not

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    55

1   being?

2       A       For CISOM, I had said five to seven

3   full-time employees.  In addition to the Deputy

4   Ombudsman, currently we have one detailee.

5               CRCL, we said about 20 additional

6   full-time employees, and we have two-plus

7   contractors.

8               And then for OIDO, five to seven -- and

9   I don't see OIDO here.  Hold on.

10      Q       That's paragraph 13.

11      A       Oh.  Five -- yes.  Five to seven

12  full-time employees, and we currently have three

13  plus two detailees.

14      Q       Just sticking with what you believed and

15  knew as of May when you assumed the role, the

16  roles that you now have, we can talk later about

17  what's happened since then.

18              But does the staffing plan that is

19  reflected in this document, is that the staffing

20  that you believed at the time was necessary to

21  perform the statutory functions of the three

22  offices?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    57

```
 1   CRCL?

 2      A      Well, I didn't say they weren't a

 3   permanent solution.  They are indeed part of the

 4   permanent solution, particularly the contract at

 5   issue in paragraph 5.

 6      Q      You may have already testified to this,

 7   but just so that we have a clear record:  Can you

 8   say how many full-time employees are at CISOM

 9   besides yourself?

10      A      One, and one detailee.

11      Q      And who is the one full-time employee?

12      A      ████████████████

13      Q      And Mr. ██████ also performs work for

14   CRCL and for OIDO; is that correct?

15      A      Yes.

16      Q      So other than the one detailee, is there

17   anyone who is performing work for CISOM full-time?

18      A      No.

19      Q      When did the detailee come on board?

20      A      I don't remember, but it was probably

21   somewhere in the early summer.  June, perhaps.

22      Q      Have there been any other detailees
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    58

1    since May of 2025 at CISOM?

2        A      No.

3        Q      And how many full-time employees are

4    currently working at CRCL?

5        A      Two.

6        Q      Any detailees?

7        A      No.

8        Q      How many full-time employees are

9    currently working at OIDO?

10       A      Three.

11       Q      Any detailees?

12       A      Two.

13       Q      Do you know what the length of their

14   details is?

15       A      I have them -- the offices have

16   indicated that I have them as long as I want them,

17   and right now we are assuming at least a one-year

18   detail.

19       Q      Is that the same for the CISOM detailee?

20       A      Yes.

21              MS. GILBRIDE:   This would be 50 -- 50,

22   I believe.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    59

```
1              MS. DECKER:   Yes.

2              (Exhibit 50 was marked for

3    identification and is attached to the transcript.)

4    BY MS. GILBRIDE:

5        Q      Have you seen this document before?

6        A      Yes.

7        Q      What is it?

8        A      It is the position description for the

9    Law Enforcement Specialist Assessment programs.

10   Or, rather, the job posting for that job, not the

11   position description.

12       Q      Did you participate in drafting this job

13   announcement?

14       A      I did.  I drafted it in coordination

15   with the Office of the Chief Human Capital

16   Officer.

17       Q      Did you also participate in the hiring

18   process?

19       A      Yes.

20       Q      Do you know how many people applied for

21   this position?

22       A      I don't remember the exact number.  But
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          70

1      A      Well, Mr. Bice handles a good portion of

2   the EEO complaint management work, including

3   drafting some of the documents on the EEO side.

4   They help with report writing.  And that's it.

5      Q      All right.

6             MS. GILBRIDE:   I think this is Exhibit

7   51.

8             (Whispered conversation.)

9             MS. GILBRIDE:   Are there full copies?

10             MS. DECKER:   Yeah.  So this is three

11   copies.

12             MS. GILBRIDE:   51.  All right.  And

13   we'll just figure out what that is later.

14             (Exhibit 51 was marked for

15   identification and is attached to the transcript.)

16      Q      Are you familiar with this document, Mr.

17   Sartini?

18      A      Yes.  And the title and body of the

19   document look correct here.  This is the Law

20   Enforcement Specialist Assessment Programs for

21   OIDO Job Announcement.

22      Q      Did you have a role in drafting this job

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    71

1    announcement?

2        A       Yes, I drafted it with OCHCO.

3        Q       And you had a role in the hiring process

4    as well?

5        A       Yes.

6        Q       Did anyone else participate in the

7    hiring besides you?

8        A       Yes.  ███████████.

9        Q       And what qualifications were you seeking

10   for the law enforcement specialist role?

11       A       We were looking for individuals who had

12   experience inspecting facilities and understanding

13   documents that had complex requirements, who had

14   experience conducting investigations of detainee

15   complaints, particularly complaints related to

16   being in detention.  That's it.

17       Q       And based on your conversation with the

18   former head of OIDO, did you understand that that

19   office previously had a set of employees that were

20   focused on inspections and a different set of

21   employees that were focused on case management?

22       A       Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                 73

1    large detention facilities.

2              And then we have another in the

3    mid-Atlantic.

4              And we have a detailee -- where do we

5    have a detailee?  Somewhere also in the southwest.

6    Yeah.  So well spread.

7       Q      So you said one person in Pennsylvania

8    and another person in the mid-Atlantic?

9       A      Yes.  And one in Texas.

10      Q      Looking at the job announcement that was

11   posted, is a location given for where the

12   employees in this role would be based?

13      A      Yes.

14      Q      What does it say?

15      A      Washington, D.C.

16      Q      Did you have to obtain permission to

17   hire people who are not based in Washington, D.C.?

18      A      No.  Because their duty station is

19   Washington, D.C.

20      Q      Is there an adjustment to pay if they're

21   living in another part of the country but their

22   duty station is Washington, D.C.?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    74

```
1      A       No.  Because they are traveling to those

2   areas of the country.

3      Q       So to your knowledge, where do these

4   individuals live?

5      A       They live in the National Capital

6   Region, so far as I know.

7      Q       I see.  And how frequently do they

8   travel to their assigned locations, as far as you

9   know?

10     A       They are traveling regularly.

11     Q       For what purpose are they traveling?

12     A       To conduct facility inspections and

13  follow-up on complaints -- complaints.

14     Q       How frequently are they traveling to

15  conduct inspections.

16     A       Regularly.  I -- sorry.

17     Q       So there's -- go ahead.

18     A       They're on travel regularly.  So right

19  now, we have a small data set from which to answer

20  that question because they were onboarded, I

21  believe in September, and then there was the

22  shutdown.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                76

1    report, despite having 120 employees.

2      Q      And from your understanding of the OIDO

3    2023 report, did those employees make repeated

4    visits to the same facilities?

5      A      I don't know.  It's not -- from my

6    reading or what I remember of the report, it's not

7    quite clear.

8      Q      Under your current plan for OIDO going

9    forward, will employees be expected to return to

10   the same facility that they have already visited?

11     A      Sure.  It would be a natural part of an

12   after-action plan or following up on a report.

13            So, for example, if there are

14   recommendations set forth in the report and ICE or

15   CBP adopt the recommendations, it would be natural

16   to follow up to see if those recommendations were

17   implemented at some point.

18     Q      So how frequently would you anticipate a

19   law enforcement specialist returning to a facility

20   within their portfolio?

21     A      I don't have an expectation.  I think

22   that's a decision that we can make as we move

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    77

1    along.

2       Q       So between the five individuals

3    currently working for OIDO, how are detention

4    facilities distributed?

5       A       Primarily by the region that the

6    individuals know and are comfortable with.  So if

7    an individual -- the individual who we have who

8    comes from Texas and was a border patrol agent in

9    Texas and knows those facilities well, he is more

10   likely to be assigned to cover those facilities.

11           And, for example, we have an employee in

12   Pennsylvania who worked at one of the larger

13   facilities there.  And so it makes sense that she

14   would be more likely to be assigned both to

15   inspecting that facility and the others around it.

16      Q       Do you know how many detention

17   facilities are currently in operation?

18      A       I believe -- so the number changes all

19   the time, but it's around 200.

20      Q       So would you anticipate each of your

21   five OIDO employees being responsible for

22   approximately 40 facilities?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    78

1      A      Yes.  That's feasible.  And the fact

2    that we already have knocked out 22 inspections

3    tells me that that can be done.

4             And it doesn't only have to be done by

5    the three employees.  We have detailees, and we

6    also have -- CRCL is authorized to conduct

7    inspections, as well.

8             But yes.  I think that is feasible.

9      Q      Do you intend to make additional hires

10   at OIDO?

11     A      It's under discussion, but no decisions

12   have been reached.  In particular, because we are

13   in a three-month CR, and the Office of Budget

14   informs me that no office should be doing hiring

15   when you don't have a year-long appropriation in

16   place.  That is standard practice.

17     Q      Do you intend to make any additional

18   hires at CISOM?

19     A      Same -- same answer:  Potentially.  No

20   formal decisions made, and advise not to make them

21   while we have a short CR.

22     Q      Are you familiar with the budget

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          79

1    recommendation that was made to Congress for these

2    three offices?

3        A      Yes.

4        Q      Have the projections in that budget

5    affected your plans for the future for staffing

6    these three offices?

7        A      They do.  Yes, they have.

8        Q      In what way have they affected your

9    plans?

10       A      So the budget recommendation is a

11   reflection of OMB's guidance to the Department.

12   And right now, we do not -- we would not take

13   action that is inconsistent with OMB's guidance

14   without discussing all the way up the chain.

15             And so, again, the shutdown heavily

16   complicates things here because we don't know what

17   would have happened if there was a year-long CR or

18   not.  But the fact of the matter is right now, all

19   of the plans don't really matter because we don't

20   have funding past January 30th.

21       Q      And do your plans differ depending on

22   whether OIDO has an operating budget going forward

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    80

1    or whether its budget is zeroed out after January?

2               MR. DAVIS:   Objection, deliberative

3    process privilege.  The witness can answer at a

4    high level of generality, but not about specific

5    discussions or plans.

6       A     Generally, yes.  Not having money

7    impacts operational and staffing plans.

8       Q     What is your plan if the funding is

9    reduced to zero?

10              MR. DAVIS:   Same objection,

11   deliberative process privilege.  Answer at a

12   general level.

13      A     I would be consulting the Office of the

14   General Counsel for what happens in that

15   situation.  I don't have any experience in such a

16   situation.

17      Q     Would the projected budget also reduce

18   the funding available for CRCL going forward after

19   January?

20      A     I don't know that it would.  Right now,

21   we are staffed to the level in the budget.  So I

22   don't know that it would reduce it further.  I

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    86

1    when the selection was made.

2             But, again, I moved with all haste, and

3    Mr. Guy moved as many roadblocks as he could.

4        Q       And when were the three full-time hires

5    for OIDO onboarded?

6        A       So I think they came on shortly after

7    the CRCL staff, so that was probably end of

8    August, early September.  Two of them asked for a

9    significantly later start date.  We were able to

10   onboard earlier than they onboarded, and then we

11   wound up onboarding them all at the same time.

12            So we were able to onboard earlier, but

13   they asked for -- I don't know if it was a pay

14   period, maybe two pay periods.  Because they were

15   actually moving to the National Capital Region to

16   take the job, and they needed time to move.

17       Q       I'm sorry.  Did you say they had to

18   relocate to the Capital Region?

19       A       Yes.

20       Q       Okay.  I have another exhibit.  I want

21   to make sure I'm on the right page.

22            MS. DECKER:  Actually, it's --

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                87

```
1            MS. GILBRIDE:   Is there anything else

2   down there?  Yes.  Yeah.  That's the only thing

3   left in here.  I'll pass it around.

4            MS. DECKER:   Sure.  And this is going

5   to be another exhibit?

6            MS. GILBRIDE:   Yes.  We haven't used

7   this one before.

8            MS. DECKER:   53?

9            MS. GILBRIDE:   53.

10           MS. COOGLE:   This would be 54.

11           MS. GILBRIDE:   Oh.  Thank you.

12           (Exhibit 54 was marked for

13  identification and is attached to the transcript.)

14  BY MS. GILBRIDE:

15     Q     Mr. Sartini, are you familiar with this

16  document?

17     A     Yes.

18     Q     What is it?

19     A     A transcript of the motions hearing

20  before Judge Reyes from May 23rd, 2025, and it

21  appears to be the testimony given by myself and

22  Nicole Barksdale-Perry.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    88

1    Q      Okay.  I'd like to turn your attention

2    to page 98, which is a portion of your testimony.

3    A      Okay.

4    Q      And feel free to familiarize yourself

5    with this section of testimony, but you're

6    describing the time period to complete the hiring

7    process and how long you estimate it will take.

8           Do you see where you say you think it

9    will take around a month?

10   A      Yes.

11   Q      How long did it actually take for these

12   individuals to assume their roles?

13   A      From that point, probably another two

14   months, depending on who we're talking about.  If

15   it's a CRCL staff, maybe June, July.  Yeah.  Two,

16   two and a half months.  And then OIDO staff,

17   probably three months.

18   Q      Why did it take longer than you

19   estimated that it would take?

20   A      So, again, for some of the candidates,

21   they requested that it be longer before they

22   onboard, and we accommodated.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          89

```
 1              And then the other is -- and, I mean,

 2    that's not that far off the mark for -- for a

 3    hiring process.  I think if you told any hiring

 4    manager, we can go from cradle to grave to hiring

 5    someone within 3 months, they would laugh and say,

 6    no, it always takes 6 to 12 months.  So it's still

 7    very fast.  And certainly my actions were taken

 8    within a month, so far as I recall.

 9              And I think where it took longer was

10    likely in the security vetting for the candidates,

11    which is outside my control and not a good process

12    to try to intrude on.  So I believe that's why it

13    took longer.

14              But, again, that it happened as fast as

15    it did was a credit to the hurdles that high

16    leadership moved so that we could get this done.

17    Q      You mentioned security vetting.  Is that

18    something that you were familiar with when you

19    gave this testimony to Judge Reyes in May?

20    A      I'm aware that it's a process that

21    happens.  But the process, depending on the

22    candidate, varies.  It can be very quick, as I was
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    90

1    hoping in this case, and it can take longer,

2    depending on individuals' backgrounds.

3              And it also depends on department

4    priorities, which I may not have been aware of at

5    the time.  So, for example, if we're trying to

6    surge the number of ICE agents that we're hiring,

7    that may have slowed the security process down.

8    Q        Since you mentioned the number of ICE

9    agents changing, is that a change that occurred

10   after you made your staffing estimates for CRCL

11   and OIDO in May of 2025?

12   A        I don't know that there is a formal

13   change in the number of ICE agents that I'm aware

14   of even now.  I mean, I know there's a hiring

15   surge.  I don't know how many of those hires or

16   potential hires have actually been put into the

17   field.

18             So I don't know if there is a change in

19   the numbers.  But I am generally aware that DHS

20   operations would be ramping up.  I was aware of

21   that at the time that I made my staffing

22   recommendations.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    92

1    that OGC is providing to -- maybe we'll take

2    offices one at a time.

3                What support is OGC providing to CRCL?

4       A       OGC reviews, in concert with the federal

5    staff, all of the complaints that we receive.  And

6    in that review, the OGC portion is to determine if

7    a given complaint might be a Section 504 of the

8    Rehabilitation Act complaint.  Because those are

9    required to be investigated one-to-one.  And so we

10   need to make sure we're not missing any of those.

11               And then they advise further on what

12   civil liberties or civil rights may be implicated

13   in a particular complaint and what the law is in

14   that area, particularly Title VI 345.

15               And then there is the attorneys that

16   advise me on EEO matters and have a background in

17   EEO law.  And they are both writing final agency

18   decisions, reviewing the quality of the work of

19   the investigators for legal sufficiency, and then

20   advising me on the finer points of the law when I

21   have questions.

22      Q       And what about for OIDO?  What support

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    94

```
1      Q       So the two current OIDO detailees

2    started out at CISOM; is that right?

3      A       One of them did.  One dropped.  So there

4    were three:  One dropped, one remained at CISOM,

5    one went over to OIDO, and then we had another one

6    added at OIDO after that.

7      Q       Okay.  And the next bullet point refers

8    to the Deputy CIS Ombudsman.  Do you know when Mr.

9    Gomez was selected for his role?

10     A       Yes.  I believe he onboarded -- I don't

11   remember about selection, but I believe he

12   onboarded in late June, early July.

13     Q       Okay.  And when he was hired as Deputy

14   CIS Ombudsman, was he aware that he would be doing

15   work for CRCL and OIDO as well?

16     A       No.  That decision had not been reached

17   yet.

18     Q       When did that decision get made?

19     A       I don't remember.  Probably not long

20   after he onboarded.

21     Q       And then the next bullet point down says

22   you expect a job announcement by which CISOM will
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    95

```
1    be fully staffed will be posted in the coming

2    weeks.

3            Was an additional job announcement for

4    CISOM ever posted?

5      A     It was not posted because what happened

6    between the date of this declaration and before we

7    posted anything was the OMB budget recommendations

8    came out saying no more than two at CISOM.  And so

9    we had two; we had myself and Mr. ███████  So we

10   stopped there for the time being.

11     Q     And we spoke earlier today about salary

12   allocations in the budget for people who are

13   wearing two or three hats.  Was there any way that

14   you could use that funding to hire additional

15   people at CISOM?

16     A     No.  So I'm not sure I understand the

17   question, though.  Where -- what extra funding are

18   you referring to?

19     Q     So I'm referring to the fact that, for

20   example, there's money allocated for Mr.

21   Hemenway's salary or for the salary of the CRCL

22   officer, but Mr. Hemenway has another full-time
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    99

1    not include for the sake of brevity.

2              Have you ever seen this position title,

3    Regional Representative, Local Ombudsman before?

4        A      Yes.

5        Q      What is your understanding of what that

6    position did?

7        A      So in my extensive transition

8    discussions with the acting ombudsman, he

9    intimated to me that there were four local

10   ombudsmen or four regional representatives that

11   they were hoping could serve as the local

12   ombudsman function, and that they simply did not

13   have money to hire more, and that in the office's

14   20-year history, they've only had these regional

15   representatives for a year or two and that this

16   was their attempt to meet the unfunded mandate in

17   the statute.

18       Q      And as part of your staffing plan for

19   CISOM, did you include any regional

20   representatives or local ombudsmen going forward?

21       A      I did not, for two reasons.  The

22   position, again, was -- is simply not funded by

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                      100

1    Congress.  The statute, I think, is quite clear

2    that it envisions 50 local ombudsmen, one for each

3    state.  That's how I read it.  I'm pretty sure it

4    says the number 50.

5            And four is not 50.  Regional is not in

6    each state, so that's not the same thing.  And I

7    didn't think that we needed to begin fulfilling

8    that requirement at this point in time when, in

9    the 20-year history of the office, it never had

10   been.  That was reason one.

11           Number two, my plan at the time -- and

12   it is still my plan -- is to explore, after

13   seeking counsel, other ways that we may appoint

14   local ombudsmen other than hiring full-time

15   federal employees.

16   Q     And you said that is still your plan.

17   Do you have a timetable for when that may occur?

18   A     It is just a plan.  It needs to be

19   researched and discussed with counsel.  There is

20   no timetable at the moment.

21           MS. GILBRIDE:   Let's go off the record.

22           THE REPORTER:   One moment.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    104

1    contractors to seek the help of IT to just make

2    the system function.

3            It is nowhere near as efficient as it

4    should be, and we are in the process of rolling

5    out the incremental improvements right now.  We've

6    developed the user stories, which is a technical

7    term to develop software and alter it, and we are

8    in the process of releasing updates that would

9    simplify the system.

10   Q      And any of those system changes that

11   you're describing, will they affect the interface

12   that members of the public have with the CRCL web

13   portal?

14   A      No.  This is purely on the back end.

15   Q      Are there any other ways that members of

16   the public can submit complaints besides the web

17   portal?

18   A      No.

19   Q      Do you know if that is a change from

20   prior CRCL policy?

21   A      It is a change.

22   Q      Do you know when that change went into

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    105

1   effect?

2      A      I adopted the change.  I don't know

3   exactly when.  It was probably over the late --

4   around the late summer.

5      Q      And why did you make that change?

6      A      For efficiency's sake.  The president

7   has directed efficiency through executive orders.

8   And the ability to receive mail is a burden on us

9   that is inefficient, and it is not in keeping with

10  good customer service, either.

11          We get mail very slowly, and then it

12  becomes a problem to log correctly.  We also don't

13  have a great way to get mail back out if we don't

14  have anything other than a mailing address.

15          If a complainant sent us mail at a given

16  time, it takes, like, two weeks to reach us

17  because of the irradiation facility that's used to

18  screen the mail.  Often they are not still

19  available at the address they sent it from.

20          And so it's much faster, and the data

21  entry is much tighter and more efficient if

22  everything is borne online.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    106

```
1      Q      Is it also burdensome for CRCL to

2   receive complaints via email?

3      A      It is, and so we have stopped doing so.

4   We only use email for appeals.

5             But email actually has a worse problem

6   than snail mail in that it is very easy to spam it

7   and to send viruses and large attachments that

8   wreck our system.  This was happening recently,

9   and we had to take steps to protect the network so

10  that we could actually access legitimate claims

11  and not have the system crippled by spammers.

12     Q      Do individual contractors or full-time

13  employee investigators correspond with

14  complainants using email?

15     A      The contractors may.  I don't believe

16  the Feds do.  The contractors correspond, at least

17  for appeals, via email.  And yes, we do send

18  emails back.

19     Q      So you had given an answer earlier in

20  today's deposition about what happens when a

21  complaint is submitted and the contractor

22  reviewing it, and then a number of things can
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    115

1    intuitive.  And that's part of what we're

2    simplifying now.

3        Q       And once a matter is referred to another

4    component, is the -- what sort of follow-up occurs

5    between CRCL and that component?

6        A       So it's case-by-case.  But the MOUs that

7    we have with the components and the understanding

8    that we have to be formal and informal is that we

9    reserve the right to do follow-ups, conduct

10   quality checks, ask for a monthly or annual

11   readout of what they did with our cases.

12           Some cases, we will just refer, and CRCL

13   will then be done with it.  And others, we will

14   follow up.

15       Q       And then the instance when the case is

16   referred and CRCL is done with it, do you then

17   close the case in the CRCL tracking system?

18       A       Typically, yes.

19       Q       And would a notice be sent to the

20   complainant notifying them that the matter had

21   been closed?

22       A       Typically, yes.  That is what should be

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    117

1    produced or will be producing.

2        Q       Is there a specialized protocol

3    different from what we've already been discussing

4    when the complaint relates to a death in DHS

5    custody?

6        A       Yes, there is.  The previous agreement

7    and process before the RIF is still in place.  ICE

8    or CBP sends me personally a notification of the

9    death, and they CC our group internal mailbox so

10   that the record is properly saved and maintained

11   in our corporate system.

12           And I read the circumstances around the

13   death.  There is usually a pretty detailed rundown

14   from ICE or CBP as to the circumstances of the

15   death and actually a history going back to the

16   first time the United States encountered this

17   individual, often in a law enforcement context or

18   in a legal immigration context.

19           So you have the whole rundown of their

20   history, and then you have a pretty good write up

21   of what the circumstances of the death were.  And

22   that is just the notification.  And the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    118

1    understanding is that soon thereafter, a coroner's

2    report will follow up with the medical

3    documentation of the body and their assessment of

4    the circumstances of the death.

5        Q       And who else do you coordinate with on

6    investigating the circumstances of deaths in

7    custody?

8        A       So I will coordinate with any of my

9    employees, I will talk it over with counsel, and

10   where needed, I -- I bring in the Office of Health

11   Services.

12       Q       Have you investigated any deaths in

13   custody since taking on your role as acting CRCL

14   deputy?

15       A       No.

16       Q       To your knowledge, have there been

17   deaths in custody since you took on that role?

18       A       Yes, there have been.  As of a couple of

19   days ago, there were about 22 deaths in custody.

20               There is some debate as to what

21   constitutes a death in custody.  But the way I'm

22   looking at it, there are about 13 or 14 in

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    119

```
1    facilities, and then that broader group of

2    individuals who are killed when involved with ICE

3    or CDP in pursuits and such brings that number to

4    about 22 since March.

5        Q      And if you have not personally

6    participated in investigations of those deaths,

7    have you reviewed reports of investigations

8    conducted by others?

9        A      Yes.  So I have read all of the

10   summaries.  I have looked at all the documents

11   produced by ICE and CBP.  I have read every page

12   of every single one myself.

13           And keeping in mind that the report

14   takes time to generate, so I am not in receipt of

15   22 full deaths with autopsy reports.  I don't know

16   how many I have.  Maybe 10 currently in my

17   possession, and I have not found cause to

18   investigate thus far.

19       Q      Is the figure of 22 that you just gave

20   an increase from the number of deaths in custody

21   in past years, to your knowledge?

22       A      It is an increase, but it is lower per
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    123

1    ICE and CBP are required to take it.

2        Q      And as new ICE and CBP employees are

3    onboarded, do you know how soon they're required

4    to undergo that training?

5        A      I don't know.

6        Q      Returning to the web portal that we

7    discussed previously, do you know if family

8    members or other representatives are able to lodge

9    complaints on the web portal for someone else?

10       A      They are.  But they need to accompany

11   the complaint with a signed consent form.

12       Q      Is there a particular form of consent

13   form that they need to use?

14       A      Yes.  It's the -- well, they don't have

15   to use it for OIDO.  I believe it's not specified

16   with CRCL.  It is specified to use the G-28, which

17   is a standard form for this purpose in the

18   immigration ecosystem.

19       Q      So if a family member or some other

20   third party is not an attorney, would they be able

21   to complete a G-28 form?

22       A      Yes.  It's for a representative of any

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    124

```
1   kind.  Our standards are somewhat different from

2   USCIS, so we're using the G-28 form because it's a

3   standard form.  And yes, you do not need to be an

4   attorney to complete that form.

5       Q       If a complaint is submitted by a third

6   party that does not include a signed G-28 form,

7   will that complaint be processed?

8       A       No.

9       Q       Will the individual who submitted the

10  form be notified about the status of their

11  complaint?

12      A       Yes.  They'll likely get a letter

13  saying, we're not going to look into your case

14  because it didn't have the requisite form

15  attached.

16              MS. GILBRIDE:   No.  We've used this one

17  before, but I'm not sure which number it is.

18              MS. DECKER:   Let me take a look.  Oh.

19  We haven't used it as an exhibit before.

20              MS. GILBRIDE:   We haven't.

21              MS. DECKER:   Oh.  Wait.  I --

22              MS. GILBRIDE:   The first day.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    125

```
1              MS. DECKER:   We did.  Let me look.

2              MS. GILBRIDE:   I know it -- one moment.

3   I believe it's 16.

4              (Exhibit 16 was marked for

5   identification and is attached to the transcript.)

6   BY MS. GILBRIDE:

7     Q      Are you familiar with this document?

8     A      No.  I don't believe I've seen this

9   before.

10    Q      If a third party submitted this form

11  instead of the G-28, would their complaint be

12  processed for CRCL?

13    A      Yes.  I believe we would not kick it

14  back if this form were properly completed.  I

15  think that is something that my CRCL contractors

16  would probably come to me for guidance on.  And I

17  would say that if the form is properly completed,

18  we could accept it.

19             What we're using with the G-28 is that

20  standard DHS form.  This, to me -- again, I

21  haven't seen this, and I'm not seeing some of the

22  indicia of a standard DHS form like the seal and
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    128

1   notice between this version of the acknowledgment

2   letter and the acknowledgment letters that are now

3   being sent out?

4      A      I don't know.  I'd have to have the

5   current letter in front of us.

6            I mean, I note the OIG writer first

7   refusal in here, which we still do.  I probably

8   neglected to mention that before, but that is a

9   part of the process that is up front before the

10  complaints make it to me.  So that is still

11  happening.

12           As far as other textual differences, I

13  wouldn't know.  I would need it in front of me to

14  see.

15           (Pause.)

16     Q      So turning your attention to the, I

17  believe, third page of this document, immediately

18  before the Privacy Act statement.

19     A      Okay.

20     Q      Do you see that there's a phone number

21  provided for someone to call if they have

22  questions?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                         129

1      A      Yes.

2      Q      Is that phone number still operational?

3      A      No.

4      Q      So when someone submits a complaint

5   today, if they want to follow up to ask questions

6   about the status of their complaint, how would

7   they be able to do so?

8      A      They will receive status information

9   when it is available.  We do not have a mechanism

10  for knowing the status of the complaint.

11     Q      And if a complainant wishes to

12  supplement the information they previously

13  provided, is there a mechanism that they can use

14  to do that?

15     A      No.  Consistent with a lot of government

16  complaint management, it is a one-step mechanism

17  at intake.  And so, no.  If we fail to take up the

18  complaint, if we choose not to, at that point, the

19  complainant can submit another complaint.

20          I don't view this as being of a piece

21  with, for example, a Social Security application

22  where you are denied benefits if you don't submit

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    130

1    proper documentation.  This is -- it is not a

2    government benefit process.  And so we do a

3    one-shot intake.  And if we need more information,

4    we will contact the complainant to obtain it.

5        Q       And what if the individual who submitted

6    the complaint no longer wishes to pursue it or

7    have it investigated?  Is there a mechanism for

8    withdrawing the complaint?

9        A       No.

10       Q       All right.

11               MS. DECKER:    56?

12               MS. GILBRIDE:   Sure.  I think we used

13   this one before, but just in case we're -- I am

14   not confident enough with my recollection, so we

15   can --

16               MS. DECKER:    Okay.

17               MS. GILBRIDE:    -- use a new exhibit

18   number.

19               (Exhibit 56 was marked for

20   identification and is attached to the transcript.)

21       Q       Have you ever seen this document before?

22       A       Yes.  I signed it.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    133

1    workflows built into the system different to each

2    complaint type, and some of them have these

3    intermediary steps that require documents to be

4    uploaded to the system.

5        Q       Okay.  We are done with that document.

6                MS. GILBRIDE:    This is 57.

7                MS. DECKER:    57.

8                (Exhibit 57 was marked for

9    identification and is attached to the transcript.)

10       Q       Did you get a chance to review this

11   document?

12       A       I've reviewed it.

13       Q       What does this document appear to be?

14       A       A letter from CRCL dated September 10,

15   2025, to Complainant ████████████        indicating

16   that we are not pursuing her complaint further.

17       Q       What's the basis given in this letter

18   for no longer pursuing the complaint?

19       A       That the alien has been removed and was

20   removed two years ago.

21       Q       And to your knowledge, how long has it

22   been CRCL policy to stop investigating a complaint

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    134

1    when the individual referenced in the complaint

2    is -- has been removed or is out of custody?

3        A       Since Mr. Hemenway and I were appointed.

4        Q       Why did you make that change in policy?

5        A       Because when we look at the most

6    efficient use of CRCL resources, however much

7    staff we have, it doesn't -- we are not able to do

8    anything for aliens who are removed.  They are no

9    longer subject to CRCL jurisdiction.  And,

10   therefore, it makes the most sense to focus

11   resources on the individuals still in the United

12   States.

13           That does not preclude us from, as we

14   do, storing all the information and tracking for

15   trends and analysis and reporting and

16   recommendations based on the content of those

17   complaints.

18       Q       So in your understanding of CRCL's

19   statutory requirements, is CRCL focused on

20   redressing harms experienced by individual

21   complainants?

22       A       That is one area that CRCL has in its

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    138

1    they remain available to this investigator to see

2    what that universe that we have received looks

3    like.  It's a valuable data set for us, whether or

4    not we investigate it.

5        Q      And the information you would have for

6    those prior investigations would consist of

7    anything that the complainant sent to you and

8    anything you subsequently requested; is that

9    correct?

10       A      Yes.  All records, all documents are

11   attached to the case file in the system, including

12   physical mail is scanned and saved.

13       Q      Will CRCL request additional information

14   from components like ICE or CBP only in those

15   cases where it opens a formal investigation?

16       A      Not necessarily.  But I think that is --

17   at the point we are requesting documents from a

18   component, I consider that an open investigation

19   and call it a formal investigation.  To me, that

20   term doesn't mean anything.

21              But yes.  If we are querying a component

22   for documents, that's a complaint we're likely

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    142

1    it's at least a dozen, maybe quite a bit more than

2    that.  But I don't recall.

3        Q       And do you sign all of the Section 504

4    determination letters?

5        A       Yes.

6        Q       What does your level of review and

7    involvement with those complaints look like before

8    signing them?  Or -- sorry -- with those

9    determination letters look like before signing

10   them?

11       A       So at the very beginning, I make the

12   determination to both open an investigation and to

13   pursue it as a 504 investigation vice VI 345

14   complaint, and that decision is informed by

15   counsel.

16           And then the investigators will

17   investigate and compile the documentation.  And

18   they will present me with the final determination

19   and written letter after consulting counsel, but

20   before it gets to me.

21           And then I will review it.  I will ask

22   any questions of the investigator and counsel if I

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    143

```
1    have.  And if I have, those questions are

2    answered.  And if I don't have, I sign it, and we

3    reissue it.

4        Q      Do you recall whether you had any

5    questions about this particular determination

6    letter?

7        A      I do not.

8        Q      I'm turning your attention to the third

9    page of the letter.  There's a Bates number 22597.

10       A      Yes.

11       Q      Item C:  ICE did not discriminate

12   against your client?

13       A      Yes.

14       Q      Do you remember reviewing the legal

15   analysis in this section of the determination

16   letter?

17       A      I don't remember when I -- I was

18   reviewing it, but it looks familiar to me.

19       Q      And do you believe that the legal

20   analysis in this letter is adequate?

21       A      Yes.

22       Q      Looking to Section Roman IV, Right to
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    144

1    Appeal, the letter outlines the amount of time

2    that the complainant has to appeal.  Have you

3    participated in any appeals of Section 504

4    complaints since you've been in your role?

5      A      No.  To my knowledge, we haven't

6    received any.

7      Q      And what is the process for handling an

8    appeal, should you receive one?

9      A      Those will be looked at manually.

10   Everyone will be looked at.  And it is going to

11   result in a conversation between the investigator,

12   my counsel, and me.

13          And at that point, we will determine who

14   the appropriate authority is to review the appeal.

15   It would not be me.  It would likely be Mr.

16   Hemenway.

17     Q      In the time that you have been acting as

18   CRCL Deputy, do you know whether any of the

19   determination letters on Section 504 complaints

20   have concluded that the statute was violated?

21     A      I don't believe any have.  But, again,

22   that's data that we have available.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    146

```
1       A       No.

2       Q       Do you know approximately how many of

3   your determination letters on Section 504

4   complaints have been issued within the 180-day

5   timeline?

6       A       I don't know the number, but I know that

7   all 504 complaints received since I have been in

8   the position are timely.

9               I note that this letter was already late

10  before the RIF even happened, this complaint.  It

11  would have been late.

12              And so all of the late 504s that I

13  inherited upon assuming my position, we are

14  getting to them.  I think we've gotten to all of

15  them.  I could be wrong about that.  But all of

16  the ones that have come in since I've been in the

17  position have been addressed timely.

18      Q       And how do you prioritize new complaints

19  coming in as opposed to the backlog that you

20  inherited after the RIF?

21      A       We take them as they come.  So it is a

22  FIFO, first-in, first-out process.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    170

 1    but most of them were OIG inspections of detention

 2    facilities.

 3         Q       And who from CRCL attended?

 4         A       I did.

 5         Q       How did these meetings inform your work

 6    going forward with regard to the portfolio of CRCL

 7    complaints?

 8              MR. DAVIS:   Objection, deliberative

 9    process privilege.  Just at a very high level,

10    nothing specific.

11       A       The investigations that OIG did were

12    thorough and well done, and they're a good model

13    for us to follow.

14       Q       Next item, number 5, Reviewing

15    Management Directives and Instructions.  How often

16    was CRCL called upon to review these sorts of

17    documents?

18       A       As needed.  And we're redoing all of the

19    directives and instructions within DHS, and

20    they're all sent to me for review.

21       Q       So in total, how many of these sorts of

22    documents would you say you've reviewed since May?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                 171

1    A        Dozens.  I don't know.  And there are

2    more coming.  But we're only at the beginning of

3    this project, so probably at least a couple of

4    dozen.

5    Q        What does your review entail?

6    A        My review entails making sure CRCL

7    equities are covered and, in particular, that any

8    functions that are required to reside in CRCL

9    remain and are not eliminated or moved somewhere

10   where they're not permitted to be.

11   Q        Are there other types of policy

12   documents that you have -- you or others in CRCL

13   have had occasion to review for other components

14   of DHS?

15   A        Yes.

16   Q        And how many such policy documents would

17   you say you've reviewed or others within CRCL?

18   A        Easily two or three dozen.  I mean, any

19   policy that even remotely has a nexus to civil

20   rights and civil liberties, which is almost

21   anything the operational components do, comes to

22   CRCL as a required clearer of the policy or

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    172

```
1    document.

2        Q      Who has been responsible for reviewing

3    those policy documents?

4        A      I am.

5        Q      And have you suggested any changes to

6    any of the documents that you've reviewed?

7              MR. DAVIS:   Objection, deliberative

8    process privilege.  High level of generality, no

9    specific advice or recommendations given.

10       A      A few.  I've -- I've made minor edits to

11   a few.

12       Q      And have you consulted with anyone else

13   in coming to those conclusions about what changes

14   to recommend?

15             MR. DAVIS:   Just caution the witness

16   not to reveal attorney-client privilege or

17   anything deliberative.

18       A      Only Mr. Hemenway.

19       Q      To your knowledge, have the changes that

20   you've proposed been adopted?

21       A      Yes.

22       Q      Returning back to the interrogatory
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    173

1    response, the next item is Review of Congressional

2    Correspondence.  Who would be responsible for

3    reviewing inquiries from Congress and responding

4    to them?

5        A     So for the department, all congressional

6    correspondence comes through the Executive

7    Secretariat, and then they are supposed to be

8    disseminating that mail to the appropriate office

9    for a response.  Sometimes that happens.

10   Sometimes it does not.

11             But for CRCL, I am the one -- department

12   policy requires clearance and drafting at the

13   Chief of Staff level and above.  And so I am

14   handling that in conjunction with Mr. Hemenway.

15       Q     Have you reviewed any congressional

16   inquiries?

17       A     Yes.

18       Q     How many, approximately?

19       A     Maybe about five or six.

20       Q     And have you consulted with Mr. Hemenway

21   about those inquiries?

22       A     Yes.  And I'm required to.  Because if

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    174

1    they're addressed to the Secretary and for her to

2    sign it, the memo to her to sign the response must

3    come from him, not me.

4        Q       Have you responded to any inquiries?

5        A       Yes.  That --

6        Q       All five that you mentioned having

7    reviewed have been responded to?

8        A       I believe so.  We don't -- if we're in

9    receipt of a congressional letter, we don't ignore

10   it.

11       Q       And next item on this list, Giving

12   Guidance on Medical and Religious Accommodations,

13   would that be included in the review of written

14   policies that you mentioned earlier, or is this

15   something separate?

16       A       Yes.  But in this case, we are the

17   originator of those policies.

18       Q       And have you drafted new policies since

19   taking on your role as Deputy CRCL Officer?

20       A       Yes.

21       Q       How many such policies?

22       A       Related to medical and religious

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    175

1    accommodations, probably four.  There is at least

2    one change generally to the medical; there is one

3    about religious; and then there have been maybe

4    three component-specific religious accommodation

5    policies that CRCL issued, that Mr. Hemenway

6    issued to those components.

7        Q       What role did you have in creating those

8    policies?

9        A       I communicated to the Office of the

10   General Counsel that there were changes needed to

11   the existing policies and a lot of clarification.

12   That was requested by our customers, meaning the

13   components and our headquarters employees.

14              And so we needed to issue new guidance

15   both to issue clarification and to accommodate the

16   guidance coming out from OPM and the White House

17   as to various changes within the workforce at the

18   beginning of the administration.

19       Q       Did those policy changes involve the

20   rescission of existing policy guidances that had

21   been in effect?

22              MR. DAVIS:   Objection, deliberative

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                   176

1    process privilege and possibly attorney-client

2    privilege.  You can answer at a very high level.

3        A       Yes.

4        Q       Last item on this list, Annual Use of

5    Force Review for CBP in August.  What was CRCL's

6    role in that annual review?

7        A       I was a member of the board, and the

8    board has seven or eight voting members on it.

9    And so I and the other members voted on, I think,

10   the ten instances of force that CBP OPR presented

11   to us over that two-day span, and we voted on

12   whether or not the uses of force were legitimate

13   or within policy.

14       Q       And what is the consequence if the board

15   concludes that a use of force was not legitimate?

16       A       It depends on the case.  But the board

17   then votes on the order of magnitude of the

18   offense, is my understanding of it.

19           The particular determination is a

20   supervisory and chain-of-command issue, but they

21   need that determination from the board to proceed

22   if it was not found to be legitimate.  But the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    183

1    identification and monitoring of pregnant

2    detainees that was put in place in 2023?  Do you

3    know if that remains in effect?

4        A    I do not.

5        Q    And ICE's memo on the care and custody

6    of transgender detainees, do you know if it

7    remains in effect?

8        A    I do not.

9        Q    And do you know if CRCL has been

10   consulted about either of those two topics,

11   pregnant detainees and the care of transgender

12   people in custody?

13       A    We have not since I've been in the

14   position.  I know ICE has its own CRCL-type office

15   and their own counsel, but we have not been

16   consulted.

17            MS. GILBRIDE:   All right.  We can go

18   off the record.

19            (A recess was taken.)

20            THE REPORTER:   Back on record.

21            MS. DECKER:   Is this going to be a new

22   exhibit?

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                                    186

1     Q        Before the RIF and the staffing changes

2     at OIDO, do you know what the most common method

3     for receiving complaints by OIDO was?

4     A        I think I do.

5     Q        What do you think it was?

6     A        Case workers in the facilities.

7     Q        And under the way that OIDO is currently

8     organized, can detained individuals submit

9     complaints to case workers in the facilities now?

10    A        No.

11    Q        Is it your understanding that all

12    detained individuals have access to the web portal

13    to file complaints?

14    A        Yes.

15    Q        How do you understand that they can file

16    complaints electronically?

17    A        They have access to tablets, which have

18    access to wifi, and that way they can access the

19    portal and submit a complaint.

20    Q        And is it your understanding that all of

21    the approximately 200 detention facilities have

22    tablets in the facilities?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    187

```
1      A       I don't know if they all do, but neither

2  did every facility have a case worker in it.

3      Q       In the facilities that do have tablets,

4  do you know if there is a one-to-one

5  correspondence between number of detained

6  individuals and number of tablets?

7      A       I don't know if there's a one-to-one.

8  It's not my understanding that there is.

9      Q       Do you have an understanding of what the

10 ratio of detained individuals to tablets is?

11     A       No.

12     Q       Do you know whether there are

13 limitations placed on internet access using the

14 tablets?

15     A       I don't know.

16     Q       Do you know if people who are in

17 solitary confinement in detention have access to

18 tablets?

19     A       I don't know.  I know we receive

20 complaints from people in solitary confinement,

21 though.

22     Q       Are there any other ways besides tablets
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                              189

```
1        A       I do not know.

2        Q       Do you know how many complaints have

3   been received by OIDO since March 21st, 2025?

4        A       About 285.

5        Q       Do you know how many complaints were

6   received by OIDO in 2024?

7        A       No.

8        Q       Do you know how many complaints were

9   received by OIDO in 2023?

10       A       I believe the report said it was 11,000

11  or 12,000.

12       Q       Do you have any idea why the number of

13  complaints has reduced so drastically between 2023

14  and 2025?

15       A       I'm sure some part of it is not having

16  the case workers there.  But the CRCL complaint

17  volume has increased, so I don't -- yeah.  That's

18  it.

19       Q       Of the 280 complaints that you

20  referenced, how many of those complaints are

21  currently being investigated?

22       A       I don't know for sure, but I know it's
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                              191

```
1      Q       So in CRCL context, one of the examples

2   you gave was an urgent medical referral.  Would

3   the same steps be taken with an urgent medical

4   referral to OIDO?

5      A       Yes.

6      Q       Are there any other circumstances

7   specific to OIDO besides medical issues that would

8   tend to result in a referral?

9      A       Any type of issue could result in a

10  referral.  Again, there's a prioritization around

11  use of force, sexual assault, suicidal ideations.

12     Q       And what sorts of situations would lead

13  to opening of an investigation by OIDO?

14     A       The same.  I mean, again, any one

15  complaint can lead to us investigating, but there

16  is the prioritization for the aforementioned

17  categories.

18     Q       So what I'm trying to get at, if you are

19  able to answer, is, what would lead something to

20  be investigated instead of referred?  Are there

21  any particular criteria that would make an

22  investigation more likely?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    192

1      A        Allegations alleging sexual, physical

2   assault, something like corrupt contractors or ICE

3   and CBP officers and agents, something that it

4   would be inherently problematic for the component

5   to investigate themselves, would almost always be

6   something CRCL retains for investigation.  Or

7   OIDO.  I'm sorry.

8      Q        And you did mention earlier that certain

9   issues are referred from OIDO to CRCL.  What types

10  of issues would warrant a referral to CRCL?

11     A        Particularly serious matter where a

12  medical -- not a medical -- where a sexual assault

13  has occurred or a grave medical matter where CRCL

14  is more, because of the volume of their work,

15  involved in doing it.

16          We would ask -- I would ask OIDO case

17  workers to confer with their federal colleagues in

18  CRCL and do any number of things in an

19  investigation that you would do in the course of

20  investigating.

21     Q        And similar to what we discussed with

22  CRCL, when a referral is made to a component --

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          193

1    like ICE, most likely -- what is OIDO's ongoing

2    role after that referral has happened?

3        A      It's similar to CRCL.  We reserve the

4    right to follow up to see if there's been

5    resolution.  We may choose not to follow up.

6    We're always recording and storing the information

7    for trend analysis and reporting.

8        Q      And do you know, of the 280 or so

9    complaints that you've received, how many have

10   been referred to ICE or another component?

11       A      I do not know.  But that's a number we

12   track and have.

13       Q      Okay.  For those that are being

14   investigated, what does an investigation for OIDO

15   entail?

16       A      It's similar to CRCL.  We start by

17   contacting the component for more information

18   about the complaint to see if it has a voracity.

19   And when the component responds, we evaluate what

20   that response is and take appropriate action.

21              If there is something the attorneys need

22   to look at and consult on, they'll be brought in

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          195

1      Q      When OIDO makes a referral to ICE, is

2   that referral at the headquarters level?  Or who

3   at ICE is the matter typically referred to?

4      A      It is referred at the SES level to ICE

5   ERO headquarters.

6      Q      And to your knowledge, when OIDO had

7   case managers present in detention facilities,

8   were they often able to interface directly with

9   detention facility staff to address problems that

10  detainees were having?

11     A      That is my understanding.

12     Q      Would you describe that as a more direct

13  way of addressing certain types of day-to-day

14  problems, such as needing to have a sick hall or

15  needing access to a blanket in a cold facility?

16  Is it easier to address those problems at the

17  facility level?

18            MR. DAVIS:   Objection, vague.

19     A      Not necessarily.  What I like about the

20  arrangement we have now is I get SES-level

21  leadership assurance that something is going to be

22  taken care of, whereas there isn't great

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    198

```
 1    least in these five instances.

 2              Do you know how many other instances or

 3    other complaints were referred to ERO for further

 4    action?

 5       A    No.

 6       Q    And these complaints were all pending

 7    for different lengths of time, or they weren't all

 8    received by OIDO on the same date; is that

 9    correct?

10       A    I don't know.  I'd have to look.

11       Q    Sure.  Take your time.

12       A    It appears a few were in April, early

13    April, and the others at different times.

14       Q    So you had previously testified with

15    regard to CRCL that there's a FIFO,

16    first-in-first-out, protocol for handling

17    complaints.  Is that true for OIDO, as well?

18       A    Yes.

19       Q    Okay.  Can you look at the emails that

20    were sent to the complainants for these five cases

21    and let me know if they were sent on different

22    dates or on the same date?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    199

1     A       They were sent on the same date.

2   Because in this instance, we were clearing out the

3   backlog of cases that was sitting in the portal at

4   the time of the RIF.

5           And so whatever cases predated our

6   working the cases in the portal all received a

7   notice as of the same date that we issued a batch

8   set of notices for the cases that were being --

9   receiving a similar disposition.

10    Q       How many of those backlogged cases

11  resulted in closures?

12    A       I don't know.

13    Q       How many of those backlogged cases that

14  received emails on or about September 19th were

15  referred to ICE ERO for further action?

16    A       I don't know.

17    Q       One -- you had mentioned that referral

18  to a component is something that's tracked in the

19  OIDO system.  So would all of these complaints

20  that you've just reviewed that were referred to

21  ICE ERO be categorized in the same way in the

22  internal system?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                204

1    employees that previously worked for GEO?

2        A      Yes.

3        Q      And the person who previously worked for

4    CBP, is that also one of the full-time employees?

5        A      Yes.  One detailee and one employee

6    worked for CBP.

7        Q      And each inspection is conducted by a

8    single law enforcement specialist acting on their

9    own; is that right?

10       A      No.  Some are conducted by one.  Some

11   are conducted -- have been conducted by two.

12   There are others that may be conducted by more.

13       Q      And how is it determined what level of

14   staffing or what number of people to send on an

15   inspection?

16       A      There isn't a bright-line rule, but the

17   size of the facility is an indicator of how many

18   staff we should send out.  If we are conducting an

19   investigation in concert with CRCL to look at the

20   complaints they have on file for that facility,

21   that will be a multi-person investigation.

22       Q      And you mentioned that the standards

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                               208

1    they are coming.

2        Q       How much advance notice do you give to

3    the facility before conducting an inspection?

4        A       Typically a few business days, no more.

5    Some of the trips that are more intensive for us

6    need a little bit more planning, like if we're

7    going to travel far afield.  But typically, the

8    standard right now is a few business days.

9        Q       And how long does each inspection last

10   from the time that the employee or employees get

11   there?  How long are they on site?

12       A       It varies by the complexity and size of

13   the facility.  So if it's a big facility, it will

14   be a multi-day.  Right now, those are two full

15   days, those facilities.

16           If it is a smaller facility, like a

17   holding cell or a similar temporary-type facility,

18   both either temporary like a soft-sided facility

19   or temporary meaning that the detainee is meant to

20   be moved out of there in short order, that may

21   only be one day or a five-hour inspection.  Our

22   shortest inspections so far have been about five

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    214

1     A     Only what I had just discussed where we

2  can look at past inspections.  I'm not aware of

3  open inspections that need to be formally followed

4  up on.

5     Q     OIDO does have a statutory requirement

6  to annually report to Congress.  What is the

7  status of the 2025 congressional report?

8     A     It is in draft.  It will likely be

9  delayed because of the shutdown, but it will be

10  timely if you bump the end of the year out by the

11  length of the shutdown, which brings us to about

12  mid-February.

13     Q     And do you know what the status of the

14  2024 OIDO report to Congress is?

15     A     I do not.  I searched the files of my

16  predecessors and can't find any evidence one was

17  drafted.  And so at this point, I'm focused on

18  getting the current one out timely.

19     Q     And I don't think I asked you previously

20  about the status of the CRCL annual report to

21  Congress.  What is the status of that report?

22     A     Same:  Being drafted and should be on

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    215

```
 1   time if you push the deadline out by the length of

 2   the shutdown.

 3        Q       And the presence of law enforcement

 4   specialists at detention facilities, do you have

 5   any plan to have them visit facilities on a

 6   regular basis outside of conducting inspections?

 7        A       No.

 8        Q       Before we turn our attention to CISOM, I

 9   want to go back and ask you a question about -- a

10   couple of other staffing questions that are

11   specific to CRCL.

12            So you have testified -- you had

13   testified that you have learned since being in the

14   role that it's possible to perform statutory

15   functions with fewer staff members than you

16   earlier anticipated.  Can you describe -- because

17   the difference between your staffing plan and the

18   current staffing is particularly drastic for CRCL.

19            So can you describe why you believe it's

20   possible to conduct all the statutory functions of

21   CRCL with just two full-time employees besides

22   yourself and Mr. Hemenway?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    218

1   CRCL by having detailees from the other components

2   of DHS provide that policy advice?

3       A       Yes.

4       Q       Is that still a plan that you intend to

5   put into effect?

6       A       It is something we're still considering,

7   and it remains a plan that I am looking into.

8       Q       But as of now, you have not brought any

9   detailees on board at CRCL; is that correct?

10      A       There is actually one attorney detailee.

11  There is.  And not to provide policy advice as

12  such, but to assist with any number of legal

13  reviews for CRCL.

14      Q       And when did that person get onboarded

15  to CRCL?

16      A       I think shortly before the shutdown.

17      Q       And does that person work for CRCL on a

18  full-time basis?

19      A       She is detailed to OGC to support CRCL

20  on a full-time basis.

21      Q       And what sorts of functions does she

22  perform for CRCL?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    219

```
 1     A       She reviews our correspondence and our

 2   claim decisions, or complaint decisions, and

 3   assists in reviewing EEO matters and writing final

 4   agency decisions.

 5     Q       I think we can turn our attention now to

 6   CISOM.  How many assistance requests for CISOM

 7   have been reviewed since you took over as

 8   Ombudsman, approximately?

 9     A       We've received approximately 7,500

10   requests.

11     Q       You've received 7,500.  And how many

12   were pending at the time that you took on the

13   role?

14     A       I don't remember.

15     Q       Okay.  Do you remember, or do you know,

16   are there more open requests for assistance now

17   than there were when you took on the role in --

18   was it May?

19     A       Yeah.  Early May.

20     Q       Okay.

21     A       I don't remember if we have more now

22   than then.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                220

1      Q       Okay.  What happens when CISOM receives

2   a request?  So this is the same question I've

3   asked for the other two offices.  What is the

4   first step in the review process?

5      A       We have our staff look at the complaint

6   or look at the request for assistance.  And based

7   on our prioritization, they choose to either not

8   act on the request or to tee it up in a

9   spreadsheet that we eventually batch and send over

10  to USCIS.

11          If there are questions that we can

12  answer, we will answer them straight away if we

13  can do that with our access to USCIS systems

14  without asking USCIS.

15     Q       So you said that there are certain

16  requests that you would take no further action.

17  What types of requests would fall into that

18  category?

19     A       A good example is cases where the

20  handling of those application types is in flux or

21  outright paused right now, which is a significant

22  number of form types, and they make up a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    221

1  significant portion of the requests that we

2  receive at CISOM.

3           It does not make sense to act on those

4  requests because we aren't going to be able to

5  give an answer; USCIS won't be either.  And so it

6  doesn't make sense to respond to those requests

7  until there is more clarity on how they will be

8  handled by USCIS.

9   Q      And if you determine that a request

10 falls in that category and that you're not going

11 to take any further action, is any sort of

12 correspondence sent to the requester informing

13 them of that decision?

14  A      Yes.

15  Q      And what about in the instance where

16 you're able to resolve the matter or give an

17 answer without referring the matter to USCIS?

18 What would be done in those types of cases?

19  A      A message would go back to the requester

20 because, of course, that is in the nature of

21 closing out, would be informing them of the answer

22 to their question.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    231

```
 1   Lepe.  And the request seems to have been received

 2   April 7, 2025.  And it includes our receipt

 3   response to him and our further response on

 4   September 19th.  It's saying that we've referred

 5   his request to USCIS, and we'll let you know when

 6   we hear back from them.

 7        Q      Okay.  So noticing that both this

 8   response to ███████  and the other response we

 9   were just looking at were both sent on September

10   19th -- and I can represent to you there were some

11   others we received in the discovery responses with

12   that same date -- is this a similar situation to

13   the situation with OIDO, where you were clearing

14   out a large number of requests from the time

15   period of the RIF all at the same time?

16        A      Yes.  The cases were all reviewed

17   individually.

18             And then what we do is we assign a --

19   you group them in a batch.  You assign a status to

20   all of those similarly situated.  For example, all

21   of those that we are going to send to USCIS, you

22   batch-mark them with that condition in the system.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    232

```
1              And then you batch-generate notices,

2    which is why the notice date may be different than

3    the date we actually sent it to USCIS.  Because

4    the sending to USCIS is a manual action, but the

5    generation of the notice is a separate manual

6    action.  And so that might have happened at a

7    different time.

8        Q       And just one more of these, I promise.

9              (Exhibit 68 was marked for

10   identification and is attached to the transcript.)

11       Q       What is this document?

12       A       It appears to be the extract from our

13   case management system for the same Salvador Lepe

14   case.

15       Q       Okay.  And on this one, I would like to

16   focus you -- and I don't know which page it's on;

17   I apologize -- but the column entitled Assigned.

18   This may be about halfway through.

19       A       Okay.

20       Q       What does that field refer to?

21       A       It's a field that we don't quite use the

22   way our predecessors probably did.  It just means
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    233

1   the day we assigned it to a case worker or a case

2   worker would have picked it up and looked at it.

3       Q       So does this mean that the first time

4   someone reviewed this request was on September

5   13th?

6       A       No, it does not necessarily mean that.

7       Q       Okay.  So someone could have looked at

8   it previously but then picked it back up on that

9   date?

10      A       Yes.

11      Q       Okay.  And then there's a field that

12  says Modified By, with ██████████ name in it?

13      A       Yes.

14      Q       What does that refer to?

15      A       That means he took any number of

16  actions.  That's an automated field.  Anytime

17  someone touches a data element in SharePoint, that

18  field will automatically adjust with the name and

19  the date.

20              So I know that ██████ was taking a lot

21  of the batch actions based on our detail user

22  review.  Because of his technical prowess, he was

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                     234

1    the one going in and doing the automated or semi-

2    automated functions in the system.

3        Q       Okay.  So for example, putting together

4    the list of requests that were going to get that

5    same response we saw saying, Your matter has been

6    referred to USCIS, that's something he would have

7    been responsible for doing?

8        A       Yes.

9        Q       Okay.  Okay.  We're done with that

10   exhibit.

11           So once a matter is referred to USCIS,

12   does CISOM continue to have any involvement or

13   check-in role with USCIS?

14       A       Yes.  We have to, because the completion

15   is USCIS getting back to us, not getting back to

16   the requester.  So it's a bit different from CRCL

17   and OIDO.

18       Q       So what does that ongoing involvement

19   with USCIS look like?  Are you meeting in person

20   or sending emails?  What type of interaction do

21   you have?

22       A       So there's different interactions for

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    235

1    different things.  For the cases, we are sending a

2    list of our requests and then pinging them if it

3    takes a while, which we've already pinged them for

4    some.  And that is for the cases; that is the

5    nature of that interaction.

6              I meet with USCIS leadership regularly

7    to discuss policy issues and trends and topics of

8    the annual report.

9    Q       And what sort of ongoing follow-up or

10   interaction do you have with the requester after a

11   matter is referred to USCIS?

12   A       Typically nothing until we get the

13   response because there's nothing to say until we

14   receive the response.

15   Q       Okay.

16             MS. GILBRIDE:   Let's see where we are.

17   Exhibit 69.

18             (Exhibit 69 was marked for

19   identification and is attached to the transcript.)

20   Q       I'll give you a chance to review this

21   document.  Let me know when you're ready.

22   A       Okay.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    238

1      A        We have not received any responses from

2    USCIS yet, and I am in touch with leadership about

3    that.  But we have not received any replies on any

4    particular case yet.

5      Q        Okay.  So you haven't had occasion to

6    give that sort of information to a requester so

7    far; is that right?

8      A        Correct.

9      Q        Okay.  All right.  Another exhibit.

10            MS. DECKER:   Yep.

11            MS. GILBRIDE:   Let me make sure I'm not

12    getting too --

13            (Exhibit 70 was marked for

14    identification and is attached to the transcript.)

15      Q        I'll give you a chance to review this

16    one.  It's rather lengthy.

17      A        Okay.

18      Q        So I'll represent to you this is a

19    document that was produced by the defendants to us

20    in discovery.  What does it appear to be?

21      A        A request for assistance sent to CISOM

22    by Poua Vue.  And that seems to have been received

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    245

1    A    I don't know.  That is a number that we

2    have.  It is probably the majority.

3    Q    Which would be the majority?

4    A    That we are not taking action.

5    Q    With no further substantive response

6    given?

7    A    Correct.

8    Q    Okay.  And, again, can you walk us

9    through the reasons why you would decide to take

10   no further action and provide this sort of a

11   fairly cursory response?

12   A    Well, there is never a bright-line

13   distinction.  But generally speaking, I see this

14   as a humanitarian request, or the underlying

15   request to USCIS is based on a humanitarian

16   category.  We have deprioritized those because

17   USCIS has deprioritized those.

18        And as has been made public, a good

19   number, if not all, of the humanitarian type of

20   requests are paused.  And so it does not make

21   sense for CISOM to focus on humanitarian requests

22   because USCIS will not likely be able to give us a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    246

```
1    satisfactory response.

2             MS. GILBRIDE:    Okay.   71.

3             (Whispered conversation.)

4             MS. DECKER:    72.

5             (Exhibit 72 was marked for

6    identification and is attached to the transcript.)

7    BY MS. GILBRIDE:

8        Q      What does this document appear to be?

9        A      A request from ███████████████    for

10   assistance.  And she received a response from us

11   that we were not taking action on September 11,

12   2025.

13       Q      And do you have a sense from reviewing

14   the request of why the decision was made not to

15   take further action in this case?

16       A      It is a type of humanitarian benefit, so

17   that will likely be deprioritized.  I note that

18   it's a U visa request.  So that subset, we do look

19   at those.

20             But, again, due to the situation being

21   in flux at USCIS's handling of all humanitarian

22   visa requests, it does not always make sense, and
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    249

1    period -- were those part of a batched set of

2    responses?

3        A      I don't know, but that is very possible.

4        Q      And do you know how many responses were

5    included and sent out contemporaneously, the same

6    time?

7        A      No.

8        Q      Do you know if there have been similar

9    batched responses since September 11th, September

10   12th, that include this same language saying, we

11   are not taking any further action?

12       A      I don't know, but there probably is.

13   Because all of the cases, in terms of effectuating

14   an action in the system, are handled in a batched

15   manner.  That's just an efficient way to handle

16   complaints when you have thousands, so they're

17   reviewed one by one.

18           But when a case worker will look at it

19   and say, okay, I know all of these that I'm going

20   to mark in the system as no action, nothing

21   happens when our staff takes that action in the

22   system.  It's just denoting an internal system for

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    250

1    an action that the public would see, like one of

2    these emails being triggered.  That always happens

3    in a batch.

4        Q       And how frequently are those batches

5    acted upon since you've been in the role at CISOM?

6        A       Mr. Gomez takes care of that.  But I

7    think we're sending out batches at least every

8    couple of weeks, perhaps more frequently.  But I'm

9    not sure.

10       Q       And are batch responses being sent out

11   for OIDO and CRCL, as well?

12       A       Yes.

13       Q       And for CISOM, I think we've seen two

14   types of responses, one for the no further action

15   and one for the, your matter has been referred to

16   USCIS.  Are there any other types of CISOM

17   responses that have been sent out in batches?

18       A       I don't believe so.

19       Q       What about for CRCL?  What types of

20   responses have been sent out in batches for CRCL?

21       A       CRCL has a more varied set of form

22   responses.  There's 504 responses; there's the 345

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    251

1    response; and it could look like we're opening

2    investigation; we're not pursuing it further;

3    we've referred it with no further action from us;

4    we've done a medical referral, I believe, has its

5    own form letter.  So there's a broader range

6    there.

7        Q      And do you know what form responses are

8    sent out in batches for OIDO?

9        A      There is a similar to CISOM, we're not

10   taking action on your complaint, letter.  And then

11   there is a, we've referred it to ICE or CBP,

12   letter.

13            And then there is another one where it's

14   not automated, but it's customized if we need a

15   more substantive response or if we need more

16   information.

17            (Exhibit 74 was marked for

18   identification and is attached to the transcript.)

19       Q      What does this document appear to be?

20       A      It's a message from T.J. Mills to you,

21   saying that CISOM terminated assistance with the

22   delayed receipt from the NSC.  And it has there

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    253

```
1     A       There are a large number of very

2   detailed fields that they can fill out all of

3   their case information, but they're not all

4   required.  There's also a freeform text box.  So

5   they can submit whatever they wish.

6            And there's also the opportunity to

7   upload documents of any kind, of course:  Case

8   documents, G-28s.  So they can submit almost

9   anything.

10    Q       What if an individual had previously

11  submitted a CISOM request and then the matter was

12  resolved and they wanted to withdraw it?  Is that

13  something that can be done via the web portal?

14    A       They can start a new request and say,

15  you can withdraw my current request.  But at this

16  time, no, there isn't a way to withdraw an

17  existing request.

18            (Exhibit 75 was marked for

19  identification and is attached to the transcript.)

20    Q       What is this document?

21    A       I'm not quite sure.  It's --

22    Q       Take your time.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    254

1    A      Okay.  So it's a letter or a declaration

2    from Vincente Lozano Lovelace, Esquire, to --

3    well, it's just a declaration saying his recent

4    experience with CISOM.

5    Q      And his experience consisted of both

6    sending an email and receiving an auto-response

7    that the mailbox is not monitored, as well as an

8    interaction he had trying to use the CISOM phone

9    number.

10           Do you know if the CISOM phone number is

11   still currently operational?

12   A      It is not.  That was a contract that I

13   canceled well before August.

14           So I know that there was a lot of

15   confusion and performance issues with that

16   contract and that line, and it was not an

17   exclusively CISOM phone line.  I know that from my

18   own interactions testing the quality of that

19   service.

20           So I don't know who he reached at all in

21   August, but it was not a contract that we had in

22   pay any longer.  We had terminated that contract

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          255

```
 1   months prior.

 2       Q      Well, I don't think he reached anyone.

 3   He said he was on hold for a lengthy period and

 4   then gave up, so perhaps that's why he didn't

 5   reach anyone.

 6              Is the phone number -- has there been

 7   any notice or announcement posted on the CISOM

 8   website indicating that that phone number is no

 9   longer in use?

10       A      The number is no longer posted, which I

11   consider as being notice.  I'm also not aware of

12   any duty to affirmatively notify.

13       Q      So is there currently any way for an

14   individual to have a real-time conversation with a

15   representative of CISOM, like a request for

16   information that would be responded to in real

17   time?

18       A      No.

19       Q      CISOM also has an obligation to annually

20   report to Congress.  And there's a date associated

21   with that, I believe, June 30th.  What is the

22   status of the report that was due to Congress on
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    256

1    June 30th of 2025?

2       A       The report was submitted over the

3    summer.

4       Q       And is that report to Congress publicly

5    available?

6       A       A redacted version of the report is

7    publicly available on the DHS website.

8       Q       You mentioned earlier that there is an

9    individual from OGC who is detailed to CRCL.  What

10   is that individual's name?

11      A       ████████        I forget the last name.

12      Q       Besides      ████████     are there any other

13   either full-time employees or detailees at any of

14   the three offices that we have not already

15   discussed today?

16      A       There's the admin functions that are

17   performed by dozens of admin office employees, and

18   that should be captured.

19              As far as the attorneys go, that

20   attorney who's detailed is really no different

21   than the many other attorneys who support me.  So

22   I don't know if you're looking for more names or

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                257

1   numbers, but there's not one attorney helping

2   CRCL, to be clear.  There's multiple.

3      Q      And those attorneys are helping CRCL

4   with Section 504 and EEO matters.  Any other

5   matters?

6      A      345's policy review, as they did before

7   the RIF and have always done.

8             MS. GILBRIDE:  I don't have anything

9   further, but I'd like to make sure I'm not missing

10  anything.  So could we take five minutes?

11            THE REPORTER:  One moment.

12            (A recess was taken.)

13            THE REPORTER:  Back on the record.

14  BY MS. GILBRIDE:

15     Q      A few minutes ago, Mr. Sartini, you

16  mentioned a detailee whose first name is Diana.

17  Where is Diana detailed from?

18     A      I believe FEMA.

19     Q      And she is working or performing support

20  functions for CRCL; is that correct?

21     A      She's performing support legal functions

22  for CRCL.  Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    259

```
1       Q       And this may be retreading previous

2   ground, but I want to make sure I'm understanding:

3   These individuals, all five of them do live in the

4   National Capital Area; is that correct?

5       A       Yes.  To my understanding, they do.

6       Q       Okay.  You gave a figure for the number

7   of OIDO complaints of approximately 280.  Does

8   that figure correspond to the entire calendar year

9   of 2025 to date or a subset of the calendar year?

10      A       That is March 22nd to October --

11  December 1st or the last day of November, maybe.

12      Q       Okay.  Do you know how many complaints

13  were received in 2025 prior to March 22nd?

14      A       No.  It's a number we have and may have

15  even produced.  But no, I don't recall.

16      Q       And I hate to do this at this late stage

17  of the deposition, but just to refresh your

18  recollection, if you could pull up the discovery

19  responses that you looked at earlier.  I think

20  that's one of the first exhibits we gave you.

21      A       What would the title be?

22      Q       It would be Defendants' First Set of
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    263

1      A      I don't know.  But I know that we have

2   corresponded with complainants, so I believe they

3   have a method of receiving email.

4      Q      Okay.  With regard to the Office of

5   Health Services, which you said is able to review

6   medical documents, what sorts of medical documents

7   have you asked them to review?

8      A      Entire medical files and histories of

9   the complainants at issue.

10     Q      And have those medical files come

11   through OIDO inspections or also from complaints?

12     A      Both.

13     Q      And are the complaints OIDO and CRCL

14   complaints, both?

15     A      Yes.

16     Q      And you said in total, how many sets of

17   medical documents has OHS reviewed thus far?

18     A      They're in the process of reviewing the

19   first batch.  And I don't know how many we have

20   there, but it's at least a dozen.

21            (Whispered conversation.)

22            MS. GILBRIDE:   Oh, yes, I got it.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                 271

1    case summaries and conclusions.

2        Q       In the investigations that you have

3    opened for OIDO since taking over your role, have

4    any violations been found in any of those

5    investigations?

6            MR. DAVIS:   Objection, deliberative

7    process privilege.  You can answer generally, but

8    not about specific complaints.

9        A       Minor violations, some.

10       Q       And compared to the total number of

11   complaints that you have received, what percentage

12   have resulted in a finding of a violation?

13           MR. DAVIS:   Objection, vague.

14       A       Very few.  Small percentage, very small

15   percentage.

16       Q       Would you say more or less than 10

17   percent?

18       A       Less than 10 percent.

19       Q       Okay.  Nothing further.

20           MR. DAVIS:   Nothing further from

21   defendants.  We will designate the transcript as

22   confidential, especially because one of the