Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 13

1      A.   Correct.

2      Q.   And what position did you take on in early

3  2025 with the change of administration?

4      A.   I joined the front office as the Principal

5  Deputy Chief of Staff.

6      Q.   The front office of DHS?

7      A.   That's correct.

8      Q.   So when did you begin working for DHS?

9      A.   January 20, 2025.

10     Q.   And do you still hold the position of, did

11 you say Deputy Principal Chief of Staff?

12     A.   Principal Deputy Chief of Staff.  And yes,

13 I am still in that position.

14     Q.   Approximately, how many hours per week

15 would you estimate that you spend performing the

16 responsibilities of your Principal Deputy Chief of

17 Staff role?

18     A.   At least 40.

19     Q.   What are the principal duties of that role?

20     A.   As you would expect with really any front

21 office management role, it's a lot of oversight,

22 contribution, day-in and day-out activities.

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 14

1      Q.   And does that role require you to be on

2  call at all hours of the day?

3      A.   It does.

4      Q.   Does it require significant travel?

5      A.   That can vary depending on the principal's

6  calendar.

7      Q.   In that role, are you closely advising

8  Secretary Noem in her duties?

9      A.   In some select areas, yes.

10      Q.   What are those select areas?

11      A.   Recently, as matters pertain to the CFIUS,

12  in the same case too, some of the components that I

13  oversee.

14      Q.   In addition to your role as Principal

15  Deputy Chief of Staff, do you hold any other roles?

16      A.   I am additionally the acting Officer for

17  Civil Rights and Civil Liberties.

18      Q.   We will talk more about that.  Do you hold

19  any additional roles besides those two?

20      A.   Just those two.

21      Q.   So, turning to the Office for Civil Rights

22  and Civil Liberties, when did you first become aware

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 31

1     A.    Eventually, they were.  I think that took

2   place in mid-to-late March.

3     Q.    And do you know if it was conducted in

4   accordance with this March 6th request that we're

5   looking at?

6     A.    As we noted previously, it was conducted as

7   a 100% RIF.

8     Q.    What is your basis for that statement?

9     A.    We still have employees performing some of

10  the statutory functions.

11    Q.    And when were those employees hired?

12    A.    I can't recall exactly.

13    Q.    All right. I have another exhibit,

14  Exhibit 4.

15          (Plaintiffs Exhibit 4 marked for

16  identification)

17          BY MS. GILBRIDE:

18    Q.    Let me know when you've finished reviewing

19  the document.

20    A.    Okay. I'm finished reading.

21    Q.    What does this document appear to be?

22    A.    It appears to be -- a notification of OPM

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 40

1    continue working or whether they had to stop work?

2         A.    I think it was signed in late March, but

3    when it took effect, depending on what OPM signed as

4    the waiver, it would have been either 30 or 60 days.

5    I can't remember exactly, but I don't think I'm aware

6    of what notice went out to the employees exactly.

7         Q.    So between the time when they were

8    notified that they were reached for RIF and when that

9    RIF became effective, were they permitted to continue

10   discharging their duties?

11        A.    I'm not sure.

12        Q.    And you also don't know, if I'm remembering

13   your testimony correctly, how many employees were

14   affected at CRCL by the RIF notice.  Is that right?

15        A.    I think it was over or around 140.

16        Q.    We were looking a few minutes ago at

17   Exhibit 5, which was the chart. It shows 151

18   employees.  Do you know if that number is correct in

19   terms of the CRCL RIF?

20        A.    I've seen a couple of different numbers as

21   we've gone through the exhibits.

22        Q.    And you don't know whether anyone was

Page 41

1    continuing to perform duties at CRCL after the RIF

2    was announced in March of 2025; is that correct?

3         A.    I can't recall exactly.

4         Q.    Okay. So, this would be Exhibit 7.

5              (Plaintiffs Exhibit 7 marked for

6    identification)

7              BY MS. GILBRIDE:

8         Q.    Let me know when you've had a chance to

9    review the document.

10        A.    Okay.

11        Q.    Are you familiar with this document?

12        A.    This is my declaration.

13        Q.    And this declaration recounts a staffing

14   plan that you discussed with Ronald Sartini on May

15   22nd of this year.  Do you remember having that

16   discussion with Mr. Sartini?

17        A.    I do recall my designation as acting

18   officer.

19        Q.    And this staffing plan, as it says in

20   paragraph 4 of your declaration, called for 20

21   full-time employees at CRCL to handle casework, along

22   with a deputy, the officer, and an additional staff

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 43

1    "surprised."

2        Q.    Had anything happened between March and

3    May 22nd to change your own views about how CRCL

4    should be staffed?

5        A.    In that time frame, I wasn't the acting

6    officer.

7        Q.    So you hadn't spent much time thinking

8    about CRCL before you were appointed acting officer?

9        A.    Not particularly.

10       Q.    Do you still believe the staffing plan

11   presented by Mr. Sartini is correct for CRCL now that

12   you've had more time there?

13       A.    I think for the most part we've implemented

14   it, though those 20-some employees that were

15   referenced are in a contract function.

16       Q.    How many full-time staff members does CRCL

17   currently have?

18       A.    Four, including myself.

19       Q.    Who are the other three?

20       A.    We're primarily following the guidance of

21   the President's budget in that it only allows for

22   about four employees.  Those other three are Mr.

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 44

1    Sartini as the deputy, and then two GS-13

2    investigators who oversee those 20-some contract

3    staff that considering our contractors, we can bulk

4    up where they're needed.

5         Q.    So paragraph 4 of your declaration also

6    refers to temporary employees being detailed to CRCL

7    for six months- to one-year increments.  Are there

8    any detailees currently working at CRCL?

9         A.    I can't recall the status of those two

10   investigators.  They're full-time government

11   employees, but whether they're CRCL employees or

12   detailed from another component, I'm not remembering

13   it.

14        Q.    So there are no detailees in addition to

15   those two investigators; is that right?

16        A.    Not that I'm aware of.

17        Q.    Have there previously been detailees

18   between May 22nd and today?

19        A.    Going back to the status of those

20   investigators, I'm not sure if they were detailed,

21   whether or not they converted to full-time CRCL

22   employees, or if they stayed in a detailed

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 46

1      A.   Yes.

2      Q.   When were the two investigators who you've

3 just been discussing hired?

4      A.   I brought them up shortly after my

5 appointment, though I can't remember how quickly that

6 was.

7      Q.   Sorry, did you say shortly after your

8 appointment?

9      A.   Excuse me, designation, but yes.

10      Q.   Okay.  So you were hired in May, you

11 believe they were onboarded sometime in June?

12      A.   Possibly.

13      Q.   How long has Mr. Sartini been serving as

14 deputy CRCL officer?

15      A.   He may have predated myself, though I can't

16 recall exactly.

17      Q.   Okay.  Can you describe your division of

18 responsibilities with him in terms of what you do and

19 what he does?

20      A.   I primarily perform an oversight function,

21 and by nature of my role in the front office, where

22 and if he encounters any obstacles, I remove them.

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

1    Q.    How much time would you estimate you spend

2  on each week related to your role as acting CRCL

3  officer?

4    A.    Mr. Sartini and I have a regular cadence

5  where we gather once a week and communicate ad hoc

6  from there as we need to.

7    Q.    And separately from your meetings, how much

8  time do you spend performing duties related to your

9  CRCL officer role?

10    A.    I haven't calculated it.

11    Q.    Is it 50% of your time?

12    A.    I wouldn't say so.

13    Q.    Would you say it's more or less than 25% of

14  your time?

15    A.    Well, as we spoke to earlier, my capacity

16  really is around the clock.  So, where I need to

17  engage on CRCL matters, I do.  But the exact time

18  commitment, I couldn't speak to it.

19    Q.    On an average week, would you say you spend

20  more or less than 10 hours performing CRCL-related

21  duties?

22    A.    I couldn't say.

Page 50

1    that paragraph, it says, "Moreover, in the interim,

2    CRCL has a number of active contracts;"  The time you

3    wrote this, was your intention to rely less on

4    contractors and more on full-time staff over time?

5        A.   The benefit of contracts is it's a lot

6    easier to bring people on where you need them.  So

7    where and if the need arises, we can use those

8    contract vehicles to, again, bulk up staff.

9        Q.   So has your plan for staffing the office

10   changed from what is described in this declaration to

11   now rely more heavily on contractors?

12       MR. DAVIS:   Objection; deliberative

13   process privilege.  The witness can answer to the

14   extent it's not privileged information.

15       THE WITNESS:   I think our staff plan

16   has been informed by the President's budget, which,

17   as we covered, only allows for four full-time

18   government employees.  And though we're in a CR, we

19   may still enact the President's budget, if Congress

20   does so, in a couple months' time.  So the most

21   practical and prudent manner for us to keep

22   approaching the question of personnel is still

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 51

1    through the contracting model to bring on staff

2    where we need them.

3              MS. GILBRIDE:  Okay. Probably a good

4    transition to introduce Exhibit 8.

5              (Plaintiffs Exhibit 8 marked for

6    identification)

7              BY MS. GILBRIDE:

8         Q.   I know this is a lengthy document.  I can

9    direct your attention specifically to page O and S11,

10   which is where the CRCL budget is discussed.

11        A.   Okay, just one second.  I'm there.

12        Q.   Are you familiar with this document?

13        A.   I didn't work on it, no.

14        Q.   Have you seen it before?

15        A.   I believe so.

16        Q.   Okay.  What is it, to the best of your

17   knowledge?

18        A.   It is titled, back to the first page,

19   "Department of Homeland Security Office of the

20   Secretary and Executive Management Budget for Fiscal

21   Year 2026 Congressional Justification."

22        Q.   So, is it your understanding that this

Page 76

1    investigating itself?

2        A.    Could you repeat the question?

3        Q.    In the situations where the complaint is

4    forwarded to a component and the component is

5    handling the investigation, does that ever result in

6    recommendations?

7        A.    From the component themselves?

8        Q.    Correct.

9        A.    It can, so individual cases are not coming

10    to mind.

11        Q.    Okay.  Of the 97 open investigations that

12    you referenced, have any of those resulted in

13    recommendations to a component?

14        A.    No recommendations have gone to the

15    components following an investigations under my

16    tenure yet.  At least one report is currently being

17    drafted for finalization.

18        Q.    And when that report is finalized, will the

19    recommendations from the report be made publicly

20    available?

21        A.    It will result in the findings -- well,

22    that will be determined by the findings of the

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 86

1    A.    I may have the wrong document.

2    Q.    So that would be Exhibit 10?

3    MS. COOGLE:    Yes.

4    THE WITNESS:    I see it.  Yes, the

5    distinction, I'm not sure.

6         BY MS. GILBRIDE:

7    Q.    Okay. Can you walk us through the process

8    when a new complaint is filed, who is the first

9    person to review it?

10    A.    It can be triaged, though typically it's

11    among our investigators.

12    Q.    And is that the two full-time

13    investigators?

14    A.    It can be, or contractors.

15    Q.    Is there a protocol of whether it would be

16    an FTE or contractor who would review it in the first

17    instance?

18    A.    Typically it's the contractor, though

19    ultimately it's the federal employee that has to make

20    the determination for whether or not we open an

21    investigation.

22    Q.    So after the initial review, typically by a

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 87

1  contractor, what are the possible follow-up actions

2  based on that review?

3      A.   They can -- do you mean forwarding to a

4  component immediately or in terms of opening an

5  investigation?

6      Q.   I guess I'm asking you, what are the

7  possible steps that they could take?

8      A.   They would pass their judgment to a

9  government civilian, and from there we could either

10  close the case, we could open an investigation, or we

11  could forward it to a component.

12      Q.   And under what circumstances would you

13  decide to close the case right away?

14      A.   If the investigator found reason that there

15  wasn't any merit in the case.  That same, regardless

16  though, we still maintain that data.

17      Q.   And under what circumstances would you, or

18  would the investigator, decide to forward the case to

19  a component?

20      A.   Those often are urgent medical referrals,

21  of which we've had several hundred, or if it was a

22  matter that would best be deemed to be handled by the

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 88

1    component at their immediate level.

2        Q.    And other than an urgent medical situation,

3    what other matters would best be deemed to be handled

4    by the component directly?

5        A.    There can be any number of different

6    scenarios.  I would defer the casework question to my

7    deputy.

8        Q.    What are the types of situations in which

9    your office would typically open an investigation?

10        A.    The guidance that I've set and have been

11    executed through my deputy is that it's a serious

12    allegation and actionable.

13        Q.    What do you mean by "actionable"?

14        A.    That we can do something about it.  Or that

15    we can perform some kind of result function.

16        Q.    What are the types of issues that have led

17    to investigations being opened?

18        A.    They can vary, and I don't want to get into

19    the casework of it either, so I would defer to my

20    deputy.

21        Q.    I'm not asking you to talk about the facts

22    for any specific cases, but just categories, or what

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 97

1    regular mail, would it be processed?

2         A.    It would be brought to the department.

3         Q.    Does CRCL accept complaints filed in

4    languages besides English?

5         A.    Early in the administration, the president

6    signed an executive order making English the civil

7    language of the nation, and the Department of Justice

8    issued clarifying guidance over the summer, I believe

9    in July.  We accept it.  Following that guidance and

10   the implementation of it, we only accept complaints

11   in English.

12        Q.    So if someone submits a complaint in

13   another language, what will happen to it?

14        A.    I'd have to defer on the casework question.

15   That said, there's any number of different languages

16   out there, and the same case to the past several

17   years particularly, any number of people that came in

18   all across the world, and it was identified as an

19   issue in processing for all these different languages

20   and dialects for individuals to review those

21   complaints.  English streamlines it.

22        Q.    Can complaints be submitted on behalf of a

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 122

1    and would investigate them and present their opinion.

2        Q.   And I see that the determination letter is

3    signed by Mr. Sartini.  Does Mr. Sartini sign all of

4    the Section 504 determinations?

5        A.   I believe he does, yes.

6        Q.   And does he also conduct the legal analysis

7    that's reflected in that determination letter?

8        A.   I would say Mr. Sartini does his diligence.

9        Q.   Do you know if anyone else has consulted

10   for the legal analysis that's contained in these

11   determination letters?

12           MR. DAVIS:  Objection, form.

13           THE WITNESS:  I can't recall.

14           BY MS. GILBRIDE:

15       Q.   Well, I'm not asking you about this

16   particular document, but as a general matter, in your

17   capacity as acting CRCL officer, do you know who

18   conducts the legal analysis in Section 504

19   determinations?

20       A.   I would.  Though typically we have it done

21   in-house, given our distinction from ODC.

22       Q.   In-house, meaning Mr. Sartini or someone

Page 123

1    else in CRCL?

2         A.    That's correct.

3         Q.    And at the end of this letter, there's a

4    discussion of the right to appeal the determination.

5    In your time as acting CRCL officer, have there been

6    any appeals of any 504 determinations?

7         A.    It's a casework question, I would have to

8    check to my deputy.

9         Q.    If there were an appeal, who would that

10   appeal go to?

11        A.    It would go to the government employees

12   within the office.

13        Q.    I thought your testimony a few moments ago

14   was that the government employees are the ones

15   conducting the investigation.  So is it your position

16   that they would also be handling the appeal?

17        A.    I believe so.

18        Q.    Can you just describe in your own words

19   what Section 504 of the Rehabilitation Act requires

20   of a government entity like DHS?

21        A.    It's a one-to-one investigation

22   requirements for discrimination complaints.

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 130

1          BY MS. GILBRIDE:

2          Q.    So I believe this document was provided in

3    early September.

4          A.    Okay.

5          Q.    And you'll see underneath there's a

6    supplemental response.

7          A.    Let me read.

8          Q.    Okay.

9          A.    All right.

10         Q.    All right.  So I'm going to return your

11   attention to the list of individuals that are in the

12   supplemental response.  We've already discussed you

13   and Mr. Sartini.  Can you tell us who Rodolfo Gomes

14   is?

15         A.    I believe he is one of our government

16   staff.

17         Q.    So you believe he's employed by CRCL?

18         A.    Yes.

19         Q.    How about Brent Brice?

20         A.    His name doesn't ring a bell.

21         Q.    Do you know, for Mr. Gomes, or do you

22   recall what his background is or what his

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 138

1    providing feedback on those management directives?

2        A.    That should come through the deputy as the

3    COO.

4        Q.    Have you ever personally reviewed any?

5        A.    I briefly have on a couple of the contents

6    of them.  I can't remember.  Management has a pretty

7    wide role in the department.  Whether that budget or

8    personnel.  So, they can have a wide review.

9        Q.    Would that also include the components and

10   their policy proposals?

11       A.    Management directives can go to the

12   components, correct.

13       Q.    And would CRCL review component-specific

14   directives as well?

15       A.    We wouldn't control what management sends

16   out as a directive to the components.

17       Q.    So there may be other categories of

18   documents besides management directives.  So I'm

19   asking a broader question here.  How many

20   policy-related documents, to your knowledge, has CRCL

21   reviewed since March 21st of 2025?

22       A.    I'm not immediately sure.

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 139

1    Q.   Do you have -- could you give an estimate

2    of whether it's more or less than 50?

3    A.   I wouldn't want to give you an inaccurate

4    number.

5    Q.   The next item in this list is reviewed

6    congressional correspondence with a CRCL nexus.  What

7    sort of congressional correspondents are -- strike

8    that.  Let me ask a different question.  How many

9    congressional inquiries has CRCL been responsible for

10   responding to or addressing since you've been in the

11   role of acting CRCL officer?

12   A.   As you might expect, there is a lot of

13   congressional correspondence.  That they have a

14   response authored by CRCL, I believe at least a few.

15   That will require clearance on what we've been

16   hiring.

17   Q.   And have you personally been part of that

18   review process?

19   A.   From the front office side, yes.  From the

20   CRCL side, likely we've gone to the deputy.

21   Q.   Okay.  Before I talk more about

22   congressional inquiries, I want to return to the

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 144

1          MS. GILBRIDE:  This is 22.

2          (Plaintiffs Exhibit 22 marked for

3     identification)

4          BY MS. GILBRIDE:

5     Q.    Let me know when you have a chance to

6     review this document.

7     A.    Okay. Just give me a second.  Okay.  I'm

8     finished reading.

9     Q.    Have you ever seen this document before?

10    A.    I may have at some point.

11    Q.    What is the document?

12    A.    It is a letter to the Secretary from

13    Senators Peters, Murray, and Durbin.

14    Q.    And the second-to-last page of the letter

15    requests a response by July 31st.  Do you know if a

16    response was provided by that date?

17    A.    I'm not sure, though it's not uncommon for

18    congressional responses to take some time.

19    Q.    Okay.  Well, putting aside the date, do you

20    know if a response was provided to this inquiry?

21    A.    I'm not certain.

22    Q.    And were you personally consulted or

Page 145

1    involved in putting together any response to this

2    inquiry?

3        A.    This is a casework.  I would have defer to

4    my deputy.

5        Q.    So you don't have any further recollections

6    about either this document or any response to this

7    document?

8        A.    I do not.

9            MS. GILBRIDE:  Okay. We can move on to the

10    next exhibit. Exhibit 23.

11            (Plaintiffs Exhibit 23 marked for

12    identification)

13            BY MS. GILBRIDE:

14        Q.    Let me know when you've finished reviewing

15    this.

16        A.    All right.  Okay.  I have finished.

17        Q.    All right.  Are you familiar with this

18    document?

19        A.    I believe I've seen it before.

20        Q.    And what is it?

21        A.    It is a letter to myself, the Inspector

22    General, the Director of OIDO, a number of different

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 146

1    members of Congress, and a few Senators.

2        Q.    Did you and the other addressees of this

3    letter respond?

4        A.    I'm not certain, though knowing the

5    response date is September and how that closely

6    barriers the lengthy shutdown, it's possible it was

7    delayed.

8        Q.    Did you consult with the other addressees

9    in preparing a response?

10       A.    Directly, I did not, though not unlike the

11   last letter, I imagine a response would have been

12   routed to my deputy.

13       Q.    Is there anything else that you recall

14   about this document or any draft response or

15   completed response to the document?

16       MR. DAVIS:   Objection; deliberative

17   process.   The witness can answer to the extent that

18   it's general, but can't get into particular advice or

19   ongoing discussions about whether to respond or how

20   to respond.

21          THE WITNESS:   I will just note that there

22   are 9 specific request.   So I didn't know whether

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 154

1    right now?

2         A.   Our contractors have been traveling.

3         Q.   Moving on to the next item on page 13, the

4    heading, "CRCL cannot ensure confidentiality and

5    nondisclosure protections for survivors of domestic

6    violence, human trafficking, and other serious

7    crimes."  If you want to read that section to

8    yourself, I just have a couple questions about it.

9         A.   I must be looking at the wrong document.

10        Q.   Okay.  We're talking about Exhibit 9?

11             MS. DECKER:  Page 13 of 18.

12   Just below where you were.

13             THE WITNESS:  I see it.

14             BY MS. GILBRIDE:

15        Q.   Are you familiar with 8 U.S.C. Section

16   1367?

17        A.   I've heard of it.  I have not read the

18   statute.

19        Q.   Okay.  Are you aware of CRCL's obligations

20   with regard to that statute?

21        A.   Those requirements specifically, no, I'm

22   not.

Page 157

1    A.    It would have predated my time.

2    Q.    Okay.  And so I assume you're also not

3 aware of any role that CRCL played in consulting on

4 the revocation of that memo?

5    A.    I'm not familiar.

6    Q.    Has CRCL been consulted about the use of

7 national defense areas?

8    A.    I'm on the southwest border.  I don't

9 believe so.

10    Q.    Are you aware of any draft proposals

11 regarding national defense areas?

12    MR. DAVIS:  Objection; deliberative

13 process privilege.  The witness can answer at a

14 general level, but not about specific policies and

15 advice given.

16        THE WITNESS:  That wouldn't have come

17 across my desk as being the CRCL head.

18        BY MS. GILBRIDE:

19    Q.    Okay.  Do you know if DHS currently has an

20 active anti-discrimination policy?

21    A.    Yes.  Though what authorities it derives

22 from and how it's articulated, the components, I'm

Page 162

1    and advice in addition to investigations?

2        A.    Or it may be appropriate.

3        Q.    Do you intend to make any additional hires

4    to perform policy advisory functions that we've just

5    been discussing?

6        A.    To our previous conversation on the budget,

7    it wouldn't be prudent to try to bring on additional

8    full-time staff.    Primarily, the President's budget

9    doesn't allow for it.    And the same, too, it can take

10   four to six months to hire a new federal employee.

11   It's not practical.

12       Q.    And you didn't think it was practical four

13   to six months ago, either, to make those additional

14   hires?

15       A.    I can't recall when the budget was

16   released.

17       Q.    Final set of questions, so we're in the

18   home stretch.    CRCL is required to produce an annual

19   report to Congress; correct?

20       A.    That's correct.

21       Q.    So the last annual report, the one for

22   fiscal year 2023, was published in November of 2024.

Troup Hemenway - December 2, 2025
THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION

Page 163

1    When are you anticipating publishing the report for

2    fiscal year 2024?

3        A.   We anticipate delivering it on time.

4    I'm not sure what the shutdown deadlines we're told.

5    So 43 days from the end of the calendar year would be

6    our deadline for submission of it.

7        Q.   So, in other words, by February 13th?

8        A.   I'm sure you're getting math right.

9        Q.   Who is working on drafting that report?

10       A.   Some of the contractors are running point

11   on it and go through a review process with civilian

12   leadership.

13       Q.   You can either pull back up the exhibit if

14   you want or just take my word for this, but in your

15   declaration in May, in this case, you stated that the

16   plan for fully staffing CRCL included hiring another

17   employee to work on report writing.  Have you

18   subsequently changed your plan for hiring that

19   additional employee?

20       A.   I believe we can compensate for it with

21   contractor staff.  I don't expect it to become

22   necessary in the same case too, in trying to align