1      Deposition of JOSEPH GUY, held at the offices of:

2

3

4

5          1100 Connecticut Avenue, NW

6          Suite 950

7          Washington, DC 20036

8

9

10

11

12

13

14

15      Pursuant to agreement, before Konly Harding,

16  Notary Public in and for the District of Columbia.

17

18

19

20

21

22

1    defending?

2         A    Former presidential appointees.

3    Q    And then you said you had a second position

4    simultaneously, is that correct?

5         A    Yes.

6         Q    And what was the second position?

7         A    I was an action plan manager for the America

8    First Transition Project.

9         Q    And what was your role in that position?

10        A    I coordinated volunteers who were working on

11   different transition plans across the government.

12        Q    And how long were you in that position?

13        A    I'd like to say I started that in June of

14   2024. And that went until, I think, December 2024.

15        Q    Okay. And what was your next position?

16        A    I started as Deputy Chief of Staff to

17   Secretary Noem in January of 2024, or 2025 rather,

18   sorry.

19        Q    And do you still hold that role?

20        A    Yes, I do.

21        Q    And what are your responsibilities in that

22   role?

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    17

1        A    I coordinate and manage, at a high level,

2   presidential and secretarial priorities for DHS

3   components.

4        Q    And how many hours a week would you say you

5   dedicate to that position?

6        A    Roughly 50, I would say.

7        Q    And what is your current job title at OIDO?

8        A    I am the Acting Immigration Detention

9   Ombudsman.

10       Q    And when did you first enter that role?

11       A    In May of 2025.

12       Q    And how many hours per week would you say

13   that you spend in your role as the Acting Ombudsman?

14       A    I would say roughly five.

15       Q    Okay. And can you describe any prior work

16   experience that you have involving immigration

17   detention?

18       A    Yes, so when I was a legislative assistant,

19   particularly in the House of Representatives,

20   immigration was in my portfolio. So I would have had,

21   I have some familiarity with it from that time.

22       Q    And what kind of work were you doing with

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                      18

1    regard to that portfolio?

2        A    Coordinating on policy, stakeholder

3    engagement, learning about it from outside groups or

4    from other offices and legislative assistants that

5    would have been engaging on the same sorts of work, or

6    wanting Representative Cawthorn to engage from his

7    office on legislation that they were doing. That's

8    sort of the name of the game there.

9        Q    And can you describe any prior experience in

10   civil rights enforcement?

11       A    I would just say something along those

12   similar lines. General experience just through policy

13   discussions and coordination.

14       Q    And can you describe any prior experience

15   related to immigration law?

16       A    I would say the same thing for immigration

17   law, especially in that legislative assistant role. I

18   had a lot of discussions with immigration groups, and

19   while I'm not a lawyer, I did learn quite a bit about

20   the policy.

21       Q    And prior to receiving your role as the

22   acting ombudsman of OIDO, what had you heard of OIDO,

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    19

1    or were you familiar with the subcomponent?

2         A    I was not familiar with it whatsoever.

3    QAnd are you familiar with Project 2025?

4         A    I know what it is, yes.

5         Q    Have you read Project 2025?

6         A    I have not.

7         Q    Are you aware that Project 2025 includes the

8    statement that the Office of the Immigration Detention

9    Ombudsman should be eliminated?

10        A    I was not.

11        Q    Would you agree with that statement?

12        A    I don't think I would.

13        Q    Okay, and can you elaborate?

14        A    I am here to carry out the intent of the

15   President and the Secretary. And if that intent is for

16   the office to not be eliminated and to carry out its

17   statutory functions, that's what I think should

18   happen.

19        Q    Okay. And without telling me the content of

20   your conversations, how many hours did you spend with

21   your attorney in preparing for this deposition?

22        A    I would say roughly four.

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    24

1    which component we're discussing and what size of a

2    facility-- For the most part.

3    Q    Would you be able to specify the names of

4    those standards if you know them?

5         A    I do not know them.

6         Q    So I'm going to introduce an exhibit. It's

7    going to be exhibit 27. And it's a large document, so

8    I put it in a binder for you. And would you mind

9    passing this to the court reporter? Thank you so much.

10   And here's a copy for you all. All right, I'll give

11   you a minute to open this document and take a look at

12   the title page and the table of contents. And this is

13   going to be exhibit 27. And take your time, but just

14   let me know when you're ready.

15        A    Do you want me to--

16        Q    No, you definitely do not need to read

17   through the entire document. I just wanted you to

18   familiarize yourself with the table of contents.

19        A    Okay.

20        Q    Are you ready? Have you ever seen this

21   document before?

22        A    I have not.

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    25

1          Q    Okay. So I will represent to you that this

2     is a complete copy of the 2011 performance-based

3     national detention standards. Are you familiar with

4     the PBNDS?

5          A    I am not.

6          Q    Okay. And you mentioned that there are

7     different standards that are used in different

8     components. Is your understanding that these standards

9     govern ICE facilities?

10         MR. DAVIS          Objection. Lack of

11    foundation.

12         Q    Let me rephrase. Do you know what facilities

13    these standards govern?

14         A    Can I have time to go through this document?

15         Q    Yes, you can take as much time as you need.

16         A    Okay.

17         Q    So based on your brief review of this

18    document, what does it appear to govern?

19         A    Detention standards.

20         Q    And do you know whether these standards

21    apply to ICE detention facilities?

22         A    I would imagine that they do.

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                          26

```
1        Q    And do you know how these standards are
2   enforced?
3   A    At the component level, I would say.
4        Q    And by component level, do you mean by ICE?
5   Or by which component?
6        A    Yes, by ICE.
7        Q    Okay. By any other components?
8        MR. DAVIS          Objection. Lack of
9   foundation. He says he hasn't seen this document
10  before.
11       Q    Okay. Let's move on. Do you know, are these
12  standards mandatory?
13       MR. DAVIS          Objection. Lack of
14  foundation.
15       A    Without having had proper time to review the
16  document, I don't want to say.
17       Q    And do you know how these standards are
18  typically incorporated into detention facility
19  contracts?
20       MR. DAVIS          Objection. Lack of
21  foundation.
22       A    I have very dedicated and knowledgeable
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                27

1    staff who work for me, whose job it is to know exactly

2    what the detention standards are and exactly how they

3    apply. And I know that they know that, which is what I

4    see my role as.

5        Q    And we'll get into the current OIDO staff in

6    more detail later, but can you just tell me generally

7    which staff you're referring to?

8        A    Mr. Ron Sartini.

9        Q    Okay. Anyone else?

10       A    Well, we'll just say Ron for now.

11       Q    Okay. And can you tell me, based on your

12   review of the table of contents, how many pages this

13   document appears to be?

14       A    468.

15       Q    And would you agree that that's an extensive

16   document?

17       A    Yes.

18       Q    Okay. And is it your understanding that many

19   immigration detention facilities are operated through

20   contracts with private prison companies?

21       A    I know of some of that that goes on.

22   However, I would not be able to get into any specific

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    32

1   speaking?

2        A    I would say that this has to do with the way

3   we intake complaints. So I think that one is decently

4   straightforward in that you have to have a process for

5   intaking and handling complaints.

6        Q    And what does it mean for that process to be

7   independent?

8        A    It means that OIDO has to decide,

9   independent of other entities, what to do with

10  complaints that are in-taken.

11       Q    And what would those other entities refer

12  to?

13       A    It could be DHS, it could be ICE, it could

14  be CBP, it could be any number of things. Okay.

15       Q    And how would that, from your understanding,

16  how would that process be neutral?

17       A    Just in that complaints that are taken in,

18  anybody's able to file a complaint. There's not

19  anything preventing anyone from filing a complaint.

20       Q    And how would that process be confidential?

21       A    In that we don't release information on

22  complaints.

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    33

```
 1        Q    Okay. And then turning to Section 205B2,

 2   establishing an accessible and standardized process

 3   regarding complaints against any officer or employee

 4   of U.S. Customs and Border Protection or U.S.

 5   Immigration and Customs Enforcement or any contracted,

 6   subcontracted, or cooperating entity personnel for

 7   violations of law, standards of professional conduct,

 8   contract terms, or policy related to immigration

 9   detention. Generally speaking, what does that mean to

10   you in practice?

11        A    I would say, generally speaking, this just

12   means having a system to intake complaints that is

13   accessible and easy.

14        Q    And what does accessible mean to you in this

15   context?

16        A    It means that it is able to be accessed by a

17   broad swath of people that it applies to.

18        Q    And what does standardized mean to you in

19   this context?

20        A    In this context, I would say uniform is a

21   good word to use.

22        Q    And then moving to Section 205B3, conduct
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    34

1    unannounced inspections of detention facilities

2    holding individuals in federal immigration custody,

3    including those owned or operated by units of state or

4    local government and privately owned or operated

5    facilities. Generally speaking, what does that look

6    like in practice to you?

7         A    Generally speaking, I would say that this

8    means that we conduct inspections. I know it says

9    unannounced, but I think that we have been doing

10   announced inspections based on dangers posed to

11   everyone involved at facilities at the moment.

12        Q    And we'll speak more about the inspection

13   process later, but are you also conducting unannounced

14   inspections or just announced inspections at this

15   time?

16        A    As far as I know, all of our inspections

17   thus far have been announced.

18        Q    Okay. And then moving to Section 205B4,

19   review, examine, and make recommendations to address

20   concerns or violations of contract terms identified in

21   reviews, audits, investigations, or detainee

22   interviews regarding immigration detention facilities

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    46

1      A    Can you explain what you mean by that or

2   repeat the question?

3   Q    So you mentioned earlier that you reviewed

4   the 2023 OIDO congressional report, is that correct?

5      A    Yes.

6      Q    And in that report, to memory, there is a

7   discussion of how case managers often maintained a

8   physical presence in the detention facilities, is that

9   correct to your knowledge?

10      A    Yes.

11      Q    So are you aware that, as part of their

12   practice, case managers often addressed complaints in

13   person in these facilities?

14      A    Yes.

15      Q    Okay. And would you agree that a quick

16   resolution of an issue in a detention facility would

17   be a success?

18         MR. DAVIS            Objection, vague.

19      A    I don't know if I would agree with that. I

20   would say that resolving the problem is more important

21   than it being resolved quickly. Yeah, I think

22   resolving something quickly is generally could be

CONFIDENTIAL

Transcript of Joseph Guy
Conducted on December 3, 2025                    47

```
1    considered a good thing.

2         Q    So you would agree that it would be

3    productive to resolve something quickly?

4              MR. DAVIS          Objection, vague.

5         A    Generally.

6         Q    Okay. And are you aware that prior to the

7    March 2025 RIF, OIDO made use of its continued

8    presence in detention facilities to ensure that the

9    recommendations made by other subcomponents like CRCL

10   were implemented?

11        A    I'm sorry, can you repeat that?

12        Q    Were you aware that prior to the March 2025

13   RIF, OIDO made use of its continued physical presence

14   in the detention facilities to ensure that

15   recommendations from other subcomponents like CRCL

16   were implemented?

17             MR. DAVIS     Objection, vague.

18        A    I was not aware.

19        Q    Okay. And I'm going to represent to you a

20   quote from the 2023 OIDO report. And that quote is

21   that by drawing on the trust OIDO earned from detained

22   people, as well as ICE and CBP personnel, OIDO was
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    53

```
 1        A      Not that I know of.

 2        Q      How many immigration detention centers are

 3   currently in operation, if you know?

 4        A      It's difficult to say exactly how many

 5   because my understanding is that they roll off and on,

 6   on a regular basis, but somewhere in the neighborhood

 7   of 200.

 8        Q      Okay. And if you know, what is their total

 9   capacity?

10        A      Do you mean how many people they can

11   potentially hold or how many people they currently

12   hold?

13        Q      How many people they can potentially hold.

14        A      I do not know.

15        Q      Do you know how many people are currently

16   detained by DHS in total?

17        A      Roughly 66,000 people.

18        Q      And do you know which three states currently

19   have the highest detention populations?

20        A      Not with any certainty.

21        Q      Okay. And do you know what the total

22   detention capacity was on March 20th, 2025?
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                           70

1    2025?

2         A    I think that Ron was there. I don't know

3    enough. I wasn't involved with the RIF, and I don't

4    really know exactly what happened.

5         Q    Okay. Are you aware that OIDO employees

6    subject to the RIF were instructed to not perform any

7    job functions, including winding down of operations or

8    transferring complaints after the RIF?

9         A    I was not aware of that.

10        Q    Are you aware that OIDO employees were not

11   permitted to communicate with anyone about upcoming

12   detention site visits?

13        A    I was not aware of that either.

14        Q    Are you aware that OIDO employees were not

15   permitted to create out-of-office email messages

16   explaining that they were placed on administrative

17   leave by the RIF?

18        A    I was not aware of that.

19        Q    Are you aware that OIDO employees were not

20   permitted to hand off their pending caseloads or make

21   plans to transfer current investigation tasks to

22   others?

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    71

```
1        A     I was not aware.

2        Q     Do you have knowledge of, or are you aware

3   of, the creation of any transfer or transition memos

4   during the RIF?

5        A     I do not.

6        Q     Okay, so I want to check on how you're

7   doing. Would you like to take a break, or would you

8   like to keep going?

9            MR. DAVIS            It's almost 12.

10       Q     It's almost noon.

11           MR. DAVIS             Up to you, if you want

12  to go further, go for lunch.

13       A     Yeah, I think I could go for lunch. Okay. Is

14  that alright with everybody?

15       Q     Okay, so let's go off the record. We'll take

16  a lunch break.

17           THE REPORTER       Back on record.

18       Q     Okay, so I'd like to shift gears and talk

19  about the post-RIF restructuring of OIDO. When were

20  you first approached, if you remember, to take on your

21  role at OIDO?

22       A     It must have been probably in the beginning
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    72

```
1    of May.
2         Q     And if you recall, who approached you?
3    A     Probably it would have been Troup Hemingway.
4         Q     And generally speaking, what were you told
5    about what your position would be?
6         A     I don't recall really being told too much. I
7    was told that, I would be appointed to be the acting
8    ombudsman, and that I would be working with Ron. And
9    then I think it was off to the races.
10        Q     And I believe that you don't recall the
11   exact date that you officially started, is that right?
12        A     No, I don't.
13        Q     Would you say it was sometime in mid to late
14   May?
15        A     Yes.
16        Q     And to your knowledge, did Ron Sartini
17   generally play a role in the restructuring of OIDO?
18        A     Yes, to my knowledge he did.
19        Q     And do you know when he became involved?
20        A     I don't know exactly.
21        Q     Was he already involved when you became
22   involved, or did he become involved after you became
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                        73

1    involved?

2            A     He was involved when I got involved.

3    Q    When or before?

4            A     Before.

5            Q     And what was the initial division of labor,

6    generally speaking, between yourself and Ron Sartini?

7            A     Ron ran all of the day-to-day operations and

8    got into details of all of the work. And I talked to

9    him a couple of times a week just to see if he had

10   any, anything to say or updates. He would update me on

11   kind of what he was thinking and what was going on.

12           Q     And could you estimate how many hours a week

13   you would meet with Ron Sartini?

14           A     Probably two. On average.

15           Q     And how would you describe your distinct

16   role apart from what Ron Sartini was doing at that

17   time?

18           A     I have much more high-level oversight as to

19   kind of what's going on, both-- at a broad level, and

20   he takes what we discuss and makes it actually happen

21   and implements.

22           Q     And would you say that that division of

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    74

1    labor is the same today?

2        A    Yes.

3    Q    And so would you say that the division of

4    labor has been consistent from when you were first

5    appointed in mid to late May until today?

6        A    Yes, I think so.

7        Q    Okay. And did you have a role in

8    restructuring any of the oversight bodies, OIDO,

9    CISOM, or CRCL?

10       A    No.

11       Q    Did you have a role in restructuring OIDO?

12       A    I guess if you're saying, I mean, just in a

13   kind of high-level, I know this is happening type job.

14       Q    And when would you say you first became

15   involved in the high-level restructuring of OIDO?

16       MR. DAVIS          I'm going to object to

17   the characterization of what's going on with the

18   office.

19       A    I'm sorry, what was that?

20       Q    Can you repeat your objection?

21       MR. DAVIS          Objection to

22   characterizing what's happening with OIDO as a

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                              84

```
1        Q    And then, to the right of Ron Sartini, you

2    have Contractors. Is that accurate?

3    A    Yep.

4        Q    And do you know how many Contractors are

5    currently working for OIDO?

6        A    I don't.

7        Q    Do you have an estimate?

8        A    No.

9        Q    Is it more or less than five Contractors?

10       A    If I had to guess, I would say less than.

11       Q    Okay. And then, underneath Ron Sartini, you

12   have ████    And who is-- What's the person's full name?

13       A    I think ████  last name is ████

14       Q    ████      And what's his role?

15       A    He is Ron's Chief of Staff.

16       Q    And Ron Sartini has other roles within DHS.

17   Is that right?

18       A    I believe that is correct.

19       Q    Do you know what his other roles are

20   currently?

21       A    He is the Acting Deputy CRCL Officer and the

22   Acting Citizenship and Immigration Services Ombudsman.
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                                    85

1        Q      And does ▮▮▮▮▮▮▮▮ also serve as Mr.

2   Sartini's Chief of Staff in his capacities at CRCL and

3   the CIS Ombudsman as well, to your knowledge?

4        A      I believe that is the case.

5        Q      Okay. And then, underneath ▮▮▮▮▮▮▮▮, we

6   have five positions under the title Law Enforcement

7   Assessor. Is that accurate?

8        A      Yes.

9        Q      Okay. And are those positions all currently

10  filled?

11       A      Yes.

12       Q      And that would refer to the two Detailees

13  and three full-time federal employees that you

14  mentioned earlier? Is that right?

15       A      Yes.

16       Q      Okay. And how would you describe the

17  position of Law Enforcement Assessor in terms of their

18  duties?

19       A      I would say that they are versatile and that

20  they handle a number of issues. They do anything from

21  managing complaints, functioning as case managers, and

22  functioning as detention facility inspectors. And I

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                89

```
1        Q    Okay. And just so I understand, we've

2   previously referred to them as law enforcement

3   specialists, law enforcement assessors. Those are the

4   same position. Is that accurate?

5        A    Did I say law enforcement specialist?

6        Q    I believe so, but I'm not certain. I just

7   want to be certain that we're talking about the same

8   position.

9        A    If I said law enforcement specialist, I'm

10  sorry. I meant law enforcement assessor.

11       Q    Okay. And how, I'm sorry, was your answer

12  that you did interface with them or you did not yet?

13       A    I have not yet.

14       Q    Okay. Do you have plans to interface with

15  these individuals?

16       A    I do.

17       Q    And how often do you anticipate meeting with

18  these individuals?

19       A    Ron and I have discussed maybe a monthly

20  meeting.

21       Q    Monthly meeting. But just so I understand,

22  there has not been a monthly meeting since these
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    90

1    individuals were hired in late summer. Is that

2    accurate?

3         A    That is accurate.

4         Q    Okay. Are there any software tools currently

5    being used at OIDO?

6         A    What do you mean by that?

7         Q    Any automation, any systems, databases that

8    are being used?

9         A    I'm sure that there is, but Ron Sartini

10   manages the details of that.

11        Q    Okay. And did you have a role in the fiscal

12   year 2026 budgeting process?

13        A    No.

14        Q    Do you have knowledge of who was involved in

15   that process?

16        A    Generally, I can say that I know it is a

17   combination of the White House Office of Management

18   and Budget and the Management Directorate, for the

19   most part, at DHS.

20        Q    And so you were not consulted in the budget

21   proposal. Is that accurate?

22        A    That is correct.

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    103

1   stricter controls on this actually is in the

2   detainee's best interest.

3        Q    And do you have knowledge of fraudulent

4   complaints being filed with OIDO in the past?

5        A    Not specifically, but I believe that it has

6   happened in the past.

7        Q    Do you have an estimation of how many times

8   it's happened in the past?

9        A    I do not.

10       Q    Would you say it's more or less than 20

11  times?

12            MR. DAVIS            Objection. Speculation.

13       A    I don't know that.

14       Q    Okay. And outside of the online portal, are

15  there any other methods to submit a complaint?

16       A    It has to be done through the portal, as far

17  as I know.

18       Q    And to your knowledge, how does a detained

19  person access the portal from inside a detention

20  facility?

21       A    They have access to the internet.

22       Q    So your understanding is that people in

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    104

1    detention have access to the internet? Is that

2    accurate?

3        A    Generally, yes.

4        Q    Are you aware that people in immigration

5    detention facilities do not have access to the

6    internet?

7        A    I'm not aware of that.

8        Q    Okay. So assuming that detained individuals

9    do not have access to the internet, from your

10   understanding, how would a detained person access the

11   OIDO portal?

12       A    They would be able to have their NGOs and

13   family that come in and visit detention facilities all

14   the time. And they would be able to do it through them

15   if they don't have access to the internet themselves.

16       Q    So hypothetically speaking, if a person is

17   not able to be visited by family or NGOs, because

18   they're detained in an isolated area or far away from

19   their family and community, from your understanding,

20   would they be able to file a complaint through the

21   OIDO portal?

22       A    It is my understanding that detainees, for

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    105

1    the most part in permanent facilities, have access to

2    the internet. That's my understanding.

3         Q    And what is that understanding based on?

4         A    Discussions with my team.

5         Q    Okay. And are you aware that prior to the

6    RIF, individuals in detention could submit OIDO

7    complaints by paper form?

8         A    I had heard that, yes.

9         Q    And are you aware that prior to the RIF,

10   individuals could submit OIDO complaints verbally to

11   an OIDO employee that was on site in the detention

12   facility?

13        A    Yes, I think I was aware of that.

14        Q    Do you know why OIDO eliminated all but the

15   online portal submission process for OIDO complaints?

16        A    The President directed efficiency, and in

17   the spirit of efficiency, we made the determination

18   that we would streamline and have complaints filed

19   through one singular web-based portal, where

20   instantaneously you have access to be able to see who

21   complained, and to do whatever the next steps are. You

22   have access, it's all in one place, you don't have

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    106

1  things getting tangled up, and the short answer is

2  efficiency.

3      Q    Okay. And was there analysis performed that

4  came to the conclusion that the online portal was the

5  most efficient way to process complaints?

6          MR. DAVIS            Objection. Deliberative

7  process privilege. The witness can answer at a high

8  level of generality, but not any specific analysis or

9  advice given.

10     A    I would say that there were.

11     Q    Were you involved in that analysis?

12     A    No.

13     Q    Do you know who was involved in that

14 analysis?

15     A    Mr. Sartini would have been.

16     Q    Okay. So just to be sure, you don't have

17 knowledge of what that analysis involved. Mr. Sartini

18 does. Is that accurate?

19     A    Yes.

20     Q    Okay. And if hypothetically detained people

21 in fact cannot access the online portal from inside a

22 detention facility, would you agree that that would

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    107

```
1    make complaints inaccessible to detained people?
2            MR. DAVISObjection, vague, and
3    speculation.
4        A    I don't want to speculate.
5        Q    Would you agree that accessible necessarily
6    requires being able to access the complaint portal?
7        A    Yes.
8        Q    Okay. And I'll represent to you that in the
9    2023 OIDO congressional report, the breakdown of how
10   complaints were submitted, of the 12,664 complaints
11   submitted in 2023, 11,453 were submitted in person,
12   and 282 were submitted by the online portal. Does that
13   change your assessment as to why only 37 complaints
14   were filed between March 21st and August 12th, 2025?
15           MR. DAVIS            Objection, lack of
16   foundation. He doesn't have the report to see the
17   context and also speculation.
18       A    No.
19       Q    Okay. And are you aware of whether an
20   individual can submit a complaint through the OIDO
21   portal in a language other than English?
22       A    I believe that the only language available
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                         108

1    right now is English.

2         Q      And so would you agree that if a person does

3    not speak English, a complaint system that can only be

4    accessed in English might be inaccessible to that

5    person?

6              MR. DAVIS              Objection, speculation,

7    and vague.

8         A      I don't want to speculate about that.

9         Q      Do you know if there are instructions posted

10   in the detention facilities that direct people to the

11   OIDO online portal?

12        A      I do not.

13        Q      Would you agree that in order to make a

14   complaint system accessible, there should be

15   information provided to detain people about how to

16   reach that portal?

17             MR. DAVIS              Objection, vague, and

18   speculation.

19        A      I would not like to speculate about that.

20        Q      Okay. And with regard to the OIDO complaint

21   portal being available only in English, are you aware

22   of any analysis that was taken in reaching that

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    151

```
1        A     I believe five.

2        Q     And would those five employees refer to the

3  law enforcement assessors?

4        A     As far as I know, yes.

5        Q     Do you have any knowledge of how those roles

6  are delegated amongst the five law enforcement

7  assessors?

8        A     No, Ron handles that.

9        Q     Okay. Do you have any knowledge of how many

10 inspections have occurred since you took your position

11 as acting ombudsman?

12       A     Yes.

13       Q     How many have occurred?

14       A     Twenty-two.

15       Q     Twenty-two since May, late May of this year?

16       A     That's correct.

17       Q     And who conducted those inspections?

18       A     One of our five law enforcement assessors

19 would have been the person at each of the 22

20 inspections.

21       Q     Okay. So there was one law enforcement

22 assessor at each inspection. Is that correct?
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    152

```
1        A     That is my understanding.

2        Q     Okay. And do you know among those 22

3   inspections, were any of those inspections

4   unannounced?

5        A     As far as I know, they were all announced.

6        Q     And do you have knowledge of what analysis

7   was conducted to determine where those inspections

8   were to take place?

9              MR. DAVIS          Objection, deliberative,

10  process privilege. You can answer generally, but not

11  about specific analysis done.

12       A     Generally, the trends and complaints coming

13  in and reporting.

14       Q     Were you part of that analysis?

15       A     I was not.

16       Q     Who conducted that analysis?

17       A     I don't know for certain, but I'm certain

18  that Ron Sartini knows.

19       Q     Okay. And have there been any unannounced

20  inspections conducted since May 2025?

21       A     I'm sorry, didn't you ask that question

22  already?
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                                    155

1    qualified to be doing them.

2        Q    And are you directly involved in any of the

3    training or briefing of the law enforcement assessors

4    related to inspections?

5        A    Not at this time.

6        Q    And who is in charge of that? Would that be

7    Ron Sartini?

8        A    I think so.

9        Q    And how, to your knowledge, are the

10   inspectors supervised?

11       A    I'm not familiar with the cadence and the

12   methods that Ron and Chief of Staff ███ employ to

13   supervise the law enforcement assessors, but I know

14   that they do it.

15       Q    Do you have any knowledge as to the quality

16   control of inspections?

17       A    What do you mean by quality control?

18       Q    Ensuring that they are consistent.

19       A    I don't know specifics.

20       Q    Is it your testimony that one law

21   enforcement assessor conducts each inspection? Is that

22   accurate?

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                      156

1        A      As far as I know, yes, that's accurate.

2     Q      Could you walk me through, to your

3     knowledge, what an inspection consists of?

4        A      To my knowledge, not being on the ground, an

5     inspection is essentially a full work day where an

6     inspector goes to a detainment facility and they have

7     access to records, detainees, rooms, timesheets, and

8     they go through all these various things at their

9     discretion and inspect against relevant standards.

10     Q      And to your knowledge, how long, generally

11     speaking, does an inspection take?

12     A      One full work day, generally.

13     Q      Would that be generally eight hours?

14     A      I think so, yes.

15     Q      And as part of the inspection, to your

16     knowledge, does the inspection speak with detained

17     people?

18     A      Yes.

19     Q      And do you have any knowledge of how the

20     inspector determines which people to speak with?

21     A      It could be based on a complaint, but I

22     think there's a fair amount of discretion that the law

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                              165

1       A    The ones that were made in 2023 and 2024?

2    Policy recommendations? No.

3       Q    Do you have knowledge of how many

4    recommendations were issued between March 20, 2025,

5    and the date that you became the acting ombudsman of

6    OIDO?

7       A    I am not.

8       Q    Do you have any knowledge of how many

9    recommendations have been issued since you became the

10   acting ombudsman of OIDO?

11      A    I don't think any specific policy

12   recommendations have been issued yet.

13      Q    And to your knowledge, who in the current

14   OIDO staff would be responsible for drafting and

15   implementing those recommendations?

16      A    I have to have a discussion with Mr. Sartini

17   about that.

18      Q    Is there currently any process for issuing

19   recommendations?

20      A    There is not that I know of.

21      Q    So the next statutory obligation that you

22   testified about was assisting individuals affected by

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    168

1  process. Privilege. You can answer generally, but not

2  about specific analysis conducted.

3      A    It was likely based on the trends that we've

4  seen in the data and maybe coordination with things

5  that we've seen from the ICE and CBP.

6      Q    Do you have any knowledge to estimate what

7  percentage of time the five law enforcement assessors

8  are spending inside detention facilities?

9      A    Well, I know that before the shutdown, we

10 had done three inspections, and since the shutdown

11 ended, we have done 19. So they've spent a fair amount

12 of their time in these facilities in the last couple

13 of weeks. I don't know how to put a percentage on

14 that, but it's certainly, they've been doing a lot of

15 work over the last few weeks.

16     Q    And do you know where these five law

17 enforcement assessors are based?

18     A    Not specifically, but I know that they're in

19 areas with high concentrations of detention facilities

20 right now.

21     Q    Okay. Is it your opinion that these law

22 enforcement assessors are assisting individuals during

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                                    176

1    annual report to Congress. Would you agree that that's

2    a statutory function of OIDO?

3        A    Yes.

4        Q    What is the current status of the 2024 OIDO

5    report to Congress?

6        A    It is being drafted.

7        Q    And who is participating in the drafting of

8    that report?

9        A    Mr. Sartini and, from what I'm told, law

10   enforcement assessors.

11       Q    Will you be involved in the review of that

12   report?

13       A    Yes.

14       Q    Do you have knowledge of the anticipated

15   timeline for the finalization of that report?

16       A    I do.

17       Q    What is the anticipated timeline?

18       A    I think because of the shutdown, all yearly

19   congressional reports were extended for 45 days or

20   something like that. And we are planning on having the

21   report done and submitted at the latest mid-February.

22       Q    And, to your knowledge, will that report be

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    177

1    made publicly available?

2        A    I believe it will.

3        Q    In addition to issuing annual reports to

4    Congress, what other communication with Congress does

5    OIDO currently do?

6        A    I do not know.

7        Q    Have you, since your time as Acting

8    Ombudsman of OIDO, received any inquiries from members

9    of Congress?

10       A    No.

11       Q    If you were to receive an inquiry from a

12   member of Congress, what would be the process for

13   responding to that inquiry?

14       A    I would call my colleague, the Acting

15   Assistant Secretary for Legislative Affairs at DHS,

16   Dillon McGregor. And I would let him know that this

17   person reached out. And then I would probably talk to

18   others at the department who are on the executive team

19   and let them know that this happened. And make a

20   determination on what to do from there.

21       Q    I'm going to introduce another exhibit. What

22   are we at? 47?

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                178

1          MS. GILBRIDE                48. Is this one we

2   used yesterday?

3      Q    Yes, actually it is. It's the July 18th

4   letter. Do you remember what that number was?

5          MS. GILBRIDE                Maybe we should

6   just reintroduce it because I'm not certain. I believe

7   it was 21, but let's just reintroduce it.

8      Q    Okay, so this will be 48. Did you introduce

9   those?

10

11         MS. GILBRIDE                They were

12  consecutive with each other. I'll be able to figure it

13  out. I'll look at my exhibit list from yesterday.

14  It was 22 and 23.

15     Q    Okay, do we want to re-number it?

16         MS. GILBRIDE                If it's not a

17  hassle.

18     Q    Can we re-number this exhibit 22? Thank you.

19  Have you seen this document before?

20     A    No.

21     Q    So I will represent to you that this is a

22  letter from July 18th, 2025. Based on your review of

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                          179

1    the document, what does this document appear to be?

2         A    A letter from Senators Gary Peters, Patty

3    Murray, and Richard Durbin asking for five things from

4    the Secretary of Homeland Security having to do with

5    these oversight offices.

6         Q    And would you agree that OIDO is referenced

7    in this letter?

8         A    Yes.

9         Q    And that information is requested pertaining

10   to OIDO?

11        A    Yes.

12        Q    And would you agree that you were the acting

13   ombudsman at the time this letter was submitted?

14        A    Yes.

15        Q    But your testimony, just to be sure, is that

16   you've never yourself reviewed this letter?

17        A    That's true.

18        Q    Do you have any knowledge of who is

19   responding to this letter?

20        A    I would imagine OLA is coordinating, but I

21   don't know for certain.

22        Q    And the letter appears to request the

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                                    180

1    information by July 31st, 2025. Would you agree?

2         A    Yes.

3         Q    And to your knowledge, has a response been

4    submitted?

5         A    Not to my knowledge.

6         Q    Okay. I'm going to introduce another

7    exhibit, which will be 23. Have you ever seen this

8    document before?

9         A    No.

10        Q    I will represent to you that this is a

11   letter dated August 8th, 2025. Based on your review of

12   this document, what do you understand this document to

13   be?

14        A    It is a letter addressed to Mr.

15   (indiscernible), Mr. Hemingway, and myself, requesting

16   a number of hitbacks, nine of them to be exact, by a

17   number of members of Congress.

18        Q    And to be clear, you've never seen this

19   letter before, is that correct?

20        A    No.

21        Q    Do you have knowledge of who from your

22   office would have reviewed this letter, if anyone?

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                    181

```
1        A    I think Mr. Sartini would likely know.

2        Q    And would Mr. Sartini typically consult you

3   with regard to these types of letters?

4        A    We have not discussed this letter or other

5   congressional letters. Typically, letters are the

6   congressional correspondence is handled by the Office

7   of Legislative Affairs.

8        Q    And would you consider this letter to be a

9   congressional inquiry?

10       A    I would.

11       Q    And would you agree that the letter appears

12   to request certain categories of information by

13   September 5th, 2025?

14       A    It does say that.

15       Q    And to your knowledge, has any response been

16   provided?

17            MR. DAVIS              Objection, lack of

18   foundation.

19       A    I would have to go look into it.

20       Q    And to your knowledge, who in your office

21   would be involved in putting together a response to

22   this type of congressional inquiry?
```

CONFIDENTIAL
Transcript of Joseph Guy
Conducted on December 3, 2025                              182

```
1        A    Ron and the law enforcement assessors.

2        Q    I think we can go off to record.

3     THE REPORTER        We're back on the

4     record.

5        Q    So, Mr. Guy, you testified that the next

6     annual congressional report is going to be published

7     in mid-February 2026. Is that accurate?

8        A    I think we are aiming for mid-February at

9     the latest.

10       Q    And to clarify, is that going to be the 2024

11    annual report?

12       A    No, I don't believe so.

13       Q    Which year annual report will that be?

14       A    This past year.

15       Q    2025?

16       A    Yes.

17       Q    Do you know what the status of the 2024

18    annual report is?

19       A    I have discussed that with Ron, and he told

20    me that he has not been able to find anything to do

21    with that report.

22       Q    Okay, so you have no additional knowledge on
```