UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | Civil Action No. 25-1270-ACR |

**SUPPLEMENTAL DECLARATION OF MARGARET CARGIOLI**

I, Margaret Cargioli, declare as follows:

1.      I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues.

2.      I am the Directing Attorney of Policy and Advocacy at Immigrant Defenders Law Center (ImmDef).  I have held this role for three and a half years and have worked at ImmDef since 2019.  I previously submitted a declaration in this case in support of Plaintiffs' Motion for a Preliminary Injunction.  I provide this supplemental declaration to report on additional events that have occurred since my first declaration dated May 2025.

1

3. ImmDef is a social justice law firm based in southern California that defends immigrant communities against injustices in the immigration system. Currently, ImmDef is composed of 177 staff members, including 83 lawyers. We represent approximately 3,100 noncitizens annually in their removal proceedings and provide other legal services to approximately 33,000 additional noncitizens.

4. ImmDef is a member of the Southern Border Communities Coalition, an organizational plaintiff in this case.

5. When employees of the DHS Office for Civil Rights and Civil Liberties (CRCL) and Office of the Immigration Detention Ombudsman (OIDO) were placed on administrative leave on March 21, 2025, ImmDef had complaints pending with both offices. To date, we have not received further correspondence from the agencies concerning the status of those pending complaints.

6. On September 18, 2025, ImmDef filed a complaint with both CRCL and OIDO regarding the deplorable conditions at several immigration detention facilities throughout Southern California that ImmDef lawyers observed directly while visiting these facilities and learned about in greater detail through conversations with their detained clients. Our complaint explained that detainees in several overcrowded facilities were relegated to sleeping on cold floors without blankets or on cold metal benches, that people went for days without access to showers or clean clothes and had to drink out of bathroom sinks because no potable drinking water was provided, and that inadequate staffing led to widespread medical neglect. The complaint also documented multiple instances of people with serious cognitive impairments being coerced into signing voluntary departure orders without access to counsel, a practice that raises serious due process and

disability discrimination concerns.  A true and correct copy of this complaint is attached to this declaration as Exhibit A.

7.    To date, ImmDef has received no acknowledgement or response from either CRCL or OIDO to this complaint submitted on September 18, 2025.

8.    On October 23, 2025, an ImmDef staff attorney filed a complaint with CRCL and OIDO via their online portals about conditions at Adelanto ICE Processing Center-West in Southern California. Their client had not been given outdoor yard time for about a month. To date, ImmDef has received no response from either CRCL or OIDO.

9.    ImmDef attorneys who previously filed complaints with CRCL and OIDO or who previously requested assistance from the CIS Ombudsman's Office stopped doing so since March 21, 2025, when the administration announced it was dismantling the agencies.  We have heard from attorneys in the immigration advocacy legal community that these offices are no longer responding substantively to complaints. As a result, many of my colleagues have concluded that filing complaints with these offices is no longer an effective use of their limited time and that they should instead focus on other forms of client advocacy.

10.    ImmDef previously attended public engagement events held by CRCL such as webinars that discussed the systemic civil rights issues they were investigating, and reviewed materials on CRCL's website about the investigations they were conducting and the recommendations they had made to Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE).  We found these public engagement events and online materials valuable because they gave us insight into what issues CRCL was prioritizing for investigation. When we encountered examples of those types of violations in our representation of our clients, we would be more likely to send a complaint about that issue to CRCL.  For instance, CRCL would

3

hold "listening sessions" with stakeholders to gather information about on-the-ground issues that immigration advocates were encountering across the country.  When new programs were launched, CRCL would hold meetings with stakeholders to provide insight on how programs would function and whom to contact as to certain issues. For example, on April 16, 2024, ImmDef attended a meeting titled, "Overview of the Case Management Pilot Program (CMPP)," which DHS was implementing in Los Angeles, California, among other cities.  Because these types of presentations, listening engagements, and webinars have ceased under the current administration, stakeholders lack insight into agency priorities and their responsiveness to emerging civil rights and abuse concerns.

11.    Presentations and other community outreach sessions led by CRCL and OIDO provided immigration attorneys and advocates valuable information about the types of matters that could be addressed by these agencies. Previously, meetings with CRCL and OIDO allowed ImmDef to obtain staff contacts to whom we could report urgent immigration violations. Today, such direct contact information is no longer publicly available, making it difficult to directly reach these agencies' staff. This lack of access has hindered our ability to advocate for our detained clients.

12.    Since March 21, 2025, CRCL has not published on its website any investigation memos, recommendation memos, or other new information about its areas of focus, nor has it conducted any webinars or public engagement events.  ImmDef is in the dark about what, if anything, CRCL is investigating and cannot send information about those priority issues to CRCL's attention when we encounter relevant examples in our practice, as we had done in the past.

13.     The immigrant communities ImmDef represents are in dire need of legal assistance because mass detention and deportation are a primary goal of the Trump administration and there has been a record-level 32 deaths in ICE custody in 2025.[1]  To meet these urgent needs, ImmDef attorneys are using all available legal and advocacy strategies.  However, we no longer find reaching out to CRCL, OIDO or the Ombudsman's office for assistance as a reliable option to help our clients.  Though these offices may still exist on paper, from our perspective as community stakeholders, they are no longer functional.  Consequently, there are even fewer options for preventing abuse—and possibly even death—in immigration detention than there were a year ago, and it has become increasingly difficult for ImmDef lawyers to serve their clients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 14, 2026

_____
Margaret Cargioli

---

[1] Maanvi Singh, Coral Murphy Marcos, and Charlotte Simmonds, "2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody". (The Guardian, January 24, 2026) https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline.

Exhibit A



September 18, 2025


via email and online portals

CRCLCompliance@hq.dhs.gov
Office for Civil Rights and Civil Liberties, Compliance Branch
U.S. Department of Homeland Security
OIDOPolicy@hq.dhs.gov
Office of the Immigration Detention Ombudsman, U.S. Department of Homeland Security



**Re: CRCL and OIDO Complaint on the Deterioration of Conditions in Immigration Detention in Southern California since June 6, 2025**



A. <u>**Introduction**</u>

Since June 6, 2025, Immigration and Customs Enforcement (ICE) has conducted unprecedented raids on immigrant communities in the Southern California area. ICE has also detained these individuals en masse without providing them with adequate access to necessities such as food, water, medicine, and beds. ICE has targeted hard-working immigrants in locations such as Home Depots, carwash sites, garment factories, and other workplaces throughout Southern California, conducting warrantless arrests often made by masked individuals in unmarked vehicles. Most of the immigrants arrested have no criminal history and have resided in the United States for decades.

Immigrant Defenders Law Center ("ImmDef") and its team of attorneys have been on the ground responding to this crisis. Since June 6, 2025, ImmDef attorneys have conducted intakes with many noncitizens detained at B-18 in Downtown Los Angeles, as well as the Adelanto ICE Processing Center, Desert View Annex, Otay Mesa Detention Center, and Santa Ana holding facilities. B-18 is an ICE basement holding area in a federal building in downtown Los Angeles, which is supposed to be a short-term holding area. Adelanto ICE Processing Center is a detention facility in San Bernardino County, California. Otay Mesa Detention Center is an ICE detention center operated by Core Civic in San Diego County. ICE has also been holding individuals in a federal building in Santa Ana meant for short-term processing.

Through interviews with detainees, ImmDef has documented deplorable conditions at these sites. Detainees at several facilities have complained of extreme overcrowding, as well as a lack of adequate food, water, sanitation, and medicine. Additionally, ImmDef has witnessed government authorities denying detainees access to counsel or severely limiting access to counsel.

### A. **B18**

During the ongoing raids, ICE has been taking individuals who are swept up en masse to the basement of the federal immigration building at 300 North Los Angeles Street in downtown Los Angeles, commonly known as "B-18." B18 is run by ICE, but the facility is staffed by a local federal contractor. It is a facility designed to hold a limited number of individuals temporarily so they can be processed and released into the community, or processed and transported to a long-term detention facility. It does not have beds, showers, or medical facilities. Nevertheless, ICE has used B18 as a makeshift detention center. While most individuals have been held at B18 for 24-48 hours, ImmDef has documented at least six cases of individuals being detained at B18 for a week or longer.

### 1. *Conditions at B-18*

Detainees have reported that conditions at B-18 are deplorable. The basement does not have any windows, beds, or showers. Since there are no beds or cots, detainees are expected to sleep in cold rooms on the floor without any bedding. There are also only two toilets, and many people complained that the bathrooms were unsanitary and covered in urine, fecal matter, and vomit. Individuals reported that they lacked the ability to brush their teeth. Detainees were often held for days at a time and forced to wear the same soiled clothes that they wore when they were initially detained. Numerous individuals reported that the conditions felt freezing and raised complaints regarding the excessive cold. Many detainees requested blankets or sweaters from B18 staff, but these amenities were not available. In one case, a B18 officer provided his own jacket to a child who was shivering inside the facility.

Many individuals also complained about inadequate food and water. Detainees were not given potable drinking water and as a result were forced to drink water from the bathroom sink. Meals were also severely inadequate and were served at irregular hours such as at 2 a.m. Meals often consisted of a burrito, chips, and a drink. Other times the detainees were given snacks instead of meals, such as crackers and juice.

### 2. *Access to Counsel Issues at B-18*

Access to counsel is limited at B-18. In the first few weeks of the ICE raids in Los Angeles, ImmDef attorneys had to wait hours to meet with one or two individuals. There are only two attorney visitation rooms, so there has been a backlog of attorneys waiting to meet with individuals. Detainees were permitted only a few minutes to make a phone call, which was typically limited to contacting family members. They were not provided with a list of pro bono legal service providers and were not permitted to make phone calls for the purpose of seeking legal counsel. Access to counsel was further restricted by the imposition of unnecessary

obstacles. For example, facility staff sometimes required attorneys to provide documents such as a signed G-28 or an individual's A-Number before permitting communication, both of which were not legally necessary. Such restrictions had the effect of impeding and delaying access to counsel. By August 2025, after the imposition of a temporary restraining order requiring the facility to ensure access to counsel, attorney access had improved in some ways.

3.  *Detainee Stories*[1]

- In early June, an ImmDef attorney spoke with Ashley, who was held in B18 for nearly 72 hours and did not receive food for 14 hours. She then was provided food at irregular hours, such as 1:00 a.m. and 4:00 a.m. She reported that the food was inadequate, and she was given burnt burritos. She shared that detainees slept on the cold floor with no blankets or on a flat metal bench. Since no blankets were provided, she had to bang on the door to ask for a sweater. She and the people she was detained with were not provided with drinking water but instead had to drink water from the bathroom sink. She had to beg for toilet paper. Despite suffering from high blood pressure, the staff did not allow her family to deliver her prescription medication.

- Owen met with an ImmDef attorney and described that he was held at B-18 for over 24 hours and only received one meal consisting of a burrito, chips, cookies, and juice. There were only two bathrooms for approximately 50-75 people detained at one time. He was allowed a brief three-minute call to his wife at 3:00 a.m. but was not permitted to speak with an attorney.

- In late June 2025, ImmDef met with Marcus, a schizophrenic detainee who reported not receiving his antipsychotic medication. Detention staff refused him access to his oral medications because they were stored with his personal property.  When his attorney requested that staff provide his medications, the officer stated that detainees must remind staff to receive medication. Marcus was described as mentally incompetent and actively experiencing psychosis, making such self-advocacy unreasonable.

- Lucas reported to an ImmDef attorney in June 2025 that he had to sleep on the ground without pillows or blankets while guards would nudge or kick detainees to move them out of the way. He reported being fed only twice a day on an inconsistent schedule, usually receiving a burrito, sometimes water or milk, and small snacks, like chips, cereal, or crackers.

- In late June 2025, Nathan informed an ImmDef attorney of being held in overcrowded, unsanitary conditions for over five days with about 60-90 other people, where bathrooms were covered in pubic hair and fecal matter. There was no access to showers, clean clothes, or hygiene supplies for at least five days. He reported sleeping on the floor with no bedding, receiving only bags of chips three times a day. Nathan described neck and throat pain from being choked by ICE agents and, as a result, he had difficulty eating but was refused medical attention because there was no medical team on site.

---

[1] Pseudonyms are used in the place of all detainee names to protect confidentiality.

- In July 2025, Victor reported needing medication for a heart condition, but when his brother came to the facility to deliver it, staff made his brother wait outside for four to five hours before accepting the medicine.
- In July 2025, ImmDef spoke with Samuel who reported sleeping on the ground for five days without access to a shower while officers barely provided any food. He stated that most of the detainees were developing allergies and getting sick with fevers.

## B. <u>Adelanto ICE Processing Center</u>

The Adelanto ICE Processing Center is an immigration detention center located in the high desert in Riverside County, California. It is the largest immigration detention center in California with approximately 1,900 beds. The detention center is operated by a private company called GEO Group. Due to an injunction related to COVID and the facility's poor track record of handling that health crisis, a federal court limited the number of individuals who could be held at Adelanto. That injunction expired in April 2025, and ICE immediately started to re-fill the detention center. In May 2025, there were only 300 detainees, but due to the ICE raids in Los Angeles, the population quadrupled to nearly <u>1,400</u> by the end of June 2025.[2] GEO Group was not equipped to handle this large influx of detainees and struggled to meet the basic needs of detainees, including the provision of adequate food, water, medicine, sanitation, and beds.

### 1. *Conditions at Adelanto ICE Processing Center*

Conditions in detention have severely deteriorated since the massive influx of detainees that started in June 2025. Through intakes with new arrivals, ImmDef has documented complaints of severe overcrowding, with detainees being forced to sleep on the floor in common areas. Several individuals reported that the processing room they were initially held in at Adelanto was extremely hot, particularly during the peak summer months of 2025. The room reportedly lacked adequate ventilation, and some individuals indicated that the heat was so severe that men removed their shirts in an effort to cool down.

Conditions are also unsafe and unsanitary because GEO staff have been unable to provide adequate sanitation for the facility and medical care for the new arrivals. ImmDef spoke with detainees who suffered from medical conditions such as high blood pressure, diabetes, and heart problems, but who were denied medications brought by their families. The sanitation of the common areas, such as the bathrooms and kitchen, has reportedly been very poor since there are insufficient GEO staff to clean the facility. Many individuals reported that they were not given a clean uniform and were forced to wear the same soiled clothes they arrived in for 10 days or more. Some of these individuals were forced to wear for many days the same underwear they arrived in.

---

[2] "They Treat Us Like Dogs in Cages: Inside the Adelanto ICE Processing Center," Disability Rights California, July 17, 2025, https://www.disabilityrightsca.org/drc-advocacy/investigations/inside-the-adelanto-ice-processing-center.

Many of the detainees complained of inadequate food and drinking water at Adelanto. Several individuals told ImmDef that they were served meals very late in the day and were provided with small portions that were insufficient. Many people also complained of poor food quality that was inappropriate for people with conditions such as diabetes. Several individuals complained about the lack of adequate drinking water at Adelanto. For example, detainees complained that they once went 14 hours without potable filtered drinking water, which is served in the common areas. During this time, they were forced to drink water from the bathroom sinks. The water that comes from the bathroom sinks is reportedly cloudy and has a bad taste, which makes potable drinking water a necessity for the facility.

2. *Access to Counsel Issues at Adelanto ICE Processing Center*

Since June 2025, ImmDef has conducted several legal intakes of new detainees at Adelanto ICE Processing Center. In the first few days after the raids started on June 6, ImmDef attorneys were not allowed to visit with any detainees since GEO staff said they were still processing many individuals. Access to counsel has also effectively been curtailed by the lack of meeting spaces for confidential attorney-client visitation. GEO staff also told ImmDef that they did not have sufficient staff to accommodate walk-in attorney visits. As a result, in the first few weeks of the ICE raids, ImmDef attorneys often had to wait hours at time just to meet with one individual. One detainee reported that upon his arrival in Adelanto, he asked GEO staff if he could reach out to his lawyer, but he was not permitted to make such a phone call for two days. Lack of access to counsel violates a detainee's due process rights. Many of the new arrivals had imminent hearing dates and thus prompt access to counsel was especially critical.

3. *Detainee Stories*
   - At the end of June 2025, Alexander met with an ImmDef attorney and shared that he had been arrested at the Santa Ana Immigration Court where he had been held until 2:00 a.m. when he was transported to Adelanto ICE Processing Center in the middle of the night. Due to a lack of staff to process him at that late hour, he was forced to sleep for six hours in the van in the parking lot until the Adelanto facility opened at 8:00 a.m.
   - In early June 2025, ImmDef spoke with Wesley, who had been held in a room with about 80 other men, waiting up to 14 hours before he was provided water. He described the food as inedible and said there was no way to raise concerns or file a complaint.
   - An ImmDef attorney met with Vivian at Adelanto ICE Processing Center in June 2025. Vivian, who suffers from diabetes and other medical conditions, relayed that the detention staff would not allow her family to deliver necessary medications to her. As a result, she had not taken her medication for six days.
   - Michael, a cancer patient, was detained at B18 and staff refused to release him for his scheduled chemotherapy appointment. Sadly, he missed his chemotherapy appointment. However, after persistent advocacy by an ImmDef attorney who presented evidence of his medical condition, ImmDef finally secured Michael's release so he could resume his chemotherapy.

### C.  <u>Desert View Annex</u>

Desert View Annex is a separate detention facility located on the same premises as Adelanto ICE Processing Center. It is also run by the GEO Group. As of June 2025, the facility was at capacity, with 750 detained individuals.

### 1.  *Conditions at Desert View Annex*

Conditions at Desert View Annex have also been deplorable. In a letter authored by 85 individuals currently detained at the Desert View Annex, detainees described being confined in overcrowded cells, served cold and spoiled food, denied clean drinking water, and subjected to severe medical neglect. *See* Exhibit A.  Some detainees complained they have been confined to their cells for 22 hours a day with only one hour of yard time every other day. "We are dying and in desperate [need] for [help]," one detainee wrote. Another added, "You really need to be dying before [medical staff] can see you."

### 2.  *Access to Counsel Issues at Desert View Annex*

Detainees also complained about access to counsel issues at Desert View Annex. ImmDef attorneys sometimes had to wait hours to conduct an intake with a new arrival. This facility has only two attorney visitation rooms, which severely hinders a detainee's ability to meet with their lawyer. There were significant delays in commencing attorney-client meetings. Attorneys were required to wait until either of the two rooms were available before they could conduct an in-person visit with their client, which often resulted in prolonged wait times.

### 3.  *Detainee Stories*

- ImmDef spoke with Stephen, who had been held in the booking area of the facility for two days, which is twice the 24-hour limit, in extremely hot conditions. He has diabetes and was given insulin shots only on the first day of his detention. On the second day, he suffered from extremely high blood pressure and nausea because he was denied his medication.

### D.  <u>Otay Mesa Detention Facility</u>

### 1.  *Conditions at Otay Mesa Detention Center*

ImmDef has documented severe overcrowding and systemic medical neglect at Otay Mesa Detention Center (OMDC).  OMDC is in San Diego County, California, and is run by Core Covic. Detainees are confined to cramped rooms housing 10 to 13 people, despite the availability of only 8 beds, forcing many to sleep on the floor. Unsanitary conditions and constant exposure to harsh air conditioning have led to illness among detainees. A report by the California Attorney General's Office also identified significant medical and mental health neglect, noting:

"Inadequate staffing impacted the quality of services available for both mental health and medical care, which in turn resulted in detainees feeling that care was ineffective. Mental health services were particularly limited due to insufficient staffing."[3]

Additionally, ImmDef client Andry Jose Hernandez Romero, one of over 250 Venezuelan men sent to CECOT in El Salvador, reported experiencing both physical and sexual abuse by staff while detained at Otay Mesa. In a recorded interview, he recounted[4]being assaulted by guards, stating that they left his "integrity on the ground," a phrase reflecting the deep psychological and physical trauma he endured during his detention.[5]

### 2. *Access to Counsel Issues at Otay Mesa Detention Center*

Attorneys representing detainees at OMDC reported significant barriers to attorney access, which negatively impacted their ability to prepare their client's cases for court. Lawyers frequently struggled to reach clients, noting that it was nearly impossible to make phone contact with detainees. In some cases, detainees were transferred to other facilities without notification to their attorneys, which undermined the attorney-client relationship since many attorneys were then forced to represent their clients remotely. Attorneys routinely must wait hours to visit detainees in person, and they are not allowed to bring in cell phones or their laptops, which results in limited productivity for attorney visits. Staff at the facility often inform attorneys they cannot see their clients without an appointment or an ICE security clearance and turn them away, even though in-person attorney visitation without an appointment is technically permissible at the facility.

### 3. *Detainee Stories*

- ImmDef spoke with David, who got a rash all over his body from the dirty uniform he was provided. The medical unit told him they did not have any anti-rash cream. When he continued to ask for treatment for the rash, he was sent to the mental health unit and offered sleep medication.
- Eric reported that several people in his unit were not being provided critical medications on a regular basis, including a man with epilepsy, several men with hypertension, and one man with hallucinatory psychosis. Medical staff provided the medications on some days, indicating they knew of the conditions and the prescribed treatments. However, on other days the medical staff never delivered

---

[3] California Attorney General's Office, *Immigration Detention in California: 2025 Report* (Sacramento: California Department of Justice, April 16, 2025), 133, https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf.

[5] "Venezuelans describe being beaten, sexually assaulted and told to 'commit suicide' during El Salvador detention" July 28, 2025, https://www.nbcnews.com/news/us-news/venezuelans-cecot-el-salvador-returned-abuse-rcna220924

---

the medications, with no explanation. He also reported one detainee in his unit who was confined to a wheelchair and was unable to access the chow hall. It was only due to the other detainees that this man was provided food because staff refused to transport him to the chow hall or bring his meals to his unit.

- Many detainees reported having only a few minutes to eat their meals and feeling hungry after the meal. Only those with commissary funds were able to obtain sufficient amounts of food.

- At least ten to eleven men were confined to cells designed to hold eight individuals. As a result, several detainees have been required to sleep on the floor. Several of those individuals reported that they have fallen ill from having to sleep on the cold floor without any bedding.

- Conditions for women held at OMDC have also deteriorated. ImmDef spoke with one woman, Mary, who was detained at OMDC for almost a year. During that time, Mary suffered from chronic health conditions including high blood pressure and pain in her leg that required surgery. Mary never received treatment for her leg while she was at OMDC, and the treatment she received for her high blood pressure was inadequate. Her medication or dosages would often be changed without her consent and without any explanation for the change. Mary also experienced multiple instances of sexual harassment within the facility. However, when she tried to report this complaint to ICE, they failed to investigate it and accused her of fabricating the incident to get out of detention. Shortly thereafter, ICE retaliated against Mary for reporting sexual harassment by transferring her to a detention facility in Georgia, far from her legal counsel and family.

### E. Santa Ana ICE Field Office

The Santa Ana ICE Field Office is located at 34 Civic Center Plaza. Immigrants attend ICE check-ins at this facility. It is not a detention center but, as of August 2025, ImmDef attorneys learned that some individuals who were arrested by ICE were temporarily detained in the basement of the Santa Ana facility.

*1. Conditions at the Santa Ana ICE Field Office*

As of August 2025, ImmDef attorneys have not been able to meet with detainees held in the basement of the Santa Ana ICE Field Office to obtain information about conditions there.

*2. Access to Counsel Issues at Santa Ana ICE Field Office*

In August 2025, ImmDef attorneys learned that two vulnerable individuals were detained at the Santa Ana Field Office. Both attorneys were initially denied access to meet with these individuals and were told by staff that there were no meeting rooms because the building was a processing facility. After requesting to speak with a senior ICE officer, one attorney was able to meet with a high-risk pregnant woman who was detained at the facility. The other attorney attempted to meet with an 18-year-old young man who had recently been detained to provide a legal consultation, but the ICE officer denied her access and told her that they had no attorney

visitation rooms. When the attorney requested to meet with the young man in any part of the facility, the ICE officer said that she could not take her to the basement where other detainees were being held. Finally, when the attorney directly asked the ICE officer if she was denying his right to counsel, she answered yes.

### F. Examples of ICE coercing persons with severe cognitive or mental disabilities into taking voluntary departure

Since June 2025, ImmDef has also learned that many immigrants have been coerced into signing voluntary departure orders or otherwise agreeing to self deport. This practice is especially troubling when it comes to individuals with mental disorders or disabilities. ImmDef has documented at least two cases in which ICE coerced individuals with serious cognitive or mental health impairments into signing voluntary departure orders, in violation of their constitutional due process rights.

For example, in June 2025, an individual named Jeremy who is under a legal conservatorship was coerced into signing a voluntary departure order and quickly deported to Mexico. Jeremy is under conservatorship by his siblings due to a significant mental disability. He is minimally verbal and carried a laminated card with his name and emergency contacts. Due to his disability, he is unable to recall basic biographical information such as his age or date of birth, and he incorrectly believed that he did not live in the United States. Although ICE stated that they conducted a medical intake, they failed to identify clear indicators of his cognitive impairment. As a result, Jeremy was pressured into signing a voluntary departure order before being issued a Notice to Appear (NTA). Had he been placed into regular removal proceedings in California, his lack of competency would have been discovered, and he would have likely been designated a *Franco-Gonzalez v. Holder* class member and provided with court-appointed counsel.

Similarly in early July 2025, ImmDef was notified by family members that a woman named Deborah with severe cognitive disabilities was arrested by ICE and taken to Adelanto ICE Processing Center. She was described by her family as having the cognitive functioning of a little girl. An ImmDef attorney filed a G28 on behalf of this woman and attempted to immediately notify ICE of her mental incompetency. However, once again, before the NTA was ever issued, ICE coerced Deborah into signing a voluntary departure order and she was quickly removed to her home country.

The practice of coercing people with severe cognitive or mental disorders into signing voluntary departure orders before they are placed in formal removal proceedings amounts to serious violations of both constitutional and federal disability law. ICE must immediately ensure that individuals who are approached for voluntary departure are properly screened for competency.

### G. Recommendations

The deplorable conditions in detention and access to counsel issues must be addressed immediately. To that end, ImmDef makes the following demands of ICE:

- Allow congressional delegations to visit ICE detention centers and holding facilities without requiring seven-days advance notice
- Provide adequate food to detainees, including three healthy meals per day at regular intervals
- Provide clean drinking water to detainees
- Cease to detain vulnerable immigrants with health conditions
- Provide proper medical care to detainees
- Provide access to attorneys at all times to all detainees
- Immediately and regularly provide clean clothes to new detainees
- Provide clear information to detainees on where and how to make complaints to OIDO and CRCL about detention conditions
- Ensure that those who are offered voluntary departure are properly screened for competency issues

We thank you for your attention and eagerly await your response. We can be reached at (213) 634-7607 or MCargioli@immdef.org.


Sincerely,


Margaret Cargioli

Directing Attorney, Policy and Advocacy




Jennifer Norris

Directing Attorney


Immigrant Defenders Law Center

| Exhibit | |
|---|---|
| A | Pro Se Complaint by 85 Desert View Annex detainees |

# Exhibit A

### CONDITIONS OF DETENTION

detention has become punitive and violates our Eight Amendment right. The Supreme Court held more than a century ago that civil detention of a removable noncitizen violates the Constitution if is punitive. *Wong Wing v. United States*, 163 U.S. 228, 237-38, 16 S. Ct. 977, 41 L. Ed. 140 L. Ed. 140 (1986). At a "bare minimum", noncitizens subject to civil immigration detention – just like people detained under civil process or accused but not convicted of a crime – "cannot be subjected to conditions that 'amount to pun ishment." *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (*quoting Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2D 447 (1979)).

Some detainees has been detained at ICE processing Center in Adelanto, CA for 26/34months. As a civil detainee, detainees are entitled to more considerate treatment than criminal detainees whose conditions of confinement are designed to punish. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22, 102 S. Ct. 2452, 73 L. Ed. 2D 28 (1982). But the fact of the matter is that detainees has been under treatment worse than that of an inmate.

Detainees has less access to the law library than those in prison, has less access to yard and night yard than that of a prisoner, detainess only receives 1 hours of yard every other day, which leaves them in a cage for 22 hours. All Detainess has less access to their family through video calls, and family visits. Visiting is only permitted for 1 hour 2 days of the week and their family drives 2hrs coming and 2hrs going. If family is stuck in traffic they only receives the remaining time permitted. detainees has less access to free telecommunications services like phone calls. In county jail, phone calls are free. Commissary is extremely expensive at the detention facility making it difficult to buy our own hygienic items, cosmetics, and other

similar items. These 24/34 months of detention have caused detainees to feel like a financial burden to family and friends.

There's not enough tablets in the facility at times causing detainees to fight. One of the captain said to us, (quote) Fuck all you immigrant, y'all' get free food and medication what else do you immigrant want all of you should get deported.

These are civil detainees and has paid his debt to society and is no longer an inmate, this is a civil detention.

The detention is worse than some of the time They served while in jail.

discussing, *Doe v. Becerra*, "In *Jones*, for example, the Ninth Circuit considered the due process rights of people who had completed prison sentences but remained in detention pending involuntary civil commitment proceedings. The court emphasized that people detained under civil rather than criminal process are "entitled to more considerate treatment than … criminal counterparts are held," courts "presume that the detainee is being subjected to 'punishment." and that "If conditions of civil confinement are equivalent to or more restrictive than criminal detention or civil post-commitment detention, they are presumptively punitive and the burden shifts to the government "to show (1) legitimate, non-punitive interests

justifying the conditions of the detainee's confinement and (2) that the restrictions imposed are presumptively punitive and the burden shifts to the government "to show (1) legitimate, non-punitive interests justifying the conditions of the detainee's confinement and (2) that the restrictions imposed are not excessive in relation to these interests." *King v. Cty, of L.A.*, 885 F.3d 548, 557 (9th Cir. 2018)(cleaned up) (citing Jones, 393 F.3d at 933)

Detainees only seeks to remedy our immigration proceedings and is in the pursuit for avenues of relief, but should not be kept in such conditions. Such conditions amount to punishment and the Court should mandate the Immigration Court to conduct a constitutionally adequate bond hearing or should immediately release with appropriate super

vision conditions that do not amount to punishment and are less harsh. During count times we are locked in for hrs, They always serve the food cold, and mixed everything in one plate like beans with bread, with sauce by the time the food gets to us, the bread is wet and nasty, sometimes we don't have water for 2 to 7 hrs and they said to us to drink from the sink, is four detainees in each small cell and have to smell the wast during toilet, We are dying and in desperate for help, The medical department is very disappointing if your having any type of medical need you will be ask to write a medical request and waite for weeks you really need to be dying before they can see you, we do write grievance but the coordinator come's in and tell you anything she like but the problem will still continues some detainees have no access to computer to do their legal work because of no password and have requested a password but the library said to waite for weeks even you have a dead line to meet everything is going crazy the officer's are very rude at times slams our doors, refused to change the Television for us, one officer (Hutchinson) called one detainee the N word after he asked for the TV to be changed, one other officer refused to give a detainee a toothbrush, one officer said to us we all should get out deported.







W 3.



