**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROBERT F. KENNEDY HUMAN RIGHTS,
et al.,

               Plaintiffs,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity,

             Defendants.

Civil Action No. 25-1270-ACR

<u>**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.    The Department Executed Lawful RIFs of the Offices to Focus on Statutorily-
      Required Functions Pursuant to Executive Order 14210....................................... 3

II.   Statutory Requirements of the Offices................................................................... 4

III.  Mr. Sartini Works to Refocus the Offices. ............................................................ 5

IV.   The Offices Continue to Perform Their Statutorily-Required Work. ................... 10

      A.    Complaints and Access. ............................................................................. 10

      B.    Other Statutory Functions are Also Being Performed. ............................. 16

V.    Plaintiffs Have Not Been Injured......................................................................... 17

STANDARD OF REVIEW ................................................................................................. 18

ARGUMENT ...................................................................................................................... 18

I.    The Court Lacks Jurisdiction Over Plaintiffs Claims. ......................................... 18

      A.    Plaintiffs Lack Standing............................................................................. 19

            1.    Plaintiffs cannot aggregate their claims for standing.................... 20

            2.    Plaintiffs are not harmed by most statutory violations they
                  allege. ........................................................................................... 21

            3.    At most Plaintiffs submit complaints, but any injuries are
                  speculative and moot..................................................................... 23

            4.    Diversion harms are vague, self-inflicted, and cannot be
                  redressed. ...................................................................................... 27

      B.    The CSRA Precludes District Court Jurisdiction Over Plaintiffs'
            Claims. ....................................................................................................... 28

II.   Plaintiffs lack a cause of Action. ......................................................................... 30

      A.    Plaintiffs Fail to Establish Reviewable Final Agency Action Under the
            APA............................................................................................................. 30

      B.    Plaintiffs' *Ultra Vires* Claim Fails............................................................ 34

III.  Plaintiffs' Claims Fail on the Merits.................................................................... 35

A.     Defendants Have Not Acted in Excess of Authority or Contrary to Law. 35

B.     The RIFs were not arbitrary and capricious.................................................. 42

IV.     Plaintiffs' Requested Remedy is Improper. ............................................... 43

CONCLUSION............................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*,
   716 F.3d 633 (D.C. Cir. 2013) ............................................................. 30

*Am. Fed'n of Gov't Emps. v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ............................................................. 30

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
   No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ............................ 30

*Am. Foreign Serv. Ass'n v. Trump*,
   792 F. Supp. 3d 116 (D.D.C. 2025) ................................................. 20, 29, 31

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
   659 F.3d 13 (D.C. Cir. 2011) ......................................................... 19, 22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................... 18

*Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ...................................................................... 32

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ............................................................. 27

*Ayyoubi v. Holder*,
   712 F.3d 387 (8th Cir. 2013) ............................................................. 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................... 32

*Biden v. Texas*,
   597 U.S. 785 (2022) ...................................................................... 30

*Center for Biological Diversity v. U.S. Dep't of Interior*,
   144 F.4th 296 (D.C. Cir. 2025) ....................................................... 20, 21

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................. 44

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...................................................................... 19

*Claybrook v. Slater*,
   111 F.3d 904 (D.C. Cir. 1997) ............................................................. 23

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ........................................................... 33

*Coney Island Prep v. HHS*,
   506 F. Supp. 3d 203 (S.D.N.Y. 2020) .................................................. 44

*Daimler Trucks N. Am. LLC v. EPA*,
   745 F.3d 1212 (D.C. Cir. 2013) ........................................................ 25

*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................ 34

*Elgin v. Department of the Treasury*,
   567 U.S. 1 (2012) ............................................................................ 29

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
   39 F.4th 756 (D.C. Cir. 2022) .......................................................... 35

*Federal Law Enforcement Officers Ass'n v. Ahuja*,
   62 F.4th 551 (D.C. Cir. 2023) .......................................................... 29

*Food & Drug Admin. v. All. for Hippocratic Med.* (Alliance),
   602 U.S. 367 (2024) ................................................... 23, 24, 27, 28

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .......................................................... 28

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) .......................................................... 21

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ...................................................... 30, 31

*Gill v. Whitford*,
   585 U.S. 48 (2018) .......................................................................... 20

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ...................................................... 34, 35

*Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*,
   146 F. Supp. 3d 112 (D.D.C. 2015) .................................................. 39

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ........................................................................ 28

*Hunt v. Wash. St. Apple Adver. Comm'n*,
   432 U.S. 333 (1977) ........................................................................ 19

*Hutchins v. District of Columbia*,
   188 F.3d 531 (D.C. Cir. 1999) .......................................................... 39

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000) .................................................. 33, 34

*In re Core Communications, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ................................................................ 33

*Independent Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ............................................................... 31

*Johnson v. Becerra*,
    111 F.4th 1237 (D.C. Cir. 2024) ........................................................... 45

*LaRoque v. Holder*,
    679 F.3d 905 (D.C.Cir.2012) ................................................................ 25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................ 20, 21, 27

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ............................................................................ 31

*Make The Rd. New York v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ............................................................. 42

*Maryland v. U.S. Dep't of Agriculture*,
    No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025) ................... 30

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................ 44

*Nat. Res. Def. Council v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) ............................................................. 36

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................ 44

*Noem v. Tincher*,
    2026 WL 194768 (8th Cir., Jan. 26, 2026) ......................................... 45

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................ 31, 32, 33, 34

*Nuclear Regulatory Comm'n v. Texas (NRC)*,
    605 U.S. 665 (2025) ..................................................................... 34, 35

*OPM v. AFGE*,
    2025 WL 1035208 (U.S. Apr. 8, 2025) ......................................... 28, 44

*People for the Ethical Treatment of Animals v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015) ........................................................... 27

*Sampson v. Murray*,
    415 U.S. 61 (1974) .............................................................................. 44

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) ........................................................................ 23

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ........................................................................ 45

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ....................................................... 42

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ......................................................... 32

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................................ 28

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................. 19, 23

*Telecommunications Research & Action Ctr. v. FCC* (TRAC),
  750 F.2d 70 (D.C. Cir. 1984) ......................................................... 33

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................................ 20

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................. 28, 45

*Trump v. Orr*,
  223 L.Ed.2d 180 (U.S. 2025) ......................................................... 42

*Turlock Irr. Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ......................................................... 28

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................ 19

*Widakuswara v. Lake*,
  2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................. 31

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952) ........................................................................ 34

**Statutes**

5 U.S.C. § 551 ...................................................................................... 1

5 U.S.C. § 701 .................................................................................... 32

5 U.S.C. § 704 ................................................................................................ 30

5 U.S.C. § 706 ........................................................................................... 33, 35

5 U.S.C. § 2301 note ....................................................................................... 39

5 U.S.C. § 3501 .............................................................................................. 35

5 U.S.C. § 3502 .............................................................................................. 35

5 U.S.C. § 3503 .............................................................................................. 35

5 U.S.C. § 3504 .............................................................................................. 35

5 U.S.C. § 7502 ........................................................................................... 29, 35

5 U.S.C. § 7512 ........................................................................................... 29, 35

6 U.S.C. § 113 ................................................................................................. 4

6 U.S.C. § 205 ........................................................................................... *passim*

6 U.S.C. § 211 .................................................................................................5

6 U.S.C. § 272 ........................................................................................... *passim*

6 U.S.C. § 345 ........................................................................................... *passim*

6 U.S.C. § 452 ........................................................................................... 35, 36

31 U.S.C. § 1512 ............................................................................................. 37

42 U.S.C. § 2000ee-1 ................................................................................ 5, 37, 38

**Regulation**

5 C.F.R. § 315.801 ................................................................................................................ 4

5 C.F.R. § 351.402 ............................................................................................................. 3, 4

5 C.F.R. § 351.901 .............................................................................................................. 29

29 C.F.R. § 1614.108 ........................................................................................................... 5

Exec Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ........................................... 3

Exec. Order No. 14224, 90 Fed. Reg. 11363 (Mar. 1, 2025)........................................ 39

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 18

Fed. R. Civ. P. 65 ................................................................................................................ 45

## INTRODUCTION

Over nine months into this litigation, the Office for Civil Rights and Civil Liberties (CRCL), Citizenship and Immigration Services Ombudsman's Office (CISOMB), and Office of the Immigration Detention Ombudsman (OIDO) (the Offices) are not shut down and continue to perform their statutory functions. Now that that the completion of discovery has made this apparent, the immigration advocacy organizations that bring this action, Plaintiffs Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC), pivot to a new case theory, arguing that the Offices are effectively shut down because they are not working the way they want. Sure, the Offices are reviewing complaints, inspecting facilities, reviewing policies, and providing recommendations, but that is not enough for Plaintiffs, who allege that the lack of local ombudsmen, the lack of unannounced inspections, and the involvement of DHS counsel in internal discrimination claims constitute statutory violations. But none of these alleged acts or omissions violates any statutory requirement or harms Plaintiffs. Moreover, Plaintiffs seek a sweeping follow-the-law injunction that, while couched in impermissible vague terms, would effectively ask the Court to actively manage how to staff the Offices, how much work they do, and how they do it. The Court should reject these claims and proposed remedies, instead granting summary judgment for Defendants on multiple grounds.

First, Plaintiffs lack standing. Plaintiffs try to transform their RIF-based claims into a broadside against an alleged "elimination" of the Offices. But Plaintiffs cannot aggregate numerous agency actions to have standing to challenge them all. Properly disaggregated, most of the things they complain about are not required by statute and do not injure them. The only thing that might injure them are if no complaints are being reviewed, but they are,

and even that is speculative. Moreover, their arguments are primarily a voluntary diversion of resources, which never suffices to confer standing. At base, Plaintiffs' claims have always been targeting the RIF. But such challenges must be channeled through Congress' statutory scheme, which Plaintiffs cannot use.

Furthermore, Plaintiffs lack a cause of action. Their Administrative Procedure Act (APA) claims fail because there is no final agency action. The alleged "dissolution" of the Offices represents an impermissible programmatic attack, and many of the alleged acts and omissions Plaintiffs challenge are committed to agency discretion. And Plaintiffs do not even try to defend their *ultra vires* claims in the face of binding preclusive precedent. Regardless, Plaintiffs' claims fail on the merits. The statutes establish officers and set broad guidelines on what activities the Offices must do, without specifying how they must do that. The Offices are carrying out their statutory functions. Just because they are not doing so in the way or at the pace Plaintiffs prefer does not mean they are violating their statutes. Nor was the decision to better align the Offices with their core statutory duties arbitrary and capricious. Finally, Plaintiffs cannot meet the injunctive factors, and their vague follow-the-law injunction cannot pass muster. Fundamentally, Plaintiffs seek to recast the Offices in their own image through the power of this Court. But it is the President, elected by and accountable to the people, who is empowered to shape how individual agencies are run day-to-day. It is the broad claims and remedies that Plaintiffs assert, not the alleged acts and omissions they challenge, that encroach on the separation of powers.

The Court should grant Defendants' motion for summary judgment, deny Plaintiffs' motion, and enter judgment for Defendants.

## BACKGROUND

**I.    The Department Executed Lawful RIFs of the Offices to Focus on Statutorily-Required Functions Pursuant to Executive Order 14210.**

On February 11, 2025, President Trump issued the Workforce Executive Order, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."  Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).  The Section entitled "Reductions in Force" directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." *Id.* § 3(c).  Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including . . . all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations." *Id.*  The Workforce Executive Order further provides that, within 30 days of its issuance (i.e., by March 13, 2025), "Agency Heads shall submit to" OMB "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* § 3(e).  That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.*

Consistent with the Executive Order, the Department of Homeland Security (DHS or Department) began preparing for RIFs the Office for Civil Rights and Liberties (CLCR), Office of the Immigration Detention Ombudsman (OIDO), and Office of the Citizen and Immigration Services Ombudsman (CISOMB) (collectively, "the Offices") because they had substantial workforces not performing statutory duties.  Ex.1 (Sartini Decl. May 18) ¶ 5.  On March 7, 2025, the Department sent a memorandum to OPM seeking approval of competitive areas that would be subject to the RIFs.  *Id.*; Ex.2 (AR) at 18-19; *see* 5 C.F.R. § 351.402(c).  The Department proposed eliminating 46 positions in OIDO, 118 positions in CISOMB, and 147 positions in CRCL.  Ex.1 ¶

6; Ex.2 at 18-19.  These figures represented the entire staff of these components, excluding employees in the Senior Executive Service.  Ex.1 ¶ 6.  Though not always clearly messaged, the positions were being eliminated so new ones could be made; the Offices were never being eliminated.  Ex.3 (Barksdale-Perry Decl.) ¶¶ 3, 6; Ex.4 (Hearing May 23) at 8:20-9:22, 28:24-29:10.

OPM approved these competitive areas on March 7, 2025.  Ex.1 ¶ 6.  On March 20, 2025, Secretary Noem gave final approval for the RIFs.  *Id.*  On March 21, 2025, DHS delivered RIF and stop work notices to most of the workforce in CISOMB, OIDO, and CRCL.  *Id.* ¶ 7.  The notices stated that, under Order 14210, the Department "must prioritize the *reduction of positions* performing functions *not explicitly mandated* by statute or regulation" and conducted "a comprehensive statute-by-statute analysis" to identify those positions.  Ex.5 (RIF Notices).  Under 5 C.F.R. § 315.801, these employees were given a 60-day notice period, with a May 23 separation date.  Ex.1 ¶ 7.  During the intervening time, those employees were largely placed on paid administrative leave.  Ex.4 at 37:1-19.  In addition, on April 7, 2025, many employees were offered the Workforce Transition Program to take benefits for voluntary separation.  Ex.1 ¶ 8.  Approximately 102 employees between the Offices accepted.  Ex.4 at 37:20-38:10.  The RIF was finalized on May 23, and the remaining workers were separated.

## II.    <u>Statutory Requirements of the Offices.</u>

<u>CRCL.</u>  In the wake of 9/11, Congress established the Department to defend the nation from threats foreign and domestic.  This new Department included a presidentially appointed "Officer for Civil Rights and Civil Liberties."  6 U.S.C. § 113(d)(3).  CRCL is required to "investigate complaints and information indicating possible abuses of civil rights or civil liberties unless the Inspector General" takes the complaint.  *Id.* § 345(a)(1), (6).  The Department must also consult with CRCL on specific policies touching on civil rights and liberties.  *Id.* §§ 345(a)(3)-(5);

211(k)(1)(E).  CRCL was also delegated authority to adjudicate certain equal employment opportunity (EEO) complaints for Department employees that must be completed in 180 days.  29 C.F.R. § 1614.108.  CRCL must "make public through the *Internet*, radio, television, *or* newspaper advertisements information on the responsibilities and functions of, and how to contact, the Officer."  6 U.S.C. § 345(a)(2) (emphasis added).  CRCL must also submit an annual report to Congress and make it public.  *Id.* § 345(b); 42 U.S.C. § 2000ee-1(g).

CISOMB.  CISOMB was created at the same time to "assist individuals and employers in resolving problems with [USCIS]" and propose changes to mitigate these problems.  6 U.S.C. § 272(b).  USCIS leadership, in turn, must meet with the Ombudsman regularly, *id.* § 272(d)(4), and respond to any recommendations from the Ombudsman's Office within three months, *id.* § 272(f).  CISOMB must also submit reports to Congress, though not publicly.  *Id.* § 272(c).

OIDO.  In 2019, Congress created OIDO to "[e]stablish and administer an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress" for cases where Department personnel "are found to have engaged in misconduct or violated the rights of individuals in immigration detention" and ensure an "accessible and standardized process regarding complaints."  6 U.S.C. § 205(b)(1)-(2).  As part of its role, OIDO inspects detention facilities, makes recommendations regarding those inspections, reviews violations of contract terms with facilities, and assists detainees impacted by misconduct.  *Id.* §§ 205(b)(3)–(5), (c).  OIDO submits an annual report to Congress but does not have to make it public.  *Id.* § 205(e).  OIDO must ensure its functions "are complementary to existing functions within the Department of Homeland Security."  *Id.* § 205(b)(6).

III.    **Mr. Sartini Works to Refocus the Offices.**

The Department recognized that the Offices had necessary statutory functions.  Ex.6 (Hearing Tr., May 19) at 77:18-78:1; Ex.7 (Statutory Authorities).  It thus sought to realign the

Offices to focus on those statutory functions, not eliminate or restructure them. Ex.1 ¶¶ 9-10, 13-14; *see also* Ex.8 (Hemenway Dep.) at 28:18-29:1 (Principal Deputy Chief of Staff testifying that his "only goal was to maintain statutory compliance"). To do this, around March 21, Department leadership tasked Ronald Sartini—who has extensive experience in the immigration space—to study the Offices and propose a plan to refocus them. Ex.6 at 77:18-78:1; Ex.9 (Sartini Dep.) at 12:20-19:12. Sartini spent over a month reviewing data, contracts, previous practices, policies, and collaborating with employees to understand their functions and what staff would be necessary. Ex.6 at 15:25-16:17, 19:2-20:3, 25:3-26:11, 46:22-48:25, 117:17-118:4. As Sartini described, "[t]he Offices have been engaged in unnecessary and sometimes duplicative discretionary oversight and public engagement activities," Ex.1 ¶ 10, such as foreign travel and "expensive marketing," Ex.6 at 17:5-19:1, 92:18-93:12. *See also* Ex.4 at 95:14-96:16. Sartini also explained that OIDO and CRCL often received the same complaints and there was no mechanism "to ensure they weren't doing the same work." Ex.6 at 70:5-9. Additionally, other offices in the Department, such as the Inspector General, Office of Partnership and Engagement, and Office of Public Affairs, were performing tasks similar to "many of the discretionary matters" the Offices were doing. Ex.1 ¶ 11.

Given this, DHS "assessed the number of government positions necessary to fulfill the statutory duties, assessed the type of positions best suited to perform the work, [and] assessed which duties can be performed by existing contractors." Ex.10 (Defs. Resp. to Pls. Disc. Req.) at 8. Sartini also sought to leverage technology to "risk-stratify the workloads" by elevating the most urgent claims, which would also better serve the public. Ex.6 at 90:20-91:11; *see also* Ex.9 at 103:3-104:10. The Department gave Sartini the authority to hire through "an expedited pipeline" "to staff these offices up," Ex.6 at 109:12-110:5, and he received authorization for the

hiring to be exempt from the hiring freeze, Ex.4 at 78:21-79:1.  But as Sartini warned at the start, allocations and appropriations "always control."  Ex.6 at 46:7-10.

After a thorough review of the Offices and their functions, Sartini was appointed Ombudsman of CISOMB on May 4.  Ex.11 (Sartini Decl. June 2) ¶ 5.  Troup Heminway was named Officer for CRCL, Jospeh Guy was named Ombudsman for OIDO, and Sartini was named Deputy for both to carry out daily functions.  *Id.* ¶¶ 3-4.  Sartini met with them to present his plan. *Id.*  Sartini had an initial estimate as to the number of employees he would seek to hire, but that number shifted after Sartini assumed his position and saw that the Offices "can accomplish the statutory functions" with a "mix of employees, detai[l]ees, and contractors, and OGC support." Ex.9 at 91:9-21.  "Each Office [moved] as expeditiously as possible"—indeed "faster than the normal hiring process"—"to staff up and ensure the statutory duties are and will be fully performed."  Ex.11 ¶ 2.  The hiring was much faster than the 6 to 12 months it can take, but security vetting and employee requests to start in August to relocate delayed start dates to August.  Ex.9 at 85:14-89:16; Ex.22 ¶ 10.

The Offices also had dozens of employees to handle their own administrative functions like Human Resources, IT, budget, contracting, and support.  Ex.9 at 26:7-18.  Now this is being handled by the general Management Directive.  *Id.*  They also get legal help from the Office of General Counsel (but not final decisions) and FOIA is handled by the Privacy Office, which was done historically.  Ex.6 at 102:19-103:8, 119:8-18; Ex.9 at 25:14-26:6, 44:21-46:10.

CRCL.  For many years, CRCL had between 100 to 110 and even as low as 9 to 20 positions, which ballooned to 147 at the time of the RIF despite only about 20 fulltime caseworkers.  Ex.6 at 29:16-30:20; Ex.22 (Sartini Decl., Feb. 6, 2025) ¶ 3.  For the realignment, Sartini initially proposed about twenty investigators and one report writer.  Ex.4 at 87:7-15.  Detail

solicitations and an investigator job announcement were posted in May. Ex.11 ¶ 3. Meanwhile, fifteen contractors were "actively intaking and logging cases, conducting counseling and investigations, and drafting Final Agency Decisions." *Id.*; *see also* Ex.12 (Hemenway Decl.) ¶ 5 (discussing contract with PCI Government Services to intake, review, and process allegations). OGC lawyers provide legal advice, especially for EEO complaints, but CRCL signs off on all agency decisions based on its "independent judgment" as has always been the case. Ex.22 ¶ 15; Ex.9 at 44:21-46:10, 140:16-143:3, 216:7-19, 265:4-266:6. There are 4 attorneys that primarily work on CRCL matters. Ex.22 ¶ 3. The Department also had contracts in place to provide EEO counseling and investigation services, drafting final agency decisions, and for correctional nursing and mental health experts to review allegations and conduct investigations into detainees alleging medical issues. Ex.22 ¶ 4; Ex.12 ¶¶ 8-12; Ex.6 at 32:9-33:15.[1] While a number of inefficient healthcare contracts were cancelled, the Department's Office of Health Services conducts medical review for CRCL and OIDO. Ex.9 at 46:11-48:2.

By August 2025, CRCL onboarded two full-time federal employees who conduct investigations, handle case work, and resolve complaints, Ex.10 at 11-12, at least one is a former CRCL investigator. Ex.8 at 130:21-31:2. Sartini intentionally hired "generalists" for CRCL instead of subject matter specialists because it allowed for a "more efficient and flexible staffing model." Ex.9 at 62:7-20. Those employees, along with Mr. Hemenway, Mr. Sartini, oversee about twenty contract investigators (between 25 and 30 full-time equivalent contractors in total) working on complaints and other needs, which can be increased further. Ex.9 at 50:6-51:3-50, 85; Ex.8 at 43:16-44:4. Mr. Hemenway described that the benefit of contractors as "it's a lot easier to bring

---

[1]    Though some of those contracts have since been cut because of the continuing resolution, Ex.9 at 38:2-19, other contracts were "pluss[ed]" up (in some cases "quintupling") to meet demand, *id.* at 48:3-49:9.

people on where you need them.  So where and if the need arises, we can use those contact vehicles to, again, bulk up staff."  Ex.8 at 50:5-8.  Mr. Sartini was also able to authorize overtime for the contractors "to meet the workload."  Ex.9 at 41:11-13.  In total, around 33 to 38 employees work on CRCL not including the Management Directive.  Ex.22 ¶ 4.  As Mr. Sartini testified, "the evidence" that the staffing as constituted has been "performing all of the required functions with the current mix of staff and contractors and OGC support" "speaks for itself."  *Id.* at 215:8-16:6.

OIDO.  OIDO started off with 3 employees when created in 2019 and "ballooned to 118 in the last year or two," with only around 38 case managers.  Ex.6 at 29:16-30:20; Ex.22 ¶ 6.  Sartini's initial plan was to hire one or two facility inspectors and five to seven complaint caseworkers, Ex.4 at 88:7-23; Ex.12 ¶ 13.  The Department posted detail solicitations and job announcements in May.  Ex.11 ¶ 4.  The Department filled three OIDO law enforcement specialist positions (two of them with previous OIDO employees, all with experience inspecting facilities) and also has two detailees performing that role, contractors, and 2 attorneys for legal advice.  Ex.13 (Guy Dep.) at 78:6-19, 84:4-10; Ex.9 at 58:8-8, 202:11-204:06; Ex.22 ¶¶ 5-6.  OIDO also pulls from the Management Directorate to perform administrative functions so, in total, it is "closer to about 25 to 30 people who do OIDO work."  *Id.* at 79:13-18; *see also* Ex.9 at 26:7-18.  Guy testified that this staff is "getting the job done."  Ex.13 at 80:17, 82:1.

CISOMB.   CISOMB had 20 positions for most of its history but "doubled in size in the last two to three years" to 40, with only 10 to 12 handling cases.  Ex.6 at 29:13-30:20.  Sartini planned on hiring about five to eight employees, with detailees and contractors.  Ex.4 at 85:5-11.  Sartini posted a detail solicitation during the third week of May and had already started reviewing applications.  *Id.* at 83:18-25.  Three detailees started in June, although two of them have since moved over to OIDO.  Ex.9 at 93:10-94:6. In May 2025, Sartini also sought a new Deputy because

the previous one had suddenly taken a new position. Ex.14 (Sartini Decl. May 21) ¶¶ 4-6. Sartini hired Mr. Gomez, an immigrant with a decade of experience at USCIS, to be the Deputy and to assist with CRCL and OIDO. Ex.9 at 30:18-32:14. As of December 2025, CISOMB had two full-time employees, Sartini and the deputy, as well as a detailee. *Id.* at 57:6-10, 95:3-10, 225:6-10. As Sartini made clear, there has never been a budget for 50 local ombudsmen. *Id.* at 99:2-100:15; Ex.6 at 30:23-31:6. As the statute says, CISOMB must "make available at least 1 such ombudsman for *each* State." 6 U.S.C. § 272(e)(1)(A) (emphasis added). Plaintiffs' own evidence shows at most there were four regional ombudsmen, the first being hired in 2023. Pls. Attach. 19, ECF 64-19 (Tacey Decl.) ¶¶ 2-5.

Budgetary Issues. Hiring additional employees is under discussion, but no decisions have been reached because Budget has advised that there should be no additional hiring until a year-long appropriation is in place. Ex.9 at 78:11-79:20. The longest government shutdown in history also disrupted the Offices' work and made it impossible to hire more people from October 1 through November 12. *Id.*; Ex.22 ¶ 10. The short-term budget did not help because they could not hire and onboard people just for the budget to shift. *Id.* Indeed, the Offices shutdown again on February 1, only providing funding through February 13 when another shutdown is likely. *Id.* Without clarity on a future budget, it remains difficult to hire more people, as the President's budget proposal largely controls. *Id.* Regardless, the Offices have continued to carry out their statutory functions with remarkable results in such a short and chaotic time. Ex.10 at 33-35.

## IV.    **The Offices Continue to Perform Their Statutorily-Required Work.**

### A.    **Complaints and Access.**

The main function each Office performs is intaking and reviewing complaints. To start, the Offices cannot provide "direct" assistance, meaning they cannot "directly remedy complaints." Ex.9 at 266:13-267:13. Instead, the component agencies, namely CBP, ICE, and USCIS, are the

ones "able to directly assist." Ex.13 at 169:15-22. The Offices merely serve as "intermediaries," i.e., they served as "a middle person" even for "the simplest remedies" like providing a blanket. Ex.9 at 266:13-267:13. Even when staff was present in facilities they "had to go to the facility staff to provide the remedy." *Id.* Importantly, with some minor exceptions for some EEO issues, even recommendations have no "enforcement mechanisms," the component agency is free to accept or reject the recommendation. *Id.* at 267:10-18; Ex.6 at 9:5-10:12, 38:11-39:3. This has always been the case. Ex.9 at 267:1-9. As a result, the Offices have always referred complaints back to component agencies, especially for emergencies, as they must address them in the first instance. *Id.* at 107:13-109:3, 266:7-12. Such referrals serve to highlight issues at an executive level. *Id.* at 195:1-96:5, 267:21-268:9. The Offices retain the right to keep the complaints open, follow up, reopen them, and they always keep the data for long-term trends and recommendations. *Id.* at 106:19-110:7. The Offices have always done this. *Id.* at 266:7-12.

To do all of this, every single complaint is processed and reviewed. *Id.* at 231:7-232:7; Ex.22 ¶ 8. Many complaints fall into similar buckets for responses, such as no further action or referral. *Id.* at 231:7-232:7. As a result, each Office has its own batch responses that are sent out periodically addressing similar actions. *Id.* at 199:1-9, 231:7-32:7, 249:8-251:16. That is an efficient means of addressing a significant number of complaints requiring similar responses. *Id.* For example, CRCL and OIDO recently determined that some individual complaints are "not actionable." Ex.13 at 115:20-117:13. This includes complaints relating to detainees where the individual has been removed since the Offices can no longer redress those particular concerns. *Id.*; Ex.9 at 133:17-134:17, 136:14-138:12; Ex.22 ¶ 9. But the data is kept, tracked, used for long term trends and recommendations, can be reopened, and inform broader proposals and policies. *Id.* Such long-term policy concerns are historically what CRCL has done. *Id.* at 136:14-138:12.

- 11 -

The Offices have also moved to easily accessible web-based filing portals that have "optimiz[ed]" the complaint submission process so the Offices "can more effectively congregate and analyze data." Ex.8 at 55:1-8; *see also* Ex.13 at 100:13-17; Ex.22 ¶ 11. The portal "reduces administrative lag, data input errors, and allows for better tracking of correspondence." Ex.9 at 185:12-22. Mail, which was previously accepted, was problematic because it took a long time to receive and "detainees are moving" around. *Id.*; *see also id.* at 105:6-22. Additionally, email complaints resulted in excessive amounts of spam and viruses, so the Offices are moving people to the portal. *Id.* at 106:1-11. Detainees generally have access to tablets with internet access to file complaints and the ability to call family members or others for help. *Id.* at 186:11-188:8; Ex.22 ¶ 13. Family members, organizations, and lawyers can file on behalf of individuals as long by filling out forms with basic information and consent. *Id.* at 123:6-126:7, 188:9-19; Ex.22 ¶ 13. Even so, complaints by mail and email are still accepted, processed, and reviewed; the Offices are simply attempting to reduce their use for efficiency. *Id.* at 126:8-27:2.

CRCL. CRCL continues to open investigations and draft recommendation memoranda when appropriate. Ex.10 at 11. CRCL intakes, triages, and reviews every complaint from detainees, the public, and employees for civil rights and civil liberties issues, discrimination, Section 504, and internal EEO complaints. Ex.9 at 66:17-70:4. In recent years CRCL has received around 3,000 complaints and has only opened investigations into about 20%, with fewer receiving recommendations. Ex.6 at 11:17-12:7; Ex.9 at 137:17-22. From March 21 to December 12, CRCL complaints have increased to 5,989, Ex.15 (Defs. Suppl. Resp. to Pls. Disc. Req.), many coming from detainees using the web portal, Ex.9 at 261:20-262:8. In that time, CRCL has received 70 Section 504 complaints, opened investigations into 2, is processing 54, and closed 11. Ex.15. For Section 345, CRCL has 74 open investigations, has investigated 554 with 183 done directly, has

referred 409 urgent medical complaints, and has otherwise referred 490 complaints to components. *Id.* For internal EEO complaints, CRCL has issued final agency decision on 177, issued 21 reports, is counseling in 59, investigating another 39, and adjudicated 9 requests for amendments. *Id.*

Most, though not all, CRCL complaints and recommendations are based on long-term trends and systematic issues. Ex.6 at 14:9-24, 39:4-11. There has been no recommendations issued, but responses to complaints, especially recommendations, used to take 6 to 18 months. *Id.* at 37:19-38:8; Ex.9 at 121:13-122:6; Ex.22 ¶ 8. By that time, usually the person complaining has had their issue resolved or, if they are in detention, been removed. Ex.9 at 133:17-134:17. Many other complaints, especially urgent medical ones, cannot wait for a recommendation and are thus quickly referred to component leadership. *Id.* at 191:1-192:7. Priorities for investigation, however, include sexual assaults, use of force, and other misconduct by component agents. *Id.* at 120:8-18. Sartini personally reviews all deaths in detention or transit for CRCL and one is being investigated based on a medical examiner's report. *Id.* at 117:2-120:8; Ex.22 ¶ 8.

For example, on August 27, 2025, a CRCL investigator opened an investigation into a complaint about the detention condition at an intake room/holding cells. Ex.16. As part of the investigation, DHS requested additional information from ICE. *Id.* Likewise, on September 18, 2025, a CRCL investigator reached out to ICE following an OIG referral for alleged sexual abuse at a detention center. Ex.17. To determine if further action was warranted, CRCL requested additional information from ICE. *Id.* In April 2025, SOLACE (Souls Offering Loving and Compassionate Ears), filed a "citizen's complaint" with CRCL on behalf of a detainee who alleged a need for medical care. Ex.18 (Jones Decl.) ¶ 8. About one month after she filed the complaint, a CRCL representative contacted SOLACE for more information, to which SOLACE responded. *Id.* The detainee was then scheduled for a medical evaluation. *Id.* ¶ 9. Indeed, Plaintiff RFK states

it files only a few complaints per year, Ex.19 (Pls. Interr. Resp.) at 7, and CRCL has responded to at least one complaint since the realignment, Ex.20 (Pls. Adm. Resp.) at 5. CRCL has not only been investigating detainee complaints, but it has been active in adjudicating detainees' Rehabilitation Act Section 504 disability and accommodation complaints are no longer untimely as they were before. Ex.9 at 146:2-17.

OIDO. OIDO continues to open investigations and refer complaints to the proper Department component on detention complaints. Ex.10 at 12. After a complaint is filed, they are triaged by investigators, investigation commences on claims that contain actionable information, and then action is taken to have the Department component remedy the complaint if warranted. *Id.* In recent years, OIDO received around 12,000 complaints but only redressed around 800, about 7%. Ex.6 at 12:12-15. From March 21 through December 21, new complaints are down to 280 with 14 being investigated and 15 referred. Ex.15. Part of this decline is attributable to the overlap with CRCL, which has received substantially more complaints. Ex.9 at 191:1-192:20. By December 2025, OIDO worked through the backlog, now only taking a couple weeks to review after filing. *Id.* at 200:11-201:11. Some violations have been found and reports are being worked on. *Id.* at 271:2-9.

OIDO used to have a number of employees and contractors physically in detention facilities to meet with detainees and take complaints. Ex.4 at 102:14-22. These employees were never in all facilities at all times, however, as there are between 250 and 300 facilities. *Id.* at 100:21-22. OIDO no longer has individuals in facilities other than for inspections because there were serious issues of abuse, exploitation, and even sexual assault resulting in criminal conviction. *Id.* at 89:13-24; Ex.6 at 45:11-25; Ex.9 at 269:3-270:3. Moreover, there was substantial evidence that these individuals generated and resolved substantial complaints that were 'make work.' Ex.9 at 269:3-

270:3.  Even still, these individuals had to interact with facility employees to remedy any problem and could not redress complaints on their own, such as asking ICE to get a blanket.  *Id.* at 267:1-9.  While there are some benefits of having individuals at facilities, OIDO is still considering if and how that would work given the serious issues.  Ex.4 at 89:13-24.

CISOMB.  In recent years CISOMB received about 25,000 inquiries closing 40%, the vast majority of which were forwarded to USCIS for an answer while taking no action on 60%.  *Id.* at 93:8-23; Ex. 6 at 11:8-12:11; Ex. 9 at 247:3-21.  A 6-month delay in responding was common, as even one of Plaintiffs' complaints shows simple updates from March 2024 to March 2025 saying USCIS was delayed.  Ex.9 at 229:20-230:16.  From March 21 through December 12, CISOMB received over 8,000 case requests, referring 113 to USCIS and taking "no further action" on 7,914, which includes directly answering the request or determining no answer is likely to be given.  *Id.* at 222:9-22; Ex.15.  These numbers are much closer to historical rates as Sartini predicted due to less migration, as they started to decline prior to the RIF.  Ex.6 at 11:8-16; Ex.4 at 112:18-113:18.  The majority of the time, CISOMB assesses the requests and decides to take no further action if, for example, "the handling of those application types is in flux or outright paused . . . [which] make up a significant portion of the requests."  Ex.9 at 220:15-221:14; *see also id.* at 244:3-247:2.  This is because the programs administered by USCIS, like visas and humanitarian relief, are in considerable flux, thus answers are constantly changing.  *Id.* at 220:15-221:14.  "[C]onsistent with past practice," the majority of the requests are not referred to USCIS.  *Id.* at 222:17-223:3.  Other times, when appropriate, CISOMB referred matters to USCIS for review and possible action, generally for benefits that USCIS is still processing regularly, such as green cards.  *Id.* at 224:2-225:5, 241:7-21.  USCIS has not responded to any referrals, however, an issue Sartini has raised

with their leadership. *Id.* at 238:1-4. Sartini regularly meets with USCIS leadership to discuss policies, trends, and issues. *Id.* at 234:18-235:8.

### B. Other Statutory Functions are Also Being Performed.

<u>Facility Inspections.</u>  Despite the shutdown and realignment, from March 21 through December 12 OIDO inspected 27 facilities out of 250 or so, *more* than the previous years. *Id.* at 75:11-76:1; Ex.15. As always, these inspections review contract terms, policies, inspectors are given full access, including the review of documents, medical records, interviews with detainees including following up on complaints, and have the ability to return with experts. *Id.* at 202:3-208:10. While OIDO provides a couple days notice before arriving at a facility due to safety concerns, that has always been the case and OIDO will go even over the objection of the facility. *Id.* at 207:11-208:08. CRCL has also engaged in some facility inspections. *Id.* at 121:21-122:3. Reports are currently being drafted with some recommendations, which typically take several months. *Id.* at 212:2-15; Ex. 6 at 13:13-19.

<u>CRCL Policy Reviews.</u>  CRCL has been consulting with other Department components about their policies and providing feedback. Ex.9 at 135:2-136:2, 157:18-158:3, 165:16-178:10. Since March 21, 2025, this includes the use of facial reorganization, AI uses, data confidentiality, OIG conferences including inspections, reviewed all DHS Management Directives and Instructions, reviewed congressional correspondence, issued guidance on, and advised offices regarding, medical and religious reasonable accommodations, participated in use of force reviews, passed new policies, and much more. *Id.* at 165:16-178:10; Ex.10 at 17-18. For example, Sartini sits on many boards, such as the Use of Force Board, to review policies. Ex.9 at 135:2-136:2, 157:18-158:3. On June 10, 2025, Mr. Sartini issued reasonable accommodation guidance to supervisors "to ensure that the Department continues to meet its statutory and regulatory obligations to accommodate qualified individuals with known disabilities and/or known

limitations related to pregnancy, childbirth, or related medical conditions." Ex.21 (Reasonable Accommodation Guidance). CRCL also continues to overseeing trainings for DHS, including PREA. Ex.9 at 122:7-123:1.

Reports. The CISOMB and CRCL Congressional reports have been submitted and are public. Ex.22 ¶ 14. The OIDO report will be submitted in February given the shutdowns. Ex.9 at 214:5-12; Ex.13 at 38:6-15; Ex.8 at 163:1-8. Sartini has found no evidence his predecessors worked on a report for the previous year for either. Ex.9 at 214:13-18. Nothing else is required to be made public, but that does not preclude the Offices from disseminating more information.

## V.    **Plaintiffs Have Not Been Injured.**

On April 24, a group of immigration organizations, Robert F. Kennedy Human Rights (RFK), Southern Border Communities Coalition (SBCC), and Urban Justice Center (UJC) (Plaintiffs), sued DHS and Secretary Noem (Defendants) claiming that the RIF was unlawful. ECF 1 (Compl.). Plaintiffs are not employees challenging the abolishment of their positions nor detainees challenging the conditions of their confinement. Rather, Plaintiffs are a group of immigration organizations who have filed complaints and case assistance requests with the Offices and "have matters they would currently be raising with one or more of these offices if they were still functioning." Compl. ¶ 7.

Plaintiffs sued the Department, claiming that the "elimination" the Offices hurt them because they previously "benefited" from the Offices' investigations, interventions, and reports. *Id.* ¶¶ 7, 65-68, 71. Plaintiffs allege that they "must dedicate additional resources to other, more costly and labor-intensive methods of seeking information about DHS policies, reporting rights violations, and advocating for clients in immigration matters." *Id.* The relief that Plaintiffs seek is for the Offices to "resume performing [their] statutory functions," not "any particular staffing levels" at the Offices. Ex.19 at 27.

Despite the realignment, Plaintiffs "continue to advocate for their clients and, when resources allow, to litigate on behalf of their clients… and to advocate on behalf of border residents and immigrants." Ex.20 at 7. Plaintiffs still "file complaints and requests for assistance with other components of DHS such as U.S. Customs and Border Protection [(CBP)], U.S. Immigration and Customs Enforcement [(ICE)], and U.S. Citizenship and Immigration Services [(USCIS)]," but believe that these "alternative methods" are "inferior" are "less effective and more difficult, time-consuming and expensive forms of advocacy and litigation." *Id.* at 6. Plaintiffs have continued to file civil rights complaints with CRCL regarding detainees' medical treatment and other incidents at detention centers. *Id.* at 8. Plaintiffs admit that, even before the reorganization, complaints did not necessarily result in investigations, *id.* at 9, or even "prompt[]" a response, Ex.19 at 7.

## STANDARD OF REVIEW

The Court must grant summary judgment to a party when "there is no genuine dispute as to any material fact" and that party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only legally relevant facts "that might affect the outcome of the suit" can preclude judgment. *Id.*

## ARGUMENT

## I.    The Court Lacks Jurisdiction Over Plaintiffs Claims.

Plaintiffs are immigration advocacy groups that file complaints and advocate on behalf of immigrants. They seek a sweeping follow-the-law injunction to require the Offices to perform their statutory functions. ECF 64-22; Br.43 (ECF 61-1). This astonishing request faces numerous hurdles. First, Plaintiffs impermissibly try to aggregate their claims to achieve standing. Second, properly disaggregated, Plaintiffs are not injured by Defendants actions or the statutory requirements, much less redressable ones. Third, at most Plaintiffs could be injured by complaints

not being reviewed, but that is speculative and complaints are being reviewed, rendering their claims moot.  Fourth, their claimed injuries all voluntary diversions of resources and abstract ideological grievances.  None of this is sufficient.  Finally, because Plaintiffs challenge the stop work notice and RIF as the relevant action, their claims are precluded by the Civil Service Reform Act (CSRA).  The Court should grant Defendants judgment on all claims for this reason alone.

### A.  Plaintiffs Lack Standing.

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  Plaintiffs must provide sufficient evidence that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An organization has standing either (1) by "its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy," or (2) "in the absence of injury to itself, . . . solely as the representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  All Plaintiffs claim organizational standing.  Br.15.  "[A]n organization may establish Article III standing if it can show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests."  *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (internal quotations omitted).  SBCC claims associational standing on behalf of its members, which are also immigration organizations.  Br.15.  Associational standing requires the members to have standing "in their own right," which since they are organizations collapses into the same inquiry.  *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Plaintiffs wholly lack standing.

1. Plaintiffs cannot aggregate their claims for standing.

Plaintiffs seek a sweeping follow the law injunction requiring the Offices to carry out alleged statutory requirements with sufficient human and financial resources. ECF 64-22; Br.43. They claim Defendants unlawfully "eliminat[ed]" the Offices through "the RIF and stop-work order on March 21," thus injuring their activities. Br.27-28, 35. But Plaintiffs are not employees or unions that represented the RIF'd employees. Instead, they are immigration advocacy groups that litigate, advocate for, and sometimes file complaints on behalf of immigrants with the Offices. Compl. ¶¶ 11-13. The purported elimination includes things as disparate as not placing workers in 250 plus facilities to not including recommendations on a website. Br.30-34.

Plaintiffs cannot show standing for this array of conduct by trying to aggregate it together as the "elimination" of the Offices. Plaintiffs "must demonstrate standing for each claim" they seek to press, however, "and 'for each form of relief sought,' even if the various claims are derived from similar facts or raise similar legal questions." *Center for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (quotation omitted). The "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). These limitations ensure that federal courts do not sit to "exercise general legal oversight of the Legislative and Executive Branches" but instead redress concrete injuries to cognizable interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Courts routinely enforce these limits by requiring plaintiffs to establish standing for every action that they challenge. *See Am. Foreign Serv. Ass'n v. Trump*, 792 F. Supp. 3d 116, 129–30 (D.D.C. 2025).

The Supreme Court has rejected attempts to "challenge a more generalized level of Government action" instead of "specifically identifiable Government violations of law." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992). Such a generalized approach presents "obvious

difficulties insofar as proof of causation or redressability is concerned." *Id.* This Court rejected a similar challenge to the approval of permits for oil and gas wells, the plaintiffs sought to challenge a group of permits "in the aggregate." *Center for Biological Diversity*, 144 F.4th at 300. This Court recognized, however, that because "each [permit] is a distinct agency action, plaintiffs must establish standing to challenge each," *id.* at 309, including by showing how each permit "contribute[d] to their injury in fact," *id.* at 305. Properly disaggregating all of the statutory functions Plaintiffs seek redress for demonstrates their utter lack of standing.

2. <u>Plaintiffs are not harmed by most statutory violations they allege.</u>

Plaintiffs claim the RIF and stop work notice effectively dissolved the Offices and thus harmed them by ending various functions. Br.16. But again, Plaintiffs are not employees or their representatives, so the RIF itself did not cause them any injury. Instead, they argue the lack of resources due to the RIF has caused certain statutory functions to fall off. *Id.* But much of that is not traceable to the RIF or redressable. And even ceasing most statutory functions would not injure Plaintiffs. They provide no evidence otherwise. In any event, none of the statutory functions ceased.

Start with an obvious one. Plaintiffs complain that CRCL took down recommendations from their website. Br.32. But it is not apparent how this injures them. They no longer clearly claim an informational injury, though SBCC member ImmDef can no longer track investigations through webinars and notices. Br.23. Nor could they, as no "statute requires the government or a third party to disclose" recommendations or hold webinars. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Nor is it traceable to the RIF or even alleged dissolution, as it occurred earlier and would be a reasonable policy to maintain if the RIF were reversed. Ex.6 at 50. Plaintiffs similarly complain they cannot easily contact CRCL in informal ways other than filing complaints

and there are no public engagements. Br.32. But neither is required and undoing the RIF or dissolution will not change that. It is also speculative how that injures Plaintiffs and is not concrete. Plaintiffs also complain that internal DHS EEO complaints are being assisted by OGC. Br.31. Plaintiffs are obviously not injured by internal DHS employee complaints being handled by OGC. And this has been done before, so it is not necessarily because of the RIF, nor would it be redressed by requiring more staff to do more work. Ex.22 ¶ 15; Ex.9 at 44:21-46:10, 140:16-143:3, 216:7-19, 265:4-266:6.

Plaintiffs also complain about CRCL's review of DHS policies and their lack of recommendations, which are often long-term systematic recommendations. Br.31. CRCL has reviewed numerous policies and is involved in policy boards. Ex.9 at 135:2-136:2, 157:18-158:3, 165:16-178:10; Ex.10 at 17-18. Even so, it is unclear how a lack of reviews or recommendations for a wide variety of policies harm Plaintiffs. An injunction requiring more reviews will not necessarily redress any injury either, as no remedy could compel specific recommendations nor do components have to accept them. And this would be true absent the RIF, the Offices have discretion on what to review and recommend. Plaintiffs claim is the speculative hope they will review policies and make recommendations that they like, but that is a pure "abstract social interest[]." *Am. Soc. for Prevention of Cruelty to Animals*, 659 F.3d at 25.

Plaintiffs explicitly ask this Court to require unannounced OIDO inspections. ECF 64-22; Br.43. Again, it is unclear how Plaintiffs who advocate on behalf of clients are injured by OIDO announcing an imminent inspection. Plaintiffs have no role in that process and offer no evidence. OIDO is conducting *more* inspections and reviews than before. Ex.9 at 75:11-76:1; Ex.15. Moreover, this is not caused by the RIF or "elimination" or lack of staffing. It is for safety concerns, consistent with previous practices. Ex.9 at 207:11-208:08. Similarly, Plaintiffs request

that CISOMB hire at least 4 regional ombudsman as local ombudsman.  ECF 64-22; Br.43.  It is unclear how the lack of 4 employees injured Plaintiffs.  Nor would any such injury be redressable, as there has never been money for local ombudsmen and at most there were 4 regional employees starting in 2023.  ECF 64-19 at 4; Ex.9 at 99:2-100:15.  Plaintiffs also complain about not being able to talk to a live person.  Br.43.  Again, unclear how that injures Plaintiffs or is a statutory violation.  Even so, that was because the contract was poor quality, not because of the RIF or elimination of the Offices.  Ex.9 at 254.

The desire that the Offices obey their statutory commands and do more work is a quintessential "generalized interest" that "[a]ll citizens" share and thus is "too abstract to constitute a 'case or controversy' appropriate for judicial resolution."  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974).  And some of what they complain about is not even statutorily required, like public engagement.  Since Plaintiffs' "claim has no foundation in law, [they have] no legally protected interest and thus no standing to sue."  *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997).  Even if a statute requires some of these actions, a bare "statutory violation" does not constitute a "concrete injury."  *Spokeo, Inc.*, 578 U.S. at 341.  At bottom, much of what Plaintiffs complain about are "general legal, moral, ideological, or policy objection to a particular government action," which is not cognizable.  *Food & Drug Admin. v. All. for Hippocratic Med. (Alliance)*, 602 U.S. 367, 381 (2024).

3. <u>At most Plaintiffs submit complaints, but any injuries are speculative and moot.</u>

Plaintiffs do submit complaints on behalf of clients; their evidence of injury is unaddressed or disfavorable responses to those complaints.  Br.16-25.  But it is speculative that they are injured by the RIF or that any injury could be redressable.  Injuries and causation "must not be too speculative or too attenuated."  *Alliance*, 602 U.S. at 383.  Plaintiffs' claimed injuries are both.

Plaintiffs admit they only file a few complaints a year, including recently.  Ex.19 at 7; Br.16-25.  They also admit that not every complaint was previously investigated or redressed, much less in a timely manner.  *Id.*; Ex.20 at 9.  Indeed, CRCL only investigates 20% of complaints and redresses fewer; OIDO redresses about 7%, and CISOMB only refers 40% of inquiries.  Ex.6 at 11:8-12:15; Ex.9 at 137:17-22, 247:3-21.  Any redress or recommendation can also take between 6 and 18 months, as one of Plaintiffs' complaints illustrates, so sometimes the issue no longer exists such as when a detained individual is removed.  Ex.6 at 37:19-38:8; Ex.9 at 121:13-122:6, 229:20-230:16.  And even when a recommendation is issued, the Offices have never been able to fix issues directly.  Ex.13 at 169:15-22; Ex.9 at 266:13-267:18; Ex.6 at 9:5-10:12, 38:11-39:3, 118.  They always have to request action by the component, which has discretion to deny or take additional time to consider.  *Id.*  So the idea that Plaintiffs are being harmed by the RIF and a reduced staff because their complaints are not getting resolved satisfactorily is highly speculative at best.

Furthermore, Plaintiffs can and do seek redress directly from the component agencies, they just vaguely claim it is "inferior."  Ex.20 at 6, 13-14.  It is speculative that an injunction requiring increased staffing would better address those complaints.  Moreover, such an injunction could not ensure the complaints were reviewed or redressed, as a court would have no power to dictate the recommendations given or force the Offices to redress every complaint (which has never been done).  There are simply too many "links in the chain of causation."  *Alliance*, 602 U.S. at 383.

Plaintiffs also complain that the OIDO process is not "accessible" because detainees now have to use a web portal, whereas there were previously individuals at some facilities.  Br.42.  Put aside that this is not statutorily required; it is difficult to see how this injures Plaintiffs rather than their clients or other detainees.  Plaintiffs can file on behalf of their clients with consent; they know how to use the portal, and they can translate.  Ex.9 at 123:6-127:2, 185:12-188:19; Ex.22 ¶ 13.  In

any event, the portals are easily accessible, others can file on detainees' behalf, and mail and other complaints are still accepted. *Id.* So that is no injury to them. Nor are they harmed by a lack of people in facilities. Plaintiffs represent detainees, so people in the facilities doing things without their input has no impact on them. Again, at most that is an injury to their client. And even so, it is speculative because those employees were never in all 250-plus facilities at all times, nor could they directly remedy complaints. Ex.4 at 100:21-22; Ex.9 at 267:1-9. Requiring some employees to return is unlikely to redress any harm either. And removing those people is unrelated to the RIF; it was because there was mismanagement and even serious abuse that led to cancelling contracts. Ex.4 at 89:13-24; Ex.6 at 45:11-25; Ex.9 at 269:3-270:3. Undoing the RIF will not change that.

Plaintiffs may have had an injury if no complaints were being reviewed, though again redress would be speculative. But that is not the case. So any injury is moot. A claim "must remain live at all stages of review, not merely at the time the complaint is filed." *Daimler Trucks N. Am. LLC v. EPA*, 745 F.3d 1212, 1216 (D.C. Cir. 2013) (cleaned up). In addition, "the mootness doctrine requires a federal court to refrain from deciding [a case] if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *LaRoque v. Holder*, 679 F.3d 905, 907 (D.C.Cir.2012). The Offices are receiving, processing, and have reviewed thousands of complaints and investigated or referred hundreds. *See supra* Background.IV. Some recommendations are being worked on as well. Ex.9 at 212:2-15; Ex. 6 at 13:13-19. When an agency engages in the action the plaintiff requested, the claim becomes moot. *See Ayyoubi v. Holder*, 712 F.3d 387, 391 (8th Cir. 2013) (USCIS granted exemption so claim was moot). So any injury Plaintiffs might have suffered had the Offices continued to not have staff working complaints, as at the time of their complaint, is

now moot.  The only things Plaintiffs point to are unannounced inspections and local ombudsmen (Br.27), neither of which are violations nor injure Plaintiffs at all.  If anything, their reliance on these issues proves mootness.

Plaintiffs' alleged injuries do not show otherwise; instead they prove that their complaints are being reviewed, Plaintiffs just do not like the results.  RFK complains that they filed a complaint in March 2024, but it has since laid dormant.  Br.18.  That just shows how long investigations and complaints take have always taken.  RFK absurdly points to a complaint over the summer (Br.18) that Defendants already explained undermines their case: the medical issue was quickly referred by OIOD and CRCL to ICE to remedy, which quickly resulted in an appointment with a specialist that the individual declined.  ECF 51 at 8 (citing ECF 50-1 ¶ 17).  And CRCL has responded to one of their complaints.  Ex.20 at 5.  SBCC notes a complaint where CRCL determined not to open an investigation but noted it would track for trends (Br.19), which proved it was reviewed, and again, 80% of complaints were not investigated prior to the RIF.  Ex.6 at 11:17-12:7; Ex.9 at 137:17-22.[2]  SBCC member Kino has recently received responses, just not as detailed as it would like.  Br.24-25.  They admit this is because people are no longer detained.  Br.25n.13.  That is a reasonable policy based on the ability to provide individual redress and gather evidence, but the complaints are kept for long term trends.  Ex.22 ¶ 9.

UJC complains it has gotten batch responses from CISOMB taking no action and thus they have to use less effective means like contacting USCIS.  Br.19-20.  A lot is in flux so there are often not answers to give, CISOMB usually refers to USCIS anyways, and UJC has gotten help

---

[2] SBCC also complains that deaths in custody have not been investigated and questions on use of force not answered (Br.19), but Sartini has personally reviewed the reports and one is being investigated, Ex.22 ¶ 8.  It is unclear why a lack of a further investigation injures SBCC or how the requested relief would remedy any injury.  This does not seem connected to a complaint, but some of the informal reach out SBCC would do is clearly not required. *See* 2nd Serrano Decl. ¶ 9.

from USCIS.  Ex.9 at 220:15-225:5, 244:3-247:2.  Another organization Plaintiffs have relied on,

SOALCE, had a complaint with CRCL result in a medical evaluation.  Ex. ¶¶ 8-9.  The fact is the

Offices are doing the work, Plaintiffs just do not like that they are not getting the same "tangible

results" or able to "draw[] attention" to their concerns as much.  Br.16, 20.  But again, they admit

they have often not got results in the past and it is speculative any injunction will provide the

results they want, which they are not entitled to in any event.

          4.   <u>Diversion harms are vague, self-inflicted, and cannot be redressed.</u>

       To demonstrate organizational standing court's ask whether the agency "'injured the

[organization's] interest' and whether the organization 'used its resources to counteract that

harm.'"  *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir.

2015) (PETA) (quotation omitted).  But standing does not exist just "when an organization diverts

its resources in response to a defendant's actions."  *Alliance*, 602 U.S. at 395.  Instead, the

organization must show that the challenged actions have "inhibit[ed] their daily operations" and

"perceptibly impaired" the organization's ability to engage in specific activities core to advancing

its mission.  *PETA*, 797 F.3d at 1094–95.

       As before, Plaintiffs conclusory complain that they have to use what they consider "less

effective" or "time consuming" alternatives such as dealing with the agencies directly.  Br.21-22.

RFK says it has "been required to spend more time traveling to immigration detention facilities

and more money on litigation to resolve complaints."  *Id.*[3]  These are classic diversion injuries that

cannot establish standing lest every organization can manufacture standing to challenge every

---

[3] RFK claims it lost grant funding because it has lost effectiveness.  Br.22  But "the independent action of some third party not before the court."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 561).  It is speculative why these unknown third parties stopped providing funds and if an injunction would reopen the spigot.

policy.  *See Alliance*, 602 U.S. at 395.  It is well established that an increase in an entity's expenditures on its normal activities is not enough to confer organizational standing.  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.").  An impairment that gives rise to organizational standing involves something more than just an entity's allocation of additional resources toward its normal activities.  *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("The Trust does not allege impairment of its ability to provide services, only impairment of its advocacy. As we noted above, this will not suffice.").  Yet that is all Plaintiffs can show. In fact, the Supreme Court stayed an injunction in a nearly identical case because the allegations [were] presently insufficient to support the organizations' standing."  *OPM v. AFGE*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025). The same result should apply here.  Indeed, Defendants have previously explained this before.  ECFs 19, 51.

Moreover, as explained, these injuries are not redressable.  Redressability requires the court to award relief "through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion."  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).  Here, Plaintiffs' proposed relief, as detailed below, is a sweeping follow the law injunction that requires more staff, policy reviews, and assistance without any guidance.  These remedies are not tied to any plausible injury and go beyond Plaintiffs' interests.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).  Such micromanagement, especially vague directions, are anathema to the separation of powers.

## B.    The CSRA Precludes District Court Jurisdiction Over Plaintiffs' Claims.

Plaintiffs' claims suffer an additional fatal jurisdictional defect—they are precluded by the Civil Service Reform Act (CSRA).  In the CSRA, Congress "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of

federal agencies. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted). The only real question here is whether Plaintiffs' claims are "of the type Congress intended to be reviewed within" the CSRA. *Federal Law Enforcement Officers Ass'n v. Ahuja*, 62 F.4th 551, 555 (D.C. Cir. 2023). They are.

Plaintiffs maintain that the final agency action here was complete with the RIF and stop work notice. Br.1, 5, 27-28. As a result of those actions, Plaintiffs claim the Offices have reduced staff to a degree they cannot perform their statutory functions, harming them. Br.30-34. These challenges and injuries are derivative of the sorts of personnel claims that are channeled under the CSRA. *See* 5 U.S.C. §§ 7502, 7512 (identifying various personnel actions subject to specified CSRA review procedures); 5 C.F.R. § 351.901 (permitting MSPB challenges to a RIF). Indeed, some employees are bringing claims through this process similar to the ones here. Plaintiffs are neither individual DHS employees nor unions representing such employees; they are organizations properly understood here as end-users of government services. But the injuries they allege stem from DHS actions toward its employees, as their motion for a preliminary injunction made clear. ECF 15 at 17-18. In fact, their arbitrary and capricious claim is focused on the "dissolving [of] the Oversight Offices, effectuated through the blanket terminations of all their employees and ordered cessation of their work." Br.35-337. The redress they seek is a follow the law injunction requiring the Offices to have "sufficient human" resources. ECF 64-22; Br.43. Indeed, the main redress sought in the complaint is "to reverse the RIF and termination of contractors." ECF 1 (E). That is a quintessential claim channeled through CSRA. *See AFSA*, 792 F. Supp. 3d at 137.

That Plaintiffs are several steps removed from those employees and seek an injunction does not exclude their claims from the CSRA's procedures and transform them into *favored* plaintiffs who can challenge the federal government's termination decisions directly in district court, without

any of the limitations that would apply if the real parties in interest were to bring suit.  *See Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025).  That Plaintiffs "may not pursue a claim through the CSRA does not mean [they have] access to the courts.  Rather, it means [Plaintiffs] may not raise the claim at all."  *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013); *see also Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019).

## II.  **Plaintiffs lack a cause of Action.**

### A.  **Plaintiffs Fail to Establish Reviewable Final Agency Action Under the APA.**

Only "final agency action" is reviewable under the APA.  5 U.S.C. § 704.  That requirement has two distinct parts: whether the act at issue qualifies as an agency "action" under the APA and whether it is "final."  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  Plaintiffs claim "the RIF and stop-work order on March 21" was the specific agency action but try to refashion that action as implementing the "elimination" of the Offices.  Br.27-28, 35.  That argument fails.

**1.**      To start, there was no "dissolution" decision, only a RIF.  Plaintiffs' attempts to manufacture an "abstract decision apart from specific agency action" is meritless.  *Biden v. Texas*, 597 U.S. 785, 809 (2022).  Early discussions on the RIF make clear that the Department was focused on figuring out how to realign the Offices with their statutory functions, not dissolve them.  Ex. at 77:18-78:1; Ex.7; Ex.1 ¶¶ 9-10, 13-14; Ex.8 at 28:18-29:1.  This is why, parallel with the stop work notice, Sartini was tasked with evaluating how to refocus the Offices.  Ex.6 at 77:18-78:1; Ex.9 (Sartini Dep.) at 12:20-19:12.  He did so, and the Offices continue to perform their statutory duties with staff.  Ex.10 at 33-35.  Indeed, Plaintiffs admit that functions have restarted, they just disapprove of them as "limited."  Br.28.

**2.** Even so, an agency action must be a "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C. § 551(13). That definition is "not so all encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). That is precisely what Plaintiffs seek to do here by transforming this discrete personnel decision into a broadside against the Offices prioritizing their statutory functions over purely discretionary work. *See AFSA*, 792 F. Supp. 3d at 129. But "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'" *Widakuswara v. Lake*, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) *partially vacated by en banc on other grounds*; *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18–19 (D.C. Cir. 2006). For example, Plaintiffs complain about staffing, policy reviews, complaint handling, "public engagement activities," and much more as part of their claims and relief. Br.30-34, 42-43. Several of those discrete decisions (though not final agency actions) have been made since the RIF and are disconnected from the RIF, such as using a web portal or closing cases for removed individuals. Ex.9 at 133:17-134:17, 185:12-22. The APA does not permit such micromanagement. *Lujan*, 497 U.S. at 899.

**3.** Nor is the agency action Plaintiffs imagine final, meaning (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been

determined,'" or from which "'legal consequences will flow[.]'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation omitted).  There was no decision to dissolve the Offices, as they are still performing their statutory duties.  And the realignment of the Offices is not final, as they are still working out how best to run them and staffing levels, which the shutdowns have complicated.  Ex.4 at 89:13-24; Ex.9 at 78:11-79:20; Ex.13 at 80:17-82:1.  Moreover, the actions must impose "direct and appreciable legal consequences" on Plaintiffs.  *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).  Even if the RIF itself is final, it is not apparent what legal consequences there are to Plaintiffs, who can still file complaints freely as they admit.  *See* Ex.20 at 8; *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) ("no final agency action where the action "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks[.]").

4.      Moreover, the APA also does not permit review of actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *Norton*, 542 U.S. at 64.  All of the things Plaintiffs complain about are discretionary, as none of the Offices' statutes: set staffing levels, address how complaints should be reviewed and redressed, how to make them "accessible," how many complaints to review, how quickly, what policies to review, how to review them, where staff must be located, what information must be made public, or much else other than complaints must be handled.  *See* Br.30-34, 42-43; 6 U.S.C. § 345; 6 U.S.C. § 272; 6 U.S.C. § 205.  Simply put, Plaintiffs lack an APA cause of action for multiple reasons and judgment must be granted for Defendants.

5.      At most, Plaintiffs' claims would be governed by the APA's mandamus-like standard permitting courts to "compel agency action unlawfully withheld."  5 U.S.C. § 706(1).  Plaintiffs assert that the RIF violated the law because it will cause (or has caused) the Department to cease performing functions mandated by statute.  Br.30-34, 42-43.  Indeed, Plaintiffs complain about the

amount of complaints reviewed, the amount of policies reviewed, and the timing of recommendations. *Id.* They fundamentally seek to force the agency to take *more actions faster*.

"The only agency action that can be compelled under the APA is action legally *required*." *Norton*, 542 U.S. at 63. Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (quoting 5 U.S.C. § 706(1)). Even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *Telecommunications Research & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 79 (D.C. Cir. 1984)). And even where performance of a required duty is delayed sufficiently to satisfy that deferential standard, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108-09 (D.C. Cir. 2001) (quotation marks omitted).

As in *Norton*, there was no "agency action" that Plaintiffs could challenge here. 542 U.S. at 64. And even if Plaintiffs had identified a discrete and statutorily required action that the Department was in danger of withholding, any relief would have to accord with the remedial principles applicable under Section 706(1). Yet Plaintiffs do not identify any "specific, unequivocal command" to which the Department is subject such that the Court could "order[] . . . a precise, definite act." *Id.* at 63. The statutes say nothing about how many complaints or policies must be reviewed, how that is done, or how fast. Plaintiffs describe no "transparent violations of

- 33 -

a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *Bluewater*, 234 F.3d at 1315 (citation omitted).

### B.  Plaintiffs' *Ultra Vires* Claim Fails.

Plaintiffs also claim that Defendants have acted *ultra vires* in violation of the separation of powers.  Br.38-42.  But Plaintiffs themselves admit that binding case law precludes this claim.  Br.41.  In *Dalton v. Specter*, the Supreme Court rejected an attempt to transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were *ipso facto* unconstitutional" there would be "little need" for "specifying unconstitutional and ultra vires conduct as separate categories."  511 U.S. 462, 472 (1994).  Plaintiffs distinguish *Dalton* as focusing on discretion (which exists here in any event) and point to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  Br.40.  But the D.C. Circuit explicitly rejected this distinction and reliance on *Youngstown*, making clear that "plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one."  *Glob. Health Council v. Trump*, 153 F.4th 1, 14-15 (D.C. Cir. 2025).  There, the D.C. Circuit rejected a cause of action that the President violated the separation of powers by violating the Impoundment Control Act.  *Id.*  Plaintiffs' distinction that the President could act lawfully there but Defendants here cannot (Br.41) is found nowhere in the case and violates the entire point of the circumvention rule explained in *Dalton*.

Plaintiffs then shift to non-statutory review under *Nuclear Regulatory Comm'n v. Texas (NRC)* (Br. 41-42), which held that *ultra vires* "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute."  605 U.S. 665, 681 (2025) (quotation omitted) (emphasis in original).  Plaintiffs do not even attempt to point to a specific prohibition despite the conjunction and emphasis.  Br.41.  There is none.  As explained, the Offices were not dissolved, Plaintiffs just believe the staffing levels, amount of

work, and how the work is being done is a practical dissolution.  But the statutes set no standards for any of that.  At most, this is a close and contestable issue on the margins, as Plaintiffs must show more than "routine error in statutory interpretation" to support such a claim.  *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763, (D.C. Cir. 2022).  Plaintiffs ultra vires claim thus falls short of the "Hail Mary pass" required and thus judgment must be entered for the Government.  *NRC*, 605 U.S.at 681; *Glob. Health Council*, 153 F.4th at 20 (same).

### III. Plaintiffs' Claims Fail on the Merits.

Plaintiffs' claims fail on the merits regardless.  Plaintiffs argue that the Department exceeded its statutory authority, 5 U.S.C. § 706(2)(C), acted contrary to law, *id.* § 706(2), and arbitrarily and capriciously, *id.* § 706(2)(A), by conducting the RIFs.  Br.30-37.  The Offices are performing the statutory functions, however.  All that Plaintiffs complain about is how those functions are being performed.  But the statutes say nothing about that.  At bottom, Plaintiffs want to micromanage the staffing levels and workflow of these Offices.  They have no basis to do so.

### A.    Defendants Have Not Acted in Excess of Authority or Contrary to Law.

**1.**    Plaintiffs argue that the Department exceeded its authority by abolishing the Offices in violation of the reorganization statute.  Br.29 (citing 6 U.S.C. § 452(b)(2)).  But the Offices were not reorganized or abolished, and there was no reallocation of functions that required notice to Congress.  Instead, the Department used its authority under the RIF statutes to reduce the workforce and realign the Offices to their statutory functions.  *See* 5 U.S.C. §§ 3501-3504; *supra* Background.III.  But even if there was a reorganization, as Plaintiffs note, that is permissible.  Br.29 (citing 6 U.S.C. § 452(a)).  Plaintiffs just argue that no congressional notice was sent.  Br.29-30.  A congressional notice provision does not confer judicially enforceable rights upon other parties, however.  *See Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988)

(Ginsburg, R.B., J.,) ("Generally, congressional reporting requirements are, and heretofore have been, a management tool employed by Congress for its own purposes.").  So Plaintiffs lack a cognizable claim.

**2.**    The realignment was also perfectly in line with the Offices' statutory mandates.  Plaintiffs raise several arguments that the realignment is contrary to law, namely the staff is too small to handle the functions, the functions are not being done sufficiently, and access is inadequate.  Br.30-34.  In doing so, Plaintiffs ignore the facts and the law.  Instead, they seek to micromanage how the Offices staff and perform their broad statutory functions.  That is for the Executive to decide.

To start, the relevant statutes do not establish offices of any particular size or structure.  Rather, each establishes a single *officer*, who is tasked with performing broad functions.  6 U.S.C. §§ 345 ("Establishment of Officer for Civil Rights and Civil Liberties"), 272 (CISOMB) ("there shall be *a position* of Citizenship and Immigration Services Ombudsman" (emphasis added)), 205 (OIDO) ("there shall be *a position* of Immigration Detention Ombudsman," (emphasis added)).  The size and structure of the staff who work for the Offices are not established.  Indeed, the staff has fluctuated over time, most notably for OIDO which went from around 3 people to 118 in a couple years to now 5 employees, 2 detailees, contractors, and 2 attorneys for advice.  Ex.13 at 78:6-19, 84:4-10; Ex.9 at 58:8-8, 202:11-204:06; Ex.22 ¶¶ 5-6. Ex.6 at 29:16-30:20.  Each Office has a mix of staff, assistance from the Management Directive, and contractors.  Ex.9 at 26:7-18.  Plaintiffs point to the fact that CISOMB has 2 employees and a detailee but is required to have local ombudsmen and recently there were four regional ombudsmen.  Br.34.  But the statute requires "*at least* 1 such ombudsman for *each* State," 6 U.S.C. 272 (e)(1)(A) (emphasis added), which there has never been funding for, Ex.9 at 99:2-100:15, 111; Ex.6 at 30:23-31:6.  And the regional ombudsmen were first hired in 2023, proving that for over two decades this ostensible

requirement was never close to being met.  *Id.*; ECF 64-19 at 4.  Plaintiffs cannot claim injury from this, nor is it redressable if the funds are not there.

Plaintiffs also ignore that it took time to staff up and the Offices had to deal with more than one lapse in appropriations, including the longest one in history.  Ex.9 at 78:11-79:20, 85:14-89:16; Ex.22 ¶ 10.  The Offices did a significant amount during this period despite how long they have historically taken.  *Supra* Background.IV.  That surely satisfies the statutory requirements.  That Plaintiffs may want more work to be done faster or differently is of no moment.  The statutes set no parameters for how these functions are to be performed or in what time.  Defendants should be granted judgment on these claims.

<u>CRCL</u>.  CRCL is mainly required to "investigate complaints and information indicating possible abuses of civil rights or civil liberties."  6 U.S.C. § 345(a)(1), (6).  Plaintiffs contend that the staff is too small to handle the number of complaints and are referring too many.  Br.30-31.  The statute does not set a staff, require a certain number of complaints to be addressed, or say how to do so.  CRCL has 4 employees, 25 to 30 contractors, and additional assistance for 33 to 38 employees doing CRCL work.  Ex.9 at 26:7-18, 50:6-51:3-50, 85; Ex.8 at 43:16-44:4; Ex.22 ¶¶ 3-4.[4]  Plaintiffs also complain that only 1 recommendation has been issued.  Br.30-31.  Historically, though, CRCL would only investigate 20% of complaints and remedy fewer, often taking between 6 to 18 months to issue recommendations.  Ex.6 at 11:17-12:7, 37:19-38:8; Ex.9 at 121:13-122:6, 137:17-22.  Between March 21 and December 12, despite disruptions, CRCL has investigated, closed, or referred over a thousand complaints across its various responsibilities.  Ex.15.

---

[4] Plaintiffs appear to drop their previous claims that Defendants violates statutes on their resources, *see* 42 U.S.C. § 2000ee-1(d)(1), cooperation, *see* 6 U.S.C. §§ 205(c)-(d), 272(f), and appropriations, 31 U.S.C. § 1512(c)(1) under the APA.  Compl. ¶ 72.  The Court must grant Defendants judgment on these claims.

Plaintiffs also complain about how many complaints CRCL and OIDO refer to the components. Br.31-32. This misunderstands the functions of the Offices. The Offices have never been able to directly remedy issues; they have always had to request or recommend changes that the components can refuse. Ex.9 at 266:13-267:18; Ex.6 at 9:5-10:12, 38:11-39:3. As a result, the Offices have always made referrals, especially for emergencies so on the ground staff can remedy the problem quickly. Ex.9 at 106:19-109:3, 195:1-96:5, 267:21, 266:7-268:9. That is what the Offices are doing. That does not mean they lack independence; the Offices review each complaint, independently decide what to do, and can independently follow up, keep the investigation, reopen it, make recommendations, and more without component input. *Id.*

Plaintiffs also complain that CRCL is not reviewing enough policies or providing enough feedback. Br.31. But the statute does not say how many policies must be reviewed or what level of revisions are required; it only requires CRCL to "periodically review Department policies and procedures" and "oversee compliance" with civil rights and civil liberties. 6 U.S.C. § 345(a)(3)-(5). CRCL is doing so. Plaintiffs ignore that despite disruptions, CRCL has reviewed "dozens" of policies since May 2025, is "redoing all of the directives and instructions within DHS" all sent to CRCL, and participates on numerous policy boards. Ex.9 at 135:2-136:2, 157:18-158:3, 165:16-178:10; Ex.10 at 17-18.

CRCL also must "make the reports of such officer, including reports to Congress, available to the public to the greatest extent" and "otherwise inform the public of the activities of such officer" consistent with law. 42 U.S.C. § 2000ee-1(g). Plaintiffs no longer contest that the congressional report is done. Ex.22 ¶ 14. As usual, that report describes CRCL's "activities" and thus satisfy all statutory requirements. Plaintiffs still complain that there is no "way for members of the public to contact CRCL, CRCL no longer conducts any public engagement activities, and

nearly all investigation and recommendation memoranda have been removed from its website." Br.32.  The statute says nothing about a means of public contact beyond filing complaints in the portal.  Nor does it require all recommendations to be made public, which was never the case.  It certainly does not require "public engagement activities," whatever that means.[5]

Plaintiffs now claim, for the first time, that OGC's involvement in EEO complaints violates the NO FEAR ACT because it creates a process "under the control, either structurally or practically, of the agency's Office of Human Capital or Office of the General Counsel (or the equivalent)."  Br.31 (citing 5 U.S.C. § 2301 note); Compl. (absent).  Plaintiffs also footnote they have the same concern with Rehabilitation Act complaints, but have no law to support that argument.  Br.32n.15.  Plaintiffs clearly lack standing to challenge internal EEO procedures.  Even so, the EEO complaints are not "under the control" of OGC.  OGC simply assists with the legal work for complaints as it always has.  Ex.22 ¶ 15; Ex.9 at 44:21-46:10, 140:16-143:3, 216:7-19, 265:4-266:6.  CRCL staff review all decisions and make the final determination regardless of OGC input.  *Id.*  That is hardly illegal.

*OIDO.*  OIDO's primary function is to "[e]stablish and administer an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress" for cases where Department personnel "are found to have engaged in misconduct or violated the rights of individuals in immigration detention" and ensure an "accessible and standardized process

---

[5] Plaintiffs, for the first time in a footnote, argue that the Executive Order requiring the use of English violates various laws and is inaccessible.  Br.31 n.4; 90 Fed. Reg. 11363 (Mar. 1, 2025).  Plaintiffs never raised a challenge to the implementation of that EO and a footnote is insufficient, thus they have waived any argument. *See* ECF 1 (no mention in complaint); *Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 126 (D.D.C. 2015); *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc) (courts "need not consider cursory arguments made only in a footnote").  The same is true for their accessibility argument regarding language, which has not been raised before and also fails for the reasons below.  Br.33.

regarding complaints."  6 U.S.C. § 205(b)(1)-(2).  Again, there is no mandate on how to receive, investigate, resolve, or redress complaints, what staff is needed, or how long it should take. Plaintiffs argue the process is not "independent" because OIOD refers complaints to the components due to a lack of staff.  Br.32.  As explained, referrals have always been common and are independently determined.  On volume, historically OIDO has only redressed about 7% of complaints, Ex.6 at 12:12-15 (800 of 12,000), which is about the percentage being investigated now, Ex.15.  Many are closed because the individual is no longer detained so there cannot be redress, but the complaints are kept for trend analysis and systematic recommendations.  Ex.9 at 133:17-134:17, 136:14-138:12; Ex.22 ¶ 9.

While Plaintiffs say OIDO is required to make recommendations and it has not yet (Br.42), such recommendations historically took months and OIDO is working on several.  Ex.9 at 212:2-15; Ex. 6 at 13:13-19.  This includes facility inspection reports, which involve in-person document reviews, interviews, and more.  Ex.9 at 202:3-208:10.  Notably, Plaintiffs no longer claim this function is not being satisfied because OIDO inspected 27 facilities and is drafting reports, *more than previous years.*  Ex.9 at 75:11-76:1; Ex.15.[6]

Plaintiffs next demand a return to in-facility case managers based on the fact the process must be "accessible."  Br.42.  That word cannot bear the weight of requiring OIDO to permanently staff employees in some of the 250 to 300 detention facilities.  Indeed, even when OIDO had such staff they were only in some facilities some of the time.  Ex.4 at 102:14-22.  And even when there they had to request assistance from ICE to even get a blanket.  Ex.9 at 267:1-9.  OIDO has broad

---

[6] Though Plaintiffs request relief to require inspections be unannounced, they do not say this is contrary to law and thus waive that argument.  Br.27, 43.  In any event, a few days notice is given due to ongoing safety concerns at facilities, which has historically been the practice.  Ex.9 at 207:11-208:08.

discretion to take another path, especially where there are serious issues of mismanagement, abuse, exploitation, and even sexual assault resulting in criminal conviction. Ex.4 at 89:13-24; Ex.6 at 45:11-25; Ex.9 at 269:3-270:3. Moreover, there was evidence that these individuals generated and resolved substantial complaints to justify their existence rather than address actual issues. Ex.9 at 269:3-270:3. Forcing OIDO to restaff some facilities with some people hardly renders the process more "accessible." In any event, the web portal is efficient and accessible to the public, Ex.9 at 185:12-22, detainees typically have internet access, Ex.9 at 186:11-188:8; Ex.22 ¶ 13, and family, lawyers, and organizations like Plaintiffs can and do file on behalf of individuals and help with language as long as they fill out a form with basic information and consent, 123:6-126:7, 188:9-19; Ex.22 ¶ 13. While mail and email are much less efficient, the Offices still accept complaints submitted via those mechanisms. Ex.9 *at* 126:8-27:2. The process is efficient and accessible.

<u>CISOMB.</u> CISOMB's primary function is to "assist individuals and employers in resolving problems" with USCIS. 6 U.S.C. § 272(b)(1). There is no guidance on how to provide that assistance or on what timeline. Plaintiffs simply conclude that CISOMB is not assisting because most of its responses involve taking "no action" and there is not a live person to talk to. Br.43. First, there is no requirement that people can reach a live person. Individuals can and have used the web portal to submit inquires, which are all individually reviewed. Ex.15 (around 8,000 new inquires, mainly through web portal); Ex.9 at 231-32, 254 (phone contract had issues). Second, prior to the RIF, CISOMB took "no action" on 60% of inquiries while referring most of the rest to USCIS for an answer, which can take 6 months to a year, as Plaintiffs' experience shows. Ex.4 at 93:8-23; Ex.6 at 11:8-12:11; Ex. 9 at 247:3-21, 229:20-230:16. While it is true that "no action" responses are up, this is because "the handling of those application types is in flux or outright paused," such as visas subject to travel bans or revisions. Ex.9 at 220:15-221:14, 244:3-247:2. As

a result, there is currently no answer to give but the efficient and uniform one. *Id.* For things like green cards that are being processed, CISOMB usually refers questions to USCIS. Ex.9 *at* 224:2-225:5, 241:7-21. From March 21 through December 12, CISOMB has referred 113 inquiries to USCIS, met with USCIS leadership, and pressed them on the lack of responses. Ex.15; Ex.9 at 222:17-223:3, 234:18-235:8, 238:1-4. That is sufficient.

### B. The RIFs were not arbitrary and capricious.

Plaintiffs claim that the "blanket terminations of all their employees and ordered cessation of their work, was arbitrary and capricious." Br.35. First, they say it was substantively unreasonable to leave the Offices without sufficient staffing to carry out their functions and staffing levels are in the Department's discretion. *Id.* As explained, the Offices are carrying out their functions. Second, Plaintiffs claim the RIF was unreasonable because it claimed the staff was performing non-statutory functions when they were. Br.35. It would have been arbitrary and capricious not to follow the President's executive order to RIF non-statutorily mandated positions, however. *See Trump v. Orr*, 223 L.Ed.2d 180, 181 (U.S. 2025); *Make The Rd. New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). The RIFs here did not eliminate the offices or RIF the required officers, it was "the reduction of positions performing functions not explicitly mandated by statute," of which there were many. Ex.5; *see also* Ex.6 at 17:5-19:1, 92:18-93:12. So the Department sought a realignment with new positions focused on the statutory work, not no positions. Ex.6 at 77:18-78:1; Ex.7.

Third, Plaintiffs say the Department did not consider reliance interests or the continued functions of the Offices. Br.36-37. But the Department did consider all of this as part of a rational process. Before making the decision to conduct the RIFs, the Department engaged in significant deliberation, including engagement with OPM. Ex.1 ¶¶ 5-6. Indeed, the Department recognized that the Offices had necessary statutory functions. Ex.6 at 77:18-78:1; Ex.1 ¶¶ 9-10, 13-14; Ex.8

at 28:18-29:1.  The Department tasked Sartini to study the Offices and propose a plan to refocus them.  Ex.6 at 77:18-78:1; Ex.9 at 12:20-19:12.  Sartini spent over a month reviewing data, contracts, previous practices, policies, and collaborating with employees of the Offices to understand their functions and what staff would be necessary to then propose a plan.  Ex.6 at 15:25-16:17, 19:2-20:3, 25:3-26:11, 46:22-48:25, 117:17-118:4.  Plaintiffs say this was done "belatedly" (Br.37), but it was tasked around the time of the work notice and done before the RIF was final. Ex.6 at 77:18-78:1; Ex.9 at 12:20-19:12.[7]  That work cannot be ignored as part of the decision-making process. In line with that work, the Offices have staff and are doing the work.  This is an ongoing learning process, not a final decision.  Ex.9 at 78:11-79:20; Ex.13 at 80:17, 82:1.  This process thus did and continues to take into account reliance interests.

## IV. Plaintiffs' Requested Remedy is Improper.

Plaintiffs' requested follow the law injunction is improper on multiple fronts even if Plaintiffs have a claim.  ECF 64-22; Br.43.  A plaintiff seeking a permanent injunction must actually succeed on the merits and demonstrate that (1) he has suffered an irreparable injury; (2) remedies available at law, like monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the parties warrants equitable relief; and (4) the injunction is not against the public interest.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).  As explained, Plaintiffs fail on the merits for a myriad of reasons.  Even so, Plaintiffs cannot satisfy the remaining requirements for a permanent injunction or justify the requested relief.

Even if Plaintiffs have standing (they do not), the inconveniences of using alternative

---

[7] Plaintiffs' concerns about pending complaints are not to the contrary, as the Offices often took months to act.  Ex.6 13:13-19, 37:19-38:8; Ex.9 at 121:13-122:6, 212:2-15.  This is also why Sartini moved as fast as he could to rehire and focus on clearing the backlog, which has been done for CISOMB and OIDO.  Ex.9 at 85:14-89:16, 200:11-201:11.

methods of redress hardly meet the "high standard" as irreparable.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  As explained, the Offices continue to perform their statutory functions, just not how Plaintiffs want.  And a diversion of resources is insufficient.  *See Coney Island Prep v. HHS*, 506 F. Supp. 3d 203, 215 (S.D.N.Y. 2020).

The public interest and harm to Defendants "merge" when the government is the Defendant.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs request is a quintessential follow the law injunction, requesting that the Offices perform various statutory functions are provided such as "proactively reviewing policies" and ensure Defendants "provide sufficient human and financial resources to the Oversight Offices to allow them to comply."  ECF 64-22; Br.43.  Each one of these requests intrude on Article II and create impractical barriers to the management of these Offices.  Plaintiffs seek to transform this Court into a micromanager of the day-to-day, internal operations of a federal agency.  But the "well-established rule [is] that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs."  *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974).  This is why the Supreme Court stayed a nearly identical injunction in *OPM v. AFGE*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025).  The intrusion on the Executive thus clearly tips the equities against an injunction.

Plaintiffs claim they are not seeking to "micromanage the staffing or day-to-day operations" by dictating a particular number of staff or reviews, just a "sufficient amount."  Br.42.  But these vagaries create another problem: the injunction is not in "specific in terms" nor does it "describe in reasonable detail—and not by reference to the complaint or other document—the act or acts sought to be restrained" under Rule 65(d).  "[T]he specificity provisions of Rule 65(d) are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt

citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). But that is precisely the case with Plaintiffs' improper "generalized injunction to obey the law." *Johnson v. Becerra*, 111 F.4th 1237, 1243 (D.C. Cir. 2024) (quotation omitted); *see also Noem v. Tincher,* 2026 WL 194768 (8th Cir., Jan. 26, 2026) (staying injunction that "simply commands to obey the law, which are not specific enough."). The injunction provides no guidance on how much staff or funding is "sufficient," how to provide for local ombudsmen, how to ensure assistance or access, how many complaints to investigate and recommend and how fast, how many and how to "proactively" review policies, or how to staff facilities. ECF 64-22. This threatens the separation of powers and, as explained earlier, is not tailored to redress Plaintiffs' specific injuries. *CASA, Inc.*, 606 U.S. at 858. The injunction must be rejected.

## CONCLUSION

The Court should grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.


Dated: February 6, 2026

BRETT A. SHUMATE                       /s/      *Tiberius Davis*
Assistant Attorney General             TIBERIUS DAVIS
                                       Counsel to the Assistant Attorney General
ERIC HAMILTON                          *U.S. Department of Justice*
Deputy Assistant Attorney General      *950 Pennsylvania Avenue NW*
                                       *Washington, DC 20530*
CHRISTOPHER R. HALL                    *(202)-514-4357*
Assistant Branch Director              Tiberius.Davis@usdoj.gov

M. JARED LITTMAN
Trial Attorney