EXHIBIT 4

```
1                    IN THE UNITED STATES DISTRICT COURT
                          DISTRICT OF COLUMBIA
2


3    ROBERT F. KENNEDY HUMAN RIGHTS,   ) CIVIL NO.:
                                       ) 25-1270-ACR
4            Plaintiff,                )
         vs.                           )
5                                      )
     DEPARTMENT OF HOMELAND SECURITY,  )
6    et al.,                           ) May 23, 2025
             Defendant.                ) Washington, D.C.
7    _____  ) 9:30 a.m.


8


9                      Transcript of Motions Hearing
                     Before the Honorable Ana C. Reyes
10                      United States District Judge


11


12   APPEARANCES:


13   For the Plaintiff:  Karla A. Gilbride, Esquire
                         Public Justice, P.C.
14                       1620 L Street NW
                         Suite 630
15                       Washington, DC 20036


16                       Michael C. Martinez, Esquire
                         Christina Coogle, Esquire
17                       Democracy Forward Foundation
                         P.O. Box 34553
18                       Washington, DC 20043


19                       Medha Raman, Esquire
                         Robert F. Kennedy Human Rights
20                       1300 19th St NW
                         Suite 750
21                       Washington, DC 20036


22


23


24


25
```

```
 1    APPEARANCES: (Cont'd)

 2

 3    For the Defendant:   Tiberius T. Davis, Esquire
                           Department of Justice
 4                         Civil Division
                           950 Pennsylvania Avenue
 5                         Suite 400
                           Washington, DC 20530-0001
 6
                           Christopher R. Hall, Esquire
 7                         U.S. Department of Justice
                           Federal Programs Branch, Civil Division
 8                         20 Massachusetts Avenue, NW
                           Room 7224
 9                         Washington, DC 20530

10

11

12

13

14

15

16

17

18

19

20

21    Reported by:    Christine T. Asif, RPR, FCRR
                       Federal Official Court Reporter
22                     333 Constitution Avenue, NW
                       Washington, D.C. 20001
23                     (202) 354-3247

24

25    Proceedings recorded by machine shorthand; transcript produced
      by computer-aided transcription
```

1    **A.**  So the approval for the reduction of force within my

2    department has to come from the secretary.  Once I receive the

3    approval package, then my office works to initiate the

4    reduction in force actions and notices.

5    **Q.**  Okay.  What does that approval package look like?  Would

6    that have been a memo to you?

7    **A.**  The approval package that goes up to the secretary was a

8    memorandum indicating that the department would initiate a

9    reduction in force, and it explains the three offices that are

10   involved, the number of personnel, the functions of the

11   office, and the manner in which a reduction in force would

12   need to be carried out.

13   **Q.**  Okay.  And do you recall off the top of your head if that

14   memo that you received or that document that you received

15   discussed eliminating the offices?

16   **A.**  I do not recall off the top of my head.

17   **Q.**  You don't recall?  You'd have to see it to remember?

18   **A.**  Yes.

19   **Q.**  Okay.  All right.

20        Is it your understanding that the offices are being

21   eliminated?

22   **A.**  No, the positions within --

23   **Q.**  The positions?

24   **A.**  The GS positions within the offices were being abolished

25   in accordance with the reduction in force procedures and the

1    notice that the employees received.

2    **Q.**  Okay.  And when you got the memo, the package of the

3    reduction in force, I take it it didn't -- as I understand it,

4    it didn't have a plan for rehiring?  What did it say about

5    refilling the slots?

6    **A.**  I did not have the inform- -- I do not recall.

7    **Q.**  You don't recall?  Okay.

8        And your declaration says that because there's a

9    reduction in force, once these people are fired, let go, that

10   they can't be considered for rehiring.  That's my

11   understanding of one of the reasons that you used the

12   elimination language?

13   **A.**  The elimination -- well, the elimination language did not

14   indicate within the reduction in force notice -- and, again, I

15   would have to see it in front of me.

16   **Q.**  Okay.

17   **A.**  I do not recall that the notice indicated that the

18   employees would not be able to be rehired.

19   **Q.**  Okay.

20   **A.**  I would have to see the notice.

21   **Q.**  All right.  So hold on.

22   **A.**  Uh-huh.

23           MR. DAVIS:  Your Honor, if I may, I think there's a

24   difference between reassignment and rehiring.  Is that --

25           THE WITNESS:  That is accurate.  Yes.

1    want these 20 people back, I don't want them to be separated,

2    can he just do that?  Would that be simple, if I gave you the

3    vacancy and the thingamajig?  You would need to look into

4    it?

5    **A.**  Yes.

6    **Q.**  Okay.

7              THE COURT:  Okay.  I think that's all I have for

8    right now.  But, Mr. Davis, do you have any questions?  I'll

9    let the plaintiffs ask questions.

10             MR. DAVIS:  I guess --

11             THE COURT:  And then we may be at the end of this

12   situation where I will want her to look into this.  I'm just

13   trying -- but I'll have an argument with you about that

14   later.

15             MR. DAVIS:  Okay.  Would it be helpful to give some

16   of her background, or are you sort of good on all that front?

17             THE COURT:  No, she seems quite credible and

18   qualified to me.  I mean, if plaintiffs want to get into it,

19   but I trust -- she clearly knows what she's talking about.

20             MR. DAVIS:  I'll ask just a couple questions.

21             THE WITNESS:  Sure.

22                          DIRECT EXAMINATION

23   BY MR. DAVIS:

24   **Q.**  Did anybody tell you to use the language of dissolution or

25   eliminate in any of these documents?

**A.**  I was not told to use language of dissolution in the documents.

**Q.**  And did anybody tell you that the offices themselves were going to be dissolved or eliminated?

**A.**  Not the offices, no, the positions.

**Q.**  And the purpose of these documents is to convey that to the employees?

**A.**  Which documents?

**Q.**  The RIF notice and the FAQ.

**A.**  Yes.

**Q.**  Okay.  And is there a distinction between the positions and the offices in your mind?

**A.**  Yes.

**Q.**  And what is that distinction?

**A.**  The distinction -- the reduction in force notice as well as the frequently asked questions were meant to convey to the employees that were subject of the reduction in force that their positions were being abolished, not that the offices were being abolished or dissolved.

**Q.**  And is the importance of that the fact that they can't be reassigned?

**A.**  Yes.  It has to do with the competitive area, which is a part of the reduction in force procedures.

**Q.**  So what are the competitive areas here?

**A.**  So the competitive areas for this particular reduction in

**Q.**  I know you're not a lawyer, but in your sort of work and long career as an HR person, are there any sort of requirements for putting people on unpaid administrative leave that would have to be met?

**A.**  So, administrative -- so leave without pay, separate and apart from administrative leave.

**Q.**  Yeah, sorry.

**A.**  So, normally, leave without pay is an employee requested and a supervisory approved status.  We don't normally place an employee in a leave without pay status.  One, because there are not only pay implications, compensation implications, depending on how long that employee is on a leave without pay status, there's also implications to their benefits.  So right now, these employees are in a paid status, even though they're on administrative leave, and right now, they have access to their full benefits.  Time in a leave without pay status for a certain period would impact their benefits.  The exact impacts I would have to research, but I do know that there would be an impact.

**Q.**  And then some people voluntarily took the -- what is it, the WTP?

**A.**  Yes, the Workforce Transition Program.

**Q.**  And how many people have taken that so far?

**A.**  We -- we have had approximately 102 employees, what we refer to as opt in to the department's Workforce Transition

```
1    Program.
2    Q.  Do you expect that all those will be approved?
3    A.  So all of the employees that opted in were approved to --
4    and the Workforce Transition Program is the opportunity to
5    voluntarily separate.  So all of those employees have been
6    approved to voluntarily separate.  And so now we are in the
7    process of the employees need to sign their agreements and
8    then once they sign their agreements, they're placed on
9    administrative leave, just another type of administrative
10   leave, up until their separation date.
11   Q.  I'm trying to understand the C-TAP thing a little bit.
12   A.  Sure.
13   Q.  Right now, is there anybody else on C-TAP?
14   A.  Yes.  I'm sorry.
15   Q.  No --
16   A.  So when you say right now, is there anyone else on
17   C-TAP --
18   Q.  Other than the employees who are RIFed for these offices.
19   A.  I would have to look at the C-TAP list to determine if
20   there are other employees on the C-TAP list, but I know that
21   for headquarters, we do have the employees that received
22   reduction in force notices.  They are on the C-TAP list.
23   Q.  I understand you'd have to look, but what sort of
24   situations would other employees be on the C-TAP list?
25   A.  Displaced employees.  That's how you become eligible for
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    hiring for those positions?  And in your answer, I'm quite

2    interested in -- you know, there are people in these offices

3    who I understand have been there for years, if not more than a

4    decade, who I understand not everyone was aces, but clearly, a

5    number of them would be, just that's what you would expect

6    from federal government workers.  And I assume you don't want

7    to lose all of that experience.  And so my first question is

8    sort of what's your thought process for, A, creating the

9    positions, how long that might take, and then, two, for

10   filling those positions?

11   **A.**  Right.  So the contracts and the detailees are stopgaps

12   like today, right now.  And then for creating new positions,

13   once there is the authority to do that, which we have the

14   approval to do it, I assume that the RIF process has to play

15   out, and that's a more detailed HR question, but I have the

16   authority to start hiring into newly created positions as soon

17   as I wish to.

18        And so I heard my colleague's testimony.  The 90 or 115

19   days, that is under the normal standard.

20   **Q.**  Right.

21   **A.**  I have already received approval from Mr. Hemingway, who

22   is also the principal deputy chief of staff of the department,

23   to not be subject to the hiring freeze.  So he's already

24   waived --

25   **Q.**  Great.

1    **A.**  -- so that hiring can happen.  That's taken care of.

2         I know from having been the chief of staff of the Office

3    of General Counsel, I have asked my colleagues' boss, the

4    chief human capital officer, to conduct hiring actions and

5    onboard individuals within one pay period.  That's two weeks.

6    **Q.**  Okay.

7    **A.**  Every time, he has done it.

8    **Q.**  Okay.

9    **A.**  So it is possible.  And then, of course, the process has

10   to play out, but they can do it within two weeks if directed

11   to do it.

12   **Q.**  And when you said you have approval for the positions but

13   you need authority, I don't think I -- I don't understand the

14   distinction.

15   **A.**  Right.  Well, I'm not totally clear on the distinction.

16   It's more this issue of not violating the RIF.

17   **Q.**  The RIF.  Oh, I see.

18   **A.**  Right.  Yeah.

19   **Q.**  All right.  Got it.  But that's out of your control?

20   **A.**  Yeah.

21   **Q.**  Okay.

22             THE COURT:  All right.  Mr. Davis, you and I will

23   talk about that later?

24             MR. DAVIS:  Yes.

25             THE COURT:  Okay.  All right.

**A.**  No.

**Q.**  Okay.

        THE COURT:  All right.  Go ahead, Mr. Davis.

               DIRECT EXAMINATION

BY MR. DAVIS:

**Q.**  Mr. Sartini, let's start a bit in the past.  When were you asked to sort of reconstitute these offices?

**A.**  Around the time that the RIFs -- RIF notices went out, very close in time, maybe the same day, day after.

**Q.**  Okay.  Did anybody at the time say that these offices were going to be completely eliminated?

**A.**  No.

**Q.**  Okay.  So could you talk specifically about your plan for CIS OM, since you're in charge of it?

**A.**  Yes.

**Q.**  Sort of your next steps?

**A.**  Sure.

    So as I had mentioned before, details or covering as a stopgap right now.  So I already put a detail solicitation out on the intranet within the department.  I've already received several applicants s for that detail, all of whom, at a minimum, meet the requirements for what I'm looking for.  And as soon as I have an opportunity, I will be contacting those individuals to do a quick interview and then we would seek to onboard them within a pay period.

**Q.**  If you don't know this, this is fine, but can you create new positions while the RIF is still in place, like before it's finalized?

**A.**  That, I don't know.

**Q.**  Okay.  And about how many people do you plan on staffing at CIS OM?

**A.**  CIS OM, I think the right number is somewhere around five to seven with an additional report writer and then detailees filling, so maybe eight government employees and then detailees and potentially leveraging existing contracts from elsewhere, which I can do.

**Q.**  And what are some of those contracts you can leverage for the work?

**A.**  So right now, CRCL, they're housed under CRCL, but they're not exclusive to CRCL if we ask them not to be.  There are casework and investigation-type contracts, and so it may be as simple as a contract modification, which is something that usually takes a week or two, to say, you do this kind of investigative work for us or casework or queue triaging and now we want you to do the same type of work for this type of queue.  And there are already extensive SOPs in the office's files that have been transferred over to me, and there would be a training period and, say, you see this type of complaint or question, here's how you would handle it, here's how you prioritize, et cetera.

1    for a year that is in the past.

2    **Q.** So what about for future years, if the workload increases

3    what are your tools to handle that?

4    **A.** Well, so always contracting and always detailees. And if

5    the appropriation authorizations are there in terms of

6    funding, you can staff up.

7    **Q.** And how about CRCL, what's the plan for CRCL?

8    **A.** So the plan, as I briefed it to Mr. Hemingway, and that he

9    approved, is we think the right number there is about 20

10   investigators and then another report writer. So that's about

11   21. Plus there would be a CRCL officer and a deputy officer.

12   And my understanding from the prior leadership is those two

13   executives, one has oversight over the EEO process, and the

14   other one is the CRCL officer. So that's total FTEs 23ish,

15   24.

16   **Q.** And how do those levels compare historically to

17   staffing?

18   **A.** So that's lower. So in recent years, they grew to about

19   118. But they were not historically at 118. I'm not entirely

20   sure. It's not quite -- it's not easy to reconstruct those

21   numbers, but I know that there was a growth of at least 30 or

22   40 in the last three or so years. So it's maybe a quarter of

23   where they were previously.

24   **Q.** How about for a staff that were focused on the

25   complaints?

1    **A.**  For the staff that did casework, it's actually the same

2    number.  I think that is the core function of the office, is

3    investigating cases and complaints that come in.  They had 20

4    or so assigned to that core work.  I think that number should

5    probably be left intact.  And again, they would have contract

6    support and detailees.

7    **Q.**  How about the last office, OIDO, what's the --

8    **A.**  So OIDO, they had, I believe -- so there's the two parts

9    of OIDO.  There's the casework as it came into headquarters

10   and then there's the facility inspections.  They had something

11   like 10 to 15 facility inspectors.  I think the right number

12   for that is probably one to two given the number of facilities

13   they inspected per year.

14       Again, looking at that and having spoken to outgoing

15   leadership, I think there is inefficiency and gaps there in

16   performance.  And I'm not understanding why one or two

17   individuals can't inspect 20 or so facilities a year, and I

18   think we will probably do quite a bit better than that.

19       For the casework side, there, it seemed that the

20   headquarters element had about 10 to 15 individuals.  I think

21   if you staffed it with five or seven and then again, detailees

22   to help plug the gap, potentially contracts, you can do the

23   work that the prior staff was doing.

24   **Q.**  And how does that compare to staffing levels

25   historically?

1    **A.**  So it's lower in the total count, quite a bit lower, but

2    depending on the historical, so we talked about this a little

3    bit.  The office is only three years old.  For the beginning,

4    and I don't quite know how long, they only had three

5    employees.  And there was the understanding that the office

6    was intended to be small.  And then within the last two or so

7    years, they grew from three to 118.  So it's kind of hard to

8    put an average on where they were historically.

9    **Q.**  Can I just get some clarity on how old the office was.  It

10   was established in 2019?

11   **A.**  Yeah, it was written into law in 2019, but they did not

12   start in earnest until, I believe, 2022.

13   **Q.**  Okay.  And how about the sort of on the ground in the

14   detention facility people that we talked about last time?

15   **A.**  Right.  So that remains a question that I think Mr. Guy

16   will have to look into.  Where I landed on that was the

17   contract had gross mismanagement, in my estimation, and there

18   were a lot of problems.  And there may be some value to

19   putting individuals in detention facilities, but how that gets

20   done needs to be looked at.  That may need a new contract.

21   Perhaps that gets hiring.  Perhaps that becomes a collateral

22   duty assignment of some kind, like a rotational detail for a

23   corps of individuals who want to do that work.  That needs

24   some re-examination.

25              THE COURT:  Do you have a sense -- and I understand

1    the right size of each of these offices is -- that's based on

2    the analysis that you did of their functions and of what staff

3    you think is necessary to perform them; correct?

4    **A.**  Yes.

5    **Q.**  And that in some instances, you believed the offices, as

6    they were currently being run, were inefficient?

7    **A.**  In some places, yes.

8    **Q.**  When we were discussing some of those inefficiencies on

9    Monday, you testified that for CIS OM, the office you now

10   lead, only 40 percent of the inquiries that came in went to --

11   were officially opened or required follow-up with USCIS.  You

12   saw that as inefficient; is that right?

13   **A.**  No, I never said that was inefficient.  I just said that

14   is the number that they happen to work.

15   **Q.**  Okay.  And do you believe that that number -- that -- what

16   do you understand is happening with the other 60 percent?

17   **A.**  Nothing was done with them.  The prior ombudsman, this is

18   the same person who was my deputy and now has moved on to

19   USCIS, said that they don't -- they may send out a close-out

20   notice to say we are not acting on your inquiry, but they did

21   not work the inquiry.  Now, that's either because they

22   couldn't get to it or because it didn't meet the requirements

23   for ombudsman follow-up.

24   **Q.**  So if they couldn't get to it, that might indicate that

25   there was a large volume given their staffing levels at the

1    to their question, that wouldn't be reflected as an inquiry to

2    the USCIS because the ombudsman's office member handled it

3    directly; correct?

4    **A.**  I'm not sure about that.  So any work being tracked and

5    done should be recorded somewhere in a system.  And I think

6    the ombudsman's office would want to show a higher percentage

7    work.  So if there is any action being taken on an inquiry,

8    that should be reflected in the statistics.

9    **Q.**  But you don't actually know how those were tracked,

10   correct, because you hadn't performed that work?

11   **A.**  I know to a fairly good degree how they were tracked.  I

12   mean, the exact case type or inquiry type you're referring to,

13   no, I can't say for sure.

14   **Q.**  Turning to OIDO and one of the inefficiencies you

15   identified, you referred to what you called swag, that OIDO

16   case managers in the detention facilities were wearing branded

17   hats or bandanas or other types of clothing.  Did you ever

18   speak to anyone in OIDO about why they were wearing those

19   branded clothing items?

20   **A.**  Yes.  And I did not just say they were wearing them, and

21   the amounts that were procured were exponentially higher than

22   the staff.  So the swag was not just to be worn on the person

23   of the OIDO staff.  They ordered thousands of jackets, hats,

24   and coffee mugs.  I don't know about each of those items, but

25   the numbers were in the thousands, the unit quantities.  So

1  that was not just for personally identifying them in the --

2  **Q.**  What was the reason that was told to you?

3  **A.**  Marketing.

4  **Q.**  So --

5  **A.**  Marketing and advocacy.

6  **Q.**  So by marketing, do you mean making people in detention

7  facilities aware of the services that they provide and the

8  fact that they're different from ICE and other components of

9  DHS?

10  **A.**  I assume that's what was meant.

11  **Q.**  Okay.  And particularly, that that sort of wearing

12  something visible and emblematic would be helpful for

13  identification purposes for people who don't speak the same

14  language, were you told that as well?

15  **A.**  I was not told that specifically.  That makes sense to me,

16  but again, the quantities do not make sense.

17  **Q.**  Okay.  Let's turn to the staffing levels that you believe

18  are appropriate for these three offices.  You believe that an

19  appropriate staffing level for CIS OM to perform their

20  statutory functions is five to seven case managers, plus a

21  deputy; is that right?

22  **A.**  Yes, plus a report writer.

23  **Q.**  Okay.  You've been in the position for two weeks or a

24  little -- I guess closer to three weeks now?

25  **A.**  Yes.

1  managers; is that correct?

2  **A.**  Yes.

3  **Q.**  And how would those people be geographically dispersed, in

4  your view?

5  **A.**  That is a -- what I would say is a last 10 yards question

6  that Mr. Guy will have to figure out.  So we're in a different

7  situation than we were previously.  There is a return to

8  office executive order.  So they can be in an office.  They

9  don't have to be in the National Capital region.  And I -- if

10  I were Mr. Guy, I would look at a heat map of where detention

11  facilities are, and I would say we put the critical mass of

12  employees closest to the detention facilities.  So they would

13  likely be co-located in government facilities in the

14  southwest, probably some on the Canadian border.

15  **Q.**  And you believe that five to seven individuals is adequate

16  to service all of the detention facilities around the United

17  States?

18  **A.**  I believe that we can perform the statutory functions as

19  the cases come in with five to seven individuals plus the help

20  of contracts, plus the help of detailees.

21  **Q.**  How many facilities are currently being operated?

22  **A.**  Somewhere between 250 and 300.

23  **Q.**  Do you understand that the President plans to increase

24  detention capacity?

25  **A.**  Yes.

1    currently subject to the RIF, how many of those were case

2    managers who were responsible for going into detention

3    facilities and meeting in person with detained people?

4    **A.**   I don't know.  The number was, I believe, trying to

5    envision an org chart in my head, probably and 40 or 50, but

6    I'm not positive.

7    **Q.**   So it was the largest component of the OIDO staff, were

8    the case managers, and we can pull that up in the report to

9    Congress that we discussed previously, but would you disagree

10   with me the case managers -- I'm not talking about

11   contractors.  I'm talking about full-time employees -- were

12   the largest component of the OIDO staff?

13   **A.**   I'm not positive, but that sounds correct.

14   **Q.**   Okay.  And is it also your understanding that those

15   full-time employee case managers were not perhaps every day,

16   but that part of their duties were to go to detention

17   facilities and meet in person and monitor conditions in the

18   facilities directly?

19   **A.**   Yes.  And they were not in every facility -- not every

20   facility had an OIDO staffer in it all the time.  It's not

21   clear how often they were staffed.  But it was not a

22   one-to-one relationship.

23   **Q.**   Nor would it be a one-to-one relationship if we had seven

24   people performing the tasks; correct?

25   **A.**   Correct.

1    days.  We've also made other details effectuated in two days.

2    No formal action needs to be generated by HR.

3        And so I'm -- I can bring those individuals over as soon

4    as their offices are ready to let them go.  And the

5    understanding is that this is a priority, and they'll be

6    expected to enter on to duty on the detail within two weeks.

7    **Q.**  And do you expect you'll get five to seven detailees for

8    CIS OM?

9    **A.**  I think I can, yeah.

10   **Q.**  Do you expect to get 23 detailees for CRCL?

11   **A.**  No, the goal is not to get 23 detailees for CRCL.  I never

12   said that it was.

13   **Q.**  Okay.  So you won't be able to fill the number of

14   positions that you believe are necessary to staff these

15   agencies and perform the statutory functions just using

16   detailees; correct?

17   **A.**  Correct.

18   **Q.**  You mentioned how the number of incoming cases has gone

19   down for CIS OM and maybe you don't know about the other

20   offices.  You have some theories about why that is; right?

21   Why the numbers have gone down?

22   **A.**  Yes.

23   **Q.**  Is another plausible explanation for why numbers have gone

24   down that DHS publicly announced the office was being

25   closed?

1    **A.**  No.  No, as the deputy ombudsman explained to me, there

2    are a number of legal pathways to obtain an immigration

3    benefit.  Those streams have been -- are largely drying up.

4    Right.  So the number of applications being processed are

5    potentially less.  The appetite for individuals around the

6    country to come to the United States in this administration is

7    likely less.  No, so -- and I don't believe that is the case

8    at all.

9         And actually, I know for a fact the -- what some might

10   think is the office's closure is not the reason for the

11   decrease, because the deputy ombudsman told me they saw that

12   decline well before the RIF notices went out on March 21st,

13   that they started seeing that decline way back into the Biden

14   administration.  Because around the middle of the last year of

15   the Biden administration, they started tightening up the

16   border, and so they saw a decline from maybe the middle of

17   last year.  So no, it's quite clearly not at all related to

18   the RIF notice.

19   **Q.**  Well, an effect can have more than one cause.  Would you

20   agree with me?  There can be more than one factor contributing

21   to a phenomenon?

22   **A.**  At a very high level, yes.  But as I just said, we saw or

23   they saw a marked decrease, maybe six to eight months, maybe

24   more than eight months before the RIF notices went out.  So

25   that tells me there is no cause-and-effect relationship.