# EXHIBIT 6

```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3      Robert F. Kennedy Human       )
       Rights, et al.,               ) Civil Action
4                                    ) No. 25-cv-1270
                        Plaintiffs,  )
5                                    ) EVIDENTIARY HEARING
       vs.                           )
6                                    ) Washington, DC
       U.S. Department of Homeland   ) May 19, 2025
7      Security, et al.,             ) Time:  11:00 a.m.
                                     )
8                        Defendants. )

9      _____

                    TRANSCRIPT OF EVIDENTIARY HEARING
10                            HELD BEFORE
                   THE HONORABLE JUDGE ANA C. REYES
11                    UNITED STATES DISTRICT JUDGE

12     _____
                       A P P E A R A N C E S
13
       For Plaintiffs:        Karla Gilbride
14                            Public Justice, P.C.
                              1620 L Street, NW
15                            Suite 630
                              Washington, DC  20036
16                            (202) 797-8600
                              Email:  Kgilbride@citizen.org
17
                              Michael C. Martinez
18                            Democracy Forward Foundation
                              P.O. Box 34553
19                            Washington, DC  20043
                              (202) 894-6582
20                            Email:  Mmartinez@democracyforward.org

21                            Anthony Enriquez
                              Robert F. Kennedy Human Rights
22                            80 Pine Street
                              Suite 801
23                            New York, NY  10005
                              (917) 941-9141
24                            Email:  Enriquez@rfkhumanrights.org

25
```

 1                                Adina Rosenbaum
                                  Public Citizen Litigation Group
 2                                1600 20th Street, NW
                                  Washington, DC  20009
 3                                (202) 588-1000
                                  Email:  Arosenbaum@citizen.org
 4
        For Defendants:           Christopher H. Hall
 5                                U.S. Department of Justice
                                  Federal Programs Branch, Civil Division
 6                                20 Massachusetts Avenue, NW
                                  Room 7224
 7                                Washington, DC  20530
                                  (202) 514-4778
 8                                Email:  Christopher.hall@usdoj.gov

 9                                Tiberius Davis
                                  U.S. Department of Justice
10                                Civil Division
                                  950 Pennsylvania Avenue
11                                Suite 400
                                  Washington, DC  20530
12                                (202) 514-4357
                                  Email:  Tiberius.davis@usdoj.gov

13
        _____
14
        Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
15                                Official Court Reporter
                                  United States Courthouse, Room 6523
16                                333 Constitution Avenue, NW
                                  Washington, DC  20001
17                                202-354-3267

18

19

20

21

22

23

24

25

1    understanding from the individuals who I've spoken to in those

2    offices is they have an approach to analyze them.  They will

3    look to see if they have merit, they'll triage them to see if

4    there are trends, and then they work the portion that they can.

5    Q.  And how would you describe the level of authority each

6    office has in resolving these complaints?

7    A.  It's relatively minimal.  So it's primarily a persuasive

8    influence.  They do not have the ability to compel a change.

9    There is one caveat where CRCL, for -- I believe it's Section

10   504 complaints of the Rehabilitation Act, can require a change,

11   but they typically will recommend something to CBP or ICE or,

12   in CRCL's case, any component within DHS, and then that office

13   can decide to take action or not.  And that's where the

14   programmatic recommendations for the cases -- they're typically

15   referring cases to the primary component and just saying please

16   take a look at this, we recommend X.  But the component is not

17   typically obligated to act on that request.

18   Q.  So you said they refer them to the primary components.

19   What is the role of the primary components in this process?

20   A.  The primary components are not obligated to do anything.

21   They can take action or not.  So, for -- a good example is that

22   CISOMB, which I'll use as an abbreviation for Citizenship and

23   Immigration Services Ombudsman.  They'll refer cases back to

24   USCIS and they build up in a queue and it's another queue for

25   USCIS to work.  And they can work it, but they don't have to.

1    Q.  Those offices, the primary agents also handle these

2    complaints?

3    A.  Yes.  In all of the cases, there are offices of

4    professional responsibility, or OPR, in all of these, what I'll

5    call primary components, and they intake the same kind of

6    complaints as well, or questions.  There's a robust contact

7    enter at USCIS that has hundreds of employees to answer that.

8    There's an office of -- let me back up for a moment.

9            There's also the Office of the Inspector General of

10   the Department of Homeland Security and they intake these kinds

11   of complaints as well and either investigate and then -- and/or

12   forward to the primary component.

13   Q.  And is there any other overlap in duties between -- or, any

14   work that these offices do in other parts of the department?

15   A.  Yes.  There's a substantial amount of engagement, public

16   engagement, that CRCL and OIDO did, and CISOMB as well.

17   When -- there is an Office of Partnership and Engagement at the

18   Department of Homeland Security.  There's also an Office of

19   Public Affairs.  And in my view, the primary duty to liaise

20   with the public is on those offices.

21   Q.  How about FOIA requests, for example?

22   A.  FOIA is handled by the Office of Privacy.  And recently

23   there was a consolidation of those functions into the Office of

24   Privacy.  It makes sense from a contracting and budget

25   perspective, and also a subject matter expertise perspective,

1  that the Office of Privacy would handle all FOIA requests for

2  the department.

3  Q.  And how about any overlaps between the offices at issue?

4  A.  There's a substantial amount of overlap between CRCL and

5  OIDO.  Not so much CISOMB.  But CRCL and OIDO will often get

6  the same complaints simultaneously and, to me, that seems

7  rather inefficient.

8  Q.  Focusing back on the complaints.  About how many complaints

9  does each office receive a year?  Just an estimate.

10  A.  So, CISOMB has received, most recently, about 25,000

11  inquiries a year.  That number is historically very high and I

12  would expect that number to come down substantially.  Their

13  number is typically more around 12,000 a year, but we saw

14  elevated immigration levels under the Biden administration.

15  Again, we expect that to come down, probably to 12,000 or less

16  this year.

17            CRCL saw about 3,000 complaints a year recently and

18  OIDO saw about 11,000 complaints filed.

19  Q.  And about how many of these complaints do each offices open

20  in a year?

21  A.  So, it varies.

22            THE COURT:  Why don't you give us a per office and

23  per year, or a year?

24  BY MR. DAVIS:

25  Q.  Last year you said that CRCL got -- was it 3,000?  Do you

1    know?  Do you have an estimate of how many of them were

2    actually investigated beyond the initial review?

3    A.  My understanding is they worked about 20 percent of them.

4    And I'm not exactly sure -- I know that they opened, at a

5    minimum, 20 percent.  I don't know that that means there were

6    recommendations issued in 20 percent, it could be.  But I know

7    that they saw merit in opening 20 percent of those cases.

8    Q.  And how about CIS for the last year?

9    A.  CIS Ombudsman opened about 40 percent of those cases, and I

10   would say the substan -- from my understanding, a substantial

11   majority of those were forwarded to USCIS.

12   Q.  For the OIDO office, how many did they recommend remedies

13   for?

14   A.  Of the 11,000, my understanding is about 800 received some

15   kind of remedy or recommendation.

16   Q.  Do you know how many detention facilities, approximately,

17   there are in the Department of Homeland Security?

18   A.  It varies all the time, but somewhere between 250 and 300.

19   Q.  And how many detention facilities did OIDO inspect last

20   year?

21   A.  Last year they inspected about 22 facilities of that 250 or

22   300.

23   Q.  And how did these offices determine whether that's

24   sufficient under their statutes?

25   A.  I have not found evidence that there was -- like, what the

1    model they use to discern that is.  I have asked employees of

2    those offices.  There isn't, like, a clear rubric, so far as I

3    can tell.  I suspect part of it is just resource constraints.

4    But beyond that, I don't know.

5    Q.  Have the statutes ever offered any guidance on how these

6    are to be handled, or how many?

7    A.  No, there's nothing in the statutes, as I understand them.

8              THE COURT:  I'm sorry, was there an objection?

9              MS. GILBRIDE:  Objection.  Calls for a legal

10   conclusion.

11             THE COURT:  Sustained.

12             MR. DAVIS:  I'd move on.

13             THE COURT:  Before you do that, you said that there

14   was 22 inspections of facilities last year.  What happens after

15   an inspection?  Is there a report written up?

16             THE WITNESS:  Yes.  Typically -- it will take a few

17   months, but typically there is a record findings and then that

18   report of finding is sent to ICE or CBP with recommendations

19   that they either accept or don't.

20             THE COURT:  Can I find those?  If I wanted to look at

21   those reports, could I look at them?

22             THE WITNESS:  I don't know that they were ever

23   public.  I'm honestly not sure.

24             THE COURT:  How many of those recommendations went up

25   to ICE?  And then how do we find out if ICE does anything with

1    those recommendations?

2              THE WITNESS:  ICE will typically respond in writing

3    to these reports.  I don't know what that format looks like,

4    though.  I haven't been able to find any.

5              THE COURT:  You haven't been able to find any?

6              THE WITNESS:  Yep.

7              THE COURT:  Okay.  All right.

8    BY MR. DAVIS:

9    Q.  So you mentioned some other statutory roles that these

10   offices hold.  What about the, sort of, oversight and advisory

11   side of it?

12   A.  So there is what I would call a programmatic oversight

13   role, where CRCL folks will make recommendations.  And it might

14   not necessarily be linked to a specific case, but it could.  So

15   they may intake -- out of 1,000, they may see there's a

16   commonality of, let's say, 500 of those cases and then they say

17   okay, we have something we need to examine here and there's a

18   persistent problem at TSA.  TSA, we should look at this because

19   we have 500 complaints about the same thing.

20              So that winds up being in a report at the end of the

21   year, or recommendations in writing to the component.  And it's

22   similar for OIDO and CISOMB, it's the same thing, there's a

23   back and forth that ultimately winds up in the annual report.

24   USCIS is required to respond to those recommendations.

25              THE COURT:  One second.

```
 1              Mr. Martinez, can you please put a mic in front of
 2    Ms. Gilbride and make sure to turn it on?  Because otherwise
 3    I'm not able to hear the objections.
 4              All right.  Sorry.  Go ahead.
 5    BY MR. DAVIS:
 6    Q.  Let me back up a second.  Why weren't you able to find some
 7    of the reports from the detention facility -- from the
 8    detention ombudsman?
 9    A.  To be honest, the recordkeeping of the office when I went
10    into it didn't match, like, normal recordkeeping procedures
11    that I would know of and know where to find stuff.
12              THE COURT:  When did you go into the office?
13              THE WITNESS:  Over the last couple of months that I'm
14    asked to look into it.
15              THE COURT:  Okay.  All right.
16              THE WITNESS:  And so I did talk to staff there.  I
17    mean, they do have reports.  They have documentation, to be
18    sure, but not everything was well categorized.  A lot of
19    documents were just not findable.  Again, it's not to say that
20    if we asked, let's say, the chief information officer to pull
21    all the data in a forensic way, that they can't find it.  It
22    was not readily available, other than, like, the annual
23    reports.
24    BY MR. DAVIS:
25    Q.  You said you had talked to some of the people in the
```

1    office.  Could you explain to us what you talked to them about?

2    A.  Yeah.  So for all the offices I asked:  How do they run?

3    How do you think they should run?  What are some problems that

4    have been found in the past and what would you change, if you

5    wanted to change anything, and then --

6              THE COURT:  They said we should fire everybody?

7              THE WITNESS:  Right, so that was not their

8    recommendation.

9              THE COURT:  Yeah.  No, I didn't think so.

10   A.  So they had some recommendations for substantial changes.

11   And I also asked them if there were urgent cases, open cases of

12   note that I needed to know about.  None were flagged at that

13   time, or at all.  But there were -- what was told to me by CRCL

14   was there is a workload for urgent medical requests that came

15   from detainees.  And the executives who were at CRCL at that

16   time were working that queue and forwarding those requests to

17   ICE, as per normal handling.

18   BY MR. DAVIS:

19   Q.  Was that happening after the March 21st, notice?

20   A.  Yes.

21   Q.  Moving back to some of the other statutory roles.  What

22   about the congressional reports, what can you tell us about

23   those?

24   A.  So CIS ombudsman has a report to deliver -- has a

25   requirement to deliver a report to Congress by June 28th or

1    June 30th of every year.  CRCL has an annual required report,

2    maybe a semiannual as well, and that has to be made public.

3    The CISOMB report only has to go to Congress, could be made

4    public.  And then OIDO has an annual reporting requirement.

5    Q.  And do the offices do anything other than the statutory

6    work that's required?

7    A.  They do.

8            MS. GILBRIDE:  Objection.  Vague.  Lacks foundation.

9            MR. DAVIS:  Your Honor, I think --

10           THE COURT:  I'll let that one go.

11           Go ahead, sir.

12   A.  Yes.  They do a lot of what we call discretionary work.

13   And so primarily that's in the realm of advocacy and public

14   engagement and travel.  Lot of, like, foreign travel,

15   international travel.  Lot of marketing.  Lot of quite

16   expensive marketing.  And, again, the public engagement is

17   largely discretionary and somewhat duplicative with other

18   offices in the department.

19           THE COURT:  I'm sorry.  What was duplicative?

20           THE WITNESS:  The public engagements.

21           THE COURT:  That was duplicative with what other

22   offices?

23           THE WITNESS:  Office of Partnership and Engagement

24   and Office of Public Affairs.

25           THE COURT:  Okay.  So can you give me an example?

```
 1              THE WITNESS:  Sure.  So stakeholder engagements, that

 2      would be the same type of audience and subject matter as FORA,

 3      held by USCIS, because they have their own external affairs

 4      director.  There's the --

 5              THE COURT:  Could you give me like an actual example?

 6      Like, they held a meeting on medicine in detention facilities

 7      and that same type of meeting was held by this other office.

 8              THE WITNESS:  I would say same audiences.  Off the

 9      top of my head, I don't remember specific topics, but like AILA

10      engagements, where primarily the same topics are discussed

11      between USCIS and then CISOMB, and then there would be tension

12      in the department, why department offices under the same

13      department are saying different things about policy, when, for

14      example --

15              THE COURT:  Can you give me an example of one?

16              THE WITNESS:  I don't have one off the top of my

17      head.

18              THE COURT:  Okay.

19      BY MR. DAVIS:

20      Q.  Do you have any examples of any of the, sort of,

21      international public engagement or anything like that?

22      A.  One example that stands out is the head of -- or, the

23      acting head of CRCL took a trip to the Hague and testified on

24      civil liberties issues at the Hague, and that stands out as a

25      particularly high travel expense, which does not seem to be
```

1  linked to a statutory function.

2  Q.  Okay.  And what is the department's plan with these offices

3  going forward, at a high level?

4  A.  The plan is to perform the statutory duties of the offices.

5          THE COURT:  How is that going to happen?

6          THE WITNESS:  So, right now we're in the process of

7  forming our plan.  The secretary's office has asked me to come

8  up with a notional plan for the two offices of which I am not

9  the head.  And I could give quite a bit of detail about the

10  office of which I am the current head.  But, at a high level,

11  for the offices of which I'm not the head, the idea is to

12  refocus on the statutory functions and build up based on, like,

13  a staffing model that would be needed to perform those

14  functions.

15          THE COURT:  But give me like an actual what that

16  means.

17          THE WITNESS:  Yeah.  So we know X amount of cases are

18  expected to come in to OIDO.  So we would know how many in the

19  prior staffing worked on cases, because it turns out to be

20  quite a small percentage.  And so then that might be a place to

21  start with where to restaff on the casework side.

22          But then there's a second piece of that, which is the

23  classification.  We want to make sure the right series, OPM job

24  series is being used to hire.  I have looked at it and found

25  that perhaps they did not have the right individuals in the

```
1    in charge?

2              THE WITNESS:  Correct.

3              THE COURT:  And you're basically tasked with, so far

4    as I can tell, trying to find out from the lawyers the bare

5    minimum that these offices have to do and then staff up to do

6    that?

7              THE WITNESS:  Not quite the bare minimum.  I'm

8    talking to the individuals, the senior executives who are the

9    heads of these offices, Public Partnership and Engagement,

10   Privacy Office, all of the offices that had touch points with

11   these offices and to figure out what needs to be done and where

12   there is value in any of the discretionary work.

13             THE COURT:  But when you figure out what needs to be

14   done, you're just asking the lawyers:  What do I have to do

15   under the statute, right?

16             THE WITNESS:  And these other stakeholders who could

17   say whether or not there was value in some of the discretionary

18   activities.

19             THE COURT:  Have they given you any values with

20   discretionary activities?

21             THE WITNESS:  Some of the public engagement might

22   have value.

23             THE COURT:  Like what?

24             THE WITNESS:  Stakeholder meetings, for example, with

25   advocacy groups, some of that may -- the way it's been
```

1    presented to me is there may be value in helping the

2    operational components like TSA, CBP, and ICE do their jobs

3    more effectively if we engage with certain groups who can bring

4    concerns ahead of time.

5              THE COURT:  Okay.  But right now, whatever the

6    statutory duties are, you're not alone able to do it all,

7    right?

8              THE WITNESS:  No, not alone.  But what we're doing is

9    we're taking a beat -- their expectation is that new leadership

10   will be appointed soon by the secretary and then resuming the

11   functions.

12             THE COURT:  What's the plan -- when will that happen?

13             THE WITNESS:  I don't know when the secretary will

14   make the decision, but I've been told very soon.

15             THE COURT:  Who has told you that?

16             THE WITNESS:  Advisors to the secretary.

17             THE COURT:  Who are the advisors?  I mean, we could

18   do this all day.  Who were the advisors to the secretary who

19   told you that?

20             THE WITNESS:  A number of them.  We could start with

21   the general counsel, acting --

22             THE COURT:  Names.

23             THE WITNESS:  -- general counsel --

24             MR. DAVIS:  Your Honor, I think this is getting a bit

25   into deliberative processes here --

1          THE WITNESS:  No.

2          THE COURT:  Okay.  Did you get any -- basically, did

3     you get any papers or anything from anybody?

4          THE WITNESS:  No.

5          THE COURT:  Just we're firing all these people, we

6     need to figure out how to start over?

7          THE WITNESS:  No papers.

8          THE COURT:  All right.  Go ahead.

9     BY MR. DAVIS:

10    Q.  So you said about 300 employees were getting RIF'd, is that

11    right?

12    A.  Yes.

13    Q.  Could you break that down by office for us?

14    A.  Approximately 147 from CRCL, about 118 from OIDO, and about

15    40 from CISOMB.

16    Q.  How does that compare to staffing historically?

17    A.  So those numbers are quite high historically.  For example,

18    OIDO started with three employees and that ballooned to 118 in

19    the last year or two.  CRCL had less of an increase, but they

20    historically were somewhere about 30 or 40 positions lower than

21    where they are now.

22         THE COURT:  I'm sorry, which office was that?

23         THE WITNESS:  CRCL.

24         THE COURT:  Give me the numbers again.

25         THE WITNESS:  Sure.  So CRCL, currently 147; OIDO,

1    118; and CISOMB 40.  And then historically they were around 20

2    and then they doubled in size in the last two to three years.

3                THE COURT:  I'm sorry, what was the size increase for

4    CRCL?

5                THE WITNESS:  Approximately 30 or 40.

6                THE COURT:  In how long?

7                THE WITNESS:  I think two to three years.  It's a

8    little hard to track with the way HR is recorded.

9    BY MR. DAVIS:

10   Q.  And could you repeat on OIDO, how many they had and how

11   many it's increased to?

12   A.  So they started with two or three and now they have 118,

13   and that was within maybe a two-year span.

14   Q.  Okay.  And how many employees in each office handled

15   complaints?

16   A.  So, it varied.  In CRCL there were about 20 caseworkers.

17   OIDO, it's a little hard to tell, but it sounds like around 20

18   or thereabout as well, although it's hard to tell there, and

19   their duties were a little bit more -- a little less defined.

20   And then CISOMB had about 12 -- maybe 10 to 12 caseworkers.

21   Q.  And how many staff were the offices required to have?

22   A.  There is no minimum requirement.

23   Q.  What about the local ombudsman for CIS?

24   A.  So there is a requirement in statute for CISOMB to have a

25   local ombudsman in every state.  There has never been local

1    ombudsmen.  And that was, it seems to me, an unfunded mandate

2    from Congress because there was never more than 50 employees in

3    the office, let alone 50-plus headquarters staff.  And talking

4    to the now-deputy ombudsman, who was the acting ombudsman, he

5    said that was just -- there never money to fulfil that

6    requirement, so it was never fulfilled.

7    Q.  And following the March 21st notice, right after, how many

8    people were actively working in these offices?

9    A.  There were three senior executives in CRCL actively working

10   and doing their jobs.  There is one executive in OIDO, and then

11   a senior executive in CISOMB.

12   Q.  Are federal employees --

13          THE COURT:  I'm sorry.  You said that there's a

14   statutory -- your interpretation is the statute requires local

15   ombudsman in every state?

16          THE WITNESS:  Yes.

17          THE COURT:  But that there was not money for that?

18          THE WITNESS:  Right.

19          THE COURT:  But now we have 20 to 40 people there in

20   headquarters?

21          THE WITNESS:  Right.

22          THE COURT:  So there would be money for at least 40

23   of local ombudsmans, right?

24          THE WITNESS:  If no one performed the headquarter

25   functions, yes.

1    THE COURT:  Okay.  But no one is performing them

2    right now, right?

3    THE WITNESS:  Right now, I am performing them and my

4    deputy is performing them.

5    THE COURT:  So, 39?

6    THE WITNESS:  Right.

7    THE COURT:  Okay.  All right.

8    BY MR. DAVIS:

9    Q.  Is there any other way that the work of these offices gets

10   done, other than federal employees?

11   A.  Oh, yes.  There's contracts.  There are quite a few

12   contracts, and many of those contracts are still in place and

13   actively in a paid status, and those contracts --

14   THE COURT:  Which are those?

15   THE WITNESS:  There's a few.  I don't remember all of

16   them off the top of my head, but --

17   THE COURT:  That are currently working, they're

18   currently being paid?

19   THE WITNESS:  Yes, they're currently being paid and

20   working and they're primarily focused on adjudication of

21   medical issues and casework, the core casework contracts.

22   THE COURT:  Who are those contracts with?

23   THE WITNESS:  Oh, I don't remember the names.

24   THE COURT:  How many contracts?

25   THE WITNESS:  The ones still in the pay status, about

1    ten.

2              THE COURT:  And how much money is going into those?

3              THE WITNESS:  At least 10 million, probably more,

4    that we're talking now, like an annual spend.

5              THE COURT:  For a total?

6              THE WITNESS:  Total.  Total.

7              THE COURT:  Okay.  And there's no plans to end those

8    contracts?

9              THE WITNESS:  No.  I deliberately recommended to the

10   office of contracting that they keep them running, that they

11   are absolutely necessary, and they will be left in a pay

12   status.

13             THE COURT:  So they've told you they're going to be

14   left in pay status?

15             THE WITNESS:  Yes.

16             THE COURT:  All right.

17   BY MR. DAVIS:

18   Q.  Were there any contracts that were not left in pay status?

19   A.  There were some that were canceled.  So I have a long

20   history as a contracting expert with the government.  I was at

21   one time a certified contracting officers' representative.  I

22   was the executive over USCIS's largest contract for years and

23   so I know what large contracts should look like, and small

24   ones, and what they should not look like, and there were some

25   that were plainly duplicative.

1    exposure to extreme temperatures; suppression of speech and

2    religious worship protected by the First Amendment; denial of

3    medical care for chronic, urgent, and emergency conditions that

4    has led to preventible illness and death; and discriminations

5    from officials on the basis of race, gender, sexual

6    orientation, disability, and other abuses.

7          And I have, for example, a declaration at 15-5 from a

8    Lilian Serrano, at paragraph 8, who writes of a complaint that

9    CBP gave migrants held at the OADS only one bottle of water and

10   one granola bar per day, had only one portable toilet for

11   hundreds of migrants and provided no showers, handwashing

12   stations or feminine hygiene products, even though migrants

13   were being held at the sites for up to a week.

14         I mean, I could go on.  I'm not saying that you were

15   trying to downplay it.  I'm not accusing you of anything.  But

16   these are serious issues.  I guess what I want to know is, like

17   right now if these issues are coming to the fore, which I

18   assume they are, who is dealing with those?

19         THE WITNESS:  At the moment, we are reviewing those

20   complaints, but not taking action on them.

21         I will say there is one case mentioned in the

22   complaint where the allegation was made that ICE attacked

23   several detainees conducting a hunger strike.  If you look at

24   the timeline there, it is indicative of a typical timeline

25   response from OIDO and CRCL.  Six months to even acknowledge

1    receipt and a year before a paper recommendation was issued.

2         So these are not claims that -- these are not offices

3    that supplant 911 or officers on the ground.  They have an

4    important oversight function, but they are not quick.  And so

5    the two-month or so intervening period here, when -- six months

6    to acknowledge receipt, a year to issue recommendations, we

7    are -- like, the timeline is not substantially slowed, if we

8    could staff back up and work these cases efficiently.

9         THE COURT:  Okay.

10   BY MR. DAVIS:

11   Q.  How does the department handle, sort of, these immediate

12   urgent needs that are raised in complaints?

13   A.  Well, so the department generally -- I mean, the first

14   response should always be from the officers on the ground.

15   Right?  And so if a detainee has a complaint, the officers

16   there are the first individuals who can provide a remedy.

17        The department intakes through the Office of the

18   Inspector General and then the office intakes through the

19   offices that we're discussing here.  But typically the remedy

20   looks like a written recommendation to the primary component

21   that the primary component either accepts or did does not

22   accept.

23   Q.  How do these offices remedy individual issues or complaints

24   like some of the ones the judge was mentioning?

25   A.  Typically, a caseworker will ask -- and this is how it

1   always is -- a caseworker will ask ICE or CPB to provide the

2   remedy as appropriate, and then they take whatever action they

3   deem fit.

4   Q.  How often are these individualized, versus more systemic,

5   the recommendations?

6   A.  It depends on the office.  So CRCL almost entirely deals

7   with the higher-level programmatic.  Even where there are

8   allegations of individual rights deprivations, it's not an

9   immediate response.  I don't know what the mix is between

10  programmatic and casework and that's a hard comparison to do.

11  Yeah, I just don't know.

12  Q.  And so, going forward, how do you -- you mentioned a plan,

13  how do you plan on ensuring that these offices meet their

14  statutory duties?

15  A.  So, at a high level, the plan is to make sure we have the

16  right number and the right type of job, of federal civil

17  servant identified, and to begin priority hiring actions for

18  those individuals, contractors, get them spun up, if they need

19  to increase.

20          So as we look at the mix of staffing, contractors did

21  a lot of the work of these three offices.  Perhaps the right

22  mix going forward, a mix that's more efficient for the

23  government is more contracting.  And that is on the table and

24  one of the primary recommendations that I will be making, is to

25  scale up the amount of contractors.  And then something I've

1    contractees yourself?

2           THE WITNESS:  I could, yes.

3           THE COURT:  All right.  What else?

4           THE WITNESS:  And then, again, details.  Absolutely

5    details.  But then there there's a larger piece for the Office

6    of the General Counsel because there are attorneys assigned to

7    that work who are expert in CRCL-type work.  They will be --

8           THE COURT:  They haven't been fired?

9           THE WITNESS:  No.  No, they work for the general

10   counsel.

11          THE COURT:  All right.  And then OIDO?

12          THE WITNESS:  OIDO.  The plan there is, again, I

13   think we need at least 10 and maybe 20 to do both casework and

14   then inspections.  As I've said before, I think inspections

15   were not handled correctly.  And, so, the plan there is --

16   again, contractors, they relied heavily on contractors and I

17   want to look at that contract carefully because there were a

18   lot of complaints made on that contract, some of them quite

19   serious PREA complaints.

20          THE COURT:  What is that?

21          THE WITNESS:  Prison Rape Elimination Act.  So there

22   are quite a few complaints that were quite very serious on that

23   contract.  I want to see what's going on there.  It strikes me

24   that it was not managed correctly and diligently overseen.  And

25   then, again, detailees as well.

1          THE COURT:  Okay.  All right.

2   BY MR. DAVIS:

3   Q.  Just for clarity sake, the numbers that you gave for the

4   offices you're not currently in charge of, those are just sort

5   of your personal thoughts and recommendations?

6   A.  Yes.

7   Q.  And how will it be determined what the correct staffing is?

8   A.  The resources, those always control.  So we can't do more

9   than we're allocated or appropriated to do.  So, you know, it

10  will be whatever we can do within the appropriation amount.

11          THE COURT:  I'm sorry.  But right now the

12  appropriation has been for tremendously more people than you

13  now say you need.

14          THE WITNESS:  Yes.

15          THE COURT:  So why would appropriations be an issue?

16          THE WITNESS:  Well, right now there is a certain

17  allocated amount, but then we're coming up on fiscal year '26

18  and that will be a different budget and we don't know what that

19  budget will look like.

20          THE COURT:  Okay.

21  BY MR. DAVIS:

22  Q.  And what -- have you engaged in any analysis in the last

23  couple of months on what the work should look like going

24  forward in your role?  Could you explain any of that?

25  A.  Yes.  So it's largely what I just said.  The analysis is

1    that there are queues and those queues have a certain size,

2    they have a certain pending status, an age status, what we

3    would call, and then there's a certain amount of work that

4    needs to be done or should be done in a certain amount of time.

5    And that mix of contractors, employees, and detailees to

6    perform the statutory functions is what that work looks like.

7    And then a handful or a few individuals to perform the annual

8    reporting requirements as well.

9    Q.  And so what is being done right now with the complaints in

10   these different offices?  We've made some mention of that, but

11   could you expand --

12   A.  Right.  So, the urgent medical requests that come in are

13   being worked and forwarded to the respective component, and the

14   other complaints are being reviewed and triaged and then

15   prioritized for when leadership is appointed.  That's for two

16   of the offices.  And the office I'm the head of, we're working

17   those inquiries.

18   Q.  And we talked a little bit about, from the Enriquez

19   declaration, some of the outstanding complaints that were filed

20   by the plaintiffs.  Do you recall that?

21   A.  Yes.

22   Q.  And what would the office do with those complaints going

23   forward?

24   A.  So, what CRCL, for example, would do with one of those

25   complaints is if that is open, which it seems to me that it is

1    open, we would investigate whether or not it has merits.  I

2    would see if CRCL has drafted anything for that particular

3    complaint and then we would issue the recommendations, if they

4    had merit.  And that's with any case.  And then, you know, one

5    thing I do want to work on or look at is the timeliness of the

6    responses.  I know there is a high volume of complaints, but it

7    seems to me that six months to acknowledge receipt of a

8    complaint that has merit is a long time and I'm not convinced

9    that more staff means a faster response time.

10   Q.  Why aren't you convinced of that?

11   A.  Because there's a number of factors that, from my review,

12   may have led to a delayed response.  There was a lot of

13   thinking of the politics and liaising with components and

14   different stakeholders weighing in on recommendations that I'm

15   not sure is absolutely necessary.  And this is a recommendation

16   that I would make, that the offices move faster and do a more

17   analytical triaging of the complaints.  And where something is

18   truly urgent and has merits, that you separate them out and

19   respond faster.  And then other ones that need longer

20   investigation or that aren't as clear that they have merit,

21   that they can perhaps take longer.

22          But again, this would be for the future leadership to

23   decide.  But I would like to see a better risk stratification

24   of these complaints so that the most serious ones don't take a

25   year to close out.

1   presented it to me.  If you ask them, they have jurisdiction

2   over every kind of claim, to include everything covered by

3   OIDO.  And this is one of the big inefficiencies I uncovered

4   and I think needs to be deconflicted.

5           So CRCL, including the complaint in one of the briefs

6   here, seem to receive all of the complaints that OIDO did, or

7   at least of a certain kind, and also chose to act on them, from

8   what I can tell.  I don't have evidence of a crosswalk between

9   CRCL and OIDO to ensure they weren't doing the same work.

10  Q.  OIDO and CRCL did enter into a memo of understanding to

11  share functions and assign functions between them to avoid --

12  to do just the sort of deconfliction that you're speaking

13  about.  That's actually covered in the OIDO report that you

14  have in front of you, the MOU and the deconfliction mechanism.

15  Are you familiar with that?

16  A.  I'm familiar with the MOU.  I'm also familiar with

17  anecdotal reports that that did not work in practice.

18  Q.  Do you know how many new OIDO cases have been opened since

19  March 21st?

20  A.  No.

21  Q.  The report that we've been looking at from OIDO, at page

22  11, talks about the most common topics of the complaints, that

23  many OIDO complaints involve allegations of inadequate medical

24  care causing serious medical problems.  Can you tell me how

25  many OIDO complaints have come in since March 21st involving

1    decided, oh, the out-of-office is say what the RIF said?

2              THE WITNESS:  Correct.

3              THE COURT:  Go ahead.

4    BY MS. GILBRIDE:

5    Q.  Speaking of the RIF, I would like to find out what you know

6    about the process leading up to the RIF, and even backing up

7    from that, to the memo that was sent to OPM on March 7th.  Were

8    you consulted about the memo that was sent to OPM on March 7th?

9    A.  No.  That was some weeks before I had any involvement with

10   these offices.

11   Q.  And were you consulted about the RIF before the notices

12   went out on March 21st?

13   A.  No.

14   Q.  Have you seen the memo that went to OPM on March 7th?

15   A.  I don't believe so.

16   Q.  So you may not know the answers to this question -- these

17   next couple questions either, but I'll ask and you can tell me.

18              Between the executive order being issued on February

19   11th and the memo going to OPM on March 7th, was any analysis

20   conducted, to your knowledge, of positions across DHS, across

21   all of the components of the department to determine which

22   positions were performing statutory functions and which were

23   performing discretionary functions?

24   A.  I do believe that analysis was conducted.  I know it was

25   conducted because I conducted it, or led the doing of that for

1    the office of the general counsel.

2    Q.  Okay.  And as part of that analysis, who was consulted

3    about the functions being performed by CRCL, CISOMB and OIDO?

4    A.  I don't know.

5            MR. DAVIS:  Objection.  I think we're getting into

6    deliberative process.

7            THE COURT:  Well, he doesn't know, right?

8            THE WITNESS:  I don't know.

9    BY MS. GILBRIDE:

10   Q.  I take it you don't know if anyone in CRCL was consulted?

11   A.  I don't know.

12   Q.  You don't know if anyone from CISOMB was consulted?

13   A.  I don't know.

14   Q.  And you don't know if anyone from OIDO was consulted?

15   A.  I don't know.

16   Q.  Do you know if anyone from OGC was consulted?

17   A.  About those offices, I do not know.  We were certainly

18   consulted about our own positions.

19   Q.  Okay.  Do you know if DHS has conducted RIFs before the

20   February 11th executive order?

21   A.  I don't know.  I'm trying to think back to my history.  I

22   don't know.  Not at the offices that I was at when I was at

23   them.

24   Q.  Do you know, anecdotally or in any other way, how long

25   those RIF processes took to plan and to implement?

90

1    Q.  And you are not the decisionmaker with regard to the

2    staffing levels that are laid out in that plan, correct?

3    A.  Correct.

4    Q.  And when you started this process of evaluating the work of

5    the three offices, were you starting from scratch?  Or was

6    there anyone else within the department who had begun looking

7    at these functions and handed something off to you?

8    A.  There was no other person in the department who has

9    performing the task that I'm performing and looking at them.

10   The existing work is what was provided to me by the leaders of

11   those offices at the time.

12   Q.  So as of March 21st, when the decision was made to conduct

13   the RIF and place everyone on administrative leave, as of that

14   time, to your knowledge there was no plan for how the work of

15   the offices would continue?

16   A.  I was not aware of a plan.

17   Q.  And that plan, as we've heard you describe it, has three

18   main components; detailees, hiring new full-time staff, and

19   hiring contractors, is that accurate?

20   A.  Yes.  There's another component that I would add, which is

21   technology.  There are a lot of tools that could be brought to

22   bear to risk-stratify the workloads, to triage and then to run

23   analytics, keyword searches, for example, on the claims in

24   queue so that we can elevate the most urgent or relevant,

25   full-of-merit claims possible in those workloads.

1    Q.  So the role that you envision for technology is to separate

2    meritorious complaints from non-meritorious complaints?

3    A.  Every complaint would need to be read by a human.  But

4    given as we've seen the offices do not work the majority of

5    these cases, by far, then what we're looking to do is help

6    expedite the processing of those claims that might have been

7    opened in the past.

8             So, for example, if there's a certain type of claim

9    that was consistently opened at a higher rate by these offices,

10   then we want to find those faster so that they can then be

11   worked by the staff.

12   Q.  So I wanted to go back to this idea of complaints, how

13   quickly a complaint is opened.  You mentioned that you had read

14   the briefing in this case.  Do you recall the example that is

15   mentioned in our brief of one of the complaints that was filed

16   by RFK Human Rights regarding an individual with epilepsy who

17   was in detention, brought a complaint under Section 504.  That

18   complaint was successfully resolved, even though a formal

19   investigation was never opened.

20           Are you familiar with complaints that are just resolved

21   at the facility level, without an investigation formally being

22   opened so that they would show up in the statistics of opened

23   complaints?

24   A.  Yes.  I'm not familiar with that particular complaint.

25   But, yes, I'm aware that some complaints were resolved at the

1    facility level.

2    Q.  If a complaint is resolved at the facility level, would you

3    consider that successful?

4    A.  Yes.

5    Q.  Good outcome?

6    A.  Yes.

7    Q.  One of the things that you mention in your declaration,

8    paragraph 9, in terms of what your plan is for the agencies or

9    for the offices, is that you will, you know, make sure that

10   they cease all discretionary activities.  Of course, right now

11   all activities are ceased, but when they resume operations, do

12   you have a list in your plan of what you consider the

13   discretionary activities to be?

14   A.  I do have a list of recommendations to make to department

15   leadership as to what I believe -- and this part has been

16   cleared through the Office of the General Counsel -- what is

17   statutorily required and what I believe to be discretionary.

18   Q.  Okay.  So what are the activities that fall into the

19   discretionary category?

20   A.  So primarily I would characterize it as public engagement

21   that is duplicative with other public engagement going on in

22   the department.  And then travel, travel that is not directly

23   linked to work functions.  So by that I do not mean travel to a

24   detention facility, but I mean international travel, or travels

25   to give speeches that don't have a clear nexus to the work and

1    do not advance the mission of the department.

2    Q.   Okay.  So any other discretionary activities besides travel

3    and public engagement to work -- duplicative public engagement?

4    A.   Yes.  For example, marketing expenditures that don't

5    clearly advance the mission of the office.  For example, OIDO

6    spent millions of dollars, and maybe tens of millions of

7    dollars -- depending on how the contracts were worded, it's a

8    little bit unclear -- but, at a minimum, millions of dollars on

9    what I would call swag.  So these are OIDO emblems on

10   windbreakers, hats, coffee mugs, anything that you can stick a

11   logo on they bought it and gave it out and I don't see how that

12   advances the mission.

13   Q.   With regard to what you described as duplicative public

14   engagement, who would be authorized, in your view, to determine

15   if a public engagement activity is duplicative or not?

16   A.   I don't think there's one answer.  I mean, it certainly

17   would start with the secretary and deputy secretary.  But

18   something like engagement, jurisdiction, in my view, belongs

19   with the assistant secretary for public affairs and the head of

20   the Office of Partnership and Engagement.

21   Q.   Okay.  With regard to detailees, which is one of the

22   components of your strategy, how long do details typically

23   last?

24   A.   Oh, it ranges.  I would say the average detail is probably

25   six months, but oftentimes they'll go at least a year,

1    Q.  And CRCL in particular is also required to make information

2    public about the complaints that it has received and resolved?

3            MR. DAVIS:  Objection.  I think that calls for a

4    legal conclusion.

5            THE COURT:  I'm sorry.  Ask the question again.

6    BY MS. GILBRIDE:

7    Q.  Is it your understanding that CRCL is required to publicly

8    disclose information about the complaints that it has received

9    and resolved?

10           THE COURT:  Well, I mean, to the extent he's

11   testifying that what's publicly required to be published is

12   being published, he has a right to know what he thinks is

13   publicly required to be published, which I think is part of the

14   question.  So overruled.  In your view.

15           THE WITNESS:  I am not aware of that requirement or,

16   at a minimum, I'm not sure that that means that every

17   recommendation issued is required to be posted.

18   BY MS. GILBRIDE:

19   Q.  And with regard to FOIA requests, which there had been a

20   FOIA office within CRCL, who is currently handling FOIA

21   requests for these three offices?

22   A.  The Office of Privacy is handling all requests for them,

23   and has been continuously since around March 21st.  So there

24   has been a concerted effort to consolidate all FOIA requests

25   processing across the department in the Office of Privacy

1    because that is where the contract vehicles and the federal

2    government employee expertise exists.  It is the most efficient

3    way to do it and they are intaking and processing all CRCL,

4    CISOMB, and OID FOIA requests and have been continuously.

5    Q.  And for other components of DHS, or just for those three?

6    A.  No.  So headquarters privacy is handling all offices in

7    headquarters and then each component has its own FOIA or

8    privacy office handling theirs.

9    Q.  With regard to report to Congress, you mentioned the annual

10   reports for each of the three offices.  But didn't CRCL also

11   have an obligation to report on the -- with regard to delegated

12   law enforcement functions under 8 USC 1357 to have additional

13   reporting requires about that?

14                MR. DAVIS:  Objection.  I think that's still a legal

15   conclusion.

16                THE COURT:  What's your understanding?

17                THE WITNESS:  I'm not immediately familiar with it.

18   I do know there are other statistics-based recording

19   requirements.  I believe they can be rolled into the annual

20   report, but in my discussions with our counsel, my

21   understand --

22                THE COURT:  No, no, don't talk to me about

23   discussions with counsel because then all things kind of blow

24   up and my life becomes more difficult than I want it to be.

25                MR. DAVIS:  Thank you, Your Honor.

1    already working those cases, as well as the deputy ombudsman

2    working them, and the report is being written.  So the

3    statutory functions are being performed.

4            Now, they're going to be performed to a much higher

5    degree in the very near future and if I can get three or four

6    detailees on in a week -- or, two weeks, rather, and there were

7    10 to 15 caseworkers in CISOMB prior, we're already a good way

8    of the way there within a couple of weeks to working that

9    queue.  And again, there is no specific timeline for when that

10   queue gets worked or an obligation to respond to every inquiry.

11   BY MS. GILBRIDE:

12   Q.  And with regard to the offices that you know less about,

13   which are -- I think your estimates had those at higher

14   staffing levels, that would presumably take a somewhat longer

15   period of time, correct?

16   A.  Well, to staff to higher levels, it would probably take a

17   little bit longer, but not necessarily.  And let me explain why

18   that is.  So I've been in touch with the Office of the Chief

19   Human Capital Officer and they understand that when new

20   leadership is in place and wants to hire for these offices,

21   that hiring has to go through an expedited pipeline.  And so

22   what that means is expedited handling within the Chief Human

23   Capital Office and using hiring authorities within the civil

24   service or the accepted service that can hire faster than the

25   typical hiring timeline.

1          So that understanding has already been reached.  So

2     new leadership would have access to expedited hiring to staff

3     these offices up.  And you don't have to hire in series, you

4     can hire in parallel.  So there's no reason new leadership

5     couldn't hire ten simultaneously.

6     Q.  Would any of the people who were working for these offices

7     up until two months ago be eligible for rehire?

8     A.  If -- if they are RIF'd, they are eligible.  They have --

9     right now they would -- so if -- when they're RIF'd, they would

10    have, I believe, ICTAP preference or some kind of rehire

11    preference, yes.  About a third of the employees impacted by

12    the RIF have chosen to take the deferred resignation program,

13    so they have elected to separate from the government.  And I

14    believe those agreements, they have opted to not return to

15    government service.  But the others, if they are in fact RIF'd,

16    they would have rehire preference.

17    Q.  And as fast and expedited as that hiring authority might

18    be, wouldn't it have been faster for people just not to have

19    lost their jobs in the first place, than to have to lose their

20    job, then go through a reapplication process to get rehired

21    again?

22    A.  Faster, yes.  Again, speed is not the only goal with the

23    refocusing of functions here.

24    Q.  So, given that you are not the ultimate decisionmaker and

25    we have functions that are currently not being performed at

1    travel and the secretary was in a meeting.  But he said if we

2    could respectfully have until 10 a.m. tomorrow to get you a

3    response on your question?

4              THE COURT:  Perfect.

5              MR. SMITH:  Thank you.

6              THE COURT:  Where is he going?

7              MR. SMITH:  I don't think I can say, Your Honor.

8              THE COURT:  All right.  Probably not the Hague.

9                        REDIRECT EXAMINATION

10   BY MR. DAVIS:

11   Q.  Just a couple more questions, Mr. Sartini, then you can get

12   out of here.

13             THE COURT:  Well, after mine.

14             MR. DAVIS:  Besides whatever the judge wants, of

15   course.

16   BY MR. DAVIS:

17   Q.  Did you have any conversations with outgoing leadership

18   about the functions of these offices?

19   A.  Yes.

20   Q.  What conversations about, sort of, outstanding complaints

21   did you have?

22   A.  I asked if there were urgent or important complaints that

23   needed to be attended to within the next few weeks or some near

24   period, and I was told the answer was no, other than the urgent

25   medical requests that came in and were being worked by an SES

1    in that office.

2    Q.  Were you told about any that were close to lapsing?

3    A.  No.  I was told that the queues were all in pretty good

4    shape.

5    Q.  Okay.  And the EEO functions of CRCL, is that internal or

6    is it outward facing?

7    A.  Say that again.

8    Q.  The EEO functions of CRCL, is that internal or is that

9    outward facing?

10   A.  My understanding is that's internal.  If an employee files

11   an EEO complaint, like a supervisor has discriminated against

12   me because of the color of my skin, that's an internal matter.

13   Q.  Do any of the primary components handle their EEO issues?

14   A.  All of the large operational primary components have EEO

15   shops and deal with their own.

16   Q.  And when we talk about the Rehabilitation Act, that's

17   public accommodations, things like that?

18   A.  Yes.

19   Q.  And are these issues addressed in other ways on the ground?

20   A.  Oh, yes, often they are.  So, for example, if an

21   accommodation is needed in detention, the ICE or CBP officers

22   and staff are always the first line to provide that.  They are

23   closest to the situation.

24   Q.  And if there are outstanding complaints that are nearing

25   the time period, will the office be handling those as soon as

1       they can?

2       A.  Yes.  And if I were the incoming leadership, the first

3       thing I would do is look at the oldest complaints and then I

4       would simultaneously look at any complaints that seemed to be

5       urgent but might not be old.  And so it's a two-part handling

6       of the workload, which is standard in government caseload

7       management.

8       Q.  And you were asked about -- you said that the FOIA

9       functions are being handled by the privacy office.  Was that

10      ever true in the past?

11      A.  Oh, yes.  So, it used to be that the Office of Privacy

12      handled all of DHS headquarters.  And only in the last few

13      years -- I'm not sure, but somewhere within the last two, three

14      years CRCL fought with -- internally to take that function

15      back.  There was disagreement, but they did take it back and

16      now the plan is to -- well, for the plan, it's already

17      happened, at least a month ago, probably more, to fully

18      centralize it back in the Office of Privacy.

19              MR. DAVIS:  No further questions, Your Honor.

20              THE COURT:  All right.  I just have a few questions

21      for you.  You would agree with me that individuals in -- held

22      in detention centers are human beings?

23              THE WITNESS:  Of course.

24              THE COURT:  And they're entitled to safe, clean

25      accommodations?