UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; and URBAN JUSTICE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | Civil Action No. 25-1270-ACR |

**DEFENDANTS' COUNTER-STATEMENT OF DISPUTED FACTS**

Defendants respectfully submit this Counter-Statement of Disputed Facts in opposition to Plaintiffs' Statement of Undisputed Material Facts (ECF No. 64-2), in accordance with Local Civil Rule 7(h) and Judge Reyes's standing order. Defendants, however, object to Plaintiffs' 24-page, 204-item statement because it includes all facts—material and immaterial—without making any distinction as to which ones comport with the rule. *See* Local Civ. R. 7(h)(1) (statement must include only material facts). A "material" fact is one capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs did not comply with rule, thus putting an enormous burden on Defendants and the Court, without providing any aid to the Court to assist determining genuine issues of material fact, contrary to the intent of the rule.

| Actions Leading to March 21, 2025, RIF Announcement and Stop-Work Order | |
|---|---|
| 1. On March 6, 2025, in preparation for a reduction in force (RIF), Department of Homeland Security (DHS)'s Chief Human Capital Officer sent a memorandum to the Office of Personnel Management (OPM) asking to establish three new competitive areas, as that term is defined in 5 C.F.R. § 351.402, comprising all employees at the Office for Civil Rights and Civil Liberties (CRCL), the Office of the Citizenship and Immigration Services Ombudsman (CISOM), and the Office of the Immigration Detention Ombudsman (OIDO), respectively, with the justification for the proposed action being that "the Secretary has determined that the above referenced functions, programs, and capabilities of the Department do not advance the national security mission of DHS and can properly be eliminated to enhance the coherence, effectiveness, and efficiency of the Department as a whole." Memorandum from Roland Edwards, Chief Human Capital Officer, RIF – Request for Establishment of Competitive Areas (included in Defendants' Administrative Record at 18-19). | Admit in part; deny in part. The memo also states that the proposed changes follow the direction set by President's Trump's Executive Order "to reduce the federal workforce and enhance the efficiency of federal operations" among other things. AR 19. Defendants thus deny "the justification for the proposed action" as set forth by Plaintiffs. Otherwise admit. |
| 2. On March 6, 2025, DHS's Chief Human Capital Officer sent a memorandum to OPM seeking an exemption from the standard 60-day RIF notice period, in which DHS explained that it would be conducting a "100% RIF" for OIDO, CISOM, and CRCL in response to "determinations made by the President, and the Secretary of the Department of Homeland Security, that certain functions, programs, and capabilities of DHS do not advance mission of the Department to protect our homeland." Memorandum from Roland Edwards, Chief Human Capital Officer, RIF – Request for Exception to the 60-Day RIF Notice Requirement (included in Defendants' Administrative Record at 20). | Admit in part; deny in part. Defendants deny that the RIF of the position was solely in response to what Plaintiffs provide here. Plaintiffs neglect to state that DHS was acting on the President's Executive Order and other Presidential Secretarial determinations that "the scope of DHS's existing workforce and footprint is inefficient and inconsistent with the national interest." AR 20. The positions as |

| | |
|---|---|
| | constructed, not the Offices, were unnecessary. Otherwise admit. |
| 3. People within DHS's Office of the Chief Human Capital Officer stated in internal correspondence on March 6, 2025, that they believed some positions would be permitted to remain with CRCL and CISOM but that the final decision would rest with the Department of Government Efficiency (DOGE). Ex. 6: Declaration of Karla Gilbride (Gilbride Decl.), Exhibit A. | Admit in part and deny in part. Some employees may have believed that but the Secretary made final decisions. |
| 4. On March 17, 2025, Secretary Noem was asked to approve a RIF affecting "all employees" of CRCL, OIDO, and CISOM except those who were participating in the deferred resignation program. 3/17/2025 Memorandum for the Secretary (included in Defendants' Administrative Record at 1-4). | Admit. |
| 5. Secretary Noem was informed that the RIF would reach 45 General Schedule (GS) employees at CISOM, 147 GS employees at CRCL, and 117 GS employees at OIDO. 3/17/2025 Memorandum for the Secretary. | Admit. |
| 6. The reasons given for conducting the RIF in the March 17 memorandum to Secretary Noem were Executive Order 14210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, and the follow-up guidance issued by OPM and the Office of Management and Budget (OMB). 3/17/2025 Memorandum for the Secretary. | Admit. More reasoning was provided but the Executive Order initiated the process. |
| 7. The February 26, 2025, guidance from OPM and OMB specified that in conducting Agency RIF and Reorganization Plans (ARRPs), agencies should develop a "suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements." Memorandum from Russell T. Vought, Director, Office of Management and Budget, Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of | Admit in part and deny in part. The guidance does say this and some funds were moved but the Offices were not reorganized and these guidance had no effect on the RIF or realignment. |

| | |
|---|---|
| Government Efficiency" Workforce Optimization Initiative (included in Defendants' Administrative Record at 12). | |
| 8. In response to a request for documents regarding communications with Congress or any congressional committees about the potential reorganization of CRCL, CISOM, or OIDO on or before March 21, 2025, Defendants stated that they were unable to locate any responsive documents. Ex. 4: Defendants' 9-11-2025 Supplemental Discovery Responses, Supplemental Response to Document Request 14. | Denied. Defendants stated that a reasonable search of the Oversight Offices revealed no responsive documents. |
| 9. The description of statutory authorities presented to Secretary Noem along with the March 17 memorandum about the RIF mentioned the requirement to appoint local CIS ombudsmen and noted that "the statute does not necessarily require one ombudsman per state; a single local ombudsman could serve several states within a local area (e.g., NY/NJ/CT)." Statutory Authorities for Office of the Immigration Detention Ombudsman, Office for Civil Rights and Civil Liberties, and Office of the Citizenship and Immigration Services Ombudsman (included in Defendants' Administrative Record at 7-8). | Admit, though that is no what the statute says and there were no regional ombudsman until 2023. |
| 10. The description of statutory authorities presented to Secretary Noem along with the March 17 memorandum about the RIF noted that CRCL is required by statute to assess information about, and investigate complaints of, abuses of civil rights or civil liberties by DHS employees, and further noted that CRCL "carries out DHS's legal obligations to establish an 'equal opportunity program,' and to comply with the EEOC's [Equal Employment Opportunity Commission's] rules, regulations, and orders relating to that program" as required by 42 U.S.C. § 2000e-16(b). Statutory Authorities for Office of the Immigration Detention Ombudsman, Office for Civil Rights and Civil Liberties, and Office of the Citizenship and Immigration Services Ombudsman. | Admit. |
| 11. Secretary Noem approved the RIF on March 20, 2025. Ex. 6-B: Signed RIF approval. | Admit. |
| 12. The RIF abolished all GS positions at all three offices. Ex. 8: Transcript of 5-23-2025 hearing (5-23-2025 HT) 8:20-9:1, 46:15-18. | Admit. But "[a]fter making the initial decision to conduct a |

| | |
|---|---|
| | RIF, DHS assessed the number of government positions necessary to fulfill the statutory duties, assessed the type of positions best suited to perform the work, [and] assessed which duties can be performed by existing contractors." Defs. Resp. Interr. No. 2, at 8. Mr. Sartini, who was overseeing the realignment, was "refocus[ing]" the Offices on performing "their core statutory duties" of reviewing and responding to complaints, providing necessary information to the public, and submitting reports to Congress, performing those duties with a "more efficient process," and ending performance of "discretionary activities." Sartini Decl. (May 18, 2025) ¶¶ 9-10, 13-14. |
| 13. Employees of the three offices were issued RIF notices on March 21, 2025, with separation dates of May 23, 2025, all of which stated that the reason for the RIF was the "dissolution" of their respective offices. Exs. 6-C to 6-E: RIF notices for CISOM, CRCL, and OIDO. | Admit that the word "dissolution" appeared in the notices. Deny that the Offices were being dissolved. The positions were being dissolved so they could be recreated with new billets as part of refocusing the Offices on their statutory duties. |

| | |
|---|---|
| | *See, e.g.*, Sartini Decl. (May 18, 2025) ¶¶ 5, 9-10, 13-14; Hearing Tr. May 19, 2025, at 77-78; Defs. Resp. Interr. No. 2, at 8. |
| 14. Four of the CISOM employees presented with RIF notices had the position of "regional representative, Local Ombudsman." Ex. 6-C: CISOM RIF notices. | Admit but employees with certain positions and/or titles was not necessary to perform statutorily-required duties. The statute requires the Ombudsman to "appoint local ombudsmen and make available at least 1 such ombudsman for each State." 6 USC 272(e)(1)(A). There has never been local ombudsman for every state as Congress has never provided sufficient funding. The regional ombudsman were first hired in 2023, over 20 years after CISOMB was created. |
| 15. Several of the CRCL employees presented with RIF notices had positions that focused on equal employment opportunity, such as "EEO Specialist" or "Equal Employment Manager." Ex. 6-D: CRCL RIF notices. | Admit but having employees with certain positions and/or titles "focused" on certain tasks was not necessary to perform statutorily-required duties. |
| 16. Before the RIF, the majority of OIDO's workforce was made up of case managers, whose jobs involved frequent visits to detention facilities to meet with detained people and observe conditions. Ex. 6-F: OIDO organizational | Deny, while a majority of spots were authorized for case workers based on the chart, only around 38 |

| | |
|---|---|
| chart (also included in Defendants' administrative record at 27); 5-23-2025 HT 101:25-102:25; Declaration of Kelsey Vitullo (Vitullo Decl.), ECF 15-11, ¶¶ 2-3, 8-10. | were actually employed. That is less than a majority of the 118 employees. |
| 17. All GS employees of CRCL, CISOM, and OIDO were placed on administrative leave and ordered to stop work on March 21, 2025. Ex. 7: Transcript of 5-19-2025 hearing (5-19-2025 HT) 22:11-24:6. | Admit. |
| 18. Nicole Barksdale-Perry, the DHS human resources employee handling administration of the RIF, acknowledged that the default status for employees during the 60-day RIF notice period, pursuant to applicable regulations, is to remain on duty, not on administrative leave. Ex. 8: 5-23-2025 HT 44:20-45:8. | Deny. Ms. Barksdale-Perry clarified that the "default status" is to remain in "paid status" and the RIF'd employees here were in "paid status. They're just on administrative leave." Hearing Tr. (May 23, 2025) at 44-45. |
| 19. In her nearly 30-year career in H.R. within the federal government, Ms. Barksdale-Perry had never heard of a prior situation in which every position in an office was abolished or dissolved. Ex. 8: 5-23-2025 HT 49:25-50:15. | Admit. But "[a]fter making the initial decision to conduct a RIF, DHS assessed the number of government positions necessary to fulfill the statutory duties, assessed the type of positions best suited to perform the work, [and] assessed which duties can be performed by existing contractors." Defs. Resp. Interr. No. 2, at 8. Mr. Sartini, who was overseeing the realignment, was "refocus[ing]" the Offices on performing "their core statutory duties" of reviewing and responding to |

|  | complaints, providing necessary information to the public, and submitting reports to Congress, performing those duties with a "more efficient process," and ending performance of "discretionary activities." Sartini Decl. (May 18, 2025) ¶¶ 9-10, 13-14. |
|---|---|
| **Immediate Aftermath of March 21 Stop-Work Order and RIF Announcement** | |
| 20. In the days immediately following March 21, 2025, emails were sent to and about the three senior executives remaining at CRCL and the one senior executive remaining at CISOM, mentioning new roles to which they could potentially be reassigned, and these emails consistently referred to the "elimination" of their former offices due to a "reorganization." Ex. 6-G: Reassignment emails. | Admit that such emails exist. Deny that the Offices were being eliminated. The Offices were being refocused on statutory duties. *See, e.g.*, Sartini Decl. (May 18, 2025) ¶¶ 5, 9-10, 13-14; Hearing Tr. May 19, 2025, at 77-78; Defs. Resp. Interr. No. 2, at 8. |
| 21. No employees remained at CRCL as of May 19, 2025. Ex. 7: 5-19-2025 HT 67:4-9. | Denied. The referenced section of the hearing transcript shows that Mr. Sartini was asked about full-time employees. Peter Mina, Veronica Venture, and Dana Salvano Dunn were around longer and contractors existed. |
| 22. The head of H.R. for DHS composed a letter to Senator John Cornyn dated May 12, responding to an inquiry about a constituent who had worked for OIDO, and the letter referred to the "dissolution of the Office of the Immigration Detention Ombudsman." Ex. 6-H: Senator Cornyn letter. | Admitted that the drafted letter said this but it was never sent. Denied that OIDO was dissolved. The positions were being dissolved so they could be recreated with new |

| | |
|---|---|
| | billets as part of refocusing the Offices on their statutory duties. |
| 23. No employees remained at OIDO as of May 19, 2025. Ex. 7: 5-19-2025 HT 80:21-24. | Deny. OIDO employed Maryellen Meymarian in May 2025. She facilitated the transfer of leadership to Joseph Guy. Guy Dep. Tr. at 71-72. |
| 24. Ronald Sartini was appointed as CIS Ombudsman on May 4, 2025. Ex. 7: 5-19-2025 HT 5:16-20. | Admit. |
| 25. The senior executive who had been serving as deputy CIS Ombudsman was reassigned to a role at United States Citizenship and Immigration Services (USCIS) on May 18. 5-21-2025 Sartini Declaration, ECF 30-1. | Admit. He voluntarily took another position he wanted, which Sartini found out about later. |
| 26. In meetings at which affected employees were permitted to ask questions about the RIF before it went into effect, several asked how the statutory functions of their offices would be performed going forward. Ex. 6-I: Questions from RIF-ed employees. | Admit. |
| 27. Employees within DHS's Office of the Chief Human Capital Officer internally expressed concerns in March and May of 2025 about who would handle functions related to equal employment opportunity and reasonable accommodations since employees of CRCL could no longer do so. Ex. 6-J: Questions from H.R. employees. | Admit that concerns were expressed but CRCL continues to perform its statutory EEO functions and DHS continues to perform all statutorily required reasonable accommodations functions. |
| 28. DHS's Acting General Counsel asked Ronald Sartini to study the functions of CRCL, OIDO, and CISOM in or around late March 2025, after DHS had already requested permission from OPM to conduct the RIF and on or after the date that RIF notices were sent out. Ex. 7: 5-19-2025 HT 56:19-24, 77:5-10, 82:14-22; Ex. 9: Deposition of Ronald Sartini (Sartini Depo.) 13:9-17. | Admit, it was around March 21. |
| 29. When Mr. Sartini began his analysis of CRCL's, CISOM's, and OIDO's operations in late March of 2025, he was aware of no existing plans for how the work of | Admit, it was around March 21. He was tasked |

| | |
|---|---|
| those offices would continue after the stop-work order and RIF. Ex. 7: 5-19-2025 HT 90:4-16. | with developing the plan to refocus and restaff. |
| 30. Mr. Sartini's analysis of CRCL's, CISOM's, and OIDO's operations concluded that before the March 21, 2025, stop-work order, some employees at all three offices were performing statutorily required functions. Ex. 7: 5-19-2025 HT 80:13-20. | Admit that the Offices were performing some statutorily-required functions. Otherwise deny. |

| **Staffing of CRCL, OIDO, and CISOM Following RIF** | |
|---|---|
| 31. On May 19, 2025, Mr. Sartini understood that DHS's intention was to "take a beat" for two or three months while he developed a new staffing plan for the three offices under which their statutory functions could be resumed after Secretary Noem appointed new leadership for the offices. Ex. 7: 5-19-2025 HT 26:5-11, 107:1-108:7. | Deny that the statutory functions were not met. Hearing Tr. (May 19, 2023) at 107. Otherwise admit. |
| 32. On May 22, Troup Hemenway submitted a declaration recounting a plan presented to him that day by Mr. Sartini under which eight to ten employees would staff CISOM, eight to ten employees would staff OIDO, and 23 employees and a number of contractors would staff CRCL. Declaration of Troup Hemenway (Hemenway Decl.), ECF 33-1. | Deny. Mr. Hemenway was referring to a "proposed plan" about number of "staff," which includes detailees, contractors, and other federal workforce, not necessarily the hiring of additional full-time federal employees. Hemenway Decl. Regardless, the statute did not require a certain staffing level. Indeed, Plaintiffs are not seeking "any particular staffing levels" at the Offices. Pls. Interr. Resp. No. 14, at 27. |
| 33. Mr. Sartini testified on May 23 that his staffing plan for CISOM would represent an approximately 50% reduction from the office's historic staffing levels of 20 full-time employees. Ex. 8: 5-23-2025 HT 86:1-10. | Admit, and such staffing plan was consistent with the expected 50% drop in complaints. Hearing Tr. (May 23, 2025) at 86. Regardless, the statute |

| | did not require a certain staffing level. |
|---|---|
| 34. Mr. Sartini did not include any local or regional ombudsmen in his staffing plan for CISOM because he believed that the statute requires a local ombudsman for each state and that the office had never fully complied with the statute since it had only employed four local ombudsmen and "four is not 50." Ex. 9: Sartini Depo. 99:7-100:20. | Admit. Congress had never funded the local ombudsmen mandate and CISOMB, which requires at least for each state. So CISOMB had never fulfilled the requirement in the twenty-year history of the Office. Sartini Dep. Tr. at 99-100. |
| 35. Mr. Sartini testified on May 23 that his staffing plan of 21 employees and two executives at CRCL would represent about a quarter of that office's historic staffing level. Ex. 8: 5-23-2025 HT 87:7-23. | Admit. But Mr. Sartini also testified that the plan was equivalent to the number of employees investigating cases and complaints, "the core function of the office." Hearing Tr. (May 23, 2025) at 87. Mr. Sartini subsequently testified that these numbers shifted after he assumed his position and saw that the Offices "can accomplish the statutory functions" with a "mix of employees, detai[l]ees, and contractors, and OGC support." Sartini Dep. Tr. at 91. As Mr. Sartini testified, the evidence" that the staffing as constituted has been "performing all of the required functions with the current mix of staff and contractors and OGC support" "speaks |

| | |
|---|---|
| | for itself." *Id.* at 57, 215-16. Regardless, the statute did not require a certain staffing level. |
| 36. Mr. Sartini testified on May 23 that he thought OIDO should be staffed with one or two facility inspectors and five to seven employees to handle casework. Ex. 8: 5-23-2025 HT 88:7-23. | Admit. OIDO currently has 7 employees and contractors. Mr. Sartini subsequently testified that these numbers shifted after he assumed his position and saw that the Offices "can accomplish the statutory functions" with a "mix of employees, detai[l]ees, and contractors, and OGC support." Sartini Dep. Tr. at 91. And Mr. Guy testified that this staff is "getting the job done." Guy Dep. Tr. at 80. Regardless, the statute did not require a certain staffing level. |
| 37. On May 23, Mr. Sartini testified that he expected to be able to create the new positions in his staffing plan, publish job announcements, and hire people to fill them within approximately one month. Ex. 8: 5-23-2025 HT 97:1-98:22. | Admit. The Department gave Mr. Sartini the authority to hire through "an expedited pipeline" "to staff these offices up." Sartini Dep. Tr. at 109-10. But as Mr. Sartini forewarned, allocations and appropriations "always control." *Id.* at 44-46. Nevertheless, the Department expeditiously filled positions much faster than normal. DHS |

| | |
|---|---|
| | 20556-57, 20890, 20987, 20990, 20988, 20989, 20838-40. Regardless, the statute did not require a certain staffing level. |
| 38. On June 2, Mr. Sartini stated in a declaration that job announcements had been posted for restaffing CRCL and OIDO and that he expected "to select the first candidates no more than three weeks from today." 6-2-2025 Declaration of Ronald Sartini, ECF 40-1, ¶¶ 3-4. | Admit. The Department gave Mr. Sartini the authority to hire through "an expedited pipeline" "to staff these offices up." Sartini Dep. Tr. at 109-10. But as Mr. Sartini forewarned, allocations and appropriations "always control." *Id.* at 44-46. The Department expeditiously filled CRCL positions in July, much faster than normal. DHS 20556-57, 20890, 20987. Regardless, the statute did not require a certain staffing level. |
| 39. As of August 13, when Defendants provided their responses to Plaintiffs' Interrogatories, two full-time employees had been hired to work at CRCL as investigators, both of whom began work just two days earlier on August 11. Ex. 3: Responses to Plaintiffs' First Set of Discovery Requests (Discovery Responses), Responses to Interrogatories 4 and 13. | Admit. But the Department expeditiously filled the positions in July. DHS 20556-57, 20890, 20987. The delay in start date was at the request of the employees to allow them to move. Sartini Dep. Tr. at 86. Also, by this time, Mr. Hemenway had already been appointed Acting CRCL Officer and Mr. Sartini was the Acting Deputy. Sartini |

| | |
|---|---|
| | Decl. (June 2, 2025) ¶ 3. Additionally, in the meantime, fifteen contractors were "actively intaking and logging cases, conducting counseling and investigations, and drafting Final Agency Decisions," staff resumed issuing decisions, and OGC lawyers continued to advise on legal matters. *Id.*; *see also* Hemenway Decl. ¶ 5 (discussing contract with PCI Government Services to intake, review, and process allegations). Regardless, the statute did not require a certain staffing level |
| 40. The two full-time CRCL employees are assisted in their work by seven or eight contractors from PCI Government Services, one more contractor than before the RIF. Hemenway Decl. ¶ 5; Ex. 9: Sartini Depo. 39:15-41:19. | Admit in part and Deny in part. The two PCI investigators oversaw about twenty contract investigators, which includes EEO. Hemenway Dep. Tr. at 43-44. There are about 25-30 full-time contractors doing CRCL work. Sartini Dep. at 50:6-51:3-50, 85. Regardless, the statute did not require a certain staffing level. |
| 41. Eleven to thirteen contractors currently work on EEO matters for CRCL, which is the same number of contractors that worked on EEO matters before the RIF, | Admit that the number of contractors has been the same. CRCL also has |

| | |
|---|---|
| when CRCL also had multiple federal employees devoted to EEO issues. Hemenway Decl. ¶¶ 7-9, 12; Ex. 9: Sartini Depo. 43:4-44:7. | federal employees who work on EEO issues, and who do so in a more effective, efficient manner. Additionally, CRCL recently leveraged another contract to supplement EEO resources. |
| 42. As of August 13, three full-time employees had been hired to work at OIDO, along with two detailees. Ex. 3: Discovery Responses, Response to Interrogatory 13. | Admit. But contractors also did OIDO work. Guy Dep. Tr. at 84. OIDO also pulls from the Management Directorate to perform administrative functions so, in total, its "closer to about 25 to 30 people who do OIDO work." *Id.* at 79; *see also* Sartini Dep. Tr. at 26 (explaining that the Management Directorate performs OIDO's administrative functions, including human resources, budgeting, and contracting). Regardless, the statute did not require a certain staffing level. |
| 43. The two OIDO detailees began their details on August 11, two days before Defendants' discovery responses were due. Ex. 3: Discovery Responses, Response to Interrogatory 10. | Admit. |
| 44. The three newly hired OIDO employees did not begin work until after August 15, and perhaps not until September. 8-15-2025 Declaration of Ronald Sartini, ECF 51-6, ¶ 4; Ex. 9: Sartini Depo. 74:20-21. | Admit. Again, the delay in start dates was in part at the employees' requests. Sartini Dep. Tr. at 86. Regardless, the statute did not require a certain staffing level. |

| | |
|---|---|
| 45. Mr. Sartini testified at his deposition that the reason hiring at CRCL and OIDO took longer than he had anticipated in May was the need for security vetting and the surge in hiring Immigration and Customs Enforcement (ICE) agents during the same time period. Ex. 9: Sartini Depo. 87:15-90:7. | Admit in part. Hiring still occurred faster than normal but it is true that vetting and a surge in other onboarding delayed the process. In adddition, certain hires requested a later start date because they were moving for the job. Sartini Dep. Tr. at 86. Also deny that Mr. Sartini testified that a surge in ICE agents delayed his hiring, he thought that might be a reason *onboarding* was delayed by HR. *Id.* at 88-90. |
| 46. On May 27, Defendants stated in a status report that additional job announcements for CISOM besides the job announcement for the deputy ombudsman position were "in progress." May 27 Joint Status Report, ECF 39. | Admit. |
| 47. As of August 13, the only individuals Defendants listed as having been hired to work at CISOM were the deputy ombudsman and one detailee. Ex. 3: Discovery Responses, Response to Interrogatory 13. | Admit. But the Department also posted a CISOMB Law Enforcement Specialist position. Job Announcement (ECF No. 41-1, at 71-84). In the meantime, however, the OMB budget recommendations were released stating that CISOMB could only have two employees. Sartini Dep. Tr. at 95. Given that the budget remains in flux, CISOMB could not readily hire more people. |

| | |
|---|---|
| | As of December 2025, CISOMB had two full-time employees, Mr. Sartini and the deputy, as well as a detailee. *Id.* at 57, 95, 225. Regardless, the statute did not require a certain staffing level. |
| 48. As of August 13, Defendants stated that "hiring is not yet complete, and this process will continue until the offices are adequately staffed or personnel budget is fully expended." Ex. 3: Discovery Responses, Response to Interrogatory 13. | Admit. |
| 49. As of September 11, Defendants stated that since August 13, when their initial discovery responses were submitted, "CRCL has onboarded new staff and is training them." Ex. 4: Defendants' 9-11-2025 Supplemental Discovery Responses, Supplemental Response to Interrogatory 11. | Admit. |
| 50. As of December 5, 2025, Mr. Sartini testified that no one else had been hired to work at CRCL, OIDO, or CISOM beyond the nine individuals listed on August 13, in Defendants' response to Interrogatory 13. Ex. 9: Sartini Depo. 55:2-13, 58:3-12. | Admit. But numbers shifted after Mr. Sartini assumed his position and saw that the Offices "can accomplish the statutory functions" with a "mix of employees, detai[l]ees, and contractors, and OGC support." Sartini Dep. Tr. at 91. Additionally, as Mr. Sartini forewarned, allocations and appropriations "always control." *Id.* 44-46. Hiring additional employees is under discussion, but no decisions have been reached because Budget has advised that there should be no additional |

| | |
|---|---|
| | hiring until a year-long appropriation is in place. *Id.* at 78. The shutdown and lack of a year-long budget have disrupted this process. Regardless, the statute did not require a certain staffing level. |
| 51. The only person working full-time at CISOM as of December 5 was one detailee. Ex. 9: Sartini Depo. 57:6-18. | Denied. As of December 2025, CISOMB had two full-time employees, Mr. Sartini and the deputy, as well as a detailee. Sartini Dep. at 57, 95, 225. |
| 52. On May 22, Troup Hemenway, who already had, and continues to have, a full-time position as Principal Deputy Chief of Staff at DHS, was also appointed Acting CRCL Officer. Hemenway Decl. ¶ 1; Ex. 8: 5-23-2025 HT 77:5-14; Ex. 10: Deposition of Troup Hemenway (Hemenway Depo.) 13:2-14:17. | Admit. |
| 53. Mr. Hemenway testified that he spends at least 40 hours per week performing the duties of his principal deputy chief of staff role, including directly advising Secretary Noem on certain matters, but could not estimate how much additional time he spends on his CRCL Officer duties. Ex. 10: Hemenway Depo. 13:14-18, 14:7-9, 47:1-22. | Admit. |
| 54. Mr. Hemenway testified that he had not thought much about CRCL before assuming the role of CRCL Officer. Ex. 10: Hemenway Depo. 43:2-9. | Admit. |
| 55. Mr. Hemenway did not know whether CRCL employees were allowed to continue performing their duties between the time the RIF was announced and the time their employment ended. Ex. 10: Hemenway Depo. 40:7-11, 40:22-41:3. | Admit. He was not appointed in his CRCL position at that time. |
| 56. Mr. Hemenway could not recall when any other employees were hired to work at CRCL. Ex. 10: Hemenway Depo. 31:8-12, 46:2-12. | Admit. Mr. Sartini, the acting deputy, was responsible for the hirings. |

| | |
|---|---|
| 57. Mr. Hemenway could not recall whether the two investigators working for CRCL were direct hires or detailees. Ex. 10: Hemenway Depo. 44:5-13. | Admit. Mr. Sartini, the acting deputy, was responsible for the hirings. |
| 58. When asked during his deposition about one of the two newly hired CRCL investigators, Brent Bice, Mr. Hemenway was not familiar with his name. Ex. 10: Hemenway Depo. 130:9-10. | Admit. Mr. Sartini, the acting deputy, was responsible for the hirings and operations. |
| 59. On May 22, Joseph Guy, who already had, and continues to have, a full-time position as Deputy Chief of Staff at DHS, was also appointed as Acting OIDO Ombudsman. Hemenway Decl. ¶ 13. | Admit. |
| 60. Mr. Guy testified that he spends roughly five hours per week on his OIDO duties, compared with roughly 50 hours per week on his duties as Deputy Chief of Staff. Ex. 11: Deposition of Joseph Guy (Guy Depo.) 16:15-17:14. | Admit. Mr. Sartini—not Mr. Guy—performs the functions of the office, including managing its operations, ensuring adequate facility inspections, managing the intake and processing of complaints, and leading the drafting of the annual report. Sartini Dep. Tr. at 29. |
| 61. Mr. Guy testified that he was not familiar with OIDO "whatsoever" before being designated Acting OIDO Ombudsman in May of 2025. Ex. 11: Guy Depo. 18:21-19:2. | Admit. |
| 62. Mr. Guy was not aware of the stop-work order given to OIDO employees on March 21 or of the specific tasks it prevented them from continuing, nor was he aware of any transfer or transition memos prepared during the RIF notification period. Ex. 11: Guy Depo. 70:5-72:5. | Admit. Mr. Guy was not appointed Acting Ombudsman until May 2025. Sartini Decl. (June 2, 2025) ¶ 4; Guy Dep. Tr. at 72. |
| 63. When shown a copy of the 2011 Performance-Based Detention Standards that govern immigration detention, Acting Ombudsman Guy testified that he had never seen them before and deferred more specific questions about their application to his deputy, Ronald Sartini. Ex. 11: Guy Depo. 24:6-27:10. | Admit. Mr. Guy was responsible for providing guidance and oversight to keep with the Secretary's priorities. Sartini Dep. Tr. at 30. Mr. Sartini, on the |

| | |
|---|---|
| | other hand, performs the functions of the office, including managing its operations, ensuring adequate facility inspections, managing the intake and processing of complaints, and leading the drafting of the annual report. *Id.* at 29. |
| 64. As of his deposition on December 3, Joseph Guy had not yet met with any of the newly hired OIDO employees. Ex. 11: Guy Depo. 89:11-90:3. | Admit. Mr. Guy was responsible for providing guidance and oversight to keep with the Secretary's priorities. Sartini Dep. Tr. at 30. Mr. Sartini, on the other hand, performs the functions of the office, including managing its operations, ensuring adequate facility inspections, managing the intake and processing of complaints, and leading the drafting of the annual report. Id. at 29. |
| 65. Sometime in late May of 2025, Ronald Sartini was named both deputy CRCL Officer and deputy OIDO Ombudsman in addition to his role of CIS Ombudsman. 6-2-2025 Declaration of Ronald Sartini, ECF 40-1, ¶¶ 3-4. | Admit. |
| 66. Mr. Sartini drafted the position descriptions for the job announcements posted for both CRCL and OIDO and participated in the hiring processes for both offices. Ex. 9: Sartini Depo. 59:12-19, 70:16-71:5. | Admit. |
| 67. Mr. Guy testified that the initial division of labor between himself and Mr. Sartini when Mr. Guy was first appointed as OIDO Ombudsman was that Mr. Sartini "ran all of the day-to-day operations and got into details of all of the | Admit. |

| | |
|---|---|
| work" and that this division of labor has remained consistent through the time of his deposition in December. Ex. 11: Guy Depo. 72:16-74:6. | |
| 68. Mr. Sartini testified that he spends about 30% of his time on his duties as CIS Ombudsman, 40% of his time on his duties as deputy CRCL Officer, and 30% of his time on his duties as deputy OIDO Ombudsman. Ex. 9: Sartini Depo. 24:2-20. | Admit. But Plaintiffs neglected to ask Mr. Sartini how many hours he worked. |
| 69. Rodolfo Gomes was hired to fill the role of deputy CIS Ombudsman but acts as Ronald Sartini's chief of staff in all of his roles at DHS. Ex. 3: Discovery Responses, Response to Interrogatory 13; Ex. 11: Guy Depo. 84:11-85:4; Ex. 9: Sartini Depo. 25:18-20, 30:17-21, 94:7-17. | Admit, he does both. |
| **Funding of CRCL, CISOM, and OIDO** | |
| 70. According to DHS Budget Division Director Ann Tipton, in fiscal year (FY) 2025, during the full-year Continuing Resolution, CISOM, CRCL, and OIDO did not receive specific appropriations from Congress but received funding as part of the larger Operations & Support appropriation for the Office of the Secretary and Executive Management. Declaration of Ann Tipton ("Tipton Decl."), ECF 43-1, ¶ 2. | Admit. |
| 71. According to Ann Tipton, DHS assigned each office a specific funding level in the expenditure plan sent to Congress for FY2025, initially assigning $10,383,000 to CISOM, $42,964,000 to CRCL, and $27,341,000 to OIDO. Tipton Decl. ¶ 2. | Admit. |
| 72. Ann Tipton noted that DHS can make funding adjustments during the fiscal year by transferring funds consistent with its authorities. Tipton Decl. ¶ 3. | Admit. Ms. Tipton's full statement is as follows: "During the fiscal year, the Department can, and does, making funding adjustments to PPAs through reprogramming and transferring funds consistent with its authorities. These adjustments are made because funding needs and priorities at the |

| | |
|---|---|
| | Department can change throughout the year within an appropriation or across the appropriations for the entire enterprise." Tipton Decl. ¶ 3. |
| 73. DHS sent a transfer and reprogramming notification to Congress on June 13, 2025, increasing CRCL's funding allocation for FY2025 to $48,405,000, with the additional funds coming from OIDO, whose allocation for FY2025 was reduced to $20,862,000. Tipton Decl. ¶ 3. | Admit. |
| 74. The DHS budget justification sent to Congress for FY2026 on May 30, 2025, requested $1.6 million for CISOM and $4.9 million for CRCL, "allocated for interim staff salaries, severance pay, and leave payouts for employees who received RIF notifications." Ex. 12: Office of the Secretary and Executive Management Congressional Justification, OSEM - O&S-11. | Admit, but this does not necessarily reflect DHS's initial request. More cannot be said due to privilege. ECF 43. |
| 75. CIS Ombudsman Sartini testified that the reason no additional job announcements besides deputy ombudsman were ever posted for CISOM was that the budget presented to Congress for FY2026 would only allow for two full-time employees at CISOM. Ex. 9: Sartini Depo. 94:21-95:10. | Admit. Given the shutdown and lack of a year long budget, the Budget office has made clear that hiring additional positions that may not be funded would be problematic. Indeed, the Offices were recently shutdown again and only have funding through February 13. |
| 76. Acting CRCL Officer Hemenway testified that the reason so few full-time employees had been hired at CRCL during 2025 and that the office was instead relying heavily on contractors was because the budget presented to Congress for FY2026 only allowed for four full-time federal employees at CRCL. Ex. 10: Hemenway Depo. 50:1-51:2. | Denied. Mr. Hemenway testified that the staff plan was "informed by the President's budget." Hemenway Dep. Tr. at 50. Given the shutdown and lack of a year-long budget, the Budget office has made clear that hiring |

| | |
|---|---|
| | additional positions that may not be funded would be problematic. Indeed, the Offices were recently shutdown again and only have funding through February 14. He also testified that the contractor model was better "it's a lot easier to bring people on where you need them. So where and if the need arises, we can use those contact vehicles to, again, bulk up staff." *Id.* |
| 77. Acting CRCL Officer Hemenway testified that it "wouldn't be prudent" to bring on additional full-time staff at CRCL given the funding level for CRCL in the 2026 proposed budget and the length of time it takes to hire new federal employees. Ex. 10: Hemenway Depo. 162:3-11. | Admit. Given the shutdown and lack of a year-long budget, the Budget office has made clear that hiring additional positions that may not be funded would be problematic. Indeed, the Offices were recently shutdown again and only have funding through February 13. |
| 78. The DHS budget justification sent to Congress for FY2026 on May 30, 2025, requested no funding for OIDO, stating that "[t]his program change reflects the RIF that occurred within the Office of the Immigration Detention Ombudsman" and adding that "OIDO has been eliminated in its entirety." Ex. 12: Office of the Secretary and Executive Management Congressional Justification, OSEM - O&S-12. | Admit, though DHS did not make this suggestion and did not draft this language. ECF 43. The document is inaccurate in concluding that OIDO has been eliminated in its entirety, as evidenced by the employees, contractors, and statutory work that continues to be carried out. These |

| | |
|---|---|
| | proposals carry significance when there is no year-long budget. But Congress ultimately chooses what budget to provide. Indeed, the Offices were recently shutdown again and only have funding through February 13. |
| 79. Acting OIDO Deputy Ombudsman Sartini testified that he does not have a plan for how to continue operating OIDO if the FY2026 recommended budget is adopted by Congress because he has no experience with an office whose funding has been reduced to zero. Ex. 9: Sartini Depo. 79:21-80:16. | Admit in part and deny in part. Mr. Sartini testified that hiring additional employees is under discussion, but no decisions have been reached because Budget has advised that there should be no additional hiring until a year-long appropriation is in place. Sartini Dep. Tr. at 78. If Congress provides no funds, then that is a congressional choice. Unfunded mandates often cannot be carried out. Congress has yet to provide a year-long budget, however. Indeed, the Offices were recently shutdown again and only have funding through February 13. |
| **CRCL Operations** | |
| 80. In FY2023, CRCL received 3,104 complaints, of which approximately 25% resulted in an investigation. CRCL Annual Report to Congress, FY2023 (Nov. 2024), at 45, https://perma.cc/3SWH-KEGX. | Admit, though Mr. Sartini had evidence the number was closer to 20%. |

| | |
|---|---|
| 81. In FY2023, CRCL issued 653 individual recommendations, informal resolutions, and instances of informal advice to DHS components based on investigations it conducted. CRCL FY2023 report at 49. | Admit |
| 82. In FY2023, CRCL published 56 investigative work products on its Investigation and Recommendation Memoranda webpage, bringing the total number of available documents on that webpage to 159. CRCL FY2023 report at 49. | Admit |
| 83. On March 21, 2025, 778 complaints were pending with CRCL. Ex. 3: Discovery Responses, Response to Interrogatory 4. | Admit. |
| 84. Between March 21 and December 12, 2025, CRCL received 5,989 complaints. Ex. 5: Defendants' 12-12-2025 Supplemental Discovery Responses. | Admit. |
| 85. Sometime in 2025, CRCL stopped accepting complaints filed in any language other than English. Ex. 10: Hemenway Depo. 97:3-21. | Admit that CRCL "only accept[s] complaints in English," but Mr. Hemenway did not know what happened to a complaint submitted in another language. Hemenway Dep. Tr. at 97. Plaintiffs neglected to ask Mr. Sartini that question. |
| 86. Sometime in late summer of 2025, CRCL stopped accepting complaints via mail or email, and now only accepts complaints submitted through its online portal. Ex. 9: Sartini Depo. 104:15-106:11. | Admit in part and deny in part. The web-based filing portal has "optimiz[ed]" the complaint submission process as CRCL "can more effectively congregate and analyze data." Hemenway Dep. Tr. at 55. For example, CRCL can filter by complaint type, component, and location, which will assist in |

| | |
|---|---|
| | "identify[ing] trends" and opening "aggregate investigations." *Id.* at 91. Additionally, the acceptance of mail was inefficient and resulted in poor customer service. Sartini Dep. Tr. at 105. Email complaints resulted in excessive amounts of spam and viruses. *Id.* at 106. CRCL is attempting to push the public to use the web portal. *Id.* |
| 87. For a complaint to be filed with CRCL on someone else's behalf, the web portal states that it must be accompanied by a signed G-28 form. Ex. 9: Sartini Depo. 123:6-124:8. | Admit in part and Denied in part. The web portal states that a signed G-28 must be uploaded to allow CRCL to release information to the complainant. Other forms can be submitted if they provide the same information. Sartini Dep. Tr. At 125-126. |
| 88. Mr. Sartini testified at his deposition that family members could submit G-28 forms on a relative's behalf because the form does not require that the representative be an attorney. Ex. 9: Sartini Depo. 123:19-124:4. | Admit that Mr. Sartini testified that family members could submit G-28 forms on a relative's behalf. |
| 89. The G-28 form can only be completed by an attorney or someone authorized to represent immigrants before the Executive Office for Immigration Review. G-28: Notice of Appearance as Attorney or Accredited Representative, https://www.uscis.gov/g-28. | Denied. Mr. Sartini stated that the form can also be completed by family members and other third parties and other forms that provide similar information can be used instead. Sartini Dep. Tr. at 123-26. The |

| | |
|---|---|
| | point is the information provided and consent by the detained individual, G-28 if just a standard form for that purpose. *Id.* |
| 90. CRCL used to maintain a phone number that people who had submitted complaints could call if they had questions, but this phone number is no longer operational. Ex. 9: Sartini Depo. 128:20-129:3. | Admit. |
| 91. There is currently no method for complainants to update CRCL with additional information once a complaint has been submitted or to inquire about the status of a complaint. Ex. 9: Sartini Depo. 129:4-130:4. | Denied. The complainant can submit another complaint to update CRCL. As to inquiries, CRCL will send a complainant status updates when they are available. Sartini Dep. Tr. at 129. |
| 92. There is currently no method for someone to notify CRCL that they wish to withdraw a previously filed complaint. Ex. 9: Sartini Depo. 130:5-9. | Admit, as the fact of the complaint is still useful data for systematic and policy reviews. |
| 93. Between January 20 and March 21, 2025, 310 CRCL complaints were resolved, dismissed, or otherwise closed. Ex. 6-K: CRCL Explanatory Chart for Response to Interrogatory 6. | Admit. |
| 94. Between March 21 and August 13, 2025, only one CRCL complaint was resolved, dismissed, or otherwise closed. Ex. 6-K, CRCL Explanatory Chart for Response to Interrogatory 6. | Admit. |
| 95. CRCL is processing complaints in a first-in, first-out manner to address the backlog inherited from before the March 21 stop-work order. Ex. 9: Sartini Depo. 146:18-22. | Denied. CRCL has implemented a first in first out process with further prioritization depending on the type of complaint, prioritizing medical and emergency complaints. Sartini Dep. Tr. at 146-47. |

| | |
|---|---|
| 96. CRCL has begun sending out form emails in batches for specific types of events, such as opening of an investigation, closure of a complaint with no further action to be taken, referral of a complaint to another component, and medical referral. Ex. 9: Sartini Depo. 250:10-12, 250:19-251:6. | Admit. |
| 97. On March 27, 2024, Kennedy Human Rights Center, formerly known as RFK Human Rights, filed a CRCL complaint, along with other organizations, regarding the pepper-spraying of multiple immigrants detained at Winn Detention Center in Louisiana who had been protesting their conditions of detention. Ex. 13: Fifth Declaration of Anthony Enriquez (Enriquez Decl.), Exhibit A. | Admit |
| 98. In response to the complaint about pepper-spraying of detained people at Winn Detention Center, CRCL opened a short-form investigation and requested documents from ICE on April 18, 2024, and also requested that video footage from Winn Detention Center be retained. Exs. 13-B to 13-C: CRCL correspondence with ICE. | Admit |
| 99. CRCL conducted a multidisciplinary onsite investigation at Winn Detention Center in September of 2024 and notified KHRC of these developments via email. Ex. 13-D: Correspondence about multidisciplinary investigation. | Admit |
| 100. On December 19, 2024, KHRC and other organizations filed a CRCL complaint about conditions at the South Louisiana ICE Processing Center in Basile, Louisiana. Ex. 13-E: 12/19/2024 complaint letter. | Admit |
| 101. CRCL opened a short-form investigation into the December 19, 2024, complaint about conditions at the South Louisiana ICE Processing Center on February 27, 2025, and requested documents from ICE by March 13. Ex. 13-F: CRCL correspondence initiating investigation. | Admit |
| 102. KHRC has heard nothing about the status of the December 2024 complaint regarding conditions at the South Louisiana ICE Processing Center since an acknowledgment letter was received by their colleagues at ACLU of Louisiana on February 7, 2025. Ex. 13: Enriquez Decl.; Ex. 13-G: 2/7/2025 acknowledgment letter. | Admit |
| 103. SBCC filed a complaint with CRCL on June 24, 2025, regarding a use of excessive force by ICE agents in San | Admit |

| | |
|---|---|
| Diego on May 30, 2025, and received no response from CRCL until a December 3, 2025, email indicating that CRCL had received the complaint but would be taking no further action on it. Ex. 14: Declaration of Lilian Serrano. | |
| 104. SBCC member Immigrant Defenders Law Center filed a complaint with both CRCL and OIDO on September 18, 2025, regarding the deteriorating conditions in immigration detention centers in southern California, and to date has received no response. Ex. 15: Declaration of Margaret Cargioli. | Admit |
| 105. A UJC attorney submitted a complaint to CRCL via email on April 4, 2025, regarding a violation of 8 U.S.C. § 1367 by CIS affecting one of her clients, and to date has received no response. Ex. 16: Declaration of Heather Lothrop. | Admit |
| 106. Acting CRCL Officer Hemenway testified that when a new complaint is received, it is usually reviewed by a contractor who makes a recommendation to one of CRCL's full-time employees, and that employee then decides to either close the complaint if it lacks merit, forward it to another DHS component if it involves an urgent medical issue or something else that the employee thinks is best handled by the component directly, or open a CRCL investigation if it involves a serious allegation on which CRCL can take action. Ex. 10: Hemenway Depo. 86:7-88:15. | Admit. |
| 107. In its FY2023 report to Congress, CRCL noted that when it refers a case to another component to investigate, that component must prepare a report of investigation for CRCL to review. CRCL FY2023 Report at 46-47. | Admit in part. The actual language of the report cited states, "If a complaint is referred to an agency, the agency issues a Report of Investigation to Compliance for review." |
| 108. Under Mr. Hemenway's and Mr. Sartini's leadership, CRCL retains the right to follow up on complaints that have been referred to another component but does not always exercise this right. Ex. 9: Sartini Depo. 115:3-18. | Admit. |
| 109. CRCL will only request documents from another DHS component for complaints it is investigating. Ex. 9: Sartini Depo. 138:13-18. | Denied. Mr. Sartini testified, "Not |

| | |
|---|---|
| | necessarily." Sartini Dep. Tr. at 138-39. |
| 110. After Mr. Hemenway and Mr. Sartini obtained their roles at CRCL, they adopted a new policy, to more efficiently use CRCL resources, under which complaints involving people who have since been deported will no longer be investigated and will be closed. Ex. 9: Sartini Depo. 133:21-134:12. | Admit in part and Denied in part. Such applicants are "no longer subject to CRCL jurisdiction." Sartini Dep. Tr. at 134. CRCL cannot remedy an individuals complaint if they are no longer subject to DHS's control. *Id.* Nevertheless, CRCL stores the information to facilitate "tracking for trends" and CRCL can analyze, report, and recommend "based on the content of those complaints" for systemic and policy recommendations and reviews. *Id.* |
| 111. All of the complaints filed by SBCC member Kino Border Initiative (KBI) are filed on behalf of individuals who are no longer in detention but have been removed to Mexico and reached KBI's shelter in Nogales. Ex. 17: Third Declaration of Tracey Horan ¶ 9. | No knowledge. |
| 112. Between March 21 and December 12, 2025, CRCL investigated 183 complaints under 6 U.S.C. § 345 itself and referred an additional 371 § 345 complaints to other components of DHS. Ex. 5: Defendants' 12-12-2025 Supplemental Discovery Responses. | Admit. |
| 113. Between March 21 and December 12, 2025, CRCL received 73 allegations of sexual assault under the Prison Rape Elimination Act (PREA), which it either investigated itself or referred to another component within DHS. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 114. Between March 21 and December 12, 2025, CRCL made 409 urgent medical referrals to other DHS components. Ex. | Admit. |

| | |
|---|---|
| 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | |
| 115. Between March 21 and December 12, 2025, CRCL received 70 complaints of disability discrimination under section 504 of the Rehabilitation Act, and closed 11 of them. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 116. None of the Section 504 complaints that CRCL has reviewed since Mr. Sartini became Acting CRCL Deputy Officer has resulted in a finding that the statute was violated. Ex. 9: Sartini Depo. 144:17-21. | Admit. The statute does not require CRCL to find violations when no violations exist. |
| 117. Acting CRCL Officer Hemenway testified that the legal analysis for determination letters on Section 504 investigations is conducted "in-house" by Mr. Sartini or others within CRCL "given our distinction from OGC [Office of General Counsel]." Ex. 10: Hemenway Depo. 122:15-123:2. | Admit in part and deny in part. Investigators investigate the claims and consult with OGC for legal analysis and then the written determination is submitted to Mr. Sartini. CRCL ultimately makes the decision. This division existed prior to the RIF. Sartini Dep. Tr. at 142. |
| 118. Acting Deputy CRCL Officer Sartini testified that he consults with counsel before deciding if a complaint should be investigated under Section 504 and that the investigators who draft Section 504 determination letters consult with counsel before presenting the determination letter for Mr. Sartini's signature. Ex. 9: Sartini Depo. 142:6-143:3. | Admit. |
| 119. As of December 12, 2025, 76 CRCL investigations remained open—74 under 6 U.S.C. § 345, and two under Section 504 of the Rehabilitation Act. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 120. As of August 13, 2025, Defendants reported having issued only one draft CRCL recommendation memorandum to another DHS component based on a complaint pending on March 21, 2025. Ex. 3: Discovery Responses, Response to Interrogatory 4. | Admit. The statute does not require a certain amount of recommendation memos or a timeline for completing them. Such |

| | |
|---|---|
| | memos often take a long time to complete and before often took at least a year to 18 months. |
| 121. Defendants reported no new recommendation memos between August 13 and December 12, 2025. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses; Ex. 10: Hemenway Depo. 76:11-17. | Admit. The statute does not require a certain amount of recommendation memos or a timeline for completing them. Such memos often take a long time to complete and before often took at least a year to 18 months. |
| 122. In FY2023, CRCL contract medical subject matter experts participated in multidisciplinary onsite investigations and additional targeted onsite investigations, resulting in 288 recommendations to DHS components from those medical experts. CRCL FY2023 report at 48-49. | Admit. |
| 123. Mr. Sartini testified that CRCL's contracts with medical experts have been replaced by an arrangement where CRCL can call on DHS's Office of Health Security (OHS), which Mr. Sartini referred to as the Office of Health Services, for assistance with medical issues. Ex. 9: Sartini Depo. 46:13-47:16; Office of Health Security, https://www.dhs.gov/office-health-security. | Admit. |
| 124. Since the consulting relationship between CRCL and OHS began in 2025, CRCL has not asked OHS to conduct any in-person inspections or observations. Ex. 9: Sartini Depo. 47:17-20. | Admit. |
| 125. In December of 2025, OHS was in the process of reviewing the first batch of medical documents sent to it, which related to a dozen or more complaints from CRCL and OIDO combined. Ex. 9: Sartini Depo. 263:2-20. | Admit. |
| 126. As Acting Deputy CRCL Officer, Mr. Sartini reviews reports from ICE and Customs and Border Protection (CBP) of every death that occurs in DHS custody, of which he identified 22 at the time of his deposition, but has to date not found cause to open a CRCL investigation into any of these deaths. Ex. 9: Sartini Depo. 117:2-119:18. | Denied. Mr. Sartini has all reports and has reviewed about ten, finding no cause to investigate thus far. Sartini Dep. Tr. at 119. |

| | |
|---|---|
| 127. As Acting Deputy CRCL Officer, Mr. Sartini is responsible for heading the EEO program for DHS. Ex. 9: Sartini Depo. 27:4-7. | Admit. |
| 128. The initial review of EEO complaints is done by contractors, and their work product is reviewed by attorneys within DHS's Office of General Counsel and signed by Mr. Sartini. Ex. 9: Sartini Depo. 43:4-46:10. | Deny. Initial review of EEO complaints is done by CRCL staff, and, as needed, their work product is reviewed by attorneys within the DHS Office of the General Counsel for legal issues and signed by Mr. Sartini. |
| 129. Most final agency decisions on EEO complaints are written by lawyers within DHS's Office of General Counsel, with some assistance from contractors. Ex. 9: Sartini Depo. 48:14-50:5, 92:15-21. | Admit that most final agency decisions on EEO complaints have been drafted by lawyers within the DHS Office of the General Counsel. All draft final agency decisions are reviewed by Mr. Sartini, and Mr. Sartini is responsible for the final decisions. |
| 130. An attorney was detailed from FEMA to OGC shortly before the 2025 government shutdown to assist CRCL on a full-time basis, including with writing final agency decisions on EEO complaints. Ex. 9: Sartini Depo. 218:8-219:4, 257:15-22. | Admit. |
| 131. According to Acting CRCL Officer Troup Hemenway, "some of the statutory functions" of CRCL are currently being performed. Ex. 10: Hemenway Depo. 31:8-10. | Denied. All of the statutory functions of CRCL are being performed. Sartini Dep. Tr. at 57, 215-16; Defts. Resp. Adm. No. 4, at 34. |
| 132. Acting CRCL Officer Hemenway did not know how many DHS policy documents CRCL had reviewed since March 21, 2025, nor could he provide an estimate of whether the figure was more or less than 50. Ex. 10: Hemenway Depo. 138:17-139:4. | Admit. Mr. Hemenway testified that he was "not immediately sure" of the number. Hemenway Dep. Tr. at 138-39. |

| | |
|---|---|
| 133. Acting Deputy CRCL Officer Sartini testified that he has reviewed dozens of DHS policy documents in consultation with Mr. Hemenway and has made "minor edits to a few" of them. Ex. 9: Sartini Depo. 170:15-172:18. | Admit. |
| 134. Acting CRCL Officer Hemenway testified at his deposition that he does not believe CRCL has been consulted, or that he as Acting CRCL Officer would be consulted, about the use of national defense areas near the southern border. Ex. 10: Hemenway Depo. 157:6-17. | Admit. |
| 135. Acting CRCL Officer Hemenway testified that he is not familiar with 8 U.S.C. § 1367 or with CRCL's obligations regarding that statute. Ex. 10: Hemenway Depo. 154:15-22. | Admit, Mr. Sartini is aware of the requirements and performs them with CRCL's team. |
| 136. CRCL has not been consulted about policies for care of pregnant or transgender detainees since Mr. Sartini obtained his role with CRCL. Ex. 9: Sartini Depo. 183:9-16. | Admit. |
| **OIDO Operations** | |
| 137. In calendar year 2023, OIDO opened 12,664 new cases. Office of the Immigr. Det. Ombudsman, OIDO Annual Report 2023 at 64 (Mar. 29, 2024), https://perma.cc/C5RF-U4RT. | Admit. |
| 138. OIDO stated in its 2023 report to Congress that its persistent presence throughout the detention landscape allows it to address issues swiftly at the lowest level before they escalate, which in some cases may prevent costly investigations from other oversight bodies or litigation against DHS. OIDO 2023 report at 20. | Admit. |
| 139. Acting Ombudsman Guy testified that he was familiar with these statements in OIDO's 2023 report and generally agreed that case managers' ability to resolve issues quickly by visiting facilities in person was beneficial. Ex. 11: Guy Depo. 46:11-47:5. | Denied. Mr. Guy stated that "resolving the problem is more important than it being resolved quickly" and his response was not connected to OIDO's physical presence in detention centers. Guy Dep. Tr. at 46-47. |

| | |
|---|---|
| 140. On March 21, 2025, 388 complaints were pending with OIDO. Ex. 3: Discovery Responses, Response to Interrogatory 4. | Admit. |
| 141. Between March 21 and December 12, 2025, 280 complaints were filed with OIDO. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 142. At the end of 2024, just over 39,000 people were in immigration detention. TRAC Immigration, https://tracreports.org/immigration/detentionstats/pop_agen_table.html | No knowledge, as Defendants played no role in this report. |
| 143. Acting Ombudsman Guy testified that as of December 2025, there were approximately 200 immigration detention facilities throughout the United States at which roughly 66,000 people were being detained. Ex. 11: Guy Depo. 53:2-17. | Admit. |
| 144. Acting Deputy Ombudsman Sartini testified that the lack of case managers in detention facilities has contributed to the drastic drop in complaints received by OIDO in 2025. Ex. 9: Sartini Depo. 189:12-16. | Admit but having caseworkers in facilities is not a statutory requirement. Mr. Sartini noted that many of the complaints filed by in person case managers were duplicative or make work. Mr. Sartini noted that case managers were never in all facilities at all times and had serious issues with rape and abuse. He also did not attribute the drop this solely. Mr. Sartini also pointed out that the amount of CRCL complaints has increased. Sartini Dep. Tr. at 189. |
| 145. Acting Ombudsman Guy testified that in his understanding, a neutral OIDO complaint process requires that "anybody's able to file a complaint" and that "there's not anything preventing anyone from filing a complaint." Ex. 11: Guy Depo. 32:15-19. | Admit. |

| | |
|---|---|
| 146. Acting Ombudsman Guy testified that in his understanding, an accessible OIDO complaint process is one that can "be accessed by a broad swath of people that it applies to." Ex. 11: Guy Depo. 33:14-17. | Admit. |
| 147. In 2023, OIDO received 11,453 complaints in person and received 282 complaints via its web portal. OIDO 2023 report at 53. | Admit. |
| 148. The only way that OIDO currently accepts complaints is through its web portal, a change that was made after March 2025 in the interest of "efficiency." 8-15-2025 Sartini Declaration ¶ 4; Ex. 11: Guy Depo. 103:14-106:2. | Admit in part and deny in part. OIDO's online portal "reduces administrative lag, data input errors, and allows for better tracking of correspondence." Sartini Dep. Tr. at 185. Even so, Mr. Sartini made clear that any complaints received are triaged and handled. *Id.* at 126-27. Complaints are not rejected because of how they are submitted. *Id.* OIDO is attempting to push the public to use the web portal. *Id.* |
| 149. OIDO complaints cannot be submitted in any language besides English. Ex. 11: Guy Depo. 107:19-108:1. | Admit. Mr. Guy testified that the only language "available right now is English." Guy Dep. Tr. at 107-08. |
| 150. IPad-like tablets are available at some but not all detention facilities, and even in those facilities where they are available, there are typically fewer tablets than the number of people detained in that facility. Vitullo Decl., ECF 15-11, ¶ 4; Ex. 19: Declaration of Christopher Brundage (Brundage Decl.) ¶ 4. | Admit. The provision of tablets depends on the facility but they are generally available for use or some alternative access to internet is available. Generally they are not 1 to 1 with detainees. This is |

| | |
|---|---|
| | generally true and we can say Admit. |
| 151. Acting Deputy Ombudsman Sartini was unaware of how many detention facilities had tablets or of the ratio of tablets to detained individuals in those facilities where tablets are available. Ex. 9: Sartini Depo. 186:11-187:11. | Admit. |
| 152. People detained in multiple immigration detention facilities have reported that information that had previously been posted within those facilities about how to file complaints with CRCL and OIDO was removed as of June 2025. Declaration of Sarah Gillman, ECF 45, ¶¶ 5, 7. | Do not know what detainees reported to Ms. Gillman. |
| 153. Between January 20 and March 21, 2025, 2,057 complaints were resolved, dismissed, or otherwise closed by OIDO. Ex. 6-L: OIDO Explanatory Chart for Response to Interrogatory 6. | Admit |
| 154. Between March 21 and August 13, 2025, no complaints were resolved, dismissed, or otherwise closed by OIDO. Ex. 6-L: OIDO Explanatory Chart for Response to Interrogatory 6. | Admit |
| 155. Acting Deputy Ombudsman Sartini testified that OIDO will open an investigation of its own, rather than referring a complaint to another component, if the allegation involves abuse or misconduct by an employee of that component. Ex. 9: Sartini Depo. 191:18-192:7. | Admit in part. Mr. Sartini testified OIDO would generally open up such cases for investigations. Sartini Dep. Tr. at 191-92. |
| 156. Of the 280 complaints received by OIDO between March 21 and December 12, 2025, 15 have been forwarded to another component (three to CRCL and 12 to ICE), while OIDO has opened investigations of its own into 14. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 157. Violations have been found in less than 10% of the complaints received by OIDO since Mr. Sartini became acting Deputy Ombudsman. Ex. 9: Sartini Depo. 271:2-18. | Admit. The statute does not require OIDO to find violations when no violation exists. |
| 158. Mr. Sartini testified that once a complaint is referred to another component, OIDO has the choice of whether or not to follow up on it. Ex. 9: Sartini Depo. 192:21-193:5. | Admit. |
| 159. Mr. Sartini testified that OIDO referrals to ICE are made to someone within the senior executive service at ICE | Admit in part and Denied in part. Referrals to |

| | |
|---|---|
| Enforcement and Referral Operations, whereas prior to the RIF, when OIDO had case managers located within facilities, they would often interface directly with facility staff in seeking to investigate or solve detained individuals' problems. Ex. 9: Sartini Depo. 195:1-11. | component agencies were common before the RIF because the components were the only ones who could directly resolve issues, especially emergencies. Referrals are still helpful because it makes sure SES level leadership is aware of serious issues and that OIDO is concerned. This arrangement increases accountability. Sartini Dep. Tr. at 195-96. The case managers within facilities are generally unrelated to these referrals. While they could sometimes go directly to facility staff, that was not always the case and they were not always present at every facility where issues arose. |
| 160. During a July 2025 visit to a detention facility in Louisiana, when a KHRC attorney asked a Geo Group employee who manages health services for detained people in the region what the best way of obtaining prompt attention to a client's urgent medical issues would be, he was told that the only way to seek such attention now was through ICE directly, because OIDO was no longer effective at providing coordination on medical issues through its on-the-ground presence in detention facilities. Enriquez Decl., ECF 50-1, ¶¶ 18-19. | Do not know about the conversations between a KHRC attorney and a Geo Group employee. |
| 161. Numerous closure emails were sent on September 19, 2025, for OIDO complaints filed on different dates in April, July, and August of 2025. Ex. 6-N: OIDO closures. | Admit. OIDO sent a batch set of notices for backlogged cases "receiving a similar |

| | |
|---|---|
| | disposition," but they were individually reviewed and coded. Sartini Dep. Tr. at 199. |
| 162. Mr. Sartini explained the identical September 19 dates on multiple OIDO closure emails as being "because in this instance, we were clearing out the backlog of cases that was sitting in the portal at the time of the RIF" and all cases that "predated our working the cases in the portal" and that were being disposed of in a similar way received a batch email on the same date. Ex. 9: Sartini Depo. 198:6-199:9. | Denied. Mr. Sartini stated that OIDO issued a batch set of notices on the same date for backlogged cases "receiving a similar disposition." Sartini Dep. Tr. at 199. They were each individually reviewed and coded based on that review. Similar coded complaints would get batch responses for efficiency, there was no broad clearing out of complaints due to their age. |
| 163. All three recently hired OIDO employees are based in the Washington, D.C. area and must travel to the detention facilities they visit. Ex. 9: Sartini Depo. 73:10-74:6, 259:1-5. | Admit. |
| 164. Two of the three newly hired OIDO employees had to relocate to Washington, D.C., delaying their start dates to late August or early September. Ex. 9: Sartini Depo. 86:4-19. | Admit. |
| 165. A former OIDO case manager reported that before March 21, 2025, she was assigned to six detention facilities and was expected to visit each one two to three times per week, or at minimum once a month for those located further from her home. Vitullo Decl., ECF 15-11, ¶ 3. | Do not know. |
| 166. Mr. Sartini expects that each of the five people now working for OIDO will visit approximately 40 detention facilities per year and has no expectation of how often an employee would return to any particular facility in their portfolio. Ex. 9: Sartini Depo. 76:18-78:8. | Admit, they can and may return to facilities but there is no set expectation. |

| | |
|---|---|
| 167. There is no plan for OIDO employees to be present in any of the approximately 200 detention facilities on a regular basis when not conducting inspections. Ex. 9: Sartini Depo. 215:3-7. | Admit Nevertheless, a certain amount of physical presence is not statutorily required. Mr. Sartini is skeptical of the value of in-person case managers since they created "make work" and engaged in abuses of detainees. But OIDO is not categorically excluding the possibility in the future. |
| 168. Between March 21 and August 13, 2025, OIDO did not conduct any inspections of detention facilities. Ex. 3: Discovery Responses, Response to Interrogatory 10. | Admit, but since the realignment until December 2025, OIDO inspected 22 facilities despite the shutdown—the same number that OIDO, with 120 employees, inspected all of last year. Sartini Dep. Tr. at 75-78. |
| 169. Between August 13 and December 12, 2025, OIDO conducted 27 inspections of detention facilities. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 170. OIDO conducted three inspections between August 13 and the start of the government shutdown. Ex. 11: Guy Depo. 168:9-10. | Admit. |
| 171. OIDO conducted 19 inspections between the end of the government shutdown on November 13, 2025, and December 3, 2025, when Mr. Guy was deposed. Ex. 11: Guy Depo. 168:10-15. | Admit. After the shutdown disrupted work, OIDO wanted to prioritize this requirement. |
| 172. In its 2023 report to Congress, OIDO explained that it conducted both announced and unannounced inspections by multi-employee teams that included medical and environmental experts, and the former Acting Deputy Ombudsman at OIDO has testified that unannounced | Admit. This was the case prior to the RIF as well. No inspections, to Defendants' knowledge, were truly unannounced. |

| | |
|---|---|
| inspections were never conducted with more than same-day notice. OIDO 2023 report at 23-24; Ex. 19: Brundage Decl. ¶ 3. | This is due to safety concerns, which are currently heightened. Sartini Depo. at 207-08 |
| 173. All inspections conducted by OIDO since March 21, 2025, have been announced, with at least a few business days' notice provided. Ex. 11: Guy Depo. 34:7-17, 151:9-152:5; Ex. 9: Sartini Depo. 208:2-8. | Admit. This was the case prior to the RIF as well. No inspections, to Defendants' knowledge, were truly unannounced. This is due to safety concerns, which are currently heightened. Sartini Depo. at 207-08 |
| 174. Each inspection conducted by OIDO since March 21, 2025, was conducted by one or two employees and took between five hours and two days. Ex. 11: Guy Depo. 155:20-156:14; Ex. 9: Sartini Depo. 204:7-11, 208:9-21. | Admit. |
| 175. In its 2023 report to Congress, OIDO announced that it had published 11 inspection reports that year and made 36 recommendations to ICE and CBP, 26 of which were resolved to OIDO's satisfaction. OIDO 2023 report at 64. | Admit |
| 176. Mr. Guy testified at his December 3 deposition that he did not believe OIDO had issued any policy recommendations since he became Acting OIDO Ombudsman in May of 2025. Ex. 11: Guy Depo. 165:8-12. | Admit. Inspection reports "are in draft." Sartini Dep. Tr. at 212. |
| **CISOM Operations** | |
| 177. In FY2023, CISOM received nearly 24,000 requests for assistance. Dep't of Homeland Sec., Citizenship and Immigr. Servs. Ombudsman, *Annual Report 2024* at 7 (June 28, 2024), https://perma.cc/7TB9-D824. | Admit |
| 178. CIS Ombudsman Sartini testified at the May 19, 2025, hearing in this case that in the previous year CISOM opened around 40% of the requests for assistance it received, and forwarded a substantial majority of those requests to CIS. Ex. 7: 5-19-2025 HT 12:8-11. | Admit. |
| 179. On March 21, 2025, 4,489 requests for assistance were under review with CISOM staff. Ex. 3: Discovery Responses, Response to Interrogatory 4. | Admit. |

| | |
|---|---|
| 180. Between March 21 and December 12, 2025, CISOM received 8,027 requests for assistance. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 181. Between January 20 and March 21, 2025, 4,534 requests for assistance were resolved, dismissed, or otherwise closed by CISOM. Ex. 6-M: CISOM Explanatory Chart for Response to Interrogatory 6. | Admit |
| 182. Between March 21 and August 13, 2025, no requests for assistance were resolved, dismissed, or otherwise closed by CISOM. Ex. 6-M: CISOM Explanatory Chart for Response to Interrogatory 6. | Admit |
| 183. Between August 13 and December 12, 2025, 7,914 requests for assistance were closed by CISOM with "no further action" to be taken. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 184. CIS Ombudsman Sartini testified that CISOM will close requests with no further action to be taken if the request relates to a type of immigration assistance that is in flux or on pause, such as humanitarian assistance, because it "doesn't make sense to respond to those requests until there is more clarity on how they will be handled by USCIS." Ex. 9: Sartini Depo. 220:15-221:8, 245:13-246:1. | Admit. |
| 185. CISOM has begun sending out two types of form emails: one to people whose requests are being closed with no further action to be taken and one for those whose requests have been forwarded to CIS. Ex. 9: Sartini Depo. 249:7-250:18. | Admit. |
| 186. On September 11, 2025, UJC attorneys received two identically worded emails indicating, with no explanation, that their requests were being closed with no further action to be taken. Exs. 16-C & 16-D: CISOM closures. | Admit. |
| 187. Between March 21 and December 12, 2025, CISOM has referred 113 requests for assistance to CIS. Ex. 5: Defendants' 12/12/2025 Supplemental Discovery Responses. | Admit. |
| 188. Correspondence on multiple CISOM requests sent by UJC attorneys, as well as an exemplar request for assistance provided by Defendants that dates to the time period before the March 2025 stop-work order, includes periodic emails from CISOM informing the requester of the status of their | Admit. |

| | |
|---|---|
| inquiry, of CISOM's efforts to obtain a response from CIS, and of any action ultimately taken by CIS. Exs. 6-O and 16-A to 16-B: Pre-March 21, 2025, CISOM correspondence. | |
| 189. For those inquiries that were forwarded to CIS since March 21, 2025, requesters received a single email dated September 19, 2025, which was identically worded for all requesters whose inquiries were forwarded to CIS and said nothing specific about their particular case. Ex. 6-Q: CISOM case management notes. | Do not know that it is all inquiries from that date. |
| 190. The reason that all requesters whose inquiries were forwarded to CIS were sent an email the same day that contained identical language is that Rodolfo Gomes programmed a batch-generated notice to be sent to everyone whose requests had been forwarded to CIS on or before that date. Ex. 9: Sartini Depo. 231:7-232:7, 233:20-234:8. | Admit. |
| 191. Mr. Sartini testified that CISOM has no ongoing interaction with the requester after forwarding their inquiry to CIS until CIS responds. Ex. 9: Sartini Depo. 235:9-14. | Denied. Mr. Sartini stated that there is "[t]ypically" no ongoing follow-up. Sartini Dep. Tr. at 235. CISOM retains the ability to re-open or follow up on requests. |
| 192. CIS has not yet responded to any CISOM inquiries since Mr. Sartini became CIS Ombudsman. Ex. 9: Sartini Depo. 238:1-4. | Denied, USCIS has recently responded to dozens of inquiries. Sartini Decl. ¶ 8 (~~Feb. 13,~~ 2026). |
| 193. On August 8, 2025, an immigration attorney attempted to close a request pending with CISOM because CIS had sent responsive correspondence, rendering the CISOM request moot. Declaration of Vicente Lovelace (Lovelace Decl.), ECF 53-2, ¶ 5. | Do not know. |
| 194. CISOM requests cannot be withdrawn through the web portal. Ex. 9: Sartini Depo. 253:10-17. | Admit. |
| 195. When attempting to close a pending CISOM request via email in August 2025, an immigration attorney received a message that the mailbox was no longer monitored, and | Do not know. |

| | |
|---|---|
| when he tried to close the request by calling CISOM's toll-free number, he remained on hold for over an hour with no one picking up the phone. Lovelace Decl., ECF 53-2, ¶¶ 5-8. | |
| 196. The toll-free number for CISOM is no longer operational, and the contract to operate its call center was canceled prior to August 2025. Ex. 9: Sartini Depo. 254:5-13. | Admit. "[T]here was a lot of confusion and performance issues with that contract and that line." Sartini Dep. Tr. at 254. |
| 197. There is currently no way for a requester or any other member of the public to have a real-time conversation with a representative of CISOM. Ex. 9: Sartini Depo. 256:13-18. | Deny. Sartini has had multiple real time conversations with requestors for assistance. |
| 198. An immigration lawyer who received the one-sentence form closure email from CISOM on September 12 responded to the email, requesting more information about the status of his inquiry, and immediately received an autoresponse indicating that the CISOM email box was unattended. Ex. 6-P: CISOM email exchange. | Do not know. |
| 199. A former regional representative performing duties of the local ombudsman for Texas, Utah, and several other states noted in a declaration that her connections with stakeholders and ongoing presence in local communities helped to demystify an otherwise opaque federal immigration bureaucracy and answer questions from both employers and immigrants. Ex. 18: Declaration of Krista Tacey. | Do not know. |
| **Congressional Inquiries and Reports, and Public Engagement Activities** | |
| 200. When shown two letters from members of Congress involving CRCL during his deposition, one of which was addressed to him, Mr. Hemenway testified that he did not know if the letters had ever been answered and suggested that any responses were probably handled by his deputy, Mr. Sartini. Ex. 10: Hemenway Depo. 144:9-146:12. | Admit. But Mr. Hemenway did not state that he did not review or otherwise see a response if one had been prepared. Also, he was not asked if he was consulted about an issue raised in the letter. |
| 201. Mr. Sartini testified that he is required to consult with Mr. Hemenway on responses to any congressional inquiry | Admit. |

| | |
|---|---|
| addressed to the Secretary, and that he did consult with Mr. Hemenway on all CRCL-related inquiries. Ex. 9: Sartini Depo. 173:20-174:3. | |
| 202. Mr. Guy testified that he had received no congressional inquiries as Acting OIDO Ombudsman, and when presented with a letter from members of Congress addressed to him and others, testified that he had never seen it before and that any response would have been handled by Mr. Sartini. Ex. 11: Guy Depo. 178:19-182:1. | Admit. He also testified that OLA was probably coordinating. Guy Dep. Tr. at 179. |
| 203. Mr. Sartini testified that he would expect Mr. Guy to be familiar with any congressional correspondence to or from OIDO. Ex. 9: Sartini Depo. 30:14-17. | Denied. Mr. Sartini testified that he would expect Mr. Guy to be familiar with the correspondence if Mr. Guy had received it. Sartini Dep. Tr. at 30. |
| 204. Mr. Hemenway testified that CRCL plans to produce the congressional report for FY2024 by sometime in early 2026, with the report primarily being drafted by contractors. Ex. 10: Hemenway Depo. 163:1-12. | Denied. CRCL plans to produce the report in mid-February. Hemenway Dep. Tr. at 163. Contractors are "running point" on the report and then it will "go through a review process with civilian leadership." *Id.* |
| 205. Mr. Sartini told Mr. Guy that he had been unable to find OIDO's 2024 report to Congress, and neither Mr. Guy nor Mr. Sartini has ever seen it. Ex. 11: Guy Depo. 182:17-185:4; Sartini Depo. 214:13-18. | Admit. |
| 206. Mr. Guy testified that OIDO plans to submit its 2025 report to Congress by mid-February, with the report being drafted by Mr. Sartini with the assistance of other OIDO employees. Ex. 11: Guy Depo. 176:4-21, 182:5-16. | Admit. |
| 207. A redacted version of CISOM's 2025 report to Congress was published on DHS's website on December 2, 2025. https://www.dhs.gov/publication/cis-ombudsman-2025-annual-report. | Admit. |
| 208. Only two investigation and recommendation memoranda can now be found on CRCL's website, in contrast to the | Admit that two investigations and |

| | |
|---|---|
| hundreds of documents that could be found there when CRCL published its FY2023 report to Congress. Ex. 6-R: CRCL webpage; CRCL FY2023 report at 49. | memoranda can now be found on CRCL's website. Do now know whether "hundreds of documents" could be found there previously. The statute does not require recommendations to be made public. |