# EXHIBIT 9



**CONTAINS CONFIDENTIAL INFORMATION**

# Transcript of Ronald Sartini

**Date:** December 5, 2025

**Case:** Robert F. Kennedy Human Rights, et al. -v- US Dept. of Homeland Security, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1                UNITED STATES DISTRICT COURT FOR

2                   THE DISTRICT OF COLUMBIA

3       --------------------------------

4       ROBERT F. KENNEDY HUMAN RIGHTS;        Case No.:

5       SOUTHERN BORDER COMMUNITIES            25-1270-ACR

6       COALITION; URBAN JUSTICE CENTER,

7                    Plaintiff,

8       v.

9       U.S. DEPARTMENT OF HOMELAND

10      SECURITY; KRISTI NOEM, IN HER

11      OFFICIAL CAPACITY AS SECRETARY

12      OF HOMELAND SECURITY,

13                    Defendant.

14      --------------------------------

15          --- CONTAINS CONFIDENTIAL INFORMATION ---

16                Deposition of RONALD SARTINI

17                     Washington, D.C.

18                Friday, December 5, 2025

19                       9:28 a.m.

20      Job No.: 609438

21      Pages: 1 - 274

22      Recorded by: Justice Dominguez

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    2

```
1        Deposition of RONALD SARTINI, held at the

2    offices of:

3

4

5           PLANET DEPOS - D.C. OFFICE

6           1100 CONNECTICUT AVENUE NW

7           SUITE 950

8           WASHINGTON, D.C. 20036

9

10

11       Pursuant to Notice, before Justice Dominguez,

12   Notary Public in and for the District of Columbia.

13

14

15

16

17

18

19

20

21

22
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    3

```
1                 A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS, ROBERT F. KENNEDY

4    HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES

5    COALITION; URBAN JUSTICE CENTER:

6         KARLA GILBRIDE, ESQUIRE

7         PUBLIC CITIZEN LITIGATION GROUP

8         1600 20th Street NW

9         Washington, D.C. 20009

10        (202) 588-1000

11

12        CHRISTINE COOGLE, ESQUIRE

13        DEMOCRACY FORWARD

14        P.O. Box 34553

15        Washington, D.C. 20043

16        (202) 445-4939

17

18

19

20

21

22
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    4

```
1          A P P E A R A N C E S     (C T N' D)

2

3    ON BEHALF OF THE PLAINTIFF, ROBERT F. KENNEDY

4    HUMAN RIGHTS:

5         SARAH DECKER, ESQUIRE

6         ROBERT F. KENNEDY HUMAN RIGHTS

7         1300 19th Street NW

8         Suite 750

9         Washington, D.C. 20036

10        (202) 463-7575

11

12   ON BEHALF OF THE DEFENDANT, U.S. DEPARTMENT OF

13   HOMELAND SECURITY; KRISTI NOEM, IN HER OFFICIAL

14   CAPACITY AS SECRETARY OF HOMELAND SECURITY:

15        TIBERIUS DAVIS, ESQUIRE

16        U.S DEPARTMENT OF JUSTICE

17        950 Pennsylvania Avenue

18        Washington, D.C. 20530

19        (202) 514-4357

20

21

22
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                 5

```
 1        A P P E A R A N C E S      (C T N' D)

 2

 3   ON BEHALF OF THE DEFENDANT, U.S. DEPARTMENT OF

 4   HOMELAND SECURITY; KRISTI NOEM, IN HER OFFICIAL

 5   CAPACITY AS SECRETARY OF HOMELAND SECURITY:

 6        RENE E. BROWNE, ESQUIRE

 7        MATTHEW FLEISCHMAN, ESQUIRE

 8        U.S. DEPARTMENT OF HOMELAND SECURITY

 9        3801 Nebraska Ave NW

10        Washington, D.C. 20528

11        (202) 447-3891

12

13        LISA M. TAYLOR, ESQUIRE

14        U.S. DEPARTMENT OF HOMELAND SECURITY, OFFICE

15        OF GENERAL COUNSEL

16        245 Murray Lane

17        M.S. 0185

18        Washington, D.C. 20528

19        (202) 357-7610

20

21   ALSO PRESENT:

22        KONLY HARDING, Planet Depos Trainer
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    12

1      Q      Okay.  And for approximately how long

2  did you meet?

3      A      Two and a half, three hours.

4      Q      Did you speak with anyone besides

5  counsel about your testimony today?

6      A      No.

7      Q      Did you talk to Troup Hemenway about the

8  deposition testimony that he gave?

9      A      No.

10     Q      Did you talk to Joseph Guy about the

11  deposition testimony that he gave?

12     A      No.

13     Q      Are you familiar with the deposition

14  testimony that those two gentlemen provided?

15     A      Not directly familiar.

16     Q      You've testified previously in this case

17  at a couple of hearings before Judge Ana Reyes.

18  Do you recall that testimony?

19     A      Yes.

20     Q      During your testimony on May 19th, you

21  were asked or you gave testimony about

22  conversations you had had with existing staff at

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    13

1    three offices within the Department of Homeland

2    Security:  Office for Civil Rights and Civil

3    Liberties, Office of the Immigration Detention

4    Ombudsman, and the Citizenship and Immigration

5    Services Ombudsman's Office.

6            Do you remember testifying about those

7    conversations with existing staff?

8      A      Yes.

9      Q      Who asked you to speak with the staff at

10   those three offices about their operations?

11     A      The Acting General Counsel, Joseph

12   Mazzaro.

13     Q      And when did Mr. Mazzaro ask you to have

14   those conversations?

15     A      I don't remember the date, but I'm

16   fairly confident it was March 21st or 22nd.  It

17   was shortly after the RIF notices went out.

18     Q      And what were you told was the reason

19   for having those conversations with the staff?

20            MR. DAVIS:  Objection, deliberative

21   process privilege.  I'm going to instruct the

22   witness not to answer that.  And attorney-client

1    privilege.

2        Q      What did you -- strike that.

3               Do you remember who at CRCL you spoke

4    with?

5        A      Yes.

6        Q      Who did you speak with?

7        A      Peter Mina, Veronica Venture, and Dana

8    Salvano-Dunn, and Brian Sterling.

9        Q      And I guess we'll expedite and look for

10   an exhibit.

11              MS. GILBRIDE:   Does anyone recall what

12   exhibit we ended on Wednesday?  Was it 47th?

13              MS. DECKER:   It was -- yes.  47.

14              MS. GILBRIDE:   So we'll mark this as

15   Exhibit 48.

16              (Exhibit 48 was marked for

17   identification and is attached to the transcript.)

18       Q      Mr. Sartini, have you had a chance to

19   review this document?

20       A      Yes.

21       Q      And what does the document appear to be?

22       A      It appears to be an org chart of CRCL as

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                           15

1    of March 5th, 2025.

2        Q      And a couple moments ago, you listed

3    some individuals who you had spoken with at CRCL.

4    Do you see their names on this org chart?

5        A      I see some of the names.  I see Sterling

6    and Venture.  Yes, I see Peter Mina.  Yes.  And I

7    see Dana.  The org chart's a little hard to read.

8        Q      Okay.

9        A      A lot going on there.

10       Q      Well, either from your own recollection

11   or from the org chart, if it's helpful to you, can

12   you tell us the positions within CRCL of the

13   individuals that you spoke with?

14       A      Yes.  So the way the positions were

15   presented to me does not exactly line up with the

16   org chart.

17              But Peter Mina, I believe, presented

18   himself as the Acting CRCL Officer.

19              Veronica Venture presented herself as

20   the Deputy Officer and the Head of the EEO

21   Program.

22              Dana Salvano-Dunn, I believe, presented

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    16

1    herself as the Head of Programs and Compliance.

2    But it was understood to me she was the third

3    highest ranking in the office at that time and in

4    SES.

5            And then fourth in the hierarchy would

6    have been ▆▆▆▆▆▆▆▆▆, who presented himself as

7    the Chief of Staff, not in SES.

8      Q      And you spoke with those individuals

9    about the functions that CRCL was performing; is

10   that correct?

11     A      Yes.

12     Q      And as well as about its day-to-day

13   operations and staffing?

14     A      Yes.

15     Q      Is that accurate?

16     A      Yes.

17     Q      And did you meet with individuals at the

18   Office of the Immigration Detention Ombudsman?

19     A      Yes.

20     Q      Who did you meet with at that office?

21     A      Mary Ellen May Marion.

22     Q      Anyone else?

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                17

```
 1     A       There was one other -- one other

 2   individual whose name now escapes me.  I don't

 3   remember.

 4           My conversations were primarily with

 5   her.  He was an ancillary figure in the

 6   conversations.

 7     Q       And what did you discuss with Mary Ellen

 8   May Marion?

 9           MR. DAVIS:   Objection, deliberative

10   process privilege.  The witness can answer at a

11   high level of generality, but not about specific

12   conversations or advice given.

13     A       The functions of the office and

14   operations.

15     Q       And who did you meet with at the

16   Citizenship and Immigration Services Ombudsman's

17   office?

18     A       Nathan Steifel, the Deputy Ombudsman who

19   was acting as the Ombudsman.

20     Q       Anyone else?

21     A       No.

22     Q       Was the subject matter of those
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    18

```
1    conversations similar to what you've described for

2    the other offices?

3       A      Yes.

4       Q      And did you report back to anyone else

5    at DHS on the conversations that you had with

6    personnel at these three offices?

7       A      Only the General Counsel and perhaps

8    some of his attorneys.

9       Q      And did you tell them that based on what

10   you had learned from these conversations, you did

11   not believe that the offices should be eliminated

12   in their entirety?

13          MR. DAVIS:   Objection, attorney-client

14   privilege and deliberative process privilege.  I'm

15   going to instruct the witness not to answer about

16   conversations and topics he had with his

17   attorneys.

18      Q      Independent of what you told anyone, did

19   you believe after having these conversations that

20   the offices should be eliminated in their

21   entirety?

22      A      No.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    19

```
 1      Q       Did you believe that all positions in
 2  the offices should be eliminated?
 3      A       I did not have an opinion as to
 4  elimination of positions.
 5      Q       When did you complete your review of the
 6  three offices?
 7      A       I don't recall.  I know I was at the
 8  active work of understanding their functions and
 9  figuring out how to continue their operations for
10  at least several weeks, maybe more.  I would say
11  probably no more than a month and a half of active
12  transition, planning, and research.
13      Q       And during that several week period, did
14  you have one conversation with the Office of
15  General Counsel personnel or more than one
16  conversation?
17      A       More than one.
18      Q       Did you record any of your observations
19  and conclusions in writing?
20      A       I had notes, personal notes, like,
21  handwritten notes.  There was at one point a
22  CONOPS, a concept of operations, which was early
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    25

```
 1    like to see it.  But you testified about not being

 2    able to personally perform all the statutory

 3    functions of all three offices yourself.  Do you

 4    still agree that that is the case?

 5        A      I don't recall particularly -- in

 6    particular, saying that.  Do I perform -- I am

 7    able to execute all of the required functions of

 8    the offices that I hold, keeping in mind that none

 9    of these components of DHS ever had their

10    functions executed by one person each.

11             They are all offices.  They are staffed.

12    I am not executing the functions alone by any

13    stretch.

14        Q      Who is helping you to perform these

15    functions?

16        A      So there is Mr. Guy and Mr. Hemenway at

17    OIDO and CRCL, respectively.

18             I have a chief of staff in CRCL and

19    OIDO, ███████████, who is an enormous help in

20    operating those offices.

21             I have staff, line-level,

22    non-supervisory staff in OIDO and CRCL.
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                26

```
 1              And there are contractors.  And all of
 2   the admin functions have been realigned to offices
 3   in the Management Directory.
 4              And I also have assistance from the
 5   Office of the General Counsel where and when
 6   counsel is needed.
 7      Q      I would like to go back and ask, when
 8   you referred to the Management Directorate and
 9   their role in assisting with performance of these
10   functions, can you elaborate on what sort of
11   assistance they provide?
12      A      Sure.  So prior to the RIF, there were
13   dozens of employees at these three offices who
14   performed what I would call admin-type functions:
15   HR, IT, budget, contracting, travel support.  And
16   all of those functions have been realigned under
17   the management offices that do that work for the
18   department generally.
19              So, for example, contracting.  Instead
20   of CORs, Contracting Officer Representatives,
21   being in CRCL, there are now already level 3 CORs,
22   which is the highest level of COR available to me
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    30

```
 1      A       Mr. Guy provides guidance and oversight

 2   to ensure that we are in keeping with the

 3   Secretary's priorities for how the office should

 4   be run.

 5              He removes -- as Mr. Hemenway does.  I

 6   neglected to say this.  He removes hurdles, which

 7   is a very important role.  And it's very nice to

 8   have individuals at such a high standing in the

 9   department to be able to clear any hurdles that we

10   may face.  And so he removes those hurdles for us

11   and reviews documents that require higher-level

12   signature, including the Secretary's signature, or

13   that may go out of the department to Congress.

14      Q       So you would expect that Mr. Guy would

15   be familiar with correspondence to and from

16   members of Congress involving OIDO?

17      A       If received, yes.

18      Q       Who is ███████████████?

19      A       He is my Deputy Ombudsman in CISOM, and

20   he is acting as the Chief of Staff of CRCL and

21   OIDO.

22      Q       What duties does he perform?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                31

1     A      So they vary more by office.  So for

2   CISOM, he is overseeing management of the queue of

3   questions that we receive from the public portal,

4   and he assisted in the drafting of the annual

5   report.

6            For OIDO, he oversees and manages the

7   day-to-day of the complaint portal and works with

8   ICE and CBP to schedule inspections.

9            And then for CRCL, he is heavily

10  involved on the technical side, helping to reform

11  the complaint management system and the many

12  technical problems that arise out of having such a

13  high-volume, complex system.

14           And then he manages admin functions for

15  CRCL and OIDO pertaining to interfacing with the

16  admin offices so that we have funding and travel

17  approved and time cards and performance plans.

18  All of the issues that crop up, he is my primary

19  liaison with the management offices.

20    Q      What is Mr. ██████ professional

21  background?

22    A      ████████████████████████████████████████

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    32

1    least -- or he was an employee of USCIS for at

2    least 10 years, maybe 12.  He is an immigrant

3    himself, and so he brought to his role at USCIS a

4    knowledge of -- personal knowledge of the

5    immigration experience.

6              And over that time, he was a product

7    owner of some of the largest case processing

8    systems, record holding and management systems in

9    the entire government.  And so he has worked both

10   on the business side of those systems and the

11   technical side of those systems and brings an

12   enormous skill set:  Not just in technical system

13   management, but supervision and contract

14   management.

15       Q     When did you take on your role as Deputy

16   Officer of CRCL?

17       A     I don't remember.  But I believe it was

18   sometime in May, mid-May.

19       Q     Was it around the same time that Mr.

20   Hemenway took on his role?

21       A     Yes.

22       Q     And what about your role at OIDO?  Did

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          38

```
1    more or less than $10 million contracts?
2       A       So currently we are spending less than
3    $10 million, particularly because we're in a CR
4    that only covers about a third of the year.
5       Q       So does that mean that contracts have
6    been cut?
7       A       Some have been cut.  Yes.
8       Q       Which ones were cut?
9       A       I may not remember all of them.  But I
10   could tell you as a category, contracts related to
11   medical document review have been cut.
12              I believe there was a translation
13   contract that was cut.  And all of the contracts
14   at -- well, are we only talking about CRCL?
15      Q       No, all three.
16      A       All three?  So all of the contracts at
17   OIDO.  So what I just said was CRCL only, and then
18   all of the contracts at OIDO and CISOM have been
19   cut.
20      Q       We may return to that exhibit, but you
21   can set it aside for now.  Thank you.
22              This, we will mark as Exhibit 8.  It was
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    41

1    seven of them.

2        Q      And is that the same number of

3    contractors given the proviso you just made about

4    not knowing the exact number?  Is the volume of

5    work being performed under that contract the same

6    as it was in May of 2025 or more?

7        A      It is slightly more.  And I have

8    accordingly plussed up the contract to both add --

9    and how the contractor chose to handle my plussing

10   it up was to add an FTE who happens to have been a

11   former CRCL employee who was RIF'd.  And they have

12   also chosen to work overtime to meet the workload,

13   and I have authorized that time.

14       Q      So if there were -- if there are now

15   approximately seven FTEs, that means that in May

16   there were approximately six; is that right?

17       A      There was one less than there is now.

18   Yes.  Maybe it's eight now and seven then.  I'm

19   not 100 percent sure.

20       Q      All right.  Turning to paragraph 6 of

21   Mr. Hemenway's declaration.  Is the contract

22   described in paragraph 6 still active?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    44

```
 1              But as far as I know, there are at least
 2    three individuals on that contract for us.
 3       Q      And to your knowledge, were those
 4    staffing levels on the three contracts the same
 5    when CRCL also had full-time employees handling
 6    equal employment matters?
 7       A      Yes.
 8       Q      You mentioned earlier that part of your
 9    role as Deputy CRCL Officer involves managing the
10    processing of the EEO complaints?
11       A      Yes.
12       Q      Does that mean that you are personally
13    responsible for supervising these contractors?
14       A      Yes.
15       Q      And what does that supervision entail?
16       A      It entails ensuring that case processing
17    in every step of the process is timely, and then
18    ensuring that the quality, the work is being done
19    to an acceptable level of performance to meet our
20    legal requirements.
21       Q      Do you review their work product?
22       A      I sign their work product.  The work
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                45

1   product is primarily reviewed by attorneys from

2   the Office of the General Counsel.

3      Q       And are there certain tasks that must be

4   performed by a full-time federal employee and

5   cannot be performed by a contractor?

6      A       The signing of the documents is done by

7   myself.  And as I understand it, that has to be

8   done by a federal employee.

9              I'm not aware of any others in the EEO

10  space that have to be performed by a federal

11  employee, but we do have one federal employee

12  assisting with managing the work and doing the

13  work itself, the investigations, plus the

14  attorneys from the Office of the General Counsel.

15     Q       And you mentioned that you sign

16  documents.  Do you ever recommend revisions or

17  changes to any of the documents before signing

18  them?

19     A       At times, I do.  Yes.

20     Q       What would be the basis for recommending

21  a change?

22     A       Reading the fact pattern in the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    46

1    complaint and making a reasoned judgment as to

2    whether or not discrimination has occurred.  And

3    that will typically result in a conference between

4    me and my attorneys.  And we will go through the

5    law point by point, and the attorneys will explain

6    why the determination was reached that was.

7        Q       And when you say my attorneys, you're

8    referring to attorneys in DHS Office of General

9    Counsel?

10       A       Yes.

11       Q       Turning to paragraph 11 of Mr.

12   Hemenway's declaration, is the contract with

13   Klemen Consulting (phonetic) still in effect?

14       A       No.

15       Q       Has any other contract been entered into

16   to take the place of this contract with Klemen

17   Consulting?

18       A       Not a contract.  We have engaged the

19   Office of Health Services in the department to

20   conduct all medical review that we deem necessary.

21       Q       Is the Office of Health Services a

22   subcomponent of ICE, or is it a separate

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                47

```
1    component?

2       A       No.  It's a headquarters component

3    reporting direct to the Secretary.

4       Q       And can you speak more about this nature

5    of that consultation?  Are there staff details

6    full-time from OHS to CRCL, or is it more ad hoc?

7       A       It is as we need it, not -- there are no

8    details.

9       Q       And when you call in someone from the

10   Office of Health Services, are they being asked to

11   review documents, or are they being asked to go in

12   person to observe someone in detention?  What

13   sorts of things are they being asked to do?

14      A       So our agreement is that they will do

15   all of the above.  At the moment, we have asked

16   them to undertake document review.

17      Q       So you, between May of 2025 and today,

18   have not had occasion to ask them to consult

19   in-person on a case?

20      A       Correct.

21      Q       And approximately how many cases have

22   you asked them to conduct document review for?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    48

1       A       I don't know the exact number, but it's
2    at least a dozen.
3       Q       Turning back to Mr. Hemenway's
4    declaration, paragraph 12.  Oh, I'm sorry.  That's
5    JDG.  We've already talked about them.
6            I'll ask anyway:  Is JDG still
7    performing this function of writing up final
8    decisions that is discussed in paragraph 12?
9       A       Yes.  And this is a different contract
10   than the other JDG contract.  This is a
11   contract -- not only am I plussing up, but I'm
12   probably quintupling compared to its previous
13   utilization.
14      Q       Is JDG Associates writing all final
15   agency decisions for DHS at this time?
16      A       No.
17      Q       Which decisions are assigned to JDG
18   Associates?
19      A       There isn't a rubric that I use.  It's
20   as my attorneys are available.  Right now,
21   attorneys are writing the FADs.  And as their
22   workload allows their writing, and if they are not

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                      49

```
 1    able to do it and they want increased capacity, we

 2    are relying on JDG.

 3       Q      So you anticipate increasing JDG's

 4    footprint from what it currently is, but have not

 5    done so yet; is that right?

 6       A      No, we are in the process of doing it.

 7    The order has already gone out to do it, and the

 8    contractor is in the process of onboarding staff

 9    to meet our requirement.

10       Q      Approximately how many employees are

11    employed across all of DHS at this time?

12       A      I don't know.  Maybe 200,000.

13       Q      Do you know how many EEO complaints are

14    currently pending with CRCL?

15       A      I don't know the number, but I know we

16    have those numbers.  I think we've produced them

17    or are going to update them.  I know that we are

18    timely on our EEO workload.

19       Q      Do you know how many final agency

20    decisions or FADs have been issued since May of

21    2025?

22       A      I do not know.
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    50

```
 1      Q       And it's your testimony that those final
 2   agency decisions up until this date have all been
 3   written by OGC attorneys?
 4      A       No, I do not know that.  I know there
 5   has been some contract work done.
 6      Q       So total, across all of the various
 7   contracts that we've been discussing, how many
 8   contractors or FTE, full-time equivalent, hours by
 9   contractors are being utilized by CRCL at this
10   time?
11      A       Probably somewhere between 25 and 30.
12      Q       And is that a higher number of
13   contractor FTE, full-time equivalents, than was
14   being utilized in May of 2025?
15      A       Yes.
16      Q       By how much of an increase?
17      A       I don't know how much of an increase.
18   But I know there is, again, the plussing up of the
19   one contract that handles civil rights complaints.
20           So that's at least an FTE of one, but
21   probably more depending on that flexible capacity
22   that the contractor utilizes, plus a significant
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025          51

1    increase in the FAD writing contract.  And then

2    the other contracts are probably at the same

3    level.

4       Q     And do any of these CRCL contractors

5    that we've been discussing perform tasks for other

6    offices besides CRCL?

7       A     No.

8       Q     Do you know what the backgrounds of the

9    contractors who are reviewing the complaints from

10   members of the public?  Do you know what subject

11   matter expertise those individuals have?

12      A     At CRCL?

13      Q     Yes.  That would be the first contract

14   we discussed in paragraph 5.

15      A     Yes.  To my knowledge, so I know what

16   the contract requirements are for those staff.  So

17   that is the requirement that I work with.  But I

18   do happen to know that most of those contractors

19   are attorneys, and one of them is a former CRCL

20   employee.

21      Q     And we talked earlier with regard to the

22   EEO contractors about whether there were certain

1    CRCL?

2        A        Well, I didn't say they weren't a

3    permanent solution.  They are indeed part of the

4    permanent solution, particularly the contract at

5    issue in paragraph 5.

6        Q        You may have already testified to this,

7    but just so that we have a clear record:  Can you

8    say how many full-time employees are at CISOM

9    besides yourself?

10       A        One, and one detailee.

11       Q        And who is the one full-time employee?

12       A        ███████████████

13       Q        And Mr. ██████ also performs work for

14   CRCL and for OIDO; is that correct?

15       A        Yes.

16       Q        So other than the one detailee, is there

17   anyone who is performing work for CISOM full-time?

18       A        No.

19       Q        When did the detailee come on board?

20       A        I don't remember, but it was probably

21   somewhere in the early summer.  June, perhaps.

22       Q        Have there been any other detailees

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    58

1    since May of 2025 at CISOM?

2        A      No.

3        Q      And how many full-time employees are

4    currently working at CRCL?

5        A      Two.

6        Q      Any detailees?

7        A      No.

8        Q      How many full-time employees are

9    currently working at OIDO?

10       A      Three.

11       Q      Any detailees?

12       A      Two.

13       Q      Do you know what the length of their

14   details is?

15       A      I have them -- the offices have

16   indicated that I have them as long as I want them,

17   and right now we are assuming at least a one-year

18   detail.

19       Q      Is that the same for the CISOM detailee?

20       A      Yes.

21              MS. GILBRIDE:   This would be 50 -- 50,

22   I believe.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    62

1      A      Yes.

2      Q      And when you drafted this job

3    announcement, it was a single job announcement

4    from which you would hire multiple candidates; is

5    that right?

6      A      Yes.

7      Q      So why did you decide to hire

8    generalists for CRCL instead of having specialists

9    in particular subject matters?

10     A      It's a more efficient and flexible

11   staffing model, which is a common way to approach

12   staffing in the federal government.

13            This is something, actually, that I

14   learned from one of the SESs at the FBI some time

15   ago who had mentored me.  And they found that if

16   they trained staff who handled a particular type

17   of inquiry or complaint as generalists, they were

18   able to spread their work over a much greater

19   capacity.  Specialization comes with inherent

20   bottlenecking.

21     Q      Do you intend to hire additional law

22   enforcement specialists besides Mr. ████████ and

1    description made sense, whereas CRCL's is much

2    broader, and Investigator covers the breadth of

3    work that CRCL employees might encounter.

4              So I believe that that was not a change

5    on my part, but an error on OCHCO's part.  And

6    when we discovered the error, we probably had them

7    take it down, which might account for why the

8    position was posted for such a short time.

9        Q      This might be a good time to talk more

10   about the division of responsibilities between the

11   contractors and the investigators.  When a

12   complaint comes in to CRCL, who would be the first

13   person to review it?

14       A      Consistent with my understanding of past

15   practice, it's the contractors on the PCI

16   contract.

17       Q      And what does that initial review

18   entail?

19       A      They read the entire complaint, and they

20   determine, firstly, whether or not it's spam,

21   whether it's legitimate mail.  Because we get an

22   enormous amount of pure spam, and we're working on

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    67

```
 1    fixing that problem.

 2            And then secondly, if we have

 3    jurisdiction.  So if it looks like a legitimate

 4    complaint, then is it even in our jurisdiction,

 5    both within the department and the government, but

 6    also then, in particular, within CRCL's

 7    jurisdiction?

 8            And at that point, they categorize the

 9    complaint by type, using categories that

10    preexisted me.  We have not changed this part of

11    the process, to my knowledge.  And they write up a

12    summary of the complaint, and then they propose it

13    in a spreadsheet to myself, Mr. ███████    the

14    Office of the General Counsel.  Attorneys who

15    advise us are also aware of the cases presented to

16    us.

17            And then we have discussions to

18    determine which we will take up for investigation,

19    which we will not, which we will forward to ICBP

20    or the relevant component, which are purely going

21    to be handled as medical referrals.

22            And then when there is a course of
```

1    action decided, it is tasked out either to a Fed

2    or to a contractor.  And that's the process.

3       Q      So once a decision is made about how to

4    categorize a complaint, under what circumstances

5    would it be assigned to a Fed?

6       A      We are flexible.  There isn't a bright-

7    line rule.  But right now the standard that I'm

8    operating under is if we are going to make -- if

9    we are going to group the complaint in with

10   similar complaints -- for example, all complaints

11   related to a particular detention facility --

12   those are being assigned to a Fed for onsite

13   follow-up on any number of complaints that have a

14   commonality to them.

15           And then right now, the rest, for the

16   most part, if not entirely, are being investigated

17   by the contractors.

18      Q      A few moments ago, you mentioned

19   complaints that are outside of CRCL's

20   jurisdiction.  What would be an example of a type

21   of complaint that would fall outside of CRCL's

22   jurisdiction?

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    69

```
 1     A      If it doesn't directly concern civil

 2   liberties.  And we get a lot for other law

 3   enforcement agencies, as well.  We have a lot that

 4   concern the FBI because individuals think the FBI

 5   is under DHS.  But typically it would be something

 6   that doesn't have a civil liberties nexus.

 7     Q      And once a contractor determines that a

 8   complaint is outside of CRCL's jurisdiction, is

 9   that determination reviewed by a full-time

10   employee?

11     A      We do.  We receive logs of everything

12   that they receive, including the spam, and we do

13   review that.

14     Q      And then what is the next step that's

15   taken for an outside jurisdiction complaint?

16     A      We will refer it over to the relevant

17   office, and that is the end of it.

18     Q      Other than investigating a subset of

19   complaints and reviewing the work product of the

20   contractors, are there other duties that Mr.

21   N▮▮▮▮▮    and Mr. ▮▮▮▮  have that we haven't

22   discussed?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    70

```
1      A      Well, Mr. ███ handles a good portion of

2    the EEO complaint management work, including

3    drafting some of the documents on the EEO side.

4    They help with report writing.  And that's it.

5      Q      All right.

6             MS. GILBRIDE:   I think this is Exhibit

7    51.

8             (Whispered conversation.)

9             MS. GILBRIDE:   Are there full copies?

10            MS. DECKER:   Yeah.  So this is three

11    copies.

12            MS. GILBRIDE:   51.  All right.  And

13    we'll just figure out what that is later.

14            (Exhibit 51 was marked for

15    identification and is attached to the transcript.)

16     Q      Are you familiar with this document, Mr.

17    Sartini?

18     A      Yes.  And the title and body of the

19    document look correct here.  This is the Law

20    Enforcement Specialist Assessment Programs for

21    OIDO Job Announcement.

22     Q      Did you have a role in drafting this job
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    75

```
 1              So this has not been going on all that

 2    long.  But since we've been back, they've been on

 3    constant travel.  And I believe there was travel

 4    right before the shutdown, as well.

 5       Q      So going forward, what do you anticipate

 6    being the number of days per month that the law

 7    enforcement specialists will spend in detention

 8    facilities?

 9       A      Probably about half their time.

10       Q      How many inspect -- strike that.

11              How may distinct detention facilities is

12    each employee expected to visit?

13       A      There isn't a quota.  Our goal is to

14    inspect as many as we can within a year until we

15    hit all of the facilities and we have the option

16    to focus on particular ones if there is a reason

17    to.

18              But I'm proud to state that we've

19    inspected as many facilities already in just a few

20    months, even with the longest shutdown in

21    government history as OIDO inspected in their --

22    as they reported they inspected in their FY23
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    76

1   report, despite having 120 employees.

2       Q       And from your understanding of the OIDO

3   2023 report, did those employees make repeated

4   visits to the same facilities?

5       A       I don't know.  It's not -- from my

6   reading or what I remember of the report, it's not

7   quite clear.

8       Q       Under your current plan for OIDO going

9   forward, will employees be expected to return to

10  the same facility that they have already visited?

11      A       Sure.  It would be a natural part of an

12  after-action plan or following up on a report.

13              So, for example, if there are

14  recommendations set forth in the report and ICE or

15  CBP adopt the recommendations, it would be natural

16  to follow up to see if those recommendations were

17  implemented at some point.

18      Q       So how frequently would you anticipate a

19  law enforcement specialist returning to a facility

20  within their portfolio?

21      A       I don't have an expectation.  I think

22  that's a decision that we can make as we move

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    77

1    along.

2        Q        So between the five individuals

3    currently working for OIDO, how are detention

4    facilities distributed?

5        A        Primarily by the region that the

6    individuals know and are comfortable with.  So if

7    an individual -- the individual who we have who

8    comes from Texas and was a border patrol agent in

9    Texas and knows those facilities well, he is more

10   likely to be assigned to cover those facilities.

11            And, for example, we have an employee in

12   Pennsylvania who worked at one of the larger

13   facilities there.  And so it makes sense that she

14   would be more likely to be assigned both to

15   inspecting that facility and the others around it.

16       Q        Do you know how many detention

17   facilities are currently in operation?

18       A        I believe -- so the number changes all

19   the time, but it's around 200.

20       Q        So would you anticipate each of your

21   five OIDO employees being responsible for

22   approximately 40 facilities?

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    78

```
 1      A      Yes.  That's feasible.  And the fact

 2   that we already have knocked out 22 inspections

 3   tells me that that can be done.

 4          And it doesn't only have to be done by

 5   the three employees.  We have detailees, and we

 6   also have -- CRCL is authorized to conduct

 7   inspections, as well.

 8          But yes.  I think that is feasible.

 9      Q      Do you intend to make additional hires

10   at OIDO?

11      A      It's under discussion, but no decisions

12   have been reached.  In particular, because we are

13   in a three-month CR, and the Office of Budget

14   informs me that no office should be doing hiring

15   when you don't have a year-long appropriation in

16   place.  That is standard practice.

17      Q      Do you intend to make any additional

18   hires at CISOM?

19      A      Same -- same answer:  Potentially.  No

20   formal decisions made, and advise not to make them

21   while we have a short CR.

22      Q      Are you familiar with the budget
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                79

1    recommendation that was made to Congress for these

2    three offices?

3        A        Yes.

4        Q        Have the projections in that budget

5    affected your plans for the future for staffing

6    these three offices?

7        A        They do.  Yes, they have.

8        Q        In what way have they affected your

9    plans?

10       A        So the budget recommendation is a

11   reflection of OMB's guidance to the Department.

12   And right now, we do not -- we would not take

13   action that is inconsistent with OMB's guidance

14   without discussing all the way up the chain.

15             And so, again, the shutdown heavily

16   complicates things here because we don't know what

17   would have happened if there was a year-long CR or

18   not.  But the fact of the matter is right now, all

19   of the plans don't really matter because we don't

20   have funding past January 30th.

21       Q        And do your plans differ depending on

22   whether OIDO has an operating budget going forward

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    85

```
1      Q      Okay.  Just turning your attention two
2  bullets down:  Approximately 15 contractors are
3  actively intaking and logging cases.
4             Is that consistent with the contractor
5  presence that you described in your deposition
6  testimony today?
7      A      Yes.  It's more now.  I think there's a
8  lot of question as to how you would define what's
9  in that 15, but yeah.  What is meant there is now
10 either the same or slightly higher.
11     Q      Okay.  Turning your attention to
12 paragraph 4 on OIDO.
13     A      Okay.
14     Q      Let's go to the fifth bullet:  A job
15 announcement by which OIDO will be appropriately
16 restaffed.
17            Again, here, you estimated that you
18 would make a selection within three weeks of June
19 2nd.  Did that occur, to your recollection?
20     A      I'm pretty sure I did make a selection
21 within three weeks.  Again, that's different from
22 the onboarding date, but I'm not 100 percent sure
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    86

1    when the selection was made.

2            But, again, I moved with all haste, and

3    Mr. Guy moved as many roadblocks as he could.

4      Q     And when were the three full-time hires

5    for OIDO onboarded?

6      A     So I think they came on shortly after

7    the CRCL staff, so that was probably end of

8    August, early September.  Two of them asked for a

9    significantly later start date.  We were able to

10   onboard earlier than they onboarded, and then we

11   wound up onboarding them all at the same time.

12           So we were able to onboard earlier, but

13   they asked for -- I don't know if it was a pay

14   period, maybe two pay periods.  Because they were

15   actually moving to the National Capital Region to

16   take the job, and they needed time to move.

17     Q     I'm sorry.  Did you say they had to

18   relocate to the Capital Region?

19     A     Yes.

20     Q     Okay.  I have another exhibit.  I want

21   to make sure I'm on the right page.

22           MS. DECKER:  Actually, it's --

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025          87

```
 1              MS. GILBRIDE:   Is there anything else

 2    down there?  Yes.  Yeah.  That's the only thing

 3    left in here.  I'll pass it around.

 4              MS. DECKER:   Sure.  And this is going

 5    to be another exhibit?

 6              MS. GILBRIDE:   Yes.  We haven't used

 7    this one before.

 8              MS. DECKER:   53?

 9              MS. GILBRIDE:   53.

10              MS. COOGLE:   This would be 54.

11              MS. GILBRIDE:   Oh.  Thank you.

12              (Exhibit 54 was marked for

13    identification and is attached to the transcript.)

14    BY MS. GILBRIDE:

15       Q     Mr. Sartini, are you familiar with this

16    document?

17       A     Yes.

18       Q     What is it?

19       A     A transcript of the motions hearing

20    before Judge Reyes from May 23rd, 2025, and it

21    appears to be the testimony given by myself and

22    Nicole Barksdale-Perry.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    88

1      Q      Okay.  I'd like to turn your attention

2   to page 98, which is a portion of your testimony.

3      A      Okay.

4      Q      And feel free to familiarize yourself

5   with this section of testimony, but you're

6   describing the time period to complete the hiring

7   process and how long you estimate it will take.

8            Do you see where you say you think it

9   will take around a month?

10     A      Yes.

11     Q      How long did it actually take for these

12  individuals to assume their roles?

13     A      From that point, probably another two

14  months, depending on who we're talking about.  If

15  it's a CRCL staff, maybe June, July.  Yeah.  Two,

16  two and a half months.  And then OIDO staff,

17  probably three months.

18     Q      Why did it take longer than you

19  estimated that it would take?

20     A      So, again, for some of the candidates,

21  they requested that it be longer before they

22  onboard, and we accommodated.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                89

```
 1              And then the other is -- and, I mean,
 2    that's not that far off the mark for -- for a
 3    hiring process.  I think if you told any hiring
 4    manager, we can go from cradle to grave to hiring
 5    someone within 3 months, they would laugh and say,
 6    no, it always takes 6 to 12 months.  So it's still
 7    very fast.  And certainly my actions were taken
 8    within a month, so far as I recall.
 9              And I think where it took longer was
10    likely in the security vetting for the candidates,
11    which is outside my control and not a good process
12    to try to intrude on.  So I believe that's why it
13    took longer.
14              But, again, that it happened as fast as
15    it did was a credit to the hurdles that high
16    leadership moved so that we could get this done.
17    Q     You mentioned security vetting.  Is that
18    something that you were familiar with when you
19    gave this testimony to Judge Reyes in May?
20    A     I'm aware that it's a process that
21    happens.  But the process, depending on the
22    candidate, varies.  It can be very quick, as I was
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    91

1      Q       What about the number of people in

2    detention?  Has the number of people in detention

3    increased since you made your staffing

4    recommendations?

5      A       I don't know if it's increased since

6    May.  It probably has.  But, again, I had

7    awareness that the number of detainees would be

8    going up in this administration vice the previous.

9      Q       What else has changed since you made

10   your staffing recommendations to Mr. Hemenway in

11   May of 2025 that's relevant to what the

12   appropriate staffing levels are?

13     A       Well, largely what's changed is I have

14   been in the position for more than a few months

15   now, and I have seen that we can accomplish the

16   statutory functions with the staff we have.  It

17   doesn't preclude future hiring.

18           But I have seen that we can, in fact,

19   meet our statutory requirements with the mix of

20   employees, detainees, and contractors, and OGC

21   support that we have.

22     Q       Can you speak more about the support

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    93

```
1    is OGC providing, if any, to OIDO?
2            MR. DAVIS:   Just want to caution the
3    witness on attorney-client privilege data, high
4    level of generality, as you have been.
5       A      They are reviewing our work product, so
6    drafts of reports, of inspection results.  Yeah.
7    They review our products.  They can advise on
8    immigration -- well, no.  That would be CISOM.
9    Never mind.  That's it for OIDO.
10      Q      All right.  I will ask you to set aside
11   the May 23rd hearing transcript for now.  We may
12   return to it later.  But I'd like you to return to
13   your June 2nd declaration and turn to paragraph 6.
14   And this relates to CISOM.
15           MS. COOGLE:   Paragraph 5?
16           MS. GILBRIDE:   Oh, is it paragraph 5?
17   You're right.  Paragraph 5.
18      A      Okay.  So the second bullet point here
19   discusses detailed solicitations.  Is it accurate
20   that three individuals began details on June 2nd?
21      A      Yes.  So it was accurate.  We have moved
22   them over, two of them, to OIDO.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    94

```
1        Q       So the two current OIDO detailees
2    started out at CISOM; is that right?
3        A       One of them did.  One dropped.  So there
4    were three:  One dropped, one remained at CISOM,
5    one went over to OIDO, and then we had another one
6    added at OIDO after that.
7        Q       Okay.  And the next bullet point refers
8    to the Deputy CIS Ombudsman.  Do you know when Mr.
9    ████████ was selected for his role?
10       A       Yes.  I believe he onboarded -- I don't
11   remember about selection, but I believe he
12   onboarded in late June, early July.
13       Q       Okay.  And when he was hired as Deputy
14   CIS Ombudsman, was he aware that he would be doing
15   work for CRCL and OIDO as well?
16       A       No.  That decision had not been reached
17   yet.
18       Q       When did that decision get made?
19       A       I don't remember.  Probably not long
20   after he onboarded.
21       Q       And then the next bullet point down says
22   you expect a job announcement by which CISOM will
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    95

1    be fully staffed will be posted in the coming

2    weeks.

3            Was an additional job announcement for

4    CISOM ever posted?

5      A     It was not posted because what happened

6    between the date of this declaration and before we

7    posted anything was the OMB budget recommendations

8    came out saying no more than two at CISOM.  And so

9    we had two; we had myself and Mr. ████████.  So we

10   stopped there for the time being.

11     Q     And we spoke earlier today about salary

12   allocations in the budget for people who are

13   wearing two or three hats.  Was there any way that

14   you could use that funding to hire additional

15   people at CISOM?

16     A     No.  So I'm not sure I understand the

17   question, though.  Where -- what extra funding are

18   you referring to?

19     Q     So I'm referring to the fact that, for

20   example, there's money allocated for Mr.

21   Hemenway's salary or for the salary of the CRCL

22   officer, but Mr. Hemenway has another full-time

```
 1   not include for the sake of brevity.

 2            Have you ever seen this position title,

 3   Regional Representative, Local Ombudsman before?

 4      A     Yes.

 5      Q     What is your understanding of what that

 6   position did?

 7      A     So in my extensive transition

 8   discussions with the acting ombudsman, he

 9   intimated to me that there were four local

10   ombudsmen or four regional representatives that

11   they were hoping could serve as the local

12   ombudsman function, and that they simply did not

13   have money to hire more, and that in the office's

14   20-year history, they've only had these regional

15   representatives for a year or two and that this

16   was their attempt to meet the unfunded mandate in

17   the statute.

18      Q     And as part of your staffing plan for

19   CISOM, did you include any regional

20   representatives or local ombudsmen going forward?

21      A     I did not, for two reasons.  The

22   position, again, was -- is simply not funded by
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    100

```
1    Congress.  The statute, I think, is quite clear
2    that it envisions 50 local ombudsmen, one for each
3    state.  That's how I read it.  I'm pretty sure it
4    says the number 50.
5            And four is not 50.  Regional is not in
6    each state, so that's not the same thing.  And I
7    didn't think that we needed to begin fulfilling
8    that requirement at this point in time when, in
9    the 20-year history of the office, it never had
10   been.  That was reason one.
11           Number two, my plan at the time -- and
12   it is still my plan -- is to explore, after
13   seeking counsel, other ways that we may appoint
14   local ombudsmen other than hiring full-time
15   federal employees.
16      Q     And you said that is still your plan.
17   Do you have a timetable for when that may occur?
18      A     It is just a plan.  It needs to be
19   researched and discussed with counsel.  There is
20   no timetable at the moment.
21           MS. GILBRIDE:   Let's go off the record.
22           THE REPORTER:   One moment.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    103

```
1   pure spam is not typically part of an office's

2   casework.

3       Q      And in your declaration that we looked

4   at earlier today that you submitted in May, May

5   14th of 2025, you referred to one of the things

6   you were tasked to do is determine if there were

7   any software innovations or efficiencies that

8   could help streamline the operations of the three

9   offices.

10          Have you made any software innovations

11  or adopted any new technologies at CRCL?

12      A      Not new technologies.  We are

13  simplifying the case management system.  The CRCL

14  case management system, as I have inherited it, is

15  very difficult to work with.  It doesn't match

16  what I would call best practices in any industry

17  for high-volume complaint or case management.

18          And having been an executive over

19  offices that ran a number of such systems, my

20  goal -- and I've tasked Rodolfo Gomez as well --

21  to get this system operating in a very standard

22  way so that there is not a constant need for our
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    104

```
1   contractors to seek the help of IT to just make

2   the system function.

3            It is nowhere near as efficient as it

4   should be, and we are in the process of rolling

5   out the incremental improvements right now.  We've

6   developed the user stories, which is a technical

7   term to develop software and alter it, and we are

8   in the process of releasing updates that would

9   simplify the system.

10    Q      And any of those system changes that

11  you're describing, will they affect the interface

12  that members of the public have with the CRCL web

13  portal?

14    A      No.  This is purely on the back end.

15    Q      Are there any other ways that members of

16  the public can submit complaints besides the web

17  portal?

18    A      No.

19    Q      Do you know if that is a change from

20  prior CRCL policy?

21    A      It is a change.

22    Q      Do you know when that change went into
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    105

```
 1   effect?
 2     A     I adopted the change.  I don't know
 3   exactly when.  It was probably over the late --
 4   around the late summer.
 5     Q     And why did you make that change?
 6     A     For efficiency's sake.  The president
 7   has directed efficiency through executive orders.
 8   And the ability to receive mail is a burden on us
 9   that is inefficient, and it is not in keeping with
10   good customer service, either.
11          We get mail very slowly, and then it
12   becomes a problem to log correctly.  We also don't
13   have a great way to get mail back out if we don't
14   have anything other than a mailing address.
15          If a complainant sent us mail at a given
16   time, it takes, like, two weeks to reach us
17   because of the irradiation facility that's used to
18   screen the mail.  Often they are not still
19   available at the address they sent it from.
20          And so it's much faster, and the data
21   entry is much tighter and more efficient if
22   everything is borne online.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    106

```
 1        Q       Is it also burdensome for CRCL to
 2   receive complaints via email?
 3        A       It is, and so we have stopped doing so.
 4   We only use email for appeals.
 5               But email actually has a worse problem
 6   than snail mail in that it is very easy to spam it
 7   and to send viruses and large attachments that
 8   wreck our system.  This was happening recently,
 9   and we had to take steps to protect the network so
10   that we could actually access legitimate claims
11   and not have the system crippled by spammers.
12        Q       Do individual contractors or full-time
13   employee investigators correspond with
14   complainants using email?
15        A       The contractors may.  I don't believe
16   the Feds do.  The contractors correspond, at least
17   for appeals, via email.  And yes, we do send
18   emails back.
19        Q       So you had given an answer earlier in
20   today's deposition about what happens when a
21   complaint is submitted and the contractor
22   reviewing it, and then a number of things can
```

```
 1   happen based on the nature of the complaint.
 2   I want to return to that topic and speak more
 3   about complaints that involve a medical or
 4   health-related issue.
 5            First of all, do you know as an
 6   approximation or estimate how many of the
 7   complaints that are currently in your system at
 8   CRCL involve a health or medical issue?
 9     A      I don't know.  But that is information
10   we have and do track, and I get readouts on the
11   breakdown every so often.  But I don't know here
12   today.
13     Q      And if a contractor who is reviewing a
14   complaint identifies it as a medical or
15   health-related complaint, what would the next step
16   be?
17     A      So there are a number of things that can
18   happen.  If it's determined that that is a
19   relatively urgent complaint, consistent with past
20   practice, we are sending them over to a particular
21   POC at ICE or CBP, although they tend to be
22   related to ICE, those complaints.  They're sent
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    108

1    over.

2            And then there is the option to treat it

3    also as a complaint needing investigation, or it

4    ends with the medical referral being sent over.

5        Q    So earlier, you had testified about the

6    Office of Health Services?

7        A    Yes.

8        Q    In what circumstances would a medical

9    complaint be referred to the Office of Health

10   Services?

11       A    That is an option that I can exercise if

12   I see fit or that any of our Feds can authorize.

13   And it depends on the nature of the complaint.

14   Again, there is not a bright-line rule for when we

15   would do that.

16           The medical referrals, as we use the

17   term, is all about getting ICE rapid notification

18   of the complaint, not about a doctor reviewing it.

19   Because the proximate problem there is the

20   complainant presumably needs care, and that's what

21   we're concerned about.

22           And no one in the Office of Health

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                109

1    Services is going to administer care.  It is

2    always on ICE to provide the care or one of their

3    medical contractors.

4        Q      Does OIDO also process complaints

5    regarding health or medical concerns for people in

6    detention?

7        A      Yes.

8        Q      Does OIDO handle those complaints

9    itself, or does it refer them elsewhere?

10       A      It depends.  They have the option to

11   handle directly, so an investigator or a program

12   assessor may choose to directly contact ICE or CBP

13   about those complaints.  They can investigate

14   them.  They can refer them straight over to the

15   component.

16              And then in some cases where there's a

17   particularly serious matter or perhaps a systemic

18   matter, I've asked that they share them with CRCL

19   because CRCL has the capability to do larger

20   investigations.

21              And that's one of the ways I've made

22   sure the office's work is complimentary, is to

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                110

```
1    say, where we have systemic trends and larger

2    issues, CRCL will investigate those cases.

3              It also makes a lot of sense because

4    CRCL gets the lion's share of the complaints.

5    We've seen OIDO's complaint volume is small

6    compared to CRCL.  So there's better data on the

7    CRCL side from which we can draw trend analysis.

8      Q     Would it surprise you to learn that Mr.

9    Guy testified at his deposition that all health

10   and medical issues are referred from OIDO to CRCL?

11             MR. DAVIS:   Objection, form.

12     A     It wouldn't surprise me.  There's a lot

13   of ways that one could describe the processing,

14   but it is the case that OIDO has the ability to

15   handle medical complaints.  But as I said, there

16   are cases where they will send them over to CRCL

17   because that workload is well established.

18             There's a particular contractor who

19   handles it -- excuse me -- handles it almost as a

20   full-time job.

21     Q     Do you need some water?

22     A     No, I have.  I'm okay.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    117

1    produced or will be producing.

2        Q       Is there a specialized protocol

3    different from what we've already been discussing

4    when the complaint relates to a death in DHS

5    custody?

6        A       Yes, there is.  The previous agreement

7    and process before the RIF is still in place.  ICE

8    or CBP sends me personally a notification of the

9    death, and they CC our group internal mailbox so

10   that the record is properly saved and maintained

11   in our corporate system.

12            And I read the circumstances around the

13   death.  There is usually a pretty detailed rundown

14   from ICE or CBP as to the circumstances of the

15   death and actually a history going back to the

16   first time the United States encountered this

17   individual, often in a law enforcement context or

18   in a legal immigration context.

19            So you have the whole rundown of their

20   history, and then you have a pretty good write up

21   of what the circumstances of the death were.  And

22   that is just the notification.  And the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    118

1    understanding is that soon thereafter, a coroner's

2    report will follow up with the medical

3    documentation of the body and their assessment of

4    the circumstances of the death.

5        Q      And who else do you coordinate with on

6    investigating the circumstances of deaths in

7    custody?

8        A      So I will coordinate with any of my

9    employees, I will talk it over with counsel, and

10   where needed, I -- I bring in the Office of Health

11   Services.

12       Q      Have you investigated any deaths in

13   custody since taking on your role as acting CRCL

14   deputy?

15       A      No.

16       Q      To your knowledge, have there been

17   deaths in custody since you took on that role?

18       A      Yes, there have been.  As of a couple of

19   days ago, there were about 22 deaths in custody.

20              There is some debate as to what

21   constitutes a death in custody.  But the way I'm

22   looking at it, there are about 13 or 14 in

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    119

```
 1    facilities, and then that broader group of

 2    individuals who are killed when involved with ICE

 3    or CDP in pursuits and such brings that number to

 4    about 22 since March.

 5        Q      And if you have not personally

 6    participated in investigations of those deaths,

 7    have you reviewed reports of investigations

 8    conducted by others?

 9        A      Yes.  So I have read all of the

10    summaries.  I have looked at all the documents

11    produced by ICE and CBP.  I have read every page

12    of every single one myself.

13              And keeping in mind that the report

14    takes time to generate, so I am not in receipt of

15    22 full deaths with autopsy reports.  I don't know

16    how many I have.  Maybe 10 currently in my

17    possession, and I have not found cause to

18    investigate thus far.

19        Q      Is the figure of 22 that you just gave

20    an increase from the number of deaths in custody

21    in past years, to your knowledge?

22        A      It is an increase, but it is lower per
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    120

1    capita of detainee.

2       Q      And if you haven't conducted any

3    investigations, I assume it is fair to say you

4    haven't made any recommendations for changes in

5    policy based on the reports you have reviewed?  Is

6    that right?

7       A      Correct.

8       Q      Is there a particular protocol when a

9    complaint is received that involves an allegation

10   of physical or sexual abuse in detention?

11      A      I wouldn't say it is a different

12   protocol, but there is a prioritization that I

13   have directed my staff to put around such

14   complaints.  Just like CRCL before the RIF, there

15   is always a prioritization.  We cannot investigate

16   every single complaint.

17             And one of my areas of focus have been

18   sexual assault and use of force.

19      Q      Can you estimate how many complaints of

20   sexual assault you have received since becoming

21   Acting CRCL Deputy?

22      A      I cannot.  But, again, that is a number

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    121

1   we have.

2       Q       Is there an estimate of the number of

3   complaints involving use of force?

4       A       No.  But, again, we do track it.  It's

5   broken out and categorized in the system.

6       Q       Are there any open investigations of

7   either of these types of complaints?

8       A       Yes.

9       Q       Can you give an estimate?

10      A       It's in the dozens.  That is the best

11  I -- I don't know off the top of my head, again,

12  that kind of break-out we have.

13      Q       And have any recommendations been made

14  to components based on these investigations?

15      A       Not yet.  It's early days consistent

16  with CRCL taking 6 to 18 months to issue a

17  recommendation from the time they received a

18  complaint.

19              The complaints I am in receipt of, I

20  have only been looking at them for a few months,

21  so I am not ready to issue recommendations.  But

22  after doing 22 inspections from OIDO and a number

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                        122

```
1    of CRCL facility inspections, trends are starting

2    to emerge.

3            And there are ideas that my staff

4    brought to me, and we are working on

5    recommendations.  But everything is still at the

6    deliberative stage right now.

7       Q       Is CRCL involved in conducting training

8    on PREA requirements --

9       A       Yes.

10      Q       -- for ICE?

11      A       I'm sorry.  Yes.

12      Q       And what does that training entail?

13      A       That training entails my attorneys

14   training anyone in the department as to what the

15   law is.  I know ICE and CBP separately have

16   trainings that we have reviewed and that I have

17   had my counsel review as to what those

18   requirements are for PREA and how they should

19   handle PREA-type cases.

20              So CRCL is a, quote/unquote, sponsor of

21   that training.  And it is in the training system

22   that we use in DHS, and I'm fairly certain all of
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                         123

1    ICE and CBP are required to take it.

2         Q       And as new ICE and CBP employees are

3    onboarded, do you know how soon they're required

4    to undergo that training?

5         A       I don't know.

6         Q       Returning to the web portal that we

7    discussed previously, do you know if family

8    members or other representatives are able to lodge

9    complaints on the web portal for someone else?

10        A       They are.  But they need to accompany

11   the complaint with a signed consent form.

12        Q       Is there a particular form of consent

13   form that they need to use?

14        A       Yes.  It's the -- well, they don't have

15   to use it for OIDO.  I believe it's not specified

16   with CRCL.  It is specified to use the G-28, which

17   is a standard form for this purpose in the

18   immigration ecosystem.

19        Q       So if a family member or some other

20   third party is not an attorney, would they be able

21   to complete a G-28 form?

22        A       Yes.  It's for a representative of any

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    124

1    kind.  Our standards are somewhat different from

2    USCIS, so we're using the G-28 form because it's a

3    standard form.  And yes, you do not need to be an

4    attorney to complete that form.

5       Q     If a complaint is submitted by a third

6    party that does not include a signed G-28 form,

7    will that complaint be processed?

8       A     No.

9       Q     Will the individual who submitted the

10   form be notified about the status of their

11   complaint?

12      A     Yes.  They'll likely get a letter

13   saying, we're not going to look into your case

14   because it didn't have the requisite form

15   attached.

16            MS. GILBRIDE:  No.  We've used this one

17   before, but I'm not sure which number it is.

18            MS. DECKER:  Let me take a look.  Oh.

19   We haven't used it as an exhibit before.

20            MS. GILBRIDE:  We haven't.

21            MS. DECKER:  Oh.  Wait.  I --

22            MS. GILBRIDE:  The first day.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    125

```
1              MS. DECKER:   We did.  Let me look.

2              MS. GILBRIDE:   I know it -- one moment.

3     I believe it's 16.

4              (Exhibit 16 was marked for

5     identification and is attached to the transcript.)

6     BY MS. GILBRIDE:

7       Q     Are you familiar with this document?

8       A     No.  I don't believe I've seen this

9     before.

10      Q     If a third party submitted this form

11    instead of the G-28, would their complaint be

12    processed for CRCL?

13      A     Yes.  I believe we would not kick it

14    back if this form were properly completed.  I

15    think that is something that my CRCL contractors

16    would probably come to me for guidance on.  And I

17    would say that if the form is properly completed,

18    we could accept it.

19             What we're using with the G-28 is that

20    standard DHS form.  This, to me -- again, I

21    haven't seen this, and I'm not seeing some of the

22    indicia of a standard DHS form like the seal and
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    126

1    the usual stationary.  It's not to say that it's

2    not -- or an illegitimate form.  But the point is

3    I'm using what is typically used in the

4    immigration context because it's a DHS form.

5              But, again, if this were properly

6    completed, this would not result in a kickback, or

7    it should not result in one.

8    Q       And we talked about CRCL no longer

9    accepting complaints submitted via mail.  If

10   someone does submit a complaint via mail, would

11   any sort of response be sent back to that

12   individual notifying them of the status of their

13   submission?

14   A       So if mail reaches us now, we are taking

15   it and logging it and acting on it like we would

16   any other complaint.  However, we've removed the

17   address from the website in an attempt to end mail

18   submissions, and I am working with our facilities

19   staff to properly end those mail stops so that

20   individuals would then receive mail back so they

21   know not to rely on that process.

22             But if mail is received today -- and it

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    127

1    is being received every day -- we are logging it

2    and treating those complaints like any other.

3              MS. GILBRIDE:   All right.  We've

4    definitely used this one before, so let me have

5    one second while I figure it out.  Make sure this

6    one comes in 18.

7              MS. DECKER:   18?

8              MS. GILBRIDE:   Uh-huh.

9              (Exhibit 18 was marked for

10   identification and is attached to the transcript.)

11   BY MS. GILBRIDE:

12     Q     I'll give you a minute to review this

13   document, Mr. Sartini.

14             (Pause.)

15     Q     What does this document appear to be?

16     A     It appears to be a letter to complainant

17   ██████████████       from May 3, 2023, from CRCL.

18     Q     And is it still CRCL's practice to send

19   an acknowledgment letter like this when a

20   complaint is received?

21     A     Yes.

22     Q     Are there any differences that you would

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    133

```
1    workflows built into the system different to each
2    complaint type, and some of them have these
3    intermediary steps that require documents to be
4    uploaded to the system.
5        Q      Okay.  We are done with that document.
6               MS. GILBRIDE:   This is 57.
7               MS. DECKER:   57.
8               (Exhibit 57 was marked for
9    identification and is attached to the transcript.)
10       Q      Did you get a chance to review this
11   document?
12       A      I've reviewed it.
13       Q      What does this document appear to be?
14       A      A letter from CRCL dated September 10,
15   2025, to Complainant                    indicating
16   that we are not pursuing her complaint further.
17       Q      What's the basis given in this letter
18   for no longer pursuing the complaint?
19       A      That the alien has been removed and was
20   removed two years ago.
21       Q      And to your knowledge, how long has it
22   been CRCL policy to stop investigating a complaint
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                              134

1    when the individual referenced in the complaint

2    is -- has been removed or is out of custody?

3        A      Since Mr. Hemenway and I were appointed.

4        Q      Why did you make that change in policy?

5        A      Because when we look at the most

6    efficient use of CRCL resources, however much

7    staff we have, it doesn't -- we are not able to do

8    anything for aliens who are removed.  They are no

9    longer subject to CRCL jurisdiction.  And,

10   therefore, it makes the most sense to focus

11   resources on the individuals still in the United

12   States.

13           That does not preclude us from, as we

14   do, storing all the information and tracking for

15   trends and analysis and reporting and

16   recommendations based on the content of those

17   complaints.

18       Q      So in your understanding of CRCL's

19   statutory requirements, is CRCL focused on

20   redressing harms experienced by individual

21   complainants?

22       A      That is one area that CRCL has in its

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    135

```
 1    statutory requirements.  Yes.

 2        Q       You mentioned that CRCL makes policy

 3    recommendations to the components of DHS regarding

 4    issues of civil rights and civil liberties.  Have

 5    there been any policy recommendations made to any

 6    DHS components since you assumed the role of

 7    acting deputy?

 8        A       Not discrete recommendations as such.

 9    We have been asked to review and approve or make

10    edits to any number of documents that have been

11    proposed as policies within DHS.  We are a regular

12    part of the policy clearance process.

13              And I sit on the various boards, which I

14    believe I have stated in my declarations.  But

15    there is a privacy review board; there is an AI

16    council; there is various watch-listing rules

17    created by several of our components that I

18    all-clear.

19              And so in that way, I am making policy

20    recommendations on particular artifacts as

21    presented to me by the components, and I do that

22    in coordination with Mr. Hemenway.  But there is
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    136

```
 1    not a policy recommendation memo that I have

 2    issued yet or that he has issued.

 3        Q      What about recommendations based on

 4    investigations of complaints?  Have you issued any

 5    recommendations based on investigations of

 6    complaints?

 7        A      Not formally, but there are several in

 8    draft.  There have been informal communications

 9    between my investigator and the component saying,

10    we are seeing this, you should do that, or the

11    like.  And they are informing larger

12    recommendation memos that are still under

13    deliberation.

14        Q      And can recommendations be made based on

15    an investigation that has been closed?

16        A      Of course.

17        Q      How would the investigator have the

18    information to make those recommendations if they

19    have ceased investigating the complaint?

20        A      Well, the investigators and the

21    contractors all have access to all the data in the

22    case management system at any time.  All one has
```

```
 1    to do is query the system by whatever parameter,

 2    and it will be there.

 3              So an example might be if the

 4    investigator has a live complaint in front of

 5    them, and they think they saw something like this

 6    from a month ago, but they know we didn't open the

 7    investigation, they can go search for those

 8    parameters, find it, choose to reopen it, use it

 9    as background information.

10              They can -- out of their own interest --

11    actually, I think one of our contract

12    investigators is doing this now.  He has several

13    live complaints in front of him and is querying

14    the system to see what the universe of similar

15    complaints from a particular facility look like in

16    our system.

17              So the fact that we may have not chosen

18    to investigate the majority of them, for

19    example -- and, again, like CRCL before the RIF

20    only having investigated a minority, a small

21    minority percentage of the complaints, most of

22    them are going to be closed with no action.  But
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          138

1    they remain available to this investigator to see

2    what that universe that we have received looks

3    like.  It's a valuable data set for us, whether or

4    not we investigate it.

5        Q      And the information you would have for

6    those prior investigations would consist of

7    anything that the complainant sent to you and

8    anything you subsequently requested; is that

9    correct?

10       A      Yes.  All records, all documents are

11   attached to the case file in the system, including

12   physical mail is scanned and saved.

13       Q      Will CRCL request additional information

14   from components like ICE or CBP only in those

15   cases where it opens a formal investigation?

16       A      Not necessarily.  But I think that is --

17   at the point we are requesting documents from a

18   component, I consider that an open investigation

19   and call it a formal investigation.  To me, that

20   term doesn't mean anything.

21              But yes.  If we are querying a component

22   for documents, that's a complaint we're likely

1    query the system.  I think that this is a regular

2    step in the process.  We're querying, again, for,

3    what is the universe of complaints like this?

4              And that's often where we find the

5    trends for a facility that we might want to focus

6    on if we see that there are a lot of medical

7    complaints from a certain facility.  And we will

8    do that as part of the investigation.

9              But the main first step is always

10   requesting documentation from the component for

11   obvious reasons.  We're looking for evidence that

12   it happened, and the component's going to be in

13   receipt of that evidence or not.  But if it does

14   exist, the component is the logical first place to

15   go.

16     Q    So does the process that you've just

17   been describing differ in any material respect

18   with regards to investigations of Section 504

19   complaints?

20     A    I wouldn't say it's substantially

21   different.  The difference there is we know we

22   have an obligation to investigate everyone.  We

```
1    know we're on a 180-day clock.  And there is, I

2    would say, more OGC involvement at the outset of

3    that complaint.

4              But no.  The process is generally the

5    same.

6              MS. GILBRIDE:   This would be Exhibit

7    58?

8              MS. DECKER:   Yes.

9              (Exhibit 58 was marked for

10   identification and is attached to the transcript.)

11   BY MS. GILBRIDE:

12     Q     Are you familiar with this document?

13     A     I don't recall all the details.  But I

14   did review it, and I did sign it.  So, yes, I have

15   seen it before.

16     Q     And as you said, you signed it.  What

17   level of involvement do you -- strike that.

18             How many determination letters on

19   Section 504 complaints have you signed since

20   you've been in your role?

21     A     I don't recall.  That is a number that

22   we do have, and I think we are producing.  I think
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    142

1   it's at least a dozen, maybe quite a bit more than

2   that.  But I don't recall.

3       Q      And do you sign all of the Section 504

4   determination letters?

5       A      Yes.

6       Q      What does your level of review and

7   involvement with those complaints look like before

8   signing them?  Or -- sorry -- with those

9   determination letters look like before signing

10  them?

11      A      So at the very beginning, I make the

12  determination to both open an investigation and to

13  pursue it as a 504 investigation vice VI 345

14  complaint, and that decision is informed by

15  counsel.

16             And then the investigators will

17  investigate and compile the documentation.  And

18  they will present me with the final determination

19  and written letter after consulting counsel, but

20  before it gets to me.

21             And then I will review it.  I will ask

22  any questions of the investigator and counsel if I

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    143

1    have.  And if I have, those questions are

2    answered.  And if I don't have, I sign it, and we

3    reissue it.

4        Q       Do you recall whether you had any

5    questions about this particular determination

6    letter?

7        A       I do not.

8        Q       I'm turning your attention to the third

9    page of the letter.  There's a Bates number 22597.

10       A       Yes.

11       Q       Item C:  ICE did not discriminate

12   against your client?

13       A       Yes.

14       Q       Do you remember reviewing the legal

15   analysis in this section of the determination

16   letter?

17       A       I don't remember when I -- I was

18   reviewing it, but it looks familiar to me.

19       Q       And do you believe that the legal

20   analysis in this letter is adequate?

21       A       Yes.

22       Q       Looking to Section Roman IV, Right to

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    144

1    Appeal, the letter outlines the amount of time

2    that the complainant has to appeal.  Have you

3    participated in any appeals of Section 504

4    complaints since you've been in your role?

5       A       No.  To my knowledge, we haven't

6    received any.

7       Q       And what is the process for handling an

8    appeal, should you receive one?

9       A       Those will be looked at manually.

10   Everyone will be looked at.  And it is going to

11   result in a conversation between the investigator,

12   my counsel, and me.

13             And at that point, we will determine who

14   the appropriate authority is to review the appeal.

15   It would not be me.  It would likely be Mr.

16   Hemenway.

17      Q       In the time that you have been acting as

18   CRCL Deputy, do you know whether any of the

19   determination letters on Section 504 complaints

20   have concluded that the statute was violated?

21      A       I don't believe any have.  But, again,

22   that's data that we have available.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    145

```
 1      Q       We're done with that exhibit.

 2              MR. DAVIS:   Just for purposes of the

 3      record, I don't know if that document or the last

 4      one, the exhibit number was said, just for clarity

 5      in the transcript later.

 6              MS. COOGLE:   Oh, it was 58.

 7              MR. DAVIS:   Okay.

 8              MS. DECKER:   The previous one was 57.

 9              MR. DAVIS:   Okay.

10              MS. GILBRIDE:   And this one is 59.

11              MS. DECKER:   Yes.

12              (Exhibit 59 was marked for

13      identification and is attached to the transcript.)

14      Q       I'll give you a moment to review that

15      document.

16      A       Okay.

17      Q       And what is this document?

18      A       It is a determination letter from me to

19      Complainant ███████████████████ dated August 29,

20      2025, regarding the complainant's 504 complaint.

21      Q       As a preliminary matter, does it appear

22      to you that this determination letter was timely?
```

```
 1     A      No.

 2     Q      Do you know approximately how many of

 3   your determination letters on Section 504

 4   complaints have been issued within the 180-day

 5   timeline?

 6     A      I don't know the number, but I know that

 7   all 504 complaints received since I have been in

 8   the position are timely.

 9           I note that this letter was already late

10   before the RIF even happened, this complaint.  It

11   would have been late.

12           And so all of the late 504s that I

13   inherited upon assuming my position, we are

14   getting to them.  I think we've gotten to all of

15   them.  I could be wrong about that.  But all of

16   the ones that have come in since I've been in the

17   position have been addressed timely.

18     Q      And how do you prioritize new complaints

19   coming in as opposed to the backlog that you

20   inherited after the RIF?

21     A      We take them as they come.  So it is a

22   FIFO, first-in, first-out process.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                157

1   345s.

2             Actually, it's more than dozens.  It's

3   probably at least 30 or 40.

4      Q      Okay.  Other than receiving and

5   investigating complaints, what other statutory

6   functions does CRCL have?

7      A      We provide training on any number of

8   topics.  That is, I believe, a required function,

9   but it is something we're doing.  That's on PREA;

10  504; 345, generally; 1367 protections regarding

11  disclosure of those protected by U and T visas and

12  VAWA, Violence Against Women Act.

13            So all of those protections, we own

14  those trainings, and we make sure they're updated.

15  They're available in the training management

16  systems, and bespoke trainings are given by CRCL

17  on those topics as requested.

18            We advise on policy and review products

19  from all of the components.  That is a function.

20            As I mentioned before, I sit on any

21  number of boards that the CRCL officer or deputy

22  are supposed to be on.  We are on all of them,

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    158

```
1    including the Use of Force Board, where quarterly,

2    we meet to review uses of force by ICE and CBP and

3    vote on whether or not the force was justified.

4              Then, of course, there's the EEO

5    function that is required and all that entails.

6              I may be missing a few.  But those are

7    the main CRCL-required functions.

8        Q      So you mentioned several areas in which

9    CRCL provides training.  Who specifically provides

10   the training?

11       A      My attorneys.

12       Q      And are those attorneys contractors, or

13   are they attorneys within OGC?

14       A      They're attorneys within OGC that are

15   funded by CRCL.

16       Q      You mentioned training specific to 8 USC

17   1367.  What does that training entail, and who

18   receives it?

19       A      There is a requirement for -- it is

20   delineated either in our internal documents, like

21   a management directive.  It may be regulatory.

22   But I know -- I'm almost certain all USCIS
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    165

```
 1              MR. DAVIS:   Objection, deliberative

 2   process privilege.  Can you restate the question?

 3   Actually, I can read it.

 4              Witness can answer at a general level

 5   but not any specific advice given.

 6      A      It has to do -- point 1 has to do with

 7   their use of facial recognition technologies.

 8      Q      Okay.  And who within CRCL provided this

 9   advice?

10      A      Myself and ███████████████████

11      Q      Was it provided verbally or in writing?

12      A      Verbally.

13      Q      Okay.  And to your knowledge, have the

14   components adopted the advice that you gave?

15              MR. DAVIS:   Objection, deliberative

16   process privilege.  The witness can answer at a

17   high level of generality but not specific actions

18   taken.

19              THE WITNESS:   Okay.  Can I confirm on

20   how to -- because that's a little confusing.

21   Like, the answer is binary, the way the question

22   was worded.  I can answer binary?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                166

```
 1      A      Yes.

 2      Q      Okay.  And, again, without disclosing

 3   the specific advice that was given, did your

 4   advice comport with prior CRCL policy, or did it

 5   diverge from prior CRCL policy?

 6             MR. DAVIS:   I think objection,

 7   deliberative process privilege.  Because that gets

 8   into the substance of what the advice was.  I'm

 9   going to instruct the witness not to answer that

10   one.

11      Q      All right.  We may or may not return to

12   that topic area.  But moving on to number 2,

13   Regarding Use of Artificial Intelligence.

14             First of all, what components within DHS

15   sit on the AI council?

16      A      I don't recall.  I think at a minimum,

17   it's management and it's various admin offices.

18   Privacy is definitely on the council.

19             I believe the major operational

20   components are on it, as well, but I'm not 100

21   percent sure.  Most of the council time and work

22   is taken up and done by OCIO, chief information
```

1    officer.

2        Q      Okay.  And what are the outputs of the

3    council meetings?  Is there any written work

4    product that's generated?

5        A       There is certainly meeting agenda and

6    minutes.  But the substantive products are

7    typically use cases that are inventoried across

8    the department for how a component can ask AI to

9    solve a particular problem it has, and then the

10   council is inventorying these use cases and

11   figuring out, can we implement AI-based solutions

12   to them?  Is there a common procurement vehicle we

13   can use to tackle more than one of these at a

14   time?  Things like that.

15            So the output is usually that.  It's,

16   like, a use case inventory, maybe a planning

17   document or two at a very high level.

18       Q      What do you consider to be CRCL's

19   equities with regard to the AI council?

20       A       To ensure that the utilization of AI

21   does not violate civil rights and civil liberties,

22   which is actually a particular focus of mine as

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    168

```
1    someone who is skeptical of AI.  I am not -- I am

2    skeptical.

3              So -- but at this point, the AI use

4    cases are so general and early, there is nothing

5    like that that I've had concern about yet.

6      Q      So is it fair to say, given your

7    testimony, that CRCL is not itself utilizing AI in

8    any of its functions currently?

9      A      Correct.

10     Q      Moving on to number 3.  What is the Data

11   Integrity Board?

12     A      So the Data Integrity Board is run by

13   privacy with CRCL as a corollary or an auxiliary

14   lead of it.  And we're making sure that data in

15   government information systems is used for its

16   intended purpose, and if it is ever shared, that

17   it is shared in accord with PTAs, PIAs, all of the

18   privacy documents that -- and the SORNs,

19   everything that accompanies government information

20   systems and govern how information is shared.

21             So the output of that kind of meeting

22   will typically be, this data was shared here with
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    169

1    certain entities.  Here is why we'd agree that

2    this is a legitimate reason to share it.

3        Q      And at a high level of generality, what

4    sort of advice would CRCL give at these meetings,

5    or has CRCL given since you've come online?

6              MR. DAVIS:   High level of generality.

7        A      That civil rights and civil liberties

8    need to be protected and 1367 protections need

9    particular awareness.

10       Q      Okay.  Number 4, Regarding OIG

11   Conferences and Reviews.  Are these held at a

12   regular interval or just as needed?

13       A      As needed.

14       Q      And how often has CRCL participated in

15   these conferences or reviews since you've been in

16   the role?

17       A      I believe four times.

18       Q      High level of generality, what was the

19   subject matter of the conferences or what was the

20   need for them?

21       A      These were reviews of detention

22   facilities.  There may have been one that was not,

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    170

1    but most of them were OIG inspections of detention

2    facilities.

3        Q      And who from CRCL attended?

4        A      I did.

5        Q      How did these meetings inform your work

6    going forward with regard to the portfolio of CRCL

7    complaints?

8            MR. DAVIS:   Objection, deliberative

9    process privilege.  Just at a very high level,

10   nothing specific.

11       A      The investigations that OIG did were

12   thorough and well done, and they're a good model

13   for us to follow.

14       Q      Next item, number 5, Reviewing

15   Management Directives and Instructions.  How often

16   was CRCL called upon to review these sorts of

17   documents?

18       A      As needed.  And we're redoing all of the

19   directives and instructions within DHS, and

20   they're all sent to me for review.

21       Q      So in total, how many of these sorts of

22   documents would you say you've reviewed since May?

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    171

```
1      A      Dozens.  I don't know.  And there are

2   more coming.  But we're only at the beginning of

3   this project, so probably at least a couple of

4   dozen.

5      Q      What does your review entail?

6      A      My review entails making sure CRCL

7   equities are covered and, in particular, that any

8   functions that are required to reside in CRCL

9   remain and are not eliminated or moved somewhere

10  where they're not permitted to be.

11     Q      Are there other types of policy

12  documents that you have -- you or others in CRCL

13  have had occasion to review for other components

14  of DHS?

15     A      Yes.

16     Q      And how many such policy documents would

17  you say you've reviewed or others within CRCL?

18     A      Easily two or three dozen.  I mean, any

19  policy that even remotely has a nexus to civil

20  rights and civil liberties, which is almost

21  anything the operational components do, comes to

22  CRCL as a required clearer of the policy or
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025          172

```
 1    document.
 2       Q      Who has been responsible for reviewing
 3    those policy documents?
 4       A      I am.
 5       Q      And have you suggested any changes to
 6    any of the documents that you've reviewed?
 7              MR. DAVIS:   Objection, deliberative
 8    process privilege.  High level of generality, no
 9    specific advice or recommendations given.
10       A      A few.  I've -- I've made minor edits to
11    a few.
12       Q      And have you consulted with anyone else
13    in coming to those conclusions about what changes
14    to recommend?
15              MR. DAVIS:   Just caution the witness
16    not to reveal attorney-client privilege or
17    anything deliberative.
18       A      Only Mr. Hemenway.
19       Q      To your knowledge, have the changes that
20    you've proposed been adopted?
21       A      Yes.
22       Q      Returning back to the interrogatory
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    173

1    response, the next item is Review of Congressional

2    Correspondence.  Who would be responsible for

3    reviewing inquiries from Congress and responding

4    to them?

5        A      So for the department, all congressional

6    correspondence comes through the Executive

7    Secretariat, and then they are supposed to be

8    disseminating that mail to the appropriate office

9    for a response.  Sometimes that happens.

10   Sometimes it does not.

11           But for CRCL, I am the one -- department

12   policy requires clearance and drafting at the

13   Chief of Staff level and above.  And so I am

14   handling that in conjunction with Mr. Hemenway.

15       Q      Have you reviewed any congressional

16   inquiries?

17       A      Yes.

18       Q      How many, approximately?

19       A      Maybe about five or six.

20       Q      And have you consulted with Mr. Hemenway

21   about those inquiries?

22       A      Yes.  And I'm required to.  Because if

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    174

```
 1    they're addressed to the Secretary and for her to

 2    sign it, the memo to her to sign the response must

 3    come from him, not me.

 4        Q      Have you responded to any inquiries?

 5        A      Yes.  That --

 6        Q      All five that you mentioned having

 7    reviewed have been responded to?

 8        A      I believe so.  We don't -- if we're in

 9    receipt of a congressional letter, we don't ignore

10    it.

11        Q      And next item on this list, Giving

12    Guidance on Medical and Religious Accommodations,

13    would that be included in the review of written

14    policies that you mentioned earlier, or is this

15    something separate?

16        A      Yes.  But in this case, we are the

17    originator of those policies.

18        Q      And have you drafted new policies since

19    taking on your role as Deputy CRCL Officer?

20        A      Yes.

21        Q      How many such policies?

22        A      Related to medical and religious
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    175

1   accommodations, probably four.  There is at least

2   one change generally to the medical; there is one

3   about religious; and then there have been maybe

4   three component-specific religious accommodation

5   policies that CRCL issued, that Mr. Hemenway

6   issued to those components.

7       Q      What role did you have in creating those

8   policies?

9       A      I communicated to the Office of the

10  General Counsel that there were changes needed to

11  the existing policies and a lot of clarification.

12  That was requested by our customers, meaning the

13  components and our headquarters employees.

14            And so we needed to issue new guidance

15  both to issue clarification and to accommodate the

16  guidance coming out from OPM and the White House

17  as to various changes within the workforce at the

18  beginning of the administration.

19      Q      Did those policy changes involve the

20  rescission of existing policy guidances that had

21  been in effect?

22            MR. DAVIS:   Objection, deliberative

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    176

1    process privilege and possibly attorney-client

2    privilege.  You can answer at a very high level.

3        A       Yes.

4        Q       Last item on this list, Annual Use of

5    Force Review for CBP in August.  What was CRCL's

6    role in that annual review?

7        A       I was a member of the board, and the

8    board has seven or eight voting members on it.

9    And so I and the other members voted on, I think,

10   the ten instances of force that CBP OPR presented

11   to us over that two-day span, and we voted on

12   whether or not the uses of force were legitimate

13   or within policy.

14       Q       And what is the consequence if the board

15   concludes that a use of force was not legitimate?

16       A       It depends on the case.  But the board

17   then votes on the order of magnitude of the

18   offense, is my understanding of it.

19           The particular determination is a

20   supervisory and chain-of-command issue, but they

21   need that determination from the board to proceed

22   if it was not found to be legitimate.  But the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    177

1    details are not determined by the board.

2       Q      In that August review, were any of the

3    ten uses of force found to be legitimate?

4             MR. DAVIS:   Objection, deliberative

5    process privilege.  I'm going to instruct the

6    witness not to answer that question.

7             MS. GILBRIDE:   So if that was the

8    conclusion of the board's review, it seems that

9    the deliberative process has concluded.

10            MR. DAVIS:   Not necessarily.  Is there

11   any follow-up from the board or reports?

12            THE WITNESS:   Yeah.  There's supposed

13   to be a public report issued out of that meeting.

14   I don't know that it's been made public yet.

15            MR. DAVIS:   So my objection stands, and

16   my instruction stands.

17      Q      You mentioned earlier that there were

18   quarterly use of force reviews.  Are those a

19   different process than the process that you've

20   just described for CBP?

21      A      No.  It's the same thing.

22      Q      So does that process happen once a year

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    178

1    or four times a year?

2        A      My understanding is it's supposed to

3    happen four times a year.

4        Q      And is there any analogous review for

5    any other components within DHS besides CBP?

6        A      There is one for ICE, as well.

7        Q      And has that occurred since you have

8    been in your role with CRCL?

9        A      I am not aware that it has.  I have not

10   been invited to one.

11       Q      Are you familiar with 8 USC Section

12   1357?

13       A      The number?  Not by the -- not by the

14   citation, but I may be familiar with the content.

15       Q      Are you familiar with sometimes

16   colloquially referred to as 287-G?

17       A      Yes.

18       Q      And what is your understanding of CRCL's

19   role with regard to 287-G?

20       A      CRCL has to ensure that local -- state

21   and local law enforcement who are performing work

22   on behalf of the federal government or to whom we

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    185

1      A      Give me a moment, please, to read that

2    bullet.  Because that does not -- okay.  Can you

3    ask the question again?

4      Q      Is it your understanding that the

5    decision to only accept complaints via the portal

6    was made before you became Deputy Ombudsman?

7      A      Yes.

8      Q      Do you know who made the decision?

9      A      I do not.

10     Q      Do you agree with the decision?

11     A      Yes.

12     Q      Why do you think it is a good idea to

13   only accept OIDO complaints via the online portal?

14     A      For the sake of efficiency:  It reduces

15   administrative lag, data input errors, and allows

16   for better tracking of correspondence or perfect

17   tracking of correspondence.

18            Mail is sloppy and gets lost, takes too

19   long, and detainees are moved around.  And so an

20   address that was the address prior may not be the

21   best way to reach them by the time we're ready to

22   act on the complaint.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    186

```
 1      Q       Before the RIF and the staffing changes

 2   at OIDO, do you know what the most common method

 3   for receiving complaints by OIDO was?

 4      A       I think I do.

 5      Q       What do you think it was?

 6      A       Case workers in the facilities.

 7      Q       And under the way that OIDO is currently

 8   organized, can detained individuals submit

 9   complaints to case workers in the facilities now?

10      A       No.

11      Q       Is it your understanding that all

12   detained individuals have access to the web portal

13   to file complaints?

14      A       Yes.

15      Q       How do you understand that they can file

16   complaints electronically?

17      A       They have access to tablets, which have

18   access to wifi, and that way they can access the

19   portal and submit a complaint.

20      Q       And is it your understanding that all of

21   the approximately 200 detention facilities have

22   tablets in the facilities?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    187

```
1      A       I don't know if they all do, but neither

2   did every facility have a case worker in it.

3      Q       In the facilities that do have tablets,

4   do you know if there is a one-to-one

5   correspondence between number of detained

6   individuals and number of tablets?

7      A       I don't know if there's a one-to-one.

8   It's not my understanding that there is.

9      Q       Do you have an understanding of what the

10  ratio of detained individuals to tablets is?

11     A       No.

12     Q       Do you know whether there are

13  limitations placed on internet access using the

14  tablets?

15     A       I don't know.

16     Q       Do you know if people who are in

17  solitary confinement in detention have access to

18  tablets?

19     A       I don't know.  I know we receive

20  complaints from people in solitary confinement,

21  though.

22     Q       Are there any other ways besides tablets
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    188

1    that you believe individuals in immigration

2    detention can access the portal?

3       A       They can access it through relatives,

4    representatives, et cetera, filing on their

5    behalf.  And they are visited regularly by those

6    types of individuals and NGOs and religious

7    workers, and those individuals can file on their

8    behalf.

9       Q       And what would an individual have to do

10   in order to file on behalf of a detained person?

11      A       We would need a signed form indicating

12   they had permission to do so.

13      Q       And does that form need a wet signature

14   from the detained individual?

15      A       No.  But it does need something that

16   would have the probative value of a wet signature,

17   so I don't exactly know what that would be.  It

18   would be a case-by-case situation.  But it doesn't

19   have to be a wet signature.

20      Q       Do you know if instructions are posted

21   in detention facilities informing people of the

22   existence of OIDO and how to access the portal?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                              191

1      Q       So in CRCL context, one of the examples

2   you gave was an urgent medical referral.  Would

3   the same steps be taken with an urgent medical

4   referral to OIDO?

5      A       Yes.

6      Q       Are there any other circumstances

7   specific to OIDO besides medical issues that would

8   tend to result in a referral?

9      A       Any type of issue could result in a

10  referral.  Again, there's a prioritization around

11  use of force, sexual assault, suicidal ideations.

12     Q       And what sorts of situations would lead

13  to opening of an investigation by OIDO?

14     A       The same.  I mean, again, any one

15  complaint can lead to us investigating, but there

16  is the prioritization for the aforementioned

17  categories.

18     Q       So what I'm trying to get at, if you are

19  able to answer, is, what would lead something to

20  be investigated instead of referred?  Are there

21  any particular criteria that would make an

22  investigation more likely?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    192

1      A       Allegations alleging sexual, physical

2    assault, something like corrupt contractors or ICE

3    and CBP officers and agents, something that it

4    would be inherently problematic for the component

5    to investigate themselves, would almost always be

6    something CRCL retains for investigation.  Or

7    OIDO.  I'm sorry.

8      Q       And you did mention earlier that certain

9    issues are referred from OIDO to CRCL.  What types

10   of issues would warrant a referral to CRCL?

11     A       Particularly serious matter where a

12   medical -- not a medical -- where a sexual assault

13   has occurred or a grave medical matter where CRCL

14   is more, because of the volume of their work,

15   involved in doing it.

16             We would ask -- I would ask OIDO case

17   workers to confer with their federal colleagues in

18   CRCL and do any number of things in an

19   investigation that you would do in the course of

20   investigating.

21     Q       And similar to what we discussed with

22   CRCL, when a referral is made to a component --

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                      195

1      Q       When OIDO makes a referral to ICE, is

2   that referral at the headquarters level?  Or who

3   at ICE is the matter typically referred to?

4      A       It is referred at the SES level to ICE

5   ERO headquarters.

6      Q       And to your knowledge, when OIDO had

7   case managers present in detention facilities,

8   were they often able to interface directly with

9   detention facility staff to address problems that

10   detainees were having?

11      A       That is my understanding.

12      Q       Would you describe that as a more direct

13   way of addressing certain types of day-to-day

14   problems, such as needing to have a sick hall or

15   needing access to a blanket in a cold facility?

16   Is it easier to address those problems at the

17   facility level?

18              MR. DAVIS:   Objection, vague.

19      A       Not necessarily.  What I like about the

20   arrangement we have now is I get SES-level

21   leadership assurance that something is going to be

22   taken care of, whereas there isn't great

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    196

```
1    visibility on what happens in the field when there

2    is 120 case workers spread throughout the country.

3              I like being able to get assurance from

4    the highest level that leadership is ensuring

5    something is being taken care of.

6      Q      And when leadership at ICE assures you

7    that they're going to take care of something, is

8    your understanding that their next step might

9    involve going down the chain of command to someone

10   at the facility to actually act on that request?

11     A      I don't know what they do, but I assume

12   someone in the facility would have to resolve it.

13   Yes.

14     A      All right.  Got another exhibit.

15              (Exhibit 64 was marked for

16   identification and is attached to the transcript.)

17     Q      So I will represent to you, Mr. Sartini,

18   that this is a collection of several documents

19   that were produced by DHS in response to our

20   discovery requests.  So they're not all -- they're

21   several documents of the same type.

22              You can take a minute to review the
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025　　　　　199

```
 1     A       They were sent on the same date.

 2   Because in this instance, we were clearing out the

 3   backlog of cases that was sitting in the portal at

 4   the time of the RIF.

 5             And so whatever cases predated our

 6   working the cases in the portal all received a

 7   notice as of the same date that we issued a batch

 8   set of notices for the cases that were being --

 9   receiving a similar disposition.

10     Q       How many of those backlogged cases

11   resulted in closures?

12     A       I don't know.

13     Q       How many of those backlogged cases that

14   received emails on or about September 19th were

15   referred to ICE ERO for further action?

16     A       I don't know.

17     Q       One -- you had mentioned that referral

18   to a component is something that's tracked in the

19   OIDO system.  So would all of these complaints

20   that you've just reviewed that were referred to

21   ICE ERO be categorized in the same way in the

22   internal system?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    202

```
 1    complaints about that particular facility before

 2    you go.

 3            And then inspecting the facility:  Going

 4    through the standards by category, because the

 5    standards are divvied up into different categories

 6    like health and hygiene and facilities and

 7    emergency protocols, all of that.  They're very

 8    involved.  There are hundreds of pages each.  And

 9    going through those standards with a checklist,

10    essentially, to inspect the conditions.

11      Q      And the people conducting these

12    inspections are the three full-time employees and

13    two detailees at OIDO, correct?

14      A      Correct.

15      Q      Each of those individuals was onboarded

16    sometime in August, sometime this summer; is that

17    right?

18      A      Yes.

19      Q      And before beginning to conduct

20    inspections, what training did they receive?

21      A      They were already trained, and I've

22    confirmed that.  So two of the employees were from
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    203

```
 1    OIDO, and they're doing the same work they were

 2    doing before.  One of those individuals supervised

 3    that work.

 4              The third individual did this exact same

 5    work for the biggest detention contractor.

 6              And then one of the detailees did this

 7    work, but for CBP internally.

 8              And then I had the individual who was

 9    trained -- who was a supervisor in the OIDO work

10    previously, trained one detailee who didn't have a

11    background explicitly in detention inspections,

12    although I believe -- I'm confident she worked for

13    the Bureau of Prisons doing similar work.  So she,

14    again, also had a background in this.

15              So they were trained.  And the quality

16    of their inspections shows that they are expert in

17    the field.

18        Q    You mentioned that one of the OIDO

19    workers previously worked for a contractor.  Which

20    contractor was that?

21        A    GEO.

22        Q    And is that one of the full-time
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    204

1    employees that previously worked for GEO?

2       A      Yes.

3       Q      And the person who previously worked for

4    CBP, is that also one of the full-time employees?

5       A      Yes.  One detailee and one employee

6    worked for CBP.

7       Q      And each inspection is conducted by a

8    single law enforcement specialist acting on their

9    own; is that right?

10      A      No.  Some are conducted by one.  Some

11   are conducted -- have been conducted by two.

12   There are others that may be conducted by more.

13      Q      And how is it determined what level of

14   staffing or what number of people to send on an

15   inspection?

16      A      There isn't a bright-line rule, but the

17   size of the facility is an indicator of how many

18   staff we should send out.  If we are conducting an

19   investigation in concert with CRCL to look at the

20   complaints they have on file for that facility,

21   that will be a multi-person investigation.

22      Q      And you mentioned that the standards

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    205

```
 1   differ from one facility to another.  Are the

 2   employees conducting inspections given a chance to

 3   familiarize themselves with the particular

 4   applicable standards before going to the facility,

 5   or is that something that they are expected to do

 6   while they're on site?

 7      A      No.  They're going out familiar with the

 8   standards.  We discuss it as a team before they go

 9   out.  We run through the standards and walk

10   through what that inspection should look like

11   based on the standard.  And we make sure we know

12   the operative standard before we go out because

13   sometimes that's not obvious.

14      Q      And for facilities that are under

15   contract, do the inspectors also review the

16   applicable contract terms before conducting their

17   inspection?

18      A      Yeah.  So as part of the on-site

19   inspection, there are a lot of documents

20   requested, logs, contracting documents.  We have

21   the right to request medical evidence.  We'll talk

22   to detainees, we'll talk to staff, leadership at
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    206

1    the facility.

2            But, yes, contract review is part of

3    that.

4       Q      You mentioned medical evidence being a

5    part of what is reviewed.  Are any medical

6    personnel accompanying the law enforcement

7    specialists on their inspections?

8       A      At the moment, we are taking medical

9    evidence and bringing it back for OHS to review.

10   But they are available if we wish for them to

11   accompany us in the future.

12      Q      What about experts in environmental

13   conditions like mold and other potential

14   contaminants?  Are they present for these

15   inspections?

16      A      It is an area that our investigators are

17   aware of and have knowledge of.  If they -- the

18   process right now is if they see something like an

19   industrial hygiene issue, that will be

20   photographed and then followed up separately.  We

21   are not going out with industrial hygienists.

22      Q      You mentioned that there are documents

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    207

1    reviewed as part of the inspection.  What types of

2    documents in particular are reviewed?

3       A      For example, logs such as the feeding.

4    There are logs that are required to be kept when

5    detainees are moved, fed, given recreation time,

6    put into solitary confinement, hunger strike logs.

7    So all of those are reviewed, and then contracting

8    documents, medical documents.

9            I may be missing a few, but those are

10   the big ones.

11      Q      Since you became acting deputy at OIDO,

12   have any unannounced inspections been conducted?

13      A      No.  And in keeping with past practice,

14   we are in touch with the facility shortly before

15   we go out.

16           My understanding of past practice is

17   they were in touch with the facility and did not

18   conduct truly unannounced inspections because it's

19   logistically difficult to do.  And given the

20   amount of rioting that we are seeing around

21   detention facilities, I cannot in good conscience

22   send my people out without ICE or CBP knowing that

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    208

1    they are coming.

2        Q        How much advance notice do you give to

3    the facility before conducting an inspection?

4        A        Typically a few business days, no more.

5    Some of the trips that are more intensive for us

6    need a little bit more planning, like if we're

7    going to travel far afield.  But typically, the

8    standard right now is a few business days.

9        Q        And how long does each inspection last

10   from the time that the employee or employees get

11   there?  How long are they on site?

12       A        It varies by the complexity and size of

13   the facility.  So if it's a big facility, it will

14   be a multi-day.  Right now, those are two full

15   days, those facilities.

16           If it is a smaller facility, like a

17   holding cell or a similar temporary-type facility,

18   both either temporary like a soft-sided facility

19   or temporary meaning that the detainee is meant to

20   be moved out of there in short order, that may

21   only be one day or a five-hour inspection.  Our

22   shortest inspections so far have been about five

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    212

1      A      No.

2      Q      Are there any systemic issues that you

3   and your staff have identified in the months that

4   you've been in the role?

5            MR. DAVIS:   Objection, deliberative

6   process privilege.  You can keep it at a very high

7   level of generality, but not about specific things

8   that are subject to ongoing reports and

9   investigations.

10     A      Yes.  And they will be mentioned in

11  reports that are in draft.

12     Q      Are you referring to reports in addition

13  to the annual report to Congress?

14     A      Yes.  I'm referring to inspection

15  reports, per-facility inspection reports.

16     Q      And will those inspection reports be

17  made publicly available?

18     A      I don't see a requirement that they be

19  made public in the statute.  If my attorneys

20  advise me otherwise, then I will change that

21  position.

22            It's not to say we can't make them

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    214

1      A      Only what I had just discussed where we

2   can look at past inspections.  I'm not aware of

3   open inspections that need to be formally followed

4   up on.

5      Q      OIDO does have a statutory requirement

6   to annually report to Congress.  What is the

7   status of the 2025 congressional report?

8      A      It is in draft.  It will likely be

9   delayed because of the shutdown, but it will be

10  timely if you bump the end of the year out by the

11  length of the shutdown, which brings us to about

12  mid-February.

13     Q      And do you know what the status of the

14  2024 OIDO report to Congress is?

15     A      I do not.  I searched the files of my

16  predecessors and can't find any evidence one was

17  drafted.  And so at this point, I'm focused on

18  getting the current one out timely.

19     Q      And I don't think I asked you previously

20  about the status of the CRCL annual report to

21  Congress.  What is the status of that report?

22     A      Same:  Being drafted and should be on

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    215

```
 1   time if you push the deadline out by the length of
 2   the shutdown.
 3       Q      And the presence of law enforcement
 4   specialists at detention facilities, do you have
 5   any plan to have them visit facilities on a
 6   regular basis outside of conducting inspections?
 7       A      No.
 8       Q      Before we turn our attention to CISOM, I
 9   want to go back and ask you a question about -- a
10   couple of other staffing questions that are
11   specific to CRCL.
12            So you have testified -- you had
13   testified that you have learned since being in the
14   role that it's possible to perform statutory
15   functions with fewer staff members than you
16   earlier anticipated.  Can you describe -- because
17   the difference between your staffing plan and the
18   current staffing is particularly drastic for CRCL.
19            So can you describe why you believe it's
20   possible to conduct all the statutory functions of
21   CRCL with just two full-time employees besides
22   yourself and Mr. Hemenway?
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                216

1            MR. DAVIS:   Objection, form.

2      A      Because we are.  I think the evidence

3   speaks for itself.  I can demonstrate that we're

4   performing all of the required functions with the

5   current mix of staff and contractors and OGC

6   support.

7      Q      Would you say that the role of OGC has

8   been particularly large for CRCL compared to the

9   two other offices?

10           MR. DAVIS:   Objection, vague.

11     A      There is more OGC work to be done at

12   CRCL, as was always the case.  There were never

13   attorneys assigned to CISOM, or that were

14   leveraged by CISOM, I should say.  OIDO had less

15   attorneys assigned to it than CRCL.

16           And I think that ratio remains the case.

17   CRCL has a lot more work that involves OGC review

18   than the other offices always has, and the ratio

19   is probably the same.

20           MS. GILBRIDE:   Let's see if I can find

21   the page number I want.

22     Q      Okay.  I'd like to turn your attention

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    220

1      Q      Okay.  What happens when CISOM receives

2   a request?  So this is the same question I've

3   asked for the other two offices.  What is the

4   first step in the review process?

5      A      We have our staff look at the complaint

6   or look at the request for assistance.  And based

7   on our prioritization, they choose to either not

8   act on the request or to tee it up in a

9   spreadsheet that we eventually batch and send over

10  to USCIS.

11          If there are questions that we can

12  answer, we will answer them straight away if we

13  can do that with our access to USCIS systems

14  without asking USCIS.

15     Q      So you said that there are certain

16  requests that you would take no further action.

17  What types of requests would fall into that

18  category?

19     A      A good example is cases where the

20  handling of those application types is in flux or

21  outright paused right now, which is a significant

22  number of form types, and they make up a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                              221

1    significant portion of the requests that we

2    receive at CISOM.

3            It does not make sense to act on those

4    requests because we aren't going to be able to

5    give an answer; USCIS won't be either.  And so it

6    doesn't make sense to respond to those requests

7    until there is more clarity on how they will be

8    handled by USCIS.

9     Q      And if you determine that a request

10   falls in that category and that you're not going

11   to take any further action, is any sort of

12   correspondence sent to the requester informing

13   them of that decision?

14    A      Yes.

15    Q      And what about in the instance where

16   you're able to resolve the matter or give an

17   answer without referring the matter to USCIS?

18   What would be done in those types of cases?

19    A      A message would go back to the requester

20   because, of course, that is in the nature of

21   closing out, would be informing them of the answer

22   to their question.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    222

```
 1     Q      And so for purposes of tracking, would
 2  those, both first category where it's in flux and
 3  there's nothing to be done, and the second
 4  category where you're able to give an answer,
 5  would they both be categorized the same way, as no
 6  further action?
 7     A      No.  Could you say your question again?
 8  I think the second part was off.
 9     Q      Sure.  So you described two situations
10  where you would not refer the matter to USCIS.
11  One is when there is no action to be taken because
12  the matter is in flux.  The second category was
13  where you, at CISOM, are able to provide an answer
14  directly.  Would those both be classified in your
15  internal database as no further action?
16     A      Yes.
17     Q      And what percentage of requests are
18  categorized as no further action versus being
19  referred to USCIS?
20     A      I don't know other than -- consistent
21  with past practice, the majority are not responded
22  to.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    223

```
1      Q      When you say responded to, do you mean
2   referred to CIS?
3      A      Yes.  Right.
4             (Exhibit 65 was marked for
5   identification and is attached to the transcript.)
6      Q      What does this document appear to be?
7      A      A complaint submitted -- or a request
8   for assistance submitted to CISOM on March 12,
9   2025, by ██████████████████ and the response
10  from CISOM or maybe just the automated receipt
11  response upon intake.
12     Q      I'll give you a chance to review this
13  document --
14     A      Yeah.
15     Q      -- since it's somewhat lengthy.
16     A      Yeah.
17            (Pause.)
18     A      Okay.
19     Q      So based on your review of the document,
20  do you know if this matter was categorized as no
21  further action or if it was referred to USCIS?
22     A      I do.  I can say that it was referred to
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    224

1    USCIS and is still pending their response.

2       Q      Okay.  And based on the nature of the

3    request and based on your knowledge of these types

4    of requests, why was this in the minority of cases

5    that was referred to USCIS?

6       A      I'm going to need a little bit more time

7    here.

8       Q      That's fine.

9       A      So similar to CRCL and OIDO, the

10   decision process starts out with our staff looking

11   at the complaints and making a determination.  Not

12   all of these need my approval to go.

13          I can say the thought process here

14   probably was related to it being a 485, a question

15   about a 485 green card.  That is a form type that

16   is being processed.  It is a form type that is

17   significant, or it's the second most significant

18   that USCIS processes, I would say.  So that puts

19   it at a higher likelihood of being referred.

20          And because the case will be more

21   durable in that if it's a visa question, that

22   issue may be resolved, or it may be overtaken by

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    225

```
1    events by the time we get to it.  But a green card

2    is not likely to be in that situation.

3              But beyond that, nothing stands out.  It

4    is a judgment call.  But it looks like a good case

5    to refer to USCIS.

6      Q      So you referred to your staff.  And just

7    to make sure I'm not missing anyone, your staff

8    for CISOM consists of your deputy, Mr. Gomez, and

9    one detailee; is that correct?

10     A      Yes.

11     Q      And you do not have any contractors

12   assisting with the work of CISOM; is that right?

13     A      Correct.

14     Q      Okay.  So would the initial review and

15   categorization typically be done by the detailee?

16     A      It would be -- it would be done by the

17   detailee or Mr. Gomez or myself.  We have all

18   worked that queue at one time or another.

19     Q      And another exhibit.

20            MS. DECKER:   Is this Exhibit 66?

21            MS. GILBRIDE:   Yeah.

22            (Exhibit 66 was marked for
```

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    229

1    A       No.  No page or column numbers.  If it's

2    IJ, that's probably towards the back.

3    Q       It is towards the back.

4            (Pause.)

5    A       Okay.  It's on the last page.  9/9/2025.

6    Q       Sorry to make you flip through that

7    entire thing.  And I know you said that there's a

8    high volume of these complaints.  Do you know when

9    someone at CISOM first had a chance to review this

10   request and decide what to do with it?

11   A       I do not.  That information may be in

12   one of these fields, but I do not.

13   Q       And returning, I guess, your attention

14   away from the spreadsheet to the other document

15   that includes the case notes.

16   A       Yes.

17   Q       And if you look at page -- the page with

18   Bates number 21415.

19   A       Okay.

20   Q       What is that?  There's a, I guess, a

21   copy of the notification that was sent to the

22   complainant or the requester.  What does that

1    correspondence indicate?

2      A      That CISOM received the complaint or the

3    request for assistance on March 12th, 2025.  And

4    on September -- well, this is dated September

5    19th.  It says, We referred your correspondence to

6    USCIS.  And we will let you know when we hear back

7    from them.

8      Q      And in the recent months, as you've been

9    dealing with the sort of backlog of requests,

10   would you say a six-month interval between the

11   receipt date and the referral to USCIS is pretty

12   typical, or is that unusual?

13     A      I believe that is typical, from my

14   understanding of the timelines that CISOM dealt

15   with before, based on my conversations with

16   Nathan.

17     Q      All right.  You can put that exhibit

18   aside.

19            (Exhibit 67 was marked for

20   identification and is attached to the transcript.)

21     Q      What does this document appear to be?

22     A      A request for assistance from ██████████

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                            231

1    ████.   And the request seems to have been received

2    April 7, 2025.  And it includes our receipt

3    response to him and our further response on

4    September 19th.  It's saying that we've referred

5    his request to USCIS, and we'll let you know when

6    we hear back from them.

7        Q      Okay.  So noticing that both this

8    response to Mr. ████ and the other response we

9    were just looking at were both sent on September

10   19th -- and I can represent to you there were some

11   others we received in the discovery responses with

12   that same date -- is this a similar situation to

13   the situation with OIDO, where you were clearing

14   out a large number of requests from the time

15   period of the RIF all at the same time?

16       A      Yes.  The cases were all reviewed

17   individually.

18           And then what we do is we assign a --

19   you group them in a batch.  You assign a status to

20   all of those similarly situated.  For example, all

21   of those that we are going to send to USCIS, you

22   batch-mark them with that condition in the system.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                              232

1              And then you batch-generate notices,

2     which is why the notice date may be different than

3     the date we actually sent it to USCIS.  Because

4     the sending to USCIS is a manual action, but the

5     generation of the notice is a separate manual

6     action.  And so that might have happened at a

7     different time.

8        Q       And just one more of these, I promise.

9              (Exhibit 68 was marked for

10    identification and is attached to the transcript.)

11       Q       What is this document?

12       A       It appears to be the extract from our

13    case management system for the same ███████████

14    case.

15       Q       Okay.  And on this one, I would like to

16    focus you -- and I don't know which page it's on;

17    I apologize -- but the column entitled Assigned.

18    This may be about halfway through.

19       A       Okay.

20       Q       What does that field refer to?

21       A       It's a field that we don't quite use the

22    way our predecessors probably did.  It just means

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    234

1   the one going in and doing the automated or semi-

2   automated functions in the system.

3       Q       Okay.  So for example, putting together

4   the list of requests that were going to get that

5   same response we saw saying, Your matter has been

6   referred to USCIS, that's something he would have

7   been responsible for doing?

8       A       Yes.

9       Q       Okay.  Okay.  We're done with that

10  exhibit.

11          So once a matter is referred to USCIS,

12  does CISOM continue to have any involvement or

13  check-in role with USCIS?

14      A       Yes.  We have to, because the completion

15  is USCIS getting back to us, not getting back to

16  the requester.  So it's a bit different from CRCL

17  and OIDO.

18      Q       So what does that ongoing involvement

19  with USCIS look like?  Are you meeting in person

20  or sending emails?  What type of interaction do

21  you have?

22      A       So there's different interactions for

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                235

1    different things.  For the cases, we are sending a

2    list of our requests and then pinging them if it

3    takes a while, which we've already pinged them for

4    some.  And that is for the cases; that is the

5    nature of that interaction.

6              I meet with USCIS leadership regularly

7    to discuss policy issues and trends and topics of

8    the annual report.

9      Q      And what sort of ongoing follow-up or

10   interaction do you have with the requester after a

11   matter is referred to USCIS?

12     A      Typically nothing until we get the

13   response because there's nothing to say until we

14   receive the response.

15     Q      Okay.

16             MS. GILBRIDE:   Let's see where we are.

17   Exhibit 69.

18             (Exhibit 69 was marked for

19   identification and is attached to the transcript.)

20     Q      I'll give you a chance to review this

21   document.  Let me know when you're ready.

22     A      Okay.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    238

1      A      We have not received any responses from

2  USCIS yet, and I am in touch with leadership about

3  that.  But we have not received any replies on any

4  particular case yet.

5      Q      Okay.  So you haven't had occasion to

6  give that sort of information to a requester so

7  far; is that right?

8      A      Correct.

9      Q      Okay.  All right.  Another exhibit.

10         MS. DECKER:   Yep.

11         MS. GILBRIDE:   Let me make sure I'm not

12  getting too --

13         (Exhibit 70 was marked for

14  identification and is attached to the transcript.)

15      Q      I'll give you a chance to review this

16  one.  It's rather lengthy.

17      A      Okay.

18      Q      So I'll represent to you this is a

19  document that was produced by the defendants to us

20  in discovery.  What does it appear to be?

21      A      A request for assistance sent to CISOM

22  by ███████.  And that seems to have been received

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    241

1     Q      Okay.  Currently, what is the average

2  length of delay between a request coming in and

3  someone on your staff being able to review it?

4     A      I believe consistent with past delays,

5  it's probably about three months, although I'm not

6  sure.

7     Q      And are you continuing or are you

8  operating a first in, first out system in terms of

9  the order of review?

10    A      It is, like the other offices, a

11  combination of first in, first out and

12  prioritization or categories.

13            In this case, that makes sense to focus

14  on if they are categories being actively worked by

15  USCIS.

16    Q      Okay.  So you mentioned I-485 green card

17  applications being one of those.  What other

18  categories of requests are prioritized?

19    A      Military, EB-5, naturalization, O-1.

20  And there's a couple of others that now escape me,

21  but that's most of them.

22            MS. GILBRIDE:   All right.  71.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    243

1     assistance from █████████████████.

2          Q      Is there a response?

3          A      I'll say the request seems to have been

4     received on August 12th of 2025.  And there

5     doesn't appear to be a response here, although I'm

6     not sure what this first -- these first pages are.

7                 So there is some sort of response, but

8     I'm not seeing any of the usual header information

9     on the response.

10         Q      Okay.  So this was a document that we

11    produced in discovery where the client's

12    information, name, and other identifying

13    information was redacted, which might be why

14    you're not seeing the typical header information.

15                But do you see the date of the response

16    on the email?

17         A      Oh, okay.  So yes.  All right.  Now, the

18    order's a little messy here, but the response

19    looks like it was received or the request was

20    received on 8/12, and we responded 9/11.

21         Q      And what is the substance of the

22    response on 9/11?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    244

1    A      We will not be taking further action on

2    your inquiry.

3    Q      Okay.  Is this standard language when

4    CISOM determines not to take further action?

5    A      Yes.

6    Q      And you mentioned that the determination

7    of taking no further action, that's the majority,

8    and that the referrals to USCIS is the minority.

9    Are there any other possible outcomes for a CISOM

10   request besides those two?

11   A      Well, again, we might be able to respond

12   directly to the requester.

13   Q      And if that is the case, then the email

14   would say more than just, we're taking no further

15   action?

16   A      Yes.  There would be a substantive

17   answer to the question.  Yes.

18   Q      And would you say of the cases that are

19   not referred to USCIS, what percentage have

20   concluded in just this more generic no further

21   action response versus a more substantive

22   response?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    245

1      A      I don't know.  That is a number that we

2    have.  It is probably the majority.

3      Q      Which would be the majority?

4      A      That we are not taking action.

5      Q      With no further substantive response

6    given?

7      A      Correct.

8      Q      Okay.  And, again, can you walk us

9    through the reasons why you would decide to take

10    no further action and provide this sort of a

11    fairly cursory response?

12    A      Well, there is never a bright-line

13    distinction.  But generally speaking, I see this

14    as a humanitarian request, or the underlying

15    request to USCIS is based on a humanitarian

16    category.  We have deprioritized those because

17    USCIS has deprioritized those.

18            And as has been made public, a good

19    number, if not all, of the humanitarian type of

20    requests are paused.  And so it does not make

21    sense for CISOM to focus on humanitarian requests

22    because USCIS will not likely be able to give us a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    246

```
 1    satisfactory response.

 2              MS. GILBRIDE:   Okay.  71.

 3              (Whispered conversation.)

 4              MS. DECKER:   72.

 5              (Exhibit 72 was marked for

 6    identification and is attached to the transcript.)

 7    BY MS. GILBRIDE:

 8       Q      What does this document appear to be?

 9       A      A request from ███████████████    for

10    assistance.  And she received a response from us

11    that we were not taking action on September 11,

12    2025.

13       Q      And do you have a sense from reviewing

14    the request of why the decision was made not to

15    take further action in this case?

16       A      It is a type of humanitarian benefit, so

17    that will likely be deprioritized.  I note that

18    it's a U visa request.  So that subset, we do look

19    at those.

20              But, again, due to the situation being

21    in flux at USCIS's handling of all humanitarian

22    visa requests, it does not always make sense, and
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    247

1    it often does not make sense for us to pursue

2    those requests.

3        Q    And is there any information, even if

4    not in this specific email to this specific

5    requester, but any information that CISOM has made

6    available about the types of issues that are being

7    prioritized and being deprioritized?

8        A    No.  That is not information that I

9    think needs to be shared with the public because

10   that decision process is always under deliberation

11   and changing.

12           And, again, there are no bright-line

13   distinctions, so we may act on any one particular

14   case.

15           And I don't know that CISOM ever shared

16   anything like that, and they almost certainly had

17   a prioritization rubric of some sort.  Again, they

18   only handled a minority of cases, so I assume

19   there was a prioritization, like all offices have.

20   And I don't recall ever seeing that shared, and I

21   don't recall Nathan indicating it ever was.

22           MS. COOGLE:   Exhibit 73.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    249

1    period -- were those part of a batched set of

2    responses?

3        A      I don't know, but that is very possible.

4        Q      And do you know how many responses were

5    included and sent out contemporaneously, the same

6    time?

7        A      No.

8        Q      Do you know if there have been similar

9    batched responses since September 11th, September

10   12th, that include this same language saying, we

11   are not taking any further action?

12       A      I don't know, but there probably is.

13   Because all of the cases, in terms of effectuating

14   an action in the system, are handled in a batched

15   manner.  That's just an efficient way to handle

16   complaints when you have thousands, so they're

17   reviewed one by one.

18            But when a case worker will look at it

19   and say, okay, I know all of these that I'm going

20   to mark in the system as no action, nothing

21   happens when our staff takes that action in the

22   system.  It's just denoting an internal system for

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    250

```
 1    an action that the public would see, like one of

 2    these emails being triggered.  That always happens

 3    in a batch.

 4       Q      And how frequently are those batches

 5    acted upon since you've been in the role at CISOM?

 6       A      Mr. ████ takes care of that.  But I

 7    think we're sending out batches at least every

 8    couple of weeks, perhaps more frequently.  But I'm

 9    not sure.

10       Q      And are batch responses being sent out

11    for OIDO and CRCL, as well?

12       A      Yes.

13       Q      And for CISOM, I think we've seen two

14    types of responses, one for the no further action

15    and one for the, your matter has been referred to

16    USCIS.  Are there any other types of CISOM

17    responses that have been sent out in batches?

18       A      I don't believe so.

19       Q      What about for CRCL?  What types of

20    responses have been sent out in batches for CRCL?

21       A      CRCL has a more varied set of form

22    responses.  There's 504 responses; there's the 345
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                           251

```
1    response; and it could look like we're opening

2    investigation; we're not pursuing it further;

3    we've referred it with no further action from us;

4    we've done a medical referral, I believe, has its

5    own form letter.  So there's a broader range

6    there.

7        Q      And do you know what form responses are

8    sent out in batches for OIDO?

9        A      There is a similar to CISOM, we're not

10   taking action on your complaint, letter.  And then

11   there is a, we've referred it to ICE or CBP,

12   letter.

13            And then there is another one where it's

14   not automated, but it's customized if we need a

15   more substantive response or if we need more

16   information.

17            (Exhibit 74 was marked for

18   identification and is attached to the transcript.)

19       Q      What does this document appear to be?

20       A      It's a message from ███████ to you,

21   saying that CISOM terminated assistance with the

22   delayed receipt from the NSC.  And it has there
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    261

1    respect to OIDO?

2        A       Thirty-seven OIDO complaints.

3        Q       Do you have any idea why that number

4    would be so low if there have now been 288

5    complaints received?

6        A       No.  No.

7        Q       Okay.  Do you -- well, let me ask you a

8    different question.  If you looked at the

9    complaints over the course of, you know, from

10   month to month, would the numbers be pretty steady

11   throughout the year?  Or have there been more

12   complaints in the latter part of 2025?

13       A       There have been more in the latter part

14   of 2025.

15       Q       Okay.  You also mentioned that there has

16   been an uptick in CRCL complaints.  Would you say

17   that's also been from month to month with there

18   being more CRCL complaints recently?

19       A       Yes.

20       Q       Okay.  And if you had to break it down

21   between detained individuals, family members,

22   NGOs, where would you say the majority of those

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          262

1    complaints are coming from for CRCL?

2        A      They're coming from the complainant

3    themself.

4        Q      So the detained individual specifically?

5        A      Yes.  Yes.

6        Q      And those are being submitted via the

7    web portal?

8        A      Yes.

9        Q      Okay.  How do you correspond and provide

10   status updates or the sorts of correspondence we

11   were talking about earlier, referrals or case

12   closures, to individuals in detention when they

13   submit a complaint?

14       A      To the email address attached to the

15   complaint.

16       Q      And is an email address required to

17   submit?

18       A      I'm not sure if it is.  I don't know.

19       Q      Okay.  So if someone was using a tablet

20   at a detention facility to submit a complaint, do

21   you know if they would have access to sending and

22   receiving email as well?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    265

 1    Defendants here.

 2          EXAMINATION BY COUNSEL FOR THE DEFENDANTS

 3    BY MR. DAVIS:

 4      Q        You discussed the Office of General

 5    Counsel's roles in the various offices; do you

 6    recall that?

 7      A        Yes.

 8      Q        And for CRCL, they're involved in 504

 9    decisions; does that sound right?

10      A        Yes.

11      Q        Who makes the actual final

12    determinations on 504 complaints?  Is it CRCL

13    staff or is it OGC?

14      A        It is me.

15      Q        And so what is OGC's role in the process

16    of reviewing 504s?

17      A        They advise me as to precedent and case

18    law that might be applicable to 504s.  And they

19    analyze the fact pattern in a complaint to case

20    law and precedent and advise me on which way the

21    determination should likely go based on precedent

22    and case law.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                266

```
1        Q        And how does this differ from OGC's role

2    before the RIF?

3        A        It does not.

4        Q        So who decides the EEO final agency

5    decision, as you called it?

6        A        I do.

7        Q        How often -- before the RIF, how often

8    did the offices refer complaints to the component

9    agencies?

10               MS. GILBRIDE:   Objection, vague.

11        A        I don't know, but it was certainly

12    something they did.

13        Q        What steps can the various offices do to

14    remedy complaints that are filed with them?

15        A        There are any number of actions that we

16    can take.  A statute does not proscribe an action.

17    We can choose to investigate ourselves; we can

18    refer out; we can not take action at all.

19        Q        I believe Plaintiff's counsel asked you

20    about when OIDO staff was in detention facilities.

21    Do you recall that?

22        A        Yes.
```

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    267

1      Q      And they used an example of a blanket.

2   How could, in those terms, the offices directly

3   remedy complaints?

4      A      They could not.  My understanding from

5   extensive conversations with outgoing OIDO

6   leadership is even for the simplest remedies, they

7   had to go to facility staff to provide that

8   remedy.  So they were a middle person for

9   something like getting a blanket.

10     Q      And do, generally, the offices provide

11  recommendations, policy recommendations based on

12  complaints or systemic issues; is that right?

13     A      Yes.

14            MS. GILBRIDE:   Objection, compound.

15     A      Yes.

16     Q      And what enforcement mechanisms do the

17  offices have to enforce those recommendations?

18     A      None.

19            MS. GILBRIDE:   Objection, compound.

20     A      None.

21     Q      What are the benefits of referring

22  complaints to a component if, let's say, the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    268

1    component already has that complaint, like ICE?

2       A      With current leadership, it is putting

3    the highest level of department leadership's heat

4    on it.  And so it will not be overlooked because

5    the fourth and fifth highest ranking officials in

6    the department, by my understanding of it, are

7    saying, this complaint is coming from my office.

8    You better pay attention to it.

9       Q      Going back to the people at the

10   detention facilities previously, were there any

11   issues with the case managers at those facilities?

12             MS. GILBRIDE:   Objection, vague.

13      A      There are abundant issues.

14      Q      Could you elaborate on them at a high

15   level of generality?

16      A      One OIDO employee was convicted of

17   criminality and served jail time for it for

18   distributing contraband in the facility and we

19   have numerous complaints against contractors who

20   did that case work for all manner of things, like

21   drug distribution, rape, sexual assault of

22   detainees, illegally trying to influence

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                        269

1    immigration applications and coach detainees for

2    how to get their applications approved.

3        Q      Are you aware of any problems with the

4    complaints that the people on the ground received

5    on behalf of OIDO?

6              MS. GILBRIDE:   Objection, vague.

7        A      Could you rephrase?

8        Q      Are you aware of any -- do you have any

9    concerns with the types of complaints that the

10   case managers from OIDO received on the ground?

11       A      Yeah.  So in looking at their case

12   management system and the complaints they filed on

13   behalf of the detainees, it was clear to me that

14   there was a lot of gaming of the numbers.  So for

15   something as simple as one problem, they would

16   file five different tickets, which inflated the

17   amount of work that they appeared to be doing.

18             And I don't know if that accounts for

19   the discrepancy in their report.  The '23 annual

20   report had something like 12,000 complaints,

21   quote/unquote, closed, but only 800 redressed.

22             So I don't really know what that means.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          271

```
1    case summaries and conclusions.

2       Q       In the investigations that you have

3    opened for OIDO since taking over your role, have

4    any violations been found in any of those

5    investigations?

6               MR. DAVIS:   Objection, deliberative

7    process privilege.  You can answer generally, but

8    not about specific complaints.

9       A       Minor violations, some.

10      Q       And compared to the total number of

11   complaints that you have received, what percentage

12   have resulted in a finding of a violation?

13              MR. DAVIS:   Objection, vague.

14      A       Very few.  Small percentage, very small

15   percentage.

16      Q       Would you say more or less than 10

17   percent?

18      A       Less than 10 percent.

19      Q       Okay.  Nothing further.

20              MR. DAVIS:   Nothing further from

21   defendants.  We will designate the transcript as

22   confidential, especially because one of the
```