EXHIBIT 19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS; SOUTHERN BORDER COMMUNITIES COALITION; URBAN JUSTICE CENTER,<br><br>PLAINTIFFS,<br><br>V.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY,<br><br>DEFENDANTS. | CIVIL ACTION NO. 25-1270-ACR |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

PROPOUNDING PARTY: ALL DEFENDANTS

RESPONDING PARTY: ALL PLAINTIFFS

SET #: 1

Pursuant to the Scheduling Order entered in this case on July 11, 2025 (ECF No. 49), Plaintiffs provide these objections and responses to Defendants' First Set of Interrogatories served on July 23, 2025.

**GENERAL OBJECTIONS**

In addition to any objections set forth below to particular interrogatories, Plaintiffs object on the following grounds to all of Defendants' interrogatories, and those objections are incorporated in full into Plaintiffs' response to each Interrogatory.

1. Plaintiffs object to these Interrogatories, including the instructions and definitions, to the extent they impose requirements that are inconsistent with, or beyond those contemplated by, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Columbia, or any other applicable rule or law. Plaintiffs will construe and respond to each Interrogatory in accordance with the requirements of the Federal Rules of Civil Procedure, the Local Rules, and any other applicable rule or law.

2. Plaintiffs object to these Interrogatories to the extent that they seek "all facts," "all complaints," "all functions," or otherwise request an exhaustive list as to any covered topic. Plaintiffs' investigation of this case is ongoing, and Plaintiffs reserve the right to supplement, clarify, or revise their responses based on additional information obtained during discovery or that otherwise comes to light during the pendency of the litigation.

3. Plaintiffs object to these Interrogatories to the extent that they seek information that is equally available to, known to, or in the possession of Defendants.

4. Plaintiffs object to these Interrogatories to the extent that they seek evidence unrelated to Plaintiffs' claims or allegations of injury, or Defendants' defenses, and are thus unlikely to lead to the discovery of admissible evidence. By responding to these requests, Plaintiffs do not concede the admissibility of any Interrogatory responses.

5. Plaintiffs object to these Interrogatories to the extent they seek information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. Any information provided in response to these Interrogatories shall not constitute a waiver of any applicable privilege, and Plaintiffs expressly reserve the right to claw back and object to the use of any information inadvertently provided.

6. Each and all of the foregoing General Objections are hereby expressly incorporated into each and all of the following specific Interrogatory responses. For particular emphasis, one or more of these General Objections may be reiterated in a specific Interrogatory response. The absence of any reiteration in a given specific response is neither intended as, nor shall be construed as, a limitation or waiver of any General Objection. Moreover, the inclusion of a specific objection to a specific Interrogatory is neither intended as, nor shall be construed as, a limitation or waiver of a General Objection or any other specific objection.

**DEFINITIONS**

The following definitions shall apply to the Interrogatory responses below:

1. "CBP" means Customs and Border Protection.

2. "CISOM" means the Citizenship and Immigration Services Ombudsman's Office.

3. "CIS" or "USCIS" means U.S. Citizenship and Immigration Services.

4. "CRCL" means the DHS Office for Civil Rights and Civil Liberties.

5. "DHS" means Department of Homeland Security.

6. "DHS Oversight Offices" means, collectively, CISOM, CRCL and OIDO.

7. "ECF," unless otherwise indicated, refers to the docket in *Robert F. Kennedy Human Rights v. Department of Homeland Security*, No. 1:25-cv-1270-ACR. As used herein, "ECF" will be followed by the document number of the court record at issue and, where necessary, the page number of the record.

8. "ICE" means Immigration and Customs Enforcement.

9. "OIDO" means the Office of the Immigration Detention Ombudsman.

10. "RFKHR" means Plaintiff Robert F. Kennedy Human Rights.

3

11. "SBCC" means Plaintiff Southern Border Communities Coalition.

12. "UJC" means Plaintiff Urban Justice Center.

**SPECIFIC OBJECTIONS AND RESPONSES**

1. Describe in detail all facts that support your allegation that the Offices have been eliminated or closed or are not functioning.

Objection: Plaintiffs incorporate by reference the above General Objections and further object that the term "functioning" is vague and ambiguous. Plaintiffs will construe that term to mean "fulfilling functions required by statute." Plaintiffs further object that this Interrogatory pertains to three discrete allegations: 1) that the offices have been eliminated; 2) that the offices have been closed; and 3) that the offices are not functioning.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: On March 21, 2025, Defendants placed all non-Senior Executive Service employees of CRCL, CISOM and OIDO on administrative leave and prevented them from performing any further work, including work on pending complaints or investigations to which they were assigned. Those employees were told at meetings they attended, in written notices from human resources personnel, and in follow-up FAQ documents that all positions in the three offices were being eliminated.

A May 15 whistleblower disclosure from several former CRCL employees stated that approximately 550 open CRCL investigations were pending when the March 21 stop-work order went into effect. When asked about the status of these 550 investigations at a May 19 evidentiary hearing in this case, Defendants' witness did not know the status of any of those investigations or whether any work had been performed on them since March 21. Defendants' witness likewise did not know the status of complaints pending with OIDO as of March 21, 2025, or of new complaints that had been filed with CRCL or OIDO since March 21. While this witness, Ronald Sartini, had

4

some knowledge of requests for case assistance pending with CISOM because he had been appointed as the new CIS Ombudsman earlier that month, he lacked other key information about DHS's plans for CISOM, such as the fact that his deputy had been assigned to another position within DHS on the same day he was testifying in court.

On or about May 23, 2025, all non-Senior Executive Service employees of CRCL, CISOM and OIDO were separated from federal service through a reduction in force. At a hearing in this case that same day, Mr. Sartini testified that he saw no conflict between the statutes creating these offices and a plan to staff those offices with detailees from the same components of DHS whose programs and activities they would be responsible for reviewing.

On April 4, 2025, an employee of UJC filed a complaint with CRCL regarding a violation of 8 U.S.C. § 1367 to which she has to date received no response, not even an automated acknowledgment of receipt. SBCC members filing complaints with CRCL and OIDO in May, June, and July of 2025 have similarly, to date, received no acknowledgment of, or substantive response to, any of the complaints they submitted. On July 16, 2025, an employee of RFKHR emailing OIDO regarding an ongoing medical issue for a detainee received an automated response that said, "We are no longer able to receive or address complaints."

No new recommendation memos have been posted on CRCL's Recommendation and Investigation memos Collection webpage since March 21, 2025, and nearly all of the reports previously posted on this webpage have been removed.

Written instructions on how to submit complaints to CRCL and OIDO that had previously been posted in housing units in at least two immigration detention centers have been removed, according to information conveyed to RFKHR attorneys. None of the offices have submitted reports to Congress since March 21, 2025.

2. In your Complaint, you state that RFK, SBCC, and UJC "have all filed complaints with CRCL and/ or OIDO or requests for case assistance with the CIS Ombudsman Office, and all have matters they would currently be raising with one or more of these offices if they were still functioning." Compl. ( ECF No. 1) ¶ 7. Please identify all complaints that RFK, SBCC, and UJC have filed with CRCL or OIDO and requests for case assistance with the CIS Ombudsman Office within the relevant period; describe in detail how the Offices handled, processed, or disposed of those complaints or case assistance requests; identify any complaints or case assistance requests that RFK, SBCC, and UJC would have raised with the Offices "if they were still functioning," and describe in detail how RFK, SBCC, and UJC instead proceeded with the information or allegations underlying each one of those complaints or case assistance requests.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory to the extent that it seeks disclosure of the identities of Plaintiffs' clients, clients' private health information, the status of ongoing legal or immigration proceedings, and other material of a private or sensitive nature. Plaintiffs will limit their response to exclude personally identifying information about the individuals who were the subjects of particular complaints or requests for assistance. Plaintiffs further object that this Interrogatory contains four discrete subparts: 1) identifying past complaints and requests for case assistance; 2) describing in detail the response to those complaints and requests; 3) identifying complaints or requests for case assistance that would have been filed if the offices were still functioning; and 4) describing in detail how those matters not resulting in complaints or requests for assistance to the DHS Oversight Offices were handled instead. At a minimum, the questions about past complaints and requests should be treated as a distinct Interrogatory from the questions about complaints and requests that would have been, but were not, filed with the DHS Oversight Offices.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:

6

**RFKHR**

RFKHR has filed over a dozen complaints with CRCL and OIDO on behalf of detained individuals since January of 2022, including by copying email addresses for CRCL and OIDO on email correspondence to ICE. These complaints have involved such issues as denial of medical care, sexual abuse, disability discrimination, excessive force, and retaliation for exercising First Amendment rights.

These complaints have often prompted responses from CRCL, who has notified RFKHR that it is initiating an investigation on the subject of the complaint. Involving these offices has also resulted in direct improvements to the detention conditions of the individuals for whom RFKHR advocates. For example, RFKHR filed a complaint with CRCL and OIDO on March 29, 2023, and a follow-up complaint with CRCL on November 7, 2023, on behalf of a man with a seizure disorder detained at the Central Louisiana ICE Processing Center in Jena, Louisiana. In response, an OIDO case manager met with the detained individual several times and was able to secure improvements to his conditions of confinement. In addition, CRCL issued a finding on September 24, 2024 that the man had been discriminated against in violation of Section 504 of the Rehabilitation Act and was entitled to a reasonable accommodation of a modified sleeping arrangement so that he would no longer have to sleep on a top bunk, from which he was at risk of falling.

On March 27, 2024, RFKHR filed a complaint with CRCL and OIDO alleging excessive use of force, medical neglect, verbal abuse, retaliation, and violations of First Amendment rights of people detained at the Winn Correctional Center in Winnfield, Louisiana stemming from a January 2024 incident where officials attacked approximately 200 people in a housing unit with pepper spray in retaliation for participation in a peaceful demonstration and hunger strike

protesting conditions of confinement and then locked the unit's doors and windows, turned off cameras in the unit, and cut power and water to the unit, denying people the ability to rinse their eyes, throats, and skin. In response, CRCL conducted a multidisciplinary onsite investigation at the Winn Correctional Center later in 2024. Since March 21, 2025, RFKHR has received no updates on the status of the investigation, and no recommendation memorandum has been published online.

On July 9, 2024, RFKHR filed a complaint with CRCL and OIDO alleging excessive use of force and retaliatory use of solitary confinement in violation of the First Amendment against 40 individuals detained at the Buffalo Federal Detention Facility (BFDF) in Batavia, New York. These punitive actions were taken after the 40 individuals engaged in a hunger strike the month before to protest the discontinuation of free phone calls to family members and BFDF's policy of locking people in their cells for approximately 18 hours per day. In September 2024, CRCL contacted RFKHR by letter to state that RFKHR's complaint had informed an ongoing investigation into systemic retaliation in the ICE detention system and that a recommendation memorandum to ICE regarding the investigation was pending. The letter described CRCL's online posting process, noting that "we have not issued our recommendations in the retaliation investigation yet, but we wanted to make you aware of the posting process for future reference." Since March 21, 2025, RFKHR has received no updates on the status of the investigation, and no recommendation memorandum has been published online.

On September 3, 2024, RFKHR filed a complaint with CRCL on behalf of an individual with mobility impairments detained at the Southern Louisiana ICE Processing Center in Basile, Louisiana. On May 30, 2025, CRCL provided a response finding that the woman's rights under Section 504 of the Rehabilitation Act had not been violated.

On November 14, 2024, RFKHR filed a complaint with CRCL and OIDO about sexual abuse, unlawful use of force, solitary confinement, medical neglect, and retaliation against a woman detained at the Baker County Detention Center in Macclenny, Florida. The complaint recounted a June 2023 incident during which male officers stripped the woman, strapped her to a restraint chair with her breast exposed, and laughed at her. On March 5, 2025, CRCL informed RFKHR by letter that it had opened a complaint investigation in response to RFKHR's November 14 complaint. Since March 21, 2025, RFKHR has received no updates on the status of the investigation.

Since March 21, 2025, RFKHR has focused on advocating directly with ICE to secure medical care for its detained clients because RFKHR did not believe that filing complaints with CRCL or OIDO would be fruitful. However, when efforts to secure medical care through ICE proved unavailing, RFKHR attempted filing a CRCL complaint via email on behalf of a detained client at the South Louisiana ICE Processing Center in Basile, Louisiana on June 27, 2025 and later attempted to include OIDO on a July 16 email to ICE about the ongoing medical situation in hopes of enlisting OIDO's assistance. In response to the July 16 email to OIDO, RFKHR received an autoresponse indicating that OIDO could no longer "receive or address complaints." RFKHR has also made multiple visits to a Louisiana detention facility earlier this year in an attempt to remediate sexual abuse affecting multiple individuals, and would have filed complaints with CRCL and OIDO regarding this pattern of sexual abuse, but declined to do so at that time because of its understanding that the offices were not performing their statutory functions.

**SBCC**

SBCC filed a complaint with CRCL on May 13, 2023 regarding the conditions at open air detention sites (OADS) operated by CBP at the San Ysidro port of entry in California. Specifically,

the complaint noted that the migrants being held in the OADS were not provided with adequate food, water, shelter, sanitation, or medical assistance (e.g., only one bottle of water and granola bar per day; only one portable toilet for hundreds of people; and no handwashing stations, showers or feminine hygiene products despite migrants being detained at the sites for up to a week). SBCC filed a second complaint with CRCL on December 11, 2023, documenting similar inhumane conditions at multiple new OADS that CBP had established near Jacumba, California. In response to these complaints, CRCL conducted an on-site investigation in December 2023 and, on information and belief, made recommendations to CBP based on the results of that investigation. CRCL shared an update on the status of the investigation in a letter sent to SBCC on February 2, 2024.

After receiving assurances through this litigation that CRCL was continuing to function, SBCC filed a complaint with CRCL on June 24, 2025 regarding an excessive use of force and deployment of flash bang grenades against peaceful protesters by ICE and Homeland Security Investigations (HSI) personnel on May 30, 2025. ICE and HSI agents deployed these grenades in the South Park neighborhood of San Diego, injuring a pregnant woman and knocking down at least two children, when a small crowd of protesters spontaneously gathered outside a popular Italian restaurant where armed, masked ICE and HSI agents wearing tactical gear were conducting an immigration raid. To date SBCC has received no response to this complaint, not even an acknowledgment of receipt.

If CRCL had remained functional after March 21, 2025, SBCC would have reached out to CRCL regarding the transfer of the Roosevelt Reservation and surrounding land to the Department of Defense, as SBCC is concerned that this could indicate an expansion of open-air detention. To date, SBCC has not done so because it is unaware of who at CRCL to reach out to, having received

no public engagement from anyone at CRCL since March 21, 2025. In the past SBCC would also have reached out to CRCL regarding fatal encounters with CBP agents but has discontinued this practice because those channels of communication are no longer available. Since March 21, 2025, there have been at least four fatal encounters with CBP.

SBCC would also have reached out to CRCL with concerns about ICE and CBP agents wearing masks and failing to identify themselves; concerns about the pattern or practice of using levels of force that are neither necessary nor proportionate in violation of the DHS Use of Force policy, the U.S. Constitution, and/or international human rights obligations; and concerns about compliance with the Inter-American Commission on Human Rights decision in *Family of Anastasio Hernandez Rojas v. United States*. Finally, SBCC would have reached out informally to someone at CRCL before, or perhaps instead of, filing a formal complaint about the May 30 incident where protesters of an ICE raid in San Diego were met with excessive force and violence, but could not do so because there was no one at CRCL to reach out to informally.

**UJC**

On April 4, 2025, a lawyer at UJC's Domestic Violence Project filed a complaint with CRCL regarding a violation of 8 U.S.C. § 1367 experienced by one of her clients. Specifically, the client's abusive spouse filed a request under the Freedom of Information Act (FOIA) for her U nonimmigrant status application and that of her minor child. CIS unlawfully shared the contents of the statutorily protected filing with this spouse, who then used the information against UJC's client in family court proceedings. To date, UJC has received no response from CRCL to the complaint, not even an acknowledgment of receipt.

UJC lawyers sought assistance from CISOM with respect to specific client matters approximately twelve times per year before March 21, 2025. Specifically, they sought assistance

from CISOM when a client's petition was pending with USCIS for longer than the usual processing time, to seek an asylum interview for a client earlier than the date provided, or when CIS had made an error or done something requiring clarification (such as noting in the client's online portal that a notice was sent but where no notice was received and the nature of the notice was unclear from the online portal).

Involving CISOM often resulted in getting cases that had been stuck in the USCIS bureaucracy for extended periods of time unstuck. For example, on July 21, 2023, a UJC lawyer requested assistance from the Ombudsman's office for an I-751 Battered Spouse Waiver that had been pending for years outside of standard processing times. UJC submitted an Ombudsman case assistance request on March 21, 2024, and after Ombudsman intervention, the client was scheduled for an interview with USCIS. In another case, a client's I-90 application to renew her green card was well outside of processing times, and after Ombudsman intervention, USCIS sent a request for additional evidence which UJC was able to respond to so that the client's case could be adjudicated. In another instance, a UJC client had an approved Violence Against Women Act (VAWA) petition and an application for lawful permanent residence on Form I-485 that was also well outside of processing times. UJC submitted a CISOM case assistance request on May 3, 2024. After Ombudsman intervention, the client's I-485 was transferred to the National Benefits Center and processing continued to a final adjudication.

Since March 21, 2025, UJC lawyers have made inquiries with the USCIS email hotline on at least six occasions when clients' applications were pending outside of normal processing time or when an error or anomaly would previously have prompted a case assistance request to CISOM. On two occasions, UJC lawyers have also reached out for assistance directly from members of Congress in the districts where the clients reside.

12

3. In your Complaint, you state, "Because of the elimination of these offices, Plaintiffs must dedicate additional resources to other, more costly and labor- intensive methods of seeking information about DHS policies, reporting rights violations, and advocating for clients in immigration matters." Compl. ¶ 7. Describe in detail the type and amount of "additional resources" that you have dedicated and describe in detail the "more costly and labor- intensive methods of seeking information about DHS policies, reporting rights violations, and advocating for clients in immigration matters" that you have used since March 21, 2025. For each additional resource, describe in detail how the alleged elimination of the Offices caused you to dedicate these additional resources.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory to the extent that it seeks disclosure of the identities of Plaintiffs' clients, clients' private health information, the status of ongoing legal or immigration proceedings, and other material of a private or sensitive nature. Plaintiffs will limit their response to exclude personally identifying information about the individuals who were the subjects of particular complaints or requests for assistance. Plaintiffs further object that this Interrogatory contains three discrete subparts as it requests information about additional resources expended on 1) seeking information about DHS policies; 2) reporting rights violations; and 3) advocating for clients in immigration matters.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: RFKHR has expended attorney time corresponding with ICE officials in an attempt to resolve unmet medical needs of clients in immigration detention. It has also spent money on airfare, local transportation and hotel accommodations, and meals for staff during seven trips to visit detention centers to meet with clients and/or detention center officials in person in April, June, and July of 2025. The closure of the DHS Oversight Offices necessitated expending these resources because in the past, OIDO would have engaged directly with ICE or detention center staff to resolve problems, while CRCL would have investigated systemic abuses and made recommendations to DHS components, so that RFKHR would not have needed to continue

13

engaging with ICE and detention center officials on an ongoing basis. Moreover, the presence of OIDO case managers on site at detention facilities would have obviated the need for RFKHR staff to spend as much time visiting detention facilities in person.

RFKHR has also expended attorney time and court filing fees to pursue FOIA litigation against DHS after CRCL failed to timely respond to RFKHR's January 27, 2025 FOIA request regarding CRCL's investigation of allegations that unaccompanied immigrant children were pressured to sign false affidavits stating that they were over 18 years old. In this FOIA litigation, attorneys for DHS have pointed to the decimation of CRCL's FOIA office as a justification for a slow pace of production, and RFKHR attorneys have been required to oppose these arguments. CRCL has also failed to timely respond to RFKHR's March 31, 2025 FOIA request about the abolition of the Case Management Pilot Program (CMPP) earlier this year, leading RFKHR to file a FOIA lawsuit in the Southern District of New York on August 8, 2025.

SBCC has expended staff time contacting CBP and ICE directly about matters that SBCC would previously have raised with CRCL, such as fatal encounters with Border Patrol agents and excessive use of force in response to protests of ICE raids. These alternative methods of seeking information are more burdensome and time-consuming for SBCC's small staff because CBP's Office of Professional Responsibility is less responsive than CRCL, and so SBCC must try multiple points of contact or contact the office multiple times in an effort to obtain a response, whereas in the past CRCL was a conduit through which SBCC's concerns could be raised and conveyed more efficiently to the appropriate component within DHS. The closure of the DHS Oversight Offices necessitated this expenditure of additional resources because SBCC no longer has points of contact at CRCL it can reach out to, and the one formal complaint it has tried to file since the offices' closure has yielded no response.

UJC has expended attorney time sending emails to the CIS hotline about matters that UJC attorneys would previously have raised with CISOM. This alternative is not well-suited to the often time-sensitive needs of UJC's VAWA-protected clients, as responses from the email hotline can take 120 days or more to arrive, if a response is ever received at all. UJC attorneys have also spent time instructing their clients about how to request information from the CIS contact center by phone, since attorneys cannot utilize the contact center on their clients' behalf. This alternative to requesting assistance from CISOM is also problematic, as clients often do not get the information they seek through this process, adding to their frustration and sometimes damaging lawyer-client relations. Finally, since March 21, 2025, UJC lawyers have expended time engaging with congressional offices on their clients' behalf in hopes of getting cases out of the CIS bureaucracy, a process that requires multiple conversations and can be both time-consuming and slow to yield results, whereas an inquiry from CISOM could be made in writing and was a far more streamlined process that typically resulted in a resolution within a few weeks.

4. As stated in your complaint, describe in detail the "core business activities" of RFK, SBCC, and UJC, including, for each, the manner and extent of harm to those activities caused by the alleged closure of the Offices. If certain " core business activities" have not been harmed, please say so.

Objection: Plaintiffs incorporate by reference the above General Objections and further object that the Interrogatory seeks information beyond that which is relevant to Plaintiffs' standing because no court precedent interpreting Article III requires that a defendant's actions interfere with all or even a certain percentage of an organization's "core business activities" so long as the organization's core business activities are perceptibly impaired by the challenged actions.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:

**RFKHR**

RFKHR partners with grassroots human rights defenders to reduce the size, scope, and power of mass incarceration in the United States by exposing and stopping human rights abuses in the U.S. criminal and immigration legal systems. RFKHR's core business activities include raising awareness of human rights abuses in immigration and criminal detention, advocating for detained individuals through strategic litigation and through other advocacy channels, and educating detained individuals about their legal rights.

RFKHR's ability to perform all of these core business activities has been perceptibly impaired by the closure of the DHS Oversight Offices. First, some of the information RFKHR previously relied on to raise awareness about conditions in immigration detention was published by CRCL and has been removed from the CRCL website. In terms of advocating for detained individuals, RFKHR must channel more of its limited staff resources into direct advocacy with ICE personnel, which is a relatively ineffective strategy, and litigation, which is a particularly time-consuming and expensive strategy given RFKHR's limited staff, now that advocacy through the channel of filing CRCL and OIDO complaints is no longer a viable option. Defendants' actions have also interfered with RFKHR's ability to educate detained individuals about their legal rights because one of the rights about which RFKHR would educate detained people, the ability to file complaints with CRCL and OIDO, has been rendered meaningless by the gutting of the offices. Finally, RFKHR's ability to carry out its core activities regarding criminal detention has also been impaired as staff time has been diverted to meet the increasing immigration detention-related needs caused by the DHS Oversight Offices' closure, leaving less time to pursue criminal detention-related work.

**SBCC**

SBCC advocates for border enforcement policies and practices that are fair and that respect human dignity and human rights. SBCC also seeks to prevent loss of life along the U.S.-Mexico border, improve the quality of life in border communities, and promote a positive image of the border region. Its core business activities include monitoring CBP actions and raising awareness of human rights abuses, advocating for more humane treatment of immigrants and residents of border communities, and disseminating information and sharing resources among the over 60 organizations that make up the coalition.

SBCC's ability to perform all of these activities has been perceptibly impaired by the shutdown of the DHS Oversight Offices. SBCC can no longer rely on information it used to obtain about CBP and other DHS activities from written CRCL and OIDO reports and from contacting and asking questions of CRCL employees. It can no longer use CRCL complaints as a method of advocating for more humane treatment of immigrants and border residents and must instead advocate directly with CBP's Office of Professional Responsibility, which is less responsive and accessible than CRCL and, unlike CRCL, does not regularly hold meetings with community groups to seek their input and ask about their concerns. Finally, because Defendants' actions have deprived SBCC of the conduit for communicating with other components within DHS that CRCL used to provide, it can also no longer disseminate information and resources obtained through this conduit to its coalition members.

**UJC**

UJC provides free legal services to low-income New Yorkers, including many noncitizens, in specific subject matter areas, including housing and domestic violence. UJC's Domestic Violence Project (DVP) seeks to meet the needs of survivors by providing comprehensive, trauma-

informed, holistic legal and advocacy services to survivors of intimate partner violence in New York City. In order to fully meet the needs of the many DVP clients who are undocumented and allow them to gain financial and physical independence from their abusers, UJC lawyers seek legal immigration status for their domestic violence survivor clients and their children as part of the DVP's core business activities. They seek such immigration relief through a variety of remedies, including VAWA self-petitions, Battered Spouse waivers, T and U nonimmigrant status petitions, and Special Immigrant Juvenile Status petitions. All of these forms of relief are obtained from, and require working with, CIS.

The closure of the DHS Oversight Offices has perceptibly impaired UJC's ability to holistically meet the needs of its undocumented DVP clients by impeding UJC's ability to pursue immigration-related relief on their behalf. Since March 21, 2025, UJC lawyers have not obtained effective interventions from the CIS Ombudsman's Office on any cases where they have requested CISOM assistance, even though CISOM interventions were previously very effective at resolving cases where CIS had made a mistake or where a case had gotten bogged down with CIS for an unusually long time. As a result, UJC lawyers have had a more difficult time obtaining immigration-related relief for their domestic violence survivor clients and have been able to assist fewer clients with immigration-related petitions.

5. Describe in detail any funding that RFK, SBCC, and UJC have lost because of the alleged closure of the Offices, including any communications from funders, other individuals, or entities about discontinuation of current or future funding because of the alleged closures of the Offices.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory as harassing and oppressive in that it seeks proprietary business information of SBCC and UJC that bears no relationship to their allegations of injury in this case. Neither SBCC nor UJC made any allegations in the complaint or statements in any declaration

regarding any loss of funding or potential loss of funding as a result of Defendants' actions. Plaintiffs will therefore only answer this Interrogatory as to RFKHR, the only plaintiff for which the information sought could reasonably be calculated to lead to the discovery of admissible evidence.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: As a nonprofit organization that depends on philanthropic support, RFKHR regularly meets with potential funders to describe its work. At these meetings RFKHR staff make presentations that reference RFKHR's successful use of CRCL and OIDO to initiate federal investigations of conditions at immigration detention centers. RFKHR has also made the case to funders that RFKHR has unique value as an organization that visits detention centers to teach detained people how to advocate for their rights through engagement with CRCL and OIDO, including through OIDO's on-site investigators. The credibility of these claims has been damaged by the sudden cessation of CRCL and OIDO statutory functions. Funders who had previously expressed interest in RFKHR's model of visiting detention centers to address abuses and empower detained people have not continued those conversations. And a current funder, a family foundation based in California, stated during a June 2025 Zoom call with RFKHR that it would not be renewing its support when the current grant period ends.

6. Describe in detail any alleged harm related to loss of advocacy opportunities, policy development, public engagement, or reputation that RFK, SBCC, and UJC have suffered because of the alleged closure of the Offices, including from loss of public engagement events or the posting of information.

Objection: Plaintiffs incorporate by reference the above General Objections and add that this Interrogatory asks about four distinct types of harms: 1) loss of advocacy opportunities; 2) harms related to policy development; 3) harms related to public engagement; and 4) harms to reputation.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: The loss of advocacy opportunities (in terms of the ability to advocate for RFKHR's clients and other detained individuals, SBCC's ability to advocate for immigrants and border community residents, and UJC's ability to advocate for its domestic violence survivor clients) have already been addressed in Plaintiffs' responses to Interrogatories 2, 3, and 4.

SBCC has also been harmed by the inability to participate in public engagement events that CRCL previously organized, as well as interactions with specific CRCL employees, and share information gained through those events and interactions with the members of the coalition, as described in greater detail in Plaintiffs' responses to Interrogatories 3 and 4.

RFKHR and SBCC have both been harmed reputationally by no longer being able to rely on information published on CRCL's website, and RFKHR has been harmed reputationally in its relationships with potential funders, as described in more detail in Plaintiffs' response to Interrogatory 5, and in strained relationships with detained individuals who it lacks the resources to represent in litigation and who are frustrated that there are few if any remaining advocacy channels through which RFKHR can help them. Finally, UJC has been harmed reputationally in that the loss of the ability to obtain assistance for clients through CISOM, and being forced to rely on less effective and slower alternatives like the CIS email hotline, has caused stress to clients, strained relationships between lawyers and clients, and reduced the number of clients that UJC's Domestic Violence Project is able to serve.

7. Describe in detail all facts that support your allegation that RFK "will be forced to spend attorney time and organizational resources that otherwise would have been saved through CRCL and OIDO intervention," Compl. ¶ 52, including the "intervention" that the Offices provided, whether such "intervention" is statutorily mandated, the specific amount of attorney time that "would have been saved," the specific amount and nature of resources that "would have been saved," and how the Offices "forced" RFK to spend this attorney time and organizational resources.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory to the extent that it seeks disclosure of the identities of RFKHR's clients, clients' private health information, the status of ongoing legal or immigration proceedings, and other material of a private or sensitive nature. Plaintiffs will limit their response to exclude personally identifying information about the individuals who were the subjects of particular complaints or requests for assistance.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: The types of "intervention" that CRCL and OIDO previously provided have already been described in Plaintiffs' response to Interrogatory 2.

This intervention was statutorily mandated because it pertained to the investigation of complaints, which both CRCL and OIDO are required to investigate, and the direct provision of assistance to detained individuals affected by potential misconduct, excessive force, or violations of law or detention standards, which is part of OIDO's statutory mandate. *See* 6 U.S.C. § 205(b)(5). RFKHR attorneys have spent approximately 45 hours on such client advocacy with ICE and detention center staff since March 21, 2025, and have spent an additional 81 hours of attorney time on FOIA litigation necessitated by the closure of CRCL's FOIA office and related to CRCL's statutory mandate to "make the reports of such officer, including reports to Congress, available to the public to the greatest extent" that applicable law will allow. 42 U.S.C. § 2000ee-1(g)(1).

Defendants' actions "forced" RFKHR to spend this additional time and resources because Defendants' public statements on or about March 21, 2025 represented that the DHS Oversight Offices would no longer be functioning, and RFKHR reasonably believed that attempting to engage with them would be futile. Moreover, RFKHR's experiences when attempting to submit complaints to CRCL and OIDO after March 21, 2025, have confirmed this impression.

8. Describe in detail how "SBCC's mission is frustrated by no longer being able to file complaints with or contact CRCL and OIDO and by CRCL's inability to respond to SBCC activities," Compl. ¶ 57, including how SBCC's "mission" has been "frustrated," all facts that support your allegation that you are "no longer . . . able to file complaints or contact CRCL and OIDO," and all facts that support your allegation that CRCL is unable to respond to SBCC's activities ( include that specific activities to which you are referring).

Response: Subject to and without waiving the foregoing General Objections, Plaintiffs respond as follows: As explained in Plaintiffs' response to Interrogatory 4, SBCC advocates for border enforcement policies and practices that are fair and that respect human dignity and human rights. SBCC also seeks to prevent loss of life along the U.S.-Mexico border, improve the quality of life in border communities, and promote a positive image of the border region. Its core business activities include monitoring CBP actions and raising awareness of human rights abuses, advocating for more humane treatment of immigrants and residents of border communities, and disseminating information and sharing resources among the over 60 organizations that make up the coalition.

Its mission has been frustrated by Defendants' actions, as described at length in Plaintiffs' responses to Interrogatories 2, 3 and 4, because SBCC no longer has points of contact at CRCL it can reach out to with questions, it can no longer rely on written information published by CRCL and OIDO (as no new information has been published since March 21, 2025, and previous CRCL publications have been removed from its website), and the one formal complaint that SBCC has tried to file since the offices' closure has yielded no response. As a result, SBCC's ability to perform its core business activities of monitoring  CBP actions, advocating for immigrants and border residents, and gathering and disseminating information to its coalition members, have been perceptibly impaired.

CRCL is unable to respond to SBCC activities of filing complaints and informal outreach for several reasons. First, between March 21 and May 23, 2025, CRCL employees were prevented from performing work, including responding to emails or other inquiries from community groups like SBCC. Then, after May 23, 2025, CRCL was unable to respond because it lacked adequate staff to do so and because Defendants refused to perform CRCL's statutory function of engaging with the public by providing "information on the responsibilities and functions of, and how to contact" CRCL. 6 U.S.C. § 345(a)(2).

9.  Describe in detail all "channels" by or through which RFK, SBCC, and UJC support or advocate for aliens and immigrants and seek government oversight and accountability at the border. See Compl. ¶ 57.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory as taking the sentence from which it quotes out of context. Paragraph 57 of Plaintiffs' Complaint specifically referred to SBCC's injuries and the removal of these valuable channels from "SBCC and its members." Plaintiffs will therefore only answer this Interrogatory as to SBCC, the only plaintiff for which the information sought could reasonably be calculated to lead to the discovery of admissible evidence.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: Taken in context, the channels to which paragraph 57 refers are the ability to file complaints with and otherwise interact with CRCL and OIDO.

10. As to each channel discussed in response to interrogatory 9, describe in detail how Defendants' actions have impaired that channel, and for each impaired channel, how RFK, SBCC, and UJC have responded or otherwise changed their approach.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory as taking the sentence from which it quotes out of context. Paragraph 57 of Plaintiffs' Complaint specifically referred to SBCC's injuries and the removal of these

valuable channels from "SBCC and its members." Plaintiffs will therefore only answer this Interrogatory as to SBCC, the only plaintiff for which the information sought could reasonably be calculated to lead to the discovery of admissible evidence.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: The ways in which these channels have been impaired, and the changes that SBCC has been required to make in response to Defendants' actions, have already been addressed in Plaintiffs' responses to Interrogatories 2, 3, 4 and 8.

11. Describe in detail how "[t]he unavailability of the [CIS] Ombudsman[ hampers UJC's] ability to obtain information needed to represent their clients and require them to expend additional time on each client's case by pursuing mechanisms for redress that would have been unnecessary with a functioning CIS Ombudsman's Office," Compl. ¶ 60, including what information UJC is seeking to obtain, why UJC contends that the CIS Ombudsman Office is unavailable, what "mechanisms for redress that would have been unnecessary with a functioning CIS Ombudsman's Office" that UJC has pursued, whether UJC was able to obtain the information, and how much additional time on each case that UJC expends.

Objection: Plaintiffs incorporate by reference the above General Objections and further object to this Interrogatory to the extent that it seeks disclosure of the identities of UJC's clients, clients' private health information, the status of ongoing legal or immigration proceedings, and other material of a private or sensitive nature. Plaintiffs will limit their response to exclude personally identifying information about the individuals who were the subjects of particular complaints or requests for assistance.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: Material responsive to this Interrogatory has already been described in Plaintiffs' responses to Interrogatories 2, 3 and 4.

The information that UJC previously sought from CISOM and has more recently sought through alternative methods relates to particular client matters pending with CIS. The reason

Plaintiffs stated in paragraph 60 of the Complaint that the CIS Ombudsman's Office was unavailable was that Defendants had made public statements on or about March 21, 2025 that the CIS Ombudsman's office was being closed and all of its employees placed on leave and prevented from performing any work because it and the other DHS Oversight Offices were "internal adversaries" that undermined DHS's mission.

The alternative methods through which UJC pursued redress include the CIS email hotline and direct outreach to congressional offices, as described in greater detail in Plaintiffs' response to Interrogatory 3. These alternatives are seldom effective and require additional attorney time. Each inquiry to the CIS email hotline takes approximately 20 to 30 minutes to prepare because the attorney must obtain client consent first, gather documentation to demonstrate an attorney-client relationship and evidence of the issue being queried, and email the hotline. Because the CIS email hotline does not respond substantively to most inquiries, the attorney must follow up periodically with the CIS email hotline. Each inquiry to congressional offices takes approximately 30 to 45 minutes of the attorney's time to schedule a meeting with the client, meet with the client, prepare releases of attorney-client privilege for the relevant Congressman's office, read the client the release and have the client sign it, and submit the inquiry to the Congressman's office with the appropriate documentation.

Being required to use these alternative methods of seeking redress has other detrimental effects on UJC attorneys that are more difficult to quantify. It is tedious for employees of an overwhelmed nonprofit to have to use less effective methods of case assistance and to remember that they must follow up with the hotline when the hotline likely will not work. When the hotline does not work, the case also stays on the attorney's docket longer and impedes the attorney's ability to take on new cases. The longer a case is pending, the more anxious clients become, and the more

frequently the lawyer and client must communicate due to the case not being resolved yet and the client requesting status updates, in turn impairing the attorney's ability to work on cases for other clients.

12. Describe in detail all statutorily-mandated reports and functions that you believe have not been fulfilled because of the alleged closure of the Offices, what statutory provision mandates that report or function, and how the Offices have not fulfilled that mandate.

Objection: Plaintiffs incorporate by reference the above General Objections and further object that Interrogatory 12 is a contention Interrogatory that is premature while discovery is still underway. Plaintiffs are not in a position to describe how particular statutory mandates are not being fulfilled, as this is a key focus of Plaintiffs' discovery requests to Defendants.

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: The statutory functions that Plaintiffs contend are not being fulfilled by the DHS Oversight Offices since their closure on March 21, 2025, and the specific statutory provisions mandating those functions, are laid out at pages 16-18 of Plaintiffs' Reply Memorandum in Support of their Motion for a Preliminary Injunction, ECF No. 24. Plaintiffs will provide evidence of how these functions are not being performed, and how they have not been performed since March 21, 2025, in their motion for summary judgment to be filed later this year.

13. Describe in detail any injury, if any, as a result of the staffing changes at the Offices, and for each injury, describe how the requested judicial relief would redress that injury.

Objection: Plaintiffs incorporate by reference the above General Objections and further object that Interrogatory 13 is a contention Interrogatory that is premature while discovery is still underway. Plaintiffs are not in a position to describe the precise judicial relief they will seek at the summary judgment phase of this case, and how that relief will remedy particular injuries, until discovery is complete.

26

Response: Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: Plaintiffs' injuries have already been described in detail in Plaintiffs' responses to Interrogatories 3, 4, 5 and 6. Judicial relief in the form of an injunction requiring that Defendants resume performing the statutory functions of the DHS Oversight Offices will redress Plaintiffs' injuries by ending the diversion of Plaintiffs' resources, informational injury, reputational harm, and other harms that the ongoing disruption of the DHS Oversight Offices' statutory functions is causing Plaintiffs.

14. Describe in detail what judicial relief you are seeking, including but not limited to, how many employees performing what tasks for each Office you think are necessary to remedy your alleged injuries.

Objection: Plaintiffs incorporate by reference the above General Objections and further object that Interrogatory 14 is a contention Interrogatory that is premature while discovery is still underway. Plaintiffs are not in a position to describe the precise judicial relief they will seek at the summary judgment phase of this case until discovery is complete. Plaintiffs further object that they have not sought and will not seek any particular staffing levels at any of the DHS Oversight Offices, and thus Interrogatory 14 contains a false and unwarranted premise. Based on the above objections, Plaintiffs will not respond to this Interrogatory as written.

15. List the full names and contact information for each declarant or potential witness that you will seek to admit or rely on, including those using pseudonyms. If you do not plan on admitting or relying on any existing declaration going forward, identify which declarations you do not intend to admit or rely on.

Objection: Plaintiffs incorporate by reference the above General Objections and further object that Interrogatory 15 is ambiguous in its use of the phrase "admit or rely on" because the Interrogatory does not specify whether such declarations would be relied on for summary judgment, at trial, or for some other purpose. Moreover, this Interrogatory appears to contradict an

agreement reached by the parties through their proposed scheduling order filed with the Court on

July 11, 2025, under which all declarations previously submitted in this litigation were deemed to

be admissible. Based on the above objections, Plaintiffs will not respond to this Interrogatory as

written.


Dated: August 13, 2025                          Respectfully submitted,

                                                */s/ Karla Gilbride*

Michael C. Martinez (DC Bar No. 1686872)        Karla Gilbride (DC Bar No. 1005586)
Christine L. Coogle (DC Bar No. 1738913)        Adina H. Rosenbaum (DC Bar No. 490928)
Brian D. Netter (DC Bar No. 979362)             Public Citizen Litigation Group
Skye L. Perryman (DC Bar No. 984573)            1600 20th Street NW
Democracy Forward Foundation                    Washington, DC 20009
P.O. Box 34553                                  (202) 588-1000
Washington, DC 20043                            kgilbride@citizen.org
(202) 448- 9090


                                                *Counsel for All Plaintiffs*


Anthony Enriquez (DDC Bar No. NY0626)           Sarah E. Decker (DDC Bar No. NY0566)
Sarah T. Gillman (DDC Bar No. NY0316)           Robert F. Kennedy Human Rights
Robert F. Kennedy Human Rights                  1300 19th Street NW, Suite 750
88 Pine Street, Suite 801                       Washington, DC 20036
New York, NY 10005                              (202) 559-4432
(917) 284- 6355


                                                *Counsel for Plaintiff RFK*

Verification

  I, Anthony Enriquez, Vice President of U.S. Advocacy and Litigation at Robert F. Kennedy Human Rights, declare and affirm under penalty of perjury that the foregoing Responses to Defendants' First Set of Interrogatories are true and correct to the best of my knowledge, information and belief as to Robert F. Kennedy Human Rights.

  Executed on August 13, 2025

  */s/ Anthony Enriquez*
  Anthony Enriquez

Verification

I, Ricardo Garza, Border Policy Counsel at the Southern Border Communities Coalition, declare and affirm under penalty of perjury that the foregoing Responses to Defendants' First Set of Interrogatories are true and correct to the best of my knowledge, information and belief as to Southern Border Communities Coalition.

Executed on August 13, 2025

*/s/ Ricardo Garza*
Ricardo Garza