IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ROBERT F. KENNEDY HUMAN RIGHTS, ) CIVIL NO.:
) 25-1270-ACR
Plaintiff, )
vs. )
)
DEPARTMENT OF HOMELAND SECURITY, )
et al., ) May 23, 2025
Defendant. ) Washington, D.C.
________________________________) 9:30 a.m.

Transcript of Motions Hearing
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff: Karla A. Gilbride, Esquire
Public Justice, P.C.
1620 L Street NW
Suite 630
Washington, DC 20036

Michael C. Martinez, Esquire
Christina Coogle, Esquire
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Medha Raman, Esquire
Robert F. Kennedy Human Rights
1300 19th St NW
Suite 750
Washington, DC 20036

APPEARANCES: (Cont'd)

For the Defendant: Tiberius T. Davis, Esquire
Department of Justice
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001

Christopher R. Hall, Esquire
U.S. Department of Justice
Federal Programs Branch, Civil Division
20 Massachusetts Avenue, NW
Room 7224
Washington, DC 20530

Reported by: Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
333 Constitution Avenue, NW
Washington, D.C. 20001
(202) 354-3247

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription

INDEX

Witness Name Page
Nicole Barksdale-Perry
Examination By The Court .................................. 6
Direct Examination By Mr. Davis........................... 28
Cross-examination By Mr. Martinez ........................ 39
Ronald Sartini
Direct Examination By Mr. Davis........................... 83
Cross-examination By Ms. Gilbride ........................ 92

P R O C E E D I N G S

THE CLERK: This is civil action 25-1270, Robert F. Kennedy Human Rights, et al., versus U.S. Department of Homeland Security, et al.

Would the parties please identify themselves for the record, starting with plaintiff's counsel.

MS. GILBRIDE: Good morning, Your Honor. Karla Gilbride with Public Citizen Litigation for the plaintiffs.

THE COURT: Good morning.

MR. MARTINEZ: Good morning, Your Honor. Michael Martinez, Democracy Forward, for plaintiffs.

THE COURT: Good morning.

MS. COOGLE: Good morning, Your Honor, Christina Coogle with Democracy Forward for plaintiffs.

THE COURT: Good morning.

MS. RAMAN: Good morning. Medha Raman, Robert F. Kennedy Human Rights, for plaintiff Robert F. Kennedy, Jr.

THE COURT: Good morning.

MR. DAVIS: Good morning. Tiberius Davis on behalf of the United States. And with me is Christopher Hall from the Department of Justice and Renee Brown from the Department of Homeland Security.

THE COURT: All right. Good morning, everyone.

Mr. Davis, would you like to say anything? I'll give you the chance to speak throughout the hearing, but

before we get started on witnesses, is there anything you want to say in response to the TRO filed last night?

MR. DAVIS: Your Honor, I reviewed it this morning. I believe the legal issues and sort of disputes are still the same, so I don't think it changes a whole lot, but we can discuss those as we go through.

THE COURT: Okay. At some point I'm going to want to discuss with you, just so you know, the plaintiff's citation to 6 U.S.C. 452, which says that the Secretary of the Department of Homeland Security cannot abolish any office, et cetera, but I noted it also said "cannot abolish any function mandated by Congress," and I don't think we talked about that last time. So if we could talk about that later, that would be helpful.

MR. DAVIS: Absolutely.

THE COURT: Okay. So why don't we start with witnesses. Is Ms. -- sorry, I don't have the name handy.

MR. DAVIS: Barksdale-Perry?

THE COURT: Yes.

MR. DAVIS: How do you want to handle this, Judge, with directs and crosses?

THE COURT: I have a number of questions for the witnesses, so let me do that first. And then I, of course, will let you all ask whatever questions you want.

MR. DAVIS: Okay. The government calls

Ms. Barksdale-Perry to the stand.

THE CLERK: Good morning. Remain standing and raise your right hand.

NICOLE BARKSDALE-PERRY

called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

THE CLERK: Thank you. You may be seated.

THE WITNESS: Good morning, Your Honor.

EXAMINATION

BY THE COURT:

**Q.** Hi, ma'am, how are you?

**A.** I'm good, how are you?

**Q.** Thank you for working late last night. I understand, you know, sort of a fire drill got dropped on your lap. That was my fault. So I appreciate you working with counsel to sort of explain better to me what was going on with respect to the RIF notices that were filed.

And I've been through your declaration. And I understand your point that the reference to eliminating the offices was not sort of to be taken literally but more of a layperson's way of saying you all are being reduced and forced and we can't hire you back, essentially. That's my understanding of what happened.

**A.** Yes.

**Q.** Did you come up with the elimination language yourself, or did you get it from somebody? Or did you take it from the prior RIF notices? How did that come about?
**A.** The language contained in the reduction in force notice?
**Q.** Yeah, the question and answer to No. 44.
**A.** I would have to --
MR. DAVIS: The FAQ.
THE WITNESS: The FAQ.
**A.** Oh, you mean the FAQ. Yeah, the language --
**Q.** (BY THE COURT) If you could put the mic close to you since you're talking my direction.
**A.** I'm so sorry.
**Q.** You can move it. Yeah, it's just the court reporter needs it.
**A.** Okay.
THE WITNESS: Is this better?
THE COURT: Is that okay, Christine?
THE WITNESS: Apologies.
**Q.** (BY THE COURT) No, you're fine.
**A.** So the frequently asked questions were developed by my office, and the language was developed by my office.
**Q.** All right. And that was -- who worked with your office initially to say we're, you know, getting rid of these, you know, 300-plus people from the three offices we're talking about, which is CRCL, the CIS Ombudsman, and OIDO?

**A.** So the approval for the reduction of force within my department has to come from the secretary. Once I receive the approval package, then my office works to initiate the reduction in force actions and notices.

**Q.** Okay. What does that approval package look like? Would that have been a memo to you?

**A.** The approval package that goes up to the secretary was a memorandum indicating that the department would initiate a reduction in force, and it explains the three offices that are involved, the number of personnel, the functions of the office, and the manner in which a reduction in force would need to be carried out.

**Q.** Okay. And do you recall off the top of your head if that memo that you received or that document that you received discussed eliminating the offices?

**A.** I do not recall off the top of my head.

**Q.** You don't recall? You'd have to see it to remember?

**A.** Yes.

**Q.** Okay. All right.

Is it your understanding that the offices are being eliminated?

**A.** No, the positions within --

**Q.** The positions?

**A.** The GS positions within the offices were being abolished in accordance with the reduction in force procedures and the

notice that the employees received.
**Q.** Okay. And when you got the memo, the package of the reduction in force, I take it it didn't -- as I understand it, it didn't have a plan for rehiring? What did it say about refilling the slots?
**A.** I did not have the inform- -- I do not recall.
**Q.** You don't recall? Okay.
And your declaration says that because there's a reduction in force, once these people are fired, let go, that they can't be considered for rehiring. That's my understanding of one of the reasons that you used the elimination language?
**A.** The elimination -- well, the elimination language did not indicate within the reduction in force notice -- and, again, I would have to see it in front of me.
**Q.** Okay.
**A.** I do not recall that the notice indicated that the employees would not be able to be rehired.
**Q.** Okay.
**A.** I would have to see the notice.
**Q.** All right. So hold on.
**A.** Uh-huh.
MR. DAVIS: Your Honor, if I may, I think there's a difference between reassignment and rehiring. Is that --
THE WITNESS: That is accurate. Yes.

**Q.** (BY THE COURT) Oh, okay. Explain to me that difference to me.

**A.** So for reassignment, a reassignment means that we're moving an employee from one position to another position. Most often, those positions that the employee is being reassigned to has to be at the same grade, most often the same series position, and other prom- -- other personnel factors.

Rehired means that an individual, more often than not, has left the federal service, and they are applying for a position within the federal service, and they want to be considered for that position to be rehired into a position.

**Q.** So the individuals who are being let go today, if I don't do anything, are not eligible for reassignment but would be eligible for rehiring?

**A.** Yes.

**Q.** Okay.

**A.** They would be eligible -- once an individual has separated from the federal service, whether it's voluntary or involuntary, there are -- there is a potential for the individual to return to federal service, depending on how they separated, of course, so yes.

**Q.** So as I understand it, and I'll talk more about this with Mr. Sartini, there's a plan that has -- either is in place or might be in place, or there's some hope and desire that a handful of people will be -- that the offices will hire a

handful of people for each office. Is there a way that Mr. Sartini or somebody could easily go through the CVs of the people who are being let go and say, actually, I want to keep that person A, B, C?

**A.** So I don't have any information about the plan moving forward.

**Q.** No, I understand. From your --

**A.** Just in general.

**Q.** Right, right. I'm just asking from your role in human resources --

**A.** Yes, ma'am.

**Q.** -- is that something Mr. Sartini -- he come to you later this afternoon and say, you know what, I want to look at the CVs of the people that we're letting go, and I want to keep these 20 people. Is that something that he can do or no?

**A.** So in general, I can speak in general terms.

**Q.** Yes.

**A.** So in general, when an employee receives a reduction in force notice, which is an involuntary -- notice of involuntary separation, those employees become eligible for career transition assistance program.

**Q.** Okay.

**A.** Which means that if an agency has a vacant position for which they plan to recruit, the Agency must review and consider those employees first prior to filling the vacancy.

**Q.** Okay.
**A.** So upon notice, those employees that received reduction in force notices, they are automatically placed on -- we refer to it as a C-TAP list.
**Q.** Okay.
**A.** And if there is an availability of a position within the department -- I can only speak for headquarters -- within the department of headquarters, then the hiring official has -- must review that list first.
**Q.** Okay.
**A.** And also provide those individuals with notice that these positions -- that the Agency plans to fill these positions via a vacancy announcement and provide those individuals with an opportunity to apply. And then if they apply for those positions, they must be considered.
**Q.** Okay. That's incredibly helpful. Thank you.
**A.** Sure.
**Q.** So let's say I'm just -- this is a hypothetical.
**A.** Uh-huh.
**Q.** And I realize I'm not allowed to ask fact witnesses hypotheticals, but I'm the judge, so I'm going to.
**A.** Okay.
**Q.** But if you can't answer it, just let me know. Okay?
**A.** Okay.
**Q.** But just pretend that a plan is in place -- someone calls

you the second you get off of the stand and says, we have an approved plan in place from the Secretary of Homeland Security, and the approved plan is that we will hire 20 staff to fill the CRCL office. Does that make sense so far?

**A.** Okay. Hypothetically.

**Q.** Yeah, hypothetically. Yeah, I understand, you're not committing the government to anything. Don't worry. We're not going to charge you for 20 people's salaries.

So would it be my understanding that at that point, the --

THE COURT: How many people were let go from CRCL?

MR. DAVIS: 147, I believe.

**Q.** (BY THE COURT) So let's say there were 147 who were on the RIF for CRCL. If there was an authorization for those -- for 20 vacancies to open up today, is it my understanding, based on what you said, that what Mr. Sartini would have to do is first review applications from those 147 people, assuming they didn't do a voluntary departure, before he fills the spots with people outside of that group?

**A.** So, hypothetically.

**Q.** Hypothetically.

**A.** If my office received -- and normally, we would receive this through a recruitment action. So the office would submit a recruitment action, advise what type of positions the office plans to recruit for, and then, working with my office, we

would then determine how to properly -- working along with the hiring manager, of course, and the office head -- how to properly fill those positions.

Depending on the type of position, to include series and grade, my office would inform that office that we currently have a number of employees that are on the C-TAP list, that the Agency is obligated to notify the employees that these positions are available. The employees must apply for those positions and indicate their C-TAP eligibility. Those employees must be considered prior to the hiring manager filling that position with an individual outside of the C-TAP list.

**Q.** Got it.

**A.** Now, those individuals have to be -- so it's not an automatic.

**Q.** Right.

**A.** The individuals have to opt in, essentially. They have to be well qualified for the position, and again, the hiring manager would have to --

**Q.** Okay. Remind me what C-TAP stands for?

**A.** Career Transition Assistance Program.

**Q.** Got it. Okay.

When you say be considered, like what does that mean? Can Mr. Sartini just say -- just look at a person's name and say, yeah, I considered it, no?

**A.** Well, not the name. So we would provide the individuals' resumes as well.

**Q.** Right. I'm just asking, so what is -- can Mr. Sartini just sort of look at the resume for a nanosecond and be like nope, or what does considered mean?

**A.** So I can't speak to how the hiring manager would make the consideration. However, what my office would provide is any -- the resume of the employee -- it's for employees -- that based off of qualification review, which is done by -- 201, so a human resources specialist. A qualification review is done, cross-walked against the requirements of the position that's provided by the hiring manager. Normally, that's contained in a position description, and any other relevant documentation.

That information is provided to the hiring manager and indicated that these individuals, based off of a qualification review, are -- have been determined to be well qualified, they're on the C-TAP list. We would advise the hiring manager that you must consider these individuals prior to making a selection outside of the C-TAP list.

**Q.** And on average, like are we talking that takes weeks, months, days? From the moment you get notice that these vacancies are available, how long would that take?

**A.** So our time to hire is 115 days.

**Q.** Okay. So you would fill the vacancy within 115 days?

**A.** That is the goal.
**Q.** Okay. What if we had a unique situation --
**A.** Uh-huh.
**Q.** -- where we had just let go 147 people who were in the office, and 20 of the spots were being reopened, let's say, for more or less the same work, for some of them. Is there an easier sort of shortcut where Mr. Sartini can say, I just want the keep these 20 people?
**A.** There -- keep the 20 people that received the reduction in force notices?
**Q.** Well, everyone received the reduction in force -- the 150 would receive the reduction in force notice.
**A.** Yes.
**Q.** But since he wants to -- since he wants 20 spots working, can he just go to those 150 people and say, I want just these 20, A through whatever number 20 is on the alphabet?
**A.** Well, hypothetically.
**Q.** Hypothetically.
**A.** If the individuals have not been separated. So once they're separated, then there's another process for employees that have been involuntarily separated. However, prior to the employees being separated, they are on the C-TAP list, and a hiring manager has the ability to indicate that they want to place these employees, well-qualified employees, in a position --

**Q.** All right.
**A.** -- within the organization.
**Q.** Okay. I had a feeling that's what you were going say. All right. So the separation time becomes important --
**A.** Yes.
**Q.** -- for Mr. Sartini's ability to act?
**A.** Well, for any hiring manager's ability.
**Q.** Yes, okay.
**A.** And then for any employee.
**Q.** All right. I thought I saw in your declaration, you were talking about sort of the time for separation and --
MR. DAVIS: I think it's paragraph 6.
THE COURT: All right. Thank you, Mr. Davis.
MR. DAVIS: Let me see. 8.
THE COURT: Yeah, 8.
**Q.** (BY THE COURT) All right. So is it the case that we have a little bit more time than I thought? Because in paragraph 8, you say, "As matters stand now, my team is preparing to submit Standard Form 52 documents to separate most of the employees from the three offices." And by most, we're talking about 99.9 percent or so, for the record. "The effective date of separation will be May 23rd, 2025. However, because these separation forms must be submitted to the National Finance Center for processing, along with the employees' final timecards, the relevant paperwork for these

separations will not be submitted until June 4, 2025. Up until that date, my office can place a pause on these separations."

So do I understand, then, that if, let's say, I order you, on June 2nd, 2024 [sic], to put a pause on the separations, you could still do that, put a pause on the separations, and at that point, we would have sort of the more streamlined of that where Mr. Sartini could say, I want these 20 people who are on C-TAP back?

**A.** So it depends on -- oh, sorry.

**Q.** No, go ahead.

**A.** It depends on how the -- depends on the language in the order and in the pause. So my office has until essentially June 3rd. I said June 4th because that is the absolute date --

**Q.** Sure.

**A.** -- like processing all personnel actions that are pay impacting. So essentially until June 4th, because that's within the declaration, my office has the ability to pause the -- to initiate processing, the separation actions for the employees whose separation date is May 23rd.

**Q.** Okay.

**A.** After that time, my office would initiate in order to ensure timely submission --

**Q.** Sure.

**A.** -- of the separation action along with ensuring that the employees no longer receive salary payment after that time.
**Q.** Sure.
**A.** June 4th would be the cutoff. So up until that point.
**Q.** Right. But so if on June 3rd, Mr. Sartini -- if June 2nd, give you like some time --
**A.** Uh-huh.
**Q.** -- Mr. Sartini came to you and said -- identifies 20 people that he wants their separations paused because he wants to keep them, he wants to take them off the RIF, he can do that?
**A.** I would have to look into that, the manner in which that would need to be done.
**Q.** Okay.
**A.** But now --
**Q.** I'm sorry. If I ordered it, you could do it?
**A.** Well, if I'm ordered to do it, then --
**Q.** Yeah, I --
**A.** I mean, I don't mean to --
**Q.** No, no, I understand. I totally hear you.
Here's the bottom line. I am trying to figure out how much time I have to ensure that an efficient plan is being put in place and Mr. Sartini has to put an efficient plan in place without having to rehire people.
**A.** Yes.

**Q.** So my understanding, on hypotheticals, and you'd have to look into it more, but my understanding is, is that we have, you know, a little bit more than today?
**A.** For the personnel processing action.
**Q.** Yes.
**A.** So essentially, the notices that the separation is supposed to go into effect May 23rd.
**Q.** Uh-huh.
**A.** Now, the actual processing of it in the finance systems, which will result in a final personnel record, my office has until June 3rd -- essentially, June 4th would be the cutoff date in order to submit those personnel actions to the National Finance Center for processing and application. So it's sort of a two-step process.
And then the second piece of that, of course, is ensuring that their time and attendance is properly coded so that it shows that this is their final time card. So all that has to be done within a certain amount of time. And right now, my team is on track to initiate the actions for January 4th.
**Q.** Okay. So let me maybe -- I think I understand. I think the answer to my question is about to be, I'd have to look into that, which is fine.
**A.** Yes, uh-huh.
**Q.** Let's say there are 125 people in a different office. Let's just like --

**A.** Okay.
**Q.** The Guillermo office. Guillermo is my clerk. The Guillermo office has a reduction in force of 50 people, and it's the -- they've had their 60-day notice and they're being separated as of May 23rd, and you're putting in all the paperwork for that to happen that you've talked about. And let's say, Monday -- let's say, Wednesday, so May 28th, Guillermo changes his mind, and he wants to keep 10 of those people. He's like never mind on the first ten, I don't want them actually to be separated. At that point, you could stop the separations in the processing?
**A.** So there would be two pieces to that; right. So I would, of course, need to determine how -- I would first need to determine how Mr. Guillermo would want to -- how he has identified those individuals, what positions the individuals, of course, would potentially be placed in because of the way that the reduction in force notice indicated with the positions, and then that's what I would have to look into.
**Q.** Okay.
**A.** Because again, right now -- so right now, those individuals are on a C-TAP list.
**Q.** They're on a C-TAP list right now?
**A.** They're on C-TAP -- yes, they go in the C-TAP list, initiation of the reduction in force notice, and they're on the list throughout the notice period.

**Q.** And I understand that this is all hypothetical, and I understand you don't want to tie down the Agency. But so far as I'm hearing it, if we do something, let's say before June 3rd, we're not going to have to go through a new process that's going to take us 115 days. It's going to be like much more streamlined, potentially?
**A.** I would have to look into that.
**Q.** Okay. All right.
When you say you'd have to look into that, what would you look into?
**A.** So I would have -- so again, it would depend on how the hiring official -- how they identified these individuals, what positions these individuals would potentially go into, because the C-TAP allows the Agency to place individuals within vacant positions prior to, you know, if they determine the vacancy announcement throughout headquarters.
**Q.** Got it. So he'd have to sort of, say, come to you with like, I have 20 vacancies for data entry people, I need 20 data entry people, here's the vacancy, here's the level, here's the salary, here's the requirements. Of the people who are being severed, separated, I've identified 20 people who have the right qualifications by reviewing everyone's CVs, and here's the 2 -- we have 20 vacancies, and here's the 20 people I want based on a review of CVs. Then those people could sort of more quickly come off and be put into those spots?

**A.** So in general terms --
**Q.** Yes.
**A.** -- the C-TAP list does afford hiring managers with a more streamlined approach to filling vacant positions.
**Q.** Got it. Okay.
So the 300-plus individuals who are being separated as of today will be on the C-TAP list?
**A.** They've been on the C-TAP list.
**Q.** They will continue to be on the C-TAP list until June --
**A.** Until -- no, they'll continue to be on the C-TAP list until the date of separation, so May 23rd for some. There are a handful that didn't -- I'm sorry, their separation date is after May 23rd because they did not receive their notices the same day as the majority of the others.
So you remain on the C-TAP list throughout the notice -- what we refer to the notice period. Once the separation occurs, then you -- the employees, if they opt in, are then placed on the reemploy priority list.
**Q.** Okay. Shoot, because now what I thought I understood I no longer understand.
So what's the June 4th date allow you to do up until that date?
**A.** So the June 4th date is a processing date. So you have the reduction in force notice, you have the effective date of the separation. So that essentially is a personnel action.

It's an involuntary -- essentially an involuntary separation. So that is a -- that's a personnel action.

The personnel action must be placed into our financial systems in order for there to be a resulting what we refer to as a Standard Form 50. So the final personnel action that shows that the employee was subject to a reduction in force, is no longer employed by the Department of Homeland Security at headquarters.

It also allows -- also we have to stop the salary payment, so that also has to be done. So we have to submit another action to ensure that the sal- -- within our time and attendance system, that indicates that May 23rd was the final day of regular duty or, in this case, the employees are on admin leave, but paid duty status, to ensure that the employees no longer receive salary payment after today.

So essentially, those two -- they're two separate systems. Those two systems have to align in order to ensure that the resulting action is the involuntary separation from service.

**Q.** Okay. So can you -- so in paragraph 8 -- and if you need to look at it, I have it here in your declaration -- you talk about relevant paperwork for the separations will not be submitted until June 4, 2025. I understand it's June 3rd. Then you wrote -- write, quote, Up until that date, my office can place a pause on those separations. What does pause

mean?

**A.** So as far as the processing.

**Q.** But they're still separated, it's just they're not going to be processed out of the system?

**A.** So the reduction in force notice has to indicate a date, right, an effective date. Then that is what, as HR specialists, we use in order to initiate a personnel action.

So everything -- essentially, the majority of movement within the federal government as an employee is tied to a personnel action. So -- and that personnel action is reflected in your official personnel folder. The SF 52 initiates the personnel action, whether it's pay impacting or non pay impacting.

**Q.** Okay.

**A.** And that has to be input into our financial system within a certain time frame.

**Q.** Okay. So here's like bottom line what I wanted to know. Maybe I'm -- I don't do any HR. I've literally had two jobs my entire life, and this is one of them. So -- I guess technically three, three jobs. I want to figure out if it's possible to not do anything today to stop these separations from going into effect, but make it such that Mr. Sartini can rehire people off of a list as quickly as humanly possible if he chooses to do that. How do I -- is that possible?

**A.** So I would --

**Q.** Do you need to look into it?
**A.** Well, it -- so if you're asking about the -- as far as the time line, so the processing is -- when I said I could pause the action, I would -- that meant the processing piece --
**Q.** Right.
**A.** -- of the action. Otherwise, up until a potential order is given or a different decision is made, my office would continue to move toward processing the action.
**Q.** Let's say I ordered you to pause the processing on Wednesday. Right?
**A.** Yes. Prior to the --
THE COURT: Don't freak out, Mr. Davis.
**Q.** (BY THE COURT) Let's say I asked you to put a pause on everything. You get an order on Wednesday saying put a pause on these separations. Are these people now just like in legal HR limbo, or can Mr. Sartini say, I want 20 of these people back, or you don't know, and that's totally fine.
**A.** I do need to look into it.
**Q.** Okay.
**A.** Because the reduction in force notice indicates that the separation is May 23rd, so that is what initiates the personnel action. So essentially, that is the effective date.
**Q.** Right, right.
**A.** The personnel action is the record of the Standard

Form 52, and then the resulting Standard Form 50 is a result of the personnel action.

**Q.** If I entered an order today that said I want you to extend the effective separation date of these employees until June 4th, what kind of chaos would that create for you, if any? Like what actual burden would that -- and I don't need you to pay these people in the interim, but I just need them not to be separated.

**A.** Nothing -- so I wouldn't refer to it as chaos, but I would need to look into, okay, so in what manner are we carrying these individuals, because right now -- so currently, they are being carried in a paid administrative leave status up until the date of separation.

**Q.** Could they be put on an unpaid administrative leave status?

**A.** No, administrative leave is a paid status.

**Q.** Okay. So what's an unpaid status?

**A.** For example, leave without pay would be --

**Q.** Right. Could we put them on leave without pay? What would it take to do that?

**A.** So it would just take an authority right now advising that these individuals would need to be placed in a leave without pay status until such time as --

**Q.** Okay. And if they were placed on a leave without pay status, and Mr. Sartini goes through the CVs and determines, I

want these 20 people back, I don't want them to be separated, can he just do that? Would that be simple, if I gave you the vacancy and the thingamajig? You would need to look into it?

**A.** Yes.

**Q.** Okay.

THE COURT: Okay. I think that's all I have for right now. But, Mr. Davis, do you have any questions? I'll let the plaintiffs ask questions.

MR. DAVIS: I guess --

THE COURT: And then we may be at the end of this situation where I will want her to look into this. I'm just trying -- but I'll have an argument with you about that later.

MR. DAVIS: Okay. Would it be helpful to give some of her background, or are you sort of good on all that front?

THE COURT: No, she seems quite credible and qualified to me. I mean, if plaintiffs want to get into it, but I trust -- she clearly knows what she's talking about.

MR. DAVIS: I'll ask just a couple questions.

THE WITNESS: Sure.

DIRECT EXAMINATION

BY MR. DAVIS:

**Q.** Did anybody tell you to use the language of dissolution or eliminate in any of these documents?

**A.** I was not told to use language of dissolution in the documents.
**Q.** And did anybody tell you that the offices themselves were going to be dissolved or eliminated?
**A.** Not the offices, no, the positions.
**Q.** And the purpose of these documents is to convey that to the employees?
**A.** Which documents?
**Q.** The RIF notice and the FAQ.
**A.** Yes.
**Q.** Okay. And is there a distinction between the positions and the offices in your mind?
**A.** Yes.
**Q.** And what is that distinction?
**A.** The distinction -- the reduction in force notice as well as the frequently asked questions were meant to convey to the employees that were subject of the reduction in force that their positions were being abolished, not that the offices were being abolished or dissolved.
**Q.** And is the importance of that the fact that they can't be reassigned?
**A.** Yes. It has to do with the competitive area, which is a part of the reduction in force procedures.
**Q.** So what are the competitive areas here?
**A.** So the competitive areas for this particular reduction in

force were the independent offices. So CRCL, that was a competitive area, CIS OMB was a competitive area, and OIDO was a competitive area. And so that --

**Q.** Is that why those offices were listed in the same sentence as elimination or dissolve in some of these documents?

**A.** Well, the employees that were a part of those offices, their positions were being abolished as a part of the reduction in force.

**Q.** And does that mean that these offices can't carry out their statutory functions in the future?

**A.** No.

**Q.** And does it mean that there can't be new positions created for these offices?

**A.** Yes, uh-huh.

**Q.** Or yes --

**A.** The existing --

THE COURT: He was -- why don't you re-ask it.

**Q.** (BY MR. DAVIS) Does the elimination of the positions that currently exist mean that news position cannot be created going forward?

**A.** No, the positions, as they existed with -- at that time were being abolished.

**Q.** And what about future positions? Can new ones be made for these offices?

**A.** If the department determines that that is the plan, yes.

Q. You said 115 days. Is that required by statute for new hires, or is that just sort of the average processing time?
A. That is the average processing time.
Q. Is there any way to prioritize if the department wants to prioritize hiring certain people?
A. Yes. There are means to streamline the recruitment hiring and onboarding process within the department.
THE COURT: That's what I wanted -- good question, Mr. Davis.

EXAMINATION

BY THE COURT:
Q. Tell me about that. What are ways to streamline?
A. So there are various ways. So, hypothetically.
Q. Hypothetically.
A. If a hiring manager has identified a -- what I normally refer to as a vacant funded position within the organization for which they want to recruit, normally, my office would promote noncompetitive means to hire, to find well-qualified individuals to fill those positions.
There are those that we have to do first, which are the C-TAP. Depending on if the position -- if the hiring manager wants to hire outside of the department, there's the re-employed priority list, and those are -- it's a list of displaced employees. So again, that's another means for streamlined hiring, because those individuals have been

displaced, and the Agencies are required to consider and hire those well-qualified individuals first.

There's also Schedule A. Those are individuals that have qualifying disabilities. We can noncompetitively hire those individuals.

On average, if we were to go the noncompetitive route, we normally have been able to EOD from the initiation of a recruitment action -- entry on duty -- in about 90 days.

**Q.** So if we just took people off C-TAP, that would be about 90 days?

**A.** Yes.

**Q.** Is there any way to speed that up, or that's just sort of what it takes?

**A.** That's sort of what it takes. So again, there are other pre-employment factors that are outside of HR's control.

**Q.** Yeah, okay.

THE COURT: Okay. All right. Thank you, Mr. Davis.

DIRECT EXAMINATION (CONT'D)

BY MR. DAVIS:

**Q.** What about people already within DHS? Is it fast --

**A.** Yes.

**Q.** Can a manager transfer people between offices?

**A.** Yes. So reassignments are also another means to fill vacant positions as well.

**Q.** And I think as we may have found out, can that happen relatively fast?

**A.** Yes.

**Q.** And how about detailees? How fast can detailees be --

**A.** Detailees, another opportunity to fill vacant positions as well, so it's not -- so details are not permanent. Depending on the type of position, details should only be about 120 days. If it needs to be longer than 120 days, then, normally, the office should think about hiring for a permanent position.

**Q.** It can be extended beyond 120 days?

**A.** Yes, it can be extended beyond the 120 days if there is a business need.

**Q.** Okay. How long can it be extended? One year, two years?

**A.** No, I don't believe -- no, it's not the one to two years. I believe it can be up to six months, but I would have to -- oh, I'm -- I would have to confirm.

**Q.** Okay. On the June 3rd, June 4th date --

**A.** Uh-huh.

**Q.** -- if there was a pause, would it be easier to sort of undo the RIF or the separation than it would be afterwards?

**A.** Absolutely. So if there was an order to pause the involuntary separation date, we -- it would be better or easier, I should say, and I hate to say it that way, but it

would be easier from an administrative perspective for my office to receive that order prior to June 4th.

After June 4th, the actions would have already been processed -- the actions would have already been processed, and then we would have to -- it would be quite an administrative feat in order to determine how we would return the employees to federal service. And essentially, we would have to do a series of corrective actions to return the employees to federal service and to essentially place them back on our records.

EXAMINATION

BY THE COURT:

**Q.** And how difficult would it be -- maybe you've already told me that you'd have to look into this, but how difficult would be to place -- I understand some people have voluntarily left. Forget those people.

**A.** Okay.

**Q.** The people who are being involuntarily separated as of today, how complicated would it be to put them, instead of as separated today, today, put them on unpaid leave?

**A.** So it's essentially an administrative action to place them in a leave without pay status. That's --

**Q.** So you could like do that with a few clicks of the keyboard or -- I mean, I understand not just that, but it wouldn't be sort of a day's process; you could do that today,

if need be?
**A.** So I would need something in writing to indicate that the employees would be placed in a leave without pay status, and then I would need to know the date and for how long. Because once we need to process the final personnel action and then once we need to pro- -- I'm sorry, process the final timecards, right now, we have that these individuals are being involuntarily separated.
**Q.** Got it.
**A.** So if, hypothetically, we were told to pause until --
**Q.** Say two weeks.
**A.** Yeah, and nothing were to occur, then we would move forward with the original involuntary separation action.
**Q.** Oh, so you could put them on unpaid leave today and if I wanted them on unpaid leave for two weeks, you would just continue as you were, but instead of being separated as of today, they would be unpaid leave as of today?
**A.** So, hypothetically --
**Q.** Hypothetically.
**A.** -- I would need to be ordered to do that.
**Q.** Let's say -- let's say DHS, in its wisdom, decided that this was a good idea, and you got an order from somebody or from me today, saying instead of these people being separated as of today, we want them on unpaid leave for two weeks. If that were to occur, you could continue all the processing

you're doing right now to get them final payment as of June 4th, instead of not being C-TAP eligible for that time period, they would be C-TAP eligible for that time period?
**A.** So I would need to determine how long the C-TAP eligibility would remain in effect.
**Q.** Okay.
**A.** And whether or not the -- if they were in an unpaid status beyond the initial 60-day notice, whether or not that C-TAP eligibility would remain after today, because today is the effective date of the separation. So I would have to look into whether or not they would continue to keep that eligibility --
**Q.** Okay.
**A.** -- after the initial separation date.
**Q.** Because my understanding is that the C-TAP is sort of the key of making this go more streamlined; right?
**A.** Well, that is one way.
**Q.** One way.
**A.** As far as trying to fill any position within --
**Q.** Right.
**A.** Within DHS headquarters, yes.
**Q.** Okay.
THE COURT: Okay. All right.
DIRECT EXAMINATION - CONTINUED
BY MR. DAVIS:

**Q.** I know you're not a lawyer, but in your sort of work and long career as an HR person, are there any sort of requirements for putting people on unpaid administrative leave that would have to be met?

**A.** So, administrative -- so leave without pay, separate and apart from administrative leave.

**Q.** Yeah, sorry.

**A.** So, normally, leave without pay is an employee requested and a supervisory approved status. We don't normally place an employee in a leave without pay status. One, because there are not only pay implications, compensation implications, depending on how long that employee is on a leave without pay status, there's also implications to their benefits. So right now, these employees are in a paid status, even though they're on administrative leave, and right now, they have access to their full benefits. Time in a leave without pay status for a certain period would impact their benefits. The exact impacts I would have to research, but I do know that there would be an impact.

**Q.** And then some people voluntarily took the -- what is it, the WTP?

**A.** Yes, the Workforce Transition Program.

**Q.** And how many people have taken that so far?

**A.** We -- we have had approximately 102 employees, what we refer to as opt in to the department's Workforce Transition

Program.
**Q.** Do you expect that all those will be approved?
**A.** So all of the employees that opted in were approved to -- and the Workforce Transition Program is the opportunity to voluntarily separate. So all of those employees have been approved to voluntarily separate. And so now we are in the process of the employees need to sign their agreements and then once they sign their agreements, they're placed on administrative leave, just another type of administrative leave, up until their separation date.
**Q.** I'm trying to understand the C-TAP thing a little bit.
**A.** Sure.
**Q.** Right now, is there anybody else on C-TAP?
**A.** Yes. I'm sorry.
**Q.** No --
**A.** So when you say right now, is there anyone else on C-TAP --
**Q.** Other than the employees who are RIFed for these offices.
**A.** I would have to look at the C-TAP list to determine if there are other employees on the C-TAP list, but I know that for headquarters, we do have the employees that received reduction in force notices. They are on the C-TAP list.
**Q.** I understand you'd have to look, but what sort of situations would other employees be on the C-TAP list?
**A.** Displaced employees. That's how you become eligible for

C-TAP, is when you receive the reduction in force notice.
**Q.** And if there was any desire to hire anybody on the C-TAP list, the same process would sort of apply even if they weren't from these offices?
**A.** Yes, if they were on the C-TAP list, the hiring manager would have to consider those employees on the C-TAP list prior to attempting to fill that vacant position with another qualified candidate that's not on the C-TAP list.
MR. DAVIS: No further questions, Your Honor.
THE COURT: All right. Thank you, Mr. Davis.
Plaintiffs, any cross?

CROSS-EXAMINATION

BY MR. MARTINEZ:
**Q.** Good morning, Ms. Barksdale-Perry. How are you?
**A.** Good morning. How are you?
**Q.** I'm okay.
So a couple of questions here. So you are the executive director and CHICO; is that right? Are you the CHICO?
**A.** No. So I'm the executive director for human resources management and services office of the chief human capital office.
**Q.** I see, not the CHICO.
**A.** Yes.
**Q.** How long have you been in that role?
**A.** Since March of 2021.

**Q.** And before that, you were the deputy director?
**A.** Yes.
**Q.** And this has coverage, I'm assuming, for all of DHS; right? It's not just for parts of it?
**A.** No, just headquarters. So my office services headquarters only.
**Q.** Okay. So you talked a bit about this memo you received that kicked off this RIF process. Do you recall that?
**A.** I recall the memorandum.
**Q.** Yes. When was that? When did you first see it?
**A.** Prior to the initiation of the RIF. I do not recall the exact date.
**Q.** Sometime before March 21st?
**A.** Yes.
**Q.** And do you know what kicked off that memo? Was it an executive order by the President?
**A.** I do not know.
**Q.** In your time in the office of the CHICO, how many RIFs have you seen?
**A.** None.
**Q.** So this year the first time you've seen a RIF?
**A.** Yes, for -- well, first time I've been involved in a reduction in force, yes.
**Q.** And have you heard of RIFs at DHS before these?
**A.** No.

**Q.** So it's safe to say they're pretty rare?
**A.** Yes.
**Q.** When DHS sent OPM -- I'm sorry, are you familiar with DHS sending to OPM, the Office of Personnel Management, a list of employees that would be subject to a RIF?
**A.** No, I'm not familiar with that.
**Q.** Are there any other offices at DHS that are currently subject to a RIF?
**A.** Not to my knowledge, but again, I only service headquarters.
**Q.** Right. In headquarters, the only offices that are subject to RIF are these three, the CRCL, OIDO, and the Office of the -- the CIS Ombudsman; right?
**A.** Those are the only three offices that received reduction in force notices.
**Q.** Okay. A few questions about the RIF process itself generally, and then we can get into more of the specifics.
**A.** Okay.
**Q.** So my understanding is that the RIF process is quite voluminous. Have you seen 5 CFR 351, the actual OPM RIF regulations?
**A.** I've seen the CFR, and yes, I've seen the OPM guidance, yes.
**Q.** It's pages and pages of regulations?
**A.** Yes. Yes.

**Q.** Yeah.

There's a part you mentioned before, the competitive area. Can you describe a bit more what that means? What is a competitive area?

**A.** So essentially, the competitive area -- the competitive area is a process where the Agency has determined that particular offices and/or positions are similar enough in nature that should there be a reduction in force, that the -- there is an opportunity for employees to compete for vacant positions that remain after a reduction in force. So that's essentially, in laymen's terms, that's what a competitive area is.

**Q.** And the Agency has discretion on how to set that competitive area?

**A.** The competitive areas are set, and then the Agency determines, in advance of a reduction in force, how the competitive areas will be set during the reduction in force.

**Q.** Who sets the competitive area?

**A.** The competitive areas are set at the headquarters level. They were set prior to me assuming the role. So the competitive areas had been set prior to me assuming the role, so I don't know who set these.

**Q.** And the competitive area can be bigger than a single office; is that right?

**A.** Yes.

**Q.** The decision here, I'm assuming, was made to have three competitive areas all encompassing a single office?
**A.** Yes.
**Q.** Is that how you understand it?
**A.** Uh-huh.
**Q.** If the competitive area was bigger, for example, hypothetically, if it was all of HQ, then the employees who are in these offices, would they have had rights to potentially be reassigned into HQ anywhere?
**A.** Well, so it depends on the type of -- if there are vacant positions available when the reduction in force is initiated, there is a potential for re- -- what we refer to as reassignment rights, bump and retreat rights. Depending on the individual's length of service, Veteran's preference status, their performance rating, they're set on a retention register, there's a determination. It's quite involved, but short answer is yes.
**Q.** Right. And once they're on this retention register, they're grouped into tiers; is that right?
**A.** Yes, uh-huh.
**Q.** How many tiers are there? Do you know?
**A.** It depends on the reduction in force.
**Q.** And what's the function of these tiers in your mind?
**A.** I'm sorry?
**Q.** What is the function of these tiers? Why are they tiered

in that way?
**A.** So they're tiered in order to determine placement and priority. So essentially, if, you know, number -- if you have a certain number of years of service, Veteran's preference status, again, also using performance rating, then the tiers, based within -- based within the tier and the positions that are available that you would qualify for, then, essentially, the employees compete for those vacant positions, but it has to be within that tier.
**Q.** So if I were a hiring manager and I wanted an employee from a tier 3, I would first have to go through tiers 1 and 2 to get to that employee?
**A.** Essentially, hypothetically, yes. The tiers -- and it also depends on the -- so that's -- again, it depends on the type of position for which you are trying to pull qualified positions. And also the Agency would then first, of course, try to determine what vacant funded positions would be available that we could potentially place these employees into once they compete.
**Q.** Have you seen the RIF regulations about status during a notice?
**A.** Yes, uh-huh.
**Q.** Do you know what the default status is during a notice during a RIF?
**A.** The default status is for the employees to be -- to remain

in a paid status.
**Q.** On duty?
**A.** On duty, regular duty status.
**Q.** Do you know why the employees here were taken off duty?
**A.** They weren't -- so they're still in a paid status. They're just on administrative leave.
**Q.** Admin leave?
**A.** Yes.
**Q.** Is there any limit to the admin leave with paid status?
**A.** There are various limits to administrative leave depending on the reason for the employee being placed on administrative leave.
**Q.** You -- in your declaration that -- you discuss the use of the word "dissolution," and you say you developed that those FAQs; is that correct?
**A.** Yes. Well, not me personally.
**Q.** Yes, your office did.
Does that -- those FAQs go through some clearance process outside of your office?
**A.** We received guidance on the FAQs; not necessarily clearance, guidance.
**Q.** Did you receive it from the Office of General Counsel, for example?
**A.** Yes.
**Q.** Did you receive it from the Office of the Secretary?

**A.** No.
**Q.** Any other offices involved in the FAQ clearance process?
**A.** No.
**Q.** The -- I guess the term "dissolution" has an actual effect in the regulation; is that right?
**A.** I would have to honestly look at the regulation. I don't recall off the top of my head.
**Q.** Fair enough.
The RIF notices themselves included competitive areas, as we said, that say the CSRC --
**A.** CRC.
**Q.** Yeah, the Office of Ombudsman or OIDO, and because they were being dissolved, the individuals had no abilities to compete within those offices; is that right?
**A.** Well, so the offices were not being dissolved or abolished. The positions themselves were being abolished.
**Q.** Every single nonSES position?
**A.** Yes.
**Q.** So when the notices say that the competitive areas that are the offices are being dissolved, is that incorrect?
**A.** I'm sorry?
**Q.** Is that inaccurate?
**A.** The notices say that the competitive area was being dissolved or that the -- I would have to see the notice, because the -- I do know that the reduction in force notice

indicated that the positions were being -- that their positions were being abolished.

**Q.** I believe the -- and we can confirm this -- that the offices were listed as the competitive area.

**A.** Uh-huh.

**Q.** That the employees were told that because the competitive area would be dissolved, they had no ability to compete within those offices --

**A.** Yes.

**Q.** -- for retention; is that correct?

**A.** Because within the competitive area are the positions. So the competitive area for each office was the office. And so since all the GS positions, nonSES positions within that organization were being abolished, there was not an opportunity for compete or bump and retreat because of no positions. Those positions were being abolished within that office, within the competitive area.

**Q.** Right.

So is it your take that the dissolution of the offices of the competitive level has a legal effect?

**A.** Well, I mean, the entire process is, of course, legal. The competitive area, again -- and when -- the communication to the employees was that their positions were being abolished and that the competitive area had been set, and the competitive area was that particular office that they were

assigned to and that the positions within that -- the GS positions within that office were being abolished.

**Q.** Changing gears for a second, the offices -- the positions in the offices will be dissolved today; is that correct?

**A.** The reduction in force indicated that the positions were being abolished, and the employees would be separated from those positions and separated from federal service effective today. The majority of the employees.

**Q.** So after today, you have to recreate these positions within these offices in order to refill them?

**A.** The positions have been abolished. I do not have any information about the future state of the offices.

**Q.** Do you know if DHS has started the process to create these offices anew after today?

**A.** You said "anew"?

**Q.** Yeah, to renew them.

**A.** I do not have any information about the future state of the offices. I am involved in the reduction of force process for the positions and the employees.

**Q.** So safe to say that after today, there should be a process to re-create the actual position in order for it to be refilled?

**A.** So there's a process for filling positions within the -- you know, the federal government and specifically within DHS. I do not have any information about the future state of the

offices. I am focused on the positions and the reduction in force process.

**Q.** Let me ask you, is there currently a federal hiring freeze?

**A.** I don't know if there's a federal hiring freeze. I know that there was a -- I know that there is a hiring freeze in effect for -- at least for DHS headquarters.

**Q.** Is there still a hiring freeze for DHS headquarters?

**A.** The hiring freeze, from what I understand, does not -- and it was recently extended, and it does not expire until, I believe, it's either June or July.

**Q.** Is when the hiring freeze expires, June or July?

**A.** Yes, uh-huh.

EXAMINATION

BY THE COURT:

**Q.** Hold on. Hold on. Does that mean DHS can't even hire anyone until June or July?

**A.** So the way that the hiring freeze was implemented, essentially, the way that it was written, was that for every four individuals that leave, you can onboard one once you've determined that that position is required. However, there is a process, of course, every -- well, there is a process, of course, for requesting an exception to -- for that particular 4-to-1 process.

**Q.** By the way, I'm sorry how long have you been in HR?

**A.** Since 1996.
**Q.** Oh, wow. How long you been in the federal government?
**A.** Since 1996.
**Q.** Where did you start?
**A.** Legacy U.S. Customs Service.
**Q.** Then have you been in DHS since it was created?
**A.** Yes.
**Q.** Have you ever seen a situation in which all positions in an office were dissolved?
**A.** All po- -- I've never been a part of a RIF from either side, so no.
**Q.** Have you ever seen -- have you ever heard of like every office -- every position in an office being dissolved?
**A.** No, huh-uh.

THE COURT: Okay.

CROSS-EXAMINATION (CONT'D)

BY MR. MARTINEZ:
**Q.** You mentioned a waiver process.
**A.** Uh-huh.
**Q.** Who does that waiver go to, the request?
**A.** I don't -- the waiver goes up through the human capital, the deputy human capital officer for the department in order to be reviewed and then a decision is made.
**Q.** Does that go to OPM?
**A.** I do not know. I don't have any information about that.

**Q.** So you don't know if OPM or some other agency has a say in the waiver for the hiring freeze?
**A.** For the hiring freeze for headquarters?
**Q.** Yes.
**A.** For the hiring freeze for headquarters, I do not know if OPM has any involvement.
**Q.** Do you know if the Department of Government Efficiency has a part of the process for the waiver?
**A.** I do not recall.
**Q.** So if employees are separated today from service --
**A.** Uh-huh.
**Q.** -- the hiring freeze would impact how fast they are brought on?
**A.** So there is a hire -- there is a hiring freeze in effect. However, there's also a process for requesting an exemption to the hiring freeze, so, essentially, to the 4-and-1. And that is separate and apart, of course, from what we're talking about today. That has been in place for -- since March 14th, is when the process was stood up for offices within headquarters, because I can only speak to headquarters can request an exemption.
**Q.** Fair enough.
This 4-to-1 exception, who does that go to?
**A.** To request an exemption?
**Q.** Yes.

**A.** So for me, for my knowledge, it goes up through the deputy chief human capital officer, and that's -- that's my knowledge, is that that's where we would have to send those.

**Q.** And that's where the final decision happens for the exception?

**A.** I not know if the deputy chief human capital officer has the final decision.

**Q.** After today, these employees are separated. Is that considered a break in service?

**A.** Yes, they are no longer federal employees. So yes.

**Q.** And if they were to be brought on, just hypothetically, a week from now, would they lose any accrued rights? Would they become probationary employees, for example?

**A.** So it depends on how -- so if they are involuntarily separated, it would -- for any federal employee, once you leave the federal service -- and for instance, for example, if you retire, so if you voluntarily separate and you retire and you choose to re-enter federal employee, you become a re-employed annuitant.

THE COURT: You become a what?

THE WITNESS: Re-employed annuitant.

THE COURT: Okay.

THE WITNESS: Because you have separated from federal service; you have retired.

**A.** For individuals that have been involuntarily separated,

they could, in fact, return to the federal service. And it depends how they are returning to the federal service, under what appointment, and that would dictate how they are not only brought on but what status they are carried in.

They've already satisfied a probationary period, so for that particular -- the majority of them for that particular position. So if they were brought into a position under an appointment authority that required a probationary period because they have never served in that particular role, then yes, they could, in fact, be considered a probationary employee. However, they may not be -- they're not considered the same type of probationary employee as an individual with no federal service.

**Q.** (BY MR. MARTINEZ) Have you -- are you aware of any exemptions that have been done to this 4-to-1 requirement?

**A.** I do know there have been approvals, yes.

**Q.** There have?

**A.** Because unless -- my office has to receive the document of the approval prior to moving forward with any recruitment action, so I do know there have been approvals.

**Q.** How long does that process take from request to approval?

**A.** That, I do not know, because the requests do not come from my office. We only receive the approval.

**Q.** But it takes some time, a few days?

**A.** I cannot answer that question.
**Q.** In your declaration on paragraph 8, I think we've gone through this, it says, up until June 4th, 2025, you can place a pause on the separations; is that correct?
**A.** Yes.
**Q.** Is it possible that the Agency could request that you speed that up, that you do it sooner than June 4th?
**A.** It just has to be done -- so if I receive an order from the Agency, of course, or the Courts, of course, I will comply. But I mean, I would just need to know what action would need to be taken.
My office is already preparing those Standard Form 52s in order to be prepared for, of course, the processing for June 4th. Because there are a large number of employees, it's essentially a manual process, so it's -- we have to start preparing in advance.

EXAMINATION

BY THE COURT:
**Q.** So let me ask you this question, and I might have already asked it, so I apologize. If I enter an order saying I need the separation date of today extended for two weeks, so people continue to be put on administrative leave and I don't want them separated for two weeks, what kind of work would that create for you all? Like how easy or simple would it be -- how easy or difficult would be to effectuate that?

**A.** So right now we would just stop the prep work. So, essentially, we would just -- so right now we are ensuring that the Standard Form 52s are properly coded and ready for initiation -- initiating, excuse me, the personnel action in our financial systems.

We are also -- because they are a large number of employees, the individual time and attendance records, we also need to ensure that we flag that May 23rd is the final date.

**Q.** Okay.

**A.** So that would -- that's the largest part of it right now. Essentially, all it would be, quite frankly, is to stop the prep work.

**Q.** So if the administrative leave were extended by two weeks, you would presumably send out a notice to the employees, but that's all you would have to do?

**A.** We would need to -- we would have to notify the employees.

**Q.** Right.

**A.** Now, if it's -- if the two weeks -- and I don't have a calendar in front of me, but if the two weeks extends beyond the processing date for when we have to have timecards, especially for the timecards, we have to have the timecards validated and certified, then those are what we refer to as -- those are pushed down to the National Finance Center, and they will start processing, which means that the employee would be in a paid status, and the employee would receive full salary

for the entire two-week period.

**Q.** Got it.

**A.** Whereas, with the reduction in force, they're only scheduled to receive salary for, essentially, this week, which is the first week of the pay period.

**Q.** Okay. So other than the cost of two weeks salary for the employees, though, this wouldn't create like -- you wouldn't have to move mountains to get this done, you would just stop what you were doing --

**A.** If it's before.

**Q.** If it's before, what, June 3rd?

**A.** June 3rd is preferable. June 4th, the reason I say June 4th is June 4th is the last date, essentially, that we would need to ensure that a personnel action not only is processed but applies to the system before we would have to go back and make corrections.

**Q.** So what would happen if you got an order from me today saying that the separation dates needed to be extended to May 30th? That would -- for say one week. You would give a notice to the employees?

**A.** Uh-huh.

**Q.** They would get an additional week's salary?

**A.** We would prep the personnel action. So yes, they would be -- depending on what the order said, the employees would be carried in a paid administrative leave status up until the

date of the order.
**Q.** The 30th?
**A.** Then but if the order indicated that the separation date was the 30th, then my office would still -- because it's within the same pay period, so my office would still have to initiate those personnel actions by the 4th.
**Q.** Oh, so it wouldn't really change your work at all?
**A.** I don't have a --
**Q.** Yeah, sure.
**A.** I'm sorry.
**Q.** So the 23rd is a Friday, so the 30th is a Friday, and the 4th is a Wednesday.
**A.** So the 23rd is today and the 30th is next Friday?
**Q.** Friday.
**A.** So that's within the same pay period, because there are two weeks. And because it's pay period 10, we would still have until the 4th in order to -- so we would still -- then the date, essentially, would change for the reduction in force involuntary separation from the 23rd, through the 30th. And we would then -- that, of course, then we would need to ensure that all of those actions are input.
**Q.** But that wouldn't delay your work at all; right? I mean, other than putting out a notice, it wouldn't delay your work?
**A.** Not delay. It would just mean that we have a short time

frame to make sure that the actions are properly coded, input into the system, and that they not only process but that they properly apply to the system. So we would have, essentially, only, what, that Monday, Tuesday, and Wednesday, essentially.

**Q.** What if like I extended the separations until the 25th?

**A.** Of?

**Q.** So next Wednesday.

**A.** So it's the same --

**Q.** But would four days give you enough time to do the coding that you're talking about?

**A.** Yes.

**Q.** Yes. All right.

**A.** The coding -- so the coding will be done. I mean, we have to complete the coding.

**Q.** Let me ask it to you -- let me maybe do this differently. If I enter an order -- if I enter an order today saying I want these separations halted, I don't want the separation date to be today, I want it to be until some point next week, what is the latest I could make the separation dates that wouldn't materially negatively impact your ability to do the coding and everything correctly by the 4th?

**A.** I would say up until the 3rd, quite frankly.

**Q.** The 3rd?

**A.** Yes. So the way that it works is that the 4th --

**Q.** I'm sorry, but I thought you told me that if I put it to the 30th, that would only give you two days?

**A.** It gives me the Monday and the Tuesday.

**Q.** That would be enough time?

**A.** That would be sufficient.

Now, this would be all of us, of course, ensuring that each of these individual records are properly coded for the separation.

**Q.** Right.

**A.** But it is more about ensuring that we have properly coded actions, personnel actions in general, prior to the processing date. And that's just in general.

**Q.** So but if I -- let's say I extended the separations until the 29th. You would have Friday, Monday, Tuesday. That would give you enough time?

**A.** That would -- I mean, we would have that time in order to ensure proper coding for the separation actions, yes, for time and attendance.

**Q.** Okay. All right. That's helpful.

And during that time period, people would be on C-TAP?

**A.** They would -- I would need to confirm if they would remain on C-TAP prior to the initial May 23rd separation, because the C-TAP applies during the notice period. And so, essentially, the 60-day notice period ends today.

**Q.** Right. But if I gave you an order to extend the notice

period as well, then they would be on C-TAP?

**A.** I would have to look into that, quite frankly.

**Q.** How long would it take you to do that?

**A.** I would need to -- I don't -- I can do it if ordered. I can do it now, look into it and --

**Q.** Okay. Well, hold off on that.

**A.** Okay.

THE COURT: Go ahead.

MR. MARTINEZ: Just a few more questions.

THE WITNESS: Sure.

CROSS-EXAMINATION (CONT'D)

BY MR. MARTINEZ:

**Q.** Without a court order, kind of going back to the June 3rd date, is it possible that you could be ordered by the secretary's office, for example, to submit the paperwork that we're talking about sooner than June 4th?

**A.** I'm sorry. I'm not understanding the question.

**Q.** I'm wondering if June 4th is the outer boundary here, because you say up until that date you can place a pause, but could you complete the process sooner? Could you be ordered to do it sooner?

THE COURT: Basically, could the secretary call you and say, I want the separation date today and I want all the paperwork done by Tuesday or Wednesday. I don't want you taking until the 4th; I want it all done immediately?

THE WITNESS: If I'm ordered to do so by -- I mean, hypothetically.

THE COURT: Hypothetically.

**Q.** (BY MR. MARTINEZ) If it's physically possible to do it?

**A.** Yeah, I mean, of course, it's physically possible. I don't believe that there's anything preventing my office from initiating the action in the system, but the system is not going to process that action until that particular day.

THE COURT: Got it. Okay.

**Q.** (BY MR. MARTINEZ) I think you've answered this, but so everything we process on the 4th, it's not on a rolling basis or in tranches; everything would happen on the 4th?

**A.** So it's -- I mean, they're systems, right, so we initiate the personnel action -- and this is just in general. So we initiate the personnel action in the financial system and then the system processes those actions the next day, quite frankly. We are provided with a read out, again, all personnel actions, to determine whether or not the personnel action applies.

So that's why I said it was a two-step process. Receive confirmation that the personnel action applied to the system, that personnel action will be in effect. So the involuntary separation will be in effect, it will result in a permanent Standard Form 50, which is the personnel action.

We also would need to confirm that the time and

attendance had not only been validated but certified. Once certified for the separation date, which is May 23rd, we would need to ensure that that is complete as well, so that the employees are not in a paid status after the 23rd.

So those two separate systems, and those systems have to align in order to ensure that a personnel action is properly effected.

**Q.** I want to walk through, I guess, the hiring process just to make sure I have it straight. So if there's no order today, at the end of the day, the positions that we talked about will be abolished; is that right?

THE COURT: I think she said they've already been abolished.

Right?

**A.** The positions?

**Q.** (BY MR. MARTINEZ) Have already been abolished?

**A.** Yes, uh-huh.

**Q.** If there's a retention register and if the offices wanted to hire from that retention register, they would first have to create a new position in that office, in one of the three offices?

**A.** So there would need to be -- I would need to look into that, because the positions have -- the positions have been abolished. So I would need to look into if there's any adjustment to the process that is already in place and is

essentially set to take effect today.
**Q.** And there's currently no process that's currently happening to make those positions starting back up tomorrow or after today to recreate the positions?
**A.** I'm not involved in the future state of the offices. I am involved in the reduction in force process now.
MR. MARTINEZ: Can I have 30 seconds just to --
THE COURT: Yeah, sure, of course.
**Q.** (BY MR. MARTINEZ) I take it you're not involved in the creation of -- you have not been, in the past, involved in the creation of new positions. Would you be involved in this -- with the creation of these new positions, or would you not have a role in these either?
**A.** Hypothetically, if an office wants to recruit for a position, then my office is involved from the recruitment, hiring, and onboarding perspective. So hypothetically, yes, my office would be involved.
**Q.** And I guess my last question is, do you have any estimate how long it takes to create a new position in headquarters?
**A.** To create a new position or fill a vacant -- so to fill a --
**Q.** To create a new position?
**A.** No, I do not have an estimate of how long it takes to create a new position.
**Q.** Thank you.

**A.** Of course.

THE COURT: All right. Mr. Davis, any redirect?

MR. DAVIS: Really brief, Your Honor.

THE COURT: What's that?

MR. DAVIS: Really brief, Your Honor.

THE COURT: Yeah, sure. Come on up.

REDIRECT EXAMINATION

BY MR. DAVIS:

**Q.** So we were talking about the process of pausing things and sort of extending administrative stay of the employees, right. About how much staff would it take you to sort of do that pause and then restart it when it needed to be restarted?

**A.** So right now, I have three -- I have three staff members currently developing the SF 52s. I would still need those three to continue. And then there would be additional two to three on my payroll and processing side, so total of six.

**Q.** And what proportion of your office is that?

**A.** I oversee 72 employees, but -- but the payroll and processing side, I only have -- I have less than 10 employees.

THE COURT: But I thought -- sorry, maybe I misunderstood. I thought you told me if the separation was only until next Thursday, they basically would be doing the same thing. Would you need extra staff for that?

THE WITNESS: So it's same -- it's the same -- I

thought he asked me --

THE COURT: I think he wanted to know -- basically, he wants to know if I order this to continue to Thursday, is that going to make it so that you have more work to do such that you will need to bring more staff in than you would bring in had I not extended things. Does that make sense?

THE WITNESS: Yes. So potentially, and the reason I say potentially is because what I would -- quite frankly, what I would do is I would ensure that I have only senior members working on the coding to make sure that we make the deadline.

THE COURT: Okay. But it's not going to make or break the work of your office.

THE WITNESS: I mean, we would -- quite frankly, we would adjust. If I'm ordered, we would adjust.

**Q.** (BY MR. DAVIS) And would that adjustment take away from other important tasks?

**A.** So we're responsible for any and all pay impacting actions for headquarters personnel, personnel actions. So yes, I don't have a specific number, but that would mean that I would be pulling senior level employees from other personnel and pay impacting related activities in order to ensure that we meet the deadline, if we're given a very short time, yes.

**Q.** And I know you're not a lawyer, but from sort of a HR perspective, are there any other requirements to extending an

administrative stay with pay?

**A.** I would have to receive an order to extend.

**Q.** Are there any sort of like resulting consequences from extending that, like other than you just keep paying them?

**A.** We would continue to pay them now -- there has already been a decision and coordination that the employees would essentially stop being paid as of today. There would need to be, I'm assuming, a discussion about, if they're going to remain in a pay status, whether or not that has been considered. Because essentially, we've already -- there's been a determination that the employees are no longer going to be paid after this particular day.

The employees have also been informed and if they remain in a paid status, should not have any impact to their benefits, but if they are not going to be in a paid status, I think you mentioned leave without pay, then there is a potential impact to the employees' benefits.

**Q.** What sort of impacts, if you --

**A.** So the Agency, of course, the Agency pays a portion depending on the type of claim, of course, and it is very individual to the employee. And benefits is not my specialty. But there is a potential to impact the employees' benefits when you're in a nonpaid status after a certain amount of time. Because the Agency pays a portion of those benefits, and the employee pays a portion of those benefits. And by

agreement, it's because you are in a paid status because you are a federal employee. After a certain amount of time you're not in a paid status, there is that potential to impact negatively.

**Q.** So if the payments are ending today, would there be any work in sort of having to restart those payments for next week?

**A.** So we would need to ensure -- because when any type -- when you have -- whether it's a voluntary separation or an involuntary separation, when you submit the actions, of course, there are other organizations that are notified that these particular actions are taking place, of course.

So we have to ensure that, of course, depending upon the type of action, OPM does receive notification, the employees are expected to notify their benefits provider as well that they will be in a nonpaid status effective X, Y, and Z date so they can start planning.

If, in fact, that date adjusts, then the employees would need to provide notification to their -- to the health care providers. Again, it's a very individual process.

EXAMINATION

BY THE COURT:

**Q.** So let me ask you this question, sort of get to the heart of the matter. Maybe this will be a better way for me to ask it. Let's say that as of yesterday, you had gotten an order,

so before anyone separated, you had gotten an order saying stop the separations, I want them paused. I want the separation date moved out by two weeks. So they're not going to be separated until June 15th. Let's say you got that order yesterday. Let's say you get the same order Monday, after they've been separated. What is the difference with respect to how quickly new positions could be opened and filled based on those two time lines? Like does it make any -- basically, here's what I want to know. With respect to how long it will take to create new positions and fill them, does it make any difference whether the people have been separated as of today or not?

**A.** Well, if they're -- if the office wants to create new positions, they can create the new positions.

**Q.** I mean -- in terms of -- I'm talking about length of time to get them filled?

**A.** So it depends if they're -- if the office wants to fill those positions via the streamline method, and they want to consider -- hypothetically, and they want to consider individuals that are currently on the C-TAP list, as far as I know now, the C-TAP, that expires today, May 23rd. If the employees are, in fact, separated, then they go on to another list, if they opted in, and that's the re-employed priority list.

**Q.** So what's the difference in terms of timing and how long

it would take to fill a position from C-TAP versus how long it would take to fill a position from the re-employed list?
**A.** So the noncompetitive hiring, which would include C-TAP, normally we can complete those actions within 90 days.
**Q.** Okay.
**A.** The 115 days is normally our competitive process.
**Q.** That would include the re-employed part?
**A.** The re-employed priority list. So the hiring manager must first consider the re-employed list. If they want to -- if they find individuals they believe, in coordination with my office, are qualified, then that could potentially be a more streamlined method and shorten the 115 days to fill that position.
But there are, of course, circumstances outside of my control --
**Q.** Sure.
**A.** -- because at that point, now the individual is no longer a federal employee.
**Q.** Got it. But so we're talking basically, on average, hypothetically, a difference of 25 days to fill a position from C-TAP versus from re-employed.
**A.** Yes.
**Q.** Got it.
THE COURT: Okay.

REDIRECT EXAMINATION (CONT'D)

BY MR. DAVIS:

**Q.** If you -- you might not know this, and that's fine if you don't, but do you know about how much the salaries of all these employees would cost for another pay period?

**A.** No, I do not know that.

**Q.** If somebody is RIFed from a competitive area, and they're on C-TAP, and they're attempted to be hired back to that competitive area, would that violate the RIF?

**A.** I would have to look into that.

MR. DAVIS: I think we should maybe talk about that in a bit, Your Honor.

THE COURT: Yeah, yeah.

EXAMINATION

BY THE COURT:

**Q.** And just one more question.

**A.** Sure.

**Q.** Whenever a lawyer says one more question, it's at least 10, but I will try to keep it to one.

There's nothing else that could be done as of today to speed up the process; right? There's no way to make the C-TAP for the re-employment process shorter?

**A.** As far as the employees' rights to be placed on either list?

**Q.** In terms of how fast the positions would be filled.

**A.** So the C-TAP, the way that I understand it now, the C-TAP ends once the employee is separated.
**Q.** Sure.
**A.** So they have C-TAP eligibility through the notice period.
**Q.** Forget about today.
**A.** Okay.
**Q.** Forget about this issue.
**A.** Yes. Okay.
**Q.** Forget about this case.
**A.** Uh-huh.
**Q.** In general, let's say someone goes to you and says, I have ten individuals on a C-TAP list. I know it usually takes 90 days for the positions to get filled with those ten people, but I want to do it ASAP. Could that be possible, or no, you're kind of sort of stuck with that average time?
**A.** No, no, not necessarily we're stuck with -- that's just our average time for noncompetitive hire.
**Q.** Right.
**A.** But hypothetically, if a hiring manager says that I have a vacant position, of course, we would say, well, we know that there are employees on the C-TAP list, we would need to notify these employees of this vacancy. The employees would have to, of course, apply for it.
So baked into that, normally, if we were to announce a

position, normally, positions are announced for at least five to seven days depending on the area of consideration. Those employees would have to essentially say, yes, I want to apply for that position. If they show up on what we refer to as a certificate of eligibles, if they show up on a certificate of eligibles, we've highlighted their C-TAP, the manager would take a look at those employees first. And then they would -- the manager has the opportunity to determine qualifications, if they're well qualified. If they want to select them, they can select them.

So, essentially, we have the list of individuals that are C-TAP. Once the -- once we have been notified that there is a position for which they want to apply, so then you have to bake in that five to seven days, the employees have to opt in, and then the qualification review, quite frankly, and this -- if we're advised that we need to ensure that this is done within a certain amount of time after that vacancy closes, we can accommodate streamlined rehiring in certain cases.

**Q.** Got it. Got it.

**A.** We try not to make it a habit.

**Q.** Understood. Understood.

And that would be the same if from the C-TAP list or the re-employed list, right, you could do that quicker -- quickly, if necessary?

**A.** So the RPL list, again -- so the RPL list would not only

include just DHS headquarters.

**Q.** Right.

**A.** The RPL list also includes other federal employees that have been displaced.

**Q.** Understood. But if -- do you still keep it up for five or seven days' notification, and you can streamline it if the manager comes to you and says we need this done quickly?

**A.** Yes.

**Q.** Yes.

THE COURT: Great. Thank you.

MR. DAVIS: No further questions, Your Honor.

THE COURT: All right. Mr. Davis, would you be amenable to her checking whether or not the individuals will remain on C-TAP if the separation date was paused or extended into next week?

MR. DAVIS: Yes, we can ask. I think the -- doing this with a C-TAP could violate the RIF, is my concern as a legal matter.

THE COURT: Even if we just extended the RIF?

MR. DAVIS: I think -- my understanding, and I am not a RIF expert. I'm learning this like as we sort of go, is that if somebody was RIFed from a competitive area and they're on C-TAP, it would be a violation of the RIF to put them back and rehire them. If they're separated and then they're rehired sort of separately through the normal process --

THE COURT: But if they're on a RIF and I extend the end date of the RIF, they would still on the RIF and then it would be a violation to hire them from that C-TAP list?

MR. DAVIS: I think so.

THE COURT: Okay. Is that something that we can figure out?

MR. DAVIS: Yeah.

THE COURT: Okay. All right.

Ma'am, you've been incredibly helpful.

THE WITNESS: Thank you.

THE COURT: Thank you. I don't think that we're going to need to be in touch with you today, but could you just make sure to be available in case one of the attorneys needs to talk to you?

THE WITNESS: Okay.

THE COURT: Thank you very much.

THE WITNESS: Thank you very much.

THE COURT: Yeah, yeah, you're done. Thanks.

We've been going an hour and a half. Why don't we take a 15-minute break. We'll come back and we'll talk to Mr. Sartini who is back with us. All right. Thank you, everyone.

(A recess was taken.)

THE COURT: Mr. Sartini, you're up, sir.

RONALD SARTINI,

called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE CLERK: You may be seated.

EXAMINATION

BY THE COURT:

**Q.** Mr. Sartini, on a scale of 1 to 10, how excited are you to be here?

**A.** Nine and a half.

**Q.** All right. I'm only at a 5, so.

All right. You met with Mr. Hemingway yesterday?

**A.** Yes.

**Q.** Can you tell me first how long you met?

**A.** About 45 minutes.

**Q.** And can you tell me what time of day you met?

**A.** Probably between 11:00 and 1:00, 11 a.m. and 1:00 p.m., somewhere midafternoon.

**Q.** Okay. Was there anyone else in the meeting with you other than Mr. Hemingway?

**A.** No.

**Q.** And I don't need to know everything that you discussed. I understand that he set out the plan that you all have?

**A.** Yes.

**Q.** But my main concern with the plan, other than the regular concerns I have about firing everyone and then rehiring random

people, is it said that it was a plan, but I never saw that anything was approved. So has the plan in his declaration been approved?

**A.** The plan, as I explained it to him, and I reviewed his declaration, it's essentially the plan that he and I discussed, yes. He loved the plan. He said let's start ASAP.

**Q.** So like you don't need further approvals?

**A.** No.

**Q.** So it's an approved plan?

**A.** Yes.

**Q.** All right. That's good. Thank you.

Then let me ask you sort of a couple of questions about the plan. My second main concern with the plan in terms of things that I can be worried about is the timing. And you were here for my discussion with Ms. Barksdale-Perry. So as I understand it, part of the plan involves sort of creating some new positions, I think two or three at two of the offices and 20 at CRCL?

**A.** Yes.

**Q.** And let me just say that I think the plaintiffs are right to raise and be concerned about, you know, basically getting rid of every position and then sort of re-creating things somewhat from scratch. I'm not sure that I can do anything about that. But I can assure myself that the timing is

realistic. And so can you just tell me based on what you heard, you know, earlier and your own views as to how long it would get -- it would take to be staffed up. And I'm particularly concerned about your deputy. I understand Mr. Hemingway is going to be the Acting --

**A.** CRCL.

**Q.** -- CRCL. When did he get put in that position, by the way?

**A.** Yesterday, I believe.

**Q.** Yesterday? Okay. Was it yesterday morning, afternoon or evening?

**A.** I don't know.

**Q.** Okay. Had he been in that position by the time you met?

**A.** Yes. So it was probably the morning by the time we met.

**Q.** Okay. So we have one more office to fill, OIDO?

**A.** That's been filled as well.

**Q.** That's been filled.

**A.** Yes.

**Q.** Great. Okay. So we have the three offices -- officers?

**A.** Yes.

**Q.** Okay. And I understand the declaration, that some contracts have continued. And that was consistent with your testimony.

And let me just ask you first sort of what are your plans for the hiring -- for creating the new positions and the

hiring for those positions? And in your answer, I'm quite interested in -- you know, there are people in these offices who I understand have been there for years, if not more than a decade, who I understand not everyone was aces, but clearly, a number of them would be, just that's what you would expect from federal government workers. And I assume you don't want to lose all of that experience. And so my first question is sort of what's your thought process for, A, creating the positions, how long that might take, and then, two, for filling those positions?

**A.** Right. So the contracts and the detailees are stopgaps like today, right now. And then for creating new positions, once there is the authority to do that, which we have the approval to do it, I assume that the RIF process has to play out, and that's a more detailed HR question, but I have the authority to start hiring into newly created positions as soon as I wish to.

And so I heard my colleague's testimony. The 90 or 115 days, that is under the normal standard.

**Q.** Right.

**A.** I have already received approval from Mr. Hemingway, who is also the principal deputy chief of staff of the department, to not be subject to the hiring freeze. So he's already waived --

**Q.** Great.

**A.** -- so that hiring can happen. That's taken care of.

I know from having been the chief of staff of the Office of General Counsel, I have asked my colleagues' boss, the chief human capital officer, to conduct hiring actions and onboard individuals within one pay period. That's two weeks.

**Q.** Okay.

**A.** Every time, he has done it.

**Q.** Okay.

**A.** So it is possible. And then, of course, the process has to play out, but they can do it within two weeks if directed to do it.

**Q.** And when you said you have approval for the positions but you need authority, I don't think I -- I don't understand the distinction.

**A.** Right. Well, I'm not totally clear on the distinction. It's more this issue of not violating the RIF.

**Q.** The RIF. Oh, I see.

**A.** Right. Yeah.

**Q.** All right. Got it. But that's out of your control?

**A.** Yeah.

**Q.** Okay.

THE COURT: All right. Mr. Davis, you and I will talk about that later?

MR. DAVIS: Yes.

THE COURT: Okay. All right.

**Q.** (BY THE COURT) And the individuals who are being separated today, could they reapply for those positions?
**A.** Yes.
**Q.** All right. And do you have access to like their CVs already or their reviews or their, you know, peer -- like do you have a way to figure out who is exceptional and who wasn't, or who was exceptional and who you might want to rehire?
**A.** Yes. I don't have it in hand but if I ask the office of the chief human capital officer, I would want their resumes and their performance reviews from the last year. I could obtain them.
**Q.** Okay. And I take it you didn't know -- or let me ask you in a nonleading way. Did you know about the language in the Q and A?
**A.** No.
**Q.** Fun surprise for you when you got home -- when you got back to the office?
**A.** Yes.
**Q.** Yeah. Okay.
And where are you in your process of searching for and finding a deputy?
**A.** I've already been in touch with the office of the chief human capital officer. I have submitted to -- the position description to them, which is the first step in getting a

posting out. They're reviewing the classification for it to see if it fits all the legal requirements, and they're working on the job announcement, which is the posting that you would see if you went on USA Jobs and has all the details of the position. So we should be able to have that out probably Tuesday.

**Q.** Okay. How long have you been in the federal government? I'm sorry, you told me and I forget.

**A.** 16 total.

**Q.** In all that time, have you seen a situation in which all positions of an officer were dissolved?

**A.** I have not been personally involved. I know such RIFs have happened at Veterans Affairs, for example, but not at DHS.

**Q.** Okay. Recently, or back in time?

**A.** Throughout, because their workload goes up and down, unfortunately, as wars are conducted, but it's been throughout.

**Q.** Okay.

THE COURT: All right. Mr. Davis, do you have any questions? Those are my questions, I think. Let me just double-check.

MR. DAVIS: I'll ask a few if you're done, Your Honor.

THE COURT: What's that?

MR. DAVIS: I'll ask a few if you're done.

THE COURT: Yeah, just one more.

**Q.** (BY THE COURT) So I think plaintiff's concern is all great what you're saying but how do I actually have confidence all this is going to happen and in a timely and effective way. So what can you do to alleviate my concerns? I don't think you're going to alleviate theirs, but you might alleviate mine.

**A.** Right. I have been tasked to figure out how we're performing the statutory functions of these offices. Every time I've ever been given an order from a superior, I've done it in my career. I plan to do it here. No one has told me anything other than that. Like we're going to do a head fake to do it and not do it, no, we are doing it. For at least CIS OM, I will be held accountable for performing those functions and I will.

**Q.** All right. Do you know the name of the individual who's been put in OIDO?

**A.** Yeah, Mr. Joseph Guy, G-U-Y.

**Q.** Okay. And do you believe him to be qualified for the position?

**A.** Yes.

**Q.** All right. And I take it, if I asked for biweekly status reports, that's something that wouldn't be too much of a burden on you?

**A.** No.
**Q.** Okay.
THE COURT: All right. Go ahead, Mr. Davis.

DIRECT EXAMINATION

BY MR. DAVIS:
**Q.** Mr. Sartini, let's start a bit in the past. When were you asked to sort of reconstitute these offices?
**A.** Around the time that the RIFs -- RIF notices went out, very close in time, maybe the same day, day after.
**Q.** Okay. Did anybody at the time say that these offices were going to be completely eliminated?
**A.** No.
**Q.** Okay. So could you talk specifically about your plan for CIS OM, since you're in charge of it?
**A.** Yes.
**Q.** Sort of your next steps?
**A.** Sure.
So as I had mentioned before, details or covering as a stopgap right now. So I already put a detail solicitation out on the intranet within the department. I've already received several applicants s for that detail, all of whom, at a minimum, meet the requirements for what I'm looking for. And as soon as I have an opportunity, I will be contacting those individuals to do a quick interview and then we would seek to onboard them within a pay period.

**Q.** Can you -- sorry, if you have more to add, please continue.

**A.** Right.

So then I continue to work the queue. And I've already had a third meeting with USCIS to discuss what will be in the forthcoming report to Congress to talk about what I've already seen in the queue of inquiries that come into the ombudsman's office and to figure out where they want to receive them. Because there have been a lot of changes at USCIS, the previous protocols used in the last administration are changing. Now they would like to receive them in a different way. So even if I were sending those inquiries over to USCIS, I would have been sending them to the wrong people. So now I have the right individuals to be sending them to. And I've got a bunch ready to go over, and they'll be going over depending what time I get out of here, today or maybe next week.

**Q.** And how long does it take you to create new positions?

**A.** If instructed to do so by leadership, so I am in a department leadership position, if I tell the chief human capital officer, I need these positions created within two weeks or within a pay period, I think they can get it done. I mean, they would probably have to do some work on their end. It's not the normal process, but they have done it, and they can do it within a pay period.

**Q.** If you don't know this, this is fine, but can you create new positions while the RIF is still in place, like before it's finalized?

**A.** That, I don't know.

**Q.** Okay. And about how many people do you plan on staffing at CIS OM?

**A.** CIS OM, I think the right number is somewhere around five to seven with an additional report writer and then detailees filling, so maybe eight government employees and then detailees and potentially leveraging existing contracts from elsewhere, which I can do.

**Q.** And what are some of those contracts you can leverage for the work?

**A.** So right now, CRCL, they're housed under CRCL, but they're not exclusive to CRCL if we ask them not to be. There are casework and investigation-type contracts, and so it may be as simple as a contract modification, which is something that usually takes a week or two, to say, you do this kind of investigative work for us or casework or queue triaging and now we want you to do the same type of work for this type of queue. And there are already extensive SOPs in the office's files that have been transferred over to me, and there would be a training period and, say, you see this type of complaint or question, here's how you would handle it, here's how you prioritize, et cetera.

**Q.** And how does your plan for staffing compare to the staffing levels historically in the office?

**A.** So it winds up not being that much lower. It may be around 50 percent lower. So we had talked about there is 40 -- around 40 employees by the time of the RIF notice. But that is not historically where that office was staffed. It was usually around 20 throughout most of its 20-year history, 20 FTEs, full-time equivalents. So given that the workload is expected to half, and the statistics bear that out from last year, having roughly half the staff to me seems reasonable.

**Q.** I guess you anticipated my follow-up question. How -- can that staff handle what last year was 24,000 complaints, at least reviewing them?

**A.** Well, so five to seven probably can't fully review 25,000 complaints, but again, we're not getting 25,000 questions or inquiries this year. Because I can see the trend line from what we've already received given that we're midyear now, I think, at most, we would receive 12,000, and many of those have already been worked from when the staff was there prior to the RIF.

So at this point, we're looking at a much smaller universe, several thousand, maybe five or six thousand more. And it seems like a staff of five to seven, even without contract support, could work them. And so, yeah, they could handle the workload that we're anticipating, not a workload

for a year that is in the past.

**Q.** So what about for future years, if the workload increases what are your tools to handle that?

**A.** Well, so always contracting and always detailees. And if the appropriation authorizations are there in terms of funding, you can staff up.

**Q.** And how about CRCL, what's the plan for CRCL?

**A.** So the plan, as I briefed it to Mr. Hemingway, and that he approved, is we think the right number there is about 20 investigators and then another report writer. So that's about 21. Plus there would be a CRCL officer and a deputy officer. And my understanding from the prior leadership is those two executives, one has oversight over the EEO process, and the other one is the CRCL officer. So that's total FTEs 23ish, 24.

**Q.** And how do those levels compare historically to staffing?

**A.** So that's lower. So in recent years, they grew to about 118. But they were not historically at 118. I'm not entirely sure. It's not quite -- it's not easy to reconstruct those numbers, but I know that there was a growth of at least 30 or 40 in the last three or so years. So it's maybe a quarter of where they were previously.

**Q.** How about for a staff that were focused on the complaints?

**A.** For the staff that did casework, it's actually the same number. I think that is the core function of the office, is investigating cases and complaints that come in. They had 20 or so assigned to that core work. I think that number should probably be left intact. And again, they would have contract support and detailees.

**Q.** How about the last office, OIDO, what's the --

**A.** So OIDO, they had, I believe -- so there's the two parts of OIDO. There's the casework as it came into headquarters and then there's the facility inspections. They had something like 10 to 15 facility inspectors. I think the right number for that is probably one to two given the number of facilities they inspected per year.

Again, looking at that and having spoken to outgoing leadership, I think there is inefficiency and gaps there in performance. And I'm not understanding why one or two individuals can't inspect 20 or so facilities a year, and I think we will probably do quite a bit better than that.

For the casework side, there, it seemed that the headquarters element had about 10 to 15 individuals. I think if you staffed it with five or seven and then again, detailees to help plug the gap, potentially contracts, you can do the work that the prior staff was doing.

**Q.** And how does that compare to staffing levels historically?

**A.** So it's lower in the total count, quite a bit lower, but depending on the historical, so we talked about this a little bit. The office is only three years old. For the beginning, and I don't quite know how long, they only had three employees. And there was the understanding that the office was intended to be small. And then within the last two or so years, they grew from three to 118. So it's kind of hard to put an average on where they were historically.

**Q.** Can I just get some clarity on how old the office was. It was established in 2019?

**A.** Yeah, it was written into law in 2019, but they did not start in earnest until, I believe, 2022.

**Q.** Okay. And how about the sort of on the ground in the detention facility people that we talked about last time?

**A.** Right. So that remains a question that I think Mr. Guy will have to look into. Where I landed on that was the contract had gross mismanagement, in my estimation, and there were a lot of problems. And there may be some value to putting individuals in detention facilities, but how that gets done needs to be looked at. That may need a new contract. Perhaps that gets hiring. Perhaps that becomes a collateral duty assignment of some kind, like a rotational detail for a corps of individuals who want to do that work. That needs some re-examination.

THE COURT: Do you have a sense -- and I understand

this is a difficult question to answer. Do you have a sense how long that will take to figure out?

THE WITNESS: I mean, it will fall to Mr. Guy to do that. I think that's probably months. I don't think that's an easy one to solve.

THE COURT: Okay.

**Q.** (BY MR. DAVIS) Has Mr. Guy been -- because I know he wasn't at the meeting. Has he been briefed or told about this plan?

**A.** He's been appointed. He knows he's been delegated the authority but that's all. I have not been able to speak to him yet.

**Q.** Okay. Let's talk a little bit about the deputy ombudsman. When did you first learn he was transferring positions?

**A.** So that notification came in to me only through our court proceedings. I still have not received any formal notification that he has been transferred. When I spoke to him Tuesday night of this week, he said, yes, I've been at USCIS. Since Monday, they told me to come and start working here ahead of any formal personnel actions and so I went. And so that's when I learned of it, was Tuesday night.

**Q.** And how long were you sort of aware that there were conversations about his possible transfer?

**A.** As I testified Monday, we had been discussing the leadership of these offices being moved, or what they would be

doing as next actions in their careers, for -- since the RIF notices went out. So about two months. And I had spoken to the deputy and said, look, you have an impeccable reputation, I would be happy if you stayed. He did a phenomenal job transitioning work over to me in those two months, but I understand if you don't want to stay or if you want to do something different. He had been there four years. And he told me he would be happy to do anything, but if a opportunity came, he would probably take it.

**Q.** So it was a voluntary transfer?

**A.** Yes.

**Q.** Okay. And you mentioned that you had already sort of put in to fill this position?

**A.** Yes.

**Q.** And do you know -- have an estimate about how long that might take?

**A.** I suspect we can get it filled within a pay period. Again, HR is moving very, very fast because I've asked them to. The competing of it is what could take longer. That's for me to receive resumes and review them and interview everyone. But -- so like an actual start date is maybe a month out. But it could be as soon as a pay period, two weeks.

**Q.** If the RIF is finalized and the current employees are terminated, could you rehire them into positions if you

thought that they were a good fit?

**A.** Yes. And they would have, to my understanding, re-employment preference to be hired, which is different than C-TAP. I know it's similar but not the same. But they do have some type of preference.

**Q.** Okay. And can you tell the Court a little bit about what is happening with the CIS OM work right now as it currently stands?

**A.** Yes.

I'm writing the report. And then having spoken to USCIS yesterday, we're in a very good place. I now have everything I need from them to finish this report. There was some data points they owed my predecessor. I now have that information. So I have what I need to finish writing the report.

As I've said before, the queue that I'm triaging and working through, I have buckets now categorized, and I'm ready to start transferring them over to USCIS and -- well, that's it.

MR. DAVIS: No further questions, Your Honor.

THE COURT: Plaintiffs?

CROSS-EXAMINATION

BY MS. GILBRIDE:

**Q.** Good morning, Mr. Sartini.

**A.** Good morning.

**Q.** So the numbers that you arrived at for what you believe

the right size of each of these offices is -- that's based on the analysis that you did of their functions and of what staff you think is necessary to perform them; correct?

**A.** Yes.

**Q.** And that in some instances, you believed the offices, as they were currently being run, were inefficient?

**A.** In some places, yes.

**Q.** When we were discussing some of those inefficiencies on Monday, you testified that for CIS OM, the office you now lead, only 40 percent of the inquiries that came in went to -- were officially opened or required follow-up with USCIS. You saw that as inefficient; is that right?

**A.** No, I never said that was inefficient. I just said that is the number that they happen to work.

**Q.** Okay. And do you believe that that number -- that -- what do you understand is happening with the other 60 percent?

**A.** Nothing was done with them. The prior ombudsman, this is the same person who was my deputy and now has moved on to USCIS, said that they don't -- they may send out a close-out notice to say we are not acting on your inquiry, but they did not work the inquiry. Now, that's either because they couldn't get to it or because it didn't meet the requirements for ombudsman follow-up.

**Q.** So if they couldn't get to it, that might indicate that there was a large volume given their staffing levels at the

time; is that correct?
**A.** It could indicate that. It doesn't necessarily. And I see no requirement to respond to every inquiry in the statute.
**Q.** And, in fact, did you know or are you aware of the work sharing agreement, information sharing agreement that CIS OM has with USCIS that allows CIS OM case managers to access the databases of USCIS?
**A.** I am aware of it. I'm also aware it's no longer in effect. USCIS chose not to honor the terms of the agreement, and the agreement is no longer being operationalized. And that was told to me by the deputy ombudsman.
**Q.** When did USCIS make that decision?
**A.** I don't know, but it didn't sound recent. It sounded like it was at least months ago. And it was before this administration. It sounded like the problems had occurred months, if not years ago.
**Q.** And is it your understanding that CIS OM workers, based on having, for example, the name and date of birth of an individual who was calling them for assistance, can look up information such as that person's receipt notice? If that receipt notice was lost in the mail and they didn't get it, they can do that themselves without having to go to USCIS?
**A.** Yes.
**Q.** Okay. And if that occurred and got the person the answer

to their question, that wouldn't be reflected as an inquiry to the USCIS because the ombudsman's office member handled it directly; correct?

**A.** I'm not sure about that. So any work being tracked and done should be recorded somewhere in a system. And I think the ombudsman's office would want to show a higher percentage work. So if there is any action being taken on an inquiry, that should be reflected in the statistics.

**Q.** But you don't actually know how those were tracked, correct, because you hadn't performed that work?

**A.** I know to a fairly good degree how they were tracked. I mean, the exact case type or inquiry type you're referring to, no, I can't say for sure.

**Q.** Turning to OIDO and one of the inefficiencies you identified, you referred to what you called swag, that OIDO case managers in the detention facilities were wearing branded hats or bandanas or other types of clothing. Did you ever speak to anyone in OIDO about why they were wearing those branded clothing items?

**A.** Yes. And I did not just say they were wearing them, and the amounts that were procured were exponentially higher than the staff. So the swag was not just to be worn on the person of the OIDO staff. They ordered thousands of jackets, hats, and coffee mugs. I don't know about each of those items, but the numbers were in the thousands, the unit quantities. So

that was not just for personally identifying them in the --
**Q.** What was the reason that was told to you?
**A.** Marketing.
**Q.** So --
**A.** Marketing and advocacy.
**Q.** So by marketing, do you mean making people in detention facilities aware of the services that they provide and the fact that they're different from ICE and other components of DHS?
**A.** I assume that's what was meant.
**Q.** Okay. And particularly, that that sort of wearing something visible and emblematic would be helpful for identification purposes for people who don't speak the same language, were you told that as well?
**A.** I was not told that specifically. That makes sense to me, but again, the quantities do not make sense.
**Q.** Okay. Let's turn to the staffing levels that you believe are appropriate for these three offices. You believe that an appropriate staffing level for CIS OM to perform their statutory functions is five to seven case managers, plus a deputy; is that right?
**A.** Yes, plus a report writer.
**Q.** Okay. You've been in the position for two weeks or a little -- I guess closer to three weeks now?
**A.** Yes.

**Q.** Have you announced these five to seven caseworker positions and report writer position yet? Have they been announced for -- as vacancies?
**A.** No, because I'm not sure I can announce them yet so as to not violate the RIF.
**Q.** But you -- so there's one announcement that you have put out, correct, and that's for the deputy?
**A.** That is in the process of being put out, yes. HR is creating the various forms and paperwork to get it out now.
**Q.** And you began the process of sending that to HR to create the forms and paperwork when?
**A.** Last week.
**Q.** And it hasn't yet been announced publicly on USA Jobs?
**A.** No, because this was literally maybe two business days ago that we started the -- that I received and returned the position description for the position.
**Q.** And when it is announced, will it be internal only, or will it also be announced externally?
**A.** My plan is to announce it and make it open to all of DHS.
**Q.** And for how long will it be open?
**A.** Oh, I haven't determined that, but to move the process along, my thinking is five days.
**Q.** Then once you receive your list, certificate of eligibles, how long will it take for that position to be filled?

**A.** Then it's a question of how quickly I can review the resumes, interview the candidates, and then select them. And then HR reaches out to make the offer. So I don't know, that's probably at least two weeks, but likely longer.

**Q.** Okay. So from start to finish, from last week, when you began the process to when you anticipate having someone in the role, we're looking at a month, more than a month? What would you estimate?

**A.** Probably a month.

**Q.** So that's one position?

**A.** Yes.

**Q.** For each of the seven or eight other positions within CIS OM, do you anticipate a similar length of process to fill those vacancies?

**A.** Yes. And the reason for that is they're not hired, or they could not -- they don't have to be hired in series, they would be hired in parallel. So if it's all the same position type, the same series, the same grade or a ladder of grades, it would be a multivacancy announcement and then we would get the certificate of eligibles. And I'm able to interview and hire anyone off of that list, and all of those individuals could be hired in one shot.

**Q.** And in the meantime, until all of those people are hired, you're performing all of the work of the CIS ombudsman's office by yourself; correct?

**A.** In addition to -- right now, yes, and then whatever detailees I'm able to bring on in the intervening period.
**Q.** And the detailees -- again, you've been in this role for almost three weeks. How many detailees have you brought on board so far?
**A.** I have not brought on board any yet, because the solicitation just went out last week and there's already interest.
**Q.** And how many detailees do you intend to hire?
**A.** I will bring on as many as there is interest for, because there is no limit to how many. It's not subject to any kind of funding cap. So I will bring on as many as are qualified.
**Q.** You said that the plan was -- for CIS OM was approved by Mr. Hemingway. Is he the last level of approval that's needed within DHS to create and fill these vacancies, or is there anyone else from whom you need to get approval within DHS?
**A.** No, there's no one else from whom I need to get approval. The ability to waive the hiring freeze, he has -- there's no one set authority, is my understanding, but he certainly has the authority and he's granted it.
**Q.** What about outside of DHS? Is there approval that needs to be obtained from OPM or from any other federal agency?
**A.** No.
**Q.** Let's turn to OIDO. Your view of what full staffing for that office should entail also requires five to seven case

managers; is that correct?
**A.** Yes.
**Q.** And how would those people be geographically dispersed, in your view?
**A.** That is a -- what I would say is a last 10 yards question that Mr. Guy will have to figure out. So we're in a different situation than we were previously. There is a return to office executive order. So they can be in an office. They don't have to be in the National Capital region. And I -- if I were Mr. Guy, I would look at a heat map of where detention facilities are, and I would say we put the critical mass of employees closest to the detention facilities. So they would likely be co-located in government facilities in the southwest, probably some on the Canadian border.
**Q.** And you believe that five to seven individuals is adequate to service all of the detention facilities around the United States?
**A.** I believe that we can perform the statutory functions as the cases come in with five to seven individuals plus the help of contracts, plus the help of detailees.
**Q.** How many facilities are currently being operated?
**A.** Somewhere between 250 and 300.
**Q.** Do you understand that the President plans to increase detention capacity?
**A.** Yes.

**Q.** And would that entail opening additional detention facilities?

**A.** I'm not sure that that's true. It could be true. You could enlarge capacity at existing facilities. I have not heard any more detail than that.

**Q.** So if we were anticipating what the total number of immigrants in detention is a year from now, do you anticipate it would be a higher number than it is today?

**A.** Yes.

**Q.** And you still believe that seven people is sufficient staff for monitoring conditions in all those facilities going forward?

**A.** No. So this is a key distinction. I am talking about the case managers who worked the queue at headquarters that came in electronically, for the most part, at headquarters, right. So this is not a one-to-one replacement for the individuals who were largely contractors in the detention facilities. That is a somewhat different problem.

And I see nothing requiring anyone to be in the detention facilities. That is not to say there is no value in it. It is to say that is a problem that is difficult to solve and needs to be examined by Mr. Guy.

**Q.** Okay. But I think you spoke earlier about contractors -- well, let me back up a step.

Out of the 118 full-time employees at OIDO, who are

currently subject to the RIF, how many of those were case managers who were responsible for going into detention facilities and meeting in person with detained people?

**A.** I don't know. The number was, I believe, trying to envision an org chart in my head, probably and 40 or 50, but I'm not positive.

**Q.** So it was the largest component of the OIDO staff, were the case managers, and we can pull that up in the report to Congress that we discussed previously, but would you disagree with me the case managers -- I'm not talking about contractors. I'm talking about full-time employees -- were the largest component of the OIDO staff?

**A.** I'm not positive, but that sounds correct.

**Q.** Okay. And is it also your understanding that those full-time employee case managers were not perhaps every day, but that part of their duties were to go to detention facilities and meet in person and monitor conditions in the facilities directly?

**A.** Yes. And they were not in every facility -- not every facility had an OIDO staffer in it all the time. It's not clear how often they were staffed. But it was not a one-to-one relationship.

**Q.** Nor would it be a one-to-one relationship if we had seven people performing the tasks; correct?

**A.** Correct.

**Q.** Okay. Let's turn to CRCL. You say that the full staffing for CRCL would be 20 people, and those would all be handling -- well, you tell me in your own words. What is your understanding of what those 20 people would be doing?

**A.** So I'm envisioning 20 individuals working the cases and then probably one more for report writing. And then there would be a officer and a deputy officer at the leadership level. So again, that winds up to be 23, 24 individuals plus contractors.

And the contracts right now that I've left in a pay status are all housed within CRCL. They are expensive and they are robust, and there are a lot of FTEs available on those contracts. And then, of course, detailees are available as well.

**Q.** When you say "working the cases," are you referring to the compliance branch of CRCL that handled complaints from members of the public?

**A.** No. So I am not looking at the way the office was constituted previously. There are many ways the office can be constituted. I'm talking about casework generally. So it could be EEO investigations, it could be looking into reasonable accommodations, internal or external, for the EEO casework period.

**Q.** Okay. And you said that you thought that was around the same number staffingwise that CRCL has currently. I know you

said the office could be constituted differently, but you did testify a few moments ago that you thought this would not be a reduction in the size of CRCL. Is it your understanding that there were around 20 people in the compliance branch previously handling complaints from the public?

**A.** Again, I can't speak to the breakdown. The way I asked the question of outgoing leadership was not tell me how many you have in the compliance branch, because I'm looking at work streams, not arbitrary organizational structures. So the work stream is that of investigating complaints. And outgoing leadership told me they had about 20 individuals plus a fair number of contractors doing casework and investigations.

**Q.** And that 20 individuals would not -- we talked about some of the statutory functions of CRCL, and one of the ones that we discussed on Monday was oversight of DHS programs and activities, to check them for compliance with civil rights law. In your sort of reorganized view under the plan, where you have around 23 staff, would there be any staff members dedicated to performing those programmatic oversight functions?

**A.** Not in my plan, and there's a very specific reason that. I think that that -- the best way to handle that skill set is with attorneys who would be detailed from other parts of the organization. That is an area where my research has indicated quality could have been improved, and the right skill set is

an attorney skill set. And I think detailees are the right way to close that gap.

And also, you're bringing in an expertise perhaps from the areas where there is oversight. So, for example, someone from TSA may have good insight into what kind of civil liberties challenges are faced by TSA customers or members of the public who interface with TSA.

**Q.** Given the statutory scheme that envisioned there being a separate office to conduct oversight of the DHS components, do you think that detailees from TSA, for example, would be able to perform that oversight function, if they're going to be going back to TSA in six months, the same way someone who is in a separate office that doesn't report to the TSA hierarchy would be able to do?

**A.** Yes. Actually, I've -- I'm aware of individuals who have done exactly this in the past. They use their knowledge to advance their career in a detail. And then at the end of the detail, if they perform well, and often the whole point of doing a detail is to try to explore opportunities to leave your current job, you're then able to impress your boss on detail and then you're hired into the new position.

But there are a lot of employees who would love to be able to share what they've learned, both the good and the bad, in jobs in their home office and share that with an oversight body. This also happens a lot with Congress. The Executive

branch details employees to work on committees in Congress, and they're there to share both the flaws and the positive of their home agency's work.

**Q.** I want to turn your attention to the deputy who was working with you. Sounds like you had a pretty close relationship in the two weeks that you were in the CIS ombudsman role. How frequently would you say you and the deputy spoke or interacted via email?

**A.** Multiple times per day, and even beyond that window. From around March 21st until I had to testify here on Monday, we were in contact multiple times daily.

**Q.** And during that -- those conversations, you learned of his potential interest in another position within DHS leadership; correct?

**A.** Yes.

**Q.** When we were here on Monday, and you testified about how you would accomplish the work of the position with his help, did you think it was relevant to mention that he might be leaving for another position?

**A.** I did mention that. We had discussed it. As you just said, I mentioned that he was looking at other opportunities. I know I said that on Monday. I did not realize that his move was imminent; otherwise, I would have mentioned it.

**Q.** When you testified here on Monday, did you know about the impending appointment of Mr. Hemingway as acting civil rights

civil liberties officer?

**A.** No.

**Q.** And Mr. Hemingway also has the position of deputy chief of staff, principal deputy chief of staff; is that correct?

**A.** Yes.

**Q.** The officer for civil rights and civil liberties is a Presidentially appointed position, understand can be performed in an acting status, but typically, is it the only position that someone holds?

**A.** I don't know.

**Q.** Are you aware of any past occurrences where someone has served as officer for civil rights and civil liberties while also holding another leadership position within the Agency?

**A.** I don't know. That's not something I would have paid attention to in the past.

**Q.** What about Joseph Guy? Does he hold any other positions within DHS simultaneously with his new role as OIDO ombudsman?

**A.** Yes. He's the deputy chief of staff of the department.

**Q.** And I imagine that deputy chief of staff is a position that comes with a lot of responsibilities; correct?

**A.** I would imagine.

**Q.** So he's not really going to be performing his OIDO responsibilities on a full-time basis, will he?

**A.** I do not know.

**Q.** Returning to Mr. Hemingway, are you aware that before joining DHS, he was an employee of the Heritage Foundation?
**A.** No.
**Q.** And are you aware that in his role with the Heritage Foundation, he is identified as one of the authors of Project 2025?
**A.** No, I'm not aware of that.
**Q.** Are you aware that Project 2025, on pages 165 and 166, advocates for the abolition of the CIS Ombudsman's Office and OIDO?
**A.** No, I have not read Project 2025.
**Q.** Do you know what Mr. Hemingway's current views of the viability or value of CIS OM and OIDO are?
**A.** I know as we spoke yesterday, he said we will be performing the statutory functions of the office. I would have a particular interest in CIS OM not being shut down, because then I would be out of a job. And since I assume he was involved in the approval of my being hired into the position, I would like to think he didn't hire me two or three weeks ago into a position that is going to be abolished. So I believe him when he says the goal now is to perform the statutory duties of these offices.
**Q.** Okay.
MS. GILBRIDE: May I consult with my colleagues for a moment?

THE COURT: Yes, of course.

**Q.** (BY MS. GILBRIDE) Just a couple more questions. You've talked about how quickly you have been able to hire in the past, within a couple of weeks. Were those competitive hiring or noncompetitive hiring when you were able to fill positions within, you know, approximately two weeks?

**A.** I believe they were a mix. I'm not a hundred percent sure. Now, I know some of them were noncompetitive. But there is no reason why a competitive position could not be competed within two weeks.

You could post for as little as three days. HR can -- given that that's a short window, HR would probably not have -- and if it's internal, they would not have a particularly large number of resumes to go through and create the certificate of eligibles.

And so they could turn the certificate of eligibles around probably within a few days. And then it's a question of me going through the list. So that can happen within two weeks. But again, I mean, more realistically for competitive hiring, about a month.

**Q.** And you've talked about detailees as kind of a stopgap that you plan to use. In order to have a detailee come over from another office, their supervisor has to approve that, because they're giving up their employee for some period of time; correct?

**A.** Yes.
**Q.** So people who have expressed interest, do you know if all of them will be -- you know, will be able to come over as detailees?
**A.** Yes, because I don't just know of their interest, they have applied and I have received their resume, and it is a prerequisite for when you send that application and that your supervisor has already approved.
**Q.** And do you know for how long they're approved? Is that something that their supervisor would also have some say in, how long they're going to give this person up for?
**A.** Yes, of course, the supervisor would have a say. The posting went out for six months at a minimum. So when a supervisor signs on to that, they're typically agreeing to the stated term on the detail. Otherwise, it really would not be prudent for them to approve. It says at least six months.
**Q.** And that's just for CIS OM; correct? You haven't put any details out, or you're not aware of anyone else having put details out for any of the other offices?
**A.** Right. I'm not aware of any solicitations going out for the other offices, and I did not put any out because I don't have any formal authority to do so for any other offices.
**Q.** If you are going to the same pool seeking detailees when you seek, you know, your third, your fourth, your fifth, your sixth, in your experience, do you -- is there a situation of

diminishing returns when you've already sort of found your volunteers and you're less likely to find volunteers later?
**A.** No. And it's not necessarily the same pool. So let's talk about CIS OM. The pool right there for me is USCIS employees, and that is how the ombudsman office hired previously. They almost exclusively hired USCIS employees, or at least that's what was told to me by the deputy ombudsman.
That is right now a pool of something like 21,000 employees. And there is always churn within that organization. And so I don't view that as a -- if I need somewhere between four or six or even ten detailees, I don't think that I'm drying up the well of 21,00 employees by taking a few at any time.
**Q.** And we talked about how long it would take from the beginning of the process for hiring, actually filling a new position permanently, that -- you said around a month, give or take?
**A.** Right.
**Q.** What about for a detailee? From the time that you post that detail opportunity to the time that person comes online, is that less than a month?
**A.** I can -- yes, it's definitely less than a month. It can be as fast as we want, because details are not formal actions. So, for example, when I was detailed from USCIS to the Office of the General Counsel, that detail was effectuated within two

days. We've also made other details effectuated in two days. No formal action needs to be generated by HR.

And so I'm -- I can bring those individuals over as soon as their offices are ready to let them go. And the understanding is that this is a priority, and they'll be expected to enter on to duty on the detail within two weeks.

**Q.** And do you expect you'll get five to seven detailees for CIS OM?

**A.** I think I can, yeah.

**Q.** Do you expect to get 23 detailees for CRCL?

**A.** No, the goal is not to get 23 detailees for CRCL. I never said that it was.

**Q.** Okay. So you won't be able to fill the number of positions that you believe are necessary to staff these agencies and perform the statutory functions just using detailees; correct?

**A.** Correct.

**Q.** You mentioned how the number of incoming cases has gone down for CIS OM and maybe you don't know about the other offices. You have some theories about why that is; right? Why the numbers have gone down?

**A.** Yes.

**Q.** Is another plausible explanation for why numbers have gone down that DHS publicly announced the office was being closed?

**A.** No. No, as the deputy ombudsman explained to me, there are a number of legal pathways to obtain an immigration benefit. Those streams have been -- are largely drying up. Right. So the number of applications being processed are potentially less. The appetite for individuals around the country to come to the United States in this administration is likely less. No, so -- and I don't believe that is the case at all.

And actually, I know for a fact the -- what some might think is the office's closure is not the reason for the decrease, because the deputy ombudsman told me they saw that decline well before the RIF notices went out on March 21st, that they started seeing that decline way back into the Biden administration. Because around the middle of the last year of the Biden administration, they started tightening up the border, and so they saw a decline from maybe the middle of last year. So no, it's quite clearly not at all related to the RIF notice.

**Q.** Well, an effect can have more than one cause. Would you agree with me? There can be more than one factor contributing to a phenomenon?

**A.** At a very high level, yes. But as I just said, we saw or they saw a marked decrease, maybe six to eight months, maybe more than eight months before the RIF notices went out. So that tells me there is no cause-and-effect relationship.

THE COURT: Or at least that there was a cause-and-effect relationship between March 21st.

THE WITNESS: Right. Correct.

THE COURT: Okay.

**Q.** (BY MS. GILBRIDE:) Are you familiar with how many complaints have been filed with CRCL in the first and second quarters of the fiscal year, so before March 21st, after March 21st, for example?

**A.** No, I don't have that information. I've never seen it.

**Q.** And you don't know, for OIDO, if the numbers have gone down, the numbers of complaints have gone down since March 21st for OIDO, do you?

**A.** Correct, I don't know.

**Q.** And do you think if somebody read in the news or heard through, you know, the organization that they're getting support from, that the office where they would normally file complaints has been closed, would it be rational for someone in that position not to bother filing a complaint?

**A.** It might be.

**Q.** Okay.

MS. GILBRIDE: I have nothing further.

THE COURT: All right. Thank you.

Mr. Davis.

MR. DAVIS: I have nothing.

THE COURT: Great.

Mr. Sartini, thank you for everything. I know that a lot has been thrown onto your plate recently, and particularly this week and in particular, I imagine, yesterday. I am very appreciative. Thank you. I recognize that you have little desire to see me again. I may have to have you back at some point. I'll try very hard not to make that happen. If I do ask for that, know I have exhausted every other avenue before that. All right. Thank you, sir.

THE WITNESS: Thank you.

THE COURT: All right. I will say that based on the declarations that I received yesterday and today's testimony, I am satisfied that my concerns from yesterday regarding the veracity of the department's desire or ability or effectiveness of implementing Mr. Sartini's plan were unfounded. I'm satisfied that DHS has an approved plan in place. I do not think it is in my purview or ability to determine whether or not that plan is a good one, an effective one. It certainly is aimed at addressing the functions of the three offices we now have, unlike when we were here last, an officer at every post, contracts -- some contracts are being continued, there's a definitive plan for detailees. Mr. Sartini has already received applications for those and has authority, as I understand it, to open up positions at each of the three agencies.

So that said, I am still concerned about whether or

not these steps go into effect. I agree with plaintiffs, if there was an elimination of the offices, that there would be irreparable harm, and that they would have standing to bring some sort of action and that the action would most likely than not be ultra vires. I just don't think, based on what I've seen so far, that the offices have, in fact, been abolished, in which case, plaintiff's arguments are less valid.

I also was concerned about whether or not, if the separation goes forward today, it would be difficult to unwind that clock. Based on what I've heard, and certainly I'll hear argument otherwise if people disagree, but what I heard both from Ms. Barksdale-Perry and Mr. Sartini, I don't think it's going to make a massive difference with respect to whether the individuals are separated or not in terms of them being able to be rehired and the timing of them being able to be rehired. So far as I can tell, the main difference will be whether they're on C-TAP list or the re-employment list.

Ms. Barksdale-Perry indicated that the difference between being on the list, on average, would be about 25 days from a 90-day turnaround to 115 day around [sic]. Mr. -- she indicated, testified that that could be sped up. And that Mr. Sartini clearly thinks that that can be sped up and has approval to open up the positions and is just waiting on sort of the legal technicalities as to when he can open up those positions.

So I'm not currently inclined to stop the RIFs from being effectuated today in terms of separations, particularly where it looks like the paperwork won't be finalized until June 4th, June 3rd. So even in the next two weeks, we can take some action if need be, if I learn something different.

All of that said, I am -- so I'm going to deny the TRO with respect to the separations and will deny it -- will deny the TRO.

The preliminary injunction I'm going to reserve judgment on with respect to whether or not to grant that personal -- the preliminary injunction, pending what I see happening on the ground in the next couple of weeks. So I'm going to ask Mr. Davis and the plaintiffs to put together a joint status report that will be filed with me by 12:00 p.m. on Friday, May 30th, and another one -- actually, let's make it -- let's make the second one June 2nd, the second status report. In the June 2nd status report, I want a declaration from Mr. Sartini that he is effectuating the plan and that there's been no hurdles put in his way. And then we can -- if need be, if I feel like I need more status reports or ongoing status reports, I will so indicate after I receive your June 2nd status report.

Everyone should keep their schedules clear in case I find -- so make it by noon on June 2nd, so everyone keep your schedules clear, so if I find that we need to have an

emergency hearing on June 2nd, we will do that.

I'm going to revise my earlier -- I'm going to deny the TRO, but I'm going to deny it without prejudice, with the plaintiffs able, of course, to refile the motion if what we have heard today turns out not to be true.

I don't know that we need a -- far more argument, but I certainly want to give the parties the ability to have that argument if you would like. I need to step out at 12:30. I'm happy to hear a bit more argument right now and if you guys want to come back at 1:30, I'm certainly happy to continue to hear you guys out. But I'm pretty definitive on where I am with respect to the evidence I've heard so far.

I think my only outstanding question is, Mr. Davis, do we know when, pursuant to the RIF, since the separations occur today, that vacancies can be announced? Can that happen on Monday?

MR. DAVIS: I will look into that, but I believe so.

THE COURT: Okay. Could you find that out for me today and let either --

MR. DAVIS: Can I email the email we were using --

THE COURT: Yeah, just email the email we were using. Make sure to let plaintiffs know and be sure to let Mr. Sartini know as well.

MR. DAVIS: Yes.

THE COURT: So he understands that and he -- to pass

it along to the three other officers.

MR. DAVIS: Isn't Monday a holiday?

THE COURT: Oh, Monday's a holiday, I apologize. So Tuesday.

MR. DAVIS: Okay.

THE COURT: I am still in law firm world where there were no holidays.

All right. So plaintiffs, would you like to be heard further?

MS. GILBRIDE: Just very briefly, Your Honor.

THE COURT: Sure.

MS. GILBRIDE: So I understand Your Honor's ruling with regard to the TRO. I do want to note that -- I want to note two things. One is the reason that we are here is that the RIF that was initiated on March 21st says in the RIF notice the offices are being abolished. I know there was some sort of testimony about the positions versus the offices. It's sort of -- it's two ways of saying the same thing if all of the positions within the offices are being abolished, but it says we are eliminating these offices in their entirety. That -- those words were used by DHS leadership in communications that went out to the workforce and in public communications that went out from a spokesperson to the public.

I understand that the administration is now taking a

different tack, but when there is a final Agency action that has consequences, legal consequences for the plaintiffs here, who interact with these agencies, for other members of the public, you know, there is a mechanism for setting aside that unlawful and harmful action that has already occurred. And I'm concerned about creating a precedent that you can say you're going to eliminate an office, get rid of a whole bunch of employees who perhaps Agency leadership doesn't want to -- doesn't want working for the Agency anymore, wants to hire different people. There's been some testimony about, you know, not being aligned, not being on the same page. That's not, you know, a basis for getting rid of people, and the use of the RIF mechanism to say we're not going to give you the chance to, you know, recompete for your position because we're eliminating the office in its entirety.

If that isn't actually what DHS intended, if it didn't intend to eliminate the offices in their entirety, then it shouldn't have issued a RIF that said that, but it did. And if we let that RIF go into effect today, it's -- you know, DHS basically is accomplishing something, accomplishing the legal consequences of an unlawful act. And that's why today is significant, because today is the day that that RIF becomes final. I understand that there's processing that still has to occur between now and June 2nd, but for all legal purposes, and you heard that from Ms. Barksdale-Perry, the legal

consequence, people are separated from their employment, the action is final as of today. And it's an unlawful action, and the government has never justified and given reasons why that action was taken back in March. That's why we filed this case. That's why we're here. We haven't heard any explanation for that March action. All we've heard about is don't worry about it because we're actually going to put the office back together again.

As to that, as to what they're actually going to be able to do to put them back together again, you know, we've heard a lot of testimony about numbers and how long it's going to take. And I appreciate the status reports so that we can follow up on what's actually happening on the ground. But I still believe that the fastest way to get people back into these positions is to not have the RIF go into effect. And there's many courts that have done this. We cited a couple of new examples in the TRO that we filed. And even though you're going to deny the TRO, Your Honor, I would urge you to look at the cases we cite, because some of them are more recent than what was in our PI filings.

So there's a case out of the Southern District of West Virginia, the *Wiley* case, where the organization said it's in the middle -- you know, this is the Office of Occupational Safety and Health. They said we're in the middle of a reorganization, we're not sure, you know, we may put some

of these people back, we're not sure what we're doing, we may move the functions. The Court still said there's irreparable harm being caused by these health inspectors who help coal miners with black lung disease. By having them not in their positions, that's causing irreparable harm right now. I'm going to enjoin the RIF so that it does not take effect.

Same thing a judge in Boston just yesterday, the New York v. McMahon case, enjoined RIFs as to many staff at the Department of Education that were set for -- those RIFs were set to take effect, I believe, in the beginning of June.

So courts are doing this. It wouldn't be unprecedented for you to do it, Your Honor. And for all the reasons we've said, you know, that is the fastest way of getting people back on the ground to do this work. They're people who already know the jobs who've already been performing the jobs. And for our clients who need these offices to be stood back up as soon as possible, getting people in those positions next week versus next month versus several months from now makes a difference. So we would urge you to think about, you know, the expediency of how to get this done most quickly, also in a way that does not essentially reward an unreasoned, and in our view, unlawful action the defendants took back in March.

THE COURT: All right. Thank you.

Well, the good news is that nothing I do creates

precedent. So we're not going to set any precedent here today whatever I do. The -- I understand the point about a final agency action. I understand the point that it may well be that DHS did intend to eliminate this office, and somehow their OGC got them to see -- have religion and realize that they can't do that and that they actually have to have these offices ongoing and functioning.

Look, you're not going to find a more sympathetic ear to your claim than me in any court. I'm an immigrant, I spent all of my pro bono work doing asylum work, I've litigated immigration cases against the government. I'm quite confident that when they found out I was the judge assigned to this case, everyone on the other side of the aisle from you groaned.

But having said all that, my job is to apply the law, is to consider the facts in evidence, and while I have views as to what -- I might have speculation as to what happened and why it happened with respect to the original RIF and the language of the RIF, I am convinced that since then or all along, the offices are not being abolished, that there is a plan in place from a senior -- that has been approved by a senior DHS official that has given authority to a senior or midlevel official -- I think Mr. Sartini's probably senior -- to put in place at least a plan. And I find Mr. Sartini quite credible with respect to how he has gone thinking about this,

what he plans to do and what he's been authorized to do.

I also think, based on Ms. Barksdale-Perry's testimony, that we're not going to be saving much in terms of time with me extending the RIF, whether or not I can even do that or whether or not that even actually puts these people in C-TAP, I just -- based on everything I heard today, I do not think extending the RIF or abolishing the RIF is going to make things go smoother or faster. If anything, I think undoing sort of the process that's going forward, that seems in place to be in effect at least with respect to detailees within the next couple weeks and people being hired within the next month or so, I think it will upend that.

And so where does that leave you with your very good point about a final Agency action? Where it leads you is that if they are remediating the harm, and I believe that their plan is to, and that they are remediating the harm, then there is no irreparable harm for purposes of the analysis. And I just don't think that, under the circumstances, and of course what's happening in coal or at Department of Education is totally different than what's happening here. I just don't think the public policy therefore favors doing everything that would have to be done to eliminate the RIF.

I will say this, Mr. Davis, Ms. Gilbride does raise a good concern. If the offices are, in fact, being abolished and if, in fact, the RIF was incorrect and the Q and A was

incorrect, I assume DHS -- and you have one of the lawyers here -- would have no problem issuing a statement to the effect that the offices are not being abolished and, in fact, are going to continue to be opened and are going to be staffed. Is there any problem with having a statement that says that today?

MR. DAVIS: I think we would have to take that back, but I understand the point.

THE COURT: Okay. Let me put it to you this way. If when you go back they don't want to do that, let me know and I will order it.

MR. DAVIS: Understood.

THE COURT: Which I think would be better if everyone just did that. All right?

MR. DAVIS: Understood.

THE COURT: I mean, it was, based on what you've told me, a mistake and not correct, and I imagine the government wants to be correct in its public-facing materials.

MR. DAVIS: We just have to clear it with --

THE COURT: No, I understand you have to clear it, but I also understand that when you go back to clear it, they're going to be like no, and I'm saying you tell them yeah.

MR. DAVIS: Understood, your Honor.

THE COURT: All right. Plaintiffs, I have know from -- all too well from a lot of experience how much work goes into everything that you've done, particularly putting together the TRO last night on very short order. It's got to be frustrating that after I raised the possibility, I'm now denying it. I understand the frustration. I understand how much work went into it. I think it was excellent work. I think certainly you've convinced me, and we're at point where at least we know that we didn't before your complaint that individuals are paying attention, a plan will be in place.

Mr. Hall, are you Mr. Davis' supervisor?

MR. HALL: I am not, Your Honor. I'm a career member of --

THE COURT: All right. Can you call his supervisor today and say that he had an incredibly skeptical judge who was beyond concerned about whether or not his case had been presented to me with veracity and that I found his actions and his emails last night, and particularly with respect to meeting very quick turnaround deadlines explaining exactly what was going on, getting two declarations that I thought were quite well done, done within four or five hours, was exemplary and went a very long way to easing a number of my concerns? People often ask me if hearings matter, and they certainly do, and they did in this case. So please, let his supervisor know that.

MR. HALL: I will happily do so, your Honor.

THE COURT: All right. Thank you, Mr. Davis.

MR. DAVIS: Thank you, Your Honor.

THE COURT: If you go back and the people are saying no, we're not going to put something on the public sphere, let me know because I will order it.

MR. DAVIS: Absolutely, Your Honor.

THE COURT: All right. Thank you, everyone.

(The proceedings were concluded at 12:35 p.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_________/s/______________
Christine T. Asif
Official Court Reporter

< Dates >.
January 4th 20:19.
July 49:11, 49:12.
June 18:14, 23:9, 24:23, 34:2, 49:11, 49:12, 49:17, 54:14, 68:4.
June 2nd 117:16, 117:21.
June 2nd, 19:5, 117:23, 117:25, 120:23.
June 2nd, 2024 18:5.
June 3rd 20:11, 56:11, 56:12, 60:13.
June 3rd, 19:5, 22:4.
June 3rd, June 4th 33:19.
June 4, 2025. 18:1, 24:23.
June 4th 18:14, 19:4, 20:11, 23:21, 23:23, 54:7, 56:13, 60:16, 60:18.
June 4th, 18:18, 27:5, 34:3, 36:2, 56:12.
June 4th, 2025, 54:3.
June 4th, June 117:3.
March 121:5.
March 14th, 51:18.
March 21st 40:13, 106:9, 114:1, 114:11, 119:14.
March 21st, 113:11, 114:6, 114:7.
March of 2021 39:25.
May 68:21, 108:23.
May 23rd 18:21, 20:7, 23:11, 23:13, 24:12, 55:8, 59:22.
May 23rd, 21:5, 26:21, 62:2.
May 23rd, 2025. 17:22.
May 28th, 21:7.
May 30th 56:19.
May 30th, 117:14.
second one June 2nd, 117:15.
.
.
< 0 >.
00 75:15, 111:11, 117:13.
000 86:11, 86:13, 86:14, 86:17, 111:7.
.
.
< 1 >.
1 44:11, 75:6, 75:15, 118:9.
10 21:8, 57:16, 64:19, 70:18, 75:6, 88:10, 88:19, 100:4.
102 37:24.
11 75:15.
115 15:24, 15:25, 22:5, 31:1, 69:6, 69:12, 78:17, 116:19.
118 87:18, 89:6, 101:24.
12 86:17, 117:13, 118:7, 127:8.
120 33:8, 33:11, 33:12.
125 20:24.
1300 1:39.
147 13:12, 13:13, 13:17, 16:4.
15 88:10, 88:19.
15-minute 74:19.
150 16:11, 16:15.
15th 68:4.
16 81:8.
1620 1:27.
165 108:7.
166 108:7.
1996 50:1, 50:3.
19th 1:39.
.
.
< 2 >.
2 22:23, 44:11.
20-year 86:6.
20001 2:44.
20036 1:29, 1:41.
20043 1:35.
201 15:10.
2019 89:9, 89:10.
202 2:45.
2022 89:11.
2025 1:11, 108:5, 108:7, 108:10.
20530 2:17.
20530-0001 2:10.
21 87:10, 111:7, 111:11.
23 103:7, 104:17, 112:9, 112:10.
23ish 87:13.
23rd 57:11, 57:13, 57:19, 62:4, 68:21.
24 86:11, 87:14, 103:7.
25 69:20, 86:13, 86:14, 116:18.
25-1270 4:2.
25-1270-ACR 1:6.
250 100:21.
25th 58:6.
29th 59:14.
.
.
< 3 >.
3 44:11.
30 63:7, 87:20, 118:7, 118:9.
300 100:21.
300-plus 7:24, 23:6.
30th 57:2, 57:4, 57:11, 57:13, 57:19, 59:2.
333 2:43.
34553 1:34.
35 127:8.
351 41:20.

354-3247 2:45.
3rd 18:14, 24:23, 58:23, 58:24, 117:3.
.
.
< 4 >.
4-and-1 51:16.
4-to-1 49:24, 51:23, 53:15.
40 86:4, 87:21, 93:9, 102:4.
400 2:9.
44 7:5.
45 75:13.
452 5:9.
4th 34:2, 54:14, 57:6, 57:12, 57:17, 58:22, 58:25, 60:25, 61:11, 61:12.
.
.
< 5 >.
5 41:20, 75:9.
50 21:3, 24:5, 27:1, 61:24, 86:3, 102:4.
52 17:19, 25:11, 27:1.
52s 54:12, 55:3, 64:14.
.
.
< 6 >.
6 5:9, 17:12.
60 93:15.
60-day 21:4, 36:8, 59:24.
630 1:28.
.
.
< 7 >.
72 64:18.
7224 2:16.
750 1:40.
.
.
< 8 >.
8 17:14, 17:18, 24:20, 54:2.
8. 17:15.
.
.
< 9 >.
90 32:8, 32:10, 69:4, 71:13, 78:17.
90-day 116:19.
950 2:8.
99.9 17:21.
9:30 a.m. 1:13.
[sic] 18:5, 116:19.
_________/s/___ ___________ 127:14.
.
.
< A >.
A. 1:25, 32:3.
a.m. 75:15.
abilities 46:13.
ability 16:23, 17:6, 17:7, 18:19, 47:7, 58:21, 99:17, 115:12, 115:15, 118:6.
able 9:18, 32:7, 81:4, 90:10, 98:19, 99:1, 105:9, 105:13, 105:19, 105:22, 109:2, 109:4, 110:2, 112:12, 116:13, 116:14, 118:3, 121:9.
abolish 5:10, 5:11.
abolished 8:24, 29:18, 29:19, 30:7, 30:22, 46:16, 47:2, 47:14, 47:16, 47:23, 48:2, 48:6, 48:11, 62:11, 62:13, 62:16, 62:24, 108:19, 116:5, 119:15, 119:18, 123:19, 124:23, 125:2.
abolishing 124:6.
abolition 108:8.
above-entitled 127:12.
absolute 18:14.
Absolutely 5:15, 33:23, 127:6.
access 37:15, 80:3, 94:6.
accommodate 72:17.
accommodations 103:21.
accomplish 106:16.
accomplishing 120:19.
accordance 8:25.
accountable 82:14.
accrued 52:12.
accurate 9:25.
aces 78:3.
act 17:6, 120:20.
Acting 77:4, 93:19, 106:24, 107:7.
actions 8:4, 18:17, 18:20, 20:12, 20:19, 34:3, 34:4, 34:8, 57:6, 57:21, 58:1, 59:11, 59:17, 61:16, 61:18, 65:18, 65:19, 67:10, 67:12, 69:4, 79:3, 90:19, 90:25, 111:22, 126:16.
activities 65:22, 104:15.
actual 20:9, 27:6, 41:20, 46:4, 48:21, 91:20.
Actually 11:3, 21:10, 82:3, 87:25, 95:8, 105:14, 111:14, 113:8, 117:14, 120:15, 121:6, 121:8, 121:12, 123:5, 124:4.
add 83:25.
addition 98:25.

additional 56:22, 64:15, 85:7, 100:25.
addressing 115:17.
adequate 100:14.
adjust 65:15.
adjustment 62:25, 65:16.
adjusts 67:18.
Admin 24:14, 45:7, 45:9.
administration 84:9, 94:15, 113:5, 113:13, 113:14, 119:24.
administrative 27:12, 27:14, 27:16, 34:1, 34:6, 34:21, 37:3, 37:5, 37:6, 37:15, 38:9, 45:6, 45:10, 45:11, 54:22, 55:13, 56:25, 64:10, 66:1.
advance 42:16, 54:16, 105:16.
advise 13:24, 15:18.
advised 72:15.
advising 27:21.
advocacy 96:4.
advocates 108:8.
Affairs 81:12.
afford 23:3.
afternoon 11:13, 77:9.
afterwards 33:22.
Agencies 32:1, 112:14, 115:23, 120:2.
Agency 11:23, 11:24, 12:12, 14:7, 22:2, 22:14, 42:6, 42:13, 42:15, 44:16, 51:1, 54:6, 54:9, 66:19, 66:24, 99:21, 106:2, 107:12, 119:25, 120:7, 120:8, 123:2, 124:13.
ago 94:14, 94:16, 97:13, 104:1, 108:19.
agree 113:19, 115:25.
agreeing 110:13.
agreement 67:1, 94:5, 94:9, 94:10.
agreements 38:7, 38:8.
ahead 18:11, 60:8, 83:2, 90:19.
aimed 115:17.
aisle 123:12.
al 1:11, 4:3, 4:4.
align 24:17, 62:6.
aligned 120:10.
alleviate 82:5, 82:6.
allow 23:21.
allowed 12:20.
allows 22:14, 24:9, 94:6.
almost 99:3, 111:5.
alphabet 16:16.
amenable 73:12.
amount 20:18, 66:23, 67:2, 72:16.
amounts 95:20.
Ana C. Reyes 1:18.
analysis 93:1, 124:16.
and/or 42:7.
anew 48:14, 48:15.
announce 71:24, 97:3, 97:18.
announced 71:25, 96:25, 97:2, 97:12, 97:16, 97:17, 112:23, 118:14.
announcement 12:13, 22:16, 81:2, 97:5, 98:18.
annuitant 52:19, 52:21.
answer 7:5, 12:23, 20:21, 43:17, 54:1, 77:25, 89:25, 94:24.
answered 61:10.
anticipate 98:5, 98:12, 101:6.
anticipated 86:10.
anticipating 86:24, 101:5.
anybody 28:24, 29:3, 38:13, 39:2, 83:9.
apart 37:6, 51:17.
Apologies 7:18.
apologize 54:20, 119:2.
APPEARANCES 1:23, 2:1.
appetite 113:4.
applicants 83:20.
application 20:13, 110:6.
applications 13:17, 113:3, 115:21.
applied 61:21, 110:5.
applies 56:15, 59:23, 61:19.
apply 12:14, 14:8, 39:3, 58:3, 71:23, 72:2, 72:12, 123:14.
applying 10:9.
appointed 90:9, 107:6.
appointment 53:3, 53:8, 106:24.
appreciate 6:16, 121:11.
appreciative 115:3.
approach 23:4.
appropriate 96:17,

96:18.
appropriation 87:4.
approval 8:1, 8:3, 8:5, 8:7, 53:19, 53:22, 53:24, 78:13, 78:20, 79:11, 99:13, 99:15, 99:16, 99:20, 108:17, 116:22.
approvals 53:16, 53:20, 76:7.
approve 109:22, 110:15.
approved 13:2, 13:3, 37:9, 38:2, 38:3, 38:6, 76:1, 76:2, 76:9, 87:8, 99:12, 110:7, 110:8, 115:14, 123:20.
approximately 37:24, 109:5.
arbitrary 104:8.
area 29:22, 30:2, 30:3, 42:3, 42:4, 42:5, 42:6, 42:11, 42:14, 42:18, 42:23, 43:6, 46:23, 47:4, 47:7, 47:11, 47:12, 47:17, 47:22, 47:24, 47:25, 70:6, 70:8, 72:1, 73:21, 104:23.
areas 29:24, 29:25, 42:15, 42:17, 42:19, 42:21, 43:2, 46:9, 46:19, 105:3.
argument 28:13, 116:10, 118:5, 118:7, 118:8.
arguments 116:6.
Around 83:7, 85:6, 86:3, 86:4, 86:6, 100:15, 103:23, 104:3, 104:17, 106:9, 109:16, 111:15, 113:4, 113:13, 116:19.
arrived 92:24.
ASAP 71:14, 76:6.
aside 120:3.
Asif 2:41, 127:10, 127:15.
assigned 48:1, 88:3, 123:11.
assignment 89:21.
Assistance 11:21, 14:21, 94:19.
assume 78:5, 78:13, 96:9, 108:16, 124:25.
assuming 13:17, 40:3, 42:20, 42:21, 43:1, 66:8.
assure 76:24.
asylum 123:9.
attempted 70:7.
attempting 39:7.
attendance 20:16, 24:12, 55:7, 59:18, 62:1.
attention 106:3, 107:14, 126:9.
attorney 104:25.
attorneys 74:12, 104:22.
authority 27:21, 53:8, 78:12, 78:15, 79:12, 90:10, 99:18, 99:19, 110:21, 115:22, 123:21.
authorization 13:14.
authorizations 87:4.
authorized 123:25.
authors 108:4.
automatic 14:15.
automatically 12:3.
availability 12:6.
available 14:8, 15:23, 43:11, 44:7, 44:18, 74:12, 103:11, 103:12.
Avenue 2:8, 2:15, 2:43, 115:6.
average 15:21, 31:2, 31:3, 32:6, 69:19, 71:15, 71:17, 89:7, 116:18.
aware 53:14, 90:21, 94:4, 94:8, 96:6, 105:14, 107:10, 107:25, 108:3, 108:6, 108:7, 110:17, 110:19.
away 65:16.
.
.
< B >.
background 28:16.
bad 105:22.
bake 72:13.
baked 71:24.
bandanas 95:16.
Barksdale-perry 5:18, 6:1, 6:4, 39:14, 76:15, 116:11, 116:17, 120:24, 124:1.
Based 13:15, 15:9, 15:16, 22:24, 44:6, 68:7, 76:25, 92:25, 94:17, 115:9, 116:4, 116:9, 124:1, 124:5, 125:15.
Basically 60:22, 64:23, 65:2, 68:8, 69:19, 76:21, 120:19.
basis 61:11, 107:23, 120:11.
bear 86:8.
become 11:20, 38:25, 52:13,

52:18,
52:20.
becomes 17:4,
89:20,
120:21.
began 97:9,
98:5.
beginning 89:2,
111:14,
122:9.
behalf 4:19.
believe 5:4,
13:12, 33:16,
33:17, 47:3,
49:11, 61:6,
69:10, 77:8,
82:19, 88:7,
89:11, 92:24,
93:14, 96:16,
96:17,
100:14,
100:17,
101:9, 102:3,
108:20,
109:6,
112:13,
113:6,
118:16,
121:13,
122:9,
124:14.
believed
93:4.
benefit
113:2.
benefits 37:13,
37:16, 37:17,
66:15, 66:17,
66:21, 66:22,
66:24, 66:25,
67:15.
best 104:21.
better 6:17,
7:16, 33:24,
67:24, 88:17,
125:12.
beyond 33:11,
33:12, 36:8,
55:19, 106:8,
126:15.
Biden 113:12,
113:14.
bigger 42:23,
43:6.
birth 94:18.
bit 17:17,
20:3, 38:11,
40:7, 42:3,
70:11, 83:5,
88:17, 88:25,
89:2, 90:12,
92:5,
118:8.
biweekly
82:22.
black 122:3.
board 99:4,
99:5.
body 105:24.
bono 123:9.
border 100:13,
113:15.
boss 79:2,
105:19.
Boston 122:6.
bother
114:17.
bottom 19:21,
25:17.
boundary
60:18.
Box 1:34.
Branch 2:14,
103:15,
104:3, 104:7,
105:25.
branded 95:15,
95:18.
break 52:9,
65:13,
74:19.
breakdown
104:5.
brief 64:3,
64:5.
briefed 87:7,
90:7.
briefly
119:9.
bring 65:5,
99:1, 99:9,
99:11, 112:2,
116:2.
bringing
105:2.
brought 51:13,
52:11, 53:4,
53:7, 99:3,
99:5.
Brown 4:21.
buckets
92:15.
bump 43:13,
47:15.
bunch 84:14,
120:6.
burden 27:6,
82:24.
business 33:13,
97:13.
.
.
< C >.
C. 1:12, 1:26,
1:31, 2:44,
5:9.
calendar
55:19.
call 60:22,
126:13.
called 6:5,
74:25,
95:14.
calling
94:19.
calls 5:25,
12:25.
Canadian
100:13.
candidate
39:8.
candidates
98:1.
cap 99:11.
capacity
100:23,
101:3.
Capital 39:20,
50:21, 50:22,
52:2, 52:6,
79:3, 80:9,
80:23, 84:20,
100:8.
card 20:17.
care 67:19,
78:25.
Career 11:20,
14:21, 37:2,
82:11,
105:16,
126:11.
careers
90:25.
carried 8:12,
27:12, 53:4,
56:25.
carry 30:9.
carrying
27:10.
case 17:16,
24:13, 71:9,
74:12, 94:6,
95:11, 95:15,
96:19, 99:24,
101:13,
101:25,
102:7, 102:9,
102:14,
113:6, 116:6,
117:22,
121:4,
121:20,
121:21,
122:7,
123:12,
126:15,
126:23.
cases 72:17,
88:2, 100:18,
103:4,
103:14,
112:17,
121:18,
123:10.
casework 85:15,
85:18, 87:25,
88:8, 88:18,
103:19,
103:22,
104:11.

caseworker 96:25.
categorized 92:15.
cause 113:18.
cause-and-effect 113:24, 114:1.
caused 122:2.
causing 122:4.
Center 17:24, 20:13, 55:23.
certain 20:18, 25:16, 31:5, 37:17, 44:4, 66:23, 67:2, 72:16, 72:17.
certainly 99:18, 115:17, 116:9, 118:6, 118:9, 126:7, 126:23.
certificate 72:4, 97:23, 98:19, 109:14, 109:15.
certified 55:22, 62:1, 62:2.
certify 127:10.
cetera 5:11, 85:24.
CFR 41:20, 41:22.
challenges 105:5.
chance 4:25, 120:13.
change 57:7, 57:18.
changes 5:5, 21:8, 84:8.
Changing 48:3, 84:10.
chaos 27:5, 27:9.
charge 13:8, 83:13.
chart 102:4.
check 104:15.
checking 73:12.
CHICO 39:18, 39:22, 40:18.
chief 39:20, 52:2, 52:6, 78:21, 79:1, 79:3, 80:9, 80:22, 84:19, 107:2, 107:3, 107:18, 107:19.
choose 52:18.
chooses 25:24.
chose 94:9.
Christina 1:32, 4:13.
Christine 2:41, 7:17, 127:10, 127:15.
Christopher 2:12, 4:20.
churn 111:8.
circumstances 69:14, 124:17.
CIS 7:25, 30:2, 41:13, 82:13, 83:13, 85:5, 85:6, 92:6, 93:8, 94:5, 94:6, 94:17, 96:18, 98:11, 98:23, 99:12, 106:5, 108:8, 108:12, 108:15, 110:16, 111:3, 112:7, 112:18.
citation 5:9.
cite 121:18.
cited 121:15.
Citizen 4:8.
Civil 1:5, 2:7, 2:14, 4:2, 104:15, 105:4, 106:24, 106:25, 107:5, 107:11.
claim 66:20, 123:8.
clarity 89:8.
classification 80:25.
clear 79:14, 102:20, 117:22, 117:24, 125:19, 125:20, 125:21.
clearance 45:18, 45:21, 46:2.
clearly 28:19, 78:3, 113:16, 116:21.
CLERK 4:2, 6:2, 21:2.
clicks 34:23.
clients 122:15.
clock 116:9.
close 7:10, 83:8, 105:1, 106:4.
close-out 93:18.
closed 112:24, 114:16.
closer 96:23.
closes 72:16.
closest 100:11.
closure 113:9.
clothing 95:16, 95:18.
co-located 100:12.
coal 122:2, 124:18.
coded 20:16, 55:3, 58:1, 59:7, 59:10.
coding 58:10, 58:14, 58:15, 58:21, 59:17, 65:10.
coffee 95:23.
collateral 89:20.
colleague 78:17.
colleagues 79:2, 108:23.
COLUMBIA 1:2.
comes 73:6, 107:20, 111:19.
committees 105:25.
committing 13:7.
communication 47:22.
communications 119:21, 119:22.
compare 85:25, 87:15, 88:23.
compensation 37:11.
compete 42:9, 44:8, 44:19, 46:14, 47:7, 47:15.
competed 109:9.
competing 91:18.
complaint 85:22, 114:17, 126:8.
complaints

86:11, 86:14, 87:24, 88:2, 103:15, 104:4, 104:9, 114:5, 114:10, 114:16.
complete 58:15, 60:20, 62:3, 69:4.
completely 83:10.
compliance 103:15, 104:3, 104:7, 104:15.
complicated 34:19.
comply 54:10.
component 102:6, 102:11.
components 96:7, 105:8.
computer-aided 2:49.
concern 73:16, 75:23, 76:13, 82:2, 124:23.
concerned 76:21, 77:3, 115:24, 116:7, 120:5, 126:15.
concerns 75:24, 82:5, 115:11, 126:22.
concluded 127:8.
conditions 101:10, 102:16.
conduct 79:3, 105:8.
conducted 81:16.
confidence 82:3.
confident 123:11.
confirm 33:18, 47:3, 59:21, 61:25.
confirmation 61:21.
Congress 5:12, 84:5, 102:8, 105:24, 105:25.
consequence 120:25.
consequences 66:3, 120:1, 120:20.
consider 11:25, 15:19, 32:1, 39:6, 68:19, 69:9, 123:15.
consideration 15:7, 72:1.
considered 9:10, 10:11, 12:15, 14:10, 14:23, 14:25, 15:5, 52:9, 53:10, 53:11, 66:10.
consistent 77:21.
constituted 103:18, 103:19, 103:25.
Constitution 2:43.
consult 108:23.
CONT'D 2:1, 32:19, 50:16, 60:11.
contact 106:10.
contacting 83:22.
contained 7:4, 15:13.
continue 23:9, 23:10, 26:8, 35:16, 35:25, 36:11, 54:22, 64:15, 65:3, 66:5, 84:1, 84:3, 118:10, 125:3.
CONTINUED 36:24, 69:25, 77:21, 115:20.
contract 85:16, 86:23, 88:4, 89:16, 89:19.
contracting 87:3.
contractors 101:16, 101:22, 102:10, 103:8, 104:11.
contracts 77:21, 78:10, 85:9, 85:11, 85:15, 88:21, 100:19, 103:9, 103:12, 115:19.
contributing 113:19.
control 32:15, 69:15, 79:18.
conversations 90:22, 106:11.
convey 29:6, 29:16.
convinced 123:18, 126:7.
Coogle 1:32, 4:13, 4:14.
coordination 66:6, 69:10.
core 88:1, 88:3.
corps 89:22.
Correct 45:15, 47:10, 48:4, 54:4, 93:2, 93:25, 95:2, 95:9, 97:6, 98:24, 99:25, 102:12, 102:23, 102:24, 106:13, 107:3, 107:20, 109:24, 110:16, 112:15, 112:16, 114:2, 114:12, 125:16, 125:17, 127:11.
corrections 56:16.
corrective 34:8.
correctly 58:22.
cost 56:6, 70:4.
Counsel 4:6, 6:16, 45:22, 79:2, 111:24.
count 88:25.
country 113:5.
couple 28:20, 39:17, 76:12, 109:1, 109:3, 117:11, 121:15, 124:10.
Courts 54:9, 121:15, 122:10.
coverage 40:3.
covering

83:17.
CRC 46:11.
CRCL 7:25, 13:4, 13:11, 13:14, 30:1, 41:12, 76:18, 77:5, 77:6, 85:13, 85:14, 87:6, 87:10, 87:13, 102:25, 103:1, 103:10, 103:15, 103:24, 104:2, 104:13, 112:9, 112:10, 114:5.
create 27:5, 48:13, 54:24, 56:7, 62:20, 63:19, 63:20, 63:22, 63:24, 68:10, 68:13, 68:14, 84:17, 84:25, 97:9, 99:14, 109:13.
created 30:12, 30:19, 50:6, 78:15, 84:20.
creates 122:24.
creating 76:16, 77:24, 78:7, 78:11, 97:8, 120:5.
creation 63:10, 63:11, 63:12.
credible 28:17, 123:24.
critical 100:10.
cross 39:11.
CROSS-EXAMINATION 39:12, 50:16, 60:11, 92:20.
cross-walked 15:11.
crosses 5:21.
CSRC 46:10.
current 91:23, 105:19, 108:11.
currently 14:5, 27:11, 30:19, 41:7, 49:3, 63:2, 64:14, 68:20, 92:6, 93:5, 100:20, 101:25, 103:24, 116:25.
customers 105:5.
Customs 50:5.
cutoff 19:4, 20:11.
Cvs 11:2, 11:14, 22:22, 22:24, 27:25, 80:3.
.
.
< D >.
daily 106:10.
data 22:18, 22:19, 92:11.
databases 94:7.
dates 56:18, 58:20.
Davis 2:5, 4:19, 4:24, 17:13, 26:12, 28:8, 28:10, 31:9, 32:18, 39:10, 64:2, 64:5, 73:11, 79:21, 81:19, 83:2, 114:22, 117:12, 118:12, 118:23, 119:4, 124:22, 126:10, 127:1.
day 23:14, 24:13, 34:25, 61:8, 61:16, 62:10, 66:12, 75:14, 83:8, 102:14, 106:8, 116:19, 120:21.
days 15:22, 15:24, 15:25, 22:5, 31:1, 32:8, 32:10, 33:8, 33:11, 33:12, 53:25, 58:10, 59:2, 69:4, 69:6, 69:12, 69:20, 71:13, 72:1, 72:13, 73:5, 78:18, 97:13, 97:22, 109:10, 109:16, 111:25, 116:18.
DC 1:29, 1:35, 1:41, 2:10, 2:17.
deadline 65:11, 65:23.
deadlines 126:18.
decade 78:3.
decided 35:21.
decision 26:7, 43:1, 50:23, 52:4, 52:7, 66:6, 94:12.
declaration 6:19, 9:8, 17:10, 18:19, 24:21, 45:13, 54:2, 76:1, 76:4, 77:20, 117:16.
declarations 115:10, 126:19.
decline 113:11, 113:12, 113:15.
decrease 113:10, 113:22.
dedicated 104:18.
default 44:23, 44:25.
Defendant 1:12, 2:5.
defendants 122:22.
definitely 111:21.
definitive 115:20, 118:10.
degree 95:10.
delay 57:22, 57:23, 57:25.
delegated 90:9.
Democracy 1:33, 4:11, 4:14.
deny 117:5, 117:6, 117:7, 118:1, 118:2, 121:17.
denying 126:5.
Department 2:6, 2:13, 4:3, 4:21, 5:10, 8:2, 8:8, 12:7, 12:8, 24:7, 30:25, 31:4, 31:7, 31:22, 37:25, 50:22, 51:7, 78:21, 83:19, 84:19, 107:18,

115:12,
122:8,
124:18.
DEPARTMENT OF
HOMELAND
1:10.
departure
13:18.
depend 22:11.
Depending
10:20, 14:4,
31:21, 33:6,
37:12, 43:13,
45:10, 56:24,
66:20, 67:13,
72:1, 84:15,
89:1.
depends 18:10,
18:12, 43:10,
43:22, 44:14,
52:14, 53:2,
68:17.
deputy 40:1,
50:22, 52:1,
52:6, 77:3,
78:21, 80:21,
87:10, 90:12,
91:2, 93:17,
94:11, 96:20,
97:6, 103:6,
106:3, 106:7,
107:2, 107:3,
107:18,
107:19,
111:6,
112:25,
113:10.
describe
42:3.
description
15:13, 80:24,
97:15.
desire 10:24,
39:2, 115:4,
115:12.
detail 83:18,
83:20, 89:21,
101:4,
105:16,
105:17,
105:18,
105:20,
110:14,
111:19,
111:24,
112:5.
detailed 78:14,
104:22,
111:23.
detailee
109:21,
111:18.
Detailees 33:4,
33:5, 78:10,
85:7, 85:9,
87:3, 88:5,
88:20, 99:1,
99:2, 99:3,
99:8, 100:19,
103:12,
104:25,
105:9,
109:20,
110:3,
110:22,
111:10,
112:6, 112:9,
112:10,
112:15,
115:20,
124:9.
details 33:6,
33:7, 81:3,
83:17,
105:25,
110:17,
110:18,
111:22,
111:25.
detained
102:2.
detention
89:13, 89:18,
95:15, 96:5,
100:9,
100:11,
100:15,
100:23,
100:25,
101:6,
101:16,
101:18,
102:1,
102:15.
determination
43:16,
66:11.
determine 14:1,
21:13, 21:14,
22:15, 34:6,
36:4, 38:19,
44:2, 44:17,
61:18, 72:7,
115:16.
determined
15:17, 42:6,
49:21,
97:21.
determines
27:25, 30:25,
42:16.
developed 7:20,
7:21,
45:14.
developing
64:14.
dictate 53:3.
difference
9:24, 10:1,
68:6, 68:11,
68:25, 69:20,
116:12,
116:15,
116:17,
122:18.
different
20:24, 26:7,
84:10, 91:6,
92:2, 96:7,
100:5,
101:17,
117:4,
119:25,
120:9,
124:19.
differently
58:16,
103:25.
difficult
34:13, 34:14,
54:25, 89:25,
101:20,
116:8.
diminishing
110:25.
DIRECT 28:22,
32:19, 36:24,
83:3.
directed
79:9.
direction
7:11.
directly 95:2,
102:17.
director 39:18,
39:19,
40:1.
directs 5:21.
disabilities
32:4.
disagree 102:8,
116:10.
discretion
42:13.
discuss 5:6,
5:8, 45:13,
84:4.
discussed 8:15,
75:20, 76:5,
102:8,
104:14,
106:19.
discussing
90:23,
93:7.
discussion
66:8,
76:15.
disease
122:3.
dispersed
100:2.
Displaced
31:24, 32:1,
38:25,
73:3.
disputes 5:4.
dissolution
28:24, 29:1,
45:14, 46:4,

47:19.
dissolve 30:5.
dissolved 29:4, 29:19, 46:13, 46:15, 46:20, 46:24, 47:7, 48:4, 50:9, 50:13, 81:10.
distinction 29:11, 29:14, 29:15, 79:13, 79:14, 101:12.
District 1:1, 1:2, 1:19, 121:20.
Division 2:7, 2:14.
document 8:14, 53:18.
documentation 15:14.
documents 17:19, 28:25, 29:2, 29:6, 29:8, 30:5.
doing 36:1, 56:9, 64:23, 73:15, 82:13, 88:22, 90:25, 103:3, 104:11, 105:18, 121:25, 122:10, 123:9, 124:20.
double-check 81:21.
down 22:2, 55:23, 81:15, 108:15, 112:18, 112:20, 112:23, 114:10.
drill 6:15.
dropped 6:15.
drying 111:11, 113:2.
duly 6:5, 74:25.
during 42:17, 44:20, 44:23, 44:24, 59:20, 59:23, 106:11.
duties 102:15, 108:21.
duty 24:13, 24:14, 32:8, 45:2, 45:3, 45:4, 89:21, 112:5.
.
.
< E >.
ear 123:8.
earlier 77:1, 101:22, 118:1.
earnest 89:11.
easier 16:7, 33:21, 33:25, 34:1.
easily 11:2.
easing 126:21.
easy 54:24, 54:25, 87:19, 90:4.
Education 122:8, 124:18.
EEO 87:12, 103:20, 103:21.
effect 20:7, 25:22, 36:5, 46:4, 47:20, 49:7, 51:14, 61:22, 61:23, 63:1, 94:9, 113:18, 115:25, 120:18, 121:14, 122:5, 122:9, 124:9, 125:2.
effected 62:7.
effective 17:22, 23:24, 25:6, 26:22, 27:4, 36:10, 48:7, 67:16, 82:4, 115:16.
effectiveness 115:13.
effectuate 54:25.
effectuated 111:24, 111:25, 117:1.
effectuating 117:17.
Efficiency 51:7.
efficient 19:22, 19:23.
eight 85:8, 98:11, 113:22, 113:23.
either 10:23, 49:11, 50:10, 63:13, 70:22, 93:20, 118:18.
electronically 101:14.
element 88:19.
eligibility 14:9, 36:5, 36:9, 36:12, 71:3.
eligible 10:13, 10:14, 10:17, 11:20, 36:2, 36:3, 38:25.
eligibles 72:4, 72:5, 97:23, 98:19, 109:14, 109:15.
eliminate 28:25, 120:6, 120:16, 123:3, 124:21.
eliminated 8:21, 29:4, 83:10.
eliminating 6:20, 8:15, 119:19, 120:14.
elimination 7:1, 9:12, 9:13, 30:5, 30:18, 116:1.
elsewhere 85:10.
email 106:7, 118:19, 118:20.
emails 126:17.
emblematic 96:11.
emergency 117:24.
employed 24:7.
employee 10:4, 10:5, 11:18, 15:8, 17:9, 24:6, 25:9, 37:8, 37:10, 37:12, 44:10, 44:12, 45:11, 52:15, 52:18, 53:11, 53:12, 55:24, 55:25, 66:21, 66:25, 67:2, 69:18, 71:1, 102:14, 108:1, 109:23.
employment

120:25.
encompassing 43:2.
end 28:11, 62:10, 74:1, 84:22, 105:16.
ending 67:5.
ends 59:24, 71:1.
enjoin 122:5.
enjoined 122:7.
enlarge 101:3.
enough 42:7, 46:8, 51:22, 58:10, 59:4, 59:15.
ensure 18:24, 19:22, 24:11, 24:14, 24:17, 55:8, 56:14, 57:20, 59:17, 62:3, 62:6, 65:9, 65:22, 67:8, 67:13, 72:15.
ensuring 19:1, 20:15, 55:2, 59:6, 59:10.
entail 99:24, 100:25.
enter 54:20, 58:17, 112:5.
entered 27:3.
entire 25:19, 47:21, 56:1.
entirely 87:18.
entirety 119:20, 120:14, 120:16.
entry 22:18, 22:19, 32:8.
envision 102:4.
envisioned 105:7.
envisioning 103:4.
EOD 32:7.
equivalents 86:7.
especially 55:21.
Esquire 1:25, 1:31, 1:32, 1:37, 2:5, 2:12.
established 89:9.
estimate 63:18, 63:23, 91:14, 98:7.
estimation 89:16.
et 1:11, 4:3, 4:4, 5:10, 85:24.
evening 77:10.
Everyone 4:23, 16:11, 22:22, 74:21, 75:24, 78:3, 91:20, 117:22, 117:23, 123:12, 125:13, 127:7.
everything 25:8, 26:14, 58:22, 61:11, 61:12, 75:20, 92:10, 114:25, 124:5, 124:20, 126:2.
evidence 118:11, 123:15.
exact 37:17, 40:12, 95:11.
exactly 105:15, 126:18.
EXAMINATION 6:10, 28:22, 31:10, 32:19, 34:11, 36:24, 49:14, 54:17, 64:7, 67:21, 69:25, 70:13, 75:4, 83:3.
examined 6:5, 74:25, 101:21.
example 27:18, 43:6, 45:23, 52:13, 52:16, 60:15, 81:12, 94:18, 105:3, 105:9, 111:23, 114:7.
examples 121:16.
excellent 126:6.
exception 49:23, 51:23, 52:5.
exceptional 80:5, 80:6.
excited 75:6.
exclusive 85:14.
exclusively 111:5.
excuse 55:4.
Executive 39:17, 39:19, 40:16, 100:7, 105:24.
executives 87:12.
exemplary 126:21.
exemption 51:15, 51:21, 51:24.
exemptions 53:15.
exhausted 115:6.
exist 30:19.
existed 30:21.
existing 30:16, 85:9, 101:3.
expect 38:2, 78:4, 112:6, 112:9.
expected 67:15, 86:8, 112:5.
expediency 122:19.
expensive 103:10.
experience 78:6, 110:24, 126:1.
expert 73:20.
expertise 105:2.
expire 49:10.
expires 49:12, 68:21.
Explain 6:17, 10:1.
explained 76:3, 112:25.
explaining 126:18.
explains 8:9.
explanation 112:22, 121:5.
explore 105:18.
exponentially 95:20.
expressed 110:1.
extend 27:3, 59:25, 66:2, 73:25.
extended 33:11, 33:12, 33:14, 49:10, 54:21, 55:13, 56:18,

58:6, 59:13, 65:6, 73:13, 73:18.
extending 64:10, 65:25, 66:4, 124:3, 124:6.
extends 55:19.
extensive 85:20.
external 103:21.
externally 97:17.
extra 64:24.
.
.
< F >.
F. 1:38, 4:2, 4:16, 4:17.
faced 105:5.
facilities 88:11, 88:16, 89:18, 95:15, 96:6, 100:10, 100:11, 100:12, 100:15, 100:20, 101:1, 101:3, 101:10, 101:16, 101:19, 102:2, 102:16, 102:17.
facility 88:9, 88:10, 89:13, 102:18, 102:19.
fact 12:20, 29:20, 53:1, 53:10, 67:18, 68:22, 94:4, 96:7, 113:8, 116:5, 124:23, 124:24, 125:2.
factor 113:19.
factors 10:7, 32:15.
facts 123:15.
Fair 46:8, 51:22, 104:10.
fairly 95:10.
fake 82:12.
fall 90:2.
familiar 41:3, 41:6, 114:4.
FAQ 7:7, 7:8, 7:9, 29:9, 46:2.
Faqs 45:15, 45:18, 45:20.
far 13:4, 22:2, 25:2, 26:2, 36:19, 37:23, 68:20, 70:22, 99:4, 116:5, 116:15, 118:5, 118:11.
fast 32:21, 33:2, 33:4, 51:12, 70:24, 91:17, 111:22.
faster 124:7.
fastest 121:13, 122:12.
fault 6:16.
favors 124:20.
FCRR 2:41, 127:10.
feat 34:6.
Federal 2:14, 2:42, 10:9, 10:10, 10:18, 10:20, 25:9, 34:7, 34:9, 48:7, 48:24, 49:3, 49:5, 50:2, 52:10, 52:15, 52:16, 52:18, 52:24, 53:1, 53:2, 53:13, 67:2, 69:18, 73:2, 78:5, 81:6, 99:21.
feel 117:19.
feeling 17:3.
few 34:23, 41:16, 53:25, 60:9, 81:22, 81:25, 104:1, 109:16, 111:12.
fifth 110:23.
figure 19:21, 25:20, 74:5, 80:5, 82:8, 84:7, 90:1, 100:5.
file 114:15.
filed 5:2, 6:18, 114:5, 117:13, 121:3, 121:16.
files 85:21.
filing 114:17.
filings 121:19.
fill 12:12, 13:4, 14:3, 15:25, 31:19, 32:24, 33:5, 36:19, 39:7, 63:20, 68:10, 68:17, 69:1, 69:2, 69:12, 69:20, 77:14, 91:12, 98:12, 99:14, 109:4, 112:12.
filled 68:7, 68:16, 70:24, 71:13, 77:15, 77:16, 91:16, 97:24.
filling 11:25, 14:11, 23:4, 48:23, 78:9, 85:8, 111:14.
fills 13:18.
final 17:25, 20:10, 20:17, 24:5, 24:12, 35:5, 35:6, 36:1, 52:4, 52:7, 55:8, 119:25, 120:22, 121:1, 123:1, 124:13.
finalized 85:2, 91:23, 117:2.
Finance 17:24, 20:9, 20:13, 55:23.
financial 24:3, 25:15, 55:5, 61:15.
find 31:18, 69:10, 111:1, 117:23, 117:24, 118:17, 123:7, 123:23.
finding 80:21.
fine 7:19, 20:22, 26:17, 70:2, 84:25.
finish 92:11, 92:13, 98:4.
fire 6:15.
fired 9:9.
firing 75:24.
firm 119:5.
first 5:23, 6:5, 11:25, 12:9, 13:17, 21:9, 21:13, 31:20, 32:2, 40:10, 40:21,

40:22, 44:11, 44:16, 56:5, 62:19, 69:9, 72:6, 74:25, 75:12, 77:23, 78:6, 80:24, 90:13, 114:5.
fiscal 114:6.
fit 91:25.
fits 81:1.
five 71:25, 72:13, 73:4, 85:6, 86:13, 86:21, 86:22, 88:20, 96:19, 96:25, 97:22, 99:24, 100:14, 100:18, 112:6, 126:20.
flag 55:8.
flaws 106:1.
focused 49:1, 87:23.
folder 25:11.
follow 121:12.
follow-up 86:10, 93:10, 93:22.
follows 6:6, 75:1.
forced 6:22.
foregoing 127:11.
Forget 34:16, 71:5, 71:7, 71:9, 81:7.
Form 17:19, 24:5, 27:1, 54:12, 55:3, 61:24.
formal 90:15, 90:19, 110:21, 111:22, 112:1.
forms 17:23, 97:8, 97:10.
forthcoming 84:5.
Forward 1:33, 4:11, 4:14, 11:6, 30:20, 35:13, 53:19, 101:11, 116:8, 124:8.
found 33:1, 110:25, 123:11, 126:16.
Foundation 1:33, 108:1, 108:4.
four 49:20, 58:10, 91:6, 111:10, 126:20.
fourth 110:23.
frame 25:16, 58:1.
frankly 55:11, 58:23, 60:2, 61:17, 65:8, 65:14, 72:14.
freak 26:12.
freeze 49:4, 49:5, 49:6, 49:8, 49:9, 49:12, 49:18, 51:2, 51:3, 51:5, 51:12, 51:14, 51:16, 78:22, 99:17.
frequently 7:20, 29:16, 106:6.
Friday 57:11, 57:13, 57:14, 59:14, 117:14.
front 9:15, 28:16, 55:19.
frustrating 126:4.
frustration 126:5.
Ftes 86:7, 87:13, 103:11.
full 37:16, 55:25, 99:23, 102:25.
full-time 86:7, 101:24, 102:10, 102:14, 107:23.
fully 86:13.
Fun 80:16.
function 5:11, 43:23, 43:25, 88:1, 105:10.
functioning 123:6.
functions 8:10, 30:10, 82:9, 82:14, 93:1, 96:19, 100:17, 104:13, 104:19, 108:14, 112:14, 115:17, 122:1.
funded 31:16, 44:17.
funding 87:5, 99:11.
future 30:10, 30:23, 48:12, 48:17, 48:25, 63:5, 87:1.
.
.
< G >.
G-U-Y 82:18.
gap 88:21, 105:1.
gaps 88:14.
gave 28:2, 59:25.
gears 48:3.
General 11:8, 11:16, 11:18, 23:1, 45:22, 59:11, 59:12, 61:14, 71:11, 79:2, 111:24.
generally 41:17, 103:19.
generated 112:1.
geographically 100:2.
gets 89:18, 89:20.
getting 7:23, 76:21, 80:24, 86:14, 114:14, 120:11, 122:13, 122:16, 126:19.
Gilbride 1:25, 4:7, 4:8, 92:21, 108:23, 109:1, 114:4, 114:20, 119:9, 119:11, 124:22.
give 4:25, 19:6, 28:15, 56:19, 58:10, 59:2, 59:15, 110:10, 111:15, 118:6, 120:12.
Given 26:7, 65:23, 82:10, 86:7, 86:16, 88:11, 93:24, 105:7, 109:11,

121:2,
123:21.
gives 59:3.
giving
109:23.
goal 16:1,
108:20,
112:10.
gotten 67:25,
68:1.
Government
5:25, 13:7,
25:9, 48:24,
50:2, 51:7,
78:5, 81:6,
85:8, 100:12,
121:2,
123:10,
125:17.
grade 10:6,
14:5,
98:17.
grades 98:17.
grant 117:9.
granted
99:19.
Great 73:9,
77:18, 78:24,
82:3,
114:24.
grew 87:17,
89:6.
groaned
123:13.
gross 89:16.
ground 89:12,
117:11,
121:12,
122:13.
group 13:19.
grouped
43:19.
growth 87:20.
GS 8:24, 47:13,
48:1.
guess 25:19,
28:10, 46:4,
62:8, 63:18,
86:10,
96:23.
guidance 41:22,
45:20,
45:21.
Guillermo 21:2,
21:3, 21:8,
21:14.
Guy 82:18,
89:14, 90:2,
90:6, 100:5,
100:9,
101:21,
107:15.
guys 118:9,
118:10.
.
.
< H >.
habit 72:19.
half 74:18,
75:8, 86:8,
86:9.
HALL 2:12,
4:20, 126:10,
126:25.
halted 58:18.
hand 6:3,
80:8.
handful 10:25,
11:1,
23:12.
handle 5:20,
85:23, 86:11,
86:24, 87:2,
104:21.
handled 95:1,
103:15.
handling 103:2,
104:4.
handy 5:17.
happen 21:6,
33:1, 56:17,
61:12, 78:25,
82:4, 93:13,
109:17,
115:5,
118:14.
happened 6:24,
81:12,
123:17.
happening 63:3,
92:6, 93:15,
117:11,
121:12,
124:18,
124:19.
happens 52:4,
105:24.
happily
126:25.
happy 91:3,
91:7, 118:8,
118:9.
hard 89:6,
115:5.
harm 116:2,
122:2, 122:4,
124:14,
124:15,
124:16.
harmful
120:4.
hate 33:25.
hats 95:16,
95:22.
head 8:13,
8:16, 14:2,
46:7, 82:12,
102:4.
headquarters
12:7, 12:8,
22:16, 24:8,
36:21, 38:21,
40:5, 41:10,
41:11, 42:19,
49:7, 49:8,
51:3, 51:5,
51:20, 63:19,
65:19, 72:25,
88:8, 88:19,
101:13,
101:14.
Health 67:19,
121:23,
122:2.
hear 19:20,
116:9, 118:8,
118:10.
heard 40:24,
50:12, 77:1,
78:17, 101:4,
114:13,
116:9,
116:10,
118:4,
118:11,
119:8,
120:24,
121:4, 121:5,
121:10,
124:5.
hearing 4:25,
22:3,
117:25.
hearings
126:22.
heart 67:23.
heat 100:9.
held 82:14.
help 88:21,
100:18,
100:19,
106:16,
122:2.
helpful 5:14,
12:16, 28:15,
59:19, 74:8,
96:11.
Hemingway
75:10, 75:18,
77:4, 78:20,
87:7, 99:13,
106:24,
107:2,
107:25,
108:11.
hereby
127:10.
Heritage 108:1,
108:3.
hierarchy
105:12.
high 113:21.
higher 95:5,
95:20,
101:7.
highlighted
72:5.
hire 6:23,
10:25, 13:3,
15:24, 31:18,

31:22, 32:1, 32:4, 39:2, 49:16, 51:14, 62:19, 71:17, 74:2, 98:20, 99:8, 108:18, 109:2, 120:8.
hired 70:7, 92:2, 98:14, 98:15, 98:16, 98:21, 98:22, 105:20, 108:17, 111:4, 111:5, 124:10.
hires 31:2.
historical 89:1.
historically 86:1, 86:5, 87:15, 87:18, 88:24, 89:7.
history 86:6.
Hold 9:21, 49:16, 60:6, 107:15.
holding 107:12.
holds 107:8.
holiday 119:1, 119:2.
holidays 119:6.
home 80:16, 105:23, 106:2.
Homeland 4:4, 4:22, 5:10, 13:2, 24:7.
honestly 46:6.
Honor 4:7, 4:10, 4:13, 5:3, 6:9, 9:23, 39:9, 64:3, 64:5, 70:11, 73:10, 81:23, 92:18, 94:9, 119:9, 119:11, 121:17, 122:11, 125:24, 126:11, 126:25, 127:2, 127:6.
Honorable 1:18.
hope 10:24.
hour 74:18.
hours 126:20.
housed 85:13, 103:10.
HQ 43:7, 43:9.
HR 25:6, 26:16, 32:15, 37:2, 49:25, 65:24, 78:14, 91:17, 97:7, 97:9, 98:2, 109:10, 109:11.
HR. 25:18, 112:1.
huh-uh 50:14.
Human 1:5, 1:38, 4:3, 4:17, 11:9, 15:10, 39:19, 39:20, 50:21, 50:22, 52:2, 52:6, 79:3, 80:9, 80:23, 84:19.
humanly 25:23.
hundred 109:6.
hurdles 117:18.
hypothetical 12:18, 22:1.
Hypothetically 13:5, 13:6, 13:20, 13:21, 16:17, 16:18, 31:13, 31:14, 35:10, 35:18, 35:19, 43:7, 44:13, 52:11, 61:2, 61:3, 63:14, 63:16, 68:19, 69:20, 71:19.
hypotheticals 12:21, 20:1.
.
.
< I >.
ICE 96:7.
idea 35:22.
identification 96:12.
identified 21:15, 22:12, 22:21, 31:15, 95:14, 108:4.
identifies 19:8.
identify 4:5.
identifying 95:25.
imagine 107:19, 107:21, 115:2, 125:16.
immediately 60:25.
immigrant 123:8.
immigrants 101:6.
immigration 113:1, 123:10.
imminent 106:22.
impact 37:17, 37:19, 51:12, 58:21, 66:14, 66:17, 66:22, 67:3.
impacting 18:18, 25:12, 25:13, 65:18, 65:22.
impacts 37:17, 66:18.
impeccable 91:2.
impending 106:24.
implemented 49:18.
implementing 115:13.
implications 37:11, 37:13.
importance 29:20.
important 17:4, 65:17.
impress 105:19.
improved 104:24.
in. 53:4, 88:2.
inaccurate 46:22.
inclined 116:25.
include 14:4, 69:3, 69:7, 72:25.
included 46:9.
includes 73:2.
incoming 112:17.
incorrect 46:20, 124:24, 124:25.
increase 100:22.
increases 87:1.
incredibly 12:16, 74:8, 126:14.
independent

30:1.
indicate 9:14, 14:9, 16:23, 25:5, 35:2, 93:23, 94:1, 117:20.
indicated 9:17, 15:16, 21:17, 47:1, 48:5, 57:3, 104:23, 116:17, 116:20.
indicates 24:12, 26:20.
indicating 8:8.
individual 10:8, 10:17, 10:20, 14:11, 43:14, 53:12, 55:7, 59:7, 66:21, 67:20, 69:17, 82:16, 94:19.
inefficiencies 93:7, 95:13.
inefficiency 88:14.
inefficient 93:5, 93:11, 93:12.
inform 14:5.
inform- 9:6.
information 11:5, 15:15, 48:12, 48:17, 48:25, 50:25, 92:12, 94:5, 94:20, 114:8.
informed 66:13.
initial 36:8, 36:14, 59:22.
initially 7:23.
initiate 8:3, 8:8, 18:20, 18:23, 20:19, 25:7, 57:6, 61:13, 61:15.
initiated 43:11, 119:14.
initiates 25:12, 26:21.
initiating 55:4, 61:7.
initiation 21:24, 32:7, 40:11, 55:4.
injunction 117:8, 117:10.
input 25:15, 57:21, 58:1.
inquiries 84:6, 84:11, 86:15, 93:9.
inquiry 93:19, 93:20, 94:2, 94:25, 95:6, 95:11.
insight 105:4.
inspect 88:16.
inspected 88:12.
inspections 88:9.
inspectors 88:10, 122:2.
instance 52:16.
instances 93:4.
instead 34:19, 35:16, 35:23, 36:2.
instructed 84:18.
intact 88:4.
intend 99:8, 120:16, 123:3.
intended 89:5, 120:15.
interact 120:2.
interacted 106:7.
interest 99:7, 99:9, 106:12, 108:15, 110:1, 110:4.
interested 78:1.
interface 105:6.
interim 27:7.
internal 97:16, 103:21, 109:12.
intervening 99:1.
interview 83:23, 91:19, 98:1, 98:19.
intranet 83:19.
investigating 88:2, 104:9.
investigation-type 85:15.
investigations 103:20, 104:11.
investigative 85:18.
investigators 87:9.
involuntarily 16:21, 34:18, 35:8, 52:14, 52:25.
involuntary 10:19, 11:19, 24:1, 24:18, 33:24, 35:13, 57:19, 61:22, 67:10.
involved 8:10, 40:22, 43:16, 46:2, 48:18, 63:5, 63:6, 63:9, 63:10, 63:11, 63:15, 63:17, 81:11, 108:17.
involvement 51:6.
involves 76:16.
irreparable 116:2, 122:1, 122:4, 124:16.
issue 71:7, 79:15.
issued 120:17.
issues 5:4.
issuing 125:1.
items 95:18, 95:23.
itself 41:16.
.
.
< J >.
jackets 95:22.
job 81:2, 91:3, 105:19, 108:16, 123:14.
Jobs 25:18, 25:20, 81:3, 97:12, 105:23, 122:14, 122:15.
joining 108:1.
joint 117:13.
Joseph 82:18, 107:15.
Jr 4:17.

Judge 1:19, 5:20, 12:21, 122:6, 123:11, 126:14.
judgment 117:9.
July 49:17.
June 122:9.
Justice 1:26, 2:6, 2:13, 4:21.
justified 121:2.
.
.
< K >.
Karla 1:25, 4:7.
keep 11:3, 11:14, 16:8, 16:9, 19:10, 21:8, 36:11, 66:4, 70:18, 73:4, 117:22, 117:23.
Kennedy 1:38, 4:3, 4:17.
key 36:16, 101:12.
keyboard 34:24.
kicked 40:8, 40:15.
kind 27:5, 54:23, 60:13, 71:15, 85:17, 89:6, 89:21, 99:10, 105:4, 109:20.
knowledge 41:9, 52:1, 52:3, 105:15.
knows 28:19, 90:9.
.
.
< L >.
ladder 98:17.
landed 89:15.
language 7:1, 7:4, 7:9, 7:21, 9:12, 9:13, 18:12, 28:24, 29:1, 80:13, 96:13, 123:18.
lap 6:15.
large 54:14, 55:6, 93:24, 109:13.
largely 101:16, 113:2.
largest 55:10, 102:6, 102:11.
Last 5:2, 5:13, 6:14, 56:13, 63:18, 80:10, 84:9, 86:8, 86:11, 87:21, 88:6, 89:5, 89:13, 97:11, 98:4, 99:6, 99:13, 100:4, 113:13, 113:16, 115:18, 126:3, 126:17.
late 6:14.
later 5:13, 11:12, 28:14, 79:22, 111:1.
latest 58:20.
law 89:10, 104:16, 119:5, 123:15.
lawyer 37:1, 65:24, 70:17.
lawyers 124:25.
laymen 42:11.
layperson 6:21.
lead 93:9.
leadership 84:18, 84:19, 87:11, 88:14, 90:24, 103:6, 104:6, 104:10, 106:12, 107:12, 119:20, 120:7.
leads 124:13.
learn 90:13, 117:4.
learned 90:20, 105:22, 106:11.
learning 73:20.
least 49:7, 70:17, 71:25, 82:13, 86:12, 87:20, 94:14, 98:3, 110:15, 111:6, 113:25, 123:23, 124:9, 126:8.
leaving 106:18.
left 10:9, 34:15, 88:4, 103:9.
Legacy 50:5.
legal 5:4, 26:15, 47:20, 47:21, 73:17, 81:1, 113:1, 116:23, 120:1, 120:20, 120:23, 120:24.
length 43:14, 68:15, 98:12.
less 16:6, 64:19, 111:1, 111:20, 111:21, 113:4, 113:6, 116:6.
letting 11:14.
level 22:19, 42:19, 47:20, 65:21, 96:18, 99:13, 103:7, 113:21.
levels 86:1, 87:15, 88:23, 93:24, 96:16.
leverage 85:11.
leveraging 85:9.
liberties 105:5, 106:25, 107:5, 107:11.
life 25:19.
likely 98:3, 100:12, 111:1, 113:6, 116:3.
limbo 26:16.
limit 45:9, 99:10.
limits 45:10.
line 19:21, 25:17, 26:3, 86:15.
lines 68:8.
listed 30:4, 47:4.
literally 6:21, 25:18, 97:13.
litigated 123:10.
Litigation 4:8.
little 17:17, 20:3, 38:11, 89:1, 90:12, 92:5, 96:23, 109:10, 115:3.
longer 19:2,

23:20, 24:7, 24:15, 33:8, 52:10, 66:11, 69:17, 91:18, 94:8, 94:10, 98:3.
looked 89:19.
looking 83:21, 86:20, 88:13, 98:6, 103:17, 103:20, 104:7, 106:20.
looks 117:2.
lose 52:12, 78:6.
lost 94:21.
lot 5:5, 84:8, 89:17, 103:11, 105:21, 105:24, 107:20, 114:25, 121:10, 126:1.
love 105:21.
loved 76:5.
lower 86:2, 86:3, 87:17, 88:25.
lung 122:3.
.
.
< M >.
Ma'am 6:12, 11:11, 74:8.
machine 2:48.
mail 94:21.
main 75:23, 76:13, 116:15.
majority 23:14, 25:8, 48:8, 53:6.
Management 39:20, 41:4.
manager 14:2, 14:10, 14:19, 15:6, 15:12, 15:15, 15:18, 16:23, 17:7, 31:15, 31:21, 32:23, 39:5, 44:10, 69:8, 71:19, 72:5, 72:7, 73:6.
managers 23:3, 94:6, 95:15, 96:19, 99:25, 101:13, 102:1, 102:7, 102:9, 102:14.
mandated 5:12.
manner 8:11, 19:12, 27:10.
manual 54:15.
map 100:9.
March 121:3, 122:22.
marked 113:22.
Marketing 96:2, 96:4, 96:5.
MARTINEZ 1:31, 4:11, 53:14.
mass 100:10.
Massachusetts 2:15.
massive 116:12.
materially 58:21.
materials 125:18.
matter 67:24, 73:17, 126:22, 127:12.
matters 17:18.
May 23 1:11.
Mcmahon 122:7.
means 10:3, 10:8, 11:23, 31:6, 31:18, 31:24, 32:24, 42:3, 55:24.
meant 26:4, 29:16, 96:9.
meantime 98:22.
mechanism 120:3, 120:12.
Medha 1:37, 4:16.
meet 65:22, 83:21, 93:21, 102:16.
meeting 75:17, 84:4, 90:7, 102:2, 126:18.
member 95:1, 126:12.
members 64:13, 65:9, 103:15, 104:17, 105:5, 120:2.
memo 8:6, 8:14, 9:2, 40:7, 40:15.
memorandum 8:8, 40:9.
mention 106:17, 106:19.
mentioned 42:2, 50:18, 66:16, 83:17, 91:11, 106:20, 106:22, 112:17.
met 37:4, 75:10, 75:12, 75:14, 77:12, 77:13.
method 68:18, 69:12.
mic 7:10.
Michael 1:31, 4:10.
midafternoon 75:16.
middle 113:13, 113:15, 121:22, 121:23.
midlevel 123:22.
midyear 86:16.
mind 21:8, 21:9, 29:12, 43:23.
mine 82:7.
miners 122:3.
minimum 83:21, 110:12.
minutes 75:13.
mismanagement 89:16.
mistake 125:16.
misunderstood 64:22.
mix 109:6.
modification 85:16.
moment 15:22, 108:24.
moments 104:1.
Monday 21:7, 58:4, 59:3, 59:14, 68:5, 90:18, 90:23, 93:8, 104:14, 106:9, 106:15, 106:21, 106:23, 118:15, 119:1, 119:2.
monitor 102:16.
monitoring 101:10.

month 91:21, 98:6, 98:8, 109:19, 111:15, 111:20, 111:21, 122:17, 124:10.
months 15:22, 33:17, 90:3, 91:1, 91:4, 94:14, 94:16, 105:11, 110:12, 110:15, 113:22, 113:23, 122:18.
morning 4:7, 4:9, 4:10, 4:12, 4:13, 4:15, 4:16, 4:18, 4:19, 4:23, 5:3, 6:2, 6:9, 39:14, 39:15, 77:9, 77:13, 92:22, 92:23.
motion 118:3.
Motions Hearing 1:17.
mountains 56:8.
move 7:13, 26:8, 35:12, 56:8, 97:21, 106:21, 122:1.
moved 68:3, 90:24, 93:17.
movement 25:8.
moving 10:4, 11:5, 53:19, 91:17.
MR. HALL 126:11.
MR. MARTINEZ 4:10, 39:13, 50:17, 60:9, 60:12, 61:4, 61:10, 62:16, 63:7, 63:9.
Ms 4:7, 4:13, 5:17, 6:1, 39:14, 76:15, 92:21, 108:23, 109:1, 114:4, 114:20, 116:11, 116:17, 119:9, 119:11, 120:24, 124:1, 124:22.
MS. RAMAN 4:16.
mugs 95:23.
Multiple 106:8, 106:10.
multivacancy 98:18.
myself 76:24.
.
.
< N >.
name 5:17, 14:24, 15:1, 82:16, 94:18.
nanosecond 15:4.
National 17:24, 20:13, 55:23, 100:8.
nature 42:8.
necessarily 45:20, 71:16, 94:1, 111:2.
necessary 72:23, 93:2, 112:13.
needed 56:18, 64:12, 99:13.
needs 7:13, 33:8, 74:13, 89:19, 89:22, 99:20, 101:21, 112:1.
negatively 58:21, 67:4.
New 22:4, 30:12, 30:23, 31:1, 62:20, 63:11, 63:12, 63:19, 63:20, 63:22, 63:24, 68:7, 68:10, 68:13, 68:14, 76:17, 77:24, 78:11, 84:17, 85:1, 89:19, 105:20, 107:16, 111:14, 121:16, 122:6.
newly 78:15.
news 30:19, 114:13, 122:24.
next 57:13, 58:8, 58:19, 61:16, 64:23, 67:6, 73:14, 83:15, 84:15, 90:25, 117:3, 117:11, 122:17, 124:10.
NICOLE 6:4.
night 5:2, 6:14, 90:17, 90:20, 126:3, 126:17.
Nine 75:8.
No. 1:5, 7:5, 39:19, 50:11, 101:12, 103:17, 111:2, 112:25.
non 25:13.
noncompetitive 31:18, 32:6, 69:3, 71:17, 109:4, 109:7.
noncompetitively 32:4.
None 40:20.
nonleading 80:13.
nonpaid 66:23, 67:16.
nonses 46:17, 47:13.
noon 117:23.
nope 15:5.
Nor 102:22.
normal 73:24, 78:18, 84:23.
Normally 13:22, 15:12, 31:15, 31:17, 32:7, 33:9, 37:8, 37:9, 69:4, 69:6, 71:24, 71:25, 114:15.
note 119:12, 119:13.
noted 5:11.
Nothing 27:9, 35:12, 70:19, 93:16, 101:18, 114:20, 114:23, 122:24.
notices 6:18, 7:3, 8:4, 12:3, 16:10, 20:6, 23:13, 38:22, 41:15, 46:9, 46:19, 46:23, 83:7, 91:1, 113:11, 113:23.
notification 67:14, 67:19,

73:5, 90:14, 90:16.
notified 67:11, 72:11.
notify 14:7, 55:16, 67:15, 71:21.
numbers 87:20, 92:24, 95:24, 112:20, 112:22, 114:9, 114:10, 121:10.
NW 1:27, 1:39, 2:15, 2:43.
.
.
< O >.
O. 1:34.
obligated 14:7.
obtain 80:11, 113:1.
obtained 99:21.
Occupational 121:23.
occur 35:12, 35:25, 118:14, 120:23.
occurred 94:15, 94:24, 120:4.
occurrences 107:10.
occurs 23:17.
offer 98:2.
officer 50:22, 52:2, 52:6, 79:3, 80:9, 80:23, 81:10, 84:20, 87:10, 87:13, 103:6, 106:25, 107:5, 107:11, 115:19.
officers 77:18, 118:25.
offices. 17:20.
Official 2:42, 12:8, 22:12, 25:11, 123:21, 123:22, 127:16.
officially 93:10.
often 10:5, 10:6, 10:8, 102:20, 105:17, 126:22.
OGC 123:4.
OIDO 7:25, 30:2, 41:12, 46:12, 77:14, 82:17, 88:6, 88:7, 88:8, 95:13, 95:14, 95:17, 95:22, 99:23, 101:24, 102:6, 102:11, 102:19, 107:16, 107:22, 108:9, 108:12, 114:9, 114:11.
old 89:2, 89:8.
OM 82:14, 83:13, 85:5, 85:6, 92:6, 93:8, 94:5, 94:6, 94:17, 96:18, 98:12, 99:12, 108:12, 108:15, 110:16, 111:3, 112:7, 112:18.
OMB 30:2.
Ombudsman 7:25, 41:13, 46:12, 84:6, 90:12, 93:16, 93:22, 94:11, 95:1, 95:5, 98:23, 106:6, 107:17, 108:8, 111:4, 111:6, 112:25, 113:10.
onboard 49:20, 79:4, 83:24.
onboarding 31:7, 63:16.
Once 8:2, 9:9, 10:17, 16:19, 23:16, 35:5, 35:6, 38:8, 43:18, 44:19, 49:20, 52:15, 62:1, 71:1, 72:11, 78:12, 97:23.
one-to-one 101:15, 102:21, 102:22.
ones 30:23, 104:13.
ongoing 117:19, 123:6.
online 111:19.
open 13:15, 97:18, 97:20, 115:22, 116:22, 116:23.
opened 68:7, 93:10, 125:3.
opening 100:25.
operated 100:20.
operationalized 94:10.
OPM 41:3, 41:4, 41:20, 41:22, 50:24, 51:1, 51:6, 67:14, 99:21.
opportunities 105:18, 106:20.
opportunity 12:14, 33:5, 38:4, 42:9, 47:15, 72:7, 83:22, 91:7, 111:19.
opt 14:17, 23:17, 37:25, 72:13.
opted 38:3, 68:23.
ordered 19:16, 19:17, 26:9, 35:20, 60:4, 60:14, 60:20, 61:1, 65:15, 95:22.
org 102:4.
organization 17:2, 31:16, 47:14, 104:23, 111:9, 114:14, 121:21.
organizational 104:8.
organizations 67:11.
original 35:13, 123:17.
others 23:14.
Otherwise 26:6, 106:22, 110:14, 116:10.
outer 60:18.
outgoing 88:13, 104:6, 104:9.
outside 13:19,

14:11, 15:20, 31:22, 32:15, 45:19, 69:14, 99:20.
outstanding 118:12.
oversee 64:18.
oversight 87:12, 104:14, 104:18, 105:3, 105:8, 105:10, 105:23.
owed 92:12.
own 77:1, 103:2.
.
.
< P >.
p.m. 75:15, 117:13, 127:8.
package 8:3, 8:5, 8:7, 9:2.
page 120:10.
pages 41:24, 108:7.
paid 24:14, 27:12, 27:16, 37:14, 45:1, 45:5, 45:9, 55:25, 56:25, 62:4, 66:7, 66:12, 66:14, 66:15, 67:1, 67:3, 107:13.
paperwork 17:25, 21:6, 24:22, 60:15, 60:24, 97:8, 97:10, 117:2.
paragraph 17:12, 17:18, 24:20, 54:2.
parallel 98:16.
part 29:23, 30:6, 30:7, 42:2, 50:10, 51:8, 55:10, 69:7, 76:16, 101:14, 102:15.
particular 29:25, 42:7, 47:25, 49:23, 53:6, 53:9, 61:8, 66:12, 67:12, 108:15, 115:2.
particularly 77:3, 96:10, 109:13, 115:1, 117:1, 126:2, 126:17.
parties 4:5, 118:6.
parts 40:4, 88:7, 104:22.
pass 118:24.
past 63:10, 83:5, 86:25, 105:15, 107:10, 107:14, 109:3.
pathways 113:1.
pause 18:2, 18:5, 18:6, 18:13, 18:19, 24:25, 26:3, 26:9, 26:13, 26:14, 33:21, 33:23, 35:10, 54:4, 60:19, 64:12.
paused 19:9, 68:2, 73:13.
pausing 64:9.
paying 66:4, 126:9.
payment 19:2, 24:10, 24:15, 36:1.
payments 67:5, 67:6.
payroll 64:16, 64:18.
pays 66:19, 66:24, 66:25.
peer 80:4.
pending 117:10.
Pennsylvania 2:8.
per 88:12, 106:8.
percent 17:21, 86:3, 93:9, 93:15, 109:6.
percentage 95:5.
perform 93:2, 96:18, 100:17, 105:10, 105:17, 108:20, 112:14.
performance 43:15, 44:5, 80:10, 88:15.
performed 95:9, 107:6.
performing 82:9, 82:14, 98:23, 102:23, 104:18, 107:22, 108:14, 122:15.
Perhaps 89:20, 102:14, 105:2, 120:7.
period 21:25, 23:16, 36:3, 37:17, 53:5, 53:8, 56:1, 56:5, 57:5, 57:15, 57:16, 59:20, 59:23, 59:24, 60:1, 70:4, 71:4, 79:4, 83:24, 84:21, 84:24, 85:22, 91:16, 91:21, 99:1, 103:22, 109:23.
permanent 33:6, 33:9, 61:23.
permanently 111:15.
person 11:4, 14:24, 37:2, 93:17, 94:20, 94:24, 95:21, 102:2, 102:16, 110:10, 111:19.
personal 117:10.
personally 45:16, 81:11, 95:25.
perspective 34:1, 63:16, 65:25.
phenomenal 91:3.
phenomenon 113:20.
physically 61:4, 61:5.
PI 121:19.
piece 20:15, 26:4.
pieces 21:12.
place 10:23, 10:24, 12:25, 13:2, 16:24, 18:2, 19:23,

22:14, 24:25, 34:9, 34:15, 34:21, 37:9, 44:18, 51:18, 54:3, 60:19, 62:25, 67:12, 85:1, 92:10, 115:15, 123:20, 123:23, 124:8, 126:9.
placed 12:3, 21:16, 23:18, 24:3, 27:22, 27:24, 35:3, 38:8, 45:11, 70:22.
placement 44:2.
places 93:6.
Plaintiff 1:7, 1:25, 4:6, 4:17, 5:8, 82:2, 116:6.
Plaintiffs 4:8, 4:11, 4:14, 28:9, 28:18, 39:11, 76:20, 92:19, 115:25, 117:12, 118:3, 118:21, 119:7, 120:1, 125:25.
planning 67:17.
plans 12:12, 13:25, 77:23, 100:22, 123:25.
plate 115:1.
plausible 112:22.
play 78:13, 79:9.
please 4:5, 83:25, 126:23.
plug 88:21.
Plus 87:10, 96:19, 96:21, 100:18, 100:19, 103:7, 104:10.
po- 50:10.
point 5:7, 6:20, 13:9, 18:7, 19:4, 21:10, 58:19, 69:17, 86:20, 105:17, 115:5, 123:1, 123:2, 124:13, 125:7, 126:7.
points 92:12.
policy 124:20.
pool 110:22, 111:2, 111:3, 111:7.
portion 66:19, 66:24, 66:25.
positive 102:5, 102:12, 106:1.
possibility 126:4.
possible 25:21, 25:23, 25:24, 54:6, 60:14, 61:4, 61:5, 71:14, 79:8, 90:22, 122:16.
post 109:10, 111:18, 115:19.
posting 80:25, 81:2, 110:12.
potential 10:19, 26:6, 43:12, 66:17, 66:22, 67:3, 106:12.
potentially 21:16, 22:6, 22:13, 43:9, 44:18, 65:7, 65:8, 69:11, 85:9, 88:21, 113:4.
pre-employment 32:15.
precedent 120:5, 122:25.
predecessor 92:12.
preferable 56:12.
preference 43:14, 44:4, 92:2, 92:4.
prejudice 118:2.
preliminary 117:8, 117:10.
prep 55:1, 55:12, 56:23.
prepared 54:13.
preparing 17:19, 54:12, 54:16.
prerequisite 110:6.
presented 126:16.
President 40:16, 100:22.
Presidentially 107:6.
presumably 55:14.
pretend 12:25.
pretty 41:1, 106:4, 118:10.
preventing 61:6.
previous 84:9.
previously 87:22, 100:6, 102:8, 103:18, 104:4, 111:5.
principal 78:21, 107:3.
Prior 7:3, 11:25, 14:10, 15:19, 16:21, 22:15, 26:11, 34:2, 39:6, 40:11, 42:20, 42:21, 53:19, 59:11, 59:22, 86:18, 87:11, 88:22, 93:16.
prioritize 31:4, 31:5, 85:24.
priority 23:18, 31:23, 44:3, 68:23, 69:8, 112:4.
pro 123:9.
pro- 35:6.
Probably 75:15, 77:13, 81:4, 84:22, 86:13, 88:4, 88:11, 88:17, 90:3, 91:8, 98:3, 98:8, 100:13, 102:4, 103:5, 109:11, 109:16, 123:22.
probationary 52:13, 53:5, 53:8, 53:10, 53:12.
problem 101:17, 101:20,

125:1,
125:4.
problems 89:17,
94:15.
procedures
8:25,
29:23.
Proceedings
2:48, 90:15,
127:8,
127:12.
processed 25:4,
34:4, 56:15,
113:3.
processes
61:16.
processing
17:24, 18:17,
18:20, 20:4,
20:9, 20:13,
21:11, 23:23,
25:2, 26:3,
26:4, 26:8,
26:9, 31:2,
31:3, 35:25,
54:13, 55:20,
55:24, 59:11,
64:16, 64:19,
120:22.
procured
95:20.
produced
2:48.
Program 11:21,
14:21, 37:22,
38:1, 38:4.
programmatic
104:18.
Programs 2:14,
104:14.
Project 108:5,
108:7,
108:10.
prom- 10:7.
promote
31:18.
proper 59:17.
properly 14:1,
14:3, 20:16,
55:3, 58:1,
58:3, 59:7,
59:10,
62:6.
proportion
64:17.
protocols
84:9.
provide 12:11,
12:13, 15:1,
15:7, 67:19,
96:6.
provided 15:12,
15:15,
61:17.
provider
67:15.
providers
67:20.
prudent
110:15.
Public 1:26,
4:8, 103:16,
104:4, 105:6,
119:21,
119:23,
120:3,
124:20,
127:4.
public-facing
125:17.
publicly 97:12,
112:23.
pull 44:15,
102:7.
pulling
65:21.
purpose 29:6.
purposes 96:12,
120:23,
124:16.
pursuant
118:13.
purview
115:15.
pushed 55:23.
puts 124:4.
putting 21:5,
37:3, 57:23,
89:18,
126:2.
.
.
< Q >.
qualification
15:9, 15:10,
15:16,
72:14.
qualifications
22:22,
72:7.
qualified
14:18, 15:17,
28:18, 39:8,
44:15, 69:11,
72:8, 82:19,
99:11.
qualify 44:7.
qualifying
32:4.
quality
104:24.
quantities
95:24,
96:15.
quarter
87:21.
quarters
114:6.
question 7:5,
20:21, 31:8,
54:1, 54:19,
60:17, 63:18,
67:23, 70:15,
70:17, 78:6,
78:14, 85:23,
86:10, 89:14,
89:25, 94:25,
97:25, 100:4,
104:6,
109:16,
118:12.
questions 5:22,
5:24, 7:20,
28:8, 28:9,
28:20, 29:16,
39:9, 39:17,
41:16, 60:9,
73:10, 76:12,
81:20, 86:14,
92:18,
109:1.
queue 84:3,
84:6, 85:18,
85:20, 92:14,
101:13.
quick 83:23,
126:18.
quicker
72:22.
quickly 22:25,
25:23, 68:7,
72:22, 73:6,
97:25, 109:2,
122:20.
quite 28:17,
34:5, 41:19,
43:16, 55:11,
58:23, 60:2,
61:16, 65:8,
65:14, 72:14,
77:25, 87:19,
88:17, 88:25,
89:3, 113:16,
123:10,
123:23,
126:20.
quote 24:24.
.
.
< R >.
R. 2:12.
raise 6:2,
76:21,
124:22.
raised 126:4.
Raman 1:37,
4:16.
random 75:24.
rare 41:1.
rating 43:15,
44:5.
rational
114:16.
re- 43:12.
re-ask 30:17.
re-create
48:21.
re-creating
76:22.
Re-employed

31:23, 52:19, 52:21, 68:23, 69:2, 69:7, 69:8, 69:9, 69:21, 72:22.
re-enter 52:18.
re-examination 89:23.
reaches 98:2.
read 61:17, 108:10, 114:13.
ready 55:3, 84:14, 92:15, 112:3.
realistic 76:25.
realistically 109:18.
realize 12:20, 106:21, 123:4.
Really 57:7, 64:3, 64:5, 107:22, 110:14.
reapply 80:1.
reason 45:11, 56:12, 65:7, 96:1, 98:14, 104:20, 109:8, 113:9, 119:13.
reasonable 86:9, 103:21.
reasons 9:11, 121:2, 122:12.
reassigned 10:6, 29:21, 43:9.
reassignment 9:24, 10:3, 10:13, 43:13.
reassignments 32:24.
recall 8:13, 8:16, 8:17, 9:6, 9:7, 9:17, 40:8, 40:9, 40:11, 46:7, 51:9.
receipt 94:20, 94:21.
Receive 8:2, 13:22, 16:12, 19:2, 23:13, 24:15, 34:2, 39:1, 45:22, 45:25, 53:18, 53:24, 54:8, 55:25, 56:4, 61:20, 66:2, 67:14, 84:7, 84:10, 86:17, 91:19, 97:23, 117:20.
received 8:14, 9:1, 12:2, 13:22, 16:9, 16:11, 38:21, 40:7, 41:14, 45:20, 78:20, 83:19, 86:16, 90:15, 97:14, 110:5, 115:10, 115:21.
receives 11:18.
recent 87:17, 94:13, 121:18.
Recently 49:10, 81:14, 115:1.
recess 74:22.
recognize 115:3.
recompete 120:13.
reconstitute 83:6.
reconstruct 87:19.
record 4:6, 17:21, 20:10, 26:25, 127:12.
recorded 2:48, 95:4.
records 34:10, 55:7, 59:7.
recreate 48:9, 63:4.
recruit 11:24, 13:25, 31:17, 63:14.
recruitment 13:23, 13:24, 31:6, 32:8, 53:19, 63:15.
REDIRECT 64:2, 64:7, 69:25.
reduced 6:22.
reemploy 23:18.
re-employment 70:21, 92:2, 116:16.
refer 12:3, 23:16, 24:4, 27:9, 31:16, 37:25, 43:12, 55:22, 72:3.
reference 6:20.
referred 95:14.
referring 95:11, 103:14.
refile 118:3.
refill 48:10.
refilled 48:22.
refilling 9:5.
reflected 25:11, 94:25, 95:7.
regard 119:12.
regarding 115:11.
region 100:8.
register 43:16, 43:18, 62:18, 62:19.
regular 24:13, 45:3, 75:23.
regulation 46:5, 46:6.
regulations 41:21, 41:24, 44:20.
rehire 19:24, 25:23, 73:23, 80:7, 91:24.
Rehired 9:18, 10:8, 10:11, 73:24, 116:14.
rehiring 9:4, 9:10, 9:24, 10:14, 72:17, 75:24.
related 65:22, 113:16.
relationship 102:21, 102:22, 106:5, 113:24, 114:1.
relatively 33:2.
relevant 15:13, 17:25, 24:22, 106:17.
religion 123:4.
Remain 6:2, 23:15, 36:5, 36:9, 42:10, 44:25, 59:21, 66:9, 66:13, 73:13.
remains 89:14.
remediating

124:14,
124:15.
remember
8:17.
Remind 14:20.
Renee 4:21.
renew 48:16.
reopened
16:5.
reorganization
121:24.
reorganized
104:16.
replacement
101:15.
report 84:5,
85:7, 87:9,
92:9, 92:11,
92:13, 96:21,
97:1, 102:7,
103:5,
105:12,
117:13,
117:16,
117:21.
Reported
2:41.
Reporter 2:42,
7:13,
127:16.
reports 82:23,
117:19,
117:20,
121:11.
reputation
91:2.
request 50:20,
51:21, 51:24,
53:21,
54:6.
requested
37:8.
requesting
49:23,
51:15.
requests
53:23.
required 31:1,
32:1, 49:21,
53:8,
93:10.
requirement
53:15,
94:2.
requirements
15:11, 22:20,
37:3, 65:25,
81:1, 83:21,
93:21.
requires
99:24.
requiring
101:18.
research 37:18,
104:23.
reserve
117:8.
resources
11:10, 15:10,
39:19.
respect 6:17,
68:6, 68:9,
116:12,
117:6, 117:9,
118:11,
123:17,
123:24,
124:9,
126:17.
respond 94:2.
response 5:2.
responsibilitie
s 107:20,
107:23.
responsible
65:18,
102:1.
restart 64:12,
67:6.
restarted
64:12.
result 20:10,
27:1,
61:23.
resulting 24:4,
24:18, 27:1,
66:3.
resume 15:4,
15:8,
110:5.
resumes 15:2,
80:9, 91:19,
98:1,
109:13.
retention
43:15, 43:18,
47:10, 62:18,
62:19.
retire 52:17.
retired
52:24.
retreat 43:13,
47:15.
return 10:20,
34:6, 34:8,
53:1,
100:6.
returned
97:14.
Returning 53:2,
107:25.
returns
110:25.
review 11:24,
12:9, 13:17,
15:9, 15:10,
15:17, 22:24,
72:14, 86:13,
91:19,
97:25.
reviewed 5:3,
50:23,
76:3.
reviewing
22:22, 80:25,
86:12.
reviews 80:4,
80:10.
revise 118:1.
reward
122:21.
rid 7:23,
76:22, 120:6,
120:11.
Rifed 38:18,
70:6,
73:21.
Rifs 40:18,
40:24, 81:11,
83:7, 116:25,
122:7,
122:8.
Rights 1:5,
1:38, 4:3,
4:17, 43:8,
43:13, 52:12,
70:22,
104:15,
106:24,
107:5,
107:11.
Robert 1:38,
4:2, 4:16,
4:17.
ROBERT F.
KENNEDY
1:5.
robust
103:11.
role 11:9,
39:24, 42:20,
42:21, 53:9,
63:13, 98:6,
99:2, 106:6,
107:16,
108:3.
rolling
61:11.
RONALD 74:24.
Room 2:16.
rotational
89:21.
roughly 86:9.
route 32:6.
RPL 72:24,
73:2.
RPR 2:41,
127:10.
ruling
119:11.
run 93:5.
.
.
< S >.
S. 2:13, 4:3,
50:5.
safe 41:1,
48:20.
Safety
121:23.

sal- 24:11.
salaries 13:8, 70:3.
salary 19:2, 22:20, 24:9, 24:15, 55:25, 56:4, 56:6, 56:22.
satisfied 53:5, 115:11, 115:14.
saving 124:2.
saw 17:10, 75:25, 93:11, 113:10, 113:15, 113:21, 113:22.
saying 6:22, 26:14, 35:23, 54:20, 56:18, 58:17, 68:1, 82:3, 119:17, 125:22, 127:3.
says 5:9, 9:8, 13:1, 54:3, 70:17, 71:11, 71:19, 73:6, 108:20, 110:15, 119:14, 119:19, 125:5.
scale 75:6.
Schedule 32:3.
scheduled 56:4.
schedules 117:22, 117:24.
scheme 105:7.
scratch 76:23.
searching 80:20.
seated 6:8, 75:3.
second 13:1, 20:15, 48:3, 76:13, 114:5, 117:15.
seconds 63:7.
Secretary 5:9, 8:2, 8:7, 13:2, 45:25, 60:15, 60:22.
Security 1:10, 4:4, 4:22, 5:10, 13:3, 24:7.
seeing 113:12.
seek 83:23, 110:23.
seeking 110:22.
seemed 88:18.
seems 28:17, 86:9, 86:22, 124:8.
seen 40:19, 40:21, 41:20, 41:22, 44:20, 50:8, 50:12, 81:9, 84:6, 114:8, 116:4.
select 72:8, 72:9, 98:1.
selection 15:20.
send 52:3, 55:14, 93:18, 110:6.
sending 41:4, 84:11, 84:12, 84:13, 97:9.
senior 65:9, 65:21, 123:20, 123:21, 123:22.
sense 13:4, 65:6, 89:24, 89:25, 96:14, 96:15.
sent 41:3.
sentence 30:4.
separate 17:19, 24:16, 37:5, 38:5, 38:6, 51:17, 52:17, 62:5, 105:8, 105:12.
separately 73:24.
separations 18:1, 18:6, 18:7, 19:9, 21:11, 24:22, 24:25, 25:21, 26:15, 54:4, 58:6, 58:18, 59:13, 68:2, 117:1, 117:6, 118:13.
separations. 18:3.
series 10:7, 14:4, 34:8, 98:15, 98:17.
served 53:9, 107:11.
Service 10:9, 10:10, 10:18, 10:20, 24:19, 34:7, 34:9, 41:9, 43:14, 44:4, 48:7, 50:5, 51:10, 52:9, 52:16, 52:24, 53:1, 53:2, 53:13, 100:15.
services 39:20, 40:5, 96:6.
set 42:13, 42:15, 42:17, 42:19, 42:20, 42:21, 42:22, 43:15, 47:24, 63:1, 75:21, 99:18, 104:21, 104:24, 104:25, 122:8, 122:9, 122:25.
sets 42:18.
setting 120:3.
seven 72:1, 72:13, 73:5, 85:7, 86:13, 86:22, 88:20, 96:19, 96:25, 98:11, 99:24, 100:14, 100:18, 101:9, 102:22, 112:6.
several 83:20, 86:21, 122:18.
severed 22:21.
SF 25:11, 64:14.
share 105:22, 105:23, 106:1.
sharing 94:5.
Shoot 23:19.
short 43:17, 57:25, 65:23, 109:11, 126:3.
shortcut 16:7.
shorten 69:12.
shorter 70:21.
shorthand 2:48.
shot 98:21.
shouldn't 120:17.
show 72:3, 72:4, 95:5.
shows 20:17, 24:6.
shut 108:15.

side 50:11, 64:16, 64:19, 88:18, 123:12.
sign 38:7, 38:8.
significant 120:21.
signs 110:13.
similar 42:7, 92:3, 98:12.
simple 28:2, 54:24, 85:16.
simultaneously 107:16.
single 42:23, 43:2, 46:17.
sir 74:23, 115:7.
situation 16:2, 28:12, 50:8, 81:9, 100:6, 110:24.
situations 38:24.
six 33:17, 64:16, 86:21, 105:11, 110:12, 110:15, 111:10, 113:22.
sixth 110:24.
size 92:25, 104:2.
skeptical 126:14.
skill 104:21, 104:24, 104:25.
slots 9:5.
small 89:5.
smaller 86:20.
smoother 124:7.
solicitation 83:18, 99:6.
solicitations 110:19.
solve 90:4, 101:20.
somebody 7:2, 11:2, 35:22, 70:6, 73:21, 114:13.
somehow 123:3.
someone 12:25, 71:11, 98:5, 105:3, 105:11, 107:8, 107:10, 114:16.
Sometime 40:13.
somewhat 76:23, 101:17.
Somewhere 75:16, 85:6, 95:4, 100:21, 111:10.
soon 78:15, 83:22, 91:21, 112:2, 122:16.
sooner 54:7, 60:16, 60:20, 60:21.
Sops 85:20.
sorry 5:17, 7:12, 18:10, 19:16, 23:12, 35:6, 37:7, 38:14, 41:3, 43:24, 46:21, 49:25, 57:10, 59:1, 60:17, 64:21, 81:7, 83:25.
sound 94:13.
sounded 94:13, 94:15.
Sounds 102:12, 106:4.
Southern 121:20.
southwest 100:13.
specialist 15:10.
specialists 25:7.
specialty 66:21.
specific 65:20, 104:20.
specifically 48:24, 83:12, 96:14.
specifics 41:17.
speculation 123:16.
sped 116:20, 116:21.
speed 32:12, 54:7, 70:20.
spent 123:9.
sphere 127:4.
spoke 90:16, 101:22, 106:7, 108:13.
spoken 88:13, 91:1, 92:9.
spokesperson 119:22.
spots 13:18, 16:5, 16:14, 22:25.
St 1:39.
staff 13:3, 64:11, 64:13, 64:24, 65:5, 78:21, 79:1, 86:9, 86:11, 86:18, 86:22, 87:5, 87:23, 87:25, 88:22, 93:1, 95:21, 95:22, 101:10, 102:6, 102:11, 104:17, 107:3, 107:18, 107:19, 112:13, 122:7.
staffed 77:2, 86:5, 88:20, 102:20, 125:4.
staffer 102:19.
staffing 85:4, 85:25, 86:1, 87:16, 88:23, 93:24, 96:16, 96:18, 99:23, 102:25.
staffingwise 103:24.
stand 6:1, 13:1, 17:18.
Standard 17:19, 24:5, 26:25, 27:1, 54:12, 55:3, 61:24, 78:18.
standing 6:2, 116:2.
stands 14:20, 92:7.
start 5:16, 50:4, 54:15, 55:24, 67:17, 76:5, 78:15, 83:5, 89:11, 90:18, 91:20, 92:16, 98:4.
started 5:1, 48:13, 97:14, 113:12, 113:14.
starting 4:6, 63:3.
state 48:12, 48:17, 48:25, 63:5.

stated 110:14.
statement 125:1, 125:4.
States 1:1, 1:19, 4:20, 100:16, 113:5.
statistics 86:8, 95:7.
statute 31:1, 94:3.
statutory 30:10, 82:9, 96:19, 100:17, 104:13, 105:7, 108:14, 108:21, 112:14.
stay 64:10, 66:1, 91:5.
stayed 91:3.
stenographic 127:11.
step 80:24, 101:23, 118:7.
steps 83:15, 115:25.
stood 51:19, 122:16.
stop 21:10, 24:9, 25:21, 55:1, 55:11, 56:8, 66:7, 68:2, 116:25.
stopgap 83:18, 109:20.
stopgaps 78:10.
straight 62:9.
stream 104:9.
streamline 31:6, 31:12, 68:18, 73:5.
streamlined 18:8, 22:6, 23:4, 31:25, 36:16, 69:12, 72:17.
streams 104:8, 113:2.
Street 1:27.
structures 104:8.
stuck 71:15, 71:16.
subject 24:6, 29:17, 41:5, 41:8, 41:11, 78:22, 99:10, 101:25.
submission 18:24.
submit 13:23, 17:19, 20:12, 24:10, 60:15, 67:10.
submitted 17:23, 18:1, 24:23, 80:23.
sufficient 59:5, 101:9.
Suite 1:28, 1:40, 2:9.
superior 82:10.
supervisor 109:22, 110:7, 110:9, 110:11, 110:13, 126:10, 126:13, 126:24.
supervisory 37:9.
support 86:23, 88:5, 114:15.
supposed 20:7.
surprise 80:16.
suspect 91:16.
swag 95:14, 95:21.
sworn 6:5, 74:25.
sympathetic 123:7.
system 24:12, 25:4, 25:15, 56:15, 58:2, 58:3, 61:7, 61:15, 61:16, 61:21, 95:4.
systems 20:9, 24:4, 24:17, 55:5, 61:13, 62:5.
.
.
< T >.
T. 2:5, 2:41, 127:15.
tack 119:25.
taken. 74:22.
talked 5:12, 21:6, 40:7, 62:10, 86:3, 89:1, 89:13, 104:12, 109:2, 109:20, 111:13.
tasked 82:8.
tasks 65:17, 102:23.
team 17:18, 20:19.
technicalities 116:23.
technically 25:20.
tells 113:24.
ten 21:9, 71:12, 71:13, 111:10.
term 46:4, 110:14.
terminated 91:24.
terms 11:16, 23:1, 42:11, 68:15, 68:25, 70:24, 76:13, 87:4, 94:9, 116:13, 117:1, 124:2.
testified 6:6, 75:1, 90:23, 93:8, 106:15, 106:23, 116:20.
testify 104:1, 106:9.
testimony 77:22, 78:17, 115:10, 119:16, 120:9, 121:10, 124:2.
Thanks 74:17.
THE CLERK 6:8, 75:3.
THE WITNESS 60:10, 65:7, 90:2, 114:2.
theirs 82:6.
themselves 4:5, 29:3, 46:9, 46:16, 94:22.
theories 112:19.
they'll 23:10, 84:14, 112:4.
They've 21:4, 23:8, 53:5, 62:12, 68:6, 105:22.
thingamajig 28:3.
thinking 97:22, 123:24.

thinks 116:21.
third 84:4, 110:23.
though 37:14, 56:7, 121:16.
thousand 86:21.
thousands 95:22, 95:24.
three 7:24, 8:9, 17:20, 25:20, 41:12, 41:14, 43:1, 62:20, 64:13, 64:15, 64:16, 76:17, 77:18, 87:21, 89:2, 89:3, 89:6, 96:17, 96:23, 99:3, 108:18, 109:10, 115:18, 115:23, 118:25.
Throughout 4:25, 21:25, 22:16, 23:15, 81:15, 81:17, 86:6.
thrown 115:1.
Thursday 64:23, 65:3.
Tiberius 2:5, 4:19.
tie 22:2.
tied 25:9.
tier 44:6, 44:9, 44:11.
tiered 43:25, 44:2.
tiers 43:19, 43:21, 43:23, 43:25, 44:5, 44:11, 44:13.
tightening 113:14.
timecards 17:25, 35:7, 55:20, 55:21.
timely 18:24, 82:4.
timing 68:25, 76:14, 76:24, 116:14.
together 117:12, 121:7, 121:9, 126:3.
tomorrow 63:3.
took 32:9, 37:20, 122:22.
tools 87:2.
top 8:13, 8:16, 46:7.
total 64:16, 81:8, 87:13, 88:25, 101:5.
totally 19:20, 26:17, 79:14, 124:19.
touch 74:11, 80:22.
toward 26:8.
track 20:19.
tracked 95:3, 95:8, 95:10.
training 85:22.
tranches 61:12.
Transcript 1:17, 2:48, 127:11.
transcription 2:49.
transfer 32:23, 90:22, 91:9.
transferred 85:21, 90:16.
transferring 90:13, 92:16.
Transition 11:21, 14:21, 37:22, 37:25, 38:4.
transitioning 91:4.
trend 86:15.
triaging 85:18, 92:14.
TRO 5:2, 117:6, 117:7, 118:2, 119:12, 121:16, 121:17, 126:3.
true 101:2, 118:4.
trust 28:19.
try 44:17, 70:18, 72:19, 105:18, 115:5.
trying 19:21, 28:13, 36:19, 38:11, 44:15, 102:3.
TSA 105:4, 105:5, 105:6, 105:9, 105:11, 105:12.
Tuesday 58:4, 59:3, 59:14, 60:24, 81:5, 90:17, 90:20, 119:3.
turn 96:16, 99:23, 102:25, 106:3, 109:15.
turnaround 116:19, 126:18.
Turning 95:13.
turns 118:4.
two-step 20:14, 61:20.
two-week 56:1.
type 13:24, 14:4, 33:7, 38:9, 43:10, 44:15, 53:12, 66:20, 67:8, 67:14, 85:19, 85:22, 92:4, 95:11, 98:17.
types 95:16.
typically 107:7, 110:13.
.
.
< U >.
ultra 116:4.
understanding 6:23, 8:20, 9:11, 13:9, 13:15, 20:1, 20:2, 36:15, 41:19, 60:17, 73:19, 87:11, 88:15, 89:4, 92:1, 94:17, 99:18, 102:13, 103:3, 104:2, 112:4.
understands 118:24.
Understood 23:19, 72:20, 73:4, 125:11, 125:14, 125:24.
undo 33:22.
undoing 124:7.
unfortunately 81:16.
unfounded 115:14.
unique 16:2.

unit 95:24.
United 1:1, 1:19, 4:20, 100:15, 113:5.
universe 86:21.
unlawful 120:4, 120:20, 121:1, 122:21.
unless 53:18.
unlike 115:18.
unpaid 27:14, 27:17, 34:20, 35:14, 35:15, 35:17, 35:24, 36:7, 37:3.
unprecedented 122:11.
unreasoned 122:21.
unwind 116:8.
upend 124:11.
urge 121:17, 122:18.
USA 81:3, 97:12.
USCIS 84:4, 84:8, 84:11, 90:18, 92:9, 92:16, 93:10, 93:18, 94:6, 94:7, 94:9, 94:12, 94:22, 95:1, 111:3, 111:5, 111:23.
using 44:5, 112:14, 118:19, 118:21.
.
.
< V >.
v. 122:7.
vacancies 13:15, 15:23, 22:18, 22:23, 97:2, 98:13, 99:14, 118:14.
vacancy 11:25, 12:13, 15:25, 22:15, 22:19, 28:3, 71:22, 72:16.
vacant 11:23, 22:14, 23:4, 31:16, 32:25, 33:5, 39:7, 42:9, 43:10, 44:8, 44:17, 63:20, 71:20.
valid 116:6.
validated 55:22, 62:1.
value 89:17, 101:19, 108:12.
various 31:13, 45:10, 97:8.
veracity 115:12, 126:16.
versus 4:3, 69:1, 69:21, 119:16, 122:17.
Veteran 43:14, 44:4.
Veterans 81:12.
via 12:12, 68:18, 106:7.
viability 108:12.
view 99:23, 100:3, 104:16, 111:9, 122:21.
views 77:1, 108:11, 123:16.
violate 70:8, 73:16, 97:4.
violating 79:15.
violation 73:22, 74:2.
Virginia 121:21.
virus 116:4.
visible 96:11.
volume 93:24.
voluminous 41:20.
voluntarily 34:15, 37:20, 38:5, 38:6, 52:17.
voluntary 10:18, 13:18, 67:9, 91:9.
volunteers 111:1.
vs 1:8.
.
.
< W >.
waiting 116:22.
waive 99:17.
waived 78:23.
waiver 50:18, 50:20, 50:21, 51:2, 51:8.
walk 62:8.
wanted 25:17, 31:8, 35:15, 44:10, 62:18, 65:2.
wants 16:14, 19:9, 19:10, 21:8, 31:4, 31:22, 63:14, 65:3, 68:13, 68:17, 120:8, 125:17.
wars 81:16.
Washington 1:12, 1:29, 1:35, 1:41, 2:10, 2:17, 2:44.
ways 31:12, 31:13, 103:18, 119:17.
wearing 95:15, 95:17, 95:19, 96:10.
Wednesday 21:7, 26:10, 26:14, 57:12, 58:4, 58:8, 60:24.
week 52:12, 56:4, 56:5, 56:19, 56:22, 58:19, 67:7, 73:14, 84:16, 85:17, 90:17, 97:11, 98:4, 99:6, 115:2, 122:17.
well-qualified 16:24, 31:18, 32:2.
West 121:21.
whatever 5:24, 16:16, 98:25, 123:1.
Whenever 70:17.
Whereas 56:3.
whether 10:18, 25:12, 36:7, 36:8, 36:11, 61:18, 66:9, 67:9, 68:11, 73:12, 115:16, 115:24, 116:7, 116:12, 116:15, 117:9, 124:3, 124:4, 126:15.
who've

122:14.
whole 5:5, 105:17, 120:6.
whom 83:20, 99:15, 99:16.
Wiley 121:21.
window 106:8, 109:11.
winds 86:2, 103:7.
wisdom 35:21.
wish 78:16.
Without 19:24, 27:18, 27:19, 27:22, 27:24, 34:22, 35:3, 37:5, 37:8, 37:10, 37:12, 37:16, 60:13, 66:16, 86:22, 94:22, 118:2.
WITNESS 6:5, 6:7, 6:9, 7:8, 7:16, 7:18, 9:25, 28:21, 52:21, 52:23, 61:1, 64:25, 65:14, 74:9, 74:14, 74:16, 74:25, 75:2, 115:8.
witnesses 5:1, 5:17, 5:23, 12:20.
wondering 60:18.
word 45:14.
words 103:2, 119:20.
worked 7:22, 86:18, 101:13.
workers 78:5, 94:17.
Workforce 37:22, 37:25, 38:4, 119:21.
working 6:14, 6:16, 13:25, 14:1, 16:14, 65:10, 81:1, 90:18, 92:15, 103:4, 103:14, 106:4, 120:8.
workload 81:15, 86:7, 86:24, 87:1.
works 8:3, 58:25.
world 119:5.
worn 95:21.
worried 76:14.
worry 13:7, 121:6.
wow 50:2.
write 24:24.
writer 85:7, 87:9, 96:21, 97:1.
writing 35:2, 92:9, 92:13, 103:5.
written 49:19, 89:10.
wrote 24:24.
WTP 37:21.
.
.
< Y >.
yards 100:4.
year 33:14, 40:21, 80:10, 86:9, 86:11, 86:15, 86:25, 88:12, 88:16, 101:6, 113:13, 113:16, 114:6.
years 33:15, 33:16, 44:4, 78:2, 87:1, 87:17, 87:21, 89:2, 89:6, 91:6, 94:16.
Yesterday 67:25, 68:5, 75:10, 77:8, 77:9, 92:10, 108:13, 115:2, 115:10, 115:11, 122:6.
York 122:7.
yourself 7:1, 98:24.