IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ROBERT F. KENNEDY HUMAN RIGHTS, ) CIVIL NO.:
) 25-1270-ACR
Plaintiff, )
vs. )
)
DEPARTMENT OF HOMELAND SECURITY, )
et al., ) June 12, 2025
Defendant. ) Washington, D.C.
__________________________________) 11:00 a.m.

Transcript of Zoom Status Conference
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff: Karla A. Gilbride, Esquire
Public Justice, P.C.
1620 L Street NW
Suite 630
Washington, DC 20036

Michael C. Martinez, Esquire
Christina Coogle, Esquire
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Medha Raman, Esquire
Anthony Enriquez, Esquire
Robert F. Kennedy Human Rights
1300 19th St NW
Suite 750
Washington, DC 20036

APPEARANCES: (Cont'd)

For the Defendant: Tiberius T. Davis, Esquire
Department of Justice
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001

Reported by: Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
333 Constitution Avenue, NW
Washington, D.C. 20001
(202) 354-3247

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription

P R O C E E D I N G S

THE CLERK: This is case No. 25-1270. Robert F. Kennedy Human Rights, et al., v. U.S. Department of Homeland Security, et al.

Will the parties please identify themselves for the record.

MS. GILBRIDE: Karla Gilbride with Public Citizen for the plaintiffs.

MR. MARTINEZ: Michael Martinez with Democracy Forward for plaintiffs.

MR. ENRIQUEZ: Anthony Enriquez for plaintiff Robert F. Kennedy Human Rights.

MS. RAMAN: Medha Raman for plaintiff Robert F. Kennedy Human Rights.

MR. DAVIS: Tiberius Davis on behalf of defendants.

THE COURT: Is that everyone?

THE CLERK: Ms. Coogle just joined the feed, Your Honor.

THE COURT: Okay. All right. Mr. Davis, you're alone today?

MR. DAVIS: Yes. If Mr. Sartini joins then somebody from DHS will join, but it's just me for now.

THE COURT: All right. So I've gotten plaintiff's many status reports. And I'm a little bit confused as to what

you all think I can do. So I want to take up the congressional budget issue first. If the executive doesn't -- I mean, they've asked for interim money for interim employees as far as I understand it, which because what they have right now is interim employees. If Congress thinks that they've not asked for sufficient money to satisfy congressional action offices that seems like congress's deal, not mine. So I'm not sure what you all want me to do about this and how you think that this impacts your current case.

MS. GILBRIDE: In two ways, Your Honor. First of all, with regard to the Office of the Immigration Detention Ombudsman, they did not ask for interim funding, they say that the office has been eliminated, which directly contradicts what they have told this court regarding the plan to hire employees and to continue performing statutory functions.

With regard to the other two offices, the amount of money they're allocated, first of all, don't seem sufficient to cover the number of staff that they have told this court they intend to hire. And referring to the money as allocation for leave and severance payments or the employees subject to the riff as well as interim staffing, doesn't suggest -- at least doesn't suggest to me an intent to have full time staff, you know, that that would continue to perform these functions on an ongoing basis, just based on the word interim.

But again, that's a question perhaps to ask

defendants in terms of what the intention was. But both the amounts of money they are allocated in that budget justification and the purposes for which they say that the funding is intended did not appear to be consistent with what they have represented to this court.

THE COURT: Well, let's take those backwards. So as to the last thing you mentioned. I mean, that may be the case, they might not be asking for enough money. But if so, then that's congresses job to say you're not asking for enough money for these offices that we've established. I don't -- I don't understand what role the Court would possibly have in telling the executive that they haven't budgeted enough, or they haven't in their budget given the right description of what the money is needed for.

I mean, it would just be -- it would just be an endless free for all if any plaintiff could come into court and say they don't have enough money for the thing that's as required by Congress. I mean, Congress is the one that should decide whether or not the executive has provided enough budgetary resources or asked for some to fulfill what Congress wants to fill. If not, then Congress can give the office more. I mean, they're not constrained by the budget.

I just -- I don't think the Court is the gatekeeper. Do you have a case in which a court has said you, executive, haven't asked to put enough money in the budget?

MS. GILBRIDE: We could certainly look for such a case, Your Honor, but that's not the purpose for which we submitted the budget justification. The purpose for which we submitted it was to point to bad faith, or at least a discrepancy between the representations that have been made, you know, to Your Honor by Mr. Sartini and suggesting that we plan -- this is our plan. This is our plan going forward, which was, you know, in response to our argument that the Agency was shut down.

The response from the government was, no, it's not shut down. We have a plan, it involves this number of staff. And, you know, that's what we intend to do. And we have short from the leadership. You know, you were asking Mr. Sartini do you have, you know, go ahead from the leadership of DHS to put this plan into effect. And he said yes, I do. Now we see something, also presumably from the leadership of DHS, which seems to be saying something very different.

So my point wasn't that the budget justification was insufficient. Our reason for submitting it was to point out an inconsistency between what you're being told and what the -- what DHS is saying, to call into question whether what this Court is being told about the plan is actually accurate.

THE COURT: All right. Well, I mean, I'm going to ask about the eliminated office thing, because that seems to

me to be a direct contradiction, but not -- I'm not going to say you're not putting in enough money to do what you say you're going to do. I don't think I have that role of second guessing -- saying you're acting in bad faith because you're not asking for enough money. That's putting me in the job of having to play human resource director or DOH, which I'm not going to do.

So Mr. Davis, can you talk to me about the office eliminated language that is a direct contradiction to what I've been told by you all.

MR. DAVIS: So I think the first point is this isn't really a question of the intentions of DHS, this is the president's budget. And it's the president's budget down to the specific offices, actually. So this is just a reflection of the back and forth between DHS and what the president sort of told them him he wanted. I can't get into the specifics, obviously, of that discussion, but that's what the president wanted to propose to Congress. And whether, as you said, Congress passes it is up to them and that's fairly speculative.

Mr. Sartini is perfectly willing to say and will say, if you want to hear from him, that as long as he has the money he has the authority and will carry out the plan that he laid out and continues to do so. In fact, they have already gotten resumes for a lot of the offices. They agreed to hire

a deputy, who has agreed to sign on. They just have to onboard him. They're actually, after they reviewed complaints for both OIDO and for CRCL, including they responded specifically to complaints that one of the plaintiffs had and have reviewed and opened investigations in about eight and reviewed a hundred more.

So the plan is still going forward. They continue to do the plan. If Congress ends up passing the president's budget there will be less money, especially for OIDO. I think for the other two offices there will be less money in the proposed budget, but it's not just for interim people, per the language there, but my understanding is that will include staff contracts, things like that. But again, that's sort of all dependant on whether Congress decides to pass the president's budget, which, you know, given progress who knows.

But, again, this is not DHS sort of leadership plans, this came from the White House. It's a reflection --

THE COURT: -- well, does DHS senior -- I mean, I imagine the senior people at DHS must have had some input into these numbers. I mean, you don't have some guy or gal in the White House, you know, typing away at their computer creating these numbers out of thin air. I mean, if I gave -- I mean, I guess I could give plaintiffs discovery to find out, you know, any communications between DHS and the executive concerning the budget calculations and specifically the language with

respect to limiting the office.

I mean, if that language came from DHS, then you're going to have a very serious sanctions issue. Because at that point, I mean, depending on when that language came out. If it came out after this lit -- after you told the Court that the office wasn't being eliminated, and there's internal discussions within DHS or between DHS and the presidency that they are eliminating it, then we're looking at potential contempt of court proceedings. I mean, that's just where we are. I don't know if that's happened. But I mean, this is directly contrary to what your client, through you, has told the Court on more than one occasion.

So, I mean, here's what I'm -- Mr. Davis, I'm going to give you until close of business Monday to have conversations with your client and for you to represent to me how -- that whether there were communications with the executive with respect to the language of eliminating the office and respect to sort of the budget numbers for those three offices. If you do not get me sort of sufficient information by Monday or information that I think, through no fault of your own, I'm sure is in good faith, I'm going to allow plaintiff's discovery. But I'm not going to jump the gun on that until I've given you the opportunity to try to figure out what's going on. Does that make sense?

MR. DAVIS: I will obviously take that back and tell

them that. I think the front line position would be that communications are probably privileged, but --

THE COURT: Well --

MR. DAVIS: -- allowed to say --

THE COURT: Well, no, then we can do it ex parte, because right now what we're looking at is communications with respect to you through your client lying to the Court, right. I mean, if it wasn't -- I mean, if we were just talking about numbers and the numbers aren't enough then, yeah, maybe I would agree with you that I don't have any role. But when we're talking about whether the senior staff or any staff at DHS, after the onset of this litigation, your client telling the Court they haven't been eliminated and then saying to the executive, we're eliminating this, then there are then -- I'm going to -- I will have access to the materials. I will enter an order for them. I will do whatever for them. If you want to take an emergency appeal, by all means. But I'm not just going to accept that it's a black box.

Now, if you come back to me and explain what happened and DHS was not at all involved, okay. If you can come back and explain to me that DHS gave budget numbers and did not say that the office was being eliminated and that came from the executive, they don't know how it got there, then that is what that is. And then you just have a ripeness issue with respect to when, you know, the plaintiffs would be able

to proceed on their claim. But right now this isn't directed at their claim so much as directed at whether you all were truthful when you would be talking to me and, of course (INAUDIBLE).

But, again, I'm not jumping the gun. I'm not ordering that immediately. I'm giving you time. And, you know, if you can't do it at Monday at COB I might be open to giving you 24, 48 hours maybe if you tell me that you're traveling, or what not, and that you acted in good faith, okay. But we are going to get the bottom of this, all right? And if we have to do it ex parte that's fine too.

All right, Mr. Davis?

MR. DAVIS: Yes. Understood. I just -- again, it's a proposal from the president, but that doesn't mean that the office is being planned to be closed down, especially if the money is there.

THE COURT: No, I understand. My question -- I totally understand. The language came from somewhere. And if it came from the brains of the executive outside of DHS, then you know that will be part of plaintiffs -- you know, then that claim is not yet ripe, I don't think. I mean, yeah, they might be able to get discovery on it later on. But if someone at DHS -- if the executive asks for input from the Agencies. And the Agencies gave the input that we don't need to fund this particular office because it's been eliminated, and that

happened after you all told me that it hadn't been eliminated, then that's where we're running into issues. Okay?

MR. DAVIS: Understood.

THE COURT: All right. Anything else from the plaintiffs?

MS. GILBRIDE: With regard to the status report that we submitted yesterday, you know, we raised those matters in the new declarations to just bring the Court's attention to ongoing issues that are happening without, you know, the functioning of the offices or at least, you know, the significant backlog based on the fact that the offices ceased work in March. And both with regard to ongoing investigation of complaints, which we've talked a great deal about, but also with regard to oversight of DHS programs and activities and development of policy. And that's why we submitted the declaration from Lilian Serrano of SBCC regarding some of the issues happening in Southern California, and declaration from a former CRCL employee discussing some of the oversight functions that they would have performed on those topics.

You referred to potential discovery, Your Honor, and that is something that plaintiffs are -- would like to request given the lack of clarity about what is -- what functions are actually being performed at this moment. I mean, we know what our plaintiffs have experienced in terms of response times on complaints. But would request, you know, further discovery

into the status of investigations, into the status of the funding, as Your Honor alluded to, and the status of those oversight statutory functions and what is currently being performed, just to have some further visibility into that. Because it remains very opaque to us at this time.

THE COURT: All right. Mr. Davis.

MR. DAVIS: I mean, I -- we don't think that discovery is necessary. We think plaintiffs have had plenty of chances for their PI to prove it and we're not at that stage yet. And looking into the functions and day-to-day aspects of it while offices are trying to get started back up and do the work is going to cause a lot more delays and problems that the plaintiffs are trying to avoid.

THE COURT: Yeah, I mean, I agree with Mr. Davis. My role is not to, again, look over the shoulders of these offices and make sure that they're running as efficiently as humanly possible, that's just not my role. And I'm sure as heck not going to get into whatever's happening in California. The California courts or the California governor can deal with that, but that's definitely not my role.

With respect to discovery, I agree I don't just want to do discovery as one off. You all should get together and come up with a plan for getting to a permanent injunction hearing, whether you want to collapse the permanent injunction hearing with a hearing on the merits is totally fine with me,

if that's what you all want to do.

But you all get together. Put the plan together. They will get discovery, you know, it will go both ways, obviously, Mr. Davis. So at some point there's going to be discovery. But I want you guys to work that out amongst yourselves. Does that make sense to everybody? And ideally maybe, you know, get that to me in the next couple of weeks.

You guys can, you know, set a hearing, you know, whatever my schedule with Ms. White. Mr. Davis, this isn't going to be five years out. It's going to be sooner rather than later. So keep that in mind when you negotiate with the plaintiffs.

All right. Anything else?

MS. GILBRIDE: I was just going to ask if my colleagues had anything else. I apologize.

MR. ENRIQUEZ: No, thank you.

MR. MARTINEZ: No, thank you.

MR. DAVIS: I was just going to ask about the answer, which I believe is due in early, mid-July is there any reason not to stay that if we plan on moving forward with sort of a permanent injunction hearing at some point near in the future?

THE COURT: I mean, I'm totally happy for you not to answer. I don't know if the plaintiffs care one way or the other.

MS. GILBRIDE: We'll talk to defense counsel about that.

THE COURT: I mean, I can tell you what the answer is going to be. It's going to be denied on everything except the fact that they're agencies. I never find answers to be particularly useful. But you all do you.

Okay. Anything else?

All right. Thank you, everyone.

MS. GILBRIDE: Thank you.

MR. DAVIS: Thank you.

(The proceedings were concluded at 11:18 a.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_________/s/______________
Christine T. Asif
Official Court Reporter