# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT F. KENNEDY HUMAN
RIGHTS; SOUTHERN BORDER
COMMUNITIES COALITION; and
URBAN JUSTICE CENTER,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her
official capacity as Secretary of
Homeland Security,

      Defendants.

Civil Action No. 25-1270-ACR

### COMBINED REPLY IN SUPPORT OF PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Christine L. Coogle (DC Bar No. 1738913)
Brian D. Netter (DC Bar No. 979362)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

Karla Gilbride (DC Bar No. 1005586)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
kgilbride@citizen.org

*Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert & Ethel Kennedy Human Rights
Center
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355

Sarah E. Decker (DDC Bar No. NY0566)
Robert & Ethel Kennedy Human Rights
Center
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432

*Counsel for Plaintiff KHRC*

February 27, 2026

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

ARGUMENT .........................................................................................................3

I.  Defendants conflate the single agency action that Plaintiffs challenge with the action's numerous harmful consequences. ......................................................3

   A.  Plaintiffs challenge Defendants' March 21, 2025, dissolution of the Oversight Offices, which Defendants cannot retroactively convert into a mere realignment. ........4

   B.  Plaintiffs do not separately challenge the consequences of the offices' dissolution. ....7

II.  This Court has subject matter jurisdiction over Plaintiffs' claims.......................................9

   A.  Plaintiffs have standing..........................................................................10

   B.  Plaintiffs' claims do not involve employment and cannot be channeled to the Merit Systems Protection Board. ..........................................................17

III.  Plaintiffs have a cause of action under the Administrative Procedure Act.......................19

IV.  Defendants' March 2025 dissolution of the Oversight Offices violated the Administrative Procedure Act...............................................................22

   A.  Defendants' dissolution of the Oversight Offices exceeded their statutory authority. 22

   B.  Defendants' dissolution of the Oversight Offices was contrary to law. .....................23

   C.  Defendants' dissolution of the Oversight Offices was arbitrary and capricious. ........30

V.  Defendants' dissolution of the Oversight Offices violated the separation of powers and was ultra vires. ............................................................................32

VI.  Plaintiffs' proposed injunction is appropriate...................................................33

CONCLUSION...............................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*,
  789 F.2d 931 (D.C. Cir. 1986) ................................................................. 14

*AFGE v. Trump*,
  782 F. Supp. 3d 793 (N.D. Cal. 2025) ...................................................... 17

*AFGE v. Trump*,
  145 S. Ct. 2635 (2025) ............................................................................. 18

*AFL-CIO v. DOL*,
  778 F. Supp. 3d 56 (D.D.C. 2025) ...................................................... 14, 15

*American Textile Manufacturers Institute, Inc. v. Donovan*,
  452 U.S. 490 (1981) ................................................................................... 6

*American Federation of Government Employees v. Secretary of Air Force*,
  716 F.3d 633 (D.C. Cir. 2013) ................................................................. 17

*Armstrong v. Exceptional Child Center*,
  575 U.S. 320 (2015) ................................................................................. 32

*Axon Enterprise, Inc. v. FTC*,
  598 U.S. 175 (2023) ........................................................................... 18, 19

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................. 21

*Capital Area Immigrants' Rights Coalition v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................... 15

*Center for Biological Diversity v. U.S. Department of Interior*,
  144 F.4th 296 (D.C. Cir. 2025) ................................................................ 10

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................... 31, 32

*DHS v. Regents of University of California*,
  591 U.S. 1 (2020) ................................................................................. 6, 31

*Doctors for America v. OPM*,
  793 F. Supp. 3d 112 (D.D.C. 2025) .......................................................... 12

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ................................................................................................ 16

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ...................................................................................... 15, 16

*Food and Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................ 16

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
  561 U.S. 477 (2010) ............................................................................................ 19

*Fund for Animals, Inc. v. U.S. Bureau of Land Management*,
  460 F.3d 13 (D.C. Cir. 2006) .............................................................................. 19

*Global Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ......................................................................... 31, 32

*Harmon v. Thornburgh*,
  878 F.2d 484 (D.C. Cir. 1989) ............................................................................ 10

*Las Americas Immigrant Advocacy Center v. DHS*,
  783 F. Supp. 3d 200 (D.D.C. 2025) .................................................................... 10

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ...................................................................................... 10, 19

*Make the Road New York v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ............................................................................ 30

*Maryland v. USDA*,
  No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) .................................... 17

*McMahon v. New York*,
  145 S. Ct. 2643 (2025) ........................................................................................ 17

*National Mining Ass'n v. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998) .......................................................................... 10

*Natural Resources Defense Council v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ............................................................................ 22

*Nuclear Regulatory Commission v. Texas*,
  605 U.S. 665 (2025) ............................................................................................ 32

*People for the Ethical Treatment of Animals v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ................................................................. 11, 14, 16

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ................................................................. 30

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ................................................................. 16

*Somerville Public Schools v. McMahon*,
  139 F.4th 63 (1st Cir. 2025) ................................................................. 17

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ................................................................. 18

*Trump v. Orr*,
  223 L.Ed.2d 180 (2025) ................................................................. 30

*Turlock Irrigation District v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ................................................................. 16

*Widakuswara v. Lake*,
  2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................................................. 20

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................. 4, 21

5 U.S.C. § 702 ................................................................. 10

5 U.S.C. § 706(1) ................................................................. 8, 21

5 U.S.C. § 706(2) ................................................................. 22

6 U.S.C. § 205(b)(3) ................................................................. 26, 32

6 U.S.C. § 205(b)(4) ................................................................. 8, 9

6 U.S.C. § 272(a) ................................................................. 28

6 U.S.C. § 272(b)(1) ................................................................. 28

6 U.S.C. § 272(d) ................................................................. 32

6 U.S.C. § 272(d)(3) ................................................................. 28

6 U.S.C. § 272(e) ............................................................................................ 32

6 U.S.C. § 272(g) ............................................................................................ 32

6 U.S.C. § 272(g)(2) ........................................................................................ 28

6 U.S.C. § 345(a)(3) ...................................................................................... 8, 9

6 U.S.C. § 345(b) ............................................................................................ 26

6 U.S.C. § 452 ........................................................................................... 22, 32

6 U.S.C. § 452(b) ...................................................................................... 22, 32

6 U.S.C. § 452(b)(2) ........................................................................................ 22

42 U.S.C. § 2000ee-1(g)(2) ............................................................................ 26

Pub. L. No. 118-47 .......................................................................................... 24

Pub. L. No. 119-4 ............................................................................................ 24

Pub. L. No. 119-37 .......................................................................................... 24

Pub. L. No. 119-75 .......................................................................................... 24

**Rules**

Federal Rule of Civil Procedure 65(d) ............................................................ 33

**Other Authorities**

Executive Order 14210, Implementing the "Department of Government Efficiency" Workforce
    Optimization Initiative, 90 Fed. Reg. 9669 (Feb. 11, 2025) ......................... 4, 5, 6, 30

Executive Order 14224, Designating English as the Official Language of the United States, 90
    Fed. Reg. 11363  (Mar. 1, 2025) ............................................................................ 27

**INTRODUCTION**

Defendants seek to obtain summary judgment in this case by revising history. They suggest that they never made a decision to eliminate the Office for Civil Rights and Civil Liberties (CRCL), the Office of the Citizenship Immigration Ombudsman (CISOM), or the Office of the Immigration Detention Ombudsman (OIDO) (together, the Oversight Offices), even though the reduction-in-force (RIF) notices sent to over 300 employees of those offices announced that each of the offices was being dissolved. And the RIF included all General Service (GS) positions in all three offices, without making any distinction between those employees who were performing functions required by statute and those who were not. In short, the administrative record in this case, as supplemented through discovery, leaves no doubt that Defendants targeted the Oversight Offices for elimination, and carried out that action through the RIF and stop-work order announced on March 21, 2025.

The reason for this elimination is evident from the contemporaneous statements made to the Office of Personnel Management (OPM) and to the public by Defendants' former spokesperson Tricia McLaughlin, who described the offices as "internal adversaries" that "slow[ed] down operations" and "obstructed immigration enforcement by adding bureaucratic hurdles and undermining DHS's mission."[1] *See also* Plaintiffs' Statement of Material Facts (PSOMF) ¶¶ 1–2 (describing March 6, 2025, memoranda to OPM that requested authorization for a "100% RIF" of the Oversight Offices because their functions "do not advance the national security mission of DHS and can properly be eliminated").

But Congress created all three Oversight Offices and requires each to carry out specific functions, a fact Defendants now concede. *See* Defendants' Statement of Material Facts (DSOMF)

---

[1] Ellen M. Gilmer, *Trump Aides Shutter Homeland Security Civil Rights Office*, Bloomberg Gov't (Mar. 21, 2025), https://perma.cc/P88P-SEZP.

¶ 4.  And yet, as discovery has also revealed, Defendants continue to starve the offices of resources in a manner that interferes with their ability to perform statutorily required functions, demonstrating that the hostility to those functions that caused Defendants to target the offices for elimination last March remains unchanged.  *See* PSOMF ¶¶ 74–79 (describing Defendants' budget proposal submitted to Congress on May 30, 2025, that would eliminate all funding for OIDO and reduce funding for the other offices by 90%).

Defendants offer a blizzard of legal arguments aimed at stripping this court of jurisdiction or cutting off Plaintiffs' Administrative Procedure Act (APA) claims at their inception so that the Court never has to consider the factual record in this case.  These efforts to evade the merits fall flat.  Plaintiffs are challenging a discrete, final agency action that injured them—the March 21, 2025, dissolution of the three Oversight Offices—giving them standing to seek relief as to that action under the APA.  Plaintiffs do not challenge an adverse employment action taken against any particular federal employee, and so the administrative review scheme established by the Civil Service Reform Act (CSRA) does not deprive this Court of jurisdiction.  Nor do Plaintiffs challenge how Defendants are currently performing various statutory functions or seek to compel unreasonably delayed agency action.  They are challenging a single unlawful action that occurred last March and that has caused a host of foreseeable consequences that continue to injure them.

To address the irreparable harm to Plaintiffs from the ongoing consequences of that unlawful agency action, this Court should issue a permanent injunction to ensure that the Oversight Offices resume performing their statutory functions and are able to perform those functions going forward.  The balance of equities and public interest both strongly favor the proposed injunction to protect the safety and civil and constitutional rights of immigrants and citizens alike from abuses of authority by employees of DHS, which is precisely the role Congress created these offices to

perform.    The Court should enter summary judgment, and permanent injunctive relief, for Plaintiffs.

## ARGUMENT

### I.    Defendants conflate the single agency action that Plaintiffs challenge with the action's numerous harmful consequences.

Plaintiffs challenge a single agency action under the APA: the March 21, 2025, dissolution of the three Oversight Offices.  Defendants seek to redefine this agency action as a realignment of the offices to focus on statutorily required functions, but all evidence in the administrative record points to a decision to eliminate the offices entirely, while no evidence from the relevant time period supports Defendants' alternative realignment narrative.

Many of Defendants' arguments—on subject matter jurisdiction, on whether Plaintiffs have an APA cause of action, and even on the merits—rely on the premise that Plaintiffs are challenging more than one agency action under the APA: specifically, that they are challenging how particular statutory functions of the Oversight Offices are currently being performed.  This premise is mistaken, and the various arguments that depend on it fail.

Of course, the dissolution of the offices has had wide-ranging ramifications in the months since it occurred.  Plaintiffs have introduced evidence and made arguments about some of these ramifications in discussing their standing, Mem. in Support of Plfs. Mot. for Summary Judgment (Plfs. Mem.), Dkt. 64-1, at 15–26, and these harmful consequences include but are not limited to statutory functions previously performed by the Oversight Offices on which Plaintiffs can no longer rely.  Separately, in their discussion of why Defendants' action in dissolving the Oversight Offices was contrary to law, Plfs. Mem. 30–35, Plaintiffs catalog various statutory functions that are no longer being performed as a result of the office dissolutions. Enumerating the consequences of the challenged agency action, however, does not transform those consequences into additional

3

challenged agency actions, let alone agency actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Thus, there is no need for the Court to parse whether Plaintiffs are criticizing Defendants for not performing certain statutory functions at all or merely performing them badly; these examples are significant only as consequences of the single unlawful agency action challenged here.

### A. Plaintiffs challenge Defendants' March 21, 2025, dissolution of the Oversight Offices, which Defendants cannot retroactively convert into a mere realignment.

Defendants deny that any dissolution occurred on March 21, 2025. Mem. in Support of Defs. Mot. for Summary Judgment and in Opp. to Plfs. Mot. for Summary Judgment (Defs. Mem.), ECF 69-1, at 30. But Defendants' bid to recast what happened in March as a RIF followed by a realignment is belied by the record. First, the RIF eliminated all positions in all three offices, and the RIF notices announced the offices' dissolution. PSOMF ¶¶ 12–13. Second, the memorandum to OPM requesting authorization for the RIF focused on a mismatch between the Oversight Offices' functions and what Defendants understood to be the mission of DHS, *id.* ¶¶ 1–2, and these three offices were the only ones within the 200,000-employee agency for which a RIF was conducted. Third, the timeline does not support Defendants' realignment narrative, for their analysis of the offices' statutorily required functions did not occur until after a 100% RIF of all three offices had already been approved to effectuate the offices' elimination. *Id.* ¶ 28.

Defendants point to Executive Order 14210 as the impetus for the dissolution of the three Oversight Offices. This executive order stated that "offices that perform functions not mandated by statute" should be prioritized for RIFs. Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025). Under the executive order's own terms, then, the Oversight Offices were not appropriate RIF targets: Secretary Noem was provided with a list of statutory authorities for the three offices,

4

which made clear that they performed mandatory functions.  PSOMF ¶¶ 9–10; March 17 Memorandum for the Secretary, with Exhibits (AR1–8), ECF 70-3.  Yet she approved a RIF affecting all employees in all three offices and abolishing all of their positions, not just those whose work focused on discretionary rather than mandatory functions.  PSOMF ¶¶ 4–5, 11.  In other words, what Secretary Noem was presented with, and what she approved, was a wholescale elimination of the three offices, not a targeted RIF.

Defendants specifically used the term "elimination" in describing their plans for these offices, telling OPM in a March 6 memorandum requesting authorizations related to the RIF that the offices "could properly be eliminated" to "enhance the coherence, effectiveness, and efficiency of the Department as a whole."  *Id.* ¶ 1; Memoranda to OPM (AR18–20), ECF 70-2.  Such elimination was appropriate, according to Defendants, because the offices "do not advance the national security mission of DHS."  *Id.*

The exclusive focus on these three offices is also telling.  Defendants repeatedly cite to testimony from Ronald Sartini at the May 19, 2025, hearing in this case as evidence that Defendants recognized the Oversight Offices' statutorily required functions and sought to focus on those functions rather than eliminating the offices.  DSOMF ¶ 4; Defs. Mem. at 5, 30, 42–43 (citing 5-19-2025 Hearing Transcript 77:18-78:1).  But the question that elicited this testimony did not ask about the three Oversight Offices specifically.  Rather, it asked whether Mr. Sartini knew about any analysis conducted across all components of DHS to determine which positions were performing functions required by statute after President Trump issued Executive Order 14210 on February 11, 2025, and before the RIF-related requests were sent to OPM on March 6.

Mr. Sartini answered this question about an agencywide analysis as follows: "I do believe that analysis was conducted.  I know it was because I conducted it, or led the doing of that for the

5

Office of the General Counsel." Defendants' May 19 Hearing Transcript Excerpts, ECF 69-10, 77:24-78:1. But the general counsel asked Mr. Sartini to analyze only the functions of the three Oversight Offices, not any other DHS components, DSOMF ¶¶ 5–6, and Mr. Sartini was not aware of any other offices within DHS that underwent a RIF in response to Executive Order 14210. Plaintiffs' Further May 19 Hearing Transcript Excerpts, ECF 70-4, 81:3-16. Thus, the Oversight Offices were singled out for elimination, not identified as part of a comprehensive analysis of DHS as a whole to determine which offices were performing functions not required by statute.

The final reason that Defendants' "realignment" narrative fails is that the primary support for it, the analysis conducted by Mr. Sartini, did not even begin until after Secretary Noem approved the RIF that would carry out the offices' dissolution. PSOMF ¶ 28. As the Supreme Court has explained, "the post hoc rationalizations of the agency … cannot serve as a sufficient predicate for agency action." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 23 (2020) (alterations omitted) (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)). Instead, "an agency must defend its actions based on the reasons it gave when it acted." *Id.* at 24.

When Defendants acted on March 6 by requesting OPM's approval of competitive areas for the RIF, the reason Defendants gave was that the Oversight Offices "do not advance the national security mission of DHS." PSOMF ¶ 1; *see also id.* ¶ 2 (describing another memorandum to OPM on the same date in which Defendants explained they would be conducting a "100% RIF" of the Oversight Offices because certain functions within DHS did not advance the "mission of the Department to protect our homeland"). The memoranda sent to OPM said nothing about realigning the offices to focus on required statutory functions, nor did they mention new positions being created within those offices after the RIF eliminated all the existing ones. Memoranda to OPM, ECF 70-2. The March 17 memorandum to Secretary Noem presenting the RIF for approval,

and the RIF notices sent to the affected employees, said nothing of the sort either; to the contrary, those notices stated that employees had no right to be reassigned to another position because all positions were being "abolished" as part of the offices' "dissolution."  PSOMF ¶¶ 6, 13; March 17 Memorandum for the Secretary, ECF 70-3; Gilbride Decl., ECF 64-6, Exs. C–E.  Finally, DHS spokesperson Tricia McLaughlin made a public statement on March 21, the same day the RIFs were announced and all employees at the three offices were ordered to stop work, striking a similar tone to the OPM memoranda in describing the Oversight Offices as "internal adversaries" that "obstructed immigration enforcement" and "undermin[ed] DHS's mission."[2]

These contemporaneous statements give a consistent account of a decision to eliminate three offices whose functions and activities Defendants found incompatible with, or inconvenient to, their immigration enforcement objectives.  That decision was implemented on March 21 with the stop-work order and 100% RIF of those offices.  PSOMF ¶¶ 12, 17.  The Court should not credit Defendants' post hoc rationalizations, based on actions that Mr. Sartini took later, to redefine the nature of what occurred on March 21.

**B.  Plaintiffs do not separately challenge the consequences of the offices' dissolution.**

Defendants also argue that Plaintiffs have defined the challenged elimination of the three offices to include other discrete agency actions.  *See, e.g.*, Defs. Mem. at 20 ("The purported elimination includes things as disparate as not placing workers in 250 plus facilities to not including recommendations on a website.").  But these are not components of the March 21, 2025, dissolution action; they are its downstream consequences.

Specifically, Plaintiffs discuss various complaints and assistance requests that they have filed with the Oversight Offices, and the unhelpful form responses, or lack of any responses

---

[2] Gilmer, *supra* note 1.

whatsoever, that they have received since March 21, 2025. Plfs. Mem. at 18 (Plaintiff Robert and Ethel Kennedy Human Rights Center (KHRC)); *id.* at 19 (Plaintiff Southern Border Communities Coalition (SBCC)); *id.* at 19–20 (Plaintiff Urban Justice Center (UJC)); *id.* at 23–25 (SBCC members). Plaintiffs are not challenging the resolution of these complaints, however, either as agency actions taken or "agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1). Rather, Plaintiffs point to their recent experiences with the Oversight Offices to explain why filing complaints or requesting assistance from these offices is no longer a reliable or effective means for Plaintiffs and SBCC's members to advocate for their clients and constituents, and why they have been forced to resort to more expensive and time-consuming, less effective mechanisms for conducting their core activities. Plfs. Mem. at 16–25. In other words, the complaints and their unsatisfactory resolution, or lack of resolution, are examples of Plaintiffs' and SBCC members' injuries, traceable to the March 21, 2025, dissolution of the offices, and offered to establish their standing.

Similarly, Plaintiffs point out that neither CRCL nor OIDO have issued any written recommendations to other components of DHS since March 21, 2025, and that CRCL employees testified to reviewing and commenting on only a handful of policies, Plfs. Mem. at 31–33, despite provisions in both offices' authorizing statutes requiring policy review and recommendations, 6 U.S.C. § 345(a)(3) (CRCL); *id.* § 205(b)(4) (OIDO). Plaintiffs offered these examples of statutory functions going unfulfilled in the wake of the Oversight Offices' March 2025 dissolution to explain why that dissolution was contrary to law, and to demonstrate that Defendants' token restaffing efforts have not undone the damage.

Because Plaintiffs are challenging the March 2025 dissolution and not its effects, it is immaterial whether the offices' authorizing statutes "address … how many complaints to review,

how quickly, what policies to review, [or] how to review them."  Defs. Mem. at 32 (explaining

that the APA does not permit review of "agency action committed to agency discretion by law").

Defendants may have discretion about how thoroughly to review policies or how many

recommendations to make, but they do not have discretion about whether to review policies or

make recommendations at all.  6 U.S.C. § 345(a)(3); *id.* § 205(b)(4).  Plaintiffs can dispute whether

statutory functions are being performed in pressing their "contrary to law" claim under the APA,

and they can opine on how poorly functions are being performed in discussing standing, without

turning every function they discuss into a separate APA challenge.

Plaintiffs are not asking the Court to review, as agency actions under the APA, anything

that has happened since March 21, 2025.  They challenge only Defendants' March 2025

dissolution, an agency action that has had wide-ranging and devastating consequences.  Plaintiffs

chronicle those consequences to underscore the unlawfulness of Defendants' action in dissolving

the offices, to show the harmful impact that action has had on Plaintiffs and SBCC members, and

to explain why permanent injunctive relief is necessary.

## II.    This Court has subject matter jurisdiction over Plaintiffs' claims.

Reflecting their confusion between the challenged agency action and its consequences,

Defendants suggest that Plaintiffs lack standing because not every effect flowing from the

Oversight Offices' dissolution injured them.  Defs. Mem. at 20–23.  But under the APA, once a

plaintiff establishes that an unlawful agency action caused it harm, the standard remedy is to vacate

that entire unlawful action, not just those consequences of the action that injured the plaintiff.

Defendants also contend that Plaintiffs' complaint-related harms are speculative or have been

rendered moot, *id.* at 23–27, but this contention misunderstands the nature of Plaintiffs' injuries

and the multiple ways in which the Oversight Offices previously helped them.  Nor are Plaintiffs'

injuries the result of voluntary diversions of resources or issue advocacy, *id.* at 27–28, but rather

canonical impairments of core activities recognized by Supreme Court and D.C. Circuit precedent. Finally, the CSRA does not preclude this Court's jurisdiction, *id.* at 28–30, for the CSRA's administrative scheme pertains to employment-related claims brought by federal employees and their union representatives, none of which are at issue here.

### A. Plaintiffs have standing.

An organization or individual that has "suffer[ed] legal wrong" because of an agency action may seek judicial review of that agency action under the APA.  5 U.S.C. § 702.  And where a court finds such agency action to be unlawful, the court's remedy will run against the unlawful agency action as a whole, not just those consequences of the action that injured the plaintiff.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) (noting that if the plaintiffs had successfully identified a final agency action, such an action could "of course be challenged under the APA by a person adversely affected" and the "entire … action" would be implicated by such a challenge); *see also Nat'l Mining Ass'n v. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (where an unlawful agency action of broad applicability injures a plaintiff, that plaintiff may obtain correspondingly broad relief); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *Las Americas Immigrant Advocacy Ctr. v. DHS*, 783 F. Supp. 3d 200, 232 (D.D.C. 2025) (appeal pending) (relying on *National Mining Association* and *Harmon v. Thornburg*).

Defendants cite *Center for Biological Diversity v. U.S. Department of Interior*, 144 F.4th 296 (D.C. Cir. 2025), to suggest that Plaintiffs are improperly aggregating multiple statutory violations caused by the March 2025 dissolution to manufacture standing.  Defs. Mem. at 20–21. In that case, however, the plaintiffs challenged over 4,000 separate permits for oil and gas drilling on public land, with the challenged permits covering hundreds of miles in two states.  144 F.4th at

306–08.  While the declarations from the organizations' members described in general terms the harmful aesthetic, health, and safety effects of oil and gas drilling, the declarations did not draw a connection between any particular challenged permit and injuries to any particular organization member.  *Id.* at 308–09.  Because each permit was a distinct agency action, and the members' declarations failed to allege injury traceable to each permit, the court held that the plaintiffs lacked standing.  *Id.* at 309–10.

Here, in contrast, Plaintiffs are not challenging numerous distinct agency actions: They challenge just one agency action—the March 2025 dissolution of the Oversight Offices.  And Plaintiffs have established injury traceable to that agency action.  Plaintiffs do not need to have standing to challenge every one of the multiple statutory violations that stemmed from the dissolution in order to challenge the dissolution that harmed them.

Proceeding from the faulty premise that Plaintiffs must show injury from each effect of the offices' dissolution to have standing, Defendants list several such effects that Plaintiffs discussed in their opening memorandum, opining on how each, in Defendants' view, either is not required by statute, did not injure Plaintiffs, or both.  Defs. Mem. at 21–23.  Defendants never explain why whether individual effects of the dissolution constitute statutory violations is relevant to standing; indeed, neither of the two types of injury to Plaintiffs—injury to their activities in the manner recognized by the D.C. Circuit in *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), or financial injury to KHRC from the loss of grant funding—turns on the violation of any statute.[3]

---

[3] Defendants argue that Plaintiffs are not injured by the involvement of Office of General Counsel (OGC) attorneys in internal Equal Employment Opportunity (EEO) matters at DHS, or by CRCL's failure to review or substantively respond to more than a few DHS policies, Defs. Mem. at 22, but Plaintiffs have not asserted, and do not rely on, any such injuries.  The discussion

Moreover, several of the items on Defendants' laundry list did contribute to standing for one or more plaintiff or SBCC member.  For example, regardless of whether the Oversight Offices are statutorily required to engage with the public, an issue that will be discussed further in part IV below, the sudden cessation of the public engagement activities those offices had been doing, Defs. Mem. at 21, harmed Plaintiff SBCC and its member Immigrant Defenders Law Center, who had come to rely on CRCL's website notices and public events, as well as email exchanges with CRCL personnel, in conducting their daily operations.  Third Serrano Decl., ECF 64-15, ¶¶ 7–8, 10; Second Cargioli Decl., ECF 64-16, ¶¶ 10, 12.  *See also Doctors for Am. v. OPM*, 793 F. Supp. 3d 112, 132–34 (D.D.C. 2025) (holding that plaintiff had associational standing because its members relied on information published on government websites, which a guidance document from OPM caused to be abruptly removed from those websites).  Similarly, Plaintiff UJC is harmed by the loss of local ombudsmen specifically and loss of personnel at CISOM generally, which has resulted in CISOM's email address no longer being monitored and made it impossible to have a real-time conversation with a CISOM employee.  Defs. Mem. at 22–23.[4]

Defendants dismiss Plaintiffs' injuries related to complaints submitted to the offices as speculative because the offices did not previously open an investigation on every complaint received.  Defs. Mem. at 24.  But the process of filing complaints with CRCL and OIDO was not valuable to Plaintiffs only in those instances in which the offices opened an investigation in

---

of EEO matters and policy review appeared in the section of Plaintiffs' opening memorandum on why Defendants' dissolution of the Oversight Offices was contrary to law, Plfs. Mem. at 31–32, not in its section on standing.

[4] Defendants suggest nonsensically that the inability to communicate with an employee is traceable to the loss of a poor-quality phone contract, not to the loss of all but one full-time employee at CISOM.  Defs. Mem. at 23.  But UJC's declarant explained that most conversations with CISOM personnel previously occurred through email and provided valuable information to UJC attorneys about the status of their clients' immigration petitions.  Lothrop Decl., ECF 64-17, ¶¶ 6–7 and Exs. A–B.

response.  These complaints also fulfilled an important deterrent function by reminding personnel in other DHS components, like Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), that their actions were subject to independent scrutiny.  Fifth Enriquez Decl., ECF 64-14, ¶ 8.  Because of Defendants' gutting of the Oversight Offices, the effectiveness of this deterrent function, like the effectiveness of the complaint process as a whole, has diminished greatly, because CRCL and OIDO, with their drastically reduced staffs, are investigating so few complaints on their own and either referring complaints back to components to investigate themselves or declining to investigate altogether.  *See* PSOMF ¶¶ 84, 112, 115 (CRCL has opened its own investigation into 253 complaints out of the 5,989 it received between March 21 and December 12, 2025, for an investigation rate of 4.2%); *id.* ¶¶ 81, 120–21 (CRCL issued no recommendation memos since March 21, 2025, compared to 653 recommendations, informal resolutions, and instances of informal advice that it issued to DHS components during fiscal year (FY) 2023); *id.* ¶¶ 175–76 (OIDO issued no recommendations since March 21, 2025, compared to 36 issued during 2023).  And in response to this deterrent function of complaint filing being rendered less effective, KHRC has been forced to expend additional resources engaging in litigation and other in-person client advocacy that would not otherwise have been necessary.  Fifth Enriquez Decl. ¶¶ 22–23.

Further demonstrating their misunderstanding of Plaintiffs' theory of standing, Defendants suggest that an injunction would not redress Plaintiffs' injuries because it could not guarantee that every complaint would be reviewed or resolved to Plaintiffs' satisfaction.  Defs. Mem. at 24.  But Plaintiffs do not seek an injunction that would require all their complaints to be reviewed or that would require any particular outcome as to those complaints.  They seek an injunction that would require a resumption of the statutory functions at the Oversight Offices so that the complaint filing

process, on the whole, will once again serve the functions for which Plaintiffs previously found it beneficial.  *Cf. AFL-CIO v. DOL*, 778 F. Supp. 3d 56, 75 (D.D.C. 2025) (holding that organizations had standing to challenge sharing of Consumer Financial Protection Bureau complaint database with the Department of Government Efficiency when that information sharing made the complaint process less reliable, and deterred the organizations from using it as a tool in providing direct services to consumers).

Defendants also question how Plaintiffs are injured by the fact that OIDO case managers are no longer present in detention facilities, or by the fact that complaints must be filed in English through an online portal.  Defs. Mem. at 24–25.  For one thing, KHRC conducts know-your-rights sessions in detention facilities in which it explains how detained people can file complaints with CRCL and OIDO to advocate for themselves, Fifth Enriquez Decl. ¶ 5, and making complaints more difficult for detained people to file interferes with these education-related activities.  *See PETA*, 797 F.3d at 1094–95 (citing *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986)) (finding standing where defendants' actions impaired the organizational plaintiffs' ability to conduct their education-related activities).  Second, without being able to rely on OIDO case managers in facilities to serve as in-person intermediaries with facility staff, KHRC staff must make more frequent visits to detention facilities themselves to advocate for their clients.  Fifth Enriquez Decl. ¶ 21; *see also* Fourth Enriquez Decl., ECF 50-1, ¶¶ 10, 14 (discussing three in-person visits that KHRC attorneys made to South Louisiana ICE Processing Center during the spring and summer of 2025 to visit a client with medical problems that they previously would have asked for OIDO's help to resolve).  Indeed, a medical official for private contractor GEO Group, with whom KHRC's declarant met during one of these visits, explained that OIDO's embedded personnel had previously been "very helpful in efficiently

resolving medical needs" because they could "directly approach detention center staff without the need for filing a formal complaint and could seek quick resolution of issues with medical treatment." Fifth Enriquez Decl. ¶¶ 18–19.

Defendants argue that because CRCL and OIDO have resumed reviewing complaints, and some of Plaintiffs and SBCC members' complaints have recently received closure notices, their claims regarding complaints are moot. Defs. Mem. at 25–27. But Plaintiffs do not assert claims regarding complaints specifically; rather, they assert APA, ultra vires, and separation of powers claims regarding the dissolution of the Oversight Offices. Moreover, the fact that Plaintiffs can still file and receive responses to complaints does not prevent them from being injured by Defendants' March 2025 action that rendered the complaint process less effective than it was before. *See AFL-CIO v. DOL*, 778 F. Supp. 3d at 75; *see also Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 40–41 (D.D.C. 2020) (observing that, to establish standing, an organization need not be entirely hamstrung by the government's action, so long as its activities are perceptibly impaired by that action) (collecting cases). For these reasons and the reasons discussed in part I-B of Plaintiffs' opening memorandum, Plfs. Mem. at 26–27, this case is not moot.

Finally, Defendants assert that Plaintiffs' diversions of resources are the sorts of voluntary, self-inflicted harms described in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Defs. Mem. at 27–28. They are not. As the Court explained in *Alliance*, organizations that have not otherwise been injured by a defendant's action cannot "spend their way into standing" by diverting resources from other activities to oppose the defendant's action. *Alliance*, 602 U.S. at 394–95. But Plaintiffs are not spending more time and resources visiting detention facilities and engaging in litigation (KHRC), corresponding directly with CBP (SBCC), and making inquiries

15

with members of Congress and sending emails to the CIS hotline about their clients' stalled immigration petitions (UJC) for the purpose of opposing Defendants' dissolution of the Oversight Offices.  *See* Fifth Enriquez Decl. ¶¶ 20–23; Third Serrano Decl. ¶ 12; Lothrop Decl. ¶¶ 5, 10. Plaintiffs are doing these things to serve their clients (in the case of KHRC and UJC) or to advance their mission of improving conditions on the U.S.-Mexico border (in the case of SBCC), and they must use these less efficient methods because of Defendants' dissolution of the Oversight Offices. This is the sort of diversion of resources that established standing in *PETA*, 797 F.3d at 1095–96, not the sort of self-inflicted, advocacy-related diversion of resources rejected in *Alliance*.[5]

In short, Defendants' decimation of the Oversight Offices has injured all three plaintiffs, and at least one SBCC member, by impairing their core activities, Fifth Enriquez Decl. ¶¶ 20–23; Third Serrano Decl. ¶¶ 7–8, 11–12; Lothrop Decl. ¶¶ 5, 10, and has further harmed KHRC by causing the loss of grant funding, Fifth Enriquez Decl. ¶ 24.  Plaintiffs have both organizational and associational standing.

## B. Plaintiffs' claims do not involve employment and cannot be channeled to the Merit Systems Protection Board.

Defendants invoke the "comprehensive system" established by the CSRA to review "personnel action taken against federal employees," Defs. Mem. at 28 (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012)) (internal quotation marks omitted), claiming that the CSRA's

---

[5] Defendants also cite *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015), and *Turlock Irrigation District v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).  These cases, like *Alliance*, stand for the proposition that organizations cannot manufacture standing by spending money on litigation or advocacy to oppose a policy they dislike.  Such advocacy-related injuries amount to a mere "interest in a problem," which the Supreme Court has long held inadequate to establish standing.  *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  If Plaintiffs here were basing their standing on resources expended on this lawsuit or to otherwise advocate against the dissolution of the Oversight Offices, these cases would warrant discussion.  But Plaintiffs have never advanced such a theory of injury.

administrative review scheme precludes this Court's jurisdiction.  There are two problems with that argument: Plaintiffs are not federal employees, and their claims do not seek review of personnel actions.

Defendants cite a series of cases that found the CSRA's administrative scheme, in which claims are channeled to the Merit Systems Protection Board (MSPB), to be exclusive and to preclude district-court jurisdiction.  Defs. Mem. at 30.  All but one of these cases involve claims brought by federal employees or federal-employee unions, so it is unsurprising that the courts reviewing these claims found the CSRA administrative scheme to apply.[6]  And while the majority of the Fourth Circuit motions panel in *Maryland v. USDA*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025), a case involving a challenge by several states to the mass layoff of federal probationary employees, was sympathetic to the government's jurisdictional arguments, other courts recently encountering these same arguments in cases involving non-employee plaintiffs have held that the CSRA's administrative scheme did not apply.  *See Somerville Public Schools v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025) (finding government unlikely to succeed on its CSRA-based jurisdiction-stripping argument, because the court was unwilling to conclude that "federal courts lack the power to hear non-CSRA claims brought by parties who will be imminently injured by the agency's inability [due to a mass layoff of federal workers] to provide them with the services to which they are entitled");[7] *AFGE v. Trump*, 782 F. Supp. 3d 793, 818 (N.D. Cal. 2025) (noting

---

[6] Some of Defendants' cited cases, such as *American Federation of Government Employees v. Secretary of Air Force*, 716 F.3d 633 (D.C. Cir. 2013), involved a subdivision of the CSRA called the Federal Service Labor-Management Relations Statute, which channels disputes between federal-sector unions and federal agency employers to the Federal Labor Relations Authority rather than to the MSPB.  *Id.* at 636–37.

[7] The Supreme Court subsequently granted the government's application for a stay, *McMahon v. New York*, 145 S. Ct. 2643 (2025), but the order did not discuss the CSRA or administrative channeling.

that "the Civil Service Reform Act says nothing at all about" nonprofit organizations and concluding that "[t]he Court is not persuaded that, when Congress created the Merit Systems Protection Board[,] it intended for constitutional and APA claims by these sorts of plaintiffs to be precluded from federal court").[8]

Moreover, Defendants are wrong that Plaintiffs' claims are "derivative of the sorts of personnel claims that are channeled under the CSRA." Defs. Mem. at 29. Plaintiffs do argue that the Oversight Offices have been starved of human resources and that more staff is needed to perform those offices' statutory functions, Plfs. Mem. at 42–43, but it is immaterial to Plaintiffs whether the employees affected by the RIF are reinstated or different employees are hired, so long as the statutory functions are being performed by someone.

"The ultimate question" in cases involving implicit jurisdiction-stripping "is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches" the claims at issue: here, Plaintiffs' claims regarding the wholescale elimination of the Oversight Offices. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court set out three considerations to guide the analysis of whether a particular claim is "of the type" Congress intended to channel away from district courts. All three of these factors argue in favor of this court retaining jurisdiction here.

First, courts are unlikely to channel claims to an administrative forum if "a finding of preclusion could eliminate all meaningful judicial review," as would be the case if these non-employee plaintiffs' claims were channeled to a forum that cannot adjudicate them. *Id.* at 212–13.

---

[8] The Supreme Court later granted the government a stay of a preliminary injunction in this case, 145 S. Ct. 2635 (2025), but the stay order did not address administrative channeling or any arguments regarding jurisdiction.

Here, while former employees of the Oversight Offices may be able to challenge their individual terminations before the MSPB, no one can bring in that forum claims that Defendants illegally dissolved the Oversight Offices altogether and ended performance of their statutorily mandated activities. Second, Plaintiffs' claims are "wholly collateral" to the CSRA's review scheme, which focuses on personnel actions taken against particular federal employees. *Id.* at 212. Finally, Plaintiffs' claims are well "outside the [MSPB's] expertise." *Id.* Plaintiffs' claims "raise 'standard questions of administrative' and constitutional law" rather than questions specific to the CSRA or the intricacies of the RIF regulations, and the statutory obligations Plaintiffs invoke are "distant from [the MSPB's] competence and expertise." *Axon*, 598 U.S. at 194 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010)). At base, the APA and separation-of-powers claims in this case are not "of the type Congress intended" to channel to the MSPB. The CSRA presents no bar to this Court's exercise of jurisdiction.

## III.    Plaintiffs have a cause of action under the Administrative Procedure Act.

As Plaintiffs explained in their opening memorandum, Plfs. Mem. at 28–29, the March 21, 2025, dissolution of the Oversight Offices was a discrete, final agency action. Defendants' arguments to the contrary, Defs. Mem. at 31–32, are unavailing.

Defendants first compare Plaintiffs' claims to those in *Lujan v. National Wildlife Federation*, where the plaintiffs challenged the ongoing operations of the Bureau of Land Management, comprising over 1200 discrete "classification terminations and withdrawal revocations" under the umbrella term "land withdrawal review program." 497 U.S. at 890. This so-called "land withdrawal review program," the Supreme Court held, was not a discrete "agency

action," and so could not be challenged under the APA. *Id.*[9] But Defendants' analogy to *Lujan* falls flat when they name the "program" that Plaintiffs are supposedly challenging: Defendants' "prioritizing [the Oversight Offices'] statutory functions over purely discretionary work." Defs. Mem. at 31. Defendants cannot substitute their own revised realignment narrative for the action Plaintiffs actually challenge—the dissolution of the offices, *see* part I, *supra*—and then charge that their substituted action has too many components to be discrete.

Defendants also cite a nonprecedential opinion of the motions panel on the D.C. Circuit in *Widakuswara v. Lake*, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025), for the proposition that when an agency dismantling involves many separate agency actions, these multiple actions cannot be "packaged together" for "wholesale correction" under the APA. The merits panel on the D.C. Circuit heard oral argument in *Widakuswara* in September 2025, and the appeal remains pending. Moreover, similar issues regarding dismantling of a federal agency, the Consumer Financial Protection Bureau, were heard by the D.C. Circuit sitting en banc on February 24, 2026, *Nat'l Treasury Emps. Union v. Vought* (*NTEU*), D.C. Cir. No. 25-5091. Thus, a precedential decision from the D.C. Circuit will soon eclipse whatever persuasive value this unpublished opinion from the *Widakuswara* motions panel may have.

Critically, the various "actions" that Defendants accuse Plaintiffs of combining here—policy reviews, complaint processing, and public engagement activities—are all functions that the Oversight Offices were performing before the dissolution and that they are now no longer

---

[9] *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006), is similar to *Lujan* in that it involved a challenge to a comprehensive strategy document, sent to Congress as a request for a funding increase, describing how the agency planned to manage an overpopulation of wild horses and burros over the next five years. *Id.* at 19–21. That planning document, which the D.C. Circuit found not to be an "agency action" challengeable under the APA, is nothing like the action Plaintiffs challenge here.

performing at all or performing in a greatly diminished way.  Evidence about these functions is relevant to explaining the many laws Defendants are violating because of the dissolution, how the dissolution has harmed Plaintiffs, and how those harmful effects persist despite Defendants' purported efforts to "realign" the offices by hiring a skeleton crew months later to handle limited tasks.  But these functions are not components of the March 2025 dissolution—they are its consequences.  And as Plaintiffs explained in part I, *supra*, they are not challenging any consequences of the March 2025 dissolution under the APA.

Defendants next claim that Plaintiffs do not challenge final agency action, because the realignment of the offices is still ongoing, and although the RIF was final, it did not impose legal consequences on Plaintiffs within the meaning of *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Defs. Mem. at 31–32.  Again, Plaintiffs are not challenging any post-RIF "realignment," but are rather challenging the March 21, 2025, dissolution of the Oversight Offices implemented through the RIF and stop-work order, and the Court should not entertain Defendants' post hoc rationalizations in considering Plaintiffs' APA claims.  As for the legal consequences that the March 2025 dissolution has had on Plaintiffs, they are discussed at length in the standing sections of the opening memorandum and this memorandum.  Plfs. Mem. at 15–26; part II-A, *supra*.

Perpetuating the confusion between challenged action and consequences, Defendants cite 5 U.S.C. § 701(a)(2) for the proposition that review under the APA is not available for "agency action committed to agency discretion by law."  Defs. Mem. at 32.  But Plaintiffs are not seeking review under the APA of whether any of the Oversight Offices' statutory functions are being properly performed, so how much discretion the Oversight Offices have in performing those functions is of no moment.

Finally, Defendants aver that because Plaintiffs complain about statutory functions that are not being performed, or that are being performed too slowly, their claims should have been brought under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." Defs. Mem. at 32–33.  But the only APA claims Plaintiffs brought in this action were under 5 U.S.C. § 706(2), and they decline Defendants' invitation to amend their complaint.

## IV.  Defendants' March 2025 dissolution of the Oversight Offices violated the Administrative Procedure Act.

### A. Defendants' dissolution of the Oversight Offices exceeded their statutory authority.

Congress granted the Secretary of Homeland Security the authority to reorganize functions within DHS pursuant to the limits set out in 6 U.S.C. § 452.  Defendants argue that they did not exceed that reorganization authority because they were acting pursuant to the RIF statutes instead. Defs. Mem. at 35.  But the fact that Defendants believed another federal statute authorized their action did not free them from the requirements of 6 U.S.C. § 452.  It simply required them to analyze the two statutes and determine whether their obligations under both laws could be harmonized.  Defendants certainly could have conducted a more limited RIF that did not eliminate all positions at the offices, which would have avoided the "abolition" of an "entity, organizational unit, program, or function established or required to be maintained by statute," as prohibited by 6 U.S.C. § 452(b)(2).  But Defendants made a different choice, and, in so doing, exceeded their authority under 6 U.S.C. § 452(b).

Defendants also cite *Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 316–19 (D.C. Cir. 1988), for the proposition that congressional reporting requirements are not judicially enforceable by third parties.  Defs. Mem. at 35–36.  But 6 U.S.C. § 452(b) is more than a congressional reporting requirement.  It explicitly bars reorganizations within DHS that would

abolish an entity, program, or function created by statute. And the APA provides for judicial review of that unlawful action.

**B.  Defendants' dissolution of the Oversight Offices was contrary to law.**

As Plaintiffs explained in their opening memorandum, Plfs. Mem. at 30, the dissolution of the Oversight Offices caused performance of those offices' various statutory functions to abruptly cease last March, violating the statutes that require those functions to occur. In the intervening months, some minimal functions have resumed, performed by a handful of existing contractors and the six employees and three detailees the offices have hired, while other functions continue not to be performed at all. Still others have been outsourced to the very components of DHS whose potential abuses of civil rights or detention standards are being investigated, thwarting the statutory design that these offices exist to provide independent monitoring and oversight of DHS activities.

Defendants' scattershot response is replete with factual errors, exaggerations, and non sequiturs, *see* Defs. Mem. at 36–42, but leaves Plaintiffs' core contentions about how Defendants' dissolution of the Oversight Offices violated and continues to violate the law unscathed. Defendants made various representations to this Court in May about how quickly and to what degree they would restaff the offices and resume performing their statutory functions, PSOMF ¶¶ 31–38, but that restaffing has not come to pass as Defendants had promised, leaving complaints and assistance requests to pile up for months in the wake of the March dissolution without any responses, and leaving other statutory functions, such as review of departmental policies for compliance with the Constitution and civil rights laws (CRCL), development of an accessible complaint mechanism for people in immigration detention (OIDO), and establishment of local ombudsmen's offices (CISOM), to similarly go unfulfilled.

Defendants suggest that Plaintiffs "ignore that it took time to staff up," Defs. Mem. at 37, but to the contrary, Plaintiffs asked probing questions about the pace of restaffing when Defendants

assured this Court in May that new employees could be hired within a month, and that the interruption to performance of statutory functions caused by the offices' March dissolution would therefore be brief. Plaintiffs' May 23 Hearing Transcript Excerpts, ECF 64-9, 97–98. At that stage of the case, Plaintiffs sought an injunction halting the stop-work order and RIF that Defendants had put in place to accomplish the dissolution of the Oversight Offices, because Plaintiffs faced irreparable harm from the disruption of the Oversight Offices' statutory functions that would continue until Defendants restaffed the offices to the point where they could again perform their statutory functions, if that ever occurred.[10] That no one was hired at CRCL or OIDO until August, PSOMF ¶¶ 39–44, and that only one detailee was ever hired to work full-time at CISOM, id. ¶¶ 47, 69, has confirmed Plaintiffs' fears about the long-term disruption of statutory functions that resulted from the March 2025 dissolution of the Oversight Offices, from which those offices have never recovered.[11]

Perhaps even more emblematic of Defendants' continued intention to eliminate the Oversight Offices than their shifting narratives around staffing is their shell game regarding the budget. Defs. Mem. at 36–37; DSOMF ¶¶ 12, 25–28. Defendants now blame continuing resolutions and government shutdowns for their failure to hire anywhere near the number of people described in Mr. Sartini's May staffing plan, but congressional appropriations remained flat under

---

[10] Indeed, Defendants concede that the backlog from before March of 2025 has still not been eliminated at CRCL. Defs. Mem. at 43 n.7.

[11] Defendants also make erroneous claims about the offices' current staffing, stating that contractors are assisting with the work at all three offices. Defs. Mem. at 36. But Mr. Sartini testified that the contracts for OIDO and CISOM have been cut and that only CRCL now has contractors. Plaintiffs' Further Sartini Depo. Excerpts, ECF 70-5, 38:5-19. And Defendants' staffing estimate for CRCL includes twice as many consulting attorneys from OGC as full-time CRCL employees, underscoring the concerns about the NO FEAR Act and Rehabilitation Act-related conflicts of interest raised in Plaintiffs' opening memorandum. Plfs. Mem. at 31–32 and n.15.

the continuing resolutions, which funded DHS at FY2024 levels.  *See* Pub. L. No. 119-75, div. H, § 101, 140 Stat. 173 (Feb. 3, 2026); Pub. L. No. 119-37, div. A, § 101, 139 Stat. 495, 496 (Nov. 12, 2025); Pub. L. No. 119-4, div. A, §§ 1101(a)(6), 1105, 139 Stat. 9, 11 (Mar. 15, 2025); *see also* Pub. L. No. 118-47, div. C, tit. V, 138 Stat. 460, 593 (Mar. 23, 2024). Defendants also have the authority to transfer and reprogram funds within the agency, which they did during FY2025 to provide CRCL with additional funding.  PSOMF ¶¶ 72–73.  However, Defendants' own budget proposal for FY2026 would slash the budgets for CRCL and CISOM dramatically, from $48.4 million to $4.9 million for CRCL and from $10.4 million to $1.6 million for CISOM.  *Id.* ¶¶ 71, 74; ECF 64-13.  And that same budget proposal reduced funding for OIDO to $0.  PSOMF ¶ 78. As Defendants' witnesses testified during their depositions, it was this unenacted budget proposal originating with Defendants and other entities within the executive branch, not the level of FY2025 appropriations, that caused them to limit hiring at the Oversight Offices.  *Id.* ¶¶ 75–77. Defendants' protestations of poverty and inability to fund the offices' work because of actions taken by Congress ring hollow in light of the DHS budget director's testimony about Defendants' transfer authority and the FY2026 budget proposal, which reveals that any funding crisis relating to the Oversight Offices is of Defendants' own making and represents a further attempt to implement the decision to eliminate the offices that Defendants made last March.

Defendants assure the Court, Defs. Mem. at 38, 40, that there is no loss of independence when OIDO refers nearly as many complaints to ICE as it investigates itself, PSOMF ¶ 156, and when CRCL refers more than twice as many complaints as it investigates itself, *id.* ¶ 112.  Putting urgent medical referrals to the side, where Defendants' practice makes sense, the concept of investigation entails fact finding, a function CRCL previously retained when it required the component in a referred investigation to produce a report that it would review.  *Id.* ¶ 107.  This

25

reporting requirement no longer exists, *id.* ¶ 108, no doubt because these thinly staffed offices would not be able to review reports in the hundreds of matters they are now referring, even if they received them.   Moreover, a former CRCL employee, who handled complaints involving immigration detention before she was ordered to stop work as part of the March 2025 dissolution of the offices, explained that only a small percentage of complaints involving allegations of misconduct by specific officers were referred to another component—specifically, the Office of Professional Responsibility (OPR) for either ICE or CBP—and that complaints involving broader policy concerns or general conditions of detention were always investigated by CRCL directly. Second Plavsic Decl., ECF 70-6, ¶¶ 3–4.

Defendants blithely assert that the FY2024 report to Congress recently issued by CRCL described its activities "[a]s usual."  Defs. Mem. at 38.  But this cursory report contained almost no description of the on-site inspections CRCL conducted, the policies on which it provided advice, its EEO activities, or its activities regarding recipients of federal financial assistance.[12] Instead, most of its 17 pages were filled with the statutes describing CRCL's required functions and charts showing the number of complaints investigated and resolved during FY2024.[13]  These charts, devoid of any narrative content about the complaints or the responses to them, hardly "detail[]" the "allegations of" civil rights and civil liberties violations or "any actions taken by the Department in response to such allegations."  6 U.S.C. § 345(b).

---

[12] By contrast, the FY2023 CRCL report to Congress spanned 129 pages, discussed CRCL's policy reviews and recommendations as well as its monitoring of federal funding recipients for compliance with civil rights laws, and described several complaints and their resolution in detailed narratives rather than resorting to summary charts.  CRCL Annual Report to Congress, FY2023 (Nov. 2024), https://perma.cc/3SWH-KEGX.

[13] CRCL, FY2024 Annual Report (Jan. 2026), https://perma.cc/WH3E-GTVF.

Defendants deny that CRCL has any other obligations to engage with the public beyond the annual report to Congress, Defs. Mem. at 39, ignoring the requirement in 42 U.S.C. § 2000ee-1(g)(2) to "otherwise inform the public of the activities of such Officer," with "otherwise" referring to the congressional report discussed in the immediately preceding paragraph. *Id.* § 2000ee-1(g)(1). Thus, the webinars that CRCL previously organized and the materials it previously published on its website about its activities, Cargioli Decl. ¶¶ 10, 12, implicated a required statutory function.[14]

Turning to OIDO, Defendants state that inspections have always been preceded by a few days' notice, regardless of the statutory requirement in 6 U.S.C. § 205(b)(3) that inspections be unannounced. Defs. Mem. at 40 n.6. But the testimony of OIDO's former deputy ombudsman directly contradicts this assertion. Brundage Decl., ECF 64-20, ¶ 3 (stating that the practice was to provide a courtesy heads-up the morning of the inspection, but nothing earlier).

Defendants further dismiss the utility of having OIDO personnel physically located in detention facilities because "they were only in some facilities some of the time." Defs. Mem. at

---

[14] Defendants chide Plaintiffs for failing to address the offices' refusal to accept complaints in languages other than English in their complaint. Defs. Mem. at 39 n.5. But that policy change occurred months after Plaintiffs filed this action. And that change cannot be justified by the executive order making English the official language of the United States, for that executive order did not require any agency to "amend, remove, or otherwise stop production of documents, products, or other services prepared or offered in languages other than English." Exec. Order 14224, Designating English as the Official Language of the United States, Fed. Reg. 11363 (Mar. 1, 2025). Indeed, other components of DHS, such as ICE, continue to make documents available in languages other than English to people in immigration detention. *See ICE National Detention Standards, 2025,* https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf (specifying that written documents provided to detainees must be translated into Spanish "and other frequently encountered languages" and that oral interpretation must be provided "to any detainee who speaks a language in which written material has not been translated or who is illiterate"). Thus, the decision that CRCL and OIDO would stop accepting complaints in languages other than English does not reflect a departmentwide policy and is more likely a response to the resource constraints Defendants have placed on the offices.

41.  But the most recent OIDO report establishes that they were persistently present in over 100 facilities,[15] a far more robust presence than the five current OIDO employees would be able to manage.  PSOMF ¶ 166 (Mr. Sartini estimating that each OIDO employee will be asked to visit approximately 40 detention facilities).  The OIDO case managers' consistent presence in detention facilities enabled them to address issues swiftly by either sharing information between detained people and facility staff, such as with respect to unmet medical needs, or observing and reporting on environmental conditions like water leaks or lack of temperature control, before those issues escalated into larger problems.  PSOMF ¶ 138; Vitullo Decl., ECF 15-11, ¶¶ 8–9, 17; Fourth Enriquez Decl. ¶¶ 18–19; Second Brundage Decl., ECF 70-8, ¶¶ 3–4.  Finally, Defendants repeatedly refer to serious issues of mismanagement, exploitation, and sexual abuse, suggesting a widespread pattern of misconduct among OIDO employees.  In fact, there was only one reported incident of an OIDO contractor having a sexual relationship with a detained person, an incident that was promptly investigated and resulted in the individual in question losing her job.  Second Brundage Decl., ¶ 5.  That single incident should not cast the entire office into disrepute.  Nor does it vitiate the functions that OIDO is required by statute to perform, and that it has not been performing since the case managers' persistent presence in detention facilities ceased with the March 2025 dissolution, causing complaints received by OIDO to plummet from over 12,000 in 2023 to 280 in the nine months following the dissolution.  PSOMF ¶¶ 137, 141.

On CISOM, Defendants insist "there is no requirement that people can reach a live person." Defs. Mem. at 41.  But CISOM is an office focused on "customer service" and "assist[ing] individuals and employers in resolving problems" with CIS.  6 U.S.C. §§ 272(a), (b)(1).  The

---

[15] Office of the Immigr. Det. Ombudsman, OIDO Annual Report 2023 at 11 (Mar. 29, 2024), https://perma.cc/C5RF-U4RT.

statute refers to both a "local telephone number," *id.* § 272(d)(3), and "means of electronic communication access," *id.* § 272(g)(2), when discussing local ombudsmen's offices. The notion that CISOM need not have any method of answering questions or engaging in two-way communication with those requesting its assistance, whether that be phone, email, or in-person meetings, *see* Tacey Decl., ECF 64-19, ¶ 6, is completely at odds with the statutory scheme.

CISOM referred 113 requests to CIS between March 21 and December 12, 2025. Defs. Mem. at 42. Considering that CISOM had 4,489 requests pending when the dissolution occurred on March 21 and received 8,027 more requests between March 21 and December 12, 2025, PSOMF ¶¶ 179–80, CISOM's March 21–December 12 referral rate was 0.9%.

Defendants confusingly state that CISOM received "dozens of responses" from CIS between these same two 2025 dates. Defs. Mem. at 42. But as recently as February 6, when Defendants filed a nearly identical motion for summary judgment in this case before their extension request was granted, Defendants admitted Plaintiffs' statement of material fact asserting that CIS had not yet responded to any CISOM inquiries, adding that "Mr. Sartini has been in touch with USCIS about the responses." Defendants' Counterstatement of Facts, ECF 66-3, ¶ 192; *see also* Sartini Decl., Dkt. 66-26, ¶ 8 (saying nothing about CIS responses in describing the offices' operations, in contrast to the current version of the same paragraph). So while the record is unclear about precisely when these responses from CIS came in, it was likely not before December 12, 2025.

If CIS did respond to dozens of referrals in the week before Defendants filed this motion, it would not be the first time that a key action necessary to performing the offices' statutory functions occurred on the eve of a deadline in this case. PSOMF ¶¶ 52, 59 (Troup Hemenway and Joseph Guy were appointed to their acting positions in CRCL and OIDO on May 22, the day before

a hearing in this case); PSOMF ¶ 38 and Gilbride Decl., ECF 41-1, ¶¶ 4–5 (job announcements for CRCL and OIDO were posted on June 2, the same day a status report was due in this case); PSOMF ¶¶ 39, 43 (CRCL employees and OIDO detailees began work on August 11, two days before Defendants' discovery responses were due). This pattern causes Plaintiffs significant concern about what compliance will look like once Defendants are no longer required to report to this Court.

### C. Defendants' dissolution of the Oversight Offices was arbitrary and capricious.

The dissolution of the Oversight Offices was arbitrary and capricious because it removed staff who were performing statutorily required functions and because it did not adequately consider the reliance interests of detained immigrants, air travelers with complaints about Transportation Security Administration (TSA) pat-downs and use of facial recognition, employers with questions about pending visas, and others who sought assistance from the Oversight Offices. Plfs. Mem. at 35–38. Defendants respond to the argument that their March 2025 dissolution action left the offices without sufficient staff to perform their duties by noting that staffing levels at the offices are discretionary. Defs. Mem. at 42. But Mr. Sartini testified that "none" of the offices "ever had their functions executed by one person each. They are all offices. They are staffed." Plaintiffs' Sartini Depo. Excerpts, ECF 64-10, 25:8-11.

Defendants' March 2025 action did not just reduce the offices' staff; it eliminated the staff completely. Secretary Noem approved a RIF of "all employees" at the offices, except those who chose to leave voluntarily. PSOMF ¶ 4. All GS positions in all three offices were "abolished." *Id.* ¶ 12. Meanwhile, Human Resources was tasked with finding other positions in DHS for the seven senior executives "subject to the RIF," March 17 Memorandum, ECF 70-3, at AR1, who were also required to leave their dissolved offices, PSOMF ¶ 20. Neither the March 6 memoranda to OPM nor the memorandum to Secretary Noem seeking approval for the RIF said anything about

30

creating and filling new positions later.  Nor did Defendants develop any plans before March 21 for transferring the Oversight Offices' functions to other staff or determining how the work of the employees subject to the RIF would continue.  PSOMF ¶ 29.  Instead, Defendants eliminated all employees at all three offices with no plan to continue their statutorily required work, which was arbitrary and capricious.  Subsequent developments do not change this.

Defendants also argue that it would have been arbitrary and capricious for them not to follow Executive Order 14210.  Defs. Mem. at 42 (citing *Trump v. Orr*, 223 L.Ed.2d 180, 181 (2025)).[16]  But Defendants did not stop at eliminating positions not required by statute, as Executive Order 14210 directed.  They eliminated all positions from the Oversight Offices without regard to whether the people in those positions were performing statutorily required tasks.  Nor did they conduct an analysis of any other component or office within DHS besides the three Oversight Offices to compare their respective ratios of statutorily required to discretionary functions to determine which offices would be the best candidates for a RIF under the executive order's parameters.  Defendants' May 19 Hearing Transcript Excerpts, ECF 69-10, 77:24-78:1; *see also* part I-A, *supra*.  Thus, Defendants cannot credibly claim that the Oversight Offices were "prioritized" for RIF under the terms of the executive order because some of their employees were performing non-statutorily required functions, when no other DHS offices were even considered.

Finally, Defendants assure the Court that they did consider reliance interests before conducting the RIF and indeed "engaged in significant deliberation, including engagement with OPM."  Defs. Mem. at 42.  This engagement with OPM consisted of two memoranda with two-

---

[16] Defendants cite two other cases at this point in their memorandum, the relevance of which is unclear.  The cited portion of *Make the Road New York v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020), discusses the concept of agency action committed to discretion by law, while the cited portion of *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012), involves responding to comments during a rulemaking.

sentence descriptions of why the RIFs were necessary, namely, "that the above referenced functions, programs, and capabilities of the Department do not advance the national security mission of DHS and can properly be eliminated to enhance the coherence, effectiveness, and efficiency of the Department as a whole." PSOMF ¶ 1; *see also id.* ¶ 2 (other memorandum to OPM stated that "certain functions, programs, and capabilities" within DHS did not advance DHS's mission "to protect our homeland"). These short memoranda said nothing about reliance interests or about what the Oversight Offices did. Indeed, the summary of affected positions was not even accurate, with numbers for OIDO and CISOM being reversed. Memorandum to OPM, ECF 70-2, at AR18. Defendants did not meaningfully analyze reliance interests before deciding to eliminate the offices on March 21, and the pre-March 21 time period is the only one the Court should consider. *See Regents of Univ. of Cal.*, 591 U.S. at 23 (refusing to consider an agency's post hoc rationalizations). Defendants' March 2025 action was arbitrary and capricious.

## V. Defendants' dissolution of the Oversight Offices violated the separation of powers and was ultra vires.

**A.** Defendants seem to misunderstand the distinction that Plaintiffs drew (Plfs. Mem. at 41) between this case and *Dalton v. Specter*, 511 U.S. 462 (1994), as interpreted by the D.C. Circuit in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). That distinction turns on whether a statute spoke to, and potentially authorized, the executive action in question, not whether the executive "could act lawfully." Defs. Mem. at 34. In *Dalton*, a statute authorized the president to approve shipyard closures like the one the plaintiff was suing over, and so, the Court held, the claim that the president had exceeded his statutory authority with respect to that closure could not be pursued as a constitutional violation. 511 U.S. at 474. And in *Global Health Council*, the D.C. Circuit found it significant that the Impoundment Control Act gave the president authority to act on impoundment. 153 F.4th at 16. Here, Defendants can point to no statute that grants them

authority to eliminate three offices created, and required to perform specified functions, by Congress. Thus, Plaintiffs can pursue their claim that Defendants' action violated the separation of powers. *See Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015) (recognizing court's power to enjoin unconstitutional action by federal officers).

**B.** Defendants' action was also ultra vires in that it was "contrary to a specific prohibition in" multiple statutes: the statutes creating CRCL, CISOM, and OIDO, as well as the ban on eliminating statutorily required functions within DHS codified at 6 U.S.C. § 452(b). *See Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation and internal quotation marks omitted). Defendants respond that the offices are again operating and so they are no longer violating the authorizing statutes. Defs. Mem. at 34. But their response neither addresses the violation of 6 U.S.C. § 452, nor accounts for the statutory functions that Defendants admit they are not performing, such as conducting unannounced inspections by OIDO, 6 U.S.C. § 205(b)(3), or establishing local ombudsmen's offices under CISOM, *id.* §§ 272(d), (e), (g). Thus, if the Court holds that Plaintiffs cannot proceed with their APA claim, it should enter summary judgment for Plaintiffs on their ultra vires claim in the alternative.

**VI.    Plaintiffs' proposed injunction is appropriate.**

Defendants first complain that Plaintiffs' requested injunction is intrusive and would "transform the Court into a micromanager of the day-to-day operations of a federal agency." Defs. Mem. at 44. In the next breath, they criticize the injunction as insufficiently specific under Federal Rule of Civil Procedure 65(d). *Id.* Neither charge has merit.

Although the proposed injunction defines Defendants' obligations in terms of the various statutory functions required by the three Oversight Offices, it is not a generalized follow-the-law injunction, for it specifies concrete steps that Defendants must take to comply with those statutory requirements that they are not currently taking. *See* Proposed Order, ECF 64-24, ¶ 1 (requiring

33

CRCL to accept complaints in multiple modalities and in multiple languages); *id.* ¶ 3 (requiring OIDO to provide a mechanism for detained individuals to submit complaints that does not require use of the internet); *id.* ¶ 6 (requiring that CISOM provide a mechanism for individuals requesting assistance to communicate in real time with CISOM employees).  At the same time, it leaves the details of implementation to Defendants' discretion in various respects, such as requiring them to notify the public of CRCL's activities "in such other ways as Defendants deem appropriate," *id.* ¶ 2, and requiring OIDO employees to be "consistently present" in detention facilities, without specifying a required number of days per week or month, *id.* ¶ 5.  This injunction does not intrude unduly into the executive's exercise of its discretion, but neither is it too vague for Defendants to understand their obligations.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiffs' opening memorandum, this Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

Dated: February 27, 2026                          Respectfully submitted,

                                                  /s/ Karla Gilbride
Christine L. Coogle (DC Bar No. 1738913)          Karla Gilbride (DC Bar No. 1005586)
Brian D. Netter (DC Bar No. 979362)               Adina H. Rosenbaum (DC Bar No. 490928)
Skye L. Perryman (DC Bar No. 984573)              Public Citizen Litigation Group
Democracy Forward Foundation                      1600 20th Street NW
P.O. Box 34553                                    Washington, DC 20009
Washington, DC 20043                              (202) 588-1000
(202) 448-9090                                    kgilbride@citizen.org

*Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)             Sarah E. Decker (DDC Bar No. NY0566)
Sarah T. Gillman (DDC Bar No. NY0316)             Robert & Ethel Kennedy Human Rights
Robert & Ethel Kennedy Human Rights               Center
Center                                            1300 19th Street NW, Suite 750
88 Pine Street, Suite 801                         Washington, DC 20036
New York, NY 10005                                (202) 559-4432
(917) 284-6355

*Counsel for Plaintiff KHRC*

35