

CONTAINS CONFIDENTIAL INFORMATION

# Transcript of Ronald Sartini

**Date:** December 5, 2025
**Case:** Robert F. Kennedy Human Rights, et al. -v- US Dept. of Homeland Security, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                38

```
 1   more or less than $10 million contracts?
 2       A     So currently we are spending less than
 3   $10 million, particularly because we're in a CR
 4   that only covers about a third of the year.
 5       Q     So does that mean that contracts have
 6   been cut?
 7       A     Some have been cut.  Yes.
 8       Q     Which ones were cut?
 9       A     I may not remember all of them.  But I
10   could tell you as a category, contracts related to
11   medical document review have been cut.
12             I believe there was a translation
13   contract that was cut.  And all of the contracts
14   at -- well, are we only talking about CRCL?
15       Q     No, all three.
16       A     All three?  So all of the contracts at
17   OIDO.  So what I just said was CRCL only, and then
18   all of the contracts at OIDO and CISOM have been
19   cut.
20       Q     We may return to that exhibit, but you
21   can set it aside for now.  Thank you.
22             This, we will mark as Exhibit 8.  It was
```

```
 1   previously used.
 2          (Exhibit 8 was marked for identification
 3   and is attached to the transcript.)
 4      Q    Mr. Sartini, have you ever seen this
 5   document before?
 6      A    I don't know that I've seen it.  I'm
 7   familiar with its content.
 8      Q    If you need a moment to read through it
 9   and become familiar with it, let me know when
10   you're ready.
11      A    Okay.
12      Q    I'd like to direct your attention to
13   paragraph 5 of this document.
14      A    Okay.
15      Q    Is the contract described in Paragraph 5
16   still active with CRCL?
17      A    Yes.
18      Q    And what tasks are being performed under
19   that contract?
20      A    Those contractors are intaking,
21   reviewing, and processing allegations from the
22   public complaint portal and also those still
```

1  received by mail.

2  And they are analyzing the complaints
3  and proposing them to the federal staff, including
4  myself, for a determination of which complaints
5  will be opened and investigated. And they're also
6  forwarding urgent medical complaints to ICE or
7  CBP.

8  Q    How many contractors are performing
9  those functions?

10  A    I would say it's about seven, although
11  contractor headcounts are always a difficult
12  number for the government to nail down because we
13  are not paying for a particular number of bodies
14  to be on the contract at a given time. We are
15  paying for FTE utilization. The way I'm using the
16  term is full-time equivalent.

17  And so they are allowed to staff it with
18  as many or as few individuals as they deem fit to
19  meet the workload that we are paying them to
20  accomplish. But there seems to be a fairly stable
21  set of contractors working, at least that I
22  interface with, and I believe there are about

1  seven of them.
2      Q    And is that the same number of
3  contractors given the proviso you just made about
4  not knowing the exact number?  Is the volume of
5  work being performed under that contract the same
6  as it was in May of 2025 or more?
7      A    It is slightly more.  And I have
8  accordingly plussed up the contract to both add --
9  and how the contractor chose to handle my plussing
10 it up was to add an FTE who happens to have been a
11 former CRCL employee who was RIF'd.  And they have
12 also chosen to work overtime to meet the workload,
13 and I have authorized that time.
14     Q    So if there were -- if there are now
15 approximately seven FTEs, that means that in May
16 there were approximately six; is that right?
17     A    There was one less than there is now.
18 Yes.  Maybe it's eight now and seven then.  I'm
19 not 100 percent sure.
20     Q    All right.  Turning to paragraph 6 of
21 Mr. Hemenway's declaration.  Is the contract
22 described in paragraph 6 still active?

1    A    Yes.
2    Q    Have there been any changes to the
3    volume of work on that contract since May of 2025?
4    A    No.
5    Q    Turning to paragraph 7, is this contract
6    still in place?
7    A    Yes.
8    Q    Have there been any changes in the
9    volume of work under this contract since May of
10   2025?
11   A    No.
12   Q    The contract described in paragraph 8
13   with Bashen, is that still in place?
14   A    Yes.
15   Q    Have there been any changes to the
16   volume of work under that contract since May of
17   2025?
18   A    No.
19   Q    All right.  Turning to paragraph 9, is
20   the contract with JDG Associates still in place?
21   A    Yes.
22   Q    Have there been any changes in the

1  volume of work under that contract since May of
2  2025?
3     A    No.
4     Q    So the contracts described in paragraphs
5  7, 8, and 9 all pertain to employment -- equal
6  employment matters.  In total, between the three
7  contracts, how many FTEs are working on EEO
8  matters for CRCL?
9     A    I do not know.  Because we do not
10 interface with them directly in a way that would
11 make it easy to count, and the names seem to
12 change often for Bashen and JDG.
13          I know that there are at least four or
14 five investigators for Bashen.  There's at least
15 four or five for JDG.
16          And the IntelliTrack case management
17 system, I would not know, because there's a lot of
18 behind-the-scenes.  That's a software contract, so
19 there's a lot of software engineers on the
20 contract that I just don't interface with.  But
21 they're devoted to the system either full-time or
22 at least half-time.

1         But as far as I know, there are at least
2    three individuals on that contract for us.
3         Q    And to your knowledge, were those
4    staffing levels on the three contracts the same
5    when CRCL also had full-time employees handling
6    equal employment matters?
7         A    Yes.
8         Q    You mentioned earlier that part of your
9    role as Deputy CRCL Officer involves managing the
10   processing of the EEO complaints?
11        A    Yes.
12        Q    Does that mean that you are personally
13   responsible for supervising these contractors?
14        A    Yes.
15        Q    And what does that supervision entail?
16        A    It entails ensuring that case processing
17   in every step of the process is timely, and then
18   ensuring that the quality, the work is being done
19   to an acceptable level of performance to meet our
20   legal requirements.
21        Q    Do you review their work product?
22        A    I sign their work product.  The work

1  product is primarily reviewed by attorneys from
2  the Office of the General Counsel.
3      Q     And are there certain tasks that must be
4  performed by a full-time federal employee and
5  cannot be performed by a contractor?
6      A     The signing of the documents is done by
7  myself.  And as I understand it, that has to be
8  done by a federal employee.
9            I'm not aware of any others in the EEO
10 space that have to be performed by a federal
11 employee, but we do have one federal employee
12 assisting with managing the work and doing the
13 work itself, the investigations, plus the
14 attorneys from the Office of the General Counsel.
15     Q     And you mentioned that you sign
16 documents.  Do you ever recommend revisions or
17 changes to any of the documents before signing
18 them?
19     A     At times, I do.  Yes.
20     Q     What would be the basis for recommending
21 a change?
22     A     Reading the fact pattern in the

1  complaint and making a reasoned judgment as to
2  whether or not discrimination has occurred.  And
3  that will typically result in a conference between
4  me and my attorneys.  And we will go through the
5  law point by point, and the attorneys will explain
6  why the determination was reached that was.
7      Q    And when you say my attorneys, you're
8  referring to attorneys in DHS Office of General
9  Counsel?
10     A    Yes.
11     Q    Turning to paragraph 11 of Mr.
12 Hemenway's declaration, is the contract with
13 Klemen Consulting (phonetic) still in effect?
14     A    No.
15     Q    Has any other contract been entered into
16 to take the place of this contract with Klemen
17 Consulting?
18     A    Not a contract.  We have engaged the
19 Office of Health Services in the department to
20 conduct all medical review that we deem necessary.
21     Q    Is the Office of Health Services a
22 subcomponent of ICE, or is it a separate

1  component?

2      A     No.  It's a headquarters component
3  reporting direct to the Secretary.

4      Q     And can you speak more about this nature
5  of that consultation?  Are there staff details
6  full-time from OHS to CRCL, or is it more ad hoc?

7      A     It is as we need it, not -- there are no
8  details.

9      Q     And when you call in someone from the
10 Office of Health Services, are they being asked to
11 review documents, or are they being asked to go in
12 person to observe someone in detention?  What
13 sorts of things are they being asked to do?

14     A     So our agreement is that they will do
15 all of the above.  At the moment, we have asked
16 them to undertake document review.

17     Q     So you, between May of 2025 and today,
18 have not had occasion to ask them to consult
19 in-person on a case?

20     A     Correct.

21     Q     And approximately how many cases have
22 you asked them to conduct document review for?

1    A    I don't know the exact number, but it's
2  at least a dozen.
3    Q    Turning back to Mr. Hemenway's
4  declaration, paragraph 12.  Oh, I'm sorry.  That's
5  JDG.  We've already talked about them.
6         I'll ask anyway:  Is JDG still
7  performing this function of writing up final
8  decisions that is discussed in paragraph 12?
9    A    Yes.  And this is a different contract
10 than the other JDG contract.  This is a
11 contract -- not only am I plussing up, but I'm
12 probably quintupling compared to its previous
13 utilization.
14   Q    Is JDG Associates writing all final
15 agency decisions for DHS at this time?
16   A    No.
17   Q    Which decisions are assigned to JDG
18 Associates?
19   A    There isn't a rubric that I use.  It's
20 as my attorneys are available.  Right now,
21 attorneys are writing the FADs.  And as their
22 workload allows their writing, and if they are not

1  able to do it and they want increased capacity, we
2  are relying on JDG.
3      Q    So you anticipate increasing JDG's
4  footprint from what it currently is, but have not
5  done so yet; is that right?
6      A    No, we are in the process of doing it.
7  The order has already gone out to do it, and the
8  contractor is in the process of onboarding staff
9  to meet our requirement.
10     Q    Approximately how many employees are
11 employed across all of DHS at this time?
12     A    I don't know.  Maybe 200,000.
13     Q    Do you know how many EEO complaints are
14 currently pending with CRCL?
15     A    I don't know the number, but I know we
16 have those numbers.  I think we've produced them
17 or are going to update them.  I know that we are
18 timely on our EEO workload.
19     Q    Do you know how many final agency
20 decisions or FADs have been issued since May of
21 2025?
22     A    I do not know.

1    Q    And it's your testimony that those final
2  agency decisions up until this date have all been
3  written by OGC attorneys?
4    A    No, I do not know that.  I know there
5  has been some contract work done.
6    Q    So total, across all of the various
7  contracts that we've been discussing, how many
8  contractors or FTE, full-time equivalent, hours by
9  contractors are being utilized by CRCL at this
10 time?
11   A    Probably somewhere between 25 and 30.
12   Q    And is that a higher number of
13 contractor FTE, full-time equivalents, than was
14 being utilized in May of 2025?
15   A    Yes.
16   Q    By how much of an increase?
17   A    I don't know how much of an increase.
18 But I know there is, again, the plussing up of the
19 one contract that handles civil rights complaints.
20        So that's at least an FTE of one, but
21 probably more depending on that flexible capacity
22 that the contractor utilizes, plus a significant

1  increase in the FAD writing contract.  And then
2  the other contracts are probably at the same
3  level.
4      Q     And do any of these CRCL contractors
5  that we've been discussing perform tasks for other
6  offices besides CRCL?
7      A     No.
8      Q     Do you know what the backgrounds of the
9  contractors who are reviewing the complaints from
10 members of the public?  Do you know what subject
11 matter expertise those individuals have?
12     A     At CRCL?
13     Q     Yes.  That would be the first contract
14 we discussed in paragraph 5.
15     A     Yes.  To my knowledge, so I know what
16 the contract requirements are for those staff.  So
17 that is the requirement that I work with.  But I
18 do happen to know that most of those contractors
19 are attorneys, and one of them is a former CRCL
20 employee.
21     Q     And we talked earlier with regard to the
22 EEO contractors about whether there were certain

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    91

```
1       Q       What about the number of people in
2    detention?  Has the number of people in detention
3    increased since you made your staffing
4    recommendations?
5       A       I don't know if it's increased since
6    May.  It probably has.  But, again, I had
7    awareness that the number of detainees would be
8    going up in this administration vice the previous.
9       Q       What else has changed since you made
10   your staffing recommendations to Mr. Hemenway in
11   May of 2025 that's relevant to what the
12   appropriate staffing levels are?
13      A       Well, largely what's changed is I have
14   been in the position for more than a few months
15   now, and I have seen that we can accomplish the
16   statutory functions with the staff we have.  It
17   doesn't preclude future hiring.
18              But I have seen that we can, in fact,
19   meet our statutory requirements with the mix of
20   employees, detainees, and contractors, and OGC
21   support that we have.
22      Q       Can you speak more about the support
```

1  that OGC is providing to -- maybe we'll take
2  offices one at a time.
3      What support is OGC providing to CRCL?
4  A   OGC reviews, in concert with the federal
5  staff, all of the complaints that we receive.  And
6  in that review, the OGC portion is to determine if
7  a given complaint might be a Section 504 of the
8  Rehabilitation Act complaint.  Because those are
9  required to be investigated one-to-one.  And so we
10 need to make sure we're not missing any of those.
11     And then they advise further on what
12 civil liberties or civil rights may be implicated
13 in a particular complaint and what the law is in
14 that area, particularly Title VI 345.
15     And then there is the attorneys that
16 advise me on EEO matters and have a background in
17 EEO law.  And they are both writing final agency
18 decisions, reviewing the quality of the work of
19 the investigators for legal sufficiency, and then
20 advising me on the finer points of the law when I
21 have questions.
22 Q   And what about for OIDO?  What support

1  is OGC providing, if any, to OIDO?
2          MR. DAVIS:  Just want to caution the
3  witness on attorney-client privilege data, high
4  level of generality, as you have been.
5     A    They are reviewing our work product, so
6  drafts of reports, of inspection results.  Yeah.
7  They review our products.  They can advise on
8  immigration -- well, no.  That would be CISOM.
9  Never mind.  That's it for OIDO.
10    Q    All right.  I will ask you to set aside
11 the May 23rd hearing transcript for now.  We may
12 return to it later.  But I'd like you to return to
13 your June 2nd declaration and turn to paragraph 6.
14 And this relates to CISOM.
15         MS. COOGLE:   Paragraph 5?
16         MS. GILBRIDE:   Oh, is it paragraph 5?
17 You're right.  Paragraph 5.
18    A    Okay.  So the second bullet point here
19 discusses detailed solicitations.  Is it accurate
20 that three individuals began details on June 2nd?
21    A    Yes.  So it was accurate.  We have moved
22 them over, two of them, to OIDO.