CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025          12

Q    Okay.  And for approximately how long did you meet?

A    Two and a half, three hours.

Q    Did you speak with anyone besides counsel about your testimony today?

A    No.

Q    Did you talk to Troup Hemenway about the deposition testimony that he gave?

A    No.

Q    Did you talk to Joseph Guy about the deposition testimony that he gave?

A    No.

Q    Are you familiar with the deposition testimony that those two gentlemen provided?

A    Not directly familiar.

Q    You've testified previously in this case at a couple of hearings before Judge Ana Reyes. Do you recall that testimony?

A    Yes.

Q    During your testimony on May 19th, you were asked or you gave testimony about conversations you had had with existing staff at

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    24

job position is?

A        I am the CIS Ombudsman, the Acting
Deputy Immigration Detention Ombudsman, and Acting
Deputy CRCL Officer.

Q        How would you estimate that you divide
your time between those three roles?  How much
time do you spend on your duties as CIS Ombudsman?

A        It varies by the day.  I would say there
is -- I have to do some quick math in my head if
you're looking for one percentage first.  I would
say approximately 30 percent of my day is spent on
CISOM tasks.

Q        And approximately how much time do you
spend on tasks related to your Deputy CRCL Officer
role?

A        About 40 percent.

Q        And about how much time do you spend on
tasks related to your Deputy Detention Ombudsman
role?

A        About 30 percent.

Q        You testified during the May 19th
hearing -- I can show you the exact line if you'd

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    25

like to see it.  But you testified about not being able to personally perform all the statutory functions of all three offices yourself.  Do you still agree that that is the case?

A      I don't recall particularly -- in particular, saying that.  Do I perform -- I am able to execute all of the required functions of the offices that I hold, keeping in mind that none of these components of DHS ever had their functions executed by one person each.

They are all offices.  They are staffed. I am not executing the functions alone by any stretch.

Q      Who is helping you to perform these functions?

A      So there is Mr. Guy and Mr. Hemenway at OIDO and CRCL, respectively.

I have a chief of staff in CRCL and OIDO, ███████████ who is an enormous help in operating those offices.

I have staff, line-level, non-supervisory staff in OIDO and CRCL.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          27

in the Office of Contracting to support all of our contracts. And the same for all of the other admin functions.

Q      Thank you. What are your duties as acting CRCL Deputy Officer?

A      So for -- the primary duty is to be the EEO Program Director, so I perform that function. And then the way Mr. Hemenway has structured the office, I'm primarily the Chief Operating Officer for the component.

I operate the office. I ensure that we're meeting -- we're performing our statutory requirements and regulatory requirements.

And that is what I do. It's a varied job. But there's a lot to it, and I perform those functions.

Q      And what duties does Mr. Hemenway perform?

A      Mr. Hemenway provides guidance. He ensures that the Secretary signs whatever is required of her to sign, and presents any correspondence that needs signature related to

A        Mr. Guy provides guidance and oversight to ensure that we are in keeping with the Secretary's priorities for how the office should be run.

He removes -- as Mr. Hemenway does.  I neglected to say this.  He removes hurdles, which is a very important role.  And it's very nice to have individuals at such a high standing in the department to be able to clear any hurdles that we may face.  And so he removes those hurdles for us and reviews documents that require higher-level signature, including the Secretary's signature, or that may go out of the department to Congress.

Q        So you would expect that Mr. Guy would be familiar with correspondence to and from members of Congress involving OIDO?

A        If received, yes.

Q        Who is ███████████████ ?

A        He is my Deputy Ombudsman in CISOM, and he is acting as the Chief of Staff of CRCL and OIDO.

Q        What duties does he perform?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    39

previously used.

(Exhibit 8 was marked for identification and is attached to the transcript.)

Q       Mr. Sartini, have you ever seen this document before?

A       I don't know that I've seen it.  I'm familiar with its content.

Q       If you need a moment to read through it and become familiar with it, let me know when you're ready.

A       Okay.

Q       I'd like to direct your attention to paragraph 5 of this document.

A       Okay.

Q       Is the contract described in Paragraph 5 still active with CRCL?

A       Yes.

Q       And what tasks are being performed under that contract?

A       Those contractors are intaking, reviewing, and processing allegations from the public complaint portal and also those still

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    40

received by mail.

And they are analyzing the complaints and proposing them to the federal staff, including myself, for a determination of which complaints will be opened and investigated.  And they're also forwarding urgent medical complaints to ICE or CBP.

Q       How many contractors are performing those functions?

A       I would say it's about seven, although contractor headcounts are always a difficult number for the government to nail down because we are not paying for a particular number of bodies to be on the contract at a given time.  We are paying for FTE utilization.  The way I'm using the term is full-time equivalent.

And so they are allowed to staff it with as many or as few individuals as they deem fit to meet the workload that we are paying them to accomplish.  But there seems to be a fairly stable set of contractors working, at least that I interface with, and I believe there are about

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    41

seven of them.

Q      And is that the same number of contractors given the proviso you just made about not knowing the exact number?  Is the volume of work being performed under that contract the same as it was in May of 2025 or more?

A      It is slightly more.  And I have accordingly plussed up the contract to both add -- and how the contractor chose to handle my plussing it up was to add an FTE who happens to have been a former CRCL employee who was RIF'd.  And they have also chosen to work overtime to meet the workload, and I have authorized that time.

Q      So if there were -- if there are now approximately seven FTEs, that means that in May there were approximately six; is that right?

A      There was one less than there is now. Yes.  Maybe it's eight now and seven then.  I'm not 100 percent sure.

Q      All right.  Turning to paragraph 6 of Mr. Hemenway's declaration.  Is the contract described in paragraph 6 still active?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    43

volume of work under that contract since May of 2025?

A     No.

Q     So the contracts described in paragraphs 7, 8, and 9 all pertain to employment -- equal employment matters.  In total, between the three contracts, how many FTEs are working on EEO matters for CRCL?

A     I do not know.  Because we do not interface with them directly in a way that would make it easy to count, and the names seem to change often for Bashen and JDG.

I know that there are at least four or five investigators for Bashen.  There's at least four or five for JDG.

And the IntelliTrack case management system, I would not know, because there's a lot of behind-the-scenes.  That's a software contract, so there's a lot of software engineers on the contract that I just don't interface with.  But they're devoted to the system either full-time or at least half-time.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    44

But as far as I know, there are at least three individuals on that contract for us.

Q     And to your knowledge, were those staffing levels on the three contracts the same when CRCL also had full-time employees handling equal employment matters?

A     Yes.

Q     You mentioned earlier that part of your role as Deputy CRCL Officer involves managing the processing of the EEO complaints?

A     Yes.

Q     Does that mean that you are personally responsible for supervising these contractors?

A     Yes.

Q     And what does that supervision entail?

A     It entails ensuring that case processing in every step of the process is timely, and then ensuring that the quality, the work is being done to an acceptable level of performance to meet our legal requirements.

Q     Do you review their work product?

A     I sign their work product.  The work

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    45

product is primarily reviewed by attorneys from the Office of the General Counsel.

Q    And are there certain tasks that must be performed by a full-time federal employee and cannot be performed by a contractor?

A    The signing of the documents is done by myself.  And as I understand it, that has to be done by a federal employee.

I'm not aware of any others in the EEO space that have to be performed by a federal employee, but we do have one federal employee assisting with managing the work and doing the work itself, the investigations, plus the attorneys from the Office of the General Counsel.

Q    And you mentioned that you sign documents.  Do you ever recommend revisions or changes to any of the documents before signing them?

A    At times, I do.  Yes.

Q    What would be the basis for recommending a change?

A    Reading the fact pattern in the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    46

complaint and making a reasoned judgment as to whether or not discrimination has occurred.  And that will typically result in a conference between me and my attorneys.  And we will go through the law point by point, and the attorneys will explain why the determination was reached that was.

Q       And when you say my attorneys, you're referring to attorneys in DHS Office of General Counsel?

A       Yes.

Q       Turning to paragraph 11 of Mr. Hemenway's declaration, is the contract with Klemen Consulting (phonetic) still in effect?

A       No.

Q       Has any other contract been entered into to take the place of this contract with Klemen Consulting?

A       Not a contract.  We have engaged the Office of Health Services in the department to conduct all medical review that we deem necessary.

Q       Is the Office of Health Services a subcomponent of ICE, or is it a separate

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    47

component?

A       No.  It's a headquarters component reporting direct to the Secretary.

Q       And can you speak more about this nature of that consultation?  Are there staff details full-time from OHS to CRCL, or is it more ad hoc?

A       It is as we need it, not -- there are no details.

Q       And when you call in someone from the Office of Health Services, are they being asked to review documents, or are they being asked to go in person to observe someone in detention?  What sorts of things are they being asked to do?

A       So our agreement is that they will do all of the above.  At the moment, we have asked them to undertake document review.

Q       So you, between May of 2025 and today, have not had occasion to ask them to consult in-person on a case?

A       Correct.

Q       And approximately how many cases have you asked them to conduct document review for?

A        I don't know the exact number, but it's at least a dozen.

Q        Turning back to Mr. Hemenway's declaration, paragraph 12.  Oh, I'm sorry.  That's JDG.  We've already talked about them.

I'll ask anyway:  Is JDG still performing this function of writing up final decisions that is discussed in paragraph 12?

A        Yes.  And this is a different contract than the other JDG contract.  This is a contract -- not only am I plussing up, but I'm probably quintupling compared to its previous utilization.

Q        Is JDG Associates writing all final agency decisions for DHS at this time?

A        No.

Q        Which decisions are assigned to JDG Associates?

A        There isn't a rubric that I use.  It's as my attorneys are available.  Right now, attorneys are writing the FADs.  And as their workload allows their writing, and if they are not

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    55

being?

A      For CISOM, I had said five to seven full-time employees.  In addition to the Deputy Ombudsman, currently we have one detailee.

CRCL, we said about 20 additional full-time employees, and we have two-plus contractors.

And then for OIDO, five to seven -- and I don't see OIDO here.  Hold on.

Q      That's paragraph 13.

A      Oh.  Five -- yes.  Five to seven full-time employees, and we currently have three plus two detailees.

Q      Just sticking with what you believed and knew as of May when you assumed the role, the roles that you now have, we can talk later about what's happened since then.

But does the staffing plan that is reflected in this document, is that the staffing that you believed at the time was necessary to perform the statutory functions of the three offices?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    57

CRCL?

A        Well, I didn't say they weren't a permanent solution.  They are indeed part of the permanent solution, particularly the contract at issue in paragraph 5.

Q        You may have already testified to this, but just so that we have a clear record:  Can you say how many full-time employees are at CISOM besides yourself?

A        One, and one detailee.

Q        And who is the one full-time employee?

A        ████████████████

Q        And Mr. ████ also performs work for CRCL and for OIDO; is that correct?

A        Yes.

Q        So other than the one detailee, is there anyone who is performing work for CISOM full-time?

A        No.

Q        When did the detailee come on board?

A        I don't remember, but it was probably somewhere in the early summer.  June, perhaps.

Q        Have there been any other detailees

since May of 2025 at CISOM?

A       No.

Q       And how many full-time employees are currently working at CRCL?

A       Two.

Q       Any detailees?

A       No.

Q       How many full-time employees are currently working at OIDO?

A       Three.

Q       Any detailees?

A       Two.

Q       Do you know what the length of their details is?

A       I have them -- the offices have indicated that I have them as long as I want them, and right now we are assuming at least a one-year detail.

Q       Is that the same for the CISOM detailee?

A       Yes.

        MS. GILBRIDE:   This would be 50 -- 50, I believe.

MS. DECKER:   Yes.

(Exhibit 50 was marked for identification and is attached to the transcript.)

BY MS. GILBRIDE:

Q      Have you seen this document before?

A      Yes.

Q      What is it?

A      It is the position description for the Law Enforcement Specialist Assessment programs. Or, rather, the job posting for that job, not the position description.

Q      Did you participate in drafting this job announcement?

A      I did.  I drafted it in coordination with the Office of the Chief Human Capital Officer.

Q      Did you also participate in the hiring process?

A      Yes.

Q      Do you know how many people applied for this position?

A      I don't remember the exact number.  But

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    70

A        Well,          handles a good portion of the EEO complaint management work, including drafting some of the documents on the EEO side. They help with report writing.  And that's it.

Q        All right.

MS. GILBRIDE:   I think this is Exhibit 51.

(Whispered conversation.)

MS. GILBRIDE:   Are there full copies?

MS. DECKER:   Yeah.  So this is three copies.

MS. GILBRIDE:   51.  All right.  And we'll just figure out what that is later.

(Exhibit 51 was marked for identification and is attached to the transcript.)

Q        Are you familiar with this document, Mr. Sartini?

A        Yes.  And the title and body of the document look correct here.  This is the Law Enforcement Specialist Assessment Programs for OIDO Job Announcement.

Q        Did you have a role in drafting this job

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                               71

announcement?

A       Yes, I drafted it with OCHCO.

Q       And you had a role in the hiring process as well?

A       Yes.

Q       Did anyone else participate in the hiring besides you?

A       Yes.  ███████████.

Q       And what qualifications were you seeking for the law enforcement specialist role?

A       We were looking for individuals who had experience inspecting facilities and understanding documents that had complex requirements, who had experience conducting investigations of detainee complaints, particularly complaints related to being in detention.  That's it.

Q       And based on your conversation with the former head of OIDO, did you understand that that office previously had a set of employees that were focused on inspections and a different set of employees that were focused on case management?

A       Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    73

large detention facilities.

And then we have another in the mid-Atlantic.

And we have a detailee -- where do we have a detailee?  Somewhere also in the southwest.  Yeah.  So well spread.

Q     So you said one person in Pennsylvania and another person in the mid-Atlantic?

A     Yes.  And one in Texas.

Q     Looking at the job announcement that was posted, is a location given for where the employees in this role would be based?

A     Yes.

Q     What does it say?

A     Washington, D.C.

Q     Did you have to obtain permission to hire people who are not based in Washington, D.C.?

A     No.  Because their duty station is Washington, D.C.

Q     Is there an adjustment to pay if they're living in another part of the country but their duty station is Washington, D.C.?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    74

A        No.  Because they are traveling to those areas of the country.

Q        So to your knowledge, where do these individuals live?

A        They live in the National Capital Region, so far as I know.

Q        I see.  And how frequently do they travel to their assigned locations, as far as you know?

A        They are traveling regularly.

Q        For what purpose are they traveling?

A        To conduct facility inspections and follow-up on complaints -- complaints.

Q        How frequently are they traveling to conduct inspections.

A        Regularly.  I -- sorry.

Q        So there's -- go ahead.

A        They're on travel regularly.  So right now, we have a small data set from which to answer that question because they were onboarded, I believe in September, and then there was the shutdown.

report, despite having 120 employees.

Q    And from your understanding of the OIDO 2023 report, did those employees make repeated visits to the same facilities?

A    I don't know.  It's not -- from my reading or what I remember of the report, it's not quite clear.

Q    Under your current plan for OIDO going forward, will employees be expected to return to the same facility that they have already visited?

A    Sure.  It would be a natural part of an after-action plan or following up on a report.

So, for example, if there are recommendations set forth in the report and ICE or CBP adopt the recommendations, it would be natural to follow up to see if those recommendations were implemented at some point.

Q    So how frequently would you anticipate a law enforcement specialist returning to a facility within their portfolio?

A    I don't have an expectation.  I think that's a decision that we can make as we move

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    77

along.

Q        So between the five individuals currently working for OIDO, how are detention facilities distributed?

A        Primarily by the region that the individuals know and are comfortable with.  So if an individual -- the individual who we have who comes from Texas and was a border patrol agent in Texas and knows those facilities well, he is more likely to be assigned to cover those facilities.

And, for example, we have an employee in Pennsylvania who worked at one of the larger facilities there.  And so it makes sense that she would be more likely to be assigned both to inspecting that facility and the others around it.

Q        Do you know how many detention facilities are currently in operation?

A        I believe -- so the number changes all the time, but it's around 200.

Q        So would you anticipate each of your five OIDO employees being responsible for approximately 40 facilities?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    78

A        Yes.  That's feasible.  And the fact that we already have knocked out 22 inspections tells me that that can be done.

And it doesn't only have to be done by the three employees.  We have detailees, and we also have -- CRCL is authorized to conduct inspections, as well.

But yes.  I think that is feasible.

Q        Do you intend to make additional hires at OIDO?

A        It's under discussion, but no decisions have been reached.  In particular, because we are in a three-month CR, and the Office of Budget informs me that no office should be doing hiring when you don't have a year-long appropriation in place.  That is standard practice.

Q        Do you intend to make any additional hires at CISOM?

A        Same -- same answer:  Potentially.  No formal decisions made, and advise not to make them while we have a short CR.

Q        Are you familiar with the budget

recommendation that was made to Congress for these three offices?

A    Yes.

Q    Have the projections in that budget affected your plans for the future for staffing these three offices?

A    They do.  Yes, they have.

Q    In what way have they affected your plans?

A    So the budget recommendation is a reflection of OMB's guidance to the Department. And right now, we do not -- we would not take action that is inconsistent with OMB's guidance without discussing all the way up the chain.

And so, again, the shutdown heavily complicates things here because we don't know what would have happened if there was a year-long CR or not.  But the fact of the matter is right now, all of the plans don't really matter because we don't have funding past January 30th.

Q    And do your plans differ depending on whether OIDO has an operating budget going forward

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    80

or whether its budget is zeroed out after January?

MR. DAVIS:  Objection, deliberative process privilege.  The witness can answer at a high level of generality, but not about specific discussions or plans.

A       Generally, yes.  Not having money impacts operational and staffing plans.

Q       What is your plan if the funding is reduced to zero?

MR. DAVIS:  Same objection, deliberative process privilege.  Answer at a general level.

A       I would be consulting the Office of the General Counsel for what happens in that situation.  I don't have any experience in such a situation.

Q       Would the projected budget also reduce the funding available for CRCL going forward after January?

A       I don't know that it would.  Right now, we are staffed to the level in the budget.  So I don't know that it would reduce it further.  I

when the selection was made.

But, again, I moved with all haste, and Mr. Guy moved as many roadblocks as he could.

Q    And when were the three full-time hires for OIDO onboarded?

A    So I think they came on shortly after the CRCL staff, so that was probably end of August, early September.  Two of them asked for a significantly later start date.  We were able to onboard earlier than they onboarded, and then we wound up onboarding them all at the same time.

So we were able to onboard earlier, but they asked for -- I don't know if it was a pay period, maybe two pay periods.  Because they were actually moving to the National Capital Region to take the job, and they needed time to move.

Q    I'm sorry.  Did you say they had to relocate to the Capital Region?

A    Yes.

Q    Okay.  I have another exhibit.  I want to make sure I'm on the right page.

MS. DECKER:  Actually, it's --

MS. GILBRIDE:    Is there anything else down there?  Yes.  Yeah.  That's the only thing left in here.  I'll pass it around.

MS. DECKER:    Sure.  And this is going to be another exhibit?

MS. GILBRIDE:    Yes.  We haven't used this one before.

MS. DECKER:    53?

MS. GILBRIDE:    53.

MS. COOGLE:    This would be 54.

MS. GILBRIDE:    Oh.  Thank you.

(Exhibit 54 was marked for identification and is attached to the transcript.)

BY MS. GILBRIDE:

Q       Mr. Sartini, are you familiar with this document?

A       Yes.

Q       What is it?

A       A transcript of the motions hearing before Judge Reyes from May 23rd, 2025, and it appears to be the testimony given by myself and Nicole Barksdale-Perry.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025

88

Q        Okay.  I'd like to turn your attention to page 98, which is a portion of your testimony.

A        Okay.

Q        And feel free to familiarize yourself with this section of testimony, but you're describing the time period to complete the hiring process and how long you estimate it will take.

Do you see where you say you think it will take around a month?

A        Yes.

Q        How long did it actually take for these individuals to assume their roles?

A        From that point, probably another two months, depending on who we're talking about.  If it's a CRCL staff, maybe June, July.  Yeah.  Two, two and a half months.  And then OIDO staff, probably three months.

Q        Why did it take longer than you estimated that it would take?

A        So, again, for some of the candidates, they requested that it be longer before they onboard, and we accommodated.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025 89

And then the other is -- and, I mean, that's not that far off the mark for -- for a hiring process. I think if you told any hiring manager, we can go from cradle to grave to hiring someone within 3 months, they would laugh and say, no, it always takes 6 to 12 months. So it's still very fast. And certainly my actions were taken within a month, so far as I recall.

And I think where it took longer was likely in the security vetting for the candidates, which is outside my control and not a good process to try to intrude on. So I believe that's why it took longer.

But, again, that it happened as fast as it did was a credit to the hurdles that high leadership moved so that we could get this done.

Q      You mentioned security vetting. Is that something that you were familiar with when you gave this testimony to Judge Reyes in May?

A      I'm aware that it's a process that happens. But the process, depending on the candidate, varies. It can be very quick, as I was

hoping in this case, and it can take longer, depending on individuals' backgrounds.

And it also depends on department priorities, which I may not have been aware of at the time.  So, for example, if we're trying to surge the number of ICE agents that we're hiring, that may have slowed the security process down.

Q       Since you mentioned the number of ICE agents changing, is that a change that occurred after you made your staffing estimates for CRCL and OIDO in May of 2025?

A       I don't know that there is a formal change in the number of ICE agents that I'm aware of even now.  I mean, I know there's a hiring surge.  I don't know how many of those hires or potential hires have actually been put into the field.

So I don't know if there is a change in the numbers.  But I am generally aware that DHS operations would be ramping up.  I was aware of that at the time that I made my staffing recommendations.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    92

that OGC is providing to -- maybe we'll take offices one at a time.

What support is OGC providing to CRCL?

A       OGC reviews, in concert with the federal staff, all of the complaints that we receive.  And in that review, the OGC portion is to determine if a given complaint might be a Section 504 of the Rehabilitation Act complaint.  Because those are required to be investigated one-to-one.  And so we need to make sure we're not missing any of those.

And then they advise further on what civil liberties or civil rights may be implicated in a particular complaint and what the law is in that area, particularly Title VI 345.

And then there is the attorneys that advise me on EEO matters and have a background in EEO law.  And they are both writing final agency decisions, reviewing the quality of the work of the investigators for legal sufficiency, and then advising me on the finer points of the law when I have questions.

Q       And what about for OIDO?  What support

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                        94

Q        So the two current OIDO detailees started out at CISOM; is that right?

A        One of them did.  One dropped.  So there were three:  One dropped, one remained at CISOM, one went over to OIDO, and then we had another one added at OIDO after that.

Q        Okay.  And the next bullet point refers to the Deputy CIS Ombudsman.  Do you know when ██████ ███ was selected for his role?

A        Yes.  I believe he onboarded -- I don't remember about selection, but I believe he onboarded in late June, early July.

Q        Okay.  And when he was hired as Deputy CIS Ombudsman, was he aware that he would be doing work for CRCL and OIDO as well?

A        No.  That decision had not been reached yet.

Q        When did that decision get made?

A        I don't remember.  Probably not long after he onboarded.

Q        And then the next bullet point down says you expect a job announcement by which CISOM will

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    95

be fully staffed will be posted in the coming weeks.

Was an additional job announcement for CISOM ever posted?

A       It was not posted because what happened between the date of this declaration and before we posted anything was the OMB budget recommendations came out saying no more than two at CISOM.  And so we had two; we had myself and Mr. ▮▮▮▮.  So we stopped there for the time being.

Q       And we spoke earlier today about salary allocations in the budget for people who are wearing two or three hats.  Was there any way that you could use that funding to hire additional people at CISOM?

A       No.  So I'm not sure I understand the question, though.  Where -- what extra funding are you referring to?

Q       So I'm referring to the fact that, for example, there's money allocated for Mr. Hemenway's salary or for the salary of the CRCL officer, but Mr. Hemenway has another full-time

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    99

not include for the sake of brevity.

Have you ever seen this position title, Regional Representative, Local Ombudsman before?

A        Yes.

Q        What is your understanding of what that position did?

A        So in my extensive transition discussions with the acting ombudsman, he intimated to me that there were four local ombudsmen or four regional representatives that they were hoping could serve as the local ombudsman function, and that they simply did not have money to hire more, and that in the office's 20-year history, they've only had these regional representatives for a year or two and that this was their attempt to meet the unfunded mandate in the statute.

Q        And as part of your staffing plan for CISOM, did you include any regional representatives or local ombudsmen going forward?

A        I did not, for two reasons.  The position, again, was -- is simply not funded by

Congress.  The statute, I think, is quite clear that it envisions 50 local ombudsmen, one for each state.  That's how I read it.  I'm pretty sure it says the number 50.

And four is not 50.  Regional is not in each state, so that's not the same thing.  And I didn't think that we needed to begin fulfilling that requirement at this point in time when, in the 20-year history of the office, it never had been.  That was reason one.

Number two, my plan at the time -- and it is still my plan -- is to explore, after seeking counsel, other ways that we may appoint local ombudsmen other than hiring full-time federal employees.

Q    And you said that is still your plan. Do you have a timetable for when that may occur?

A    It is just a plan.  It needs to be researched and discussed with counsel.  There is no timetable at the moment.

MS. GILBRIDE:    Let's go off the record.

THE REPORTER:    One moment.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    104

contractors to seek the help of IT to just make the system function.

It is nowhere near as efficient as it should be, and we are in the process of rolling out the incremental improvements right now.  We've developed the user stories, which is a technical term to develop software and alter it, and we are in the process of releasing updates that would simplify the system.

Q    And any of those system changes that you're describing, will they affect the interface that members of the public have with the CRCL web portal?

A    No.  This is purely on the back end.

Q    Are there any other ways that members of the public can submit complaints besides the web portal?

A    No.

Q    Do you know if that is a change from prior CRCL policy?

A    It is a change.

Q    Do you know when that change went into

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    105

effect?

A      I adopted the change.  I don't know exactly when.  It was probably over the late -- around the late summer.

Q      And why did you make that change?

A      For efficiency's sake.  The president has directed efficiency through executive orders. And the ability to receive mail is a burden on us that is inefficient, and it is not in keeping with good customer service, either.

We get mail very slowly, and then it becomes a problem to log correctly.  We also don't have a great way to get mail back out if we don't have anything other than a mailing address.

If a complainant sent us mail at a given time, it takes, like, two weeks to reach us because of the irradiation facility that's used to screen the mail.  Often they are not still available at the address they sent it from.

And so it's much faster, and the data entry is much tighter and more efficient if everything is borne online.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                106

Q        Is it also burdensome for CRCL to receive complaints via email?

A        It is, and so we have stopped doing so. We only use email for appeals.

But email actually has a worse problem than snail mail in that it is very easy to spam it and to send viruses and large attachments that wreck our system. This was happening recently, and we had to take steps to protect the network so that we could actually access legitimate claims and not have the system crippled by spammers.

Q        Do individual contractors or full-time employee investigators correspond with complainants using email?

A        The contractors may. I don't believe the Feds do. The contractors correspond, at least for appeals, via email. And yes, we do send emails back.

Q        So you had given an answer earlier in today's deposition about what happens when a complaint is submitted and the contractor reviewing it, and then a number of things can

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    115

intuitive.  And that's part of what we're simplifying now.

Q    And once a matter is referred to another component, is the -- what sort of follow-up occurs between CRCL and that component?

A    So it's case-by-case.  But the MOUs that we have with the components and the understanding that we have to be formal and informal is that we reserve the right to do follow-ups, conduct quality checks, ask for a monthly or annual readout of what they did with our cases.

Some cases, we will just refer, and CRCL will then be done with it.  And others, we will follow up.

Q    And then the instance when the case is referred and CRCL is done with it, do you then close the case in the CRCL tracking system?

A    Typically, yes.

Q    And would a notice be sent to the complainant notifying them that the matter had been closed?

A    Typically, yes.  That is what should be

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    117

produced or will be producing.

Q        Is there a specialized protocol different from what we've already been discussing when the complaint relates to a death in DHS custody?

A        Yes, there is.  The previous agreement and process before the RIF is still in place.  ICE or CBP sends me personally a notification of the death, and they CC our group internal mailbox so that the record is properly saved and maintained in our corporate system.

And I read the circumstances around the death.  There is usually a pretty detailed rundown from ICE or CBP as to the circumstances of the death and actually a history going back to the first time the United States encountered this individual, often in a law enforcement context or in a legal immigration context.

So you have the whole rundown of their history, and then you have a pretty good write up of what the circumstances of the death were.  And that is just the notification.  And the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    118

understanding is that soon thereafter, a coroner's report will follow up with the medical documentation of the body and their assessment of the circumstances of the death.

Q      And who else do you coordinate with on investigating the circumstances of deaths in custody?

A      So I will coordinate with any of my employees, I will talk it over with counsel, and where needed, I -- I bring in the Office of Health Services.

Q      Have you investigated any deaths in custody since taking on your role as acting CRCL deputy?

A      No.

Q      To your knowledge, have there been deaths in custody since you took on that role?

A      Yes, there have been.  As of a couple of days ago, there were about 22 deaths in custody.

There is some debate as to what constitutes a death in custody.  But the way I'm looking at it, there are about 13 or 14 in

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    119

facilities, and then that broader group of individuals who are killed when involved with ICE or CDP in pursuits and such brings that number to about 22 since March.

Q      And if you have not personally participated in investigations of those deaths, have you reviewed reports of investigations conducted by others?

A      Yes.  So I have read all of the summaries.  I have looked at all the documents produced by ICE and CBP.  I have read every page of every single one myself.

And keeping in mind that the report takes time to generate, so I am not in receipt of 22 full deaths with autopsy reports.  I don't know how many I have.  Maybe 10 currently in my possession, and I have not found cause to investigate thus far.

Q      Is the figure of 22 that you just gave an increase from the number of deaths in custody in past years, to your knowledge?

A      It is an increase, but it is lower per

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    123

ICE and CBP are required to take it.

Q      And as new ICE and CBP employees are onboarded, do you know how soon they're required to undergo that training?

A      I don't know.

Q      Returning to the web portal that we discussed previously, do you know if family members or other representatives are able to lodge complaints on the web portal for someone else?

A      They are.  But they need to accompany the complaint with a signed consent form.

Q      Is there a particular form of consent form that they need to use?

A      Yes.  It's the -- well, they don't have to use it for OIDO.  I believe it's not specified with CRCL.  It is specified to use the G-28, which is a standard form for this purpose in the immigration ecosystem.

Q      So if a family member or some other third party is not an attorney, would they be able to complete a G-28 form?

A      Yes.  It's for a representative of any

kind.  Our standards are somewhat different from USCIS, so we're using the G-28 form because it's a standard form.  And yes, you do not need to be an attorney to complete that form.

Q      If a complaint is submitted by a third party that does not include a signed G-28 form, will that complaint be processed?

A      No.

Q      Will the individual who submitted the form be notified about the status of their complaint?

A      Yes.  They'll likely get a letter saying, we're not going to look into your case because it didn't have the requisite form attached.

MS. GILBRIDE:   No.  We've used this one before, but I'm not sure which number it is.

MS. DECKER:   Let me take a look.  Oh. We haven't used it as an exhibit before.

MS. GILBRIDE:   We haven't.

MS. DECKER:   Oh.  Wait.  I --

MS. GILBRIDE:   The first day.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    125

MS. DECKER:   We did.  Let me look.

MS. GILBRIDE:   I know it -- one moment.
I believe it's 16.

(Exhibit 16 was marked for
identification and is attached to the transcript.)

BY MS. GILBRIDE:

Q       Are you familiar with this document?

A       No.  I don't believe I've seen this
before.

Q       If a third party submitted this form
instead of the G-28, would their complaint be
processed for CRCL?

A       Yes.  I believe we would not kick it
back if this form were properly completed.  I
think that is something that my CRCL contractors
would probably come to me for guidance on.  And I
would say that if the form is properly completed,
we could accept it.

What we're using with the G-28 is that
standard DHS form.  This, to me -- again, I
haven't seen this, and I'm not seeing some of the
indicia of a standard DHS form like the seal and

notice between this version of the acknowledgment letter and the acknowledgment letters that are now being sent out?

A        I don't know.  I'd have to have the current letter in front of us.

I mean, I note the OIG writer first refusal in here, which we still do.  I probably neglected to mention that before, but that is a part of the process that is up front before the complaints make it to me.  So that is still happening.

As far as other textual differences, I wouldn't know.  I would need it in front of me to see.

(Pause.)

Q        So turning your attention to the, I believe, third page of this document, immediately before the Privacy Act statement.

A        Okay.

Q        Do you see that there's a phone number provided for someone to call if they have questions?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025 129

A        Yes.

Q        Is that phone number still operational?

A        No.

Q        So when someone submits a complaint today, if they want to follow up to ask questions about the status of their complaint, how would they be able to do so?

A        They will receive status information when it is available.  We do not have a mechanism for knowing the status of the complaint.

Q        And if a complainant wishes to supplement the information they previously provided, is there a mechanism that they can use to do that?

A        No.  Consistent with a lot of government complaint management, it is a one-step mechanism at intake.  And so, no.  If we fail to take up the complaint, if we choose not to, at that point, the complainant can submit another complaint.

I don't view this as being of a piece with, for example, a Social Security application where you are denied benefits if you don't submit

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    130

proper documentation.  This is -- it is not a government benefit process.  And so we do a one-shot intake.  And if we need more information, we will contact the complainant to obtain it.

Q       And what if the individual who submitted the complaint no longer wishes to pursue it or have it investigated?  Is there a mechanism for withdrawing the complaint?

A       No.

Q       All right.

MS. DECKER:    56?

MS. GILBRIDE:    Sure.  I think we used this one before, but just in case we're -- I am not confident enough with my recollection, so we can --

MS. DECKER:    Okay.

MS. GILBRIDE:    -- use a new exhibit number.

(Exhibit 56 was marked for identification and is attached to the transcript.)

Q       Have you ever seen this document before?

A       Yes.  I signed it.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    133

workflows built into the system different to each complaint type, and some of them have these intermediary steps that require documents to be uploaded to the system.

Q        Okay.  We are done with that document.

            MS. GILBRIDE:    This is 57.

            MS. DECKER:    57.

            (Exhibit 57 was marked for identification and is attached to the transcript.)

Q        Did you get a chance to review this document?

A        I've reviewed it.

Q        What does this document appear to be?

A        A letter from CRCL dated September 10, 2025, to Complainant ██████████ indicating that we are not pursuing her complaint further.

Q        What's the basis given in this letter for no longer pursuing the complaint?

A        That the alien has been removed and was removed two years ago.

Q        And to your knowledge, how long has it been CRCL policy to stop investigating a complaint

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    134

when the individual referenced in the complaint is -- has been removed or is out of custody?

A        Since Mr. Hemenway and I were appointed.

Q        Why did you make that change in policy?

A        Because when we look at the most efficient use of CRCL resources, however much staff we have, it doesn't -- we are not able to do anything for aliens who are removed.  They are no longer subject to CRCL jurisdiction.  And, therefore, it makes the most sense to focus resources on the individuals still in the United States.

         That does not preclude us from, as we do, storing all the information and tracking for trends and analysis and reporting and recommendations based on the content of those complaints.

Q        So in your understanding of CRCL's statutory requirements, is CRCL focused on redressing harms experienced by individual complainants?

A        That is one area that CRCL has in its

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    138

they remain available to this investigator to see what that universe that we have received looks like.  It's a valuable data set for us, whether or not we investigate it.

Q      And the information you would have for those prior investigations would consist of anything that the complainant sent to you and anything you subsequently requested; is that correct?

A      Yes.  All records, all documents are attached to the case file in the system, including physical mail is scanned and saved.

Q      Will CRCL request additional information from components like ICE or CBP only in those cases where it opens a formal investigation?

A      Not necessarily.  But I think that is -- at the point we are requesting documents from a component, I consider that an open investigation and call it a formal investigation.  To me, that term doesn't mean anything.

But yes.  If we are querying a component for documents, that's a complaint we're likely

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    142

it's at least a dozen, maybe quite a bit more than that.  But I don't recall.

Q       And do you sign all of the Section 504 determination letters?

A       Yes.

Q       What does your level of review and involvement with those complaints look like before signing them?  Or -- sorry -- with those determination letters look like before signing them?

A       So at the very beginning, I make the determination to both open an investigation and to pursue it as a 504 investigation vice VI 345 complaint, and that decision is informed by counsel.

And then the investigators will investigate and compile the documentation.  And they will present me with the final determination and written letter after consulting counsel, but before it gets to me.

And then I will review it.  I will ask any questions of the investigator and counsel if I

have.  And if I have, those questions are answered.  And if I don't have, I sign it, and we reissue it.

Q     Do you recall whether you had any questions about this particular determination letter?

A     I do not.

Q     I'm turning your attention to the third page of the letter.  There's a Bates number 22597.

A     Yes.

Q     Item C:  ICE did not discriminate against your client?

A     Yes.

Q     Do you remember reviewing the legal analysis in this section of the determination letter?

A     I don't remember when I -- I was reviewing it, but it looks familiar to me.

Q     And do you believe that the legal analysis in this letter is adequate?

A     Yes.

Q     Looking to Section Roman IV, Right to

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    144

Appeal, the letter outlines the amount of time that the complainant has to appeal.  Have you participated in any appeals of Section 504 complaints since you've been in your role?

A    No.  To my knowledge, we haven't received any.

Q    And what is the process for handling an appeal, should you receive one?

A    Those will be looked at manually. Everyone will be looked at.  And it is going to result in a conversation between the investigator, my counsel, and me.

And at that point, we will determine who the appropriate authority is to review the appeal. It would not be me.  It would likely be Mr. Hemenway.

Q    In the time that you have been acting as CRCL Deputy, do you know whether any of the determination letters on Section 504 complaints have concluded that the statute was violated?

A    I don't believe any have.  But, again, that's data that we have available.

A       No.

Q       Do you know approximately how many of your determination letters on Section 504 complaints have been issued within the 180-day timeline?

A       I don't know the number, but I know that all 504 complaints received since I have been in the position are timely.

I note that this letter was already late before the RIF even happened, this complaint.  It would have been late.

And so all of the late 504s that I inherited upon assuming my position, we are getting to them.  I think we've gotten to all of them.  I could be wrong about that.  But all of the ones that have come in since I've been in the position have been addressed timely.

Q       And how do you prioritize new complaints coming in as opposed to the backlog that you inherited after the RIF?

A       We take them as they come.  So it is a FIFO, first-in, first-out process.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    170

but most of them were OIG inspections of detention facilities.

Q        And who from CRCL attended?

A        I did.

Q        How did these meetings inform your work going forward with regard to the portfolio of CRCL complaints?

MR. DAVIS:   Objection, deliberative process privilege.  Just at a very high level, nothing specific.

A        The investigations that OIG did were thorough and well done, and they're a good model for us to follow.

Q        Next item, number 5, Reviewing Management Directives and Instructions.  How often was CRCL called upon to review these sorts of documents?

A        As needed.  And we're redoing all of the directives and instructions within DHS, and they're all sent to me for review.

Q        So in total, how many of these sorts of documents would you say you've reviewed since May?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                     171

A        Dozens.  I don't know.  And there are more coming.  But we're only at the beginning of this project, so probably at least a couple of dozen.

Q        What does your review entail?

A        My review entails making sure CRCL equities are covered and, in particular, that any functions that are required to reside in CRCL remain and are not eliminated or moved somewhere where they're not permitted to be.

Q        Are there other types of policy documents that you have -- you or others in CRCL have had occasion to review for other components of DHS?

A        Yes.

Q        And how many such policy documents would you say you've reviewed or others within CRCL?

A        Easily two or three dozen.  I mean, any policy that even remotely has a nexus to civil rights and civil liberties, which is almost anything the operational components do, comes to CRCL as a required clearer of the policy or

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    172

document.

Q      Who has been responsible for reviewing those policy documents?

A      I am.

Q      And have you suggested any changes to any of the documents that you've reviewed?

MR. DAVIS:   Objection, deliberative process privilege.  High level of generality, no specific advice or recommendations given.

A      A few.  I've -- I've made minor edits to a few.

Q      And have you consulted with anyone else in coming to those conclusions about what changes to recommend?

MR. DAVIS:   Just caution the witness not to reveal attorney-client privilege or anything deliberative.

A      Only Mr. Hemenway.

Q      To your knowledge, have the changes that you've proposed been adopted?

A      Yes.

Q      Returning back to the interrogatory

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                     173

response, the next item is Review of Congressional

Correspondence.  Who would be responsible for

reviewing inquiries from Congress and responding

to them?

A       So for the department, all congressional

correspondence comes through the Executive

Secretariat, and then they are supposed to be

disseminating that mail to the appropriate office

for a response.  Sometimes that happens.

Sometimes it does not.

        But for CRCL, I am the one -- department

policy requires clearance and drafting at the

Chief of Staff level and above.  And so I am

handling that in conjunction with Mr. Hemenway.

Q       Have you reviewed any congressional

inquiries?

A       Yes.

Q       How many, approximately?

A       Maybe about five or six.

Q       And have you consulted with Mr. Hemenway

about those inquiries?

A       Yes.  And I'm required to.  Because if

they're addressed to the Secretary and for her to sign it, the memo to her to sign the response must come from him, not me.

Q        Have you responded to any inquiries?

A        Yes.  That --

Q        All five that you mentioned having reviewed have been responded to?

A        I believe so.  We don't -- if we're in receipt of a congressional letter, we don't ignore it.

Q        And next item on this list, Giving Guidance on Medical and Religious Accommodations, would that be included in the review of written policies that you mentioned earlier, or is this something separate?

A        Yes.  But in this case, we are the originator of those policies.

Q        And have you drafted new policies since taking on your role as Deputy CRCL Officer?

A        Yes.

Q        How many such policies?

A        Related to medical and religious

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    175

accommodations, probably four.  There is at least one change generally to the medical; there is one about religious; and then there have been maybe three component-specific religious accommodation policies that CRCL issued, that Mr. Hemenway issued to those components.

Q    What role did you have in creating those policies?

A    I communicated to the Office of the General Counsel that there were changes needed to the existing policies and a lot of clarification. That was requested by our customers, meaning the components and our headquarters employees.

And so we needed to issue new guidance both to issue clarification and to accommodate the guidance coming out from OPM and the White House as to various changes within the workforce at the beginning of the administration.

Q    Did those policy changes involve the rescission of existing policy guidances that had been in effect?

MR. DAVIS:    Objection, deliberative

process privilege and possibly attorney-client privilege.  You can answer at a very high level.

A       Yes.

Q       Last item on this list, Annual Use of Force Review for CBP in August.  What was CRCL's role in that annual review?

A       I was a member of the board, and the board has seven or eight voting members on it. And so I and the other members voted on, I think, the ten instances of force that CBP OPR presented to us over that two-day span, and we voted on whether or not the uses of force were legitimate or within policy.

Q       And what is the consequence if the board concludes that a use of force was not legitimate?

A       It depends on the case.  But the board then votes on the order of magnitude of the offense, is my understanding of it.

The particular determination is a supervisory and chain-of-command issue, but they need that determination from the board to proceed if it was not found to be legitimate.  But the

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    183

identification and monitoring of pregnant detainees that was put in place in 2023? Do you know if that remains in effect?

A        I do not.

Q        And ICE's memo on the care and custody of transgender detainees, do you know if it remains in effect?

A        I do not.

Q        And do you know if CRCL has been consulted about either of those two topics, pregnant detainees and the care of transgender people in custody?

A        We have not since I've been in the position. I know ICE has its own CRCL-type office and their own counsel, but we have not been consulted.

        MS. GILBRIDE:    All right. We can go off the record.

        (A recess was taken.)

        THE REPORTER:    Back on record.

        MS. DECKER:    Is this going to be a new exhibit?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    186

Q        Before the RIF and the staffing changes
at OIDO, do you know what the most common method
for receiving complaints by OIDO was?

A        I think I do.

Q        What do you think it was?

A        Case workers in the facilities.

Q        And under the way that OIDO is currently
organized, can detained individuals submit
complaints to case workers in the facilities now?

A        No.

Q        Is it your understanding that all
detained individuals have access to the web portal
to file complaints?

A        Yes.

Q        How do you understand that they can file
complaints electronically?

A        They have access to tablets, which have
access to wifi, and that way they can access the
portal and submit a complaint.

Q        And is it your understanding that all of
the approximately 200 detention facilities have
tablets in the facilities?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                187

A        I don't know if they all do, but neither did every facility have a case worker in it.

Q        In the facilities that do have tablets, do you know if there is a one-to-one correspondence between number of detained individuals and number of tablets?

A        I don't know if there's a one-to-one. It's not my understanding that there is.

Q        Do you have an understanding of what the ratio of detained individuals to tablets is?

A        No.

Q        Do you know whether there are limitations placed on internet access using the tablets?

A        I don't know.

Q        Do you know if people who are in solitary confinement in detention have access to tablets?

A        I don't know.  I know we receive complaints from people in solitary confinement, though.

Q        Are there any other ways besides tablets

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    189

A        I do not know.

Q        Do you know how many complaints have been received by OIDO since March 21st, 2025?

A        About 285.

Q        Do you know how many complaints were received by OIDO in 2024?

A        No.

Q        Do you know how many complaints were received by OIDO in 2023?

A        I believe the report said it was 11,000 or 12,000.

Q        Do you have any idea why the number of complaints has reduced so drastically between 2023 and 2025?

A        I'm sure some part of it is not having the case workers there.  But the CRCL complaint volume has increased, so I don't -- yeah.  That's it.

Q        Of the 280 complaints that you referenced, how many of those complaints are currently being investigated?

A        I don't know for sure, but I know it's

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    191

Q     So in CRCL context, one of the examples you gave was an urgent medical referral. Would the same steps be taken with an urgent medical referral to OIDO?

A     Yes.

Q     Are there any other circumstances specific to OIDO besides medical issues that would tend to result in a referral?

A     Any type of issue could result in a referral. Again, there's a prioritization around use of force, sexual assault, suicidal ideations.

Q     And what sorts of situations would lead to opening of an investigation by OIDO?

A     The same. I mean, again, any one complaint can lead to us investigating, but there is the prioritization for the aforementioned categories.

Q     So what I'm trying to get at, if you are able to answer, is, what would lead something to be investigated instead of referred? Are there any particular criteria that would make an investigation more likely?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    192

A        Allegations alleging sexual, physical assault, something like corrupt contractors or ICE and CBP officers and agents, something that it would be inherently problematic for the component to investigate themselves, would almost always be something CRCL retains for investigation.  Or OIDO.  I'm sorry.

Q        And you did mention earlier that certain issues are referred from OIDO to CRCL.  What types of issues would warrant a referral to CRCL?

A        Particularly serious matter where a medical -- not a medical -- where a sexual assault has occurred or a grave medical matter where CRCL is more, because of the volume of their work, involved in doing it.

We would ask -- I would ask OIDO case workers to confer with their federal colleagues in CRCL and do any number of things in an investigation that you would do in the course of investigating.

Q        And similar to what we discussed with CRCL, when a referral is made to a component --

like ICE, most likely -- what is OIDO's ongoing role after that referral has happened?

A        It's similar to CRCL.  We reserve the right to follow up to see if there's been resolution.  We may choose not to follow up.  We're always recording and storing the information for trend analysis and reporting.

Q        And do you know, of the 280 or so complaints that you've received, how many have been referred to ICE or another component?

A        I do not know.  But that's a number we track and have.

Q        Okay.  For those that are being investigated, what does an investigation for OIDO entail?

A        It's similar to CRCL.  We start by contacting the component for more information about the complaint to see if it has a voracity.  And when the component responds, we evaluate what that response is and take appropriate action.

        If there is something the attorneys need to look at and consult on, they'll be brought in

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                          195

Q      When OIDO makes a referral to ICE, is that referral at the headquarters level?  Or who at ICE is the matter typically referred to?

A      It is referred at the SES level to ICE ERO headquarters.

Q      And to your knowledge, when OIDO had case managers present in detention facilities, were they often able to interface directly with detention facility staff to address problems that detainees were having?

A      That is my understanding.

Q      Would you describe that as a more direct way of addressing certain types of day-to-day problems, such as needing to have a sick hall or needing access to a blanket in a cold facility? Is it easier to address those problems at the facility level?

        MR. DAVIS:   Objection, vague.

A      Not necessarily.  What I like about the arrangement we have now is I get SES-level leadership assurance that something is going to be taken care of, whereas there isn't great

least in these five instances.

Do you know how many other instances or other complaints were referred to ERO for further action?

A       No.

Q       And these complaints were all pending for different lengths of time, or they weren't all received by OIDO on the same date; is that correct?

A       I don't know.  I'd have to look.

Q       Sure.  Take your time.

A       It appears a few were in April, early April, and the others at different times.

Q       So you had previously testified with regard to CRCL that there's a FIFO, first-in-first-out, protocol for handling complaints.  Is that true for OIDO, as well?

A       Yes.

Q       Okay.  Can you look at the emails that were sent to the complainants for these five cases and let me know if they were sent on different dates or on the same date?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    199

A        They were sent on the same date. Because in this instance, we were clearing out the backlog of cases that was sitting in the portal at the time of the RIF.

And so whatever cases predated our working the cases in the portal all received a notice as of the same date that we issued a batch set of notices for the cases that were being -- receiving a similar disposition.

Q        How many of those backlogged cases resulted in closures?

A        I don't know.

Q        How many of those backlogged cases that received emails on or about September 19th were referred to ICE ERO for further action?

A        I don't know.

Q        One -- you had mentioned that referral to a component is something that's tracked in the OIDO system.  So would all of these complaints that you've just reviewed that were referred to ICE ERO be categorized in the same way in the internal system?

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                          204

employees that previously worked for GEO?

A     Yes.

Q     And the person who previously worked for CBP, is that also one of the full-time employees?

A     Yes.  One detailee and one employee worked for CBP.

Q     And each inspection is conducted by a single law enforcement specialist acting on their own; is that right?

A     No.  Some are conducted by one.  Some are conducted -- have been conducted by two. There are others that may be conducted by more.

Q     And how is it determined what level of staffing or what number of people to send on an inspection?

A     There isn't a bright-line rule, but the size of the facility is an indicator of how many staff we should send out.  If we are conducting an investigation in concert with CRCL to look at the complaints they have on file for that facility, that will be a multi-person investigation.

Q     And you mentioned that the standards

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    208

they are coming.

Q        How much advance notice do you give to the facility before conducting an inspection?

A        Typically a few business days, no more. Some of the trips that are more intensive for us need a little bit more planning, like if we're going to travel far afield.  But typically, the standard right now is a few business days.

Q        And how long does each inspection last from the time that the employee or employees get there?  How long are they on site?

A        It varies by the complexity and size of the facility.  So if it's a big facility, it will be a multi-day.  Right now, those are two full days, those facilities.

If it is a smaller facility, like a holding cell or a similar temporary-type facility, both either temporary like a soft-sided facility or temporary meaning that the detainee is meant to be moved out of there in short order, that may only be one day or a five-hour inspection.  Our shortest inspections so far have been about five

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    214

A     Only what I had just discussed where we can look at past inspections.  I'm not aware of open inspections that need to be formally followed up on.

Q     OIDO does have a statutory requirement to annually report to Congress.  What is the status of the 2025 congressional report?

A     It is in draft.  It will likely be delayed because of the shutdown, but it will be timely if you bump the end of the year out by the length of the shutdown, which brings us to about mid-February.

Q     And do you know what the status of the 2024 OIDO report to Congress is?

A     I do not.  I searched the files of my predecessors and can't find any evidence one was drafted.  And so at this point, I'm focused on getting the current one out timely.

Q     And I don't think I asked you previously about the status of the CRCL annual report to Congress.  What is the status of that report?

A     Same:  Being drafted and should be on

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini
Conducted on December 5, 2025                    215

time if you push the deadline out by the length of the shutdown.

Q       And the presence of law enforcement specialists at detention facilities, do you have any plan to have them visit facilities on a regular basis outside of conducting inspections?

A       No.

Q       Before we turn our attention to CISOM, I want to go back and ask you a question about -- a couple of other staffing questions that are specific to CRCL.

So you have testified -- you had testified that you have learned since being in the role that it's possible to perform statutory functions with fewer staff members than you earlier anticipated.  Can you describe -- because the difference between your staffing plan and the current staffing is particularly drastic for CRCL.

So can you describe why you believe it's possible to conduct all the statutory functions of CRCL with just two full-time employees besides yourself and Mr. Hemenway?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    218

CRCL by having detailees from the other components of DHS provide that policy advice?

A        Yes.

Q        Is that still a plan that you intend to put into effect?

A        It is something we're still considering, and it remains a plan that I am looking into.

Q        But as of now, you have not brought any detailees on board at CRCL; is that correct?

A        There is actually one attorney detailee. There is.  And not to provide policy advice as such, but to assist with any number of legal reviews for CRCL.

Q        And when did that person get onboarded to CRCL?

A        I think shortly before the shutdown.

Q        And does that person work for CRCL on a full-time basis?

A        She is detailed to OGC to support CRCL on a full-time basis.

Q        And what sorts of functions does she perform for CRCL?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    219

A        She reviews our correspondence and our claim decisions, or complaint decisions, and assists in reviewing EEO matters and writing final agency decisions.

Q        I think we can turn our attention now to CISOM. How many assistance requests for CISOM have been reviewed since you took over as Ombudsman, approximately?

A        We've received approximately 7,500 requests.

Q        You've received 7,500. And how many were pending at the time that you took on the role?

A        I don't remember.

Q        Okay. Do you remember, or do you know, are there more open requests for assistance now than there were when you took on the role in -- was it May?

A        Yeah. Early May.

Q        Okay.

A        I don't remember if we have more now than then.

Q       Okay.  What happens when CISOM receives a request?  So this is the same question I've asked for the other two offices.  What is the first step in the review process?

A       We have our staff look at the complaint or look at the request for assistance.  And based on our prioritization, they choose to either not act on the request or to tee it up in a spreadsheet that we eventually batch and send over to USCIS.

        If there are questions that we can answer, we will answer them straight away if we can do that with our access to USCIS systems without asking USCIS.

Q       So you said that there are certain requests that you would take no further action.  What types of requests would fall into that category?

A       A good example is cases where the handling of those application types is in flux or outright paused right now, which is a significant number of form types, and they make up a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    221

significant portion of the requests that we receive at CISOM.

It does not make sense to act on those requests because we aren't going to be able to give an answer; USCIS won't be either.  And so it doesn't make sense to respond to those requests until there is more clarity on how they will be handled by USCIS.

Q       And if you determine that a request falls in that category and that you're not going to take any further action, is any sort of correspondence sent to the requester informing them of that decision?

A       Yes.

Q       And what about in the instance where you're able to resolve the matter or give an answer without referring the matter to USCIS? What would be done in those types of cases?

A       A message would go back to the requester because, of course, that is in the nature of closing out, would be informing them of the answer to their question.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    231

█████      And the request seems to have been received April 7, 2025.  And it includes our receipt response to him and our further response on September 19th.  It's saying that we've referred his request to USCIS, and we'll let you know when we hear back from them.

Q      Okay.  So noticing that both this response to █████ and the other response we were just looking at were both sent on September 19th -- and I can represent to you there were some others we received in the discovery responses with that same date -- is this a similar situation to the situation with OIDO, where you were clearing out a large number of requests from the time period of the RIF all at the same time?

A      Yes.  The cases were all reviewed individually.

And then what we do is we assign a -- you group them in a batch.  You assign a status to all of those similarly situated.  For example, all of those that we are going to send to USCIS, you batch-mark them with that condition in the system.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025 232

And then you batch-generate notices, which is why the notice date may be different than the date we actually sent it to USCIS. Because the sending to USCIS is a manual action, but the generation of the notice is a separate manual action. And so that might have happened at a different time.

Q And just one more of these, I promise.

(Exhibit 68 was marked for identification and is attached to the transcript.)

Q What is this document?

A It appears to be the extract from our case management system for the same ███████ case.

Q Okay. And on this one, I would like to focus you -- and I don't know which page it's on; I apologize -- but the column entitled Assigned. This may be about halfway through.

A Okay.

Q What does that field refer to?

A It's a field that we don't quite use the way our predecessors probably did. It just means

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    233

the day we assigned it to a case worker or a case worker would have picked it up and looked at it.

Q       So does this mean that the first time someone reviewed this request was on September 13th?

A       No, it does not necessarily mean that.

Q       Okay.  So someone could have looked at it previously but then picked it back up on that date?

A       Yes.

Q       Okay.  And then there's a field that says Modified By, with ▋▋▋▋ name in it?

A       Yes.

Q       What does that refer to?

A       That means he took any number of actions.  That's an automated field.  Anytime someone touches a data element in SharePoint, that field will automatically adjust with the name and the date.

So I know that ▋▋ was taking a lot of the batch actions based on our detail user review.  Because of his technical prowess, he was

the one going in and doing the automated or semi-automated functions in the system.

Q       Okay.  So for example, putting together the list of requests that were going to get that same response we saw saying, Your matter has been referred to USCIS, that's something he would have been responsible for doing?

A       Yes.

Q       Okay.  Okay.  We're done with that exhibit.

So once a matter is referred to USCIS, does CISOM continue to have any involvement or check-in role with USCIS?

A       Yes.  We have to, because the completion is USCIS getting back to us, not getting back to the requester.  So it's a bit different from CRCL and OIDO.

Q       So what does that ongoing involvement with USCIS look like?  Are you meeting in person or sending emails?  What type of interaction do you have?

A       So there's different interactions for

different things.  For the cases, we are sending a list of our requests and then pinging them if it takes a while, which we've already pinged them for some.  And that is for the cases; that is the nature of that interaction.

I meet with USCIS leadership regularly to discuss policy issues and trends and topics of the annual report.

Q      And what sort of ongoing follow-up or interaction do you have with the requester after a matter is referred to USCIS?

A      Typically nothing until we get the response because there's nothing to say until we receive the response.

Q      Okay.

MS. GILBRIDE:   Let's see where we are. Exhibit 69.

(Exhibit 69 was marked for identification and is attached to the transcript.)

Q      I'll give you a chance to review this document.  Let me know when you're ready.

A      Okay.

A       We have not received any responses from USCIS yet, and I am in touch with leadership about that.  But we have not received any replies on any particular case yet.

Q       Okay.  So you haven't had occasion to give that sort of information to a requester so far; is that right?

A       Correct.

Q       Okay.  All right.  Another exhibit.

MS. DECKER:   Yep.

MS. GILBRIDE:   Let me make sure I'm not getting too --

(Exhibit 70 was marked for identification and is attached to the transcript.)

Q       I'll give you a chance to review this one.  It's rather lengthy.

A       Okay.

Q       So I'll represent to you this is a document that was produced by the defendants to us in discovery.  What does it appear to be?

A       A request for assistance sent to CISOM by ███          And that seems to have been received

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                                    245

A       I don't know.  That is a number that we have.  It is probably the majority.

Q       Which would be the majority?

A       That we are not taking action.

Q       With no further substantive response given?

A       Correct.

Q       Okay.  And, again, can you walk us through the reasons why you would decide to take no further action and provide this sort of a fairly cursory response?

A       Well, there is never a bright-line distinction.  But generally speaking, I see this as a humanitarian request, or the underlying request to USCIS is based on a humanitarian category.  We have deprioritized those because USCIS has deprioritized those.

And as has been made public, a good number, if not all, of the humanitarian type of requests are paused.  And so it does not make sense for CISOM to focus on humanitarian requests because USCIS will not likely be able to give us a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    246

satisfactory response.

MS. GILBRIDE:    Okay.   71.

(Whispered conversation.)

MS. DECKER:    72.

(Exhibit 72 was marked for identification and is attached to the transcript.)

BY MS. GILBRIDE:

Q        What does this document appear to be?

A        A request from ██████████ for assistance.   And she received a response from us that we were not taking action on September 11, 2025.

Q        And do you have a sense from reviewing the request of why the decision was made not to take further action in this case?

A        It is a type of humanitarian benefit, so that will likely be deprioritized.   I note that it's a U visa request.   So that subset, we do look at those.

But, again, due to the situation being in flux at USCIS's handling of all humanitarian visa requests, it does not always make sense, and

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    249

period -- were those part of a batched set of responses?

A       I don't know, but that is very possible.

Q       And do you know how many responses were included and sent out contemporaneously, the same time?

A       No.

Q       Do you know if there have been similar batched responses since September 11th, September 12th, that include this same language saying, we are not taking any further action?

A       I don't know, but there probably is. Because all of the cases, in terms of effectuating an action in the system, are handled in a batched manner.  That's just an efficient way to handle complaints when you have thousands, so they're reviewed one by one.

        But when a case worker will look at it and say, okay, I know all of these that I'm going to mark in the system as no action, nothing happens when our staff takes that action in the system.  It's just denoting an internal system for

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    250

an action that the public would see, like one of these emails being triggered.  That always happens in a batch.

Q       And how frequently are those batches acted upon since you've been in the role at CISOM?

A       ████████ takes care of that.  But I think we're sending out batches at least every couple of weeks, perhaps more frequently.  But I'm not sure.

Q       And are batch responses being sent out for OIDO and CRCL, as well?

A       Yes.

Q       And for CISOM, I think we've seen two types of responses, one for the no further action and one for the, your matter has been referred to USCIS.  Are there any other types of CISOM responses that have been sent out in batches?

A       I don't believe so.

Q       What about for CRCL?  What types of responses have been sent out in batches for CRCL?

A       CRCL has a more varied set of form responses.  There's 504 responses; there's the 345

response; and it could look like we're opening investigation; we're not pursuing it further; we've referred it with no further action from us; we've done a medical referral, I believe, has its own form letter.  So there's a broader range there.

Q      And do you know what form responses are sent out in batches for OIDO?

A      There is a similar to CISOM, we're not taking action on your complaint, letter.  And then there is a, we've referred it to ICE or CBP, letter.

And then there is another one where it's not automated, but it's customized if we need a more substantive response or if we need more information.

(Exhibit 74 was marked for identification and is attached to the transcript.)

Q      What does this document appear to be?

A      It's a message from T.J. Mills to you, saying that CISOM terminated assistance with the delayed receipt from the NSC.  And it has there

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                253

A        There are a large number of very detailed fields that they can fill out all of their case information, but they're not all required.  There's also a freeform text box.  So they can submit whatever they wish.

And there's also the opportunity to upload documents of any kind, of course:  Case documents, G-28s.  So they can submit almost anything.

Q        What if an individual had previously submitted a CISOM request and then the matter was resolved and they wanted to withdraw it?  Is that something that can be done via the web portal?

A        They can start a new request and say, you can withdraw my current request.  But at this time, no, there isn't a way to withdraw an existing request.

(Exhibit 75 was marked for identification and is attached to the transcript.)

Q        What is this document?

A        I'm not quite sure.  It's --

Q        Take your time.

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Ronald Sartini

Conducted on December 5, 2025                    254

A     Okay.  So it's a letter or a declaration from Vincente Lozano Lovelace, Esquire, to -- well, it's just a declaration saying his recent experience with CISOM.

Q     And his experience consisted of both sending an email and receiving an auto-response that the mailbox is not monitored, as well as an interaction he had trying to use the CISOM phone number.

Do you know if the CISOM phone number is still currently operational?

A     It is not.  That was a contract that I canceled well before August.

So I know that there was a lot of confusion and performance issues with that contract and that line, and it was not an exclusively CISOM phone line.  I know that from my own interactions testing the quality of that service.

So I don't know who he reached at all in August, but it was not a contract that we had in pay any longer.  We had terminated that contract

months prior.

Q        Well, I don't think he reached anyone. He said he was on hold for a lengthy period and then gave up, so perhaps that's why he didn't reach anyone.

Is the phone number -- has there been any notice or announcement posted on the CISOM website indicating that that phone number is no longer in use?

A        The number is no longer posted, which I consider as being notice.  I'm also not aware of any duty to affirmatively notify.

Q        So is there currently any way for an individual to have a real-time conversation with a representative of CISOM, like a request for information that would be responded to in real time?

A        No.

Q        CISOM also has an obligation to annually report to Congress.  And there's a date associated with that, I believe, June 30th.  What is the status of the report that was due to Congress on

June 30th of 2025?

A       The report was submitted over the summer.

Q       And is that report to Congress publicly available?

A       A redacted version of the report is publicly available on the DHS website.

Q       You mentioned earlier that there is an individual from OGC who is detailed to CRCL.  What is that individual's name?

A       █████       I forget the last name.

Q       Besides █████ are there any other either full-time employees or detailees at any of the three offices that we have not already discussed today?

A       There's the admin functions that are performed by dozens of admin office employees, and that should be captured.

As far as the attorneys go, that attorney who's detailed is really no different than the many other attorneys who support me.  So I don't know if you're looking for more names or

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    257

numbers, but there's not one attorney helping CRCL, to be clear.  There's multiple.

Q    And those attorneys are helping CRCL with Section 504 and EEO matters.  Any other matters?

A    345's policy review, as they did before the RIF and have always done.

MS. GILBRIDE:  I don't have anything further, but I'd like to make sure I'm not missing anything.  So could we take five minutes?

THE REPORTER:  One moment.

(A recess was taken.)

THE REPORTER:  Back on the record.

BY MS. GILBRIDE:

Q    A few minutes ago, Mr. Sartini, you mentioned a detailee whose first name is ▆▆▆▆ Where is ▆▆▆▆ detailed from?

A    I believe FEMA.

Q    And she is working or performing support functions for CRCL; is that correct?

A    She's performing support legal functions for CRCL.  Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                               259

Q      And this may be retreading previous ground, but I want to make sure I'm understanding: These individuals, all five of them do live in the National Capital Area; is that correct?

A      Yes.  To my understanding, they do.

Q      Okay.  You gave a figure for the number of OIDO complaints of approximately 280.  Does that figure correspond to the entire calendar year of 2025 to date or a subset of the calendar year?

A      That is March 22nd to October -- December 1st or the last day of November, maybe.

Q      Okay.  Do you know how many complaints were received in 2025 prior to March 22nd?

A      No.  It's a number we have and may have even produced.  But no, I don't recall.

Q      And I hate to do this at this late stage of the deposition, but just to refresh your recollection, if you could pull up the discovery responses that you looked at earlier.  I think that's one of the first exhibits we gave you.

A      What would the title be?

Q      It would be Defendants' First Set of

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    263

A       I don't know.  But I know that we have corresponded with complainants, so I believe they have a method of receiving email.

Q       Okay.  With regard to the Office of Health Services, which you said is able to review medical documents, what sorts of medical documents have you asked them to review?

A       Entire medical files and histories of the complainants at issue.

Q       And have those medical files come through OIDO inspections or also from complaints?

A       Both.

Q       And are the complaints OIDO and CRCL complaints, both?

A       Yes.

Q       And you said in total, how many sets of medical documents has OHS reviewed thus far?

A       They're in the process of reviewing the first batch.  And I don't know how many we have there, but it's at least a dozen.

        (Whispered conversation.)

        MS. GILBRIDE:   Oh, yes, I got it.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Ronald Sartini
Conducted on December 5, 2025                    271

case summaries and conclusions.

Q    In the investigations that you have opened for OIDO since taking over your role, have any violations been found in any of those investigations?

MR. DAVIS:    Objection, deliberative process privilege.  You can answer generally, but not about specific complaints.

A    Minor violations, some.

Q    And compared to the total number of complaints that you have received, what percentage have resulted in a finding of a violation?

MR. DAVIS:    Objection, vague.

A    Very few.  Small percentage, very small percentage.

Q    Would you say more or less than 10 percent?

A    Less than 10 percent.

Q    Okay.  Nothing further.

MR. DAVIS:    Nothing further from defendants.  We will designate the transcript as confidential, especially because one of the