IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ROBERT F. KENNEDY HUMAN RIGHTS, ) CIVIL NO.:
) 25-1270-ACR
Plaintiff, )
vs. )
)
DEPARTMENT OF HOMELAND SECURITY, )
et al., ) July 1, 2026
Defendant. ) Washington, D.C.
________________________________) 10:30 a.m.

Transcript of Motions Hearing
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff:

Karla A. Gilbride, Esquire
Adina H. Rosenbaum, Esquire
Public Justice, P.C.
1620 L Street NW, Suite 630
Washington, DC 20036

Christina Coogle, Esquire
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Anthony Enriquez, Esquire
Robert F. Kennedy Human Rights
1300 19th St NW, Suite 750
Washington, DC 20036

For the Defendant:

Tiberius T. Davis, Esquire
Department of Justice
950 Pennsylvania Avenue, Suite 400
Washington, DC 20530-0001

Reported by: Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
333 Constitution Avenue, NW
Washington, D.C. 20001
(202) 354-3247

Proceedings recorded by machine shorthand;
transcript produced by computer-aided transcription

P R O C E E D I N G S

THE CLERK: This is civil action 25-1270, Kennedy Human Rights Center, et al., versus U.S. Department of Homeland Security, et al.

Would the parties please identify themselves for the record, using a microphone please, starting with the plaintiffs.

MS. GILBRIDE: Good morning, Your Honor. Karla Gilbride with Public Citizen for the plaintiffs.

THE COURT: Good morning.

MR. ENRIQUEZ: Anthony Enriquez of Kennedy Human Rights Center for the plaintiffs.

THE COURT: Good morning.

MS. ROSENBAUM: Adina Rosenbaum Public Citizen for plaintiffs.

THE COURT: Good morning.

MR. DAVIS: Tiberius Davis on behalf of the defendants.

THE COURT: Hello, Mr. Davis.

Okay. It's nice to see everyone again.

First I want to start by commending everyone for the briefing, I thought it was exceptionally well done on both sides. It makes my life much easier. Thank you.

Okay. First with respect to mootness, I do not think the case is moot. This is based on no extensive legal

analysis, other than I just can't think it's right that the president asked Congress to withdraw all funding from something and then used the lack of funding as a basis to reject that he wasn't supposed to get rid of the thing in the first place. It just seems, like, logical to me. So I don't think the case is moot.

But, and then with respect to the actual merits, it seems like we actually do have factual disputes as to whether or not the offices are working as intended. So I'm actually not sure I can grant summary judgment to either side on that.

But I do have substantial concerns about standing. And so I want to focus our attention on standing today. And I guess I'd like to start by hearing from plaintiffs about what the actual harms are. Because as I understand what people do agree on, it's not that the entities aren't functioning at all. It's not you know that they sort of posted a gone fishing sign up on their doors or web addresses, it's that they're not moving things as quickly as the plaintiffs think they should be moving, or as, you know, easily as they should be moving, or with announced versus unannounced inspections. And I just don't -- I mean, if that's sufficient to confer standing, then it just seems like every government entity doing anything at all in a way that some group that uses it doesn't like, could be sued. And that just seems not right to me. But I will hear from plaintiffs.

MS. GILBRIDE: Good morning, Your Honor.

THE COURT: Good morning.

MS. GILBRIDE: So with regard to your specific question on the harms to the three organizational plaintiffs, and the members of the southern border communities coalition, which is a membership organization, all three of these entities have engaged with the three oversight offices: Offices for civil rights and civil liberties; the office of the immigration detention ombudsman; and in the case of plaintiff Urban Justice Center, with the Citizenship and Immigration Services ombudsman.

And they've done this in various ways, in Kennedy Human Rights Center's case and in UJC's case, to better serve their clients who are either in detention, for KHRC's clients, and individuals who it helps. And UJC's clients are receiving various types or applying for various types of immigration relief with USCIS, and they've enlisted the assistance of the CIS ombudsman's office to expedite those immigration forms of relief for their clients, who have petitions with the Violence Against Women Act, for U visas, T visas, or other types of immigration relief that USCIS administers.

And all of them, since the defendant's actions of March 21st, 2025, have not been able to get the assistance that they previously had gotten from those offices, because either complaints were not being processed at all. In the

case of Kennedy Human Rights Center, several complaints that they had filed back in 2024 regarding detention conditions, there have had no contact, no responses whatsoever since March 21st.

THE COURT: But I thought that historically, the offices had greater or lesser number of people and, you know, greater or lesser rates of responsiveness. I mean, I don't think that you're entitled to a response to every single complaint as a matter of law, and not, you know, within, I don't know, two months. I just -- it -- I mean, I just have to think that if an individual has conferred standing to challenge the human rights -- or human resources management of a government office because their complaints aren't being handled or not being handled expeditiously, I mean, my docket is going to go through the roof.

MS. GILBRIDE: I understand the concern, Your Honor. And the source of the injury to the organizational plaintiffs here is not, you know, based on the speed at which any particular complaint has been processed or whether any particular complaint, you know, was responded to at all. The problem is that the entire system of engaging with these offices has become unreliable and ineffective.

THE COURT: Well, I mean, welcome to the, you know, working with government bureaucracy sometimes. I just -- I mean, look, I hear you. I'm not -- I don't want to -- I tend

to cut to the chase on things, which means I don't do sort of the prefatory this is important work that these offices do, this is work that should be done, these are offices that should be resourced correctly. And I'm not belittling that or why you all are challenging these reorganizations or reductions in force. So I just want to make that clear, because the rest of how I sound is going to sound not as understanding, just because I just -- I cut to the chase on things. Which makes me a delight in relationships.

But I just still -- at the end of the day, I mean, it seems like the problem is, is that we have government entities that the plaintiffs complain aren't working efficiently and well. And, you know, I was recently at the DMV, and they -- everyone there is doing a very good job and trying their best, and I have no complaints about the people who are working on it, but, you know, there's just a lot of people who have DMV issues and so you're there for a long time.

MS. GILBRIDE: So with respect to, you know, again, what the nature of the injury is, when the service that the government provided, on which the entities here used to rely, and so this isn't like, well, government's just inefficient, it never works well. The issue here is that it used to work reasonably well, not perfectly. You know, the plaintiffs here certainly didn't get responses promptly to every complaint

that they filed. But --

THE COURT: And they didn't get responses to every complaint; right?

MS. GILBRIDE: That's correct. But in the case of Kennedy Human Rights Center, they did have individual clients who received accommodations. You know, once they filed a complaint with CRCL and with OIDO, an individual who had epilepsy and was at risk of falling was moved to a lower bunk so that he was at diminished risk. Other investigations were opened into some of the systemic issues at detention centers that Kennedy Human Rights Center had raised.

And the other thing that Kennedy Human Rights Center in particular has done as part of its organizational mission is to educate detained individuals to advocate for themselves by filing these complaints; so to provide information on how to walk through the CRCL and OIDO complaint filing process. And this entire process now has stopped functioning and has become unreliable.

And in the AFL-CIO versus FTC case that we cite in both our opening and reply brief, when the -- the organizations that had filed complaints with the CFPB previously, you know, found that as a useful way of fulfilling their organizational mission, similar to the plaintiffs here, learned that or suspected that information that they were filing or including in those complaints was being shared with

the Department of Government Efficiency, they stopped filing those complaints, they stopped engaging with the offices, and they stopped encouraging their clients and the people that they served through their community education, you know, efforts to engage and file complaints with CFPB because they did not consider it a reliable avenue or vehicle for raising concerns.

And similarly, here, the plaintiffs have stopped filing complaints, have, you know, changed the educational offerings that they do, or, you know, to the extent that they still make those presentations in detention facilities, it is no longer feasible for the detained individuals to file complaints, because only for -- with respect to OIDO, complaints are only being accepted through the web portal, which not all detained individuals can access. There are not enough tablets available in detention facilities. Many facilities don't have tablets at all. OIDO issued a report on this topic back in 2024, which we cited to in response to defendant's statement of fact 33 and 34, showing that only somewhere around 39 facilities operated by ICE had tablets. And defendants are telling us that there are now somewhere around 250 facilities where immigrants are being detained. So there are not enough tablets even in -- you know, in all of the facilities, many tablet -- many facilities that have some tablets don't have enough tablets for each detained individual

to use one, which a former ICE official stated in his declaration, which is at Exhibit No. 19 -- Exhibit No. 20 in support of our motion for summary judgment.

So simply isn't an effective, you know, use of Kennedy Human Rights Center's resources to educate individuals about the complaint filing process that has broken down and that no longer works, because the resources have been removed. And this was all done pursuant to an action taken by defendants on March 21st, 2025. They chose to single out these three offices. This wasn't about an across-the-board reduction in resources across DHS. DHS has been given, you know, additional funding by Congress and has hired new staff. In fact, one of the reasons that Mr. Sartini testified that the hiring of the handful of, I believe it was two investigators at CRCL and three employees at OIDO, why it took so much longer than he told this Court it would take is that there was a surge in hiring new ICE agents during the summer and that slowed down the hiring process.

So the department has, you know, plenty of resources. But defendants made a choice in March of last year to conduct a 100 percent RIF targeting only these three offices. And the reason given for that, that it -- defendants stated to OPM in their memo of March 6th, 2025, was that these offices, those three offices do not advance the national security mission of the Department of Homeland Security and

can properly be eliminated. And then went ahead -- when the reductions in force were announced on March 21st, the spokesperson for DHS made a similar statement, that these offices were internal adversaries that interfered with the law enforcement immigration enforcement actions of the department.

THE COURT: So, I mean, I hear you, I hear you on all that, but at the end of the day, they didn't eliminate the offices. I mean, at the end of the day, you do still have the required sort of head officer. At the end of the day, they are still processing complaints. And yes, is it more difficult for your organizational plaintiff to train people on it, is it taking longer, is it diverting resources, yes. But I think defendants do a nice job in their opposition arguing that diversion of resources within an organization is not sufficient to confer standing.

I mean, I just -- the AFL-CIO case that you cited, and I haven't looked at it recently, but it's a district court decision by Judge Bates. And Judge Bates is brilliant, and far be it for me to second guess him. But it's not a D.C. Circuit case. And more to the point, it -- as far as I understand it, the question there was that there was intrusion on individual member's privacy interests. So it wasn't necessarily just a government not acting efficiently. I mean, having, you know, your private information accessed by the

wrong government agency I think is a far cry in terms of standing from the website isn't working as efficiently as possible or there are not enough people to do the job in your client's estimation.

MS. GILBRIDE: So two responses to that, Your Honor. First, as a factual matter, you said that there were officers or, you know, head of each department. That's no longer the case. As we understand, and as we notified this Court in docket entry 80, when former Secretary Kristi Noem moved to the State Department, Mr. Hemenway and Mr. Guy also moved to the State Department and are no longer heading CRCL or OIDO respectively, and Mr. Sartini is acting as head of all three offices. So yes, in a sense, there is someone there, but it's the same person doing three jobs.

THE COURT: Well, welcome to being a woman for most of life.

But yes, I mean, we might have someone who has other jobs, but it's not -- there's someone with responsibility for the office.

MS. GILBRIDE: That's true, Your Honor. And, you know, he's being asked to do an awful lot, and so I don't think it's a, you know, knock on him that things are not being done that these offices are required to do.

I want to talk a little bit about the test for standing before I move back into facts and giving more

examples of --

THE COURT: Sure. Fair.

MS. GILBRIDE: -- particular harms, but just on the law, because you asked about the D.C. Circuit and diversion of resources. And I think, you know, the defendants talk about diversion of resources and cite cases that talk about diversion of resources on advocacy efforts to oppose the government's conduct. And that is not what has happened here.

What has happened here is that these organizations have existing missions that they're trying to perform. So we've talked a little bit about Kennedy Human Rights Center's missions already and working with detained clients. Urban Justice Center, working with their domestic violence survivor clients, has been using the, you know, services of the ombudsman office when they were available. And the two-part test laid out in People for the Ethical Treatment of Animals versus USDA, a D.C. Circuit case, says that in order for an organization to prove standing, based on, you know, diversion of its resources, it has to show that the government's action directly injured its interests and that it expended resources to respond to that harm.

So with regard to UJC, for example, the actions of the defendants in removing all staff and shutting down the operations and functionally, you know, eliminating the CIS ombudsman office harmed their interests, because they looked

to the CIS ombudsman to help move their cases along or to get information about why their cases were stalled. They could no longer do that. No one was answering their requests. And so they have expended resources to respond to that harm by trying to get that information in other ways, by going to members of Congress and asking for their intercession, by going to the help line that the USCIS bureau operates. But all of those things, they're not doing them to oppose the government's actions. They're not diverting resources as advocacy. They're diverting resources to try to meet their client's needs and serve their clients.

And that's the same injury that PETA experienced in that case against USDA. It operated -- it conducted educational programming. And, you know, there's a little confusion around the word "advocacy," because PETA's mission does involve advocacy on behalf of animals. But when USDA didn't take action to protect birds and didn't process complaints that PETA was filing regarding birds, only regarding mammals, what PETA did was it filed complaints with other entities. It found other ways of accomplishing its mission of trying to protect birds and also of conducting its educational missions regarding, you know, informing the public about animal rights. But it couldn't use this particular channel of filing complaints with USDA. It had to find other ways of accomplishing its -- of performing its core

activities.

And similarly, UJC has to find other ways of performing its core activities of serving its domestic violence clients. Not -- it's not diverting resources to advocacy like the Food & Water Watch case, you know, found. It is diverting resources to respond and to compensate for the harm caused by defendant's actions of neutralizing and removing the CIS ombudsman office on which it used to rely.

And just to put a finer point on how nonfunctional the CIS ombudsman's office has become, you talked about -- you know, earlier you asked a question about if the office is just functioning a little more slowly or not processing things as quickly as one would like. You know, I think looking at what's happened at the CIS ombudsman's office show that we're not talking about a matter of degree. We're talking about functions that have essentially stopped being performed whatsoever.

The way the CIS ombudsman's office used to work is that people would file a complaint, yeah, on a web portal or via email, and they would get a response letting them know, you know, the complaint was received. Then there would be periodic updates on what was happening with the complaint. There was also a phone number people could call if they wanted to talk to someone, but often the correspondence went back and forth via email. But there was two-way communication between

the person with the request and someone in the ombudsman's office who was looking into that request.

In terms of numbers, around 40 percent of requests for assistance that were sent to the CIS ombudsman's office were opened and to -- you know, were acted upon, usually by being forwarded to USCIS, and then someone at the ombudsman's office would interact with USCIS and try to get an answer. So that was what was happening before the defendants acted to eliminate these offices.

What's happening now is that at the time on the March 21st date, when all of this took place, there were -- I'm looking for my number. There were 4,489 requests pending with CIS OM. That's plaintiff's statement of fact 179. And then 8,027 additional requests were placed with CIS OM between March 21st and December 12th. Instead of the 40 percent that CIS OM used to act on, we now have 1.5 percent.

So, specifically, out of the 8,027, 7,914 of those received a one-sentence email saying, "We have received your request and are taking no further action." Only 113 of the 8,027 were forwarded to USCIS for any sort of follow-up. And when someone received one of these emails, whether it was one of the 7,914 we're not doing anything with your request close your emails, or one of the 113 other ones, there was no way to follow up and ask for additional information or why is my request being closed. In fact, we included in our summary

judgment materials several attorneys or individuals who followed up when they received one of these closure emails asking for more information, and the response that they got was an autogenerated response, "This mailbox is unattended and cannot receive any inquiries."

So as an ombudsman's office that was set up by Congress in 6 U.S.C. 272, to provide customer service and assist individuals and employers with problems with USCIS is not interacting with members of the public and employers, it's simply sending out one-sentence emails to which people cannot respond.

THE COURT: I thought -- I thought all that one-sentence email -- I have some vague recollection that Mr. Sartini or someone indicated that that was -- that that was no longer happening, that that was a mistake, or is that --

MR. DAVIS: You're thinking of the emails that said that the offices were closed. These are responses to complaints saying no action is being taken on your complaint. That is happening.

THE COURT: That is happening.

MR. DAVIS: Yeah. But there's -- but what you're talking about is the kickback email. That's not happening.

THE COURT: Okay. All right. Thank you.

MS. GILBRIDE: So, you know, these offices are not

functioning, and this is directly harming all three of the organizational plaintiffs.

And the one plaintiff I haven't talked about is the Southern Border Communities Coalition, which has several members who also filed complaints and interact with these agencies. And they've also received some of these autoresponse emails. You know, several months after filing complaints in early 2025, we had these rash of responses that all went out on the same day. OIDO sent several automated closure emails on September 19th for complaints that were filed in April, May, August, all when there were no staff members, you know, at these offices processing complaints. They were all identically worded. And again, if someone tried to follow up, there's no way to engage with these offices other than, when we asked at deposition, how would someone follow up if they had new information they wanted to send or they wanted to, you know, provide information, it was, well, you know, file a new complaint.

And, you know, some of these organizations that are members of SBCC, like the Kino Border Initiative and the Immigrant Defenders Law Center, you know, they had engaged with these offices to sort of help them direct some of their systemic work with detained people. Immigrant Defenders Law Center is also a legal organization that, you know, provides direct services. The Kino Border Initiative provides direct

assistance to people on the border who have been in detention and have returned to Mexico. And understanding systemic trends about what these offices were doing, what sort of complaints they were investigating and taking action on helped those organizations to direct their efforts to be more effective. And now, when they file complaints, they're going into a black hole. They're not getting any sort of substantive response or engagement.

And so that is causing deterrence where they no longer, you know, feel -- especially with Kino Border Initiative, where some of the people there are interacting with -- they've recently been deported across the border, they may still have family members in this country, they no longer feel, you know, comfortable, and this is in the most recent declaration of Tracy Horan, advising people to file complaints because the risk of, you know, potential retaliation doesn't seem, you know, worth the benefit when these entities are no longer acting on complaints, no longer providing information, public information about sort of the systemic actions that they're taking.

THE COURT: So the People for Ethical Treatment of Animals case, which is a D.C. Circuit case, fair enough, touche. As I understand there, the office or the U.S. Department of Agriculture had, for ten years, taken the position that, as a matter of law, it wasn't required to

process complaints or respond or give information about birds. And so it wasn't just that they weren't moving as quickly or they weren't staffed properly, but that it was sort of, as a matter of law, this is not our job, and we are not going to do it. And in that, over ten years of the organization trying and trying and trying to get them to move, and having to expend resources to go to local or state officials as opposed to the federal government, and not having the materials that they need from the organization to provide the educational resources that they provide, under those circumstances, there was a concrete injury.

But it seems like a far cry from what we have here. I mean, I guess in some ways the standing maybe gets wrapped up in the merits, which is a question I have for both of you, which is, to the extent I think there are factual disputes on the merits, I mean, it seems like then we sort of have factual disputes on standing, and are we basically just going to have to, you know, go to a, I don't know, evidentiary hearing on this or something. It just seems to me that that's different from what we have here.

I mean, first of all, I mean -- well, I mean, this goes to the merits, that it's unclear to me that, under the statute, you're entitled to the things that you claim that you're entitled to, and even if you are, it's unclear to me that the Court is the one who's supposed to be the one

figuring that out. But talk to me about the Ethical Treatment case and then talk to me about sort of disputed issues and standing and merits sort of being wrapped up together.

MS. GILBRIDE: Sure. So with regard to the PETA case, you know, in my reading of the PETA case, the length of time that this had been going on was not dispositive to the Court's --

THE COURT: No, I think -- I mean, that's fair, although I think the fact that it was going on for ten years certainly got the judge's attention. But I think the bigger issue was that the organization was taking a view that, as a matter of law, we do not process these complaints, which, as I understand it -- maybe the government can tell me if I'm wrong.

That's not the government's contention here; right?

MR. DAVIS: That's correct, Your Honor. That's not our contention.

THE COURT: Okay.

MS. GILBRIDE: Well, you know, I am glad to hear that that's not the government's position with regard to any of the three offices. I hope that that's the case and that they don't feel differently with regard to OIDO. Based on their papers --

THE COURT: Hold on.

Do you feel that way with regard to OIDO?

MR. DAVIS: We can talk about that, but OIDO literally has no money. Like there's no money for OIDO to do anything at the moment, because Congress zeroed it out and restricted moving funds around, which we can talk about.

THE COURT: Okay.

MS. GILBRIDE: So, you know, if -- the PETA case turned on the fact that the government had taken action that harmed the plaintiff's interest and that the plaintiff had to expend resources in response, and we have met that standard here. The government has taken action to freeze processing of complaints. You know, on March 21st of last year, there were 3,000 -- more than 3,000 complaints pending with CRCL, including complaints filed by all three plaintiffs here, had filed complaints or its -- SBC's members had. And there were over 300 complaints pending with OIDO. There were thousands of inquiries pending with CIS OM, the ombudsman's office, including by Urban Justice Center, and nothing happened with those complaints for months, which harmed the plaintiffs. And they had to find alternative means of getting the information or trying to advocate for their detained clients. In the case of Kennedy Human Rights Center, that involved making more visits to detention centers to try to resolve matters in person, filing additional litigation with all the costs that that entails.

So regardless of the length of time that passed, the

two elements of the PETA case were met. The defendants took action. Nothing was happening at these offices. They ground to a standstill. As a result -- that was action that defendant. Took there were 309 employees at these offices performing functions required by Congress. It all stopped because of defendant's action on March 21st. As a result, all three plaintiffs had to defer resources to try to get their core business activities achieved in other ways.

THE COURT: That --

MS. GILBRIDE: That is an injury that is ongoing, because the offices are still functioning with skeleton crews, and, you know, some of them are not performing -- some functions are not being performed at all.

The former head of CRCL, Troup Hemenway, admitted as much in his declaration -- in his deposition. He said some functions were being performed, but, you know, there are certainly some that have not. For example, the -- making recommendations. One of CRCL's core statutory functions is to oversee compliance by DHS with constitutional statutory regulatory requirements regarding civil rights and civil liberties, and they -- one of the ways they do this is by, you know, making recommendations about things that components of DHS should do differently. In fiscal year 2023, there were 653 recommendations and formal advice given to various DHS components. Since March 21st, 2025, based on discovery

responses, there has been one recommendation drafted. None have been finalized.

So this is a function that's required by statute that is simply not being done. It's not a matter of it being done less well or more slowly, it's just not being done.

THE COURT: Okay. Well, talk to me about -- I mean, I have cross-motions for summary judgment, and your issues of material fact not in dispute, on both sides, have a number of disputes, which, you know, screams not summary judgment to me. And my only question right now is whether or not I can decide standing at the summary judgment stage. So if the question is -- well, I mean, just explain to me how I can decide standing at the summary judgment stage when it seems like there are substantial disputes about exactly what's occurring on the ground and exactly what you're having to do or not do.

MS. GILBRIDE: So the, you know, specific facts in evidence, which is what we have to show to establish standing for the summary judgment stage, we believe the declarations of Mr. Enriquez, Ms. Serrano, Ms. Cargioli, Sister Horan, and Ms. Lothrop from UJC, are sufficient to place specific facts in evidence regarding the plaintiff's injuries and the fact that it is defendant's actions of March 21st, 2025 that have caused those injuries.

With regard to fact disputes, you know, certainly,

it's our -- it's plaintiff's position that some of the facts that I've just laid out for you regarding, you know, recommendations, regarding the inaccessibility of the complaint filing process with OIDO, regarding the complaint, you know, ceasing of CIS ombudsman's office to interact with the public on complaints, I think that is sufficient to -- as a matter of law, statutory functions are not currently being performed. But if this Court doesn't agree with that regarding the current state of affairs, I think it's a much easier case with regard to our request for declaratory relief and whether or not the actions that defendant took in March of 2025 to shut down these offices were, you know, contrary to law and were arbitrary and capricious.

THE COURT: Well, you keep saying -- you keep saying that they took actions to shut down the offices, and when Mr. Sartini was here, I mean, it was very clear to me that they weren't shut, shut down. I mean, I think there's like a fundamental dispute between you two as to whether or not the offices were, in fact, shut down and, to the extent that they were partially shut or whatnot, the extent of that partial shutting down.

MS. GILBRIDE: So two responses to that.

THE COURT: I mean, I'm just wondering --

MS. GILBRIDE: Yeah.

THE COURT: I'm just wondering if -- go ahead. I'm

sorry.

MS. GILBRIDE: Sorry, I wasn't sure if I heard the whole question.

THE COURT: I stopped midquestion because I was about to say something that I thought was dumb, and so I decided just to stop talking, which is what I used to tell people to do when they were in deposition and lost their train of thought midway.

MS. GILBRIDE: So with regard to, you know, what actions were taken to shut down the offices, again, I started speaking about some of this earlier, but I want to go through it, the sort of chronology, in a little bit more detail.

So starting with, you know, the pre-March 21st time period, we have these memos that were sent to OPM. And they didn't talk about, you know, okay, these offices performed some statutory functions but some discretionary functions and we want to reduce their size so that they're focusing on just the statutorily required things that they're doing. It said we want a 100 percent RIF of all three of these offices.

And similarly, when --

THE COURT: I mean, you keep saying that, but that's not what ended up happening.

MS. GILBRIDE: Well, I'm talking about what happened -- you know, what -- what the action of March 21st, 2025 was. And then I can talk about what happened after that.

But just to sort of have that line of --

THE COURT: No, I understand. You say that they want --

MS. GILBRIDE: -- demarcation.

THE COURT: I mean, your view is that the administration came in, they hated these offices, they wanted to get rid of the offices, whatever Congress says, who cares, and they fired everyone and the offices shut down, and there were like "gone fishing" signs and that's the end of the story. And yes, I understand that that was sort of the state of play in your view initially. But that didn't end up being exactly what happened or even close to it.

MS. GILBRIDE: So, again, the action, you know, that we challenged in our complaint, which was taken on March 21st with a stop work order and the RIF notices going out, was, across the board, all of these positions are being abolished. All 309 employees are -- have to leave the federal government. It doesn't matter whether they were performing statutorily required functions or not. In fact, in the memo to Secretary Noem, it lays out some of the statutory functions. It acknowledges there were statutory functions. But if you look at docket 69-6, which is part of defendant's filing where they have the administrative record excerpts, if you look at pages 1 to 4 of that document, which was the memo sent to Secretary Noem on March 17th, it said we're going to conduct

this RIF of all employees at all three offices. No exceptions. And that's what they did.

So now let's -- so that's the action that we're challenging, just to be clear, and I think our reply brief, you know, makes this point repeatedly. That is the singular agency action to remove all employees from all three of these offices and stop them from functioning that the defendants took on March 21st.

Now let's talk about what has happened since then, because I understand that's what Your Honor's concerned about. So Mr. Sartini came to this Court, you know, in May and said that we -- we're going to have a pause while we do some, you know -- while we create new positions and we hire new people, and we'll get the offices up and running again. And none of that ever happened in the way that, you know, Mr. Sartini had hoped, perhaps, and had represented to this Court that he would -- that it would. You know, we point out the distinction between the number of employees that he said he was going to hire and the number that actually got hired, which was two investigators at CRCL compared to the 147 that used to be there, and three employees at OIDO who didn't start until September and --

THE COURT: Look, I hear you. But -- when I was young, for reasons I don't quite remember anymore, maybe because I really liked The Love Boat, I really wanted to be a

cruise director, and that was like my life's ambition, was to be a cruise director. And my dad very politely told me that -- it was that or being a lawyer. And my dad very politely gently said there weren't that many cruises in the world and maybe I should stick with being a lawyer because there were a lot more legal jobs. And really what he was saying was I have zero, zero temperament or capability of being a cruise director because I just don't like managing people or being around people or really anything to do with people, which would make me a horrible cruise director. It would also make me a horrible human resource manager. And that's why I'm a judge and not a human resource manager.

And it just continues to sound to me like the harms you're complaining of are harms of how is -- how are the resources within this agency being managed, and I just don't think that's the Court's job. I don't think it's a Court's job to say you used to have a hundred people in there, and although I think at some lows it was 20, and now you have two and I just don't think that's enough. I mean, at the end of the day, that's -- your -- the judgment you want me to issue would be telling them, I think, like you have to have so many people do this job, you have to, you know, quote, unquote, follow the law, and I think what you mean by that is process complaints, I don't know, more quickly or more efficiently or more something. And that just all seems to be very human

resource managey of me and, you know, I just -- I don't think that we are in a legal world right now where Courts are being instructed to manage how the executive conducts its internal affairs.

MS. GILBRIDE: So we certainly don't expect this Court to micromanage how these three offices conduct their affairs. Nor is the gravamen of our case that they don't have enough staff or they're moving too slowly.

THE COURT: So what do you want me -- like at the end of the day, at the end of the day, if you had your druthers and I said, government, do X, what would the X be?

MS. GILBRIDE: So I would say that the X is laid out in our proposed order, which is operate the offices, do the things that they're not currently doing, and to have some Court oversight, because this is the point I was going to make --

THE COURT: But, see, that's a fancy way of saying tell them how to manage the offices. I mean, do what you're not currently doing, so far as I understand it, means hire more people and process things more quickly and more efficiently, and Court oversight to make sure that they're doing those things. I mean, the government's going to get up here and tell me, I assume, that they are doing their job, to the extent that they can, I guess, facing current budgetary constraints, but that they are doing their job. And that if I

told them go do your jobs, they'd say that's what we're doing. And then you guys would have a dispute as to whether or not they were actually doing their jobs correctly and then I would become a, quote, human resource manager.

MS. GILBRIDE: So there are some things that defendants acknowledge and admit they are not doing that the statute requires, and they say that, well, it was either never done this way or they interpret the statute differently. For example, their -- OIDO was not conducting unannounced inspections. They're giving several days' notice. 6 U.S.C. 205(b)(3) says they have to conduct unannounced inspections --

THE COURT: Okay.

MS. GILBRIDE: -- so we --

THE COURT: Government --

MS. GILBRIDE: -- dispute there.

THE COURT: Government, do you dispute that you're required to give unannounced inspections?

MR. DAVIS: Your Honor, I don't think plaintiffs believe it has to be truly announced, because their proposed order says 24 hours. And they agreed that there's always been some announced. So that would just put the Court in another line-drawing problem of what is unannounced enough. So I agree it says that, but that's never practically been what's happened. And even plaintiffs, in their own proposed order, say 24 hours, but no -- no more than that. So I don't see

how --

THE COURT: Well, can't you guys just agree to give 24 hours' notice and not more? I mean, I don't think you need Court intervention to do that. Can't you just take that back to your client?

MR. DAVIS: I can.

THE COURT: Get rid of Reyes.

MR. DAVIS: The reason -- well, we can get into OIDO, because that is OIDO, but the reason they were doing that was because of increased protests and security concerns at the facilities, so they were giving a couple more days' notice.

THE COURT: Okay. Well, you know, just give 24 notice, like, who cares. I mean --

MR. DAVIS: I will take that back to the --

THE COURT: Okay. What else?

MS. GILBRIDE: And the operation of local ombudsman, which there were previously four regional representatives. We have a declaration in the record from one of them. This allowed, you know, again, the customer service to be provided closer to the locations where --

THE COURT: Now we don't have regional ombudsman?

MS. GILBRIDE: I'm sorry?

THE COURT: We don't have the regional ombudsman anymore?

MS. GILBRIDE: No.

THE COURT: Isn't the government going to tell me that's not required by statute?

MS. GILBRIDE: I mean, it's in the statute. It's in 272(d), 272(e), 272(g).

THE COURT: That you need the regional ombudsman.

MS. GILBRIDE: Correct.

THE COURT: Okay. Is that in the statute? Do you agree?

MR. DAVIS: It says that there should be a regional or a local ombudsman in every state. That has never been the case. The plaintiffs don't dispute that because there's never been a budget for it. Only recently they hired four regional ones. That's not in every state. Those were RIF'd. They have MSBP cases that are moving forward currently. But if four regional ombudsman meet the statutory requirements, I then don't see why Mr. Sartini can't function the same way as the local ombudsman.

THE COURT: Mr. Sartini has a lot of jobs.

MR. DAVIS: Oh, he does, but like the point is it says in every state. That's never been the case. Only recently did they hire four people, which is not in every state. So I just -- the budget -- and also the budget's much smaller now. There's never been a budget for that, and there's certainly not a budget for that now, so I'm not sure

what the redress would be.

THE COURT: Can't you just take back to your client like let's just do at least two people, let's give Mr. Sartini some help?

MR. DAVIS: I will -- I will pass that along.

THE COURT: Okay.

MS. GILBRIDE: And --

THE COURT: What else?

MS. GILBRIDE: So, you know, the other things that we have in our proposed order relate to the -- having OIDO representatives in the detention facilities to perform, you know, some of that -- that go-between function between the folks operating the facility and detained individuals.

THE COURT: Okay. Is that statutorily required to have a OIDO person at every detention facility?

MS. GILBRIDE: It doesn't specifically say in the facility, but it does say that the complaint process is accessible. And historically, most of the vast majority of complaints were filed via interactions with the case managers.

The other thing that the statute requires in --

THE COURT: Well, hold on. Hold on. Let's just keep these one by one. Now, if you want to file a complaint, how do you do it?

MS. GILBRIDE: It has to be done using a web portal, and it has to be done in English.

THE COURT: Okay.

MS. GILBRIDE: Which is --

THE COURT: I can't tell the government they have to use people instead of web portals. I mean, I'm pretty sure I can't do that.

MS. GILBRIDE: Well, I think that with respect -- given the realities on the ground, you -- the statute requires that the complaint process be accessible. Accessing the internet is not accessible to detained individuals for the reasons that I laid out and, you know, we discussed in response --

THE COURT: Because they just don't have an iPad.

MS. GILBRIDE: They don't have access to the internet in many cases, that's correct. And so if it says you can file a complaint --

THE COURT: So does each --

Hold on. I'm talking to the government. I'm sorry.

Does each detention center have -- how many detention centers are there in the U.S. anyway?

MR. DAVIS: It is kind of unclear because there are private ones. There are some that are temporary. It's somewhere between 200 and 300 at any time. Our understanding is that the vast majority of them do, but we don't have perfect insight into all of them. Obviously, it's not an iPad per person, but there are multiple tablets that people can

have access to.

THE COURT: Okay. Can you just get back to your client and do an assessment and maybe work with the plaintiffs to see who has no access whatsoever and maybe we can get a tablet or computer there. And is there any reason that these can't be put in Spanish too?

MR. DAVIS: That was a policy choice based on an executive order. And I'll note that the plaintiffs only brought this up in a footnote, not in their complaint.

THE COURT: Okay. I mean, I don't think I can force them to adopt -- to take complaints in any particular language. I mean, that would give me the power to force them to take complaints in, I don't know, Timbuktu or whatever, you know, that language is. But if you guys can get together and at least make sure that we have one or two tablets in detention centers that are government run or are subcontracted that don't currently have them, I'm sure the plaintiffs can get you that information and we can get some movement that way.

What's next.

MS. GILBRIDE: So the next thing that we talk about in our proposed order is, again, the CRCL making information about its activities public. There is an obligation to report to Congress. But if you look at 42 U.S.C. 2000(e)(E)(2)(G), in addition, there's two things that they're required to do.

They're required to report to Congress, and then they're required to otherwise make available to the public information about their activities. And they used to do that by publishing on their website, you know, the draft recommendations or redacted recommendation, memos and all of that has stopped.

And so one of the ways in which the plaintiffs, you know, have been harmed is that they can no longer sort of focus their activities on the particular areas that CRCL or send complaints on areas they know CRCL is already investigating because all of that public information has been removed.

THE COURT: Okay. Hold on. Stop. I gotcha.

The reports to Congress, are they still being drafted and sent?

MR. DAVIS: The reports have been drafted and sent. I believe the CRCL one is public, as required. And they've about they didn't think it had sufficient detail, but that --

THE COURT: Okay. Well, I can't tell them to put more detail in. I mean, if -- I mean, I --

MS. GILBRIDE: I understand, Your Honor.

THE COURT: I certainly can't micromanage what information they make public or not public.

MS. GILBRIDE: We didn't make a -- the proposed order, in laying out the components of an injunction, does not

say anything about the report to Congress. However, it does talk about making other information publicly available periodically about recommendations that are --

THE COURT: Recommendations --

MS. GILBRIDE: We don't even know that recommendations have been drafted. It seems as if that has ground to a halt. But to the extent that recommendations are drafted to components, that that information be publicly shared, as it, you know, has been and as I believe the statute, when it talks about other -- making information available.

THE COURT: Okay. If there are recommendations being made, can you just make them public? Is there any reason not to make them public?

MR. DAVIS: The client believes that it's not required statutorily, and they are --

THE COURT: Well, something is required to be done statutorily if what she's telling me is right, that you have to make not just the reports to Congress but other information also public. So what's that other information?

MR. DAVIS: It just says to make -- well, I think the language is quite broad, and it's just of our activities. And the website explains what CRCL does. It's publicly available, it's easily accessible. And micromanaging what recommendations are or are not put up, some of which will have

to be redacted or might be deliberative, I think the client's just unwilling to go there and doesn't think it's required. They might in some instances decide to do that, but I think that's in their discretion.

And, again, I don't think any of this, frankly -- I don't see how they're injured by any of this. I can understand the not being able to file complaints, which they don't dispute that they can do, but most of this is just -- I don't see how whether it's 24 hours or 3 hours they're injured by, I don't see how more recommendations or less being public they're injured by. A lot of this is flyspecking for stuff that they're not injured by, and it's not traceable to any decision.

THE COURT: Okay.

MS. GILBRIDE: So there's two other things, you know, with -- I'm just kind of walking through the elements of the proposed order, and one of them regards two-way communication with the CIS ombudsman's office, not this, you know, automated emails to which people can't respond. That certainly has injured, you know --

THE COURT: I mean, that does seem right to me. It can't be that I file a complaint and I get back a we're not going to help you or X, Y, and Z, and then my only option in response is to issue a new complaint. I mean, there must be some mechanism by which I can at least complain back on the

same thread; right. I mean, how hard is that.

MR. DAVIS: I'm not sure how hard it is. I think the reason they did the website portal this way was to better track individual complaints sort of -- in a time, because a lot of what they do is long-term trend analysis. That's what a lot of these offices historically did, is they would look at a bunch of complaints and say is there an overarching problem to make recommendations of. They've determined this is the most efficient way to do it, and I don't see anything in the statute that says there has to be back-and-forth. They have to receive, process, review complaints, and decide further action.

THE COURT: Okay. But isn't there a way -- I mean, just talk to your people. There must be a way in which we can tag the fact that we had this one complaint and here's our follow-up request. I mean, even if it's a new request, there must be a way to sort of tag it back to some number or something so that -- I mean, look, here's what they're complaining about. They're saying we send in a complaint, it goes into this black box, we get back a thank you for letting us know about this, don't call us, we'll call you. Right?

And that seems to me, like, inconsistent with what the purpose of the statute was. And it seems to me that if your agency is acting in good faith, which I'm going to assume unless it's proven otherwise to me, that if the complaint is

what they have, and it seems like a legitimate complaint, there must be a way to aggregate like a threat of complaint and that, at the end of the day, they have some understanding that they're actually being heard. Because it can't be that what Congress intended was that these complaints go into a black box and then disappear.

MR. DAVIS: I mean, they are being aggregated. And, again, I think a big part --

THE COURT: Aggregated for the person so that if I send a complaint that I don't have a tablet in detention center A, and the response is thank you for letting us know, we'll get on it and then, a year later, I still don't have a tablet and then I send another complaint in a wholly new thread, and they say thanks for letting us know, we'll get on it, that I can understand the frustration if you can't say this is like the fifth time I've asked in the last year.

MR. DAVIS: I mean, I understand the frustration, but as Your Honor pointed out, and I think even plaintiffs concede, historically, a huge number of complaints were not investigated. Even a larger percentage were never redressed. Most of what they do are these long-term trend analysis. And it's not the case that there are no responses being sent out, that there's no things --

THE COURT: Look, I hear you, I totally hear you. But it seems to me that other than me wanting -- them wanting

me to tell you, you have to hire another hundred more people, which they're not saying, but it's what they want. They're asking for like really discrete things as we're going through it, and it seems like if you work with your department, you could at least, you know, get some of these moving in a way that will at least alleviate some of their concern. Because they have legitimate concerns. I mean, they might have concerns that aren't redressable by, you know, in courtroom 12. I mean, I don't know yet, but they have legitimate concerns.

MR. DAVIS: I don't dispute that they have legitimate policy and otherwise concerns. I, again, don't think they have standing or a statutory basis to get relief from it. I'm happy to ask the client about --

THE COURT: By they way, have you guys actually sat in a room with like the high-level officials at the agency?

MR. DAVIS: No, I don't believe so.

MS. GILBRIDE: Not other than the depositions that we took, not in --

THE COURT: Okay.

MS. GILBRIDE: -- posture --

THE COURT: All right. Well, that's --

MS. GILBRIDE: -- if that's what you're asking.

THE COURT: -- that's the first thing we're going to have out of this. You're going to go back to your client,

you're going to go through these issues. And then you guys are going to have a meeting, a mediation settlement-type meeting, and I want the highest level official from the government and his or her second, and Mr. Sartini in on that meeting, the highest level official at the -- I mean, who's in charge of this process, Mr. Sartini and whoever his boss is, not just Mr. Sartini. I want someone who can actually like effect change in the room.

MR. DAVIS: He reports to the secretary. In fact, he just reported to the secretary the other day on this. I don't know that there's much of an intermediary between --

THE COURT: Well, then it's going to be the secretary in the room with them. So you figure out who other -- if Mr. Sartini has the authority to say yes, we will do X, Y, or Z, then it can just be Mr. Sartini and his No. 2. If he has to get approval from the secretary, then have a room with the secretary. I'm sure the secretary has time.

MR. DAVIS: I don't think the secretary would be willing to do that.

THE COURT: Well, he's going to do it if I order him to do it. Now, I can order him to do it, or we can try to do this voluntarily first.

MR. DAVIS: I will ask the client what is possible.

THE COURT: I suggest that what you say to the

client is we're in a voluntary place right now where the judge is ordering us to get in the room together with the person who's going to be able to effect change. So if that's Mr. Sartini, and he has the authority to effect change, then that's fine. If he has to ask Joe Bob or Jeanine Bob to get authority, then Joe or Jeanine Bob has to be in the room. And if Joe and Jeanine Bob is the secretary, then the secretary is either going to have to be in the room or is going to have to say to Mr. Sartini, I'm delegating to you the authority-making decision on this.

Now, if you want me to make an order, I can.

MR. DAVIS: Understood, Your Honor.

THE COURT: All right.

MS. GILBRIDE: So I think --

THE COURT: And I want that to happen -- I want that to happen in July.

MS. GILBRIDE: So I think I sort of understand where the Court, you know, is -- what you're thinking and where the Court would like to go, but I just want to sort of wrap up by making -- you know, just again summarizing our points on the final agency action that we believe occurred here and the injury that has resulted, which I think does make this case appropriate for summary judgment. You know, it's obviously your decision what to do and when to do it, but in terms of, you know, the defendant's actions, they targeted these three

offices. The reasons that they've sort of come up with after the fact to say this was about separating statutorily required from discretionary functions is not what they said contemporaneously to OPM when they asked for authority to conduct this RIF. They said -- and not what they said in the secretary memo at pages 1 to 4 of the administrative record excerpts. They said we're shutting down these offices completely because they're contrary to the mission.

So, you know, when we look at final agency action to determine was it arbitrary and capricious, was it contrary to law, we look at the actions and the reasons given at the time, not sort of, you know, ex post facto reasons that were given later. And at the time all of the stated reasons were we want to eliminate these three offices, these three offices only. When Mr. Sartini was here last year and was asked about any other offices where there were similar analyses underway within DHS to figure out are there discretionary functions that can be eliminated, he wasn't aware of any. We haven't subsequently learned of any. There are none others mentioned in the administrative record, only these three offices.

That is contrary to the statutes requiring that these offices exist. It exceeds DHS's authority under 6 U.S.C. 452 which says you cannot eliminate a specific function. And it has harmed all three of the plaintiffs here by making it more difficult for them to conduct their core

activities on which they had previously relied on these offices. So we do believe summary judgment is appropriate.

We're happy to have this discussion in terms of interim relief if there are things that can be done to improve the reality on the ground. We're certainly interested in exploring that with defendants. But we would suggest that, you know, whether it's an interim measure, but that there be some sort of reporting requirement, because what we've seen in this case is when there is a court deadline or something that's happening coming up in the case, whether it's discovery responses that are due or a hearing before this Court, there's often action that gets taken, you know, the day before or two days before --

THE COURT: Welcome to litigation. Okay. All right. Thank you.

All right. Do you have anything that you want to add? I mean, I'm inclined -- well, first of all, I'm going to make you guys talk, as I noted. But do you want to add anything? I mean, I don't -- I don't -- I don't see, on the merits, how there aren't sort of serious factual disputes. And if I'm going to deal with a hearing on the merits, I don't know why I just wouldn't throw standing in there. But do you have anything you want to say on that?

MR. DAVIS: I mean, briefly, Your Honor, and I think it's worth talking about the OIDO point.

THE COURT: Okay.

MR. DAVIS: So on the standing, obviously we need standing to even get to the merits. And I think, as a legal matter, they don't have standing. I think the only thing --

THE COURT: But it doesn't sound like -- I mean, it sounds like you're making a -- you're not making, so far as I understand it, a facial challenge to standing on their complaint. I mean, we have a lot of discovery. There's things that are included in summary judgment that are well past the complaint. And so, I mean, I don't think I can't have -- take evidence on standing; right?

MR. DAVIS: I don't think you -- yeah, I mean, I think that's -- well, so taking a step back, right, *Lujan* says that at every stage of litigation, you have to meet the burden for standing purposes.

THE COURT: Yeah.

MR. DAVIS: For summary judgment, that means they have to provide sufficient evidence that, if you view the evidence in the light most favorable to them, they would have standing. I think even if you look at the evidence that they have --

THE COURT: But that's -- that's assuming that we meet the summary judgment standard; right? I mean --

MR. DAVIS: And I think we do, Your Honor, because they don't dispute, again, that the offices are taking

complaints, they're reviewing them, they're processing them, that they have --

THE COURT: No, I think they are -- I mean, I think -- I mean, I think they are disputing them. I mean, I that think it's sort of the de facto versus de jure. I mean, I think what they're saying -- and I always get these confused -- the de jure, it might be that they're, quote/unquote, taking complaints, but de facto they're not.

I mean, is that the plaintiff's position basically?

MS. GILBRIDE: Yes, yes, Your Honor, at least with regard to any complaints we're aware of, there are these -- there's either nothing happening or there are these summary dismissals or summary closure notices. We have not heard of any complaints that are -- where there's been any sort of back and forth and true investigation. And even, you know, numerically, when defendants talk about investigation --

THE COURT: Okay. I got it. I got it. Okay.

MR. DAVIS: I mean, I think we have evidence in the record that we put that they don't dispute that there have responses, including to some of theirs. CISM, for example, they have -- and fundamentally, taking a step back, all these offices have to go to the component agencies for them to do anything. Schism, for example, and this is historically true, has to go to USCIS with complaints. And they've been -- and Mr. Sartini has been forwarding the ones that he thinks have

real issues, and USCIS has been taking a very long time.

THE COURT: Okay. Do plaintiffs agree with that or disagree with that?

MS. GILBRIDE: We were told that 113 complaints out of 8,027 were forwarded to USCIS. We have no reason to dispute.

THE COURT: Okay. Well, that -- that's greater than zero. I mean --

MR. DAVIS: Right, I agree. And part of the reason is sometimes things are no longer a problem, and so they get put in no action, which is these automatic batch responses.

THE COURT: Okay. But, come on, you're not going to tell me that things are like moving along swimmingly; right? I mean --

MR. DAVIS: They're not just --

THE COURT: Then, I mean --

MR. DAVIS: Can I give you one example? So when OIDO still had funds, right, and there were two shutdowns, the longest shutdown where they weren't allowed to work --

THE COURT: Sure.

MR. DAVIS: -- they did 27 inspections of detention facilities, more than the previous year when they had way more people. These were in-person, looking at documents, talking to people.

THE COURT: Okay. Was that true? Did they have 27

inspections?

MS. GILBRIDE: Yes, that is what we were told by defendants. We don't have any reason to dispute it.

THE COURT: Okay.

MR. DAVIS: And even since the last lapse, and now OIDO doesn't have funding, CRCL has taken over report writing for all of them and has done 13 additional ones. So I think there's just plenty of examples of us continuing to do the work, including reviewing complaints. CRCL has an uptick in complaints, I think partially because OIDO stuff is shifting to them.

THE COURT: Well, you would expect an uptick in complaints given that there are a lot more people being put in ICE detentions. It's just a numbers issue.

MR. DAVIS: Yes, yes. CRCL, especially with the OIDO situation, has seen an increase.

THE COURT: Yeah. Sure.

MR. DAVIS: Schism has seen an increase. I believe they've had 58,000 complaints. They've reviewed almost all of them. They're opening investigations into 200-some. And recommendations, historically, have taken, because they're longer term, six to 18 months. So given the shutdowns and everything, it's not surprising that there aren't some. That doesn't mean they're not going to do them. Mr. Sartini has reviewed all the deaths in custody reports that he's gotten.

He's done policy reviews, which they contest like, oh, they're not doing enough, but again, the statute doesn't say how much or what to do.

THE COURT: Okay. All right. I have it. Thank you.

MR. DAVIS: So I guess my point is I don't think there's disputes about those things. They're just saying we don't think they're doing enough, you're not giving enough recommendations, you're not doing it fast enough or giving us the back-and-forth communication that we were used to. I don't think any of that is required.

As far as PETA, Your Honor, I think you're right that the real problem there was the agency was saying this law just doesn't apply, so we just don't take any complaints at all and give you any information at all. And they were saying no, we want to be able to do complaints. That's how we effectuate our purpose. But they're not saying they're not able to, again, do complaints and file them.

In the DOL case, again, I agree with Your Honor, the Judge Bates case, that part of the problem there was a harm from having their PII disclosed to a party that they didn't think legally could have them. And that was true of the CFPB too. The organization there was saying, look, our clients don't want to file complaints anymore because they think their PII is going to be distributed and that's a harm. There's no

harm from the plaintiffs and their clients filing complaints here like that. They're just not getting the answers that they want.

THE COURT: Okay. All right. I got you. Thank you.

MR. DAVIS: On the -- it's maybe not mootness for the entire case, Your Honor, because obviously CRCL and Schism still have money. Some of the things they ask for, which I don't think they have standing for, but like is not moot, right, like putting stuff on the website. Regardless of their budget, I get they can do that --

THE COURT: Well, you were telling me that there were some restricted funds. What's that?

MR. DAVIS: So this is a little bit complicated, but the appropriations budget that came out from the last shutdown for just DHS gave specific funds and made clear they were incorporating certain line item funds for these offices. This is at the front of it, and I can pull it up real quick.

THE COURT: Just give me the big-picture problem.

MR. DAVIS: The big-picture problem is that Congress very specifically gave these different offices certain funds. It cut CRCL and Schism, but they still have funds. CRCL is hiring two more people with those funds. But OIDO, it completely zeroed out. And if you go to Section 503 of that Appropriations Act, it puts restrictions on reprogramming.

Sometimes agencies either have lump funds or they can move money around with certain restrictions.

THE COURT: Got it.

Okay. Plaintiffs, what do I do with that? I mean, the case might not be moot, but I -- I can't override congressional funding issues.

MS. GILBRIDE: So as Mr. Davis was just starting to say, their -- Section 503 of the Appropriations Act discusses reprogramming, and it does allow certain reprogramming to occur. They're, you know, both with regard to current year funds and previous appropriations.

THE COURT: All right. Got it. I got it. I got it. I'm not going to, like, get into the weeds of who's moving money from what program to what program. Not only am I a bad human resource manager, I would be a horrible accountant.

All right. Here's what we're going to do. You guys are going to get into high-level discussions. You're going to get someone in the room, or someone's in the room, who can actually make decisions. So if that's the secretary, the secretary's going to have to find the time. It's going to be in July. And you guys are going to give me a joint status report at the end of July.

Plaintiffs --

MS. GILBRIDE: Yes, Your Honor.

THE COURT: -- I would, in good faith, engage in those discussions and get what you can, because while I have not yet made a decision, even if I rule in your favor, they're going to appeal. And if I don't rule in your favor, you're going to appeal. Either way, this isn't going to be done for quite a while, so better to try to figure something out that you all can live with than the uncertainty and additional years of litigation.

You're going to tell your client that it's the right thing to do to try to listen from people in the field as to how we could make these complaints better. Because I imagine that your client actually does care about people in detention centers and wants to ensure that if there are legitimate complaints, that they are processed and that they want to hear from the people who have been doing this for years and years and years as to how, most efficiently and effectively, to do that; right?

MR. DAVIS: Understood, Your Honor.

THE COURT: All right. Thank you, everyone.

(The proceedings were concluded at 11:39 a.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_________/s/______________
Christine T. Asif
Official Court Reporter

< Dates >.
April, May, August, 17:11.
December 15:15.
July 43:16.
July 1, 2026 1:11.
March 5:4, 22:6, 27:8.
March 17th, 26:25.
March 21st 15:11, 15:15, 26:14.
March 21st of 21:11.
March 21st, 10:2.
March 21st, 2025 23:23, 25:24.
March 21st, 2025, 4:23, 22:25.
March 21st, 2025. 9:9.
March 6th, 2025, 9:23.
March of 9:20.
March of 2025 24:11.
May 27:11.
September 27:22.
September 19th 17:10.
.
.
< 0 >.
000 21:12, 49:19.
027 15:14, 15:17, 15:20, 48:5.
.
.
< 1 >.
1 26:24, 44:6.
1.5 15:16.
10 1:13.
100 9:21, 25:19.
11 53:20.
113 15:19, 15:23, 48:4.
12 41:9.
12th 15:15.
13 49:7.
1300 1:36.
147 27:20.
1620 1:26.
179 15:13.
18 49:22.
19 9:2.
19th 1:36.
.
.
< 2 >.
2 42:15.
20 9:2, 28:18.
200 34:22.
200-some 49:20.
2000(e)(e)(2)(g 35:24.
20001 1:49.
20036 1:27, 1:37.
20043 1:32.
202 1:50.
2023 22:23.
2024 5:2, 8:18.
2025 17:8.
205(b)(3 30:11.
20530-0001 1:44.
21st 5:4, 22:6, 25:13, 27:8.
24 30:20, 30:25, 31:3, 31:14, 38:9.
25-1270 2:2.
25-1270-ACR 1:6.
250 8:22.
27 48:21, 48:25.
272 16:7.
272(d 32:5.
272(e 32:5.
272(g 32:5.
.
.
< 3 >.
3 21:12, 38:9.
30 1:13.
300 21:15, 34:22.
309 22:4, 26:17.
33 8:19.
333 1:48.
34 8:19.
34553 1:31.
354-3247 1:50.
39 8:20, 53:20.
.
.
< 4 >.
4 15:12, 26:24, 44:6.
40 15:3, 15:15.
400 1:43.
42 35:24.
452 44:23.
489 15:12.
.
.
< 5 >.
503 51:24, 52:8.
58 49:19.
.
.
< 6 >.
6 16:7, 30:10, 44:23.
630 1:26.
653 22:24.
69-6 26:22.
.
.
< 7 >.
7 15:17, 15:22.
750 1:36.
.
.
< 8 >.
8 15:14, 15:17, 15:20, 48:5.
80 11:9.
.
.
< 9 >.
914 15:17, 15:22.
950 1:43.
__________/s/__ ____________ 53:26.
.
.
< A >.
A. 1:23.
a.m. 1:13, 53:20.
able 4:23, 38:7, 43:3, 50:16, 50:18.
abolished 26:16.
above-entitled 53:24.
accepted 8:14.
access 8:15,

34:13, 35:1, 35:4.
accessed 10:25.
accessible 33:18, 34:8, 34:9, 37:24.
Accessing 34:8.
accommodations 7:6.
accomplishing 13:20, 13:25.
accountant 52:16.
achieved 22:8.
acknowledge 30:6.
acknowledges 26:21.
across 9:11, 18:12, 26:16.
across-the-board 9:10.
Act 4:20, 15:16, 51:25, 52:8.
acted 15:5, 15:8.
acting 10:24, 11:12, 18:18, 39:24.
action 2:2, 9:8, 12:19, 13:17, 16:19, 18:4, 21:7, 21:10, 22:2, 22:3, 22:6, 25:24, 26:13, 27:3, 27:6, 39:12, 43:21, 44:9, 45:12, 48:11.
action. 15:19.
actions 4:22, 10:5, 12:22, 13:9, 14:7, 18:19, 23:23, 24:11, 24:15, 25:10, 43:25, 44:11.
activities 14:1, 14:3, 22:8, 35:23, 36:3, 36:9, 37:22, 45:1.
actual 3:7, 3:14.
actually 3:8, 3:9, 27:19, 30:3, 40:4, 41:15, 42:7, 52:20, 53:12.
add 45:17, 45:18.
addition 35:25.
additional 9:12, 15:14, 15:24, 21:23, 49:7, 53:7.
addresses 3:17.
Adina 1:24, 2:14.
administers 4:21.
administration 26:6.
administrative 26:23, 44:6, 44:20.
admit 30:6.
admitted 22:14.
adopt 35:11.
advance 9:24.
adversaries 10:4.
advice 22:24.
advising 18:15.
advocacy 12:7, 13:9, 13:15, 13:16, 14:5.
advocate 7:14, 21:20.
affairs 24:9, 29:4, 29:7.
AFL-CIO 7:19, 10:17.
agencies 17:6, 47:22, 52:1.
agency 11:1, 27:6, 28:15, 39:24, 41:16, 43:21, 44:9, 50:13.
agents 9:17.
aggregate 40:2.
Aggregated 40:7, 40:9.
agree 3:15, 24:8, 30:23, 31:2, 32:9, 48:2, 48:9, 50:19.
agreed 30:20.
Agriculture 18:24.
ahead 10:1, 24:25.
al 1:11, 2:3, 2:4.
alleviate 41:6.
allow 52:9.
allowed 31:20, 48:19.
almost 49:19.
already 12:12, 36:10.
alternative 21:19.
although 20:9, 28:18.
ambition 28:1.
an injury 22:10.
Ana C. Reyes 1:16.
analyses 44:16.
analysis 3:1, 39:5, 40:21.
animal 13:23.
Animals 12:16, 13:16, 18:22.
announced 3:20, 10:2, 30:19, 30:21.
answer 15:7.
answering 13:3.
answers 51:2.
Anthony 1:34, 2:11.
anyway 34:19.
appeal 53:4, 53:5.
APPEARANCES 1:19.
apply 50:14.
applying 4:16.
appropriate 43:23, 45:2.
Appropriations

51:15, 51:25, 52:8, 52:11.
approval 42:16.
arbitrary 24:13, 44:10.
areas 36:9, 36:10.
arguing 10:14.
around 8:20, 8:22, 13:15, 15:3, 21:4, 28:9, 52:2.
Asif 1:46, 53:22, 53:27.
assessment 35:3.
assist 16:8.
assistance 4:17, 4:23, 15:4, 18:1.
assume 29:23, 39:24.
assuming 46:22.
attention 3:12, 20:10.
attorneys 16:1.
authority 42:14, 43:4, 43:6, 44:4, 44:22.
authority-making 43:9.
autogenerated 16:4.
automated 17:9, 38:19.
automatic 48:11.
autoresponse 17:7.
available 8:16, 12:15, 36:2, 37:2, 37:11, 37:24.
Avenue 1:43, 1:48, 8:6.
aware 44:18, 47:11.
awful 11:21.
.
.
< B >.
back 5:2, 8:18, 11:25, 14:24, 31:4, 31:15, 33:2, 35:2, 38:22, 38:25, 39:17, 39:20, 41:25, 46:13, 47:14, 47:21.
back-and-forth 39:10, 50:10.
bad 52:15.
Based 2:25, 5:18, 12:18, 20:22, 22:25, 35:7.
basically 19:17, 47:9.
basis 3:3, 41:13.
batch 48:11.
Bates 10:19, 50:20.
become 5:22, 7:18, 14:10, 30:4.
behalf 2:17, 13:16.
believe 9:14, 23:19, 30:19, 36:17, 37:9, 41:17, 43:21, 45:2, 49:18.
believes 37:15.
belittling 6:4.
benefit 18:17.
best 6:15.
better 4:13, 39:3, 53:6, 53:11.
big 40:8.
big-picture 51:19, 51:20.
bigger 20:10.
birds 13:17, 13:18, 13:21, 19:1.
bit 11:24, 12:11, 25:12, 51:14.
black 18:7, 39:20, 40:6.
board 26:16.
Boat 27:25.
Bob 43:5, 43:6, 43:7.
Border 4:5, 17:4, 17:20, 17:25, 18:1, 18:10, 18:12.
boss 42:6.
Box 1:31, 39:20, 40:6.
brief 7:20, 27:4.
briefing 2:22.
briefly 45:24.
brilliant 10:19.
broad 37:22.
broken 9:6.
brought 35:9.
budget 32:13, 32:23, 32:24, 32:25, 51:11, 51:15.
budgetary 29:24.
bunch 39:7.
bunk 7:8.
burden 46:14.
bureau 13:7.
bureaucracy 5:24.
business 22:8.
.
.
< C >.
C. 1:12, 1:25, 1:49, 10:20, 12:4, 12:17, 16:7, 18:22, 30:10, 35:24, 44:23.
call 14:23, 39:21.
capability 28:7.
capricious 24:13, 44:10.
care 53:12.
cares 26:7, 31:14.
Cargioli 23:20.
cases 12:6, 13:1, 13:2, 32:15,

34:14.
caused 14:7, 23:24.
causing 18:9.
ceasing 24:5.
Center 2:3, 2:12, 4:10, 4:13, 5:1, 7:5, 7:11, 7:12, 9:5, 12:11, 12:13, 17:21, 17:24, 21:17, 21:21, 34:18, 40:11.
centers 7:10, 21:22, 34:19, 35:16, 53:13.
certain 51:17, 51:21, 52:2, 52:9.
certainly 6:25, 20:10, 22:17, 23:25, 29:5, 32:25, 36:22, 38:20, 45:5.
certify 53:22.
CFPB 7:21, 8:5, 50:22.
challenge 5:12, 46:7.
challenged 26:14.
challenging 6:5, 27:4.
change 42:8, 43:3, 43:4.
changed 8:9.
channel 13:24.
charge 42:6.
chase 6:1, 6:8.
choice 9:20, 35:7.
chose 9:9.
Christina 1:29.
Christine 1:46, 53:22, 53:27.
chronology 25:12.
Circuit 10:21, 12:4, 12:17, 18:22.
circumstances 19:10.
CIS 4:18, 12:24, 13:1, 14:8, 14:10, 14:14, 14:18, 15:4, 15:13, 15:14, 15:16, 21:16, 24:5, 38:18.
CISM 47:20.
cite 7:19, 12:6.
cited 8:18, 10:17.
Citizen 2:9, 2:14.
Citizenship 4:10.
CIVIL 1:5, 2:2, 4:8, 22:20.
claim 19:23.
clear 6:6, 24:16, 27:4, 51:16.
client 11:4, 13:10, 31:5, 33:2, 35:3, 37:15, 38:1, 41:14, 41:25, 42:23, 43:1, 53:9, 53:12.
clients 4:14, 4:15, 4:19, 7:5, 8:3, 12:12, 12:14, 13:11, 14:4, 21:20, 50:23, 51:1.
close 15:22, 26:12.
closed 15:25, 16:18.
closer 31:21.
closure 16:2, 17:10, 47:13.
Coalition 4:5, 17:4.
COLUMBIA 1:2.
comfortable 18:14.
coming 45:10.
commending 2:21.
communication 14:25, 38:18, 50:10.
Communities 4:5, 17:4.
community 8:4.
compared 27:20.
compensate 14:6.
complain 6:12, 38:25.
complaining 28:14, 39:19.
completely 44:8, 51:24.
compliance 22:19.
complicated 51:14.
component 47:22.
components 22:22, 22:25, 36:25, 37:8.
computer 35:5.
concede 40:19.
concern 5:16, 41:6.
concerned 27:10.
concerns 3:11, 8:7, 31:10, 41:7, 41:8, 41:10, 41:12.
concluded 53:20.
concrete 19:11.
conditions 5:2.
conduct 9:21, 12:8, 26:25, 29:6, 30:11, 44:5, 44:25.
conducted 13:13.
conducting 13:21, 30:9.
conducts 29:3.
confer 3:21, 10:16.
conferred

5:11.
confused 47:7.
confusion 13:15.
Congress 3:2, 9:12, 13:6, 16:7, 21:3, 22:5, 26:7, 35:24, 36:1, 36:14, 37:1, 37:19, 40:5, 51:20.
congressional 52:6.
consider 8:6.
Constitution 1:48.
constitutional 22:19.
constraints 29:25.
contact 5:3.
contemporaneously 44:4.
contention 20:15, 20:17.
contest 50:1.
continues 28:13.
continuing 49:8.
contrary 24:12, 44:8, 44:10, 44:21.
Coogle 1:29.
core 13:25, 14:3, 22:8, 22:18, 44:25.
Correct 7:4, 20:16, 32:7, 34:14, 53:23.
correctly 6:4, 30:3.
correspondence 14:24.
costs 21:23.
country 18:13.
couple 31:11.
courtroom 41:9.
Courts 29:2.
CRCL 7:7, 7:16, 9:15, 11:11, 21:12, 22:14, 22:18, 27:20, 35:22, 36:9, 36:10, 36:17, 37:23, 49:6, 49:9, 49:15, 51:7, 51:22.
create 27:13.
crews 22:11.
cross-motions 23:7.
cruise 28:1, 28:2, 28:8, 28:10.
cruises 28:4.
cry 11:1, 19:12.
current 24:9, 29:24, 52:10.
currently 24:7, 29:14, 29:19, 32:15, 35:17.
custody 49:25.
customer 16:7, 31:20.
cut 6:1, 6:8, 51:22.
.
.
< D >.
dad 28:2, 28:3.
date 15:11.
Davis 1:41, 2:17, 2:19, 48:21, 49:18, 52:7.
day 6:10, 10:8, 10:9, 10:10, 17:9, 28:20, 29:10, 40:3, 42:10, 45:12.
days 30:10, 31:11, 45:13.
DC 1:27, 1:32, 1:37, 1:44.
de 47:5, 47:7, 47:8.
deadline 45:9.
deal 45:21.
deaths 49:25.
decide 23:10, 23:12, 38:3, 39:11.
decided 25:6.
decision 10:19, 38:13, 43:10, 43:24, 53:3.
decisions 52:20.
declaration 9:2, 18:15, 22:15, 31:19.
declarations 23:19.
declaratory 24:10.
Defendant 1:12, 1:39, 4:22, 8:19, 14:7, 22:4, 22:6, 23:23, 24:11, 26:22, 43:25.
defendants 2:18, 8:21, 9:9, 9:20, 9:22, 10:14, 12:5, 12:23, 15:8, 22:1, 27:7, 30:6, 45:6, 47:16, 49:3.
Defenders 17:21, 17:23.
defer 22:7.
degree 14:15.
delegating 43:9.
deliberative 38:1.
delight 6:9.
demarcation 26:4.
Democracy 1:30.
Department 1:42, 2:3, 8:1, 9:19, 9:25, 10:6, 11:7, 11:10, 11:11, 18:24, 41:4.
DEPARTMENT OF HOMELAND 1:10.
deported 18:12.
deposition 17:15, 22:15,

25:7.
depositions 41:18.
detail 25:12, 36:18, 36:20.
detained 7:14, 8:12, 8:15, 8:22, 8:25, 12:12, 17:23, 21:20, 33:13, 34:9.
detention 4:9, 4:14, 5:2, 7:10, 8:11, 8:16, 18:1, 21:22, 33:11, 33:15, 34:18, 34:19, 35:16, 40:10, 48:21, 53:12.
detentions 49:14.
determine 44:10.
determined 39:8.
deterrence 18:9.
DHS 9:11, 10:3, 22:19, 22:23, 22:24, 44:17, 44:22, 51:16.
different 19:19, 51:21.
differently 20:22, 22:23, 30:8.
difficult 10:12, 44:25.
diminished 7:9.
direct 17:22, 17:25, 18:5.
directly 12:20, 17:1.
director 28:1, 28:2, 28:8, 28:10.
disagree 48:3.
disappear 40:6.
disclosed 50:21.
discovery 22:25, 45:10, 46:8.
discrete 41:3.
discretion 38:4.
discretionary 25:16, 44:3, 44:17.
discussed 34:10.
discusses 52:8.
discussion 45:3.
discussions 52:18, 53:2.
dismissals 47:13.
dispositive 20:6.
dispute 23:8, 24:18, 30:2, 30:15, 30:16, 32:12, 38:8, 41:11, 46:25, 47:19, 48:6, 49:3.
disputed 20:2.
disputes 3:8, 19:15, 19:17, 23:9, 23:14, 23:25, 45:20, 50:7.
disputing 47:4.
distinction 27:18.
distributed 50:25.
District 1:1, 1:2, 1:17, 10:18.
diversion 10:15, 12:4, 12:6, 12:7, 12:18.
diverting 10:13, 13:9, 13:10, 14:4, 14:6.
DMV 6:14, 6:17.
docket 5:14, 11:9, 26:22.
document 26:24.
documents 48:23.
doing 3:23, 6:14, 11:14, 13:8, 15:22, 18:3, 25:18, 29:14, 29:19, 29:22, 29:23, 29:25, 30:1, 30:3, 30:6, 31:9, 50:2, 50:8, 50:9, 53:15.
DOL 50:19.
domestic 12:13, 14:3.
done 2:22, 4:12, 6:3, 7:13, 9:8, 11:23, 23:4, 23:5, 30:8, 33:24, 33:25, 37:17, 45:4, 49:7, 50:1, 53:5.
doors 3:17.
down 9:6, 9:18, 12:23, 24:12, 24:15, 24:17, 24:19, 24:21, 25:10, 26:8, 44:7.
draft 36:4.
drafted 23:1, 36:15, 36:16, 37:6, 37:8.
druthers 29:11.
due 45:11.
dumb 25:5.
during 9:17.
.
.
< E >.
earlier 14:11, 25:11.
early 17:8.
easier 2:23, 24:10.
easily 3:19, 37:24.
educate 7:14, 9:5.
education 8:4.
educational 8:9, 13:14,

13:22, 19:9.
effect 42:8, 43:3, 43:4.
effective 9:4, 18:6.
effectively 53:16.
effectuate 50:17.
Efficiency 8:1.
efficient 39:9.
efficiently 6:13, 10:24, 11:2, 28:24, 29:21, 53:16.
efforts 8:5, 12:7, 18:5.
Either 3:10, 4:14, 4:25, 30:7, 43:8, 47:12, 52:1, 53:5.
elements 22:1, 38:16.
eliminate 10:8, 15:9, 44:14, 44:23.
eliminated 10:1, 44:18.
eliminating 12:24.
email 14:20, 14:25, 15:18, 16:13, 16:23.
emails 15:21, 15:23, 16:2, 16:10, 16:17, 17:7, 17:10, 38:19.
employees 9:15, 22:4, 26:17, 27:1, 27:6, 27:18, 27:21.
employers 16:8, 16:9.
encouraging 8:3.
end 6:10, 10:8, 10:9, 10:10, 26:9, 26:11, 28:19, 29:10, 40:3, 52:23.
ended 25:22.
enforcement 10:5.
engage 8:5, 17:14, 53:1.
engaged 4:7, 17:21.
engagement 18:8.
engaging 5:21, 8:2.
English 33:25.
enlisted 4:17.
enough 8:16, 8:23, 8:25, 11:3, 18:22, 28:19, 29:8, 30:22, 50:2, 50:8, 50:9.
Enriquez 1:34, 2:11, 23:20.
ensure 53:13.
entails 21:24.
entire 5:21, 7:17, 51:7.
entities 3:15, 4:7, 6:12, 6:21, 13:20, 18:17.
entitled 5:8, 19:23, 19:24.
entity 3:22.
entry 11:9.
epilepsy 7:8.
especially 18:10, 49:15.
Esquire 1:23, 1:24, 1:29, 1:34, 1:41.
essentially 14:16.
establish 23:18.
estimation 11:4.
et 1:11, 2:3, 2:4.
Ethical 12:16, 18:21, 20:1.
everyone 2:20, 2:21, 6:14, 26:8, 53:19.
everything 49:23.
evidence 23:18, 23:22, 46:11, 46:18, 46:19, 46:20, 47:18.
evidentiary 19:18.
ex 44:12.
exactly 23:14, 23:15, 26:12.
example 12:22, 22:17, 30:9, 47:20, 47:23, 48:17.
examples 12:1, 49:8.
exceeds 44:22.
exceptionally 2:22.
exceptions 27:2.
excerpts 26:23, 44:7.
executive 29:3, 35:8.
Exhibit 9:2.
exist 44:22.
existing 12:10.
expect 29:5, 49:12.
expedite 4:18.
expeditiously 5:14.
expend 19:7, 21:9.
expended 12:20, 13:4.
experienced 13:12.
explain 23:12.
explains 37:23.
exploring 45:6.
extensive 2:25.
extent 8:10, 19:15, 24:19, 24:20, 29:24, 37:7.
.

.
< F >.
F. 1:35.
facial 46:7.
facilities 8:11, 8:16, 8:17, 8:20, 8:22, 8:24, 31:11, 33:11, 48:22.
facility 33:13, 33:15, 33:17.
facing 29:24.
fact 8:19, 9:13, 15:13, 15:25, 20:9, 21:7, 23:8, 23:22, 23:25, 24:19, 26:19, 39:15, 42:9, 44:2.
facto 44:12, 47:5, 47:8.
facts 11:25, 23:17, 23:21, 24:1.
factual 3:8, 11:6, 19:15, 19:16, 45:20.
Fair 12:2, 18:22, 20:8.
faith 39:24, 53:1.
falling 7:8.
family 18:13.
fancy 29:17.
far 10:20, 10:21, 11:1, 19:12, 29:19, 46:6, 50:12.
fast 50:9.
favor 53:3, 53:4.
favorable 46:19.
FCRR 1:46, 53:22.
feasible 8:12.
Federal 1:47, 19:8, 26:17.
feel 18:10, 18:14, 20:22, 20:25.
field 53:10.
fifth 40:16.
figure 42:13, 44:17, 53:6.
figuring 20:1.
file 8:5, 8:12, 14:19, 17:18, 18:6, 18:15, 33:22, 34:15, 38:7, 38:22, 50:18, 50:24.
filed 5:2, 7:1, 7:6, 7:21, 13:19, 17:5, 17:11, 21:13, 21:14, 33:19.
filing 7:15, 7:16, 7:25, 8:1, 8:9, 9:6, 13:18, 13:24, 17:7, 21:23, 24:4, 26:22, 51:1.
final 43:21, 44:9.
finalized 23:2.
find 13:24, 14:2, 21:19, 52:21.
fine 43:5.
finer 14:9.
fired 26:8.
First 2:21, 2:24, 3:5, 11:6, 19:21, 41:24, 42:22, 45:17.
fiscal 22:23.
fishing 3:17, 26:9.
flyspecking 38:11.
focus 3:12, 36:9.
focusing 25:17.
folks 33:13.
follow 15:24, 17:14, 17:16, 28:23.
follow-up 15:20, 39:16.
followed 16:2.
Food 14:5.
footnote 35:9.
force 6:6, 10:2, 35:10, 35:12.
foregoing 53:23.
formal 22:24.
former 9:1, 11:9, 22:14.
forms 4:18.
forth 14:25, 47:15.
Forward 1:30, 32:15.
forwarded 15:6, 15:20, 48:5.
forwarding 47:25.
found 7:22, 13:20, 14:5.
Foundation 1:30.
four 31:18, 32:13, 32:16, 32:22.
frankly 38:5.
freeze 21:10.
front 51:18.
frustration 40:15, 40:17.
FTC 7:19.
fulfilling 7:22.
function 23:3, 32:17, 33:12, 44:24.
functionally 12:24.
functioning 3:15, 7:17, 14:12, 17:1, 22:11, 27:7.
functions 14:16, 22:5, 22:13, 22:16, 22:18, 24:7, 25:16, 26:19, 26:20, 26:21, 44:3, 44:17.
fundamental

24:18.
fundamentally 47:21.
funding 3:2, 3:3, 9:12, 49:6, 52:6.
funds 21:4, 48:18, 51:13, 51:16, 51:17, 51:21, 51:22, 51:23, 52:1, 52:11.
.
.
< G >.
gave 51:16, 51:21.
gently 28:4.
gets 19:13, 45:12.
getting 18:7, 21:19, 51:2.
GILBRIDE 1:23, 2:9, 22:10, 24:24, 30:13, 30:15, 32:7, 37:5, 41:21.
give 19:1, 30:17, 31:2, 31:13, 33:3, 35:12, 48:17, 50:15, 51:19, 52:22.
given 9:11, 9:22, 22:24, 34:7, 44:11, 44:12, 49:13, 49:22.
giving 11:25, 30:10, 31:11, 50:8, 50:9.
glad 20:19.
go-between 33:12.
gotcha 36:13.
gotten 4:24, 49:25.
Government 3:22, 5:13, 5:24, 6:11, 6:21, 6:22, 8:1, 10:24, 11:1, 12:8, 12:19, 13:8, 19:8, 20:13, 20:15, 20:20, 21:7, 21:10, 26:17, 29:11, 29:22, 30:14, 30:16, 32:2, 34:3, 34:17, 35:16, 42:4.
grant 3:10.
gravamen 29:7.
greater 5:6, 5:7, 48:7.
ground 22:2, 23:15, 34:7, 37:7, 45:5.
group 3:23.
guess 3:13, 10:20, 19:13, 29:24, 50:6.
Guy 11:10.
guys 30:2, 31:2, 35:14, 41:15, 42:1, 45:18, 52:17, 52:22.
.
.
< H >.
H. 1:24.
halt 37:7.
handful 9:14.
handled 5:14.
happen 43:15, 43:16.
happened 12:8, 12:9, 14:14, 21:17, 25:24, 25:25, 26:12, 27:9, 27:15, 30:24.
happening 14:22, 15:8, 15:10, 16:15, 16:20, 16:21, 16:23, 22:2, 25:22, 45:10, 47:12.
happy 41:14, 45:3.
hard 39:1, 39:2.
harm 12:21, 13:4, 14:7, 50:20, 50:25, 51:1.
harmed 12:25, 21:8, 21:18, 36:8, 44:24.
harming 17:1.
harms 3:14, 4:4, 12:3, 28:13, 28:14.
hated 26:6.
head 10:10, 11:7, 11:12, 22:14.
heading 11:11.
hear 3:25, 5:25, 10:7, 20:19, 27:23, 40:24, 53:14.
heard 25:2, 40:4, 47:13.
Hearing 1:15, 3:13, 19:18, 45:11, 45:21.
Hello 2:19.
help 13:1, 13:7, 17:22, 33:4, 38:23.
helped 18:4.
helps 4:15.
Hemenway 11:10, 22:14.
hereby 53:22.
high-level 41:16, 52:18.
highest 42:3, 42:5.
hire 27:13, 27:19, 29:19, 32:22, 41:1.
hired 9:12, 27:19, 32:13.
hiring 9:14, 9:17, 9:18, 51:23.
historically 5:5, 33:18, 39:6, 40:19, 47:23, 49:21.

Hold 20:24, 33:21, 34:17, 36:13.
hole 18:7.
Homeland 2:4, 9:25.
Honor 2:8, 4:1, 5:16, 11:5, 11:20, 20:16, 27:10, 30:18, 36:21, 40:18, 43:12, 45:24, 46:24, 47:10, 50:12, 50:19, 51:7, 52:25, 53:18.
Honorable 1:16.
hope 20:21.
hoped 27:16.
Horan 18:15, 23:20.
horrible 28:10, 28:11, 52:15.
hours 30:20, 30:25, 31:3, 38:9.
huge 40:19.
Human 1:5, 1:35, 2:3, 2:11, 4:13, 5:1, 5:12, 7:5, 7:11, 7:12, 9:5, 12:11, 21:21, 28:11, 28:12, 28:25, 30:4, 52:15.
hundred 28:17, 41:1.
.
.
< I >.
ICE 8:20, 9:1, 9:17, 49:14.
identically 17:13.
identify 2:5.
imagine 53:11.
Immigrant 17:21, 17:23.
immigrants 8:22.
Immigration 4:9, 4:11, 4:16, 4:18, 4:21, 10:5.
important 6:2.
improve 45:4.
in-person 48:23.
in. 36:20.
inaccessibility 24:3.
inclined 45:17.
included 15:25, 46:9.
including 7:25, 21:13, 21:17, 47:20, 49:9.
inconsistent 39:22.
incorporating 51:17.
increase 49:16, 49:18.
increased 31:10.
indicated 16:14.
individual 5:11, 7:5, 7:7, 8:25, 10:23, 39:4.
individuals 4:15, 7:14, 8:12, 8:15, 9:5, 16:1, 16:8, 33:13, 34:9.
ineffective 5:22.
inefficient 6:22.
information 7:15, 7:24, 10:25, 13:2, 13:5, 15:24, 16:3, 17:16, 17:17, 18:18, 18:19, 19:1, 21:19, 35:18, 35:22, 36:2, 36:11, 36:23, 37:2, 37:8, 37:10, 37:19, 37:20, 50:15.
informing 13:22.
initially 26:11.
Initiative 17:20, 17:25, 18:11.
injunction 36:25.
injured 12:20, 38:6, 38:9, 38:11, 38:12, 38:20.
injuries 23:22, 23:24.
injury 5:17, 6:20, 13:12, 19:11, 43:22.
inquiries 21:16.
inquiries. 16:5.
insight 34:24.
inspections 3:20, 30:10, 30:11, 30:17, 48:21, 49:1.
instances 38:3.
Instead 15:15, 34:4.
instructed 29:3.
intended 3:9, 40:5.
interact 15:7, 17:5, 24:5.
interacting 16:9, 18:11.
interactions 33:19.
intercession 13:6.
interest 21:8.
interested 45:5.
interests 10:23, 12:20, 12:25.
interfered 10:4.
interim 45:4, 45:7.
intermediary

42:11.
internal 10:4, 29:3.
internet 34:9, 34:14.
interpret 30:8.
intervention 31:4.
intrusion 10:22.
investigated 40:20.
investigating 18:4, 36:11.
investigation 47:15, 47:16.
investigations 7:9, 49:20.
investigators 9:15, 27:20.
involve 13:16.
involved 21:21.
ipad 34:12, 34:24.
issue 6:23, 20:11, 28:20, 38:24, 49:14.
issued 8:17.
issues 6:17, 7:10, 20:2, 23:7, 42:1, 48:1, 52:6.
item 51:17.
.
.
< J >.
Jeanine 43:5, 43:6, 43:7.
job 6:14, 10:14, 11:3, 19:4, 28:16, 28:17, 28:22, 29:23, 29:25.
jobs 11:14, 11:18, 28:6, 30:1, 30:3, 32:19.
Joe 43:5, 43:6, 43:7.
joint 52:22.
Judge 1:17, 10:19, 20:10, 28:12, 43:1, 50:20.
judgment 3:10, 9:3, 16:1, 23:7, 23:9, 23:11, 23:13, 23:19, 28:20, 43:23, 45:2, 46:9, 46:17, 46:23.
July 52:22, 52:23.
jure 47:5, 47:7.
Justice 1:25, 1:42, 4:10, 12:13, 21:17.
.
.
< K >.
Karla 1:23, 2:8.
keep 24:14, 25:21, 33:22.
Kennedy 1:35, 2:2, 2:11, 4:12, 5:1, 7:5, 7:11, 7:12, 9:5, 12:11, 21:21.
KHRC 4:14.
kickback 16:23.
kind 34:20, 38:16.
Kino 17:20, 17:25, 18:10.
knock 11:22.
Kristi 11:9.
.
.
< L >.
lack 3:3.
laid 12:16, 24:2, 29:12, 34:10.
language 35:12, 35:14, 37:22.
lapse 49:5.
larger 40:20.
last 9:20, 21:11, 40:16, 44:15, 49:5, 51:15.
later 40:12, 44:13.
Law 5:9, 10:4, 12:4, 17:21, 17:23, 18:25, 19:4, 20:12, 24:7, 24:13, 28:23, 44:11, 50:13.
lawyer 28:3, 28:5.
laying 36:25.
lays 26:20.
learned 7:24, 44:19.
least 33:3, 35:15, 38:25, 41:5, 41:6, 47:10.
leave 26:17.
legal 2:25, 17:24, 28:6, 29:2, 46:3.
legally 50:22.
legitimate 40:1, 41:7, 41:10, 41:12, 53:13.
length 20:5, 21:25.
less 23:5, 38:10.
lesser 5:6, 5:7.
letting 14:20, 39:20, 40:11, 40:14.
level 42:3, 42:5.
liberties 4:8, 22:21.
life 2:23, 11:16, 28:1.
light 46:19.
line 13:7, 26:1, 51:17.
line-drawing 30:22.
listen 53:10.
literally 21:2.
litigation 21:23, 45:14, 46:14, 53:8.
little 11:24, 12:11,

13:14, 14:12, 25:12, 51:14.
live 53:7.
local 19:7, 31:17, 32:11, 32:18.
locations 31:21.
logical 3:5.
long 6:17, 48:1.
long-term 39:5, 40:21.
longer 8:12, 9:7, 9:16, 10:13, 11:7, 11:11, 13:3, 16:15, 18:10, 18:13, 18:18, 36:8, 48:10, 49:22.
longest 48:19.
Look 5:25, 26:21, 26:23, 27:23, 35:24, 39:6, 39:18, 40:24, 44:9, 44:11, 46:20, 50:23.
looked 10:18, 12:25.
looking 14:13, 15:2, 15:12, 48:23.
lost 25:7.
lot 6:16, 11:21, 28:6, 32:19, 38:11, 39:5, 39:6, 46:8, 49:13.
Lothrop 23:21.
Love 27:25.
lower 7:8.
lows 28:18.
Lujan 46:13.
lump 52:1.
.
.
< M >.
mailbox 16:4.
majority 33:18, 34:23.
mammals 13:19.
manage 29:3, 29:18.
managed 28:15.
management 5:12.
manager 28:11, 28:12, 30:4, 52:15.
managers 33:19.
managey 29:1.
managing 28:8.
material 23:8.
materials 16:1, 19:8.
matter 5:9, 11:6, 14:15, 18:25, 19:4, 20:12, 23:4, 24:7, 26:18, 46:4, 53:24.
matters 21:22.
means 6:1, 21:19, 29:19, 46:17.
measure 45:7.
mechanism 38:25.
mediation 42:2.
meet 13:10, 32:16, 46:14, 46:23.
meeting 42:2, 42:3, 42:5.
member 10:23.
members 4:5, 13:5, 16:9, 17:5, 17:12, 17:20, 18:13, 21:14.
membership 4:6.
memo 9:23, 26:19, 26:24, 44:6.
memos 25:14, 36:5.
mentioned 44:19.
merits 3:7, 19:14, 19:16, 19:22, 20:3, 45:20, 45:21, 46:3.
met 21:9, 22:1.
Mexico 18:2.
micromanage 29:6, 36:22.
micromanaging 37:24.
microphone 2:6.
midquestion 25:4.
midway 25:8.
mission 7:13, 7:23, 9:25, 13:15, 13:21, 44:8.
missions 12:10, 12:12, 13:22.
mistake 16:15.
moment 21:3.
money 21:2, 51:8, 52:2, 52:14.
months 5:10, 17:7, 21:18, 49:22.
moot 2:25, 3:6, 51:9, 52:5.
mootness 2:24, 51:6.
morning 2:8, 2:10, 2:13, 2:16, 4:1, 4:2.
motion 9:3.
Motions 1:15.
move 11:25, 13:1, 19:6, 52:1.
moved 7:8, 11:9, 11:10.
movement 35:18.
moving 3:18, 3:19, 3:20, 19:2, 21:4, 29:8, 32:15, 41:5, 48:13, 52:14.
MR. ENRIQUEZ 2:11.
MS 22:10, 23:20,

23:21, 24:24, 30:13, 30:15, 32:7, 37:5, 41:21.
MS. ROSENBAUM 2:14.
MSBP 32:15.
multiple 34:25.
.
.
< N >.
national 9:24.
nature 6:20.
necessarily 10:24.
need 19:9, 31:3, 32:6, 46:2.
needs 13:11.
neutralizing 14:7.
new 9:12, 9:17, 17:16, 17:18, 27:13, 38:24, 39:16, 40:13.
next 35:20, 35:21.
nice 2:20, 10:14.
No. 1:5, 9:2, 42:15.
Noem 11:9, 26:20, 26:25.
None 23:1, 27:14, 44:19.
nonfunctional 14:9.
Nor 29:7.
note 35:8.
noted 45:18.
Nothing 21:17, 22:2, 47:12.
notice 30:10, 31:3, 31:12, 31:14.
notices 26:15, 47:13.
notified 11:8.
number 5:6, 14:23, 15:12, 23:8, 27:18, 27:19, 39:17, 40:19.
numbers 15:3, 49:14.
numerically 47:16.
NW 1:26, 1:36, 1:48.
.
.
< O >.
O. 1:31.
obligation 35:23.
Obviously 34:24, 43:23, 46:2, 51:7.
occur 52:10.
occurred 43:21.
occurring 23:14.
offerings 8:10.
office 4:8, 4:18, 5:13, 11:19, 12:15, 12:25, 14:8, 14:10, 14:11, 14:14, 14:18, 15:2, 15:4, 15:7, 16:6, 18:23, 21:16, 24:5, 38:18.
officer 10:10.
officers 11:6.
Official 1:47, 9:1, 42:3, 42:5, 53:28.
officials 19:7, 41:16.
often 14:24, 45:12.
OIDO 7:7, 7:16, 8:13, 8:17, 9:15, 11:11, 17:9, 20:22, 20:25, 21:1, 21:2, 21:15, 24:4, 27:21, 30:9, 31:9, 33:10, 33:15, 45:25, 48:18, 49:6, 49:10, 49:16, 51:23.
OM 15:13, 15:14, 15:16, 21:16.
ombudsman 4:9, 4:11, 4:18, 12:15, 12:25, 13:1, 14:8, 14:10, 14:14, 14:18, 15:1, 15:4, 15:6, 16:6, 21:16, 24:5, 31:17, 31:22, 31:24, 32:6, 32:11, 32:16, 32:18, 38:18.
once 7:6.
One 9:1, 9:13, 13:3, 14:13, 15:21, 15:23, 16:2, 17:3, 19:25, 22:18, 22:21, 23:1, 31:19, 33:22, 35:15, 36:7, 36:17, 38:17, 39:15, 48:17.
one-sentence 15:18, 16:10, 16:13.
ones 15:23, 32:14, 34:21, 47:25, 49:7.
ongoing 22:10.
opened 7:10, 15:5.
opening 7:20, 49:20.
operate 29:13.
operated 8:20, 13:13.
operates 13:7.
operating 33:13.
operation 31:17.
operations 12:24.
OPM 9:23, 25:14, 44:4.
oppose 12:7, 13:8.
opposed 19:7.

opposition 10:14.
option 38:23.
order 12:17, 26:15, 29:13, 30:20, 30:24, 33:10, 35:8, 35:22, 36:25, 38:17, 42:20, 42:21, 43:11.
ordering 43:2.
organization 4:6, 10:15, 12:18, 17:24, 19:5, 19:9, 20:11, 50:23.
organizational 4:4, 5:17, 7:13, 7:23, 10:12, 17:2.
organizations 7:21, 12:9, 17:19, 18:5.
others 44:19.
otherwise 36:2, 39:25, 41:12.
overarching 39:7.
override 52:5.
oversee 22:19.
oversight 4:7, 29:15, 29:21.
own 30:24.
.
.
< P >.
pages 26:24, 44:6.
papers 20:23.
part 7:13, 26:22, 40:8, 48:9, 50:20.
partial 24:20.
partially 24:20, 49:10.
particular 5:19, 5:20, 7:13, 12:3, 13:23, 35:11, 36:9.
parties 2:5.
party 50:21.
pass 33:5.
passed 21:25.
past 46:10.
pause 27:12.
pending 15:12, 21:12, 21:15, 21:16.
Pennsylvania 1:43.
per 34:25.
percent 9:21, 15:3, 15:15, 15:16, 25:19.
percentage 40:20.
perfect 34:24.
perfectly 6:24.
perform 12:10, 33:11.
performed 14:16, 22:13, 22:16, 24:8, 25:15.
performing 13:25, 14:3, 22:5, 22:12, 26:18.
perhaps 27:16.
period 25:14.
periodic 14:22.
periodically 37:3.
person 11:14, 15:1, 21:23, 33:15, 34:25, 40:9, 43:2.
PETA 13:12, 13:15, 13:18, 13:19, 20:4, 20:5, 21:6, 22:1, 50:12.
petitions 4:19.
phone 14:23.
PII 50:21, 50:25.
place 3:5, 15:11, 23:21, 43:1.
placed 15:14.
Plaintiff 1:7, 1:21, 4:10, 10:12, 15:13, 17:3, 21:8, 23:22, 24:1, 47:9.
Plaintiffs 2:7, 2:9, 2:12, 2:15, 3:13, 3:18, 3:25, 4:4, 5:17, 6:12, 6:24, 7:23, 8:8, 17:2, 21:13, 21:18, 22:7, 30:18, 30:24, 32:12, 35:3, 35:8, 35:17, 36:7, 40:18, 44:24, 48:2, 51:1, 52:4, 52:24.
play 26:11.
please 2:5, 2:6.
plenty 9:19, 49:8.
point 10:21, 14:9, 27:5, 27:17, 29:15, 32:20, 45:25, 50:6.
pointed 40:18.
points 43:20.
policy 35:7, 41:12, 50:1.
politely 28:2, 28:4.
portal 8:14, 14:19, 33:24, 39:3.
portals 34:4.
position 18:25, 20:20, 24:1, 47:9.
positions 26:16, 27:13.
possible 11:3, 42:24.
post 44:12.
posted 3:16.
posture

41:21.
potential 18:16.
power 35:12.
practically 30:23.
pre-march 25:13.
prefatory 6:2.
presentations 8:11.
president 3:2.
pretty 34:4.
previous 48:22, 52:11.
previously 4:24, 7:22, 31:18, 45:1.
privacy 10:23.
private 10:25, 34:21.
problem 5:21, 6:11, 30:22, 39:7, 48:10, 50:13, 50:20, 51:19, 51:20.
problems 16:8.
proceedings 53:20, 53:24.
process 7:16, 7:17, 9:6, 9:18, 13:17, 19:1, 20:12, 24:4, 28:23, 29:20, 33:17, 34:8, 39:11, 42:6.
processed 4:25, 5:19, 53:14.
processing 10:11, 14:12, 17:12, 21:10, 47:1.
program 52:14.
programming 13:14.
promptly 6:25.
properly 10:1, 19:3.
proposed 29:13, 30:19, 30:24, 33:10, 35:22, 36:24, 38:17.
protect 13:17, 13:21.
protests 31:10.
prove 12:18.
proven 39:25.
provide 7:15, 16:7, 17:17, 19:9, 19:10, 46:18.
provided 6:21, 31:20.
provides 17:24, 17:25.
providing 18:18.
Public 1:25, 2:9, 2:14, 13:22, 16:9, 18:19, 24:6, 35:23, 36:2, 36:11, 36:17, 36:23, 37:13, 37:14, 37:20, 38:10.
publicly 37:2, 37:8, 37:23.
publishing 36:4.
pull 51:18.
purpose 39:23, 50:17.
purposes 46:15.
pursuant 9:8.
put 14:9, 30:21, 35:6, 36:19, 37:25, 47:19, 48:11, 49:13.
puts 51:25.
putting 51:10.
.
.
< Q >.
question 4:4, 10:22, 14:11, 19:14, 23:10, 23:11, 25:3.
quick 51:18.
quickly 3:18, 14:13, 19:2, 28:24, 29:20.
quite 27:24, 37:22, 53:6.
quote 28:22, 30:4.
quote/unquote 47:8.
.
.
< R >.
raised 7:11.
raising 8:6.
rash 17:8.
rates 5:7.
reading 20:5.
real 48:1, 50:13, 51:18.
realities 34:7.
reality 45:5.
really 27:25, 28:6, 28:9, 41:3.
reason 9:22, 31:8, 31:9, 35:5, 37:14, 39:3, 48:5, 48:9, 49:3.
reasonably 6:24.
reasons 9:13, 27:24, 34:10, 44:1, 44:11, 44:12, 44:13.
receive 16:5, 39:11.
received 7:6, 14:21, 15:18, 15:21, 16:2, 17:6.
receiving 4:15.
recent 18:14.
recently 6:13, 10:18, 18:12, 32:13, 32:22.
recollection 16:13.
recommendation 23:1, 36:5.

Recommendations 22:18, 22:22, 22:24, 24:3, 36:5, 37:3, 37:4, 37:6, 37:7, 37:12, 37:25, 38:10, 39:8, 49:21, 50:9.
record 2:6, 26:23, 31:19, 44:6, 44:20, 47:19, 53:24.
redacted 36:5, 38:1.
redress 33:1.
redressable 41:8.
redressed 40:20.
reduce 25:17.
reduction 9:11.
reductions 6:6, 10:2.
regard 4:3, 12:22, 20:4, 20:20, 20:22, 20:25, 23:25, 24:10, 25:9, 47:11, 52:10.
regarding 5:2, 13:18, 13:19, 13:22, 22:20, 23:22, 24:2, 24:3, 24:4, 24:9.
Regardless 21:25, 51:10.
regards 38:17.
regional 31:18, 31:22, 31:24, 32:6, 32:10, 32:13, 32:16.
regulatory 22:20.
reject 3:4.
relate 33:10.
relationships 6:9.
reliable 8:6.
relied 45:1.
relief 4:17, 4:19, 4:21, 24:10, 41:13, 45:4.
rely 6:21, 14:8.
remember 27:24.
remove 27:6.
removed 9:7, 36:12.
removing 12:23, 14:8.
reorganizations 6:5.
repeatedly 27:5.
reply 7:20, 27:4.
report 8:17, 35:23, 36:1, 37:1, 49:6, 52:23.
Reported 1:46, 42:10.
Reporter 1:47, 53:28.
reporting 45:8.
reports 36:14, 36:16, 37:19, 42:9, 49:25.
representatives 31:18, 33:11.
represented 27:16.
reprogramming 51:25, 52:9.
request 15:1, 15:2, 15:19, 15:22, 15:25, 24:10, 39:16.
requests 13:3, 15:3, 15:12, 15:14.
required 10:10, 11:23, 18:25, 22:5, 23:3, 25:18, 26:19, 30:17, 32:3, 33:14, 35:25, 36:1, 36:2, 36:17, 37:16, 37:17, 38:2, 44:2, 50:11.
requirement 45:8.
requirements 22:20, 32:16.
requires 30:7, 33:20, 34:7.
requiring 44:21.
resolve 21:22.
resource 28:11, 28:12, 29:1, 30:4, 52:15.
resourced 6:4.
resources 5:12, 9:5, 9:7, 9:11, 9:20, 10:13, 10:15, 12:5, 12:6, 12:7, 12:19, 12:20, 13:4, 13:9, 13:10, 14:4, 14:6, 19:7, 19:10, 21:9, 22:7, 28:15.
respect 2:24, 3:7, 6:19, 8:13, 34:6.
respectively 11:12.
respond 12:21, 13:4, 14:6, 16:11, 19:1, 38:19.
responded 5:20.
response 5:8, 8:18, 14:20, 16:3, 16:4, 18:8, 21:9, 34:11, 38:24, 40:11.
responses 5:3, 6:25, 7:2, 11:5, 16:18, 17:8, 23:1, 24:22, 40:22, 45:11, 47:20, 48:11.
responsibility 11:18.
responsiveness 5:7.

rest 6:7.
restricted 21:4, 51:13.
restrictions 51:25, 52:2.
result 22:3, 22:6.
resulted 43:22.
retaliation 18:16.
returned 18:2.
review 39:11.
reviewed 49:19, 49:25.
reviewing 47:1, 49:9.
reviews 50:1.
Reyes 31:7.
rid 3:4, 26:7, 31:7.
RIF 9:21, 25:19, 26:15, 27:1, 44:5.
Rif'd 32:14.
Rights 1:5, 1:35, 2:3, 2:12, 4:8, 4:13, 5:1, 5:12, 7:5, 7:11, 7:12, 9:5, 12:11, 13:23, 21:21, 22:20.
risk 7:8, 7:9, 18:16.
Robert 1:35.
ROBERT F. KENNEDY 1:5.
roof 5:15.
room 41:16, 42:8, 42:13, 42:16, 43:2, 43:6, 43:8, 52:19.
Rosenbaum 1:24, 2:14.
RPR 1:46, 53:22.
rule 53:3, 53:4.
run 35:16.
running 27:14.
.
.
< S >.
S. 2:3, 18:23, 34:19.
Sartini 9:13, 11:12, 16:14, 24:16, 27:11, 27:15, 32:17, 32:19, 33:3, 42:4, 42:6, 42:7, 42:14, 42:15, 43:4, 43:9, 44:15, 47:25, 49:24.
sat 41:15.
saying 15:18, 16:19, 24:14, 25:21, 28:7, 29:17, 39:19, 41:2, 47:6, 50:7, 50:13, 50:15, 50:17, 50:23.
says 12:17, 26:7, 30:11, 30:20, 30:23, 32:10, 32:21, 34:14, 37:21, 39:10, 44:23, 46:13.
SBC 21:14.
SBCC 17:20.
Schism 47:23, 49:18, 51:7, 51:22.
screams 23:9.
second 10:20, 42:4.
Secretary 11:9, 26:19, 26:25, 42:9, 42:10, 42:13, 42:16, 42:17, 42:18, 43:7, 44:6, 52:20, 52:21.
Section 51:24, 52:8.
Security 1:10, 2:4, 9:25, 31:10.
seem 18:17, 38:21.
seems 3:5, 3:8, 3:22, 3:24, 6:11, 19:12, 19:16, 19:19, 23:13, 28:25, 37:6, 39:22, 39:23, 40:1, 40:25, 41:4.
seen 45:8, 49:16, 49:18.
send 17:16, 36:10, 39:19, 40:10, 40:13.
sending 16:10.
sense 11:13.
sent 15:4, 17:9, 25:14, 26:24, 36:15, 36:16, 40:22.
separating 44:2.
serious 45:20.
Serrano 23:20.
serve 4:13, 13:11.
served 8:4.
service 6:20, 16:7, 31:20.
Services 4:11, 12:14, 17:25.
serving 14:3.
set 16:6.
settlement-type 42:2.
several 5:1, 16:1, 17:4, 17:7, 17:9, 30:10.
shared 7:25, 37:9.
shifting 49:10.
show 12:19, 14:14, 23:18.
showing 8:19.
shut 24:12, 24:15, 24:17, 24:19, 24:20,

25:10, 26:8.
shutdown 48:19, 51:15.
shutdowns 48:18, 49:22.
shutting 12:23, 24:21, 44:7.
side 3:10.
sides 2:23, 23:8.
sign 3:17.
signs 26:9.
similar 7:23, 10:3, 44:16.
similarly 8:8, 14:2, 25:20.
simply 9:4, 16:10, 23:4.
single 5:8, 9:9.
singular 27:5.
Sister 23:20.
situation 49:16.
six 49:22.
size 25:17.
skeleton 22:11.
slowed 9:18.
slowly 14:12, 23:5, 29:8.
smaller 32:24.
someone 11:13, 11:17, 11:18, 14:24, 15:1, 15:6, 15:21, 16:14, 17:13, 17:15, 42:7, 52:19.
Sometimes 5:24, 48:10, 52:1.
somewhere 8:20, 8:21, 34:22.
Sorry 25:1, 25:2, 31:23, 34:17.
sort 3:16, 6:1, 10:10, 15:20, 17:22, 18:3, 18:7, 18:19, 19:3, 19:16, 20:2, 20:3, 25:12, 26:1, 26:10, 36:8, 39:4, 39:17, 43:17, 43:19, 44:1, 44:12, 45:8, 45:20, 47:5, 47:14.
sound 6:7, 28:13, 46:5.
sounds 46:6.
source 5:17.
Southern 4:5, 17:4.
Spanish 35:6.
speaking 25:11.
specific 4:3, 23:17, 23:21, 44:23, 51:16.
specifically 15:17, 33:16, 51:21.
speed 5:18.
spokesperson 10:3.
St 1:36.
staff 9:12, 12:23, 17:11, 29:8.
staffed 19:3.
stage 23:11, 23:13, 23:19, 46:14.
stalled 13:2.
standard 21:9, 46:23.
standing 3:11, 3:12, 3:22, 5:11, 10:16, 11:2, 11:25, 12:18, 19:13, 19:17, 20:3, 23:11, 23:13, 23:18, 41:13, 45:22, 46:2, 46:3, 46:4, 46:7, 46:11, 46:15, 46:20, 51:9.
standstill 22:3.
start 2:21, 3:13, 27:21.
started 25:10.
starting 2:6, 25:13, 52:7.
State 11:10, 11:11, 19:7, 24:9, 26:10, 32:11, 32:14, 32:21, 32:23.
stated 9:1, 9:23, 44:13.
statement 8:19, 10:3, 15:13.
States 1:1, 1:17.
status 52:22.
statute 19:23, 23:3, 30:7, 30:8, 32:3, 32:4, 32:8, 33:20, 34:7, 37:10, 39:10, 39:23, 50:2.
statutes 44:21.
statutorily 25:18, 26:18, 33:14, 37:16, 37:18, 44:2.
statutory 22:18, 22:19, 24:7, 25:16, 26:20, 26:21, 32:16, 41:13.
stenographic 53:23.
step 46:13, 47:21.
stick 28:5.
Stop 25:6, 26:15, 27:7, 36:13.
stopped 7:17, 8:1, 8:2, 8:3, 8:8, 14:16, 22:5, 25:4, 36:6.
story 26:10.

Street 1:26.
stuff 38:11, 49:10, 51:10.
subcontracted 35:16.
subsequently 44:19.
substantial 3:11, 23:14.
substantive 18:8.
sued 3:24.
sufficient 3:21, 10:16, 23:21, 24:6, 36:18, 46:18.
suggest 42:25, 45:6.
Suite 1:26, 1:36, 1:43.
summarizing 43:20.
summary 3:10, 9:3, 15:25, 23:7, 23:9, 23:11, 23:13, 23:19, 43:23, 45:2, 46:9, 46:17, 46:23, 47:12, 47:13.
summer 9:17.
support 9:3.
supposed 3:4, 19:25.
surge 9:17.
surprising 49:23.
survivor 12:13.
suspected 7:24.
swimmingly 48:13.
system 5:21.
systemic 7:10, 17:23, 18:2, 18:19.
.
.
< T >.
T. 1:41, 1:46, 53:27.
tablet 8:24, 35:5, 40:10, 40:13.
tablets 8:16, 8:17, 8:20, 8:23, 8:25, 34:25, 35:15.
tag 39:15, 39:17.
talked 12:11, 14:10, 17:3.
talks 37:10.
targeted 43:25.
targeting 9:21.
temperament 28:7.
temporary 34:21.
ten 18:24, 19:5, 20:9.
tend 5:25.
term 49:22.
terms 11:1, 15:3, 43:24, 45:3.
test 11:24, 12:16.
testified 9:13.
thanks 40:14.
THE CLERK 2:2.
theirs 47:20.
themselves 2:5, 7:14.
They've 4:12, 4:17, 17:6, 18:12, 36:17, 39:8, 44:1, 47:24, 49:19.
thinking 16:17, 43:18.
thinks 47:25.
thousands 21:15.
thread 39:1, 40:14.
threat 40:2.
three 4:4, 4:6, 4:7, 9:10, 9:15, 9:21, 9:24, 11:12, 11:14, 17:1, 20:21, 21:13, 22:7, 25:19, 27:1, 27:6, 27:21, 29:6, 43:25, 44:14, 44:20, 44:24.
throw 45:22.
Tiberius 1:41, 2:17.
Timbuktu 35:13.
today 3:12.
together 20:3, 35:14, 43:2.
Took 9:15, 15:11, 22:1, 22:4, 24:11, 24:15, 27:8, 41:19.
topic 8:18.
totally 40:24.
touche 18:23.
traceable 38:12.
track 39:4.
Tracy 18:15.
train 10:12, 25:7.
Transcript 1:15, 53:23.
Treatment 12:16, 18:21, 20:1.
trend 39:5, 40:21.
trends 18:3.
tried 17:13.
Troup 22:14.
true 11:20, 47:15, 47:23, 48:25, 50:22.
truly 30:19.
try 13:10, 15:7, 21:22, 22:7, 42:21, 53:6, 53:10.
trying 6:15, 12:10, 13:4, 13:21, 19:5, 19:6, 21:20.
turned 21:7.
two 5:10, 9:14, 11:5, 22:1, 24:18, 24:22, 27:20, 28:18, 33:3, 35:15, 35:25, 38:15, 45:12, 48:18, 51:23.
two-part 12:15.
two-way 14:25,

38:17.
types 4:16, 4:20.
.
.
< U >.
UJC 4:13, 4:15, 12:22, 14:2, 23:21.
unannounced 3:20, 30:9, 30:11, 30:17, 30:22.
unattended 16:4.
uncertainty 53:7.
unclear 19:22, 19:24, 34:20.
understand 3:14, 5:16, 10:22, 11:8, 18:23, 20:13, 26:2, 26:10, 27:10, 29:19, 36:21, 38:7, 40:15, 40:17, 43:17, 46:7.
understanding 6:8, 18:2, 34:22, 40:3.
Understood 43:12, 53:18.
underway 44:16.
United 1:1, 1:17.
unless 39:25.
unquote 28:22.
unreliable 5:22, 7:18.
until 27:22.
unwilling 38:2.
updates 14:22.
uptick 49:9, 49:12.
Urban 4:10, 12:12, 21:17.
USCIS 4:17, 4:21, 13:7, 15:6, 15:7, 15:20, 16:8, 47:24, 48:1, 48:5.
USDA 12:17, 13:13, 13:16, 13:24.
useful 7:22.
uses 3:23.
using 2:6, 12:14, 33:24.
.
.
< V >.
vague 16:13.
various 4:12, 4:16, 22:24.
vast 33:18, 34:23.
vehicle 8:6.
versus 2:3, 3:20, 7:19, 12:17, 47:5.
via 14:20, 14:25, 33:19.
view 20:11, 26:5, 26:11, 46:18.
Violence 4:19, 12:13, 14:4.
visas 4:20.
visits 21:22.
voluntarily 42:22.
voluntary 43:1.
vs 1:8.
.
.
< W >.
walk 7:16.
walking 38:16.
wanted 14:23, 17:16, 17:17, 26:6, 27:25.
wanting 40:25.
wants 53:13.
Washington 1:12, 1:27, 1:32, 1:37, 1:44, 1:49.
Watch 14:5.
Water 14:5.
ways 4:12, 13:5, 13:20, 13:25, 14:2, 19:13, 22:8, 22:21, 36:7.
web 3:17, 8:14, 14:19, 33:24, 34:4.
website 11:2, 36:4, 37:23, 39:3, 51:10.
weeds 52:13.
Welcome 5:23, 11:15, 45:14.
whatever 26:7, 35:13.
whatnot 24:20.
whatsoever 5:3, 14:17, 35:4.
whether 3:8, 5:19, 15:21, 23:10, 24:11, 24:18, 26:18, 30:2, 38:9, 45:7, 45:10.
whoever 42:6.
whole 25:3.
wholly 40:13.
will 3:25, 31:15, 33:5, 37:25, 41:6, 42:14, 42:23.
willing 42:19.
withdraw 3:2.
within 5:9, 10:15, 28:15, 44:17.
woman 11:15.
Women 4:20.
wondering 24:23, 24:25.
word 13:15.
worded 17:13.
work 6:2, 6:3, 6:23, 14:18, 17:23, 26:15, 35:3, 41:4, 48:19, 49:9.
working 3:9, 5:24, 6:12, 6:16, 11:2, 12:12, 12:13.
works 6:23,

9:7.
world 28:5,
29:2.
worth 18:17,
45:25.
wrap 43:19.
wrapped 19:13,
20:3.
writing
49:6.
.
.
< Y >.
year 9:20,
21:11,
22:23,
40:12,
40:16,
44:15,
48:22,
52:10.
years 18:24,
19:5, 20:9,
53:8, 53:15,
53:16.
young 27:24.
.
.
< Z >.
zero 28:7,
48:8.
zeroed 21:3,
51:24.